## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FURIE OPERATING ALASKA, LLC, *et al.*,[1] | Case No. 19-11781 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF SCOTT M. PINSONNAULT IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Scott M. Pinsonnault, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the Interim Chief Operating Officer of Furie Operating Alaska, LLC ("FOA" and, collectively, with each of its affiliates that are debtors and debtors in possession in these chapter 11 cases, the "Debtors").  In addition to my role as Interim Chief Operating Officer of the Debtors, I am and have been a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura"), a business advisory and expert services firm whose professionals have significant experience providing bankruptcy crisis management, consulting and financial advisory services. At Ankura, I focus primarily on restructuring in the energy sector.  My past experiences include leading the energy restructuring and advisory practices for two national consulting firms, serving as the chief restructuring officer for multiple oil and gas companies, and acting as the advisor to numerous companies in the energy sector in connection with various restructuring transactions.

2.      On March 23, 2018, the Debtors retained Ankura to assist them with interim management and financial advisory services.  At that time, I was appointed as Interim Chief

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Furie Operating Alaska, LLC (8721); Cornucopia Oil & Gas Company, LLC (9914); and Corsair Oil & Gas LLC (8012). The location of the Debtors' corporate headquarters and the service address for all Debtors is 188 W. Northern Lights Blvd. Suite 620, Anchorage, Alaska 99503.

Operating Officer and oversaw the Ankura team engaged by the Debtors.  In that role, I have become familiar with the Debtors' day-to-day operations, businesses, and financial affairs.

3.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief (collectively, the "Petitions") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Court"), and filed the motions described herein requesting certain relief (the "First Day Pleadings").  I submit this declaration on behalf of the Debtors in support of the Petitions and the First Day Pleadings.

4.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. Contemporaneous with the filing of this declaration, the Debtors have requested procedural consolidation and joint administration of the above-captioned chapter 11 cases (these "Chapter 11 Cases").

5.      The First Day Pleadings seek, among other things, to meet the Debtors' goals of: (a) continuing their operations as debtors in possession with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' employees, customers, vendors, and other key constituencies during these Chapter 11 Cases; and (c) establishing procedures for the smooth and efficient administration of these Chapter 11 Cases. Gaining and maintaining the support of the Debtors' employees, customers, vendors, and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to a successful sale or restructuring in these Chapter 11 Cases.

DM_US 159754247-15.091621.0012

6.      Except as otherwise indicated herein, all of the facts set forth in this declaration are based upon my personal knowledge, information supplied to me by other members of the Debtors' management or professionals, information learned from my review of the relevant documents, or my experience and knowledge of the Debtors' operations and financial condition and the oil and gas industry, generally.  If called as a witness, I could and would testify to the facts set forth in this declaration.  I am authorized to submit this declaration on behalf of the Debtors.

7.      Parts I through III of this declaration describe the Debtors' business operations, organizational structure, and capital structure.  Part IV of this declaration describes the events leading to these Chapter 11 Cases.  Part V of this declaration briefly summarized the Debtors' proposed timeline for these Chapter 11 Cases.  Finally, Part VI of this declaration sets forth the relevant facts in support of the First Day Pleadings.

## I.      <u>BACKGROUND AND BUSINESS OPERATIONS</u>

8.      The Debtors, which are headquartered in Anchorage Alaska, operate as an independent energy company primarily focused on the acquisition, exploration, production, and development of offshore oil and gas properties in the State of Alaska's Cook Inlet region (the "<u>Cook Inlet</u>").

9.      The Debtors hold a majority working interest in thirty five (35) competitive oil and gas leases in the Cook Inlet (the "<u>Oil and Gas Leases</u>").  Additionally, the Debtors wholly own and operate an offshore production platform in the middle of the Cook Inlet to extract natural gas under the Oil and Gas Leases.  This facility, comprised of three decks, can accommodate a total of six wells and a production crew of up to 28 workers.  As of the Petition Date, the Debtors are operating four wells on the production platform.  The production platform is connected to a

subsea pipeline that delivers natural gas directly to the Debtors' onshore processing facility. The pipeline rests on the bottom of the Cook Inlet and exits through a directionally drilled bore in the coastal bluff before connecting to the Debtors' 10-acre natural gas processing facility.

10.    In the year ended December 31, 2017, the Debtors had net gas sales of approximately $25.4 million and a net loss of approximately $58.5 million.  In the year ended December 31, 2018, the Debtors had net gas sales of approximately $42.8 million and a net loss of approximately $151.8 million.  For the first quarter of 2019, the Debtors had net gas sales of approximately $7.9 million and a net loss of approximately $21.4 million.

## II.    ORGANIZATIONAL STRUCTURE

11.    The Debtors were founded in 1999 as a Texas limited liability company under the name Escopeta Oil Company, LLC ("Escopeta").  Escopeta formally changed its name to Furie Operating Alaska, LLC (referred to herein as FOA) on September 21, 2011, and converted from a Texas limited liability company to a Delaware limited liability company on January 25, 2018. Under the Escopeta name, the Debtors acquired their first oil and gas leases in 1999 for mineral extraction rights from acreage in the Cook Inlet.  During the 2000s, Escopeta acquired additional oil and gas leases in the Cook Inlet, including leases from other independent oil and gas companies.  Escopeta's consolidated oil and gas leases became known as the "Kitchen Unit" production area.  In 2009, the State of Alaska approved the expansion of the Kitchen Unit, incorporating two additional exploration units.  This consolidated production area is known today as the "Kitchen Lights Unit," the largest, contiguous exploration and production area in the Cook Inlet.  The Debtors' Oil and Gas Leases are subject to the Kitchen Lights Unit Operating Agreement, dated as of October 21, 2010, by and among FOA (as successor-in-interest to

- 4 -

Escopeta), Cornucopia Oil & Gas Company, LLC (through its predecessor-in-interest), and other parties thereto (the "Kitchen Lights JOA").

12.     Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company ("Cornucopia"), is a holding company with no business operations other than through the collection of income earned as a working interest holder under the Oil and Gas Leases.  In 2011, Cornucopia acquired Escopeta, which, as described above, subsequently changed its name to Furie Operating Alaska, LLC.  In December 2011, Deutsche Oel & Gas AG (*n/k/a* Brutus AG) (the "Sponsor") was formed as a management holding company of Cornucopia.  As of the Petition Date, 100% of Cornucopia's outstanding equity interests are held by the Sponsor.  The Debtors operate their acquisition, exploration, production, and development activities primarily through FOA, which is a wholly-owned subsidiary of Cornucopia.  FOA is the operator of the Debtors' Oil and Gas Leases under the Kitchen Lights JOA and holds a minority working interest in such leases.

13.     Corsair Oil & Gas LLC, a Delaware limited liability company ("Corsair"), is an affiliate of Cornucopia and FOA that holds a minority working interest in the Oil & Gas Leases. Prior to October 20, 2014, Corsair was a wholly-owned subsidiary of Cornucopia.  On October 20, 2014, Cornucopia distributed and transferred its equity interests in Corsair to the Sponsor, and, as of the Petition Date, the Sponsor owns 100% of Corsair's outstanding equity interests.

14.     The organizational chart attached hereto as Exhibit A illustrates the foregoing.

## III.    CAPITAL STRUCTURE

15.     As of the Petition Date, the Debtors' primary liabilities consist of Term Loan Obligations (as defined below) and Tax Credit Loan Obligations (as defined below).  The Debtors were generally paying undisputed trade creditors on a current basis prior to the filing.

As such the Debtors believe they have a limited amount of trade debt and royalty obligations that remain outstanding.

16.     On July 15, 2014, FOA and Cornucopia (collectively, the "Borrowers") entered into that certain Credit Agreement (the "Original Term Loan Credit Agreement"), dated as of that date, among the Borrowers, various lenders party thereto (the "Term Loan Lenders"), and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as administrative and collateral agent on behalf of the Term Loan Lenders ("Term Loan Administrative Agent" and, together with the Term Loan Lenders, the "Term Loan Secured Parties").  The Original Term Loan Credit Agreement was subsequently amended pursuant to that certain First Amended and Restated Credit Agreement, dated March 19, 2015, and that certain Second Amended and Restated Credit Agreement, dated April 12, 2018 (as subsequently amended on June 29, 2018 and October 10, 2018 and as may be further amended from time to time, the "Term Loan Credit Agreement" and, collectively with all agreements, documents, notes (including in respect of the Tranche A Loans, Tranche B Loans, and Tranche C Loans, each defined in the Term Loan Credit Agreement), letters of credit (including the Letters of Credit, as defined in the Term Loan Credit Agreement), mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, account agreements, instruments, indemnities, indemnity letters, working fee letters, side letter agreements, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Term Loan Documents").

