## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FURIE OPERATING ALASKA, LLC, *et al.*,[1] | Case No. 19-11781 (LSS) |
| Debtors. | (Joint Administration Requested) |
| | **Re: Docket No. 11** |

**INTERIM ORDER
(I) AUTHORIZING THE DEBTORS
TO (A) OBTAIN POSTPETITION FINANCING
ON A SUPER-PRIORITY, SENIOR SECURED BASIS,
(B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE
PROTECTION TO PREPETITION LENDERS, (III) MODIFYING
THE AUTOMATIC STAY, AND (IV) SCHEDULING A FINAL HEARING**

Upon the motion dated August 9, 2019 (the "Motion")[2] of Furie Operating Alaska, LLC

("FOA"), Cornucopia Oil & Gas Company, LLC ("Cornucopia"), and Corsair Oil & Gas LLP

("Corsair") as debtors and debtors in possession (collectively, the "Debtors" or "Borrowers") in

the above captioned chapter 11 cases (these "Chapter 11 Cases"), pursuant to sections 105, 361,

362, 363, and 364 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), and rules 2002-1, 4001-2, and 9013-1(m) of the Bankruptcy Practice

and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local

Rules"), seeking entry of an interim order (this "Interim Order") and a final order (the "Final

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Furie Operating Alaska, LLC (8721); Cornucopia Oil & Gas Company, LLC (9914); and Corsair Oil & Gas LLC (8012).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 188 W. Northern Lights Blvd. Suite 620, Anchorage, Alaska 99503.

[2]    Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms as set forth in the Motion and the DIP Documents.

Order" and, together with the Interim Order, the "DIP Orders") providing for, among other things:

1. authority for the Borrowers to obtain superpriority senior secured postpetition financing in the principal amount of up to $15 million (the "DIP Facility") pursuant to the terms and conditions of that certain superpriority senior secured *Debtor in Possession Credit Agreement* dated August 8, 2019 (the "DIP Credit Agreement," together with all agreements, documents, certificates, and instruments including the Approved Budget (as defined herein), delivered or executed from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents"), by and among the Borrowers and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as agent (the "DIP Agent"), Energy Capital Partners Mezzanine Opportunities Fund A, LP ("ECP Fund A"), Energy Capital Partners Mezzanine Opportunities Fund B, LP ("ECP Fund B"), and Energy Capital Partners Mezzanine Opportunities Fund, LP ("ECP Fund", and together with ECP Fund A and ECP Fund B, the "ECP DIP Lenders"), Melody Special Situations Offshore Credit Mini-Master Fund., L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund., L.P. and Melody Capital Partners FDB Credit Fund, L.P. and/or their respective affiliates (the "Melody Lenders") and AFG Investments 1A. LLC (the "McGinty Lender," and, collectively with the ECP DIP Lenders and the Melody Lenders, the "DIP Lenders" and, together with the DIP Agent, the "DIP Secured Parties"), substantially in the form attached hereto as **Exhibit A**;

2. authority for the Debtors to (a) execute, deliver, and perform under the DIP Documents and (b) perform such other acts as may be necessary or desirable in connection with

the DIP Documents, including ongoing adherence by the Debtors to their existing deposit account and cash management arrangements (as modified herein and by that certain *Interim Order Authorizing Debtors to Continue Using Existing Bank Accounts, Business Forms, and Cash Management* [Docket No. 57] (the "Cash Management Order"));

3.      authority for the Debtors to use Cash Collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") as of the Petition Date pursuant to and in accordance with the Approved Budget (as defined herein), the Workover Plan, the Cash Management Order and the DIP Orders;

4.      a grant to the DIP Agent, for the benefit of the DIP Secured Parties, and any other parties referred to in the DIP Credit Agreement with respect to the DIP Obligations (as defined below), of security interests in and liens on the DIP Collateral (as defined below) and a superpriority administrative expense claim, to the extent and as provided in this Order and the DIP Documents and subject and subordinate to the Carve-Out and Non-Primed Excepted Liens[3], effective and perfected immediately upon entry of this Interim Order (collectively, the "DIP Liens") without the need for any further action or notice:

(a)      pursuant to section 364(c)(1) of the Bankruptcy Code, joint and several superpriority allowed administrative expense claim status, which claims shall be senior to all other administrative expense claims in these Chapter 11 Cases, including those specified in

---

[3]      "Non-Primed Excepted Liens" means, other than the existing Prepetition Liens in favor of the Prepetition Term Loan Secured Parties created under the Prepetition Term Loan Documents, (x) valid, perfected and unavoidable liens or security interests in existence as of the Petition Date or (y) valid and unavoidable liens or security interests in existence for amounts outstanding as of the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, but in each case under the foregoing clause (x) and (y), only to the extent such valid, perfected and unavoidable liens are senior by operation of law in priority to the Prepetition Secured Obligations.

sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113, and 1114 of the Bankruptcy Code or any other provisions of the Bankruptcy Code;

(b)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority security interest in and lien on all DIP Collateral, now or hereafter acquired and all proceeds thereof, other than the Prepetition Tax Credit Priority Collateral[4] (the "<u>DIP Priority Collateral</u>"), to the extent such DIP Priority Collateral is not subject to a Lien as of the Petition Date;

(c)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior-priority security interest and lien on Prepetition Tax Credit Priority Collateral and DIP Priority Collateral, now or hereafter acquired and all proceeds thereof, but only to the extent the Prepetition Tax Credit Priority Collateral or DIP Priority Collateral is subject to Non-Primed Excepted Liens;

(d)     pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming security interest in and lien on the DIP Priority Collateral, subject to any existing Lien (other than any Collateral subject to Non-Primed Excepted Liens which are described in paragraph (c) above) and a perfected second priority priming security interest and lien on the Prepetition Tax Credit Priority Collateral (such security interests and liens, the "<u>Priming Lien</u>"), which Priming Lien:  (i) shall be senior in all respects to the interests in such property of the Prepetition Term Loan Secured Parties under the Prepetition Term Loan Documents; (ii) shall be senior to the interests of the Prepetition Tax Credit Secured Parties in the ECP Priority Collateral (as defined in the Prepetition Intercreditor Agreement) and immediately junior to the interests of the Prepetition Tax Credit Secured Parties in the

---

[4]     "<u>Prepetition Tax Credit Priority Collateral</u>" shall have the meaning ascribed to the term "<u>Tax Credit Priority Collateral</u>" in the Prepetition Intercreditor Agreement.

Prepetition Tax Credit Priority Collateral; (iii) shall be senior to any Adequate Protection Liens granted to the Prepetition Term Loan Administrative Agent; and (iv) shall be senior to the Adequate Protection Liens granted to the Prepetition Tax Credit Administrative Agent as it relates to the ECP Priority Collateral;

5.      authority for the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, the reasonable and documented fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisers, accountants, and other consultants, all to the extent provided in and in accordance with the terms of the DIP Credit Agreement and DIP Documents;

6.      the granting of adequate protection on account of the Debtors' use of Cash Collateral and any diminution in value of the Prepetition Secured Parties' (as defined below) respective interests in the Prepetition Collateral, subject to and pursuant to the terms and conditions set forth in this Interim Order, to:

(a)     the Prepetition Term Loan Secured Parties under that certain Second Amended and Restated Credit Agreement, dated as of April 12, 2018 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition Term Loan Credit Agreement" and, collectively with all agreements, documents, notes (including in respect of the Tranche A Loans, Tranche B Loans, and Tranche C Loans, each as defined in the Prepetition Term Loan Credit Agreement), letters of credit (including the Letters of Credit, as defined in the Prepetition Term Loan Credit Agreement), mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, account agreements, instruments, indemnities, indemnity letters, working fee letters, side letter agreements, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Term Loan Documents") by and among Cornucopia and FOA, as borrowers (the "Prepetition Obligors"), Energy Capital Partners Mezzanine Opportunities Fund A, LP, as collateral agent and as administrative agent (in such capacity, the "Prepetition Term Loan Administrative Agent") for the lenders thereunder (the "Prepetition Term Loan Lenders" and, collectively with the Prepetition Term Loan Administrative Agent, the "Prepetition

Term Loan Secured Parties"), and the Prepetition Term Loan Lenders, subject to:

(i)     that certain Intercreditor Agreement, dated as of July 30, 2015 (as amended, restated, supplemented, or otherwise modified, the "Prepetition Intercreditor Agreement");[5] and

(ii)     that certain side letter agreement, dated as of August 8, 2019 and attached hereto as **Exhibit B** (the "New Side Letter");

(b)    the Prepetition Tax Credit Secured Parties under that certain Credit Agreement, dated as of July 30, 2015 (as amended, restated, supplemented, or otherwise modified from time to time prior to the date hereof, the "Prepetition Tax Credit Agreement" and, collectively with all agreements, documents, notes, mortgages, security agreements, pledges, guarantees, subordination agreements, deeds, instruments, indemnities, indemnity letters, working fee letters, assignments, charges, amendments, and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Tax Credit Documents," and together with the Prepetition Term Loan Documents, the "Prepetition Loan Documents") by and among the Prepetition Obligors, ING Capital, LLC, as collateral agent and as administrative agent (in such capacity, the "Prepetition Tax Credit Administrative Agent") for the lenders thereunder (the "Prepetition Tax Credit Lenders" and, collectively with the Prepetition Tax Credit Administrative Agent, the "Prepetition Tax Credit Secured Parties"), and the Prepetition Tax Credit Lenders, subject to the Prepetition Intercreditor Agreement;

7.     a modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as set forth herein;

8.     approval of the Milestones in accordance with the DIP Credit Agreement through the implementation of a bid, auction, and sale process whereby the DIP Agent and Prepetition Term Loan Administrative Agent shall have the right to credit bid, subject to the Prepetition

---

[5]    For purposes of this Interim Order, the Prepetition Term Loan Secured Parties and the Prepetition Tax Credit Secured Parties are referred to collectively as the "Prepetition Secured Parties" and the Prepetition Term Loan Administrative Agent and the Prepetition Tax Credit Administrative Agent are referred to collectively as the "Prepetition Agents."

Intercreditor Agreement, up to the full amount of the DIP Obligations, and the Prepetition

Secured Obligations (as defined below), respectively, in accordance with the Milestones;

9.        scheduling of a final hearing (the "Final Hearing") to consider entry of the Final

Order and approving the form of notice with respect to the Final Hearing; and

10.       granting the Debtors such other and further relief as is just and proper.

The Court having considered the Motion, the *Declaration of Scott M. Pinsonnault in*

*Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "First Day

Declaration"), the DIP Documents, the evidence submitted or proffered at the interim hearing to

consider the relief requested in the Motion held on August 12, 2019 (the "Interim Hearing"); and

notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b),

(c) and (d), and 9014; and Local Rules 2002-1, 4001-1(a), 5005-1, and 9013-1(m); and all

objections, if any, to the interim relief requested in the Motion having been withdrawn resolved,

or overruled by the Court; and it appearing to the Court that granting the interim relief requested

in the Motion as modified by this Interim Order is necessary to avoid immediate and irreparable

harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best

interests of the Debtors, their estates, and their creditors and equity holders, and is essential for

the continued operation of the Debtors' business; and after due deliberation and consideration,

and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND DETERMINES**:[6]

11.       *Petition Date*.  On August 9, 2019 (the "Petition Date"), each of the Debtors filed

with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, and each

is continuing to manage its properties and to operate its business as a debtor in possession

---

[6]      To the extent any findings of fact constitute conclusions of law, they are adopted as such, and *vice versa*.

pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed for any Debtor.

12.    *No Committee*.  As of the date hereof, the Office of the United States Trustee (the "U.S. Trustee") has not yet appointed any statutory committee in these Chapter 11 Cases.

13.    *Jurisdiction and Venue*.  This Court has jurisdiction over these Chapter 11 Cases, this Motion, the parties, and the Debtors' property pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  Venue for these Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-2, and 9013-1(m).

14.    *Adequate Notice*.  On August 9, 2019, the Debtors filed the Motion with the Court pursuant to Bankruptcy Rules 2002, 4001, and 9014, and based on the affidavit of service filed at Docket No. 38 provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery, or overnight delivery to the following parties and/or their respective counsel as indicated below:  (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (d) counsel to the Prepetition Term Loan Administrative Agent for itself and for the ECP Lenders; (e) counsel to the Melody Lenders; (f) counsel to the Prepetition Tax Credit Administrative Agent for itself and for the Prepetition Tax Credit Lenders; (g) counsel to the DIP Agent, counsel to the ECP DIP Lenders, counsel to the Melody DIP Lenders and counsel to the McGinty Lender; and (h) all parties holding security interests in any of the Debtors' assets.  The

parties have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Interim Order.

