## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FURIE OPERATING ALASKA, LLC, *et al.*, | Case No. 19-11781 (LSS) |
| Debtors. | (Jointly Administered) |

## <u>DECLARATION OF DAVID W. ELDER</u>

I, David W. Elder, do hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.    I am over the age of 21.  Based on my review of relevant documents and/or participation to some extent in the events in question, I have personal knowledge of, and am competent to testify to, the matters set forth below.

2.    I am the Chief Financial Officer of Furie Operating Alaska, LLC ("Furie"), Cornucopia Oil & Gas Company, LLC ("Cornucopia"); and Corsair Oil & Gas, LLC ("Corsair") (collectively and/or individually, the "Debtors").

3.    I am providing this declaration in response to the following motions (collectively, the "Standing Motions") in the above-captioned case:

   a.    *The Amended Motion of Bruce Webb and the Webb Family Trust (A) Seeking Authority and Standing to Pursue Derivative Claims, if any, (B) Requesting an Extension of the Challenge Deadline, and (C) Requesting Conversion of Cases to Chapter 7, or Alternatively, Appointment of Chapter 11 Trustee* (Docket No. 283) (the "Webb Standing Motion"); and

   b.    *The Motion of Certain Royalty and Working Interest Owners for Entry of an Order (i) Determining Nature of Certain Claims and (ii) if Necessary, Granting Leave, Standing and Authority to Prosecute and, if Appropriate, Settle Certain Claims on Behalf of the Debtors' Estates* (Docket No. 285) (the "RWIO Standing Motion").

I have reviewed the Standing Motions and their exhibits.

**Personal Background**

4.      I have served as the Chief Financial Officer ("CFO") for some or all of the Debtors (or their predecessors in interest) since November 2010.[1]

5.      I have extensive background in corporate finance, accounting, financial reporting, and capital budgeting and forecasting.

6.      I graduated from Eastern Michigan University in 1981 with a B.B.A. in Accounting while working full time as a welder for General Motors Assembly Division.  I began my career at Primark Corporation in May 1981 as a finance trainee, holding positions in accounting, financial planning and was Senior Financial Specialist from 1983 through 1987.   While working full time, I also attended the University of Detroit School of Law and received various awards and honors, earning a Juris Doctorate in 1988.

7.      From 1988 to 1995, I was the Vice President of Corporate Finance at USAA, where I was responsible for management of all external and internal financing activities.  I then served as Senior Vice President and CFO of the Llama Company, where I was responsible for all financial reporting , financial planning and analysis and accounting.  Thereafter, I served as the Director of Corporate Finance of The Associates Company, where I held positions in the Corporate Treasury, Corporate Planning, and Consumer Planning divisions until 2000.

8.      From 2000 to 2001, I worked at American General Corp. as the Director of Corporate Finance, where I oversaw management of over $11 billion in direct commercial paper programs, $1 billion in term funding, and over $1 billion in derivatives.  I then worked as a Credit Analyst for 40/86 Mortgage until 2004, when I served as the CFO of Basic Construction Company

---

[1] With the exception of a brief absence between September 2011 and November 2011, explained below.

until 2009.  Shortly thereafter, I was hired as the CFO of Furie's predecessor company, Escopeta Oil Co., LLC ("Escopeta Oil"), in November 2010.

**Summary Response to the Movants' Allegations in the Standing Motions**

9.      I have read the Standings Motions, including the proposed First Amended Verified Complaint attached as Exhibit B to the Webb Standing Motion (the "Webb Complaint") and the Draft Complaint attached as Exhibit A to the RWIO Standing Motion (the "RWIO Complaint"). I refer to the Webb Complaint and the RWIO Complaint collectively as the "Complaints".

10.      In the Complaints, the Movants accuse Energy Capital Partners ("ECP"), Ankura Consulting Group, LLC ("Ankura"), Petrotechnical Resources of Alaska, LLC ("PRA"), Scott Pinsonnault ("Pinsonnault"), and me (collectively, the "Proposed Defendants") of various forms of mismanagement, negligence, and misconduct relating to the operations and management of the Debtors.  These allegations are false or misleading.

11.      To summarize my response to the Movants' allegations, as detailed further below:

a.    The Movants seek to misdirect blame for their own mismanagement and misconduct, and that of others – particularly the Debtors' former sole manager, Kay Rieck ("Rieck") as well as Movants Bruce Webb ("Webb"), Danny Davis ("Davis") and Allen Lawrence Berry ("Berry") – that began in 2011 and occurred during the years preceding the Proposed Defendants' involvement with the Debtors', and/or independent of any involvement or responsibility of the Proposed Defendants, including me.

b.    Many (if not all) of the problems, costs, and damages that are the subject of the Movants' complaints, including those that arose during the 2018 and 2019 drilling seasons and that the Movants inaccurately claim resulted from the mismanagement and negligence of Pinsonnault, Ankura, PRA or myself, are in fact the result of the Movants' or Rieck's mismanagement and misconduct occurring prior to April 2019.

c.    Specifically, and among other things, I understand that:

i.    the Debtors incurred over $60 million in costs associated with Movants' Davis' and Berry's failure to obtain a waiver of the Jones Act in 2011;

3

ii. Rieck and Rieck's operational management team (of which I was not a part) mismanaged the construction of the Debtors' drilling infrastructure in 2013-2015, resulting over $300 million in over-budget expenditures;

iii. Rieck and Webb imprudently entered into onerous take-or-pay gas supply contracts, which obligated the Debtors to supply volumes of gas that they were incapable of delivering and which resulted in significant penalties; and

iv. Rieck and Rieck's operatives, including Webb, provided PRA, Pinsonnault, Ankura, and ECP with inaccurate information and perpetuated fundamentally flawed assumptions as to the KLU's natural gas reserves that undermined PRA and Pinsonnault's best efforts to increase production in order to meet the impossible demands of the supply contracts that Rieck and Webb entered into prematurely.

d. There was no "hostile takeover" of the Debtors' management perpetrated by ECP and/or Ankura, Pinsonnault, or me. Nor was Rieck improperly coerced into executing any lending agreements or company agreements. To my knowledge, the lending agreements and company agreements that were required by such lending agreements were entered into at arms' length, with the assistance of counsel, and in due consideration for the hundreds of millions of dollars that ECP provided in critical funding to the Debtors, even after the Debtors, under Rieck's ownership and control, repeatedly defaulted on the various ECP loans.

e. No natural gas reserves were "destroyed". The $830 million that Webb claims is only *the difference between the estimated value of reserves based on prior, inaccurate reports* from 2016 and 2017 and the *value of proven reserves reported in current, more accurate estimates*. The 2016 and 2017 reserve reports did not account for the large volume of naturally-occurring water (which displaces and dilutes gas) in the geologic formation where the majority of the Debtors' reserves where purportedly located. Thus, the decrease in proven reserves between the 2016 and 2017 reports and the 2019 report is a reflection of more accurate data and *the reserves that Webb claims were "destroyed" never existed in the first place*.

f. I never conspired with ECP for the purpose of obtaining a renewal of my employment contract with the Debtors (or any other purpose). In fact, as I understand it, the Debtors' applicable lending agreements with ECP required that I have an employment contract.

g. I never provided any confidential information to ECP, or any other party, at any time, for any improper purpose or in breach of any agreement, including my employment agreement with the Debtors. Any information that I provided ECP concerning any of the Debtors' was consistent with my duties and responsibilities as the Debtors' CFO and consistent with the Debtors' obligations to disclose certain information ECP pursuant to the Debtors' lending agreements with ECP.

h.   I have never taken or received any improper payment, kickback, bribe or any other remuneration at the expense of the Debtors, or otherwise. The only payments I received was my compensation and reimbursement for expenses per my employment agreement.

i.   I was not responsible for the operational and drilling-related decisions that are the subject of the Movants' Complaints.  As CFO, I was not responsible for operational decisions, and I performed my duties at all times in good faith, to the best of my abilities, and in the exercise of my informed business judgment.

j.   My monthly expenses averaged under $5,000 for the last three years, including travel expenses.  I am not aware of any $58,000 invoice identifying my expenses, nor did I ever submit such an invoice, as alleged in the Webb Complaint.  Moreover, I am not aware of any charge for "Misc. vendor for clearing" in the amount of $1,483,760, as alleged in the Webb Complaint, nor did I ever receive that amount, or any other amount, other than as described herein.

**Background**

12.    The Debtors were formed under the name Escopeta Oil Co., LLC and Escopeta Oil of Alaska, LLC ("Escopeta Alaska", together with Escopeta Oil, "Escopeta") by Movants Davis and Berry as an oil and gas exploration company operating in the Kitchen Lights Unit ("the "KLU"), an 83,000 acre development region in the Cook Inlet in Alaska.  Together with certain individuals, including Davis and Berry, and other entities – including Movants the 2007 Allen Lawrence Berry Trust (the "Berry Trust"), Giza Holdings, LLC, and Taylor Minerals, LLC (collectively, the "Working Interest Owners") – the Debtors acquired the rights and working interest in a large tract of oil and gas leases in the KLU (the "KLU Oil and Gas Leases"). Managed by Davis, the Debtors sought to begin drilling in the KLU in May 2011.

13.    As discussed, I was hired by Davis in November 2010 to serve Escopeta Oil's CFO. In or around that time, I was introduced to Webb, who was also employed as a contractor by Escopeta and had worked for Davis over a number of years in various capacities.

**The Jones Act Violation**

14.     At or about the time that I began working with the Debtors, I came to understand that in order to begin drilling operations, the Debtors needed to secure a rig.  At the time, there were no available jackup drill rigs located anywhere near the KLU.  Davis had to look elsewhere, and executed a drilling contract with Spartan Offshore Drilling, LLC ("Spartan"), on August 26, 2010 (the "2010 Spartan Contract" or the "2010 Contract"), to charter the Spartan 151 jackup rig (the "Spartan Rig"), which was located in the Gulf of Mexico and required transportation to Alaska.

