**Schedule 5**
**Pledge and Security Agreement**

**COPYRIGHTS AND MATERIAL COPYRIGHT LICENSES**

None.

Schedule 5
Pledge and Security Agreement

CONFIDENTIAL

ECP00001873
DA00370

Exhibit A to
Pledge and Security Agreement

[INSERT TO LLC/PARTNERSHIP AGREEMENT]

Section _____. Transferability.

Subdivision 1.   Notwithstanding anything contained herein to the contrary, each [Member/Partner] shall be permitted to pledge or hypothecate any or all of its [Units/Partnership Interests/Ownership Interests], including all Interests, economic rights, control rights and status rights as a [Member/Partner], to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such [Units/Partnership Interests/Ownership Interests] pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Company Agreement with no further action or approval required hereunder.  Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of [Units/Partnership Interests/Ownership Interests], the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any [Member/Partner] and without becoming a [Member/Partner], to exercise the membership/partnership/ownership voting rights of the [Member/Partner] granting such pledge or hypothecation.   Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Company Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, upon its election to do so, shall become a [Member/Partner] under this Company Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a [Member/Partner] under this Company Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging [Member/Partner] shall cease to be a [Member/Partner] and shall have no further rights or powers under this Agreement.  The execution and delivery of this Company Agreement by a [Member/Partner] shall constitute any necessary approval of such [Member/Partner] under the [Texas Limited Liability Company Act/Texas Revised Uniform Limited Partnership Act] (or any successor statute) to the foregoing provisions of this Section _____.  This Section _____ may not be amended or modified so long as any of the Units is subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent.  Each recipient of a pledge or hypothecation of the Units shall be a third party beneficiary of the provisions of this Section _____.

Section __.  Article 8 Opt-In.

The Company hereby irrevocably elects that all [Units/Partnership Interests/Ownership Interests] shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of [Texas] or any other applicable jurisdiction.   Each certificate evidencing

NY\6451445.9

ECP00001874
DA00371

[Units/Partnership Interests/Ownership Interests] in the Company shall bear the following legend: "This Certificate evidences an Interest in the Company and each [Unit/Partnership Interest/Ownership Interest] represented hereby is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of [Texas] and, to the extent permitted by applicable law, each other applicable jurisdiction." No amendment to this provision shall be effective until all outstanding [Unit/Partnership Interest/Ownership Interest] certificates have been surrendered to the Company for cancellation.

Section __.  Certificated Securities.

The [Units/Partnership Interests/Ownership Interests] shall be represented by certificates substantially in the form attached hereto as Annex A.

NY\6451445.9

ECP00001875
DA00372

Form of Limited Liability Company Interest Certificate

## LIMITED LIABILITY COMPANY INTEREST CERTIFICATE
### [FURIE OPERATING ALASKA, LLC]
### a Texas Limited Liability Company

**No. ___**

      **THIS CERTIFICATE (THIS "CERTIFICATE") CERTIFIES THAT** _____ is the owner of fully paid and non-assessable units representing a _____% Ownership Interest in [Furie Operating Alaska, LLC] (the "Company") in the capacity of a Member of the Company.

      THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE OWNERSHIP INTERESTS ARE SET FORTH IN, AND THIS CERTIFICATE AND THE OWNERSHIP INTERESTS REPRESENTED HEREBY ARE ISSUED PURSUANT TO AND SHALL IN ALL RESPECTS BE SUBJECT TO THE TERMS AND PROVISIONS OF, [THE SECOND AMENDED AND RESTATED COMPANY AGREEMENT OF THE COMPANY, EFFECTIVE AS OF SEPTEMBER 21, 2011], AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME (THE "AGREEMENT"). THE TRANSFER OF THIS CERTIFICATE AND THE OWNERSHIP INTERESTS REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE AGREEMENT.

      Capitalized terms used and not otherwise defined herein are used as defined in the Agreement.

      This Certificate evidences an interest in the Company and each Ownership Interest represented hereby is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Texas and, to the extent permitted by applicable law, each other applicable jurisdiction.

      This Certificate shall be governed by, construed, interpreted and applied in accordance with the laws of the State of Texas (excluding any conflict of law rules thereof).

      **IN WITNESS WHEREOF**, the Company has caused this Certificate to be signed this _____ day of _____, 20___.

                    By: _____
                    Name:
                    Title:

      THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF

NY\6451445.9

ECP00001876
DA00373

THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

NY\6451445.9

ECP00001877
DA00374

**(REVERSE OF CERTIFICATE)**

**ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby assigns, conveys, sells and transfers unto

_____    _____

(Please insert taxpayer identification    (Please print name and address)
number of Assignee)

all rights and interest of the Assignor in [Furie Operating Alaska, LLC] represented by the within Certificate and irrevocably constitutes and appoints _____ as its attorney-in-fact with full power of substitution in the premises to transfer the same on the books of the Company.

Dated: _____    By: _____

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE.  THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS            PRINCIPAL            EXECUTIVE            OFFICES.

NY\6451445.9

ECP00001878
DA00375

**Annex I**
**Pledge and Security Agreement**

[Form of]
**ISSUER'S ACKNOWLEDGMENT**

The undersigned hereby (i) acknowledges receipt of a copy of that certain Pledge and Security Agreement, dated as of July [ ● ], 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"; capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Security Agreement), made by Cornucopia Oil & Gas Company, LLC and Furie Operating Alaska, LLC in favor of Energy Capital Partners Mezzanine Opportunities Fund A, LP, as Collateral Agent (in such capacity, together with its permitted successors and assigns, the "**Agent**") for the benefit of the Secured Parties, (ii) agrees promptly to note on its books the security interests in its Equity Interests granted to the Agent and confirmed under the Security Agreement, (iii) agrees that it will comply with written instructions of the Agent (so long as any such instruction (A) states that an Event of Default has occurred and is continuing and (B) is otherwise in accordance with the terms of the Credit Documents) with respect to the applicable all Equity Interests of the undersigned which are Pledged Securities without further consent by the applicable Grantor, (iv) agrees to notify the Agent upon obtaining knowledge of any interest in favor of any person in the applicable Pledged Securities that is adverse to the interest of the Agent therein and (v) waives any right or requirement at any time hereafter to receive a copy of the Security Agreement in connection with (a) the registration of any Pledged Securities thereunder in the name of the Agent or its nominee or (b) the exercise of voting rights by the Agent or its nominee.

*[ISSUER]*

By: _____
Name:
Title:

NY\6451445.9

ECP00001879
DA00376

# EXHIBIT 10

DA00377

## EMPLOYMENT AGREEMENT
### BRUCE D. WEBB

THIS EMPLOYMENT AGREEMENT ("the Agreement") is dated February 16, 2015 and EFFECTIVE as of March 1, 2015, by and among CORNUCOPIA OIL AND GAS COMPANY, LLC., a Texas limited liability company ("Cornucopia") its Subsidiary, FURIE OPERATING ALASKA, LLC., a Texas limited liability company ("FOA"), each having principal executive offices at 100 Enterprise Avenue, League City, Texas 77573 and 1029 West 3rd Avenue, Suite 500, Anchorage, AK 99501 and Bruce D. Webb residing at 7420 Solarset Circle, Anchorage, AK 99507 ("the Executive").   Cornucopia and FOA are hereinafter collectively referred to as the "Company".

### WITNESSETH:

WHEREAS, the Company desires to employ the Executive to work for the Company and such of its other affiliates of Cornucopia and FOA as Company may request from time to time and the Executive is willing to be employed by the Company upon the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.    EMPLOYMENT.   The Company hereby promotes Bruce D. Webb from Vice President, Governmental and External Affairs for FOA to **Senior Vice President** and employs the Executive for the FOA effective March 1, 2015 for a "Probationary Period" of 36 months. Upon the expiry of the Probationary Period (February 28, 2018) the Executive will be promoted to **Executive Vice President** of the Cornucopia and FOA, the "Company" for an additional "Permanent Period" of 48 months.   The Executive hereby accepts such employment upon the terms and conditions hereinafter set forth.    The Company and Executive understand and acknowledge that this Agreement is a contract for employment ("Employment Contract") and as such the Executive is not considered an "at-will" employee of the Company under any state, local and/or federal law.

2.    TERM.   The term of the employment of the Executive hereunder shall be for the period commencing retroactively as of March 1, 2015 and for an initial term, subject to the above detailed EMPLOYMENT, unless sooner terminated in the manner herein provided, ending at the close of business on February 28, 2022 (7-years), with each 12-month period from March 1 through February 28 during the term referred to as the "Contract Year" and the period from March 1, 2015 through February 28, 2022 referred to as the " Initial Contract Term". The Contract Term may be renewed or extended by mutual agreement of the Company and Executive by written agreement executed at last 90-days prior the expiry of the Initial Contract Term, such renewed or extended contract term referred to as the "Extended Contract". Absent an agreement for an Extended Contract, or termination before the expiry of the Initial Contract Term in the manner herein provided, at the expiry of the Initial Contract Term this Employment Contract shall be automatically extended for a 1-year period and referred to as the "Extended Contract Term", and shall be further extended in the same manner in each subsequent year.

initials: K.R.    Bruce Webb
Kay Rieck    Bruce Webb

FURIE-BANKR_00062602
DA00378

3.    DUTIES AND RESPONSIBILITIES.

(a)    The Executive agrees to faithfully and diligently serve the FOA and the Company in the initial capacity as Senior Vice President and the subsequent capacity as Executive Vice President on a full time basis and shall be in charge of all day to day supervision and management of the Alaska office and Alaska operations, governmental and regulatory affairs, investor relations, media releases, regulatory compliance, oil and gas marketing, oil and gas purchase and sales agreements, and other duties as assigned from time to time under the direction of the Managers of the Company. As Executive Vice President of the Company, the Executive shall have signatory authority to all of the Company's bank accounts and bonds held by financial institutions on behalf of the Company.

(b)    The Company will provide the Executive with an office in Anchorage, Alaska, or at such other locations as shall be mutually agreed upon between the Executive and the Managers of the Company, which shall be the same as or comparable to the office now used by the Executive, and will provide the Executive with executive secretarial services at such office.

4.    COMPENSATION.

(a)    As compensation for the services to be rendered hereunder by the Executive, the Company agrees to pay the Executive, and the Executive agrees to accept, effective March 1, 2015 a yearly salary at a rate of Two Hundred Fifteen Thousand Dollars ($215,000.00) through the Probationary Period; and effective March 1, 2018 a yearly salary at a rate of Two Hundred Fifty Thousand Dollars ($250,000.00) through the Permanent Period, which amount during the Permanent Period shall be subject to an annual cost of living increase as provided in Section 4(b) hereof. Collectively, such annual salary plus all cumulative cost of living increases shall be hereinafter referred to as the "Basic Annual Compensation". The Executive's Basic Annual Compensation shall be payable biweekly, in conjunction with the Company's payment of its employees' biweekly payroll.

(b)    In the event the "Consumer Price Index – United States City Average – Urban Consumers" published by the Bureau of Labor Statistics of the US Dept. of Labor (the "CPI-U"), shall indicate that as of December 31 of any year during the Permanent Period of the Contract Term of this Agreement, commencing March 1, 2019, the CPI-U during the twelve months then ended shall have increased over the previous twelve months, then the Basic Annual Compensation, in respect to any Contract Year, commencing with the Contract Year beginning March 1, 2018, shall be increased prospectively, effective on such day, by an amount equal to the amount so calculated within the Company's other Employment Agreements on file as of the date of this Agreement.

5.    OTHER BENEFITS.

(a)    The Executive shall be entitled to participate on the same basis and subject to the same qualifications as other executives of the Company, an employment plan, including a 401K Plan with a Company-matching provision using a "safe harbor" provision (with respect to the required annual percentage test) contribution to be determined by the Company; a life, health,

*Page 2 of 12*

initials: K.R.    bW
Kay Rieck    Bruce Webb

FURIE-BANKR_00062603
DA00379

disability, vision, dental, hospitalization or surgical insurance plan or policy (with coverage for the Executive and his family); and any vacation or fringe benefit plans or programs.

(b)    The Executive shall be entitled to an annual discretionary cash bonus payable (the "Annual Bonus") each Contract Year. Any Annual Bonus paid shall be based on the performance and criteria set forth below (the "Annual Bonus Criteria"):

(i)    the performance based portion of the Annual Bonus Criteria shall be based on: (a) the Company's EBITA performance for the 12-month period ending on the previous December 31 compared against the Company's annual budget for such period, and (b) the Company's performance in meeting its obligations in a timely manner under any governmental permit or authorization;

(ii)    in addition, the Annual Bonus Criteria shall include such other discretionary criteria established by Mr. Kay Rieck or the Company's Board of Managers to the provisions of Exhibit A attached hereto.

(c)    Provided the Annual Bonus Criteria are met, the Company, in its absolute discretion, may pay the Executive an Annual Bonus, based on the above Annual Bonus Criteria, not exceeding on hundred percent (100%) of the Executive's Basic Annual Compensation for the immediately preceding Contract Year.

(d)    The Executive shall be entitled to receive a one-time "Retention Bonus" of Two Hundred Fifty Thousand Dollars ($250,000) at the end of the 4-year Permanent Period (February 28, 2022) of the Initial Contract Term. Said Retention Bonus is payable by the Company to the Executive no later than March 16, 2022 for the Executive's commitment to stay an Executive of the Company and the successful completion of the Initial Contract Term.

(e)    In the event of a public sale of the Company or its ultimate parent entity or any equity securities of the Company or such ultimate parent entity becomes listed or any recognized state, federal, foreign, or other securities exchange, the Executive shall be entitled to receive to any amounts due to the Executive under the provisions in Section 7 below.

(f)    Nothing contained herein shall be deemed to be a waiver by the Executive of, or to diminish or modify, any vested rights that the Executive may have or may hereafter acquire under any employee benefit plan of the Company.

(g)    It is contemplated that, in connection with Executive's duties and responsibilities under this Employment Agreement, that the Executive will be required to incur reasonable business, entertainment and travel expenses. The Company agrees to reimburse the Executive in full for all such expenses upon submission by the Executive to the Company of all such receipts, vouchers, or expense reports satisfactorily evidencing such valid expenses.

(h)    It is understood and agreed by the Executive and the Company that during the term of the Executives employment hereunder, he shall be entitled to annual vacation time (taken consecutively or in segments) the length of which shall be consistent with the ability to effectively perform the Executive's duties and responsibilities; provided, however, that it is agreed the Executive shall be entitled to accrue twenty business days (20) of annual vacation

*Page 3 of 12*

initials: _KR_    _BW_
Kay Rieck    Bruce Webb

FURIE-BANKR_00062604
DA00380

time during the Executive's Probationary Period, and thirty business days (30) of annual vacation time during the Executive's Permanent Period. All accrued vacation time may be taken annually on a non-cumulative basis with any unused portion of vacation time to be carried over to the next year.

