## DEED OF GUARANTEE (the "Guarantee")

This Guarantee is made this 31st day of July 2015, by DEUTSCHE OEL & GAS, S.A., a Luxembourg societe anonyme, with registered office at 26, Boulevard Royal, L-2449, Luxembourg (the "Guarantor"), in favor of SHELF DRILLING OFFSHORE RESOURCES LIMITED II, a company incorporated in the Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (the "Owner").

### WHEREAS:

(A)   (i) Guarantor is the indirect parent entity of Cornucopia Oil & Gas Company, LLC, a Texas limited liability company ("Cornucopia") with operations under certain oil and gas leases in the Cook Inlet, Alaska (the "Cook Inlet"), (ii) Cornucopia is the sole member and owner of Furie Operating Alaska, LLC ("FOA"), which entity is the operator of Cornucopia's Cook Inlet oil and gas leases, and (iii) FOA is interested in entering into a day work drilling contract for use in the Cook Inlet of the jack-up drill rig, known as the Randolph Yost (the "Rig"), and is in discussions with the current bareboat charterer of the Rig, Offshore Drilling Solutions Ltd., an international business company incorporated in Ras Al Khaimah, United Arab Emirates, on behalf of itself and its authorized sub-charterers, if any ("Bareboat Charterer") for a long term drilling contract for the Rig;

(B)   Guarantor understands that Bareboat Charterer has entered into a Bareboat Charter Agreement dated as of July 4, 2015, as amended on the date hereof, ("Charter") for the long term bareboat charter of the Rig from Owner and it is a condition of the Charter that Guarantor provide a guarantee of the Bareboat Charterer's obligations under the Bareboat Charter in accordance with this Guarantee; and

(C)   Guarantor is aware of all the terms of the Bareboat Charter and it is willing to enter into this Guarantee.

### NOW THIS DEED WITNESSSETH and the Guarantor hereby agrees as follows:

1.   Subject to the rights, defenses and remedies of Bareboat Charterer under the Charter, Guarantor hereby irrevocably guarantees the full, prompt and complete performance of all obligations, undertakings, warranties, liabilities, Hire and debts of Bareboat Charterer under the Charter as and when such obligations, undertakings, warranties, liabilities, Hire and debts become due and performable in accordance with the terms of the Charter (the "Obligations"), and if Bareboat Charterer fails to observe and perform the Obligations, in whole or in part, the Guarantor shall, within ten (10) business days of receipt of written notice pursuant to Clause 9 hereunder of any such failure, pay to the Owner any sum due and owing, and assume and perform the Obligations, including without limitation any obligation to indemnify the Owner as if the Guarantor were the original obligor from the outset, in





FURIE-BANKR_00106657
DA00517

accordance with the terms and conditions of the Charter. For the avoidance of doubt, any requirement as expressed above for the Owner to provide written notice prior to the Guarantor having the obligation to pay any sum due and owing under the Charter shall not in any way alter, impair, prejudice, extinguish or otherwise affect any other rights and remedies of the Owner under this Guarantee and/or the Charter.

2.    Subject to the rights, defenses and remedies of Bareboat Charterer under the Charter and except for the giving of required notices under the Charter to the Bareboat Charterer and complying with the notice provisions of Clause 1 above and with any waiting periods under, and otherwise complying with, the terms of the Charter, the Owner shall not be obliged before enforcing this Guarantee to take any action (including any court or arbitral proceedings) against the Bareboat Charterer, to make any claim against or any demand of the Bareboat Charterer, to enforce any other security held by it in respect of the Obligations, or to exercise any distress, diligence or other process of execution against the Bareboat Charterer, and the Guarantor agrees that, subject to the above provisions of this paragraph, this Guarantee is a guarantee of performance of the Obligations and that Guarantor's obligations under this Guarantee shall be primary (and not merely as surety), absolute and shall not be impaired, discharged or prejudiced by:

(i)    any alteration, amendment, modification or cancellation of any of the terms and conditions of the Charter;

(ii)    any change in the status or constitution (including any change of name) of the Owner, the Guarantor or Bareboat Charterer;

(iii)    the liquidation, dissolution or merger of Bareboat Charterer or Guarantor, the insolvency of Bareboat Charterer or Guarantor or any receivership or arrangement with or for the benefit of creditors or other analogous event affecting Bareboat Charterer or Guarantor or any of their respective properties;

(iv)    any indulgence or forbearance shown by the Owner towards Bareboat Charterer or to Guarantor in respect of the performance of the Obligations or otherwise; or

(v)    any failure or delay to assert any of the rights of Owner against (a) Bareboat Charterer under the Charter and/or (b) the Guarantor under this Guarantee; or

(vi)    any other circumstance which would (but for the provisions of this Guarantee or the Charter) constitute a legal or equitable discharge or defense of a guarantor generally.

3.    The Guarantor agrees that this Guarantee is an absolute and continuing guarantee and shall remain in full force and effect until all Obligations have been performed and shall not be discharged by any intermediate payment or settlement. Notwithstanding the foregoing, this Guarantee shall cease to be



FURIE-BANKR_00106658
DA00518

enforceable upon the expiry of the earlier of the applicable statute of limitations or three (3) years after termination or expiry of the Charter.

4.  The Guarantor hereby represents and warrants that the Guarantor has the power and authority and the legal right to execute and deliver, and to perform its obligations under, this Guarantee, and has taken all necessary action to authorise the execution, delivery and performance of this Guarantee.

5.  The provisions of this Guarantee may not be amended, modified, or waived, unless such amendment, modification or waiver is in writing and consented to by Owner and Guarantor. No failure or delay on the part of Owner in exercising any right under this Guarantee or the Charter shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right.

6.  Any provision of this Guarantee which is prohibited or unenforceable in any applicable jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceability such provision in any other jurisdiction.

7.  Any term used herein and not defined herein shall have the meaning ascribed to such term in the Charter, and in the event the Charter is for any reason terminated and is no longer of any force and effect, such terms shall have the meaning and effect as set forth in the Charter immediately prior to such termination.

8.  Governing Law & Dispute Resolution

    8.1  Governing Law. The substantive laws of England and Wales, exclusive of any conflicts of laws principles that could require the application of any other law, shall govern the construction interpretation and enforcement of this Guarantee for all purposes, including the resolution of all Disputes between the parties hereto.

    8.2  Disputes. For the purposes of this Guarantee, "Dispute" means any dispute, controversy or Claim (of any and every kind or type, whether based on contract, tort, statute, regulation, or otherwise) arising out of, relating to, or connected with this Guarantee, including any dispute as to the construction, existence, validity, interpretation, termination, performance, enforceability, enforcement or breach of this Guarantee, as well as any dispute over arbitrability or jurisdiction.

    8.3  Arbitration. Any Dispute arising out of or in relation to or in connection with this Guarantee shall be exclusively and finally settled by arbitration without the right to appeal in accordance with the UNCITRAL ARBITRATION RULES currently in force as of the date of this Guarantee. The appointing and administering authority shall be the administering body of the Dubai International Arbitration Centre ("DIAC") Any party hereto may submit such a dispute, controversy or





FURIE-BANKR_00106659
DA00519

claim to arbitration by notice to the other party. The parties shall pay in equal shares any fees required by the DIAC for administering the procedures for any Dispute and appointing the third neutral arbitrator if required.

8.4    <u>Arbitration Tribunal.</u> The arbitration shall be heard and determined by three (3) arbitrators. Each party hereto shall appoint an arbitrator of its choice within fifteen (15) days of the submission of a notice of arbitration by one party. The party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within fifteen (15) days following the appointment of both party-appointed arbitrators. The arbitrators need not be members or associated members of the DIAC. If the party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal or one party hereto refuses to appoint its party-appointed arbitrator within said fifteen (15) day period, the appointing authority for the implementation of such procedure shall be the DIAC, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

8.5    <u>Arbitration Procedures.</u> Unless otherwise expressly agreed in writing by the parties to the arbitration proceedings:

(i)    The arbitration proceedings shall be held in at an agreed location in Dubai, UAE and failing agreement of the parties at such location as determined by the DIAC;

(ii)    The arbitration proceedings shall be conducted in the English language and the arbitrators shall be fluent in English language;

(iii)    The arbitrator(s) shall be and remain at all times wholly independent and impartial;

(iv)    The arbitration proceedings shall be conducted under the UNCITRAL Rules, as amended from time to time (the "UNCITRAL Rules"), which UNCITRAL Rules are deemed to be incorporated by reference into this Article XIV;

(v)    Any procedural issues not determined under the UNCITRAL Rules shall be determined by the applicable laws of England, other than those laws which would refer the matter to another jurisdiction;

(vi)    The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators;

(vii)    The decision of a majority of the arbitrators shall be: (i) reduced to writing; (ii) final and binding without the right of appeal; (iii) the sole and exclusive remedy regarding any Claims or other claims, counterclaims, issues or accountings presented to the arbitrators;



FURIE-BANKR_00106660
DA00520

and (iv) promptly paid in United States dollars free of any deduction or offset;

(viii) Any costs or fees incident to enforcing the award, shall to the maximum extent permitted by law be charged against the party resisting such enforcement;

(ix) No special, incidental, indirect, consequential, exemplary or punitive damages (including loss of profit, loss of production, etc.) shall be awarded;

(x) The award may include interest from the date determined by the arbitration award, and from the date of the award until paid in full, at the interest rate set forth in Article II.D of the Charter to which this Guarantee relates;

(xi) Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be;

(xii) The arbitration may proceed in the absence of a party who, after due documented and verified notice, fails to answer or appear. An award shall not be made solely on the default of a party, but the arbitrator(s) shall require the party who is present to submit such evidence as the arbitrator(s) may determine is reasonably required to make an award; and

(xiii) If the parties hereto or others who are bound to this or another similar agreement initiate multiple arbitration proceedings, the subject matters of which are related by common questions of law or fact and which should result in conflicting awards or obligations, then the parties hereto hereby agree that all such proceedings shall be consolidated into a single arbitral proceeding.

(xiv) Small Disputes. For disputes where the total amount claimed by either party does not exceed one million United States dollars (U.S. $1,000,000) and in the case of any other dispute where the Parties so agree in writing, the arbitration shall be conducted in Dubai in accordance with the Small Claims Procedure of the London Maritime Arbitration Association.

8.6   Survival of Certain Provisions. Subject to the provisions of Clause 3 above, (i) this Clause 8 shall survive termination of this Guarantee for any cause and (ii) all other rights and obligations of the parties detailed in this Guarantee which by their nature survive termination or expiry of the Guarantee shall remain in full force and effect after such termination or expiry.



9.    If Bareboat Charterer is in breach of the Obligations the Owner shall promptly notify the Guarantor giving details of such breach, and such notice and all other notices shall be sent to the Guarantor at the address set out below:

Deutsche Oel & Gas, S.A.
Attention: Lars Degenhardt
Address: 26, Boulevard Royal, L-2449, Luxembourg

With a copy to (which shall constitute notice):

Harald Plewka
Untermainanlage 7
60329 Frankfurt, Germany

10.    The parties confirm that no terms of this Guarantee are enforceable under the Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to this Guarantee.

11.    In furtherance of the provisions of this Guarantee and pursuant to the terms of the Charter, Guarantor has  delivered and, and Owner acknowledges receipt of, a copy of the Cornucopia's financial statements and balance sheet for the fiscal quarter ending on December 31, 2014.

**IN WITNESS WHEREOF**, Guarantor has caused this Guarantee to be duly executed and delivered by its officer(s) thereunto duly authorized as of the date first above written.

DEUTSCHE OEL & GAS, S.A.

By:

Name:  _LARS DEGENHARDT_

Title:  Director

Date:  July 31, 2015

6/6

# EXHIBIT 13

DA00523

# DRILLING VESSEL MANAGEMENT AGREEMENT

*by*

*and*

*between*

## KADMAS LIMITED.,

a company formed under the laws of the Republic of Malta

*and*

## ADVANCED DRILLING SOLUTIONS, LLC,

a Louisiana limited liability company

*dated*

**NOVEMBER 2, 2015**

FURIE-BANKR_00106666
DA00524

## TABLE OF CONTENTS

1. DEFINITIONS. ........................................................................................................ 1

  1.01 DEFINITIONS. ................................................................................................ 1

  1.02 APPOINTMENT. ............................................................................................. 2

2. AVAILABILITY OF THE VESSEL. ......................................................................... 2

3. SERVICES OF HOC. ................................................................................................. 2

  3.01 REFURBISHMENT. ........................................................................................ 2

    (a) Work to be Performed ........................................................................ 2
    (b) Repair Contracts ............................................................................... 2
    (c) Repair Budget ................................................................................... 2

  3.02 PERFORMING DRILLING CONTRACT SERVICES AND MARKETING. ........... 3

  3.03 OPERATING AND TECHNICAL SERVICES. ................................................. 3

    (a) Manning Requirements ...................................................................... 3
    (b) Provisions and Supplies .................................................................... 3
    (c) Maintenance and Repairs .................................................................. 4
    (d) Classifications and Approvals ........................................................... 4
    (e) Technical Services ............................................................................ 4
    (f) Drilling Contract Obligations ............................................................ 4

  3.04 INSURANCE COVERAGE. .............................................................................. 4

  3.05 INSURANCE CLAIMS. .................................................................................... 5

  3.06 ACCOUNTING AND OTHER FINANCIAL SERVICES. ................................... 5

    (a) Books and Records ............................................................................ 5
    (b) Monthly Reports ............................................................................... 5
    (c) Tax Returns ....................................................................................... 5
    (d) Annual Budgets ................................................................................. 5
    (e) Specific Projects ............................................................................... 5
    (f) Excess Cash ...................................................................................... 5
    (h) Billings and Collections .................................................................... 5
    (h) Billings and Collections .................................................................... 5

  3.07 EXPENSES. .................................................................................................... 5

  3.08 PROJECT PLAN AND EXPENDITURE BUDGETS. ......................................... 6

4. PERSONNEL AND FACILITIES. ............................................................................. 6

  4.01 DRILLING AND SHOREBASE CREW. ........................................................... 6

  4.02 SHORE BASE FACILITIES. ........................................................................... 6

(i)

| 4.03 | HOME OFFICE SUPPORT. | 6 |
| 4.04 | THIRD PARTY SERVICES. | 6 |
| 4.05 | MANAGER'S REGULAR RATES FOR PERSONNEL. | 6 |
| **5.** | **AUTHORITY OF MANAGER.** | **6** |
| 5.01 | AUTHORITY IN GENERAL. | 7 |
| 5.02 | NOTICE OF MANAGEMENT AGREEMENT. | 7 |
| 5.03 | RELATIONSHIP BETWEEN BAREBOAT OWNER AND MANAGER. | 7 |
| 5.04 | EMERGENCY ACTION. | 8 |
| **6.** | **FEES AND COSTS.** | **8** |
| 6.01 | PAYROLL AND RELATED COSTS. | 8 |
| 6.02 | OFFICE AND OTHER FACILITIES. | 8 |
| 6.03 | SUPPLIES AND EQUIPMENT. | 8 |
| 6.04 | SPECIAL TECHNICAL PROJECTS. | 9 |
| 6.05 | THIRD PARTY EXPENSES. | 9 |
| 6.06 | MANAGEMENT FEE. | 9 |
| 6.07 | OWNER'S RIGHT TO REVIEW. | 9 |
| **7.** | **BANK ACCOUNTS, REVENUES AND DISTRIBUTIONS.** | **10** |
| 7.01 | DRILLING REVENUES. | 10 |
| 7.02 | ESTABLISHMENT OF OPERATING ACCOUNT. | 10 |
| 7.03 | PAYMENTS INTO THE OPERATING ACCOUNT. | 10 |
| 7.04 | DISBURSEMENTS FROM OPERATING ACCOUNT. | 10 |
| **8.** | **FUNDING PROVISIONS.** | **11** |
| 8.02 | DEFICIENCY CALLS. | 11 |
| **9.** | **INVOICING AND PAYMENT.** | **11** |
| 9.01 | PROCEDURE. | 11 |

