## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Make/model:<br>Chart recorder:    yes/no<br>Alarm:        yes/no | Milltronics<br>Yes<br>Yes |
| Make/model:<br>Chart recorder:    yes/no<br>Alarm:        yes/no | N/A |
| **H.1.11 Automatic Driller (see B.2.1)** | N/A |
| **H.1.12 Remote Choke Control Unit (see E.5)** | |
| **H.1.13 Crown Clearance Indicator** | N/A |
| Make/type:    yes/no | |
| **H.2    DRILLING        PARAMETER RECORDER** | |
| Quantity:    no.<br>Make/type:<br>Location - 1:<br>        Type (display/recorder/both):<br>Location  - 2:<br>Type (display/recorder/both):<br>Location - 3:<br>Type (display/recorder/both):<br>Number of parameters recorded:  no.<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded:<br>Parameter recorded: | 1<br>Electrowave Drilling Instrumentation<br>Driller's cabin<br>Both<br>OIM office<br>Display<br>Co Man Office<br>Display<br>6<br>Drill String Weight<br>RPM<br>SPM pump 1 & 2<br>Pump pressure<br>Penetration rate<br>Rotary torque |
| **H.3    INSTRUMENTATION    AT    CHOKE MANIFOLD** | |
| **H.3.1 Stand pipe Pressure Gauge (Drill pipe pressure gauge)** | |
| Quantity:    no.<br>Make/type: | 1<br>Houston Digital Instrument |



CONFIDENTIAL

TVS0004513
DA00656

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Pressure range (maximum):      psi | 6,000 |
| Quantity:      no.<br>Make/type:<br>Pressure range (maximum):      psi | |
| Visible from choke operating position:      yes/no | |
| **H.3.2  Choke Manifold Pressure Gauge<br>(Casing pressure gauge)** | |
| Quantity:      no.<br>Make/type:<br>Pressure gauge:      psi/psi | 1<br>Houston Digital instruments<br>10,000 |
| Quantity:      no.<br>Make/type:<br>Pressure gauge:      psi/psi | |
| **H.4 INSTRUMENTATION AT STANDPIPE** | |
| **H.4.1  Stand pipe Pressure Gauge** | |
| Quantity:      no.<br>Make/type:<br>Pressure gauge:      psi/psi | 1<br>Cameron Iron Works<br>0 / 10,000 |
| Quantity:      no.<br>Make/type:<br>Pressure gauge:      psi/psi | 1<br>HDI – electronic/mechanical<br>0 – 6000 |
| Quantity:      no.<br>Make/type:<br>Pressure gauge:      psi/psi | |
| Visible from driller's position:      yes/no<br>Visible from choke operating system:      yes/no | Yes<br>Yes |
| **H.5     DEVIATION EQUIPMENT** | |
| **H.5.1  Deviation Recorder** | N/A |
| Quantity:      no.<br>Make/type: | |



CONFIDENTIAL

TVS0004514
DA00657

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Deviation range:      degree/degree | |
| **H.5.2  Slick-line Unit (see B.2.4)** | |
| **H.6      RIG COMMUNICATION SYSTEMS** | |
| **H.6.1  Rig Telephone System** | |
| No. of stations:        no.<br>Make/type:<br>Explosion proof:      yes/no | 68<br>Eternity Lite<br>No |
| No. of stations:        no.<br>Make/type:<br>Explosion proof:      yes/no | |
| **H.6.2  Public Address System** | |
| Can be combined with H.6.1 above:  yes/no<br>No. of stations:        no.<br>Make/type:<br>Explosion proof:      yes/no | Yes<br>68<br>Eternity Lite<br>No |
| **H.6.3  Drill Floor Talkback System** | |
| No. of stations:        no.<br>        Location:<br>        Location:<br>        Location:<br>        Location:<br>Make/type:<br>Explosion-proof:      yes/no | 3<br>Monkey Board<br>Driller's Cabin<br>BOP Deck<br><br>Intervox<br>Yes |
| **H.6.4  Hand Held Vhf Radios** | |
| Quantity:        no.<br>Quantity intrinsically safe:  no. | 6<br>6 |
| **H.6.5  Crane Communication System** | |
| Quantity:        no.<br>Make/type:<br><br>Explosion proof:      yes/no<br>Part  of  rig  telephone  system  (H.6.1):<br>        yes/no | 1 ea<br>Eternity Lite PABX and Sailor VHF radio<br>No<br>Yes |



CONFIDENTIAL

TVS0004515
DA00658

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Part of public address system (H.6.2): yes/no | Yes |
| **H.7    ENVIRONMENTAL INSTRUMENTATION** | |
| **H.7.1. Temperature Indicators** | |
| Air temperature (make/model):<br>Recorder:    yes/no<br>Sea water temperature (make/model): yes/no<br>Recorder: | Texas Weather Instruments<br>Yes<br>No<br><br>No |
| **H.7.2  Barometric Pressure Indicator** | |
| Make/model:<br>Recorder:    yes/no | Texas Weather Instruments<br>No |
| **H.7.3  Humidity Sensing Indicator** | |
| Make/model:<br>Recorder:    yes/no | Texas Weather Instruments<br>No |
| **H.7.4  Wind Speed/Direction Meter** | |
| Make/model:<br>Recorder:    yes/no | Texas Weather Instruments<br>No |
| **H.7.5  Wave Profile Recorder** | N/A |
| Make/model:<br>Recorder:    yes/no | |
| **H.7.6  Current Indicator** | |
| Make/model:<br>Located at:<br>Recorder:    yes/no | N/A |
| **H.7.7  Weather Facsimile** | |
| Make/model:<br>Located at:<br>Recorder:    yes/no | Texas Weather Instruments<br>Radio Room<br>No |

Page 74 of 95

CONFIDENTIAL

### RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| **H.8        NAVIGATION INSTRUMENTATION** | |
| **H.8.1  Gyro Compass** | N/A |
| Make/model:<br>Located at: | |
| **H.8.2  Depth Sounder** | N/A |
| Make/model:<br>Located at:<br>Recorder:     yes/no | |
| **H.8.3  Radar** | N/A |
| Quantity:     no.<br>Make/model:<br>Located at:<br>Bandwidth:   cm | |
| **H.9 EXTERNAL COMMUNICATIONS EQUIPMENT** | |
| **H.9.1  SSB Transceiver** | |
| Location(s):<br>Quantity:     no.<br>Make/ model:<br>Power:            watts<br>Frequency ranges (low/high):     mhz/mhz<br>        (Synthesized crystal):<br>Facsimile   capable   (see   also   H.9.9):     yes/no<br>Telex capable (see also H.9.10):  yes/no | Radio room<br>1<br>Hull Model  230 SSB single side band<br>150<br>1.6 / 30<br><br>No<br><br>No |
| Location(s):<br>Quantity:     no.<br>Make/model:<br>Power:            watts<br>Frequency ranges (low/high):     mhz/mhz<br>        (Synthesized crystal):<br>Facsimile   capable   (see   also   H.9.9):     yes/no<br>Telex capable (see also H.9.10):  yes/no | N/A |
| **H.9.2  E.P.I.R.B's** | |

Page 75 of 95



TVS0004517<br>DA00660

### RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Quantity:      no.<br>Make/model:<br>Location(s): | 1<br>Class S121.5<br>In control room |
| Quantity:      no.<br>Make/model:<br>Location(s): | |
| **H.9.3  Marine VHF Radio** | |
| Quantity:      no.<br>Make/model:<br>Power:              watt<br>Channels: | 2<br>Sailor model RT144AC<br>25<br>All    maritime    channels.    5    private channels |
| Location: | Radio Room, control room. |
| Quantity:      no.<br>Make/model:<br>Power:              watt<br>Channels:<br>Location: | 4<br>HX500<br>5<br>6 channels<br>Radio Room |
| **H.9.4  Aircraft Radio Beacon Transmitter** | |
| Quantity:      no.<br>Make/model:<br>Power:              watts | 1<br>Southern Avionics model SS-800-A<br>80 |
| **H.9.5  Aeronautical Vhf Transceiver** | |
| Quantity:      no.<br>Make/model:<br>Power:              watts<br>Frequency range (low/high):      mhz/mhz<br>(Synthesized/crystal):<br>Location(s): | 1<br>Icom Type 1c - A200<br>7<br>118/136.975 |
| **H.9.6  Watch Receiver** | N/A |
| Quantity:      no.<br>Make/model:<br>Frequency:   khz | |
| **H.9.7  Satellite Communication System** | |



CONFIDENTIAL

TVS0004518
DA00661

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Make/model: | Magnavox MX2400 |
| Type: | Marisat |
| Facsimile capable (see also H.9.9) yes/no | Yes |
| Telex capable (see also H.9.10) yes/no | Yes |
| Location(s): | Radio room |
| **H.9.8 Cellular** | N/A |
| Number of phone lines:    no. | |
| **H.9.9. Facsimile** | |
| Make/model: | 1 |
| Connected to: | Marisat B |
| **H.9.10 Telex** | 2 |
| Make/model: | Nera Mk2 |
| Connected to: | Immarsat B |
| **H.9.11 Scrambler** | N/A |
| Make/model: | |
| Connected to: | |
| **H.9.12 Other Communication System** | N/A |
| Make/model: | |
| Connected to: | |

CONFIDENTIAL

TVS0004519
DA00662

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| I. PRODUCTION TEST EQUIPMENT | |
|---|---|
| **I.1 BURNERS** | N/A |
| Make/type:<br>Quantity:<br>Capacity:<br>Weight:<br>Water requirement at 100 psi: | |
| **I.2 BURNER BOOMS** | N/A |
| Make/type:<br>Quantity:<br>Length:<br>Horizontal:<br>Maximum wind speed:<br>Walkway and handrails:<br>Burner platform size:<br>Burner mounting rotatable: | |
| **I.3 PIPING ON BURNER BOOMS** | N/A |
| **I.3.1   Oil Line** | |
| ID:<br>Working pressure:<br>Connection type at burner end:<br>H2S:<br>Pressure gauge connection at barge end: | |
| **I.3.2   Gas Line** | |
| ID:<br>Working pressure:<br>Extended beyond burner by:<br>Connection type at burner end:<br>H2S:<br>Pressure gauge connection at barge end: | |
| **I.3.3   Water Line** | |
| ID:<br>Working Pressure:<br>Connection type at burner end:<br>Pressure gauge connection at barge end: | |

Page 78 of 95

TVS0004520
DA00663

### RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| **I.3.4   Air Line**<br><br>ID:<br>Working Pressure:<br>Connection type at burner end:<br>Pressure gauge connection at barge end:<br><br>**I.3.5    Pilot Gas line**<br><br>ID:<br>Working Pressure:<br>Connection type at burner end:<br>Pressure gauge connection at barge end: | |
| **I.4 SPRINKLER SYSTEM**<br><br>System in place:<br>Pump source: | N/A |
| **I.5 FIXED PIPING FOR WELL TESTING**<br><br>**I.5.1    Drill floor to Separator Area**<br><br>Type (screwed/welded, both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Connection on drill floor:<br>Connection at separator:<br>Number of valves/lines:<br>　　　Size of valves:<br>H2S:<br><br>**I.5.2    Separator Area to Burner Booms**<br><br>Service (oil/gas):<br>Type (screwed/welded, both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Connection at separator:<br>Connection at boom:<br>Number of valves/lines:<br>　　　Size of valves:<br>H2S: | N/A |

