*EXECUTION VERSION*

## JACKUP RIG
## OFFSHORE DAYWORK DRILLING CONTRACT – U.S.
### DRILLING UNIT " RANDOLPH YOST "

### THIS CONTRACT CONTAINS PROVISIONS RELATIVE TO INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK –

THIS CONTRACT ("Contract"), dated as of the 1st day of December 2015, is made between **Furie Operating Alaska, LLC**, a limited liability company organized under the laws of Texas with offices at 100 Enterprise Ave League City, TX 77573, and hereinafter called "Operator", and **Nordic Overseas Drilling & Services GmbH** , a company incorporated in Germany with offices at Am Baumwall 3, 20459 Hamburg, or its assignee, hereinafter called "Contractor". Operator and Contractor are sometimes herein referred to individually as a "party" and collectively as "parties"

WHEREAS, Operator desires to have offshore wells drilled or worked over in the Operating Area and to have performed or carried out all auxiliary operations and services as detailed in the Appendices hereto or as Operator may require; and

WHEREAS, Contractor is willing to furnish the drilling unit known as the "Randolph Yost" together with drilling and other equipment (hereinafter called the "Drilling Unit"), insurance and personnel, all as detailed in the Appendices hereto, for the purpose of drilling said wells and performing said auxiliary operations and services for Operator.

NOW THEREFORE THIS CONTRACT WITNESSETH that in consideration of the covenants herein it is agreed as follows:

### ARTICLE I - INTERPRETATION

**101.**   **Definitions**

In this Contract, unless the context otherwise requires:

(a) "Commencement Date" means the point in time defined in Appendix A, 101(a);

(b) "Operator's Items" means the equipment, material and services owned by Operator or which are listed in Appendix D that are to be provided by or at the expense of Operator;

(c) "Contractor's Items" means the Drilling Unit, equipment, material and services owned by Contractor or which are listed in Appendices B or D that are to be provided by and at the expense of Contractor;

(d) "Contractor's Personnel" means the personnel of Contractor and Contractor's subcontractors of any tier, including but not limited to their employees, consultants and other persons to be provided by Contractor from time to time in connection with operations hereunder;

(e) "Operator's Personnel" means the personnel of Operator and Operator's other contractors and subcontractors of any tier, including but not limited to their employees, consultants and other persons to be provided by Operator from time to time in connection with operations hereunder or

1

FURIE-BANKR_00106691
DA00715

present in the Operating Area;

(f) "Operating Area" means waters offshore of the state or area specified in Appendix A in which Operator is entitled to conduct drilling operations;

(g) "Operating Base" means the place onshore designated by Operator and specified in Appendix A;

(h) "Affiliated Company" means a company or other legal entity which controls or is controlled by Operator or Contractor, or which is controlled by an entity which controls Operator or Contractor. For purposes hereof, control means the ownership, directly or indirectly, of fifty percent (50%) or more of the stock of Operator or Contractor, a company in which Operator or Contractor owns fifty percent (50%) or more of the shares or voting rights in a company or legal entity.

**102.    Currency**
In this Contract, all amounts expressed in dollars are United States Dollar amounts.

**103.    Conflicts**
Appendices A, B, C, D, E, F and G attached hereto are incorporated herein by reference. If any provision of the Appendices conflicts with a provision in the body hereof, the latter shall prevail.

**104.    Headings**
The paragraph headings shall not be considered in interpreting the text of this Contract.

**105.    Further Assurances**
Each party shall perform the acts, execute and deliver the documents and give the assurances necessary to give effect to the provisions of this Contract.

**106.    Contractor's Status**
Contractor shall be an independent contractor in performing its obligations hereunder.

**107.    Operator's Status**
Operator enters into this Contract on behalf of itself and its co-venturers, co-lessees and joint owners, if any, and agrees that Operator and only Operator may enforce any obligation or rights herein contained expressed or implied to be for the benefit of Operator and/or the co-venturers, co-lessees and joint owners, and Operator and only Operator may commence any action, claim or proceedings against Contractor resulting from, arising out of or in connection with this Contract.

**108.    Governing Law**
**This Contract shall be construed, interpreted, enforced and litigated, and the relations between the parties determined in accordance with the General Maritime Law and Statutes of the United States of America and, to the extent not covered thereby, by the laws of the State of Texas, not including, however, any of its conflicts of law rules which would direct or refer to the laws of another jurisdiction.**

## ARTICLE II - TERM

**201.    Effective Date**
The parties shall be bound by this Contract when each of them has executed it (hereinafter referred to as "Effective Date").

**202.    Duration**
This Contract shall, subject to Paragraphs 203 and 204 below, be for the term specified in Appendix A.

4848-8549-1755v4

FURIE-BANKR_00106692
DA00716

### 203.  Termination

This Contract shall terminate:

    (a)  immediately if the Drilling Unit becomes an actual loss or the date Contractor's Marine Surveyor determines a constructive or arranged total loss to have occurred;

    (b)  after the number of wells or on the date specified in Appendix A or, if operations are then being conducted on a well, as soon thereafter as such operations are completed, and the Drilling Unit has been safely demobilized, jacked up or moored, whichever is applicable, at the demobilization location specified in Appendix A (unless some other location or port is mutually agreed) and all of Operator's Items have been offloaded, whichever is latest; or

    (c)  in accordance with Paragraphs 707 or 802.

### 204.  Option to Extend

As per Appendix A.

### 205.  Continuing Obligations

Notwithstanding the termination of this Contract, the parties shall continue to be bound by the provisions of this Contract that reasonably require some action or forbearance after such termination.

### 206.  Return of Operator's Items

Upon termination of operations, Contractor shall return to Operator on board the Drilling Unit, or as directed by Operator at Operator's sole cost, any of Operator's Items which are at the time in Contractor's possession.

## ARTICLE III - CONTRACTOR'S PERSONNEL

### 301.  Number, Selection, Hours of Labor and Remuneration

Except where herein otherwise provided, the number, selection, replacement, hours of labor and remuneration of Contractor's Personnel shall be determined by Contractor. Such employees or subcontractors' employees shall be the employees solely of Contractor or its subcontractors.

### 302.  Contractor's Representative

Contractor shall nominate one of its personnel as Contractor's representative who shall be in charge of the remainder of Contractor's Personnel and who shall have full authority to resolve all day-to-day matters which arise between Operator and Contractor.

### 303.  Increase in Contractor's Personnel

Operator may, at any time, with Contractor's approval, require Contractor to increase the number of Contractor's Personnel and the rates provided herein shall be adjusted accordingly.

### 304.  Replacement of Contractor's Personnel

Contractor will remove and replace in a reasonable time any of Contractor's Personnel if Operator so requests in writing and if Operator can show reasonable grounds for its request.

### 305.  Statutory Employees

In all cases where Contractor's employees (including Contractor's and its subcontractors' direct, borrowed, special, or statutory employees) are performing work in or offshore the State of Louisiana or are otherwise covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., Operator and Contractor agree that the services performed by Contractor and Contractor's employees pursuant to this Contract are an

3

FURIE-BANKR_00106693
DA00717

integral part of and are essential to Operator's ability to generate Operator's goods, products and services for the purpose of La. R.S. 23:1061(A) (1). Furthermore, Operator and Contractor agree that Operator is the statutory employer of Contractor's employees for purposes of La. R.S. 23:1061(A) (3) and that Operator shall be entitled to the protections afforded a statutory employer under Louisiana law.

## ARTICLE IV - CONTRACTOR'S ITEMS

**401.    Obligation to Supply**

Contractor shall provide Contractor's Items and Personnel and perform the services to be performed by it in accordance with Appendices B, C and D.

**402.    Maintain Stocks**

Contractor shall be responsible, at its cost, for maintaining adequate stock levels of Contractor's Items and replenishing as necessary.

**403.    Maintain and Repair Equipment**

Contractor shall, subject to Paragraph 901 and Appendix D, be responsible for the maintenance and repair of all Contractor's Items and shall provide all spare parts and materials required therefor. Contractor shall, if requested by Operator, also maintain or repair any of Operator's Items on board the Drilling Unit which Contractor is qualified to and can maintain or repair with Contractor's normal complement of personnel and equipment on board the Drilling Unit, provided, however, that Operator shall at its cost provide all spare parts and materials required to maintain or repair Operator's Items, and the basic responsibility and liability for furnishing and maintaining such items shall remain with Operator.

## ARTICLE V - CONTRACTOR'S GENERAL OBLIGATIONS

**501.    Contractor's Standard of Performance**

Contractor shall carry out all operations hereunder on a daywork basis. For purposes hereof the term "daywork basis" means Contractor shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction and supervision of Operator (which term is deemed to include any employee, agent, consultant or subcontractor engaged by Operator to direct drilling operations). *When operating on a daywork basis, Contractor shall be fully paid at the applicable rates of payment and assumes only the obligations and liabilities stated herein. Due to the uncertainties of the condition and environment that may be experienced in the well bore, well bottom, well reservoir or formation that is subject to the work or services, Contractor makes no warranty or representation that the well or wells shall be successfully drilled or drilled in the time frame that may be included in this Contract or any referenced well operations program. .*

**502.    Operation of Drilling Unit**

Subject to Paragraphs 503 & 605, Contractor shall be responsible for the operation of the Drilling Unit, including supervising moving operations and positioning on drilling locations as required by Operator. Operations under this Contract will be performed on a twenty-four (24) hour per day basis.

**503.    Compliance with Operator's Instructions**

Contractor shall comply with all instructions of Operator consistent with the provisions of this Contract, including, without limitation, drilling, well control and safety instructions. Such instructions shall, if Contractor so requires, be confirmed in writing by the authorized representative of Operator. However, Operator shall not issue any instructions which would be inconsistent with Contractor's rules, policies or procedures pertaining to the safety of its personnel, equipment or the Drilling Unit, or require Contractor to exceed the rated capacities of Contractor's Items or the minimum or maximum water depths or maximum well depth set forth in Appendix

4

FURIE-BANKR_00106694
DA00718

A.

**504.    Adverse Weather or Other Conditions**

Contractor, in consultation with Operator, shall decide when, in the face of impending adverse weather or other conditions (including loop and eddy currents and named tropical storms and hurricanes), to institute precautionary measures in order to safeguard the well, the well equipment, the Drilling Unit and personnel to the fullest possible extent. Contractor and Operator shall each ensure that each senior representative for the time being on board will not act unreasonably in the exercise of their discretion under this Paragraph.

**505.    Drilling Fluids and Casing Program**

Contractor shall take reasonable care to follow Operator's instructions with respect to the drilling fluid and casing program as specified by Operator. Operator shall provide Contractor with these programs reasonably in advance of the spud date of each well to be drilled hereunder.

**506.    Cutting/Coring Program**

Contractor shall save and identify cuttings and cores according to Operator's instructions and place them in containers furnished by Operator.

**507.    Records to be Kept by Contractor**

Contractor shall keep and furnish to Operator an accurate record of the work performed and formations drilled on the IADC-API Daily Drilling Report Form or other form acceptable to Operator. A legible copy of said form signed by Contractor's Representative shall be furnished by Contractor to Operator.

**508.    Difficulties During Drilling**

In the event of any difficulty arising which precludes either drilling ahead under reasonably normal procedures or the performance of any other operations planned for a well, Contractor may suspend the work in progress and shall immediately notify the representative of Operator, in the meantime exerting reasonable effort to overcome the difficulty. In the event Contractor is requested to drill a relief well(s) or to undertake well control activities, such operations may be subject to the consent of, and additional terms and conditions imposed by, Contractor or Contractor's underwriters. Any additional costs, insurance premiums and all deductibles shall be for Operator's account during such operations.

**509.    Well Control Equipment and Training**

Subject to, and without waiving the provisions of , Paragraph 706 and Article IX, Contractor shall maintain its well control equipment listed in Appendices B and D in good condition  and shall use  reasonable means to control and prevent fires and blowouts ; and agrees it shall have in place a training plan  which adheres to the requirements of the U.S. Department of the Interior Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement, if applicable, while performing work hereunder.

**510.    Inspection of Materials Furnished by Operator**

Without prejudice to Article IX, Contractor agrees to visually inspect all materials furnished by Operator before using same and to notify Operator of any apparent defects therein. Contractor shall not be liable for any loss or damage resulting from the use of materials furnished by Operator.

**511.    Inspection, Repair & Maintenance of Drilling Unit**

Contractor shall have the right to take the Drilling Unit into sheltered waters or harbor for any regulatory or class inspection(s) required or recommended by any applicable regulatory body or classification society, repair, maintenance, or structural defects.

FURIE-BANKR_00106695
DA00719

## ARTICLE VI - OPERATOR'S OBLIGATIONS

**601.    Equipment and Personnel**

Operator shall at its cost provide Operator's Items and Operator's Personnel and perform the services to be provided or performed by it according to Appendix D. In addition to providing the initial supply of Operator's Items, Operator shall be responsible, at its cost, for maintaining adequate stock levels and replenishing as necessary. When, at Operator's request and with Contractor's agreement, Contractor furnishes or subcontracts for certain items or services which Operator is required herein to provide, for purposes of this Contract said items or services shall be deemed to be Operator furnished items or services. Any subcontractors so hired shall be deemed to be Operator's contractor, and Operator shall not be relieved of any of its liabilities in connection therewith. For furnishing said items and services, Operator shall reimburse Contractor its entire cost plus a handling charge as specified in Appendix A. Notwithstanding any language to the contrary in this Contract, Contractor shall not be responsible for any difficulties, delays, costs or losses caused in whole or in part by the condition of any of Operator's Items.

**602.    Maintenance and Repair**

Operator shall be responsible, at its cost, for the maintenance and repair of all Operator's Items on board the Drilling Unit which Contractor is not qualified to or cannot maintain or repair with Contractor's normal complement of personnel and the equipment on board.

**603.    Operator's Representatives**

Operator may from time to time designate representatives for the purpose of this Contract who shall at all times have access to the Drilling Unit and may, among other things, observe tests, examine cuttings and cores, inspect the work performed by Contractor, or examine the records kept on the Drilling Unit by Contractor. Operator shall designate a senior representative to resolve day-to-day matters requiring decision by Operator who will be present on board the Drilling Unit. Contractor may treat Operator's senior representative for the time being on board the Drilling Unit as being in charge of all Operator's Personnel on board. Operator agrees that Operator's Personnel shall be subject to Contractor's health, safety and environmental policies including policies pertaining to the prohibition of alcoholic beverages, firearms, controlled substances and contraband, including the right to random searches and tests. Operator further agrees that Operator's Personnel who have duties which directly affect the safety operations under this Contract shall be subject to and in compliance with applicable U.S. Coast Guard regulations with respect to drug and alcohol testing.

**604.    Replacement of Operator's Personnel**

Contractor shall have the right to request in writing Operator to remove and replace any Operator's Personnel on board the Drilling Unit if Contractor can show reasonable grounds for such request.

**605.    Drilling Site and Access**

Operator will be responsible for providing access to the drilling location, as well as selecting, marking, and clearing drilling locations, for providing proper and sufficient certificates, including, without limitation, and if applicable, the Certificate of Financial Responsibility required pursuant to the OCS Lands Act and/or the Oil Pollution Act of 1990 (OPA 90) as amended, permits or permission necessary to enter upon and operate on the drilling location, and for notifying Contractor in writing of any obstructions, impediments, faulty bottom conditions or hazards to operations in the area of each drilling location or within the anchor pattern, including but not limited to wellheads, platforms, pipelines, cables, boulders, and mud filled depressions. Should Contractor be denied free access to the location, any time lost by Contractor as a result of such denial shall be paid for at the Standby Rate. Operator will also provide Contractor with soil and sea bottom condition surveys at each drilling location hereunder adequate to satisfy Contractor's Marine Surveyor. In the event the Drilling Unit is used over a platform, all surveys to determine the structural integrity of the platform will be the responsibility of Operator.

6

FURIE-BANKR_00106696
DA00720

Should seabed conditions be unsatisfactory to properly position, support or moor the Drilling Unit upon arrival at the drilling location or during operations hereunder, Operator shall continue to pay Contractor the Standby Rate until seabed conditions are ultimately remedied.

*Notwithstanding any other provision of this Contract, should there be any obstructions, impediments, faulty bottom conditions or hazards to operations at or within the area of the drilling location, including the anchor pattern, and these obstructions, impediments, faulty bottom conditions or hazards to operations damage Contractor's Items, or Contractor's Items damage these obstructions or impediments, or if seabed conditions prove unsatisfactory to properly support or moor the Drilling Unit during operations hereunder, Operator will be responsible for and hold harmless and indemnify Contractor for all resulting damage, including with respect to the Drilling Unit, payment of the Standby Rate during required repairs and costs for all transportation, including towing, of the Drilling Unit to all related repair facilities, shipyards, drydocks, and standby locations, and back to Operator's location. All expenses associated with improvements to the seabed and repositioning of the Drilling Unit at the drilling location under this Paragraph 605 shall be for Operator's account.*

**606.    State or Local Tax Liability**
In the event that Contractor, as a result of operations under this Contract in any state waters, determines that a tax payment is due to an appropriate taxing authority or receives an assessment of tax directly by an appropriate taxing authority, Contractor will, prior to making any payment, notify Operator of such determination or assessment. *If Contractor is required to pay the tax, Operator agrees to be responsible for and hold harmless and indemnify Contractor from any and all claims with respect thereto. In addition, Operator will reimburse Contractor any sums so paid.*

## ARTICLE VII - RATES OF PAYMENT

**701.    Payment**
Operator shall pay to Contractor the amounts from time to time due during the term of this Contract, calculated to the nearest hour, according to the rates of payment herein set forth and in accordance with the other provisions hereof, notwithstanding any breach of representation or warranty, either expressed or implied, or the negligence or fault of Contractor, its employees, subcontractors, consultants, agents or servants, including sole, concurrent or gross negligence, either active or passive, latent defects or unseaworthiness of any vessel or vessels, including the Drilling Unit, (whether or not preexisting) and any liability based on any theory of tort, breach of contract, breach of duty (whether statutory, contractual or otherwise), regulatory or statutory liability, or strict liability, including defect or ruin of premises, either latent or patent.

