# NSAI NETHERLAND, SEWELL & ASSOCIATES, INC.

SUMMARY PROJECTION OF RESERVES AND REVENUE
AS OF DECEMBER 31, 2015
POSSIBLE RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| PERIOD ENDING M-D-Y | GROSS RESERVES | | | NET RESERVES | | | AVERAGE PRICES | | | GROSS REVENUE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OIL MBBL | NGL MBBL | GAS MMCF | OIL MBBL | NGL MBBL | GAS MMCF | OIL $/BBL | NGL $/BBL | GAS $/MCF | OIL M$ | NGL M$ | GAS M$ | TOTAL M$ |
| 12-31-2016 | 0.0 | 0.0 | 1,554.5 | 0.0 | 0.0 | 1,161.2 | 0.000 | 0.000 | 7.010 | 0.0 | 0.0 | 8,280.4 | 8,280.4 |
| 12-31-2017 | 0.0 | 0.0 | 7,249.7 | 0.0 | 0.0 | 5,485.1 | 0.000 | 0.000 | 7.330 | 0.0 | 0.0 | 40,176.7 | 40,176.7 |
| 12-31-2018 | 0.0 | 0.0 | 5,696.7 | 0.0 | 0.0 | 4,334.9 | 0.000 | 0.000 | 7.450 | 0.0 | 0.0 | 32,399.0 | 32,399.0 |
| 12-31-2019 | 0.0 | 0.0 | 3,053.1 | 0.0 | 0.0 | 2,338.8 | 0.000 | 0.000 | 7.690 | 0.0 | 0.0 | 17,985.5 | 17,985.5 |
| 12-31-2020 | 0.0 | 0.0 | 3,945.0 | 0.0 | 0.0 | 2,930.5 | 0.000 | 0.000 | 7.940 | 0.0 | 0.0 | 23,268.2 | 23,268.2 |
| 12-31-2021 | 0.0 | 0.0 | 10,465.8 | 0.0 | 0.0 | 7,874.3 | 0.000 | 0.000 | 8.650 | 0.0 | 0.0 | 68,112.5 | 68,112.5 |
| 12-31-2022 | 0.0 | 0.0 | 8,499.7 | 0.0 | 0.0 | 6,692.0 | 0.000 | 0.000 | 9.140 | 0.0 | 0.0 | 61,165.2 | 61,165.2 |
| 12-31-2023 | 0.0 | 0.0 | -2,744.2 | 0.0 | 0.0 | -1,880.1 | 0.000 | 0.000 | 9.500 | 0.0 | 0.0 | -17,860.5 | -17,860.5 |
| 12-31-2024 | 0.0 | 0.0 | 3,824.8 | 0.0 | 0.0 | -685.7 | 0.000 | 0.000 | 9.504 | 0.0 | 0.0 | -6,611.8 | -6,611.8 |
| 12-31-2025 | 0.0 | 0.0 | 567.6 | 0.0 | 0.0 | -1,131.5 | 0.000 | 0.000 | 10.054 | 0.0 | 0.0 | -11,376.2 | -11,376.2 |
| 12-31-2026 | 0.0 | 0.0 | 9,718.4 | 0.0 | 0.0 | 5,831.1 | 0.000 | 0.000 | 10.304 | 0.0 | 0.0 | 61,458.5 | 61,458.5 |
| 12-31-2027 | 0.0 | 0.0 | 16,809.4 | 0.0 | 0.0 | 10,136.7 | 0.000 | 0.000 | 10.904 | 0.0 | 0.0 | 109,971.5 | 109,971.5 |
| 12-31-2028 | 0.0 | 0.0 | 17,381.1 | 0.0 | 0.0 | 10,429.7 | 0.000 | 0.000 | 11.332 | 0.0 | 0.0 | 119,172.6 | 119,172.6 |
| 12-31-2029 | 0.0 | 0.0 | 16,046.2 | 0.0 | 0.0 | 9,627.7 | 0.000 | 0.000 | 11.782 | 0.0 | 0.0 | 113,432.7 | 113,432.7 |
| 12-31-2090 | 0.0 | 0.0 | 10,797.7 | 0.0 | 0.0 | 6,476.6 | 0.000 | 0.000 | 12.238 | 0.0 | 0.0 | 79,284.3 | 79,284.3 |
| SUBTOTAL | 0.0 | 0.0 | 112,855.5 | 0.0 | 0.0 | 69,591.3 | | | 10.028 | 0.0 | 0.0 | 697,858.5 | 697,858.5 |
| REMAINING | 0.0 | 0.0 | 4,303.7 | 0.0 | 0.0 | 2,582.2 | | | 12.687 | 0.0 | 0.0 | 33,275.9 | 33,275.9 |
| TOTAL | 0.0 | 0.0 | 117,159.2 | 0.0 | 0.0 | 72,173.5 | | | 10.130 | 0.0 | 0.0 | 731,134.4 | 731,134.4 |
| CUM PROD | 0.0 | 0.0 | 1.2 | | | | | | | | | | |
| ULTIMATE | 0.0 | 0.0 | 117,160.4 | | | | | | | | | | |

| PERIOD ENDING M-D-Y | NUMBER OF ACTIVE COMPLETIONS | | TAXES | | CAPITAL COST M$ | ABANDONMENT COST M$ | OPERATING EXPENSE M$ | FUTURE NET REVENUE | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | GROSS | NET | PRODUCTION M$ | AD VALOREM M$ | | | | UNDISCOUNTED PERIOD M$ | CUM M$ | DISC AT 10.000% CUM M$ |
| 12-31-2016 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8,280.4 | 8,280.4 | 7,642.4 |
| 12-31-2017 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 40,176.7 | 48,457.1 | 42,330.9 |
| 12-31-2018 | -2 | -1.6 | 0.0 | 0.0 | 63.1 | 0.0 | -0.6 | 32,336.6 | 80,793.7 | 66,523.8 |
| 12-31-2019 | 0 | -0.3 | 0.0 | 0.0 | -5,745.9 | 0.0 | 243.7 | 23,467.5 | 104,281.3 | 85,584.5 |
| 12-31-2020 | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23,268.2 | 127,549.4 | 100,539.6 |
| 12-31-2021 | 0 | 0.0 | 0.0 | 0.0 | -11,098.7 | 0.0 | 565.2 | 71,696.6 | 199,246.0 | 140,712.7 |
| 12-31-2022 | -1 | -0.5 | 0.0 | 0.0 | 9,282.9 | 0.0 | -556.4 | -26,587.0 | 172,659.0 | 127,727.2 |
| 12-31-2023 | 1 | 1.5 | 0.0 | 0.0 | 0.0 | 0.0 | -2,708.1 | -9,573.3 | 163,085.7 | 123,085.5 |
| 12-31-2024 | -1 | -0.4 | 5,669.7 | 0.0 | 0.0 | 0.0 | -1,637.4 | -7,007.1 | 156,078.6 | 119,078.9 |
| 12-31-2025 | 1 | 0.5 | -2,711.6 | 0.0 | 7,950.8 | 0.0 | 1,196.2 | 37,779.4 | 193,858.0 | 134,439.6 |
| 12-31-2026 | 2 | 1.4 | 14,530.1 | 0.0 | 0.0 | 0.0 | 1,603.6 | 73,496.6 | 267,354.6 | 158,994.5 |
| 12-31-2027 | 1 | 0.8 | 34,961.3 | 0.0 | 0.0 | 0.0 | 1,657.7 | 78,802.7 | 346,157.3 | 181,941.6 |
| 12-31-2028 | 1 | 0.8 | 37,802.2 | 0.0 | 0.0 | 0.0 | 9,993.1 | 70,951.9 | 417,109.2 | 197,172.5 |
| 12-31-2029 | 2 | 1.5 | 32,487.7 | 0.0 | 0.0 | 0.0 | 11,689.1 | 64,936.0 | 482,045.2 | 221,166.5 |
| 12-31-2030 | 2 | 1.9 | 23,081.7 | 0.0 | 0.0 | 0.0 | 11,689.1 | 84,936.0 | 570,169.7 | 240,807.2 |
| SUBTOTAL | | | 145,623.1 | 0.0 | 452.4 | -40,422.5 | 22,235.9 | 570,189.7 | | 262,568.3 |
| REMAINING | | | 8,851.5 | 0.0 | 0.0 | 46,522.0 | 17,630.1 | -39,727.8 | | -7,058.3 |
| TOTAL OF 17.7 YRS | | | 154,474.6 | 0.0 | 452.4 | 6,099.6 | 39,866.0 | 530,441.9 | | 255,510.0 |

PRESENT WORTH PROFILE

| DISC RATE % | CUM PW M$ |
|---|---|
| 8.000 | 290,258.6 |
| 12.000 | 226,836.1 |
| 15.000 | 192,569.6 |
| 20.000 | 151,782.2 |
| 25.000 | 124,685.5 |
| 30.000 | 104,439.6 |
| 35.000 | 88,946.4 |
| 40.000 | 78,861.5 |
| 45.000 | 70,182.0 |
| 50.000 | 63,170.7 |

BASED ON ESCALATED PRICE AND COST PARAMETERS.

*All estimates and exhibits herein are a part of this NSAI report and are subject to its parameters and conditions.*

Table VI

FURIE-BANKR_00200231
DA00772

**NETHERLAND, SEWELL & ASSOCIATES, INC.**

COMPANY INTEREST

RESERVES AND ECONOMICS
AS OF DECEMBER 31, 2018

PROVED DEVELOPED PRODUCING RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

| LEASE NUMBER | LEASE NAME | GROSS RESERVES OIL MBBL | NGL MBBL | GAS MMCF | NET RESERVES OIL MBBL | NGL MBBL | GAS MMCF | GROSS REVENUE OIL M$ | NGL M$ | GAS M$ | TOTAL TAXES M$ | NET CAP COST M$ | ABDNMNT COST M$ | OPERATING EXPENSE M$ | NET REVENUE M$ | CUM P.W. 10.000% M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | KITCHEN LIGHTS UNT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | |
| 500003 | KLU3-4172 | 0.0 | 0.0 | 7,551.0 | 0.0 | 0.0 | 6,229.8 | 0.0 | 0.0 | 45,024.6 | 0.0 | 3,044.6 | 0.0 | 1,049.0 | 40,931.0 | 36,251.2 |
| 900001 | GAS STORAGE EXP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,470.0 | -1,470.0 | -1,429.9 |
| 800000 | ACES TAX CRED PDP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -147,078.5 | 0.0 | 0.0 | 147,078.5 | 138,398.2 |
| 800003 | AD VAL TAX PDP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 8,931.3 | 0.0 | 0.0 | 0.0 | -8,931.3 | -7,996.7 |
| 800006 | AX PROD TAX PDP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800009 | FIXED EXPENSE PDP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 30,227.0 | -30,227.0 | -27,037.6 |
| | FIELD TOTAL | 0.0 | 0.0 | 7,551.0 | 0.0 | 0.0 | 6,229.6 | 0.0 | 0.0 | 45,024.6 | 8,931.3 | -144,033.9 | 0.0 | 32,746.1 | 147,381.2 | 136,176.2 |
| | TOTAL ALASKA | 0.0 | 0.0 | 7,551.0 | 0.0 | 0.0 | 6,229.6 | 0.0 | 0.0 | 45,024.6 | 8,931.3 | -144,033.9 | 0.0 | 32,746.1 | 147,381.2 | 136,176.2 |
| | TOTAL ALL LEASES | 0.0 | 0.0 | 7,551.0 | 0.0 | 0.0 | 6,229.6 | 0.0 | 0.0 | 45,024.6 | 8,931.3 | -144,033.9 | 0.0 | 32,746.1 | 147,381.2 | 136,176.2 |

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

BASED ON ESCALATED PRICE AND COST PARAMETERS

Page 1

NETHERLAND, SEWELL & ASSOCIATES, INC.

COMPANY INTEREST

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

BASIC DATA
AS OF DECEMBER 31, 2015
PROVED DEVELOPED PRODUCING RESERVES

| LEASE NUMBER | LEASE NAME | ACTIVE COMPLTNS OIL | ACTIVE COMPLTNS GAS | GROSS ULTIMATE OIL MBBL | GROSS ULTIMATE GAS MMCF | WORKING INTEREST START | WORKING INTEREST END | REVENUE INTEREST START | REVENUE INTEREST END | OIL $/BBL START | OIL $/BBL END | NGL $/BBL START | NGL $/BBL END | GAS $/MCF START | GAS $/MCF END | GROSS OPERATING EXPENSE M$/M START | GROSS OPERATING EXPENSE M$/M END | LIFE YRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ALASKA | | | | | | | | |
| KITCHEN LIGHTS UNT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | | | | |
| 000003 | KLU3 4172 | 0 | 1 | 0.0 | 7,801.0 | 100.000 | 100.000 | 82.500 | 82.500 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 107.5 | 2.6 |
| 900001 | GAS STORAGE EXP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 210.0 | 210.0 | 0.6 |
| 900000 | ACES TAX CRED PDP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 2.6 |
| 900003 | AD VAL TAX PDP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 2.6 |
| 800006 | AK PROD TAX PDP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 2.6 |
| 800009 | FIXED EXPENSE PDP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 1,190.0 | 778.5 | 2.5 |
| | FIELD TOTAL | 0 | 1 | 0.0 | 7,801.0 | | | | | | | | | | | | | |
| | TOTAL ALASKA | 0 | 1 | 0.0 | 7,801.0 | | | | | | | | | | | | | |
| | TOTAL ALL LEASES | 0 | 1 | 0.0 | 7,801.0 | | | | | | | | | | | | | |

All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.

BASED ON ESCALATED PRICE AND COST PARAMETERS

Page 2

FURIE-BANKR_00200233
DA00774

**NSAI** NETHERLAND, SEWELL & ASSOCIATES, INC.

RESERVES AND ECONOMICS
AS OF DECEMBER 31, 2015

PROVED DEVELOPED NON-PRODUCING RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| LEASE NUMBER | LEASE NAME | GROSS RESERVES | | | NET RESERVES | | | GROSS REVENUE | | | TOTAL TAXES M$ | NET CAP COST M$ | ABANDMNT COST M$ | OPERATING EXPENSE M$ | NET REVENUE M$ | CUM P.W. 10.000% M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OIL MBBL | NGL MBBL | GAS MMCF | OIL MBBL | NGL MBBL | GAS MMCF | OIL M$ | NGL M$ | GAS M$ | | | | | | |
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | |
| 000001 | KLU3 5990-6060 BP | 0.0 | 0.0 | 8,769.6 | 0.0 | 0.0 | 7,234.9 | 0.0 | 0.0 | 56,090.5 | 0.0 | 5,607.2 | 0.0 | 3,465.2 | 47,188.1 | 32,422.5 |
| 000004 | KLU3 4018 BP | 0.0 | 0.0 | 12,800.0 | 0.0 | 0.0 | 9,600.0 | 0.0 | 0.0 | 86,480.0 | 0.0 | 8,096.3 | 0.0 | 3,870.7 | 74,513.0 | 40,455.9 |
| 800017 | AD VAL TAX PDNP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 4,944.4 | 0.0 | 0.0 | 0.0 | -4,944.4 | -3,459.6 |
| 800020 | AK FIXD TAX PDNP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800015 | FIXED EXPENSE PDNP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 51,555.0 | -51,555.0 | -31,888.1 |
| 800012 | ABANDONMENT PDNP | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 38,255.4 | 0.0 | -38,255.4 | -16,814.4 |
| | FIELD TOTAL | 0.0 | 0.0 | 21,569.6 | 0.0 | 0.0 | 16,834.9 | 0.0 | 0.0 | 142,760.5 | 4,944.4 | 13,703.6 | 38,255.4 | 58,908.9 | 26,948.2 | 20,736.1 |
| | TOTAL ALASKA | 0.0 | 0.0 | 21,569.6 | 0.0 | 0.0 | 16,834.9 | 0.0 | 0.0 | 142,760.5 | 4,944.4 | 13,703.6 | 38,255.4 | 58,908.9 | 26,948.2 | 20,736.1 |
| | TOTAL ALL LEASES | 0.0 | 0.0 | 21,569.6 | 0.0 | 0.0 | 16,834.9 | 0.0 | 0.0 | 142,760.5 | 4,944.4 | 13,703.6 | 38,255.4 | 58,908.9 | 26,948.2 | 20,736.1 |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

FURIE-BANKR_00200234
DA00775

**NETHERLAND, SEWELL & ASSOCIATES, INC.**

COMPANY INTEREST

BASIC DATA
AS OF DECEMBER 31, 2015
PROVED DEVELOPED NON-PRODUCING RESERVES

SUMMARY, CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

| LEASE NUMBER | LEASE NAME | ACTIVE COMPLTNS OIL | GAS | GROSS ULTIMATE OIL MBBL | GAS MMCF | WORKING INTEREST START | END | REVENUE INTEREST START | END | OIL $/BBL START | END | NGL $/BBL START | END | GAS $/MCF START | END | GROSS OPERATING EXPENSE M$/M START | END | LIFE YRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | ALASKA | | | | | | | | | | | | | | | | | |
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | | | |
| 000001 | KLU3 3990-6980 BP | 0 | 1 | 0.0 | 8,769.6 | 100.000 | 100.000 | 82.500 | 82.500 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 8.650 | 0.0 | 130.1 | 5.1 |
| 000004 | KLU3 4018 BP | 0 | 1 | 0.0 | 12,800.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.500 | 0.0 | 143.5 | 7.6 |
| 800017 | AD VAL TAX PDNP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 7.7 |
| 800020 | AK FROD TAX PDNP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 7.7 |
| 800015 | FIXED EXPENSE PDNP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 1,130.0 | 651.1 | 7.7 |
| 800012 | ABANDONMENT PDNP | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 8.7 |
| | FIELD TOTAL | 0 | 2 | 0.0 | 21,569.6 | | | | | | | | | | | | | |
| | TOTAL ALASKA | 0 | 2 | 0.0 | 21,569.6 | | | | | | | | | | | | | |
| | TOTAL ALL LEASES | 0 | 2 | 0.0 | 21,569.6 | | | | | | | | | | | | | |

All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.