17.     As of the Petition Date, the Term Loan Lenders are (i) Energy Capital Partners Mezzanine Opportunities Fund A, LP, a Delaware limited partnership, (ii) Energy Capital Partners Mezzanine Opportunities Fund, LP, a Delaware limited partnership, (iii) Energy Capital Partners Mezzanine Opportunities Fund B, LP, a Delaware limited partnership, (iv) Energy

Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, a Delaware limited partnership, (v) Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP, a Delaware limited partnership (such Term Loan Lenders listed in (i) through (v), collectively, the "ECP Lenders"), (vi) Melody Capital Partners FDB Credit Fund, L.P., (vii) Melody Capital Partners Onshore Credit Fund, L.P., (viii) Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., and (ix) Melody Special Situations Offshore Credit Mini-Master Fund, L.P. (such Term Loan Lenders listed in (vi) through (ix), collectively, the "Melody Lenders").

18.    Pursuant to the Term Loan Credit Agreement, the Term Loan Lenders agreed to extend to the Borrowers term loans in the aggregate principal amount of approximately $244,500,000 (the "Term Loan Credit Facility").

19.    The Term Loan Credit Facility is secured by a first priority lien over substantially all of the assets of the Borrowers, including, without limitation, the Borrowers' (i) real property, (ii) accounts receivable, (iii) inventory, and (iv) cash collateral, and a second priority lien over the Tax Credit Priority Collateral (as defined below), all as set forth in greater detail in the Term Loan Documents.  Pursuant to the Term Loan Documents, the Sponsor pledged its equity interests in Cornucopia and Corsair to the Term Loan Administrative Agent as additional collateral securing the Term Loan Credit Facility.

20.    As of the Petition Date, the aggregate amount outstanding under the Term Loan Credit Facility is approximately $368,100,000.00 (the "Term Loan Obligations").

21.    On July 30, 2015, the Borrowers entered into that certain Credit Agreement (as amended from time to time, the "Tax Credit Agreement" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments,

charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Tax Credit Documents," and together with the Term Loan Documents, the "Prepetition Loan Documents"), dated as of that date, among the Borrowers, various lenders party thereto (the "Tax Credit Lenders"), and ING Capital, LLC, as administrative and collateral agent on behalf of the Tax Credit Lenders (the "Tax Credit Administrative Agent" and, together with the Tax Credit Lenders, the "Tax Credit Secured Parties").[2]  As of the Petition Date, the sole Tax Credit Lender is ING Capital, LLC.

22.      Pursuant to the Tax Credit Agreement, the Tax Credit Lenders agreed to extend to the Borrowers term loans in the aggregate principal amount of $135,000,000 (the "Tax Credit Facility" and, together with the Term Loan Credit Facility, the "Prepetition Credit Facilities").

23.      The Tax Credit Facility is secured by a first priority lien over the Tax Credit Priority Collateral, as defined in the Intercreditor Agreement, dated July 30, 2015, between the Term Loan Administrative Agent and the Tax Credit Administrative Agent and acknowledged by the Borrowers (as amended, restated, supplemented, or otherwise modified, the "Prepetition Intercreditor Agreement"), all as set forth in greater detail in the Tax Credit Documents.

24.      As of the Petition Date, the aggregate principal amount outstanding under the Tax Credit Loan Facility is approximately $74,609,233 (the "Tax Credit Obligations" and, together with the Term Loan Obligations, the "Prepetition Secured Obligations").

25.      In addition to the Prepetition Secured Obligations, as of the Petition Date, the Debtors estimate that they also have approximately $1,281,912.86 of prepetition royalty obligations owed to certain Royalty Interest Holders (as defined below) relating to natural gas

---

[2] For purposes of this First Day Declaration, the Term Loan Secured Parties and the Tax Credit Secured Parties are referred to collectively as the "Prepetition Secured Parties" and the Term Loan Administrative Agent and the Tax Credit Administrative Agent are referred to collectively as the "Prepetition Agents".

produced in the ordinary course of the Debtors' businesses and $8,218,945.30 of outstanding unsecured debt, which is comprised mostly of professional services, trade debt, and litigation claims.

## IV.   EVENTS LEADING TO THESE CHAPTER 11 CASES

26.   The Debtors' operations, including their exploration, drilling and production operations, are capital-intensive activities that require access to significant capital.  Historically, the Debtors' primary source of liquidity to fund ongoing operations has been equity contributions from the Sponsor, proceeds from borrowings under the Prepetition Credit Facilities, and cash flow from the Debtors' operations.

A.   Uncertainty Regarding the Debtors' Production Tax Credits

27.   The Debtors historically received tax credits from the state of Alaska for upstream oil and gas exploration, development, and production costs incurred in the ordinary course of the Debtors' business.  The state of Alaska maintained an oil and gas tax credit fund through which Alaska repurchased tax credits for cash, subject to appropriation of funds from the state legislature.  During the Debtors' initial years of operations, the state legislature appropriated sufficient funds to meet 100% of the demand for purchase of tax credits.  However, following a drop in oil and gas prices, appropriations to the oil and gas tax credits fund waned.  In 2016, the governor vetoed a portion of funding, capping the amount at $500 million for the 2016 fiscal year, and the Alaska legislature passed a bill that altered the tax credits available to upstream oil and gas explorers by drastically reducing the credits for the 2017 tax year and removing the credit program entirely effective as of January 1, 2018.  In 2017, appropriations to the state oil and gas credit fund dropped to just $30 million.  As of the Petition Date, the Debtors hold approximately $105 million in tax credits eligible to be repurchased by the state of Alaska.

28.    In 2018, the Alaska legislature authorized a $1 billion state bond initiative to repurchase all outstanding tax credits.  However, the bond initiative is being challenged in the Alaska state court system, with the Alaska Supreme Court scheduled to rule sometime in 2019. Given the pending legal challenge, the state has not moved forward with the repurchase program. This has led to unprecedented uncertainty regarding the timing of payments associated with the tax credit program, which has created issues with respect to the Debtors' efforts to monetize one of its largest assets and contributed to the Debtors' financial difficulties.

B.    The Debtors' Historical Operations and Financial Difficulties

29.    Since 2016, the Debtors have breached numerous terms of the Term Loan Credit Facility as a result of various construction delays and cost overruns.  From 2016 to 2018, the Debtors and the Term Loan Secured Parties entered into various forbearance agreements and made several amendments to the Original Term Loan Credit Agreement in an attempt to reset the terms of the Term Loan Credit Facility to those achievable based on the Debtors' performance. However, the Debtors were unable to meet the amended terms of the Original Term Loan Credit Agreement, including the Debtors' failure to make certain principal and interest payments as such payments came due.  As a result of these defaults, the Term Loan Administrative Agent issued notices of foreclosure on the Debtors' membership interests in March 2018.

30.    In response to the March 2018 foreclosure notices, the Debtors, in consultation with the Term Loan Secured Parties, engaged Ankura to assist the Debtors in establishing a workable business plan, and I was appointed as Interim Chief Operating Officer.  Thereafter, in April 2018, the Debtors and the Term Loan Secured Parties entered into the Term Loan Credit Agreement, which amended and restated the Original Term Loan Credit Agreement, and the Term Loan Administrative Agent canceled the previously scheduled foreclosure sales. The Term

- 10 -

Loan Credit Agreement also increased the amount available under the Term Loan Credit Facility by $54.5 million, with such funds earmarked for approved drilling and workover expenditures.

C.    The Debtors' Current Operational Issues and Financial Overleverage

31.    Among other requirements, the Term Loan Credit Agreement required the Debtors to meet certain production requirements, achieve project completion dates set for the various capex projects approved by the Term Loan Secured Parties, comply with the terms and conditions of the Debtors' material gas sales agreements, and, beginning on January 1, 2019, make cash interest payments on a go-forward basis.

32.    The Debtors were unable to meet the foregoing requirements and breached the Term Loan Credit Agreement.  In 2018, the Debtors were unable to produce a sufficient volume of natural gas to meet their contractual requirements with the Debtors' material gas sales agreements.  Additionally, in early 2019, the Debtors lost the ability to deliver any natural gas because an unexpected operational issue resulted in a blockage of the Debtors' subsea pipeline. The Debtors' inability to meet contracted-to delivery requirements led to defaults and alleged defaults under the Debtors' material gas sales agreements.

33.    Lastly, the Debtors' historical construction delays and cost overruns required additional borrowings under the Term Loan Credit Facility.  The Debtors' added debt expense of these additional borrowings, when combined with the Debtors' continued operational issues, resulted in the Debtors becoming significantly over-levered.  Although certain of the Prepetition Term Loan Lenders have funded necessary capital expenditures historically, the Debtors' overleverage has, nevertheless, impacted their ability to continue exploration and production activities in the ordinary course of business and is a contributing factor to the filing of these Chapter 11 Cases.