15.     *DIP Facility.*  The DIP Facility consists of

(a)     a new money term loan superpriority, senior secured debtor-in-possession credit facility in the aggregate amount of up to $15 million (the loans made pursuant to the DIP Facility, the "DIP Loans"), which includes:

(i)     upon entry of this Interim Order, up to $7,000,000 of new money debtor-in-possession term loan financing, subject to satisfaction of the conditions precedent contained in the DIP Documents, the Interim Order, and the Approved Budget (the "Interim Facility"), having a final maturity of the earlier of (i) thirty-five (35) calendar days from the date of the Interim Order approving the DIP Facility (the "Interim Facility Maturity Date") if the Final Order has not been entered by such time, and (ii) the Maturity Date (defined below), which Interim Order shall be acceptable in form and substance to each of the DIP Lenders, acting reasonably; and

(ii)     upon entry of the Final Order, up to an additional $8,000,000 in aggregate principal amount of senior secured, debtor-in-possession term loan financing, payable in full and in cash on the Maturity Date, subject to satisfaction of conditions precedent in the DIP Documents, and the Final Order, which Final Order shall be acceptable in form and substance to each of the DIP Lenders, acting reasonably.

16.     *Need for Postpetition Financing and Use of Cash Collateral.*  Good cause has been shown for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  The Debtors' need to use Cash Collateral and to obtain credit pursuant to the DIP Facility as provided for herein to enable the Debtors to continue operations and to administer and

preserve the value of their estates.  The ability of the Debtors to finance their operations, to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise to finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  Without the ability to access the DIP Facility or Cash Collateral, the Debtors, their estates, their creditors, and the possibility for a successful chapter 11 would suffer immediate and irreparable harm.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral.

17.     *No Credit Available on More Favorable Terms.*  The DIP Facility is the best source of debtor-in-possession financing available to the Debtors.  Given their current financial condition, financing arrangements, and capital structure, the Debtors are unable to obtain (i) adequate unsecured credit allowable under either sections 364(b) and 503(b)(l) of the Bankruptcy Code or section 364(c)(l) of the Bankruptcy Code, (ii) adequate credit secured by a senior lien on unencumbered assets of their estates under section 364(c)(2) of the Bankruptcy Code, (iii) adequate credit secured by a lien that is junior as to all the encumbered assets of their estates under section 364(c)(3) of the Bankruptcy Code, or (iv) secured credit under section 364(d)(l) of the Bankruptcy Code from sources other than the DIP Lenders on terms more favorable than the terms of the DIP Facility.  The Prepetition Secured Parties would not consent to the Priming Liens on any other terms (including, without limitation, without the payment of Fees and Expenses).

18.     *Good Faith of the Agent and the DIP Lenders.*

(a)    *Willingness to Provide Financing.*    The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry by this Court of this Interim Order; (b) approval by this Court of the terms and conditions of the DIP Facility and the DIP Documents; and (c) entry of findings by this Court that such financing is necessary to the Debtors' estates, that the DIP Agent and DIP Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Agent's and DIP Lenders' claims, Superpriority Claims (as defined below), security interests, liens, and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument, or reconsideration of this Interim Order, or any other order.

(b)    *Business Judgment and Good Faith Pursuant to Section 364(e).*    The terms and conditions of this Interim Order, the DIP Facility, and the DIP Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent and sound business judgment, and are supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties.  The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used, and extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

19.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party set forth in Paragraph VV below (but subject to the limitations thereon contained in Paragraph FF below), each Debtor admits, acknowledges, agrees, and stipulates as follows:

(a)    *Prepetition Term Loan Obligations*.  As of the Petition Date, the Prepetition Obligors were truly and justly indebted and liable to the Prepetition Term Loan Secured Parties, without defense, counterclaim, recoupment, or offset of any kind, in the aggregate principal amount of not less than:  (i) $368,120,316 pursuant to and in accordance with the terms of the Prepetition Term Loan Documents, plus (ii) that certain letter of credit outstanding as of the Effective Date that was originally arranged under and issued in connection with the Prepetition Term Loan Agreement by the Letter of Credit Issuer in respect of the APC Gas Sales Agreement (the "Letter of Credit") in the face amount of $6,000,000, plus (iii) (A) accrued and unpaid interest (including at the default rate) from and after January 1, 2019 thereon, excluding any such interest with respect to the Tranche C Loans that has been paid in kind by adding such interest to the amount set forth in clause (i), (B) any additional fees, costs, and expenses (including, but not limited to, any attorneys', financial advisors', and other professionals fees and expenses) that are chargeable or reimbursable under the Prepetition Term Loan Documents, and (C) all other charges, indemnities, and other costs and obligations incurred therewith, whether arising before or after the Petition Date, including any Obligations (as defined in the Prepetition Term Loan Documents) of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Term Loan Documents (collectively, the "Prepetition Term Loan Obligations").  The Prepetition Term Loan Obligations consist of three tranches of debt, which include the following:

| Tranches | Lenders | Principal Amount Outstanding |
|---|---|---|
| **_Tranche A_** | (i) Energy Capital Partners Mezzanine Opportunities Fund, LP; (ii) Energy Capital Partners Mezzanine Opportunities Fund A, LP (Lender and Administrative Agent); and (iii) Energy Capital Partners Mezzanine Opportunities Fund B, LP.<br><br>(i) Melody Special Situations Offshore Credit Mini-Master Fund, L.P.; (ii) Melody Capital Partners Offshore Credit Mini-Master Fund, L.P.; (iii) Melody Capital Partners Onshore Credit Fund, L.P.; and (iv) Melody Capital Partners FDB Credit Fund, L.P. | at least $51,980,178 million aggregate principal amount of term loans and $5,334,864 million of interest as of the Petition Date, _plus_ any additional accrued and unpaid interest (including default rate interest) thereon.<br><br>$6 million face amount of issued but currently undrawn Letter of Credit. |
| **_Tranche B_** | (i) Energy Capital Partners Mezzanine Opportunities Fund, LP; (ii) Energy Capital Partners Mezzanine Opportunities Fund A, LP; and (iii) Energy Capital Partners Mezzanine Opportunities Fund B, LP. | at least $39,704,895 million aggregate principal amount of term loans and $4,075,019 million of interest as of the Petition Date, _plus_ any additional accrued and unpaid interest (including default rate interest) thereon. |
| **_Tranche C_** | (i) Energy Capital Partners Mezzanine Opportunities Fund, LP; (ii) Energy Capital Partners Mezzanine Opportunities Fund A, LP; (iii) Energy Capital Partners Mezzanine Opportunities Fund B, LP; (iv) Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP; and (v) Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP (collectively, the "ECP Lenders"). | at least $276,435,243 million aggregate principal amount of term loans and $28,371,287 million of interest as of the Petition Date, _plus_ any additional accrued and unpaid interest (including default rate interest) thereon. |

(b)      _Prepetition Tax Credit Obligations._  As of the Petition Date, the Prepetition

Obligors were truly and justly indebted and liable to the Prepetition Tax Credit Secured Parties,

without defense, counterclaim, recoupment, or offset of any kind, in the aggregate principal

amount of not less than:  (i) $74,661,388 outstanding pursuant to and in accordance with the

terms of the Prepetition Tax Credit Documents, _plus_ (ii) (A) accrued and unpaid interest thereon,

(B) any additional fees, costs, and expenses (including, but not limited to, any attorneys', financial advisors', and other professionals fees and expenses) that are chargeable or reimbursable under the Prepetition Tax Credit Documents, and (C) all other charges, indemnities, and other costs and obligations incurred therewith, whether arising before or after the Petition Date, including any Obligations (as defined in the Prepetition Tax Credit Documents) of any kind or nature, whether or not evidenced by any note, agreement, or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Tax Credit Documents (collectively, the "Prepetition <u>Tax Credit Obligations</u>" and, collectively with the Prepetition Term Loan Obligations, the "<u>Prepetition Secured Obligations</u>").

(c) *Validity of Prepetition Secured Obligations and Prepetition Loan Documents*. The Prepetition Secured Obligations constitute legal, valid, and binding obligations of each of the Prepetition Obligors. No offsets, defenses, or counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Prepetition Secured Obligations exist. No portion of the Prepetition Secured Obligations is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, cross-claims, defenses, or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity. The Prepetition Loan Documents are valid and enforceable by each of the Prepetition Secured Parties against each of the Prepetition Obligors. The Prepetition Secured Obligations constitute allowed claims against the Prepetition Obligors' estates. As of the Petition Date, the Debtors or their estates have no claim or cause of action against any of the Prepetition Secured Parties or their agents, in such capacities, whether arising

14

under applicable state, federal, or foreign law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or otherwise), or whether arising under or in connection with any of the Prepetition Loan Documents (or the transactions contemplated thereunder), the Prepetition Secured Obligations, or the Prepetition Liens (as defined below).

(d)    *Description of Prepetition Liens and Prepetition Collateral.*

(i) Pursuant to and as more particularly described in the Prepetition Term Loan Documents, the Prepetition Term Loan Obligations are secured by, among other things, (1) first priority liens on substantially all personal property, real property, and mixed personal and real property of the Debtors (other than the Prepetition Tax Credit Priority Collateral) (the "Term Loan Prepetition Liens"), and (2) second priority liens on the Prepetition Tax Credit Priority Collateral, in each case, subject to the Prepetition Intercreditor Agreement and including mortgages on, security interests in, and assignments or pledges of certain property described in the Prepetition Term Loan Documents, including, without limitation, Cash Collateral and other "Collateral" as such term is defined in the Prepetition Term Loan Credit Agreement (collectively, the "Term Loan Prepetition Collateral").

(ii)    Pursuant to and as more particularly described in the Prepetition Tax Credit Documents, the Prepetition Tax Credit Obligations are secured by, among other things, (1) first priority perfected liens on the Prepetition Tax Credit Priority Collateral; and (2) second priority perfected liens on substantially all other personal property, real property, and mixed personal and real property of the Debtors that also secures the Prepetition Term Loan Obligations (junior only to the lien of the Prepetition

Term Loan Secured Parties securing the Prepetition Term Loan Obligations and permitted prior liens thereunder) (the "Prepetition Tax Credit Liens" and, collectively with the Term Loan Prepetition Liens, the "Prepetition Liens"), in each case, subject to the Prepetition Intercreditor Agreement and including mortgages on, security interests in, and assignments or pledges of certain property described in the Prepetition Tax Credit Documents, including, without limitation, certain Cash Collateral, and other "Collateral" as such term is defined in the Prepetition Tax Credit Documents (collectively, the "Tax Credit Prepetition Collateral" and, collectively with the Term Loan Prepetition Collateral, the "Prepetition Collateral").

(iii)    The Prepetition Intercreditor Agreement governs, among other things, as between the holders of Prepetition Term Loan Obligations and the holders of Prepetition Tax Credit Obligations:  (1) the relative priority of the Prepetition Liens and any liens granted to Prepetition Secured Parties; (2) the payment priority of such holders with respect to proceeds of the Prepetition Collateral; and (3) the rights and remedies of such holders with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case.

(e)    *Validity and Perfection of Prepetition Liens.*  The Debtors admit, stipulate, acknowledge, and agree that the Prepetition Liens are:  (i) legal, valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the applicable Prepetition Collateral, and were fully protected as of the Petition Date; (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code),

impairment, or any other challenge of any kind by any person or entity; and (iii) subject and subordinate only to Non-Primed Excepted Liens, and each Debtor irrevocably waives, for itself and its estate, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Liens or the validity, enforceability, or priority of payment of the Prepetition Secured Obligations and the Prepetition Loan Documents.   The Prepetition Liens were granted to the respective Prepetition Secured Parties for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Prepetition Loan Documents.