15.     Paragraph 27 of the Webb Complaint alleges there were "issues" with the delivery of the Spartan Rig, and paragraph 28 of the Webb Complaint alleges that "[s]everal contracts were severely over budget".  But the Webb Complaint omits that these "issues" and budget overruns – which cost the Debtors tens of millions of dollars – arose from Davis's and Berry's failure to obtain a waiver of the Jones Act, 46 U.S.C. § 55102 (the "Jones Act").[2]

16.     I understand that the Jones Act is a federal law that regulates maritime commerce in the United States and requires that, absent a waiver, goods shipped between U.S. ports are transported on ships that are owned and operated by United States citizens or permanent residents.

17.     I also understand that Davis represented to Spartan that the Debtors had obtained such a waiver in order to use a Chinese ship to transport the Spartan Rig from the Gulf of Mexico to Alaska.  I later learned that Davis had not, in fact, obtained a Jones Act waiver for the Spartan Rig.  Rather, Davis apparently assumed that, because he had previously obtained such a waiver in

---

[2]  As the Debtors' manager at the time, Davis negotiated the Spartan Contract and, as I understand it, was primarily responsible for the failure to obtain the Jones Act waiver.  However, Berry was also the Debtors' co-owner at the time.

2006, there was no need to obtain one in 2011.  Davis's failure to do so ultimately resulted in significant cost to the Debtors, as detailed below.

18.     After Davis entered into the 2010 Contract, a group of German Investors, led by Kay Rieck ("Rieck"), purchased 79 percent of the working interest in the KLU Oil and Gas Leases for approximately $21 million through Deutsche Oel & Gas AG (now operating as Brutus AG ("Brutus")).  Rieck owns and controls Brutus through its parent company, Deutsche Oel & Gas, SA ("DOGSA"), as well as a network of affiliated entities that operate in the oil and gas industry. Through one or more of these companies, Rieck also purchased Escopeta Alaska.

19.     Without a waiver, the Debtors (then Escopeta) breached the 2010 Contract in May 2011.  A true and complete copy of Spartan's Notice of Default sent to Davis, dated May 7, 2011 (the "Notice of Default") is attached as <u>Exhibit 1</u> in the appendix of exhibits (the "Appendix").  The Notice of Default states, in pertinent part:

> ***The Contract contemplates that Escopeta will obtain the necessary Jones Act waiver to enable the Rig to sail to and from the Cook Inlet to perform drilling operations***.  Moreover, the letter agreement between Spartan and Escopeta, dated March 16, 2011 (the "Jones Act Agreement"), specifically provides that Escopeta is responsible for acquiring such Jones Act waiver.  Escopeta, after more than six months, has thus far failed to obtain said waiver and, based on information now at hand, it is quite reasonable to believe that Escopeta will be unable to do so. Furthermore, Spartan entered into the Jones Act Agreement as an accommodation to Escopeta and as a condition precedent to our agreement to relocate the Rig to Freeport, Texas. It has since come to our attention that, ***despite representations made by you prior to entering into said agreement that you fully expected to be able to obtain the Jones Act waiver, that you in fact knew in advance of entering into the agreement that your request for a waiver had already been denied***.

 (Ex. 1 at DA00002-3) (emphasis added.)

20.     In the wake of this default, Spartan increased the daily rates and negotiated additional charges, including a $4 million risk premium payment, costing the Debtors over $10 million to keep Spartan from terminating the contract.  As a result, Rieck and the German Investors had to pay out another $20 million to cover the Debtors' mounting costs.

21.    At or about this time, Rieck (through Escopeta Alaska) acquired Escopeta Oil from Davis and Berry, as well as an additional one percent of the working interest in the KLU Oil and Gas Leases.  As part of the deal, Davis and Berry agreed by letter dated June 29, 2011, a true and complete copy of which is attached as Exhibit 2 in the Appendix, to assume personal responsibility for any fine imposed on the Debtors for violating the Jones Act.

22.    Escopeta Alaska was thereafter renamed Cornucopia Oil & Gas, LLC and Escopeta Oil became Furie Operating Alaska, LLC.[3]  The Debtors' new management team included Edward Oliver ("Oliver") as President, Thomas Hord ("Hord") as Chief Operating Officer ("COO"), Michael A. "Tony" Nunes ("Nunes") as counsel.  Webb was eventually hired as Vice President, Government Affairs.

23.    I remained Furie's CFO until September 15, 2011, when I briefly resigned due to concerns about poor management and the difficult working environment created by internal disagreements within the Debtors' management, primarily between Hord and Oliver.  Oliver was later replaced. I was re-hired by Rieck as the CFO for all the re-organized Debtors shortly thereafter.

24.    Davis never obtained a Jones Act waiver for the Spartan Rig.  I understood that with up to $70 million in investment on the line and already in danger of defaulting on related obligations to the State of Alaska, the Debtors had no choice but to proceed with the delivery in violation of the Jones Act.

25.    On October 13, 2011, the Department of Homeland Security ("DHS") assessed a $15 million penalty against the Debtors – the largest-ever fine ever for a Jones Act violation. This fine was subsequently reduced to a $10 million penalty as part of a settlement agreement.

---

[3] Corsair was later formed on June 26, 2014.

A true and complete copy of the Settlement Agreement and Mutual Release of Claims, dated February 3, 2017 (the "Jones Act Settlement Agreement"), between the Debtors and DHS, is attached as Exhibit 24 in the Appendix.

26.     Notwithstanding its reduction, this penalty remains a substantial burden to the Debtors, and requires installment payments of over $1 million annually, with over $7 million still owed to the Government.  In addition, as described below, the Debtors incurred other significant costs in connection with the Jones Act violation.

27.     *First*, there were costs associated with the inability of the Spartan Rig to enter a U.S. port given the lack of waiver.  The Spartan Rig's transport would not enter a U.S. port until Davis obtained a waiver.  In the meantime, the Spartan Rig was towed up and down the Canadian Coast until May 31, 2011, the date originally scheduled for arrival in the KLU.  From June through August 2011, the Spartan Rig was laid up until the Debtors secured permission to proceed to Alaska (and the inevitable penalty).  This delay caused over $700,000 in demurrage charges (i.e. the additional time as cargo), $830,000 in layup costs, and $300,000 for towing.[4]

28.     *Second*, there were also costs associated with delays in drilling caused by the Spartan Rig's delayed arrival.  Because the Spartan Rig did not arrive until August 11, 2011, the Debtors were unable to begin drilling until September 5, 2011.  As a result, there was not enough time to complete a finished well to use the next year before the drilling season closed at the end of October 2011.  Between the lost production value and the cost of finishing the incomplete well (which had to be fully re-drilled the next season), the Debtors wrote off an additional $36 million in losses over the 2011 and 2012 drilling seasons.

---

[4] These costs are in addition to the $11 million that Furie was forced to pay Spartan in rate increases, risk premiums, and other charges as a result of defaulting on the 2010 Contract.

29.    In total, by my calculation, Davis's failure to obtain a Jones Act waiver cost the Debtors over $62 million in costs, fees, and penalties – none of which is mentioned in the Complaints.

30.    Although Davis's failure to obtain a Jones Act waiver occurred before, and independent of, any involvement by myself or any of the other Proposed Defendants, that failure, combined with other mismanagement on the part of the Debtors' former management (discussed herein), is responsible for many (if not all) of the problems for which the Proposed Defendants now stand accused.

### The 2013 NSAI Reserve Report

31.    As a result of the Jones Act-related issues discussed above, the Debtors faced both severe cash shortages and critical deadlines through 2012.  These constraints placed Rieck under immense pressure to secure (1) financing to complete essential production infrastructure; and (2) gas supply contracts to ensure cash flow.  The Debtors' survival depended on both, but Rieck could not secure either financing or supply contracts without proof – including reserve reports, discussed below – that the Debtors could produce and deliver the oil and gas purported to be in the KLU.  Thus, it was essential to demonstrate the productive capabilities of the KLU as soon as possible.

32.    The KLU's gas reserves at issue are generally found in two geologic formations, the Sterling Formation (the "Sterling") and the Beluga Formation (the "Beluga").  The Sterling holds the majority of the KLU's gas reserves, and is divided into two zones, the Upper Sterling and the Lower Sterling.  Together with the Beluga, the Upper and Lower Sterling were purported to hold significant natural gas reserves, which were the primary target of the Debtors' drilling operations.

33.    But tapping into these reserves proved to be a difficult task.   The first two exploration wells that the Debtors drilled were unproductive.  By the end of 2012, the Debtors still had not completed a single producing well, were in danger of default on working obligations to the State, and were constantly short of the cash needed to pay for the drilling operations.

34.    The Debtors' third exploration well (KLU-3) finally hit gas in the summer of 2013, tapping into the Sterling and the Beluga.  Netherlands, Sewell, & Associates, Inc. ("NSAI"), a leading oil and gas engineering and consulting firm retained by the Debtors, reported 59 billion cubic feet ("BCF") – a significant volume – in "proven" natural gas reserves (the "2013 NSAI Reserve Report").  A true and complete copy of the 2013 NSAI Reserve Report, dated as of December 31, 2013 and issued on February 26, 2014, is attached as Exhibit 5 in the Appendix.