(i)    In the event of termination of the Executive's employment, with or without an Act of Cause (as defined in Section 6 below), in addition to all other compensation and benefits to which the Executive is entitled to under the terms of this Agreement, the Executive is entitled to "cash-in" any unused portion of the Executive's vacation time at a rate equal the pro-rated daily rate of his Basic Annual Compensation at the time of his termination.

(j)    In the event of termination of the Executive's employment, with or without an Act of Cause (as defined in Section 6 below), in addition to all other compensation and benefits to which the Executive is entitled to under the terms of this Agreement, to the extent permitted by applicable state or federal law, the Company shall pay the costs of the Executive's health benefits under COBRA, or in the event COBRA rules apply to a longer period of time, for a period equal to the shorter of twenty-four (24) months, as may be extended by law, from the date of termination of such employment or the date the Executive ceases to be covered by the Company's COBRA coverage under his COBRA election after such termination, or in the event the COBRA election does not apply, equivalent coverage by the Company.

(k)    In the event of termination of the Executive's employment at any time during the Initial Contract Term or any Extended Term, without an Act of Cause (as defined in Section 6 below), the Company agrees to pay the Executive the remaining value of the Basic Annual Compensation (prorated to the month) for any remaining time left in the Initial Contract Term or any Extended Term, in addition to any unpaid bi-weekly compensation due to the Executive as of the date of termination, plus any reasonable attorney's fees of the Executive (up to a maximum of $100,000.00) to the extent the Executive is required to take legal action against the Company to recover any compensation or benefits due to the Executive by the Company as a result of the Company's unlawful termination of the Executive without an Act of Cause (as defined in Section 6 below).

6.    <u>TERMINATION OF THE EXECUTIVE'S EMPLOYMENT FOR CAUSE</u>. The Company shall have the right to terminate the Executive's employment under this Agreement, as well as any and all compensation that the Executive would otherwise be entitled to receive herein (except for compensation and benefits that the Executive is entitled to through the date of such termination and any compensation and benefits referred to in Section 5 above that the Executive has a vested right to receive under the terms and conditions of this Agreement pursuant to which said compensation and benefits were earned or granted), if, and only if, the Executive shall have committed any act of material dishonesty or fraud against the Company or a felony conviction or in the event of gross negligence or willful misconduct of the Executive in the performance of his duties and responsibilities (such acts or events being herein referred to as "Act of Cause"). In the event the Managers of the Company elect to terminate the employment of the Executive under this Agreement for an Act of Cause as set forth above, the Company shall send written notice of such effect and election to the Executive, and the Executive's employment under this Agreement, and this Agreement, thereupon terminate as of the date so specified in such notice, which date shall be no les than 14 business days after the Executive's receipt of such notice.

*Page 4 of 12*

initials: KR   BW
         Kay Rieck   Bruce Webb

FURIE-BANKR_00062605
DA00381

7.    **PAYMENTS UPON EXPIRATION, SALE OF ASSETS, SECURITIES OR CHANGE OF CONTROL.**

(a)    Pursuant to the Company's obligation under this Agreement, upon the earliest to occur of any events listed in (b) below during the Initial Contract Term or any Extended Term (each individually, a "Trigger Event"), the Executive shall receive a cash payment in the amount that is equal to the following:

an amount equal to the total of: (A) the remaining value of the Basic Annual Compensation (prorated to the month) for any remaining time left in the Initial Contract Term or any Extended Term, in addition to any unpaid bi-weekly compensation due to the Executive as of the date the Trigger Event occurs, *plus* (B) the maximum Annual Bonus to which the Executive would be entitled to for the twelve (12) - month period ending on the next December 1 after the date of the Trigger Event, *plus* (C) one percent (1%) of the amount by which the Sales Price (as hereinafter defined) exceeds the tangible net worth of the Company (computed in accordance with U.S. generally accepted accounting principles consistently applied with all prior periods) as of the date hereof.

In the discretion of the Company, in lieu of receiving a cash payment on the event of a Trigger Event below, the Executive *may* elect to receive, to the greatest extent permitted and allowed by law, and in compliance with all applicable laws, receive stock, warrants, options or other equity interests equivalent in value to the cash payments provided for above, in and of any public offering of the Company's stocks or shares or other company or equity to whom the Company's or any of its parent entities' assets of membership interests are sold or otherwise acquired pursuant to any Trigger Event below. The amount and terms of any such equity interests will be mutually agreed to between the Company and Executive at such time.

(b)    Trigger Events shall be:

(i)    the public sale of the Company, its immediate member equity, or its ultimate parent entity, of any equity securities, or and securities convertible or exchangeable into equity securities of any such entity;

(ii)    Mr. Kay Rieck and his affiliates sells his or their interests in the Company so that he or they own less than fifty percent (50%) of the membership interests of the Company, its immediate member entity or its ultimate parent entity (on a fully diluted basis);

(iii)    the sale transfer or other disposition in a single or related series of transactions (whether by purchase, merger, foreclosure, or otherwise) of more than fifty percent (50%) of the book value or fair market value of the consolidated assets of the Company, its immediate member entity or its ultimate parent entity, including any sale, transfer or distribution to an affiliated entity, foreclosure of any membership interests by a lender, or by way of merger or reorganization of the corporate or organizational structure of the Company or any of its affiliate entities;

*Page 5 of 12*

initials: KR. _____  Kay Rieck    BW _____  Bruce Webb

(iv)    the sale transfer or other disposition (including a farm-in or farm-out agreement) of more than fifteen percent (15%) interest in the oil and gas and other leasehold interests owned by Cornucopia in the Kitchen Lights Unit in the Cook Inlet, or elsewhere in Alaska, with or without a change of operator or manager of the leases so sold, transferred, disposed of, or farmed out; or

(v)    the merger, consolidation or other business combination with any entity other than an affiliate or the liquidation or dissolution of the Company, its immediate member entity or its ultimate parent entity.

(c)    For the purposes of this Section 7, "Sales Price" shall mean:

(i)    upon the occurrence of the Trigger Event set forth in clause (b)(i) or (b)(ii) above, the Fair Market Value (as hereinafter defined) of the Company as of the effective date of such event;

(ii)    upon the occurrence of the Trigger Event set forth in clause (b)(ii) above, (A) if the entity whose equity securities are sold is the Company, the price at which such equities are offered to the public multiplied by all common shares outstanding, fully diluted, upon the completion of the public offering less all Additional Equity (as hereinafter defined), or (B) if the entity whose equity securities are sold is an entity other than the Company, the Fair Market Value of the Company as of the date of such sale;

(iii) upon the occurrence of the Trigger Event set forth in clause (b)(iii) or (b)(iv) above(other than a liquidation or dissolution of the Company), the total consideration received by the selling members in such transaction divided by the percentage of total membership interests or common shares (if applicable), fully diluted, of the Company sold at the time of such transaction less all Additional Equity;

(iv)    upon the occurrence of the Trigger Event set forth in clause (b)(v) above, the total consideration or other compensation, in cash or in kind, received by the Company or any member affiliate of the Company for the interest sold; and

(v)    in the event of a liquidation or dissolution of the Company, the total amount distributable to the Company's members pursuant to such liquidation or dissolution after taking into account (A) a pro rata deduction in the amount distributable equally to all Additional Equity and (B) an addition thereto equal to the aggregate of all dividends and management, investment banking, and any other fees paid to the parent or affiliates of the Company.

(vi)    If the Company or its immediate or ultimate parent entity is a publically traded entity, "Fair Market Value" shall mean the amount equal to all of the shares of the owner outstanding on a fully diluted basis multiplied by the average market price of such entity's common stock for the ten (10) business days

*Page 6 of 12*

initials: _K.R._    _BW_
Kay Rieck    Bruce Webb

FURIE-BANKR_00062607
DA00383

(based upon closing share prices) prior to the effective date of such event less all Additional Equity. If such entity is not a publicly traded company, "Fair Market Value" shall mean the greater of the net worth or the appraised value of such entity, less any Additional Equity, as provided by a mutually agreed upon investment banking firm in a written opinion letter prepared at the expense of such entity that is based upon the fully diluted common stock market value of such entity would be if it were a publicly traded entity after taking into account relevant factors such as prior history, earnings potential and industry multiples of earnings, cash flow and asset values. "Additional Equity" shall mean the dollar amount initially invested in the Company or its immediate or ultimate parent entity less organization and other expenses capitalized on the balance sheet as of the date thereof as an asset, excluding any covenant not to compete, if capitalized.

8.    NON-COMPETITION.  The Company shall discharge the Executive for an Act of Cause pursuant to Section 6 hereof if the Executive, directly or indirectly accepts employment, provides consulting services to, or otherwise assists any company, individual, or group that (i) competes in the markets in the geographical areas in which the Company performs oil and gas exploration and production operations.

9.    DEATH OR DISABILITY.  The obligations of the Company hereunder shall terminate forthwith in the event of death of the Executive during the term hereof or, at the option of the Company and upon notice to the Executive or his legal representative(s), in the event the Executive shall fail to perform his duties and responsibilities hereunder because of a physical or mental incapacity or disability either for (i) a continuous period of more than 180 days or (ii) a period aggregating 180 days or more during any consecutive 12 month period.  In any such event, the Executive or his legal representative(s) as the case may be, shall, to the extent permitted by applicable law, continue to receive the compensation and benefits that the Executive would have otherwise been entitled to pursuant to Section 4 hereof (and the Company will also be responsible for the provisions of Section 5(a) hereof) and his employment continued through the end of the month in which death of termination occurs and for the following six (6) months.  The Executive or his legal representative(s) shall also receive and benefits and bonus' referred to in Section 5 hereof in which the Executive has a vested right or such annual bonus criteria had been met, as the case may be, and all stock, invested stock options, or restricted stock units to which the Executive is entitled at the time of his death shall immediately vest upon such death, as of the date of death or termination, under the terms and conditions of the plan or program pursuant to which such benefits were granted.  Any such benefits or bonus' to which the Executive was thus so entitled or which vested as of the date of the Executives death or disability shall be paid to the Executive's legal representative'(s) within ninety (90) days after such date of death or disability.

10.    CONFIDENTIALITY.  Recognizing that the Executive's employment hereunder will involve access to proprietary and confidential knowledge and information pertaining to the business of the Company and its business methods, systems, operations, plans, policies, the Executive agrees that, during the term of this agreement and his employment, he shall not (other than pursuant to his duties hereunder or as required by law) disclose to any unauthorized third party any proprietary or confidential information pertaining to the Company or its operations or customers.  In the event of such termination the Executive shall return all company property of

initials:  K.R. _____   _____
          Kay Rieck    Bruce Webb

FURIE-BANKR_00062608
DA00384

whatever nature in his possession or control to the Company.

11.    <u>NO SET-OFF, DEDUCTIONS AND WITHHOLDING.</u>

(a)    The Executive's rights hereunder, including payments to which the Executive is entitled hereunder, shall not be subject to diminution or to any right of set-off, recoupment or counterclaim by reason of any other agreement, relationship or course of dealing between the Executive, on the one hand, and the Company or any officer, director, employee, agent or affiliate thereof, or any assignee or successor of the foregoing, on the other hand, and the obligations of the Company hereunder shall be completely performed by the Company, or any aforementioned assignee or successor, without any regard to any such other agreement, relationship, or clause of dealing.  The aforementioned terms "assignee or successor" for the purposes of this Agreement are to include any and all "successors and assigns" described in Section 12 hereof.

(b)    The Executive agrees that the Company shall have the right to withhold from any and all payments required to be made to the Executive pursuant to this Agreement all federal, state, local and/or other taxes which the Company determines are required to be withheld in accordance with applicable statutes, regulations or orders as from time to time in effect and any payments due to the Company in respect to payroll advances or loans made by the Company to the Executive.

12.    <u>ASSIGNABILITY ANDBINDING EFFECT.</u>  The rights and obligations arising under this Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors, and legal representatives of the Executive, and shall inure to the benefit of and be binding upon the Company, its representatives, and its respective successors and assigns, whether by merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise, but (i) without the prior written consent of the Company, neither this Agreement nor the rights or obligations of the Executive hereunder may be assigned, pledged, hypothecated or otherwise transferred by the Executive to another person, firm or company, nor may the obligations of the Executive be delegated, and (ii) without the prior written consent of the Executive, the Company shall not assign this Agreement or its rights hereunder to a third party other than a successor to the business of the Company, whether by merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise.

13.    <u>NOTICES.</u>    All notices, requests, demands, and other communications ("Notices") hereunder shall be in writing and shall be personally delivered or sent by certified mail, first class postage prepaid and return receipt requested, to other party hereto at his or its mailing address as set forth at the beginning of this Agreement.  Notices shall be deemed given, on the date delivered if personally delivered, or at the date post marked if mailed.  Any party may change the address to which such communications hereunder may be sent by sending notice of such change to the other party as herein provided.

14.    <u>SEVERABILITY.</u>    If any condition or provision of this Agreement or any part hereof is invalid, unlawful or incapable of being enforced by reason of public policy or by any rule of law of principle of equity, all other conditions and provisions shall, nevertheless, remain in full force and effect.

*Page 8 of 12*

initials:  *KR*    *ZW*
          Kay Rieck    Bruce Webb

FURIE-BANKR_00062609
DA00385

15.   **PRIOR AGREEMENTS, COMPLETE UNDERSTANDING, AMENDMENT.** This Agreement supersedes and replaces all prior agreements and understandings between the parties hereto regarding the employment of the Executive by the Company and constitutes the complete understanding between the parties with respect to the employment of the Executive hereunder, and no statement, representation, warranty or covenant has been made by any party except as expressly set forth herein. This Agreement shall not be altered, modified, amended, or terminated except by written instrument signed and accepted by each of the parties hereto.

16.   **HEADINGS.** The headings set forth in this Agreement are for convenience only and shall not be considered as part of the Agreement in any respect nor shall they in any way affect the substance of any condition or provision contained in this Agreement.

17.   **DISPUTE RESOLUTION, FEES AND EXPENSES.**

(a)   If a dispute arises between the Executive and the Company out of or in connection with this Agreement the parties may elect to resolve the dispute via mediation in Anchorage, Alaska. If, within thirty (30) days after the dispute arises, the mediation is unsuccessful, or if the parties elect to initially forego mediation, any dispute between the Executive and the Company arising out of or in connection with this Agreement shall be submitted to trial by court or to trail by jury in Anchorage, Alaska. Except as set forth in the Section 5(k) above and in the following Section 17(b), each party shall pay his own fees and expenses in connection with any such mediation or trial proceeding.