FURIE-BANKR_00106668
DA00526

9.02    PAYROLL ADVANCES. .................................................................................... 12

10.    STANDARD OF PERFORMANCE. ....................................................... 12

11.    LIABILITIES AND INDEMNITIES. ...................................................... 12

   11.01    LIMITATION OF LIABILITY. ...................................................................... 12

   11.02    LOSS OF DAMAGE TO VESSEL. ............................................................... 12

   11.03    EMPLOYEES. ............................................................................................... 12

   11.04    CONSEQUENTIAL DAMAGES. .................................................................. 13

   11.05    BAREBOAT OWNER'S INDEMNITIES ABSOLUTE. ................................ 13

   11.06    QUIET ENJOYMENT. ................................................................................. 13

12.    EFFECTIVE DATE, TERM AND TERMINATION. ........................... 13

   12.01    EFFECTIVE DATE. ...................................................................................... 13

   12.02    TERM. .......................................................................................................... 13
      (a)    Initial Term. ........................................................................................... 13
      (b)    Renewal. ................................................................................................. 14
   12.03    EARLY TERMINATION. ............................................................................. 14

   12.04    SURVIVAL OF RIGHTS. ............................................................................. 14

13.    CONFLICTS OF INTEREST. ................................................................ 14

14.    FORCE MAJEURE. ............................................................................... 15

   14.01    EFFECT AND DEFINITION. ....................................................................... 15

   14.02    NOTIFICATION REQUIREMENTS. ........................................................... 15

15.    GOVERNING LAW. .............................................................................. 15

16.    ARBITRATION. .................................................................................... 15

17.    NOTICES. ............................................................................................... 15

18.    AUDIT RIGHTS. .................................................................................... 16

19.    INSPECTION RIGHTS. ......................................................................... 16

20.    ASSIGNMENT. ...................................................................................... 16

iii

FURIE-BANKR_00106669
DA00527

21.     TAXES. ............................................................................................................ 16

22.     PRIOR AGREEMENTS. .................................................................................... 17

23.     CONFIDENTIALITY. ........................................................................................ 17

24.     COUNTERPART SIGNATURES. ..................................................................... 17

ANNEX 1. ................................................................................................................ 19

FURIE-BANKR_00106670
DA00528

*EXECUTION VERSION*

## DRILLING VESSEL MANAGEMENT SERVICE AGREEMENT

THIS DRILLING VESSEL MANAGEMENT SERVICE AGREEMENT (*"Agreement"*) is made as of the 2nd day of November, 2015 by and between **Kadmas Limited,** a company formed under the laws of the Republic of Malta (hereinafter called *"Bareboat Owner"*) and **Advanced Drilling Solutions, LLC.,** a Louisiana limited liability company (hereinafter called *"Manager"*).

WHEREAS,

(i)      Manager is a company with personnel and management skilled in managing and operating offshore drill rigs;

(ii)      Bareboat Owner is the bareboat charterer of the jack up drilling rig known as Randolph Yost with Marshall Islands Official Registry No. 1744 (the *"Vessel"*) pursuant to a Bareboat Charter Agreement between Shelf Drilling Offshore Resources Limited II (*"Vessel Owner"*) and Offshore Drilling Solutions Ltd. (*"ODS"*), which Bareboat Charter Agreement was assigned to Bareboat Owner by ODS with the consent of Vessel Owner (the Bareboat Charter Agreement as assigned to Bareboat Owner, herein called the *"Bareboat Charter"*);

(iii)      Bareboat Owner has entered into a time charter of the Vessel (*"Time Charter"*) pursuant to which it subcharters the Vessel on a fully crewed and managed basis to Nordic Overseas Drilling & Services GmbH, a German company (*"Subcharterer"*);

(iv)      Subcharterer has entered into, or shortly intends to enter into, a drilling contract (*"Drilling Contract"*) with Furie Operating Alaska, LLC., a Texas limited liability company (*"Operator"*) for use of the Vessel for drilling and work over operations in the Cook Inlet, Alaska, or such other areas as directed by Subcharterer (the *"Area of Operations"*);

(v)      Bareboat Owner desires to engage Manager to manage, crew, provision, maintain and operate the Vessel under the terms of this Agreement; and

(vi)      Manager agrees to manage, crew, provision, maintain and operate the Vessel on a daily basis under the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Bareboat Owner and Manager hereby agree as follows:

1.      Definitions.

    1.01      Definitions. Capitalized terms used, but not defined herein shall have the meanings given them in the body of this Agreement with such terms being referenced and identified in Annex I of this Agreement.

FURIE-BANKR_00106671
DA00529

1.02    Appointment. Bareboat Owner hereby appoints Manager to act as manager, and independent contractor of Bareboat Owner for the purpose of arranging and supervising the crewing, management, maintenance, provisioning, repairing and refurbishing, as needed, and day to day operation, marketing, if required by Bareboat Owner, and conduct of the Vessel as herein provided.

2.    Availability of the Vessel. Bareboat Owner shall, on the date the Vessel is delivered to Bareboat Owner under the terms of the Bareboat Charter, arrange for delivery of possession, control, management and operation of the Vessel to Manager, free and clear of all liens, encumbrances or other claims which would interfere with the performance by Manager of its rights and obligations under this Agreement ("*Delivery*"), and Bareboat Owner shall, throughout the term of this Agreement, make the Vessel available to Manager for the purposes specified in this Agreement.

3.    Services of Manager. Manager shall, during the term of this Agreement and subject to the supervision and instructions of Bareboat Owner, provide the services specified below with respect to the Vessel:

    3.01    Refurbishment and Other Work.

        (a)    Work to be Performed. Immediately after Delivery, Manager shall commence any required refurbishment and winterizing of the Vessel, at its present location in the Port of Singapore or elsewhere as determined and agreed by Bareboat Owner and Manager in order, if necessary to (i) restore the Vessel to full class as an ABS (or equivalent) Maltese Cross A-1 self-elevating offshore drilling unit, (ii) make the Vessel safe, sound and in first class condition for offshore drilling and work-over activities, (iii) recondition, upgrade and winterize crew accommodations and quarters and other exposed areas on the Vessel to make it safe and otherwise capable of operating in the Area of Operations, (iv) if necessary recondition all engines, generators and drilling equipment, (v) recondition, strengthen, repair and replace, where necessary, all hull, tanks, and leg damage or imperfections, (vi) prepare and oversee preparation of the Vessel for transportation from the Port of Alaska, and (vii) then organize and oversee transportation of the Vessel by heavy lift transportation vessel to the Area of Operations (all of the above herein called "*Preparation Work*"). Such Preparation Work shall be subject to Bareboat Owner's prior review and approval.

        (b)    Repair Contracts. Manager shall negotiate and execute all necessary contracts with the relevant shipyard, transportation companies and all third party subcontractors for all of the above Preparation Work, subject to the approval of Bareboat Owner.

        (c)    Repair Budget. In performing the Preparation Work in (a) above, Manager shall use reasonable efforts to abide by the repair budget furnished to Manager by Bareboat Owner ("*Preparation Budget*"). Manager shall

2

FURIE-BANKR_00106672
DA00530

report all fluctuations in such budget to Bareboat Owner and shall confer with Bareboat Owner concerning any significant additional expenditures required to perform such work.

3.02   Performing Drilling Contract Services and Marketing. Manager shall, in accordance with the provisions of Paragraph 3.03 (f) below and other provisions of this Agreement, operate Vessel on Bareboat Owner's and Subcharterer's behalf in the Area of Operations pursuant to the terms of the Drilling Contract, a copy of which Drilling Contract has been or on execution will be delivered to Manager. In addition, Manager shall, if required by Bareboat Owner or any subcharterer of the Vessel from time to time actively market the Vessel with the objective, to the maximum extent possible, of keeping the Vessel continuously employed at market dayrates and under reasonably favorable contract conditions. In performing its marketing responsibilities, Manager may utilize its own personnel or employ third party brokers. Manager's marketing responsibilities shall include negotiating contracts for use of the Vessel subject to Bareboat Owner's and Subcharterer's instructions and direction.

3.03   Operating and Technical Services. Subject to the other terms and conditions of this Agreement, Manager agrees to provide support for the operation of the Vessel in the performance of drilling, workover, production, or other contracts, provide for the stacking the Vessel during periods when it is not under contract, assist in and provide technical services for all conversion, refurbishment or modification of the Vessel and provide administrative services with respect to each of the foregoing functions. The foregoing functions and services shall include the following:

(a)   Manning Requirements. Manager shall make all arrangements for the selection, appointment, dismissal, welfare, training, employment, administration and remuneration of the crew and shore based administrative and maintenance staff of the Vessel.

(b)   Provisions and Supplies. Manager shall arrange for the purchasing or leasing of all equipment, drill pipe, replacements, spare parts, stores, consumables, provisions, fuel and lubricants required in connection with the operation or stacking of the Vessel which are required for the normal management and operation of the Vessel. Manager may, as directed by Bareboat Owner, either cause purchases to be made in the name of Bareboat Owner or Subcharterer and paid for directly from Bareboat Owner's funds or to be purchased in the name of Manager and paid for by Manager subject to reimbursement to the extent such costs are not covered by the Dayrate Fees paid to Manager pursuant to the provisions of this Agreement. Plus a reasonable handling fee provided however that any such expenditure of funds by Manager for purchases in excess of $500,000 shall be subject to prior written approval of Bareboat Owner.

3

FURIE-BANKR_00106673
DA00531

(c)     <u>Maintenance and Repairs</u>. Manager shall provide for the Vessel to be maintained, repaired and kept in an orderly and good operating condition.

(d)     <u>Classifications and Approvals</u>. Manager shall, on behalf of Bareboat Owner, take all action required to maintain the Vessel's registration and classification and obtain and maintain all certificates and approvals required by applicable governmental authorities or any other relevant authorities. The foregoing responsibilities shall include arranging for all required regulatory inspections and dry-dockings.

(e)     <u>Technical Services</u>. Manager shall provide the engineering and technical services required in connection with the operation, maintenance, repair and stacking of the Vessel. If Bareboat Owner desires or agrees to have modification or conversion work done on the Vessel, Manager shall, utilizing its own staff or third party contractors, do the necessary engineering and technical work required to perform the modification or conversion.

(f)     <u>Drilling Contract Obligations</u>. On Bareboat Owner's and Subcharterer's behalf, Manager shall provide, perform and oversee all drilling, workover and other work required of Subcharterer as drilling contractor (in its capacity as drilling contractor under the Drilling Contract, herein sometimes called "*Drilling Contractor*"), and of the Vessel under the terms of the Drilling Contract with Operator and shall, on behalf of the Drilling Contractor ensure that all Drilling Contractor's obligations and work to be performed under the Drilling Contract are performed in a timely, safe and workmanlike manner pursuant to the terms of the Drilling Contract. In providing the drilling services referenced above, Manager shall work with the Operator, Bareboat Owner and the Subcharterer as necessary to ensure that Manager manages, operates and crews the Vessel in a manner consistent with Subcharterer's requirements and with the requirements of the Drilling Contract.

3.04     Insurance Coverage.

On Bareboat Owner's behalf, Manager shall procure and maintain with respect to and for the duration of this Agreement, all insurances for the Vessel, its personnel, equipment and property as is necessary for offshore drill rigs of this size and type and for offshore drilling operations, using recognized insurance brokers and underwriters with experience in the offshore drilling industry. The insurance procured by Manager on Bareboat Owner's behalf pursuant to this Agreement shall name Manager, Bareboat Owner and Subcharterer as insureds and shall, with respect to all insurance, contain full waivers of subrogation in favor of the parties hereto. Such insurance shall also, to the extent required by the Drilling Contract, name Operator as an additional insured and loss payee on such policies.

4

FURIE-BANKR_00106674
DA00532

3.05    Insurance Claims. Manager shall be responsible for preparation and submission of, and shall notify Bareboat Owner of, any and all claims to the appropriate underwriters and shall also be responsible for the supervision of any litigation where the defense of such litigation falls within the coverage of the insurance policies listed above.

3.06    Accounting and Other Financial Services. Manager shall perform the following services under the supervision of Bareboat Owner:

    (a)    Books and Records. Establish and keep proper and adequate books and accounts reflecting the business and operation of the Vessel;

    (b)    Monthly Reports. Not later than 30 days after the end of each calendar month, provide to the Bareboat Owner such information and data relating to the results of operations for the preceding month as shall reasonably be requested;

    (c)    Tax Returns. Supply to the Bareboat Owner such information and documentation as may be required for Bareboat Owner to prepare its tax returns on a timely basis;

    (d)    Annual Budgets. In addition to the Project Plan and Expenditure Budgets referenced in Section 3.08 below, prior to the first day of November each year, prepare (i) a month-by-month operating budget and a month-by-month capital expenditures budget of Bareboat Owner for the next succeeding calendar year and (ii) a revision of the budgets for the final four months of the current year for presentation to the Bareboat Owner;

    (e)    Specific Projects. From time to time at the request of Bareboat Owner, prepare budgets or forecasts relating to specific projects with respect to the Vessel;

    (f)    Excess Cash. Implement the distribution of excess cash in accordance with Section 7.04 of this Agreement;

    (g)    Billings and Collections. Prepare and render billings to customers on Bareboat Owner's or Subcharterer's behalf an in connection with the operation of the Vessel; and

    (h)    Other Actions. Take such other actions and perform other services as may be requested by bareboat Owner.

3.07    Expenses/Bank Accounts. Subject to this Agreement, Manager shall open bank accounts in its own name and make payments and settlements for Bareboat Owner's account of all necessary expenses incurred as may be directed by Bareboat Owner.

5

FURIE-BANKR_00106675
DA00533

3.08    Project Plan and Expenditure Budgets. As soon as reasonable practicable  after the date of this Agreement, Manager shall prepare and submit to Bareboat Owner for approval a budget for all expenditures reasonably anticipated by Manager to be incurred during the first year of operations ("*Initial Budget*"). Manager shall thereafter keep Bareboat Owner appraised of any expenditure variances and shall obtain Bareboat Owner's approval for any material variances to such Initial Budget and any subsequent annual budgets or expenditures approved by Bareboat Owner from time to time.