Page 79 of 95

TVS0004521<br>DA00664

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Valves installed near separator area for switching gas to either burner: yes/no<br><br>**I.5.3   Water Lines to Burner Booms**<br><br>Type (screwed/welded/both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Number of valves required:<br>          Size of valves:<br>Pump source:<br>Rated line capacity at 300 psi:<br><br>**I.5.4   Air System to Burner Booms**<br><br>Type (screwed/welded/both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Non-return valves fitted:<br>Air source:<br><br>**I.5.5   Oil Storage Tank To Offload**<br><br>Type (screwed / welded / both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Connection at separator area:<br><br>**I.5.6   Separator to Vent Stack of Rig**<br><br>Type (screwed/welded, both):<br>Quantity:<br>Size ID:<br>Working pressure:<br>Connection type at separator area:<br><br>**I.6 AUXILIARY POWER AVAILABILITY**<br><br>**I.6.1   For Field Laboratory**<br><br>Quantity:<br>Volts:<br>Frequency: | <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>N/A |

Page 80 of 95

CONFIDENTIAL

TVS0004522
DA00665

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Breaker: | |
| **I.6.2   For Crude Transfer Pump** | |
| Quantity: | |
| Volts: | |
| Frequency: | |
| Breaker: | |
| **I.6.3   For Electric Heaters** | |
| Quantity: | |
| Volts: | |
| Frequency: | |
| Breaker: | |
| **J. WORKOVER TOOLS** | |
| **K. ACCOMMODATION** | |
| **K.1 OFFICES** | |
| **K.1.1  Company Representative's Office** | |
| Quantity: no. | 1 |
| Number of combination office/ staterooms in above: no. | 1 |
| Complete with desk, filing cabinets(s) and other necessary furniture: yes/no | Yes |
| Quantity with unrestricted view to drill floor:  no. | |
| **K.1.2  Contractor's      Representative's Office** | |
| Quantity: | 1 |
| Quantity with unrestricted view to drill floor:  no. | Yes |
| **K.1.3  Control Room** | |
| Quantity: | 1 |
| **K.1.4  Radio Room** | |
| Quantity: | 1 |



CONFIDENTIAL

TVS0004523
DA00666

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| **K.1.5  Helicopter Ready Room** | |
| Quantity: | |
| **K.1.6  Hospital Room** | |
| Number of beds/bunks:<br>Dangerous drugs locker: | 1<br>Yes |
| **K.2    LIVING QUARTERS** | |
| **K.2.1  Accommodations** | |
| Total Beds:<br>No. of beds per room type (1,2,3, etc):  no.<br>Number of rooms:   no.<br>Toilets (private/shared/communal):<br>Showers (private/shared/communal): | 118<br>1 to 6<br><br>2<br>PRIVATE<br>PRIVATE |
| No. of beds per room type (1,2,3, etc):  no.<br>Number of rooms:   no.<br>Toilets (private/shared/communal):<br>Showers (private/shared/communal): | 2<br><br>4<br>2 rooms with private toilets<br>2 with private showers |
| No. of beds per room type (1,2,3, etc):  no.<br>Number of rooms:   no.<br>Toilets (private/shared/communal):<br>Showers (private/shared/communal): | 1<br><br>1<br>1 room with private toilet<br>1 room private shower |
| No. of beds per room type (1,2,3, etc):  no.<br>Number of rooms:   no.<br>Toilets (private/shared/communal):<br>Showers (private/shared/communal): | 4<br><br>13<br>Shared<br>Shared |
| No. of beds per room type (1,2,3, etc):  no.<br>Number of rooms:   no.<br>Toilets (private/shared/communal): | 6<br><br>1<br>Shared |

CONFIDENTIAL

TVS0004524<br>DA00667

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Showers (private/shared/communal): | Shared |
| No. of beds per room type (1,2,3, etc): no. | 6 |
| Number of rooms:   no. | 1 |
| Toilets (private/shared/communal): | N/A |
| Showers (private/shared/communal): | N/A |
| No. of beds per room type (1,2,3, etc): no. | 4 |
| Number of rooms:   no. | 1 |
| Toilets (private/shared/communal): | Shared |
| Showers (private/shared/communal): | |

**K.2.2  Galley**

| | |
|---|---|
| Quantity: | 1 |

**K.2.3  Mess Seating Capacity**

| | |
|---|---|
| Main mess: | 45 |
| Aux. mess: | N/A |

**K.2.4  Meeting Rooms**

| | |
|---|---|
| Quantity: | 1 |

**K.2.5  Recreation Rooms**

| | |
|---|---|
| Quantity: | 1 |
| Recreation facilities | |
| TV: | 1 |
| DVD: | 12 |
| Pool Table: | |
| Ping Pong Table: | |
| Computer: | |
| Workout/weight room: | |
| Other: | |

**K.2.6  Other Rooms**

| | |
|---|---|
| Change rooms: | |
| Prayer room: | |
| Cinema: | |



CONFIDENTIAL

TVS0004525
DA00668

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| Other: | |
|--------|--|
|        |  |

CONFIDENTIAL

TVS0004526
DA00669

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| **L.    SAFETY EQUIPMENT** | |
| **L.1    GENERAL SAFETY EQUIPMENT** | |
| **L.1.1 General Personnel Protective Gear** | |
| Safety glasses (contractor/everyone/not supplied): | Contractor |
| Safety hats (contractor/everyone/not supplied): | Contractor |
| Safety boots (contractor/everyone/not supplied): | Contractor |
| Safety clothing (contractor/everyone/not supplied): | Contractor |
| Ear protection (contractor/everyone/not supplied): | Contractor |
| Rubber gloves (contractor/everyone/not supplied): | Contractor |
| Rubber aprons (contractor/everyone/not supplied): | Contractor |
| Rubber gloves - elbow length (contractor/everyone not/supplied): | Contractor |
| Full face visors (contractor/everyone/not supplied): | Contractor |
| Eye shields (contractor/everyone/not supplied): | Contractor |
| Dust masks (contractor/everyone/not supplied): | Contractor |
| Explosion proof hand torches (contractor/everyone/not supplied): | Contractor |
| Safety belts c/w lines: (contractor/everyone/not supplied): | Contractor |
| **L.1.2  Decontamination Stations** | |
| **L.1.2.1      Eye Wash Stations** | |
| Quantity - fixed:      no.<br>Make/model:<br>Location(s): | 4 Fixed<br>Guardian Combination shower Eye wash<br>Shaker, Rig Floor, Sack Room, Pump Room |
| Quantity - portable: no.<br>Make/model:<br>Location(s): | 11<br><br>Shaker Main Deck Pit Room, Chemical hopper |



CONFIDENTIAL

TVS0004527
DA00670

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| **L.1.2.2 Safety Showers** | |
| Quantity:      no.<br>Location(s): | 4<br>Shaker, Rig Floor, Sack Room, Pump Room |
| **L.1.3   Derrick Safety Equipment** | |
| Derrick escape chute (rem chute):      no. | 1 |
| Make/type: | Sala |
| Geronimo line:      yes/no | Yes |
| Derrick safety belts: no. | 2 |
| Make/type: | DBI Sala |
| Derrick safety belts: no. | N/A |
| Make/type: | |
| **L.1.4   Derrick Climbing Assistant** | |
| Make/type: | None |
| **L.1.5   Fresh Air Blowers (Bug Blowers)** | |
| Quantity:      no.<br>Make/type:<br>Located at:<br>Located at: | 1<br>Brandt<br>Rig Floor |
| **L.2      GAS/FIRE/SMOKE DETECTION** | |
| **L.2.1   H2S Monitoring System** | |
| Make/type: | Detcon Model 1010B – 10 Channel Rack Control System. |
| Sampling points at: | |
|     Bellnipple:     yes/no | Yes |
|     Drillfloor:      yes/no | Yes |
|     Shale shaker:       yes/no | Yes |
|     Mud tanks:   yes/no | Yes |
|     Ventilation system into living quarters:      yes/no | Yes |
|     Other: | Port and starboard lifeboats, port and starboard air intakes. |
| Alarms at: | |
|     Drillers console (audible/visual/both): | |
|     Engine room (audible/visual/both): | |
|     Mud room (audible/visual/both): | |
|     Living quarters each level (audible/visual/both): | |

CONFIDENTIAL

TVS0004528
DA00671

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Central area each structural level (audible/visual/both):<br>Other: | |
| Tied to general alarm:      yes/no | No |
| Central control panel:      yes/no | Yes |
| Located at: | Radio Room |
| Local alarm (audible/visual/both): | Both |

**L.2.2  Combustible    Gas    Monitoring System**

| | |
|---|---|
| Make/type: | Detcon Model 1010B – 10 Channel Rack Control System. |
| Sampling points at: | |
| Bellnipple:    yes/no | Yes |
| Drillfloor:    yes/no | No |
| Shale shaker:      yes/no | Yes |
| Mud tanks:    yes/no | Yes |
| Ventilation    system    into    living quarters:      yes/no | Yes |
| Other: | Port and starboard lifeboats, port and starboard air intakes. |
| Alarms at: | |
| Drillers                              console (audible/visual/both): | Both |
| Engine room (audible/visual/both): | Both |
| Mud room (audible/visual/both): | Both |
| Living    quarters    each    level (audible/visual/both): | Both |
| Central area each structural level (audible/visual/both): | Both |
| Other: | |
| Tied to general alarm:      yes/no | No |
| Central control panel:      yes/no | Yes |
| Located at: | Radio Room |
| Local alarm (audible/visual/both): | Both |

**L.2.3  H2S Detectors (Portable)**

| | |
|---|---|
| Quantity:      no. | 1 |
| Make/type: | Drager 190 |
| Stain types for H2S: measuring range: | |
| from 1 to 20 percent:      % | Yes |
| from 5 to 60 percent:      % | Yes |

**L.2.4  Explosimeters**

| | |
|---|---|
| Quantity:      no. | 2 |
| Make/type: | MSA / TYPE 261 |

CONFIDENTIAL

TVS0004529
DA00672

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| **L.2.5  CO2 Gas Detectors (portable)** | |
| Quantity:      no. | 2 |
| Make/type: | MSA model 260 combustible gas and oxy meter |
| Stain tubes for CO2: measuring range | |
|      from 1 to 20 percent:      % | 1 |
|      from 5 to 60 percent:      % | |
| **L.2.6  O2 Meter (portable)** | |
| Quantity:      no. | 2 |
| Make/type: | MSA model 260 |
| **L.2.7  Fire/Smoke      Detectors      in Accommodation** | |
| Make/type: | Dooley Tackaberry |
| Fire detection:      yes/no | Yes |
| Smoke detection:    yes/no | Yes |
| Central control panel:      yes/no | Yes |
|     Location: | Radio room. |
| Alarms:                  no. | 8 |
| Pull boxes:   no. | 43 |
|     Mud room (audible/visual/both): | Both |
|     Living    quarters    each    level (audible/visual/both) | Audible |
|     Central area structural level: (audible/visual/both): | Audible |
|     Other: | |
|     Tied to general alarm:      yes/no | Yes |
| Central control panel: | Yes |
|     Located at: | Radio room |
| Local alarm (audible/visual/both): | Both |
| **L.3      FIRE FIGHTING EQUIPMENT** | |
| **L.3.1  Fire Pumps** | |
| Quantity:      no. | 1 |
| Make/model: | Halco, model H3001500244 |
| Type: | Centrifugal |
| Output (each):      U.S.gals/min | 250 |
| Location: | Fire pump room. |
| Quantity:      no. | |
| Make/model: | |
| Type: | |