**702.    Mobilization Rate**
As specified in Appendix A commencing and invoiced as set forth in Appendix A.

**703.    Demobilization Rate**
As specified in Appendix A.

**704.    Operating Rate**
The Operating Rate specified in Appendix A commencing as set forth in Appendix A. The Operating Rate shall continue to be payable throughout the duration of the Contract, except as herein otherwise provided.

**705.    Standby Rate**
The Standby Rate specified in Appendix A will be payable as follows:

7

FURIE-BANKR_00106697
DA00721

(a)   during any period of delay when Contractor is unable to proceed because of adverse sea or weather conditions, including loop and eddy currents and named tropical storms and hurricanes, or as a direct result of an act, instruction or omission of Operator including, without limitation, the failure of any of Operator's Items, or the failure of Operator to issue instructions, provide Operator's Items or furnish services, except as herein otherwise provided;

(b)   during any period after the Commencement Date until the moment when the Operating Rate first becomes payable, except to the extent the Mobilization Rate is payable during such period and, in such event, the Mobilization rate shall apply ;

(c)   during any period after the Commencement Date that the Drilling Unit is under tow, or under way, provided that if, at the termination of this Contract, the Drilling Unit does not go to the location specified in Appendix A, the period shall be the reasonable estimated time required to go to that location specified in Appendix A;

(d)   during any period after the Commencement Date that the Drilling Unit is undergoing periodic inspections required for the maintenance of the Certification and Classification Certificates;

(e)   during any period when operations are suspended to repair the Drilling Unit or other Contractor's Items as provided in Paragraph 605 or due to blowout, fire, cratering, shifting or punch through at a drilling location;

(f)   during any period when operations are being conducted hereunder to redrill or repair the hole drilled hereunder which is lost or damaged as a result of Contractor's sole negligence; and

(g)   as provided in Paragraph 901.

**706.   Rate During Repair**
The Repair Rate specified in Appendix A will be payable for the repair time specified in Appendix A per occurrence during which operations are suspended to permit necessary replacement or repair of Contractor's Items, except as provided in Paragraphs 605 and 707. Thereafter the Repair Rate shall be zero ($0) except as provided in Paragraphs 605 and 707 for all time during which Contractor is preparing to perform repairs, or actually performing repairs. Suspensions for routine maintenance and inspections, such as lubrication, packing of swivels, changing of pump parts, slipping lines, servicing the top-drive, testing BOP equipment, drill string inspections and any certification inspections, shall not be considered as repair time for purposes of this Paragraph.

**707.   Force Majeure Rate**
The Force Majeure Rate specified in Appendix A will be payable during any period in which operations are not being carried on because of Force Majeure as defined in Paragraph 1303, including periods required to repair damage caused by a Force Majeure event, up to a maximum of thirty (30) consecutive days, after which and during the continuous existence of the Force Majeure condition no rate will be payable and the Contract may be terminated at the option of either party, subject to demobilization as provided in Paragraphs 703 and 705(c).

**708.   Additional Payments**
Operator shall, in addition, pay to Contractor:

(a)   the cost of any overtime paid by Contractor to Contractor's Personnel in respect of the maintenance or repair on board the Drilling Unit of Operator's Items or other overtime required

8

FURIE-BANKR_00106698
DA00722

by Operator;

(b) Contractor's costs associated with waiting on Operator furnished transportation or for time in excess of two hours in transit to or from the Drilling Unit, or as a direct result of an act, instruction or omission of Operator;

(c) in the event the Drilling Unit is taken into sheltered waters or harbor for any regulatory or class inspection(s) required or recommended by any applicable regulatory body or classification society, repair, maintenance, or structural defects, the related rig move costs and harbor expenses will be for Operator's account;

(d) Contractor's reasonable and necessary cost associated with evacuation and accommodations of personnel caused by adverse sea or weather or other hazardous conditions, including such as loop and eddy currents, named tropical storms or hurricanes. The Standby Rate(s) shall apply from the moment the last Contractor's Personnel is evacuated from the Drilling Unit, as indicated on the IADC-API Daily Drilling Report, until such time as all Contractor's Personnel could reasonably have returned to the Drilling Unit by Contractor, in its exercise of reasonable diligence;

(e) Contractor's costs associated with moving Contractor's Items and Personnel, and their personal effects, if Contractor is required to change its Operating Base.

(f) Any and all costs incurred by Contractor associated with Rig Winterization and/or any special/specific Cook Inlet operating requirements or required Rig modifications, including but not limited to a Cook Inlet specific requirements dictated by any regulatory authority.

**709.    Variation of Rates**
The rates and payment herein set forth shall be revised by the actual amount of the change in Contractor's cost if an event as described below occurs or if the cost of any of the items hereinafter listed shall increase by more than the amount indicated below from Contractor's cost thereof on the Effective Date or by the same amount after the date of any revision pursuant to this Paragraph:

(a) labor costs, including all payroll burden and benefits paid by Contractor for its employees;

(b) Operator requires Contractor to increase the number of Contractor's Personnel or if it becomes necessary for Contractor to change the work schedule of its personnel or change the location of its Operating Base or Operating Area;

(c) Contractor's cost of operations due to a change in the rental rate for any third party equipment which Contractor is to supply;

(d) in the event described in Paragraph 1102;

(e) if the cost of insurance premiums increases by five percent (5%) or more;

(f) if the cost of catering increases by five percent (5%) or more;

(g) if there is any change in laws, rules, regulations, legislation or classification society rules, including the enforcement or interpretation thereof, that increases Contractor's financial burden; and

(h) the rates listed herein shall be increased for costs other than those listed above on the

4848-8549-1755v4

FURIE-BANKR_00106699
DA00723

Commencement Date and at three (3) month intervals thereafter based on changes in the Bureau of Labor Statistics Oil Field and Gas Field Drilling Machinery Producer Price Index (Series ID WPU119102) as published by the U.S. Department of Labor from that reported for the month of the Effective Date. Said rates shall be increased proportionately by the percentage specified in Appendix A.

## ARTICLE VIII - INVOICES, PAYMENTS AND LIENS

**801.    Monthly Invoices**

Contractor shall bill Operator on a thirty (30) day in advance basis on the first day of each month for all daily dayrate and other charges to be earned by Contractor during that month. Other charges shall be billed as earned. Any billings for daily charges will reflect details of the time to be spent (calculated to the nearest hour) and the rate charged for that time. Billings for other charges will be accompanied by invoices supporting costs incurred for Operator or other substantiation as reasonably required. Contractor's billings shall be delivered as specified in Appendix A.

**802.    Payment**

Except as otherwise provided below in this Article VIII, Operator shall pay all invoices within sixty (60) days after the receipt thereof except that if Operator disputes an item invoiced, Operator shall within twenty-five (25) days after receipt of the invoice notify Contractor of the amount disputed, specifying the reason therefor, and payment of the disputed amount may be withheld until settlement of the dispute, but payment shall be made of any undisputed portion. Any undisputed sums (including amounts ultimately paid with respect to a disputed invoice) not paid within sixty (60) days after receipt of invoice shall bear interest at the rate specified in Appendix A or the maximum allowed by law, whichever is less, from said due date until paid. Without waiving any and all other rights under contract or at law, Contractor may by written notice grant Operator one or more grace periods and time to pay any invoice but shall also shall have the right, upon no less than forty-five (45) days prior written notice, to terminate this Contract if Operator fails or refuses to timely pay Contractor amounts due and owing to Contractor.

**803.    Manner of Payment**

All payments due by Operator to Contractor hereunder shall be made by wire transfer or as otherwise agreed to Contractor's bank account which is specified in Appendix A.

**804.    Financial Guarantee**

If required by Contractor, Operator shall, prior to commencing or at any time during operations under this Contract, provide Contractor with a letter of credit or other financial security in an amount and form acceptable to Contractor. The security shall be worded in a form acceptable to Contractor to make the proceeds payable to Contractor upon presentation of a sight draft by Contractor.

**805.    Liens and Encumbrances**

Operator shall have no right, power or authority to create, incur, or permit to be imposed upon the Drilling Unit any liens or encumbrances whatsoever. *Operator shall at all times be responsible for and hold harmless and indemnify Contractor and the owners of the Drilling Unit from and against any and all claims, demands, causes of action, damages, judgments, costs and expenses (including attorney's fees, costs of litigation, and the costs of bonds or other security) which may be incurred or suffered by Contractor or the owners of the Drilling Unit resulting from or arising out of any lien or encumbrance filed, asserted or claimed against the Drilling Unit created, incurred or permitted to be imposed by, through or under Operator, except for liens arising by through or under Contractor, its subcontractors or agents with respect to operations under this Contract or otherwise.*

4848-8549-1755v4

FURIE-BANKR_00106700
DA00724

## ARTICLE IX - LIABILITY

**900.    General**
For the purposes of this Article IX, the terms "Affiliated Company," "Contractor's Items," "Operator's Items," "Contractor's Personnel" and "Operator's Personnel" shall have the meanings as defined in Article I.

**901.    Equipment or Property**

(a)  Except as specifically provided herein to the contrary, Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against damage to or loss of Contractor's Items, and the property, equipment, material and services of Contractor's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, partners, co-venturers, joint owners, and its contractors and subcontractors of any tier and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers and subrogees of each of the foregoing. To the extent that the proceeds from Contractor's insurance as made available to Contractor do not compensate Contractor therefor, except to the extent otherwise specifically provided in this Contract, Operator agrees to be responsible for the following:

(1)  Operator shall be responsible for and hold harmless and indemnify Contractor for loss or destruction of or damage to Contractor's drill pipe, drill collars, subs, reamers, bumper subs, stabilizers and other in-hole equipment when such equipment is being used in the hole below the rotary table, normal wear excepted. Abnormal wear and/or damage for which Operator shall be responsible hereunder shall include, but not be limited to, wear and/or damage resulting from the presence of $H_2S$ or other corrosive elements in the hole including those introduced into the drilling fluid, excessive wear caused by sand cutting, damage resulting from excessive or uncontrolled pressures such as those encountered during testing, blowout, or in a well out of control, excessive deviation of the hole from vertical, dog-leg severity of 3 degrees or greater for any 100' or less of hole section, fishing, cementing or testing operations, and from any unusual drilling practices employed at Operator's request. Operator's responsibility for such abnormal wear and/or damage as referred to herein shall include abnormal wear and/or damage to Contractor's choke hoses and manifolds, BOP and other appurtenant equipment. Operator shall pay the cost of repairing damaged equipment if repairable. In the case of equipment lost, destroyed or damaged beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit.

(2)  Operator shall be responsible for and hold harmless and indemnify Contractor for loss or destruction of or damage, including corrosion and contamination, to Contractor's surface equipment resulting from the presence of $H_2S$, $CO_2$ or other corrosive elements introduced into the drilling fluid (including elements introduced from the hole), or the presence of naturally occurring radioactive materials (NORM) when limits are 50 micro roentgens per hour or greater. Operator shall pay the cost of training for personnel, protective clothing, monitoring equipment, clean up and disposal, repairing and/or decontaminating damaged equipment if repairable prior to Drilling Unit departing from Operator's location. In the case of equipment lost, destroyed, damaged or contaminated beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit. Operator will utilize a State licensed or certified third party to confirm that radioactive exposure limits are below establish regulatory

11

4848-8549-1755v4

FURIE-BANKR_00106701
DA00725

requirements.   In addition, notwithstanding the provisions of Paragraph 706 of this Contract, the Standby Rate shall apply with respect to any downtime that may occur or result from such damage, including decontamination operations.

(3) Operator shall be responsible for and hold harmless and indemnify Contractor for damage to or loss of the Drilling Unit caused by Operator furnished helicopters, tugs, supply or service vessels.

(b)   Contractor's operating practices require the BOP stack to be operated vertically to avoid abnormal wear and damage. In the event the stack angle exceeds any degree from vertical except as a result of any grossly negligent act or omission by Contractor, Operator shall be responsible for and hold harmless and indemnify Contractor for loss or damage to Contractor's BOP and in-hole equipment which may result.   Operator shall pay the cost of repairing damaged equipment if repairable. In the case of equipment lost, destroyed or damaged beyond repair, Operator shall reimburse Contractor an amount equal to the then current replacement cost of such equipment delivered to the Drilling Unit. In addition, notwithstanding the provisions of Paragraph 706 of this Contract, the Standby Rate shall apply with respect to the period of time required to repair or replace Contractor's BOP and in-hole equipment that may occur or result from such loss or damage.

(c)   Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against damage to or loss of Operator's property, Operator's Items, and the property, equipment, material and services of Operator's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, co-lessees, farmors, farmees, partners, co-venturers, joint owners, and its contractors and subcontractors of any tier (with the exception of Contractor and its subcontractors of any tier) and the officers, directors, employees, agents, assigns, representatives, managers, consultants, insurers and subrogees of each of the foregoing.

## 902.   The Hole
In the event the hole should be lost or damaged at any time, Operator shall be responsible for, defend and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from such damage to or loss of the hole, including all downhole property therein.

## 903.   Contractor's Personnel
Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against all claims, demands, causes of action, losses, and liabilities of every kind and character on account of bodily injury, illness or death of Contractor's Personnel or Contractor's invitees  or damage to their property.

## 904.   Operator's Personnel
Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against all claims, demands, causes of action, losses, and liabilities of every kind and character on account of bodily injury, illness or death of Operator's Personnel or Operator's invitees or damage to their property.

## 905.   Pollution and Contamination
Notwithstanding anything to the contrary contained herein, the responsibility for pollution or contamination shall at all times be as follows:

(a)   Contractor shall be responsible for and hold harmless and indemnify Operator for control and removal of pollution or contamination which originates on or above the surface of the water

4848-8549-1755v4

FURIE-BANKR_00106702
DA00726

*from spills of fuels, lubricants, motor oils, normal water base drilling fluid and attendant cuttings, pipe dope, paints, solvents, ballast, bilge and garbage wholly in Contractor's possession and control and directly associated with Contractor's equipment and facilities. For purposes hereof the term "normal water base drilling fluid" means drilling fluid which does not exceed toxicity limits specified for offshore discharges by the environmental protection entity having jurisdiction over the Operating Area.*

(b) *Operator shall be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier against all claims, demands, causes of action, losses, and liabilities of every kind and character (including without limitation fines, penalties, assessments, third party claims, property damage, and control and removal of the pollutant involved) arising directly or indirectly from all pollution or contamination (including radioactive contamination), other than that described in Paragraph 905(a) above, which may occur including, but not limited to, that which may result from fire, blowout, cratering, seepage or any other uncontrolled flow of oil, gas, water or other substance, as well as the use of or disposition of radioactive sources, lost circulation and fish recovery materials and fluids, oil emulsion, oil base or chemically treated drilling fluids and attendant cuttings, and drilling fluids other than "normal water base drilling fluid" defined in Paragraph 905(a) above.*

(c) *In the event a third party commits an act or omission which results in pollution or contamination for which either Contractor or Operator for whom such party is performing work is held to be legally liable, the responsibility therefor shall be considered, as between Contractor and Operator, to be the same as if the party for whom the work was performed had performed the same and all of the obligations and limitations set forth in Paragraphs 905(a) and (b) above, shall be specifically applied.*

### 906.    *Debris Removal and Cost of Control*
*Operator shall at all times be responsible for and hold harmless and indemnify Contractor for the cost of removal of all wreck and debris (including Contractor's Items except as provided below). Contractor shall be responsible for and hold harmless and indemnify Operator for the cost of wreck and debris removal of Contractor's Items to the extent required by law or to prevent interference with Operator's operations. Operator shall at all times be responsible for and hold harmless and indemnify Contractor for the cost of regaining control of any wild well.*

### 907.    *Underground Damage*
*Operator shall at all times be responsible for and hold harmless and indemnify Contractor and its suppliers, contractors and subcontractors of any tier from and against any and all claims on account of injury to, destruction of or loss or impairment of any property right in or to oil, gas or other mineral substance or water, if at the time of the act or omission causing such injury, destruction, loss, or impairment, said substance had not been reduced to physical possession above the seabed, and for any loss or damage to any formation, strata, or reservoir beneath the seabed.*

### 908.    *Patent Liability*
*Contractor shall at all times be responsible for and hold harmless and indemnify Operator from and against any and all loss or liability arising from infringement of patents of the United States covering equipment furnished by Contractor. Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against any and all loss or liability arising from infringement or alleged infringements of patents covering the property, equipment, methods or processes furnished or directed by Operator.*

4848-8549-1755v4

FURIE-BANKR_00106703
DA00727

909.    *Consequential Damages*
*Subject to and without affecting the provisions of this Contract regarding the payment rights and obligations of the parties or the risk of loss, release and indemnity rights and obligations of the parties, each party shall at all times be responsible for and hold harmless and indemnify the other party from and against the indemnifying party's own special, indirect or consequential damages, and the parties agree that special, indirect or consequential damages shall be deemed to include, without limitation, the following: loss of profit or revenue; costs and expenses resulting from business interruptions; loss of or delay in production; loss of or damage to the leasehold; loss of or delay in drilling or operating rights; cost of or loss of use of property, equipment, materials and services, including without limitation those provided by contractors or subcontractors of every tier or by third parties.*