BASED ON ESCALATED PRICE AND COST PARAMETERS

FURIE-BANKR_00200235
DA00776

**NETHERLAND, SEWELL & ASSOCIATES, INC.**

RESERVES AND ECONOMICS
AS OF DECEMBER 31, 2015
PROVED UNDEVELOPED RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| LEASE NUMBER | LEASE NAME | GROSS RESERVES | | | NET RESERVES | | | GROSS REVENUE | | | TOTAL TAXES | NET CAP COST | ABANDONMENT COST | OPERATING EXPENSE | NET REVENUE | CUM P.W. 10.000% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OIL MBBL | NGL MBBL | GAS MMCF | OIL MBBL | NGL MBBL | GAS MMCF | OIL M$ | NGL M$ | GAS M$ | M$ | M$ | M$ | M$ | M$ | M$ |
| | KITCHEN LIGHTS UNT FIELD, COOK INLET COUNTY | | | | | | | ALASKA | | | | | | | | |
| 000005 | KLU 2A | 0.0 | 0.0 | 6,064.0 | 0.0 | 0.0 | 4,548.0 | 0.0 | 0.0 | 33,142.5 | 0.0 | 53,912.5 | 0.0 | 555.2 | -21,326.3 | -22,632.3 |
| 000006 | KLU 2A BP1 | 0.0 | 0.0 | 14,108.0 | 0.0 | 0.0 | 10,581.0 | 0.0 | 0.0 | 81,080.0 | 0.0 | 5,457.7 | 0.0 | 3,483.4 | 72,168.9 | 51,822.2 |
| 000007 | KLU 2A BP2 | 0.0 | 0.0 | 7,031.0 | 0.0 | 0.0 | 5,273.3 | 0.0 | 0.0 | 46,323.8 | 0.0 | 2,415.7 | 0.0 | 2,799.0 | 41,168.1 | 23,665.9 |
| 900000 | CAPITAL FACILITY | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,782.6 | 0.0 | 0.0 | -1,782.6 | -1,766.1 |
| 800019 | ACES TAX CRED PUD | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -42,108.5 | 0.0 | 0.0 | 42,108.5 | 35,498.3 |
| 800018 | AD VAL TAX PUD | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800021 | AK PROD TAX PUD | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800016 | FIXED EXPENSE PUD | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800030 | ABANDONMENT PUD | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 1,234.2 | 0.0 | -1,234.2 | -542.5 |
| | FIELD TOTAL | 0.0 | 0.0 | 27,203.0 | 0.0 | 0.0 | 20,402.3 | 0.0 | 0.0 | 160,534.2 | 0.0 | 21,461.0 | 1,234.2 | 6,838.6 | 131,000.4 | 86,046.6 |
| | TOTAL ALASKA | 0.0 | 0.0 | 27,203.0 | 0.0 | 0.0 | 20,402.3 | 0.0 | 0.0 | 160,534.2 | 0.0 | 21,461.0 | 1,234.2 | 6,838.6 | 131,000.4 | 86,046.6 |
| | TOTAL ALL LEASES | 0.0 | 0.0 | 27,203.0 | 0.0 | 0.0 | 20,402.3 | 0.0 | 0.0 | 160,534.2 | 0.0 | 21,461.0 | 1,234.2 | 6,838.6 | 131,000.4 | 86,046.6 |

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

BASED ON ESCALATED PRICE AND COST PARAMETERS

FURIE-BANKR_00200236
DA00777

**NETHERLAND, SEWELL & ASSOCIATES, INC.**

COMPANY INTEREST

BASIC DATA
AS OF DECEMBER 31, 2016
PROVED UNDEVELOPED RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

| LEASE NUMBER | LEASE NAME | ACTIVE COMPLTNS | | GROSS ULTIMATE | | WORKING INTEREST | | REVENUE INTEREST | | OIL $/BBL | | NGL $/BBL | | GAS $/MCF | | GROSS OPERATING EXPENSE M$/M | | LIFE YRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OIL | GAS | OIL MBBL | GAS MMCF | START | END | START | END | START | END | START | END | START | END | START | END | |
| KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | | | |
| 000005 | KLU 2A | 0 | 1 | 0.0 | 6,084.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 106.1 | 2.2 |
| 050006 | KLU 2A BP1 | 0 | 1 | 0.0 | 14,168.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.340 | 0.0 | 128.4 | 4.8 |
| 030007 | KLU 2A BP2 | 0 | 1 | 0.0 | 7,031.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.140 | 0.0 | 138.4 | 6.7 |
| 800000 | CAPITAL FACILITY | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 1.0 |
| 800019 | ACES TAX CRED PUD | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 1.8 |
| 890018 | AD VAL TAX PUD | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 7.7 |
| 820021 | AK PROD TAX PUD | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 7.7 |
| 800016 | FIXED EXPENSE PUD | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 1,530.0 | 851.1 | 7.7 |
| 800030 | ABANDONMENT PUD | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 6.7 |
| | FIELD TOTAL | 0 | 3 | 0.0 | 27,263.0 | | | | | | | | | | | | | |
| | TOTAL ALASKA | 0 | 3 | 0.0 | 27,263.0 | | | | | | | | | | | | | |
| | TOTAL ALL LEASES | 0 | 3 | 0.0 | 27,263.0 | | | | | | | | | | | | | |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

FURIE-BANKR_00200237
DA00778

RESERVES AND ECONOMICS
AS OF DECEMBER 31, 2015

PROBABLE RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST

| LEASE NUMBER | LEASE NAME | GROSS RESERVES | | | NET RESERVES | | | GROSS REVENUE | | | TOTAL TAXES M$ | NET CAP COST M$ | ABDNMNT COST M$ | OPERATING EXPENSE M$ | NET REVENUE M$ | CUM P.W. 10.000% M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OIL MBBL | NGL MBBL | GAS MMCF | OIL MBBL | NGL MBBL | GAS MMCF | OIL M$ | NGL M$ | GAS M$ | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | |
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | |
| 500003 | KLU3 4172 IPB | 0.0 | 0.0 | 1,860.0 | 0.0 | 0.0 | 1,534.5 | 0.0 | 0.0 | 11,534.7 | 0.0 | 0.0 | 0.0 | 844.0 | 10,650.7 | 8,164.3 |
| 500001 | KLU3 5090-5960 IPB | 0.0 | 0.0 | 2,108.0 | 0.0 | 0.0 | 1,739.1 | 0.0 | 0.0 | 16,540.0 | 0.0 | 198.9 | 0.0 | 875.0 | 15,526.5 | 7,576.5 |
| 500004 | KLU3 4018 BP IPB | 0.0 | 0.0 | 15,293.0 | 0.0 | 0.0 | 11,177.2 | 0.0 | 0.0 | 113,280.3 | 0.0 | 354.8 | 0.0 | 2,499.2 | 109,372.3 | 45,594.3 |
| 500005 | KLU 2A IPB | 0.0 | 0.0 | 3,597.0 | 0.0 | 0.0 | 2,897.8 | 0.0 | 0.0 | 19,813.5 | 0.0 | 0.0 | 0.0 | 545.0 | 19,268.5 | 18,268.0 |
| 500006 | KLU 2A BP1 IPB | 0.0 | 0.0 | 14,182.0 | 0.0 | 0.0 | 10,595.5 | 0.0 | 0.0 | 89,902.9 | 0.0 | 91.7 | 0.0 | 2,287.4 | 87,543.7 | 52,824.7 |
| 500007 | KLU 2A BP2 IPB | 0.0 | 0.0 | 3,273.0 | 0.0 | 0.0 | 2,454.8 | 0.0 | 0.0 | 26,924.4 | 0.0 | 173.6 | 0.0 | 763.3 | 25,987.6 | 8,697.7 |
| 500008 | KLU LOC | 0.0 | 0.0 | 9,061.0 | 0.0 | 0.0 | 7,245.8 | 0.0 | 0.0 | 52,955.9 | 0.0 | 24,603.7 | 0.0 | 1,101.2 | 27,251.1 | 23,595.5 |
| 500009 | KLU LOC BP1 | 0.0 | 0.0 | 28,250.0 | 0.0 | 0.0 | 21,217.5 | 0.0 | 0.0 | 170,970.9 | 0.0 | 5,549.4 | 0.0 | 5,750.9 | 159,670.6 | 104,546.9 |
| 500010 | KLU LOC BP2 | 0.0 | 0.0 | 46,039.6 | 0.0 | 0.0 | 31,869.4 | 0.0 | 0.0 | 318,557.0 | 0.0 | 6,475.6 | 0.0 | 10,791.4 | 301,270.1 | 126,121.1 |
| 800001 | ADES TAX CRED PRB | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | -16,740.5 | 0.0 | 0.0 | 16,740.5 | 12,820.6 |
| 800004 | AD VAL TAX PRB | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 178.5 | 0.0 | 0.0 | 0.0 | -178.5 | -129.6 |
| 800007 | AK PROD TAX PRB | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 116,821.6 | 0.0 | 0.0 | 0.0 | -116,821.6 | -47,306.1 |
| 800010 | FIXED EXPENSE PRB | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 49,022.2 | -49,022.2 | -18,653.0 |
| 800013 | ABANDONMENT PRB | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 932.8 | 0.0 | -932.8 | 6,838.4 |
| | FIELD TOTAL | 0.0 | 0.0 | 124,233.8 | 0.0 | 0.0 | 90,572.5 | 0.0 | 0.0 | 819,399.8 | 117,000.1 | 20,646.9 | 932.8 | 74,453.5 | 606,366.5 | 347,066.3 |
| | TOTAL ALASKA | 0.0 | 0.0 | 124,233.8 | 0.0 | 0.0 | 90,572.5 | 0.0 | 0.0 | 819,399.8 | 117,000.1 | 20,646.9 | 932.8 | 74,453.5 | 606,366.5 | 347,066.3 |
| | TOTAL ALL LEASES | 0.0 | 0.0 | 124,233.8 | 0.0 | 0.0 | 90,572.5 | 0.0 | 0.0 | 819,399.8 | 117,000.1 | 20,646.9 | 932.8 | 74,453.5 | 606,366.5 | 347,066.3 |

BASED ON ESCALATED PRICE AND COST PARAMETERS

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

FURIE-BANKR_00200238
DA00779

**NSAI NETHERLAND, SEWELL & ASSOCIATES, INC.**

COMPANY INTEREST

BASIC DATA
AS OF DECEMBER 31, 2015
PROBABLE RESERVES

SUMMARY: CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

| LEASE NUMBER | LEASE NAME | ACTIVE COMPLTNS OIL | GAS | GROSS ULTIMATE OIL MBBL | GAS MMCF | WORKING INTEREST START | END | REVENUE INTEREST START | END | OIL $/BBL START | END | NGL $/BBL START | END | GAS $/MCF START | END | GROSS OPERATING EXPENSE M$/M START | END | LIFE YRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | | | |
| 500003 | KLU3 4172 IPB | 0 | 1 | 0.0 | 1,860.0 | 100.000 | 100.000 | 82.500 | 82.500 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.690 | 0.0 | 120.7 | 3.2 |
| 500001 | KLU3 5990-6980 IPB | 0 | 1 | 0.0 | 2,108.0 | 100.000 | 100.000 | 82.500 | 82.500 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.140 | 0.0 | 136.7 | 6.2 |
| 500004 | KLU3 4018 BP IPB | 0 | 1 | 0.0 | 15,203.0 | 100.000 | 100.000 | 76.000 | 76.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 10.293 | 0.0 | 157.7 | 10.1 |
| 500005 | KLU 2A IPB | 0 | 1 | 0.0 | 3,597.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 107.9 | 2.6 |
| 500006 | KLU 2A BP1 IPB | 0 | 1 | 0.0 | 14,182.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.140 | 0.0 | 137.5 | 6.5 |
| 500007 | KLU 2A BP2 IPB | 0 | 1 | 0.0 | 3,273.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.801 | 0.0 | 152.2 | 8.8 |
| 500008 | KLU LOC | 0 | 1 | 0.0 | 9,661.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 107.9 | 2.6 |
| 500009 | KLU LOC BP1 | 0 | 1 | 0.0 | 28,290.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.140 | 0.0 | 137.5 | 6.5 |
| 500010 | KLU LOC BP2 | 0 | 1 | 0.0 | 46,639.8 | 100.000 | 100.000 | 60.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 11.616 | 0.0 | 178.0 | 13.2 |
| 600001 | ACES TAX CRED PRB | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 2.8 |
| 800004 | AD VAL TAX PRB | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 13.2 |
| 800007 | AK PROD TAX PRB | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 13.2 |
| 800010 | FIXED EXPENSE PRB | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 13.2 |
| 800013 | ABANDONMENT PRB | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 60.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 1,130.0 | 851.1 | 14.2 |
| | FIELD TOTAL | 0 | 9 | 0.0 | 124,233.8 | | | | | | | | | | | | | |
| | TOTAL ALASKA | 0 | 9 | 0.0 | 124,233.8 | | | | | | | | | | | | | |
| | TOTAL ALL LEASES | 0 | 9 | 0.0 | 124,233.8 | | | | | | | | | | | | | |

*All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.*

BASED ON ESCALATED PRICE AND COST PARAMETERS

Page 8

NETHERLAND, SEWELL & ASSOCIATES, INC.

RESERVES AND ECONOMICS
AS OF DECEMBER 31, 2015

POSSIBLE RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

COMPANY INTEREST*

| LEASE NUMBER | LEASE NAME | GROSS RESERVES | | | NET RESERVES | | | GROSS REVENUE | | | TOTAL TAXES M$ | NET CAP COST M$ | ABANDONMENT COST M$ | OPERATING EXPENSE M$ | NET REVENUE M$ | CUM P.W. 10.000*% M$ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | OIL MBBL | NGL MBBL | GAS MMCF | OIL MBBL | NGL MBBL | GAS MMCF | OIL M$ | NGL M$ | GAS M$ | | | | | | |
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | |
| 700003 | KLU3 4172 IPS | 0.0 | 0.0 | 13,016.8 | 0.0 | 0.0 | 10,758.9 | 0.0 | 0.0 | 65,617.3 | 0.0 | 0.0 | 0.0 | 4,320.4 | 61,296.9 | 55,013.5 |
| 700001 | KLU3 5990-5960 IPS | 0.0 | 0.0 | 6,653.9 | 0.0 | 0.0 | 3,604.0 | 0.0 | 0.0 | 45,982.2 | 0.0 | 672.5 | 0.0 | 2,105.3 | 44,174.4 | 10,841.1 |
| 700004 | KLU3 4016 6P IPS | 0.0 | 0.0 | 13,586.0 | 0.0 | 0.0 | 4,188.2 | 0.0 | 0.0 | 65,378.4 | 0.0 | -530.4 | 0.0 | 1,135.2 | 64,742.5 | -5,391.7 |
| 700005 | KLU 2A IPS | 0.0 | 0.0 | 7,592.0 | 0.0 | 0.0 | 5,694.0 | 0.0 | 0.0 | 41,897.6 | 0.0 | 0.0 | 0.0 | 188.3 | 41,709.3 | 34,639.9 |
| 700006 | KLU 2A BP1 IPS | 0.0 | 0.0 | 15,919.0 | 0.0 | 0.0 | 11,309.3 | 0.0 | 0.0 | 106,033.1 | 0.0 | 31.5 | 0.0 | 829.2 | 105,172.4 | 56,997.8 |
| 700007 | KLU 2A BP2 IPS | 0.0 | 0.0 | 5,488.0 | 0.0 | 0.0 | 2,650.8 | 0.0 | 0.0 | 28,567.0 | 0.0 | 62.0 | 0.0 | -772.1 | 27,277.1 | 10,912.6 |
| 700008 | KLU LOC IPS | 0.0 | 0.0 | 7,592.0 | 0.0 | 0.0 | 5,694.0 | 0.0 | 0.0 | 41,897.6 | 0.0 | 0.0 | 0.0 | 188.3 | 41,709.3 | 34,639.9 |
| 700009 | KLU LOC BP1 IPS | 0.0 | 0.0 | 15,919.0 | 0.0 | 0.0 | 11,309.3 | 0.0 | 0.0 | 106,033.1 | 0.0 | 31.5 | 0.0 | 829.2 | 105,172.4 | 56,997.8 |
| 700010 | KLU LOC BP2 IPS | 0.0 | 0.0 | 31,402.5 | 0.0 | 0.0 | 15,725.1 | 0.0 | 0.0 | 190,757.9 | 0.0 | 155.1 | 0.0 | 4,899.3 | 185,835.5 | 46,679.8 |
| 800005 | AK VAL TAX POS | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 800008 | AK PROD TAX POS | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 154,474.6 | 0.0 | 0.0 | 0.0 | -154,474.6 | -46,333.5 |
| 800011 | FIXED EXPENSE POS | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 23,872.6 | -23,872.6 | -5,692.4 |
| 800014 | ABANDONMENT POS | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 6,099.6 | 0.0 | -6,099.6 | 1,915.2 |
| | FIELD TOTAL | 0.0 | 0.0 | 117,159.2 | 0.0 | 0.0 | 72,173.5 | 0.0 | 0.0 | 731,134.4 | 154,474.6 | 452.4 | 6,099.6 | 39,666.0 | 530,441.9 | 255,510.0 |
| | | | | | | | ALASKA | | | | | | | | | |
| | TOTAL ALASKA | 0.0 | 0.0 | 117,159.2 | 0.0 | 0.0 | 72,173.5 | 0.0 | 0.0 | 731,134.4 | 154,474.6 | 452.4 | 6,099.6 | 39,666.0 | 530,441.9 | 255,510.0 |
| | TOTAL ALL LEASES | 0.0 | 0.0 | 117,159.2 | 0.0 | 0.0 | 72,173.5 | 0.0 | 0.0 | 731,134.4 | 154,474.6 | 452.4 | 6,099.6 | 39,666.0 | 530,441.9 | 255,510.0 |

All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.

BASED ON ESCALATED PRICE AND COST PARAMETERS

FURIE-BANKR_00200240
DA00781

**NSAI NETHERLAND, SEWELL & ASSOCIATES, INC.**

COMPANY INTEREST

BASIC DATA
AS OF DECEMBER 31, 2015
POSSIBLE RESERVES

SUMMARY - CERTAIN PROPERTIES
LOCATED IN THE KITCHEN LIGHTS UNIT
COOK INLET, ALASKA

| LEASE NUMBER | LEASE NAME | ACTIVE COMPLTNS OIL | GAS | GROSS ULTIMATE OIL MBBL | GAS MMCF | WORKING INTEREST START | END | REVENUE INTEREST START | END | OIL $/BBL START | END | NGL $/BBL START | END | GAS $/MCF START | END | GROSS OPERATING EXPENSE M$/M START | END | LIFE YRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | KITCHEN LIGHTS UNIT FIELD, COOK INLET COUNTY | | | | | | | | | | | | | | | | | |
| | ALASKA | | | | | | | | | | | | | | | | | |
| 700003 | KLU3 4172 IPS | 0 | 1 | 0.0 | 13,018.0 | 100.000 | 100.000 | 82.500 | 82.500 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.140 | 0.0 | 134.8 | 6.0 |
| 700001 | KLU3 5890-5960 IPS | 0 | 1 | 0.0 | 6,663.9 | 100.000 | 80.000 | 82.500 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 10.395 | 0.0 | 159.3 | 10.3 |
| 700004 | KLU3 4018 BP IPS | 0 | 1 | 0.0 | 13,386.0 | 100.000 | 80.000 | 76.500 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 12.482 | 0.0 | 191.3 | 15.0 |
| 700005 | KLU 2A IPS | 0 | 1 | 0.0 | 7,592.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 108.6 | 2.8 |
| 700006 | KLU 2A BP1 IPS | 0 | 1 | 0.0 | 15,919.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.500 | 0.0 | 140.7 | 7.2 |
| 700007 | KLU 2A BP2 IPS | 0 | 1 | 0.0 | 5,468.0 | 100.000 | 80.000 | 75.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.930 | 0.0 | 152.2 | 9.1 |
| 700008 | KLU LOC IPS | 0 | 1 | 0.0 | 7,592.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 7.450 | 0.0 | 108.6 | 2.8 |
| 700009 | KLU LOC BP1 IPS | 0 | 1 | 0.0 | 15,919.0 | 120.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 9.550 | 0.0 | 140.7 | 7.2 |
| 700010 | KLU LOC BP2 IPS | 0 | 1 | 0.0 | 31,402.5 | 100.000 | 80.000 | 75.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 7.010 | 13.589 | 0.0 | 204.9 | 16.8 |
| 800005 | AD VAL TAX POS | 0 | 0 | 0.0 | 0.0 | 100.000 | 80.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 16.8 |
| 800008 | AK PROD TAX POS | 0 | 0 | 0.0 | 0.0 | 100.000 | 100.000 | 75.000 | 75.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 16.6 |
| 800011 | FIXED EXPENSE POS | 0 | 0 | 0.0 | 0.0 | 120.000 | 80.000 | 75.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 1,260.0 | 851.1 | 16.8 |
| 800014 | ABANDONMENT POS | 0 | 0 | 0.0 | 0.0 | 120.000 | 80.000 | 75.000 | 60.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.0 | 0.0 | 17.7 |
| | FIELD TOTAL | 0 | 9 | 0.0 | 117,160.4 | | | | | | | | | | | | | |
| | TOTAL ALASKA | 0 | 9 | 0.0 | 117,160.4 | | | | | | | | | | | | | |
| | TOTAL ALL LEASES | 0 | 9 | 0.0 | 117,160.4 | | | | | | | | | | | | | |

All estimates and exhibits herein are part of this NSAI report and are subject to its parameters and conditions.