DM_US 159754247-15.091621.0012

## V.    SUMMARY OF THE DEBTORS' PROPOSED CHAPTER 11 TIMELINE

34.    In April 2019, the Debtors' board of directors interviewed various investment bankers, including Seaport Global Securities LLC ("Seaport"), to run a traditional investment banking marketing process.  On June 5, 2019, the Debtors formally retained Seaport and, with Seaport's support, started the work necessary to run a successful sale process.

35.    The Debtors, with the assistance of their advisors, explored various strategic alternatives and ultimately determined that a sale of all or substantially all of their assets and/or equity interests would maximize the value of their estates for the benefit of all stakeholders. Consequently, the Debtors filed the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Schedule an Auction For, and Hearing to Approve, the Sale of the Debtors' Assets, (D) Approving the Form and Manner of Notice Thereof, (E) Approving Contract Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* (the "Bidding Procedures and Sale Motion") concurrently with the filing of these Chapter 11 Cases.

36.    The Bidding Procedures and Sale Motion outlines the salient terms of the Debtors' proposed bidding procedures (the "Bidding Procedures"), a copy of which is included as Annex 1 to Exhibit A thereto.  The Bidding Procedures are designed to promote a competitive and efficient sale process. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the

- 12 -

Debtors' assets and/or equity interests on a schedule consistent with the deadlines under the Bidding Procedures and the Debtors' chapter 11 strategy.

37.     I believe a prompt sale of the Debtors' assets and/or equity interests represents the best option available to maximize value for all stakeholders in these Chapter 11 Cases.  The key proposed dates under the Bidding Procedures are as follows:[3]

| | |
|---|---|
| **5:00 p.m. (prevailing Eastern Time) on August 29, 2019** | • Bidding Procedures and Bidding Protections Objection Deadline |
| **10:00 a.m. (prevailing Eastern Time) on September 5, 2019** | • Hearing to consider entry of the Bidding Procedures Order |
| **No later than thirty-five (35) calendar days after the Petition Date** | • Deadline to Approve the Bidding Procedures Order |
| **Within five (5) Business Days after entry of the Bidding Procedures Order** | • Deadline for Debtors to file Potential Assumption and Assignment Notice |
| **Not later than seven (7) calendar days after service of a Stalking Horse Approval Notice (if any)** | • Stalking Horse Objection Deadline (if any) |
| **5:00 p.m. (prevailing Eastern Time) on October 2, 2019** | • Assumption and Assignment Objection Deadline |
| **5:00 p.m. (prevailing Eastern Time) on October 4, 2019** | • Bid Deadline<br>• Sale Objection Deadline |
| **10:00 a.m. (prevailing Eastern Time) on October 7, 2019** | • Auction (if necessary), to be held at the offices of McDermott Will & Emery LLP, 340 Madison Avenue, New York, New York 10173 |
| **10:00 a.m. (prevailing Eastern Time) on October 25, 2019** | • Sale Hearing |
| **The earlier of (i) 10:00 a.m. (prevailing Eastern Time) on October 25, 2019 or (ii) 5:00 p.m. (prevailing Eastern Time) on the day that is fourteen (14) days after service of the Notice of Auction Results** | • Adequate Assurance Objection Deadline |
| **Not later than one hundred fifty (150) calendar days after the Petition Date** | • Sale Closing |

---

[3] This summary is provided for the convenience of the Court and the parties in interest.  To the extent that there is any inconsistency between the terms of the Bidding Procedures and the summary of such terms in this Declaration, the terms of the Bidding Procedures shall control. Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to such terms in the Bidding Procedures.

- 13 -

38.     As part of the proposed sale process, the Debtors, through Seaport and their other professionals, will continue to engage in a robust marketing effort for the sale of their assets and/or equity interests, which started well before the Petition Date, including contacting identified financial and strategic buyers regarding a potential sale. All interested parties will be given an opportunity to execute a confidentiality agreement and be given access to the data room maintained by the Debtors. Those parties that execute a confidentiality agreement and are deemed to be a Potential Bidder will be provided with access to the Debtors' confidential electronic data room concerning the Debtors' assets and/or equity interests, including, without limitation, presentations by the Debtors and their advisors, and access to financial, operational, and other detailed information.

39.     The Bidding Procedures are reasonable and designed with the objective of generating the best value for the Debtors' assets and/or equity interests, while affording the Debtors maximum flexibility to execute the sale of the assets and/or equity interests in a quick and efficient manner. The Debtors are confident that the Bidding Procedures and the other relief requested in the Bidding Procedures and Sale Motion satisfy the requirements of Bankruptcy Code section 363 and will facilitate the sale of the Debtors' assets and/or equity interests for the best value for the benefit of the Debtors and their stakeholders.  I believe this timeline maximizes the prospect of receiving an offer without unduly prejudicing the bankruptcy estates.

40.     As part of its proposed financing, the DIP Secured Parties negotiated for the timeline requested herein.  The Debtors believe the proposed sale process will minimize any further deterioration of their assets and is in the best interests of all stakeholders.  Thus, the Debtors have determined pursuing a sale in the manner and within the time periods prescribed in

the Bidding Procedures is in the best interest of the Debtors' estates and will provide interested

parties with sufficient opportunity to participate.

## VI.   <u>FACTS RELEVANT TO FIRST DAY PLEADINGS</u>[4]

41.     Together with the filing of these Chapter 11 Cases, the Debtors filed certain First

Day Pleadings that request various types of relief.  I have reviewed each First Day Pleading

(including the exhibits thereto) and, to the best of my knowledge, information and belief, the

facts recited therein with respect to the Debtors are true and correct and are hereby incorporated

by reference.  I believe that the relief sought in each First Day Pleading is essential to the

Debtors' ability to achieve a successful reorganization.

  i.  *Debtors' Motion for Entry of an Order Directing Joint Administration of Related*
    *Chapter 11 Cases* (the "<u>Joint Administration Motion</u>")

42.     In the Joint Administration Motion, the Debtors seek entry of an order directing

the joint administration of these Chapter 11 Cases and the consolidation thereof for procedural

purposes only.  Many of the motions, applications, hearings, and orders that will arise in these

Chapter 11 Cases will affect most, if not all, of the Debtors jointly.

43.     The Debtors further seek entry of an order directing the Clerk of the Court to

maintain one file and one docket for all of these Chapter 11 Cases under the case of Furie

Operating Alaska, LLC.

44.     Joint administration of these Chapter 11 Cases will ease the administrative burden

on this Court and all parties in interest.  Joint administration of these Chapter 11 Cases will not

prejudice creditors or other parties in interest because joint administration is purely procedural

and will not impact the parties' substantive rights.

---

[4] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the relevant First Day Pleadings.

DM_US 159754247-15.091621.0012

45.     I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.

ii.     *Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent* (the "Section 156(c) Application")

46.     The Section 156(c) Application is made pursuant to 28 U.S.C. § 156(c), section 105(a) of the Bankruptcy Code, and Local Rule 2002-1(f) for an order appointing Prime Clerk LLC (the "Claims Agent") as the claims and noticing agent in order to assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.

47.     The Debtors' selection of the Claims Agent to act as the claims and noticing agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* in that the Debtors have obtained and reviewed engagement proposals from at least two (2) other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, the Debtors submit, based on all engagement proposals obtained and reviewed, that the Claims Agent's rates are competitive and reasonable given the Claims Agent's quality of services and expertise.

48.     Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 200 entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtors' estates and their creditors.

49.     I believe that the relief requested in the Section 156(c) Application is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

- 16 -

iii.   *Debtors' Motion for Interim and Final Orders Authorizing Debtors to Continue Using Existing Bank Accounts, Business Forms, and Cash Management System* (the "Cash Management Motion")

50.    The Debtors use a centralized cash management system to collect funds from, and to pay expenses incurred by, their operations (the "Cash Management System"). The Cash Management System is illustrated in overview form in the chart attached as Exhibit B to the Cash Management Motion. The Cash Management System includes fifteen (15) Debtor bank accounts, a list of which is attached as Exhibit C to the Cash Management Motion (the "Bank Accounts"). The Debtors' Bank Accounts are held at Wells Fargo Bank, National Association and Northrim Bank (collectively, the "Banks").

51.    The Cash Management System is integral to the operation and administration of the Debtors' businesses. In this regard, the Cash Management System allows the Debtors to efficiently (a) collect outstanding receivables, (b) identify cash requirements, and (c) transfer cash as needed to respond to these requirements.

52.    The principal components of the Cash Management System and the flow of funds through that system are as follows:

(i)    Cash Collection and Concentration. The Debtors maintain one collection account in the name of Cornucopia (the "Collection Account"). The Debtors also maintain one construction account in the name of Cornucopia (the "Construction Account") and two operating accounts (the Operating Accounts"), one in the name of Cornucopia and one in the name of FOA. All the Debtors' receipts are deposited in the Collection Account and ultimately flow into the Operating Accounts, with certain amounts flowing through the Construction Account prior to being transferred to the Operating Accounts. The Debtors' procedures for cash collections and concentration are described in further detail below.