(f)     *Cash Collateral*.   The Debtors acknowledge and stipulate that all of the Debtors' cash, including the cash in their deposit accounts (other than cash associated with Royalty Payments),[7] wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

(g)     *Cash Management*.   The Debtors acknowledge and stipulate that pursuant to that certain Amended and Restated Accounts Agreement, dated as of March 19, 2015, by and among, the Prepetition Obligors, the Prepetition Term Loan Administrative Agent and Wells Fargo Bank, National Association, as the depository bank (together with its successors and permitted assigns in such capacity, the "Depository Bank") (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof, the "Accounts Agreement") which was entered into pursuant to and in connection with the Prepetition Term Loan Credit Agreement, (i) the Depository Bank was appointed (and has accepted such appointment) to hold

---

[7]     "Royalty Payments" is defined in the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Payment of (I) Royalty Payments, (II) Operating Expenses, (III) Shipper and Warehousemen Claims, (IV) Section 503(B)(9) Claims, and (V) Outstanding Orders; and (B) Granting Related Relief* [Docket No. 8].

and administer monies deposited in or credited to the Trust Accounts (as defined in and established pursuant to the Accounts Agreement) and (ii) the Prepetition Obligors have agreed that, except as expressly set forth in the Accounts Agreement as modified by the Cash Management Order, they have no rights to withdraw or transfer funds from the Trust Accounts, as third party beneficiary or otherwise, or to direct the investment of amounts held in such Trust Accounts.

20.    *Sections 506(c) and 552(b)*.    In exchange for:   (a) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out and Non-Primed Excepted Liens and (b) the Prepetition Secured Parties' agreement to subordinate their liens and claims in the DIP Priority Collateral to the Carve-Out, Non-Primed Excepted Liens, and the DIP Liens, the Prepetition Secured Parties shall, only upon entry of the Final Order granting such relief, each receive; (x) a waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code; and (y) a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

A.    <u>Motion Granted</u>.  The Motion is hereby GRANTED on an interim basis as and to the extent provided herein.  Any objections to the relief requested in the Motion on an interim basis that have not previously been resolved or withdrawn are hereby overruled.  The rights of all parties in interest to object to entry of a Final Order on the Motion are fully reserved.  This Interim Order shall immediately become effective upon its entry.  To the extent that the terms of any of the DIP Documents differ from the terms of this Interim Order, this Interim Order shall control.

B.    <u>Authority to Enter into DIP Facility</u>.

(i)    The Debtors' entry into the DIP Credit Agreement is authorized and approved, and the use of Cash Collateral on an interim basis is authorized, subject to the terms and conditions set forth in this Interim Order and the DIP Documents (including the Approved Budget).

(ii)    The Debtors are hereby authorized and directed to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments and documents that may be necessary or required for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens provided for by this Interim Order and the DIP Documents.  The DIP Documents evidence valid and binding obligations of the Debtors, which shall be enforceable on a joint and several basis against each of the Debtors, their estates, and their creditors in accordance with the terms and conditions of the DIP Documents and this Interim Order.

(iii)    The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses, and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due and without need to obtain further Court approval, all to the extent provided in the DIP Documents, except to the extent expressly modified by this Interim Order.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents. All of the obligations described in the DIP Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates in accordance with the terms of the DIP Documents.

C.    <u>DIP Obligations</u>.  Upon entry of this Interim Order, the DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' obligations under the DIP Credit Agreement, the DIP Documents, and this Interim Order (the "<u>DIP Obligations</u>"), which DIP Obligations shall be enforceable against the Debtors, their estates, and any successors thereto, including, any trustee appointed in these Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of these Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Agent or to any of the DIP Lenders, under the DIP Documents, or this Interim Order, including all principal, accrued interest, costs, fees, expenses, and other amounts under the DIP Documents.    The DIP

Obligations shall be due and payable as provided for herein and in the DIP Documents, and the respective obligations of the DIP Lenders to make DIP Loans and fund the Debtors' borrowings thereunder shall be several and not joint obligations.

D.    <u>DIP Liens</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition priming, DIP Liens with the priorities set forth herein upon each of Debtors' right, title, and interest in, to, and under all assets (whether tangible, intangible, real, personal or mixed) of the Debtors whether now owned or hereafter acquired and wherever located, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, vessels, charter-hire receipts, earnings, insurance policies and proceeds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, money, investment property, choses in action, cash collateral, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, and the proceeds of causes of action (including, subject to entry of the Final Order granting such relief, proceeds of causes of action arising under

sections 502(d), 544, 545, 547, 548, 550, 551, or 553 of the Bankruptcy Code (collectively, subject to the stated exclusions, the "Avoidance Actions")), and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, including, without limitation, the products, proceeds, and supporting obligations thereof, in each case, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (including, for the avoidance of doubt, and without limitation, all Prepetition Collateral, collectively, the "DIP Collateral")), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of the DIP Obligations.

E.      Perfection of DIP Liens and Adequate Protection Liens.  This Interim Order shall be sufficient and conclusive evidence of the enforceability, validity, perfection, and priority of all liens granted herein including the DIP Liens and the Adequate Protection Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, or real property mortgage) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, the Adequate Protection Liens, or to entitle the DIP Secured Parties or the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent and the Prepetition Agents each are authorized to file, as they in their sole discretion deem necessary, such financing statements, mortgages, notices of lien, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Adequate Protection Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have

been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.  The Debtors are authorized to execute and promptly deliver to the DIP Agent all such financing statements, mortgages, notices, and other documents as the DIP Agent may reasonably request.  The DIP Agent, in its discretion, may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

      F.    <u>DIP Lien Priority</u>.  Subject only to the Carve-Out and the Non-Primed Excepted Liens, (a) the DIP Liens on the DIP Priority Collateral securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the DIP Priority Collateral and (b) the DIP Liens on the Prepetition Tax Credit Priority Collateral securing the DIP Obligations shall be senior in priority to all other security interests in, liens on, or claims against the Prepetition Tax Credit Priority Collateral other than the security interests of the Prepetition Tax Credit Secured Parties and shall be subordinate to the Prepetition Tax Credit Liens in the Prepetition Tax Credit Priority Collateral.  The DIP Liens shall not otherwise be made subject to or *pari passu* with any lien or security interest and shall be valid and enforceable against any trustee appointed in these Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Cases.  Subject to entry of the Final Order granting such relief, the DIP Liens shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

      G.    <u>Superpriority Administrative Claim</u>.  Subject only to the Carve-Out, upon entry of this Interim Order, the DIP Secured Parties are hereby granted pursuant to sections 364(c)(1) and

503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of these Chapter 11 Cases and any Successor Cases for all of the DIP Obligations with priority over any and all administrative expense claims and unsecured claims against the Debtors or their estates in any of these Chapter 11 Cases and any Successor Cases, at any time existing or arising, of the kinds specified in section 503(b) of the Bankruptcy Code, including to the extent allowed under the Bankruptcy Code, all administrative expense claims or other claims arising under sections 105, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code (the "Superpriority Claims").

H.      Extension of Credit.    The DIP Agent and the DIP Lenders shall have no obligation to make any loan or other Credit Extension, unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required Lenders[8] acting reasonably (or, where specifically required by the DIP Credit Agreement, each DIP Lender acting reasonably).

I.      Use of DIP Facility Proceeds.    The DIP Facility shall be used, subject to Permitted Variances, in each case solely in accordance with the then current Approved Budget (attached hereto as **Exhibit C**), the Workover Plan (attached hereto as **Exhibit D**), except as to the Statutory Fees, as defined below, which are not subject to any budget and the DIP Credit Agreement, to provide for postpetition working capital (including any capital expenditures expressly provided for (including as to timing and amount) in the Approved Budget and Workover Plan) and other general corporate purposes of the Debtors (including (i) payment of all accrued and invoiced fees and expenses of the professionals for each of the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties incurred prior to the Petition Date, (ii)

---

[8]      Unless specified otherwise herein, for purposes of this Interim Order, the "Required Lenders" shall have the definition assigned to it in the DIP Credit Agreement.

payment of fees and expenses of the respective retained professionals of each of the DIP Secured Parties, and the Prepetition Secured Parties incurred on and after the Petition Date, subject to the Fee Cap, (iii) the Carve-Out, (iv) payments authorized by the Bankruptcy Court pursuant to orders approving the First-Day Orders filed by the Debtors, which motions and orders shall be in form and substance acceptable to each of the Required Lenders acting reasonably with respect to any provisions that affect the rights or duties of the DIP Secured Parties (*provided* that the Cash Management Order shall be in form and substance reasonably acceptable to the DIP Agent acting reasonably), (v) payments of interest, fees, and expenses, and any other obligations under the DIP Credit Facility, and (vi) adequate protection payments set forth herein, in each case above solely in accordance with this Interim Order, the then current Approved Budget, the Workover Plan and the DIP Credit Agreement).

J.    <u>Maturity Date</u>.  Subject to the last proviso in this Paragraph J below, the DIP Loans  together with all accrued and unpaid interest, fees, charges, costs and other Obligations shall be repaid in full in cash (subject to the proviso below), and all DIP Loan Commitments shall terminate and be of no further force and effect on the date that is the earliest of (such earliest date, the "<u>Maturity Date</u>"):

(i)    the Interim Facility Maturity Date, if the Final Order has not been entered by the Bankruptcy Court on or prior to such date;

(ii)    the date that is one hundred eighty (180) calendar days following the Petition Date (the "<u>Scheduled Maturity Date</u>"), *provided* that if the Debtors request an extension of the Scheduled Maturity Date, the Required Lenders shall have the exclusive right to extend the Scheduled Maturity Date by ninety (90) calendar days; provided, further, if all conditions for the Borrowers' emergence from the Chapter 11 Cases (whether

in a Credit Bid Exit Financing Scenario or otherwise) have been satisfied (or are capable of being satisfied at such time) other than any conditions precedent in respect of required regulatory approvals, and if the applicable purchasers have requested and have continued to exercise commercially reasonable efforts to obtain regulatory approval, then the Maturity Date shall be extended until the date that falls one (1) Banking Day after the date such regulatory approval has been obtained;

(iii)    the substantial consummation (as defined in section 1101(2)) of the Bankruptcy Code of a Plan (as such term is defined in the DIP Credit Agreement), which has been confirmed by an order entered by the Bankruptcy Court;

(iv)    the consummation of a Sale Transaction ;

(v)    the dismissal of any of these Chapter 11 Cases, the appointment of a chapter 11 trustee or any examiner with expanded powers, or the conversion of any of these Chapter 11 Cases into a proceeding under chapter 7 of the Bankruptcy Code; or

(vi)    the date of the acceleration of the DIP Loans after the occurrence of an Event of Default under the DIP Credit Agreement.

Notwithstanding anything to the contrary in clause (i) through (vi) above, but subject to the Prepetition Intercreditor Agreement, in the event the Prepetition Term Loan Administrative Agent (acting on the instructions of the Required Lenders under the Prepetition Credit Agreement) consummates a Sale Transaction or other disposition of substantially all of the Borrowers' Equity or Assets by credit bidding the Prepetition Term Loan Obligations (in whole or in part) in exchange for the Borrowers' Equity or Assets (a "Credit Bid"), unless the ECP Lenders and Melody Lenders acting reasonably agree otherwise, the Lenders hereby irrevocably agree that (A) the ECP Obligations and Melody Obligations and all unused ECP DIP Loan

Commitments and Melody DIP Commitments shall be "rolled over" into a post-emergence term loan financing substantially on the terms and conditions set forth in <u>Exhibit D</u> to the DIP Credit Agreement (the "<u>Post-Emergence Credit Facility</u>" and the documentation  evidencing the Post-Emergence Credit Facility, the "<u>Post-Emergence Credit Facility Documentation</u>" and such scenario, the "<u>Credit Bid Exit Financing Scenario</u>") and (B) subject to the Melody Lenders' review rights set forth in the New Side Letter, they will each enter and execute and agree to be bound by the Post-Emergence Credit Facility Documentation; *provided*, the McGinty Lender may elect, but shall not be required, to "roll over" the McGinty Obligations and unused McGinty DIP Loan Commitments into the Post-Emergence Credit Facility and be bound by the Post-Emergence Credit Facility Documentation.  If any McGinty Lender elects to not "roll over" its Obligations and McGinty DIP Loan Commitments into the Post-Emergence Credit Facility, the Borrowers shall repay all outstanding McGinty Obligations to the McGinty Lender in full and in cash on the effective date of the Credit Bid transaction.    The foregoing is not binding on the Court or the Debtors.

K.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions set forth in, and in accordance with, this Interim Order, the DIP Facility, the Cash Management Order, the DIP Documents, and the Approved Budget, the Debtors are authorized to use Cash Collateral.  Except as expressly permitted in this Interim Order, the Cash Management Order, the DIP Credit Agreement, and the DIP Documents, nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom.  Upon the occurrence of an Event of Default (as defined below and in the DIP Documents), the Debtors' consensual use of Cash Collateral shall automatically terminate.  Notwithstanding anything to

the contrary herein, the Debtors shall not be authorized to use any Prepetition Tax Credit Priority Collateral or any cash, funds, or other proceeds arising therefrom, and the Debtors shall continue not to have any rights in, have access to, or use any cash in the Agent Account (as defined in the Prepetition Tax Credit Agreement) for any reason without the prior written consent of the Prepetition Tax Credit Administrative Agent.   As long as the Tax Credit Obligations are outstanding, if any cash proceeds of the State Tax Credits are deposited into an account of the Debtors, such cash proceeds shall immediately be transferred to the Agent Account and applied in accordance with Paragraph M herein and thereafter in accordance with Section 5.21 of the DIP Credit Agreement, and the Debtors shall have no right to access or use same except as expressly provided for in Section 5.21 of the DIP Credit Agreement in respect of Excess Proceeds.