35.    Reserve reports issued by reputable firms such as NSAI provide the audited basis for the Debtors' viability in terms of productive capabilities, as measured by proven reserves. In promotional materials for potential investors, Rieck supplemented the 2013 NSAI Reserve Report with reports provided by Sierra Pine International Resources, Inc. ("SPRI") and SPRI's President and CEO, Bruce Ganer ("Ganer").  Attached as Exhibit 6 in the Appendix is a true and complete copy of a DOGSA presentation dated April 16, 2014, including SPRI's estimate of over 200 BCF in proven reserves – ***four times greater than the estimates in the 2013 NSAI Reserve Report***.  (Ex. 6 at DA00124.)

36.    Proven reserves (i.e., quantities of oil or gas that are reported to a 90 percent certainty to be readily available for production and sale) were essential to the Debtors both in terms of securing much-needed financing and in terms of production value.  Proven reserves – as opposed to contingent reserves (i.e., oil and gas quantities that, dependent on certain variables and to varying probabilities, *may* be available for production) – are a direct indicator of an oil or gas

company's value (or potential value) for investment and acquisition purposes.  Large quantities of proven reserves also demonstrate that a company is capable of servicing large-scale supply contracts that are worth hundreds of millions of dollars.

37.    Based upon my experience, however, proven reserves are only *estimates*, based upon available data at the time.  These estimates will necessarily change over time as more data is obtained through further exploration, testing, and actual production.  Each additional well, particularly additional production wells (as opposed to exploration wells), provides exponentially more data than a single well.  As a result, initial estimates (particularly those provided by only a single production well) do not necessarily translate into productive capabilities and deliverability, which are the ultimate measure of success in the oil and gas industry and are confirmed only through sustained production from completed production wells.

**2013 Tests Indicate the Presence of Water in the Sterling**

38.    The 2013 NSAI Reserve Report's estimated 59 BCF in proven reserves was based solely upon testing from the KLU-3, which, as discussed, provided limited data.  But, importantly, the KLU-3's preliminary tests showed that while the Beluga and Upper Sterling produced "dry" gas (i.e., gas produced without the presences of water), the Lower Sterling produced "wet" gas (i.e., gas mixed with water).

39.    I understand that the presence of wet gas is significant for multiple reasons.  *First*, water dilutes and displaces gas, which decreases volume of gas available for production and sale.  As a result, the discovery of large volumes of water in formations thought to contain only dry gas (such as the Sterling) necessarily reduces the volume of proven reserves in previous estimates.  *Second*, although the presence of water does not altogether inhibit production, it adds costs (which may be significant) and logistical problems – namely, transporting the mixed water

and gas, separating the gas from the water, and then disposing of the water (referred to as "wastewater").

40.     According to Ganer's representations to the Debtors' management team, including me, the wet gas that was produced from the Lower Sterling in 2013 was expected, and was isolated to a specific depth and zone in that part of the formation.  Although I understand concepts associated with the drilling and production of natural gas (i.e., more water means less gas), I am not a drilling engineer or an expert in such matters, and I do not fully understand why the assumption persisted that only this specific zone of the Lower Sterling would produce water. But given that I came to understand the negative implications associated with the Lower Sterling's significant water production, I later raised the issue at multiple meetings.

41.     Nonetheless, and despite test results indicating otherwise, the prevailing view was that the Sterling would ***not*** produce large volumes of water.  This assumption was supported by the engineers and experts, including SPRI and Ganer, upon whom the Debtors relied at the time, and was promoted by Rieck in his efforts to secure financing and contracts (as demonstrated by Exhibit 6 in the Appendix).

42.     As discussed below, however, these assessments were later proved wrong. Notably, ECP, PRA, and Ankura were not involved at the time or responsible for these assessments.

**Mismanagement in Completing Drilling Infrastructure in 2014 and 2015**

43.     Based on the 2013 NSAI Reserve Report and the SPRI's more aggressive reserve estimates, Rieck secured the Debtors' first gas supply contract with Homer Electric Association ("Homer") on June 26, 2014 (the "Homer Contract"), obligating the Debtors to supply Homer with 4 BCF of gas per year beginning in January 2015.  Significantly, the Homer Contract was a "take-or-pay" contract – meaning that, if the Debtors failed to meet production requirements,

the Debtors would have to purchase whatever they failed to produce from other producers at market price and deliver that gas to Homer.

44.     Notwithstanding these obligations, Rieck was now armed with the revenue streams inbound from the Homer Contract and reserve estimates from NSAI and SPRI to secure the critical financing that the Debtors required in order to continue their operations.  On July 15, 2014, the Debtors entered into a Credit Agreement with ECP (the "ECP Credit Agreement"), a true and complete copy of which is attached as Exhibit 8 in the Appendix, providing $160 million in funding to complete the installation of production infrastructure.

45.     At that point, as the Debtors' CFO, I understood that their foremost priority was to complete the basic infrastructure necessary to produce the gas that the Debtors were obligated to deliver under the Homer Contract.  Among other things, the Debtors needed to complete a drilling platform and pipeline for the KLU-3, as well an onshore processing facility (which included the separating mechanism for any "wet" gas that would be produced).  In addition, I understood that because the Homer Contract could not alone produce the revenue required to service the loans under the ECP Credit Agreement, the Debtors needed to complete additional wells in order to increase production, secure larger contracts, and provide data for updated and accurate reserve reports.

46.     I also learned that Rieck needed to deliver results for his investors in Germany in order to raise the ever increasing amount of money that was required to bring the KLU into production.  To that end, I came to understand that the project was put on an extremely aggressive schedule, particularly given that the Cook Inlet is one of the most challenging environments in the world in which to operate.  Indeed, no similar project has been attempted since the 1970s.

47.   The operations team responsible for the infrastructure installation project and drilling additional wells began with Rieck and Damon Kade ("Kade"), whom Rieck hired as president from 2012 to September 2014, and then replaced with Lars Degenhardt ("Degenhardt"), who was also the CFO of Brutus.   Crowley Marine ("Crowley") and CONAM Construction Company were the lead contractors, and COO Hord also had a limited role in building or construction of the gas production infrastructure.

48.   My impression was that Kade was young and lacked the experience and technical skills required for this aspect of the job.   I also believed that Crowley lacked experience and the technical skill and equipment to effectively set the Debtors' platform and install the subsea pipeline in the aggressive time line set by Rieck.   Hord shared this view, and I understand that Hord discussed his concerns with Rieck.   Ultimately, mistakes accumulated, resulting in costly delays and significant cost overruns.

49.   As critical deadlines approached in August and September 2014, there was still no platform, pipeline or onshore production facility completed.   Lacking suitable equipment and technical expertise, the operating team and Crowley tried to set the platform over the well. The attempt failed when the only available anchor hauler (a critical part of the operation) was taken out of service due to mechanical issues.   As a result of the delays, Debtors lost the use of the vessel required to lift and install the platform.

50.   Due to the late date in the season and for safety and other considerations, the decision was made to suspend all offshore operations.   As CFO, I understand that by October 2014 the project had expended $96 million on a $62 million budget for the offshore installation, yet the platform and pipeline remained uninstalled.   Kade resigned.

51.     The infrastructure project was ultimately completed in 2015, but the cost overruns were significant.  In total, expenditures exceeded the original budget for constructing and installing the platform, pipeline, and onshore processing facility by $311 million.  Responsibility for that falls on Kade, Degenhardt, and ultimately, on Rieck.  ***Neither I nor any of the Proposed Defendants were responsible for these costly mistakes***.

52.     As CFO, my responsibilities included putting the service agreements and contracts in place, forecasting, handling accounting, processing payments, and reviewing and paying invoices.  I was not responsible for any of the Debtors' operations and operational decision-making at any time, including for this project.  Although I sought to contain costs, I did not have the authority to interfere with the equipment and services that Hord and Kade ordered or the plans that they implemented.

### The 2014 and 2015 Infrastructure Design

53.     The costs overruns through the completion of the infrastructure in 2014 and 2015 were substantial, but there were also fundamental errors in the *design* of the infrastructure that also proved costly to the Debtors over time.  The platform and pipeline for the KLU-3 were constructed based upon the assumption, previously discussed, that the neither the Beluga nor the Sterling would produce water in large volumes.

54.     For example, a report based on the 2013 NSAI Reserve Report that was prepared and provided to ECP in July 2014 by Lummus Consultants (the "2014 Lummus Report"), a true and complete copy of which is attached as Exhibit 7 in the Appendix, states that:

> The non-associated gas of the Beluga and Sterling formations is believed to be sourced indigenously from the coals that are deposited with the sands and from marsh gas buried with the sediments. The gas is reported to contain 99 percent methane and therefore, is not expected to produce commercial volumes of condensate. ***Water is also expected to be produced only in minimal quantities***.

(Ex. 7 at DA00169) (emphasis added).

55.     Based on this assumption, the Debtors presumed that there would not be large volumes of water traveling through the pipeline, let alone the possibility of that water freezing. Had the Debtors known that, in fact, the Sterling formation would produce large volumes of water, the Debtors would presumably have designed the infrastructure differently to avoid problems that later resulted under the Debtors' current management.

**Rieck and Webb Prematurely Enter the Enstar Contract in 2015**

56.     The Debtors began supplying Homer with gas in November 2015 but, as discussed, the Debtors required a more substantial supply contract to service the loans under the ECP Credit Agreement.  To that end, Rieck and Webb began negotiating a major supply contract with Enstar Natural Gas Company and its affiliate, Alaska Pipeline Company (collectively, "Enstar"). The proposed contract would secure, at minimum, $127 million in revenue between April of 2018 and 2021 and total minimum revenue of $215 million if Enstar elected to extend the contract.

57.     Webb executed the Gas Sales Agreement between the Debtors and Enstar on February 26, 2016 (the "Enstar Contract").  In so doing, Rieck and Webb obligated the Debtors to supply up to 7 BCF per year to Enstar, in addition to the 4 BCF required under the Homer Contract. A true and complete copy of the Enstar Contract is attached as <u>Exhibit 18</u> in the Appendix.