(b)   In the event the Company shall discharge the Executive during the Initial Term or Extended Term of this Agreement and in a mediation and/or a trial proceeding instituted pursuant thereto it shall be determined that said discharge was without an Act of Cause as defined herein, then the Company shall reimburse the Executive for all fees and expenses(including reasonable attorney fees) incurred by him and arising out of, or in connection with, such controversy.

18.   **GOVERNING LAW.** This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Alaska.

19.   **INDEMNIFICATION.**

(a)   TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY HEREBY AGREES TO RELEASE, PROTECT, DEFEND AND INDEMNIFY AND HOLD HARMLESS THE EXECUTIVE FROM, FOR AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, EXPENSES, LIABILITIES, JUDGEMENTS AWARDS OR LOSSES WHATSOEVER (HEREINAFTER REFERRED TO AS "CLAIMS") BROUGHT OR SUFERED BY, ANY PERSONS OR RELATING TO OR ARISING FROM ANY ACTIVITY OR SERVICES BY EXECUTIVE UNDER THISN AGREEMENT, OR ANY BREACH OF, THIS AGREEMENT BY, COMPANY, TO THE EXTENT ANY SUCH CLAIMS IN ANY WAY ARISE OUT OF, RESULT FROM, OR ARE IN ANY WAY CONNECTED WITH THE EXECUTIVE'S SERVICES OR PERFORMANCE OF HIS DUTIES AND RESPOSIBILITIES, OR COMPANY'S OBLIGATINSUNDER THIS AGREEMENT OR ANY OTHER AGREEMENT WITH ANY PERSON, ENTITY, OR THISD

*Page 9 of 12*

initials: K.R. _____  BW _____
Kay Rieck   Bruce Webb

FURIE-BANKR_00062610
DA00386

PARTY, OR COMPANY'S FAILURE TO COMPLY WITH ANY LAW OR REGULATION, EXCEPT TO THE EXTENT ANY SUCH CLAIMSARE CAUSED BY OR ARISE OUT OF THE GROSS NEGLIGENCE, WILFUL MISCONDUCT, FRAUD, BREACH OF THIS AGREEMENT OR FAILURE TO COMPLY WITH ANY LAW OR REGULATION BY THE EXECUTIVE.

        (b)    The Company agrees that the Company shall maintain throughout the term of this Agreement, directors and officer's insurance, which shall extend to and cover the Executive for all risks covered by such insurance.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

*Page 10 of 12*

initials: Kay Rieck    Bruce Webb

FURIE-BANKR_00062611
DA00387

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on February 16, 2015 with an effective date as of **March 1, 2015.**

### CORNUCOPIA OIL AND GAS COMPANY, LLC

By:  Advanced Capital Funding, LLC,
Sole Member of Cornucopia Oil and Gas Company, LLC

By: _____
Name:  Kay Rieck
Title:    Manager of Advanced Capital Funding, LLC


### FURIE OPERATING ALASKA, LLC

By:  Cornucopia Oil and Gas Company, LLC,
Sole Member of Furie Operating Alaska, LLC; and
By:  Advanced Capital Funding, LLC,
Sole Member of Cornucopia Oil and Gas Company, LLC

By: _____
Name:  Kay Rieck
Title:    Manager of Advanced Capital Funding, LLC


### EXECUTIVE

By: _____
Name:  Bruce D. Webb


*Page 11 of 12*

initials: _____   _____
         Kay Rieck   Bruce Webb

FURIE-BANKR_00062612
DA00388

**EXHIBIT A**
To the Employment Agreement of Bruce D. Webb
Effective March 1, 2015

Additional Bonus Criteria, if any:

Individual goals and targets will be used to measure additional bonus criteria and will be set annually by Mr. Kay Rieck or the Company's Board of Managers and agreed to by the Executive thirty (30) days after the execution of tis Agreement of the 2015 Contract Year and thereafter annually by December 1 for the subsequent Contract Years.

*Page 12 of 12*

initials:    Kay Rieck    Bruce Webb

FURIE-BANKR_00062613
DA00389

# EXHIBIT 11

DA00390

BAREBOAT CHARTER AGREEMENT

This Bareboat Charter Agreement (hereinafter called "*Charter*") is dated as of the 04th day of July, 2015 ("*Effective Date*"), by and between Shelf Drilling Offshore Resources Limited II, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (hereinafter called "*Owner*") and Offshore Drilling Solutions Ltd., an international business company incorporated in  Ras Al Khaimah , United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates (hereinafter called "*Charterer*").

## I.    CHARTER AND TERM

A.    Demise and Vessel Description. For and in consideration of the covenants and agreements herein, and subject to the terms and conditions hereof, OWNER DOES HEREBY LET, DEMISE AND BAREBOAT CHARTER TO CHARTERER and CHARTERER HEREBY AGREES TO TAKE AND BAREBOAT CHARTER FROM OWNER the "Vessel".

For purposes of this Article I and all other provisions of the Charter, "*Vessel*" shall mean (i) the offshore jack up drill rig called the RANDOLPH YOST, Marshall Islands Official Registry No. 1744, ABS Classification No. 7901508, IMO No. 8754281 and (ii) all related equipment, materials and consumables, each more particularly described and specified in Exhibit A hereto (including, to the extent specified in Exhibit A, all apparel, gear, engines, machinery, lifeboats, anchors, cables, chains, rigging, tackle, fittings, furnishings, spare parts, tools, supplies, stores, pumps, and other equipment on board or ashore wherever located, belonging to the drill rig and all documents, certificates and manuals appertaining or belonging thereto wherever located).

For the avoidance of doubt, for purposes of this Article I and all other provisions of the Charter, the term Vessel shall be deemed to include all Vessel Equipment (as defined in III.H. below), Refurbishments and any other upgrades, modifications, additions, improvements, renewals and replacements at any time made during the term of this Charter in or to the Vessel, provided however, that the Vessel shall never be interpreted as including any inventory or equipment on board the Vessel which do not belong to the Owner and its Affiliates (as defined in Article X).

B.    Base Charter Period. This Charter shall be effective as of the Effective Date and, subject to the provisions of this Charter, the Charter term for the Vessel shall be for an initial period commencing on the Delivery (defined in Exhibit III.C below) and ending at 11:59 p.m. on the day which is thirty six (36) months after the Delivery (hereinafter the "*Base Charter Period*"), subject to extension as set forth below.  The Base Charter Period or any Extension Period, as applicable, shall be automatically extended for the time required to complete any well in progress and any additional time as required to effect redelivery at the end of the Charter Period pursuant to the provisions of III.C. of this Charter.



C.    Extension Period. Charterer shall have the option to extend the Charter Period for two (2) additional twelve month terms (each an "*Extension Period*" and collectively "*Extension Periods*"). The Extension Periods shall be exercisable by Charterer by giving Owner written notice of extension (i) no less than one hundred-eighty (180) days prior to the end of the Base Charter Period, in the case of the first Extension Period and (ii) no less than one-hundred eighty (180) days written notice prior to the end of the first Extension Period, in the case of the second Extension Period. The Base Charter Period and all Extension Periods are herein sometimes collectively called the "*Charter Period*".

D.    No Transfer of Title. This Charter is a demise bareboat charter only and does not create in or transfer to Charterer any title or ownership (legal or equitable) of the Vessel other than possession and use thereof as a demise charterer.

E.    Permitted Use. Owner and Charterer acknowledge that Charterer intends to operate (or cause to be operated) the Vessel in the Permitted Area of Operations (as defined in IV.A. below), including that part of the Permitted Area of Operations within the jurisdiction of the State of Alaska, under a drilling contract with Furie Operating Alaska LLC ("FOA") or, subject to Article XIII, such other entity as it may determine.

## II.    HIRE, PAYMENT CURRENCY, TERMINATION

A.    Hire. Charterer shall pay to Owner as charter hire ("*Hire*") for the Vessel (i) the sum of USD 20,000 (United States Dollars Twenty Thousand) per day during the initial eighteen (18) months of the Base Charter Period, (ii) the sum of USD 23,000 (United States Dollars Twenty Three Thousand) per day during the second eighteen (18) months of the Base Charter Period and (iii) a mutually agreed daily rate during each Extension Period but not to be less than USD 23,000 (United States Dollars Twenty Three Thousand) per day or greater than USD 30,000 (United States Dollars Thirty Thousand) per day during such Extension Periods. All Hire shall be paid net of Taxes to the extent expressly set forth in Article XII, and shall be payable monthly in advance, at the first of each month during the Charter Period. Owner shall invoice Charterer (i) on the Delivery, Hire due for the number of days for which Hire will be owed during the remainder of the first calendar month of the Base Charter Period in which the Delivery occurs and (ii) thereafter, prior to the beginning of each succeeding month during the Charter Period and Charterer shall pay to Owner such invoiced amount within ten (10) days after receipt of the invoice, but not before the first of any month. All Hire and any other amounts owing by either party hereto to the other party under this Charter or any Exhibit or document ancillary hereto shall be paid by the Charterer to Owner when due, in immediately available United States Dollar funds. In support of its obligations under this Charter, Charterer agrees, on or before July 31, 2015, to cause FOA (as operator under a drilling contract for use of the Vessel in Alaska) to deliver to Owner (i) an executed guarantee of Charterer's obligations under this Charter in terms and format acceptable to Owner which shall be attached to the Charter as Exhibit B by amendment to this Charter, and (ii) a correct copy of the balance sheet and financial statements of FOA's parent company, Cornucopia Oil & Gas Company LLC, for the financial quarter ending December 31, 2014.

2

All references to USD, $, Dollars or dollars in this Charter shall mean United States dollars. Payments of Hire shall be made by wire transfer to the account designated by Owner at:

| | |
|---|---|
| Bank | : HSBC Bank Plc. |
| Bank Address | : P.O. Box 18127-32 Poultry |
| | London EC2P 2BX |
| | United Kingdom |
| Bank Swift Code | : MIDLGB22 |
| Account Name | : Shelf Drilling Offshore Resources Limited II |

for the credit of Owner account number: GB55MIDL40051576104028.

Subject to Articles II.C., III.C. and VIII the Charterer's obligation to pay the Hire after Delivery shall be absolute and, unless otherwise expressly agreed by the parties hereto, unconditional irrespective of any contingency whatsoever, including but not limited to: (i) a Force Majeure event as defined in Article X. A. or, (ii) any right of set off, counterclaim, recoupment, defense or other right which either party hereto may have against the other or, (iii) any unavailability of the Vessel for any reason, including seaworthiness, merchantability, satisfactory quality, fitness for any purpose, condition, design, or operation of any kind or nature of the Vessel, other than a breach of any representations or warranties of Owner under the provisions of this Charter or Owner's failure to timely comply with its obligations under Articles III.B., III.C., III.H to III.L. IV.A, and IV.B. hereunder, or for registration or documentation under any relevant jurisdiction other than a failure of registration or documentation at the time of Delivery by Owner.

B.      Owner Termination Right. Owner may terminate this Charter pursuant to the provisions of Article XI below if an Event of Default occurs.

C.      Charterer Termination Right. If the Owner breaches any of its representations or warranties or fails to comply with any of its covenants or obligations set forth in Article III below, Charterer may give Owner fifteen (15) days written notice of such failure and if upon expiration of such fifteen (15) day period after Charterer's notice, Owner has still not complied with such warranties, covenants or agreements, Charterer may terminate this Charter on five (5) days prior written notice without any obligation to pay any further Hire or other amounts to Owner other than the obligation to pay Hire and other amounts due by Charterer under the terms of this Charter to the effective date of such termination.

D.      Default Interest. If Charterer fails to pay Hire any within five (5) days after the day when due, such unpaid Hire shall bear interest until paid at the rate of nine (9) percent (%) per annum (based on a year of 365 days and actual days elapsed) and shall be payable within the time period for payment of Hire hereunder.

III.      **WARRANTIES. INSPECTION. DELIVERY. REDELIVERY**

3

A.    AS IS/WHERE IS. Subject to the representations and warranties contained in and other provisions of III. B., III.C., III.D., III.E., III.F., III. H., III. I., III.J, and III.K and Article IV. A. and IV. B. below, the charter of the Vessel from Owner to Charterer shall be on an "AS IS/WHERE IS" basis and OWNER EXPRESSLY DISCLAIMS AND NEGATES ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN, CONDITION, SEAWORTHINESS, MERCHANTABILITY, QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN THE VESSEL, FITNESS FOR A PARTICULAR PURPOSE OR ANY PARTICULAR TRADE, VALUE, CONDITION, COMPLIANCE WITH LAWS, DESIGN, CONFORMANCE WITH SPECIFICATIONS, OR ABSENCE OF LATENT DEFECTS AND OWNER FURTHER DISCLAIMS ALL OTHER LIABILITIES IN RESPECT OF THE VESSEL (AT COMMON LAW OR IN CONTRACT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS CHARTER) OR TORT OR OTHERWISE INCLUDING STRICT LIABILITY.

B.    Owner's Representations and Warranties.

(i) Owner represents and warrants that

      (a) it is the sole owner of the Vessel and has the absolute right and authority to charter and deliver the Vessel to Charterer under this Charter,

      (b) at the time of Delivery of the Vessel, the Vessel shall be properly documented as a Marshall Islands' flagged Vessel and in class with a current ABS Class Certificate as a + A1 Self Elevating Drilling Unit without any recommendations or requirements unless mutually agreed by Charterer and Owner,

      (c) all Marshall Islands' taxes and fees have been paid on the Vessel as of and to the time of Delivery,

      (d) all taxes, export duties, assessments and fees of any kind due and owing with respect to the Vessel or to which the Vessel is subject with regard to its ownership, operation, or storage owed to any taxing jurisdiction or state, municipal or local governmental entity in Indonesia, Singapore, or any other jurisdiction at or prior to Delivery have been or will be paid prior to Delivery,

      (e) Owner will at the time of Delivery have obtained all applicable export licenses, central bank clearances and other licenses, permits and clearances required to export and transport the Vessel from Indonesia, Singapore and any other jurisdiction where the Vessel has been stored or operated prior to Delivery,

      (f) at all times from and after the earlier of November 30, 2015 or the date the Vessel is returned to Singapore or other agreed location pursuant to the subparagraph (h) below until the Delivery Date the Owner will, except to the extent not reasonably practicable or not attributable to an event or circumstance solely and exclusively within the Owner's control, keep the Vessel safely jacked up or moored or berthed at

4

FURIE-BANKR_00106535
DA00394

a secure location in Singapore or other location agreed between Owner and Charterer,

(g) at the time of Delivery, the Vessel and its Vessel Equipment shall be in the same condition as on the Inspection Date (defined below), with the exception of fair wear and tear and the Refurbishments as described in Article III.J. below and the Vessel shall in all respects be floating free and ready for transportation to Charterer's desired location in Alaska or elsewhere at Charterer's discretion, and

(h) Owner shall ensure that the Vessel shall be returned to a safe location in Singapore, or other location mutually agreed between Owner and Charterer, on or before November 30, 2015.