4.    Personnel and Facilities. The functions and responsibilities described in Article 3 above shall be performed by Manager utilizing personnel, facilities or third party services in accordance with the following provisions:

4.01    Drilling and Shore Based Crew. Manager shall supply all of the drilling, shore based personnel and marine personnel required to properly operate the Vessel pursuant to any drilling or other contract which the Vessel may obtain or stack the Vessel.

4.02    Shore Base Facilities. Manager shall make available the shore base and financial and administrative support services and facilities in Louisiana and the Area of Operations necessary to perform the contracts to which the Vessel may be committed from time to time or to support the Vessel while stacked.  Such services and facilities shall include office space for utilization of shore base management personnel and their support staff and any required yard and warehouse facilities.

4.03    Home Office Support. Manager shall make available the services of its home office staff in connection with the operation or stacking of the Vessel.  The services to be performed by the home office staff shall include management services, personnel services, marketing, accounting and financial services, placement of insurance, engineering and technical support, purchasing of supplies and equipment for the Vessel.

4.04    Third Party Services.  Subject to the terms of this Agreement, Manager may, whenever it is necessary or desirable, engage the services of third party subcontractors for the performance of specific assignments in connection with Manager's services and responsibilities under this Agreement.   No such engagement shall relieve Manager of its responsibilities pursuant to this Agreement.

4.05    Manager's Regular Rates for Personnel. In performing all of its services hereunder Manager shall use the rates, personnel and contract labor reasonable in the market and Area of Operations and as approved by Bareboat Owner.  Manager may change the rates and its personnel needs, from time to time, by giving Bareboat Owner not less than twenty (20) business days' prior written notice.

5.    Authority of Manager.

6

FURIE-BANKR_00106676
DA00534

5.01    Authority in General. Manager shall have full discretionary authority to manage, operate and maintain the Vessel subject to the terms of this Agreement and, when required, the instructions of Bareboat Owner.  Such authority shall include but shall not be limited to working with the Operator and Operator's company man and other on board personnel regarding the drilling services being performed under the Drilling Contract contacting potential clients concerning prospective work, submitting tenders for utilization of the Vessel, negotiating drilling and other use contracts, determining the qualifications of the crew and shore base staff, determining appropriate manning levels, hiring and firing of the crew and shore base staff, purchasing of equipment and supplies required in connection with the operation or stacking of the Vessel, making repairs or replacing equipment necessary for the preservation or proper functioning of the Vessel, arranging for third party services with respect to the operation or stacking of the Vessel, complying with legal and tax requirements and the taking of such steps as are necessary to perform the drilling contracts to which the Vessel is committed from time to time.

5.02    Notice of Management Agreement. Manager will place and keep prominently displayed in the Chart Room and the Master's Cabin of the Vessel a notice substantially in the following form:

"NOTICE OF MANAGEMENT AGREEMENT

THIS VESSEL IS THE PROPERTY OF SHELF DRILLING OFFSHORE RESOURCES LIMITED II AND IS UNDER THE BARBOAT OWNESHIP AND CONTROL OF KADMAS LIMITED. IT IS BEING MANAGED AND OPERATED BY ADVANCED DRILLING SERVICES, LLC. AND BY THE TERMS OF A MANAGEMENT AND SERVICES AGREEMENT. NEITHER THE VESSEL OWNER, THE BAREBOAT CHARTERER, THE MANAGER, THE MASTER OF THE VESSEL NOR ANY OTHER PERSON HAS THE RIGHT, POWER OR AUTHORITY TO CREATE, INCUR OR PERMIT TO BE IMPOSED ON THE VESSEL ANY LIENS WHATSOEVER EXCEPT FOR LONGSHOREMEN'S OR CREWS' WAGES, SALVAGE, NECESSARIES AND NORMAL EXPENSES OF OPERATION."

5.03    Relationship between Bareboat Owner and Manager. Manager acknowledges that this is a Management Agreement only and that Manager has not acquired and shall not by virtue of this Agreement acquire during the term of this Agreement any right, title or interest in and to the Vessel by charter or otherwise. The Vessel is and shall remain at all times the bareboat property of Bareboat Owner, provided that, nothing shall be construed to deny Manager the right to assert a maritime lien for payment or reimbursement of any amount due to Manager pursuant to the terms of this Agreement and to the extent permitted by the Bareboat Charter. Any other provision notwithstanding, Manager shall for all purposes be deemed an independent contractor under this Agreement. Manager does not undertake herein or in connection herewith any fiduciary obligations with respect to the corporate management or affairs of Bareboat Owner, *provided, however that,*

7

FURIE-BANKR_00106677
DA00535

notwithstanding any provision to the contrary contained in this Agreement, Manager at all times be subject to and comply with the instructions of Bareboat Owner in the performance of its duties hereunder.

5.04    Emergency Action. Notwithstanding anything else to the contrary, Manager shall have the right and obligation to take such action as is immediately necessary to avert or reduce danger to life or health or to the Vessel or to other property. Any action taken pursuant to this Section 5.04 shall be reported to Bareboat Owner as soon as circumstances permit.

6.    Fees and Costs. As consideration for the performance by Manager of its obligations in accordance with the following provisions and in accordance with the rates and personnel needs set forth in this Agreement, subject to the provisions of Section 3.08 of this Agreement concerning the Initial Budget and other approvals of Bareboat Owner required under this Agreement, Bareboat Owner agrees to pay Manager the following:

6.01    Payroll and Related Costs. For each full-time or part-time employee hired by Manage pursuant to this Agreement, Bareboat Owner shall reimburse Manager for all direct compensation costs and indirect costs of employment (such as paid vacations, insurance costs, contributions to retirement plans, social security assessments, termination benefits, and payroll taxes paid on behalf of employees). If during any period of time any of Manager's personnel are assigned to the Vessel and to one or more other drilling units owned or operated by Manager at the same time, the reimbursement to be paid to Manager shall be allocated on a reasonable basis depending on the time spent by such employees working on matters relating to such other drilling rigs.

6.02    Office and Other Facilities. Bareboat Owner shall, pursuant to budgets agreed with Manager, pay or reimburse Manager for all direct costs of maintaining and operating its office and shore base facility and other related facilities such as warehouse facilities established to support the Vessel, including but limited to all lease costs, utilities, and general overhead. Manager agrees that such costs shall be paid and included in the Dayrate Fee paid to Manager under the provisions of Section 6.07 below. If at any time the office and other land support facilities support the operation of other drilling units or vessels in addition to the Vessel, the shore base facility costs shall be allocated on a reasonable basis depending on the number of operating rigs being supported by the shore base at the time in question.

6.03    Supplies and Equipment. Subject to the provisions of Section 6.07, the delivered price of any supplies, materials and equipment purchased by Manager for use in connection with the Vessel shall be reimbursed to Manager at cost. Such delivered price shall include transportation charges, import duties, third party handling charges and any other charges similar to the foregoing, but shall be reduced by any applicable manufacturer's or other rebates.

8

FURIE-BANKR_00106678
DA00536

6.04    Special Technical Projects, to the extent requested by Bareboat Owner, design and engineering work undertaken by Manager or an affiliate on special projects involving significant design or redesign effort shall be paid for by Bareboat Owner at Manager's standard published rates, a copy of which shall be furnished to Bareboat Owner. Manager agrees to furnish Bareboat Owner with all amendments thereto as soon as possible after changes have been made.

6.05    Third Party Expenses. Subject to the provisions of Section 6.07, Bareboat Owner shall reimburse Manager for the costs of all third party services engaged by Manager in connection with the performance of this Agreement, to the extent the Dayrate Fee is insufficient to pay for such third party services.

6.06    Handling Fee. For and in consideration of Manager's services hereunder, Bareboat Owner shall pay Manager a daily management fee and reasonable handling charge for Manager's services hereunder as may be agreed by Bareboat Owner and Manager from time to time ("*Handling Fee*").

6.07    Dayrate Fee. In line with the Initial Budget and other budgets agreed between Bareboat Owner and Manager from time to time, in consideration of the management, crewing, operating and maintenance services required to be performed by Manager under this Agreement, Bareboat Owner shall pay Manager a daily management fee payable by Bareboat Owner to Manager monthly in advance on the first (1st) day of each month during the Term of this Agreement in an amount agreed between Bareboat Owner and Manager (the "*Dayrate Fee*"). Based on the initial budget agreed between Bareboat Owner and Manager set forth on Annex 1 attached hereto ("*Initial Budget*"), the initial Dayrate Fee shall be $55,000 per day commencing on January 1, 2016, provided, however, that Bareboat Owner agrees it shall ensure that at all times Manager is kept in sufficient funds to safely, prudently and in compliance with all laws and regulations, manage, operate, crew, insure and maintain the Vessel on Bareboat Owner's behalf, if and to the extent those amounts are not covered by the Dayrate Fees paid by Bareboat Owner. Manager and Bareboat Owner agree that the Dayrate Fee paid to Manager shall be sufficient to cover all of Manager's costs of managing, crewing, maintaining, insuring and operating the Vessel on Bareboat Owner's behalf during the Term of this Agreement. Bareboat Owner agrees to timely pay the other amounts set forth in the Initial Budget and other budgets agreed from time to time and shall also pay all major repair or maintenance amounts and items required for the Vessel from time to time due to any unforeseen equipment failures or breakdowns which might occur during normal day to day operations of the Vessel, if and to the extent those amounts are not covered by the Dayrate Fees paid by Bareboat Owner.

6.08    Bareboat Owner's Right to Review. In addition to Bareboat Owner's right to audit set forth in Article 18, Bareboat Owner shall have a right to review Manager's books and records, at all reasonable times, in connection with the fees and costs to be reimbursed by Bareboat Owner under this Article 6. At the end of any calendar year during the Term of this Agreement, if and to the extent it is apparent, from

9

FURIE-BANKR_00106679
DA00537

the books and accounts of Manager, that the actual fees and costs of Manger that are required for Manager to safely maintain, crew, operate and insure the Vessel as a prudent and responsible manager on a daily basis, is materially lower or higher than the Dayrate Fee paid to Manager during such calendar year; the Bareboat Owner and Manager may jointly agree to lower or raise, as appropriate, the amount of the Dayrate Fee to an amount agreeable to both parties hereto. In such event, the revised agreed Dayrate Fee shall be included in the agreed budget for the upcoming year and such revised Dayrate Fee shall be paid to Manager monthly in the manner as set forth in Section 6.07 above and elsewhere in this Agreement.

7.  Bank Accounts, Revenues and Distributions.

7.01    Drilling Revenues. Manager agrees and acknowledges that all drilling revenues paid by the Operator t shall be paid directly by wire transfer or other agreed means to the Subcharterer as set forth in the Drilling Contract.

7.02    Establishment of Operating Account. As soon as possible following execution of this Agreement, Manager will establish a bank account (the *"Operating Account"*) in any bank acceptable to Bareboat Owner for the purpose of:

(a)    receiving funds which Bareboat Owner is required to contribute pursuant to this Agreement, including the Dayrate Fee (the *"Bareboat Owner Contributions"*).

and

(b)    paying all expenses of managing, crewing, maintaining, insuring and operating the Vessel on a daily basis as required by the terms of this Agreement.

7.03    Payments into the Operating Account. Promptly following the opening of the Operating Account, Bareboat Owner shall pay into the Operating Account such amount as may be agreed between Bareboat Owner and Manager. Such amount will be used by Manager to pay for the initial costs to be incurred in performing this Agreement and the Preparation Work and other mobilization costs to be incurred by Manager. Any other amounts received by Manager with respect to the Vessel, such as insurance proceeds for repairs and other reimbursements, shall be placed in the Operating Account. Manager will have signatory authority over the Operating Account.

7.04    Disbursements from Operating Account. Manager shall make disbursements from the Operating Account first, to pay all costs and expenses in connection with the Vessel incurred pursuant to this Agreement and, secondly, to pay and fund its home based and shore based operations in Louisiana and the Area of Operations, all in compliance with the terms of this Agreement.

10

FURIE-BANKR_00106680
DA00538

7.05    Excess Cash.  At the end of each calendar year during the Term of this Agreement, if there is any excess cash in the Operating Account, Bareboat Owner and Manager shall jointly determine and agree, based on the Manager's cash flow needs over the next ninety (90) days, that Manager shall either pay some or all of such excess cash to Bareboat Owner or retain some or all of such excess cash in the Operating Account to meet the Vessel's capital and operating expense requirements of Manager over the next ninety (90) days.

8.    Funding Provisions.

8.01    Deficiency Calls. In addition to the requirements of Section 6.07 and 7.03 above, if at any time during the term of this Agreement (i) the balance in the Operating Account becomes, or is expected (in the Manager's reasonable estimation, to be, less than the reasonable reserves needed to manage, refurbish, repair, maintain, insure or operate the Vessel, or is otherwise reasonably expected to be insufficient to pay Manager's expenses for the next ninety (90) days, or (ii) Manager, in its reasonable opinion acting as a prudent and safe manager of a vessel of equivalent size and capabilities as the Vessel, requires additional funds to make any capital expenditures required under the terms of the Bareboat Charter or applicable law, Manager shall consult with Bareboat Owner and may request Bareboat Owner to pay in cash into the Operating Account such required amount (*"Deficiency Contribution(s)"*) that Manager may determine in its reasonable judgment as a prudent and safe manager is necessary so as to prevent the balance in the Operating Account from being depleted to a level below such reserves during the 90 days following the date that such funds are payable by Bareboat Owner. Payment of any Deficiency Contribution shall be made by Bareboat Owner within five ten (10) business days of the date that Manager gives notice (*"Deficiency Notice"*). Any Deficiency Notice issued by Manager shall contain the amount required and state in reasonable detail the reasons that a Deficiency Contribution is required.

8.02    Bareboat Charter Payments and other Payments Required to be made by Bareboat Owner. Bareboat Owner agrees that it shall promptly on a timely basis pay directly to (i) the Vessel Owner all daily hire fees due by Bareboat Owner to Vessel Owner under the terms of the Bareboat Charter and (ii) all other fees and amounts which Bareboat owner and Manager have agreed shall be paid by Bareboat Owner directly to third parties, including without limitation, Vessel transportation shipping fees, rig loading and unloading fees, fees and costs of towing, tugs, surveys and other similar fees and expenses, broker's fees, and fees due to repair yards or equipment purchasers.

9.    Invoicing and Payment.

9.01    Procedure. All charges made pursuant to this Agreement, all amounts paid to Manager by Bareboat Owner pursuant to Articles 6, 7 and 8, all Dayrate Fees, Bareboat Owner Contributions, Deficiency Contributions and other sums due to Manager under this Agreement, will be paid by Bareboat Owner in immediately available funds in U.S currency pursuant to invoices specifying the nature and

11

FURIE-BANKR_00106681
DA00539

amount of such charges. Invoices shall be submitted weekly or monthly as agreed between the parties hereto and shall be supported by adequate documentation. Payment to Manager of amounts duly invoiced shall be made within five (5) business days of receipt of each invoice.