CONFIDENTIAL

TVS0004530
DA00673

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Output (each):        U.S.gals/min<br>Location: | |
| All offtake points supplied by all pumps:<br>        yes/no | Yes |
| **L.3.2  Hydrants And Hoses** | |
| Hydrants positioned such that any point may be reached by a single hose length from two separate hydrants:        yes/no | YES |
| Quantity of hydrants:        no. | 26 |
| Hose connections/hydrant: no. | 1 PER HYDRANT |
| Hos. max. diameter:in | 1-1/2" |
| Length:        ft | 50FT. |
| **L.3.3  Portable Fire Extinguishers** | |
| Quantity (total):        no. | 86 |
| Type 1 - CO2        no./lbs<br>        no./lbs | 9 / 15lbs |
| Type 2 - Dry chemical        no./lb<br><br>no /lb | 30x10lbs<br>10x5lbs<br>9x20lbs<br>11x30lbs<br>2x50lbs<br>1x150lbs (wheeled) |
| Type 3 - Foam        no./lbs<br>        no./lbs<br>        no./lbs | 6 X 2.5<br>1 X 125 LBS |
| Water        no./lbs<br>        no./lbs<br>        no./lbs | N/a |
| Halon        no./lbs<br>        no./lbs | |
| **L.3.4  Fire Blankets** | |
| Quantity:        no.<br>Location(s): | 3<br>Each Galey and SCR Room |
| **L.3.5  Fixed Foam System** | |
| Make/type:<br>Quantity of foam concentrate stored:<br>        U.S.gal | 200 |
| Foam type: | AFFF |
| Application rate:        U.S. gals/min | 250 |
| Foam nozzles:        no. | 2 |

CONFIDENTIAL

TVS0004531<br>DA00674

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Located at: | Helideck |
| Located at: | |
| Located at: | |
| Automatically injected into fixed fire water system:        yes/no | Yes |
| Make/type: | |
| Quantity of foam concentrate stored:        U.S.gal | |
| Foam type: | |
| Application rate:        U.S. gals/min | |
| Foam nozzles:        no. | |
| Located at: | |
| Located at: | |
| Located at: | |
| Automatically injected into fixed fire water system:        yes/no | |

### L.3.6  Helideck Foam System

| | |
|---|---|
| Make/type: | Same as fixed |
| Quantity of monitors:        no. | |
| Quantity of foam concentrated stored:        U.S.gal | |
| Foam type: | |
| Application rate:        U.S.gals/min | |

### L.3.7  Fixed Fire Extinguishing System

| | |
|---|---|
| Protected spaces: | Ansul Halon 1301 fire fighting system (Bromotrifluromethene) |
| Engine        room,        type (Halon/CO2/other): | Halon |
| Remote manual release located at: | |
| Paint        locker,        type (Halon/CO2/other): | CO2 consisting of 1 x 300 cu ft cylinder |
| Remote manual release located at: | |
| Emergency        generator        type (Halon/CO2/other): | Halon |
| Remote manual release located at: | |
| SCR room type (Halon/CO2/other): | CO2 |
| Remote manual release located at: | |
| Other (specify location & type): | SCR room, pump room |
| Remote manual release located at: | |
| Alarms *audible, visual, or both): | both |
| Automatic shutdown of ventilation fans in protected spaces:yes/no | Yes |

### L.3.8  Manual Water Deluge System yes/no

N/A



CONFIDENTIAL

TVS0004532
DA00675

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Protected spaced: | |
| Protected spaced: | |
| Water supplied from fire main line: yes/no | |
| **L.3.9 Water Sprinkler System in Accommodation** | N/A |
| Automatic activation:        yes/no<br>Working pressure:   psi<br>Tank capacity:        gal<br>Salt water backup:   yes/no<br>Type (wet pipe/dry pipe) | |
| **L.4      BREATHING APPARATUS** | |
| **L.4.1  General Sets** | |
| Quantity:        no.<br>Make<br>Type (demand/positive pressure):<br>Cascade system quick connects: yes/no<br>Cylinder                        duration: min.<br>Located at:    qty/loc<br>Located at:    qty/loc<br>Located at:    qty/loc<br>Located at:    qty/loc<br>Located at:    qty/loc<br>Located at:    qty/loc | 12 Ea. 30 min + 6ea 10 min.<br>Scott 2.2 30 min & MSA premier 10 min<br>Demand<br>Yes<br>30 min and 10 min |
| **L.4.2  Escape Sets** | N/A |
| Quantity:        no.<br>Make<br>Type (demand/positive pressure):<br>Cascade system quick connects: yes/no<br>Cylinder duration:    min<br>Located at:    qty/loc<br>Located at:    qty/loc | |
| **L.4.3  Cascade Stations** | N/A |
| Quantity:        no.<br>Make/type:<br>Manifold locations/outlets at location:<br>Manifold locations/outlets at location:<br>Manifold locations/outlets at location:<br>Manifold locations/outlets at location: | |



CONFIDENTIAL

TVS0004533
DA00676

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Manifold locations/outlets at location:<br>Manifold locations/outlets at location: | |
| **L.4.4 Breathing Air Recharge Compressor**<br><br>Quantity:    no.<br>Make/type:<br>Compressed air storage capacity: ft3<br>    Working pressure:   psi<br>Located at:<br>Located at: | 1<br>Mako<br>Directly to SCBA<br>5000<br>Starboard accommodation deck |
| **L.4.5 Compressed Air Breathing Apparatus Trolley Unit**<br><br>Make:<br>Type (demand/positive pressure):<br>Air line length:     ft<br>Compressed air storage capacity: ft3<br>    Working pressure:  psi<br>Including:<br>    Face Mask:  yes/no<br>    Demand valve:    yes/no<br>    Microphone:  yes/no<br>    Safety harness:    yes/no<br>    Safety line (incorporating telephone<br>    line):     yes/no | N/A |
| **L.4.6 Breathing Air Purity Test Equipment**<br><br>Quantity:    no.<br>Make/type: | N/A |
| **L.5 EMERGENCY FIRST AID EQUIPMENT**<br><br>**L.5.1 First Aid Kits**<br><br>Quantity:    no. | 11 |
| **L.5.2 Burn Kits**<br><br>Quantity:    no. | 1 |
| **L.5.3 Resuscitators**<br><br>Quantity:   no. | 2 |

CONFIDENTIAL

TVS0004534
DA00677

## RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST

| | |
|---|---|
| Charged (spare) oxygen cylinders: no. | 4 |

**L.5.4  Stretchers**

| | |
|---|---|
| Quantity:        no. | 2 |
| Type: | Wire mesh type |
| Located at: | Rig floor & outside control room |
| | |
| Quantity:        no. | 1 |
| Type: | Billy Pugh type portable |
| Located at: | Hospital |

**L.6 HELIDECK RESCUE EQUIPMENT**

| | |
|---|---|
| Aircraft Axe:  yes/no | Yes |
| Large fireman's rescue axe:        yes/no | Yes |
| Crowbar:      yes/no | Yes |
| Heavy duty hacksaw:        yes/no | Yes |
| Spare blades:        yes/no | Yes |
| Grapnel hook:        yes/no | Yes |
| Length of wire rope attached:        ft | 25' |
| Quick release knife: yes/no | Yes |
| Bolt croppers:        yes/no | Yes |
| Fireman's outfit:        yes/no | Yes |
| CO2 Lance:  yes/no | Yes |
| Other: | |

**L.7 EMERGENCY WARNING ALARMS**

| | |
|---|---|
| Approved system to give warning of different emergencies:        yes/no | Yes |
| Activated from drill floor:    yes/no | Yes |

**L.8    SURVIVAL EQUIPMENT**

**L.8.1  Lifeboats**

| | |
|---|---|
| Make/type: | Watercraft Totally Enclosed |
| Quantity:        no. | 3 |
| Capacity:        person/craft | 44 MAN EACH CRAFT |
| Locations (frwd/aft/port/stbd): | 2 FWD PORT , 1 FWD STBD |
| Fire protection:        yes/no | Yes |
| Radio/EPIRB (see section H.9): | Yes |

**L.8.2  Liferafts**

| | |
|---|---|
| Make/type: | BF Goodrich /DSB |
| Quantity:        no. | 6 |
| Capacity:        person/craft | 25 MAN |



CONFIDENTIAL

TVS0004535
DA00678

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| Davit launched:      yes/no<br>Locations (frwd/aft/port/stbd): | Yes |
| **L.8.3  Fast Rescue Boat** | N/A |
| Make/type:<br>Engine power:        hp | |
| **L.8.4  Personal Floatation Devices** | |
| Make/type:<br>Quantity:     no. | Viking Lifesaving Equipment.<br>132 |
| **L.8.5  Survival Suits** | N/A |
| Make/type:<br>Quantity:     no. | |
| **L.8.6  Life Ring Buoys** | |
| Make/type<br>Quantity total:        no.<br>         with lights:   no.<br>         with smoke:   no.<br>         with EPIRB:   no. | 8<br>8<br>2<br>0 |
| **L.8.7  Work Vests** | |
| Quantity:      no. | 12 |
| **L.8.8  Escape Ladders/Nets** | |
| Make/type:<br>Quantity:      no. | Scramble Net<br>2 |
| **M. POLLUTION PREVENTION** | |
| **M.1.   SEWAGE TREATMENT** | |
| Make/model:<br>System type: | |
| **M.2    GARBAGE COMPACTION** | N/A |
| Make/model:<br>System type: | |
| Make/model:<br>System type: | |

CONFIDENTIAL

TVS0004536
DA00679

**RIG AND EQUIPMENT SPECIFICATIONS FOR RANDOLPH YOST**

| | |
|---|---|
| **M.3    GARBAGE DISPOSAL/GRINDER**<br><br>Make/model:<br>System type: | Gulf gulp 500 series BL<br>Food Grinder |
| **M.4    INCINERATOR**<br><br>Make/model:<br>System type: | N/A |
| **M.5    OILY WATER SEPARATOR**<br><br>Quantity:<br>Make/model:<br>System type:<br>Nominal throughput: | 1 each<br>TURBULO / Model TCS 2.5HD<br>Compact Non-Cartridge<br>Max. Flow Rate 2.5 cu.m/hour |

CONFIDENTIAL

TVS0004537
DA00680

Amendment No. 01 to Bareboat Charter Agreement

CONFIDENTIAL

## AMENDMENT No.01
## TO BAREBOAT CHARTER AGREEMENT

This Amendment No. 01 is effective on and from this 04th day of October 2015 made between:

**Shelf Drilling Offshore Resources Limited II**, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (hereinafter called "***Owner***");

And

**Offshore Drilling Solutions Ltd.**, an international business company incorporated in Ras Al Khaimah , United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates (hereinafter called "***Charterer***"),

(hereinafter the party of the first or second part shall be referred to singularly as "Party" and collectively as "Parties").

**WHEREAS:**

A. Owner and Charterer have entered into a Bareboat Charter Agreement on 4th July 2015 (hereinafter called "Charter") where Owner has agreed to bareboat charter and Charterer has agreed to take and bareboat charter from the Owner the Randolph Yost (hereinafter referred to as "Vessel"); and

B. Both Parties wish to amend the Charter in the manner as detailed below.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements hereinafter contained, it is hereby agreed in principle by and between the Parties hereto as follows:

1) Unless otherwise defined herein, capitalised terms in this Amendment No. 1 shall be as defined in the Charter and references to Articles or Exhibits shall be to those Articles or Exhibits in the Charter (unless stated otherwise).

2) Article VII.A. of the Charter shall be deleted and replaced by the following:

   "*No Charterer Liens. Charterer shall not, and shall procure that no other person claiming by, through or under Charterer or its Affiliates shall  create, incur, or permit to exist on the Vessel and/or Vessel Equipment any Lien, other than (i) the Mortgage, (ii) this Charter, and (iii) Permitted Encumbrances as defined herein.*"

1

TVS0004539
DA00682

3) Exhibit A of the Charter shall be amended as detailed in Annex 1 hereinafter attached.

4) Exhibit B (Deed of Guarantee), attached hereto as Annex 2, shall be inserted after Exhibit A of the Charter.

5) Exhibit C (Pro Forma Sale and Purchase Agreement), attached hereto as Annex 3, shall be inserted after Exhibit B of the Charter.

6) Except as set forth in this Amendment No. 1, all other terms and conditions in the Charter shall remain unchanged and in full force and effect. In the event of any differences or inconsistencies between the provisions of this Amendment No. 1 and those of the Charter on the same issue, then the provisions of this Amendment No. 1 shall prevail.