*Operator shall at all times be responsible for and hold harmless and indemnify Contractor from and against all claims, demands and causes of action of every kind and character in connection with such special, indirect or consequential damages suffered by Operator's co-owners, co-venturers, co-lessees, farmors, farmees, partners and joint owners.*

910.    *Termination of Location Liability*
*Notwithstanding any other provisions of this Contract, once the Drilling Unit is under way from the well location, Operator shall be responsible for and hold harmless and indemnify Contractor for loss or damage to property, personal injury or death of any person which occurs thereafter as a result of the condition of the well or the location and Contractor shall be relieved of such liability.*

911.    *Indemnity Obligation*

    (a)    *The parties intend and agree that the phrase "be responsible for and hold harmless and indemnify" or other similar words of release or indemnity (including limitation or exclusion of damages and all other exculpatory provisions) in this Contract including without limitation Paragraphs 605, 606, 805 and 901 through 910 hereof means that the indemnifying party shall release, indemnify, hold harmless and defend (including payment of reasonable attorney's fees and costs of litigation) the indemnified party from and against any and all claims, demands, causes of action,  losses, liabilities, damages, judgments and awards of any kind or character (collectively referred to herein as "Claims"), without limit and without regard to the cause or causes thereof including claims, demands, and causes of action arising out of, directly or indirectly, incident to, or connected with performance or breach of this Contract including without limitation the operation of any vessel or vessels (including the Drilling Unit), including ingress and egress to the well location, the transportation of personnel to the well location, loading and unloading of personnel and cargo, or the presence of personnel at the well location, and also including preexisting conditions, defect or ruin of premises or equipment (whether such conditions, defect or ruin be patent or latent), the unseaworthiness of any vessel or vessels (including the Drilling Unit), breach of representation or warranty (express or implied), breach of duty (whether statutory, contractual or otherwise), strict liability, any theory of tort, breach of contract (including fundamental breaches or otherwise), fault, regulatory or statutory liability, products liability, the negligence of any degree or character (whether such negligence be sole, joint or concurrent, active, passive or gross) of any person or persons, including such negligence of the party (or any beneficiary thereof identified in paragraph 911(b))seeking the benefit of a release, indemnity or assumption of liability, or any other theory of legal liability. The persons and parties released or indemnified herein shall have the right to participate in the defense of any indemnified claims at their own expense.*

    (b)    *An indemnifying party's obligations contained in this Contract shall extend to the indemnified*

14

FURIE-BANKR_00106704
DA00728

*party and shall inure to the benefit of such party, its Affiliated Companies, and their co-owners, co-venturers, co-lessees, farmors, farmees, and joint owners, and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each, and to actions against the Drilling Unit, its legal and beneficial owners, whether in rem or in personam.*

(c) *Except as otherwise provided herein, the parties intend and agree that the phrase "be responsible for and hold harmless and indemnify" or other similar words of release or indemnity (including limitation or exclusion of damages and all other exculpatory provisions) in this Contract including without limitation Paragraphs 605, 606, 805 and 901 through 910 shall have no application to claims or causes of action asserted against Operator or Contractor which arise solely by reason of any agreement of indemnity with a person or entity not a party hereto. Except as otherwise provided herein, nothing contained herein shall confer any rights upon any third party beneficiary. Nothing contained herein shall confer any right of action in any person not a party hereto or identified as an indemnitee herein.*

(d) *Operator and Contractor shall promptly notify the other of any claims that may be presented to or served upon it which would give rise to indemnifiable Claims under this Contract.*

(e) *The releases and indemnities contained herein shall be supported by liability insurance as provided in Article X hereof (including limits), but the releases and indemnities contained herein shall not be limited by the limits thereof. If it is judicially determined that the monetary limits or scope of coverage of the insurances required under this Contract or of the release or indemnity provisions voluntarily assumed under this Contract exceed the maximum monetary limits or scope permitted under applicable law, it is agreed that said insurance requirements or release or indemnity provisions shall automatically be amended to conform to the maximum monetary limits and scope permitted under such law and either of the parties hereto may apply for reformation of this Contract accordingly.*

(f) *The release and indemnity provisions set forth in this Contract that apply to an event or condition that occurs during the performance of this Contract shall survive and not be affected by the expiration or termination of this Contract. The parties released or indemnified shall be entitled to reasonable attorney's fees and costs incurred in successfully asserting or enforcing the releases and indemnity provisions set forth in this Contract against the indemnitor.*

(g) *Notwithstanding any other provision to the contrary set forth in this Contract, neither party shall be responsible for or be required to defend, hold harmless or indemnify the other party for the willful misconduct of the other party or such other party's (or its indemnified group). For the purposes of this Contract, "willful misconduct" shall mean such deliberate course of action by any person, either knowing it to be wrongful or illegal or recklessly not caring whether it be wrongful or illegal, regardless of the consequences.*

912. *General Intent*
*The parties recognize that the performance of well drilling, workover and associated activities such as those to be performed under this Contract have resulted in bodily injury, death, damage or loss of property, well loss or damage, pollution, loss of well control, reservoir damage and other losses and liabilities. It is the intention of the parties hereto that the provisions of this Article IX and Paragraphs 605, 606 and 805 shall exclusively govern the allocation of risks and liabilities of said parties without regard to cause (as more particularly specified in Paragraph 911), it being acknowledged that the compensation payable to Contractor as specified herein has been based upon the express understanding that risks and liabilities shall*

4848-8549-1755v4

FURIE-BANKR_00106705
DA00729

*be determined in accordance with the provisions of this Contract. The parties agree to waive any rights they have to assert that a parties' exemption from liability for gross negligence as may be provided for in this Contract is violative of public policy or is otherwise unenforceable, it being the parties' intentions that its indemnity obligations in this Contract be enforceable to the fullest possible extent.*

## ARTICLE X - INSURANCE

**1001.  Insurance**
Contractor shall carry and maintain, or cause to be carried and maintained, insurance coverages of the type and in the amounts set forth in Appendix E, covering only those liabilities specifically assumed by Contractor under this Contract.

All references in this Contract to "insurance" of Contractor shall mean such insurance as set forth in Appendix E. Contractor shall have the right to self-insure any or all of that portion of insurance relating to loss or damage to Contractor's Items.

Operator shall carry and maintain, or cause to be carried and maintained, the insurance coverages of the types and in amounts set forth in Appendix F, covering only those liabilities specifically assumed by Operator under this Contract.

All references in this Contract to "insurance" of Operator shall mean such insurance as set forth in Appendix F.  Operator shall have the right to self-insure any or all of that portion of insurance relating to loss or damage to Operator's Items.

**1002.  Certificates**
Each party will furnish the other, on request, certificates indicating that the required insurance is in full force and effect and that the same shall not be canceled or materially and adversely changed without ten (10) days prior written notice to the other party.

**1003.  Subrogation**
For liabilities assumed hereunder by Contractor, its insurance shall be endorsed to provide that the underwriters waive their right of subrogation against Operator, its Affiliated Companies and their co-owners, co-venturers, co-lessees, farmors, farmees, and joint owners and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each. Operator will, as well, cause its insurer to waive subrogation against Contractor and Contractor's Affiliated Companies and their co-owners, and the officers, directors, stockholders, partners, managers, representatives, employees, consultants, agents, servants and insurers of each for liabilities it assumes.

**1004.  Additional Insured**
Contractor shall name Operator as additional insured, where permitted, under its policies of insurance, but only with respect to and to the extent of the liabilities specifically assumed by Contractor under this Contract. Operator shall name Contractor as additional insured, where permitted, under its policies of insurance, but only with respect to and to the extent of the liabilities specifically assumed by Operator under this Contract.

**1005.  Primary Insurance**

Contractor's insurance policies shall be primary and Operator's insurance policies shall be non-contributing with respect to and to the extent of the liabilities specifically assumed by Contractor under this Contract. Operator's insurance policies shall be primary and Contractor's insurance policies shall be non-contributing with respect to and to the extent of the liabilities specifically assumed by Operator under this Contract.

16

FURIE-BANKR_00106706
DA00730

**1006.** **Miscellaneous Insurance Covenants**

Notwithstanding anything to the contrary contained herein, any requirement to name the other party as additional insureds or to waive subrogation in favor thereof, or that such policies shall be primary as to such additional insureds, shall be limited in each case to the extent only of the Claims and other risks which a party expressly agrees to assume in the release and indemnity provisions in this Contract in favor of such other party. Such name as additional insured, waiver of subrogation, and primary insurance requirements will apply regardless of the enforceability of the release and indemnity provisions of this Contract. The insurance requirements of this Contract are separate and independent covenants and it is the express intention of the parties that insurance available to either party shall not be primary to nor need be exhausted before the parties are required to honor their release and indemnity obligations under this Contract. Operator and Contractor will furnish each other with certificates of insurance upon execution of this Contract. Failure to object to discrepancies or errors in the certificates of insurance shall not waive the requirements of this Contract. In the event either party seeks to be a self-insurer or the other party has consented thereto, evidence of such consent must be in writing. Irrespective of the requirements as to the insurance to be carried by either party, the insolvency, bankruptcy, or failure of any insurance company carrying insurance for either party, or failure of any insurance company to pay claims accruing, nor any act of such party which vitiates or invalidates any of the policies of insurance specified in this Contract to be carried or obtained such party shall not be held to waive any of the provisions of this Contract and the party required to carry such insurance shall release, protect, defend, and indemnify the other party all Claims which would otherwise have been covered by such insurance.

The naming of the Operator as additional insured is not intended to and shall not derogate from the risk allocation and indemnity agreements set forth in this Contract. Operator agrees that it will not assert a claim against Contractor's insurance with respect to risks, liabilities and/or losses assumed by Operator or as to which Operator has agreed to indemnify Contractor under this Contract.

## ARTICLE XI - SUBLETTING AND ASSIGNMENT

**1101.** **Subcontracts**
Either party may employ other contractors and subcontractors to perform any of the operations or services to be provided or performed by it.

**1102.** **Assignment**
Neither party may assign this Contract except to an Affiliated Company without the prior written consent of the other party, and prompt notice of any such intent to assign shall be given to the other party. In the event of such assignment, the assigning party shall remain liable to the other party as a guarantor of the performance by the assignee of the terms of this Contract. If any assignment is made that increases Contractor's financial burden, Contractor's compensation shall be adjusted to give effect to any increase in Contractor's operating costs or taxes. Notwithstanding any provision contained in this Article 1102 or elsewhere in this Contract, Operator may assign this Contract to any Affiliated Company and may assign all or any part of its, rights, benefits and interests in this Contract and the services being provided by Contractor hereunder to its lenders for financing purposes. Contractor agrees to sign a consent to assignment of such rights, benefits and interests of Operator with any of Operator's lenders in form and substance reasonably acceptable to Contractor and such Operator's lenders. No assignment by Operator shall release Operator from or diminish its liabilities and responsibilities under this Contract.

17

FURIE-BANKR_00106707
DA00731

## ARTICLE XII - NOTICES

**1201.   Notices**
Notices, reports and other communications required or permitted by this Contract to be given or sent by one party to the other shall be delivered by hand, mailed, telexed, digitally transmitted or telecopied to the address as specified in Appendix A.  Either party may by notice to the other party change its address. Notices shall be effective upon receipt.

## ARTICLE XIII - GENERAL

**1301.   Confidential Information**
Upon written request of Operator, all information relating to the well obtained by Contractor in the conduct of operations hereunder shall be held confidential by Contractor who will use the same degree of care it uses in safeguarding its own confidential information. All information relating to a party's performance of or compliance with its obligations in this Contract, including as may be determined by any audits, inspections or otherwise, shall be held confidential by the other party and any person engaged by such party to conduct any such audit or inspection, and such party agrees it and any such persons will use the same degree of care such party uses in safeguarding its own confidential information and will not make unauthorized disclosures of same.

**1302.   Attorney's Fees**
If this Contract is placed in the hands of an attorney for collection of any sums due hereunder, or Suit is brought on same, or sums due hereunder are collected through bankruptcy or arbitration proceedings, then the prevailing party shall be entitled to recover reasonable attorney's fees and costs of litigation.

**1303.   Force Majeure**
Except as otherwise provided in this Paragraph 1303 and without prejudice to the risk of loss, release and indemnity obligations under this Contract, each party to this Contract shall be excused from complying with the terms of this Contract, except for the payment of monies when due, if and for so long as such compliance is hindered or prevented by riots, strikes, wars (declared or undeclared), insurrection, rebellions, piracy, terrorist acts, civil disturbances, dispositions or order of governmental authority, whether such authority be actual or assumed, acts of God (excluding adverse sea or weather conditions whether or not associated with loop and eddy currents, named tropical storms and hurricanes), inability to obtain equipment, supplies, fuel or necessary labor, or by any act or cause (other than financial distress or inability to pay debts when due) which is reasonably beyond the control of such party, such cause being herein sometimes called "Force Majeure." Neither Operator nor Contractor shall be required against its will to adjust any labor or similar disputes except in accordance with applicable law. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obliged to pay to Contractor the Force Majeure Rate provided for in Paragraph 707.

**1304.   Right to Audit**
For a period of two years from termination of the Contract, Contractor shall keep proper books, records and accounts of operations hereunder and shall permit Operator at all reasonable times to inspect the portions thereof related to any variation of the rates under Paragraph 709 or charges for reimbursable items.

**1305.   Compliance with Laws**
Each party hereto agrees to comply with all laws, rules and regulations of any federal, state or local government

18

4848-8549-1755v4

FURIE-BANKR_00106708
DA00732

authority which are now or may become applicable to that party's operations covered by or arising out of the performance of this Contract. When required by law, the terms of Appendix G shall apply to this Contract. In the event any provision of this Contract is inconsistent with or contrary to any applicable federal, state or local law, rule or regulation, said provision shall be deemed to be modified to the extent required to comply with said law, rule or regulation, and as so modified said provision and this Contract shall continue in full force and effect. *If any act or omission by Contractor in response to an instruction of Operator's Personnel violates such law, Operator shall indemnify Contractor for any consequences thereof.*

### 1306.  Waivers or Amendments
It is fully understood and agreed that none of the requirements of this Contract shall be considered as waived or amended by either party unless the same is done in writing, and then only by the persons executing this Contract, or other duly authorized agent or representative of the party.

### 1307.  Entire Agreement
This Contract constitutes the full understanding of the parties, and a complete and exclusive statement of the terms of their agreement, and shall exclusively control and govern all work performed hereunder. All representations, offers, and undertakings of the parties made prior to the effective date hereof, whether oral or in writing, are merged herein, and no other contracts, agreements or work orders, executed prior to the execution of this Contract, shall in any way modify, amend, alter or change any of the terms or conditions set out herein.

### 1308.  Enurement
This Contract shall enure to the benefit of and be binding upon the successors and assigns of the parties.

### 1309.  Counterparts.

This Contract may be executed in counterparts by original or electronic signature, each of which counterpart shall constitute an original and all of which when read together shall constitute one and the same instrument.

**Signatures appear on the following page**

19

4848-8549-1755v4

FURIE-BANKR_00106709
DA00733

**IN WITNESS WHEREOF THE PARTIES HAVE EXECUTED THIS CONTRACT ON THE DAY AND YEAR FIRST ABOVE WRITTEN.**

**OPERATOR: Furie Operating Alaska, LLC**

BY: _____

TITLE: _CARS DEGENHARDT, PRESIDENT_

**CONTRACTOR:  Nordic Overseas Drilling & Services GmbH**

BY: _____

TITLE: _____

FURIE-BANKR_00106710
DA00734

**IN WITNESS WHEREOF THE PARTIES HAVE EXECUTED THIS CONTRACT ON THE DAY AND YEAR FIRST ABOVE WRITTEN.**

OPERATOR: Furie Operating Alaska, LLC

BY: _____

TITLE: _____

CONTRACTOR: Nordic Overseas Drilling & Services GmbH

BY: _____     December 14th 201:

TITLE: _____

20

4848-8549-1755v4

FURIE-BANKR_00106711
DA00735

## APPENDIX A

Attached to and incorporated as a part of that certain Contract dated as of December 1, 2015

Paragraph Number:

| | | |
|---|---|---|
| **101 (a)** | Commencement Date: | January 1, 2016 |
| **101 (f)** | Operating Area: | Cook Inlet, Alaska |
| **101 (g)** | Operating Base: | Nikiski, AK |
| **202** | Duration: | 7 months from commencement date with additional 6 month option terms, exercisable as set forth in 204 below |
| **203 (b)**<br>**203 (b) &**<br>**705 (c)** | Termination:<br><br>Demobilization Location: | July 31, 2016 or as extended by exercise of options<br><br>Singapore |
| **204** | Option Term:<br><br>Option Notice:<br>Deadline for Mutual<br>Agreement: | Two (2) six (6) month options with terms to be mutually agreed by the parties but with an operating Dayrate not to exceed $220,000 per day 45 days prior to end of original contract or option terms if extended.<br><br>Upon notice of exercise of option |
| **503** | Maximum Water Depth:<br>Minimum Water Depth:<br>Maximum Well Depth: | 200'<br>30'<br>25,000 |
| **601** | Handling Charge: | 15% |
| **702** | Mobilization Fee,<br>costs and charges: | (a) A rate of U.S. $160,000/day. Mobilization Rate is due for the period commencing 01/01/2016 and concludes when rig is on location, jacked up and skidded out over Furie's Julius R platform. The Mobilization Rate for the 60-day period January 1, 2016 to February 28, 2016 shall be invoiced in advance on or prior to December 15, 2015 to cover the initial mobilization rate and is payable on or before December 31, 2015 unless otherwise agreed.<br>(b) $7,000,000 shipping fee payable to Contractor in two installments - $3,500,000 on February 1, 2016 and $3,500,000 on March 1, 2016. |
| **703** | Demobilization costs<br>and charges: | (a) Not applicable |
| **704** | Operating Rate: | U.S. $220,000/day. Operating Rate commences when Mobilization rate concludes |
| **705** | Standby Rate: | U.S. $220,000/day |
| **706** | Repair Rate: | U.S. $220,000/day |

21

4848-8549-1755v4

FURIE-BANKR_00106712
DA00736

|  | Repair Time at Prior Applicable Rate: | Surface equipment: Twelve hours per occurrence up to a maximum of twenty-four hours per calendar month.  Zero per day in excess of twelve hours per occurrence or twenty-four hours per calendar month. |
|---|---|---|
| 707 | Force Majeure Rate: | U.S. $220,000/day |
| 709 | Percentage Increase for Variation of Rates: | Not more than 10% |
| 801 | Address for Contractor's Billings: | Nordic Overseas Drilling & Services GmbH<br>Am Baumwall 3, 20459 Hamburg, Germany |
| 802 | Interest Rate on Late Payments: | 18% per annum |
| 803 | Address for Payment: | See instructions on invoice |
| 1201 | Address for Notices: | |
|  | Operator: | Furie Operating Alaska, LLC<br>100 Enterprise Avenue<br>League City, TX 77573<br>1.281.957.9812 |
|  | Contractor: | Nordic Overseas Drilling & Services GmbH<br>Am Baumwall 3, 20459 Hamburg, Germany |

**Other Provisions:**

1.      Winter Layup-Any additional costs incurred by Contractor to secure and protect the Drilling unit for "Winter Layup" periods shall be borne by Operator or recharged to operator by contractor with no markup.