BASED ON ESCALATED PRICE AND COST PARAMETERS

FURIE-BANKR_00200241
DA00782

# EXHIBIT 18

DA00783

# GAS SALES AGREEMENT
# BETWEEN
# FURIE OPERATING ALASKA, LLC
# AND
# ALASKA PIPELINE COMPANY

**February 26, 2016**

CONFIDENTIAL

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| *ARTICLE 1* | **DEFINITIONS** | 1 |
| 1.1 | Defined Terms. | 1 |
| 1.2 | Interpretation. | 6 |
| *ARTICLE 2* | **SALE AND PURCHASE OF GAS** | 6 |
| 2.1 | Gas Sales and Delivery Profile. | 7 |
| 2.2 | Daily Call Option. | 7 |
| 2.3 | Emergency Gas. | 8 |
| 2.4 | Annual Adjustments. | 8 |
| 2.5 | Market Out. | 9 |
| 2.6 | Delivery Rate And Scheduling. | 9 |
| 2.7 | Communication and Rescheduling Undelivered Gas. | 11 |
| 2.8 | Incidental Deviations and Imbalances. | 11 |
| 2.9 | Unanticipated Shortages; Cover. | 12 |
| 2.10 | Buyer's Priority; Seller's Assurances. | 13 |
| 2.11 | Forecasts | 14 |
| 2.12 | Use of Gas Supply. | 15 |
| *ARTICLE 3* | **PRICE; COST ALLOCATION** | 15 |
| 3.1 | Sales Price. | 15 |
| 3.2 | Production and Transportation Costs. | 17 |
| *ARTICLE 4* | **DELIVERY POINT; TITLE; LIABILITY AND RISK OF LOSS.** | 17 |
| 4.1 | Delivery Points. | 17 |
| 4.2 | Title. | 17 |
| *ARTICLE 5* | **TAXES** | 17 |
| 5.1 | General Allocation. | 17 |
| 5.2 | New Production Taxes and Financial Incentives. | 17 |
| *ARTICLE 6* | **ROYALTIES** | 18 |

i

| *ARTICLE 7* | **QUALITY** | **18** |
|---|---|---|
| 7.1 | Quality of Gas. | 18 |
| 7.2 | Buyer's Right to Refuse Gas. | 18 |
| *ARTICLE 8* | **PRESSURE, MEASUREMENT, METERING, AND TESTING** | **19** |
| 8.1 | Pressure. | 19 |
| 8.2 | Measurement. | 19 |
| 8.3 | Inaccurate Meters. | 19 |
| 8.4 | Testing. | 19 |
| 8.5 | Correction. | 20 |
| 8.6 | Standards. | 20 |
| 8.7 | Check Meters. | 21 |
| 8.8 | Records. | 21 |
| *ARTICLE 9* | **BILLING, PAYMENT, AND RECORDS** | **21** |
| 9.1 | Billing. | 21 |
| 9.2 | Records and Audits. | 21 |
| 9.3 | Interest. | 22 |
| 9.4 | Remedies for Non-Payment. | 22 |
| *ARTICLE 10* | **APPROVALS** | **22** |
| 10.1 | Regulatory Approval. | 22 |
| *ARTICLE 11* | **FORCE MAJEURE** | **23** |
| 11.1 | Force Majeure. | 23 |
| 11.2 | Alternative Arrangements | 24 |
| 11.3 | Extended Force Majeure Events | 25 |
| *ARTICLE 12* | **CREDITWORTHINESS** | **25** |
| 12.1 | Letter of Credit. | 25 |
| 12.2 | Continuing Obligation of Seller. | 25 |
| *ARTICLE 13* | **COMMENCEMENT AND TERMINATION** | **26** |
| 13.1 | Commencement and Termination. | 26 |
| 13.2 | Option to Extend Term. | 26 |

CONFIDENTIAL

| | 13.3 | Conditions Precedent. | 26 |
|---|---|---|---|
| | 13.4 | Termination Events. | 27 |
| | 13.5 | Applicable Cure Period and Termination of Agreement. | 28 |
| | 13.6 | Reservations. | 28 |
| *ARTICLE 14* | | **NOTICES** | **29** |
| | 14.1 | Formal Notice. | 29 |
| | 14.2 | Regular Notice. | 31 |
| | 14.3 | Operational Notice. | 31 |
| | 14.4 | Changes in Contact Information. | 32 |
| *ARTICLE 15* | | **DISPUTE RESOLUTION** | **32** |
| | 15.1 | Arbitration. | 32 |
| *ARTICLE 16* | | **MISCELLANEOUS** | **33** |
| | 16.1 | Binding on Successors. | 33 |
| | 16.2 | Assignments and Other Transfers. | 33 |
| | 16.3 | Governing Law. | 34 |
| | 16.4 | Agreement Not to be Construed Against Either Party as Drafter. | 34 |
| | 16.5 | Entire Agreement. | 34 |
| | 16.6 | Headings. | 34 |
| | 16.7 | Liability and Remedies. | 34 |
| | 16.8 | Indemnification. | 35 |
| | 16.9 | Waiver. | 35 |
| | 16.10 | Multiple Originals. | 35 |
| | 16.11 | Authority to Sign. | 35 |
| | 16.12 | Severability. | 36 |
| | 16.13 | Further Assurances. | 36 |
| | 16.14 | Confidentiality. | 36 |

iii

FURIE-ANK_00002804
DA00787

# EXHIBITS

EXHIBIT A    Delivery Points

EXHIBIT B    Gas Quality Specifications

EXHIBIT C    Market Out Calculation Example

EXHIBIT D    Template for Engineer's Opinion Letter

EXHIBIT E    Template for Statement of Seller's Available Gas Reserves

EXHIBIT F    Template for Seller's Forecast of Daily Maximum Deliverability Commitments

EXHIBIT G    Template for Buyer's Forecast

EXHIBIT H    Seller's Development Schedule

.

iv

# GAS SALES AGREEMENT

This Gas Sales Agreement ("Agreement") is made and entered into this 26th day of February 2016 (the "Effective Date"), by and between Furie Operating Alaska, LLC (a Texas limited liability company) (hereinafter collectively referred to herein as "Seller"), and Alaska Pipeline Company ("Buyer"), an Alaska corporation and a wholly-owned subsidiary of SEMCO Energy, Inc.

## RECITALS

WHEREAS, Buyer is a public utility that holds Certificate No. 141 from the RCA; and

WHEREAS, Buyer and its public utility affiliate, ENSTAR, provide certain natural gas services to customers in the Municipality of Anchorage and portions of the Matanuska-Susitna and Kenai Peninsula Boroughs; and

WHEREAS, Buyer has determined that, in order to ensure continued reliable and reasonably priced utility service, it must purchase Gas (as defined in Article 1 below) under the terms and conditions in this Agreement to meet the needs of ENSTAR's Gas sales customers served under the ENSTAR tariff; and

WHEREAS, Seller desires to sell Gas to Buyer under the terms and conditions in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements of the Parties contained in this Agreement, Buyer and Seller agree as follows:

## *ARTICLE 1*     DEFINITIONS

1.1    **Defined Terms.**

As used in this Agreement, the following terms have the meanings ascribed to them below:

**"Agreement"** means this document, including the attached exhibits, and any amendments, supplements, or restatements hereto.

**"Alaska Clock Time"** or **"ACT"** means Alaska Daylight Savings Time when Daylight Savings Time is in effect and Alaska Standard Time when Daylight Saving Time is not in effect.

**"Annual Contract Quantity"** means the volume of Gas that unless otherwise excused in this Agreement, Seller is obligated to sell, and Buyer is obligated to purchase, in a given Contract Year as set forth in Section 2.1 (a), as may be adjusted pursuant to Sections 2.4, 2.5 and 7.2.

**"Applicable Cover Volume Price"** is defined in Section 2.9 (a).

**"Balancing Nomination"** is defined in Section 2.6 (b)(ii).

1

FURIE-ANK_00002806
DA00789

**"Base Season"** means a period of five consecutive Months beginning on May 1st and ending on the next September 30th.

**"Btu"** means a British thermal unit, which is the amount of energy required to raise the temperature of one pound of pure water from fifty-nine degrees (59°) Fahrenheit to sixty degrees (60°) Fahrenheit at a constant pressure of fourteen and sixty-five hundredths (14.65) pounds per square inch absolute (psia).

**"Business Day"** means any Day other than a Saturday, Sunday or a Day that is a federal or state holiday in Anchorage, Alaska.

**"Buyer"** is defined in the Preamble.

**"Buyer's Forecast"** has the meaning set forth in Section 2.11 (b).

**"Call Option Period"** means a length of time during which Daily Call Option Gas will be delivered.

**"CINGSA"** means the Gas storage facility owned by Cook Inlet Natural Gas Storage Alaska, LLC.

**"CINGSA Gas Substitution"** is defined in Section 2.9(a).

**"Claim"** means a claim, suit, liability, loss, demand, damages, lien or cause of action of any kind by any person for physical damage to property, bodily injury or death (including recoverable legal counsel fees and costs of litigation of the party asserting the Claim) arising from the physical operations of a Party, whether based in contract, tort, strict liability or otherwise. "Claim" does not include a claim based upon, arising from or related to the failure or refusal of Seller to deliver Gas or the failure or refusal of Buyer to receive Gas under this Agreement, for which the sole recourse and remedy is set forth in Section 2.9.

**"Continuous Rate"** means a continuous consistent Rate of Gas delivery without significant deviation. If Buyer has not exercised its option for Daily Call Option Gas, then the Continuous Rate shall be calculated by dividing the Firm Daily Contract Quantity by 24 hours. If Buyer has exercised its option for Daily Call Option Gas, then the Continuous Rate for a Call Option Period shall be calculated by (i) dividing the Firm Daily Contract Quantity by 24 hours, and adding (ii) the Rate for such Call Option Period specified in Buyer's notice of its exercise of the Daily Call Option Gas pursuant to Section 2.2.

**"Contract Year"** means each period beginning April 1st and ending on March 31st during the Term.

**"Cook Inlet Gas Pipeline System"** means the system of Gas transmission and distribution pipelines located in and around the Cook Inlet Area including pipelines owned by Alaska Pipeline Company and Kenai Beluga Pipeline, LLC (KBPL).

**"Cover Amount"** is defined in Section 2.9(a).

**"Cover Price"** is defined in Section 2.9(a).

2

FURIE-ANK_00002807
DA00790

**"Daily Call Option Gas"** is defined in Section 2.2(a).

**"Daily Contract Quantity"** means the volume of Gas required to be delivered by Seller and to be taken by Buyer on each Day during the Term as set forth in Article 2. "Daily Contract Quantity" is the total of the Firm Daily Contract Quantity, the Daily Call Option Gas volume requested by Buyer pursuant to Section 2.2 (if any), and the Emergency Gas volume (if any) requested by Buyer and agreed to by Seller pursuant to Section 2.3, all for the Day in question.

**"Day"** and **"Daily"** means a 24-hour calendar day beginning at 00:00 hours and ending at 23:59:59 hours ACT. "Day" includes the 23-hour calendar day when local time changes from Alaska Standard Time to Alaska Daylight Savings Time and the 25-hour calendar day when local time changes from Alaska Daylight Savings Time to Alaska Standard Time. "Daylight Savings Time" means the advancement of timekeeping clocks forward one hour from Standard Time near the start of spring pursuant to the Uniform Time Act of 1966, Pub. L. 89-387, 80 Stat. 107, 15 U.S.C. §§ 260-64, as amended, as administered by the U.S. Department of Transportation.

**"Delivery Point"** means the metering point(s) specified on Exhibit A hereto at which Buyer receives Seller's Gas.

**"Effective Date"** means the date set forth in the Preamble.

**"Emergency Gas"** means any Gas delivered by Seller and purchased by Buyer that is in addition to the sale of Firm Gas and Daily Call Option Gas contemplated in Sections 2.1 and 2.2.

**"Engineer"** means an independent, registered professional petroleum engineer from the firm then currently engaged by Seller to provide the reserve reports to Seller respecting Seller's oil and gas properties in Alaska.

**"ENSTAR"** means the natural gas distribution utility named ENSTAR Natural Gas Company, a division of SEMCO Energy, Inc. ENSTAR holds RCA Certificate of Public Convenience and Necessity No. 4. ENSTAR and Buyer are regulated as a single entity by the RCA.

**"Existing Commitments"** means all existing gas sales agreements between Seller and third parties for Firm deliveries of Gas as of the Effective Date that have been approved by the Regulatory Commission of Alaska (RCA); and all Gas needed to operate Seller's Facilities in the sole discretion of Seller.

**"Exercise Date"** means April 1, 2018.

**"Extended Term"** means April 1, 2021 through March 31, 2023.

**"Firm"** means that a Party shall perform an obligation, including, without limitation, the obligation to deliver and sell or receive and purchase Gas, and such performance may only be interrupted or excused as permitted by the terms of this Agreement.

**"Firm Daily Contract Quantity"** means the volume of Gas that unless otherwise excused in this Agreement, Seller is obligated to sell, and Buyer is obligated to purchase, on a given Day during the Term as set forth in Section 2.1(b). For clarity, Firm Daily Contract Quantity does not include Daily Call Option Gas, or Emergency Gas.

3

CONFIDENTIAL

**"Firm Gas"** is defined in Section 2.1.

**"Firm Volume Price"** is defined in Section 3.1.

**"*Force Majeure* Event"** is defined in Section 11.1(b).

**"Formal Notice"** means a notice given as provided in Section 14.1.

**"Gas"** or **"Natural Gas"** means any mixture of hydrocarbons or of hydrocarbons and non-combustible gases, in a gaseous state consisting primarily of methane and meeting the quality specifications described in Section 7.1.

**"Gas Reserves"** shall mean the total quantity of Seller's proved developed reserves and Seller's proved undeveloped reserves in the Cook Inlet Area as determined in accordance with sound petroleum reservoir engineering practices.

**"Gas Sales Commitments"** means the sum of all Seller's Firm commitments for delivery of Gas produced from Seller's Facilities as provided in executed gas sales agreements between Seller and any buyer. "Gas Sale Commitments" include Gas needed to operate Seller's Facilities in Seller's discretion and Gas needed to fulfill Firm Gas commitments under this Agreement.

**"Imbalance Volume"** means the adjustment of the volume of Gas to be delivered by Seller and received by Buyer under this Agreement to correct for previous Incidental Deviations.

**"Incidental Deviation"** means the unintended differences between the Daily Contract Quantity for a Day and the actual deliveries and receipts made on that Day which arise from the ordinary operations of the Cook Inlet Gas Pipeline System. Unless otherwise agreed, deviations greater than three percent (3%) of the Daily Contract Quantity are not Incidental Deviations.

**"KLU"** means the Kitchen Lights Unit in the Cook Inlet, Alaska.

**"Letter of Credit"** is defined in Section 12.1.

**"Major Adjustment Request"** is defined in Section 2.4(b).

**"Market Out"** is defined in Section 2.5(a).

**"Market Return"** is defined in Section 2.5(c).

**"Mcf," "MMcf,"** and **"Bcf"** mean thousand Standard Cubic Feet, Million Standard Cubic Feet, and Billion Standard Cubic Feet, respectively.

**"Minor Adjustment Notice"** is defined in Section 2.4(a).

**"Month"** means each period beginning at 12:00:00 a.m., local time in Anchorage, Alaska, on the first Day of a calendar month and ending at 11:59:59 p.m., local time in Anchorage, Alaska, on the last Day of the same calendar month.

**"Monthly Contract Quantity"** means the sum of the Firm Daily Contract Quantities for each Day of the applicable Month.

4

FURIE-ANK_00002809
DA00792

**"New Sales"** is defined in Section 2.10.

**"Non-Affected Party"** is defined in Section 11.2.

**"Operational Notice"** means a notice given pursuant to Section 14.3.

**"Parties"** means, collectively, Buyer and Seller, and "Party" means Buyer or Seller, individually.

**"Production Taxes"** means the taxes defined and set by AS 43.55.011, as amended, replaced, or supplemented from time to time, and any similar taxes imposed by the State of Alaska on the production or sale of Gas.

**"Rate"** means a volume of Gas to be delivered over a specified period of time.

**"Regular Notice"** means a notice given pursuant to Section 14.2.

**"RCA"** means the Regulatory Commission of Alaska, or any successor entity.

**"Replacement Gas"** means the Gas that Buyer purchases in substitution for the Daily Contract Quantity of Gas due from Seller.

**"Sales Price"** means the applicable sales price per Mcf of Gas volumes set forth in the respective tables in Section 3.1.

**"Seller"** is defined in the preamble.

**"Seller's Available Gas Reserves"** is defined in Section 2.10(b).

**"Seller's Facilities"** means Seller's facilities and infrastructure for the production, processing and delivery of hydrocarbons and petroleum products and the facilities for the transportation of Gas to the Delivery Point(s), whether or not owned by Seller, including without limitation production platforms, production wells, storage wells, pipelines, compression, processing and treatment facilities.

**"Seller's Lender"** is defined in Section 16.2.

**"Seller's Pro-Rata Share Percentage"** means, for any Year, the percentage derived from the quotient of the Annual Contract Quantity divided by Buyer's estimated annual gas requirements for the applicable Contract Year as set out in the most recent Buyer's Forecast.

**"Standard Cubic Foot"** means the amount of Gas that would occupy a volume of one cubic foot at a temperature of sixty degrees (60°) Fahrenheit and at a pressure of fourteen and sixty-five-hundredths (14.65) pounds per square inch absolute (psia).

**"Standard Nomination"** is defined in Section 2.6(a).

**"Standard Time"** means the time of Day without the offset for Daylight Savings Time.

**"Start Date"** means April 1, 2018.

5

FURIE-ANK_00002810
DA00793

**"Term"** means the period that commences on the Effective Date and ends on the Termination Date.

**"Termination Date"** means March 31, 2021 unless Buyer exercises its option for the Extended Term pursuant to Section 13.2, in which case the Termination Date means March 31, 2023, subject to any earlier termination under the terms of this Agreement.

**"Termination Event"** is defined in Section 13.4.

**"Un-covered Gas"** is defined in Section 2.9(b).

**"Winter Season"** means a period of seven consecutive Months beginning on October 1st and ending on the next April 30th during the Term.

**"Year"** means a period of twelve (12) consecutive Months beginning on January 1 and ending on the next December 31.

1.2    **Interpretation.**

Unless the context expressly requires otherwise, all of the following apply to the interpretation of this Agreement:

a.    The plural and singular words each include the other.

b.    The masculine, feminine and neuter genders each include the others.

c.    The word "or" is not exclusive and the word "hereunder" means under this Agreement.

d.    The word "includes" and "including" are not limiting.

e.    Reference to any statute, statutory provision or statutory instrument includes a reference to that statute, statutory provision or statutory instrument as from time to time amended, extended or re-enacted.

f.    Unless the context otherwise requires, reference to any Section or Exhibit is to a Section of this Agreement or any Exhibit.

g.    All references to time in this Agreement shall mean Alaska Clock Time.

## *ARTICLE 2*    **SALE AND PURCHASE OF GAS**

Subject to the other terms and conditions in the Agreement, at all times during the Term, Seller shall make available and deliver to Buyer and Buyer shall receive and purchase from Seller volumes of Gas in accordance with the terms set forth in this Article 2.