(1)    The Debtors' collections are deposited into the Collection Account.

(2)    Each month, the amount of the Debtors' collections attributable to Royalty Payments (as defined below) owed by the Debtors is transferred directly to FOA's Operating Account to be paid to

Royalty Interest Holders as and when such Royalty Payments come due.

(3) The remaining portion of the Debtors' collections are transferred from the Collection Account to the Construction Account. Such proceeds are released from the Construction Account, with authorization from the Prepetition Term Loan Administrative Agent, and transferred to the Operating Accounts to fund day-to-day operations on an as-needed basis.

(ii) <u>Disbursement Accounts.</u>  All payments used to fund the Debtors' operations (including for payments made with debit cards, cashiers' checks, and bank wires) are paid directly from the Operating Accounts. To reserve for the Debtors' prepetition obligations to the United States Department of Justice pursuant to a settlement agreement related to a pre-petition Jones Act claim, the Debtors periodically transfer funds from the Construction Account to the Litigation Reserve Account. Such funds are ultimately transferred to the Debtors' Operating Accounts before being used to pay annual settlement payments.

53. The Debtors seek a waiver of the U.S. Trustee operating guidelines for debtors in possession to the extent they require that the Debtors close the Bank Accounts and open new postpetition bank accounts. If enforced in these Chapter 11 Cases, such requirements would disrupt the Debtors' businesses, causing delays in payments to vendors, suppliers, subcontractors, administrative creditors, employees, and others, thereby impeding the Debtors' efforts to maximize the value of their estates.

54. The Debtors request the authority to continue to use the Bank Accounts with the same account numbers, styles, and business forms as the Debtors used prepetition. The Debtors also seek authority to open new accounts whenever needed, provided that the Debtors give the U.S. Trustee and the Prepetition Secured Parties adequate notice of such newly-opened accounts. The Debtors represent that if the relief requested in this Motion is granted, they will not pay, and will direct each of the Banks not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

55.     In connection with continuing the use of the Bank Accounts, the Debtors request the authority to pay prepetition account-related Bank fees and charges to the extent of the amount of the Debtors' cash held by such Bank.   The Debtors seek authority to pay the prepetition account-related Bank fees and charges to the extent the Debtors determine, in their good faith business judgment, that the Banks have valid setoff claims pursuant to section 553 of the Bankruptcy Code (but only to the extent of such claims).   This will save the Debtors the time and expense of responding to such lift stay requests and/or negotiating stipulated orders to allow the Banks to exercise setoff rights.   The Debtors further submit that such relief requested would not prejudice the interests of any other creditors or other parties-in-interest.

56.     The Debtors should be granted further relief from the U.S. Trustee operating guidelines to the extent that they require the Debtors to make all disbursements by check. Preventing the Debtors from conducting transactions by debit, wire, and other similar methods would unnecessarily disrupt the Debtors' business operations and create additional and unnecessary costs.

57.     Compelling the Debtors to adopt a new cash management system would be expensive and create unnecessary administrative problems, impeding the Debtors' ability to reorganize. Consequently, the Debtors' ability to continue using its Cash Management System is essential and is in the best interests of the Debtors, their estates, and their stakeholders.

58.     To minimize expenses to their estates, the Debtors also request authorization to continue using all correspondence and business forms (including, but not limited to, letterheads, purchase orders, invoices, multi-copy checks, envelopes, promotional materials, and check stock (collectively, the "Business Forms")) existing immediately prior to the Petition Date without reference to the Debtors' status as debtors in possession.

59.     The Debtors seek the further authority to, as needed, re-order new Business Forms without such legends during these Chapter 11 Cases because changing Business Forms in the middle of these Chapter 11 Cases would be needlessly expensive and burdensome to the Debtors' estates and disruptive to their business operations.  Parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession due to the Debtors providing notice of the commencement of these Chapter 11 Cases and information circulating within the Debtors' industry.  Accordingly, adding the required legend would have little practical effect and is inappropriate under the circumstances.

60.     Requiring the Debtors to strictly comply with the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with section 345(a) of the Bankruptcy Code, which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money."  The Debtors believe that any funds held in the Bank Accounts in excess of the amounts insured by the FDIC are secure, and obtaining bonds to immediately secure these funds, as required by section 345(b) of the Bankruptcy Code, is unnecessary in light of the facts and circumstances of these Chapter 11 Cases.  Only four of the Bank Accounts regularly exceed FDIC insurance limits, and such Banks are highly rated and subject to supervision by banking regulators.

61.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

   *iv.    Debtors' Motion for Entry of Interim and Final Orders Authorizing
          Payment of Certain Prepetition Employee Wages, Benefits, and Related
          Items* (the "Employee Wage Motion")

62.    To minimize the personal hardships the Debtors' employees (the "Employees")
and independent contractors (the "Contractors")[5] will suffer if prepetition employment-related
obligations are not paid when due or as expected, as well as to maintain morale during this
critical time, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay:
(i) all prepetition wages, salaries, and other accrued compensation to employees and independent
contractors; (ii) all reimbursable prepetition business expenses; (iii) all payments for which
prepetition payroll deductions, withholdings or matching employer contributions were made; (iv)
all contributions to prepetition employee benefit programs (and authorization to continue such
programs in the ordinary course of business); (v) all vacation and other paid leave benefits in the
ordinary course of business; (vi) all workers' compensation program obligations; and (vii) all
processing costs and administrative expenses relating to the foregoing payments and
contributions, including any payments to third-party administrators or other administrative
service providers.

63.    To assist in implementing the relief requested, the Debtors further request that,
subject to the Cash Management Motion and related orders, the Court authorize their banks and
other financial institutions to receive, honor, process and pay, at the Debtors' request and to the
extent of funds on deposit: (i) prepetition payroll checks or electronic transfers and (ii) all other
checks or electronic transfers issued for payments approved by this Motion, regardless of
whether such checks or electronic transfers were drawn or issued prior to the Petition Date.  The

---

[5] FOA employs 7 Employees and Contractors.  Cornucopia and Corsair do not have any Employees and Contractors.

Debtors also seek authorization to reissue prepetition checks or electronic transfers for payments approved by this Motion that are dishonored notwithstanding the foregoing direction.

A.    Wages, Salaries, and Other Compensation

64.    The Debtors have seven Employees and Contractors, including full-time, part-time, and temporary Employees, and the average aggregate monthly compensation paid to such Employees and Contractors for wages and salaries is approximately $70,405.82 exclusive of the deductions and exclusions detailed below.  Employees and Contractors are paid by the Debtors on a bi-monthly schedule with Wells Fargo Business Payroll Services ("Payroll Processor") providing certain payroll management and administrative services related thereto.  The Debtors' payroll is funded through direct deposit and paper checks.

65.    Due to the timing of these Chapter 11 Cases, some Employees and Contractors have not received compensation for time worked prior to the Petition Date.  Moreover, some payroll checks issued to Employees and Contractors prior to the Petition Date may not have been presented for payment or cleared the banking system prior to the Petition Date and, accordingly, may not have been honored and paid as of the Petition Date.

66.    The Debtors estimate that the aggregate amount of accrued prepetition wages, salaries, overtime pay, and other cash compensation that remains unpaid to the Employees and Contractors as of the Petition Date is approximately $80,429.36 (the "Unpaid Compensation"); *however*, the Debtors only seek to pay up to $58,626.50 of the Unpaid Compensation at this time.[6]    The Debtors have identified two Employees and Contractors whose prepetition compensation and benefits claims exceed $13,650.  For such Employees, the Debtors seek authorization to pay Unpaid Compensation up to the $13,650 cap.

---

[6] The amounts the Debtors do not seek authority to pay at this time represent accrued PTO for Employees above the $13,650 cap.  The Debtors reserve the right to seek authority to pay such amounts under a separate motion.

B.      Reimbursement of Prepetition Business Expenses

67.     The Debtors frequently require Employees and Contractors to incur business expenses in connection with sales efforts.   In the ordinary course of business, the Debtors reimburse Employees and Contractors for certain expenses incurred in the scope of their employment on the Debtors' behalf, for travel or other purposes (the "Reimbursable Expenses"). The Reimbursable Expenses are generally incurred using personal credit cards for which Employees and Contractors are solely liable.   The Debtors estimate that, as of the Petition Date, approximately $16,000 of Reimbursable Expenses will be unpaid.

68.     In the Employee Wage Motion, the Debtors seek authorization, but not direction, to honor and pay all Reimbursable Expenses as of the Petition Date, up to $16,000, and to continue to pay all Reimbursable Expenses as they become due in the ordinary course of business.