L.    <u>Carve-Out</u>

(a)    Subject to the terms, conditions and limitations contained in this Paragraph L, but only to the extent and subject to the express exclusions set forth herein, the DIP Liens, the Prepetition Liens (other than the liens of the Prepetition Tax Credit Secured Parties on the Prepetition Tax Credit Priority Collateral), the Adequate Protection Liens and any 507(b) claims granted hereunder. and any other liens or claims granted under this Interim Order, are all subordinate to the following (collectively, the "<u>Carve-Out</u>"):

(i)    Allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the U.S. Trustee, together with the statutory rate of interest, and 28 U S.C. § 156(c) for fees required to be paid to the Clerk of this Court (collectively, the "<u>Statutory Fees</u>"), which shall not be subject to any budget;

(ii)    All reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(iii)     All accrued and unpaid fees (other than any "success," "restructuring," "transaction" or similar fees), disbursements, costs, and expenses, allowed at any time by this Court and incurred by professionals retained by the Debtors or the Creditors' Committee (the "Case Professionals"), at any time prior to the delivery of the Carve-Out Trigger Notice; and

(iv)     All accrued and unpaid fees, disbursements and expenses incurred by the Case Professionals from and after the date of service of a Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, in an aggregate amount not to exceed $500,000 (the "Wind-Down Carve-Out Amount").

(b)     So long as no Carve-Out Trigger Notice has been issued by the DIP Agent, the Debtors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, but solely to the extent the same are incurred in accordance with the Approved Budget as the same may be due and payable and otherwise allowed and payable by order of the Court, and the same shall not reduce the Wind-Down Carve-Out Amount. "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors and their counsel, the U.S. Trustee, the Prepetition Agents and their counsel, and lead counsel to any Creditors' Committee, which notice may be delivered at any time by the DIP Agent following the occurrence and continuance of any Event of Default and, in any case, shall specify that it is a "Carve-Out Trigger Notice." Any payment or reimbursement made on or after the delivery of the Carve-Out Trigger Notice in respect of any fees or expenses of the Case Professionals shall permanently reduce the Wind-Down Carve-Out Amount on a dollar-for-dollar basis. Any funding of the Carve-Out shall be added to and made a part of the

DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under the Interim Order, the DIP Documents, the Bankruptcy Code and applicable law.

(c)     Nothing herein, including the inclusion of line items in the Approved Budget for Case Professionals, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of any Creditors' Committee, or of any other person or shall affect the right of the DIP Agent, the Prepetition Agents, the Prepetition Secured Parties, the U.S. Trustee, or any other party in interest to object to the allowance and payment of such fees and expenses. The DIP Secured Parties and the Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Case Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

M.     <u>Adequate Protection</u>.  Subject only to the Carve-Out, the DIP Orders will provide the Prepetition Secured Parties adequate protection as set forth below ("<u>Adequate Protection</u>" and such obligations, the "<u>Adequate Protection Obligations</u>"):

(i)     *Replacement Liens and Claims*:  Adequate protection claims and liens will be provided to the Prepetition Secured Parties to the extent of any diminution in the value of their respective interests in the Prepetition Collateral, which is a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale, or lease of such prepetition collateral, or the grant of a lien under section 364 of the Bankruptcy Code ("<u>Diminution in Value</u>") (such claims and liens, the "<u>Adequate</u>

Protection Liens"). Pursuant to sections 361 and 363(e) of the Bankruptcy Code, adequate protection liens will be provided in the form of replacement liens in the DIP Collateral (junior to the Carve-Out, Non-Primed Excepted Liens, and Priming Lien, and subject to the Prepetition Intercreditor Agreement) and 503(b) and 507(b) claims (which claims will be junior to the Carve-Out, Non-Primed Excepted Liens, and the Priming Lien, and subject to the Prepetition Intercreditor Agreement). Notwithstanding the foregoing, Adequate Protection Liens granted in the Prepetition Tax Credit Priority Collateral shall be subordinate to the Prepetition Tax Credit Liens.

(ii)    *Fees and Expenses*: Each of the Prepetition Secured Parties shall receive (A) payment in full in cash from the Debtors for all fees, costs, expenses and indemnities payable to or due and owing under the Prepetition Loan Documents (including the fees and expenses of all legal, financial, and other professional advisors) and incurred in connection with these Chapter 11 Cases (the "Fees and Expenses") that accrued prior to the Petition Date and (B) subject to the Fee Cap (as such term is defined below), payments in cash from the Debtors for all Fees and Expenses accruing on or after the Petition Date. For the avoidance of doubt, the Debtors shall pay the Fees and Expenses (but subject to the Fee Cap to the extent incurred on or after the Petition Date) for the following:

(a)    the Prepetition Term Loan Administrative Agent and, in their capacity as Prepetition Term Loan Lenders, the ECP Lenders, and their counsel, Kirkland & Ellis LLP (including local Delaware and Alaska counsel and one financial advisor);

(b)    in their capacity as Prepetition Term Loan Lenders, the Melody Lenders and their counsel, Milbank LLP (including local Delaware and Alaska counsel); and

(c)    the Prepetition Tax Credit Administrative Agent, its counsel Vinson & Elkins LLP (including local Delaware and Alaska

31

counsel), and its Advisor (as defined in the Prepetition Tax Credit Agreement) (collectively, the "Fee Parties");

Prepetition Secured Parties shall be entitled to reimbursement of the reasonable fees and expenses of their counsel (the "Lender's Expenses"); *provided*, however, that copies of all invoices reflecting the post-petition Lender's Expenses shall be served by email on the Debtor, the U.S. Trustee, and counsel to the Committee (if any) (collectively the "Fee Notice Parties"), who shall have ten (10) business days to review and to assert any objections thereto.  Such post-petition invoices shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; *provided*, further that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional.  Copies of all invoices reflecting the Lender's Expenses may be reasonably redacted (*provided*, however, that the U.S. Trustee reserves his right to seek to obtain unredacted copies of such invoices) and shall not be required to contain time entries or be maintained in accordance with the U.S. Trustee Guidelines, nor shall any party, counsel or other advisor or professional, be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek the Bankruptcy Court's approval of any such payments).  The provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If no objection to the payment of the Lender Expenses is made in writing by the Fee Notice Parties within ten (10) calendar days after delivery of such post-petition invoices, then, without further order of, or application to, the Court or notice to any other party, such Lender Expenses shall be promptly paid by the Debtor. If an objection is made by any of the Fee Notice Parties within the ten-day objection period to

the payment of the Lender Expenses, then the disputed portion of such Lender Expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtor.  Notwithstanding the foregoing, the Melody Lenders shall have equal access to any financial advisor or investment banker that is selected and retained by the Prepetition Term Loan Administrative Agent or the ECP Lenders, and any such financial advisor will be available to the Melody Lenders for conference calls and meetings to discuss the Debtors and the status of the Chapter 11 Cases, and will share any information and materials with the Melody Lenders regarding the Chapter 11 Cases.  Notwithstanding anything in the Approved Budget to the contrary, the Approved Budget shall provide a monthly amount of at least $50,000 for fees and expenses accruing on and after the Petition Date of the Prepetition Tax Credit Agent and its advisors (whether legal, financial or otherwise), with any unused portions of such amount rolling forward to the next succeeding month and applied in any subsequent monthly period during the Chapter 11 Cases or rolling backward for any fees and expenses that exceeded their such amount in any prior months, as applicable (the "Monthly Prepetition Tax Agent Expense Amount").  The Approved Budget may not be amended without the Prepetition Tax Credit Agent's written consent to decrease (i) the amount of $591,250 in the ING Advisors line item in the week of August 16 as set forth in the version of the Approved Budget attached to the Motion, (ii) the Monthly Prepetition Tax Agent Expense Amount, or (iii) or to take away the benefit of the carryforward or carryback of unused amounts or overages described above. Nothing herein shall prejudice any right of the Prepetition Tax Credit Agent to seek a higher amount of the Monthly Prepetition Tax Agent Expense Amount in connection with the Final

Order and the Final Hearing or shall be construed to be a cap or limitation on the amount of fees and expenses the Prepetition Tax Credit Agent may be entitled to recover as part of its claims.

        (iii)    *Reporting*:  The Debtors shall provide reporting in the form of (a) any weekly financial reporting given to the U.S. Trustee, and (b) any additional reports requested by the advisors to the Prepetition Secured Parties, including, but not limited to, (1) periodic updates regarding a sale or auction process, (2) bidders in connection therewith, and (3) any other information reasonably requested by any of the advisors to the Prepetition Secured Parties in connection to these Chapter 11 Cases.  The Debtors shall, at the request of the DIP Agent or any of the Lenders, also host a weekly telephone conference with the DIP Agent, Required Lenders, and the Prepetition Agents to discuss significant items and developments in these Chapter 11 Cases.  The Debtors shall provide copies of any and all reporting given to the DIP Agent or Lenders under the DIP Credit Agreement to the Prepetition Tax Credit Secured Parties.

        (iv)    *Access to Records and Collateral*:  The Debtors shall permit the advisors to each of the Prepetition Secured Parties (a) to have access to and inspect the Debtors' properties and any collateral of any Debtor against whom they are granted Adequate Protection Liens or Superpriority Claims, (b) to examine the Debtors' books and records, and (c) to discuss the Debtors' affairs, finances, and condition with the Debtors' financial advisors, investment bankers, and officers, whom the Debtors shall make reasonably available, in each case excluding (y) all privileged and attorney-client work product and (z) information that the Debtors are otherwise prohibited from disclosing pursuant to a third-party confidentiality agreement.

(v)     *Interest Payments*:  The Debtors shall pay interest to the Prepetition Term Loan Administrative Agent (for the ratable benefit of the Prepetition Term Loan Lenders) at the Default Rate (as such term is defined in the Prepetition Term Loan Credit Agreement) in respect of the Tranche A Loans and Tranche B Loans as defined in the Prepetition Term Loan Credit Agreement (the "Term Loan Interest Payments"), which interest shall be payable by making payment of such interest on each Interest Payment Date (as such term is defined in the Prepetition Term Loan Credit Agreement) by adding the amount of such interest to the principal balance outstanding of such Term Loans (as such term is defined in the Prepetition Term Loan Credit Agreement), and paying interest on such deferred interest at the Default Rate (as such term is defined in the Prepetition Term Loan Credit Agreement).   Notwithstanding anything in the Prepetition Term Loan Agreement to the contrary, to the extent that the Prepetition Term Loan Administrative Agent or any other Prepetition Term Loan Secured Party shall receive from the Debtors any payments or distributions in satisfaction of Prepetition Term Loan Obligations with respect to the Tranche B Loans and the Tranche C Loans (each as defined in the Prepetition Term Loan Credit Agreement), other than the payments in kind referred to in the foregoing Paragraph M(v)(a), the amount of such payments or the amount attributed to such distributions shall be applied:  (a) *first* to repay the principal of the Tranche B Loans (until the principal amount thereof is paid in full in cash or in kind); (b) *second* to repay the accrued and unpaid interest of the Tranche B Loans; (c) *third* to repay the principal of the Tranche C Loans (until the principal amount thereof is paid in full in cash or in kind); and (d) *fourth* to repay the accrued and unpaid interest of the Tranche C Loans. Notwithstanding anything to the contrary herein and for the avoidance of doubt, the

foregoing provision shall not modify the terms of the Priority Waterfall or the Prepetition Term Loan Lender Payment Priority Waterfall each as set forth below, but shall govern and control the application of payments made solely to the Tranche B Lenders and the Tranche C Lenders in accordance therewith, after repayment in full of the Tranche A Obligations.