58.     Significantly, like the Homer Contract, the Enstar Contract was a "take-or-pay" contract, the consequences of which cannot be understated.  Given the Debtors' severe cash shortages – beginning with Jones Act-related issues discussed above, and exacerbated by the huge cost overruns in completing the platform and pipeline in 2014 and 2015 – the Debtors could not afford to pay for the significant volume of gas that they were obligated to deliver if they could not produce the gas called for by the supply contracts.

59.     In that case, the Debtors would default on the contracts – which would, in turn, trigger default under the ECP Credit Agreement – resulting in insolvency absent ECP's forbearance.  As a result, the take-or-pay requirement of the Enstar and Homer contracts placed immense pressure on the Debtors to meet production demands from 2016 onward.  Indeed, the Debtors' survival depended on meeting these production demands.

60.     But the supply contracts' obligations presented serious problems because the Debtors did ***not*** have the existing production wells to meet them and were severely constrained in terms of available capital.  The Debtors had yet to complete any additional production wells beyond the KLU-3, which, following the results of the 2013 tests, had only produced from the Upper Sterling and Beluga.  Worse, although the Beluga remained dry, the previously dry Upper Sterling was increasingly producing large volumes of water.

61.     Not only did the KLU-3 lack the capacity to supply the volume Enstar required, the KLU-3 provided limited information on the production capacity of additional wells.  Indeed, the Debtors were still relying on the 2013 NSAI Reserve Report and SPRI's preliminary reserve estimates.

62.     As stated in a report dated January 1, 2014, prepared by Bruce Ganer of SPRI (a true and complete copy of which is attached as <u>Exhibit 4</u> in the Appendix, I understood that "***less than one third*** of the total equivalent pay in the Sterling and Beluga formations, as seen in the KLU #3, ***was flow tested***."  (Ex. 4 at DA00020) (emphasis added.)  I also understand that without additional testing to provide further information, NSAI had not issued a new reserve report for 2014, and that the Debtors' proven reserves reported by NSAI as of December 31, 2015 (the "2015 NSAI Reserve Report"), issued on February 26, 2016 (the date Webb executed the

Enstar Contract) actually *decreased* from 59 BCF to 56 BCF.  A true and complete copy of the

2015 NSAI Reserve Report is attached as Exhibit 17 in the Appendix.

63.     In short, Rieck and Webb entered into the Enstar Contract and Homer Contract, and

their onerous take-or-pay supply obligations, before the Debtors had the means to deliver on those

obligations.  As a result, Rieck and Webb placed the Debtors in an impossible position that would

have severe consequences and cause multiple defaults on both the Enstar Contract and the ECP

Credit Agreement.

**Failure to Complete A Third Well in 2016 and the Randolph Yost Rig**

64.     The Enstar Contract, among other things, obligated the Debtors to meet several

critical requirements in terms of production and development.    Specifically, pursuant to

Section 13.3, Enstar required that:

> By December 31, 2016, ***Seller must have at least three (3) wells that can be used
> to produce the volumes of Gas contemplated under this Agreement*** as outlined in
> the development schedule in Exhibit H. Seller shall deliver confirmation to Buyer's
> reasonable satisfaction that it has the ability to produce the Gas at rates sufficient
> to meet Seller's Existing Commitments.

(Ex. 18 at DA00814) (emphasis added.)

65.     Failure to meet these obligations would result in default, which would in turn

trigger default and foreclosure on the ECP Credit Agreement, absent ECP's forbearance.

But because of the position that Rieck and Webb (among others) had placed the Debtors, these

obligations proved impossible to meet.

66.     As discussed, when Webb executed the Enstar Contract at Rieck's behest,

the  KLU-3 was the Debtors' only production well, and could not meet the production demands

required under the Enstar Contract – in addition to the volumes called for under the Homer

Contract.  At the same time, the Debtors had not yet completed testing – let alone demonstrated

deliverability – on the productive capabilities of the vast majority of the KLU's purported reserves.

And worse, as a result of the ongoing over-expenditures in completing the infrastructure (among other things), the Debtors did not have the funds to complete the additional wells that the Debtors were required to complete by the end of 2016 in order to avoid termination of the Enstar Contract – the Debtors' most critical contract.

67.    The Debtors had arranged for ECP to fund an additional $45 million in the fourth quarter of 2015 that, together with equity contributions, should have been sufficient to fund the two additional production wells to meet the Enstar Contract in 2016.  But as the CFO, I understood that Rieck was no longer able to fund the project or the increased equity contributions that were required.

68.     Notably, the Debtors' critical funding shortages at this time coincided with the replacement of the Spartan Rig with a more expensive rig, the Randolph Yost, which had to be towed from Singapore at an additional cost of $7 million. As CFO, I was concerned that the Debtors could not afford the new rig.

69.     In that regard, in 2015 I learned that Hord and Nunes, counsel for the Debtors and other Rieck-controlled entities, began advocating to replace the Spartan Rig with the larger, more expensive Randolph Yost, which was located in Singapore at the time.  The Randolph Yost was owned by Shelf Drilling Offshore Resources Limited II ("Shelf").

70.    As CFO, I knew of no reason to replace the Spartan Rig, given that the Debtors' drilling platform was designed for the Spartan Rig and there had been no significant issues with the Spartan Rig's performance or safety of which I was aware.  Moreover, the Debtors could not even pay their tax bill at the time, let alone spend millions of dollars on a new rig.  I conveyed these concerns to Rieck and other members of the Debtors' management team.

71.     Nonetheless, Rieck, Hord and Nunes succeeded in orchestrating what appeared to me to be self-interested transactions that replaced the Spartan Rig with the Randolph Yost. I learned that this involved a network of entities, including Advanced Drilling Solutions, LLC, ("ADS"), Kadmas Limited ("Kadmas"), Nordic Overseas Drilling & Services GmbH ("Nordic"), and Offshore Drilling Solutions, Ltd. ("ODS").   I also discovered that none of these entities was previously known or recognized in the industry as a drilling contractor.

72.     These entities' involvement in the Randolph Yost-related transactions created a complicated and expensive series of contractual relationships, which appeared to be detrimental to the Debtors, and beneficial to Rieck, Hord, and Nunes.  I understand that such relationships worked as follows:

a.   Pursuant to a Bareboat Charter Agreement dated July 4, 2015 (the "Bareboat Charter Agreement"), a true and complete copy of which is attached as Exhibit 11 in the Appendix, ODS chartered the Randolph Yost from Shelf, and shortly thereafter assigned the charter to Kadmas (the "Kadmas Assignment").  A true and complete copy of the Kadmas Assignment agreement, effective as of November 2, 2015, is attached as Exhibit 14 in the Appendix.

b.   DOGSA (majority owned and controlled by Rieck) guaranteed the assignment to Kadmas under a Deed of Guarantee, dated July 31, 2015, a true and complete copy of which is attached as Exhibit 12 in the Appendix.

c.   ADS then entered into a Drilling Vessel Management Agreement with Kadmas on November 2, 2015, a true and complete copy of which is attached as Exhibit 13 in the Appendix, to crew and operate the Randolph Yost.

21

    d.   Finally, the Debtors contracted with Nordic pursuant to an Offshore Daywork Drilling Contract, dated December 1, 2015, a true and complete copy of which is attached as <u>Exhibit 15</u> in the Appendix, through which the Debtors paid Nordic.

73.     I came to understand that these transactions created an apparent conflict of interest. As I now understand, ADS, with an unidentified parent entity, is (or was) owned and controlled by Hord and Nunes, which they operated from Texas and Louisiana. The specific identities of the owners of Kadmas, Nordic, and ODS are unknown to me; however, Kadmas and ODS were represented by Harald Plewka, a German lawyer associated with several Rieck-affiliated entities, and Nordic was represented Jans Torsten Schmieling, who worked closely with Webb on behalf of Rieck and Brutus (among other Rieck-affiliated entities).

74.     Apparently in an effort to avoid these conflicts of interest, Hord, Nunes, Rieck, Kadmas, ODS, and Nordic executed a Memorandum of Agreement, dated January 31, 2016 (the "MOA") purportedly releasing ADS, Hord, and Nunes of liability for any self-interested transactions in connection with the Randolph Yost, stating (among other things) with respect to these apparent conflicts:

> ***The parties hereto specifically waive the ability to allege a conflict of interest and/or breach of fiduciary duty by Hord in regards to the ADS/ADS Parent*** and The Parties … [the Debtors] and the [Investors of Kadmas and Nordic] hereby (i) expressly authorize Hord's for work and/or ownership interest in ADS/ADS Parent and that Hord's work for and/or ownership interest in ADS/ADS Parent does NOT violate any terms of Hord's employment agreement with [the Debtors] ***nor does it constitute a breach of fiduciary duty to [the Debtors]; (ii) waive and release Hord and Nunes from any conflicts of interest between the work each performs for Rieck and the Investor Parties and [the Debtors] in their capacities as COO, officers and corporate legal counsel, respectively, for Rieck, [Investors of Kadmas and Nordic], and [the Debtors]*** …

(Emphasis added).

75.     I became aware that Rieck also executed the MOA in several conflicting capacities, including in his individual capacity, on behalf of the Debtors, and on behalf of the "Investor

Parties" of Kadmas and Nordic, referenced above.  A true and complete copy of the MOA is attached as Exhibit 16 in the Appendix.