(ii)  Owner also warrants that there is now, and at the Delivery Date will be, no mortgage, charge (whether fixed or floating), pledge, hypothecation, assignment (by way of security), trust arrangement (for the purpose of providing security), demand, claim, options, contracts (other than this Bareboat Charter), lien (of a maritime nature or otherwise) or encumbrance of any kind whatsoever securing any obligation of any person or having the effect of conferring security or any type of preferential arrangement (including title transfer and/or retention arrangements having a similar effect ("*Lien*" or plural "*Liens*")  on or affecting the Vessel or Vessel Equipment, other than First Preferred Mortgage dated 28 February 2014, as amended 11 June 2014 in favour of RBC Europe Limited, as security trustee, and a Preferred Mortgage dated 21 January 2013 in favour of Wilmington Trust, National Association, as security trustee, as same may be amended or refinanced  and any other similar  mortgage, security interest, charge or encumbrance given in respect of the Vessel or Vessel Equipment to secure such amendment or refinancing subsequent to Delivery as a result of new financing/refinancing of existing debts by the Owner or its Affiliates in the ordinary course of business ( the "*Mortgage*").

(iii)  Owner represents, covenants and agrees that it will discharge or cause to be discharged any Liens other than the Mortgage on the Vessel (including the Vessel Equipment) prior to Delivery of the Vessel to the Charterer. Owner further warrants and agrees that no Mortgage or Lien with respect to the Vessel (including the Vessel Equipment) arising out of Owner's business or any person claiming by, through or under Owner or its Affiliates, joint venture partners, contractors, employees, representatives or agents, or the business of any person on whose behalf Owner may be acting, shall interfere with Charterer's rights of quiet enjoyment of the Vessel under the Charter, and Owner shall discharge or cause to be discharged any such Lien other than the Mortgage. Owner agrees to indemnify, hold harmless and defend Charterer, its Affiliates, lenders, representatives and agents, for, from and against any such Liens existing at the time of Delivery or arising at any time during the Charter Period. Owner further agrees, prior to Delivery to cause its Mortgage lenders to enter into a quiet enjoyment letter in form and substance reasonably acceptable to Charterer whereby such Mortgage lenders agree that, provided Charterer continues to pay the Hire on a timely basis, no such Mortgage lender will interfere with Charterer's quiet enjoyment and use of the Vessel during the Charter Period.

5



FURIE-BANKR_00106536
DA00395

C.   <u>Delivery/Redelivery/Surveys.</u> The Vessel shall be deemed delivered to Charterer when Vessel is floating and ready to commence tight tow from the dock or shipyard in Singapore or other location agreed with Charterer ("***Delivery***") to the dry tow carrier location on a date ("***Delivery Date***") designated by Charterer between February 15, 2016 and March 15, 2006 ("***Delivery Window***").

The Charterer shall coordinate the physical delivery of the Vessel with Owner and shall advise Owner of the anticipated Delivery Date during the Delivery Window.  On Delivery the Vessel and Vessel Equipment shall be in the condition referenced in III.B (i)(g) above.

To the extent that Delivery is delayed or interrupted by an event or circumstance not solely and exclusively within the Owner's control (including but not limited to any delay in arrival of the dry tow vessel or any delay not attributable to Owner) (herein called a "***Charterer Delivery Delay***"), the Delivery Window shall be automatically extended by the period of such delay or interruption; provided however that if such delay of Delivery occurs prior to 1 March 2016 the Owner shall be entitled to invoice the Charterer on March 1, 2016 for Hire in respect of all days in the month of March 2016 and for each month thereafter until the termination of the Charter Period irrespective of when Delivery actually occurs. Notwithstanding any provision to the contrary contained herein, if Hire becomes payable on March 1, 2016 under the above provisions or the provisions in the immediately following paragraph but Delivery has been delayed, the Vessel shall continue to be at the risk of Owner under the provisions of III.L below until Delivery actually occurs.

For the avoidance of doubt, if Delivery occurs between 15 February 2016 and prior to 1 March 2016 the Hire shall be deemed to commence when the Vessel commences tight tow to the dry tow carrier location on the designated Delivery Date at an agreed location in Singapore or such other location agreed with Charterer.  If the Delivery occurs between 1 March 2016 and prior to 15 March 2016 and the Owner has notified the Charterer prior to 1 March 2016 that the Vessel is ready to commence tight tow from the dock or shipyard in Singapore or other location agreed with Charterer, the Owner shall be entitled to invoice the Charterer on March 1, 2016 for Hire in respect of all days in the month of March 2016 and thereafter until the termination of the Charter Period irrespective of when Delivery actually occurs.

D.   <u>Owner's Corporate Organization.</u> Owner represents and warrants that Owner is a limited liability company duly organized and validly existing in good standing under the laws of Cayman Islands, and has the legal power and authority to enter into and perform its obligations under this Charter and has legal and beneficial title to 100% of the Vessel free and clear of all Liens other than the Mortgage.

E.   <u>Charterer's Corporate Organization.</u> Charterer represents and warrants that Charterer is a an international business company limited by shares, duly organized and validly existing in good standing under the laws of the  Ras Al Khaimah,  United Arab Emirates, and has the legal power and authority to enter into and perform its obligations under this Charter.



F.    Owner's Due Authorization. Owner represents and warrants that Owner has duly authorized, executed and delivered this Charter, and this Charter constitutes, or when entered into as contemplated hereby constitutes, the legal, valid and binding obligation of Owner enforceable against the Owner in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally.

G.    Charterer's Due Authorization/Taxes. (i) Charterer represents and warrants that Charterer has duly authorized, executed and delivered this Charter, and this Charter constitutes, or when entered into as contemplated hereby constitutes, the legal, valid and binding obligation of Charterer enforceable against the Charterer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally.

   (ii)  Charterer covenants and agrees as follows:

      (a)  it will pay or cause to be paid all taxes, export duties, assessments and fees of any kind due and owing with respect to the Vessel or to which the Vessel is subject with regard to its operation or storage during the Charter Period until redelivery, whether owed to any taxing jurisdiction or state, municipal or local governmental agency.

      (b)  during the Charter Period and prior to redelivery it will obtain all export licenses, central bank clearances and other licenses, permits and clearances required to export and transport the Vessel from Alaska and any other jurisdiction where the Vessel has been stored or operated during the Charter Period.

H.    Charterer's Vessel Inspection. On or before August 31, 2015, or such other date as may be mutually agreed to in writing by the parties hereto (the "***Inspection Date***"), Charterer and its representatives (subject to permission, as applicable, from the current operator of the Vessel) shall be permitted to and shall be granted full access to the Vessel and all of its spare parts, equipment, machinery, accessories and tools whether on board or ashore wherever located (all such spare parts, equipment, machinery, accessories and tools herein collectively called the "***Vessel Equipment***") for the purposes of performing, at its own cost and expense, a full inspection and survey of the Vessel and the Vessel Equipment and their condition ("***Vessel Inspection***"). At such time, Owner and Charterer shall take and create a full inventory of all such Vessel Equipment. After the Inspection Date, Owner shall keep and maintain the Vessel and Vessel Equipment in the same condition and state of repair as on the Inspection Date, with the exception of fair wear and tear and the Refurbishments to be performed as described in Article III.J. below. In addition, no later than seven (7) days prior to Delivery on the Delivery Date, the Owner and Charterer shall perform the Delivery Survey of the Vessel and all Vessel Equipment in order to confirm the Vessel and all Vessel Equipment are in the same condition and state of repair as on the Inspection Date, with the exception of fair wear and tear, Refurbishments and any structural changes, modifications or upgrades to the Vessel or changes in in machinery, boilers, generators or appurtenances thereto approved in writing by the Owner. Any other inspection of the Vessel and Vessel Equipment other than the Redelivery Survey required to be

7



FURIE-BANKR_00106538
DA00397

performed by or on behalf of the Charterer at any time prior or subsequent to the Delivery and approved in advance by the Owner shall be at the Charterer's own cost and expense.

I.    ABS 5-Year Survey. Prior to Delivery, Owner shall, at its own cost, cause American Bureau of Shipping (ABS) to perform a 5-year special survey for the Vessel ("*ABS 5-Year Survey*"). If any repairs are specified or required by ABS in its above survey Owner at its own cost will, prior to Delivery, (i) make any repairs necessary as indicated by such ABS inspection and (ii) cause ABS to finalize the ABS 5-Year Survey and issue its new Class Certificate without any requirements or recommendations unless mutually agreed by Charterer and Owner.

J.    Vessel Refurbishments. Owner shall provide a project team to perform only the installation and commissioning of the following upgrades to the Vessel for Charterer prior to Delivery of the Vessel (to the extent it is possible to complete such upgrades prior to Delivery): (a) 3rd mud pump and (b) 15,000 psi piping on the rig floor (the "*Refurbishments*"). On or before September 30, 2015, Owner and Charterer shall agree to a detailed workscope and timeline for the implementation of the said Refurbishments. Other than the cost for Owner's project team for the installation and commissioning, Charterer shall supply such equipment and pay all costs and expenses related to (a) and (b) above including but not limited to supply of materials and equipment, all associated project costs, and shipyard charges for such Refurbishments. Charterer may supply a management team of up to three representatives during the performance of the Refurbishments at Charterer's cost. Charterer and its authorized representatives shall be granted access to the shipyard and Vessel where located in Singapore with such access commencing no later than twenty-four hours after arrival of the Vessel in Singapore or other location mutually agreed between Owner and Charterer on or prior to November 30, 2015, or other mutually agreed date, for purposes of observing and monitoring such Refurbishments and for any other inspections required by Charterer at its cost provided such inspections will not interfere with the ABS 5-Year Survey or cause any delay to the Delivery of the Vessel. Owner shall cause all the installation and commissioning of the Refurbishments to be performed to Charterer's reasonable satisfaction prior to Delivery of the Vessel to Charterer unless Charterer in its discretion decides not to proceed with such installation and commissioning prior to Delivery. All Refurbishments to the Vessel specified in this Article III.J. will remain with the Vessel and belong to Owner, unless Charterer exercises the Purchase Option per Article XVIII below.

K.    Owner's Failure to Make Repairs. Should Owner fail to timely make the required repairs pursuant to the provisions of Article III.I Charterer may either, by written notice to Owner, (a) terminate this Charter or (b) with Owner's prior written consent, waive the right to terminate under (a) and repair such damage at Owner's sole cost and expense. In addition, notwithstanding any other provision to the contrary contained in this Charter, should Owner fail to (i) cause the Vessel to be returned to Singapore or other mutually agreed location on or before November 30, 2015 or (ii) cause the ABS Survey required in Article III.I. to be timely performed and completed by the Delivery Date, Charterer may terminate this Charter by written notice to Owner.

L.    Vessel Risk Prior to Delivery. Subject to the above provisions of this Article III and notwithstanding the Owner's assistance with the loading and offloading of the Vessel as

8



described in Article III.M. below, the Vessel to be at sole risk of loss and expense of Owner prior to Delivery, except that any damages, cost and expenses arising from or related to the performance, or delay in performance of the Charterer's requested Refurbishments prior to the Delivery, shall be for Charterer's account, except to the extent caused by or arising out of the Willful Misconduct (as defined in Article X) of Owner or its representatives, employees or agents. Subject to the provisions of Article VIII, the Vessel to be at the sole risk of loss and expense of Charterer during the Charter Period until termination of the Charter on redelivery of the Vessel to Owner under the provisions of this Charter.

M.      Mobilization and Demobilization Costs. All costs related to the mobilization of the Vessel (including the costs for dry tow carrier and fuel, demurrage fee, other boats and fuel for loading and offloading the Vessel, warranty surveyor, etc.) from its location on Delivery to Alaska or other agreed location where the Vessel is to be operated by Charterer are for the account of Charterer. Charterer to pay all costs related to the demobilization of the Vessel (including the costs for dry tow carrier and fuel, demurrage fee, other boats and fuel for loading and offloading the Vessel, warranty surveyor, etc.) from its last location where operated by Charterer under the Charter back to the Redelivery Location subsequent to the expiry of either the Charter Period or early termination of the Charter by Owner pursuant to Article XI or by Charterer under the provisions of this Charter, unless the Vessel is purchased by the Charterer under the provisions of this Charter, provided all of the foregoing obligations and costs with respect to redelivery only assumed by the Charterer shall apply notwithstanding the provisions of Article X.C(iv).  As requested and/or required by the Charterer, the Owner will provide assistance to the Charterer during mobilization and demobilization by monitoring and observing all marine operations for the loading and offloading of the Vessel onto a dry tow carrier.

## IV.    USE AND OPERATION OF VESSEL

A.      Area of Operations. Subject to the provisions of this Charter, the Charterer shall have the full use of the Vessel. Charterer shall have the right to display its insignia, and to fly its own house flag. Owner shall not change the name of the Vessel during the Charter Period. Charterer will not take the Vessel out of the Permitted Area of Operations without the prior written consent of Owner. In terms of this Charter, *"Permitted Area of Operations"* means the United States of America and its territorial sea, contiguous zone, exclusive economic zone and maritime boundaries with adjacent/opposite countries. The Vessel shall be operated and maintained in a safe, operable and seaworthy condition and shall not be used, operated or sub-chartered in any manner contrary to any applicable law, rule, or regulation of the USA, Alaska, Marshall Islands or any jurisdiction where Charterer operates the Vessel, or any state or local political subdivision thereof (*"Applicable Law"*), nor shall the Vessel be operated in a manner which is inconsistent with its design capabilities or Classification Certificate or outside of the coverage of the insurance policies on the Vessel.

B.      Charterer's Exclusive Use. Subject to the terms hereof, the Charterer shall have exclusive use, possession and control of the Vessel and shall navigate, fuel, maintain, repair, operate, man, and victual the Vessel, at its expense and by its own procurement, throughout the Charter Period. The master, officers and crew of the Vessel shall be engaged and employed by or on behalf of the Charterer and its Affiliates and contractors and shall remain the employees or contractors of the

9



Charterer or its agents, navigating and working the Vessel solely on behalf of and at the risk of the Charterer to the exclusion of the Owner, its Affiliates and their directors and employees.

C.     Taxes and Operating Expenses During Charter Period. Except as provided in this Charter, the Charterer shall pay all charges, taxes and expenses of every kind and nature whatsoever incurred during the Charter Period, incidental to the use and operation of the Vessel under this Charter in accordance with the provisions of Article XII.