9.02    <u>Payroll Advances</u>. In addition, to the extent the amounts in the Operating Account are insufficient, through no fault of Manager's Manager may, not earlier than five (5) days before each payroll date for its personnel, obtain from Bareboat Owner an advance equal to the estimated amount of Direct Compensation Cost for the purpose of meeting the payroll obligations. Manager shall keep any such advances in a segregated account and keep appropriate records to account for any such advances.

10.    <u>Standard of Performance</u>. Manager undertakes to cause the Vessel to be operated prudently, safely and in accordance with good oilfield practices and to use its best efforts to maintain good client relations.

11.    <u>Liabilities and Indemnities</u>.

11.01    **<u>Limitation of Liability</u>. Manager, Bareboat Owner and the Vessel, their managers and agents and any affiliates of Manager or Bareboat Owner shall have the benefit of all exemptions from and limitations of liability to which a vessel, an owner, operator, manager or agent is entitled under the laws of the United States. It is furthermore agreed that this Agreement is not and shall not be considered a "personal contract" of a type to which the aforementioned limitation of liability statutes do not apply.**

11.02    **<u>Loss or Damage to Vessel</u>. Bareboat Owner agrees that any recovery for damages to or loss of the Vessel howsoever caused and whether resulting in whole or in part from the negligence (including but not limited to unseaworthiness of the Vessel, strict liability, breach of warranty (express or implied), preexisting conditions (whether latent or patent), and whether such negligence be sole, joint or concurrent, active or passive, and whether the claim is based on common law, civil law, maritime law or statute) or fault of either Manager or Bareboat Owner shall be limited to such amount(s) as may be recovered from underwriters under the policies of insurance to be obtained in accordance with Section 3.04 of this Agreement. Accordingly, Bareboat Owner indemnifies and holds harmless and agrees to indemnify, defend and hold harmless Manager from and against any uninsured liabilities in this regard. If Manager is liable for any damages to Bareboat Owner in any case involving gross negligence or reckless disregard on the part of Manager such damages shall be limited to any net profit Manager realizes under this Agreement.**

11.03    **<u>Employees</u>. Bareboat Owner shall protect, defend, indemnify, and hold harmless Manager, its shareholders, officers, directors, employees, agents, contractors, representatives, invitees and successors and assigns (collectively,**

12

FURIE-BANKR_00106682
DA00540

*"Manager Indemnities"*) from and against any and all claims, demands, liabilities, suits, losses and judgments of every kind and character, which are incident to, connected with, or result directly or indirectly from the services (or failure to properly perform the services) of Manager hereunder, the refurbishment work, required repairs, maintenance and operation of the Vessel, drilling services performed for the Operator, and Manager's other performance of this Agreement, or breach hereof, for (a) personal injury, illness or death of any of Manager's, Bareboat Owner's or any third party's employees or invitees, or the employees or invitees of their respective subcontractors, (b) loss of or damage to all property or equipment owned by (i) Bareboat Owner, its shareholders, officers, directors, agents, contractors, representatives, assignees, successors or assigns (collectively, *"Bareboat Owner Parties"*), or (ii) any third parties and (c) all property damage or loss of any person or entity caused by pollution or hazardous waste damage of any kind.

11.04   Consequential Damages. Manager shall not be responsible to the other hereunder for prospective profits or for special, indirect or consequential damages.

11.05   Bareboat Owner's Indemnities Absolute. Notwithstanding any provision to the contrary contained herein, all indemnities of Bareboat Owner hereunder shall apply regardless of whether caused, in whole or in part, by negligence of the Manager Indemnities, whether such negligence is sole, joint or concurrent, active or passive, unseaworthiness or other fault of any vessel, strict liability, defect in premises, equipment, material, any other anticipated or unanticipated event or condition, and regardless of whether preexisting the execution of this Agreement.

11.06   Quiet Enjoyment. Notwithstanding any other provisions of this Agreement, provided that Manager shall perform and comply with all of the terms and conditions of this Agreement, Bareboat Owner will not interfere with the peaceful and quiet use and enjoyment of the Vessel by Manager provided that Bareboat Owner and its authorized representative may at all reasonable times and at Bareboat Owner's expense inspect the Vessel as provided in Section 19. Bareboat Owner shall indemnify Manager from any loss or damage of whatsoever nature arising out of Bareboat Owner's breach of warranty of quiet enjoyment.

12.   Effective Date, Term and Termination.

12.01   Effective Date. This Agreement shall be effective on the date hereof.

12.02   Term.

(a)   Initial Term. Unless terminated sooner as described in Section 12.03, this Agreement shall remain in full force and effect for three (3) years from the

13

delivery date and time of the Vessel (*"Initial Term"*), provided, however, that Manager's obligations under this Agreement shall not commence until Bareboat Owner has complied with the funding requirements of Section Article 6 and Article 7 hereof and any other applicable sections of this Agreement.

(b)    Renewal. This Agreement may be renewed upon expiration of the Initial Term for successive three (3) year periods pursuant to the agreement of the Bareboat Owner and Manager. The Initial Term and any renewal term collectively called herein, the *"Term."*

12.03    Early Termination. This Agreement may be terminated either party hereto if:

(a)    Either party hereto serves written notice of termination on the other, in which case this Agreement shall be terminated at the end of one hundred eighty (180) days after receipt of any such termination notice by the receiving party. Upon termination, Manager shall be obligated to properly account for all amounts received and disbursed pursuant to this Agreement as well as return control of the Vessel and all other assets to Bareboat Owner upon such termination.

(b)    The Vessel is an actual or constructive total loss or is damaged to the extent that repair is uneconomical, in which event this Agreement shall terminate with effect from the date and time the Vessel was lost or declared lost or was last heard from.

(c)    Immediately, without notice if an event occurs which results in the bankruptcy of Manager.

(d)    Immediately, without notice if an event occurs which results in the bankruptcy of Bareboat Owner.

(e)    The Bareboat Charter terminates for any reason, in which event this Agreement shall terminate on the date Bareboat Owner notifies Manager that the Bareboat Charter will terminate or has terminated.

12.04    Survival of Rights. Notwithstanding the termination of this Agreement as provided above, any rights or obligations accruing before the date of termination shall survive and the indemnities contained herein shall continue to apply with respect to events which occurred prior to the date of termination.

13.    Conflicts of Interest. Bareboat Owner and Manager hereby expressly acknowledge that certain conflicts of interest (including direct competition) may from time to time occur in connection with the pursuit by Manager(and its affiliates) of its independent business and the marketing or operation of the Vessel. It is agreed that neither any provision of this Agreement nor the undertaking to market and operate the Vessel shall in any manner restrict Manager (or any of its affiliates) from conducting its business in any manner or by any means which it may choose and that any conflicts of interest are excused.

14

FURIE-BANKR_00106684
DA00542

14.   Force Majeure.

    14.01   Effect and Definition. No failure or omission by either party to perform or carry out its obligations in accordance with this Agreement shall give rise to any claim by the other party or be deemed a breach of this Agreement if such failure or omissions arises from an event of force majeure.

    For the purpose of this section, force majeure shall mean acts of God, acts of public enemies, wars, national emergencies, insurrections, riots, labor disputes of national or international scope, boycotts, extraordinary weather conditions, governmental interference, or any other event which (i) could not have been reasonably foreseen at the signing of this Agreement; and (ii) was beyond the control of the party affected; and (iii) makes fulfillment of obligations in accordance with this Agreement impossible. Financial distress or inability to make payment shall not, however, be considered to be force majeure.

    14.02   Notification Requirements. The party claimed to be affected by force majeure shall (i) promptly notify the other party of the beginning and end of any event claimed to be force majeure; and (ii) take all reasonable steps and precautions to alleviate the effects thereof; and (iii) resume performance in accordance with this Agreement as soon as is reasonably possible.

15.   Governing Law. Except for procedures in any arbitration proceedings which may occur pursuant to this Agreement, this Agreement shall be governed by and construed in accordance with the general maritime law of the United States of America and, to the extent applicable, by the laws, excluding conflict of laws' rules, of the State of Louisiana, U.S.A.

16.   Arbitration. Any dispute arising out of or in connection with this Agreement (whether such dispute arises in contract or tort), including any question regarding its existence, validity or termination, shall be referred to and finally resolved by arbitration under the Rules of the American Arbitration Association. The tribunal shall consist of three arbitrators with at least seven (7) years experience in maritime matters and the U.S. offshore drilling industry. The place of arbitration shall be Houston, Texas. Judgment upon the award of the arbitrators may be entered in any court having jurisdiction thereof. The Arbitrators may have power to award or order an injunction, the payment of any money damages and sums and the payment of interest but shall not have the power to award punitive damages of any kind.

17.   Notices. All notices or requests or consents provided for or permitted to be given pursuant to this Agreement must be in writing and must be given (a) by first class mail or commercial courier, with all charges paid, addressed to the party to be notified, (b) by delivering such notice in person to such party, or (c) by telexing or telecopying (with verification of receipt) such notice to such party. Notices given or served pursuant hereto shall be effective upon receipt by the party to be notified. All notices to be sent to a party shall be sent to or made at the addresses given below, or such other address as such party may specify by notice.

FURIE-BANKR_00106685
DA00543

If to Bareboat Owner:

Kadmas Limited
c/o HPL Yamalova & Plewka DMCC
Jumeirah Lakes Towers
Reef Tower, Office 1806
Dubai, United Arab Emirates
Telephone: +971-505-723-164
Email: Harald.plewka@hplaw.com

If to Manager:

Advanced Drilling Services, LLC.
Attn: Thomas E. Hord
4906 Ambassador Caffery, Building H, Suite 800
Lafayette, LA 70508
Telephone: (337) 806-9600
Email: thord@furiepetroleum.com

With a copy to:

Tony Nunes
Telephone: 713 530 9609
Email: tnunes@coganpartners.com

18.   Audit Rights. Bareboat Owner shall have the right at any time within two (2) years of the date that a charge was invoiced to Bareboat Owner to perform an audit for the purpose of verifying that the amounts invoiced were correct. In connection with any such audit, Manager will make its books and records available at reasonable times and places to the extent necessary to achieve the foregoing purpose.

19.   Inspection Rights. Manager shall, upon the request of Bareboat Owner, make arrangements for representatives of Bareboat Owner to visit the Vessel and the shore base from time to time for the purpose of observing the condition and operation of the Vessel and/or the shore base. In arranging all such inspections, due regard shall be given to avoiding any disruption of the operation of the Vessel or the shore base.

20.   Assignment. Except for assignment by Manager to a wholly owned affiliate of Manager, this Agreement may not be assigned by either party without the prior written consent of the other party. In case of any assignment, the assignor shall remain responsible for the performance of this Agreement by the assignee, and the indemnities provided in this Agreement shall inure to the benefit of both the assignor and the assignee (and their respective affiliates, directors, officers, employees and agents).

21.   Taxes. All transportation, use, gross revenues, sales, ad valorem or other property taxes of assessments due with respect to the ownership, operation or use of the Vessel during the term of this Agreement shall be an expense of Bareboat Owner and shall be paid from

16

FURIE-BANKR_00106686
DA00544

the Operating Account or reimbursed by Bareboat Owner if the Operating Account is insufficient. Each party hereto shall be responsible for its own income taxes, whether such taxes shall be based on profit, deemed profit, actual income or other method of computation of such taxes.

22. Prior Agreements. All prior agreements, letters of intent or understandings, whether written or oral regarding the marketing, management and operation of the Vessel are hereby superseded and of no further force and effect.

23. Confidentiality. The parties hereto agree that the terms of this Agreement, the Bareboat Charter, the Time Charter and the Drilling Contract and all information disclosed by one party hereto to the other party concerning the disclosing party's operations, concerning operations, business plans or business and activities and any proprietary information disclosed by one party hereto to the other party ("*Confidential Information*") is and shall remain confidential. There will be no disclosure of Confidential Information to third parties except to either party's lenders, bankers, affiliates and financial or other consultants, attorneys and accountants who have a reason to know and to the extent required by law, regulations or the rules of a stock exchange, required for tax or royalty filings, pursuant to a valid court order of a court or administrative agency of competent jurisdiction, with the consent of the other party hereto.

24. Counterpart Signatures. This Agreement may be executed in one or more counterparts by original or electronic signatures, each of which counterpart shall constitute an original and all of which when read together shall constitute one and the same instrument.

*Signatures appear on the following page*

17

FURIE-BANKR_00106687
DA00545

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed on the day and year first written above.

**KADMAS LIMITED,** a Malta company

By: _____

Name: Harald Plewka

Title: Attorney-in-fact

**ADVANCED DRILLING SERVICES, LLC,** a Louisiana limited liability company

By: _____

Name: _____

Title: _____

18

FURIE-BANKR_00106688
DA00546

**ANNEX 1**

*INITIAL BUDGET*

SEE ATTACHED SPREADSHEET

FURIE-BANKR_00106689
DA00547

ANNEX 1 - Initial Budget

## ADS Capital Requirements

1st Feb 2016

| Description | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rig Services ($55,000 per day) | 1,650,000$ | 1,000,000$ | 1,395,000$ | 1,395,000$ | 1,705,000$ | 1,650,000$ | 1,705,000$ | 1,705,000$ | 1,650,000$ | 1,705,000$ | 1,650,000$ | 1,705,000$ |
| Rig Service (4 days in 60@$925 months) | | | 216,667$ | 216,667$ | 216,667$ | | | | | | | |
| Rig Service Start-up (Euro $12,000 per day) | | | 381,000$ | 527,000$ | 531,000$ | | | | | | | |
| Rig down Pers ($1,8m-3) | | | 900,000$ | 900,000$ | | | | | | | | |
| Inventory deposits | 1,000,000$ | | | | | | | | | | | |
| Working Capital Reserve | | | 750,000$ | 750,000$ | 500,000$ | 500,000$ | | | | | | |
| Integration of Mud Pump and Simulation (s) | | | 500,000$ | | | | | | | | | |
| Rig Shipping | | 2,000,000$ | | | | | | | | | | |
| Bank Boat Charter Day Rate | | 600,000$ | 620,000$ | 600,000$ | 670,000$ | 600,000$ | 620,000$ | 620,000$ | 600,000$ | 670,000$ | 600,000$ | 620,000$ |
| **Sum** | 2,650,000$ | 3,600,000$ | 6,691,667$ | 4,626,667$ | 3,568,667$ | 3,260,000$ | 2,825,000$ | 2,325,000$ | 2,250,000$ | 2,325,000$ | 2,250,000$ | 2,325,000$ |

Notes:

1) You can not use 90 days in a month that has 31 days.   ADS has to pay the hands for 31 days not 30.   The same goes for the catering, crew and safety representative.  Shell will also expect to be p

Most importantly you will not want to miss out on billing Furie for the extra day at $220,000. In 2016 that is 5 days, or $1,100,000 US

2) Rig shipping includes the costs of tugs, marine survey and other loading expenses that ADS has to pay in Singapore.