7) The substantive laws of England and Wales, exclusive of any conflicts of laws principles that could require the application of any other law, shall govern the construction interpretation and enforcement of this Amendment No. 1 for all purposes, including the resolution of all Disputes between the parties hereto, and the provisions of Article XIV of the Charter shall apply mutatis mutandis in respect of any Dispute arising out of or in relation to or in connection with this this Amendment No. 1.

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment No. 1 effective as of the day and year hereinabove first written by the duly authorized representatives of the Parties.

**Charterer**                                          **Owner**

_____                    _____
**Offshore Drilling Solutions Ltd.**          **Shelf Drilling Offshore Resources Limited II**
**By:** Reinhardt Martin Schuster             **By:** William C. Hoffman
**Title:** Director, Manager and Shareholder  **Title:** Executive Vice President and Chief
                                                Operating Officer

2

TVS0004540
DA00683

**Annex 1**

**Exhibit A (Rig and Equipment Specifications for Randolph Yost) of the Charter** shall be
amended as indicated below:

1) **Section D.13 Drill Pipe:**

| D.1.3 Drill Pipe | | |
|---|---|---|
| | | |
| Drill pipe OD: | in | 5" |
| Grade: | | S-135 |
| Total length: | ft | 13,000 (430 Joints) |
| Range: | | 2 |
| Weight: | lbs/ft | 19.5 lbs /ft |
| Internally plastic coated: | yes/no | Yes |
| Tool joint OD/ID: | in/in | 6 5/8" / 3 3/4" |
| Tool joint pin length (original): | in | |
| Tapered shoulder tool joints | | |
| (box/pins): | degree/degree | 18 |
| Connection type: | | 4 ½ IF |
| API classification: | | Premium |
| Thread protectors: | yes/no | Yes |
| | | |
| ~~OD: in~~ | | ~~5"~~ |
| ~~Grade:~~ | | ~~G-105~~ |
| ~~Total length: ft~~ | | ~~10,000 (330 Joints)~~ |
| ~~Range:~~ | | ~~2~~ |
| ~~Weight: lbs/ft~~ | | ~~19.5 lbs /ft~~ |
| ~~Internally plastic coated: yes/no~~ | | ~~Yes~~ |
| ~~Tool joint OD/ID: in/in~~ | | ~~6 5/8" / 3 3/4"~~ |
| ~~Tool joint pin length (original): in~~ | | |
| ~~Tapered shoulder tool joints~~ | | |
| ~~(box/pins): degree/degree~~ | | ~~18~~ |
| ~~Connection type:~~ | | ~~4 ½ IF~~ |
| ~~Type of Hard facing:~~ | | |
| ~~API classification:~~ | | ~~Premium~~ |
| ~~Thread protectors: yes/no~~ | | ~~Yes~~ |
| | | |
| Drill pipe OD: | in | 3 ½" |
| Grade: | | G 015 |
| Total length: | ft | 4,000 ft (130 joints) |
| Range: | | 2 |
| Weight: | lbs/ft | 13.3 lbs/ft |
| Internally plastic coated: | yes/no | Yes |
| Tool joint OD/ID: | in/in | 5" OD X 2-7/16" ID |
| Tool joint pin length (original): | in | |
| Tapered shoulder tool joints | | |
| (box/pins): | degree/degree | 18 |
| Connection type: | | NC 38 |
| API classification: | | Premium |
| Thread protectors: | yes/no | Yes |
| API classification: | | |
| Thread protectors: | yes/no | Yes |



1

TVS0004541
DA00684

2) **Section D.2.13 Elevator Links:**

| D.2.13 Elevator Links | | |
|---|---|---|
| Quantity of sets: | no. | 2 |
| Make/type: | | |
| Size: | in | 3-1/2" |
| Length: | ft | 108" |
| Rated capacity: | st | 350t |
| | | |
| Quantity of sets: | no. | 1 |
| Make/type: | | |
| Size: | in | 3-1/2" |
| Length: | ft | 132" |
| Rated capacity: | st | 350t |
| | | |
| Quantity of sets: | no. | 1 |
| Make/type: | | |
| Size: | in | 3-1/2" |
| Length: | ft | 240" |
| Rated capacity: | st | 500t |

3) **Section D.3. Fishing Equipment:**

| D.3    FISHING EQUIPMENT | | N/A |
|---|---|---|
| D.3.1  Overshots | | |
| Quantity: | no. | 1 |
| Make/type: | | BOWEN – 150 FS |
| Overshot OD: | in | 11-3/4 |
| To catch size: | in | 10-1/8" max with a spiral grapple |
| To catch size: | in | 9-3/8" max with a basket grapple |
| To catch size: | in | |
| Overshot guide OD: | in | 16" |
| Extension sub length: | ft | 42" |
| Lipped guide (oversize, regular): | | oversize |
| Grapples (spiral, basket, both): | | Both |
| Pack offs: | yes/no | Yes |
| Top subs connection type: | | 6-5/8 reg Box |
| | | |
| Quantity: | no. | 1 |
| Make/type: | | BOWEN – 150 FS |
| Overshot OD: | in | 9-5/8" |
| To catch size: | in | 8" max with spiral grapple |
| To catch size: | in | 7-1/4" max with Basket grapple |
| To catch size: | in | |
| Overshot guide OD: | in | 21" |
| Extension sub length: | ft | 42" |
| Lipped guide (oversize, regular): | | oversize |
| Grapples (spiral, basket, both): | | Both |
| Pack offs: | yes/no | Yes |
| Top sub connection type: | | 6-5/8 Reg Box |
| | | |
| Quantity: | no. | 1 |

2

TVS0004542
DA00685

| | |
|---|---|
| Make/type: | Bowen 150 SFS |
| Overshot OD: _____ in | 8-1/8" |
| To catch size: _____ in | |
| To catch size: _____ in | |
| To catch size: _____ in | |
| Overshot guide OD: _____ in | |
| Extension sub length: _____ ft | 42" |
| Lipped guide (oversize, regular): | Oversize |
| Grapples (spiral, basket, both): | Both |
| Pack offs: _____ yes/no | Yes |
| Top sub connection type: | 4-1/2" IF Box |
| | |
| Quantity: _____ no. | 1 |
| Make/type: | Bowen 150 FS |
| Overshot OD: _____ in | 8-1/8 |
| To catch size: _____ in | 6-1/2" max with spiral grapple |
| To catch size: _____ in | 5-3/4" max with basket grapple |
| To catch size: _____ in | |
| Overshot guide OD: _____ in | 11" |
| Extension sub length: _____ ft | 42" extension and 36" extension |
| Lipped guide (oversize, regular): | oversize |
| Grapples (spiral, basket, both): | Both |
| Pack offs: _____ yes/no | Yes |
| Top sub connection type: | 4-1/2" XH Box |
| | |
| Quantity: _____ no. | 1 |
| Make/type: | Bowen 150 SFS |
| Overshot OD: _____ in | 5-3/4 |
| To catch size: _____ in | 4-3/4" max with spiral grapple |
| To catch size: _____ in | 4-1/4" max with basket grapple |
| To catch size: _____ in | |
| Overshot guide OD: _____ in | 5-3/4" |
| Extension sub length: _____ ft | 36" |
| Lipped guide (oversize, regular): | Regular |
| Grapples (spiral, basket, both): | Both |
| Pack offs: _____ yes/no | Yes |
| Top sub connection type: | 3-1/2 IF Box |

**D.3.2  Hydraulic Fishing Jar**

| | |
|---|---|
| Quantity: _____ no. | |
| Make/type: | |
| OD body: _____ in | |
| Min. ID: _____ in | |
| Stroke: _____ in | |
| Connection type: | |
| Repair kit: _____ yes/no | |

**D.3.3  Jar Intensifier**

| | |
|---|---|
| Quantity: _____ no. | |
| Make/type: | |
| OD body: _____ in | |
| Min. ID: _____ in | |
| Connection type: | |
| Repair kit: _____ yes/no | |

**D.3.4  Surface Jar**

3

TVS0004543
DA00686

| | |
|---|---|
| Quantity: no. | |
| Make/type: | |
| OD body: in | |
| Stroke: in | |
| Connection type: | |
| Repair kit: yes/no | |

### D.3.5  Fishing Bumper Subs

| | |
|---|---|
| Quantity: no. | |
| Make/type: | |
| OD body: in | |
| Min. ID: in | |
| Stroke: in | |
| Connection type: | |

### D.3.6  Safety Joints

N/A

| | |
|---|---|
| Quantity: no. | |
| Make/type: | |
| OD body: in | |
| Min. ID: in | |
| Connection type: | |

### D.3.7  Junk Baskets (Reverse Circulation)

| | |
|---|---|
| Quantity: no. | 1 |
| Make/type: | Houston Engineers |
| For hole size: in | 12-1/4" – 14-1/4" |
| OD body: in | 11-1/4" |
| Connection type: | 6-5/8" Reg Pin up |
| Inside magnet available: yes/no | No |
| Mill shoes type (A, B, C): | No |

| | |
|---|---|
| Quantity: no. | 1 |
| Make/type: | Houston Engineers |
| For hole size: in | 6-1/8" – 6-1/2" |
| OD body: in | 5-3/4" |
| Connection type: | 3-1/2" Reg Pin up |
| Inside magnet available: yes/no | No |
| Mill shoes type (A, B, C): | No |

### D.3.8  Junk Subs

| | |
|---|---|
| Quantity: no. | 1 |
| Make/type: | |
| For hole size: in | |
| OD body: in | 7-3/4" x 9-1/2"  (ID 3-1/2") |
| Connection type: | 6-5/8" Reg Pin up x Box down |

### D.3.9  Flat Bottom Junk Mill

| | |
|---|---|
| Quantity: no. | |
| Make/type: | |
| OD flat mill: in | |
| Connection type: | |

4

TVS0004544
DA00687

| | |
|---|---|
| ~~D.3.10 Magnet Fishing Tools~~ <br><br> ~~Quantity: ————————————— no.~~ <br> ~~Make/type:~~ <br> ~~OD body: ————————————— in~~ <br> ~~Connection type:~~ <br><br> ~~D.3.11 Taper Taps~~ <br><br> ~~Quantity: ————————————— no.~~ <br> ~~Make:~~ <br> ~~Tap OD (max/min): ————————— in/in~~ <br> ~~OD body: ————————————— in~~ <br> ~~Length overall: ————————————— ft~~ <br> ~~Connection type:~~ <br><br> ~~D.3.12 Die Collars~~ <br><br> ~~Quantity: ————————————— no.~~ <br> ~~Make/type:~~ <br> ~~OD (Max/Min): ————————— in/in~~ <br> ~~OD body: ————————————— in~~ <br> ~~Length: ————————————————— ft~~ <br> ~~Connection type:~~ | <br><br><br><br><br><br><br><br><br><br><br><br> N/A |

4)  **Section E.9.2 BOP Test Stump:**

| E.9.2    BOP Test Stump | |
|---|---|
| ~~Size: ————————————————— in~~ <br> Size:                                     in | <br> 13-5/8" BOP test stump with 13-5/8" 10M BX159 connection and 1" NPT Port. Comes with one 5" OD BOP test nubbin (top hat). |

5)  **Section E.10.3 Conductor Pipe Tensioning System:**

| E.10.3  Conductor Pipe Tensioning System | ~~N/A~~ Available- |
|---|---|
| Make/type: <br> Tension capacity:                      lbs <br> Number of lift points:                 no. <br><br> Stroke: in | <br><br> 4 (complete with 4 sets of tensioning cylinders, slings and shackles) |

# End of Section

5

**Annex 2**

### DEED OF GUARANTEE (the "Guarantee")

This Guarantee is made this 31st day of July 2015, by DEUTSCHE OEL & GAS, S.A., a Luxembourg societe anonyme, with registered office at 26, Boulevard Royal, L-2449, Luxembourg (the "Guarantor"), in favor of SHELF DRILLING OFFSHORE RESOURCES LIMITED II, a company incorporated in the Cayman Islands, with principal place of business at Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (the "Owner").