4848-8549-1755v4

FURIE-BANKR_00106713
DA00737

**APPENDIX B**

**(Insert rig inventory)**

4848-8549-1755v4

FURIE-BANKR_00106714
DA00738

## APPENDIX C
## NORDIC OVERSEAS DRILLING & SERVICES (Randolph Yost)
### PERSONNEL TO BE PROVIDED BY CONTRACTOR

Crew complement on rig at all times as follows:

| Classification | Number on Rig |
|---|---|
| OIM/Toolpusher | 2 |
| Driller | 2 |
| Derrickman | 2 |
| Floorman | 6 |
| Barge Engineer | 1 |
| Electrician/Mechanic | 1/1 |
| Motorman | 2 |
| Crane Operator | 2 |
| Welder | 1 |
| Roustabout | 8 |
| Medic | 1 |
| Steward | 1 |
| Night Cook | 1 |
| Galleyhand | 4 |
| Total | 35 |

| Classification | Hours Worked Per Day | Base Rate/Hr. (w/o Burden) | Overtime Rate/Hr. (w/o Burden) | Overtime Rate/Hr. (w/ Burden) (2) | Day Rate (w/ Burden) |
|---|---|---|---|---|---|
| OIM/Toolpusher | On 24-hour call | | | | $ 2,145.21 |
| Driller | 12 | $ 51.00 | $ 76.50 | $ 110.93 | $ 1,331.10 |
| Assistant Driller | | | | | |
| Derrickhand | 12 | $ 35.00 | $ 52.50 | $ 76.13 | $ 913.50 |
| Floorhand | 12 | $ 29.00 | $ 43.50 | $ 63.08 | $ 756.90 |
| Barge Engineer | On 24-hour call | | | | |
| Sr. Electrician/Sr. Mechanic | 12 | $ 45.00 | $ 67.50 | $ 97.88 | $ 1,174.50 |
| Motorman | 12 | $ 30.00 | $ 45.00 | $ 65.25 | $ 783.00 |
| Crane Operator | 12 | $ 37.00 | $ 55.50 | $ 80.48 | $ 965.70 |
| Welder | 12 | $ 32.00 | $ 48.00 | $ 69.60 | $ 835.20 |
| Compliance Supervisor | Third Party | | | | $ |
| Roustabout | 12 | $ 24.00 | $ 36.00 | $ 52.20 | $ 626.40 |
| Steward | Third Party | | | | |
| Night Cook | Third Party | | | | |
| Galleyhand | Third Party | | | | |

- (1) Should Contractor be requested to provide additional personnel beyond the standard manning shown above the Daily Rate plus any additional costs will apply.  Please note that the "Daily Rates" quoted above do not include costs associated with employing personnel from outside
- Contractor will make every effort to supply any additional personnel from within the ranks of Contractor's personnel.  If they are not available, however, qualified personnel can still be provided once we have come to a mutual agreement concerning any additional costs as well as when and if they would be applicable.
- (2) Labor rates above are inclusive of burden.

A maximum of two hours travel time each way (from rig to shore and from shore to rig) for each member of the crew will be allowed by the Contractor at no additional charge.  Travel time in excess of two hours each way will be charged to the Operator at the Overtime including Burden

4848-8549-1755v4

FURIE-BANKR_00106715
DA00739

**Additional Provisions:**

Travel Time & Related Expenses:

All travel, parking & lodging expenses incurred either from or to departing airports, to or from the shore base location in Alaska shall be recharged to the Operator at cost. Operator shall pay a travel per diem of $296 per crew member and a maximum of twelve hours of travel time during any 24 hour transit period at the established Alaskan minimum wage rate in affect at the time of transit.

Required Training:

Any training that may be required by Operator or regulatory agencies shall be recharged to Operator at cost. A per diem charge covering meals, lodging & wages shall also be charged to Operator at a rate of $300 per day, per person.

## APPENDIX D

### CHECKLIST OF CONTRACTOR'S AND OPERATOR'S OBLIGATIONS

|  | Category |
|---|---|
| Furnished by Contractor, paid by Contractor | 1 |
| Furnished by Contractor, paid by Operator, plus handling charge | 2 |
| Furnished by Contractor, paid by Operator, no handling charge | 3 |
| Furnished by Operator, paid by Operator | 4 |

| | | |
|---|---|---|
| 1. | Contractor's Items as set for in Appendix "B". | 1 |
| 2. | Except as otherwise specified, maintenance and repair including repair parts of Contractor's Items. | 1 |
| 3. | Maintenance and repair including repair parts of Operator's Items except as provided in Paragraph 403. | 4 |
| 4. | All charges relative to acquisition, shipping and transportation (except charges as provided in Items 65, 71, and 74) of all Contractor's Items required as replacements or spare parts. | 1 |
| 5. | Contractor's personnel as set forth in Appendix "C" including replacement, subsistence, insurance, wages, benefits, and all other costs related thereto, except for increases pursuant to Paragraph 709. | 1 |
| 6. | Extra personnel in excess of the complement of personnel set forth in Appendix | 3 |

25

4848-8549-1755v4

FURIE-BANKR_00106716
DA00740

"C" when requested in writing by Operator.

7.   Overtime beyond normal work schedule for Contractor's personnel when requested in writing by Operator.   3

8.   Required licenses, permits, certificates of financial responsibility and clearances to enter upon and depart from drilling location, pursuant to Paragraph 606.   4

9.   Surveying service and marker buoys to mark drilling location.   4

10.   Sea floor surveys required by Contractor's Marine Surveyor.   4

11.   Sea bottom coring services at the drilling location if required by Contractor.   4

12.   Fuel, oil, greases, lubes and hydraulic fluid for Contractor's equipment.

    a.   Fuel. Contractor to invoice Operator for beginning fuel inventory and credit Operator for ending fuel inventory at the current market price at end of well.   4

    b.   Oil, greases, lubes and hydraulic fluid.   3

13.   Water for drilling, wash down and cementing and excess potable water, if required.   4

14.   Drilling fluid and additives including lost circulation material.   4

15.   Mud logging services.   4

16.   Normal welding services required on Operator's Items to the extent available from Contractor's Personnel.   1

17.   Welding materials used on Operator's Items.   3

18.   Pneumatic hoses between supply vessels and Drilling Unit for unloading fuel, water, bulk cement and mud materials including repair and replacement of same:

    a.   Initial hoses.   1

    b.   All replacements.   3

19.   Mooring system between supply vessels and Drilling Unit including repair and replacement:

    a.   Initial ropes.   1

    b.   All replacements.   3

20.   Pre-slung cargo and pre-slung cargo baskets for use in transporting Contractor's   1

26

4848-8549-1755v4

FURIE-BANKR_00106717
DA00741

items to and from supply vessels.  Slings to be certified.

21. Pre-slung cargo and pre-slung cargo baskets for use in transporting Operator's items to and from supply vessels.  Slings to be certified.    4

22. Towing service (including rig fuel) for drilling unit moves, as approved by Contractor's insurance underwriters.    4

23. Towing horsepower required in addition to supply vessels.    4

24. Anchor setting and retrieving with marine vessels including anchor handling crews, if required.    4

25. Additional anchors and buoy lines, if required, including all repairs and replacement.    3

26. Inspection of Contractor's drill pipe, and other in-hole equipment according to standard (DS-1 CAT 3, Plus UT Slip Upset) before operations commence under this Contract.    1

27. Inspection of Contractor's drill pipe, drill collars and other in-hole equipment according to API standards after operations commence under this Contract at reasonable intervals requested by Operator and at conclusion of operations under this Contract.  Inspection criteria as per API standard (DS-1 CAT 3, Plus UT Slip Upset).  Additionally, all transportation costs associated with the inspections are for the Operator's account.    4

28. Drill pipe casing protectors (one per joint inside surface casing) on Contractor's drill pipe.    4

    a. All additional rubbers or replacement rubbers.    4

29. Drill pipe casing protectors on other drill pipe furnished by Operator, if required by Operator.    4

30. Kelly saver-sub rubbers and replacements for kellys furnished by Contractor.    1

31. Drill pipe wipers (surface casing).    1

32. Fishing tools other than provided by Contractor as set forth in Appendix "B".    4

33. Repair and/or replacement parts for Contractor furnished fishing tools.    N/A

34. Drilling bits, stabilizers, hole openers, reamers, under-reamers, well scrapers, drilling bumper subs, drilling safety joints, hydraulic drilling jars, and other special in-hole equipment, including replacement parts and repairs for same.    4

35. Directional surveying equipment and service including single shot camera.    4

27

FURIE-BANKR_00106718
DA00742

36. Deflection drilling tools and service, including single shot camera. 4

37. Drill pipe, drill collars and handling tools other than those specified in Appendix "B". 4

38. Blowout prevention equipment other than as listed in Appendix "B". 4

39. Wellhead equipment and supplies. 4

40. Tubular goods, hangers, packers and accessories. 4

41. Casing shoes, float collars, baskets, centralizers, scratchers, scrapers, baffles and other casing accessories. 4

42. Casing tools for sizes __N/A__, __N/A__, and __N/A__ casing. 4

    a. All repairs and replacements, if used. 4

43. Tubing tools, including slips, elevators, power tongs (or jaws for Contractor's power tongs), wrenches, and tubing pipe wipers. 4

44. Swabbing equipment, including lubricator, swab valve, swabs, oil savers, sinker bars, rope sockets and jars, if required (except sand line). 4

45. Swab rubbers and oil saver rubbers. 4

46. Core barrels and handling tools. 4

47. Core heads and core catchers. 4

48. Electric logging unit, maintenance of unit and logging services. 4

49. Wire line formation testing and sidewall sampling equipment and services. 4

50. Drill stem test equipment and services. 4

51. Gun and perforating services. 4

52. Cement and cementing services. 4

53. Cementing unit.*
*NOTE: If Operator uses the services of a cementing service company other than the owner of the cementing unit, any charges imposed upon Contractor by the owner of the cementing unit as consequence thereof shall be for the Operator's account. 4

54. Repair and maintenance of Contractor furnished cementing unit. N/A

55. Labor to install servicing equipment by Operator aboard the Drilling Unit and

28

FURIE-BANKR_00106719
DA00743

for later removal, if required, such as, but not limited to:
Cementing Unit;
Electric Logging Unit;
Mud Logging Unit;
Diving Equipment;
Well Testing System.                                                              4

56.  Supplies and materials to install Operator's Items.                          4

57.  Well testing system complete with separators, heaters, gas vents, metering,  4
     piping and valves, oil and/or gas burner, necessary booms, piping igniters,
     fabrication and installation.

58.  Test tanks for well fluid.                                                   4

     59. Administrative center including offices, office furniture, equipment and  1
     supplies    for Contractor's Personnel, warehousing and storage yard at Operating
     Base for Contractor's Items, if required.

60.  Administrative center including offices, office furniture, equipment and supplies  4
     for Operator's Personnel, warehousing and storage yard facilities for Operator's
     Items.

61.  Port facilities and dockside area in vicinity of Operating Base for loading and  4
     unloading Contractor's and Operator's Items on and off supply vessels.

62.  Transportation for Contractor's Items and Personnel:

     a.  All transportation from point of origin to Operating Base;           3

     b.  Routine transportation from Operating Base to and return from dockside  4
         and/or heliport;

     c.  Routine transportation from one Operating Base to another;          3 or 4

     d.  Temporary lodging including meals, if required and transportation from
         Operating Base to and return from dockside and/or heliport and between
         Operating Base during evacuation due to weather or other safety reasons in
         the event Operator is unable to provide adequate evacuation transportation
         pursuant to Paragraph 708 (d);                                       3

29

FURIE-BANKR_00106720
DA00744

e. Emergency transportation for both Operator and Contractor, as required.    4

f. Transportation for crews to Operator's shore base    3

63. Transportation for Operator's Items and Personnel to dockside at Operating Base or point of departure and return.    4

64. Dockside labor and equipment at Operating Base to load and unload Contractor's and Operator's Items from or to land transportation and from or to supply vessels.    4

65. Marine transportation for Contractor's and Operator's Items and Personnel from dockside to Drilling Unit and return with supply vessels supplied by Operator:    4

a. Crew boats to transport personnel of Operator and Contractor, if required;    4

b. Standby boat, if required.    4

c. Standby boat during preload operations    4

66. Marine transportation for Contractor's Personnel between Drilling Unit and Operations Base during evacuation due to weather or other safety reasons in the event Operator is unable to provide adequate evacuation transportation.    3

67. Storage space at dock site for Contractor's Items.    4

68. Storage space at dock site and Operating Base for Operator's Items.    4

69. Onshore transportation for Contractor's shore based personnel.    1

70. Onshore transportation for Operator's shore based personnel.    4

71. Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Contractor's Items and replacements or spare parts.    3

72. Fees, licenses, pilotage fees, wharfage fees, harbor fees and costs or similar charges including any sales taxes or clearing agent or brokerage fees relating to Operator's Items and replacements or spare parts.    4

73. All helicopter transportation as required including medical evacuation.    4

a. Non-directional beacon for helicopter operations.    4

74. Helicopter refueling system aboard Drilling Unit including helicopter fuel tanks, fuel tank stand, fuel pump filters, hoses and grounding systems.    4

30

FURIE-BANKR_00106721
DA00745

| | | |
|---|---|---|
| 75. | Helicopter fuel and lubes. | 4 |
| 76. | Special or additional helicopter safety equipment aboard Drilling Unit. | 4 |
| 77. | Diver services as required. | 4 |
| 78. | Meals and quarters for all of Contractor's Personnel and up to and including two (2) Operator's Personnel. | 1 |
| 79. | Meals and quarters for Operator's personnel and Operator's third party personnel in excess of three (3) per day to be charged at $26.50 per meal and $26.50 per bed. | 3 |
| 80. | Waste storage, removal and disposal, including any required registration and permits. Each party shall be responsible for their own waste removal and disposal. | 4 |
| 81. | Insurance as provided in Appendix "E". | 1 |
| 82. | Maintenance and repair including repair parts: | |
| | a. Of Contractor's surface equipment; | 1 |
| | b. Rubber goods in Contractor's BOP's; | 3 |
| | c. Of Contractor's subsurface equipment except as provided in Paragraph 901; | 3 |
| | d. Of Contractor's subsurface mooring equipment including pendant lines. | 3 |
| 83. | Extra labor (in excess of supply vessel's personnel) required aboard supply vessels when alongside Drilling Unit to unload or load Contractor's and/or Operator's Items. | 4 |
| 84. | Anchor piles, if required, and placement of same. | 4 |
| 85. | Initial set of Screens for shale shakers(80 mesh) | 1 |
| | a. Replacement screens for shale shakers. | 3 or 4 |
| 86. | All screens for mud cleaners. | 3 |
| 87. | Weather forecast services (if required). | 4 |
| 88. | Conductor drive hammer and accessories (if applicable), including repairs and/or replacement. | 4 |
| 89. | Trash compactor and bags. | 3 |

31

4848-8549-1755v4

FURIE-BANKR_00106722
DA00746

90.  Casing rams.  4

91.  Pump liners and associated expendables unless otherwise specified  3

92.  A $500.00 per day rate increase shall be in effect while working with oil  3
base/synthetic mud or corrosive fluids operations (CaCl or KCl in excess of 10.4
ppg or any bromide fluids).  Operator will furnish sets of protective clothing, i.e.
boots, gloves, goggles' and slickers, steam cleaner rental, disposal of waste and
allow sufficient time to clean rig after each oil base or corrosive fluids job.

93.  Cost on all rental equipment provided by Contractor which are not part of the  3
inventory, including transportation to and from the rig and associated dock
charges, testing and inspection upon completion of contract and repair of all
damages incurred during use on Operator's program, replacement of all
expendable items consumed during use on Operator's program

94.  If Operator elects to rearrange the BOP stack configuration, all associated cost  3
and Rig time is for Operator's account.