CONFIDENTIAL

FURIE-ANK_00002811
DA00794

2.1    **Gas Sales and Delivery Profile.**

      a.    Subject to the other provisions of this Agreement, Seller will deliver and sell to Buyer, and Buyer will receive and purchase from Seller, on a Firm basis during the Term, the Annual Contract Quantities as follows:

| Contract Year Beginning | Annual Contract Quantity (Bcf) |
|---|---|
| April 1, 2018 | 6.194 |
| April 1, 2019 | 6.194 |
| April 1, 2020 | 6.194 |

      b.    The Annual Contract Quantity shall be delivered by Seller and taken by Buyer as the Firm Daily Contract Quantity ("Firm Daily Contract Quantity") on each Day during the Term in the volumes provided in the following chart:

| Season | Months | Firm Daily Contract Quantity, (MMcf per Day) |
|---|---|---|
| Base | May through September | 10 |
| Winter | October through April | 22 |

      c.    All of the above quantities of Gas are herein called "Firm Gas".

2.2    **Daily Call Option.**

      a.    Subject to the provisions set forth in subsection (b) below of this Section 2.2, during the Winter Season, in addition to the Firm Daily Contract Quantity set forth in 2.1(b) above, Buyer shall have an option, but not the obligation, to purchase up to an additional 1 Bcf of Gas in each Contract Year at a Rate not to exceed 20 MMcf/Day ("Daily Call Option Gas"). Once Buyer has nominated any Daily Call Option Gas for delivery on any Day, Seller shall provide such Daily Call Option Gas on a Firm delivery basis as required by Buyer and Buyer shall take and pay for all such quantities of Daily Call Option Gas delivered by Seller to the Delivery Point.  If Buyer nominates Daily Call Option Gas, it must provide Seller at least twenty-four (24) hours advance notice by delivering an Operational Notice to Seller specifying the Rates and periods of Daily Call Option Gas deliveries. The volumes of any such Daily Call Option Gas shall be sold at the Sales Price then in effect during the Month in which the Gas is delivered pursuant to the applicable tables in Section 3.1 below.

      b.    Notwithstanding any other provisions to the contrary set forth in this Agreement, if Seller is unable to meet the Conditions Precedent set forth in Section 13.3(b) within

7

FURIE-ANK_00002812
DA00795

the time periods set forth therein, the Parties agree volumes of Daily Call Option Gas shall be reduced to an amount agreed to by the Parties, but in no event shall the volumes of Daily Call Option Gas available to Buyer be less than 10 MMcf/Day.

2.3    **Emergency Gas.**

If, at any time before the Termination Date (and after Firm Gas and Daily Call Option Gas are utilized), Buyer desires to purchase Emergency Gas, Buyer will so communicate by Operational Notice to Seller. Seller will have the option, but not the obligation, to provide Buyer with all or a portion of the Emergency Gas. Notwithstanding the foregoing, Buyer shall have no obligation to purchase Emergency Gas from Seller, provided, however, that once Buyer has nominated any Emergency Gas for delivery on any Day and Seller has agreed to supply any quantity of the Emergency Gas so nominated for delivery, Buyer shall take and pay for all such quantities of Emergency Gas delivered by Seller to the Delivery Point. The Parties shall agree to the Sales Price in writing prior to delivery of Emergency Gas but such Sales Price shall not exceed the then applicable Sales Price for Emergency Gas in effect for the Month in which such Gas is delivered pursuant to the applicable tables in Section 3.1 below.

2.4    **Annual Adjustments.**

a.    By notice to Seller on or before October 1 in any Contract Year during the Term, Buyer may require an increase or decrease of not more than five percent (5%) to the Annual Contract Quantity for Firm Gas sales for the then-succeeding Contract Year for reasons due to customer conservation or usage changes or due to weather related demand changes (but not otherwise) (each, a "Minor Adjustment Notice"). Each such notice from Buyer shall give reasons for the change in reasonable detail. If Buyer provides such a Minor Adjustment Notice, then the applicable Annual Contract Quantity, and the related Firm Daily Contract Quantity and Monthly Contract Quantities applicable to such succeeding Contract Year, shall be adjusted as described in the Minor Adjustment Notice. Buyer may not provide a Minor Adjustment Notice which reduces the Annual Contract Quantity for the purpose of buying from a third party the amount of Gas by which the Annual Contract Quantity was reduced and Buyer's Minor Adjustment Notice shall certify that its reduction is not requested for that purpose. In such case Seller may sell such Firm Gas not taken by Buyer to third parties. If Buyer later determines Buyer needs to purchase all or a portion of the volumes reduced by a Minor Adjustment Notice, Buyer shall provide Seller reasonable notice and Seller shall have the option, in its sole discretion, to supply those volumes to Buyer.

b.    By notice to Seller on or before any October 1 in any Contract Year during the Term, Buyer may request increases or decreases in the Annual Contract Quantity in excess of five percent for the then-succeeding Contract Year (each, a "Major Adjustment Request"). Seller shall consider each Major Adjustment Request in good faith and, if mutually agreed, the Parties shall execute a document setting forth the revisions to the applicable Annual Contract Quantity and the related Firm Daily Contract Quantity and Monthly Contract Quantities. Buyer may not provide a Major Adjustment Request which reduces the Annual Contract Quantity for the purpose of buying from a third party the amount by which the Annual Contract Quantity is proposed to be reduced and Buyer's Major Adjustment Request shall certify that its reduction is not requested for that purpose. If Buyer later determines Buyer needs to purchase all or a portion of the volumes

8

FURIE-ANK_00002813
DA00796

reduced by the agreement of the Parties after Buyer issues a Major Adjustment Request, Buyer shall provide Seller reasonable notice and Seller shall have the option, in its sole discretion, to supply those volumes to Buyer.

     2.5    **Market Out.**

          a.    From time to time, Buyer has prior to the Effective Date of this Agreement experienced a sustained loss to its customer base beyond Buyer's reasonable control (a "Market Out") that resulted in reduction of its annual demand and Buyer may experience such Market Out during the Term of this Agreement.

          b.    If a Market Out occurs which affects in excess of 1% of the Buyer's Forecast during the Term of the Agreement, Buyer will promptly provide a Formal Notice and reasonable verification based on the sample calculations in Exhibit C, with due respect given to confidentiality agreements, of such Market Out to Seller and the estimated time Buyer estimates that such Market Out event is likely to continue. Buyer may reduce its Annual Contract Quantity and the Firm Daily Contract Quantity in the affected Contract Years and related delivery periods by an amount equal to Seller's Pro Rata Share Percentage of the verified Market Out volumes. Buyer may experience multiple Market Out events during the Term of this Agreement. Buyer shall have the right to update a Market Out volume submitted under a notice to Seller as necessary.

          c.    If some or all of the Market Out returns to Buyer's customer base ("Market Return"), Buyer will provide a Formal Notice within twenty (20) Days of the Market Return and verification of such Market Return to Seller. Should Buyer need to purchase additional Gas to meet demand associated with Market Return, Buyer will first contact Seller by Formal Notice to purchase Seller's Pro Rata Share Percentage of volumes associated with Market Return under this Agreement. Upon Seller's written agreement, Buyer will thereafter increase its Annual Contract Quantity and the Firm Daily Contract Quantity in the affected Contract Years and related delivery periods by the agreed-upon volumes.

          d.    Buyer and Seller will work together in good faith to make the necessary adjustments to the volumes and delivery schedules to minimize the disruption to both Parties in the Contract Year that a Market Out or Market Return first appears, as well as in later applicable Contract Years. By way of example, Exhibit C sets forth some sample calculations of how the Market Out provision will be calculated.

     2.6    **Delivery Rate And Scheduling.**

          a.    Standard Nominations: Buyer will issue to Seller, by Operational Notice, standard nominations (a "Standard Nomination") for Gas as follows.

                i.    Buyer shall nominate Gas on a Continuous Rate. Buyer may nominate Gas deliveries throughout any given Day and Seller shall deliver the Daily Contract Quantity of Firm Gas subject to the current rules and regulations of the transporting pipeline, except that Daily Call Option Gas volumes shall be delivered by Seller no earlier than twenty-four (24) hours after Buyer's Operational Notice for Daily Call Option Gas is given to Seller under the provisions of Section 2.2.

<center>9</center>

FURIE-ANK_00002814
DA00797

ii. The Parties understand that changing weather, fluctuations in Gas volumes from other suppliers, equipment maintenance and failures, and other operating variables may not allow the Parties to consistently nominate, deliver or take (as appropriate) Gas precisely at Seller's delivery commitment according to Sections 2.1, 2.2 and 2.3.

iii. Each Standard Nomination (including any nominations for Daily Call Option Gas and Emergency Gas) will specify the Daily Contract Quantity of Gas that Buyer is electing to receive from Seller on any Day and the start time for the change, if any. Upon receipt by Seller of a nomination from Buyer under this Section 2.6(a) and confirmation of acceptance of the nomination by Seller to Buyer, Seller will make available and deliver the nominated quantity of Gas to Buyer, and Buyer will take and purchase the nominated quantity of Gas; provided, however, that if, due to an operational constraint, Seller is unable to deliver the nominated quantity of Gas at the Delivery Point, Seller and Buyer will work together promptly and in good faith to establish an alternative delivery point that will accommodate making the Gas available to Buyer. The inability of Buyer to take Gas at an alternative delivery point will not excuse Seller's delivery obligation, which shall be rescheduled in accordance with Section 2.7, provided, however, that if the Parties agree on an alternative delivery point, Buyer shall take or pay for the Gas delivered to the alternative delivery point.

iv. Buyer acknowledges that Seller may be restricted in the ability to immediately increase or decrease the flow of Gas at any Delivery Point, and the failure to so alter Gas flows will not be a default under this Agreement or otherwise result in liability to Seller, provided that Seller uses commercially reasonable efforts to increase or decrease flows as quickly as possible.

b.    Balancing Nominations.

i. Seller and Buyer acknowledge that the volumes of Gas received from Seller may vary from the Buyer's nominated amount due to variations in actual production, Buyer's ability to accept Gas, or other operational constraints; provided, however, that, subject to Section 2.8, the foregoing does not excuse Seller from delivering, or Buyer from accepting (and paying for), all Gas contracted to be delivered and received hereunder.

ii. Buyer may, on its initiative or based on a request from Seller, issue Balancing Nominations by Operational Notice subject to the provisions in this Section 2.6(b) (each, a "Balancing Nomination"). Each Balancing Nomination will be clearly identified as a Balancing Nomination, and will be administered in the same manner provided for Standard Nominations in Section 2.6(a)(iii).

10

FURIE-ANK_00002815
DA00798

       iii.  Buyer has the right not to make Balancing Nominations due to pipeline system pressures, or other operational constraints that limit Buyer's ability to accept balancing Gas.

2.7    **Communication and Rescheduling Undelivered Gas.**

       a.    Buyer and Seller understand that this Agreement will require frequent communication and cooperation for proper scheduling and delivery of Gas. The acting Party will provide timely Regular Notice to the other Party when (i) Buyer changes its receipt rate, (ii) Seller ceases or curtails deliveries or Buyer ceases or curtails receipts, or (iii) either Buyer or Seller incurs a *Force Majeure* Event.

       b.    Buyer and Seller will communicate and work in good faith to coordinate Gas deliveries and receipts with the other Party regarding anticipated shut-downs or curtailments, facility outages, maintenance, and other scheduled or irregular events which do not constitute *Force Majeure* Events.

       c.    By mutual agreement of the Parties confirmed by Regular Notice, the Parties, subject to the provisions of Section 2.8(c), may reschedule Gas deliveries which will not be or have not been delivered and received as provided in Sections 2.1, 2.2, and 2.3, whether due to shut-downs or curtailments, facility outages, maintenance, and other scheduled or irregular events, or due to *Force Majeure* Events.

2.8    **Incidental Deviations and Imbalances.**

       a.    The Parties understand that the Cook Inlet Gas Pipeline System may be unable to deliver precisely the nominated amount of Gas on any given Day. The mutual intent of the Parties is to work toward assuring that the quantity of Gas delivered for a given Day is within three percent of the Firm Daily Contract Quantity for such Day, and the quantity of Gas delivered for a given Month is within three percent of the Monthly Contract Quantity of Gas for such Month, and that the difference between the quantity of Gas delivered for each Contract Year and the Annual Contract Quantity for that Contract Year is within three percent of the average Monthly Contract Quantity of Gas for the applicable Contract Year, in each case, after giving effect to any Minor Adjustment Notice, agreed Major Adjustment Requests, Market Out, or agreed Market Return, *Force Majeure* events, or reductions pursuant to Section 6(c).

       b.    The sole and exclusive remedy for Incidental Deviations will be adjustment through Balancing Nominations to correct Imbalance Volumes nominated as provided in Section 2.6(b).

       c.    Imbalances at the end of a Contract Year (in either direction) will not be carried forward into the next Contract Year. Buyer will not be responsible to pay for any undelivered volumes of Gas except to the extent Seller's failure to deliver any Gas volumes was due to Buyer's failure to take or nominate any Gas volumes which Buyer is obligated to take under the terms of this Agreement.

CONFIDENTIAL

FURIE-ANK_00002816
DA00799

2.9     **Unanticipated Shortages; Cover.**

a.      Other than in the case of Incidental Deviations and Imbalances, the sole and exclusive remedy of either Seller or Buyer for the other Party's failure to deliver or accept Gas will be the payment by the breaching Party to the other Party of an amount ("Cover Amount") equal to, but not exceeding, (i) the volume of undelivered or unaccepted Gas other than Incidental Deviations and Imbalances, multiplied by (ii) the Cover Price.  The "Cover Price" is determined as follows:  (A) in the case where the breaching Party is Seller, the Cover Price will be an amount equal to the positive difference, if any, between (x) the price per Mcf paid by Buyer to purchase Replacement Gas in the marketplace, as adjusted for any transportation costs in excess of those Buyer would have incurred in accepting the undelivered Gas from Seller, and (y) as applicable, depending on whether the Gas to be delivered is Firm Gas, Daily Call Option Gas or Emergency Gas under Sections 2.1, 2.2 and 2.3, the Firm Volume Price for Firm Gas, the Sales Price for Daily Call Option Gas or the Sales Price for Emergency Gas pursuant to Section 3.1 under this Agreement (such applicable price as defined in this sub-clause (y), the "Applicable Cover Volume Price"), or (B) in the case where the breaching Party is Buyer, the Cover Price will be an amount equal to the Applicable Cover Volume Price  less the price per Mcf, if any, received by Seller for selling the unaccepted Gas in the marketplace, as adjusted for any transportation costs in excess of those Seller incurred or would have incurred in delivering the unaccepted Gas to Buyer. In the event either Buyer or Seller exercises its right to the remedy of cover, such Party will first notify the other Party of its intent to seek cover, will seek either the most commercially reasonable source of Replacement Gas (taking into account all factors, including timing constraints and cost) in the case of Buyer or the most commercially reasonable market for sale of the Gas in the case of Seller and in each case in quantities equivalent to the volume of Gas not being delivered or not being purchased, as applicable, under this Agreement. In each case also, the Seller or Buyer shall discontinue such cover sales or purchases, as applicable, as soon as the reason necessitating Seller's sale to alternative buyers or Buyer's purchase of Replacement Gas has ended. Subject to the provisions of this Section 2.9, if Buyer seeks cover by withdrawing Gas stored by it or on its behalf in CINGSA ("CINGSA Gas Substitution"), the price of that Replacement Gas shall be the cost of the volume of such Gas withdrawn from storage as listed in Buyer's Tariff at § 2301(3).  If Buyer is unable to obtain Replacement Gas or use CINGSA Gas Substitution and must call on electric utilities to alter their generation to allow Buyer access to additional Gas, Buyer will incur Interruption Expenses as defined by § 1205 of Buyer's Tariff, Buyer shall send Seller a Formal Notice of such occurrence with details of the electric utilities affected and the quantities of Gas affected and Interruption Expenses actually incurred by Buyer and this shall represent the purchase price of Buyer's Replacement Gas.  The breaching Party will pay to the non-breaching Party, as liquidated damages, the Cover Amount within ten (10) Business Days after Formal Notice (which shall include an invoice) issued by the non-breaching Party.

b.      In the event Buyer in the case of 2.9(a)(A) above, or Seller in the case of 2.9(a)(B) above, is unable after using commercially reasonable efforts to replace the Gas or sell the Gas in the marketplace (either in whole or in part) ("Un-Covered Gas"), then the breaching Party will pay to the non-breaching Party, as liquidated damages, the Applicable Cover Volume Price per Mcf multiplied by the volume of the Un-Covered Gas within ten (10) Business Days after Formal Notice issued by the non-breaching Party.

12

FURIE-ANK_00002817
DA00800

2.10    **Buyer's Priority; Seller's Assurances.**

By making the commitments to make Gas available under this Agreement, Seller agrees to provide to Buyer adequate Gas to satisfy its obligations under this Agreement, subject to Seller's Existing Commitments.  In all situations which curtail the volumes of Gas available for delivery by Seller after the Start Date (including due to a *Force Majeure* Event), the Existing Commitments shall have first priority over Buyer to any Gas Seller has available, including priority to any Gas still being processed by Seller at Seller's Facilities; provided, however, all of Buyer's remedies under this Agreement are preserved, including the right to cover under Section 2.9. Any subsequent third party agreements that Seller enters into to dispose of Seller's Gas after the Effective Date and during the Term must recognize this Agreement and Buyer's priority to the Firm Gas (but second to Existing Commitments), as provided by the terms of this Agreement. With effect from the Start Date, after Seller has satisfied Existing Commitments, Buyer has first call on sufficient volumes of Gas produced from Seller's Facilities to satisfy Buyer's right to Firm Gas under this Agreement. Seller shall have: (i) the right to sell Gas produced from Seller's Facilities to any purchaser; and (ii) the right to amend any contracts for Existing Commitments to increase Gas use or sales. The transactions described in the preceding sentence are collectively defined as "New Sales." The right to make any New Sale for Gas volumes is subject to the following constraints:

        a.      No New Sale for Gas volumes on a Firm basis shall be made after the Start Date unless Seller's Available Gas Reserves, as same may be adjusted from time to time, exceed:

                i.   The undelivered portions of the Seller's commitment for Firm Gas under this Agreement, as same may be amended from time to time; plus

                ii.   The undelivered portion of all prior New Sales; plus

                iii.   The amount of Gas which would be committed to the proposed New Sale.

        b.      The term "Seller's Available Gas Reserves" shall mean the total quantity of Seller's proved developed Gas reserves, and proved undeveloped Gas reserves in the various formations underlying Seller's properties in the KLU, less the undelivered portion of the total volumes of Gas which Seller has reserved and/or committed under its Gas Sales Commitments.

        c.      Each contract for a New Sale shall contain the following provision, or wording substantially similar thereto:

"If it is at any time determined that Seller's available gas reserves are insufficient to permit it to make deliveries under this contract and meet its obligations to its existing Firm gas sales to third parties, including, Alaska Pipeline Company under the agreement dated February 26, 2016, Seller may, in its sole discretion, from time to time temporarily reduce gas deliveries under this contract to an amount (not less than zero) sufficient to give priority to such prior Firm gas sales contracts."

Seller agrees that the term "available gas reserves" will be defined in any such New Sale contract in a manner consistent with the definition of such term in this Agreement.