C.      Prepetition Deductions and Withholdings

69.     During each applicable pay period, the Debtors routinely deduct certain amounts from the paychecks of Employees (collectively, the "Deductions"), including, without limitation: (i) garnishments for child support and similar deductions required by law; (ii) pre-tax contributions to flexible health spending accounts; (iii) pre-tax contributions to health, dental, and vision plans, and (iv) other pre-tax and after-tax deductions payable pursuant to certain benefit plans discussed herein and other miscellaneous deductions.   The Deductions total approximately $8,222.18 in the aggregate per month.

70.     The Debtors also are required by law to (i) withhold from the wages of Employees amounts related to, among other things, federal, state, and local income taxes, social security, and Medicare taxes (collectively, the "Withheld Amounts") for remittance to the

appropriate taxing authorities and (ii) make correlated payments for social security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").   In the aggregate, the Debtors withhold and pay approximately $22,260.42 per month on account of Payroll Taxes.

71.     The Debtors estimate that, as of the Petition Date, approximately $12,974.13 in Deductions and Payroll Taxes (collectively, "Withholding Obligations") are outstanding with respect to Unpaid Compensation.

72.     In the Employee Wage Motion, the Debtors seek authorization, but not direction, pursuant to the Order, to honor and pay all Withholding Obligations as they otherwise become due in the ordinary course of business during these Chapter 11 Cases.

D.     Prepetition Employee Benefits

73.     The Debtors also offer or provide eligible Employees (and their dependents) with a variety of benefits.   These benefits include, but are not limited to: (i) healthcare, dental, and other related coverage; (ii) certain leave benefits; (iii) a 401(k) plan in which eligible Employees can participate; (iv) COBRA medical coverage; (v) a flexible spending plan; and (vi) other miscellaneous benefits described in the Employee Wage Motion (all such benefits, collectively, the "Employee Benefits").  The Debtors believe that as of the Petition Date, there are no amounts owed on account of prepetition Employee Benefits.

E.     Third-Party Administrative Costs

74.     In the ordinary course of business, the Debtors utilize the services of numerous third-party administrators to whom the Debtors outsource tasks associated with the payment of compensation and benefits to Employees and Contractors, including (a) administering or

assisting in the administration of the Debtors' payroll processes, benefit plans, and workers' compensation obligations; (b) facilitating the administration and maintenance of their books and records; (c) assisting with legal compliance issues; and (d) conducting special administrative and legal compliance projects in respect of Employee benefit plans and programs (the costs associated therewith, the "Third-Party Administrative Costs" and, together with the Reimbursable Expenses, Unpaid Compensation, and the Employee Benefits, the "Wages and Benefits").  The ordinary course services provided by these third-parties ensure that the Debtors' obligations with respect to Employees and Contractors continue to be administered in the most cost-efficient manner and comply with all applicable laws.

75.    Keeping the Debtors' workforce intact is crucial to preserving the Debtors' going concern value.  Without a compensated, intact, and motivated workforce, there would not likely be significant interest in the Debtors' assets in any sale process or reorganization.

76.    It is essential that the Debtors continue to honor their Wages and Benefits obligations to ensure the continued operation of the Debtors' business and to maintain the morale of the Employees and Contractors.  Any depletion of the Debtors' workforce would diminish the Debtors' prospects for a successful reorganization or sale.

77.    The Deductions and Payroll Taxes principally represent the Employees' earnings that governments (in the case of taxes), Employees (in the case of voluntarily withheld amounts), and judicial authorities (in the case of involuntarily withheld amounts) have designated for deduction from the Employees' paychecks.  If the Debtors do not remit those amounts, the Employees may face legal action and the Debtors may be burdened by inquiries and disputes concerning their failure to submit legally required payments.  Most, if not all, of the unremitted

Deductions and Payroll Taxes constitute moneys held in trust and are not property of the Debtors' bankruptcy estates.

78.    The Wages and Benefits represent a competitive but reasonably limited set of policies and are necessary to retain the skilled and motivated workforce necessary to operate the Debtors' business.

79.    Therefore, I believe that the relief requested in the Employee Wage Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

v.    *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of (I) Royalty Payments, (II) Operating Expenses, (III) Shipper and Warehousemen Claims, (IV) Section 503(b)(9) Claims and (V) Outstanding Orders; and (B) Granting Related Relief* (the "Lease Operating Expense Motion ")

80.    To maximize the value of the Debtors' estates and minimize the disruption to the Debtors' businesses that will result from nonpayment of royalties and lease operating expenses, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business, whether such obligations were incurred prepetition or will be incurred postpetition, the (i) Royalty Payments, (ii) Operating Expenses, (iii) Shipper and Warehousemen Claims, (iv) 503(b)(9) Claims, and (v) Outstanding Orders (as each term is defined in the Lease Operating Expense Motion), provided that each payment is made in accordance with, and subject to, the Debtors' Financing Motion and applicable DIP Order, and (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing, subject to the Debtors' Cash Management Motion and related orders.

- 26 -

A.    Royalty Payments

81.    As outlined in greater detail in the Lease Operating Expense Motion, FOA is the operator of the Debtors' Oil and Gas Leases under the Kitchen Lights JOA.  As operator, FOA is obligated to make Royalty Payments before any proceeds from the sale of natural gas are used to pay Operating Expenses or otherwise distributed to working interest holders.  There are fourteen Royalty Interest Holders (as defined in the Lease Operating Expense Motion) entitled to payment from natural gas extracted under the Debtors' Oil and Gas Leases.  The State of Alaska's Department of Revenue is entitled to 12.5% of gross proceeds from natural gas sales.  The remaining thirteen Royalty Interest Holders are entitled to receive 12.499990% of such proceeds.  The remaining 75.00001% of gross proceeds from natural gas sales is available to cover Operating Expenses and for distribution to Working Interest Holders (as defined in the Lease Operating Expense Motion) such as the Debtors.

82.    Failure to timely pay the Operating Expenses may result in the termination or abandonment of the Debtors' Oil and Gas Leases or their interests therein.

83.    In the twelve months preceding the Petition Date, the Debtors paid Royalty Interest Holders approximately $8.5 million in Royalty Payments.

84.    As of the Petition Date, the Debtors estimate that they have approximately $1,281,912.86 of Royalty Payments outstanding (the "Unpaid Royalties"), and, when such Unpaid Royalties come due in the ordinary course of business, the Debtors will hold approximately $1,281,912.86 in proceeds from natural gas sales for the payment of Unpaid Royalties.

85.    I understand that the failure to pay production royalties may constitute abandonment of all rights acquired under the leasehold location or prospecting site involved

under Alaska law.  Nonpayment of royalties owed to Alaska's Department of Revenue may also

jeopardize the Debtors' Oil and Gas Leases, putting the Debtors' assets at substantial risk.

Lastly, I understand that, if the Debtors do not pay and continue to pay amounts owed to Royalty

Interest Holders, the failure may create statutory liens, which would burden the Debtors' assets

and could further diminish the value of those assets.

B.      LOE Obligations

        86.     If the LOE Contractors, Shippers, Warehousemen, or 503(b)(9) Claimants (as

each is defined in the Lease Operating Expense Motion) are unwilling to provide the Debtors

with materials and services postpetition because of their outstanding prepetition claims, the

Debtors' operations would suffer, compromising the value of the Debtors' estates to the

detriment of all parties in interest.  A lack of drilling materials, vital transportation services, and

access to a limited universe of specialized service providers would grind the Debtors'

exploration and production activities to a halt. If the long-standing relationships established by

the Debtors with the parties that are owed these payments are harmed, whether through non-

payment or perceived difficulties of working with a chapter 11 debtor, the Debtors may be

unable to secure future opportunities with those parties and other third-parties may be unwilling

to engage in new business with the Debtors going forward. If that were to occur, the negative

impact on the Debtors' businesses, their estates and creditors would be substantial, making

prospects for reorganization more elusive.

        87.     I understand that failure to timely pay Operating Expenses, Shipper and

Warehousemen Claims, and 503(b)(9) Claims (collectively, the "LOE Obligations") related to

the Debtors' Oil and Gas Leases may also provide grounds for removal of FOA as operator

under the Kitchen Lights JOA and may result in perfection by LOE Contractors of liens on the Debtors' working interests in and proceeds from the Oil and Gas Leases.

88.     As of the Petition Date, the Debtors estimate that they have approximately $1,018,883.99 of Operating Expenses outstanding for services provided in connection with the production of natural gas.   The Debtors estimate that they may also owe approximately $1,624.30 in Shipper and Warehousemen Claims incurred in connection with the transportation and storage of natural gas and the storage of equipment used in the ordinary course of business. Lastly, the Debtors estimate that they may owe approximately $264,781.97 in 503(b)(9) claims incurred in connection with goods used in the ordinary course of business and delivered within 20 days prior to the Petition Date.