(vi)   *Priority Waterfall and Priority Payment Waterfall.*  Notwithstanding anything herein or in any other DIP Document or Prepetition Term Loan Document or any other document to the contrary, the claims and liens of the DIP Agent on behalf of the DIP Lenders and the Prepetition Agents on behalf of the Prepetition Secured Parties shall have relative priority in respect of the DIP Priority Collateral, the Prepetition Tax Credit Priority Collateral, or the Prepetition Term Loan Prepetition Collateral, respectively, as follows:

| DIP Priority Collateral | |
| --- | --- |
| *Priority* | *Lien Priority* |
| 1st | Non-Primed Excepted Liens (if any) |
| 2nd | Priming Liens granted to the DIP Agent on behalf of the DIP Lenders to secure the DIP Obligations |
| 3rd | Adequate Protection Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and the Prepetition Term Loan Administrative Agent (subject to the Term Loan Lender Payment Priority Waterfall described below) |
| 4th | Prepetition Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and Prepetition Term Loan Administrative Agent to secure the Tranche A Obligations, the Tranche B Obligations, the obligations in respect of the Tranche C Loans and the obligations owing to the Prepetition Term Loan Administrative Agent, on a *pari passu* basis (subject to the Term Loan Lender Payment Priority Waterfall described below) |
| 5th | Adequate Protection Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties |

| | |
|---|---|
| 6th | Prepetition Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties to secure the Prepetition Tax Credit Obligations |

| Prepetition Tax Credit Priority Collateral | |
|---|---|
| *Priority* | *Lien Priority* |
| 1st | Adequate Protection Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties |
| 2nd | Prepetition Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties to secure the Prepetition Tax Credit Obligations |
| 3rd | Priming Lien granted to the DIP Agent on behalf of the DIP Lenders to secure the DIP Obligations |
| 4th | Adequate Protection Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and the Prepetition Term Loan Administrative Agent (subject to the Term Loan Lender Payment Priority Waterfall described below) |
| 5th | Prepetition Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and the Prepetition Term Loan Administrative Agent to secure the Tranche A Obligations, the Tranche B Obligations, the obligations in respect of the Tranche C Loans and the obligations owing to the Prepetition Term Loan Administrative Agent, on a *pari passu* basis (subject to the Term Loan Lender Payment Priority Waterfall described below) |

| Prepetition Term Loan Lender Payment Priority Waterfall | |
|---|---|
| *Priority* | *Tranche* |
| 1st | After satisfaction in full of the DIP Loan Obligations, and after payment of all accrued costs, expenses, and indemnities on account of claims that have been made of the Prepetition Term Loan Administrative Agent (including, but not limited to, any attorneys', financial advisors', and other professionals fees and expenses) as provided for under and subject to the Prepetition Term Loan Documents, to the Tranche A Lenders until such |

| | |
|---|---|
| | time as the Tranche A Obligations, including all claims on account of any collateral, all claims on account of adequate protection liens and claims, any 507(b) claims of the Tranche A Lenders, have been satisfied in full; provided, that to the extent the valuation of any non-cash payment is in dispute, the Melody Lenders and ECP DIP Lenders agree to engage an independent, nationally recognized valuation firm from a list of three such firms agreed by the parties and attached as **Exhibit E** hereto (each an "Agreed Valuation Firm," such that the Tranche A Lenders shall receive $52.0 million plus any drawn and unreimbursed amounts of the Letter of Credit, plus accrued and unpaid interest (including default PIK interest) and fees in value before any holder of the Tranche B Obligations or obligations in respect of the Tranche C Loans receives any payment, recovery or any other satisfaction of claims (the "Non-Cash Valuation Mechanics") |
| 2nd | To the Tranche B Lenders until such time as the Tranche B Obligations, including all claims on account of any collateral, all claims on account of adequate protection liens and claims, and any 507(b) claims of the Tranche B Lenders, have been satisfied in full |
| 3rd | To the Tranche C Lenders until such time as the obligations in respect of the Tranche C Loans, including all claims on account of any collateral, all claims on account of adequate protection liens and any 507(b) claims of the Tranche C Lenders, have been satisfied in full |

(vii)    The Prepetition Term Loan Lender Payment Priority Waterfall set forth immediately above may only be modified with the written consent of each of the Prepetition Term Loan Lenders.

(viii)    The Prepetition Term Loan Lender Priority Waterfall set forth immediately above shall not apply in the event of a Credit Bid Exit Financing Scenario, which shall be governed by the terms of the New Side Letter.

(ix)    Notwithstanding anything to the contrary, (but subject to the terms of the New Side Letter), the Debtors shall not make any payments, distributions, satisfaction

of claims, or provide any recovery on account of the Tranche B or Tranche C Prepetition Term Loan Obligations (including on account of any collateral, adequate protection lien or claim, or 507(b) claim), whether voluntary, involuntary, through the exercise of any right of setoff, sale, chapter 11 plan or otherwise, in cash, debt, equity or other securities or other form of consideration, while any DIP Claims or Tranche A Obligations are still outstanding and any such payment, distribution, satisfaction of claims, or other recovery shall be made first to the DIP Agent to satisfy the DIP Obligations until such obligations are satisfied in full, and thereafter to the Tranche A Lenders until the Tranche A Obligations (including on account of any collateral, letters of credit, adequate protection lien or claim, or 507(b) claim) are satisfied in full, *provided*, that to the extent the value of any non-cash payment is in dispute, such payment shall be subject to the Non-Cash Valuation Mechanics.

(x)    Notwithstanding anything to the contrary, but subject to the New Side Letter, if any Prepetition Term Loan Lender or the Prepetition Term Loan Administrative Agent shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, sale, chapter 11 plan, or otherwise) in cash, debt, equity or other securities or other form of consideration on account of any Prepetition Term Loan Obligations (including on account of any Superpriority Claim granted to it or to the Prepetition Term Loan Administrative Agent for its benefit in connection therewith), while any DIP Claims or Tranche A Obligations are still outstanding, such Prepetition Term Loan Lender shall forthwith segregate and hold in trust and promptly pay over to the DIP Agent for distribution among the DIP Lenders until such time as the DIP Claims have been satisfied in full, and then after to the Prepetition Term Loan Administrative Agent for distribution to the Tranche A Lenders until such time as the Tranche A Obligations

39

(including all claims on account of any collateral, any adequate protection liens or claims and any 507(b) claims of the Tranche A Lenders) have been satisfied in full; *provided*, that to the extent of any non-cash payment is in dispute, such payment shall be subject to the Non-Cash Valuation Mechanics, *provided, further*, that nothing in herein shall modify any obligation that the DIP Claims be satisfied in full in cash unless otherwise agreed to in writing by each of the DIP Lenders, except in the event of the Credit Bid Exit Financing Scenario.

(xi)     For the avoidance of doubt, all references to the Tranche A Obligations in the DIP Documents, the Prepetition Term Loan Documents, this Interim Order, the Final Order and the New Side Letter shall include Tranche A Obligations in respect of the undrawn Letter of Credit issued pursuant to the Prepetition Term Loan Credit Agreement.

(xii)     *Prepetition Tax Credit Priority Collateral*.  The automatic stay of section 362 of the Bankruptcy Code (solely to the extent applicable) is hereby modified to permit and authorize the Prepetition Tax Credit Secured Parties in their sole discretion to sweep, setoff, and apply any amounts now existing or hereafter deposited in the Agent Account against any obligations of the Debtors owed to the Prepetition Tax Credit Secured Parties under the Prepetition Tax Credit Documents and to the extent all obligations owing to the Prepetition Tax Credit Secured Parties are paid in full and there are excess proceeds remaining in the Agent Account, to allow the Prepetition Tax Credit Administrative Agent to, and the Prepetition Tax Credit Administrative Agent shall, immediately transfer any such excess deposits to the DIP Agent to be applied in accordance with the DIP Credit Agreement.  To the extent all DIP Obligations owing to the DIP Secured Parties are paid in

full and there are excess proceeds remaining in the Agent Account, the DIP Agent shall be allowed, and shall, immediately transfer any such amounts to the Prepetition Term Loan Administrative Agent, which shall apply such proceeds in accordance with the Prepetition Term Loan Lender Payment Priority Waterfall

(xiii)    *Prepetition Tax Credit Secured Party Reservation of Rights*.  Any approval, consent, or other right of the DIP Secured Parties, Required Lenders, or Prepetition Term Loan Secured Parties contained in the DIP Orders or the DIP Documents shall not be a waiver or limitation on any rights of the Prepetition Tax Credit Secured Parties to object to or seek any relief in these Chapter 11 Cases, without limitation.

N.    Credit Bidding.  Subject to (a) the provisions of section 363(k) of the Bankruptcy Code, (b) the challenge rights set forth in Paragraph VV of this Interim Order, and (c) the terms and conditions set forth in the DIP Documents and the Prepetition Intercreditor Agreement, in connection with a Sale Transaction (as defined in the DIP Credit Agreement), upon entry of the Final Order granting such relief, the Prepetition Term Loan Administrative Agent, acting at the direction of the Required Lenders (as defined in the Prepetition Term Loan Credit Agreement) and on behalf of the Prepetition Term Loan Secured Parties, shall, subject to the Prepetition Intercreditor Agreement and the New Side Letter, have the absolute right to credit bid any portion, up to the full amount, of all obligations under the Prepetition Term Loan Documents on the ECP Priority Collateral and Prepetition Tax Credit Priority Collateral, provided that the resulting assets or equity interests acquired as a result thereof shall be assets directly owned by (or equity interests indirectly wholly owned by) Holdco (as defined in the New Side Letter) and shall be subject to the rights and obligations of the ECP Lenders and the Melody Lenders set forth in the New Side Letter.

O.      _Modification of Automatic Stay_.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified to permit:  (a) the Debtors to grant the DIP Liens and the Superpriority Claim, and to perform such acts as the DIP Agent may request in its sole discretion to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the Adequate Protection, and to take all appropriate action to ensure that the Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations to the DIP Agent as contemplated under the DIP Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Interim Order; and (e) the implementation of the terms of this Interim Order.

P.      _Section 507(b) Reservation_.  Subject only to the Carve-Out, nothing contained herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided in this Interim Order is insufficient to compensate for any diminution in value of the respective interests of the Prepetition Secured Parties in any Prepetition Collateral during these Chapter 11 Cases or any Successor Cases.

Q.      _Amendment of the DIP Documents_.  The DIP Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is not material, and is:  (i) in accordance with the DIP Documents; and (ii) not adverse or prejudicial in any material respect to the rights the Debtors, the estates, or of third parties (including the Prepetition Tax Credit Secured Parties); _provided, however_, all amendments, modifications and waivers of the DIP Documents shall require the consent of the Required Lenders acting reasonably, except in the case of amendments, modifications, or waivers

42

requiring consent from all DIP Lenders, all affected DIP Lenders, or the DIP Agent (or the DIP Agent with the consent in writing of the Required Lenders acting reasonably), including without limitation, certain consent rights in respect of commitments, economics, maturity and the release of collateral as set forth in the DIP Credit Agreement.  Any material amendment, restatement, modification, or supplement to the DIP Documents may only be made pursuant to an order of this Court, upon notice and a hearing.  The Debtors shall serve all amendments, restatements, modifications, and supplements of the DIP Documents on the U.S. Trustee and the Committee, if any.

      R.    <u>Budget Compliance</u>.

      (i)    The Debtors have prepared (A) a 13-week cash flow forecast, attached hereto as **<u>Exhibit C</u>**, setting forth all projected cash receipts and cash disbursements on a weekly basis, as may be revised from time to time with the prior written consent (which may be by email from counsel) of the Required Lenders acting reasonably (such forecast, as supplemented or updated from time to time with such consent, the "<u>Approved Budget</u>"), and (B) the Workover Plan (attached hereto as **<u>Exhibit D</u>**), both of which shall be in form and substance satisfactory to the Required Lenders acting reasonably.  Notwithstanding anything in the Approved Budget to the contrary, the Approved Budget shall provide a monthly cap in the amount of $85,000 for fees and expenses accruing on and after the Petition Date of the Melody Lenders, in their capacity as both DIP Secured Parties and Prepetition Secured Parties, and their advisors (whether legal, financial or otherwise) (the "<u>Melody Fee Cap</u>") and a monthly cap in the amount of $85,000 for the fees and expenses accruing on and after the Petition Date of the McGinty Lender and its advisors (whether legal, financial or otherwise) (the "<u>McGinty Fee Cap</u>",

and each of the McGinty Fee Cap and the Melody Fee Cap, the "<u>Fee Cap</u>"), with any unused portions of either such Fee Cap rolling forward to the next succeeding month and applied in any subsequent monthly period during the Chapter 11 Cases or rolling backward to reimburse the Melody Lenders or McGinty Lender for any fees and expenses that exceeded their respective Fee Cap in any prior months, as applicable.  For the avoidance of doubt, the Melody Lenders and their advisors (whether legal, financial or otherwise) or McGinty Lender and their advisors (whether legal, financial or otherwise) (i) shall be reimbursed for all fees and expenses incurred up to their respective Cumulative Fee Reimbursement Cap, and (ii) shall not be reimbursed for any fees and expenses to the extent such fees and expenses exceed the difference between (a) the then current Cumulative Fee Reimbursement Cap for such month minus (b) the cumulative amount previously reimbursed to such party for fees and expenses accruing from and after the Petition Date through the then applicable month.