76.     In short, based upon information known to me, the Randolph Yost deal appeared to be a series of affiliate transactions, and raised red flags at the time that ownership (among others) were personally benefiting at the Debtors' expense.  Attached as Exhibit 19 in the Appendix is a true and complete copy of an email sent by Davis on May 23, 2016 to, among others, Webb, Hord, and Degenhardt, raising complaints as to the lack of progress under Hord's management, the excessive rates charged by ADS, and implying self-dealing.  A true and complete copy of an email chain including an email dated June 14, 2016 sent from Robert G. Taylor, the owner of Movants Giza Holdings, LLC and Taylor Minerals, LLC, to Degenhardt concerning ADS-related complaints is also attached as Exhibit 20 in the Appendix.

77.     Through Nordic and ADS, Rieck, Hord, and Nunes charged the Debtors' excessive daily rates for services.  Notably, these excessive payouts occurred at a time when the Debtors were experiencing critical cash shortages and were already in default on the ECP Credit Agreement and the Enstar Contract.  I had concerns regarding these aspects of the Randolph Yost deal, which I expressed to Rieck and other members of the Debtors' management team.

78.     Movants Davis and the Berry Trust sued Rieck, Kade, Degenhardt, Hord, and the Debtors in July 2016, alleging (among other things) misconduct and damages resulting from the Randolph Yost transaction (the "Berry Litigation").  A true and complete copy of the Sixth Amended Petition filed by Davis and the Berry Trust on March 3, 2017 in the Berry Litigation, is attached as Exhibit 32 in the Appendix.

79.     As I later learned, ODS and Kadmas ultimately defaulted on their obligations under the Bareboat Charter Agreement by failing to pay over $9 million owed to Shelf, and  DOGSA

(owned and controlled by Rieck) then refused to honor its guarantee.  As a result, in addition to bringing an arbitration action against DOGSA, Shelf filed liens on the Debtors' property and sued the Debtors in 2018, claiming that Debtors owed Shelf the money that ODS, Kadmas and DOGSA never paid.

80.    Similar to Davis' failure to obtain a Jones Act waiver, Rieck's reckless and premature decision to enter into the Enstar Contract; the massive budget overruns in completing the production infrastructure in 2014 and 2015; replacing the Spartan Rig with the Randolph Yost; and, engaging in related self-dealing transactions, are more examples of mismanagement and misconduct that the Movants ignore in their proposed Complaints.

### Webb's Allegations of Improper Payments

81.    Paragraph 28 of the Webb Complaint alleges that, in or around 2016 and 2017, Rieck "suspected that Elder and other Company officers were getting improper payments on contracts, equipment and supplies."  I have never taken or received any improper payment, kickback, bribe or any other remuneration at the expense of the Debtors, or otherwise.  Nor was I responsible for selecting vendors or contractors (other than those that provided administrative services) or negotiating contractor rates.

82.    To my knowledge, Spartan never received nor made any improper payments from or to the Debtors or any of its officers or employees in connection with the Spartan Rig as alleged in paragraph 29 of the Proposed Complaint.

83.    Paragraphs 30-32 of the Webb Complaint allege that I was "involved in the misappropriation of [the Debtors'] funds in connection with Louisiana and Texas-based contractors and suppliers."  This allegation is false, and seemingly attributes to me the decisions

that Rieck and Hord made to run the operations out of Texas and Louisiana, and the scheme Hord, Nunes, and Rieck ran in connection with ADS and the Randolph Yost.

84.     As CFO, I had no authority or responsibility in such operational matters.  At all times since 2011, Hord had reported directly to Rieck, who approved all decisions as to operations. All costs of the Debtors' operations were set out in detail in all plans, cash forecasts and monthly reports and were reviewed by Rieck and others in detail in direct meetings when Rieck requested. Decisions on staffing, contractors, terms, vendor selection, purchasing, shipping and service providers were assigned by Rieck to Hord, who, as I understand it, sought approvals directly from Rieck.  The decisions to approve the underlying contracts and their terms were made by Hord, Degenhardt, and Rieck.  I was not involved in those decisions.

### The 2016 Defaults

85.     Rieck ultimately failed to secure additional funding from other sources, requiring ECP to inject an additional $109 million into the Debtors' operations above the original loan by the end of 2016.  Rieck also failed to make the numerous contributions to the Debtors' operating accounts required under the ECP Credit Agreement, triggering an event of default in May 2016, among numerous other defaults that occurred in 2016.  These defaults – any of which entitled ECP to foreclose of the Debtors – are listed (among others) in Exhibit A to ECP's Reservation of Rights, dated January 31, 2018, which is attached here as <u>Exhibit 46</u> in the Appendix.

86.     Even with ECP's additional funding to cover these shortfalls, the Debtors had only completed a second production well, KLU-A2A, by September 2016.  The KLU-A2A bolstered production and, importantly, allowed further testing to support a greatly-expanded study by NSAI – which culminated in reserve reports issued on September 9, 2016 (the "2016 NSAI Reserve Report"), which marked a massive increase in NSAI's estimate on the KLU's proven reserves.

The 2016 NSAI Reserve Report, a true and complete copy of which is attached as <u>Exhibit 21</u> in the Appendix, estimated up to 151 BCF in proven reserves, nearly three times the 56 BCF estimated in the 2015 NSAI Report.

87.     Despite the encouraging report, the KLU-A2A, like the KLU-3, was still limited to producing from the Beluga and Lower Sterling – the latter of which was increasingly producing water.  Attached as <u>Exhibit 23</u> in the Appendix is a true and complete copy of an email chain concerning the Lower Sterling's water production, in which Ganer writes by email dated November 28, 2016, that "[r]ight now *it's very hard to say that with so much water that the water being recovered isn't formation water*."  (Ex. 23 at DA00879) (emphasis added.)  As Ganer's analysis here demonstrates, the water that the Sterling produced back in 2013 was not an aberration.

88.     At the same time, the Upper Sterling, which held the majority of the Debtors' purported reserves, remained untested and unutilized through 2016.  With limited data on the majority of the Debtors' purported reserves and the Lower Sterling's increasingly problematic water production, I came to understand that the proven reserves reported in the 2016 NSAI Reserve Report were simply estimates – and did not translate into successful production.

89.     In fact, despite Rieck's continued assurances to both Enstar and ECP, the Debtors' failed to complete the third production well, the KLU-A1, by the December 31, 2016 deadline.  Accordingly, the Debtors were in default (again), under Rieck's management, on both the Enstar Contract and the ECP Credit Agreement.  Responsibility for these defaults falls on Rieck and his operational team, including Degenhardt as President, and Webb, among others.

90.     As CFO, I worked diligently through this time to manage the Debtors' finances and obtain forbearance agreements from ECP and Enstar to the best of my ability.  My efforts,

however, were unable to stem mounting expenses and impossible requirements that were foisted on the Debtors' through the mismanagement of Rieck and the other operational decision-makers.

91.     In that regard, contrary to the allegations in paragraph 30, I supported moving the Debtor's headquarters to Alaska in 2016.  I also supported other cost-cutting measures that made economic sense, including the closure of the Texas and Louisiana offices and reducing excess staff.  Attached as Exhibit 30 in the Appendix is a true and complete copy (subject to redaction) of the recommendations that I sent to Rieck in an email dated July 14, 2017 to that effect.

92.     To the extent that Webb proposed cost-cutting measures, they were often misleading or inaccurate.  For example, in 2016 Webb sought to replace the Debtors' operations personnel with contractors from a local Alaskan firm called Peak Performance.  Webb claimed that his proposal would save the Debtors' over a million dollars per year, which I initially supported.  Closer analysis demonstrated that Webb's proposal was based on mathematical errors and would replace veteran operators with inexperienced contractors at only slightly lower cost.  Based on this analysis, a true and complete copy of which  is attached as Exhibit 22 in the Appendix, including the enclosing email dated October 25, 2016, Webb's proposal was rejected.

93.     The Webb Complaint also alleges that Webb's purported "investigation into mismanagement and misappropriation of funds" discovered that I had improperly destroyed documents and business records to conceal evidence of misconduct.  (Webb Compl. ¶¶ 34-35, 37.)  This claim is also false.  I have never destroyed any of the Debtors' records for any improper purpose, and any hard copy documents that were destroyed in the ordinary course of business had an electronic back-up.  All bank statements, invoices, contracts are electronically stored in the Debtors' accounting system as well as on the servers.  Accordingly, to my knowledge, no documents have been deleted or lost.

27

**2017 Renegotiation of the Enstar Contract and Reorganization of the Debtors**

94.     Despite the 2016 defaults and Rieck's continued mismanagement, ECP continued to support the Debtors.  With ECP's backing, Rieck was able to negotiate an amendment to the Enstar Contract in order to avoid its termination in 2017.  The Enstar amendment provided the Debtors with additional time to complete the third production well (the KLU-A1) and "prove-up" the huge reserves reported in the 2016 NSAI Reserve Report, including stabilizing and increasing production on the  first production well (the KLU-3) and second production well (the KLU-A2A) in the Beluga and Upper Sterling.

95.     The 2016 NSAI Reserve Report played a large role in allaying concerns about the Debtors' long-term viability.  However, as an email dated May 28, 2017 from Ganer to Webb, a true and complete copy of which is attached as <u>Exhibit 25</u> in the Appendix, demonstrates the 2016 NSAI Reserve Report was still based on incomplete data provided from the few wells and limited testing that the Debtors had yet completed.

96.     Unfortunately, even with additional time and ECP's support, the Debtors still failed to:  (1) complete the third production well (the KLU-A1) in 2017, which was required under the Enstar Contract; or (2) progress on testing the second production well (the KLU-A2A) in the Sterling, where NSAI's 2017 report issued on October 30, 2017 (the "2017 NSAI Reserve Report") estimated over 70 percent of the KLU's proven reserves were located.  A true and complete copy of the 2017 NSAI Reserve Report is attached as <u>Exhibit 31</u> in the Appendix.  Again, the Debtors were still unable to confirm – let alone capture – the vastly-increased purported reserves that the 2016 and 2017 NSAI Reserve Reports described.