D.     Charterer's Risk During Charter Period. Except as otherwise provided in this Charter, the possession, use, operation and maintenance of the Vessel and Vessel Equipment during the Charter Period shall be at the sole risk of Charterer until redelivery pursuant to the terms hereof.

E.     Insurance. The Charterer shall establish and maintain or cause to be established and maintained insurance coverage or other financial security or responsibility in respect of oil or other pollution damage as required by Applicable Law and in compliance with the provisions of Article IX below. The Charterer shall make and maintain all arrangements as may be necessary to satisfy such requirements at Charterer's sole expense and Charterer shall defend, indemnify and hold harmless the Owner, its Affiliates and their directors and employees, against all damages whatsoever (including loss of time) for any failure or inability to do so.

F.     Vessel Changes. The Charterer shall be allowed to make minor and non-structural changes and modifications to the Vessel; however, the Charterer shall make no structural changes in the Vessel or changes in the machinery, boilers, generators or appurtenances thereof, without in each instance first securing the Owner's prior written approval thereof. If the Owner so agrees, the Charterer shall, if the Owner so requires, restore the Vessel to its former condition before termination of the Charter.

G.     Wreck Removal. In the event of the Vessel becoming a wreck or obstruction to navigation during the Charter Period, the Charterer shall remove such wreckage or obstruction at Charterer's expense and shall defend, indemnify and hold harmless the Owner against any sums, including but not limited to fines, penalties and legal fees whatsoever which the Owner shall be held to be liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

H.     Owner's Representatives. Owner shall be entitled to have up to two (2) of its employees or inspectors onboard the Vessel for a short period for inspection purposes during the Charter Period, with forty-eight (48) hours' notice, at Owner's expense and responsibility and without interference with operations of the Vessel. Owner shall pay to Charterer on demand any reasonable costs incurred by Charterer for food and lodging as a result thereof. Owner and its employees or inspectors shall execute Charterer's Hold Harmless Agreement prior to boarding the Vessel.

I.     Vessel Documentation. Charterer shall throughout the Charter Period maintain at Charterer's expense documentation of the Vessel and shall ensure the Vessel remains properly documented under the laws of such country as Owner deems appropriate. Upon the written request of Charterer, the Owner shall execute promptly and with due diligence such documents and furnish such information and authority to the Marshall Islands vessel registry or such

10

governmental agencies  as may be necessary to enable Charterer to maintain the documentation of the Vessel.

J.      Owner's Inspection Rights. Owner, or its authorized representative, shall have the right, at reasonable times and on reasonable notice, to inspect the Vessel and its logs in order to ascertain its condition and to satisfy itself that the Vessel is being properly maintained in accordance with the terms of this Charter, but the Owner shall have no duty to do so.

K.      Salvage Rights. Owner shall not have any interest in any salvage monies earned by the Vessel or its master or crew or received by Charterer.  As between the Owner and Charterer, Charterer assumes and shall satisfy all costs and liabilities incurred in connection with all salvage services rendered by the Vessel.

## V.      MAINTENANCE AND REPAIRS

Charterer, at its expense, shall repair and maintain the Vessel and Vessel Equipment in the same good order, condition and repair as at the Delivery Date, ordinary wear and tear excepted, whether or not such repairs are covered by insurance, including applicable deductibles. The maintenance of the Vessel and Vessel Equipment shall at the minimum comply with the Shelf Drilling Preventive Maintenance System and the spare-parts used for such maintenance shall be Original Equipment Manufacturer (OEM) certified provided that Owner provides Charterer with a complete and correct copy of its Drilling Preventative Maintenance System handbooks or manuals or software (Shelf Drilling's JD Edwards maintenance system) and keeps Charterer updated as to any changes to same during the Charter Period.  Charterer shall maintain such class (ABS), permits and flagging (Marshall Islands) requirements as the Vessel shall have at Delivery hereunder. Charterer shall at all times comply with all Applicable Law, and shall have on board the Vessel when required thereby, valid certificates showing compliance therewith.

## VI.      EQUIPMENT AND STORES AT DELIVERY AND REDELIVERY

Owner acknowledges that such fuel, lubricants and warehouse items as may be on board the Vessel (as well as warehouse items still in transit, if applicable) and owned by Owner at the time of Delivery shall become the property of Charterer. Owner and Charterer shall agree and document the inventory levels or values of the fuel, lubricants and warehouse items as part of the Delivery Survey.  Upon redelivery or retaking of the Vessel, Owner or Charterer shall pay to the other as the case may be, on demand, the difference between the value of fuel, lubricants and warehouse items in inventory at Delivery (as per the Delivery Survey) and at redelivery or retaking based on the Redelivery Survey. Charterer shall have the use of all Vessel Equipment wherever located at the time of Delivery and all other equipment, pumps, gear, outfit, furniture, furnishings, appliances, spares, tools and replacement parts and stores as shall have been onboard the Vessel at the time of Delivery thereof to Charterer, all of which shall be and remain the property of Owner. The same Vessel Equipment and other equipment, pumps, gear, outfitting, furniture, furnishings, appliances, spares, tools, replacement parts, and stores or their substantial equivalents, shall be returned to Owner on redelivery or retaking of the Vessel, less ordinary wear and tear. The Charterer shall from time to time during the Charter Period repair or replace

11



FURIE-BANKR_00106542
DA00401

at Charterer's option such items of equipment as shall be so damaged or worn as to be unfit for use and will be responsible to replace or repair any capital asset or component thereof. In such event, the repair or replacement cost will be the obligation of Charterer. Charterer is to ensure that all repairs to or replacement of any such damaged or worn equipment be effected in such manner (both as regard to workmanship and quality of material) as not to diminish the value of the Vessel. Charterer shall, at its own expense, provide such additional outfit, tools, replacement parts, and other property as it may elect, and such items may be removed by Charterer at or prior to redelivery. Any such items not so removed shall be deemed the property of the Owner. If required by Owner, such items shall be removed from the Vessel prior to redelivery. Other than repair or replacement of such damaged or worn equipment, Charterer shall not make any permanent modifications to the Vessel without Owner's prior written approval.

## VII.   LIENS

A.      No Charterer Liens. Charterer shall not, and shall procure that no other person claiming by, through or under Owner or its Affiliates shall  create, incur, or permit to exist on the Vessel and/or Vessel Equipment any Lien, other than (i) the Mortgage, (ii) this Charter, and (iii) Permitted Encumbrances as defined herein.

B.      Permitted Encumbrances. In the event Charterer directly or indirectly creates, incurs, assumes or allows to exist any Lien, on or with respect to the Vessel and/or Vessel Equipment, except Permitted Encumbrances, Charterer will, at its own expense, take such action as may be necessary to duly discharge any such Lien. The Charterer agrees forthwith to notify the Owner by facsimile or email, confirmed by written notice, of each such event and of each such Lien release or discharge. "*Permitted Encumbrances*" shall mean (i) Liens for contract salvage, general average or necessaries, and Liens for repairs or incident to current operations of the Vessel provided the obligations secured by such Liens are not more than thirty (30) days past due, (ii) Liens in respect of obligations or liabilities of Owner or Charterer under this Charter, any expenditure in satisfaction of which will or may reasonably be expected to be recoverable from insurance (including any applicable deductibles), (iii) maritime Liens and preferred maritime Liens (as such terms may be defined or understood pursuant to Applicable Law) arising in the ordinary course of business, including Liens for insurance premiums or calls not yet due, *so long in each case* as no action has been taken to assert, enforce or record the Lien and each and every Lien is timely paid or discharged; and (iv) any retention of title or similar provisions in a supplier's conditions of supply of goods supplied to Owner or Charterer where such retention or similar provision is agreed in the ordinary course of trading activities.

C.      Libel Against the Vessel. Charterer agrees that if a libel shall be filed against the Vessel and/or Vessel Equipment or if the Vessel and/or Vessel Equipment shall be otherwise liened upon or taken into custody or detained or sequestered by virtue of proceeding in any court or tribunal or by any government or authority because of any Liens which are not the responsibility of or derived by, through or under Owner hereunder, Charterer shall, at its own expense, within thirty (30) days thereafter cause the Vessel to be released and all such Liens, to be satisfied and discharged. Charterer agrees forthwith to notify Owner by facsimile or email, confirmed by written notice, of such event and of such Lien release or discharge. Charterer hereby irrevocably appoints Owner as its attorney-in-fact to secure the release of the Vessel and satisfy and

12

discharge all Liens in the event Charterer fails to timely do so, with full powers of substitution, and Charterer hereby ratifies and approves all things and acts that such attorney-in-fact may lawfully do. Charterer agrees to indemnify Owner from any and all reasonable documented costs, including legal fees, involved in the release of the Vessel and the satisfaction and discharge any such Liens.

## VIII.  LOSS OR DAMAGE AFTER DELIVERY

The parties hereto agree that insurance proceeds received in connection with loss or damage other than an actual, constructive, or compromised total loss of the Vessel (a "*Total Loss*") shall be applied to repair or cure such loss or damage. In the event of damage to the Vessel, Charterer shall, in addition to repairing the Vessel to its state as before such damage, be liable to pay the Hire until redelivery of the Vessel, if redelivery is unable to be timely effected at the end of the Charter Period as a result of such damage. In the event of a Total Loss, Hire shall cease on the date of occurrence of the event or condition giving rise to such Total Loss or the date when the Vessel was last seen and Owner and Charterer shall proceed diligently and cooperate fully with each other in recovery of any and all insurance or other proceeds applicable thereto and such proceeds shall be paid to Owner for distribution as interests may appear.  In the event of an occurrence of Total Loss, the Charterer shall have a maximum aggregate liability to the Owner of USD 60,000,000 (United States Dollars Sixty Million) in respect of physical loss of the Vessel ("*Physical Loss Limit*"), provided that the Physical Loss Limit shall not apply, in any event, to any other losses relating to, arising from or connected with such Total Loss, including but not limited to pollution, wreck and debris removal and/or Hire.

## IX.  INSURANCE

A.    Charterer's Insurance Obligations. Charterer shall during the Charter Period and any extensions thereof, keep the Vessel fully insured against the following risks and with insurers acceptable to Owner. The form of the requirements may be different than that stated below; however the coverages shall remain the same. The form of coverages at the commencement of the Charter shall be in the form and substance reasonably acceptable to Owner and Charterer and shall include the following coverages:

(i)     Comprehensive General Liability Insurance including Pollution Insurance with a combined single limit of not less than United States Dollars Three Hundred Million (US $ 300,000,000) per occurrence including Protection and Indemnity risks, Excess Removal of Wreck over the coverage provided below, and particularly pollution risks attaching to the Vessel.

(ii)    Contingent Operators Extra Expense Insurance (COEE) of not less than United States Dollars One Hundred Million (US $ 100,000,000) per occurrence, with a deductible of no greater than United States Dollars One Million (US$1,000,000) per occurrence.

(iii)   Vessel hull and machinery insurance in the amount of $60 million with the same general physical damage coverages and limits currently maintained by Owner, including deductible of not greater than United States Dollars Five Million

13

(US$5,000,000) (but nil in the event of a total loss). The policy shall include coverage for cost of raising and removal of sunken object or craft, wreckage or debris of Owner's property and equipment with a separate limit for at least 25% of the Insured Vessel's Agreed Value. The policy shall be liable when such removal is compulsory under any applicable laws or when Charterer is liable for removal of such sunken object or craft, wreckage or debris under its contract with government or where such sunken object or craft, wreckage or debris interferes with any party's normal operations. Coverage shall include separate coverage for Sue and Labor up to 25% of the Insured Vessel's Agreed Value , and Incidental Cargo up to United States Dollars Five Million (US$5,000,000) with a deductible of no greater than Unites States Dollars One Hundred Thousand (US$100,000).

B.      Other Insurance Coverage. Other coverage and in such amounts normally required of bareboat charterers and vessel owners, including coverage for sue and labor, incidental cargo loss and contingent OEE coverage, all as reasonably acceptable to Charterer.

C.      Named Insured's. The insurances procured by Charterer pursuant to this Charter shall name Owner [and Owner's lender] as additional insured and loss payee and Charterer shall obtain from its insurers a waiver of rights of subrogation against Owner [and Owner's lender] to the extent of Charterer's obligations and liabilities contained in this Charter. Each such policy shall provide for thirty (30) days prior written notice to Owner of cancellation by underwriter or material change to such policies and that Owner [and Owner's lender] shall not be liable for premiums. Certificates of insurance or upon request certified copies of the originals of all policies, binders, cover notes, and entries, shall be delivered to Owner for custody by it. Charterer will not do or omit any act, nor voluntarily suffer or permit any act to be done or omitted, whereby any insurances required to be carried or maintained hereunder shall or may be suspended, impaired or defeated.

D.      Insurance Claims. Charterer shall be responsible for preparation and submission of any and all claims to the appropriate underwriters and shall also be responsible for the supervision of any litigation irrespective of whether the defense of such litigation falls within the coverage of the insurance policies listed above. Charterer shall furnish reasonable notice to Owner of any claims or damages which result in claims under any such insurance policy or otherwise and Owner shall, upon the reasonable request of Charterer, provide such claim assistance as is necessary. Owner may, at its expense, process any claims or participate in the defense of any litigation.

E.      Policy Terms. Except as otherwise provided in the immediately following paragraph, all policies of insurance or other evidence thereof shall provide that losses thereunder shall be payable to Owner; provided, however, that such policies shall provide that:

> any loss under any insurance on the Vessel with respect to the protection and indemnity risks or other liability insurance shall be paid (a) at Charterer's instruction directly to the person to whom any liability covered by such insurance has been incurred or (b) if Charterer has paid or is paying such loss, liability or expense of the person by whom it was incurred, then directly to the Charterer to reimburse it for

14



payments made by it; provided, however, that the underwriters shall first have received evidence that the liability insured against has been discharged or is being discharged simultaneously with such payment and have not received written notice from Owner as to the occurrence of an Event of Default under this Charter.

F.      War Risk Coverage. Charterer shall obtain such additional insurance coverages of war risk and excess protection and indemnity and the cost of all premiums and deductibles or self-insured retentions shall be for the account of Charterer.  The Owner may elect to procure Owner's interest, and breach of warranty insurance and the cost of all premiums and deductibles or self-insured retentions shall be for the account of Owner.

G.      Owner's Obligations. Owner shall, upon the request of Charterer, promptly execute such document as may be required to enable Charterer to abandon the Vessel to the underwriters and claim a constructive or compromised total loss.