Money Actually Sent:

| | | |
|---|---|---|
| 10/29/2015 | $225,000 | Energy Assist(Mud Pump) |
| 11/11/2015 | $252,400 | GOM(Shipyard) |
| 11/4/2015 | $500,000 | Wire to ADS |
| 12/4/2015 | $500,000 | Wire to ADS |
| 1/6/2016 | $1,402,000 | Wire to ADS |
| 1/14/2016 | $550,000 | Wire to ADS |
| | $3,925,400 | Total to Date |

Current Cash Balance                $1,556,216 HomeTown Bank - Operating

FURIE-BANKR_00106690
DA00548

# EXHIBIT 14

DA00549

*Execution Version*

## ASSIGNMENT OF BAREBOAT CHARTER AGREEMENT
### ("Agreement")

### Effective as of November 2, 2015

**Shelf Drilling Offshore Resources Limited II**, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (hereinafter called "*Owner*");

and

**Offshore Drilling Solutions Ltd.**, an international business company incorporated in  Ras Al Khaimah , United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates (hereinafter called "*Original Charterer*");

and

**Kadmas Limited,** a private limited liability company incorporated in the Republic of Malta, with its registered office at 114 The Strand, Gzira GZR 1027, Valletta, Malta ("*Substitute Charterer*").

(hereinafter the above parties shall be referred to singularly as "*Party*" and collectively as "*Parties*").

### WHEREAS:

A. Owner and Original Charterer entered into a Bareboat Charter Agreement on 4th July 2015, as amended by Amendment 01 to Bareboat Charter Agreement between Owner and Original Charterer on 04 October, 2015 (hereinafter called "*Charter*"), whereby Owner agreed to bareboat charter, and Original Charterer agreed to take and bareboat charter from the Owner, the offshore jack-up drill rig, Randolph Yost, Marshall Islands Official Registry No. 1744 (hereinafter referred to as "*Vessel*");

B. Substitute Charterer is a wholly owned subsidiary of the Original Charterer;

C. Original Charterer wishes to transfer and assign to Substitute Charterer all of its rights, benefits, interests, obligations and liabilities in, to and under the Charter, and Substitute Charterer agrees to accept the transfer and assignment of Original Charterer's rights, benefits interests in and to the Charter and agrees to perform all of the Original Charterer's obligations and assume and discharge all liabilities arising under and in connection with the Charter in

682124.0072 WEST 205849771 v3

TVS0004407
DA00550

respect of the period subsequent to the Effective Date, as defined below (hereinafter referred to as the "*Assignment Period*"); and

D. Owner is willing to agree to the transfer and assignment of the Charter to Substitute Charterer on the terms set forth herein.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter contained, it is hereby agreed by and between the Parties hereto as follows:

1.   All capitalized terms used but not defined herein shall bear the meanings given to them in the Charter.

2.   Original Charterer hereby irrevocably transfers and assigns to Substitute Charterer effective on the date set forth above (the "*Effective Date*") and on the terms herein provided, all of Original Charterer's right, title, interest (whether actual, contingent or accrued), obligations and liabilities (legal, equitable, beneficial or otherwise) in and to the Charter and arising under or in connection with the Charter in respect of the Assignment Period (the "*Assigned Interests and Obligations*").

3.   Owner hereby specifically consents to the transfer and assignment to Substitute Charterer of the Assigned Interests and Obligations, including the Charter, and the absolute right of the Substitute Charterer to take possession of and use the Vessel for the Assignment Period on the terms set forth in the Charter.

4.   As of and from the Effective Date and for the whole of the Assignment Period, Substitute Charterer accepts the Assigned Interests and Obligations and agrees undertakes and covenants to each of the Owner and Original Charterer as separate and independent obligations to assume be bound by and to perform and discharge the Charter in accordance with the terms, conditions and obligations contained in the Charter, including but not limited to being liable under the terms of the Charter for all Hire payments and for the maintenance and operation of the Vessel under the terms of the Charter.

5.   Owner recognizes Substitute Charterer as Original Charterer's successor in interest in and to the Charter for the Assignment Period. Substitute Charterer by this Agreement becomes entitled to all rights, titles and interests of the Original Charterer in and to the Charter as of the Effective Date and for the Assignment Period in accordance with the following:

   a.   The term "Charterer", as used in the Charter, shall mean and refer to Substitute Charterer.

   b.   All payments to Owner, as used in the Charter from and after the Delivery Date shall be made to the Owner's account set forth in the Charter.

   c.   All notices to the Charterer, as used in the Charter, shall be sent to the following address:

682124.0072 WEST 205849771 v3

TVS0004408
DA00551

Kadmas Limited
c/o HPL Yamalova & Plewka DMCC
Jumeirah Lakes Towers
Reef Tower, Office 1806
Dubai, United Arab Emirates
Telephone: +971-505-723-164
Email: Harald.plewka@hplaw.com
With a copy to: tnunes@coganpartners.com

d.   The Purchase Option provisions set forth in Article XVIII of the Charter shall remain in full force and effect with all rights and benefits of the Purchase Option provisions vesting in Substitute Charterer from and after the Effective Date.

e.   All other terms and conditions of the Charter to remain unaltered and in full force and effect as written.

6.   Owner acknowledges that pursuant to the terms of a Vessel Management Agreement to be entered into between Substitute Charterer and Advanced Drilling Solutions, LLC., a Louisiana limited liability company ("**ADS**"), the Vessel will be managed and operated for Substitute Charterer by ADS (or their respective successors or assigns) who will provide uninterrupted crew, Vessel operation and management services to and for the Vessel until redelivery by Substitute Charterer under the Charter, to the extent so provided under the Charter.

7.   Owner and Substitute Charterer hereby confirm that the copy of the Charter and its Amendment N0. 01 at Exhibit A (and any and all amendments, addenda, rider clauses and recaps thereto) given to Substitute Charterer by Original Charterer is a true and complete copy thereof and further confirms that the Charter remains in full force and effect as of the Effective Date.

8.   This Agreement shall be governed by the governing law of the Charter and any disputes arising hereunder shall be dealt with in accordance with the dispute resolution terms of the Charter.

9.   The Charter (as transferred and assigned) and this Agreement together constitute the entire agreement of the Parties hereto in relation to its subject matter and supersede any previous agreement, representations, warranties, or arrangements (whether written or oral) between them in relation to that subject matter; and no modification of this Agreement shall be effective unless it is made in writing and signed by each of the Parties hereto.

10.   This Agreement may be executed by original or electronic signatures in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement.

682124.0072 WEST 205849771 v3

TVS0004409
DA00552

*[Signature Page Follows]*

682124.0072 WEST 205849771 v3

CONFIDENTIAL

TVS0004410
DA00553

The Charter shall remain in full force and effect, except as modified by this Agreement. Each Party has executed this Agreement as of the date first written above.

**Original Charterer:**

OFFSHORE DRILLING SOLUTIONS LTD

By: _____
    Name: Reinhardt Schuster
    Title: Managing Director

**Substitute Charterer:**

KADMAS LIMITED

By: _____
    Name: Harald Plewka
    Title: Attorney-at-law in and on behalf of
    Kadmas Limited

**Owner:**

SHELF DRILLING OFFSHORE RESOURCES LIMITED II

By: _____
    Name: WILLIAM C. Hoffman
    Title: EVP & COO

CONFIDENTIAL

Exhibit A to Bareboat Charter Assignment

from

Offshore Drilling Solutions Ltd.

to

Kadmas Ltd.

CONFIDENTIAL

TVS0004412
DA00555

BAREBOAT CHARTER AGREEMENT

This Bareboat Charter Agreement (hereinafter called "***Charter***") is dated as of the 04th day of July, 2015 ("***Effective Date***"), by and between Shelf Drilling Offshore Resources Limited II, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (hereinafter called "***Owner***") and Offshore Drilling Solutions Ltd., an international business company incorporated in  Ras Al Khaimah , United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates (hereinafter called "***Charterer***").

## I.    **CHARTER AND TERM**

A.    <u>Demise and Vessel Description.</u> For and in consideration of the covenants and agreements herein, and subject to the terms and conditions hereof, OWNER DOES HEREBY LET, DEMISE AND BAREBOAT CHARTER TO CHARTERER and CHARTERER HEREBY AGREES TO TAKE AND BAREBOAT CHARTER FROM OWNER the "Vessel".

For purposes of this Article I and all other provisions of the Charter, "***Vessel***" shall mean (i) the offshore jack up drill rig called the RANDOLPH YOST, Marshall Islands Official Registry No. 1744, ABS Classification No. 7901508, IMO No. 8754281 and (ii) all related equipment, materials and consumables, each more particularly described and specified in Exhibit A hereto (including, to the extent specified in Exhibit A, all apparel, gear, engines, machinery, lifeboats, anchors, cables, chains, rigging, tackle, fittings, furnishings, spare parts, tools, supplies, stores, pumps, and other equipment on board or ashore wherever located, belonging to the drill rig and all documents, certificates and manuals appertaining or belonging thereto wherever located).

For the avoidance of doubt, for purposes of this Article I and all other provisions of the Charter, the term Vessel shall be deemed to include all Vessel Equipment (as defined in III.H. below), Refurbishments and any other upgrades, modifications, additions, improvements, renewals and replacements at any time made during the term of this Charter in or to the Vessel, provided however, that the Vessel shall never be interpreted as including any inventory or equipment on board the Vessel which do not belong to the Owner and its Affiliates (as defined in Article X).

B.    <u>Base Charter Period.</u> This Charter shall be effective as of the Effective Date and, subject to the provisions of this Charter, the Charter term for the Vessel shall be for an initial period commencing on the Delivery (defined in Exhibit III.C below) and ending at 11:59 p.m. on the day which is thirty six (36) months after the Delivery (hereinafter the "***Base Charter Period***"), subject to extension as set forth below.  The Base Charter Period or any Extension Period, as applicable, shall be automatically extended for the time required to complete any well in progress and any additional time as required to effect redelivery at the end of the Charter Period pursuant to the provisions of III.C. of this Charter.



TVS0004413
DA00556

C.    Extension Period. Charterer shall have the option to extend the Charter Period for two (2) additional twelve month terms (each an "*Extension Period*" and collectively "*Extension Periods*"). The Extension Periods shall be exercisable by Charterer by giving Owner written notice of extension (i) no less than one hundred-eighty (180) days prior to the end of the Base Charter Period, in the case of the first Extension Period and (ii) no less than one-hundred eighty (180) days written notice prior to the end of the first Extension Period, in the case of the second Extension Period. The Base Charter Period and all Extension Periods are herein sometimes collectively called the "*Charter Period*".

D.    No Transfer of Title. This Charter is a demise bareboat charter only and does not create in or transfer to Charterer any title or ownership (legal or equitable) of the Vessel other than possession and use thereof as a demise charterer.

E.    Permitted Use. Owner and Charterer acknowledge that Charterer intends to operate (or cause to be operated) the Vessel in the Permitted Area of Operations (as defined in IV.A. below), including that part of the Permitted Area of Operations within the jurisdiction of the State of Alaska, under a drilling contract with Furie Operating Alaska LLC ("FOA") or, subject to Article XIII, such other entity as it may determine.

## II.    HIRE, PAYMENT CURRENCY, TERMINATION

A.    Hire. Charterer shall pay to Owner as charter hire ("*Hire*") for the Vessel (i) the sum of USD 20,000 (United States Dollars Twenty Thousand) per day during the initial eighteen (18) months of the Base Charter Period, (ii) the sum of USD 23,000 (United States Dollars Twenty Three Thousand) per day during the second eighteen (18) months of the Base Charter Period and (iii) a mutually agreed daily rate during each Extension Period but not to be less than USD 23,000 (United States Dollars Twenty Three Thousand) per day or greater than USD 30,000 (United States Dollars Thirty Thousand) per day during such Extension Periods. All Hire shall be paid net of Taxes to the extent expressly set forth in Article XII, and shall be payable monthly in advance, at the first of each month during the Charter Period. Owner shall invoice Charterer (i) on the Delivery, Hire due for the number of days for which Hire will be owed during the remainder of the first calendar month of the Base Charter Period in which the Delivery occurs and (ii) thereafter, prior to the beginning of each succeeding month during the Charter Period and Charterer shall pay to Owner such invoiced amount within ten (10) days after receipt of the invoice, but not before the first of any month. All Hire and any other amounts owing by either party hereto to the other party under this Charter or any Exhibit or document ancillary hereto shall be paid by the Charterer to Owner when due, in immediately available United States Dollar funds. In support of its obligations under this Charter, Charterer agrees, on or before July 31, 2015, to cause FOA (as operator under a drilling contract for use of the Vessel in Alaska) to deliver to Owner (i) an executed guarantee of Charterer's obligations under this Charter in terms and format acceptable to Owner which shall be attached to the Charter as Exhibit B by amendment to this Charter, and (ii) a correct copy of the balance sheet and financial statements of FOA's parent company, Cornucopia Oil & Gas Company LLC, for the financial quarter ending December 31, 2014.

2

TVS0004414
DA00557

All references to USD, $, Dollars or dollars in this Charter shall mean United States dollars. Payments of Hire shall be made by wire transfer to the account designated by Owner at:

| | |
|---|---|
| Bank | : HSBC Bank Plc. |
| Bank Address | : P.O. Box 18127-32 Poultry |
| | London EC2P 2BX |
| | United Kingdom |
| Bank Swift Code | : MIDLGB22 |
| Account Name | : Shelf Drilling Offshore Resources Limited II |

for the credit of Owner account number: GB55MIDL40051576104028.

Subject to Articles II.C., III.C. and VIII the Charterer's obligation to pay the Hire after Delivery shall be absolute and, unless otherwise expressly agreed by the parties hereto, unconditional irrespective of any contingency whatsoever, including but not limited to: (i) a Force Majeure event as defined in Article X. A. or, (ii) any right of set off, counterclaim, recoupment, defense or other right which either party hereto may have against the other or, (iii) any unavailability of the Vessel for any reason, including seaworthiness, merchantability, satisfactory quality, fitness for any purpose, condition, design, or operation of any kind or nature of the Vessel, other than a breach of any representations or warranties of Owner under the provisions of this Charter or Owner's failure to timely comply with its obligations under Articles III.B., III.C., III.H to III.L. IV.A, and IV.B. hereunder, or for registration or documentation under any relevant jurisdiction other than a failure of registration or documentation at the time of Delivery by Owner.

B.      Owner Termination Right. Owner may terminate this Charter pursuant to the provisions of Article XI below if an Event of Default occurs.

C.      Charterer Termination Right. If the Owner breaches any of its representations or warranties or fails to comply with any of its covenants or obligations set forth in Article III below, Charterer may give Owner fifteen (15) days written notice of such failure and if upon expiration of such fifteen (15) day period after Charterer's notice, Owner has still not complied with such warranties, covenants or agreements, Charterer may terminate this Charter on five (5) days prior written notice without any obligation to pay any further Hire or other amounts to Owner other than the obligation to pay Hire and other amounts due by Charterer under the terms of this Charter to the effective date of such termination.