#### WHEREAS:

(A)     (i) Guarantor is the indirect parent entity of Cornucopia Oil & Gas Company, LLC, a Texas limited liability company ("Cornucopia") with operations under certain oil and gas leases in the Cook Inlet, Alaska (the "Cook Inlet"), (ii) Cornucopia is the sole member and owner of Furie Operating Alaska, LLC ("FOA"), which entity is the operator of Cornucopia's Cook Inlet oil and gas leases, and (iii) FOA is interested in entering into a day work drilling contract for use in the Cook Inlet of the jack-up drill rig, known as the Randolph Yost (the "Rig"), and is in discussions with the current bareboat charterer of the Rig, Offshore Drilling Solutions Ltd., an international business company incorporated in Ras Al Khaimah, United Arab Emirates, on behalf of itself and its authorized sub-charterers, if any ("Bareboat Charterer") for a long term drilling contract for the Rig;

(B)     Guarantor understands that Bareboat Charterer has entered into a Bareboat Charter Agreement dated as of July 4, 2015, as amended on the date hereof, ("Charter") for the long term bareboat charter of the Rig from Owner and it is a condition of the Charter that Guarantor provide a guarantee of the Bareboat Charterer's obligations under the Bareboat Charter in accordance with this Guarantee; and

(C)     Guarantor is aware of all the terms of the Bareboat Charter and it is willing to enter into this Guarantee.

#### NOW THIS DEED WITNESSSETH and the Guarantor hereby agrees as follows:

1.     Subject to the rights, defenses and remedies of Bareboat Charterer under the Charter, Guarantor hereby irrevocably guarantees the full, prompt and complete performance of all obligations, undertakings, warranties, liabilities, Hire and debts of Bareboat Charterer under the Charter as and when such obligations, undertakings, warranties, liabilities, Hire and debts become due and performable in accordance with the terms of the Charter (the "Obligations"), and if Bareboat Charterer fails to observe and perform the Obligations, in whole or in part, the Guarantor shall, within ten (10) business days of receipt of written notice pursuant to Clause 9 hereunder of any such failure, pay to the Owner any sum due and owing, and assume and perform the Obligations, including without limitation any obligation to indemnify the Owner as if the Guarantor were the original obligor from the outset, in

*1/6*

TVS0004546
DA00689

accordance with the terms and conditions of the Charter. For the avoidance of doubt, any requirement as expressed above for the Owner to provide written notice prior to the Guarantor having the obligation to pay any sum due and owing under the Charter shall not in any way alter, impair, prejudice, extinguish or otherwise affect any other rights and remedies of the Owner under this Guarantee and/or the Charter.

2.   Subject to the rights, defenses and remedies of Bareboat Charterer under the Charter and except for the giving of required notices under the Charter to the Bareboat Charterer and complying with the notice provisions of Clause 1 above and with any waiting periods under, and otherwise complying with, the terms of the Charter, the Owner shall not be obliged before enforcing this Guarantee to take any action (including any court or arbitral proceedings) against the Bareboat Charterer, to make any claim against or any demand of the Bareboat Charterer, to enforce any other security held by it in respect of the Obligations, or to exercise any distress, diligence or other process of execution against the Bareboat Charterer, and the Guarantor agrees that, subject to the above provisions of this paragraph, this Guarantee is a guarantee of performance of the Obligations and that Guarantor's obligations under this Guarantee shall be primary (and not merely as surety), absolute and shall not be impaired, discharged or prejudiced by:

(i)    any alteration, amendment, modification or cancellation of any of the terms and conditions of the Charter;

(ii)   any change in the status or constitution (including any change of name) of the Owner, the Guarantor or Bareboat Charterer;

(iii)  the liquidation, dissolution or merger of Bareboat Charterer or Guarantor, the insolvency of Bareboat Charterer or Guarantor or any receivership or arrangement with or for the benefit of creditors or other analogous event affecting Bareboat Charterer or Guarantor or any of their respective properties;

(iv)   any indulgence or forbearance shown by the Owner towards Bareboat Charterer or to Guarantor in respect of the performance of the Obligations or otherwise; or

(v)    any failure or delay to assert any of the rights of Owner against (a) Bareboat Charterer under the Charter and/or (b) the Guarantor under this Guarantee; or

(vi)   any other circumstance which would (but for the provisions of this Guarantee or the Charter) constitute a legal or equitable discharge or defense of a guarantor generally.

3.   The Guarantor agrees that this Guarantee is an absolute and continuing guarantee and shall remain in full force and effect until all Obligations have been performed and shall not be discharged by any intermediate payment or settlement. Notwithstanding the foregoing, this Guarantee shall cease to be

*2/6*

TVS0004547
DA00690

enforceable upon the expiry of the earlier of the applicable statute of limitations or three (3) years after termination or expiry of the Charter.

4.    The Guarantor hereby represents and warrants that the Guarantor has the power and authority and the legal right to execute and deliver, and to perform its obligations under, this Guarantee, and has taken all necessary action to authorise the execution, delivery and performance of this Guarantee.

5.    The provisions of this Guarantee may not be amended, modified, or waived, unless such amendment, modification or waiver is in writing and consented to by Owner and Guarantor.  No failure or delay on the part of Owner in exercising any right under this Guarantee or the Charter shall operate as a waiver thereof, nor shall any single or partial exercise of any right preclude any other or further exercise thereof or the exercise of any other right.

6.    Any provision of this Guarantee which is prohibited or unenforceable in any applicable jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceability such provision in any other jurisdiction.

7.    Any term used herein and not defined herein shall have the meaning ascribed to such term in the Charter, and in the event the Charter is for any reason terminated and is no longer of any force and effect, such terms shall have the meaning and effect as set forth in the Charter immediately prior to such termination.

8.    <u>Governing Law & Dispute Resolution</u>

8.1    <u>Governing Law.</u>  The substantive laws of England and Wales, exclusive of any conflicts of laws principles that could require the application of any other law, shall govern the construction interpretation and enforcement of this Guarantee for all purposes, including the resolution of all Disputes between the parties hereto.

8.2    <u>Disputes.</u>  For the purposes of this Guarantee, "Dispute" means any dispute, controversy or Claim (of any and every kind or type, whether based on contract, tort, statute, regulation, or otherwise) arising out of, relating to, or connected with this Guarantee, including any dispute as to the construction, existence, validity, interpretation, termination, performance, enforceability, enforcement or breach of this Guarantee, as well as any dispute over arbitrability or jurisdiction.

8.3    <u>Arbitration.</u>  Any Dispute arising out of or in relation to or in connection with this Guarantee shall be exclusively and finally settled by arbitration without the right to appeal in accordance with the UNCITRAL ARBITRATION RULES currently in force as of the date of this Guarantee. The appointing and administering authority shall be the administering body of the Dubai International Arbitration Centre ("DIAC") Any party hereto may submit such a dispute, controversy or

*3/6*

TVS0004548
DA00691

claim to arbitration by notice to the other party. The parties shall pay in equal shares any fees required by the DIAC for administering the procedures for any Dispute and appointing the third neutral arbitrator if required.

8.4    Arbitration Tribunal. The arbitration shall be heard and determined by three (3) arbitrators. Each party hereto shall appoint an arbitrator of its choice within fifteen (15) days of the submission of a notice of arbitration by one party. The party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within fifteen (15) days following the appointment of both party-appointed arbitrators. The arbitrators need not be members or associated members of the DIAC. If the party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal or one party hereto refuses to appoint its party-appointed arbitrator within said fifteen (15) day period, the appointing authority for the implementation of such procedure shall be the DIAC, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

8.5    Arbitration Procedures. Unless otherwise expressly agreed in writing by the parties to the arbitration proceedings:

(i)    The arbitration proceedings shall be held in at an agreed location in Dubai, UAE and failing agreement of the parties at such location as determined by the DIAC;

(ii)    The arbitration proceedings shall be conducted in the English language and the arbitrators shall be fluent in English language;

(iii)    The arbitrator(s) shall be and remain at all times wholly independent and impartial;

(iv)    The arbitration proceedings shall be conducted under the UNCITRAL Rules, as amended from time to time (the "UNCITRAL Rules"), which UNCITRAL Rules are deemed to be incorporated by reference into this Article XIV;

(v)    Any procedural issues not determined under the UNCITRAL Rules shall be determined by the applicable laws of England, other than those laws which would refer the matter to another jurisdiction;

(vi)    The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators;

(vii)    The decision of a majority of the arbitrators shall be: (i) reduced to writing; (ii) final and binding without the right of appeal; (iii) the sole and exclusive remedy regarding any Claims or other claims, counterclaims, issues or accountings presented to the arbitrators;

416

CONFIDENTIAL

TVS0004549
DA00692

and (iv) promptly paid in United States dollars free of any deduction or offset;

(viii) Any costs or fees incident to enforcing the award, shall to the maximum extent permitted by law be charged against the party resisting such enforcement;

(ix) No special, incidental, indirect, consequential, exemplary or punitive damages (including loss of profit, loss of production, etc.) shall be awarded;

(x) The award may include interest from the date determined by the arbitration award, and from the date of the award until paid in full, at the interest rate set forth in Article II.D of the Charter to which this Guarantee relates;

(xi) Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be;

(xii) The arbitration may proceed in the absence of a party who, after due documented and verified notice, fails to answer or appear. An award shall not be made solely on the default of a party, but the arbitrator(s) shall require the party who is present to submit such evidence as the arbitrator(s) may determine is reasonably required to make an award; and

(xiii) If the parties hereto or others who are bound to this or another similar agreement initiate multiple arbitration proceedings, the subject matters of which are related by common questions of law or fact and which should result in conflicting awards or obligations, then the parties hereto hereby agree that all such proceedings shall be consolidated into a single arbitral proceeding.

(xiv) Small Disputes. For disputes where the total amount claimed by either party does not exceed one million United States dollars (U.S. $1,000,000) and in the case of any other dispute where the Parties so agree in writing, the arbitration shall be conducted in Dubai in accordance with the Small Claims Procedure of the London Maritime Arbitration Association.

8.6    Survival of Certain Provisions. Subject to the provisions of Clause 3 above, (i) this Clause 8 shall survive termination of this Guarantee for any cause and (ii) all other rights and obligations of the parties detailed in this Guarantee which by their nature survive termination or expiry of the Guarantee shall remain in full force and effect after such termination or expiry.

TVS0004550
DA00693

9.    If Bareboat Charterer is in breach of the Obligations the Owner shall promptly
      notify the Guarantor giving details of such breach, and such notice and all
      other notices shall be sent to the Guarantor at the address set out below:

      Deutsche Oel & Gas, S.A.
      Attention: Lars Degenhardt
      Address: 26, Boulevard Royal, L-2449, Luxembourg

      With a copy to (which shall constitute notice):

      Harald Plewka
      Untermainanlage 7
      60329 Frankfurt, Germany

10.   The parties confirm that no terms of this Guarantee are enforceable under the
      Contracts (Rights of Third Parties) Act 1999 by a person who is not a party to
      this Guarantee.

11.   In furtherance of the provisions of this Guarantee and pursuant to the terms of
      the Charter, Guarantor has  delivered and, and Owner acknowledges receipt
      of, a copy of the Cornucopia's financial statements and balance sheet for the
      fiscal quarter ending on December 31, 2014.

**IN WITNESS WHEREOF**, Guarantor has caused this Guarantee to be duly executed
and delivered by its officer(s) thereunto duly authorized as of the date first above
written.

DEUTSCHE OEL & GAS, S.A.