95.  Global Positioning Monitoring System as required by MMS  NTL 2009-G016  1

96.  All cost associated for shear ram calculations  4

97.  Any cost associated for Contractor to comply with Operator's Safety &  3
Environmental Management Systems (SEMS) requirements

98.  Wharfage for the rig during Winter Layup including shore power& services  4

a) All towage to and from the wharfage location

b) All winter layup preparation, winter layup preservation, winter layup  3 or 4

maintenance

4848-8549-1755v4

FURIE-BANKR_00106723
DA00747

## APPENDIX E

### CONTRACTOR'S INSURANCE

**Part I**    WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE

    A.    Worker's Compensation and Employer's Liability Insurance to comply with the provisions and applicable laws of the country or state in which the Contractor qualifies as an employer and in which operations hereunder are performed, including U.S. Longshore & Harbor Workers Act and Outer Continental Shelf Lands Act coverage, if applicable.

    B.    Employer's Liability with limits of:

| | | |
|---|---|---|
| Bodily Injury by Accident | - | $1,000,000 each accident |
| Bodily Injury by Disease | - | $1,000,000 policy limit |
| Bodily Injury by Disease | - | $1,000,000 each employee |

    C.    Maritime Employers Liability including Jones Act and Death on the High Seas Act coverage and transportation, wages, maintenance and cure with limits of $1,000,000 each person/$1,000,000 each accident

    D.    "In Rem" endorsement.

    E.    Borrowed Servant/Alternate Employer Endorsement

**Part II**    COMPREHENSIVE GENERAL LIABILITY INSURANCE

    A. Commercial General Liability, Protective Liability including coverage for premises/operations, contractor's protective liability, contractual liability and products/completed operations coverage and subject to a $1,000,000 combined single limit of liability for Bodily Injury and Property Damage.

    B. Charterer's Legal Liability

    C. Deletion of watercraft exclusion for vessels in excess of thirty (30) feet as respects operations and contractual liability for watercraft exposure not covered by Protection and Indemnity policy.

    D. "In Rem" endorsement

**Part III**    AUTOMOBILE LIABILITY INSURANCE

Standard comprehensive form including all owned, non-owned and hired vehicles with a $1,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**Part IV**    AIRCRAFT LIABILITY

4848-8549-1755v4

FURIE-BANKR_00106724
DA00748

Aircraft liability including contractual liability covering all owned (if any) hired and non-owned aircraft (fixed wing and rotary) including passenger liability with a $5,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**Part V**     EXCESS/UMBRELLA LIABILITY INSURANCE

1.     Provide coverage for Employer's Liability, Maritime Employer's Liability Commercial General Liability, Automobile Liability, Aircraft Liability, and Vessel Liabilities.

2.     Limit of Liability: $50,000,000 combined single limit of liability for bodily injury and/or property damage.

**Part VI**     MARINE INSURANCE

1.  Hull and Machinery Insurance (including collision liability) shall be provided for the Drilling Unit owned or chartered by Contractor and utilized in the performance of this Contract in an amount equal to the declared value of the Drilling Unit, subject to a deductible determined by Contractor.

2.  Protection and Indemnity Insurance shall be provided with a combined single limit of U.S. $1,000,000 per occurrence.

**Part VII**     NO RECOURSE OF PREMIUM

All policies of insurance shall be endorsed to delete any recourse of premium, club calls, assessments or advances against Operator, Operator's Affiliated Companies, partnerships, and limited liability companies, and its and all of their co-owners, partners, co-venturers, and joint owners.

**Part VIII**     DEDUCTIBLES

Except as otherwise provided deductibles shall be for the account of Contractor.

**Part IX.**     SCOPE

The above specified amounts and types of insurance coverage shall not be deemed to constitute, or be construed as, a limitation on Contractor's liability under the Contract.

**Part X.**     INSURANCE TO COVER CONTRACTOR'S LIABILITIES

Notwithstanding anything to the contrary, the insurance coverages of the type and in the amounts set forth in this Appendix E, shall, as between Contractor and Operator, cover only those liabilities specifically assumed by Contractor under this Contract.

4848-8549-1755v4

FURIE-BANKR_00106725
DA00749

**APPENDIX F**

OPERATOR'S INSURANCE

**Part I.**    WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY INSURANCE

A.    Worker's Compensation and Employer's Liability Insurance to comply with the provisions and applicable laws of the country or state in which the Contractor qualifies as an employer and in which operations hereunder are performed, including U.S. Longshore & Harbor Workers Act and Outer Continental Shelf Lands Act coverage, if applicable.

B.    Employer's Liability with limits of:

Bodily Injury by Accident -      $1,000,000 each accident
Bodily Injury by Disease -       $1,000,000 policy limit
Bodily Injury by Disease -       $1,000,000 each employee

C.    Maritime Employers Liability including Jones Act and Death on the High Seas Act coverage and transportation, wages, maintenance and cure with limits of $1,000,000 each person/$1,000,000 each accident

D.    "In Rem" endorsement.

E.    Borrowed Servant/Alternate Employer Endorsement

**Part II**    COMPREHENSIVE GENERAL LIABILITY INSURANCE

A.    Commercial General Liability, Protective Liability including coverage for premises/operations, contractor's protective liability, contractual liability and products/completed operations coverage and subject to a $1,000,000 combined single limit of liability for Bodily Injury and Property Damage.

B.    Underground Resource/Equipment Coverage

C.    Charterer's Legal Liability

D.    Deletion of watercraft exclusion for vessels in excess of thirty (30) feet as respects operations and contractual liability for watercraft exposure not covered by Protection and Indemnity policy.

E.    "In Rem" endorsement

**Part III**    AUTOMOBILE LIABILITY INSURANCE

Standard comprehensive form including all owned, non-owned and hired vehicles with a $1,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

4848-8549-1755v4

FURIE-BANKR_00106726
DA00750

**Part IV      AIRCRAFT LIABILITY**

Aircraft liability including contractual liability covering all owned (if any) hired and non-owned aircraft (fixed wing and rotary) including passenger liability with a $5,000,000 combined single limit of liability each accident for bodily injury and/or property damage.

**Part V.      EXCESS/UMBRELLA LIABILITY INSURANCE**

1.    Provide coverage for Employer's Liability, Maritime Employer's Liability Commercial General Liability, Automobile Liability, Aircraft Liability, and Vessel Liabilities.

2.    Limit of Liability: $50,000,000 combined single limit of liability for bodily injury and/or property damage.

**Part VI      "ALL RISK" INSURANCE**

"All Risk" Insurance, subject to a nominal deductible, covering physical loss or damage (including wreck/debris removal) to all Operator's Items and other property of Operator.

**Part VII      OPERATOR'S EXTRA EXPENSE INSURANCE**

Operator's Extra Expense Insurance in the amount of not less than U.S. $50,000,000 combined single limit per occurrence to cover any and all sums which Operator and/or Contractor may be obligated to incur as expenses and/or liabilities which may be incurred on account of bringing under control an oil or gas well, extinguishing an oil or gas well fire, redrilling or repair of loss or damage to an oil or gas well, seepage and pollution, cleanup and contamination arising from operations under this Contract.

**Part VIII      NO RECOURSE OF PREMIUM**

All policies of insurance shall be endorsed to delete any recourse of premium, club calls, assessments or advances against any member of Contractor, and its Affiliated Companies, partnerships, and limited liability companies.

**Part IX      DEDUCTIBLES**

Except as otherwise provided deductibles shall be for the account of Operator.

**Part X      OPERATOR'S CERTIFICATE OF FINANCIAL RESPONSIBILITY**

Operator shall provide a Certificate of Financial Responsibility in compliance with the Oil Pollution Act of 1990, as applicable, for operations in U.S. waters and shall provide a copy to Contractor.

**Part XI      SCOPE**

The above specified amounts and types of insurance coverage shall not be deemed to constitute, or be construed as, a limitation on Operator's liability under the Contract.

4848-8549-1755v4

FURIE-BANKR_00106727
DA00751

**Part XII.**    <u>INSURANCE TO COVER OPERATOR'S LIABILITIES</u>

Notwithstanding anything to the contrary, the insurance coverages of the type and in the amounts set forth in this Appendix F, shall, as between Operator and Contractor, cover only those liabilities specifically assumed by Operator under this Contract.

37

4848-8549-1755v4

FURIE-BANKR_00106728
DA00752

**APPENDIX G**

(See Paragraph 1305)

The following clauses, when required by law, are incorporated in the Contract by reference as if fully set out:

1.    The Equal Opportunity Clause prescribed in 41 CFR 60-1.4.

2.    The Affirmative Action Clause prescribed in 41 CFR 60-250.4 regarding veterans and veterans of the Vietnam era.

3.    The Affirmative Action Clause for handicapped workers prescribed in 41 CFR 60-741.4.

4.    The Certification of Compliance with Environmental Laws prescribed in 40 CFR 15.20.

4848-8549-1755v4

FURIE-BANKR_00106729
DA00753

# EXHIBIT 16

DA00754

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement ("Agreement") is entered into on this the $\underline{5/}$ day of January, 2016 by and among Tom Hord ("Hord"), M.A. (Tony) Nunes ("Nunes"), Furie Operating Alaska LLC ("FOA"), Cornucopia Oil and Gas Company, LLC ("Cornucopia"), Kay Rieck, individually and as agent for the Investor parties described below ("Rieck"), Kadmas Limited, a Malta company ("Kadmas"), Offshore Drilling Solutions Limited, a Dubai company ("ODS") and Nordic Overseas Drilling and Services GmbH, a German company ("Nordic").

WHEREAS, Hord has assisted FOA and Cornucopia (collectively called ("Furie") and the investors of Kadmas, ODS and Nordic in obtaining a charter and use of the offshore jack up drill rig (Randolph Yost) from Shelf Drilling Offshore Services Limited II ("Owner") to perform drilling, work over and well completion activities for Furie in the Cook Inlet, Alaska. The investors of Kadmas, ODS and Nordic are together called "Investors" in this Agreement.

WHEREAS, at the request of ODS and Kadmas, Nunes assisted these entities and the Investors with legal services for the charter of the Randolph Yost from Owner.

WHEREAS, Hord and Nunes have caused an independent non-affiliated Louisiana limited liability company called Advanced Drilling Solutions LLC, (ADS) to be formed. ADS will manage, operate and provide for the crewing of the drill rig for the benefit of Kadmas, ODS and Nordic, Rieck and Furie under a Rig Management Agreement between Kadmas and ADS. Each of Rieck, Furie and the Investors are together herein called "Furie and Investor Parties".

WHEREAS, each of the parties executing this Agreement also acknowledges that it is the understanding and intention that ADS may be owned and managed by another limited liability company or corporation formed and organized in either Texas or Delaware or other U.S. state ("ADS Parent") and that ADS Parent may in turn be owned by Hord and Nunes and other investors of their choosing. ADS Parent will be managed by a Board of Managers or Directors which includes Hord, Nunes and at least one other independent outside manager or director. In addition, ADS will have board of managers or an Executive Committee which may include Hord, Nunes and one or more independent third parties.

NOW THEREFORE, the purpose of this Agreement is to document the agreement of the Furie and Investor Parties that it is in the best interest and to the benefit of the Furie and Investor Parties: (i) that Hord shall continue to be employed by Furie as COO to oversee Furie's operations in Alaska and elsewhere and (ii) for Hord to act as COO and President of ADS (or such other officer position as ADS's Board of managers may determine) and to oversee the day to day operations of ADS, and (iii) that Hord and Nunes may both be owners or members and managers of ADS Parent and members of the ADS Executive Committee.

The Parties to this Agreement make the following statements as an inducement for Hord to continue his existing corporate capacities with Furie. The Parties acknowledge that an argument could be made that Hord might have a conflict of interest or may be breaching his fiduciary duties to the Furie and the Investor Parties due to his being an officer of/having an ownership

1

ADS-000232

FURIE-BANKR_00106730
DA00755

interest in ADS/ADS Parent. The Parties hereto specifically waive the ability to allege a conflict of interest and/or breach of fiduciary duty by Hord in regards to the ADS/ADS Parent and the Parties. The Parties hereto desire for Hord to continue his present efforts on behalf of such Parties. The Parties hereto acknowledge that Hord could have resigned from his officer/director/COO duties to Furie and entered into a consulting agreement. Ultimately the Parties have agreed that retaining Hord as COO and having him continue to oversee operations in Alaska and elsewhere as laid out in the terms of this Agreement is preferential to entering into a consulting agreement with Hord.

By signing this Agreement in the space provided below, the Furie and Investor Parties jointly and severally agree that, in consideration of Hord and Nunes performing the services and fulfilling the roles set forth above, the Furie and Investor Parties *hereby (i) expressly authorize Hord's work for and/or ownership interest in ADS/ADS Parent and that Hord's work for and/or ownership interest in ADS/ADS Parent does NOT violate any terms of Hord's employment agreement with Furie nor does it constitute a breach of fiduciary duty to Furie; (ii) waive and release Hord and Nunes from any conflicts of interest between the work each performs for Rieck, the Investor Parties and Furie in their capacities as COO, officers and corporate legal counsel, respectively, for Rieck, the Investor Parties and Furie; and (iii) indemnify, release, protect, defend and agree to hold harmless Hord and Nunes from any cause of action, claim, expenses, liabilities, losses, judgments, awards or demand of any kind (Claims) brought or suffered by each of Rieck, Furie and the Investor Parties or any other person whatsoever arising from or in any way connected with or resulting from any activity or services by Hord or Nunes described above or from their respective activities as officers, managers and/or owners or members of ADS or ADS Parent, except to the extent and such Claims are caused by the proven gross negligence, willful misconduct or fraud of Hord or Nunes as proved by a final non- appealable judgment in a court of law.*

This Agreement is governed, construed and interpreted by the laws of the State of Texas (where each of Hord and Nunes reside), to the exclusion of the laws of any other jurisdiction, and is subject to, and each of the Furie and Investor Parties specifically agree to subject themselves to, the exclusive jurisdiction of the state or federal courts sitting in Harris County, Texas. Service of any process or action on any party may be accomplished in any manner permitted by applicable law, including by registered letter.

This Agreement may be executed by original or electronic signatures and in any number of counterparts each of which shall constitute an original and all of which when read together shall constitute one document.

This Agreement when executed by all the parties hereto shall constitute the agreement of the parties hereto to be bound by the provisions hereto.

Dated January ___, 2016

Thomas E. Hord                                    M.A. (Tony) Nunes

ADS-000233

FURIE-BANKR_00106731
DA00756

Kay Rieck, individually and as agent for Investors

Furie Operating Alaska LLC

By

Cornucopia Oil & Gas Company LLC

By

Offshore Drilling Solutions LLC, Kadmas Limited, Nordic Overseas Drilling and Services GMBH

By

Harald Plewka, attorney in fact

3

ADS-000234

# EXHIBIT 17

DA00758

 **NETHERLAND, SEWELL & ASSOCIATES, INC.**
WORLDWIDE PETROLEUM CONSULTANTS
ENGINEERING · GEOLOGY · GEOPHYSICS · PETROPHYSICS

EXECUTIVE COMMITTEE
ROBERT C. BARG            MIKE K. NORTON
P. SCOTT FROST            DAN PAUL SMITH
JOHN G. HATTNER        JOSEPH J. SPELLMAN
J. CARTER HENSON, JR.    DANIEL T. WALKER

CHAIRMAN & CEO
C.H. (SCOTT) REES III
PRESIDENT & COO
DANNY D. SIMMONS
EXECUTIVE VP
G. LANCE BINDER

February 29, 2016

Mr. David W. Elder
Furie Operating Alaska, LLC
100 Enterprise Avenue
League City, Texas 77573

Dear Mr. Elder:

In accordance with your request, we have estimated the proved, probable, and possible reserves and future revenue, as of December 31, 2015, for certain gas properties located in the Kitchen Lights Unit, Cook Inlet, Alaska, as listed in the accompanying tabulations. For the purposes of this report, Furie Operating Alaska, LLC (Furie) and other interest owners in these properties will be collectively referred to herein as the "Company". It is our understanding that the Company currently owns a 100 percent working interest in these properties. However, these properties are subject to a future interest reversion at which time the Company will own an 80 percent working interest. The net revenue interest is estimated based on Furie's current net revenue interest to working interest ratio. We completed our evaluation on or about the date of this letter. This report has been prepared using escalated price and cost parameters specified by Furie, as discussed in subsequent paragraphs of this letter. The estimates in this report have been prepared in accordance with the definitions and guidelines set forth in the 2007 Petroleum Resources Management System (PRMS) approved by the Society of Petroleum Engineers (SPE); definitions are presented immediately following this letter.

We estimate the gas reserves and future net revenue to the Company interest in these properties, as of December 31, 2015, to be:

| Category | Gas Reserves (MMCF) | | Future Net Revenue (M$) | |
| | Gross (100%) | Net | Total | Present Worth at 10% |
|---|---|---|---|---|
| Proved Developed Producing | 7,551.0 | 6,229.6 | 147,381.2 | 136,176.2 |
| Proved Developed Non-Producing | 21,569.6 | 16,834.9 | 26,948.2 | 20,736.1 |
| Proved Undeveloped | 27,203.0 | 20,402.3 | 131,000.4 | 86,046.6 |
| Total Proved | 56,323.6 | 43,466.7 | 305,329.8 | 242,958.8 |
| Probable | 124,233.8 | 90,572.5 | 606,366.5 | 347,066.3 |
| Possible | 117,159.2 | 72,173.5 | 530,441.9 | 255,510.0 |

*Totals may not add because of rounding.*

Gas volumes are expressed in millions of cubic feet (MMCF) at standard temperature and pressure bases. These properties are not expected to produce commercial volumes of condensate.