13

FURIE-ANK_00002818
DA00801

d.      Each time Seller enters into a New Sale during the Term, Seller shall provide Buyer the total and annual quantities of Gas sold, or to be sold, the term of the contract, and the maximum quantities deliverable daily. Seller shall provide this information (except for the amount of Gas actually delivered) within 15 Days of entering into a New Sale and at least 30 Days in advance of beginning deliveries under any such New Sale. Each April 1, Seller shall advise Buyer in writing of the amount of Gas sold and delivered during the prior 12 months under such New Sale contracts.

e.      Seller's Reserves Assurances. Seller must demonstrate in the manner set forth below that Seller's Available Gas Reserves are sufficient to fulfill its commitments under this Agreement. On or before the date that is 30 Days prior to the Start Date and on or before April 1st each year thereafter, Seller shall deliver to Buyer the following items by Formal Notice. To permit Buyer to evaluate the information contained therein, Buyer may request copies of all information, material and data which Seller has available concerning Seller's Available Gas Reserves. Buyer will take all necessary steps to preserve the confidentiality of data received from Seller under this Section 2.10:

i.      Reserves Report. The Engineer's reserves report shall be based on sound geologic, economic, and other data; shall be consistent with sound engineering principles; and shall set forth Seller's Gas Reserves. The Engineer's fees and expenses shall be paid by Seller.

ii.     Engineer's Opinion Letter. Based on the reserves report set forth in section (i) above, Seller shall also deliver a letter from an Engineer which states that, Seller's Gas Reserves are sufficient to meet Seller's obligations to deliver the Annual Contract Quantity and the maximum Daily Contract Quantity in Sections 2.1(a)-(b) and 2.2 (but not 2.3) in each Contract Year during the then-remaining Term, assuming reasonable and prudent operations. Engineer's letter shall be substantially in the form set forth in Exhibit D or be in such other form reasonably agreed between Seller and Buyer.

iii.    Statement of Seller's Available Gas Reserves. Seller shall deliver a Statement of Seller's Gas Reserves, the sum of Seller's Gas Sale Commitments, and a forecast of Seller's field operations Gas to be used during the remaining Term, all as of January 1 of the Year in which the statement is submitted to Buyer. The Statement of Seller's Available Gas Reserves shall contain the information concerning Seller's Gas Reserves substantially as set forth in Exhibit E.

2.11    **Forecasts**

a.      Beginning in calendar Year 2018, Seller shall provide to Buyer a total maximum daily deliverability forecast for the upcoming Contract Year in writing on or before April 1 of each Contract Year by Formal Notice. The forecast shall include all of Seller's Gas Sales Commitments, provided that such Gas Sales Commitments shall not include names of

14

Seller's buyers or prices of Gas sold thereunder. Exhibit F is the template for Seller's forecast of Seller's Daily maximum deliverability commitments.

b.    On or before October 1 of each Year following the Effective Date, Buyer will give Seller a Buyer's forecast for the next ten Years by Regular Notice ("Buyer's Forecast"). Buyer's Forecast is Buyer's estimate for each calendar Year of (i) requirements for volumes and peak Day deliverability; (ii) Gas that Buyer is obligated to purchase from each of Buyer's Gas suppliers; and (iii) Gas that Buyer projects will be injected and withdrawn from CINGSA. Exhibit G is the template for Buyer's Forecast.

2.12    **Use of Gas Supply.**

Buyer may use the Gas supplied under this Agreement for any purpose.

## ARTICLE 3     PRICE; COST ALLOCATION

3.1    **Sales Price.**

a.    The Sales Price for Gas per Mcf under this Agreement for Firm Gas, Daily Call Option Gas and Emergency Gas during each applicable Contract Year shall be as follows:

| Volumes | Cost per Mcf | | |
|---|---|---|---|
| | Contract Year beginning April 1, 2018 | Contract Year beginning April 1, 2019 | Contract Year beginning April 1, 2020 |
| Firm Gas (the "Firm Volume Price") | $6.70 | $6.83 | $6.97 |
| Daily Call Option Gas | $7.73 | $7.88 | $8.04 |
| Emergency Gas | Not to exceed $9.28 | Not to exceed $9.47 | Not to exceed $9.66 |

b.    During the Extended Term, if Buyer exercises its option pursuant to Section 13.2, the Sales Price for Gas under this Agreement for Firm Gas, Daily Call Option Gas and Emergency Gas during each applicable Contract Year shall be as follows:

| Volumes | Cost/Mcf | |
|---|---|---|
| | Contract Year beginning April 1, 2021 | Contract Year beginning April 1, 2022 |
| Firm Gas (the "Firm Volume Price") | $7.11 | $7.25 |
| Daily Call Option Gas | $8.20 | $8.36 |

15

| Emergency Gas | Not to exceed $9.85 | Not to exceed $10.05 |

       c.    If Seller is unable to meet the Conditions Precedent set forth in Section 13.3(b) within the time periods set forth therein, the Sales Price for Gas under this Agreement for Firm Gas, Daily Call Option Gas and Emergency Gas during each applicable Contract Year shall be as follows:

| Volumes | Cost per Mcf | | |
|---|---|---|---|
| | Contract Year beginning April 1, 2018 | Contract Year beginning April 1, 2019 | Contract Year beginning April 1, 2020 |
| Firm Gas (the "Firm Volume Price") | $6.30 | $6.43 | $6.57 |
| Daily Call Option Gas | $7.20 | $7.34 | $7.50 |
| Emergency Gas | $9.28 | $9.47 | $9.66 |

       d.    If Seller is unable to meet the Conditions Precedent set forth in Section 13.3(b) within the time periods set forth therein and if Buyer exercises its option pursuant to Section 13.2, the Sales Price for Gas under this Agreement for Firm Gas, Daily Call Option Gas and Emergency Gas during each applicable Contract Year shall be as follows:

| Volumes | Cost/Mcf | |
|---|---|---|
| | Contract Year beginning April 1, 2021 | Contract Year beginning April 1, 2022 |
| Firm Gas (the "Firm Volume Price") | $6.71 | $6.85 |
| Daily Call Option Gas | $7.66 | $7.82 |
| Emergency Gas | Not to exceed $9.85 | Not to exceed $10.05 |

       e.    If Seller demonstrates to Buyer's reasonable satisfaction that it can meet the Conditions Precedent set forth in Section 13.3(b) by no later than October 31, 2017, the Sales Price set forth in the tables in Sections 3.1(c) and 3.1(d) will revert to the Sales Price set forth in the tables in Sections 3.1(a) and 3.1(b).

       f.    If subsections c. or d. of this Section 3.1 apply, Buyer waives its right to seek cover for any quantity shortfall in the particular circumstance contemplated in such subsections.

CONFIDENTIAL

FURIE-ANK_00002821
DA00804

3.2 **Production and Transportation Costs.**

a.     Seller is responsible for all Gas processing and treatment expenses to meet the quality requirements of Article 7, as well as royalties and severance/production taxes. Seller is also responsible for, and all transportation cost(s) to the Delivery Point and Gas retained by pipelines to the Delivery Point.

b.     Buyer is responsible for all transportation cost(s) and Gas retained by pipelines, taxes, and any and all other costs related to Gas, at and beyond the Delivery Point.

## *ARTICLE 4*     DELIVERY POINT; TITLE; LIABILITY AND RISK OF LOSS.

4.1 **Delivery Points.**

a.     Unless otherwise agreed between the Parties, the authorized delivery points are set forth in Exhibit A ("Delivery Points") provided however that Seller shall have discretion to deliver Gas at any such Delivery Point.

b.     Buyer may request Gas to be delivered at additional delivery points, and in such case Seller will work in good faith to honor such requests. In any case where Buyer requests Gas to be delivered at an additional delivery point, Seller's good faith obligation shall be within the limitations of Seller's Gas production facilities, the requirements of Seller's other Gas sales agreements and Seller's ability to economically administer its business. In any such case where Buyer requests delivery at an additional delivery point agreed by Seller, Buyer shall pay any additional transportation costs of Seller required to deliver Gas to the Buyer's additional delivery points.

4.2 **Title.**

Title to all Gas delivered by Seller and received by Buyer will pass at the Delivery Points. All liability and risk associated with the Gas will follow title.

## *ARTICLE 5*     TAXES

5.1 **General Allocation.**

Seller will pay all taxes, fees, penalties, and assessments (including Production Taxes) attributable to Gas or any other activity or facility prior to the Delivery Point.  Buyer will pay all taxes, fees, penalties, and assessments attributable to Gas or any other activity or facility at or after the Delivery Point.

5.2 **New Production Taxes and Financial Incentives.**

Notwithstanding anything in Section 5.1 to the contrary, Seller shall be responsible for any production taxes attributable to its operations and transactions.  Seller shall be responsible for any changes in the State of Alaska's financial incentives or credits from the financial incentives or credits in place on the Effective Date, including, without limitation, any changes in the financial incentives or credits contained in AS 43.55 *et seq.*

17

## *ARTICLE 6*    **ROYALTIES**

a.    Seller will be responsible for the payment of all royalties and any fees, penalties and assessments attributable to the royalties on Gas delivered under this Agreement. If Gas sold under this Agreement is produced from land owned by the State of Alaska, Seller is responsible for obtaining acceptance by the Alaska Department of Natural Resources of the Sales Price paid under this Agreement as to the value of the State's royalty share of production under AS 35.05.180(aa).

b.    If and to the extent that any one or more royalty owners of the Gas purchased by Buyer from Seller requires Seller under applicable laws, regulations, or lease terms to pay royalties on gas sold hereunder at a value that exceeds the applicable Gas sales price under this Agreement, Buyer shall reimburse Seller the "excess royalties" that Seller pays to royalty owners.  For clarification, the "excess royalties" referred to in the previous sentence shall be calculated as the product of: (1) the value of Gas for purposes of royalty payments less the actual sales price; (2) the applicable royalty percentage; and (3) the volume of Gas sold to which the royalty percentage applies.

c.    If and to the extent that the State of Alaska elects under applicable laws, regulations, or lease terms to take its royalty in kind, then Seller will have the right, in its sole discretion, to reduce Seller's obligations under this Agreement, provided, however, that, Seller shall give Buyer no less than 30 Days' prior notice of any such event and Seller and Buyer shall then meet to work out in good faith a reasonable reduction to the Gas volumes to be provided by Seller under this Agreement.

## *ARTICLE 7*    **QUALITY**

### 7.1    **Quality of Gas.**

Seller warrants that all Gas delivered under this Agreement will be of a condition and quality meeting the specifications set forth in <u>Exhibit B</u>.

### 7.2    **Buyer's Right to Refuse Gas.**

Seller will immediately notify Buyer if Seller becomes aware that any Gas made available to Buyer does not meet the quality specifications in this Article 7.  Should any concern arise regarding the quality of the Gas made available by Seller under this Agreement, the Parties will consult and cooperate concerning the quality concerns; provided, however, that this obligation to consult and coordinate will not prejudice the right of Buyer to take actions necessary for safety or health concerns, or to prevent damage to equipment or facilities due to off-specification Gas from Seller.  If Buyer becomes aware by notice from Seller or otherwise that Gas to be delivered does not meet the quality specifications in this Article 7, then Buyer will have the right to refuse to accept delivery of any Gas failing to meet the quality specifications in this Article 7 by delivering a Regular Notice to Seller.  If Buyer refuses to accept off-specification Gas, and if Seller determines (and Buyer's engineer agrees) that Seller's incurring the cost of conditioning the Gas to meet the quality specifications would not be economic, Seller may revise downward Seller's

18

FURIE-ANK_00002823
DA00806

gas delivery obligations under this Agreement; provided, however, that all rights of Buyer to seek cover under Section 2.9 for undelivered quantities are preserved.

### *ARTICLE 8*        PRESSURE, MEASUREMENT, METERING, AND TESTING

8.1    **Pressure.**

Gas delivered under this Agreement shall be delivered at a pressure sufficient to enter the applicable Cook Inlet Gas Pipeline System at the Delivery Point.

8.2    **Measurement.**

Seller will own, maintain, and operate, at Seller's expense, a measurement station at or near the Delivery Point. Unless agreed otherwise, the Delivery Point measurement station will consist of (i) standard measuring equipment conforming to the requirements of American Gas Association Gas Measurement Committee Reports in effect on the Effective Date, or as amended or supplemented, (ii) appurtenant facilities, (iii) hydrometers, if necessary, and (iv) data telemetry equipment. Buyer will have access to the Delivery Point measurement station at which Seller tenders Gas at reasonable hours and on reasonable notice to Seller, but Seller will make all calibrations, measurements, and adjustments. Seller will make available to Buyer, and will not charge Buyer for access to, telemetry signals (pressure and flow rates) on Seller's system that Buyer requires to manage its Gas supply and demand systems. Buyer will maintain the same radio telemetry signals through the term of this Agreement, but any new costs of acquiring or using the telemetry signals by Seller will be paid by Seller.

8.3    **Inaccurate Meters.**

If a meter is out of service or registering inaccurately by more than one percent (1%), the volumes of Gas delivered will be estimated:

  i.    by using the volumes registered by the check meter or meters of Seller, if installed, and accurately registering, or

  ii.   in the absence of (i), by correcting the error if the percentage of error is ascertainable by calibration, test or mathematical calculations, or

  iii.  in the absence of both (i) and (ii), then by estimating the quantity of deliveries based on deliveries during comparable periods under similar conditions when the meter was registering accurately.

8.4    **Testing.**

Seller's measuring equipment will be continuously monitored by a condition-based monitoring system to provide continuous, remote monitoring of the natural gas measurement system. Seller shall make a monthly meter report available to the Buyer. Seller shall perform calibration and gas sampling on the measuring equipment on a monthly basis. After the Start Date, at Buyer's request, Seller will give Buyer reasonable advance notice (at a reasonable time of at least forty-eight (48) hours so that Buyer (or its designee) may conveniently witness the calibration

19

and sampling tests. If Buyer notifies Seller that it desires to test the accuracy of any measuring equipment based on a reasonable good faith belief that such testing is required, Seller will test the accuracy of the measuring equipment promptly after the notification. Buyer will have the right to witness the calibrating, adjusting and testing of the measuring equipment. Seller will, on reasonable request of Buyer, give its physical test and meter proving reports to Buyer. If there is a dispute about any measurement, the Parties will conduct a joint test that will be dispositive. If the joint test reveals there was an error, then Seller will pay all costs associated with the joint test. If the joint test reveals there was no error, then Buyer will pay all costs associated with the joint test.

8.5    **Correction.**

If any of Seller's measuring equipment is found to be inaccurate by one percent (1%) or less, previous records of the equipment will be considered accurate. If any such measuring equipment is found to be inaccurate by more than one percent (1%), any previous records of that equipment will be corrected to zero error for any period known definitely or agreed upon. If a period of inaccuracy is not definitely known or agreed upon by the Parties, the correction will be made for a period of one-half (1/2) of the time elapsed since the date of the last test. The correction will establish the volumes associated with the inaccuracy. Any such measuring equipment found by a test to be inaccurate, even if such error is less than one percent (1%), will immediately be adjusted or replaced, as appropriate.

8.6    **Standards.**

Seller will determine, or will rely on the information provided by others to determine, the volumes of Gas received and purchased under this Agreement as follows:

a.    The unit of volume measurement will be one Standard Cubic Foot with correction for temperature and pressure deviation from the Ideal Gas Laws according to ANSI/API 2530 or AGA Report No. 8, as amended and as applicable.

b.    The average absolute atmospheric pressure will be assumed to be fourteen-and-sixty-five hundredths (14.65) psia for all measurement purposes, irrespective of actual elevation or location of the Delivery Point above sea level or variations in actual atmospheric pressure.

c.    The specific gravity of Gas may be determined by the use of a spot test method or, if the Parties later agree in writing, by the use of a recording gravitometer generally accepted in the industry. If a recording gravitometer is used, the arithmetic average of the specific gravity of Gas flowing through the meters will be used in computing Gas volumes. If a spot test method is used, the specific gravity of the Gas will be determined at least twice per year, or more often if changes in specific gravity indicate that such determination is necessary. Any such test will determine the specific gravity to be used in determining the volumes of Gas delivered and purchased under this Agreement effective the first Day of the Month following the date of the test and will be used until the results of a subsequent test become effective.

d.    The temperature of Gas will be determined by a recording thermometer so installed that it will record the temperature of the Gas flowing through the meters. The average

20

FURIE-ANK_00002825
DA00808

of the recorded temperatures to the nearest one degree (1°) Fahrenheit obtained while Gas is being delivered on any Day will be used in computing the volumes of Gas made available to Buyer by Seller on that Day.

     e.  Seller will have the right to audit Buyer's records of the volumes of Gas made available and taken under this Agreement for up to two (2) Years following delivery of that Gas to Buyer.

### 8.7  **Check Meters.**

Seller will have the right to operate and maintain check meters and other test equipment and devices at or before the Delivery Point at its own expense.

### 8.8  **Records.**

Each Party will preserve for a period of at least six (6) Years all test data, charts and other similar records for amounts of Gas made available and purchased under this Agreement.

## *ARTICLE 9*  **BILLING, PAYMENT, AND RECORDS**

### 9.1  **Billing.**

On or before the fifteenth (15th) Day of each Month in which an invoice is to be delivered, Buyer will furnish to Seller a statement showing (i) the total volume of Gas delivered by Seller during the preceding Month and (ii) the total volume of any Gas made available for delivery by Seller as required under the terms of this Agreement but not taken by Buyer during such preceding Month, unless Buyer is excused from taking delivery under the terms of this Agreement. Seller will deliver to Buyer an invoice showing the amount owed by Buyer under the terms of this Agreement and any corrections for the Months prior to such preceding Month (including those due to Seller issuing provisional invoices for the reasons described in the next sentence). If Buyer fails to provide the necessary volume information by the fifteenth (15th) Day of the Month, Seller may issue provisional invoices based on its reasonable determination of the relevant volumes of Gas. Buyer shall make payment to Seller by Automated Clearing House or wire transfer within ten (10) Business Days of when the Buyer receives an invoice. Buyer may dispute an invoice by delivering a notice to Seller that reasonably sets forth the basis of the dispute, the amount in dispute and reasonable documentation supporting Buyer's position. Notwithstanding the previous sentence, Buyer will pay all undisputed amounts within ten (10) Business Days after the invoice was presented. Buyer may, without prejudice to any claim or right, pay any disputed amount. The Parties will cooperate to resolve any disputed amount within thirty (30) Days after the payment due date.

### 9.2  **Records and Audits.**

Each Party will have the right to inspect the files, books, and records of any other Party that pertains to this Agreement. Inspections will be conducted during regular business hours after reasonable notice. Adjustments for any over or under payments will be made promptly after determination. All billings will be conclusively presumed final and accurate unless objected to in

21

FURIE-ANK_00002826
DA00809

writing within two (2) Years after the end of the Month in which the Gas was delivered. The obligations to make payment for Gas received will survive the termination of this Agreement.

9.3    **Interest.**

Except for amounts incorrectly invoiced in a provisional invoice, any amount not paid when due (or any overpayment), including amounts subject to dispute under Section 9.1, will accrue interest daily at the rate of interest that is two (2) percentage points more than the one month LIBOR rate applicable at the due date for payment.

9.4    **Remedies for Non-Payment.**

a.    Seller's Remedies. If Buyer fails to pay undisputed amounts to Seller for Gas within the time required under Section 9.1 or for any Cover Amount within the time required under Section 2.9, Seller shall deliver to Buyer a formal Notice of payment default, which shall (i) detail the amount of the payment default, and (ii) provide a cure period of fifteen (15) Days for Buyer to cure the default. If Buyer fails to cure the default within the fifteen (15) Day cure period, Seller shall have the right to interrupt deliveries under this Agreement until payment (and interest under Section 9.3 above) is received. This interruption right will not prejudice Seller's rights to collect any sums due Seller (including interest under Section 9.3 above) for Gas previously delivered to Buyer hereunder or any amount due to Seller under Sections 2.9 and 9.1.

b.    Buyer's Remedies. If Seller fails to pay any amount due to Buyer within the time required under Section 2.9, Buyer shall deliver to Seller and Seller's Lender a Formal Notice of payment default, which shall (i) detail the amount of the payment default, and (ii) provide a cure period of fifteen (15) Days for Seller or Seller's Lender to cure the default. If Seller or Seller's Lender fails to cure the default within the fifteen (15) Day cure period, Buyer shall have the right to cease or curtail receipts under this Agreement without notice to Seller until payment (and interest under Section 9.3 above) is received, which interruption right will not prejudice Buyer's rights to collect any sums due Buyer (including interest under Section 9.3 above) for amounts previously invoiced to Seller under Section 2.9; (ii) subject to the provisions of Section 12.1 request payment of such amounts from the bank issuing the Letter of Credit; and/or (iii) terminate this Agreement pursuant to Section 13.4 and 13.5.