89.     To maintain access to materials, goods, equipment, and services that are critical to the continued viability of the Debtors businesses, the Debtors seek authority to pay up to 50% of all LOE Obligations on an interim basis and up to 100% of all LOE Obligations on a final basis. The payment of such LOE Obligations will not only ensure the Debtors' access to critical materials, goods, equipment, and services, the Debtors will also avoid potential disputes and diminution of the value of the Debtors' estates as a result of statutory liens on account of unpaid LOE Obligations.

C.    <u>Outstanding Orders</u>

90.     Finally, the Debtors may have placed Outstanding Order for goods which will not be delivered until after the Petition Date. To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition. To prevent any disruption to the Debtors'

- 29 -

businesses, the Debtors seek an order (a) granting administrative expense priority under section 503(b) of the Bankruptcy Code to all undisputed obligations of the Debtors arising from the postpetition acceptance of goods subject to Outstanding Orders and (b) authorizing the Debtors to satisfy such obligations in the ordinary course of business.

91.     I believe that failure to pay Unpaid Royalties and LOE Obligations could materially jeopardize the Debtors' production ability and reliability.  Indeed, the failure to pay Unpaid Royalties and LOE Obligations, or the disruption caused by the Debtors' failure to pay for Outstanding Orders, will likely result in a material diminution in the value of the Debtors' property.

92.     Therefore, I believe that the relief requested in the Lease Operating Expense Motion is necessary and appropriate and is in the best interests of the Debtors' estates, creditors, and other parties in interest.

    vi.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing on a Super-Priority, Senior Secured Basis and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, (III) Modifying the Automatic Stay, and (V) Scheduling a Final Hearing* (the "<u>Financing Motion</u>")

93.     In the Financing Motion, the Debtors seek an order (i) authorizing the Debtors to (a) obtain post-petition financing on a super-priority, senior secured basis and (b) use Cash Collateral (as defined below); (ii) granting adequate protection to the Prepetition Secured Parties for the priming of the Prepetition Liens (as defined below) and the Debtors' use of the Cash Collateral; (iii) modifying the automatic stay; and (iv) scheduling a Final Hearing on the Financing Motion.

94.     The Debtors' Prepetition Secured Obligations total approximately $440 million. The Prepetition Secured Obligations are secured by liens on substantially all of the assets of the

Debtors (the "<u>Prepetition Liens</u>") pursuant to the Prepetition Loan Documents, subject to the Prepetition Secured Parties' respective rights under the Prepetition Intercreditor Agreement and other agreements among lenders.

95.    The Prepetition Secured Obligations are secured by liens on substantially all of the Debtors' assets, including the Debtors' "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, the "<u>Cash Collateral</u>").    Without access to the Cash Collateral and the proposed secured debtor in possession financing facility (the "<u>DIP Facility</u>") described herein and in the Financing Motion, the Debtors will not have sufficient liquidity to operate their business during these Chapter 11 Cases.    Indeed, without immediate access to the Cash Collateral and the DIP Facility, the Debtors would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern and put the Debtors' Employees out of work.

96.    In the Financing Motion, the Debtors request entry of interim and final order (the "<u>DIP Orders</u>") authorizing the Debtors to borrow under the DIP Facility—which consists of a term loan in an aggregate principal amount of up to $15.0 million—pursuant to that certain Debtor-in-Possession Credit Facility, in substantially the form set forth as Exhibit A to the Financing Motion (the "<u>DIP Credit Agreement</u>" and, together with all agreements, documents, certificates, and instruments including the Approved Budget (as defined herein), delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "<u>DIP Documents</u>"), between the Debtors, certain lenders party thereto (the "<u>DIP Lenders</u>"), and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as DIP Agent for the DIP Lenders (the "<u>DIP Agent</u>" and, together

with the DIP Lenders, the "DIP Secured Parties"), on the terms set forth in the interim DIP Order

or final DIP Order, as applicable.

97.    The following is a concise statement and summary of the proposed material terms

of the DIP Documents.  Each of these terms is justified by the absence of alternative financing on

superior terms, and because the DIP Secured Parties insisted upon the inclusion of such terms as

a condition to extending the financing discussed herein.

    (i)    Maturity: The DIP Facility matures on the earliest to occur of:

        (1)    the Interim Facility Maturity Date (as defined in the DIP Credit Agreement), if the final DIP Order has not been entered on or prior to such date;

        (2)    one hundred and eighty (180) calendar days after the Petition Date;

        (3)    the consummation of a sale or other disposition of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code;

        (4)    the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a plan of reorganization of the Debtors that has been confirmed by an order entered by the Bankruptcy Court;

        (5)    the dismissal of any of these Chapter 11 Cases, the appointment of a chapter 11 trustee or any examiner with expanded powers, or the conversion of any of these Chapter 11 Cases into a chapter 7 proceeding; and

        (6)    the date of the acceleration of the DIP Loans (as defined in the interim DIP Order) after the occurrence of an Event of Default (as defined below) under the DIP Credit Agreement.

    (ii)    Interest Rate: 15.0% per annum.

    (iii)    Commitments:

        (1)    Interim Borrowing Limit: The aggregate amount of DIP Loans shall not exceed $7,000,000 at any one time prior to the entry of the final order.

        (2)    Final Borrowing Limit: $15,000,000 (less the amount already drawn pursuant to the Interim Borrowing Limit).

    (iv)    Events of Default: Along with customary events of default for a debtor in possession financing facility, the DIP Credit Agreement includes an

event of default upon Debtors' failure to comply with certain milestones with respect to the sale and marketing of a sale of substantially all of the Debtors' assets or confirmation of an approved plan of reorganization, as applicable.

(v)   Approved Budget: The DIP Credit Agreement and the interim DIP Order impose restrictions on the Debtors' operations by requiring the Debtors to comply with a detailed budget (the "Approved Budget"), subject to certain permitted variances.

(vi)   DIP Liens: As security for the obligations under the DIP Credit Agreement, the DIP Agent, for the benefit of the DIP Secured Parties, will receive the following liens and claims (collectively, the "DIP Liens"):

    (1)   Priming senior security interest in and lien upon or pledge of (subject to the Carve-Out) all DIP Priority Collateral (as defined in the DIP Credit Agreement;

    (2)   First priority senior security interest and lien upon or pledge of all unencumbered property and assets of the Debtors, including claims and causes of actions ("Avoidance Actions") arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code; and

    (3)   Second priority junior security interest and lien upon or pledge of all property and assets of the Debtors that are subject to valid Permitted Liens as of the Petition Date, including without limitation, the Prepetition Tax Credit Priority Collateral.

(vii)   Adequate Protection for the Prepetition Secured Parties: As adequate protection for any diminution in value of the Prepetition Liens, the Prepetition Agents, for the benefit of the Prepetition Secured Parties, will receive replacement security interests in and Liens upon all DIP Collateral, including Avoidance Actions (the "Adequate Protection Liens"), which shall be junior only to the Carve-Out, the DIP Facility, and the Permitted Liens specifically designated as senior in priority (including, without limitation, the Prepetition Tax Credit Administrative Agent's Liens on the Prepetition Tax Credit Priority Collateral), and subject to the Prepetition Intercreditor Agreement.

(viii)   Carve-Out: The DIP Facility, Prepetition Credit Facilities, the DIP Superpriority Claims, and Adequate Protection Liens are subject to a carve out (the "Carve-Out") for:

    (1)   Allowed administrative expenses pursuant to 28 U.S.C. § 1930 for fees payable to the Office of the United States Trustee, as determined by agreement of the U.S. Trustee or by final order of this Court and 28 U.S.C. § 156(c) for fees required to be paid to the Clerk of this Court;

- 33 -

(2)    All reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(3)    All accrued and unpaid fees (other than any "success," "restructuring," "transaction" or similar fees), disbursements, costs and expenses, allowed at any time by this Court and incurred by professionals retained by the Debtors or the Creditors' Committee (the "Case Professionals"), at any time prior to the delivery of the Carve-Out Trigger Notice; and

(4)    All accrued and unpaid fees, disbursements and expenses incurred by the Case Professionals from and after the date of service of a Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, in an aggregate amount not to exceed $500,000 (the "Wind-Down Carve-Out Amount").

(ix)    <u>Stipulations</u>: The interim DIP Order contains stipulations related to the Prepetition Credit Facilities by the Debtors, on behalf of all parties and entities, including stipulations that:

(1)    As of the Petition Date, the Debtors were indebted and liable to the Prepetition Secured Parties under the Prepetition Credit Facilities.

(2)    The Debtors have represented that the Prepetition Secured Obligations (i) constitute legal, valid, and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no portion of the Prepetition Secured Obligations is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) is secured by valid, binding, perfected, enforceable, first-priority liens and security interests over substantially all of the assets of the Debtors. The Debtors have waived any right to challenge the Prepetition Credit Facilities and the Prepetition Liens on any grounds, including those set forth above.