   (ii) The fees and expenses to be reimbursed to the Melody Lenders, in their capacity as Lenders and Prepetition Secured Parties, and their advisors will constitute a single line item in the Approved Budget (the "<u>Melody Line Item</u>").  The fees and expenses to be reimbursed to the McGinty Lender, in their capacity as Lenders and Prepetition Secured Parties, and their advisors will constitute a single line item in the Approved Budget (the "<u>McGinty Line Item</u>").  The Approved Budget may not be amended to decrease the Melody Line Item for the week of August 16 as set forth in the version of the Approved Budget attached to the Motion or to decrease the Melody Line Item below the Melody Fee Cap (or to take away the benefit of the carryforward or carryback of unused amounts or overages described above) without the Melody Lenders' written

44

consent.  The Approved Budget may not be amended to decrease the McGinty Line Item below the McGinty Fee Cap (or to take away the benefit of the carryforward or carryback of unused amounts or overages described above) without the McGinty Lender's written consent.

(iii)    On the fourth Banking Day of the week that is the second full week after the Petition Date, and on the fourth Banking Day of each week thereafter, the Debtors shall deliver to the DIP Agent, with a copy to the Prepetition Agents, a variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget for the applicable week on a line item basis (the "Budget Variance Report").  Each Budget Variance Report shall be presented on both:  (i) a cumulative basis, in that it shall include all previous weeks in the current Budget Variance Report; and (ii) a non-cumulative basis, in that it shall include only the then most recently ended calendar week (the period described in this clause (ii), the "Budget Variance Reporting Period").  Any material variance as determined by the Required Lenders acting reasonably shall be accompanied by a qualitative explanation, including an explanation of the sources of Cash used to fund such variance and an explanation for how the Debtors intend to offset such variance from available sources and uses.  Actual cash disbursements during any Budget Variance Reporting Period made by the Debtors shall not exceed the amounts set forth in the Approved Budget by more than ten percent (10%) of any individual line item ("Permitted Variance"); *provided*, that unused amounts set forth in the Approved Budget for any disbursement line item may be carried forward and used to fund such line item in the subsequent four Budget Variance Reporting Periods.  Actual cash receipts received by the Debtors may not be less than

ninety percent (90%) of the amounts set forth in the Approved Budget; *provided*, that receipts in excess of the amounts set forth in the Approved Budget for such line item may be carried forward and used to offset such line item in the subsequent four Budget Variance Reporting Periods.  Notwithstanding the foregoing, the fees, expenses and indemnities of the respective retained professionals of the DIP Agent, each of the DIP Lenders and each of the Prepetition Term Loan Secured Parties will be paid consistent with Paragraph BB of this Interim Order regardless of whether the actual cash disbursements made for any such fees, expenses and indemnities exceed the Permitted Variance amounts for such line items set forth in any Approved Budget (and such payment shall not result in an Event of Default); *provided, however*, under no circumstances shall the reimbursements to the Melody Lenders, in their capacity as DIP Secured Parties or Prepetition Secured Parties, and their retained professionals for fees and expenses incurred on or after the Petition Date exceed the Melody Fee Cap or the McGinty Lender, in their capacity as DIP Secured Parties or Prepetition Secured Parties, and their retained professionals exceed the McGinty Fee Cap (and any such payment in excess of such amounts shall result in an Event of Default).

        (iv)     On the fourth Banking Day of the week that is four full weeks after the Effective Date, and on each four week anniversary thereof, the Debtors shall deliver to the DIP Agent, with a copy to the Prepetition Agents, an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect such Debtor's projected cash receipts and cash disbursements for such 13-week period on a weekly basis, which such new 13-week cash flow forecast must be acceptable to the Required Lenders acting reasonably (and, upon such acceptance by the Required Lenders acting reasonably), such

new 13-week cash flow forecast shall become the new Approved Budget) (it being agreed and understood that if the Required Lenders acting reasonably and the Debtors do not agree to an updated Approved Budget, the Approved Budget shall be the then-existing Approved Budget or such Approved Budget as may be approved by the Court after a hearing). Notwithstanding anything to the contrary herein, no 13-Week Forecast shall become the Approved Budget that has the effect of reducing the fees, expenses or indemnities reimbursable to the Melody Lenders below the Melody Fee Cap without the Melody Lenders' written consent, that has the effect of reducing the fees, expenses or indemnities reimbursable to the McGinty Lender below the McGinty Fee Cap without the McGinty Lender's written consent, or, in any other case, that has the effect of reducing the fees, expenses or indemnities reimbursable to the DIP Agent or any other DIP Lenders hereunder without the written consent of the DIP Agent or such DIP Lender, as applicable.

(v)    The Debtors shall promptly deliver the Approved Budget, together with any approved amendments or modifications thereto, to the Prepetition Term Loan Secured Parties and their respective counsel, the U.S. Trustee, the Committee, and shall file the Approved Budget with the Court if there are any material modifications.

S.    <u>After-Acquired Property</u>.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors after the Petition Date, including all DIP Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Documents and this Interim Order is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and

unavoidable lien as of the Petition Date that is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law; *provided* that with respect to any property acquired after the Effective Date by any Debtor that is intended to be subject to the Lien created by any of the DIP Security Documents but is not so subject, the Debtors shall promptly take such actions and execute such documents as the DIP Agent shall require to confirm the validity, perfection and priority of the Lien of the DIP Security Documents on such after-acquired Collateral.

T.      Proceeds of Subsequent Financing.  If the Debtors, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to section 364(b), (c), or (d) of the Bankruptcy Code in violation of the DIP Documents at any time prior to the indefeasible payment in full of all DIP Obligations, the cancellation, backing, or cash collateralization of the letters of credit provided for under the DIP Credit Agreement, the satisfaction of the Superpriority Claims, and the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility, then all of the cash proceeds derived from such credit or debt shall: (i) immediately be turned over first to the DIP Agent; and (ii) thereafter, after the DIP Obligations have been satisfied in full and fully and indefeasibly paid, to the Prepetition Term Loan Administrative Agent to satisfy outstanding Prepetition Secured Obligations; *provided*, that any and all rights of the Prepetition Tax Credit Secured Parties to object to any such debt, including any attempt to prime the Prepetition Tax Credit Liens, and any payment related thereto being transferred to the DIP Agent or the Prepetition Term Loan Administrative Agent are hereby reserved.

U.    Maintenance of DIP Collateral.  Until the indefeasible payment in full of all DIP Obligations, all indebtedness outstanding in accordance with the Prepetition Loan Documents, and the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall (i) insure the DIP Collateral as required under the DIP Facility and the Prepetition Loan Documents, as applicable; and (ii) maintain the cash management system in effect as of the Petition Date, as modified by any Order entered by this Court with respect to the Debtors' cash management system.

V.    Cash Management.

(i)    The Debtors shall deposit (or cause or direct to be deposited):  (a) the proceeds of each of the DIP Loans into the Construction Account (as defined in the Cash Management Order); (b) except as set forth in foregoing clause (a), all other funds, proceeds, receipts and other cash inflows (excluding any State Tax Credit (as defined in the DIP Credit Agreement) proceeds) into the Gas Proceeds Account (as defined in the Cash Management Order); and (c) subject to Paragraph K above, all excess State Tax Credit (as defined in the DIP Credit Agreement) proceeds received from the Prepetition Tax Credit Agent after repayment in full of the Prepetition Tax Credit Obligations into the Tax Credit Reserve Account (as defined in the Cash Management Order).

(ii)    Construction Account:  Notwithstanding anything to the contrary contained in the Accounts Agreement, the Debtors shall comply with the Construction Account Disbursement Procedures (as defined in the Cash Management Order) from and after the Petition Date, the DIP Agent shall have the right to direct withdrawals and transfers of funds from the Construction Account pursuant to the Construction Account

Disbursement Procedures and the Depository Bank is hereby authorized and directed to follow such instructions.

(iii)    Other Accounts:  Cornucopia is authorized to withdraw and transfer to the DIP Agent for application against the DIP Obligations any amounts required to be applied to the DIP Obligations pursuant to the mandatory prepayment provisions of the DIP Credit Agreement and the Depository Bank shall, upon receipt of a New Withdrawal Certificate (as defined in the Cash Management Order), withdraw and transfer such amounts (without duplication) to the DIP Agent (for the benefit of the DIP Lenders) which amounts shall be applied by the DIP Agent in the order of priority specified in Section 2.1.6(d) of the DIP Credit Agreement.  Any material changes from the Debtors' prepetition cash management system must be acceptable to the DIP Agent acting reasonably.

W.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agent (on behalf of the applicable DIP Lenders) is deemed to be, without any further action or notice (including endorsements), named as an additional insured and lender loss payees on each insurance policy maintained by the Debtors, including, without limitation, any such insurance policy which in any way relates to the DIP Collateral.

X.    <u>Disposition of DIP Collateral</u>.  Except as expressly provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written consent of the Required Lenders acting reasonably and approval of the Bankruptcy Court.

Y.    <u>Event of Default</u>.  The occurrence of any of the following events, unless waived by the DIP Agent in writing and in accordance with the terms of the DIP Documents, shall

constitute an event of default (each, an "<u>Event of Default</u>"):  (a) the failure of the Debtors to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order or the Final Order; or (b) the occurrence of an "Event of Default" under the DIP Documents, as more completely set forth in Article 7 of the DIP Credit Agreement.

       Z.       <u>Rights and Remedies Upon Event of Default</u>.

       (i)       Unless otherwise ordered by the Court in accordance with the terms hereof, as of 12:00 a.m. prevailing Eastern Time on the third Banking Day after the date the DIP Agent files a notice of an Event of Default on the docket of the Debtors' Chapter 11 Cases (such period, the "<u>Default Notice Period</u>"), the automatic stay under section 362 of the Bankruptcy Code shall be automatically lifted as of the date thereof without further order of this Court to allow the DIP Agent, at the direction of the Required Lenders acting reasonably, to exercise remedies in accordance with the DIP Documents and take any and all actions permitted by law, subject to the Prepetition Intercreditor Agreement, and the New Side Letter, as if no case were pending under the Bankruptcy Code, in each case, with respect to the DIP Priority Collateral.  Unless otherwise ordered by the Court, the sole basis on which the Debtors can contest the automatic lifting of the automatic stay pursuant to this paragraph is on the grounds that an Event of Default has not occurred.

       (ii)       In accordance with Section 7.2 of the DIP Credit Agreement, and subject to any applicable grace periods, upon the occurrence of any Event of Default, the DIP Agent may, without notice or demand, immediately suspend or terminate all or any portion of the DIP Lenders' obligations to make additional loans or Credit Extensions under the DIP Facility.  Upon the occurrence of an Event of Default, the DIP Agent, acting at the direction of the Required Lenders acting reasonably, may declare and make all loans

and other DIP Obligations under the DIP Facility immediately due and payable in accordance with Section 7.2.2 of the DIP Credit Agreement.  Nothing herein shall be construed to limit or otherwise restrict the availability of the rights and remedies provided for in Section 7.2 of the DIP Credit Agreement.

(iii)    In the event any party requests a hearing seeking to prevent the DIP Agent or the DIP Lenders from exercising any of their rights and remedies that arise after an Event of Default, such hearing must be requested in the Bankruptcy Court which shall have the sole jurisdiction.

(iv)    Upon the occurrence of an Event of Default, all rights and remedies available to (a) the DIP Agent and Lenders under the DIP Documents, including but not limited to all remedies set forth in Section 7.2 of the DIP Credit Agreement, and (b) to the Prepetition Agents and other Prepetition Secured Parties under the Prepetition Loan Documents, shall be available pursuant to the terms and conditions of this Paragraph Z.

AA.    <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Each of the DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order, and their reliance on this Interim Order is in good faith.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed or modified on appeal, the DIP Secured Parties and the Prepetition Secured Parties are entitled to fullest extent to the protections provided in section 364(e) of the Bankruptcy Code.