97.     Instead, the Debtors repeatedly defaulted on both the Enstar Contract and the ECP Credit Agreement (amended many times over by this point) under Rieck's management through

2017, as demonstrated by ECP's January 31, 2018 Reservation of Rights, previously cited as Exhibit 46 in the Appendix.

98.    The Debtors were also – yet again – on the brink of insolvency.  Rieck had made several attempts to raise funds to re-finance the loans under the ECP Credit Agreement, including a bid to raise $300 million through Morgan Stanley in 2016 and 2017.  His efforts were all unsuccessful.  If the Debtors were going to avoid bankruptcy, the Debtors needed more money from ECP.  No other lenders were interested.

99.    During this time, Webb was busy arranging contracts between the Debtors and other Rieck-controlled entities, including Helena Energy, LLC ("Helena") and Aurora Gas, LLC ("Aurora"), at Rieck's behest, which lead to further problems described below.

100.    I understand that Rieck – through an affiliated entity and at Webb's recommendation – had purchased Aurora in August of 2015 for $2 million.  This transaction occurred at a time when Rieck was having difficulty in meeting equity funding requirements to pay for the installation of the production infrastructure.  Then during 2016 and 2017, as I later learned, Webb arranged contracts between the Debtors and Aurora, which sold gas to Helena, again at Rieck's behest.  Meanwhile, Webb, in addition to his role with the Debtors, was the president of Helena and the president of Aurora's parent company.

101.    As I now understand it, pursuant to these contracts, the Debtors supplied gas to Aurora at discounted prices, which Aurora would, in turn, sell to customers at fair market price.  Although this arrangement was approved by ECP, problems arose when Aurora declared bankruptcy in 2016, leaving the Debtors without payment for unpaid gas sales to Aurora.  I learned that, at the direction of Rieck, Webb continued to sell gas to Aurora after it filed bankruptcy, even

though the Debtors were not being paid, in order to ensure that Aurora could provide gas to Helena, which in turn could provide gas to its customers.

102.    As the CFO, I expressed my concerns with the continued sales to Aurora to Rieck and others on the Debtors' management team, but Webb and Rieck continued to sell the gas. The decision to do so ultimately resulted in approximately $718,000 in unpaid gas sales to Aurora, and, when royalties on the gas sales are included, a total loss of around $900,000. Attached as Exhibit 59 in the Appendix is a true and complete copy of an email dated March 30, 2017 sent to Webb by the Debtors' counsel confirming the Debtors' claims against Aurora's bankruptcy estate.

103.    Webb next proposed that the Debtors enter into a gas sales contract with Helena. As an affiliate transaction, the Debtors were required to obtain the consent of the Working Interest Owners and ECP. Failure to obtain both consents would violate the ECP Credit Agreement and the Joint Operating Agreement. It is my understanding that both the Working Interest Owners and ECP denied consent for a contract with Helena.

104.    Nonetheless, Rieck and Webb continued to risk the Debtors' survival by making authorized sales to Helena to benefit Rieck and the companies he controlled. I was concerned with these unauthorized sales and raised my concerns with management.

105.    Webb later attempted to set up another entity called Valley Natural Gas Co., LLC ("Valley Natural Gas") for the same purpose. When Webb requested ECP's consent for a gas sales agreement between the Debtors and Valley Natural Gas, the Debtors discovered that Webb's then-girlfriend was the president of Valley Natural Gas and that Valley Natural Gas was, in fact, an affiliate entity – which Webb had sought to conceal.

106.    A true and complete copy of an email dated July 10, 2017, sent from Jennifer Gray on ECP's behalf and denying Webb's request for approval of a transaction between the Debtors

and Valley Natural Gas, is attached as <u>Exhibit 29</u> in the Appendix.  True and complete copies of related emails that track these events and Webb's explanations for his actions, are also attached as <u>Exhibits 26-28</u> in the Appendix.

107.    I also learned that there were other reasons to doubt Rieck's credibility at this point. Rieck was involved in multiple lawsuits in which Rieck – and/or the entities that he controlled, including DOGSA – was implicated in various forms of securities fraud in Germany in connection with funds that Rieck obtained from German investors.  Specifically, as I understand it, Rieck had apparently obtained funds for the Debtors' operations without disclosing his equity interest and control of the Debtors.

108.    In addition, the amendment to the Enstar Contract that Rieck had negotiated was set to take effect on April 1, 2018, which posed even further problems for the Debtors.  Under the amended Enstar Contract, the Debtors were required to deliver – take-or-pay – a minimum of 18.3 BCF of gas to Enstar during the three year term.  These volumes were to be produced from the wells that had yet to be completed, as well as the from the KLU-A2A's untested Sterling zones.

109.    It is my understanding that, as result of all these problems, ECP required Rieck to give up sole control of the Debtors in exchange for yet another forbearance on its substantial loans to the Debtors.  Through an amendment to the Debtors' limited liability agreements, true and complete copies of which are attached as <u>Exhibits 33-35</u> in the Appendix, Rieck agreed to relinquish control of the Debtors to a three-person Board of Managers for each of the Debtors (collectively, the "BOM"), effective as of December 10, 2017.  The BOM was comprised of Rieck, as the Debtors' sole member  (the "Member Manager"),  Trent Kososki ("Kososki"), on behalf of ECP (the "ECP Manager"); and Jeffrey Brodsky ("Brodsky") (the "Independent Manager").  I had

nothing to do with the establishment of the BOM or the negotiations between ECP and Rieck that led to this arrangement.

**Production and Deliverability Concerns Are Concealed in 2018**

110.    Since the later part of 2017, Rieck had directed SPRI and Ganer to assume operational responsibilities to complete the Debtors' production wells.  Given the repeated failure of Rieck and later SPRI to complete the now-critical additional KLU-A1 well and to evaluate drilling the KLU-A4 well, however, ECP began to take a more active role in the Debtors' operations through the BOM.  To this end, PRA, one of the leading firms in the Alaskan oil and gas industry, was hired as a consultant in order to assist with the Debtors' technical operations.

111.    Beginning in or around January 2018, SPRI and PRA worked together to develop a plan for the Debtors' 2018 drilling season.  Having just joined the Debtors' team, PRA needed updated information from SPRI and the Debtors in order to work effectively and accurately assess problems and solutions.

112.    Indeed, PRA was entitled to this information from the Debtors and SPRI pursuant to the ECP Credit Agreement.  Specifically, Section 5.1.5 of the ECP Credit Agreement states:

> From time to time, as soon as practicable after the reasonable request of the ECP Administrative Agent or any Lender, ***each of the Borrowers shall deliver to the ECP Administrative Agent such other information and data with respect to the Borrowers or the Project***.

> (Ex. 8 at DA00271) (emphasis added.)

113.    As the Debtors' CFO, I understood the Debtors' obligation to provide such information to ECP (and at ECP's request, to PRA) as well as the importance of doing so.  The Debtors' drilling operations could not succeed if its technical operations team, including both SPRI and PRA, did not have accurate information for analysis and assessment.

114.    For these reasons, I sought to facilitate communication between the Debtors'

management, SPRI, and PRA in accordance with the Debtors' duties and obligations, as well as to

facilitate well-reasoned and informed decision-making.  For example, in an email chain dated

January 1, 2018, to Ganer, Webb, Theodor van Stephoudt ("van Stephoudt"), an economist and

tax expert Rieck employed as one of his closest advisors and Rieck's regular representative on the

BOM, I explained:

> [I]t is important that we fully understand the analysis and ensure that we [receive]
> the proper documentation."  ***We have duties as a prudent operator*** to dot all the I's
> and cross the t's.

> (Emphasis added.)

A true and complete copy of this e-mail chain is attached as <u>Exhibit 37</u> in the Appendix.

115.    But with the Enstar Contract's deadline of April 1, 2018 looming at the start of the

2018 drilling season, concerns as to the Debtors' ability to meet the Enstar Contract's massive

obligations began to mount.  On January 6, 2018, Ganer wrote to Rieck (with Webb copied):

> I have concerns about ***production performance versus reserve estimates to
> date***.  Mechanical issues/poor cement/communication behind pipe OR ***bad reserve
> estimates***???

A true and complete copy of this email is attached as <u>Exhibit 38</u> in the Appendix

(the "January 6, 2018 Email").

116.    At this point, as previously discussed, the Debtors (and SPRI) had still not

completed either the production wells or the necessary testing to prove the productive capabilities

of the Sterling, which was essential to the Debtors' ability to meet delivery requirements of the

Enstar Contract.  Although the Beluga was a consistent source of production, it held only

approximately 30 percent of the KLU's proven reserves and was alone insufficient to meet

production demands.  Indeed, Enstar Contract's delivery requirements were calibrated based on

the Sterling's potential production, not the Beluga's.

117.    The belief that the Sterling would not produce large volumes of water was one of the key assumptions underlying the proven reserve estimates contained in the 2016 and 2017 NSAI Reports.   Simply stated, because water displaces gas, where there is more water, there is necessarily less gas.   As a result, the huge volumes of "proven" reserves in the 2016 and 2017 NSAI Reserve Reports would be *disproven* if it was determined that the Sterling produced huge volumes of water.   More important, the Debtors would not be able to meet the take-or-pay supply contracts with gas that did not exist.

118.    As the CFO, I recognized that the inability to meet the large seasonal deliverability requirements of the Enstar Contract would bankrupt the Debtors. The recommendation Ganer provides in his January 6, 2018 Email demonstrates the concerning disconnect between what the Debtors were obligated to deliver and the uncertainty surrounding what the Debtors *could* deliver.