H.      Owner's Additional Insurance. Owner shall have the right, but not the obligation, at Owner's sole expense and for Owner's sole benefit, to secure any additional or excess insurance as Owner deems necessary or desirable. Any such insurance shall be secondary to and/or excess of insurance acquired by Charterer and Charterer's insurance shall bear an endorsement acknowledging such.

## X.     **INDEMNITY**

A.      Defined Terms. For purposes of application, interpretation and enforcement of the provisions of this Article X, and any other relevant Articles of this Charter wherein the definitions are use, the following words and expressions shall mean:

(i)     "Affiliate" means in relation to either party, any company or legal person or entity which (a) controls either directly or indirectly a party or (b) which is controlled directly or indirectly by such party, or (c) is directly or indirectly controlled by a company or legal person or entity which directly controls such party.

(ii)    "Applicable Law" means applicable laws, statutes, rules (administrative or otherwise), regulations, codes, standards or common law, or any other requirement of any Governmental Authority having the force of law, including any re-enactment, repeal or amendment thereof from time to time.

(iii)   "Authorizations" means any permit, license, certificate, approval, authorization, plan, directive, consent, order, clearance or consent decree of, from or with any Governmental Authority or other regulatory body.

(iv)    "Claims" means Liens, claims, awards, demands, losses, liabilities, damages, expenses (including legal expenses), bonding fees, disbursements, costs, suits, cause or causes of action, and judgments of every kind and character.

15

(v)     "Force Majeure" means an event beyond the reasonable control of a party, including but not limited to any act of God, war, act of terrorism, riot, civil commotion, compliance with a law or order of a Governmental Authority, rule, regulation or direction, fire, flood or storm, including hurricanes and named tropical storms.

(vi)    "Governmental Authority" means any nation or government (including any country), any state, local, municipal  or other political subdivision thereof and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or on behalf of the government.

(vii)   "Willful Misconduct" means an intentional act or failure to act by a party or any personnel of the party with actual knowledge that it is likely to result in injury or harm to a person or loss or damage to property and which is intended to cause or which is in reckless disregard of such injury, harm, loss or damage, but shall not include any error of judgment or mistake in the exercise of good faith by the person or entity in question.

B.      <u>Charterer's Indemnities.</u> Charterer shall and does hereby assume all risks, responsibility, and liabilities arising from Charterer's charter, possession, use, maintenance, and operation of the Vessel (including actions in rem or in personam) unless any such Claims arise out of any matter for which Owner is required to indemnify Charterer pursuant to Article X. B. below.

Charterer further agrees to pay, release, investigate, defend, indemnify, and hold harmless Owner its Affiliates and their directors, managers, officers, employees, servants, agents, representatives and the Vessel from and against any and all Claims:

(i)     arising directly or indirectly out of the operations of the Vessel by Charterer during the Charter Period;

(ii)    as a consequence (direct or indirect) of the breach by Charterer of any of its obligations under this Charter;

(iii)   for loss or damage to the Vessel arising out of, related to or connected with the Charterer's charter of the Vessel during the Charter Period;

(iv)    for loss or damage or loss of use of any property of Charterer, its Affiliates or any other person (other than property of Owner's employees, representatives, agents or contractors which are not part of the Vessel or Vessel Equipment);

(v)     for injury, illness, disease or death of any directors, officers, employees, servants, and agents of Charterer, its Affiliates or any other person (other than Owner's employees, representatives, agents or contractors);

16

FURIE-BANKR_00106547
DA00406

(vi)   in respect of pollution of any kind and howsoever arising, whether originating or emanating above or below the surface of water, including, without limitation, control, removal, cleanup costs and third-party damage, fines, penalties, and assessments of any kind or character;

(vii)  with respect to compliance with, or failure to comply with all Applicable Law, including but not limited to the Merchant Marine Act 1920 (as amended by 46 App. U.S.C. 883) and any Applicable Laws particular to any state in the Permit Area in which the Vessel is located from time to time, as well as any obtaining and maintaining all Authorizations needed to operate the Vessel in the Permit Area,

whether any of the types of Claims describe in the foregoing sub-paragraphs (i) to (vii) inclusive arise from, result directly or indirectly from, are incident to, or connected with this Charter or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter and shall apply irrespective of any Claim in tort, breach of contract or otherwise at law. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or enforcing the indemnities contained herein.

C.     Owner's Indemnities. Owner shall and does hereby assume, indemnify, and agrees to pay, release, defend and hold harmless Charterer, its Affiliates and their respective directors, managers, officers, employees, servants, agents, representatives and the Vessel from and against any and all Claims:

(i)    arising with respect to the Vessel or its operations, if any, prior to Delivery to Charterer hereunder, except any liability for Claims specifically assumed by Charterer prior to Delivery under the terms of this Charter, including Article III. L. above;

(ii)   in connection with or arising out of placing of Owner's employees, representatives, agents, contractors or inspectors onboard the Vessel or otherwise carrying out work or operations affecting the Vessel, with respect to damage to or loss of the property belonging to such Owner's employees, representatives, agents, contractors or inspectors (other than the Vessel and Vessel Equipment, and property of Charterer's employees, representatives, agents or contractors which are not part of the Vessel or Vessel Equipment);

17

FURIE-BANKR_00106548
DA00407

(iii)   for injury, illness, disease or death of any directors, officers, employees, servants, and agents of Owner or any of its Affiliates (other than Charterer's employees, representatives, agents or contractors); or

(iv)   as a consequence (direct or indirect) of the breach by Owner of any of its obligations under this Charter and with respect to compliance with, or failure to comply with all Applicable Law.

whether any of the types of Claims described in the foregoing sub-paragraphs (i) to (iv) inclusive arise from, result directly or indirectly from, are incident to, or connected with this Charter or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) of other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

18

FURIE-BANKR_00106549
DA00408

D.    No Consequential Damages or Loss. (i) Notwithstanding any provision to the contrary elsewhere in this Charter, the Owner shall save, indemnify, defend and hold harmless the Charterer, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Owner's own Consequential Loss and the Charterer shall save, indemnify, defend and hold harmless the Owner, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Charterer's own Consequential Loss, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

(ii) For the purposes of this Article X. D, the expression "Consequential Loss" shall mean:

(a) any indirect, special, incidental, punitive or consequential loss or damages under applicable law, and/or

(b) to the extent not covered by D.(i) above, loss or deferment of production, loss of product, loss of use (including without limitation, loss of use or the cost of use of, and increased expenditure related to property, equipment, materials and services including without limitation, those provided by contractors or subcontractors of every tier or by third parties), loss of business and business interruption, loss of revenue (which for the avoidance of doubt shall not include payments due to the Owner by way of remuneration under this Charter or actual damages of Owner or Charterer for the loss of this Charter or any profit, revenue, expectation or opportunity thereunder), loss of profit or anticipated profit, increased expenditure, loss and/or deferral of drilling rights and/or loss, restriction or forfeiture of license, concession or field interests and costs incurred by a party or their group as a result of the other party or their group's breach of contract unless explicitly provided for otherwise in this Charter,

whether or not such losses were foreseeable at the time of entering into this Charter and, in respect of sub-paragraph (b) only, whether the same are direct or indirect.


E.    Willful Misconduct. Notwithstanding any provision to the contrary contained in this Charter, neither party hereto shall be responsible to the other for any Claims caused by the Willful Misconduct of the indemnified party.

F.    No Third Party Beneficiaries/ Group Members.

19



FURIE-BANKR_00106550
DA00409

(i)     Subject to sub-paragraph F (ii)below, the parties intend that, except for indemnities in favor of any group member of any party, no provision of this Charter shall, by virtue of the Contracts (Rights of Third Parties) Act 1999 ("the Act") confer any benefit on, nor be enforceable by any person who is not a party to this Charter.

(ii)     Subject to the remaining provisions of this Charter, the provisions of Articles X. A. to E., inclusive are intended to be enforceable by any group member. For the purposes of Article X, the term 'group member' shall mean any of the Owner's and Charterer's respective Affiliates and its and their directors, officers, managers, employees, servants, agents, representatives and the Vessel.

(iii)     in making a claim under this Charter, the remedies of such group member shall be limited to the claiming of damages.

(iv)     Subject to the provisions of Article VIII, a group member shall not be entitled to assign any benefit or right conferred on it under this Charter by virtue of the Act.

(v)     Notwithstanding the provisions of this paragraph, the Charter may be rescinded, amended or varied by the parties hereto without notice or consent of such group member even if, as a result, that group member's right to enforce a term of this Charter may be varied or extinguished.

## XI.   **DEFAULT**

A.    <u>Events of Default.</u> Any of the following events shall constitute an Event of Default:

(i)     failure of Charterer to pay any Hire within five (5) days after the date when due under the provisions of Article II;

(ii)     failure of Charterer to perform any of the covenants, conditions or obligations required to be performed by Charterer under this Charter or any other obligation to Owner in connection herewith or the breach of any of Charterer's representations and warranties under this Charter, and such failure continues unremedied for fourteen (14) days after written notice from Owner to Charterer of the occurrence thereof;

(iii)     failure to carry and maintain insurance in accordance with the provisions of Article IX;

(iv)     filing by Charterer of a voluntary petition or any response seeking reorganization, rearrangement or readjustment of its debts or for any other relief under any applicable bankruptcy act or law, or under any other insolvency act or law, now or hereafter existing, or of any action by it consenting, approving of, or acquiescing in any such petition or proceeding; the application by it for or the appointment by consent or acquiescence of, a receiver or trustee for it or for all or a substantial part of its property; the making by it of an assignment for the benefit of creditors, the inability of

20



FURIE-BANKR_00106551
DA00410

it, or its admission in writing of its inability to pay its debts as they come due (the term "acquiescence" means the failure to file a petition or motion in opposition to such petition or proceeding or to vacate or discharge any order, judgment or decree providing for such appointment within twenty-five (25) days after the appointment of a receiver or trustee); or

(v)     filing of an involuntary petition against Charterer seeking bankruptcy or reorganization, arrangement or readjustment of its debts or for any other relief under any applicable bankruptcy act or law, or under any other insolvency law or act, now or hereafter existing and such petition remains undismissed or unanswered for a period of forty-five (45) days from the filing; or the involuntary appointment of a receiver or a trustee for all .or a substantial part of its property and such appointment remains unvacated or unopposed for a period of forty-five (45) days from such appointment; or the issuance of a writ of attachment, or executioner similar process against any substantial part of its property and such writ remains unbonded or undismissed for any period of forty-five (45) days from notice of its issuance.

B.     Remedies. Upon the occurrence of an Event of Default by Charterer hereunder, including the lapse of a cure period, if applicable, Owner shall have the right to terminate this Charter and demand redelivery of the Vessel from Charterer and/or to exercise all other rights and remedies granted to Owner under this Charter. In the event of such early termination, in addition to any payment already accrued or due to Owner and as otherwise provided in this Charter (including all costs related to the demobilization of the Vessel as provided under Article III. M), Charterer shall be liable to the Owner for: a) the payment of Hire from the effective date of the termination to the end of the Base Charter Period, and the payment of Hire to the end of the Extended Periods if the option(s) to extend has been exercised; and b) for the payment of Hire until redelivery of the Vessel is effected. Owner may sell, dispose of, hold, use, operate, charter or keep idle the Vessel as Owner, in its sole discretion, may decide. Owner may further exercise any right or remedy which may be available under applicable law, in equity or in admiralty, or proceed by appropriate court action to enforce the terms hereof or to recover damages, including legal fees for the breach hereof.

C.     Redelivery of Vessel on Default. Upon written demand of Owner in the event of a termination of this Charter under the provisions of Article II.B. or II.C., Owner may cause Charterer at Charterer's expense (including but not limited to all costs of demobilization as described above in Article III. M.) to, and Charterer hereby agrees that Charterer will promptly redeliver the Vessel and Vessel Equipment or cause the Vessel and Vessel Equipment to be redelivered to Owner at the Redelivery Location with all reasonable dispatch and in the same manner and condition as if the Vessel and Vessel Equipment were being redelivered at the expiration of the Charter Period, and all obligations of Charterer under this Charter shall apply to such redelivery. Owner may, but shall be under no obligation to, retake the Vessel and Vessel Equipment wherever it may be found, whether upon the high seas or at any port, harbor, or other place, and irrespective of whether Charterer, any subcharterer, or any other person is in possession of the Vessel and Vessel Equipment, all without prior demand and without legal process, and for that purpose Owner or its agent may enter upon any dock, pier, or other premises where the Vessel and Vessel Equipment is and may take possession thereof, without Owner or its

21



FURIE-BANKR_00106552
DA00411

agents incurring any liability by reason of such retaking, whether for the restoration of damaged property caused by such retaking or for damages of any kind to any person for or with respect to any cargo carried or to be carried by the Vessel or for any other reason. In such event, Charterer shall reimburse Owner for such costs incurred, including reasonable legal fees, in retaking the Vessel and Vessel Equipment. Further, Charterer shall defend, indemnify and hold Owner, and its Affiliates and their directors and employees harmless from any liability or claim alleged as a result of such retaking.

## XII.  TAXES

Except for Taxes (as defined below) either (i) associated with Owner's income, revenues, assets or operations derived from sources other than the Vessel or (ii) Owner's capital gains tax, sales tax or any other buyer related taxes arising from a sale of the Vessel to the Charterer subsequent to exercise of the option to purchase under Article XVIII (provided that the Vessel has been moved by the parties to an agreed location beyond the Permitted Area and in international waters for the purpose, and at the relevant time of completing the transaction for such sale of the Vessel), Charterer agrees that during the Charter Period, the Charterer shall pay and assume liability for, and does hereby agree to indemnify, protect, defend, and hold harmless, on an after-tax basis, Owner from and against all taxes, assessments, fees and charges, including ad-valorem taxes on the Vessel, together with any penalties, fines, additions to tax or interest thereon (hereinafter collectively called "*Taxes*"), arising from the use of the Vessel by and Charter of the Vessel to Charterer and/or any transaction for the sale of the Vessel from the Owner to the Charterer subsequent to Charterer's exercise of an option to purchase pursuant to Article XVIII, whether levied or imposed upon Owner by any United States federal or local government or governmental subdivision or other taxing authority of the United States of America, upon or with respect to the chartering, sub-chartering, possession, use or return or other disposition of the Vessel or the rental, receipts, or earnings arising therefrom. Owner agrees to pay and assume liability for, and does hereby agree to indemnify, protect, defend, and hold harmless on an after-tax basis Charterer from and against all (i) Taxes and (ii) export duties, fees, permits, licenses or clearances required, levied or imposed upon Owner or the Vessel by any Indonesia, Singapore, Cayman or other taxing jurisdiction outside of the United States of America with respect to (x) the Vessel or its operations and storage prior to Delivery under this Charter, (y) the export or transportation of the Vessel from Indonesia or Singapore or wherever same is located on Delivery and (z) central bank clearances under Applicable Law required in connection with such export or transportation. During the Charter Period, Owner agrees to cooperate with Charterer and its representatives and assist Charterer, to the extent permitted by Applicable Law, with minimizing any tax liability of Charterer under the provisions of this Article XII, Article XVIII and elsewhere in this Charter.