D.      Default Interest. If Charterer fails to pay Hire any within five (5) days after the day when due, such unpaid Hire shall bear interest until paid at the rate of nine (9) percent (%) per annum (based on a year of 365 days and actual days elapsed) and shall be payable within the time period for payment of Hire hereunder.

### III.    WARRANTIES, INSPECTION, DELIVERY, REDELIVERY

3

TVS0004415
DA00558

A.    <u>AS IS/WHERE IS.</u> Subject to the representations and warranties contained in and other provisions of III. B., III.C., III.D., III.E., III.F., III. H., III. I., III.J, and III.K and Article IV. A. and IV. B. below, the charter of the Vessel from Owner to Charterer shall be on an "AS IS/WHERE IS" basis and OWNER EXPRESSLY DISCLAIMS AND NEGATES ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN, CONDITION, SEAWORTHINESS, MERCHANTABILITY, QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN THE VESSEL, FITNESS FOR A PARTICULAR PURPOSE OR ANY PARTICULAR TRADE, VALUE, CONDITION, COMPLIANCE WITH LAWS, DESIGN, CONFORMANCE WITH SPECIFICATIONS, OR ABSENCE OF LATENT DEFECTS AND OWNER FURTHER DISCLAIMS ALL OTHER LIABILITIES IN RESPECT OF THE VESSEL (AT COMMON LAW OR IN CONTRACT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS CHARTER) OR TORT OR OTHERWISE INCLUDING STRICT LIABILITY.

B.    <u>Owner's Representations and Warranties.</u>

(i) Owner represents and warrants that

      (a) it is the sole owner of the Vessel and has the absolute right and authority to charter and deliver the Vessel to Charterer under this Charter,

      (b) at the time of Delivery of the Vessel, the Vessel shall be properly documented as a Marshall Islands' flagged Vessel and in class with a current ABS Class Certificate as a + A1 Self Elevating Drilling Unit without any recommendations or requirements unless mutually agreed by Charterer and Owner,

      (c) all Marshall Islands' taxes and fees have been paid on the Vessel as of and to the time of Delivery,

      (d) all taxes, export duties, assessments and fees of any kind due and owing with respect to the Vessel or to which the Vessel is subject with regard to its ownership, operation, or storage owed to any taxing jurisdiction or state, municipal or local governmental entity in Indonesia, Singapore, or any other jurisdiction at or prior to Delivery have been or will be paid prior to Delivery,

      (e) Owner will at the time of Delivery have obtained all applicable export licenses, central bank clearances and other licenses, permits and clearances required to export and transport the Vessel from Indonesia, Singapore and any other jurisdiction where the Vessel has been stored or operated prior to Delivery,

      (f) at all times from and after the earlier of November 30, 2015 or the date the Vessel is returned to Singapore or other agreed location pursuant to the subparagraph (h) below until the Delivery Date the Owner will, except to the extent not reasonably practicable or not attributable to an event or circumstance solely and exclusively within the Owner's control, keep the Vessel safely jacked up or moored or berthed at

4

TVS0004416
DA00559

a secure location in Singapore or other location agreed between Owner and Charterer,

(g) at the time of Delivery, the Vessel and its Vessel Equipment shall be in the same condition as on the Inspection Date (defined below), with the exception of fair wear and tear and the Refurbishments as described in Article III.J. below and the Vessel shall in all respects be floating free and ready for transportation to Charterer's desired location in Alaska or elsewhere at Charterer's discretion, and

(h) Owner shall ensure that the Vessel shall be returned to a safe location in Singapore, or other location mutually agreed between Owner and Charterer, on or before November 30, 2015.

(ii)  Owner also warrants that there is now, and at the Delivery Date will be, no mortgage, charge (whether fixed or floating), pledge, hypothecation, assignment (by way of security), trust arrangement (for the purpose of providing security), demand, claim, options, contracts (other than this Bareboat Charter), lien (of a maritime nature or otherwise) or encumbrance of any kind whatsoever securing any obligation of any person or having the effect of conferring security or any type of preferential arrangement (including title transfer and/or retention arrangements having a similar effect ("*Lien*" or plural "*Liens*")  on or affecting the Vessel or Vessel Equipment, other than First Preferred Mortgage dated 28 February 2014, as amended 11 June 2014 in favour of RBC Europe Limited, as security trustee, and a Preferred Mortgage dated 21 January 2013 in favour of Wilmington Trust, National Association, as security trustee, as same may be amended or refinanced  and any other similar  mortgage, security interest, charge or encumbrance given in respect of the Vessel or Vessel Equipment to secure such amendment or refinancing subsequent to Delivery as a result of new financing/refinancing of existing debts by the Owner or its Affiliates in the ordinary course of business ( the "*Mortgage*").

(iii)  Owner represents, covenants and agrees that it will discharge or cause to be discharged any Liens other than the Mortgage on the Vessel (including the Vessel Equipment) prior to Delivery of the Vessel to the Charterer. Owner further warrants and agrees that no Mortgage or Lien with respect to the Vessel (including the Vessel Equipment) arising out of Owner's business or any person claiming by, through or under Owner or its Affiliates, joint venture partners, contractors, employees, representatives or agents, or the business of any person on whose behalf Owner may be acting, shall interfere with Charterer's rights of quiet enjoyment of the Vessel under the Charter, and Owner shall discharge or cause to be discharged any such Lien other than the Mortgage. Owner agrees to indemnify, hold harmless and defend Charterer, its Affiliates, lenders, representatives and agents, for, from and against any such Liens existing at the time of Delivery or arising at any time during the Charter Period. Owner further agrees, prior to Delivery to cause its Mortgage lenders to enter into a quiet enjoyment letter in form and substance reasonably acceptable to Charterer whereby such Mortgage lenders agree that, provided Charterer continues to pay the Hire on a timely basis, no such Mortgage lender will interfere with Charterer's quiet enjoyment and use of the Vessel during the Charter Period.

5



TVS0004417
DA00560

C.    Delivery/Redelivery/Surveys. The Vessel shall be deemed delivered to Charterer when Vessel is floating and ready to commence tight tow from the dock or shipyard in Singapore or other location agreed with Charterer ("*Delivery*") to the dry tow carrier location on a date ("*Delivery Date*") designated by Charterer between February 15, 2016 and March 15, 2006 ("*Delivery Window*").

The Charterer shall coordinate the physical delivery of the Vessel with Owner and shall advise Owner of the anticipated Delivery Date during the Delivery Window. On Delivery the Vessel and Vessel Equipment shall be in the condition referenced in III.B (i)(g) above.

To the extent that Delivery is delayed or interrupted by an event or circumstance not solely and exclusively within the Owner's control (including but not limited to any delay in arrival of the dry tow vessel or any delay not attributable to Owner) (herein called a "*Charterer Delivery Delay*"), the Delivery Window shall be automatically extended by the period of such delay or interruption; provided however that if such delay of Delivery occurs prior to 1 March 2016 the Owner shall be entitled to invoice the Charterer on March 1, 2016 for Hire in respect of all days in the month of March 2016 and for each month thereafter until the termination of the Charter Period irrespective of when Delivery actually occurs. Notwithstanding any provision to the contrary contained herein, if Hire becomes payable on March 1, 2016 under the above provisions or the provisions in the immediately following paragraph but Delivery has been delayed, the Vessel shall continue to be at the risk of Owner under the provisions of III.L below until Delivery actually occurs.

For the avoidance of doubt, if Delivery occurs between 15 February 2016 and prior to 1 March 2016 the Hire shall be deemed to commence when the Vessel commences tight tow to the dry tow carrier location on the designated Delivery Date at an agreed location in Singapore or such other location agreed with Charterer. If the Delivery occurs between 1 March 2016 and prior to 15 March 2016 and the Owner has notified the Charterer prior to 1 March 2016 that the Vessel is ready to commence tight tow from the dock or shipyard in Singapore or other location agreed with Charterer, the Owner shall be entitled to invoice the Charterer on March 1, 2016 for Hire in respect of all days in the month of March 2016 and thereafter until the termination of the Charter Period irrespective of when Delivery actually occurs.

D.    Owner's Corporate Organization. Owner represents and warrants that Owner is a limited liability company duly organized and validly existing in good standing under the laws of Cayman Islands, and has the legal power and authority to enter into and perform its obligations under this Charter and has legal and beneficial title to 100% of the Vessel free and clear of all Liens other than the Mortgage.

E.    Charterer's Corporate Organization. Charterer represents and warrants that Charterer is a an international business company limited by shares, duly organized and validly existing in good standing under the laws of the Ras Al Khaimah, United Arab Emirates, and has the legal power and authority to enter into and perform its obligations under this Charter.



TVS0004418
DA00561

F.    Owner's Due Authorization. Owner represents and warrants that Owner has duly authorized, executed and delivered this Charter, and this Charter constitutes, or when entered into as contemplated hereby constitutes, the legal, valid and binding obligation of Owner enforceable against the Owner in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally.

G.    Charterer's Due Authorization/Taxes. (i) Charterer represents and warrants that Charterer has duly authorized, executed and delivered this Charter, and this Charter constitutes, or when entered into as contemplated hereby constitutes, the legal, valid and binding obligation of Charterer enforceable against the Charterer in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally.

(ii)    Charterer covenants and agrees as follows:

(a)    it will pay or cause to be paid all taxes, export duties, assessments and fees of any kind due and owing with respect to the Vessel or to which the Vessel is subject with regard to its operation or storage during the Charter Period until redelivery, whether owed to any taxing jurisdiction or state, municipal or local governmental agency.

(b)    during the Charter Period and prior to redelivery it will obtain all export licenses, central bank clearances and other licenses, permits and clearances required to export and transport the Vessel from Alaska and any other jurisdiction where the Vessel has been stored or operated during the Charter Period.

H.    Charterer's Vessel Inspection. On or before August 31, 2015, or such other date as may be mutually agreed to in writing by the parties hereto (the "*Inspection Date*"), Charterer and its representatives (subject to permission, as applicable, from the current operator of the Vessel) shall be permitted to and shall be granted full access to the Vessel and all of its spare parts, equipment, machinery, accessories and tools whether on board or ashore wherever located (all such spare parts, equipment, machinery, accessories and tools herein collectively called the "*Vessel Equipment*") for the purposes of performing, at its own cost and expense, a full inspection and survey of the Vessel and the Vessel Equipment and their condition ("*Vessel Inspection*"). At such time, Owner and Charterer shall take and create a full inventory of all such Vessel Equipment. After the Inspection Date, Owner shall keep and maintain the Vessel and Vessel Equipment in the same condition and state of repair as on the Inspection Date, with the exception of fair wear and tear and the Refurbishments to be performed as described in Article III.J. below. In addition, no later than seven (7) days prior to Delivery on the Delivery Date, the Owner and Charterer shall perform the Delivery Survey of the Vessel and all Vessel Equipment in order to confirm the Vessel and all Vessel Equipment are in the same condition and state of repair as on the Inspection Date, with the exception of fair wear and tear, Refurbishments and any structural changes, modifications or upgrades to the Vessel or changes in in machinery, boilers, generators or appurtenances thereto approved in writing by the Owner.  Any other inspection of the Vessel and Vessel Equipment other than the Redelivery Survey required to be

7



TVS0004419
DA00562

performed by or on behalf of the Charterer at any time prior or subsequent to the Delivery and approved in advance by the Owner shall be at the Charterer's own cost and expense.

I.  ABS 5-Year Survey. Prior to Delivery, Owner shall, at its own cost, cause American Bureau of Shipping (ABS) to perform a 5-year special survey for the Vessel ("*ABS 5-Year Survey*"). If any repairs are specified or required by ABS in its above survey Owner at its own cost will, prior to Delivery, (i) make any repairs necessary as indicated by such ABS inspection and (ii) cause ABS to finalize the ABS 5-Year Survey and issue its new Class Certificate without any requirements or recommendations unless mutually agreed by Charterer and Owner.

J.  Vessel Refurbishments. Owner shall provide a project team to perform only the installation and commissioning of the following upgrades to the Vessel for Charterer prior to Delivery of the Vessel (to the extent it is possible to complete such upgrades prior to Delivery): (a) 3rd mud pump and (b) 15,000 psi piping on the rig floor (the "*Refurbishments*").  On or before September 30, 2015, Owner and Charterer shall agree to a detailed workscope and timeline for the implementation of the said Refurbishments. Other than the cost for Owner's project team for the installation and commissioning, Charterer shall supply such equipment and pay all costs and expenses related to (a) and (b) above including but not limited to supply of materials and equipment, all associated project costs, and shipyard charges for such Refurbishments. Charterer may supply a management team of up to three representatives during the performance of the Refurbishments at Charterer's cost. Charterer and its authorized representatives shall be granted access to the shipyard and Vessel where located in Singapore with such access commencing no later than twenty-four hours after arrival of the Vessel in Singapore or other location mutually agreed between Owner and Charterer on or prior to November 30, 2015, or other mutually agreed date, for purposes of observing and monitoring such Refurbishments and for any other inspections required by Charterer at its cost provided such inspections will not interfere with the ABS 5-Year Survey or cause any delay to the Delivery of the Vessel. Owner shall cause all the installation and commissioning of the Refurbishments to be performed to Charterer's reasonable satisfaction prior to Delivery of the Vessel to Charterer unless Charterer in its discretion decides not to proceed with such installation and commissioning prior to Delivery. All Refurbishments to the Vessel specified in this Article III.J. will remain with the Vessel and belong to Owner, unless Charterer exercises the Purchase Option per Article XVIII below.

K.  Owner's Failure to Make Repairs.  Should Owner fail to timely make the required repairs pursuant to the provisions of Article III.I Charterer may either, by written notice to Owner, (a) terminate this Charter or (b) with Owner's prior written consent, waive the right to terminate under (a) and repair such damage at Owner's sole cost and expense. In addition, notwithstanding any other provision to the contrary contained in this Charter, should Owner fail to (i) cause the Vessel to be returned to Singapore or other mutually agreed location on or before November 30, 2015 or (ii) cause the ABS Survey required in Article III.I. to be timely performed and completed by the Delivery Date, Charterer may terminate this Charter by written notice to Owner.

L.  Vessel Risk Prior to Delivery. Subject to the above provisions of this Article III and notwithstanding the Owner's assistance with the loading and offloading of the Vessel as

8



TVS0004420
DA00563

described in Article III.M. below, the Vessel to be at sole risk of loss and expense of Owner prior to Delivery, except that any damages, cost and expenses arising from or related to the performance, or delay in performance of the Charterer's requested Refurbishments prior to the Delivery, shall be for Charterer's account, except to the extent caused by or arising out of the Willful Misconduct (as defined in Article X) of Owner or its representatives, employees or agents. Subject to the provisions of Article VIII, the Vessel to be at the sole risk of loss and expense of Charterer during the Charter Period until termination of the Charter on redelivery of the Vessel to Owner under the provisions of this Charter.