By:

Name:   LARS DEGENHARDT

Title:  Director

Date:  July 31, 2015

4/6

**End of Section**

TVS0004551
DA00694

**Annex 3**

**Exhibit C to Bareboat Charter Agreement by and between Shelf Drilling Offshore Resources Limited II and Offshore Drilling Solutions Ltd dated 4th July 2015 ("Charter")**

**PRO FORMA SALE AND PURCHASE AGREEMENT**

(hereinafter called "**Agreement**")

Subject to the terms and conditions contained herein,

SHELF DRILLING OFFSHORE RESOURCES LIMITED II, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Centre 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (hereinafter called "**Seller**")

has agreed to sell
and

OFFSHORE DRILLING SOLUTIONS LTD., an international business company incorporated in Ras Al Khaimah, United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates
(or its nominee or assignee)
(hereinafter called "**Buyer**")

has agreed to purchase

the offshore jack up drill rig called the RANDOLPH YOST, Marshall Islands Official Registry No. 1744, ABS Classification No. 7901508, IMO No. 8754281 and all related equipment, materials and consumables, each more particularly described and specified in Exhibit A of the Charter (as defined below) (including, to the extent specified in Exhibit A of the Charter, all apparel, gear, engines, machinery, lifeboats, anchors, cables, chains, rigging, tackle, fittings, furnishings, spare parts, tools, supplies, stores, pumps, and other equipment on board or ashore wherever located, belonging to the drill rig and all documents, certificates and manuals appertaining or belonging thereto wherever located) (hereinafter called the "**Rig**").

For and in consideration of the covenants and agreements herein, and subject to the terms and conditions hereof, the Buyer and Seller (each herein called a "party" or collectively "parties") hereby agree as follows:

1.    **Purchase Price**. The purchase price to be paid by the Buyer to the Seller for the Rig shall be Fifty Million United States Dollars ($50,000,000.00) ("**Purchase Price**").

1

TVS0004552
DA00695

At Closing, as set forth in Article 9, and subject to the provisions of this Agreement (including Articles 2 and 7), the Buyer shall pay to the Seller the Purchase Price by wire transfer in immediately available funds, in full, without any set-off or counterclaim whatsoever, free and clear of any deductions or withholdings to the following account:

| | |
|---|---|
| Bank | : HSBC Bank Plc. |
| Bank Address | : P.O. Box 18127-32 Poultry |
| | London EC2P 2BX |
| | United Kingdom |
| Bank Swift Code | : MIDLGB22 |
| Account Name | : Shelf Drilling Offshore Resources Limited II. |

or such other account as Seller shall specify in writing to Buyer. The Buyer and the Seller hereby agree that the Purchase Price represents a purchase of the Rig as a unit and not a sale of the separate components.

2. **Inspection**. Buyer currently has possession of the Rig under the terms of a Bareboat Charter Agreement between Seller and Buyer dated 4th July 2015 (the "**Charter**"). Buyer therefore is aware of and familiar with the condition of the Rig, and accepts its condition "AS IS, WHERE IS".

3. **Closing Date**. The Closing shall take place on a Business Day nominated in writing by the Buyer and accepted in writing by the Seller (the "**Closing Date**"). The Buyer shall provide the Seller with no less than fifteen (15) calendar days' written notice of the proposed Closing Date. Delivery of the Rig at Closing shall take place at the location referenced in Article 10.

4. **Equipment and Spares**. Under the terms of the Charter, Seller and Buyer have performed an inventory which includes an inventory of all of its spare parts, equipment, machinery, accessories and tools whether on board or ashore wherever located ("**Rig Equipment**") and which is attached as a part of Exhibit 1 to this Agreement. All Rig Equipment, whether or not on board the Rig, shall become Buyer's property at no additional cost. The Purchase Price shall not be adjusted for any spare parts which have been taken out of spare and used as replacement prior to delivery. Buyer shall take possession of all Rig Equipment not on board the Rig at Seller's shore base location. Notwithstanding the foregoing, for the avoidance of doubt, the Rig shall not include equipment which belongs to a third party.

The radio installation and navigational equipment shall be included in the sale without extra payment.

Seller has the right to take ashore crockery, plates, cutlery, linen and other articles bearing Seller's flag or name, provided it replaces same with, similar unmarked items.

2

5. **Seller's Representations and Warranties** - The Seller hereby represents, covenants and warrants to the Buyer the following:

5.1　That Seller owns good and marketable title to the Rig and that the Rig at the time of delivery is free from all encumbrances, liens and contractual commitments (other than the Charter or any liens, encumbrances and contractual commitments arising from, relating to or in connection with the Charter or the Buyer as bareboat charterer under the Charter) and any other debts (unless such debts are attributable to Buyer as charterer under the Charter, in which case Buyer shall be responsible therefor).

5.2　The Seller is duly incorporated and validly existing under the laws of its country of incorporation and has full legal right, power and authority to enter into this Agreement, and to perform its obligations hereunder.  The Seller has power and authority to enter into and perform this Agreement and the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorised and no other corporate proceeding on the part of the Seller is necessary to authorise the execution and delivery of this Agreement or to consummate the transactions contemplated hereby.

5.3　The execution or delivery of this Agreement and completion of all transactions contemplated hereby (including without limitation the delivery of the Rig), will not either now, or after notice or lapse of time, or both:

5.3.1　conflict with, violate, result in a breach or right of termination or acceleration under or require any consent or authorization under any of the terms, conditions or provisions of any mortgage, indenture, agreement, loan, guarantee, note, bond, permit, license, lease, grant, patent, or other undertaking or authorization, written or oral, to or by which the Seller is a party or is bound;

5.3.2　conflict with, result in a breach of or require any consent under any of the terms, conditions or provisions of Seller's certificate of incorporation, by-laws or equivalent governing instruments; or

5.3.3　result in a violation by the Seller of any contract, judgment, decree, order (including an executive order), award, writ, injunction or decree applicable to, or binding upon, the Seller.

5.4　This Agreement will be conducted in accordance with all applicable laws and regulations binding on Seller or its business and operations, including all applicable economic sanctions and export control laws in all countries in which the Seller does business.

6. **Buyer's Representations and Warranties** - The Buyer hereby represents, covenants and warrants to the Seller the following:

3

CONFIDENTIAL

TVS0004554
DA00697

6.1    The Buyer is duly incorporated and validly existing under the laws of its country of incorporation and has full legal right, power and authority to enter into this Agreement and any other documents to which it is, or may become, a party which are referred to in this Agreement and to perform its obligations hereunder and thereunder. The Buyer has power and authority to enter into and perform this Agreement and those documents and the execution and delivery of this Agreement and those documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorised and no other corporate proceeding on the part of the Buyer is necessary to authorise the execution and delivery of this Agreement and any other documents relating thereto or to consummate the transactions contemplated hereby or thereby.

6.2    The execution or delivery of this Agreement and the other documents to which the Buyer is, or may become, a party which are referred to in this Agreement, and completion of all transactions contemplated hereby (including without limitation taking delivery of the Rig), will not either now, or after notice or lapse of time, or both:

6.2.1    conflict with, violate, result in a breach or right of termination or acceleration under or require any consent or authorization under any of the terms, conditions or provisions of any mortgage, indenture, agreement, loan, guarantee, note, bond, permit, license, lease, grant, patent, or other undertaking or authorisation, written or oral, to or by which the Buyer is a party or is bound;

6.2.2    conflict with, result in a breach of or require any consent under any of the terms, conditions or provisions of the Buyer's certificate of incorporation, by-laws or equivalent governing instruments; or

6.2.3    result in a violation by the Buyer of any contract, judgment, decree, order (including an executive order), award, writ, injunction or decree applicable to, or binding upon, the Buyer.

6.3    This Agreement will be conducted in accordance with: (i) all applicable United States export and re-export controls and economic sanctions, including the International Emergency Economic Powers Act, the Export Administration Regulations and all other applicable economic sanctions laws and regulations, including the regulations set forth in 31 CFR Chapter V; and (ii) other applicable economic sanctions and export control laws binding on Buyer in other countries in which the Buyer does business. The Buyer warrants and covenants that it will not breach any United States laws or regulations regarding the transfer, export or re-export of the Rig and Rig Equipment wherever located; or any individual or entity included on the List of Specially Designated Nationals and Blocked Persons maintained by the US Treasury Department's Office of Foreign Assets Control at the time of Closing.

4

7.    **Conditions Precedent**

7.1    **Buyer's Conditions Precedent.**  The obligations of the Buyer to consummate the transactions to be performed by it in connection with the Closing are, in all respects, subject to satisfaction (or waiver by the Buyer) of the below-listed conditions precedent:

7.1.1    Issuance of any required authorization, licence or approval for the transactions contemplated by this Agreement, under all relevant laws or agreements; and

7.1.2    The representations and warranties of the Seller set forth in Article 5 shall be true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties had been made at and as of the Closing.

7.2    **Seller's Conditions Precedent.**  The obligations of the Seller to consummate the transactions to be performed by it in connection with the Closing are, in all respects, subject to satisfaction (or waiver by the Seller) of the below-listed conditions precedent:

7.2.1    Issuance of any required authorization, licence or approval for the transactions contemplated by this Agreement, under relevant laws or agreements, including clearance from all relevant flagging and registry authorities for transfer of the Rig in its current condition; and

7.2.2    The representations and warranties of the Buyer set forth in Article 6 shall be true and correct in all material respects as of the Closing with the same force and effect as if such representations and warranties had been made at and as of the Closing.

8.    **Seller's Risk of Loss Prior to Delivery of Rig**. The Rig with everything belonging to her shall be at Seller's risk and expense, subject to the terms of the Charter (which requires Buyer as charterer  to be responsible for the risk and expense of the Rig during the Charter Period described in the Charter), until title and ownership of the Rig is transferred and delivered to Buyer in accordance with this Agreement.

If, during the period between the execution hereof and delivery of the Rig in accordance with this Agreement, the Rig becomes a loss, which term will include a constructive, arranged and/or compromised total loss, Buyer may terminate this Agreement and neither party shall have any claim of whatsoever nature against the other in connection with this Agreement.

If during the period between the execution hereof and delivery of the Rig in accordance with this Agreement, the Rig suffers partial loss, then the Seller shall provide written notice to the Buyer of such damage and either (i) notify the Buyer

5

TVS0004556
DA00699

that the Seller will perform the work necessary to cause the Rig to meet the requirements specified herein ("**Repair Work**"), or (ii) notify the Buyer that the Seller does not intend to perform the Repair Work. If the Seller does not intend to perform the Repair Work and the parties are able to agree in writing on the costs of such Repair Work or other acceptable Purchase Price reduction within ten (10) days of the Buyer's receipt of such notice, the Purchase Price shall be reduced by such agreed amount and the sale shall be completed as soon as reasonably practicable. If, however the parties are unable to agree in writing on the costs of the Repair Work or other acceptable Purchase Price reduction within ten (10) days of the Buyer's receipt of such notice, then the parties shall mandate Noble Denton or another mutually agreed experienced repair yard ("**Agreed Repair Yard**") to assess the reasonable cost of carrying out such Repair Work and cost of such appointment is to be shared equally between the parties. The Agreed Repair Yard shall provide an assessment of such cost with reasons and the parties agree that such amount shall constitute the amount for the Repair Work in question and such assessment shall be final and binding upon both parties and the Purchase Price shall be reduced by such amount and the sale shall be completed as soon as reasonably practicable.

For the avoidance of doubt the parties agree that the Seller shall not be required to remedy any loss to the Rig which would reasonably be expected to cost more than ten percent (10%) of the Purchase Price in the aggregate to repair, replace or rectify.

**9.    Closing**

9.1    Closing - Subject to the other terms and conditions of this Agreement, the Seller shall sell and the Buyer shall purchase the Rig, and the Closing shall be held on the Closing Date at the time and place agreed by the parties.