The estimates shown in this report are for proved, probable, and possible reserves. This report does not include any value that could be attributed to interests in undeveloped acreage beyond those tracts for which undeveloped reserves have been estimated. Reserves categorization conveys the relative degree of certainty; reserves subcategorization is based on development and production status. The estimates of reserves and future revenue included herein have not been adjusted for risk.

This report includes summary projections of reserves and revenue by reserves category. Also included for each reserves category are one-line summaries of reserves, economics, and basic data by lease.

2100 ROSS AVENUE, SUITE 2200 · DALLAS, TEXAS 75201 · PH: 214-969-5401 · FAX: 214-969-5411
1301 MCKINNEY STREET, SUITE 3200 · HOUSTON, TEXAS 77010 · PH: 713-654-4950 · FAX: 713-654-4951

info@nsai-petro.com
netherlandsewell.com


**NETHERLAND, SEWELL & ASSOCIATES, INC.**

Gross revenue shown in this report is the Company's share of the gross (100 percent) revenue from the properties prior to any deductions. Future net revenue is after deductions for the Company's share of production taxes, capital costs, abandonment costs, and operating expenses but before consideration of any income taxes. The production taxes shown in this report include the Company's share of Alaska production taxes and ad valorem taxes. Future capital credits were provided by Furie and are based on Alaska's Clear and Equitable Share Act; these credits include the Alternative Exploration Tax Credit, the Capital Expenditure Credit, the Carried-Forward Annual Loss Credit, and the Small Producer Tax Credit. A portion of these credits are based on capital spent prior to the as of date of this report. The future net revenue has been discounted at an annual rate of 10 percent to determine its present worth, which is shown to indicate the effect of time on the value of money. Future net revenue presented in this report, whether discounted or undiscounted, should not be construed as being the fair market value of the properties.

As requested, this report has been prepared using gas price parameters specified by Furie. The gas prices along with escalation parameters are shown in the following table:

| Period Ending | Gas Price ($/MMBTU) |
|---|---|
| 12-31-2016 | |
| 12-31-2017 | |
| 12-31-2018 | |
| 12-31-2019 | |
| 12-31-2020 | |
| 12-31-2021 | |
| 12-31-2022 | |
| 12-31-2023 | |

Thereafter, escalated 4 percent per year through the lives of the properties.

Operating costs used in this report are based on operating expense records of Furie. These costs include the per-well overhead expenses allowed under joint operating agreements along with estimates of costs to be incurred at and below the district and field levels. Operating costs have been divided into field-level costs and per-well costs. Headquarters general and administrative overhead expenses of Furie are included to the extent that they are covered under joint operating agreements for the operated properties. As requested, operating costs are escalated 4 percent per year throughout the lives of the properties.

Capital costs used in this report were provided by Furie and are based on authorizations for expenditure and actual costs from recent activity. Capital costs are included as required for workovers, new development wells, and production equipment. Based on our understanding of future development plans, a review of the records provided to us, and our knowledge of similar properties, we regard these estimated capital costs to be reasonable. Abandonment costs used in this report are Furie's estimates of the costs to abandon the wells, platforms, and production facilities; these estimates do not include any salvage value for the lease and well equipment. As requested, capital costs and abandonment costs are escalated 4 percent per year to the date of expenditure.

For the purposes of this report, we did not perform any field inspection of the properties, nor did we examine the mechanical operation or condition of the wells and facilities. We have not investigated possible environmental liability related to the properties; therefore, our estimates do not include any costs due to such possible liability. The reserves shown in this report are estimates only and should not be construed as exact quantities. Proved reserves are those quantities of oil and gas which, by analysis of engineering and geoscience data, can be estimated with reasonable certainty to be commercially recoverable; probable and possible reserves are those additional reserves which are sequentially less certain to be recovered than proved reserves. Estimates of reserves may increase or decrease as a result of market conditions, future operations, changes in regulations, or actual reservoir performance. In addition to the primary economic assumptions discussed herein, our estimates are based on certain assumptions including, but not limited to, that the properties will be developed consistent with current development plans as provided to us by Furie, that the properties will be operated in a prudent manner, that no

FURIE-BANKR_00200219
DA00760



NETHERLAND, SEWELL
& ASSOCIATES, INC.

governmental regulations or controls will be put in place that would impact the ability of the interest owner to recover the reserves, and that our projections of future production will prove consistent with actual performance. If the reserves are recovered, the revenues therefrom and the costs related thereto could be more or less than the estimated amounts. Because of governmental policies and uncertainties of supply and demand, the sales rates, prices received for the reserves, and costs incurred in recovering such reserves may vary from assumptions made while preparing this report.

For the purposes of this report, we used technical and economic data including, but not limited to, well logs, geologic maps, seismic data, well test data, production data, historical price and cost information, and property ownership interests. The reserves in this report have been estimated using deterministic methods; these estimates have been prepared in accordance with generally accepted petroleum engineering and evaluation principles set forth in the Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information promulgated by the SPE (SPE Standards). We used standard engineering and geoscience methods, or a combination of methods, including performance analysis, volumetric analysis, and analogy, that we considered to be appropriate and necessary to classify, categorize, and estimate reserves in accordance with the 2007 PRMS definitions and guidelines. A substantial portion of these reserves are for behind-pipe zones, undeveloped locations, and producing wells that lack sufficient production history upon which performance-related estimates of reserves can be based; such reserves are based on estimates of reservoir volumes and recovery efficiencies along with analogy to properties with similar geologic and reservoir characteristics. As in all aspects of oil and gas evaluation, there are uncertainties inherent in the interpretation of engineering and geoscience data; therefore, our conclusions necessarily represent only informed professional judgment.

The data used in our estimates were obtained from Furie, public data sources, and the nonconfidential files of Netherland, Sewell & Associates, Inc. and were accepted as accurate. Supporting work data are on file in our office. We have not examined the titles to the properties or independently confirmed the actual degree or type of interest owned. The technical persons primarily responsible for preparing the estimates presented herein meet the requirements regarding qualifications, independence, objectivity, and confidentiality set forth in the SPE Standards. We are independent petroleum engineers, geologists, geophysicists, and petrophysicists; we do not own an interest in these properties nor are we employed on a contingent basis.

Sincerely,

**NETHERLAND, SEWELL & ASSOCIATES, INC.**
Texas Registered Engineering Firm F-2699

By:

C.H. (Scott) Rees III, P.E.
Chairman and Chief Executive Officer

By:

Richard B. Talley, Jr., P.E. 102425
Senior Vice President

By:

Mike K. Norton, P.E. 441
Senior Vice President

Date Signed:  February 29, 2016

Date Signed:  February 29, 2016

WKB:STH


**NETHERLAND, SEWELL & ASSOCIATES, INC.**

## PETROLEUM RESERVES AND RESOURCES CLASSIFICATION AND DEFINITIONS
Excerpted from the Petroleum Resources Management System Approved by
the Society of Petroleum Engineers (SPE) Board of Directors, March 2007

This document contains information excerpted from definitions and guidelines prepared by the Oil and Gas Reserves Committee of the Society of Petroleum Engineers (SPE) and reviewed and jointly sponsored by the World Petroleum Council (WPC), the American Association of Petroleum Geologists (AAPG), and the Society of Petroleum Evaluation Engineers (SPEE).

### Preamble

Petroleum resources are the estimated quantities of hydrocarbons naturally occurring on or within the Earth's crust. Resource assessments estimate total quantities in known and yet-to-be-discovered accumulations; resources evaluations are focused on those quantities that can potentially be recovered and marketed by commercial projects. A petroleum resources management system provides a consistent approach to estimating petroleum quantities, evaluating development projects, and presenting results within a comprehensive classification framework.

These definitions and guidelines are designed to provide a common reference for the international petroleum industry, including national reporting and regulatory disclosure agencies, and to support petroleum project and portfolio management requirements. They are intended to improve clarity in global communications regarding petroleum resources. It is expected that this document will be supplemented with industry education programs and application guides addressing their implementation in a wide spectrum of technical and/or commercial settings.

It is understood that these definitions and guidelines allow flexibility for users and agencies to tailor application for their particular needs; however, any modifications to the guidance contained herein should be clearly identified. The definitions and guidelines contained in this document must not be construed as modifying the interpretation or application of any existing regulatory reporting requirements.

## 1.0 Basic Principles and Definitions

The estimation of petroleum resource quantities involves the interpretation of volumes and values that have an inherent degree of uncertainty. These quantities are associated with development projects at various stages of design and implementation. Use of a consistent classification system enhances comparisons between projects, groups of projects, and total company portfolios according to forecast production profiles and recoveries. Such a system must consider both technical and commercial factors that impact the project's economic feasibility, its productive life, and its related cash flows.

### 1.1 Petroleum Resources Classification Framework

Petroleum is defined as a naturally occurring mixture consisting of hydrocarbons in the gaseous, liquid, or solid phase. Petroleum may also contain non-hydrocarbons, common examples of which are carbon dioxide, nitrogen, hydrogen sulfide and sulfur. In rare cases, non-hydrocarbon content could be greater than 50%.

The term "resources" as used herein is intended to encompass all quantities of petroleum naturally occurring on or within the Earth's crust, discovered and undiscovered (recoverable and unrecoverable), plus those quantities already produced. Further, it includes all types of petroleum whether currently considered "conventional" or "unconventional."

Figure 1-1 is a graphical representation of the SPE/WPC/AAPG/SPEE resources classification system. The system defines the major recoverable resources classes: Production, Reserves, Contingent Resources, and Prospective Resources, as well as Unrecoverable petroleum.

The "Range of Uncertainty" reflects a range of estimated quantities potentially recoverable from an accumulation by a project, while the vertical axis represents the "Chance of


Figure 1-1: Resources Classification Framework.

FURIE-BANKR_00200221
DA00762


**NETHERLAND, SEWELL & ASSOCIATES, INC.**

## PETROLEUM RESERVES AND RESOURCES CLASSIFICATION AND DEFINITIONS
Excerpted from the Petroleum Resources Management System Approved by
the Society of Petroleum Engineers (SPE) Board of Directors, March 2007

### 1.2 Project-Based Resources Evaluations

The resources evaluation process consists of identifying a recovery project, or projects, associated with a petroleum accumulation(s), estimating the quantities of Petroleum Initially-in-Place, estimating that portion of those in-place quantities that can be recovered by each project, and classifying the project(s) based on its maturity status or chance of commerciality.

This concept of a project-based classification system is further clarified by examining the primary data sources contributing to an evaluation of net recoverable resources (see Figure 1-2) that may be described as follows:



Figure 1-2: Resources Evaluation Data Sources.

- The Reservoir (accumulation): Key attributes include the types and quantities of Petroleum Initially-in-Place and the fluid and rock properties that affect petroleum recovery.

- The Project: Each project applied to a specific reservoir development generates a unique production and cash flow schedule. The time integration of these schedules taken to the project's technical, economic, or contractual limit defines the estimated recoverable resources and associated future net cash flow projections for each project. The ratio of EUR to Total Initially-in-Place quantities defines the ultimate recovery efficiency for the development project(s). A project may be defined at various levels and stages of maturity; it may include one or many wells and associated production and processing facilities. One project may develop many reservoirs, or many projects may be applied to one reservoir.

- The Property (lease or license area): Each property may have unique associated contractual rights and obligations including the fiscal terms. Such information allows definition of each participant's share of produced quantities (entitlement) and share of investments, expenses, and revenues for each recovery project and the reservoir to which it is applied. One property may encompass many reservoirs, or one reservoir may span several different properties. A property may contain both discovered and undiscovered accumulations.

In context of this data relationship, "project" is the primary element considered in this resources classification, and net recoverable resources are the incremental quantities derived from each project. Project represents the link between the petroleum accumulation and the decision-making process. A project may, for example, constitute the development of a single reservoir or field, or an incremental development for a producing field, or the integrated development of several fields and associated facilities with a common ownership. In general, an individual project will represent the level at which a decision is made whether or not to proceed (i.e., spend more money) and there should be an associated range of estimated recoverable quantities for that project.

An accumulation or potential accumulation of petroleum may be subject to several separate and distinct projects that are at different stages of exploration or development. Thus, an accumulation may have recoverable quantities in several resource classes simultaneously.

In order to assign recoverable resources of any class, a development plan needs to be defined consisting of one or more projects. Even for Prospective Resources, the estimates of recoverable quantities must be stated in terms of the sales products derived from a development program assuming successful discovery and commercial development. Given the major uncertainties involved at this early stage, the development program will not be of the detail expected in later stages of maturity. In most cases, recovery efficiency may be largely based on analogous projects. In-place quantities for which a feasible project cannot be defined using current, or reasonably forecast improvements in, technology are classified as Unrecoverable.

Not all technically feasible development plans will be commercial. The commercial viability of a development project is dependent on a forecast of the conditions that will exist during the time period encompassed by the project's activities (see

Definitions - Page 3 of 10

FURIE-BANKR_00200222
DA00763


NETHERLAND, SEWELL
& ASSOCIATES, INC.

## PETROLEUM RESERVES AND RESOURCES CLASSIFICATION AND DEFINITIONS
Excerpted from the Petroleum Resources Management System Approved by
the Society of Petroleum Engineers (SPE) Board of Directors, March 2007

To be included in the Reserves class, there must be a high confidence in the commercial producibility of the reservoir as supported by actual production or formation tests. In certain cases, Reserves may be assigned on the basis of well logs and/or core analysis that indicate that the subject reservoir is hydrocarbon-bearing and is analogous to reservoirs in the same area that are producing or have demonstrated the ability to produce on formation tests.

### 2.2 Resources Categorization
The horizontal axis in the Resources Classification (Figure 1.1) defines the range of uncertainty in estimates of the quantities of recoverable, or potentially recoverable, petroleum associated with a project. These estimates include both technical and commercial uncertainty components as follows:

- The total petroleum remaining within the accumulation (in-place resources).
- That portion of the in-place petroleum that can be recovered by applying a defined development project or projects.
- Variations in the commercial conditions that may impact the quantities recovered and sold (e.g., market availability, contractual changes).

Where commercial uncertainties are such that there is significant risk that the complete project (as initially defined) will not proceed, it is advised to create a separate project classified as Contingent Resources with an appropriate chance of commerciality.

#### 2.2.1 Range of Uncertainty
The range of uncertainty of the recoverable and/or potentially recoverable volumes may be represented by either deterministic scenarios or by a probability distribution (see Deterministic and Probabilistic Methods, section 4.2).

When the range of uncertainty is represented by a probability distribution, a low, best, and high estimate shall be provided such that:

- There should be at least a 90% probability (P90) that the quantities actually recovered will equal or exceed the low estimate.
- There should be at least a 50% probability (P50) that the quantities actually recovered will equal or exceed the best estimate.
- There should be at least a 10% probability (P10) that the quantities actually recovered will equal or exceed the high estimate.

When using the deterministic scenario method, typically there should also be low, best, and high estimates, where such estimates are based on qualitative assessments of relative uncertainty using consistent interpretation guidelines. Under the deterministic incremental (risk-based) approach, quantities at each level of uncertainty are estimated discretely and separately (see Category Definitions and Guidelines, section 2.2.2).

These same approaches to describing uncertainty may be applied to Reserves, Contingent Resources, and Prospective Resources. While there may be significant risk that sub-commercial and undiscovered accumulations will not achieve commercial production, it is useful to consider the range of potentially recoverable quantities independently of such a risk or consideration of the resource class to which the quantities will be assigned.

#### 2.2.2 Category Definitions and Guidelines
Evaluators may assess recoverable quantities and categorize results by uncertainty using the deterministic incremental (risk-based) approach, the deterministic scenario (cumulative) approach, or probabilistic methods (see "2001 Supplemental Guidelines," Chapter 2.5). In many cases, a combination of approaches is used.

Use of consistent terminology (Figure 1.1) promotes clarity in communication of evaluation results. For Reserves, the general cumulative terms low/best/high estimates are denoted as 1P/2P/3P, respectively. The associated incremental quantities are termed Proved, Probable and Possible. Reserves are a subset of, and must be viewed within context of, the complete resources classification system. While the categorization criteria are proposed specifically for Reserves, in most cases, they can be equally applied to Contingent and Prospective Resources conditional upon their satisfying the criteria for discovery and/or development.