## *ARTICLE 10*    **APPROVALS**

10.1    **Regulatory Approval.**

a.    Submission. This Agreement must be approved by the RCA before Buyer purchases Gas hereunder. Buyer will submit this Agreement to the RCA for its consideration on or before March 31, 2016.

b.    Buyer's Efforts & Seller's Cooperation. Buyer will use commercially reasonable efforts to obtain RCA Approval of this Agreement. Seller shall cooperate with Buyer and will provide letters of support to the RCA with respect to Buyer's RCA Approval of this Agreement; provided, however, that Seller need do nothing which may allow the RCA or another party to an RCA proceeding to require Seller to become a party to such proceeding, nor need

22

FURIE-ANK_00002827
DA00810

Seller do anything to incur any cost or take any other action that will expose Seller's employees or experts to being called as witnesses in an RCA proceeding.

c.    RCA Orders.  If the RCA issues an order that approves (conditionally or otherwise) this Agreement and imposes terms and conditions or modifications unacceptable to Buyer or Seller, each as determined in its sole and absolute discretion, Buyer or Seller shall attempt to negotiate in good faith mutually acceptable alternative provisions within thirty (30) Days of the RCA order. If the Parties cannot negotiate mutually acceptable provisions in that period, either Buyer or Seller may terminate this Agreement upon written notice to the other Party, such termination to take effect on the date outlined in any such written notice of termination.  If RCA Approval has not been obtained by October 31, 2016, either Party may terminate this Agreement upon notice to the other Party, such termination to take effect on the date outlined in any such written notice of termination.

d.    Approval.  "RCA Approval" will be deemed to have occurred on the date that an RCA order approving the Agreement, including approval of recovering all costs resulting from this Agreement in the rates of Buyer's affiliate ENSTAR Natural Gas Company, without conditions or modifications unacceptable to the Parties, becomes final and is not subject to further reconsideration by the RCA.

## *ARTICLE 11*    **FORCE MAJEURE**

11.1    **Force Majeure.**

a.    No Party will be responsible for any loss or damage to the other Party resulting from any delay in performing or failure to perform any obligation under this Agreement (other than Buyer's obligation to make payments due and owing under this Agreement) if the failure or delay is caused by a *Force Majeure* Event.

b.    "*Force Majeure* Event" means any event that directly or indirectly renders a Party unable, wholly or in part, to perform or comply with any obligation, covenant, or condition in this Agreement, excluding indemnification obligations and any obligation to pay money that has become due and payable hereunder, if the event is not attributable to the gross negligence or willful misconduct of the affected Party. *Force Majeure* Events include, without limitation, the following events:

i.    Act of God, fire, lightning, landslide, earthquake, tsunami, storm, volcanic eruption, flood, high water, washout, explosion, or well blowout;

ii.   strike, lockout, or other industrial disturbance, act of the public enemy, war, military operation, blockade, insurrection, riot, epidemic, arrest or restraint by government of people, terrorist act, civil disturbance, or national emergency;

iii.  the inability of the affected Party to acquire, or the delay on the part of the affected Party in acquiring, materials, supplies, machinery, equipment, servitudes, right of way grants, pipeline shipping capacity, easements,

23

FURIE-ANK_00002828
DA00811

permits or licenses, approvals, or authorizations by regulatory bodies or oil and gas lessors needed to enable the Party to perform;

    iv.  breakage of or accident to machinery, equipment, facilities, or lines of pipe, and the repair, maintenance, improvement, replacement, test, or alteration to the machinery, equipment, facilities, or lines of pipe, and the freezing of a well or line of pipe, or the partial or entire failure of a Gas well; or

    v.  act, order, or requisition of any governmental agency or acting governmental authority, or any governmental law, proration, regulation, or priority.

    vi.  In the case of Seller, if for reasons other than set forth in Section 11.1(b) sub-clauses i. through v. above, loss or inoperability of or damage to Seller's Facilities for thirty (30) consecutive Days.

    c.    Notwithstanding any provision set forth in this Article 11 or elsewhere in this Agreement, in no case shall a *Force Majeure* Event include (i) a lack of funds of either Party, (ii) financial hardship or the inability of a Party to make a profit or achieve a satisfactory rate of return from the sale, purchase or consumption of Gas, or (iii) loss of customers or loss of market.

    d.    The Party claiming excuse under Section 11.1(a) will:

    i.  notify the other Party of the *Force Majeure* Event within a reasonable time after its occurrence by Formal Notice, giving reasonably full particulars and its best estimate of the time required to remedy the *Force Majeure* Event;

    ii.  keep the other Party informed of all significant developments; and

    iii.  exercise diligence in good faith to remedy the *Force Majeure* Event and resume full performance under this Agreement as soon as reasonably practicable (except that the settlement of strikes, lockouts, or other labor disputes or the restoration of a failed Gas well will be entirely within the discretion of the affected Party).

## 11.2    **Alternative Arrangements**

    a.    A Party in receipt of a Notice of a *Force Majeure* Event served under Section 11.1(d) (the "Non-Affected Party") may make reasonable alternative arrangements to alleviate the inability to tender for delivery or receive Gas, as applicable. These alternative arrangements will be made in consultation with the other Party, and each Party shall act reasonably.

    b.    Subject to the Parties complying with Section 11.2(a), both of the following apply:

    i.    If Buyer is the Non-Affected Party, and Buyer enters into arrangements to procure alternative Gas from other sources in quantities and for a period of time that matches as nearly as practicable the expected inability of Seller to tender Gas for delivery, Buyer shall be excused from the obligation to purchase

24

FURIE-ANK_00002829
DA00812

and receive Gas under this Agreement to the extent of quantities covered by such arrangements.

ii.    If Seller is the Non-Affected Party, and Seller enters into arrangements to sell Gas to other buyers in quantities and for a period of time that matches as nearly as practicable the expected inability of Buyer to receive Gas, Seller shall be excused from the obligation to sell and tender Gas for delivery under this Agreement to the extent of quantities covered by such arrangements.

### 11.3    Extended Force Majeure Events

If the Party claiming the *Force Majeure* Event estimates that the *Force Majeure* Event will not be remedied for a period of more than ninety (90) Days, the Parties shall meet within thirty (30) Days to agree upon a commercially reasonable course of action during the period of the *Force Majeure* Event that is consistent with the intent of this Agreement. If the Parties are unable to agree upon a commercially reasonable course of action, either Party, upon sixty (60) Days' notice, may reduce Seller's and Buyer's obligations with respect to the affected portion of the Gas to be made available and taken hereunder: provided however, that the remaining provisions of this Agreement shall apply with respect to the portion of Seller's and Buyer's obligations that are not so reduced.

## *ARTICLE 12*    CREDITWORTHINESS

### 12.1    Letter of Credit.

Seller shall provide Buyer with a renewable, and irrevocable standby letter of credit to be effective as of the Start Date for annual renewable periods lasting for the later of the duration of this Agreement or until payment of all obligations due at the time the Agreement terminates. The revolving letter of credit shall be in an amount equal to $6 million at the initial date of each Contract Year issued by a mutually agreed upon major commercial bank operating in the United States naming Buyer as beneficiary (the "Letter of Credit") and shall be in a form that is mutually agreeable to both the Seller and the Buyer which permits Buyer to draw on the Letter of Credit only in the event of Seller's default under the terms of this Agreement and only after all cover provisions in Section 2.9 and elsewhere in this Agreement have been complied with, all required notices have been given and all cure periods hereunder have expired. The Letter of Credit may be drawn upon to compensate Buyer for Seller's failure to pay any amount due under this Agreement by the applicable deadline. If Seller fails to provide evidence of such Letter of Credit by April 1 of each Contract Year, Buyer shall send a Formal Notice of such default and provide a cure period of fifteen (15) days for Seller or Seller's Lender to cure the default. If Seller or Seller's Lender fails to cure the default within the thirty (30) day cure period, Buyer shall have the right to terminate this Agreement pursuant to Sections 13.4 and 13.5.

### 12.2    Continuing Obligation of Seller.

Each Party shall demonstrate and maintain creditworthiness at all times during the Term. Each Party will provide the other Party with such information as the other Party might reasonably request to enable such Party to evaluate the other Party's creditworthiness, and the Party providing

25

the information may require the Party receiving such information to execute a confidentiality agreement as a condition to providing the information. If either Party fails to provide the requested information within ten (10) Business Days of receipt of other Party's request, the non-complying Party may reasonably be deemed to be not creditworthy by other Party. In addition, each Party shall notify the other Party in writing within five Business Days of the details of any material adverse change in its business, properties conditions (financial or otherwise) or results in operations. Any failure by each Party to maintain creditworthiness, as determined by the other Party in its sole reasonable discretion, represents a breach of this Agreement.

### *ARTICLE 13*    COMMENCEMENT AND TERMINATION

#### 13.1    **Commencement and Termination.**

The term of the Agreement shall commence on the Effective Date, and shall terminate on the Termination Date subject to Section 13.2 below. Deliveries under this Agreement shall commence on April 1, 2018.

#### 13.2    **Option to Extend Term.**

If Buyer notifies Seller in writing on or before Exercise Date that it is exercising its option to proceed with the purchase and sale of Gas during the Extended Term, then Seller shall continue to provide Gas during the Extended Term according to the terms and conditions of this Agreement.

#### 13.3    **Conditions Precedent.**

a.      Seller shall deliver a Formal Notice to Buyer, no later than April 1, 2016, containing a written certification signed by an officer of Seller, and such other evidence as Buyer in its reasonable discretion deems necessary, that Seller has produced and sold Gas to third party commercial customers, provided that Seller shall not be required to provide Buyer with the name of any Gas buyer or the sales price for such Gas. If Seller does not provide such officers' certification and satisfactory evidence by April 1, 2016, Buyer may terminate this Agreement pursuant to Sections 13.4 and 13.5 and neither Buyer nor Seller shall incur no financial obligations, costs, damages or requirements to the other Party related to termination of the Agreement.

b.      By December 31, 2016, Seller must have at least three (3) wells that can be used to produce the volumes of Gas contemplated under this Agreement as outlined in the development schedule in Exhibit H. Seller shall deliver confirmation to Buyer's reasonable satisfaction that it has the ability to produce the Gas at rates sufficient to meet Seller's Existing Commitments and commitments contemplated under Sections 2.1 and 2.2. In the event Seller cannot demonstrate to Buyer's reasonable satisfaction that Seller has the ability to produce the Gas at rates sufficient to meet Seller's Existing Commitments and such commitments under this Section 2.1 and Section 2.2 of this Agreement, Seller shall provide a reasonable contingency plan to mitigate this non-performance. The contingency plan shall set forth reasonably satisfactory information, material, and data demonstrating Seller's ability to supply the Gas at rates sufficient to meet Seller's Existing Commitments, all Firm Gas commitments under Section 2.1, and at least 10 Mmcf/d of Daily Call Option Gas commitments under Section 2.2 for the Term of this

26

FURIE-ANK_00002831
DA00814

Agreement by way of third party purchases or alternate sources of Gas. If Seller does not demonstrate to Buyer's reasonable satisfaction the ability to produce Gas or provide a reasonably detailed contingency plan to Buyer's reasonable satisfaction as described in this sub-section (b), Buyer may terminate this Agreement pursuant to the terms of Sections 13.4 and 13.5, and neither Buyer nor Seller shall incur any financial obligations, costs, damages or requirements to the other Party related to termination of the Agreement.

        c.      Seller shall provide Formal Notice to Buyer, by December 31, 2016, containing an updated reserve report that reflects the results of any drilling performed in 2016 ("Updated Reserve Report"). The Updated Reserve Report must contain a statement certified by its Engineer that the Updated Reserve Report is based on sound geological, economic, and other data. Seller shall also provide Buyer with a letter signed by an authorized officer of Buyer that to Seller's knowledge, based on Seller's Available Gas Reserves and Gas Sales Commitments, Seller should be able to meet its Gas volume and deliverability obligations under this Agreement consistent with reasonable and prudent operations. Buyer shall have the right to meet and confer with the Engineer regarding the Updated Reserve Report; Buyer shall also have the right to disseminate the Updated Reserve Report to a third party expert of Buyer's choosing provided such third party signs a Confidentiality Agreement with Buyer agreeing to keep such Updated Reserve Report and related data confidential. Buyer will have fifteen (15) Days after receipt of the Updated Reserve Report to either: (i) notify Seller of its intent to proceed with this Agreement; (ii)propose reasonable adjustments to the terms of this Agreement, as agreed by the Parties; or (iii) terminate this Agreement under the terms of Sections 13.4 and 13.5 on the grounds that the Updated Reserve Report does not reasonably demonstrate Seller's ability to meet the delivery commitments set forth in this Agreement, and neither Buyer nor Seller shall incur any financial obligations, costs, damages or requirements to the other Party related to termination of the Agreement. *Force Majeure* shall not apply to the deadlines in this Section 13.

        d.      No later than October 31, 2017, the Parties will meet and confer regarding Seller's ability to fully deliver the volumes of Daily Call Option Gas. If Seller cannot demonstrate its ability to provide the entire Daily Call Option Gas (*i.e.*, less than 20 MMcf/d) to Buyer's reasonable satisfaction, the Sales Price shall be reduced to the amounts listed in Section 3.1(c) and (d) (if applicable) for the duration of this Agreement and Buyer waives its right to seek cover for such quantity shortfall in the particular circumstance contemplated in this Section 13.3(d).

        e.      This Agreement and the Parties' obligations hereunder are also subject to the agreement of Buyer to execute a Consent to Collateral Assignment in a form reasonably acceptable to Seller and Seller's Lender in accordance with the provisions of Section 16.2 below.

13.4    **Termination Events.**

As it pertains to Buyer and Seller, each of the following events is a "Termination Event":

(i)      any Party makes a non-consented assignment or general arrangement of all or substantially all of its assets, for the benefit of creditors;

(ii)     any Party defaults in its Gas delivery or payment obligations (including Seller's obligation to maintain the Letter of Credit as required under Section 12.1 for the

CONFIDENTIAL

duration of the Term) under this Agreement, subject to applicable notice and cure rights set forth in this Agreement;

(iii)     any Party commences, authorizes, or acquiesces in the commencement of a proceeding under any bankruptcy, insolvency, or similar law, or has such a proceeding commenced against it;

(iv)     any Party or any Party's parent company becomes bankrupt or insolvent, or is unable to pay its debts when due;

(v)     Seller fails to meet the conditions precedent required by Section 13.3, except that if pursuant to the provisions of Section 3.1(c), Section 3.1 (d) or Section 13.3(d), the lower Sales Price amounts in Section 3.1(c) and (d) apply, such events shall not constitute a Termination Event.

13.5     **Applicable Cure Period and Termination of Agreement.**

a.     If a Termination Event described in clause (ii) of Section 13.4 occurs, the performing Party may give Formal Notice to the non-performing Party specifying the default and stating its intention to terminate the Agreement no sooner than twenty (20) Days after the receipt of the Notice by the non-performing Party.  Upon issuance and receipt of the Notice of intent to terminate the Agreement, senior management of the Parties shall meet in person during a Business Day prior to the proposed termination date in a good faith effort to resolve the performance failure.  Each Party must propose and accept reasonable alternative times for said meeting.  If the non-performing Party does not propose or accept reasonable times for the meeting, the performing Party may terminate the Agreement on the proposed termination date described in the above referenced notice.  If the performing Party does not propose or accept reasonable times for the meeting, the notice of intent to terminate the Agreement will be void and of no effect.  There is no obligation by either Party to reach a resolution of the performance failure.  If the Parties reach a resolution of the performance failure, they shall commit the resolution to a writing signed by both Parties and such resolution shall become part of this Agreement.  If there is no resolution of the performance failure, the performing Party may terminate the Agreement on the proposed termination date described in the notice.

b.     If a Termination Event described in clause (i), (iii) or (iv) of Section 13.4 occurs, deliveries or payment shall automatically be immediately suspended and this Agreement shall be immediately terminated without any notice requirements.

c.     If a Termination Event described in clause (v) of Section 13.4, Buyer has the right immediately to terminate this Agreement upon delivery of written notice.

13.6     **Reservations.**

The termination of this Agreement will be without prejudice to any rights, obligations and remedies arising out of or in connection with this Agreement, which have vested, matured or accrued to any Party prior to the Termination Date.

28

FURIE-ANK_00002833
DA00816

## *ARTICLE 14*    **NOTICES**

### 14.1    **Formal Notice.**

a.    The following notifications and requests shall be sent by Formal Notice:

(1)    Minor Adjustment (Sec. 2.4(a));

(2)    Major Adjustment Request (Sec. 2.4(b));

(3)    Market Out and Market Return (Sec. 2.5);

(4)    Cover (Sec. 2.9);

(5)    Reserves Report (Sec. 2.10(e));

(6)    Engineer's Opinion Letter (Sec. 2.10(e));

(7)    Seller's Available Gas Reserves Statement (Sec. 2.10(e));

(8)    Seller's Forecast of Daily maximum deliverability commitments (Sec. 2.11(a));

(9)    Payment default by Buyer (Sec. 9.4(a))

(10)    Payment default by Seller (Sec. 9.4(b))

(11)    Termination of Agreement after RCA Order or failure to timely obtain RCA Order (Sec. 10.1(c))

(12)    *Force Majeure* Event (Sec. 11.1(d))

(13)    Default on obligation to maintain Letter of Credit (Sec. 12.1)

(14)    Written Certification by Officer regarding Third Party Commercial Sales (Sec. 13.3(a));

(15)    Updated Reserve Report (Sec. 13.3(c));

(16)    Termination Events (Sec. 13.5);

(17)    Direct Negotiation of a Dispute (Sec. 15.1);

(18)    Arbitration of a Dispute (Sec. 15.1);

(19)    Assignment or Transfer (Sec. 16.2); and

29

FURIE-ANK_00002834
DA00817

(20)    Changes in contact information (Sec. 14.4);

b.    Formal Notice shall be provided as a written letter to the other Party and delivered by both (i) personal delivery or certified mail return receipt requested; and (ii) an email PDF.

(1)    Formal Notice to Buyer shall be sent to both of the following:

Alaska Pipeline Company
Attn:        President
Physical:    3000 Spenard Road
            Anchorage, AK  99503
Mailing:     P.O. Box 190288
            Anchorage, AK  99519
Email:       jared.green@enstarnaturalgas.com

Alaska Pipeline Company
Attn:        Vice President and General Counsel
Physical:    3000 Spenard Road
            Anchorage, AK  99503
Mailing:     P.O. Box 190288
            Anchorage, AK  99519
Email:       moira.smith@enstarnaturalgas.com

(2)    Formal Notice to Seller shall be sent to both of the following:

Furie Operating Alaska, LLC
Attn:        Bruce Webb
Physical:    Senior Vice President
            1029 W. 3rd Avenue, Suite 500
            Anchorage, AK  99501
Mailing:     Same

Email:       B.Webb@Furiealaska.com

Furie Operating Alaska, LLC
Attn:        David Elder
            Chief Financial Officer
Physical:    100 Enterprise Avenue
            League City, TX 77573
Mailing:     Same

Email:       D.elder@Furiealaska.com

30

FURIE-ANK_00002835
DA00818

14.2    **Regular Notice.**

a.    The following notifications and requests shall be sent by Regular Notice:

(1)    Emergency Gas Agreements (Sec. 2.3);

(2)    Communication and Rescheduling Undelivered Gas (Sec. 2.7);

(3)    *Force Majeure* Event (Sec. 2.7);

(4)    Intent to seek cover (Sec. 2.9(a));

(5)    CINGSA Gas Substitution (Sec. 2.9(a));

(6)    Buyer's Forecast (Sec. 2.11(b));

(7)    Off-specification Gas notice by Seller (Section 7.2); and

(8)    Refusal to accept off-specification Gas by Buyer (Section 7.2)

b.    Regular Notice shall be provided in writing by email or email PDF to the other Party, as appropriate.