(x)    <u>Relief from Automatic Stay</u>: The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Agent to exercise, upon three (3) days' notice to the Debtors and counsel to any Committee formed of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the DIP Priority Collateral, without the need for obtaining a further order of this Court. Notwithstanding the foregoing, the Debtors may continue to use cash in accordance with the Approved Budget until three (3) days after notice of the occurrence of an Event of Default from the DIP Agent to the Debtors and counsel to any Committee formed.

- 34 -

98.     The Debtors submit that this Court should approve their entry into the DIP Facility and execution of the DIP Documents as an exercise of their sound business judgment. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that the Debtors would require postpetition financing to support their operational and restructuring activities.  Without the financing to be provided by the DIP Facility, the Debtors would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders.

99.     Because the Prepetition Secured Parties have liens on substantially all of the Debtors' assets, there is no possibility of the Debtors being able to secure DIP financing on an unsecured or junior basis.  Also, the Debtors do not have sufficient unencumbered assets to serve as collateral for senior secured DIP financing.

100.     The Prepetition Secured Parties have consented to the use of Cash Collateral and the priming liens provided under the DIP Facility in exchange for the various forms of adequate protection described herein and in the interim DIP Order.

101.     The DIP Facility is the result of arm's-length and good faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described in the Financing Motion.

102.     I believe that the relief requested in the Financing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

DM_US 159754247-15.091621.0012

*vii.*    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Broker Fees and (B) Renew, Supplement, or Purchase Insurance Policies, (C) Honor Prepetition Insurance Premium Financing Agreement, and (D) Renew Insurance Premium Financing Agreement in the Ordinary Course of Business; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief* (the "Insurance Motion")

103.    In the Insurance Motion, the Debtors seek entry of the Order (a) authorizing, but not directing, the Debtors to (i) continue insurance coverage entered into prepetition (the "Insurance Policies") and satisfy prepetition obligations related thereto including broker fees (ii) renew, supplement, or purchase insurance policies in the ordinary course of business, (iii) honor prepetition insurance premium financing agreement, and (iv) renew insurance premium financing agreements in the ordinary course of business; (b) authorizing banks and other financial institutions to honor and process check and electronic transfer requests related to the foregoing; and (c) granting related relief.

A.    The Debtors' Insurance Broker

104.    In connection with the Insurance Policies, the Debtors are party to certain insurance brokerage agreements (collectively, the "Brokerage Agreements") under which the Debtors obtain services from a third-party insurance broker, McGriff, Seibels & Williams, Inc. (the "Insurance Broker").

105.    The Debtors maintain approximately fourteen (14) active Insurance Policies, which provide coverage for, among other things, property insurance, general liability insurance, directors and officers liability insurance, workers' compensation liability insurance, environmental liability insurance, pollution liability insurance and charterer's legal liability insurance, and various other property-related and general liabilities, through their Insurers (as

- 36 -

defined below).   The Debtors are required to pay insurance premiums, taxes, and fees (the "Premiums") under the Insurance Policies based on a rate established and billed by each insurance carrier (the "Insurers"), with approximately $1,489,870.23 of the Premiums financed through First Insurance Funding, a division of Lake Forest Bank & Trust Company, N.A. (the "Insurance Lender").   The Premiums total approximately $1,935,918.00 on an annual basis, excluding financing fees, taxes, surcharges, and commissions earned by the Insurance Broker and Insurance Lender.

B.      Installment Payment Policies

106.    In the ordinary course of business, the Debtors pay some Premiums through monthly payments to the Insurers, Insurance Broker, or Insurance Lender, as applicable.   These installment arrangements benefit the Debtors by spreading out the cost of the Premiums over the terms of the respective coverage period.

107.    As of the Petition Date, the Debtors pay the below eight (8) Insurance Policies through installment payments:

(i)      Commercial general liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $48,312.50;

(ii)     Excess liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $43,000.00;

(iii)    Excess liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $341,125.00;

(iv)     Excess liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $110,437.50;

(v)      Oil pollution liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $70,000.00;

- 37 -

(vi)      Marine cargo policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $39,875.00;

(vii)     Charterer's legal liability insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $28,000.00;

(viii)    Energy package insurance policy issued by Certain Underwriters at Lloyd's of London, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $809,545.00; and

(ix)     Environmental liability insurance policy issued by Aspen Specialty Insurance Company, which covers the April 11, 2019 to April 11, 2020 policy period, for an annual Premium of $307,959.00.

108.    The Debtors were obligated to make a down payment in the amount of $372,467.56 on account of the Installment Payment Policies, due on April 11, 2019, and were thereafter obligated to make certain subsequent installment payments in the amount of $168,500.33, due on a monthly basis, including a payment of $168,500.33 due on August 11, 2019.

109.    As of the Petition Date, the total prepetition amount outstanding on account of the Installment Payment Policies is approximately $1,117,402.67.

110.    If the Debtors were forced to obtain replacement insurance on an expedited basis, it could come at a tremendous cost to their estates.

111.    I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business during the Chapter 11 Cases without disruption.

viii.   *Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Assurance (the "*Utilities Motion*")*

112.    In the Utilities Motion, the Debtors seek entry of the Interim Order and Final Order (a) prohibiting providers of electric, gas, cable, and water services to the Debtors (collectively, the "Utility Companies") from discontinuing, altering, or refusing service to the Debtors, except as set forth therein; (b) determining that the Utility Companies have been provided with adequate assurance of payment on the basis of the establishment of the Utility Deposits (as defined below); and (c) approving the Debtors' proposed procedures for Utility Companies to request additional assurance of payment.

113.    To provide adequate assurance of payment for future services to the Utility Companies, the Debtors propose to segregate an amount equal to approximately 50% of the Debtors' estimated monthly utility spend attributable to all Utility Companies (collectively, the "Adequate Assurance Deposit").

114.    In addition, the Debtors seek to establish reasonable procedures by which a Utility Company may request additional assurance of future payment if such Utility Company believes that the Adequate Assurance Deposit and the Debtors' DIP Facility do not provide it with satisfactory adequate assurances.

115.    I believe that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary to continue the Debtors' normal business operations and to preserve the Debtors' ability to restructure its business in an orderly manner.

ix.   *Debtors' Motion for Entry of an Order Authorizing Payment of Prepetition Taxes and Fees* (the "Tax Motion")

116.    In the Tax Motion, the Debtors seek entry of an order authorizing them to pay, in their sole discretion, any prepetition tax and fee obligations, including, without limitation, franchise taxes, property taxes, sales and use taxes, business license fees, annual report taxes, and other taxes and fees (collectively, the "Taxes and Fees") owing to those federal, state, provincial, and local governmental entities in the United States, including as listed on Exhibit B to the Tax Motion (the "Taxing Authorities"), provided that each payment is made in accordance with, and subject to, the Debtors' Financing Motion and applicable DIP Order.

117.    The Debtors seek authorization to pay 100% of the Debtors' Unpaid Property Taxes (as defined below), up to $2,175,500.00.  Moreover, although the Debtors believe that as of the Petition Date, no prepetition obligations related to Taxes and Fees (other than the Unpaid Property Taxes) are due and owing, in an abundance of caution, the Debtors seek relief to pay such Taxes and Fees in the event the Debtors become aware, after the Petition Date, of prepetition Taxes and Fees (other than the Unpaid Property Taxes) that any of the Taxing Authorities may claim are due and owing. The Debtors propose to limit the aggregate amount of payments to be made on account of prepetition Taxes and Fees (other than the Unpaid Property Taxes) under this Motion to $50,000 unless further authorization is obtained from this Court.

118.    In addition, the Debtors request that, subject to the Cash Management Motion and related orders, the Court authorize the Debtors' banks to receive, process, honor, and pay all prepetition and postpetition checks and fund transfers on account of the Taxes and Fees that had not been honored and paid as of the Petition Date, and authorize the Debtors' banks and financial institutions to rely on the representations of the Debtors as to which checks and fund transfers

DM_US 159754247-15.091621.0012

should be honored and paid in respect of Taxes and Fees, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

119.    Prior to the Petition Date, the Debtors incurred obligations to federal, state, provincial, and local governments in the United States. Although, as of the Petition Date, the Debtors were substantially current in the payment of assessed and undisputed Taxes and Fees (other than the Unpaid Property Taxes), certain Taxes and Fees attributable to the prepetition period may not yet have become due. Certain prepetition Taxes and Fees may not be due until the applicable monthly, quarterly, or annual payment dates—in some cases immediately and in others not until next year. In the twelve months prior to the Petition Date, the Debtors incurred approximately $3,951,177.82 in Taxes and Fees (excluding penalties and interests).   Of that amount, the Debtors have paid approximately $1,991,364.27 in Taxes and Fees (excluding penalties and interests).