BB.    <u>DIP and Other Expenses</u>.  All out-of-pocket expenses (limited, in the case of legal and advisory expenses, to the reasonable and documented fees, disbursements, and other charges

of one outside counsel, one local Delaware counsel, one local Alaska counsel, for the DIP Agent and each of the Lenders, and one financial advisor for the DIP Agent and the Lenders, taken as a whole (and, in each case, as selected by the DIP Agent) provided that the fees and expenses of the Melody Lenders and McGinty Lender incurred on and after the Petition Date will be subject in all respects to the Melody Fee Cap and McGinty Fee Cap, respectively (collectively, the "DIP Professionals"), all of whom that are selected and retained by the DIP Agent will be made available to the Melody Lenders for conference calls and meetings to discuss the Debtors and status of the Chapter 11 Cases, and will share any information and materials with the Melody Lenders regarding the Chapter 11 Cases) incurred in connection with the DIP Facility, the transactions contemplated thereby, these Chapter 11 Cases and any enforcement costs and documentary taxes associated with the DIP Facility shall be paid by the Borrowers upon demand, whether or not the closing date occurs.  For the avoidance of doubt, the fees and expenses described in the foregoing sentence shall include, to the extent set forth in Section 9.4 of the DIP Credit Agreement, all reasonable and documented out-of-pocket costs, fees, and expenses incurred in connection with the preparation, negotiation, execution, interpretation or administration of, any modification of any term of or termination of, any of the DIP Documents, any commitment or proposal letter therefor, any other document prepared in connection therewith or the consummation and administration of any transaction contemplated therein. Payment of all such fees and expenses shall not be subject to allowance by this Court, and parties entitled under the DIP Documents to receive such payment of fees and expenses shall not be required to comply with the U.S. Trustee fee guidelines *provided*, that copies of all invoices reflecting the fees and expenses of the DIP Professionals shall be served by email on the Debtor, the U.S. Trustee, and counsel to the Committee (if any) (collectively the "Fee Notice Parties"),

who shall have ten (10) business days to review and to assert any objections thereto. Such invoices shall include a general description of the nature of the matters worked on, a list of professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, the year of law school graduation for each attorney; provided, further that the U.S. Trustee reserves the right to seek copies of invoices containing the detailed time entries of any professional. Copies of all invoices reflecting the fees and expenses of the DIP Professionals may be reasonably redacted (provided, however, that the U.S. Trustee reserves his right to seek to obtain unredacted copies of such invoices) and shall not be required to contain time entries or be maintained in accordance with the U.S. Trustee Guidelines, nor shall any party, counsel or other advisor or professional, be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek the Bankruptcy Court's approval of any such payments). The provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine. If no objection to the payment of the fees and expenses of the DIP Professionals is made in writing by the Fee Notice Parties within ten (10) calendar days after delivery of such invoices, then, without further order of, or application to, the Court or notice to any other party, such fees and expenses of the DIP Professionals shall be promptly paid by the Debtor. If an objection is made by any of the Fee Notice Parties within the ten-day objection period to the payment of the fees and expenses of the DIP Professionals, then the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtor.

      CC.   <u>Indemnification</u>.

(i)    Without limiting Sections 3.1.12 and 9.4 of the DIP Credit Agreement, the Borrowers shall, jointly and severally, indemnify and hold harmless the DIP Agent, each of the DIP Lenders, their respective affiliates, successors, and assigns and the officers, managers, directors, employees, agents, advisors, controlling persons, and members of each of the foregoing (each, an "Indemnified Person") from and against all losses, claims, damages, costs, expenses (including out-of-pocket fees and disbursements of counsel, limited, in each case of legal and advisory fees, to the documented fees, disbursements and other charges of one outside counsel and one local counsel for all Indemnified Persons, taken as a whole, and, in the case of an actual conflict of interest (as determined by the Required Lenders acting reasonably), one additional outside counsel and local counsel for all similarly situated Indemnified Persons, taken as a whole, which, in the case of any such costs and expenses of the Melody Lenders (but, for the avoidance of doubt, not in the case of any such losses, claims and damages (which shall not be subject to a cap)) and McGinty Lender, shall be limited by the Fee Cap, and excluding in all cases any financial advisory and investment banking fees) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrowers or any of their Affiliates) that relates to the DIP Facility, either DIP Order, the DIP Credit Agreement, any other DIP Document or the transactions contemplated hereby or thereby; *provided*, that, no Indemnified Person will be indemnified for any cost, expense, or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted solely from its actual fraud, gross negligence, or willful misconduct; *provided*

*further*, that copies of the invoices relating to the fees and expenses of any professionals to be paid under this paragraph will be subject to the procedures set forth in Paragraph BB of this Interim Order.

(ii)     No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrowers or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnified Person's actual fraud, gross negligence, or willful misconduct.  In no event, however, shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

(iii)     The indemnities provided by the Debtors pursuant to Section 5.19 of the DIP Credit Agreement shall not apply with respect to an Indemnified Person to the extent finally determined by a court of competent jurisdiction as arising in whole or in part as a result of the actual fraud, gross negligence or willful misconduct of such Indemnified Person, but shall continue to apply to other Indemnified Persons.  In addition, such indemnities shall not include or extend to any Claims (A) incurred or suffered by any of the Indemnified Persons to the extent that such Indemnified Person shall have expressly agreed in Sections 2.3.4, 2.3.5, 2.5.1, 2.5.2, or 9.4 of the DIP Credit Agreement to bear such Claim without right of reimbursement or (B) that have not resulted from an act or omission by a Debtor or its affiliates and has been brought by an Indemnified Person against any other Indemnified Person (other than any claims against the DIP Agent in its capacity as such or in fulfilling its role as an agent or similar role hereafter).

(iv)    The provisions of this Paragraph CC shall survive foreclosure of the DIP Security Documents (as defined in the DIP Credit Agreement) and satisfaction or discharge of the Debtors' joint and several obligations hereunder, and shall be in addition to any other rights and remedies of the Lenders, and may not be amended, modified or waived in a manner adverse to any DIP Lender without each DIP Lender's written consent.

(v)    In case any action, suit or proceeding shall be brought against any Indemnified Person, such Indemnified Person shall promptly notify the Debtors of the commencement thereof, provided that failure to provide any such notice shall not relieve the Debtors of their obligations set forth in this Paragraph CC.

(vi)    Additional provisions relating to indemnity obligations are set forth in the DIP Credit Agreement, which is incorporated as if set forth herein and is fully enforceable in accordance with its terms.

DD.    <u>Release</u>.

(i)    Upon entry of a final order granting such relief , each of the Debtors , on their own behalf and on behalf of their past, present, and future predecessors, successors (subject to the rights set forth in Paragraph VV of this Interim Order, including as to any chapter 7 or chapter 11 trustee appointed in these cases), heirs, subsidiaries, and assigns, agents, representatives, officers, directors, advisors, employees, and affiliates (other than the Sponsor and its equity holders) (collectively, the "<u>Releasors</u>") shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and Prepetition Secured Parties, in all capacities under the DIP Documents and Prepetition Loan Documents and applicable law, each of their respective affiliates,

57

subsidiaries, shareholders and "controlling persons" (within the meaning of federal securities laws), and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, successors and assigns, and predecessors in interest, including in any capacities as representatives for the Prepetition Secured Parties on the Debtors' boards of directors (collectively, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, judgments, liens, and causes of action of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, matured, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description based on or arising from any events, facts or circumstances that have occurred or exist as of the date hereof arising from or relating in any way to any of the DIP Documents and Prepetition Loan Documents or the obligations thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, enforceability, perfection, or avoidability of the DIP Liens, Prepetition Liens, the obligations under the DIP Documents or Prepetition Secured Obligations of the DIP Secured Parties or Prepetition Secured Parties, as applicable (collectively, the "Released Claims").  The Debtors covenant not to sue the Prepetition Secured Parties on account of

the Released Claims.  The Debtors' acknowledgments, stipulations, waivers, and releases shall be binding on the Debtors and their respective representatives, successors (subject to the rights set forth in Paragraph VV of this Interim Order, including as to any chapter 7 or chapter 11 trustee appointed in these cases), and assigns, and on each of the Debtors' estates and, subject to the rights set forth in Paragraph VV of this Interim Order, all entities and persons, including any creditors of the Debtors, and each of their respective representatives, successors, and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, or upon conversion to chapter 7, whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.  Notwithstanding the releases and covenants contained above in this paragraph, such releases and covenants in favor of the Prepetition Secured Parties shall be deemed acknowledged and reaffirmed by the Debtors each time there is a borrowing under the DIP Facility or use of Cash Collateral by the Debtors.

(ii)    Each Releasor shall agree that it shall be, jointly and severally, obligated to indemnify and hold the Releasees harmless with respect to any and all Released Claims or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by or on behalf of any person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of any Releasor or any of their respective subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statute, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the DIP Credit

Agreement and the other DIP Documents or any other document executed and/or delivered in connection therewith; provided, that the Releasors shall not have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the actual fraud, gross negligence or willful misconduct of that Releasee as finally determined by a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Releasor shall agree to make the maximum contribution to the payment and satisfaction thereof that is permissible under applicable law.

(iii)    Each Releasor, on behalf of itself and its successors, assigns, and other legal representatives, shall absolutely, unconditionally and irrevocably, covenant and agree with and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any claim released, remised and discharged by the Releasors pursuant to Paragraph DD(i) of this general release and indemnity.  If any Releasor or any of their respective successors (subject to the rights set forth in Paragraph VV of this Interim Order as to any chapter 7 or chapter 11 trustee appointed in these cases), assigns or other legal representatives violates the foregoing covenant, each Releasor, for itself and its successors, assigns and legal representatives, shall agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

(iv)    The provisions of this Paragraph DD shall survive the termination of the DIP Credit Agreement, the other DIP Documents (including this Interim Order) and

payment in full of the obligations set forth in the DIP Credit Agreement and the other DIP Documents.

(v)     Each Releasor shall acknowledge that it may hereafter discover facts different from or in addition to those now known or believed to be true with respect to such Released Claims and shall agree that the DIP Credit Agreement and the other DIP Documents shall be and remain effective in all respects notwithstanding any such differences or additional facts.  Subject to the rights set forth in Paragraph VV of this Interim Order, this Paragraph DD shall be and remain in full force and effect notwithstanding the discovery by any Releasor after the effective date:  (a) of any new or additional Claim against any Releasee; (b) of any new or additional facts in any way relating to this release; (c) that any fact relied upon by it was incorrect; or (d) that any representation or warranty made by any Releasee was untrue or that any Releasee concealed any fact, circumstance or claim relevant to a Releasor's execution of this release. Each Releasor understands, and shall acknowledge and agree that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release.

EE.     <u>Proofs of Claim</u>.  The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases for any claim allowed herein.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce an unnecessary expense to the Debtors' estates, each of the Prepetition Agents is authorized to file in the Debtors' lead chapter 11 case *In re Furie Operating Alaska, LLC*, No. 19-11781 (LSS), a master proof of claim on behalf of its respective

Prepetition Secured Parties on account of any and all of their respective claims arising under the applicable Prepetition Loan Documents and hereunder (each, a "Master Proof of Claim") against each of the Debtors.  Upon the filing of a Master Proof of Claim by any the Prepetition Agents, such entity shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors of any type of nature whatsoever with respect to the applicable Prepetition Loan Documents, and the claims of each applicable Prepetition Secured Party (and each of its respective successors and assigns), named in a Master Proof of Claim shall be treated as if such entity had filed a separate proof of claim in each of these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to identify whether any Prepetition Secured Party acquired its claim from another party and the identity of any such party or to be amended to reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from the transfer of all or any portion of such claims.  The provisions of this paragraph DD and each Master Proof of Claim are intended solely for the purpose of administrative convenience and shall not affect the right of each Prepetition Secured Party (or its successors in interest) to vote separately on any plan proposed in these Chapter 11 Cases.  The Master Proofs of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the applicable Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to the Prepetition Agent.