119.    Specifically, Ganer's proposal demonstrates that SPRI (and thus the Debtors) still had no idea how much water the Sterling would produce:

(1) ASAP, Slide sleeves in KLU A2A, temporarily close current producing Beluga zones and open the [Upper] Sterling (4018) to verify good gas production. Leave open and produce (?)

(2) If KLU A2A [Upper] Sterling (4018) tests good, all ok, but if not try to determine source/cause of water if produced. Lower Sterling (4669, 4725) already made water, source determination "inconclusive" by Schlumberger

(3) Slide current KLU 3 producing Beluga zone sleeve closed. ReComplete KLU #3 in the Beluga, "Hilcorp" completion style to add/perforate most or all of remaining Beluga 11.64 Bcf (NSAI).

(4) Complete KLU A-1 per proposed plan via Moncla rig, adding another zone with "backup" materials and supplies pretty much already purchased. This to expose an additional 8.9 Bcf (NSAI).

(Ex. 6.)

120.    As the CFO, I was aware of this critical situation.  Production was declining and the Debtors were required to start delivering gas to Enstar in April of 2018.  Ultimately, the Debtors could not provide gas in April, and had to purchase gas at $8 per million cubic feet ("MCF") – $1.70 more than the price under the Enstar Contract – in order to meet their take-or-pay delivery obligations.

121.    I also became concerned that vital information related to the Sterling's increasing water production was being withheld from PRA and ECP.  In my opinion as the Debtors' CFO, given the multiple, repeated, and ongoing defaults that ECP had dealt with from the Debtors, ECP's continued forbearance (along with the essential funds it provided) was the only thing keeping the Debtors from total collapse.  Maintaining the Debtors' relationship with ECP, which depended on trust and credibility, was therefore critical.  The Debtors could not afford to throw away any remaining credibility they had with ECP by hiding the inevitable, inconvenient truth that the Debtors were facing.

122.    To supplement my limited knowledge and understanding of the technical matters surrounding the Sterling's water production and the Debtors' drilling operations, I raised the issue with Raines and sought his opinion on the matter.  Attached as <u>Exhibit 39</u> in the Appendix are emails dated January 8 and January 9, 2018 that Raines sent to me in connection with my efforts to determine the scope of the problem and what information was being withheld from PRA and ECP.

123.    Although I sought to provide the information that I, as an officer of the Debtors, was obligated to provide to PRA and ECP, Ganer issued strict directives on behalf of Rieck and van Stephoudt not to disclose *any* information concerning the Debtors' drilling operations and

SPRI's activities to ECP or PRA.  By email dated January 11, 2018, a true and complete copy of

which is attached as <u>Exhibit 40</u> in the Appendix, Ganer ordered that:

> Further to this, any and all information as well as ***plans being contemplated are***
> ***restricted to internal use only and not to be shared with anyone outside of Furie-***
> ***SPRI***. If there is any information to be shared or discussed outside of Furie-SPRI,
> it can only be done so with Kay Rieck's direct authorization.

124.    As I understand it, this directive is contrary to the express requirements of

Section 5.1.5 of the ECP Credit Agreement *and* contrary to the Debtors' amended operating

agreements, pursuant to which Rieck no longer exercised unilateral control over the Debtors.

(Ex. 33 at DA00978).  By issuing this directive (among others to similar effect), I believe that

Ganer sought to usurp control on Rieck's behalf from the newly formed BOM.

125.    As an officer and CFO, I was deeply concerned that the interference was undertaken

to prevent me from meeting my duties to the company.  I expressed this concern to Kososki,

who was a BOM member at this time.  I also grew increasingly concerned that declining

production was hindering the Debtors' ability to meet the Enstar Contract, which I understand the

BOM was discussing as well.

126.    I was nonetheless barred from communicating with PRA by Rieck, van Stephoudt,

Webb, and Ganer.  Attached as <u>Exhibit 42</u> in the Appendix is an email chain beginning with a

January 5, 2018 email from Tom Walsh ("Walsh"), the President and CEO of PRA, requesting the

KLU wells' daily production reports from me.  As the last three emails on Exhibit 42 demonstrate,

I was removed from the communications after providing the requested information.

127.    These emails also demonstrate that van Stephoudt directed Webb not to disclose

the KLU-A2A's production report (which that indicated large volumes of water were being

produced) to PRA.  Again, I believe that the failure to disclose this information was in violation

of the ECP Credit Agreement and contrary to the best interests of the Debtors, as subsequent events demonstrated.

128.    At the same time that I was removed from these communications, I was specifically directed not to disclose further information.  Rieck and van Stephoudt apparently did not want me reporting my concerns to anyone, especially ECP and PRA.  I received an email on January 22, 2018, from van Stephoudt, a true and complete copy of which is attached as Exhibit 41 in the Appendix, stating:

> As Furie's CFO you help us with financing, perform financial reports, analysis, budgets and projections, pay invoices and royalties on time, help Tony Nunes with contracts and insurance, help get ECP approvals for gas contracts, and other things as per instructions from ownership.
>
> As you are not in operations, ***please do not discuss operational issues with ECP or PRA or others outside of Furie such as well or reservoir*** issues unless otherwise instructed by ownership.  In addition, do not discuss issues with contractors other than finances, invoices, contracts and insurance unless otherwise instructed by ownership.  This includes all aspects of operations.  Do not discuss issues with Furie's gas buyers unless instructed by ownership or to get approvals from ECP.

(Emphasis added).

129.    Despite the efforts by Rieck, van Stephoudt, Webb, and Ganer to silence me, I continued to act in accordance with my duties and in the best interests of the Debtors. Where necessary, I sought to provide ECP and PRA with information that the Debtors were obligated to disclose, including in connection with the Sterling's water production, which Rieck, van Stephoudt, Webb, and Ganer had failed to disclose ECP and PRA, in violation of the ECP Credit Agreement.  In addition, as CFO, I also continued to perform due diligence of the alternative proposals to meet the Enstar Contract's requirements.

130.    Attached as Exhibit 48 in the Appendix is a true and complete copy of an email dated February 14, 2018 that Webb sent to Rieck and van Stephoudt, stating in part that:

Elder is on the phone with PRA and ECP. ***He's talking about how much water the Sterling produces and how Bruce Ganer's information is all wrong***. He is telling them that Bruce Ganer is NOT an officer of the company and has no right to withhold information that he (David) has requested to be sent to PRA.

131.    Despite Webb's claims to the contrary, any information that I provided ECP concerning any of the Debtors was consistent with my duties and responsibilities as the Debtors' CFO and, moreover, was required to be delivered to ECP under the express terms of the ECP Credit Agreement.  I never provided confidential information to ECP, or any other party, at any time, for any improper purpose or in breach of any agreement, including my employment agreement with the Debtors.

132.    Moreover, any confidential information that I provided to ECP pursuant to the Debtors' express obligations under the ECP Credit Agreement was protected under adequate confidentiality provisions.  For example, Section 9.7 of the ECP Credit Agreement states that:

> No party hereto … in its capacity as a "receiving party", shall disclose any Confidential Information to any third party without the prior written consent of the party delivering such Confidential Information …

(Ex. 8 at DA00315-16.)

133.    In short, it is false and misleading for Webb to claim that I was "supplying ECP with in-house confidential information" and that I was "breaching confidentiality provisions in both [my] employment agreement and [the Debtors'] confidentiality agreements by having secret communications with ECP behind the back of Rieck.  (Webb Compl. ¶¶ 35-36, 39, 122.)

134.    And worse, in addition to the efforts undertaken at Rieck's direction by van Stephoudt, Webb, and Ganer to conceal information concerning the problems that the Debtors were facing in early 2018, van Stephoudt, Webb, and Ganer also cancelled further testing that would have *confirmed* the growing evidence that the Sterling would in fact produce large volumes of water. As I later learned, this course of action was inconsistent with Ganer's prior

recommendations in his January 6, 2018 email to Rieck to test the Upper Sterling immediately. (Ex. 38.)

135.    For example, attached as <u>Exhibit 47</u> in the Appendix is a true and complete copy of an email dated February 14, 2018, in which van Stephoudt (on behalf of Rieck, copying Webb and others) advises Raines that "[w]e have determined that ***the test right now would not be appropriate as the A2-A is the well that produces the majority of our gas and we should not touch that well in the short term***."  (Emphasis added.)  As CFO, I concluded that by cancelling these tests, Rieck and his operatives intentionally blinded themselves, the Debtors' management, and ECP to the inconvenient truth that the Debtors did not have the reserves or the production capabilities that Rieck and his operatives had obligated the Debtors to deliver.

### Ankura's Engagement and the PRA Plan

136.    Against this backdrop, the Debtors were again facing bankruptcy in February 2018. Rieck was out of money and, already facing multiple lawsuits from his own investors in Germany, unable to raise any more funds.  The Debtors had also failed to complete any additional wells since 2016 with SPRI as the Debtors' technical arm.  By all indications, there was little reason for ECP to believe that Rieck and SPRI would be able to complete the additional production wells by the end of the 2018 and meet the gas-delivery obligations as required under the Enstar Contract. I understand that there were also concerns about conflicts of interest that existed among some of the Debtors' management and consultants.

137.    Even with the BOM in place, it was my understanding that ECP no longer had any confidence that Rieck could successfully manage the Debtors' operations.  To this end, it was my understanding that ECP would not commit more funds to the Debtors without a change in management.

138.    Accordingly, ECP and Rieck agreed that ECP would provide another $35 million plus a $6 million letter of credit to the Debtors in exchange for the Debtors' appointment of outside management brought in from a professional consulting firm and the retention of PRA as the Debtors' technical contractor.  It is my understanding that at least two consulting firms, including Ankura, were considered to provide restructuring and interim management services to the Debtors.