## XIII.  ASSIGNABILITY

Charterer shall not be entitled to subcharter the Vessel to any person, including any Affiliate, without prior written consent of the Owner which consent shall not be unreasonably withheld or delayed. Charterer may assign its, rights, benefits and interests in this Charter to its lenders for financing purposes and in such event, the Owner agrees to sign a consent to assignment of such rights, benefits and interests of Charterer with any of Charterer's lenders in

22



FURIE-BANKR_00106553
DA00412

form and substance reasonably acceptable to Owner and such Charterer's lenders. No permitted assignment or subcharter by Charterer shall release Charterer from or diminish its liabilities and responsibilities to Owner under this Charter.

## XIV.   GOVERNING LAW AND DISPUTES

A.     Governing Law. The substantive laws of England and Wales, exclusive of any conflicts of laws principles that could require the application of any other law, shall govern the construction interpretation and enforcement of this Charter for all purposes, including the resolution of all Disputes between the parties hereto.

B.     Disputes. For the purposes of this Charter, *"Dispute"* means any dispute, controversy or Claim (of any and every kind or type, whether based on contract, tort, statute, regulation, or otherwise) arising out of, relating to, or connected with this Charter, including any dispute as to the construction, existence, validity, interpretation, termination, performance, enforceability, enforcement or breach of this Charter, as well as any dispute over arbitrability or jurisdiction.

C.     Arbitration. Any Dispute arising out of or in relation to or in connection with this Charter and all Appendices or Exhibits (including the Memorandum of Agreement for purchase of the Vessel under the provisions of Exhibit C hereto), shall be exclusively and finally settled by arbitration without the right to appeal in accordance with the UNCITRAL ARBITRATION RULES currently in force as of the date of this Charter and with this Article XIV. The appointing and administering authority shall be the administering body of the Dubai International Arbitration Centre ("*DIAC*") Any party hereto may submit such a dispute, controversy or claim to arbitration by notice to the other party. The parties shall pay in equal shares any fees required by the DIAC for administering the procedures for any Dispute and appointing the third neutral arbitrator if required.

D.     Arbitration Tribunal. The arbitration shall be heard and determined by three (3) arbitrators. Each party hereto shall appoint an arbitrator of its choice within fifteen (15) days of the submission of a notice of arbitration by one party. The party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within fifteen (15) days following the appointment of both party-appointed arbitrators. The arbitrators need not be members or associated members of the DIAC. If the party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal or one party hereto refuses to appoint its party-appointed arbitrator within said fifteen (15) day period, the appointing authority for the implementation of such procedure shall be the DIAC, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

E.     Arbitration Procedures. Unless otherwise expressly agreed in writing by the parties to the arbitration proceedings:

(i)      The arbitration proceedings shall be held in at an agreed location in Dubai, UAE and failing agreement of the parties at such location as determined by the DIAC;

(ii)     The arbitration proceedings shall be conducted in the English language and the

23

arbitrators shall be fluent in English language;

(iii)    The arbitrator(s) shall be and remain at all times wholly independent and impartial;

(iv)    The arbitration proceedings shall be conducted under the UNCITRAL Rules, as amended from time to time (the "*Uncitral Rules*"), which Uncitral Rules are deemed to be incorporated by reference into this Article XIV;

(v)    Any procedural issues not determined under the UNCITRAL Rules shall be determined by the applicable laws of England, other than those laws which would refer the matter to another jurisdiction;

(vi)    The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators;

(vii)    The decision of a majority of the arbitrators shall be: (i) reduced to writing; (ii) final and binding without the right of appeal; (iii) the sole and exclusive remedy regarding any Claims or other claims, counterclaims, issues or accountings presented to the arbitrators; and (iv) promptly paid in United States dollars free of any deduction or offset;

(viii)    Any costs or fees incident to enforcing the award, shall to the maximum extent permitted by law be charged against the party resisting such enforcement;

(ix)    No special, incidental, indirect, consequential, exemplary or punitive damages (including loss of profit, loss of production, etc.) shall be awarded;

(x)    The award may include interest from the date determined by the arbitration award, and from the date of the award until paid in full, at the interest rate set forth in Article II.D of this Charter;

(xi)    Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be;

(xii)    The arbitration may proceed in the absence of a party who, after due documented and verified notice, fails to answer or appear. An award shall not be made solely on the default of a party, but the arbitrator(s) shall require the party who is present to submit such evidence as the arbitrator(s) may determine is reasonably required to make an award; and

(xiii)    If the parties hereto or others who are bound to this or another similar agreement initiate multiple arbitration proceedings, the subject matters of which are related by common questions of law or fact and which should result in conflicting awards or obligations, then the parties hereto hereby agree that all such proceedings shall be consolidated into a single arbitral proceeding.

24



FURIE-BANKR_00106555
DA00414

F.   <u>Small Disputes.</u> For disputes where the total amount claimed by either party does not exceed one million United States dollars (USD 1,000,000) and in the case of any other dispute where the Parties so agree in writing, the arbitration shall be conducted in Dubai in accordance with the Small Claims Procedure of the London Maritime Arbitration Association.

G.   <u>Survival of Certain Provisions.</u> Article XIV shall survive termination of this Charter for any cause. All other rights and obligations of the parties detailed in this Charter which by their nature survive termination or expiry of the Charter shall remain in full force and effect after such termination or expiry, provided that, for the avoidance of doubt, Charterer shall have no obligation or liability to Owner or any of Owner's member group for any maintenance, repairs, damages or loss of or to the Vessel or Vessel Equipment arising in respect of the period after redelivery of the Vessel to Owner at the Redelivery Location or in respect of the period after termination of the Charter, unless otherwise specifically provided in this Charter.

## XV.   **ENTIRE AGREEMENT**

This Charter constitutes the entire agreement between Owner and Charterer with respect to this subject matter and supersedes all prior agreements, understandings, and commitments, whether oral or in writing. No modification of this Charter will be binding on a party unless in writing and signed by an authorized representative of both parties.

## XVI.   **SEVERABILITY**

Should any clause, sentence, or portion of this Charter be held invalid, against the policy of any state or nation or should any court otherwise refuse to enforce any clause, sentence or portion of this Charter, such holding shall not invalidate the remainder of this Charter or the application of such clause, sentence, or portion to different circumstances or other instances. Failure to enforce any or all of the terms and conditions of this Charter at any particular time or instance shall not constitute waiver or preclude subsequent enforcement of all or any terms or conditions. Sub-captions in this Charter are merely for the convenience of the parties hereto and they shall not be used in interpreting any part of the Charter. Owner and Charterer hereby waive the benefits of any limitation of liability law, statute or treaty now or hereafter existing with respect to the obligations and liabilities of such parties to the other under this Charter.

## XVII.   **NOTICES**

All notices, demands, and other communications required to be given hereunder shall be in writing, sent by certified mail, facsimile communication or by email, confirmed by notice in writing, and shall become effective when received. Such notices, demands and communication shall be sent to the following addresses, and or telefax numbers:

If to Owner:          Shelf Drilling Offshore Resources Limited II
                      Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers,

25

Cluster Y, PO Box 212201 Dubai, United Arab Emirates
Telephone: +971-4-567 3400
Telefax: +971-4-456 1037
Email: kurt.hoffman@shelfdrilling.com &
hendrata.tjoeng@shelfdrilling.com

If to Charterer:     Offshore Drilling Solutions Ltd.
                     c/o HPL Yamalova & Plewka DMCC
                     Jumeirah Lakes Towers
                     Reef Tower, Office 1806
                     Dubai, United Arab Emirates
                     Telephone: +971-505-723-164
                     Email: Harald.plewka@hplaw.com
                     With a copy to: tnunes@coganpartners.com

## XVIII.   PURCHASE OPTION

A.   <u>Option and Purchase Price.</u> Subject always to the remaining terms and conditions of this Article XVIII and any other relevant terms and conditions of this Charter, in consideration of the payment of one United States Dollar, USD 1 (receipt of which is hereby acknowledged by the Owner), the Owner hereby grants to the Charterer, with effect from the date of execution of this Charter an option to purchase the Vessel, on an "as is where is basis" (the "***Option***") at the price of USD 50,000,000, (United States Dollars Fifty Million) free and clear of any Liens, Claims, taxes, charges or other expenses arising by, through or under Owner (the "***Purchase Price***").

B.   <u>Option Period.</u> The Option may only be exercised by Charterer's written notice pursuant to Article XVII above at any time during the Charter Period.

C.   <u>Vessel Purchase Procedures</u>

   (i)  If the Option is not exercised by Charterer on or before the end of the Charter Period, it shall lapse.

   (ii) If the Option is exercised by Charterer at any time during the Base Charter Period, the following provisions shall apply:

      (a)  Charterer shall pay the Purchase Price, provided that such amount shall be payable (as specified under XVIII.D. below) under the terms of a separate sale and purchase agreement entered into between the Owner and Charterer in respect of the Vessel ("***Purchase Agreement***"), which Purchase Agreement by its terms shall expressly supersede and terminate the Charter;

      (b)  the terms of this Charter shall, for the avoidance of doubt, remain wholly enforceable and binding between the parties hereto with full legal force and

26

effect (including but not limited to the Charterer's payment obligations in respect of Hire and other obligations in respect of risk and responsibility for operating and maintaining the Vessel) and such terms shall continue to apply until the earlier of (i) the effective date of execution of the Purchase Agreement by Owner and Charterer (the "*Sale Completion Date*") or (ii) the effective date of termination or expiration of the Charter; and

(c) if the Purchase Agreement is executed and the Charter has been expressly superseded as described in (ii)(a) above, the Owner shall have the right at such time to invoice the Charterer under the terms of Article II.A. and the Charterer shall have the obligation to pay, pursuant to Article II.A., a lump sum amount (as liquidated damages and not as a penalty) equal to an amount calculated by multiplying the daily amount of Hire by the number of days remaining in the Base Charter Period after the Sale Completion Date.

(iii) If the Option is exercised by Charterer at any time during an Extension Period, the following provisions shall apply:

(a) Charterer shall pay the Purchase Price, provided that such amount shall be payable (as specified under XVIII.D. below) under the terms of the separate Purchase Agreement, which Purchase Agreement by its terms shall expressly supersede and terminate the Charter;

(b) The terms of this Charter shall, for the avoidance of doubt, remain wholly enforceable and binding between the parties hereto with full legal force and effect (including but not limited to the Charterer's payment obligations in respect of Hire and other obligations in respect of risk and responsibility for operating and maintaining the Vessel) and such terms shall continue to apply until the earlier of (i) the Sale Completion Date or (ii) the effective date of termination or expiration of the Charter; and

(c) if the Purchase Agreement is executed and the Charter has been expressly superseded as described in (iii)(a) above, the Owner shall not be entitled to payment of the lump sum amount as described in C.(ii)(c) above and the Charterer shall have no further payment obligations under this Charter, other than payment of Hire and reimbursable amounts (if applicable) earned and payable up to the effective date of such Purchase Agreement execution.

D.    Exhibit C Finalization. If the Option is exercised by Charterer under either Article XVIII.C.(ii) or C.(iii) above, the parties hereto shall undertake good faith efforts to finalize and execute the terms and conditions of the Purchase Agreement. Owner and Charterer agree that the Purchase Agreement shall be finalized and attached to the Charter as Exhibit C by amendment to this Charter executed on or before July 31, 2015.

E.    Purchase Price Payment. For the avoidance of doubt, the Purchase Price, as defined in Article XVIII.A. above shall not, in any event, be payable upon the Option being

27



exercised and becoming valid under the terms of this Charter, but shall be payable at the time and in accordance with the terms of the separate Purchase Agreement entered into between the Owner and Charterer in respect of the Vessel.

F.    <u>Costs of Transporting the Vessel on Sale.</u> With respect to the provisions of Article XII above, the parties hereto acknowledge that should the Vessel to be moved to international waters to complete the sale as contemplated in such Article XII, Owner agrees that no Hire shall be payable by the Charterer during the time required for the relevant move of the Vessel to and from international waters; however, the Charterer shall pay all costs and expenses related to such move, including but not limited to all costs of boats and fuel.

## XIX. **CONFIDENTIALITY**

The parties hereto agree that the terms of this Charter shall be and remain confidential and the provisions of the Mutual Confidentiality and Non-Disclosure Agreement signed by Owner and Charterer on June 07th, 2015 shall bind the parties hereto for the period set forth therein as if set forth fully herein.

## XX. **INTERPRETATION**

In this Charter, unless the context otherwise requires:

(a)    words in the singular include the plural and in the plural include the singular;

(b)    "including" and variations thereof means "including but not limited to";

(c)    a reference to a law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it;

(d)    writing or written includes faxes and electronic mail;

(e)    references to a party or the parties means the parties to this Charter;

(f)    references to an Article, a numbered paragraph, any clause or an Exhibit are to an Article, a numbered paragraph, a clause or Exhibit of or to this Charter, and references to this Charter include its Exhibits or other attachments; and references to this Charter or any other document or to any specified provision of this Charter or any other document are to this Charter, that document or that provision as in force for the time being and as amended from time to time in accordance with the terms of this Charter or that document or, as the case may be, with the agreement of the relevant parties.

28

IN WITNESS WHEREOF the parties hereto hereby sign the Charter effective as of the Effective Date.

CHARTERER:

Offshore Drilling Solutions Ltd.

By: Reinhardt Martin Schuster

Title: Director, Manager and
Shareholder

OWNER

Shelf Drilling Offshore Resources Limited II

By:    William C. Hoffman

Title: Executive Vice President and
Chief Operating Officer

29

List of Exhibits

Exhibit A: Randolph Yost Equipment List in IADC Format

FURIE-BANKR_00106561
DA00420

## EXHIBIT A
## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

### STANDARD FORMAT DRILLING RIG SPECIFICATION LIST

### INTERNATIONAL ASSOCIATION OF DRILLING CONTRACTORS

### STANDARD FORMAT EQUIPMENT LIST
### JACK UP DRILLING UNITS

### TABLE OF CONTENTS

### RANDOLPH YOST

Note: All equipment listed hereunder shall be operated and maintained at all times in compliance with Contractor's standard operating manuals, policies and procedures. Operational limits and/or continuous rated capacity referenced therein shall be strictly observed, in order to assure maximum operational efficiency. Exemptions, allowing certain limits or ratings to be exceeded on a temporary basis, shall be subject to mutual agreement in writing, with Operator (Company) assuming all liability for loss or damage, or any related downtime.