M.     Mobilization and Demobilization Costs. All costs related to the mobilization of the Vessel (including the costs for dry tow carrier and fuel, demurrage fee, other boats and fuel for loading and offloading the Vessel, warranty surveyor, etc.) from its location on Delivery to Alaska or other agreed location where the Vessel is to be operated by Charterer are for the account of Charterer. Charterer to pay all costs related to the demobilization of the Vessel (including the costs for dry tow carrier and fuel, demurrage fee, other boats and fuel for loading and offloading the Vessel, warranty surveyor, etc.) from its last location where operated by Charterer under the Charter back to the Redelivery Location subsequent to the expiry of either the Charter Period or early termination of the Charter by Owner pursuant to Article XI or by Charterer under the provisions of this Charter, unless the Vessel is purchased by the Charterer under the provisions of this Charter, provided all of the foregoing obligations and costs with respect to redelivery only assumed by the Charterer shall apply notwithstanding the provisions of Article X.C(iv).  As requested and/or required by the Charterer, the Owner will provide assistance to the Charterer during mobilization and demobilization by monitoring and observing all marine operations for the loading and offloading of the Vessel onto a dry tow carrier.

## IV.     USE AND OPERATION OF VESSEL

A.     Area of Operations. Subject to the provisions of this Charter, the Charterer shall have the full use of the Vessel. Charterer shall have the right to display its insignia, and to fly its own house flag. Owner shall not change the name of the Vessel during the Charter Period. Charterer will not take the Vessel out of the Permitted Area of Operations without the prior written consent of Owner. In terms of this Charter, "*Permitted Area of Operations*" means the United States of America and its territorial sea, contiguous zone, exclusive economic zone and maritime boundaries with adjacent/opposite countries. The Vessel shall be operated and maintained in a safe, operable and seaworthy condition and shall not be used, operated or sub-chartered in any manner contrary to any applicable law, rule, or regulation of the USA, Alaska, Marshall Islands or any jurisdiction where Charterer operates the Vessel, or any state or local political subdivision thereof ("*Applicable Law*"), nor shall the Vessel be operated in a manner which is inconsistent with its design capabilities or Classification Certificate or outside of the coverage of the insurance policies on the Vessel.

B.     Charterer's Exclusive Use. Subject to the terms hereof, the Charterer shall have exclusive use, possession and control of the Vessel and shall navigate, fuel, maintain, repair, operate, man, and victual the Vessel, at its expense and by its own procurement, throughout the Charter Period. The master, officers and crew of the Vessel shall be engaged and employed by or on behalf of the Charterer and its Affiliates and contractors and shall remain the employees or contractors of the

9



TVS0004421
DA00564

Charterer or its agents, navigating and working the Vessel solely on behalf of and at the risk of the Charterer to the exclusion of the Owner, its Affiliates and their directors and employees.

C.    Taxes and Operating Expenses During Charter Period. Except as provided in this Charter, the Charterer shall pay all charges, taxes and expenses of every kind and nature whatsoever incurred during the Charter Period, incidental to the use and operation of the Vessel under this Charter in accordance with the provisions of Article XII.

D.    Charterer's Risk During Charter Period. Except as otherwise provided in this Charter, the possession, use, operation and maintenance of the Vessel and Vessel Equipment during the Charter Period shall be at the sole risk of Charterer until redelivery pursuant to the terms hereof.

E.    Insurance. The Charterer shall establish and maintain or cause to be established and maintained insurance coverage or other financial security or responsibility in respect of oil or other pollution damage as required by Applicable Law and in compliance with the provisions of Article IX below. The Charterer shall make and maintain all arrangements as may be necessary to satisfy such requirements at Charterer's sole expense and Charterer shall defend, indemnify and hold harmless the Owner, its Affiliates and their directors and employees, against all damages whatsoever (including loss of time) for any failure or inability to do so.

F.    Vessel Changes. The Charterer shall be allowed to make minor and non-structural changes and modifications to the Vessel; however, the Charterer shall make no structural changes in the Vessel or changes in the machinery, boilers, generators or appurtenances thereof, without in each instance first securing the Owner's prior written approval thereof. If the Owner so agrees, the Charterer shall, if the Owner so requires, restore the Vessel to its former condition before termination of the Charter.

G.    Wreck Removal. In the event of the Vessel becoming a wreck or obstruction to navigation during the Charter Period, the Charterer shall remove such wreckage or obstruction at Charterer's expense and shall defend, indemnify and hold harmless the Owner against any sums, including but not limited to fines, penalties and legal fees whatsoever which the Owner shall be held to be liable to pay and shall pay in consequence of the Vessel becoming a wreck or obstruction to navigation.

H.    Owner's Representatives. Owner shall be entitled to have up to two (2) of its employees or inspectors onboard the Vessel for a short period for inspection purposes during the Charter Period, with forty-eight (48) hours' notice, at Owner's expense and responsibility and without interference with operations of the Vessel. Owner shall pay to Charterer on demand any reasonable costs incurred by Charterer for food and lodging as a result thereof. Owner and its employees or inspectors shall execute Charterer's Hold Harmless Agreement prior to boarding the Vessel.

I.    Vessel Documentation. Charterer shall throughout the Charter Period maintain at Charterer's expense documentation of the Vessel and shall ensure the Vessel remains properly documented under the laws of such country as Owner deems appropriate.  Upon the written request of Charterer, the Owner shall execute promptly and with due diligence such documents and furnish such information and authority to the Marshall Islands vessel registry or such

10

TVS0004422
DA00565

governmental agencies  as may be necessary to enable Charterer to maintain the documentation of the Vessel.

J.      Owner's Inspection Rights. Owner, or its authorized representative, shall have the right, at reasonable times and on reasonable notice, to inspect the Vessel and its logs in order to ascertain its condition and to satisfy itself that the Vessel is being properly maintained in accordance with the terms of this Charter, but the Owner shall have no duty to do so.

K.      Salvage Rights. Owner shall not have any interest in any salvage monies earned by the Vessel or its master or crew or received by Charterer.  As between the Owner and Charterer, Charterer assumes and shall satisfy all costs and liabilities incurred in connection with all salvage services rendered by the Vessel.

## V.      MAINTENANCE AND REPAIRS

Charterer, at its expense, shall repair and maintain the Vessel and Vessel Equipment in the same good order, condition and repair as at the Delivery Date, ordinary wear and tear excepted, whether or not such repairs are covered by insurance, including applicable deductibles. The maintenance of the Vessel and Vessel Equipment shall at the minimum comply with the Shelf Drilling Preventive Maintenance System and the spare-parts used for such maintenance shall be Original Equipment Manufacturer (OEM) certified provided that Owner provides Charterer with a complete and correct copy of its Drilling Preventative Maintenance System handbooks or manuals or software (Shelf Drilling's JD Edwards maintenance system) and keeps Charterer updated as to any changes to same during the Charter Period.  Charterer shall maintain such class (ABS), permits and flagging (Marshall Islands) requirements as the Vessel shall have at Delivery hereunder. Charterer shall at all times comply with all Applicable Law, and shall have on board the Vessel when required thereby, valid certificates showing compliance therewith.

## VI.     EQUIPMENT AND STORES AT DELIVERY AND REDELIVERY

Owner acknowledges that such fuel, lubricants and warehouse items as may be on board the Vessel (as well as warehouse items still in transit, if applicable) and owned by Owner at the time of Delivery shall become the property of Charterer. Owner and Charterer shall agree and document the inventory levels or values of the fuel, lubricants and warehouse items as part of the Delivery Survey.  Upon redelivery or retaking of the Vessel, Owner or Charterer shall pay to the other as the case may be, on demand, the difference between the value of fuel, lubricants and warehouse items in inventory at Delivery (as per the Delivery Survey) and at redelivery or retaking based on the Redelivery Survey. Charterer shall have the use of all Vessel Equipment wherever located at the time of Delivery and all other equipment, pumps, gear, outfit, furniture, furnishings, appliances, spares, tools and replacement parts and stores as shall have been onboard the Vessel at the time of Delivery thereof to Charterer, all of which shall be and remain the property of Owner. The same Vessel Equipment and other equipment, pumps, gear, outfitting, furniture, furnishings, appliances, spares, tools, replacement parts, and stores or their substantial equivalents, shall be returned to Owner on redelivery or retaking of the Vessel, less ordinary wear and tear. The Charterer shall from time to time during the Charter Period repair or replace

11

at Charterer's option such items of equipment as shall be so damaged or worn as to be unfit for use and will be responsible to replace or repair any capital asset or component thereof. In such event, the repair or replacement cost will be the obligation of Charterer. Charterer is to ensure that all repairs to or replacement of any such damaged or worn equipment be effected in such manner (both as regard to workmanship and quality of material) as not to diminish the value of the Vessel. Charterer shall, at its own expense, provide such additional outfit, tools, replacement parts, and other property as it may elect, and such items may be removed by Charterer at or prior to redelivery. Any such items not so removed shall be deemed the property of the Owner. If required by Owner, such items shall be removed from the Vessel prior to redelivery. Other than repair or replacement of such damaged or worn equipment, Charterer shall not make any permanent modifications to the Vessel without Owner's prior written approval.

## VII.   LIENS

A.      No Charterer Liens. Charterer shall not, and shall procure that no other person claiming by, through or under Owner or its Affiliates shall  create, incur, or permit to exist on the Vessel and/or Vessel Equipment any Lien, other than (i) the Mortgage, (ii) this Charter, and (iii) Permitted Encumbrances as defined herein.

B.      Permitted Encumbrances. In the event Charterer directly or indirectly creates, incurs, assumes or allows to exist any Lien, on or with respect to the Vessel and/or Vessel Equipment, except Permitted Encumbrances, Charterer will, at its own expense, take such action as may be necessary to duly discharge any such Lien. The Charterer agrees forthwith to notify the Owner by facsimile or email, confirmed by written notice, of each such event and of each such Lien release or discharge. "*Permitted Encumbrances*" shall mean (i) Liens for contract salvage, general average or necessaries, and Liens for repairs or incident to current operations of the Vessel provided the obligations secured by such Liens are not more than thirty (30) days past due, (ii) Liens in respect of obligations or liabilities of Owner or Charterer under this Charter, any expenditure in satisfaction of which will or may reasonably be expected to be recoverable from insurance (including any applicable deductibles), (iii) maritime Liens and preferred maritime Liens (as such terms may be defined or understood pursuant to Applicable Law) arising in the ordinary course of business, including Liens for insurance premiums or calls not yet due, *so long in each case* as no action has been taken to assert, enforce or record the Lien and each and every Lien is timely paid or discharged; and (iv) any retention of title or similar provisions in a supplier's conditions of supply of goods supplied to Owner or Charterer where such retention or similar provision is agreed in the ordinary course of trading activities.

C.      Libel Against the Vessel. Charterer agrees that if a libel shall be filed against the Vessel and/or Vessel Equipment or if the Vessel and/or Vessel Equipment shall be otherwise liened upon or taken into custody or detained or sequestered by virtue of proceeding in any court or tribunal or by any government or authority because of any Liens which are not the responsibility of or derived by, through or under Owner hereunder, Charterer shall, at its own expense, within thirty (30) days thereafter cause the Vessel to be released and all such Liens, to be satisfied and discharged. Charterer agrees forthwith to notify Owner by facsimile or email, confirmed by written notice, of such event and of such Lien release or discharge. Charterer hereby irrevocably appoints Owner as its attorney-in-fact to secure the release of the Vessel and satisfy and

12

TVS0004424
DA00567

discharge all Liens in the event Charterer fails to timely do so, with full powers of substitution, and Charterer hereby ratifies and approves all things and acts that such attorney-in-fact may lawfully do. Charterer agrees to indemnify Owner from any and all reasonable documented costs, including legal fees, involved in the release of the Vessel and the satisfaction and discharge any such Liens.

## VIII.  <u>LOSS OR DAMAGE AFTER DELIVERY</u>

The parties hereto agree that insurance proceeds received in connection with loss or damage other than an actual, constructive, or compromised total loss of the Vessel (a "*Total Loss*") shall be applied to repair or cure such loss or damage. In the event of damage to the Vessel, Charterer shall, in addition to repairing the Vessel to its state as before such damage, be liable to pay the Hire until redelivery of the Vessel, if redelivery is unable to be timely effected at the end of the Charter Period as a result of such damage. In the event of a Total Loss, Hire shall cease on the date of occurrence of the event or condition giving rise to such Total Loss or the date when the Vessel was last seen and Owner and Charterer shall proceed diligently and cooperate fully with each other in recovery of any and all insurance or other proceeds applicable thereto and such proceeds shall be paid to Owner for distribution as interests may appear. In the event of an occurrence of Total Loss, the Charterer shall have a maximum aggregate liability to the Owner of USD 60,000,000 (United States Dollars Sixty Million) in respect of physical loss of the Vessel ("*Physical Loss Limit*"), provided that the Physical Loss Limit shall not apply, in any event, to any other losses relating to, arising from or connected with such Total Loss, including but not limited to pollution, wreck and debris removal and/or Hire.

## IX.  <u>INSURANCE</u>

A.     <u>Charterer's Insurance Obligations.</u> Charterer shall during the Charter Period and any extensions thereof, keep the Vessel fully insured against the following risks and with insurers acceptable to Owner. The form of the requirements may be different than that stated below; however the coverages shall remain the same. The form of coverages at the commencement of the Charter shall be in the form and substance reasonably acceptable to Owner and Charterer and shall include the following coverages:

(i)     Comprehensive General Liability Insurance including Pollution Insurance with a combined single limit of not less than United States Dollars Three Hundred Million (US $ 300,000,000) per occurrence including Protection and Indemnity risks, Excess Removal of Wreck over the coverage provided below, and particularly pollution risks attaching to the Vessel.

(ii)    Contingent Operators Extra Expense Insurance (COEE) of not less than United States Dollars One Hundred Million (US $ 100,000,000) per occurrence, with a deductible of no greater than United States Dollars One Million (US$1,000,000) per occurrence.

(iii)   Vessel hull and machinery insurance in the amount of $60 million with the same general physical damage coverages and limits currently maintained by Owner, including deductible of not greater than United States Dollars Five Million

13

TVS0004425
DA00568

(US$5,000,000) (but nil in the event of a total loss). The policy shall include coverage for cost of raising and removal of sunken object or craft, wreckage or debris of Owner's property and equipment with a separate limit for at least 25% of the Insured Vessel's Agreed Value. The policy shall be liable when such removal is compulsory under any applicable laws or when Charterer is liable for removal of such sunken object or craft, wreckage or debris under its contract with government or where such sunken object or craft, wreckage or debris interferes with any party's normal operations. Coverage shall include separate coverage for Sue and Labor up to 25% of the Insured Vessel's Agreed Value , and Incidental Cargo up to United States Dollars Five Million (U$5,000,000) with a deductible of no greater than Unites States Dollars One Hundred Thousand (US$100,000).

B.     Other Insurance Coverage. Other coverage and in such amounts normally required of bareboat charterers and vessel owners, including coverage for sue and labor, incidental cargo loss and contingent OEE coverage, all as reasonably acceptable to Charterer.