9.2    Documents to be Delivered by Seller and Buyer – On the Closing Date, representatives of the Seller and the Buyer shall meet as contemplated above for the purpose of completing the sale and purchase of the Rig.

      9.2.1    Seller's Deliveries. Simultaneously with the Seller's receipt of the Purchase Price and delivery of the items listed in Article 9.2.2, the Seller shall furnish Buyer with the following in respect of the Rig:

      (i)    A duly executed Bill of Sale for the Rig and all Rig Equipment in industry standard form;

      (ii)    A duly executed Protocol of Delivery and Acceptance, in the form of Exhibit 2;

      (iii)    A duly executed Marshall Islands official form Bill of Sale and three copies thereof;

6

TVS0004557
DA00700

(iv)    A copy of the current Marshall Islands Certificate of Registration (to the extent not already in Buyer's possession);

(v)    A certified copy of Board of Directors resolutions of Seller authorizing (i) the sale of the Rig at the Purchase Price; (ii) execution of this Agreement and (iii) the officers of Seller who are authorized to execute Bills of Sale and related documents; and

(vi)    An original executed Satisfaction of Mortgage (in duplicate) for any existing mortgage over or liens or encumbrances on the Rig which arise by, through or under Seller or its Affiliates, unless such mortgage, lien or encumbrance shall have been previously released of record; and all costs and expenses in connection with the release of any such mortgage, lien and encumbrance shall be for the account of Seller; and

(vii)    Seller will either leave on board the Rig, or deliver to Buyer at the Closing, all non-proprietary technical and operating manuals relating to the Rig, equipment and systems as well as any classification certificates, licenses, construction drawings, plans, specifications, other technical data, copies of original logbooks, repair records, inspection records, and certificates which the Seller or its Affiliates may have in its possession PROVIDED, HOWEVER that the Seller does not represent that (i) it has in its possession (or shall have in its possession at the Closing) any such documentation, (ii) any documentation, other than any classification certificates, repair records, or inspection certificates existing as of the date of the Charter, that it does have (or may have at the Closing) is (or shall be) current, valid or correct, and (iii) the Rig is (or shall be) capable of obtaining any needed documentation; and PROVIDED further that the Seller shall have no obligation to seek, obtain or deliver to the Buyer any documentation which is not in its possession at the Closing.

9.2.2    <u>Buyer's Deliveries</u>. Simultaneously with delivery of the Rig as contemplated herein and the items set forth in Article 9.2.1, the Buyer shall pay the Purchase Price to the Seller in full and free of bank charges in accordance with Article 1 and shall furnish Seller with the following in respect of the Rig:

(i)    A duly executed Protocol of Delivery and Acceptance, in the form of Exhibit 2; and

(ii)    A certified copy of Board of Directors resolutions of Buyer authorizing (i) the purchase of the Rig at the Purchase Price; (ii) execution of this Agreement and (iii) the officers of Buyer who are authorized to execute Protocol of Delivery and Acceptance and related documents.

7

TVS0004558
DA00701

10. **Delivery**. Concurrently with the delivery of the Bill of Sale, (i) the Seller shall deliver to the Buyer, and the Buyer shall accept from the Seller, the Rig and Rig Equipment, and (ii) each Party shall acknowledge such delivery and acceptance by executing and delivering the Protocol of Delivery and Acceptance. The risk of loss of, and title to the Rig, shall pass to the Buyer as of the Closing Time.

The Rig shall be delivered at a mutually agreed location in [federal] [state] waters offshore Alaska or other mutually agreed location.

11. **Taxes**. Seller shall bear all income taxes assessed against it in connection with the sale of the Rig hereunder. Buyer shall bear all, sales, value added or any other type of tax or fee which is assessed on account of the purchase and sale contemplated by this Agreement. The Seller shall be liable for and shall indemnify the Buyer against any and all Claims arising out of or relating to any tax for which the Seller is responsible under this Article 11. The Buyer shall be liable for and shall indemnify the Seller against any and all Claims arising out of or relating to any tax for which the Buyer is responsible under this Article 11. To the extent permitted by applicable law, on reasonable request of the Buyer Seller shall cooperate with and assist Buyer with minimization of any sales taxes that may otherwise be owed in connection with the sale of the Rig and Rig Equipment at the Buyer's expense.

12. **Condition on Delivery**. Except only as may be otherwise expressly stated in Article 5, Buyer hereby acknowledges that the sale, purchase and delivery of the Rig is on an "AS IS, WHERE IS" basis, with all faults (whether or not reasonably discoverable by the Buyer or its surveyors) accepted by the Buyer, and SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY AND ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, AS TO THE DESIGN, CONDITION, SEAWORTHINESS, MERCHANTABILITY, QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN THE RIG, FITNESS FOR A PARTICULAR PURPOSE OR ANY PARTICULAR TRADE, VALUE, CONDITION, COMPLIANCE WITH LAWS, DESIGN, CONFORMANCE WITH SPECIFICATIONS, OR ABSENCE OF LATENT DEFECTS AND SELLER FURTHER DISCLAIMS ALL OTHER LIABILITIES IN RESPECT OF THE RIG (AT COMMON LAW OR IN CONTRACT EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT) OR TORT OR OTHERWISE INCLUDING STRICT LIABILITY.

13. **Markings**. Upon delivery pursuant to Article 10 above, Buyer undertakes to change the name of the Rig and remove all markings on the Rig containing or relating to the name of Seller.

14. **Default**. If at the Closing, Seller has discharged all of its obligations under this Agreement, but Buyer has failed to pay the Purchase Price, Seller may elect to terminate this Agreement, in which event Buyer shall have no further obligation to

8

TVS0004559
DA00702

Seller under this Agreement. If at the Closing, Buyer has discharged all of its obligations under the Agreement but Seller has failed to timely deliver the Rig and discharge its other obligations to Buyer under this Agreement, Buyer may elect to terminate this Agreement, in which event the Seller shall have no further obligation to Buyer under this Agreement. Any such termination of this Agreement shall have no effect on the Charter.

**15.**    **Indemnities and Liability.**

15.1    Buyer's Indemnities. Buyer agrees to pay, release, defend, indemnify, and hold harmless Seller its Affiliates and their directors, managers, officers, employees, agents, representatives and the Rig from and against any and all Claims attributable to, or on account of, injury to, illness or death of employees, invitees (other than Seller or its Affiliates, or its or their directors, managers, officers, employees, agents, subcontractors, or representatives) and/or agents of the Buyer and its Affiliates and subcontractors, or loss of or damage to the property of the Buyer, its Affiliates and subcontractors (including the Rig on or after the Closing) which arise from, are incident to or result directly or indirectly from:

(i) the presence of employees, subcontractors, invitees (other than Seller or its Affiliates, or its or their directors, managers, officers, employees, agents, subcontractors, or representatives), customers and/or agents of the Buyer or its Affiliates on the Rig; and

(ii) the Rig or the operation of the Rig to the extent the alleged event giving rise to such claim occurred on or after the Closing,

whether any of the types of Claims described in the foregoing sub-paragraphs (i) and (ii) inclusive arise from, result directly or indirectly from, are incident to, or connected with this Agreement or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Rig, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Agreement and shall apply irrespective of any Claim in tort, breach of contract or otherwise at law. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or enforcing the indemnities contained herein.

9

TVS0004560
DA00703

15.2 <u>Seller's Indemnities.</u> Seller shall and does hereby assume, indemnify, and agrees to pay, release, defend and hold harmless Buyer, its Affiliates and their respective directors, managers, officers, employees, agents, representatives and the Rig from and against any and all Claims arising out of or in connection with:

    (i)    any breach of any of the representations or warranties made by the Seller in Article 5,

whether any of the types of Claims described in the foregoing sub-paragraph (i) arise from, result directly or indirectly from, are incident to, or connected with this Agreement or breach hereof, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) of other failure of any nature of the indemnitees described herein, unseaworthiness of the Rig, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Agreement. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

15.3 <u>No Consequential Damages or Loss.</u>

    15.3.1    Notwithstanding any provision to the contrary elsewhere in this Agreement, the Seller shall save, indemnify, defend and hold harmless the Buyer, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Seller's own Consequential Loss and the Buyer shall save, indemnify, defend and hold harmless the Seller, its Affiliates and their respective directors, officers, managers, employees, servants, and agents from the Buyer's own Consequential Loss, irrespective of cause and regardless of sole or concurrent negligence of any degree or character, breach of duty (whether statutory or otherwise) or other failure of any nature of the indemnitees described herein, unseaworthiness of the Rig, strict liability, or defect in premises, equipment, or material, and regardless of whether pre-existing the execution of this Agreement. The indemnitees shall be entitled to reasonable attorneys' fees, costs and expenses in asserting or endorsing the indemnities contained herein.

    15.3.2    For the purposes of this Article 15.3, the expression "Consequential Loss" shall mean:

        (i)    any indirect, special, incidental, punitive or consequential loss or damages under applicable law, and / or

        (ii)    to the extent not covered by (i) above, loss or deferment of production, loss of product, loss of use (including without limitation, loss of use or the cost of use of, and increased expenditure related to property, equipment, materials and services

10

CONFIDENTIAL

including without limitation, those provided by contractors or subcontractors of every tier or by third parties), loss of business and business interruption, loss of revenue (which for the avoidance of doubt shall not include payments due to the Seller by way of the Purchase Price under this Agreement or actual damages of Seller for the loss of this Agreement or any profit, revenue, expectation or opportunity thereunder), loss of profit or anticipated profit, increased expenditure, loss and/or deferral of drilling rights and/or loss, restriction or forfeiture of license, concession or field interests and costs incurred by a party or their group as a result of the other party or their group's breach of contract unless explicitly provided for otherwise in this Agreement,

whether or not such losses were foreseeable at the time of entering into this Agreement and, in respect of sub-paragraph (ii) only, whether the same are direct or indirect.

15.4    Willful Misconduct. Notwithstanding any provision to the contrary contained in this Agreement, neither party hereto shall be responsible to the other for any Claims caused by the Willful Misconduct of the indemnified party.

15.5    No Third Party Beneficiaries/ Group Members.

15.5.1    Subject to sub-paragraph 15.5.2 below, the parties intend that, except for indemnities in favor of any group member of any party,  no provision of this Agreement shall, by virtue of the Contracts (Rights of Third Parties) Act 1999 ("the Act") confer any benefit on, nor be enforceable by any person who is not a party to this Agreement.

15.5.2    Subject to the remaining provisions of this Agreement, the provisions of Article 15 are intended to be enforceable by any group member.  For the purposes of Article 15, the term 'group member' shall mean any of the Seller's and Buyer's respective Affiliates and its and their directors, officers, managers, employees, servants, agents, representatives and the Rig.

15.5.3    In making a claim under this Agreement, the remedies of such group member shall be limited to the claiming of damages.

15.4.4    A group member shall not be entitled to assign any benefit or right conferred on it under this Agreement by virtue of the Act.

15.5.5    Notwithstanding the provisions of this paragraph, this Agreement may be rescinded, amended or varied by the parties hereto without notice or consent of such group member even if, as a result, that group member's right to enforce a term of this Agreement may be varied or extinguished.

11

TVS0004562
DA00705

**16.** **Disputes; Governing Law**.

16.1 <u>Governing Law.</u> The substantive laws of England and Wales, exclusive of any conflicts of laws principles that could require the application of any other law, shall govern the construction interpretation and enforcement of this Agreement and all documents contemplated hereby (other than the Marshall Islands Bill of Sale) for all purposes, including the resolution of all Disputes between the parties hereto.

16.2 <u>Disputes.</u> For the purposes of this Agreement, *"Dispute"* means any dispute, controversy or Claim (of any and every kind or type, whether based on contract, tort, statute, regulation, or otherwise) arising out of, relating to, or connected with this Agreement, including any dispute as to the construction, existence, validity, interpretation, termination, performance, enforceability, enforcement or breach of this Agreement, as well as any dispute over arbitrability or jurisdiction.