FURIE-BANKR_00200223
DA00764



## PETROLEUM RESERVES AND RESOURCES CLASSIFICATION AND DEFINITIONS

Excerpted from the Petroleum Resources Management System Approved by
the Society of Petroleum Engineers (SPE) Board of Directors, March 2007

| Class/Sub-Class | Definition | Guidelines |
|---|---|---|
| Approved for Development | All necessary approvals have been obtained, capital funds have been committed, and implementation of the development project is under way. | At this point, it must be certain that the development project is going ahead. The project must not be subject to any contingencies such as outstanding regulatory approvals or sales contracts. Forecast capital expenditures should be included in the reporting entity's current or following year's approved budget.<br><br>The project "decision gate" is the decision to start investing capital in the construction of production facilities and/or drilling development wells. |
| Justified for Development | Implementation of the development project is justified on the basis of reasonable forecast commercial conditions at the time of reporting, and there are reasonable expectations that all necessary approvals/contracts will be obtained. | In order to move to this level of project maturity, and hence have reserves associated with it, the development project must be commercially viable at the time of reporting, based on the reporting entity's assumptions of future prices, costs, etc. ("forecast case") and the specific circumstances of the project. Evidence of a firm intention to proceed with development within a reasonable time frame will be sufficient to demonstrate commerciality. There should be a development plan in sufficient detail to support the assessment of commerciality and a reasonable expectation that any regulatory approvals or sales contracts required prior to project implementation will be forthcoming. Other than such approvals/contracts, there should be no known contingencies that could preclude the development from proceeding within a reasonable timeframe (see Reserves class).<br><br>The project "decision gate" is the decision by the reporting entity and its partners, if any, that the project has reached a level of technical and commercial maturity sufficient to justify proceeding with development at that point in time. |
| **Contingent Resources** | Those quantities of petroleum estimated, as of a given date, to be potentially recoverable from known accumulations by application of development projects, but which are not currently considered to be commercially recoverable due to one or more contingencies. | Contingent Resources may include, for example, projects for which there are currently no viable markets, or where commercial recovery is dependent on technology under development, or where evaluation of the accumulation is insufficient to clearly assess commerciality. Contingent Resources are further categorized in accordance with the level of certainty associated with the estimates and may be sub-classified based on project maturity and/or characterized by their economic status. |
| Development Pending | A discovered accumulation where project activities are ongoing to justify commercial development in the foreseeable future. | The project is seen to have reasonable potential for eventual commercial development, to the extent that further data acquisition (e.g. drilling, seismic data) and/or evaluations are currently ongoing with a view to confirming that the project is commercially viable and providing the basis for selection of an appropriate development plan. The critical contingencies have been identified and are reasonably expected to be resolved within a reasonable time frame. Note that disappointing appraisal/evaluation results could lead to a re-classification of the project to "On Hold" or "Not Viable" status.<br><br>The project "decision gate" is the decision to undertake further data acquisition and/or studies designed to move the project to a level of technical and commercial maturity at which a decision can be made to proceed with development and production. |
| Development Unclarified or on Hold | A discovered accumulation where project activities are on hold and/or where justification as a commercial development may be subject to significant delay. | The project is seen to have potential for eventual commercial development, but further appraisal/evaluation activities are on hold pending the removal of significant contingencies external to the project, or substantial further appraisal/evaluation activities are required to clarify the potential for eventual commercial development. Development may be subject to a significant time delay. Note that a change in circumstances, such that there is no longer a reasonable expectation that a critical contingency can be removed in the foreseeable future, for example, could lead to a reclassification of the project to "Not Viable" status.<br><br>The project "decision gate" is the decision to either proceed with additional evaluation designed to clarify the potential for eventual commercial development or to temporarily suspend or delay further activities pending resolution of external contingencies. |

FURIE-BANKR_00200224
DA00765

 NETHERLAND, SEWELL & ASSOCIATES, INC.

## PETROLEUM RESERVES AND RESOURCES CLASSIFICATION AND DEFINITIONS
Excerpted from the Petroleum Resources Management System Approved by
the Society of Petroleum Engineers (SPE) Board of Directors, March 2007

| Status | Definition | Guidelines |
|---|---|---|
| Undeveloped Reserves | Undeveloped Reserves are quantities expected to be recovered through future investments: | (1) from new wells on undrilled acreage in known accumulations, (2) from deepening existing wells to a different (but known) reservoir, (3) from infill wells that will increase recovery, or (4) where a relatively large expenditure (e.g. when compared to the cost of drilling a new well) is required to (a) recomplete an existing well or (b) install production or transportation facilities for primary or improved recovery projects. |

### Table 3: Reserves Category Definitions and Guidelines

| Category | Definition | Guidelines |
|---|---|---|
| Proved Reserves | Proved Reserves are those quantities of petroleum, which by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be commercially recoverable, from a given date forward, from known reservoirs and under defined economic conditions, operating methods, and government regulations. | If deterministic methods are used, the term reasonable certainty is intended to express a high degree of confidence that the quantities will be recovered. If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate.

The area of the reservoir considered as Proved includes (1) the area delineated by drilling and defined by fluid contacts, if any, and (2) adjacent undrilled portions of the reservoir that can reasonably be judged as continuous with it and commercially productive on the basis of available geoscience and engineering data.

In the absence of data on fluid contacts, Proved quantities in a reservoir are limited by the lowest known hydrocarbon (LKH) as seen in a well penetration unless otherwise indicated by definitive geoscience, engineering, or performance data. Such definitive information may include pressure gradient analysis and seismic indicators. Seismic data alone may not be sufficient to define fluid contacts for Proved reserves (see "2001 Supplemental Guidelines," Chapter 8).

Reserves in undeveloped locations may be classified as Proved provided that:
• The locations are in undrilled areas of the reservoir that can be judged with reasonable certainty to be commercially productive.
• Interpretations of available geoscience and engineering data indicate with reasonable certainty that the objective formation is laterally continuous with drilled Proved locations.

For Proved Reserves, the recovery efficiency applied to these reservoirs should be defined based on a range of possibilities supported by analogs and sound engineering judgment considering the characteristics of the Proved area and the applied development program. |
| Probable Reserves | Probable Reserves are those additional Reserves which analysis of geoscience and engineering data indicate are less likely to be recovered than Proved Reserves but more certain to be recovered than Possible Reserves. | It is equally likely that actual remaining quantities recovered will be greater than or less than the sum of the estimated Proved plus Probable Reserves (2P). In this context, when probabilistic methods are used, there should be at least a 50% probability that the actual quantities recovered will equal or exceed the 2P estimate.

Probable Reserves may be assigned to areas of a reservoir adjacent to Proved where data control or interpretations of available data are less certain. The interpreted reservoir continuity may not meet the reasonable certainty criteria.

Probable estimates also include incremental recoveries associated with project recovery efficiencies beyond that assumed for Proved. |

FURIE-BANKR_00200225
DA00766



**NETHERLAND, SEWELL & ASSOCIATES, INC.**

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015
TOTAL PROVED RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES OIL MBBL | NGL MBBL | GAS MMCF | NET RESERVES OIL MBBL | NGL MBBL | GAS MMCF | AVERAGE PRICES OIL $/BBL | NGL $/BBL | GAS $/MCF | GROSS REVENUE OIL M$ | NGL M$ | GAS M$ | TOTAL M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0.0 | 0.0 | 4,060.0 | 0.0 | 0.0 | 3,285.0 | 0.000 | 0.000 | 7.010 | 0.0 | 0.0 | 23,027.9 | 23,027.9 |
| 12-31-2017 | 0.0 | 0.0 | 7,560.9 | 0.0 | 0.0 | 5,670.5 | 0.000 | 0.000 | 7.330 | 0.0 | 0.0 | 41,564.4 | 41,564.4 |
| 12-31-2018 | 0.0 | 0.0 | 8,538.8 | 0.0 | 0.0 | 6,452.8 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 48,072.0 | 48,072.0 |
| 12-31-2019 | 0.0 | 0.0 | 10,234.6 | 0.0 | 0.0 | 7,988.2 | 0.000 | 0.000 | 7.690 | 0.0 | 0.0 | 61,428.1 | 61,428.1 |
| 12-31-2020 | 0.0 | 0.0 | 6,561.5 | 0.0 | 0.0 | 5,157.2 | 0.000 | 0.000 | 7.940 | 0.0 | 0.0 | 40,948.2 | 40,948.2 |
| 12-31-2021 | 0.0 | 0.0 | 9,934.5 | 0.0 | 0.0 | 7,470.9 | 0.000 | 0.000 | 8.650 | 0.0 | 0.0 | 64,623.4 | 64,623.4 |
| 12-31-2022 | 0.0 | 0.0 | 7,585.1 | 0.0 | 0.0 | 5,688.9 | 0.000 | 0.000 | 9.140 | 0.0 | 0.0 | 51,996.2 | 51,996.2 |
| 12-31-2023 | 0.0 | 0.0 | 2,338.0 | 0.0 | 0.0 | 1,753.5 | 0.000 | 0.000 | 9.500 | 0.0 | 0.0 | 16,658.3 | 16,658.3 |
| 08-31-2024 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| SUBTOTAL | 0.0 | 0.0 | 58,323.6 | 0.0 | 0.0 | 43,466.7 | 0.000 | 0.000 | 8.013 | 0.0 | 0.0 | 348,319.4 | 348,319.4 |
| REMAINING | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| TOTAL | 0.0 | 0.0 | 58,323.6 | 0.0 | 0.0 | 43,466.7 | 0.000 | 0.000 | 8.013 | 0.0 | 0.0 | 348,319.4 | 348,319.4 |
| CUM PROD | | | 250.0 | | | | | | | | | | |
| ULTIMATE | | | 58,573.6 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | NUMBER OF ACTIVE COMPLETIONS GROSS | NET | TAXES PRODUCTION M$ | AD VALOREM M$ | NET DEDUCTIONS/EXPENDITURES CAPITAL COST M$ | ABDNMNT COST M$ | OPERATING EXPENSE M$ | FUTURE NET REVENUE UNDISCOUNTED PERIOD M$ | CUM M$ | DISC AT 10.000% CUM M$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 2 | 2.0 | 4,038.2 | 0.0 | -88,336.8 | 0.0 | 14,570.0 | 92,758.5 | 92,758.5 | 84,735.6 |
| 12-31-2017 | 2 | 2.0 | 3,345.6 | 0.0 | -42,106.5 | 0.0 | 12,905.9 | 68,021.4 | 160,779.9 | 142,709.8 |
| 12-31-2018 | 4 | 4.0 | 2,653.0 | 0.0 | 11,664.9 | 0.0 | 11,481.7 | 22,872.4 | 183,652.3 | 160,433.2 |
| 12-31-2019 | 3 | 2.0 | 1,969.4 | 0.0 | 0.0 | 0.0 | 13,142.2 | 46,326.5 | 229,978.8 | 193,729.0 |
| 12-31-2020 | 3 | 3.0 | 1,274.2 | 0.0 | 2,416.7 | 0.0 | 13,000.2 | 24,257.1 | 254,236.0 | 208,723.0 |
| 12-31-2021 | 3 | 3.0 | 597.5 | 0.0 | 8,096.3 | 0.0 | 13,121.7 | 42,807.7 | 297,043.7 | 234,738.1 |
| 12-31-2022 | 2 | 2.0 | 6.9 | 0.0 | 0.0 | 0.0 | 12,997.7 | 38,991.5 | 336,035.2 | 255,924.2 |
| 12-31-2023 | 1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7,874.0 | 8,784.3 | 344,819.5 | 260,315.7 |
| 08-31-2024 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 39,489.7 | 0.0 | -39,489.7 | 305,329.8 | 242,958.8 |
| SUBTOTAL | | | 13,675.7 | 0.0 | -108,869.3 | 39,489.7 | 98,493.6 | 305,329.8 | 305,329.8 | 242,958.8 |
| REMAINING | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 305,329.8 | 242,958.8 |
| TOTAL OF 8.7 YRS | | | 13,675.7 | 0.0 | -108,869.3 | 39,489.7 | 98,493.6 | 305,329.8 | 305,329.8 | 242,958.8 |

| PRESENT WORTH PROFILE DISC RATE % | CUM PW M$ |
|---|---|
| 8.000 | 253,680.9 |
| 12.000 | 232,874.3 |
| 15.000 | 219,280.5 |
| 20.000 | 199,333.2 |
| 25.000 | 182,455.4 |
| 30.000 | 168,049.2 |
| 35.000 | 155,551.8 |
| 40.000 | 144,591.9 |
| 45.000 | 135,509.4 |
| 50.000 | 127,244.2 |

BASED ON ESCALATED PRICE AND COST PARAMETERS.

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

Table I

FURIE-BANKR_00200226
DA00767

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015

PROVED DEVELOPED PRODUCING RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA


NETHERLAND, SEWELL & ASSOCIATES, INC.

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES OIL MBBL | GROSS RESERVES NGL MBBL | GROSS RESERVES GAS MMCF | NET RESERVES OIL MBBL | NET RESERVES NGL MBBL | NET RESERVES GAS MMCF | AVERAGE PRICES OIL $/BBL | AVERAGE PRICES NGL $/BBL | AVERAGE PRICES GAS $/MCF | GROSS REVENUE OIL M$ | GROSS REVENUE NGL M$ | GROSS REVENUE GAS M$ | TOTAL M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0.0 | 0.0 | 3,000.0 | 0.0 | 0.0 | 2,475.0 | 0.000 | 0.000 | 7.010 | 0.0 | 0.0 | 17,349.8 | 17,349.8 |
| 12-31-2017 | 0.0 | 0.0 | 2,997.0 | 0.0 | 0.0 | 2,472.5 | 0.000 | 0.000 | 7.330 | 0.0 | 0.0 | 18,123.8 | 18,123.8 |
| 07-31-2018 | 0.0 | 0.0 | 1,354.0 | 0.0 | 0.0 | 1,282.3 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 9,551.1 | 9,551.1 |
| SUBTOTAL | 0.0 | 0.0 | 7,351.0 | 0.0 | 0.0 | 6,229.6 | 0.000 | 0.000 | 7.228 | 0.0 | 0.0 | 45,024.6 | 45,024.6 |
| REMAINING | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| TOTAL | 0.0 | 0.0 | 7,351.0 | 0.0 | 0.0 | 6,229.6 | 0.000 | 0.000 | 7.228 | 0.0 | 0.0 | 45,024.6 | 45,024.6 |
| CUM PROD | 0.0 | 0.0 | 250.0 | | | | | | | | | | |
| ULTIMATE | 0.0 | 0.0 | 7,601.0 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | NUMBER OF ACTIVE COMPLETIONS GROSS | NUMBER OF ACTIVE COMPLETIONS NET | TAXES PRODUCTION M$ | TAXES AD VALOREM M$ | OPERATING EXPENSE M$ | NET DEDUCTIONS/EXPENDITURES CAPITAL COST M$ | NET DEDUCTIONS/EXPENDITURES ABNDMNT COST M$ | FUTURE NET REVENUE UNDISCOUNTED PERIOD M$ | FUTURE NET REVENUE UNDISCOUNTED CUM M$ | DISC AT 10.000% CUM M$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 1 | 1.0 | 4,038.2 | 0.0 | 14,570.0 | -144,033.9 | 0.0 | 142,775.5 | 142,775.5 | 132,303.1 |
| 12-31-2017 | 1 | 1.0 | 3,345.8 | 0.0 | 11,991.7 | 0.0 | 0.0 | 2,786.5 | 145,562.0 | 134,708.7 |
| 07-31-2018 | 1 | 1.0 | 1,547.6 | 0.0 | 6,164.3 | 0.0 | 0.0 | 1,819.2 | 147,381.2 | 136,178.2 |
| SUBTOTAL | | | 8,931.3 | 0.0 | 32,746.1 | -144,033.9 | 0.0 | 147,381.2 | 147,381.2 | 136,178.2 |
| REMAINING | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| TOTAL OF 2.6 YRS | | | 8,931.3 | 0.0 | 32,746.1 | -144,033.9 | 0.0 | 147,381.2 | 147,381.2 | 136,178.2 |

| PRESENT WORTH PROFILE DISC RATE % | CUM PW M$ |
|---|---|
| 8.000 | 138,262.0 |
| 12.000 | 134,159.9 |
| 15.000 | 131,258.0 |
| 20.000 | 126,722.3 |
| 25.000 | 122,524.6 |
| 30.000 | 118,627.2 |
| 35.000 | 114,697.8 |
| 40.000 | 111,608.8 |
| 45.000 | 108,436.3 |
| 50.000 | 105,459.4 |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

Table II



NETHERLAND, SEWELL & ASSOCIATES, INC.