(1)    Regular Notice to Buyer shall be sent to both of the following:

Title:     Gas Supply Manager
Email:    inna.johansen@enstarnaturalgas.com

Title:     Gas Control Supervisor
Email:    jason.westervelt@enstarnaturalgas.com

(2)    Regular Notice to Seller shall be sent to both of the following:

Title:     Mark Slaughter        Director, Resource Marketing & Transportation
Email:     M.slaughter@Furiealaska.com

Title:     Bruce Webb        Senior Vice President
Email:     B.webb@Furiealaska.com

14.3    **Operational Notice.**

a.    All notifications and requests in Sections not addressed in Sections 14.1 or 14.2 shall be sent by Operational Notice.

31

CONFIDENTIAL

b.    Operational Notice shall be provided by a telephone call to the other Party confirmed in writing by email or email PDF to the other Party, as appropriate.

(1)    Operational Notice to Buyer shall be sent to the following:

| | |
|---|---|
| Title: | Gas Control |
| Phone: | (907) 334-7788 |
| Email: | enstar.gascontrol@enstarnaturalgas.com |

If Gas Control is not immediately available, then Operational Notice shall be sent to:

| | |
|---|---|
| Title: | Gas Control Supervisor |
| Phone: | (907) 334-7751 |
| Cell: | (907) 441-0371 |
| Email: | jason.westervelt@enstarnaturalgas.com |

(2)    Operational Notice to Seller shall be sent to the following:

| | |
|---|---|
| Title: | Mark Slaughter    Director, Resource Marketing & Transportation |
| Phone: | (907) 277-3796 |
| Cell: | (907) 632-2474 |
| Email: | M.slaughter@furiealaska.com |

14.4    **Changes in Contact Information.**

Either Party may designate changes in the contact information set forth in Sections 14.1, 14.2, and 14.3, by Formal Notice as provided in Section 14.1.

## *ARTICLE 15*    DISPUTE RESOLUTION

15.1    **Arbitration.**

a.    In the event of a dispute under the Agreement, the Parties will attempt to resolve such dispute for a period of thirty (30) Days.  If after the 30-Day period, the Parties are unable to resolve the dispute, either Party may initiate binding arbitration that will be conducted in Anchorage, Alaska.

b.    The arbitration contemplated by this Agreement will be administered by the American Arbitration Association and shall be conducted in accordance with the American Arbitration Association's Rules for commercial arbitration.

c.    The number of arbitrators shall be one if the monetary value of the dispute is $5,000,000 or less.  The number of arbitrators shall be three if the monetary value of the dispute is greater than $5,000,000.

32

d.      The arbitrator or arbitrators must remain neutral, impartial and independent regarding the dispute and the Parties. If the number of arbitrators to be appointed is one, that arbitrator, or the presiding arbitrator if the arbitrators are three, must be a lawyer experienced in the resolution of disputes with experience relating to the issues in dispute.

e.      The Parties waive any claim or right to recover for, and the arbitrator has or arbitrators have no power to award, incidental, consequential, punitive or exemplary damages. Except for liquidated damages provided in Section 2.9, the arbitrator has or arbitrators have no authority to appoint or retain expert witnesses for any purpose unless agreed to by the Parties. The arbitrator has or arbitrators have the power to rule on objections concerning jurisdiction, including the existence or validity of this arbitration clause and existence or the validity of this Agreement.

f.      All arbitration fees and costs shall be borne equally regardless of which Party prevails. Each Party shall bear its own costs of legal representation and witness expenses.

g.      The arbitrator or arbitrators must render a reasoned award in writing. This award shall be based upon a decision which must detail the findings of fact and conclusions of law on which it rests.

h.      The dispute will be resolved as quickly as possible. The arbitrator's or arbitrators' award must be issued within three (3) months from completion of the hearing, or as soon as possible thereafter. The award of the arbitrator's will be final and binding.

i.      The arbitrators shall have the right to issue subpoenas and to grant pre-judgment relief. An interim order or award may be enforced in the same manner as a final award.


## *ARTICLE 16*    **MISCELLANEOUS**

### 16.1    **Binding on Successors.**

This Agreement will be binding on and inure to the benefit of the legal representatives, successors, and assigns of the Parties.

### 16.2    **Assignments and Other Transfers.**

No Party may assign its obligations under the Agreement without first obtaining the written consent of the other Party, which consent shall not be unreasonably withheld or delayed. No consent shall be required: (i) if all or substantially all of the assets of a Party are acquired by another person; (ii) if all or substantially all of the Alaska or Cook Inlet area assets of a Party are transferred to a wholly-owned subsidiary of that Party; or (iii) in the event of a merger, consolidation or reorganization of a Party with another person. In the event of an acquisition, asset transfer, merger, reorganization, stock transfer, corporate restructuring or consolidation, the acquiring or surviving entity shall assume the obligations and benefits of the Agreement. Nothing contained in this Section shall in any way prevent any Party from pledging or mortgaging its rights under the Agreement as security for its indebtedness. Notwithstanding any provision contained in

33

FURIE-ANK_00002838
DA00821

this Section 16.2 or elsewhere in this Agreement, Seller may assign this Agreement to any affiliated entity and may assign all or any part of its, rights, benefits and interests in this Agreement to its lenders for financing purposes ("Seller's Lender"). Buyer agrees, simultaneously with the execution of this Agreement, to sign a Consent to Collateral Assignment of such rights, benefits and interests of Seller with Seller's Lender in form and substance reasonably acceptable to Seller, Seller's Lender and Buyer. No assignment by Seller shall release Seller from or diminish its liabilities and responsibilities under this Agreement. In no event shall either Party assign this Agreement, except under the Consent to Collateral Assignment, with fewer than fifteen (15) Days' notice to the other Party.

16.3    **Governing Law.**

This Agreement will be governed by and construed and interpreted in accordance with the laws of the State of Alaska, excluding its rules of conflicts of laws that would refer it to the laws of another jurisdiction.

16.4    **Agreement Not to be Construed Against Either Party as Drafter.**

The Parties recognize that this Agreement is the product of the joint efforts of the Parties and agree that it will not be construed against either Party as drafter.

16.5    **Entire Agreement.**

This Agreement constitutes the entire agreement and understanding between the Parties about the subject matter of this transaction and all prior agreements, understandings, and representations, whether oral or written, about this subject matter are merged into and superseded by this Agreement. No amendment to this Agreement will be binding on either Party until reduced to writing and signed by the Parties.

16.6    **Headings.**

The headings throughout this Agreement are for reference purposes only and will not be construed or considered in interpreting the terms and provisions of this Agreement.

16.7    **Liability and Remedies.**

Except with respect to liquidated damages set forth in Section 2.9, no Party will have any liability to the others for incidental or consequential damages (including, without limitation, special or punitive damages or lost profits or business interruption) resulting from or arising out of this Agreement. Except as provided in Section 13.4 and 13.5, and subject to the Incidental Deviations and Imbalances specified in Section 2.8, Buyer's sole remedy for Seller's failure to deliver Gas that Seller is obligated to deliver under this Agreement is the Cover Price as determined in accordance with Section 2.9. Except as provided in Section 13.5, and subject to the Incidental Deviations and Imbalances specified in Section 2.8, Seller's sole remedy for Buyer's failure to take Gas that Buyer is obligated to take under this Agreement is the Cover Price as determined in accordance with Section 2.9. The liability of the Parties shall be several and separate, and not joint or collective, and each Party shall be responsible only for its obligations.

34

16.8    **Indemnification.**

a.    Indemnification.  Each Party will protect, defend, indemnify, and hold harmless the other from any and all liability and expense on account of all Claims arising from any act or accident including a failure to act, as to which and to the extent that the indemnifying Party was at fault in connection with the installation, presence, maintenance, and operation of property, equipment, and facilities of the indemnifying Party used in connection with or associated with the Gas delivered hereunder.  This duty to protect, defend, indemnify, and hold harmless will survive the expiration or termination of this Agreement as to any obligations that accrued during the Term. Notwithstanding any provision to the contrary set forth in this Section 16.8 or elsewhere in this Agreement, neither Party shall be responsible to the other Party for any Claims caused by or arising out of the willful misconduct of the other Party.

b.    No Alteration of Cover Provisions.  Nothing in this Section 16.8 shall add to, detract from or otherwise modify the provisions of this Agreement concerning the failure or refusal of Seller to deliver Gas or the failure or refusal of Buyer to receive Gas under this Agreement, for which the sole recourse and remedies are set forth in Section 2.9 and Section 13.5.

16.9    **Waiver.**

No failure or delay by any Party in exercising any right under this Agreement will operate as a waiver of that right, nor will any partial exercise of a right preclude any further exercise of that or any other right. Any waiver must be in writing.

16.10    **Multiple Originals.**

This Agreement may be executed in multiple identical counterparts (by electronic or original signature), each of which will have the force and effect of an original, and all of which will constitute but one and the same contract.

16.11    **Authority to Sign.**

Each Party represents and warrants to the other that:

a.    it is duly organized and validly existing under the laws of its respective jurisdiction;

b.    it has full organizational power and authority to enter into and perform this Agreement;

c.    all organizational actions necessary to authorize the execution and delivery of this Agreement and the performance of its obligations under this Agreement have been duly taken;

d.    this Agreement has been duly executed and delivered by an authorized officer or other representative of the Party and constitutes the legal, valid, and binding obligation of the Party enforceable in accordance with its terms, except as such enforceability may be affected by applicable bankruptcy, reorganization, insolvency, moratorium, limitation of actions,

35

FURIE-ANK_00002840
DA00823

or other similar laws affecting creditors' rights generally, and except that the availability of equitable remedies is subject to arbitrator's discretion; and

    e.  the execution, delivery, and performance of this Agreement will not violate the organizational documents of the Party or any material agreement to which the Party is a signatory or by which it is bound.

  16.12  **Severability.**

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced as a result of any rule of law or public policy, all other terms and other provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated by this Agreement are fulfilled to the greatest extent possible.

  16.13  **Further Assurances.**

The Parties agree to do such further acts, including the correction of clerical errors or preparation of exhibits, and to execute such further documents as may reasonably be required to effectuate this Agreement.

  16.14  **Confidentiality.**

Each Party shall, and shall cause its affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective representatives to hold, in confidence any and all information, whether written or oral, concerning the subject matter of this Agreement, except to the extent that the disclosing Party can show that such information (a) is generally available to and known by the public through no fault of the disclosing Party, any of its affiliates or their respective representatives; (b) has been disclosed to any government commission, agency or organization; or (c) is lawfully acquired by the disclosing Party, any of its affiliates or their respective representatives from and after the date of this Agreement from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. Notwithstanding the foregoing, the Parties agree that disclosure may be made: (i) in order to enforce any of the provisions of this Agreement, including, without limitation, the agreement to arbitrate, any arbitration order or award and any court judgment; (ii) to the auditors, legal advisors, insurers, lenders, financial advisors, and affiliates of that Party to whom the confidentiality obligations set out in this Agreement shall extend; (iii) whether that Party is under a legal or regulatory obligation to make such disclosure, but limited to the extent of that legal obligation; (iv) with the prior written consent of the other Party; or (v) as required in connection with RCA or Alaska Department of Natural Resources approvals.

CONFIDENTIAL

FURIE-ANK_00002841
DA00824

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

**ALASKA PIPELINE COMPANY**       **FURIE OPERATING ALASKA, LLC**

By: _____       By: _____

Its: _____Presidnt_____       Its: __Sr. Vice President__

Date: __02/26/2016__       Date: __02/26/2016__

37

FURIE-ANK_00002842
DA00825

## EXHIBIT A

### DELIVERY POINTS (Sec. 4.1)

The following Delivery Points are authorized under this Agreement.

- Furie Meter 215 – At the inlet to the valve assembly at the Kenai Beluga Pipeline connection located at the Hilcorp East Forelands Production Facility approximately 700 feet south of Furie's onshore production facility.

- CINGSA Lateral Connection (ENSTAR/APC MSN 494, Meter 715A - At the facility side of the manual isolation valve flange near the intersection of the Cook Inlet Natural Gas Storage Alaska, LLC 16-inch pipeline and ENSTAR Natural Gas Company/Alaska Pipeline Company's 16-inch CINGSA Lateral pipeline, located in the Southeast ¼ of the Southeast ¼ of Section 4, Township 5 North, Range 11 West, Kenai Peninsula Borough, Seward Meridian, State of Alaska.

38

CONFIDENTIAL

## EXHIBIT B

### GAS QUALITY SPECIFICATIONS (Sec. 7.1)

The following are the gas quality specifications for Gas sold and purchased under this Agreement.

| Quality | Specification |
|---|---|
| **Gross Heating Value** | $\geq$ 950 BTUs per Standard Cubic Foot; and |
| | $\leq$ 1,050 BTUs per Standard Cubic Foot. |
| **Deleterious Matter** | |
| General | Commercially free of dust, gum, gum forming constituents, or other liquid or solid matter that may separate from the Gas in transportation |
| Temperature | $\leq$ 120° Fahrenheit |
| Water | $\leq$ 4 pounds per MMcf |
| Hydrogen Sulfide | $\leq$ 1 grain per 100 Standard Cubic Feet |
| Sulphur | $\leq$ 20 grains of sulphur per 100 Standard Cubic Feet |
| Carbon Dioxide | $\leq$ 3% by volume |
| Oxygen | $\leq$ 1% by volume |
| Filtration | Passed through a .3 micron coalescing filter prior to delivery |

39

CONFIDENTIAL

FURIE-ANK_00002844
DA00827

## EXHIBIT C

## MARKET OUT CALCULATION EXAMPLE (Sec. 2.5)

According to Section 2.5 of this Agreement, the Market Out threshold is 1% of ENSTAR's Buyer's Forecast. Assuming that ENSTAR's estimated annual Gas requirements for the current Contract Year is 33 Bcf, ENSTAR's Market Out threshold will equate to:

**Market Out threshold:** $33,000,000 \text{ Mcf} \times 1\% = 330,000 \text{ Mcf}$

The Market Out share is equal to Seller's Pro Rata Share Percentage:

**Market Out share:** $6,194,000 \text{ Mcf} \div 33,000,000 \text{ Mcf} = 18.77\%$

Assuming that, in the current Contract Year, ENSTAR experiences a loss to its customer base that results in reduction to its estimated annual Gas requirements of 350,000 Mcf, the Market Out volume will equate to:

**Market Out volume:** $350,000 \text{ Mcf} \times 18.77\% = 66,000 \text{ Mcf}$ (rounded to the nearest 1,000 Mcf)

Monthly Contract Quantities will be adjusted on a prospective basis by the Market Out volume allocated proportionally by month over the Contract Year.

**Example:** July adjustment: $310,000 \text{ Mcf} \div 6,194,000 \text{ Mcf} \times 66,000 \text{ Mcf} = 3,300$ (rounded to the nearest 100 Mcf)

### Market Out Scenario Showing Seller's Contract Year Commitment Adjusted by 66,000 Mcf

| | April | May | June | July | August | September | October | November | December | January | February | March | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Days | 30 | 31 | 30 | 31 | 31 | 30 | 31 | 30 | 31 | 31 | 28 | 31 | |
| Daily Contract Quantity, Mcfpd | 22,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | |
| Monthly Contract Quantity, Mcf | 660,000 | 310,000 | 300,000 | 310,000 | 310,000 | 300,000 | 682,000 | 660,000 | 682,000 | 682,000 | 616,000 | 682,000 | 6,194,000 |
| | | | | | | | | | | | | | |
| Market Out | -7,000 | -3,300 | -3,200 | -3,300 | -3,300 | -3,200 | -7,300 | -7,000 | -7,300 | -7,300 | -5,600 | -7,200 | -66,000 |
| | | | | | | | | | | | | | |
| Adjusted Daily Contract Quantity, Mcfpd | 21,800 | 9,890 | 9,890 | 9,890 | 9,890 | 9,890 | 21,750 | 21,770 | 21,750 | 21,760 | 21,760 | 21,770 | |
| Adjusted Monthly Contract Quantity, Mcf | 654,000 | 306,600 | 296,700 | 306,600 | 306,600 | 296,700 | 674,600 | 653,100 | 674,600 | 674,600 | 609,300 | 674,900 | 6,128,300 |

Assuming that, in the current Contract Year, ENSTAR experiences an additional loss to its customer base that results in a reduction of its annual demand by an additional 100,000 Mcf, the Market Out volume will be revised to include the additional Market Out volumes.

40

FURIE-ANK_00002845
DA00828

## EXHIBIT D

## TEMPLATE FOR ENGINEER'S OPINION LETTER
### (Sec 2.10(e))

[Engineer Firm Letterhead]

[Date]

Furie Operating Alaska, LLC
1029 W. 3rd Avenue, Suite 500
Anchorage, Alaska 99501

Dear _____:

In accordance with your request, we have conducted a review of certain oil and gas properties located in Cook Inlet, Alaska. It is our understanding that, pursuant to the terms of the Gas Sales Agreement (GSA) effective February 28, between Furie Operating Alaska, LLC (Furie) and Alaska Pipeline Company (APC), Furie must provide a letter verifying that it can meet its gas deliverability commitments (referred to herein as the Seller's Commitments).

The purpose of this review is to comment on Furie's ability to meet anticipated gas volume and deliverability obligations as specified in the GSA from 2018 through 2022. Our review is based on our estimates of gas volumes to be produced from Kitchen Lights Unit in Cook Inlet, Alaska.

We conducted our review on or about the date of this letter. It should be understood that this review is neither an audit nor a reserves evaluation. This review has been prepared in accordance with the guidelines set forth in the 2007 Petroleum Resources Management System approved by the Society of Petroleum Engineers (SPE). Gas volumes shown in this report should not be construed as reserves, contingent resources, or prospective resources.

The following table sets forth preliminary forecasts of annual gas deliverability requirements from Furie as set forth in the GSA.

**Gas Deliverability Requirements**

| Year | Number of Days | Annual MMCF | Average Daily MMCFD | Maximum Daily MMCFD[1] |
|------|----------------|-------------|---------------------|------------------------|
| 2018 | 365 | 6,194 | 16.97 | 42 |
| 2019 | 365 | 6,194 | 16.97 | 42 |
| 2020 | 366 | 6,194 | 16.93 | 42 |
| 2021 | 365 | 6,194 | 16.97 | 42 |
| 2022 | 365 | 6,194 | 16.97 | 42 |

(1) The Maximum Daily MMCFD fluctuates between 10 during the summer months and 42 during the winter months.

41

CONFIDENTIAL

Gas volumes are expressed in millions of cubic feet (MMCF) or millions of cubic feet per day (MMCFD) at standard temperature and pressure bases.

It is our opinion that the Seller's Commitments are (1) based on sound geologic, economic, and other data and (2) consistent with that data and the GSA. It is also our opinion that Furie will be able to meet its gas volume and deliverability obligations under the GSA in a manner consistent with sound engineering principles and reasonable and prudent operations.

We did not perform any field inspection of the properties, nor did we examine the mechanical operation of condition of the wells and facilities. We have not investigated possible environmental liability related to the properties.