120.    The Debtors' state and local property taxes came due prior to the Petition Date, however the Debtors did not have sufficient resources to pay all state and local property taxes in full.   On June 26, 2019, the Debtors made a payment of $1,962,862.32 on account of local property taxes assessed by the Kenai Peninsula Borough (the "Kenai Borough Taxes").   By paying the Kenai Borough Taxes before June 30, 2019, the Debtors were eligible to apply the full amount of the Kenai Borough Taxes as a credit against the state property taxes assessed by the State of Alaska.   Notwithstanding the reduction in the Debtors' state property tax liability, the Debtors were unable to pay the remaining $1,958,940.48 due on account of the Debtors' state property tax assessment.   Upon the Debtors' failure to pay its state property taxes on or before June 30, 2019, the State of Alaska assessed a 10% statutory penalty on the unpaid amount.   *See* Alaska Stat. § 43.56.160.

121.    As of the Petition Date, the total amount of the Debtors unpaid property tax liability was estimated at $2,172,102.69, including applicable interest, penalties, and fees from and after June 30, 2019 (collectively, the "Unpaid Property Taxes"), to the State of Alaska on account of unpaid property taxes for the 2019 fiscal year related to the Debtors' real property interests within the state.

122.    I believe that the prompt payment of the Unpaid Property Taxes is necessary to preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful chapter 11 process.  The Debtors will not be eligible to receive payment on account of their 2016 tax credits owed by the State of Alaska unless the Unpaid Property Taxes are paid in full prior to the redemption date of such tax credits. *Id.* § 43.55.028(e).   Moreover, the Unpaid Property Taxes continue to accrue interest at a rate of 8.25% per annum, which is approximately $443 per day.  *See, e.g.*, *id.* §§ 43.05.225, 43.56.160.   Thus, further delay in payment of the Unpaid Property Taxes may jeopardize the Debtors' tax credit certificates, which are pledged to the Prepetition Tax Credit Administrative Agent for the benefit of the Prepetition Tax Credit Secured Parties.

123.    I also believe that the continued payment of all other Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates.   If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether (i) the obligations are priority, secured, or unsecured in nature, (ii) the obligations are proratable or fully prepetition or postpetition, and (iii) penalties, interest, attorneys' fees and costs can

- 42 -

continue to accrue on a postpetition basis and, if so, whether such penalties, interest, attorneys' fees, and costs are priority, secured, or unsecured in nature.

124.    Therefore, I believe that the relief requested in the Tax Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary to continue the Debtors' normal business operations and to preserve the Debtors' ability to restructure its business in an orderly manner.

   x.    *Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities, (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtors' Estates, and (III) Granting Related Relief (the "*Equity Trading Motion*")*

125.    In the Equity Trading Motion, the Debtors seek entry of interim and final orders (i) establishing notice and objection procedures for transfers of the Debtors' equity securities, (ii) establishing a record date for notice and sell-down procedures for trading in claims against the Debtors' estates, and (iii) granting related relief.

126.    I understand that the Debtors have historically generated net operating losses ("NOLs" and together with other tax attributes, the "Tax Attributes"), and such NOLs are potentially allocable to the Debtors for operations within the State of Alaska.   The relief requested in the Equity Trading Motion is necessary to protect the potential value of the Debtors' Tax Attributes.

127.    The Debtors are treated as disregarded entities for state and federal income tax purposes, however, the Sponsor has NOLs that are directly attributable to the Debtors' operations within the state of Alaska as the Debtors have experienced years of losses from the operation of their business.   As a result, the Debtors estimate that there are state and federal income tax NOLs in excess of $350 million as of the Petition Date that are potentially allocable

- 43 -

to the Debtors' operations within the state of Alaska.  Such amounts could be even higher when the Debtors emerge from chapter 11.[7]  These NOLs could translate into future reductions of the Debtors' federal income tax liabilities.  These tax savings could substantially enhance the Debtors' cash position for the benefit of parties in interest and contribute to the Debtors' efforts in these Chapter 11 Cases.

128.    I believe that if the Debtors were to undergo an ownership change (as further described in the Equity Trading Motion) prior to consummation of a chapter 11 plan, such an ownership change would effectively eliminate the potential ability of the Debtors to use their Tax Attributes, thereby resulting in a significant loss of value.  Furthermore, I am aware that it is likely that the Debtors will undergo an ownership change for purposes of section 382 of the Internal Revenue Code of 1986 (as amended, the "IRC") upon consummation of any chapter 11 plan of reorganization. In such circumstances, the Debtors will seek to avail themselves of the special relief afforded by section 382 of the IRC for an ownership change under a confirmed chapter 11 plan.  However, if the relief requested in the Equity Motion is not granted, I understand that there is a risk that, as a result of pre-consummation trading and acquisitions of Equity Securities, this special relief would not be available to the Debtors and the use of the Debtors' Tax Attributes may be permanently impaired. Simply put, I understand that if pre-plan trading in Equity Securities results in an ownership change, the more stringent restrictions of section 382 of the IRC will apply to prospective NOL treatment.

129.    The Debtors seek limited relief that will enable them to closely monitor certain transfers of Equity Securities so as to be in a position to act expeditiously to prevent such

---

[7] The NOLs consist of losses generated in individual tax years, each of which can be "carried forward" for up to 20 subsequent tax years to offset future taxable income, thereby reducing future aggregate tax obligations.  *See* 26 U.S.C. § 172.

DM_US 159754247-15.091621.0012

transfers, if necessary, with the purpose of preserving the Tax Attributes. Accordingly, consistent with the automatic stay in these chapter 11 cases, I understand that the Debtors seek certain restrictions on trading in Equity Securities to ensure that: (i) an Ownership Change does not occur prior to the effective date of the chapter 11 plan in these cases; and (ii) with respect to an Ownership Change occurring under a chapter 11 plan, the Debtors have the opportunity to utilize the Tax Attributes to offset any income realized through the taxable year that includes the effective date of the plan and, if any Tax Attributes remain after the application of section 108(b) of the IRC, the Debtors will avail themselves of the more lenient standard provided by section 382 of the IRC with respect to chapter 11 plan ownership changes.

130.    I further believe that the Debtors' ability to meet the requirements of the applicable tax laws to protect their Tax Attributes may be seriously jeopardized unless procedures are established to ensure that certain trading in Equity Securities is either precluded or closely monitored and made subject to Court approval. I believe that the proposed Procedures are necessary to protect the value of the Tax Attributes, which may be valuable assets of the Debtors' estates, while providing appropriate latitude for trading in Equity Securities below specified levels.

131.    I submit that the relief requested in the Equity Trading Motion is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the in the Equity Trading Motion be approved.

xi.    *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* (the "Schedules and SOFA Motion")

132.    In the Extension Motion, the Debtors seek entry of a final order extending the time period to file their Schedules through and including September 25, 2019 without prejudice

to the Debtors' right to apply to this Court, upon appropriate notice, for further extension(s) of time to file the Schedules or to seek a waiver of the requirement for filing certain Schedules.

133.    Although the Schedules were not filed with the Debtors' petitions, annexed to the petitions are consolidated lists containing the names and addresses of the Debtors' thirty (30) largest unsecured creditors.  In addition, the Debtors are in the process of preparing a creditor matrix containing all of the names and addresses of the Debtors' known creditors and other parties in interest in these Chapter 11 Cases, as required by Bankruptcy Rule 1007(a).

134.    The Debtors have been unable to complete their Schedules at this early stage in these Chapter 11 Cases because of:  (a) the level of sophistication of their capital structures and their financial affairs; (b) the limited staffing available to perform the required internal review of the Debtors' books and records and accounts and affairs; (c) the diversion of resources necessary to attend to numerous issues in connection with the prosecution of these Chapter 11 Cases; and (d) the accelerated pace at which the Debtors' time-sensitive bankruptcy efforts have proceeded, including drafting first-day pleadings.

135.    At bottom, the scope and complexity of the Debtors' business, coupled with the limited time and resources available to the Debtors to marshal the information necessary to complete the Schedules, make it unlikely for the Debtors to complete the Schedules in the statutorily mandated timeframe.  Because these factors will prevent the Debtors from assembling the information necessary to complete and file their Schedules prior to the current deadline, sufficient cause exists to grant the extension.

136.    I believe that the relief requested in the Schedules and SOFA Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and is necessary

DM_US 159754247-15.091621.0012

to continue the Debtors' normal business operations and to preserve the Debtors' ability to restructure its business in an orderly manner.

[Remainder of Page Intentionally Blank]

DM_US 159754247-15.091621.0012

I declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, that the foregoing is true and correct to the best of my knowledge, information, and belief.  Accordingly, I respectfully request that the Court grant all relief requested in the First Day Pleadings and such other and further relief as may be just.

Dated: August 9, 2019

By:      */s/ Scott M. Pinsonnault*
        Scott M. Pinsonnault
        Interim Chief Operating Officer
        Furie Operating Alaska, LLC

DM_US 159754247-15.091621.0012

**EXHIBIT A**

Organizational Structure Chart