FF.    Limitation on Investigation.  No proceeds of DIP Loans, the DIP Collateral, the Prepetition Collateral, Cash Collateral, the Carve-Out, or any other amounts may be used directly or indirectly by any of the Borrowers, any Creditors' Committee or any other official committee appointed in these Chapter 11 Cases, or any trustee or other estate representative appointed in

these Chapter 11 Cases or any Successor Cases or any other person for any of the following actions or activities:

(i)       investigating, objecting to, challenging, or contesting in any manner, or in raising any defenses to, the amount, validity, extent, perfection, priority, enforceability, or avoidability of Prepetition Secured Obligations, or any liens or security interests with respect thereto, or any other rights or interests of any of the Prepetition Secured Parties, whether in their capacity as such or otherwise, including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the Prepetition Secured Parties (whether in their capacity as such or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; *provided* that up to $50,000 of Cash Collateral shall be made available to the Creditors' Committee for fees and expenses incurred in connection with any investigation of (but not preparing, drafting, or filing any documents or pleadings objecting to, challenging, or contesting in any manner, or raising any defenses to) the Liens of the Prepetition Secured Parties and alleged claims against them, prior to the Challenge Deadline (as defined below);

(ii)      paying any amount on account of any claims arising before the Petition Date unless such payments are (x) expressly agreed by the Required Lenders acting reasonably and consistent with the Interim Order and any critical vendor or similar order entered by the Bankruptcy Court, as applicable, and as provided for in the Approved Budget or (y) made by the State of Alaska in respect of the Prepetition Tax Credit Priority Collateral to be applied to the Prepetition Tax Credit Obligations.

GG.     <u>Access to the Debtors</u>.  In accordance with the provisions of access in the DIP Documents, the Debtors shall:  (i) permit any representatives, agents, and/or employees of the DIP Agent and their respective professionals to have commercially reasonable access to their premises and books and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' businesses); and (ii) cooperate, consult with, and provide to such representatives, agents, and/or employees all such information, documents, and records as they may reasonably request.

HH.     <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

II.     <u>Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases at any time shall be charged against the DIP Secured Parties and the Prepetition Secured Parties or any of their respective claims, the DIP Collateral, or any Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

JJ.     <u>Section 552(b)</u>.  Upon entry of the Final Order granting such relief, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the DIP Secured Parties and the Prepetition Secured Parties, with respect to proceeds, products, offspring, or profits of any Prepetition Collateral.

KK.     <u>No Marshaling/Application of Proceeds</u>.  Upon entry of the Final Order granting such relief, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP

Collateral or any Prepetition Collateral, as the case may be, and all proceeds shall be received and applied in accordance with the DIP Documents.

LL.    <u>Discharge Waiver</u>.  The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan in these Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash (or otherwise treated in a manner satisfactory to the DIP Agent) on or before the effective date of such confirmed chapter 11 plan or the Credit Bid Exit Financing Scenario occurs.  Other than in the case of the Credit Bid Exit Financing Scenario, it shall be an event of default under the DIP Credit Agreement for any of the Debtors to propose or support any chapter 11 plan or sale of all or substantially all of the Debtors' assets or entry of any confirmation order or sale order that is not conditioned upon the indefeasible payment in full in cash of the DIP Obligations  on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale.

MM.    <u>Rights Preserved</u>.  The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (i) the DIP Secured Parties' and the Prepetition Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (ii) any of the rights of any of the DIP Secured Parties and the Prepetition Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including the right to (a) request modification of the automatic stay of section 362 of the Bankruptcy Code or (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (iii) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties and the Prepetition Secured Parties.

NN.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Secured Parties and the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Secured Parties and the Prepetition Secured Parties.

OO.    <u>Binding Effect of Interim Order</u>.  Immediately upon execution by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of the Debtors, any Creditors' Committee, any other statutory committee that may be appointed in these Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of these Chapter 11 Cases, any Successor Cases, or upon dismissal of any of these Chapter 11 Cases or Successor Cases.

PP.    <u>Effect on Certain Pre-Petition Agreements</u>.  Except as expressly set forth in this Interim Order the terms and conditions, validity, and enforceability of the Prepetition Loan Documents shall not be affected by this Interim Order.

QQ.    <u>Right to Seek Modification</u>.  The Debtors retain the right to seek any modification or extension of this Interim Order (in whole or in part) with the prior consent of each DIP Lender, acting reasonably, and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Agent or the Required Lenders acting reasonably; *provided*, that any modification or extension of this Order (in whole or in part) without the prior consent of each DIP Lender shall constitute an Event of Default pursuant to the DIP Credit Agreement..

RR.    <u>Survival</u>.

(i)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any chapter 11 plan in any of these Chapter 11 Cases, (b) converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any of these Chapter 11 Cases or any Successor Cases, or (d) pursuant to which this Court abstains from hearing any of these Chapter 11 Cases or Successor Cases.

(ii)    The terms and provisions of this Interim Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Secured Parties and the Prepetition Secured Parties, pursuant to this Interim Order and/or the DIP Documents, notwithstanding the entry of any such order, shall continue in these Chapter 11 Cases, in any Successor Cases, or following dismissal of these Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until, (a) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full and all commitments to extend credit under the DIP Facility are terminated, and (b) in respect of the Prepetition Credit Agreements, all of the Prepetition Secured Obligations have been indefeasibly paid in full. The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in these Chapter 11 Cases, in any Successor Cases, following dismissal of these Chapter 11 Cases or any Successor Cases, termination of the DIP Documents, and/or the indefeasible repayment of the DIP Obligations.

SS.    <u>Effect of Dismissal of these Chapter 11 Cases</u>.  If these Chapter 11 Cases are dismissed, converted, or substantively consolidated, then neither the entry of this Interim Order

nor the dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall affect the rights of the DIP Secured Parties and the Prepetition Secured Parties (as to the Adequate Protection) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Secured Parties and the Prepetition Secured Parties shall remain in full force and effect as if these Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  Notwithstanding the entry of an order dismissing any of these Chapter 11 Cases at any time, (i) the Adequate Protection Liens, DIP Liens and the Superpriority Claims granted to and conferred pursuant to this Interim Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and the Prepetition Secured Obligations shall have been paid and satisfied in full and all commitments to lend under the DIP Documents have been terminated, and (ii) the Court shall retain jurisdiction, notwithstanding such dismissal, to the extent allowed by applicable law, for the purpose of enforcing the DIP Liens, the Superpriority Claims, and the Adequate Protection Liens granted in this Interim Order and the DIP Documents.

TT.    <u>Conflicts</u>.  In the event of any inconsistency between the terms and conditions of the New Side Letter, this Interim Order, and the DIP Credit Agreement, the provisions of the New Side Letter, the Interim Order, and the DIP Credit Agreement shall control in the following order: *first*, the applicable provision of the New Side Letter (but solely with respect to the parties thereto); *second*, this Interim Order; and *last*, the DIP Credit Agreement.

UU.    <u>Retention of Jurisdiction</u>.  Notwithstanding any provision in the DIP Documents or the Prepetition Loan Documents, the Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order, the DIP Facility, or the DIP Documents.

VV.    <u>Challenge Deadline</u>.  The stipulations and releases of the Debtors contained in Paragraphs 19 and DD of this Interim Order (a) shall be binding upon the Debtors for all purposes; and (b) shall be binding upon all other parties in interest, including any statutory committee, for all purposes unless (1) a party (subject in all respects to any agreement or applicable law which may limit or affect such entities right or ability to do so) has properly filed an adversary proceeding or contested matter by no later than 75 days from the Petition Date (or, in the case of any Creditors' Committee, if appointed within 30 days of the Petition Date, 60 days from the date of such appointment, if appointed after 30 days of the Petition Date, then 75 days from the Petition Date ) (such applicable period of time, the "<u>Challenge Deadline</u>"); *provided*, however, that if these cases convert to cases under chapter 7, or if a chapter 11 trustee is appointed, prior to the Challenge Deadline, that the Challenge Deadline shall be extended for the chapter 7 or chapter 11 trustee to 45 days after their appointment), (x) challenging the extent, priority, validity, perfection, amount, or allowability of the Prepetition Loan Documents or the Prepetition Agents' or the Prepetition Secured Parties' security interests in and liens upon the Prepetition Collateral, or (y) otherwise asserting any claims or causes of action against the Prepetition Agents or the Prepetition Secured Parties on behalf of the Debtors' estates; and (2) the Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is properly filed as of such dates or the Court does not rule in favor of the plaintiff in any such proceeding, then: (a) the stipulations and releases contained in this Interim Order shall be binding on all parties in interest, including any statutory committee; (b) the obligations of the Debtors under the Prepetition Loan Documents shall constitute allowed claims for all purposes in these Chapter 11 Cases and any Successor Cases; (c) the Prepetition Agents' and the Prepetition Secured Parties'

security interests in and liens upon the Prepetition Collateral shall be deemed to have been, as of Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination or otherwise avoidable; and (d) the Prepetition Secured Obligations and the Prepetition Agents' and the Prepetition Secured Parties' security interests in and liens on the Prepetition Collateral shall not be subject to any other or further challenge by any statutory committee or any other party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto.  If any such adversary proceeding or contested matter is properly filed as of such dates, the stipulations and releases contained in this Interim Order shall remain binding and preclusive (i) on any a party who did not file such adversary proceeding or contested matter; *provided*, that this provision shall not limit creditors and other persons and entities from benefitting from any successful challenge brought by any statutory committee or chapter 7 or 11 trustee, and (ii) as to any party who did file such adversary proceeding or contested matter, except to the extent that such admissions and releases were challenged in such adversary proceeding or contested matter.  Nothing contained in this Interim Order shall be deemed to grant standing to any party to commence any such adversary proceeding or contested matter.

WW.   Prepetition Intercreditor Agreement.   Nothing herein shall in any way affect, impair, or diminish the rights and remedies of any party to the Prepetition Intercreditor Agreement with respect thereto.

XX.   Waiver of Applicable Stay.   Any applicable stay (including, without limitation, under Bankruptcy Rule 6004(h)) is hereby waived and shall not apply to this Interim Order.

YY.    <u>New Side Letter</u>.  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, nothing herein shall approve the New Side Letter or any of the terms thereof and the Debtors are not bound by the New Side Letter or the terms thereof.

ZZ.    <u>Final Hearing</u>.  A Final Hearing on the Motion shall be heard before the Court on **September 11, 2019 at 2:30 p.m.** (**Eastern Standard Time**) at the United States Bankruptcy Court for the District of Delaware.  Any party-in-interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file the same with the Court (with a courtesy copy to chambers) and serve such objection no later than **September 4, 2019 at 4:00 p.m.** (**Eastern Standard Time**) on (i) the Debtors, Furie Operating Alaska, LLC, 188 W. Northern Lights Blvd., Anchorage, Alaska Attn: David Elder (d.elder@furiealaska.com); (ii)  counsel for the Debtors, McDermott Will & Emery LLP, 340 Madison Avenue, New York, NY  10173,  Attn:  Timothy  W.  Walsh  (twwalsh@mwe.com)  and  Riley  T.  Orloff (rorloff@mwe.com); (iii) proposed co-counsel for the Debtors, Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, DE 19801, Attn: Matthew P. Ward (matthew.ward@wbd-us.com)  and  Ericka  F.  Johnson  (Ericka.johnson@wbd-us.com);  (iv) counsel to DIP Agent and Prepetition Term Loan Administrative Agent, Kirkland & Ellis LLP, 300  North  LaSalle  Street,  Chicago,  Illinois  60654,  Attn:  Chad  J.  Husnick,  P.C. (chad.husnick@kirkland.com) and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: George Klidonas (george.klidonas@kirkland.com); (v) co-counsel to DIP Agent and Prepetition Term Loan Administrative Agent, Richards Layton & Finger, One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins (collins@rlf.com); (vi) counsel to the Melody Lenders, Milbank LLP, 55 Hudson Yards, New York  10001,  Attn:  Abhilash  M.  Raval  (araval@milbank.com)  and  Lauren  C.  Doyle

(ldoyle@milbank.com); (vii) counsel to the McGinty Lender, Stinson LLP, Attn: Adam M. Nathe (adam.nathe@stinson.com); and (viii) the Office of the United States Trustee for the District of Delaware, Region 3, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Juliet Sarkessian (Juliet.M.Sarkessian@usdoj.gov).

AAA. This Interim Order, and the notice of the final hearing and objection deadline related thereto, and the Motion shall be served on the largest 30 unsecured creditors of the Debtors; any Committee (if and when it is appointed); all parties known to the Debtors to be asserting liens against or security interest in, any of the collateral that is the subject of this Interim Order; the Internal Revenue Service; all state taxing authorities in the states in which the Debtors have any tax liabilities; any federal or state regulatory authorities governing the Debtors' industry; the Environmental Protection Agency and state environmental agencies in the states in which the Debtors operate; the U.S. Attorney's Office, Delaware Attorney General; the U.S. Trustee; and any party filing a request for service under Bankruptcy Rule 2002 in these cases.

SO ORDERED by the Court this _____day of _____, 2019.

72

**LAURIE SELBER SILVERSTEIN**
**UNITED STATES BANKRUPTCY JUDGE**

Dated: August 14th, 2019
Wilmington, Delaware