139.    In an email dated March 8, 2018, a true and complete copy of which is attached as Exhibit 51 in the Appendix, to Rieck, van Stephoudt, Brodsky, and others from Trent Kososki, I was invited as the CFO to meet and interview with the Debtors' BOM at ECP's office in Houston, Texas.  As part of the process – and with Rieck's knowledge – I flew to Houston to the interviews, including with Pinsonnault, who interviewed for the position of COO.  Jeff Brodsky and van Stephoudt attended the interview via teleconference.  I had never met or communicated with Pinsonnault before, and had no reason to favor the selection of Pinsonnault or Ankura above any of the other candidates.

140.    After evaluating the candidates and proposals, the Boards unanimously voted to retain Ankura as the Debtors' advisor and to appoint Pinsonnault as the Debtors' COO.  I was not part of the final decision-making process.

141.    On March 25, 2018, the Members of the Debtors' BOM, including Rieck, unanimously executed Written Consents (the "March 25, 2018 Written Consents") approving Ankura's Engagement Agreement (the "Ankura Engagement Agreement"), which I had executed in my official capacity on the Debtors' behalf on March 23, 2018.  True and complete copies of the March 25, 2018 Written Consents, including the Ankura Engagement Agreement, are attached as Exhibits 55-57 in the Appendix.

142.     As part of this compromise, my employment contract with the Debtors was also renewed.  A true and complete copy of this employment agreement, dated March 14, 2018, is included as Exhibit B to the March 25, 2018 Written Consents.

143.     Although I later learned that ECP had required that I remain as the Debtors' CFO as part of the new management team, and although I personally had expressed to the BOM that I would not remain without a contract, I had no prior unauthorized or improper discussions with ECP to that effect.  Nor did I disparage Rieck at any time to ECP or receive any additional promises, compensation, or remuneration from ECP in connection with my contract's renewal.

144.     On April 12, 2018, the Members of the Debtors' BOM, including Rieck, unanimously executed Written Consents (the "April 12, 2018 Written Consents"), true and complete copies of which are attached as <u>Exhibit 60-62</u> in the Appendix.  The April 12, 2018 Written Consents authorized, among other things, that:

> David W. Elder, as Chief Financial Officer, and Scott M. Pinsonnault, as Interim Chief Operating Officer (each, an "Authorized Signatory") be and are hereby authorized and directed, acting individually, to execute, deliver and perform, on behalf of the Company, each of the Definitive Documents and any and all other necessary documents and take all other required actions as may be necessary or advisable in such Authorized Signatory's opinion to effectuate, consummate and comply with the purposes and intent of the Definitive Documents and the transactions contemplated thereby, the execution thereof or the taking of any such action to be conclusive evidence of such determination and the authority therefor.

(Ex. 60 at DA01273.)

145.     In addition, the April 12, 2018 Written Consents approved the engagement of PRA to provide technical and operational services to the Debtors pursuant to a Master Service Agreement between the Debtors and PRA (included as Exhibit A to the April 12, 2018 Written Consents), including the approval of the work to be performed by PRA (the "PRA Plan"), which PRA had developed.  (Ex. 62 at DA01297-99.)

146.    As I understood, together with PRA, Pinsonnault's primary directive as the Debtor's COO was to implement the PRA Plan.  The primary purpose of PRA Plan was to meet the demands of the Debtors' supply contracts through:  (1) the completion of two additional wells, the KLU-A1 and the KLU-A4; and (2) to develop and prove production and deliverability capabilities, including to prove and produce the Sterling.  As discussed, the Debtors could not meet their delivery obligations under the Enstar Contract (which had already taken effect) without dramatically increased production and utilizing the full extent of the Sterling's purported reserves.

147.    Rieck supported the PRA Plan and executed the March 25, 2018 and April 12, 2018 Written Consents as a Member of the BOM.  Rieck was not coerced or bullied, as falsely alleged, by ECP to approve these documents.  Rather, Rieck agreed to the changes instituted pursuant to the March 25, 2018 and April 12, 2018 Written Consents as part of a negotiated, arms-length transaction pursuant to which the Debtors received additional funding from ECP in order to avoid bankruptcy.

148.    There was no "hostile takeover" against Rieck by ECP, Ankura, Pinsonnault, PRA and/or me.  As CFO of the Debtors, I was not directly involved in negotiations between Rieck and ECP, which were handled by Rieck and his advisors, including van Stephoudt and Reed Smith.

**Response to Allegations Concerning the 2018 and 2019 Drilling Seasons**

149.    As more fully discussed in the Declaration of Scott M. Pinsonnault, Tom Walsh, and Wayne McBride, the allegations in the Proposed Complaints concerning the purported negligence, mismanagement, and misconduct of the Proposed Defendants are false and misleading.

150.    *First*, many (if not all) of the allegations concerning mismanagement and negligence on the part of the Proposed Defendants, including Pinsonnault and PRA, based upon

my experience as CFO of the Debtors, are the direct result of the mismanagement and misconduct of Rieck, van Stephoudt, Webb, and Ganer (among others) in the preceding years.  As previously discussed, Rieck obligated the Debtors to supply massive volumes under the supply contracts, particularly the Enstar Contract, before the Debtors' production capabilities were fully tested, let alone confirmed.

151.    As CFO, I learned that Rieck, Webb, and Ganer (among others) relied on the flawed and untested assumption that the Sterling contained the huge natural gas reserves reported in the 2016 and 2017 NSAI Reserve Reports – despite evidence as early as 2013 that the Sterling inherently produced large volumes of water that would reduce and impair the Debtors' productive capabilities.  These capabilities went untested under Rieck's management because the Debtors were unable to complete the additional wells to produce the Sterling until 2018, when completed by Pinsonnault and PRA.

152.    By the time Pinsonnault and PRA took over the Debtors' operation in 2018, they had no choice but to increase production by tapping into the Sterling at full-bore, as directed by the Board-approved PRA Plan including utilizing the A2A well.  Had Pinsonnault and PRA not done so, there was no chance that the Debtors could meet the delivery requirements of the Enstar Contract, because only the Sterling (purportedly) contained reserves and production rates in sufficient volume to service the supply contracts.  Those reserves – through no fault of the Proposed Defendants – did not exist because the Sterling naturally produced water in volumes that were unaccounted for based on previous estimates, including the 2016 and 2017 NSAI Reserve Reports.

153.    Likewise, the Webb Complaint alleges that "the incompetent and imprudent decisions of Pinsonnault" resulted in the blockage of the undersea pipeline in early 2019.

(Webb Compl. ¶ 119.)   But based on the report prepared by M&H Engineering Services (the "M&H Report"), a true and complete copy of which is attached as <u>Exhibit 79</u> in the Appendix, the blockage was not caused by negligence.   Rather, the problem was caused by a combination of unusually cold temperatures and the inherent design of the Debtors' drilling pipeline and platform. (Ex. 79 at DA01729.)

154.    Specifically, because any water had to be transported through the undersea pipeline – which was not designed to handle large volumes of water – frozen hydrates formed in the pipeline when the temperature dropped below freezing, causing blockages.   As discussed, the platform and the pipeline were constructed in 2014 and 2015, based on the information available to the Debtors at the time and long before, or entirely independent of, any involvement by the Proposed Defendants, including Pinsonnault.

155.    *Second*, the allegation that the Proposed Defendants are responsible for the destruction of over $830 million in proven reserve value is patently false.   No reserves were "destroyed."   The alleged damages from this claim are merely a reflection of the difference between the reserves as estimated by the 2017 NSAI Report and the subsequent report issued by NSAI on June 21, 2019 (the "2019 NSAI Report") a true and complete copy of which is attached as <u>Exhibit 78</u> in the Appendix.

156.    Had $830 million of reserve value been destroyed (particularly due to negligence), that presumably would have been included in the 2019 NSAI Reserve Report.   Nothing of the sort is mentioned, either in the 2019 NSAI Reserve Report or in contemporaneous communications by and among the Debtors and any objective source.

157.    The decrease in proven reserves from 155 BCF in the 2017 NSAI Reserve Report to 20 BCF in the 2019 NSAI Reserve Report is the result of more accurate data provided from the

implementation of the PRA Plan by Pinsonnault and PRA, culminating in the report issued by PRA in November 2018 (the "PRA Report"), a true and complete copy of which is attached as Exhibit 74 in the Appendix.  The 2016 and 2017 NSAI Reports did not account for the large volumes of naturally-occurring water that were always present in the Sterling, but which were only confirmed through the additional wells that PRA and Pinsonnault ultimately completed and drilled, pursuant to the Board-approved PRA Plan, which finally produced accurate data.

158.    Had Rieck and his operatives – including Webb, van Stephoudt, and Ganer – not repeatedly failed to construct these wells in 2015, 2016, and 2017, more accurate data would have been reflected in the 2016 and 2017 NSAI Reserve Reports – rather than the illusory volumes that Webb now cites as the benchmark of the Movants' damages.

159.    In sum, beginning with the Jones Act issues in 2011, the mistakes and mismanagement of Rieck and his operatives – including Webb, van Stephoudt, and Ganer – as well as the Movants (among others), from 2011 through 2016 are, in large part, responsible for placing the Debtors in their current position.  The Movants now misdirect blame towards the Proposed Defendants through false and misleading allegations.

Pursuant to 28 U.S.C. § 1746, to the best of my knowledge, information and belief, and after reasonable inquiry, I declare under penalty of perjury that the foregoing is true and complete.


Dated: December 5, 2019

/s/ David W. Elder
David W. Elder
Chief Financial Officer

45