### SECTION A - UNIT SPECIFICATIONS

A1   Main Dimensions/Technical Description
A2   Storage Capacities
A3   Jackup Systems
A4   Operational Capabilities
A5   Variable Loading
A6   Environmental Limits
A7   Mooring System
A8   Marine Loading Hoses
A9   Cranes, Hoists, and Materials Handling
A10  Helicopter Land Deck
A11  Auxiliary Equipment

### SECTION B - GENERAL RIG SPECIFICATIONS

B1   Derrick and Substructure
B2   Drawworks and Associated Equipment
B3   Derrick Hoisting Equipment
B4   Rotating System

### SECTION C - POWER SUPPLY SYSTEMS

C1   Rig Power Plant
C2   Emergency Generator

FURIE-BANKR_00106562
DA00421

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

### SECTION D - DRILLSTRING EQUIPMENT

D1   Tubulars
D2   Handling Tools
D3   Fishing Equipment


### SECTION E - WELL CONTROL/SUBSEA EQUIPMENT

E1   Diverter BOP
E2   Low Pressure BOP
E3   High Pressure BOP
E4   Other Blowout Preventers
E5   BOP Control System
E6   Choke Manifold
E7   Flexible Choke & Kill Lines (BOP to Manifold)
E8   Flexible BOP Control Hoses
E9   BOP Testing Equipment
E10  BOP Handling


### SECTION F - MUD SYSTEM/BULK SYSTEM

F1   High Pressure Mud System
F2   Low Pressure Mud System
F3   Bulk System


### SECTION G - CASING / CEMENTING EQUIPMENT

G1   Casing Equipment
G2   Cement Equipment


### SECTION H - INSTRUMENTATION / COMMUNICATION

H1   Drilling Instrumentation at Driller's Position
H2   Drilling Parameter Recorder
H3   Instrumentation at Choke Manifold
H4   Stand pipe Pressure Gauge
H5   Deviation Equipment
H6   Calibrated Pressure Gauges
H7   Rig Communication System
H8   Environmental Instrumentation
H9   Navigation Instrumentation
H10  External Communications Equipment

FURIE-BANKR_00106563
DA00422

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST
## SECTION I - PRODUCTION TEST EQUIPMENT

- I1    Burners
- I2    Burner Booms
- I3    Lines Required on Burner Booms
- I4    Sprinkler System
- I5    Fixed Piping for Well Testing
- I6    Auxiliary Power Availability

## SECTION J - WORKOVER TOOLS

## SECTION K - ACCOMMODATION

- K1    Offices
- K2    Living Quarters

## SECTION L - SAFETY EQUIPMENT

- L1    General Safety Equipment
- L2    Gas / Fire / Smoke Detection
- L3    Fire Fighting Equipment
- L4    Breathing Apparatus
- L5    Emergency First Aid Equipment
- L6    Helideck Rescue Equipment
- L7    Emergency Warning Alarms
- L8    Survival Equipment

## SECTION M - POLLUTION PREVENTION EQUIPMENT

- M1    Sewage Treatment
- M2    Garbage Compaction
- M3    Garbage Disposal / Grinder
- M4    Incinerator
- M5    Oily Water Separator

FURIE-BANKR_00106564
DA00423

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

### ADDITIONAL INFORMATION

| A.    UNIT SPECIFICATIONS | | |
|---|---|---|
| Rig type: | | Cantilever Jack-Up |
| Unit/Design/Shape: | | Marathon Letourneau Design 116C |
| Unit flag: | | Marshall Islands |
| Unit classification: | | American Bureau of Shipping |
| IMO Certification: | yes/no | Yes |
| Which code version: | | IMO MODU  Resolution A414 (X). |
| Year of Construction: | | 1979 |
| Construction Yard: | | Brownsville, Texas, USA |
| **A.1    MAIN DIMENSIONS / TECHNICAL DESCRIPTION** | | Refer to the Marine Operating Manual |
| Light ship: | lt | 8465 lt |
| Displacement at loadline: | lt | 9253 lt |
| Hull length | ft | 243 ft |
| Hull width | ft | 200 ft |
| Hull depth | ft | 26 ft |
| Leg length available below hull: | ft | 355 ft. |
| Type of leg: | | Square |
| Leg spacing (center to center) | | |
| Traverse: | ft | 142 ft |
| Longitudinal | ft | 129 ft |
| Independent leg or matt: | | Independent Leg |
| Spud can diameter / bearing area: | ft xft2 | 46ft (l) x 1585 (b) |
| Spud can height: | ft | 24 ft |
| Spud can jetting system: | yes/no | Yes |
| Bottom jets: | yes/no | Yes |
| Top jets: | yes/no | Yes |
| Mat dimensions: | | |
| Length: | ft | N/A |
| Width: | ft | N/A |
| Depth: | ft | N/A |
| Cantilever or slot: | | Cantilever |
| Skid-off: | yes/no | no |
| Cantilever envelope: | | |
| Reach AFT, from / to: | ft/ft | Up to 45 ft |
| Transverse, port/stbd: | ft/ft | 12.0 / 12.0 |
| Slot dimensions: | | |
| Length: | ft | N/A |
| Width: | ft | N/A |
| Mat slot dimensions: | | |
| Length: | ft | N/A |
| Width: | ft | N/A |
| Max. cantilever load: | | |
| (combined hook+rotary+setback) | st | 1,250,000 lbs (refer to Cantilever Load Chart) |

FURIE-BANKR_00106565
DA00424

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | | |
|---|---|---|
| Max. rotary load: | st | 900,000 lbs |
| Max. setback load: | st | 450,000 lbs |
| Fuel Consumption (avg. drilling): | bbl/day | 75 bbl/day |
| Accommodation for max. no. of personnel: (See K.2.1): | no. | 118 |

### A.2     STORAGE CAPACITIES

| | | |
|---|---|---|
| Fuel: | bbl | 3,120 |
| Drilling water: | bbl | 10,814 |
| Potable water: | bbl | 1,283 |
| Mud processing tank (see F.2): | bbl | 2 ea-335 bbl, 2 ea. 367 bbls |
| Active liquid mud (see F.2): | bbl | 1 ea pre-treatment tank 238 bbls |
| Independent oil base mud storage: | bbl | 702 |
| Agitated: | yes/no | no |
| Independent base oil storage: | bbl | Yes - non agitated |
| Independent brine storage: | bbl | N/A |
| Heavy brine accepted (e.g. bromide): yes/no | | |
| Bulk bentonite/barite: (see F.3) | ft3 | 4000 |
| Bulk cement: (see F.3) | ft3 | 4000 |
| Sack storage: | sacks | 2300 Sacks |
| Pipe rack: | ft2 | |
| Upper racks dimensions: | ft x ft | 40 X 50 |
| Maximum load capacity: | | 5.0 kips max load 550 kips |
| Lower rack dimensions: | ft x ft | 45X55 |
| Maximum load capacity: | | 500 lbs / sq ft. |
| Other rack: | ft x ft | N/A |
| Maximum load capacity: | | N/a |
| Other rack: | ft x ft | N/a |
| Maximum load capacity: | | |
| Miscellaneous storage area: | ft2 | |
| Operator storage area: | ft2 | 30 sq. ft lockable storage |
| Preload capacity: | kips | 11700 |
| Time to fill and dump preload: | hrs | 9 hrs / 1.5 hours to dump (average) |

### A.3     JACKUP SYSTEMS

### A.3.1  Jacking Systems

| | | |
|---|---|---|
| Make/type: | | Marathon LeTourneau, electro mechanical quad side rack & pinion |
| No. of jacks or pinions: | no. | 48 |
| Maximum jacking load: | kips | 1765.76 |
| Jacking speed: | ft/min | 1.5 f.p.m. |
| Rack chocks available: | yes/no | No |
| Required for field tow: | yes/no | No |
| Required for ocean tow: | yes/no | No |

### A.3.2  Raw Water Systems

| | | |
|---|---|---|
| | | 3 pumps in |



FURIE-BANKR_00106566
DA00425

### RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | | |
|---|---|---|
| Pump location (water tower or leg): | | Water Tower |
| Suction distance below hull (max): | ft | Up to 108- max Rack and pinion system |
| | | |
| Pump location (water tower or leg): | | Water Tower |
| Suction distance below hull (max): | ft | |
| | | |
| Salt water service pump: | | Using the Raw Water pumps |
|     Quantity: | no. | 1 |
|     Make/Type: | | WPIL Type 1000-3 |
|     Capacity: | bbl/min | 1150  GPM 3-Stage |
| | @ pressure: | Max 80 |
| Horsepower: | hp | 75 |
| | | |
| Salt water service pump: | | |
|     Quantity: | no. | **2** |
|     Make/Type: | | S&N Pump Company type SONW 1350-3 |
|     Capacity: | bbl/min | 1350 gpm |
| | @ pressure: | Max 80 |
| Horsepower: | hp | 100 |
| | | |
| Dedicated preload pumps: | | Using Raw Water Pump |
|     Quantity: | no. | |
|     Make/Type: | | |
|     Capacity: | bbl/min | |
| | @ pressure: | |
| Horsepower: | hp | |
| | | |
| Dedicated preload pumps: | | |
|     Quantity: | no. | |
|     Make/Type: | | |
|     Capacity: | bbl/min | |
| | @ pressure: | |
| Horsepower: | hp | |
| | | |
| **A.4    OPERATIONAL CAPABILITIES** | | Refer to Marine Operating Manual |
| | | |
| Maximum design water depth capability: | ft | 300' |
| Outfitted max/min water depth capability: | ft | 300' / 25' |
| Normal minimum water depth capability: | ft | 25' |
| Draft at load line (deepest): | ft | 16.0 |
| Drilling depth capability (rated): | ft | 25,000 ft |
| Transit speed towed (historical avg.): | knots | 4.5 |
| Leg (spud can) below hull in transit: | ft | 12.56 |
| Maximum leg length permitted in tow: | | |
|     Ocean tow: | ft | 410 (subject to Underwriters approval) |
|     Field tow: | ft | 410 |
| Number of tugs for field tow: | no. | 3 X 80 tons continuous bollard pull for open locations without obstructions - 120 ton bollard combined for locations with obstructions and platform. |
| Associated minimum bollard pull per tug: | lt | |



FURIE-BANKR_00106567
DA00426

### RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | | |
|---|---|---|
| Anti-roll system: | yes/no | No |
| Maximum preload reaction per leg: | lt | 10,800 kips per leg |
| Bearing pressure at maximum preload: | lb/ft2 | 6500 |
| Thrusters: | yes/no | No |
|     Quantity: | no. | No |
|     Fixed/Azimuthing | | No |
|     Total horsepower per thruster: | hp | No |

**A.5  VARIABLE LOAD CAPACITY (VL)**
**(exclusive of drilling loads)**  —  Refer to Marine Operating Manual

| | | |
|---|---|---|
| Transit VL capacity: | lt | 1766 kips |
| Drilling VL capacity: | lt | 4765 kips |
| Survival VL capacity: | lt | 1766 kips |
| Jacking VL capacity: | lt | 1766 kips |

**A.6  ENVIRONMENTAL LIMITS**  —  Subject to nomograms in the rig's Operating Manual

Transit

| | | |
|---|---|---|
|     Max. wave height: | ft | 40 |
|     Max. wave period: | sec | 12 |
|     Max. wind velocity: | knots | 70 |
|     Max. current velocity: | knots | |
|     Max. heave (double amplitude): | ft | |
|     Max. pitch (double amplitude): | degrees | 16 |
|     Max. roll (double amplitude): | degrees | 16 |

| | | |
|---|---|---|
| Working water depth: | ft | 15ft- 300 ft |
| Drilling: | | |
|     Air gap (below bottom of main hull): | ft | 24 |
|     Max. wave height: | ft | 48 |
|     Max. wave period: | sec | 15 |
|     Max. wind velocity: | knots | 100 |
|     Max. current velocity: | knots | 1 |
| Survival: | | |
|     Air gap (below bottom of main hull): | ft | 45 (200' water Depth) |
|     Max. wave height: | ft | 48 |
|     Max. wave period: | sec | 15 |
|     Max. wind velocity: | knots | 100 |
|     Max. current velocity: | knots | 1 |

| | | |
|---|---|---|
| Working water depth: | ft | 300 |
| Drilling: | | |
|     Air gap (below bottom of main hull): | ft | 40 |
|     Max. wave height: | ft | 40 |
|     Max. wave period: | sec | 15 |
|     Max. wind velocity: | knots | 100 |
|     Max. current velocity: | knots | 0 |
| Survival: | | |
|     Air gap (below bottom of main hull): | ft | 35" |



FURIE-BANKR_00106568
DA00427

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | | |
|---|---|---|
| Max. wave height: | ft | 33 |
| Max. wave period: | sec | 10 |
| Max. wind velocity: | knots | 100 |
| Max. current velocity: | knots | 1 |

### A.7    MOORING SYSTEM

#### A.7.1  Anchor Winches

| | | |
|---|---|---|
| Quantity: | no. | 4 |
| Make/model: | | Marathon LeTourneau W-1500 |
| Type (electric/hydraulic/diesel): | | Electric deck winch |
| Total HP per winch: | hp | 75 |
| Rated pull: | lt | 22.5 |
| Control locations (local/remote/both): | | |

#### A.7.2  Anchors

| | | |
|---|---|---|
| Quantity: | no. | N/A |
| Make/type: | | |
| Weight | : | |

#### A.7.3  Anchor Lines

Wire

| | | |
|---|---|---|
| Quantity: (installed + spare): | no. | 4 |
| Make/type: | | 6x36 IWRC EEIPS RHOL galvanized steel wire rope |
| Construction: | | Wire |
| Diameter: | in | 1-1/2" |
| Useful length (nominal): | ft | 2,000 ft |

#### A.7.4  Towing Gear

| | | |
|---|---|---|
| Towing bridle size: | in | 2ea 120 ton nut bolt shackle to 3" stud link 18"x34 links<br>Followed by 1ea 3"x 100' pendant |
| Hook-up system: | | Lowered to tow vessel by air winch |
| Rating: | | 492,000 lbs |
| Spare bridle: | yes/no | yes |

#### A.7.5  Supply Vessel Mooring System

| | | |
|---|---|---|
| System description: | | 5" nylon Braided rope Bow And Stern |
| Rating: | | |
| Location (port/stbd/both): | | Both |

### A.8    MARINE LOADING HOSES

| | | |
|---|---|---|
| Location of loading manifolds (port/stbd/both): | | Both |
| no. | | |



FURIE-BANKR_00106569
DA00428