C.     Named Insured's. The insurances procured by Charterer pursuant to this Charter shall name Owner [and Owner's lender] as additional insured and loss payee and Charterer shall obtain from its insurers a waiver of rights of subrogation against Owner [and Owner's lender] to the extent of Charterer's obligations and liabilities contained in this Charter. Each such policy shall provide for thirty (30) days prior written notice to Owner of cancellation by underwriter or material change to such policies and that Owner [and Owner's lender] shall not be liable for premiums. Certificates of insurance or upon request certified copies of the originals of all policies, binders, cover notes, and entries, shall be delivered to Owner for custody by it. Charterer will not do or omit any act, nor voluntarily suffer or permit any act to be done or omitted, whereby any insurances required to be carried or maintained hereunder shall or may be suspended, impaired or defeated.

D.     Insurance Claims. Charterer shall be responsible for preparation and submission of any and all claims to the appropriate underwriters and shall also be responsible for the supervision of any litigation irrespective of whether the defense of such litigation falls within the coverage of the insurance policies listed above. Charterer shall furnish reasonable notice to Owner of any claims or damages which result in claims under any such insurance policy or otherwise and Owner shall, upon the reasonable request of Charterer, provide such claim assistance as is necessary. Owner may, at its expense, process any claims or participate in the defense of any litigation.

E.     Policy Terms. Except as otherwise provided in the immediately following paragraph, all policies of insurance or other evidence thereof shall provide that losses thereunder shall be payable to Owner; provided, however, that such policies shall provide that:

        any loss under any insurance on the Vessel with respect to the protection and indemnity risks or other liability insurance shall be paid (a) at Charterer's instruction directly to the person to whom any liability covered by such insurance has been incurred or (b) if Charterer has paid or is paying such loss, liability or expense of the person by whom it was incurred, then directly to the Charterer to reimburse it for

14

TVS0004426
DA00569

payments made by it; provided, however, that the underwriters shall first have received evidence that the liability insured against has been discharged or is being discharged simultaneously with such payment and have not received written notice from Owner as to the occurrence of an Event of Default under this Charter.

F.      <u>War Risk Coverage.</u> Charterer shall obtain such additional insurance coverages of war risk and excess protection and indemnity and the cost of all premiums and deductibles or self-insured retentions shall be for the account of Charterer.  The Owner may elect to procure Owner's interest, and breach of warranty insurance and the cost of all premiums and deductibles or self-insured retentions shall be for the account of Owner.

G.      <u>Owner's Obligations.</u> Owner shall, upon the request of Charterer, promptly execute such document as may be required to enable Charterer to abandon the Vessel to the underwriters and claim a constructive or compromised total loss.

H.      <u>Owner's Additional Insurance.</u> Owner shall have the right, but not the obligation, at Owner's sole expense and for Owner's sole benefit, to secure any additional or excess insurance as Owner deems necessary or desirable. Any such insurance shall be secondary to and/or excess of insurance acquired by Charterer and Charterer's insurance shall bear an endorsement acknowledging such.

## X.    <u>INDEMNITY</u>

A.      <u>Defined Terms.</u> For purposes of application, interpretation and enforcement of the provisions of this Article X, and any other relevant Articles of this Charter wherein the definitions are use, the following words and expressions shall mean:

(i)     "Affiliate" means in relation to either party, any company or legal person or entity which (a) controls either directly or indirectly a party or (b) which is controlled directly or indirectly by such party, or (c) is directly or indirectly controlled by a company or legal person or entity which directly controls such party.

(ii)    "Applicable Law" means applicable laws, statutes, rules (administrative or otherwise), regulations, codes, standards or common law, or any other requirement of any Governmental Authority having the force of law, including any re-enactment, repeal or amendment thereof from time to time.

(iii)   "Authorizations" means any permit, license, certificate, approval, authorization, plan, directive, consent, order, clearance or consent decree of, from or with any Governmental Authority or other regulatory body.

(iv)    "Claims" means Liens, claims, awards, demands, losses, liabilities, damages, expenses (including legal expenses), bonding fees, disbursements, costs, suits, cause or causes of action, and judgments of every kind and character.

15

(v)   "Force Majeure" means an event beyond the reasonable control of a party, including but not limited to any act of God, war, act of terrorism, riot, civil commotion, compliance with a law or order of a Governmental Authority, rule, regulation or direction, fire, flood or storm, including hurricanes and named tropical storms.

(vi)   "Governmental Authority" means any nation or government (including any country), any state, local, municipal  or other political subdivision thereof and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or on behalf of the government.

(vii)   "Willful Misconduct" means an intentional act or failure to act by a party or any personnel of the party with actual knowledge that it is likely to result in injury or harm to a person or loss or damage to property and which is intended to cause or which is in reckless disregard of such injury, harm, loss or damage, but shall not include any error of judgment or mistake in the exercise of good faith by the person or entity in question.

B.   Charterer's Indemnities. Charterer shall and does hereby assume all risks, responsibility, and liabilities arising from Charterer's charter, possession, use, maintenance, and operation of the Vessel (including actions in rem or in personam) unless any such Claims arise out of any matter for which Owner is required to indemnify Charterer pursuant to Article X. B. below.

Charterer further agrees to pay, release, investigate, defend, indemnify, and hold harmless Owner its Affiliates and their directors, managers, officers, employees, servants, agents, representatives and the Vessel from and against any and all Claims:

(i)   arising directly or indirectly out of the operations of the Vessel by Charterer during the Charter Period;

(ii)   as a consequence (direct or indirect) of the breach by Charterer of any of its obligations under this Charter;

(iii)   for loss or damage to the Vessel arising out of, related to or connected with the Charterer's charter of the Vessel during the Charter Period;

(iv)   for loss or damage or loss of use of any property of Charterer, its Affiliates or any other person (other than property of Owner's employees, representatives, agents or contractors which are not part of the Vessel or Vessel Equipment);

(v)   for injury, illness, disease or death of any directors, officers, employees, servants, and agents of Charterer, its Affiliates or any other person (other than Owner's employees, representatives, agents or contractors);

16

TVS0004428
DA00571

(vi)    in respect of pollution of any kind and howsoever arising, whether originating or emanating above or below the surface of water, including, without limitation, control, removal, cleanup costs and third-party damage, fines, penalties, and assessments of any kind or character;

(vii)   with respect to compliance with, or failure to comply with all Applicable Law, including but not limited to the Merchant Marine Act 1920 (as amended by 46 App. U.S.C. 883) and any Applicable Laws particular to any state in the Permit Area in which the Vessel is located from time to time, as well as any obtaining and maintaining all Authorizations needed to operate the Vessel in the Permit Area,

whether any of the types of Claims describe in the foregoing sub-paragraphs (i) to (vii) inclusive arise from, result directly or indirectly from, are incident to, or connected with this Charter or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter and shall apply irrespective of any Claim in tort, breach of contract or otherwise at law. The indemnities shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or enforcing the indemnities contained herein.

C.    Owner's Indemnities. Owner shall and does hereby assume, indemnify, and agrees to pay, release, defend and hold harmless Charterer, its Affiliates and their respective directors, managers, officers, employees, servants, agents, representatives and the Vessel from and against any and all Claims:

(i)     arising with respect to the Vessel or its operations, if any,  prior to Delivery to Charterer hereunder, except any liability for Claims specifically assumed by Charterer prior to Delivery under the terms of this Charter, including Article III. L. above;

(ii)    in connection with or arising out of placing of Owner's employees, representatives, agents, contractors or inspectors onboard the Vessel or otherwise carrying out work or operations affecting the Vessel, with respect to damage to or loss of the property belonging to such Owner's employees, representatives, agents, contractors or inspectors (other than the Vessel and Vessel Equipment, and property of Charterer's employees, representatives, agents or contractors which are not part of the Vessel or Vessel Equipment);

17

TVS0004429
DA00572

   (iii)    for injury, illness, disease or death of any directors, officers, employees, servants, and agents of Owner or any of its Affiliates (other than Charterer's employees, representatives, agents or contractors); or

   (iv)    as a consequence (direct or indirect) of the breach by Owner of any of its obligations under this Charter and with respect to compliance with, or failure to comply with all Applicable Law.

whether any of the types of Claims described in the foregoing sub-paragraphs (i) to (iv) inclusive arise from, result directly or indirectly from, are incident to, or connected with this Charter or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) of other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

18

TVS0004430
DA00573

D.    No Consequential Damages or Loss. (i) Notwithstanding any provision to the contrary elsewhere in this Charter, the Owner shall save, indemnify, defend and hold harmless the Charterer, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Owner's own Consequential Loss and the Charterer shall save, indemnify, defend and hold harmless the Owner, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Charterer's own Consequential Loss, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Vessel, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Charter. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

(ii) For the purposes of this Article X. D, the expression "Consequential Loss" shall mean:

(a) any indirect, special, incidental, punitive or consequential loss or damages under applicable law, and/or

(b) to the extent not covered by D.(i) above, loss or deferment of production, loss of product, loss of use (including without limitation, loss of use or the cost of use of, and increased expenditure related to property, equipment, materials and services including without limitation, those provided by contractors or subcontractors of every tier or by third parties), loss of business and business interruption, loss of revenue (which for the avoidance of doubt shall not include payments due to the Owner by way of remuneration under this Charter or actual damages of Owner or Charterer for the loss of this Charter or any profit, revenue, expectation or opportunity thereunder), loss of profit or anticipated profit, increased expenditure, loss and/or deferral of drilling rights and/or loss, restriction or forfeiture of license, concession or field interests and costs incurred by a party or their group as a result of the other party or their group's breach of contract unless explicitly provided for otherwise in this Charter,

whether or not such losses were foreseeable at the time of entering into this Charter and, in respect of sub-paragraph (b) only, whether the same are direct or indirect.

E.    Willful Misconduct. Notwithstanding any provision to the contrary contained in this Charter, neither party hereto shall be responsible to the other for any Claims caused by the Willful Misconduct of the indemnified party.

F.    No Third Party Beneficiaries/ Group Members.

19

TVS0004431
DA00574

(i)     Subject to sub-paragraph F (ii)below, the parties intend that, except for indemnities in favor of any group member of any party,  no provision of this Charter shall, by virtue of the Contracts (Rights of Third Parties) Act 1999 ("the Act") confer any benefit on, nor be enforceable by any person who is not a party to this Charter.

(ii)     Subject to the remaining provisions of this Charter, the provisions of Articles X. A. to E., inclusive are intended to be enforceable by any group member.  For the purposes of Article X, the term 'group member' shall mean any of the Owner's and Charterer's respective Affiliates and its and their directors, officers, managers, employees, servants, agents, representatives and the Vessel.

(iii)     in making a claim under this Charter, the remedies of such group member shall be limited to the claiming of damages.

(iv)     Subject to the provisions of Article VIII, a group member shall not be entitled to assign any benefit or right conferred on it under this Charter by virtue of the Act.

(v)     Notwithstanding the provisions of this paragraph, the Charter may be rescinded, amended or varied by the parties hereto without notice or consent of such group member even if, as a result, that group member's right to enforce a term of this Charter may be varied or extinguished.

## XI.    **DEFAULT**

A.    <u>Events of Default.</u> Any of the following events shall constitute an Event of Default:

(i)     failure of Charterer to pay any Hire within five (5) days after the date when due under the provisions of Article II;

(ii)     failure of Charterer to perform any of the covenants, conditions or obligations required to be performed by Charterer under this Charter or any other obligation to Owner in connection herewith or the breach of any of Charterer's representations and warranties under this Charter, and such failure continues unremedied for fourteen (14) days after written notice from Owner to Charterer of the occurrence thereof;

(iii)     failure to carry and maintain insurance in accordance with the provisions of Article IX;

(iv)     filing by Charterer of a voluntary petition or any response seeking reorganization, rearrangement or readjustment of its debts or for any other relief under any applicable bankruptcy act or law, or under any other insolvency act or law, now or hereafter existing, or of any action by it consenting, approving of, or acquiescing in any such petition or proceeding; the application by it for or the appointment by consent or acquiescence of, a receiver or trustee for it or for all or a substantial part of its property; the making by it of an assignment for the benefit of creditors, the inability of

20

TVS0004432
DA00575

it, or its admission in writing of its inability to pay its debts as they come due (the term "acquiescence" means the failure to file a petition or motion in opposition to such petition or proceeding or to vacate or discharge any order, judgment or decree providing for such appointment within twenty-five (25) days after the appointment of a receiver or trustee); or

(v)     filing of an involuntary petition against Charterer seeking bankruptcy or reorganization, arrangement or readjustment of its debts or for any other relief under any applicable bankruptcy act or law, or under any other insolvency law or act, now or hereafter existing and such petition remains undismissed or unanswered for a period of forty-five (45) days from the filing; or the involuntary appointment of a receiver or a trustee for all .or a substantial part of its property and such appointment remains unvacated or unopposed for a period of forty-five (45) days from such appointment; or the issuance of a writ of attachment, or executioner similar process against any substantial part of its property and such writ remains unbonded or undismissed for any period of forty-five (45) days from notice of its issuance.

B.     Remedies. Upon the occurrence of an Event of Default by Charterer hereunder, including the lapse of a cure period, if applicable, Owner shall have the right to terminate this Charter and demand redelivery of the Vessel from Charterer and/or to exercise all other rights and remedies granted to Owner under this Charter. In the event of such early termination, in addition to any payment already accrued or due to Owner and as otherwise provided in this Charter (including all costs related to the demobilization of the Vessel as provided under Article III. M), Charterer shall be liable to the Owner for: a) the payment of Hire from the effective date of the termination to the end of the Base Charter Period, and the payment of Hire to the end of the Extended Periods if the option(s) to extend has been exercised; and b) for the payment of Hire until redelivery of the Vessel is effected. Owner may sell, dispose of, hold, use, operate, charter or keep idle the Vessel as Owner, in its sole discretion, may decide. Owner may further exercise any right or remedy which may be available under applicable law, in equity or in admiralty, or proceed by appropriate court action to enforce the terms hereof or to recover damages, including legal fees for the breach hereof.

C.     Redelivery of Vessel on Default. Upon written demand of Owner in the event of a termination of this Charter under the provisions of Article II.B. or II.C.,_Owner may cause Charterer at Charterer's expense (including but not limited to all costs of demobilization as described above in Article III. M.) to, and Charterer hereby agrees that Charterer will promptly redeliver the Vessel and Vessel Equipment or cause the Vessel and Vessel Equipment to be redelivered to Owner at the Redelivery Location with all reasonable dispatch and in the same manner and condition as if the Vessel and Vessel Equipment were being redelivered at the expiration of the Charter Period, and all obligations of Charterer under this Charter shall apply to such redelivery. Owner may, but shall be under no obligation to, retake the Vessel and Vessel Equipment wherever it may be found, whether upon the high seas or at any port, harbor, or other place, and irrespective of whether Charterer, any subcharterer, or any other person is in possession of the Vessel and Vessel Equipment, all without prior demand and without legal process, and for that purpose Owner or its agent may enter upon any dock, pier, or other premises where the Vessel and Vessel Equipment is and may take possession thereof, without Owner or its

21

TVS0004433
DA00576