16.3 <u>Arbitration.</u> Any Dispute arising out of or in relation to or in connection with this Agreement and all Exhibits, shall be exclusively and finally settled by arbitration without the right to appeal in accordance with the UNCITRAL ARBITRATION RULES currently in force as of the date of this Agreement and with this Article 16. The appointing and administering authority shall be the administering body of the Dubai International Arbitration Centre ("*DIAC*") Any party hereto may submit such a dispute, controversy or claim to arbitration by notice to the other party. The parties shall pay in equal shares any fees required by the DIAC for administering the procedures for any Dispute and appointing the third neutral arbitrator if required.

16.4 <u>Arbitration Tribunal.</u> The arbitration shall be heard and determined by three (3) arbitrators. Each party hereto shall appoint an arbitrator of its choice within fifteen (15) days of the submission of a notice of arbitration by one party. The party-appointed arbitrators shall in turn appoint a presiding arbitrator of the tribunal within fifteen (15) days following the appointment of both party-appointed arbitrators. The arbitrators need not be members or associated members of the DIAC. If the party-appointed arbitrators cannot reach agreement on a presiding arbitrator of the tribunal or one party hereto refuses to appoint its party-appointed arbitrator within said fifteen (15) day period, the appointing authority for the implementation of such procedure shall be the DIAC, who shall appoint an independent arbitrator who does not have any financial interest in the dispute, controversy or claim. All decisions and awards by the arbitration tribunal shall be made by majority vote.

16.5 <u>Arbitration Procedures.</u> Unless otherwise expressly agreed in writing by the parties to the arbitration proceedings:

    (i)    The arbitration proceedings shall be held in at an agreed location in Dubai, UAE and failing agreement of the parties at such location as determined by the DIAC;

    (ii)    The arbitration proceedings shall be conducted in the English language and the arbitrators shall be fluent in English language;

12

TVS0004563
DA00706

(iii)    The arbitrator(s) shall be and remain at all times wholly independent and impartial;

(iv)    The arbitration proceedings shall be conducted under the UNCITRAL Rules, as amended from time to time (the "*Uncitral Rules*"), which Uncitral Rules are deemed to be incorporated by reference into this Article 13;

(v)    Any procedural issues not determined under the UNCITRAL Rules shall be determined by the applicable laws of England, other than those laws which would refer the matter to another jurisdiction;

(vi)    The costs of the arbitration proceedings (including attorneys' fees and costs) shall be borne in the manner determined by the arbitrators;

(vii)    The decision of a majority of the arbitrators shall be: (i) reduced to writing; (ii) final and binding without the right of appeal; (iii) the sole and exclusive remedy regarding any Claims or other claims, counterclaims, issues or accountings presented to the arbitrators; and (iv) promptly paid in United States dollars free of any deduction or offset;

(viii)    Any costs or fees incident to enforcing the award, shall to the maximum extent permitted by law be charged against the party resisting such enforcement;

(ix)    No special, incidental, indirect, consequential, exemplary or punitive damages (including loss of profit, loss of production, etc.) shall be awarded;

(x)    The award may include interest from the date determined by the arbitration award, and from the date of the award until paid in full;

(xi)    Judgment upon the award may be entered in any court having jurisdiction over the person or the assets of the party owing the judgment or application may be made to such court for a judicial acceptance of the award and an order of enforcement, as the case may be;

(xii)    The arbitration may proceed in the absence of a party who, after due documented and verified notice, fails to answer or appear. An award shall not be made solely on the default of a party, but the arbitrator(s) shall require the party who is present to submit such evidence as the arbitrator(s) may determine is reasonably required to make an award; and

(xiii)    If the parties hereto or others who are bound to this or another similar agreement initiate multiple arbitration proceedings, the subject matters of which are related by common questions of law or fact and which should result in conflicting awards or obligations, then the parties hereto hereby agree that all such proceedings shall be consolidated into a single arbitral

13

TVS0004564
DA00707

proceeding.

(xiv) <u>Small Disputes.</u> For disputes where the total amount claimed by either party does not exceed one million United States dollars (USD 1,000,000) and in the case of any other dispute where the parties so agree in writing, the arbitration shall be conducted in Dubai in accordance with the Small Claims Procedure of the London Maritime Arbitration Association.

17.    **Force Majeure**. Neither Seller nor Buyer shall be liable for delays in fulfilling its obligations hereunder due to any event of Force Majeure. Upon the occurrence of any event of Force Majeure, Seller shall promptly advise Buyer, or vice versa, of the occurrence of such event. In the event that Force Majeure events prevent either party from performing its obligations hereunder for a period of thirty days, the other party shall have the right to terminate this Agreement on written notice to that party.

18.    **General**.

18.1    <u>Entire Agreement.</u> This Agreement constitutes the entire agreement between Seller and Buyer with respect to this subject matter and supersedes all prior agreements, understandings, and commitments, whether oral or in writing. No modification of this Agreement will be binding on a party unless in writing and signed by an authorized representative of both parties.

18.2    <u>Severability.</u> Should any clause, sentence, or portion of this Agreement be held invalid, against the policy of any state or nation or should any court otherwise refuse to enforce any clause, sentence or portion of this Agreement, such holding shall not invalidate the remainder of this Agreement or the application of such clause, sentence, or portion to different circumstances or other instances. Failure to enforce any or all of the terms and conditions of this Agreement at any particular time or instance shall not constitute waiver or preclude subsequent enforcement of all or any terms or conditions. Sub-captions in this Agreement are merely for the convenience of the parties hereto and they shall not be used in interpreting any part of the Agreement. Seller and Buyer hereby waive the benefits of any limitation of liability law, statute or treaty now or hereafter existing with respect to the obligations and liabilities of such parties to the other under this Agreement.

18.3    <u>Notices.</u> All notices, demands, and other communications required to be given hereunder shall be in writing, sent by certified mail, facsimile communication or by email, confirmed by notice in writing, and shall become effective when received. Such notices, demands and communication shall be sent to the following addresses, and or telefax numbers:

If to Seller:    Shelf Drilling Offshore Resources Limited II
Jumeirah Business Center 3, Floor 26, Jumeirah Lakes Towers,
Cluster Y, PO Box 212201 Dubai, United Arab Emirates
Telephone: +971-4-567 3400
Telefax: +971-4-456 1037

14

CONFIDENTIAL

Email: kurt.hoffman@shelfdrilling.com &
hendrata.tjoeng@shelfdrilling.com

If to Buyer:   c/o Offshore Drilling Solutions Ltd.
c/o HPL Yamalova & Plewka DMCC
Jumeirah Lakes Towers
Reef Tower, Office 1806
Dubai, United Arab Emirates
Telephone: +49 69 4500084-20
Telefax: +49 69 4500084-66
Email: Harald.plewka@hplaw.com

18.4   <u>Defined Terms.</u> For purposes of application, interpretation and enforcement of the relevant Articles of this Agreement wherein the definitions are use, the following words and expressions shall mean:

"Affiliate" means in relation to either party, any company or legal person or entity which (a) controls either directly or indirectly a party or (b) which is controlled directly or indirectly by such party, or (c) is directly or indirectly controlled by a company or legal person or entity which directly controls such party.

"Business Day" means a day on which banks are open for business in Anchorage, Alaska, London, UK, and Jakarta, Indonesia.

"Claims" means liens, claims, awards, demands, losses, liabilities, damages, expenses (including legal expenses), bonding fees, disbursements, costs, suits, cause or causes of action, and judgments of every kind and character.

"Closing" means the consummation of the purchase and sale of the Rig.

"Closing Time" means the date and time stated on the Protocol of Delivery and Acceptance.

"Force Majeure" means an event beyond the reasonable control of a party, including but not limited to any act of God, war, act of terrorism, riot, civil commotion, compliance with a law or order of a Governmental Authority, rule, regulation or direction, fire, flood or storm, including hurricanes and named tropical storms.

"Governmental Authority" means any nation or government (including any country), any state, local, municipal  or other political subdivision thereof and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or on behalf of the government.

15

TVS0004566
DA00709

"Willful Misconduct" means an intentional act or failure to act by a party or any personnel of the party with actual knowledge that it is likely to result in injury or harm to a person or loss or damage to property and which is intended to cause or which is in reckless disregard of such injury, harm, loss or damage, but shall not include any error of judgment or mistake in the exercise of good faith by the person or entity in question.

18.4    Interpretation. In this Agreement, unless the context otherwise requires:

15.5.1  Subject to sub-paragraph 15.5.2 below, the parties intend that, except for indemnities in favor of any group member of any party,  no provision of this Agreement shall, by virtue of the Contracts (Rights of Third Parties) Act 1999 ("the Act") confer any benefit on, nor be enforceable by any person who is not a party to this Agreement.

18.4.1  words in the singular include the plural and in the plural include the singular;

18.4.2  "including" and variations thereof means "including but not limited to";

18.4.3  a reference to a law is a reference to it as it is in force for the time being taking account of any amendment, extension, application or re-enactment and includes any subordinate legislation for the time being in force made under it;

18.4.4  writing or written includes faxes and electronic mail;

18.4.5  references to a party or the parties means the parties to this Agreement;

18.4.6  references to an Article, a numbered paragraph, any clause or an Exhibit are to an Article, a numbered paragraph, a clause or Exhibit of or to this Agreement, and references to this Agreement include its Exhibits or other attachments; and references to this Agreement or any other document or to any specified provision of this Agreement or any other document are to this Agreement, that document or that provision as in force for the time being and as amended from time to time in accordance with the terms of this Agreement or that document or, as the case may be, with the agreement of the relevant parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed this __ day of _____, 20__ in multiple counterparts each of which shall be deemed an original but all of which shall constitute one instrument.

SELLER:

16

TVS0004567
DA00710

SHELF DRILLING OFFSHORE RESOURCES
LIMITED II

By: _____

Name: _____

Title: _____

BUYER:

OFFSHORE DRILLING SOLUTIONS LTD.

By: _____

Name: _Reinhardt Schuster_

Title: _Director, Manager and Shareholder_

17

TVS0004568
DA00711

EXHIBIT 1

<u>Rig Specifications</u>

18

CONFIDENTIAL

TVS0004569
DA00712

EXHIBIT 2

Protocol of Delivery and Acceptance

We, the undersigned,  SHELF DRILLING OFFSHORE RESOURCES LIMITED II, a company incorporated in the Cayman Islands, having its registered office at 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands, with principal place of business at Jumeirah Business Centre 3, Floor 26, Jumeirah Lakes Towers, Cluster Y, PO Box 212201 Dubai, United Arab Emirates (the "**Seller**"), declare to have delivered, and we, the undersigned, OFFSHORE DRILLING SOLUTIONS LTD., an international business company incorporated in Ras Al Khaimah, United Arab Emirates, with its registered office at Unit No: 1801, The Dome Tower, Plot No: JLT-PH1-N1, Jumeirah Lakes Tower, Dubai, United Arab Emirates (the "**Buyer**"), declare to have accepted, in accordance with the terms and conditions of the Sale and Purchase Agreement dated _____ day of _____, 20__  by and between the Buyer and the Seller (the "**Agreement**"), the RANDOLPH YOST, together with all equipment and spare parts to be delivered with it, all as more particularly described in the Agreement at _____ a.m./p.m. on this _____ day of _____, 20__  .

SHELF DRILLING OFFSHORE RESOURCES LIMITED II

By: _____

Name: _____

Title: _____


OFFSHORE DRILLING SOLUTIONS LTD.

By: _____

Name: _Reinhardt Schuster_

Title: _Director, Manager and Shareholder_

19

**End of Section**

# EXHIBIT 15

DA00714