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015
PROVED DEVELOPED NON-PRODUCING RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES OIL MBBL | GROSS RESERVES NGL MBBL | GROSS RESERVES GAS MMCF | NET RESERVES OIL MBBL | NET RESERVES NGL MBBL | NET RESERVES GAS MMCF | AVERAGE PRICES OIL $/BBL | AVERAGE PRICES NGL $/BBL | AVERAGE PRICES GAS $/MCF | GROSS REVENUE OIL M$ | GROSS REVENUE NGL M$ | GROSS REVENUE GAS M$ | GROSS REVENUE TOTAL M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| 12-31-2017 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| 12-31-2018 | 0.0 | 0.0 | 1,092.7 | 0.0 | 0.0 | 901.4 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 8,715.7 | 8,715.7 |
| 12-31-2019 | 0.0 | 0.0 | 4,282.6 | 0.0 | 0.0 | 3,516.6 | 0.000 | 0.000 | 7.680 | 0.0 | 0.0 | 27,042.9 | 27,042.9 |
| 12-31-2020 | 0.0 | 0.0 | 3,147.6 | 0.0 | 0.0 | 2,586.7 | 0.000 | 0.000 | 7.940 | 0.0 | 0.0 | 20,518.1 | 20,518.1 |
| 12-31-2021 | 0.0 | 0.0 | 5,424.0 | 0.0 | 0.0 | 4,098.0 | 0.000 | 0.000 | 6.650 | 0.0 | 0.0 | 35,361.3 | 35,361.3 |
| 12-31-2022 | 0.0 | 0.0 | 5,304.8 | 0.0 | 0.0 | 3,978.6 | 0.000 | 0.000 | 9.140 | 0.0 | 0.0 | 36,364.3 | 36,364.3 |
| 12-31-2023 | 0.0 | 0.0 | 2,338.0 | 0.0 | 0.0 | 1,753.5 | 0.000 | 0.000 | 9.550 | 0.0 | 0.0 | 16,656.3 | 16,656.3 |
| 08-31-2024 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| SUBTOTAL | 0.0 | 0.0 | 21,569.6 | 0.0 | 0.0 | 16,834.9 | 0.000 | 0.000 | 8.480 | 0.0 | 0.0 | 142,760.5 | 142,760.5 |
| REMAINING | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| TOTAL | 0.0 | 0.0 | 21,569.6 | 0.0 | 0.0 | 16,834.9 | 0.000 | 0.000 | 8.480 | 0.0 | 0.0 | 142,760.5 | 142,760.5 |
| CUM PROD | 0.0 | 0.0 | 0.0 | | | | | | | | | | |
| ULTIMATE | 0.0 | 0.0 | 21,569.6 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | ACTIVE COMPLETIONS GROSS | ACTIVE COMPLETIONS NET | TAXES PRODUCTION M$ | TAXES AD VALOREM M$ | CAPITAL COST M$ | ABANDMNT COST M$ | OPERATING EXPENSE M$ | UNDISCOUNTED PERIOD M$ | UNDISCOUNTED CUM M$ | DISC AT 10.000% PERIOD M$ | DISC AT 10.000% CUM M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 12-31-2017 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 12-31-2018 | 1 | 1.0 | 1,105.4 | 0.0 | 5,607.2 | 0.0 | 4,223.1 | -4,220.0 | -4,220.0 | -3,306.3 | -3,306.3 |
| 12-31-2019 | 1 | 1.0 | 1,860.4 | 0.0 | 0.0 | 0.0 | 11,677.6 | 13,404.9 | 9,184.9 | 9,616.6 | 6,310.3 |
| 12-31-2020 | 1 | 1.0 | 1,374.2 | 0.0 | 0.0 | 0.0 | 11,756.2 | 7,607.8 | 16,792.7 | 5,007.1 | 11,317.4 |
| 12-31-2021 | 2 | 2.0 | 597.5 | 0.0 | 8,096.3 | 0.0 | 11,537.6 | 15,129.8 | 31,922.5 | 7,985.7 | 19,303.1 |
| 12-31-2022 | 1 | 1.0 | 6.9 | 0.0 | 0.0 | 0.0 | 11,860.5 | 24,497.0 | 56,419.4 | 13,847.0 | 33,150.1 |
| 12-31-2023 | 1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 7,874.0 | 9,784.3 | 66,203.7 | 4,400.4 | 37,550.5 |
| 08-31-2024 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 38,255.4 | 0.0 | -38,255.4 | 28,948.2 | -16,814.4 | 20,736.1 |
| SUBTOTAL | | | 4,944.4 | 0.0 | 13,703.6 | 38,255.4 | 58,908.9 | | 28,948.2 | | 20,736.1 |
| REMAINING | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 0.0 | | 0.0 |
| TOTAL OF 8.7 YRS | | | 4,944.4 | 0.0 | 13,703.6 | 38,255.4 | 58,908.9 | | 28,948.2 | | 20,736.1 |

PRESENT WORTH PROFILE

| DISC RATE % | CUM FW M$ |
|---|---|
| 8.000 | 22,029.4 |
| 12.000 | 19,475.6 |
| 15.000 | 17,672.7 |
| 20.000 | 14,956.2 |
| 25.000 | 12,823.0 |
| 30.000 | 10,650.4 |
| 35.000 | 9,002.6 |
| 40.000 | 7,826.8 |
| 45.000 | 6,160.9 |
| 50.000 | 5,525.7 |

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

BASED ON ESCALATED PRICE AND COST PARAMETERS

Table III

FURIE-BANKR_00200228
DA00769



**NETHERLAND, SEWELL & ASSOCIATES, INC.**

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015
PROVED UNDEVELOPED RESERVES

SUMMARY: CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES OIL MBBL | GROSS RESERVES NGL MBBL | GROSS RESERVES GAS MMCF | NET RESERVES OIL MBBL | NET RESERVES NGL MBBL | NET RESERVES GAS MMCF | AVERAGE PRICES OIL $/BBL | AVERAGE PRICES NGL $/BBL | AVERAGE PRICES GAS $/MCF | GROSS REVENUE OIL M$ | GROSS REVENUE NGL M$ | GROSS REVENUE GAS M$ | GROSS REVENUE TOTAL M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0.0 | 0.0 | 1,080.0 | 0.0 | 0.0 | 810.0 | 0.000 | 0.000 | 7.010 | 0.0 | 0.0 | 5,678.1 | 5,678.1 |
| 12-31-2017 | 0.0 | 0.0 | 4,203.9 | 0.0 | 0.0 | 3,197.9 | 0.000 | 0.000 | 7.330 | 0.0 | 0.0 | 23,440.7 | 23,440.7 |
| 12-31-2018 | 0.0 | 0.0 | 5,892.2 | 0.0 | 0.0 | 4,269.2 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 31,805.2 | 31,805.2 |
| 12-31-2019 | 0.0 | 0.0 | 5,962.1 | 0.0 | 0.0 | 4,471.6 | 0.000 | 0.000 | 7.690 | 0.0 | 0.0 | 34,386.2 | 34,386.2 |
| 12-31-2020 | 0.0 | 0.0 | 3,414.0 | 0.0 | 0.0 | 2,960.5 | 0.000 | 0.000 | 7.940 | 0.0 | 0.0 | 20,330.1 | 20,330.1 |
| 12-31-2021 | 0.0 | 0.0 | 4,510.5 | 0.0 | 0.0 | 3,362.9 | 0.000 | 0.000 | 8.650 | 0.0 | 0.0 | 29,262.1 | 29,262.1 |
| 12-31-2022 | 0.0 | 0.0 | 2,280.4 | 0.0 | 0.0 | 1,710.3 | 0.000 | 0.000 | 9.140 | 0.0 | 0.0 | 15,631.9 | 15,631.9 |
| 12-31-2023 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| 08-31-2024 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| SUBTOTAL | 0.0 | 0.0 | 27,203.0 | 0.0 | 0.0 | 20,402.3 | 0.000 | 0.000 | 7.868 | 0.0 | 0.0 | 160,534.2 | 160,534.2 |
| REMAINING | 0.0 | 0.0 | 0.0 | | | | 0.000 | 0.000 | 0.000 | | | 0.0 | 0.0 |
| TOTAL | 0.0 | 0.0 | 27,203.0 | 0.0 | 0.0 | 20,402.3 | 0.000 | 0.000 | 7.868 | 0.0 | 0.0 | 160,534.2 | 160,534.2 |
| CUM PROD | 0.0 | 0.0 | 0.0 | | | | | | | | | | |
| ULTIMATE | 0.0 | 0.0 | 27,203.0 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | NUMBER OF ACTIVE COMPLETIONS GROSS | NUMBER OF ACTIVE COMPLETIONS NET | TAXES PRODUCTION M$ | TAXES AD VALOREM M$ | NET DEDUCTIONS/EXPENDITURES CAPITAL COST M$ | ABANDONT COST M$ | OPERATING EXPENSE M$ | FUTURE NET REVENUE UNDISCOUNTED PERIOD M$ | FUTURE NET REVENUE UNDISCOUNTED CUM M$ | DISC AT 10.000% CUM M$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 1 | 1.0 | 0.0 | 0.0 | 55,895.1 | 0.0 | 0.0 | -50,017.0 | -50,017.0 | -47,567.5 |
| 12-31-2017 | 1 | 1.0 | 0.0 | 0.0 | -42,109.5 | 0.0 | 314.2 | 65,234.9 | 15,217.9 | 8,004.0 |
| 12-31-2018 | 2 | 2.0 | 0.0 | 0.0 | 5,457.7 | 0.0 | 1,074.3 | 25,273.2 | 40,491.1 | 27,563.4 |
| 12-31-2019 | 1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,484.6 | 32,921.6 | 73,412.7 | 51,239.5 |
| 12-31-2020 | 2 | 2.0 | 0.0 | 0.0 | 2,416.7 | 0.0 | 1,204.1 | 18,640.4 | 90,059.1 | 62,234.5 |
| 12-31-2021 | 1 | 2.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,584.1 | 27,677.9 | 117,740.0 | 79,659.8 |
| 12-31-2022 | 1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,137.3 | 14,494.6 | 132,234.6 | 88,388.0 |
| 12-31-2023 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 132,234.6 | 88,389.0 |
| 08-31-2024 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,234.2 | 0.0 | -1,234.2 | 131,000.4 | 86,046.6 |
| SUBTOTAL | | | 0.0 | 0.0 | 21,451.0 | 1,234.2 | 6,838.6 | 131,000.4 | 131,000.4 | 86,046.6 |
| REMAINING | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 131,000.4 | 86,046.6 |
| TOTAL OF 8.7 YRS | | | 0.0 | 0.0 | 21,451.0 | 1,234.2 | 6,838.6 | 131,000.4 | 131,000.4 | 86,046.6 |

PRESENT WORTH PROFILE

| DISC RATE % | CUM PW M$ |
|---|---|
| 8.000 | 93,395.5 |
| 12.000 | 79,336.8 |
| 15.000 | 70,329.8 |
| 20.000 | 57,654.7 |
| 25.000 | 47,307.8 |
| 30.000 | 38,766.5 |
| 35.000 | 31,651.4 |
| 40.000 | 25,662.3 |
| 45.000 | 20,592.3 |
| 50.000 | 16,259.1 |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

Table IV

NSAI **NETHERLAND, SEWELL & ASSOCIATES, INC.**

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015
PROBABLE RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES OIL MBBL | GROSS RESERVES NGL MBBL | GROSS RESERVES GAS MMCF | NET RESERVES OIL MBBL | NET RESERVES NGL MBBL | NET RESERVES GAS MMCF | AVERAGE PRICES OIL $/BBL | AVERAGE PRICES NGL $/BBL | AVERAGE PRICES GAS $/MCF | GROSS REVENUE OIL M$ | GROSS REVENUE NGL M$ | GROSS REVENUE GAS M$ | GROSS REVENUE TOTAL M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 0.0 | 0.0 | 2,070.0 | 0.0 | 0.0 | 1,592.5 | 0.000 | 0.000 | 7.010 | 0.0 | 0.0 | 10,883.0 | 10,883.0 |
| 12-31-2017 | 0.0 | 0.0 | 6,964.5 | 0.0 | 0.0 | 5,223.6 | 0.000 | 0.000 | 7.330 | 0.0 | 0.0 | 38,288.7 | 38,288.7 |
| 12-31-2018 | 0.0 | 0.0 | 3,659.1 | 0.0 | 0.0 | 2,782.2 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 20,561.9 | 20,561.9 |
| 12-31-2019 | 0.0 | 0.0 | 12,522.2 | 0.0 | 0.0 | 9,338.0 | 0.000 | 0.000 | 7.690 | 0.0 | 0.0 | 71,609.3 | 71,609.3 |
| 12-31-2020 | 0.0 | 0.0 | 15,140.8 | 0.0 | 0.0 | 11,451.3 | 0.000 | 0.000 | 7.940 | 0.0 | 0.0 | 90,923.1 | 90,923.1 |
| 12-31-2021 | 0.0 | 0.0 | 4,493.5 | 0.0 | 0.0 | 3,573.1 | 0.000 | 0.000 | 8.650 | 0.0 | 0.0 | 30,906.9 | 30,906.9 |
| 12-31-2022 | 0.0 | 0.0 | 7,913.2 | 0.0 | 0.0 | 5,969.0 | 0.000 | 0.000 | 9.140 | 0.0 | 0.0 | 54,557.1 | 54,557.1 |
| 12-31-2023 | 0.0 | 0.0 | 22,382.6 | 0.0 | 0.0 | 16,786.9 | 0.000 | 0.000 | 9.500 | 0.0 | 0.0 | 159,475.9 | 159,475.9 |
| 12-31-2024 | 0.0 | 0.0 | 19,307.3 | 0.0 | 0.0 | 14,953.0 | 0.000 | 0.000 | 8.677 | 0.0 | 0.0 | 144,704.7 | 144,704.7 |
| 12-31-2025 | 0.0 | 0.0 | 14,229.2 | 0.0 | 0.0 | 10,036.6 | 0.000 | 0.000 | 10.062 | 0.0 | 0.0 | 100,715.3 | 100,715.3 |
| 12-31-2026 | 0.0 | 0.0 | 7,136.3 | 0.0 | 0.0 | 4,231.8 | 0.000 | 0.000 | 10.460 | 0.0 | 0.0 | 44,769.2 | 44,769.2 |
| 12-31-2027 | 0.0 | 0.0 | 4,490.6 | 0.0 | 0.0 | 2,864.3 | 0.000 | 0.000 | 10.865 | 0.0 | 0.0 | 29,326.6 | 29,326.6 |
| 12-31-2028 | 0.0 | 0.0 | 2,918.9 | 0.0 | 0.0 | 1,791.3 | 0.000 | 0.000 | 11.320 | 0.0 | 0.0 | 19,824.8 | 19,824.8 |
| 12-31-2029 | 0.0 | 0.0 | 375.6 | 0.0 | 0.0 | 225.3 | 0.000 | 0.000 | 11.597 | 0.0 | 0.0 | 2,613.2 | 2,613.2 |
| 02-28-2030 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| SUBTOTAL | 0.0 | 0.0 | 124,233.8 | 0.0 | 0.0 | 90,572.5 | 0.000 | 0.000 | 9.047 | 0.0 | 0.0 | 819,399.8 | 819,399.8 |
| REMAINING | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 0.0 | 0.0 |
| TOTAL | 0.0 | 0.0 | 124,233.8 | 0.0 | 0.0 | 90,572.5 | 0.000 | 0.000 | 9.047 | 0.0 | 0.0 | 819,399.8 | 819,399.8 |
| CUM PROD | 0.0 | 0.0 | 0.0 | | | | | | | | | | |
| ULTIMATE | 0.0 | 0.0 | 124,233.8 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | ACTIVE COMPLETIONS GROSS | ACTIVE COMPLETIONS NET | TAXES PRODUCTION M$ | TAXES AD VALOREM M$ | CAPITAL COST M$ | ABDNMENT COST M$ | OPERATING EXPENSE M$ | FNR UNDISCOUNTED PERIOD M$ | FNR UNDISCOUNTED CUM M$ | FNR DISC AT 10.000% CUM M$ |
|---|---|---|---|---|---|---|---|---|---|---|
| 12-31-2016 | 1 | 1.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 10,883.0 | 10,883.0 | 10,012.4 |
| 12-31-2017 | 1 | 1.0 | 44.6 | 0.0 | 24,603.7 | 0.0 | 314.2 | 13,326.2 | 24,209.2 | 21,977.7 |
| 12-31-2018 | 1 | 1.3 | 38.2 | 0.0 | -16,706.5 | 0.0 | 1,206.1 | 35,961.1 | 60,170.3 | 50,131.5 |
| 12-31-2019 | 2 | 1.6 | 31.9 | 0.0 | 5,745.8 | 0.0 | 1,220.9 | 64,810.7 | 124,991.1 | 98,253.9 |
| 12-31-2020 | 0 | 0.2 | 25.5 | 0.0 | -2,416.7 | 0.0 | 1,782.4 | 91,531.9 | 216,513.0 | 155,914.1 |
| 12-31-2021 | 1 | 0.8 | 19.1 | 0.0 | -8,096.3 | 0.0 | 1,643.6 | 37,140.5 | 253,653.5 | 178,439.9 |
| 12-31-2022 | 3 | 3.2 | 12.7 | 0.0 | 17,517.0 | 0.0 | 1,320.8 | 35,703.6 | 289,360.0 | 199,897.8 |
| 12-31-2023 | 2 | 2.3 | 6.4 | 0.0 | 0.0 | 0.0 | 7,479.2 | 151,960.3 | 441,350.4 | 271,282.2 |
| 12-31-2024 | 3 | 3.0 | 47,822.5 | 0.0 | 0.0 | -39,489.7 | 15,115.2 | 121,416.7 | 562,767.1 | 325,222.8 |
| 12-31-2025 | 2 | 1.9 | 36,871.8 | 0.0 | 0.0 | 0.0 | 12,888.2 | 50,855.2 | 613,622.3 | 345,847.2 |
| 12-31-2026 | 2 | 1.6 | 14,884.8 | 0.0 | 0.0 | 0.0 | 9,651.8 | 20,102.6 | 633,724.9 | 353,287.7 |
| 12-31-2027 | 1 | 0.8 | 9,849.2 | 0.0 | 0.0 | 0.0 | 9,773.9 | 9,703.6 | 643,428.5 | 356,592.1 |
| 12-31-2028 | 1 | 0.8 | 6,705.4 | 0.0 | 0.0 | 0.0 | 9,838.1 | 3,261.3 | 646,709.8 | 357,561.9 |
| 12-31-2029 | 1 | 0.8 | 587.9 | 0.0 | 0.0 | 0.0 | 1,646.1 | 79.2 | 646,789.0 | 357,584.7 |
| 02-28-2030 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 40,422.5 | 0.0 | -40,422.5 | 606,366.5 | 347,068.3 |
| SUBTOTAL | | | 117,000.1 | 0.0 | 20,646.9 | 932.8 | 74,453.5 | 606,366.5 | 606,366.5 | 347,068.3 |
| REMAINING | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | 347,068.3 |
| TOTAL OF 14.2 YRS | | | 117,000.1 | 0.0 | 20,646.9 | 932.8 | 74,453.5 | 606,366.5 | 606,366.5 | 347,068.3 |

PRESENT WORTH PROFILE

| DISC RATE % | CUM PW M$ |
|---|---|
| 8.000 | 395,328.0 |
| 12.000 | 313,661.3 |
| 15.000 | 271,227.9 |
| 20.000 | 216,300.3 |
| 25.000 | 175,770.6 |
| 30.000 | 145,317.4 |
| 35.000 | 122,035.5 |
| 40.000 | 103,843.0 |
| 45.000 | 89,666.2 |
| 50.000 | 78,339.2 |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

Table V

FURIE-BANKR_00200230
DA00771