Our review has been prepared in accordance with generally accepted petroleum engineering and evaluation principles set forth in the Standards Pertaining to the Estimating and Auditing of Oil and Gas Reserves Information promulgated by the SPE (SPE Standards). We used standard engineering and geoscience methods, or a combination of methods, including performance analysis, volumetric analysis, analogy, and material balance, that we considered to be appropriate and necessary to establish the conclusions set forth herein. As in all aspects of oil and gas evaluation, there are uncertainties inherent in the interpretation of engineering and geoscience data; therefore, our conclusions necessarily represent only informed professional judgment.

The data used in our review were obtained from Furie, public data sources, and the nonconfidential files of [the Engineer] and were accepted as accurate. Supporting work data are on file in our office. We have not examined the titles to the properties or independently confirmed the actual degree or type of interest owned. The technical persons primarily responsible for conducting this review meet the requirements regarding qualifications, independence, objectivity, and confidentiality set forth in the SPE Standards. We are independent petroleum engineers, geologists, geophysicists, and petrophysicists; we do not own an interest in these properties nor are we employed on a contingent basis.

Sincerely,

[The Engineer]

42

FURIE-ANK_00002847
DA00830

**EXHIBIT E**

## TEMPLATE FOR STATEMENT OF SELLER'S AVAILABLE GAS RESERVES
### (Sec. 2.10(e))

| -A- | -B- | -C- | -D- * |
|---|---|---|---|
| Seller's Gas Reserves | Seller's Gas Sales Commitments | Forecast of Seller's Field Operations Gas | Seller's Available Gas Reserves |
| ### | ### | ### | ### |

\*D = A-B-C

43

FURIE-ANK_00002848
DA00831

## EXHIBIT F

## TEMPLATE FOR SELLER'S FORECAST OF DAILY MAXIMUM
## DELIVERABILITY COMMITMENTS (Sec. 2.11(a))

| Forecast | |
|---|---|
| Month | Daily Maximum Delivery Commitments* |
| Apr-18 | ## |
| May-18 | ## |
| Jun-18 | ## |
| Jul-18 | ## |
| Aug-18 | ## |
| Sep-18 | ## |
| Oct-18 | ## |
| Nov-18 | ## |
| Dec-18 | ## |
| Jan-19 | ## |
| Feb-19 | ## |
| Mar-19 | ## |

* Daily maximum delivery commitments is the aggregate Daily maximum delivery commitments under all Seller's Gas Sales Commitments.

44

CONFIDENTIAL

# EXHIBIT G

## TEMPLATE FOR BUYER'S FORECAST (SEC. 2.11(b))

ALASKA PIPELINE COMPANY
Buyer's Forecast

October 1, 2018

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Volume (Bcf)** | | | | | | | | | | |
| **Buyer's Estimated Annual Gas Requirements** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| **Contracted Volumes** | | | | | | | | | | |
| Hilcorp - APL4 | ### | | | | | | | | | |
| Hilcorp Alaska (UNOCAL) | ### | | | | | | | | | |
| Hilcorp - APL12 | ### | | | | | | | | | |
| Buccaneer Energy - BUC1 | ### | | | | | | | | | |
| Contract "A" | ### | ### | ### | ### | | | | | | |
| Contract "B" | ### | ### | ### | ### | | | | | | |
| Contract "C" | ### | ### | ### | | | | | | | |
| **Total Purchases** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| | | | | | | | | | | |
| Storage Injection | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| Storage Withdrawals | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| **Net Change in Storage** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| | | | | | | | | | | |
| **Total Gas** (Purchases + Net Change in Storage) | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| **Undesignated** (Gas Requirements - Total Gas) | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| | | | | | | | | | | |
| **Total Forecasted Peak Day Deliverability (MMcfd)** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| **Total Firm Deliverability** | | | | | | | | | | |
| CINGSA | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| Hilcorp - APL4 | ### | | | | | | | | | |
| Hilcorp Alaska (UNOCAL) | ### | | | | | | | | | |
| Hilcorp - APL12 | ### | | | | | | | | | |
| Buccaneer Energy - BUC1 | ### | | | | | | | | | |
| Contract "A" | ### | ### | ### | ### | | | | | | |
| Contract "B" | ### | ### | ### | ### | | | | | | |
| Contract "C" | ### | ### | ### | | | | | | | |
| **Total Firm Deliveries** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |
| **Undesignated Deliverability** | ### | ### | ### | ### | ### | ### | ### | ### | ### | ### |

**Notes:**

The Hilcorp Alaska UNOCAL contract is the agreement between Union Oil Company of California and Alaska Pipeline Company dated November 17, 2000.

The BUC1 contract is the agreement between Buccaneer Alaska, LLC and Alaska Pipeline Company dated August 10, 2011.

The APL4 contract is the agreement between Hilcorp Alaska, LLC and Alaska Pipeline Company dated May 1, 1988, as amended.

The APL12 contract is the agreement between Hilcorp Alaska, LLC and Alaska Pipeline Company dated July 1, 2013.

45

FURIE-ANK_00002850
DA00833

## EXHIBIT H

## SELLER'S DEVELOPMENT SCHEDULE (SEC. 13.3(b))

The schedule below sets forth the 2016 Furie development schedules for the drilling of two additional natural gas wells in the Kitchen Lights Unit.   The schedule includes (a) the relocation of the Randolph Yost Jackup rig from Singapore to Alaska (b) inspection and preparation of the rig upon arrival in Alaska, (c) drilling and completion of two natural gas wells, (d)  production from the two wells drilled in 2016

### Furie Operating Alaska, LLC  Kitchen Lights Unit  2016 Development Plan

| | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mobilization of Randolph Yost jack up rig from Singapore | | ★ | | | | | | | | | |
| Staging /Inspection/Preparation of Randolph Yost in Alaska | | | ★ | | | | | | | | |
| Positioning of  Randolph Yost  at Kitchen Lights Unit | | | | ★ | | | | | | | |
| Drill & Log  1st 2016 well | | | | | ★ | | | | | | |
| Drill & Log  2nd  2016 well | | | | | | | ★ | | | | |
| Completion of both wells | | | | | | | | ★ | | | |
| Facility Connections | | | | | | | | ★ | | | |
| Well Log Analysis & Reserve Updates | | | | | | | | | | ★ | |
| Gas Production from 3 Production Wells | | | | | | | | | | | ★ |

46

# EXHIBIT 19

DA00835

Message

| | |
|---|---|
| **From:** | Danny S Davis [dsdavis77@gmail.com] |
| **Sent:** | 5/23/2016 1:18:00 PM |
| **To:** | admin [l.smith@furiealaska.com] |
| **CC:** | Robert Taylor [roberttaylor@rgtaylorlaw.com]; Lacy Taylor [lacyttaylor@gmail.com]; L Berry [lbarry@terrahdd.com]; Taylor Law [mgordon@rgtaylorlaw.com]; Bruce Webb [b.webb@furiealaska.com]; Tonja Fulghum [tfulghum@riverway.us]; Christian Tekell [ctekell@riverway.us]; Lars Degenhardt; SA [degenhardt@deutsche-oel-gas.com]; t.hord@furiepetroleum.com; John Stuart [j.stuart@furiealaska.com]; ESCOPETA OIL [escopeta@swbell.net] |
| **Subject:** | Re: KLU A-2 DDR 15-17 |

It's been 17 days and $6,300,000 spent so far and we have not drilled a foot yet. Who is in charge here? Tom or John ? I have already expressed my concerns about using Mr . Stewart , and once again I am right , get some people involved here that at least can get one foot drilled. What is the holdup Tom? You are paid a lot of $ as COO and this is all you can deliver. This is an embarrassment and a joke , you all need to resign and turn these operations over to Alaskan professionals . I want some answers folks this is getting old and very, very, expensive. Look like the Jack Up rig owner is the only one benefiting here. Danny Davis

Sent from my iPhone

On May 23, 2016, at 4:06 PM, admin <l.smith@furiealaska.com> wrote:

Have a good day

*Leslie K. Smith*

<!--[if !vml]--><883F74B4-15AF-47CE-A6B7-15DB2C76061B[2].png><!--[endif]-->

Furie Operating Alaska, LLC

1029 W. 3rd Avenue, Suite 500

Anchorage, Alaska 99501

Office: 907.277.3726

Cell: 907.441.2388

l.smith@furiealaska.com

<KLU A-2 DDR #15.pdf>

<KLU A-2 DDR #16.pdf>

<KLU A-2 DDR #17.pdf>

# EXHIBIT 20

DA00837

Message

| | |
|---|---|
| **From**: | Danny S Davis [dsdavis77@gmail.com] |
| **Sent**: | 7/13/2016 1:00:25 PM |
| **To**: | Lars Degenhardt; SA [degenhardt@deutsche-oel-gas.com] |
| **CC**: | Robert Taylor [rtaylor@rgtaylorlaw.com]; Lacy Taylor [lacyttaylor@gmail.com]; Lawrence Berry [lberry4@yahoo.com]; David Elder [d.elder@furiealaska.com]; K. Rieck [rieck@dogag.de]; Bruce Webb [b.webb@furiealaska.com]; Tom Hord [t.hord@furiepetroleum.com]; Maribel Gordon [mgordon@rgtaylorlaw.com] |
| **Subject**: | Re: Per our conversation and proposed meeting |

Lars that's what you have been saying for over 4 months now. Sooner or later you are going to run of of next weeks.
Danny

Sent from my iPhone

On Jul 13, 2016, at 3:30 PM, Lars Degenhardt; SA <degenhardt@deutsche-oel-gas.com> wrote:

Hey Robert,
We will follow-up short term this week.
Best, Lars
Lars Degenhardt
<image001.png>
**Deutsche Oel & Gas S.A. |45, Boulevard du Prince Henri |L-1724 Luxemburg | Luxembourg**
Office +352-2786-2290 | Fax +352-2786-2299 | Mobile +352-621-279544
degenhardt@deutsche-oel-gas.com
**GER Mobile +49-152-90043544 | US Mobile +1-907-3414361**
A Directors / Verwaltungsräte / Administrateurs: Kay Rieck, Lars Degenhardt
B Directors / Verwaltungsräte / Administrateurs: Marco Quacken
R.C.S. Luxemburg. B 179 408
-------------------------------------------------------------------------------------------
CONFIDENTIALITY NOTICE - DISCLAIMER: This e-mail and/or the accompanying documents are privileged and confidential under applicable law. The person who receives this message and who is not the addressee, one of his employees or an agent entitled to hand it over to the addressee, is informed that he may not use, disclose or reproduce the contents thereof. Should you have received this e-mail for any copy thereof in error, please let us know by telephone or e-mail without delay and delete the message from your system. Due to the electronic transmission of this message, Deutsche Oel und Gas S.A. declines all liability for any corruption which could affect the content of this message. Any views expressed in this message are those of the individual sender, except where the sender states them, with requisite authority, to be those of Deutsche Oel und Gas S.A. Thank you.
Wenn Sie den Disclaimer auf Deutsch lesen wollen, dann klicken Sie hier.
Si vous voulez lire l'avertissement en français, cliquez ici.

**From:** Robert Taylor <rtaylor@rgtaylorlaw.com>
**Date:** Wednesday 13 July 2016 at 21:20
**To:** Lars Degenhardt <degenhardt@deutsche-oel-gas.com>
**Cc:** "Lacy Taylor (lacyttaylor@gmail.com)" <lacyttaylor@gmail.com>, Danny S Davis <dsdavis77@gmail.com>, "Lawrence Berry (lberry4@yahoo.com)" <lberry4@yahoo.com>, David Elder <d.elder@furiealaska.com>, "Kay Rieck (UAE)" <rieck@dogag.de>, Bruce Webb <b.webb@furiealaska.com>, Tom Hord <t.hord@furiepetroleum.com>, Maribel Gordon <mgordon@rgtaylorlaw.com>
**Subject:** FW: Per our conversation and proposed meeting
Just a reminder of information requested

**From:** Robert Taylor
**Sent:** Tuesday, June 14, 2016 11:52 AM
**To:** 'Lars Degenhardt; SA'
**Cc:** Danny S Davis; Lawrence Berry (lberry4@yahoo.com); Lacy Taylor (lacyttaylor@gmail.com); Bruce Webb
**Subject:** Per our conversation and proposed meeting
Lars,
Hope everything is well in Germany.
I had the opportunity to visit with both Danny and Lawrence yesterday afternoon to discuss our conversation about a meeting in Houston on June 22nd or 23rd . Quite frankly, we could not understand the purpose for which you are requesting a meeting. However, we did reach a consensus that we would be available to meet during the weeks of July 18th or July 25th at Danny and Lawrence's office as long as the following people will all be present: You, Kay Reick, Bruce Webb, David Elder, Tom Hord, and John Stuart for Furie and its related entities and that these people will be prepared to

discuss all outstanding issues with the authority to make all necessary decisions. If y'all want to bring Tony Nunes or another lawyer, then let us know as we may want to also have lawyers present.

In the meantime, we feel that we cannot have meaningful discussions at this meeting without, at a minimum, all the documents and information we have previously requested, including, but not be limited to, all the documents requested in my recent email to you, all the documents requested at our previous meeting in Danny's office, all the audits done for Furie and all related entities by CRI which was promised at our last meeting but has not been received. We also need all the other information that has been previously requested by Danny and not yet provided. In addition we will need the "bare boat" contract between Nordic and the Randolph Yost's owner, which you referred in our last meeting, indicating that the Randolph Yost was chartered for $35,000.00 per day.

Since we noted from the daily reports that the vendor ADS appears frequently, we are curious. What is the actual name of ADS? How are they involved with the rig at $220,000.00 per day?

We also need the identity of each and every person who was responsible for the negotiations of the terms of the agreements between Furie, it's related entities, and Nordic, and the persons involved in negotiations of agreements between Furie, its related entities, and ADS, including the name and position of the individual within Furie and its related entities that actually agreed to the terms of each of those contracts.

As I previously indicated, in order to have a meaningful meeting, we need all this information before the end of this month so we have time to review.

On another topic, we need Furie and its related entities to tell us, in writing, their position on certain issues, along with the reasoning and support for those positions, by the end of this month so that we can be in a position to discuss them at the meeting. In particular, we are requesting the following:

1. ORRI's, to my understanding, are due and payable at the wellhead. We are not being paid on that basis. Why? Please give us the name any percentage owned by each and every ORRI owner and the amounts paid to date, the price paid by each and every purchaser of all the gas sold, as well as the name, address, phone number and individual person with each purchaser most knowledgeable about each purchase.

2. The total amount of gas claimed as a discovery royalty on the producing well.

3. The total number of dollars claimed to qualify for a tax credit with the State of Alaska for each and every year in which Furie and its related entities have been working in Alaska and the amount of tax credits awarded each year by the State of Alaska to Furie or any related entity. Please also provide all documentation submitted to the State of Alaska in support or the claims for tax credits, as well as all, communications from the State of Alaska concerning or referring to the claimed credits.

4. Please provide us with the exact number of dollars Furie claims they have spent that they are entitled to recover before the "back in" provision of the APLA comes into effect? Also provide the total number of dollars that have already been received/recovered to reduce the total amount claimed.

*Robert G. Taylor II*

**Robert G. Taylor II, P.C.**
4119 Montrose, Suite 550
Houston, Texas 77006
713.654.7799 Main Line
800.229.4035 Toll Free
713.654.7814 Facsimile
rtaylor@rgtaylorlaw.com

.........................................................................

**CONFIDENTIALITY STATEMENT:**
This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521, and is legally privileged. This e-mail and any documents attached may contain confidential information belonging to the sender that is protected by the attorney-client, work product and/or other privileges. The information is intended only for the use of the individuals or entities named above. If you have received this e-mail in error, we would appreciate your immediate notification to us by collect telephone call to arrange for the return of all copies of the e-mail. You should also delete this transmission from your computer and/or server.

# EXHIBIT 21

DA00840



**NETHERLAND, SEWELL & ASSOCIATES, INC.**

WORLDWIDE PETROLEUM CONSULTANTS
ENGINEERING • GEOLOGY • GEOPHYSICS • PETROPHYSICS

**EXECUTIVE COMMITTEE**
ROBERT C. BARG        MIKE K. NORTON
P. SCOTT FROST        DAN PAUL SMITH
JOHN G. HATTNER       JOSEPH J. SPELLMAN
J. CARTER HENSON, JR.   DANIEL T. WALKER

**CHAIRMAN & CEO**
C.H. (SCOTT) REES III
**PRESIDENT & COO**
DANNY D. SIMMONS
**EXECUTIVE VP**
G. LANCE BINDER

September 9, 2016

Mr. David W. Elder
Furie Operating Alaska, LLC
100 Enterprise Avenue
League City, Texas 77573

Dear Mr. Elder:

In accordance with your request, we have estimated the proved, probable, and possible reserves and future revenue, as of July 31, 2016, for certain gas properties located in the Kitchen Lights Unit, Cook Inlet, Alaska, as listed in the accompanying tabulations. For the purposes of this report, Furie Operating Alaska, LLC (Furie) and other interest owners in these properties will be collectively referred to herein as the "Company". It is our understanding that the Company currently owns a 100 percent working interest in these properties. However, these properties are subject to a future interest reversion at which time the Company will own an 80 percent working interest. The net revenue interest is estimated based on Furie's current net revenue interest to working interest ratio. We completed our evaluation on or about the date of this letter. This report has been prepared using escalated price and cost parameters specified by Furie, as discussed in subsequent paragraphs of this letter. The estimates in this report have been prepared in accordance with the definitions and guidelines set forth in the 2007 Petroleum Resources Management System (PRMS) approved by the Society of Petroleum Engineers (SPE); definitions are presented immediately following this letter.

We estimate the gas reserves and future net revenue to the Company interest in these properties, as of July 31, 2016, to be:

| Category | Gas Reserves (MMCF) | | Future Net Revenue (M$) | |
|---|---|---|---|---|
| | Gross (100%) | Net | Total | Present Worth at 10% |
| Proved Developed Producing | 22,773.0 | 18,787.7 | 159,144.5 | 142,936.2 |
| Proved Developed Non-Producing[1] | 20,565.3 | 15,671.6 | (17,393.2) | 58.5 |
| Proved Undeveloped | 107,828.6 | 80,871.4 | 292,493.6 | 142,487.7 |
| Total Proved | 151,166.9 | 115,330.8 | 434,244.8 | 285,482.5 |
| Probable | 83,370.5 | 62,892.8 | 277,556.9 | 83,829.2 |
| Possible | 118,942.0 | 75,088.3 | 322,490.4 | 67,354.2 |

*Totals may not add because of rounding.*

[1] Future net revenue is negative after deducting estimated abandonment costs.

Gas volumes are expressed in millions of cubic feet (MMCF) at standard temperature and pressure bases. These properties have never produced commercial volumes of condensate.

The estimates shown in this report are for proved, probable, and possible reserves. This report does not include any value that could be attributed to interests in undeveloped acreage beyond those tracts for which undeveloped reserves have been estimated. Reserves categorization conveys the relative degree of certainty; reserves subcategorization is based on development and production status. The estimates of reserves and future revenue included herein have not been adjusted for risk.

This report includes summary projections of reserves and revenue by reserves category. Also included for each reserves category are one-line summaries of reserves, economics, and basic data by lease.

Gross revenue shown in this report is the Company's share of the gross (100 percent) revenue from the properties prior to any deductions. Future net revenue is after deductions for the Company's share of production taxes, capital

2100 ROSS AVENUE, SUITE 2200 • DALLAS, TEXAS 75201 • PH: 214-969-5401 • FAX: 214-969-5411
1301 MCKINNEY STREET, SUITE 3200 • HOUSTON, TEXAS 77010 • PH: 713-654-4950 • FAX: 713-654-4951

info@nsai-petro.com
netherlandsewell.com

FURIE-BANKR_00200188
DA00841