**(REVERSE OF CERTIFICATE)**

**ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby assigns, conveys, sells and transfers unto

_____     _____

(Please insert taxpayer identification      (Please print name and address)
number of Assignee)

all rights and interest of the Assignor in [Cornucopia Oil & Gas Company, LLC] represented by the within Certificate and irrevocably constitutes and appoints _____ as its attorney-in-fact with full power of substitution in the premises to transfer the same on the books of the Company.

Dated: _____     By: _____

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

# EXHIBIT 35

DA01011

*Execution Version*

---

**FIRST AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CORSAIR OIL & GAS LLC**

**A Texas Limited Liability Company**

---

US-DOCS\97309036.3

FURIE-BANKR_00200323
DA01012

# AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
### OF
### CORSAIR OIL & GAS LLC

This FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") of CORSAIR OIL & GAS LLC (the "Company"), a Texas limited liability company organized under the Texas Business Organizations Code (as amended from time to time, the "TBOC"), is effective as of December 10, 2017 (the "Agreement Date").

### RECITALS

A.    The Company was formed as a limited liability company pursuant to that certain certificate of formation (as amended or amended and restated from time to time, the "Certificate") filed in the office of the Secretary of State of the State of Texas on June 26, 2014, in accordance with the TBOC.

B.    CORNUCOPIA OIL & GAS COMPANY, LLC (the "Sole Member") desires to amend and restate that certain Company Agreement of the Company, dated as of June 26, 2014 (as amended, the "Previous Agreement").

C.    This Agreement amends and restated the Previous Agreement in its entirety.

### AGREEMENT

In consideration of the covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Agreement.  This Agreement shall be considered the "Limited Liability Company Agreement" of the Company within the meaning of the TBOC.  To the extent this Agreement is inconsistent in any respect with the TBOC, this Agreement shall control to the extent permitted by applicable law.

2.    Member.  CORNUCOPIA OIL & GAS COMPANY, LLC is the sole member of the Company.

3.    Purpose.  The purpose of the Company is to engage in all lawful businesses or activities in which a limited liability company may be engaged under applicable law (including, without limitation, the TBOC).

4.    Name.  The name of the Company is "Corsair Oil & Gas LLC".

5.    Registered Agent and Principal Office.  The registered office and registered agent of the Company in the State of Texas shall be as the Sole Member may designate from time to time.  The Company may have such other offices as the Sole Member may designate from time to time.  The mailing address of the Company shall be 188 W. Northern Lights Blvd., Ste. 620, Anchorage, AK 99503.

US-DOCS\97309036.3

FURIE-BANKR_00200324
DA01013

6. <u>Term of Company</u>. The Company shall continue in existence in perpetuity unless its business and affairs are earlier wound up following dissolution at such time as this Agreement may specify.

7. <u>Management of Company</u>.

a) The business and affairs of the Company shall be managed and controlled by or under the direction of a board of managers (the "<u>Board</u>"), which may exercise all such powers of the Company and do all such lawful acts and things as are not prohibited by law or by the Certificate. Except as set forth in <u>Section 7(g)(ii)</u>, all consents, decisions, approvals, or any other actions taken by the Board require the consent of a majority of the entire Board and all references herein to consents, decisions, approvals and any other actions taken by the Board shall be read to require a majority of the entire Board. The Board, acting by a majority of the entire Board (subject to <u>Section 7(g)(ii)</u>), shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members of limited liability companies under the laws of the State of Texas. In connection with the foregoing, but subject to <u>Section 7(g)</u>, the Board is hereby authorized and empowered to act through its officers and employees and other persons designated by the Board in carrying out any and all of its powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Board possesses under this Agreement to any of its officers and employees and to any other person designated by the Board. Except as set forth in <u>Section 7(e)</u>, the Sole Member, in such capacity, shall not participate in the management or control of the business and affairs of the Company or have any authority to bind the Company.

b) The Board shall consist of three (3) individuals, comprised of: (i) one (1) designee appointed by Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP, Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP (collectively, the "<u>ECP Lenders</u>"); (ii) Kay Rieck (the "<u>Member Manager</u>"); and (iii) one (1) other manager appointed by (and reasonably acceptable to) both the ECP Lenders and Member Manager (the "<u>Independent Manager</u>"). The names of the initial managers of the Board, serving the Company on and after the date of this Agreement, until their successors are appointed in accordance with this Agreement, are set forth on <u>Exhibit A</u> attached hereto, without the need for further designation or approval.

c) Notwithstanding anything to the contrary in <u>Section 7(b)</u>, the ECP Lenders shall have the right to replace the Independent Manager with another manager appointed solely by the ECP Lenders if the Sole Member and Furie Operating Alaska, LLC ("<u>FOA</u>" and together with the Sole Member, the "<u>Borrowers</u>") are not able to (i) by February 15, 2018 (in lieu of the ECP Lenders and/or their affiliates or other funds managed or advised by Energy Capital Partners (collectively, "<u>ECP</u>") providing the New Capital (as defined below)), deliver to the ECP Lenders a fully executed and binding commitment from a third party to provide to one of the Borrowers additional capital (the "<u>New Capital</u>") in an amount equal to the lesser of (x) $35 million, plus reasonable and customary lender, advisor and legal fees not to exceed $1,750,000 or (y) the amount necessary to complete construction of the Osprey Well (as defined in that

3

FURIE-BANKR_00200325
DA01014

certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as heretofore amended and as further amended, amended and restated, waived, supplemented or otherwise modified from time to time, the "ECP Credit Agreement"), by and among the Borrowers, the ECP Lenders and the ECP Administrative Agent thereunder), in form and substance reasonably acceptable to the ECP Lenders, or (ii) by March 15, 2018, deliver to the ECP Lenders fully executed finance documents with respect to such third party financing consistent in all material respects with the binding commitment referred to in the foregoing clause (i) (with all conditions precedent therein having been satisfied).

d) The designee appointed by the ECP Lenders pursuant to Section 7(b) (the "ECP Manager") and, if applicable, the replacement Independent Manager appointed by the ECP Lenders pursuant to Section 7(c): (i) may each respectively only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the ECP Lenders upon notice to the Company; and (ii) may not be removed or replaced, in each case, by the Sole Member or the Board. Notwithstanding the foregoing, if the ECP Lenders have exercised their right to appoint a replacement Independent Manager pursuant to Section 7(c)(i), such Independent Manager appointed by the ECP Lenders may be replaced with an Independent Manager appointed pursuant to Section 7(b)(iii), if, on or before March 15, 2018, the Borrowers deliver to the ECP Lenders fully executed finance documents pursuant to which a third party will provide the New Capital (with all conditions precedent therein having been satisfied and in form and substance reasonably acceptable to the ECP Lenders). The ECP Lenders are intended to be express and intended beneficiaries of this Section 7.

e) The Member Manager: (i) may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the Sole Member upon notice to the Company; and (ii) may not be removed or replaced by the Board.

f) The Board shall have the power and authority to designate officers of the Company, including a Chief Executive Officer, Chief Financial Officer, President, any number of Vice Presidents, a Treasurer, a Secretary, any number of Assistant Treasurers and Assistant Secretaries and/or any other officers with such other titles as determined by the Board, who shall have such authority and perform such duties in the day-to-day administration of the Company as generally pertain to their respective offices, subject to the oversight and direction of the Board, and shall, subject to Section 7(g), have such other powers as the Board may determine. The Board may remove any officer of the Company from office at any time. The names of the initial officers serving the Company on and after the date of this Agreement and the capacities in which they serve, until their successors are appointed in accordance with this Agreement, are set forth on Exhibit B attached hereto, without the need for further designation or approval.

g) Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, any provision providing for delegation of any powers and/or authorities to any officer, employee or other designated person), the following actions by the Company shall require:

i) the consent of the majority of the entire Board: (1) issuing additional equity securities or permitting the admission or withdrawal of members; (2) effecting or permitting the sale or transfer of any equity security in, or material asset of, the Company; (3)

4

FURIE-BANKR_00200326
DA01015

making any distributions (other than distributions to the Sole Member, authority over which may be delegated by the Board to any of its officers and employees); (4) making any investment or acquisition (other than in the ordinary course of business); (5) effecting the sale of (whether structured as a sale of all or substantially all assets, or a sale of a majority of equity securities, merger, consolidation, recapitalization or otherwise) the Company; (6) effecting any recapitalization, restructuring or reorganization; (7) incurring or guaranteeing additional indebtedness (other than trade debt, accounts payable or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money)); (8) accepting or requiring a capital contribution from any Person (as defined below); (9) hiring, terminating or removing any officer or employee, or increasing the salary of any officer or employee in excess of competitive market rates in its industry for a company of comparable size; (10) authorizing the establishment of, or amending, modifying or terminating, any employee compensation plan; (11) amending or entering into any material contract or any contract with DEUTSCHE OEL & GAS AG, the Member Manager or any affiliate of DEUTSCHE OEL & GAS AG or the Member Manager, respectively; (12) seeking to amend and/or amending any permit or other material governmental authorization; (13) adopting any budget; (14) making, committing to, or approving any capital expenditures in excess of the amount included for such capital expenditures in the then adopted budget(s); or (15) creating, assuming or suffering to exist a lien or any other encumbrance on the Company's material properties or assets, in each case, other than Permitted Encumbrances (as defined in the Credit Agreement); and

ii)    the unanimous consent of the ECP Manager, the Independent Manager and the Member Manager: dissolving, liquidating or winding up the Company or any of the Company's businesses or otherwise voluntarily approving, commencing or taking any action to effectuate or that would reasonably be expected to result in the Company taking advantage of any bankruptcy or insolvency law of any jurisdiction.

8.    <u>Standards of Conduct</u>.  Whenever any manager of the Board or any officer of the Company who is also a director, officer, employee, partner or advisor of ECP is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing, then such manager or officer shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever.  To the extent that any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP has, at law or in equity, duties (including, without limitation, fiduciary duties) to the Company or other person bound by the terms of this Agreement, such manager or officer, acting in accordance with this Agreement, shall not be liable to the Company or any such other Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties of any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP, otherwise existing at law or in equity, replace such other duties to the greatest extent permitted under applicable law.

9.    <u>No Fiduciary Duties; Business Opportunities</u>.  To the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, in each case, solely in their respective capacities as such, shall have any duty, fiduciary or otherwise, to the Company in connection with the business and affairs of the Company or any consent or approval given or withheld pursuant to this Agreement.  To the fullest extent permitted by applicable law,

5

FURIE-BANKR_00200327
DA01016

neither the Member Manager, the ECP Manager nor the Independent Manager shall be precluded from engaging directly or indirectly in any other business, venture or opportunity, or from directly or indirectly purchasing, selling, holding, managing or operating properties or any other asset or interest therein for its own account or for the account of any other natural person, partnership, joint venture, association, corporation, limited liability company, trust or other entity (each, a "Person"), including the acquisition, management or operation of any business that competes with the Company or engaging in commercial transactions with any customer or supplier of the Company or any of its subsidiaries. Neither the Company nor any other Person will have any right by virtue of this Agreement in or to any such other business, venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of any such other business, venture or activity by the Member Manager, the ECP Manager or the Independent Manager, in each case, will not be deemed wrongful or improper; and no notice, approval or other sharing of any such other opportunity, venture or activity will be required, and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any such opportunity, venture or activity.

      10.    Transaction with Interested Parties. Subject to Section 7(g)(i)(11), no contract or transaction between the Company and one or more of its managers or officers, or between the Company and any corporation, company, partnership, association, or other organization (including, without limitation, ECP) in which one or more of the managers or officers of the Company are partners, directors, officers, employees, managers or agents, or have a financial interest in the Company, shall be void or voidable solely for this reason.

      11.    Distributions. Each distribution of cash or other property by the Company shall be made 100% to the Sole Member. Each item of income, gain, loss, deduction, and credit of the Company shall be allocated 100% to the Sole Member.

      12.    Dissolution and Winding Up. The Company shall dissolve and its business and affairs shall only be wound up pursuant to a written instrument executed in accordance with Section 7(g)(ii).

      13.    Limited Liability. Except as otherwise required by any non-waivable provision of the TBOC or other applicable law, none of the prior, current or future managers, officers, directors, stockholders, partners, members, employees, affiliates, representatives or agents of the same or of the Company (individually, a "Covered Person" and, collectively, the "Covered Persons") shall be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise. Except as otherwise required by any non-waivable provision of the TBOC or other applicable law, no Covered Person shall be liable to the Sole Member or any other Person bound by this Agreement for losses sustained or liabilities incurred as a result of any act or omission of a Covered Person, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, such losses or liabilities were primarily attributable to the fact that the specified Covered Person acted in bad faith or engaged in intentional fraud, willful misconduct or a knowing violation of law. The Covered Persons are intended to be express and intended beneficiaries of this Section 13.

6

US-DOCS\97309036.3

FURIE-BANKR_00200328
DA01017

14.    Indemnification.

a)  To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs ("Claims").  A Covered Person shall not be entitled to indemnification under this Section 14(a) with respect to (i) any Claim with respect to which such Covered Person has engaged in intentional fraud, willful misconduct, bad faith or a knowing violation of law or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) was brought to enforce such Covered Person's rights to indemnification hereunder.  Expenses incurred by a Covered Person regarding any Claim pursuant to this Section 14(a) shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount unless it shall be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Section 14(a).  Upon such determination, such Covered Person shall reimburse the Company for expenses already advanced.

b)  The Company hereby acknowledges that each Covered Person that is (A) ECP or (B) an officer, employee, partner or advisor of ECP (each of ECP and each such officer, employee, partner and advisor, an "ECP Covered Person") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of ECP.  Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (meaning, for the avoidance of doubt, that the Company's obligations to each ECP Covered Person are primary and any obligation of ECP to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each ECP Covered Person are secondary), (ii) the Company will be required to advance the full amount of expenses incurred by each ECP Covered Person and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Section 14(b) without regard to any rights each ECP Covered Person may have against ECP and (iii) the Company irrevocably waives, relinquishes and releases ECP from any and all claims against ECP for contribution, subrogation or any other recovery of any kind in respect thereof.  Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by ECP on behalf of an ECP Covered Person with respect to any claim for which such ECP Covered Person has sought indemnification or advancement of expenses from the Company will affect the foregoing and ECP will have a right of contribution and/or be subrogated, to the extent of such advancement or payment, to all of the rights of recovery of such ECP Covered Person against the Company.  ECP is an express and intended third party beneficiary of the terms of this Section 14(b).

c)  If a Covered Person is entitled under any provision of this Section 14 to indemnification by the Company for some or a portion of the expenses (including attorneys' fees), judgments, fines or amounts paid in settlement actually and reasonably incurred by or on behalf of such Covered Person in connection with any action, suit, proceeding or investigation and any appeal therefrom but not, however, for the total amount thereof, the Company shall

7

FURIE-BANKR_00200329
DA01018

nevertheless indemnify the Covered Person for the portion of such expenses (including attorneys' fees), judgments, fines or amounts paid in settlement to which Covered Person is entitled.

d) The Company may purchase and maintain insurance, at its expense, to protect itself and any manager, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise (including any employee benefit plan) against any expense, liability or loss incurred by him or her, as the case may be, in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the TBOC.

e) If this Section 14 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person as to any expenses (including attorney's fees), judgments, fines and amounts paid in settlement in connection with any action, suit, proceeding or investigation, whether civil, criminal or administrative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 14 that shall not have been invalidated and to the fullest extent permitted by applicable law. The Covered Persons are intended to be express and intended beneficiaries of this Section 14.

15.    UCC Article 8 Opt-In. The Company hereby irrevocably elects that all limited liability company interests (expressed in units) in the Company (the "Ownership Interests") shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Texas or any other applicable jurisdiction. Each certificate evidencing Ownership Interests shall bear the following legend: "THIS CERTIFICATE EVIDENCES AN INTEREST IN THE COMPANY AND EACH OWNERSHIP INTEREST (EXPRESSED IN UNITS) REPRESENTED HEREBY IS A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF TEXAS AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OTHER APPLICABLE JURISDICTION." No amendment to this section shall be effective until all outstanding Ownership Interest certificates have been surrendered to the Company for cancellation. Any such certificates shall be recorded in a register thereof maintained by the Company.

16.    Certificated Interests. The Ownership Interests shall be represented by certificates substantially in the form attached hereto as Exhibit C.

17.    Transferability. Notwithstanding anything contained herein to the contrary, each member of the Company shall be permitted to pledge or hypothecate any or all of its Ownership Interests, including all interests, economic rights, control rights and status rights as a member, to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such Ownership Interests pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of Ownership Interests, the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any member and without becoming a member, to exercise the

8

FURIE-BANKR_00200330
DA01019

membership/partnership voting rights of the member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, upon its election to do so, shall become a member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a member under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging member shall cease to be a member and shall have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a member shall constitute any necessary approval of such member under the TBOC to the foregoing provisions of this Section 17. This Section 17 may not be amended or modified so long as any of the Ownership Interests are subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Ownership Interests are intended to be express and intended beneficiaries of this Section 17.

18.    Amendments. This Agreement or the Certificate, in each case, may be amended or modified from time to time only by a written instrument executed by both the ECP Manager and the Independent Manager.

19.    No Partition Action. Neither the Member nor any former Member shall have any right to maintain any action for partition with respect to the property of the Company.

20.    Governing Law. The validity and enforceability of this Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to otherwise governing principles of conflicts of law. If a direct conflict occurs between the provisions of this Agreement and the Certificate, or any mandatory provision of the TBOC, the Certificate or the TBOC will control.

21.    Severability of Provisions. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

22.    Counterparts. This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile or PDF, each of which will be deemed to be an original and all of which will constitute one agreement, binding on all parties hereto.

*[Signature Page Follows]*

9

US-DOCS\97309036.3

FURIE-BANKR_00200331
DA01020

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Agreement Date.

**SOLE MEMBER:**

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By: _____
Name:  Kay Rieck
Title:  Authorized Signatory

*[Signature Page to the First A&R LLC Agreement of Corsair Oil & Gas LLC]*

US-DOCS\97309036.3

FURIE-BANKR_00200332
DA01021

**EXHIBIT A**

1. Trent Justus Kososki (the ECP Manager)

2. Kay Rieck (the Member Manager)

3. Jeffrey A. Brodsky (the Independent Manager)

US-DOCS\97309036.3

FURIE-BANKR_00200333
DA01022

**EXHIBIT B**

1. Thomas E Hord – Chief Operating Officer

2. David W. Elder – Chief Financial Officer

US-DOCS\97309036.3

FURIE-BANKR_00200334
DA01023

## EXHIBIT C

*[See attached.]*

US-DOCS\97309036.3

FURIE-BANKR_00200335
DA01024

Form of Limited Liability Company Interest Certificate

**LIMITED LIABILITY COMPANY INTEREST CERTIFICATE**
**[CORSAIR OIL & GAS LLC]**
**a Texas Limited Liability Company**

**No. \_\_\_**

    **THIS CERTIFICATE (THIS "CERTIFICATE") CERTIFIES THAT** _____ is the owner of fully paid and non-assessable units representing a _____% Ownership Interest in [Corsair Oil & Gas LLC] (the "Company") in the capacity of a Member of the Company.

    THE RIGHTS, POWERS, PREFERENCES, RESTRICTIONS (INCLUDING TRANSFER RESTRICTIONS) AND LIMITATIONS OF THE OWNERSHIP INTERESTS ARE SET FORTH IN, AND THIS CERTIFICATE AND THE OWNERSHIP INTERESTS REPRESENTED HEREBY ARE ISSUED PURSUANT TO AND SHALL IN ALL RESPECTS BE SUBJECT TO THE TERMS AND PROVISIONS OF, THE [COMPANY AGREEMENT OF THE COMPANY, EFFECTIVE AS OF JULY [●], 2014], AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME (THE "AGREEMENT"). THE TRANSFER OF THIS CERTIFICATE AND THE OWNERSHIP INTERESTS REPRESENTED HEREBY IS RESTRICTED AS DESCRIBED IN THE AGREEMENT.

    Capitalized terms used and not otherwise defined herein are used as defined in the Agreement.

    This Certificate evidences an interest in the Company and each Ownership Interest represented hereby is a security governed by Article 8 of the Uniform Commercial Code as in effect in the State of Texas and, to the extent permitted by applicable law, each other applicable jurisdiction.

    This Certificate shall be governed by, construed, interpreted and applied in accordance with the laws of the State of Texas (excluding any conflict of law rules thereof).

    **IN WITNESS WHEREOF**, the Company has caused this Certificate to be signed this \_\_\_\_ day of _____, 20\_\_\_.

By: _____
Name:
Title:

    THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF

FURIE-BANKR_00200336
DA01025

THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

NY\6483354.4

FURIE-BANKR_00200337
DA01026

**(REVERSE OF CERTIFICATE)**

**ASSIGNMENT OF LIMITED LIABILITY COMPANY INTEREST**

FOR VALUE RECEIVED, the undersigned (the "Assignor") hereby assigns, conveys, sells and transfers unto

_____     _____

(Please insert taxpayer identification    (Please print name and address)
number of Assignee)

all rights and interest of the Assignor in [Corsair Oil & Gas LLC] represented by the within Certificate and irrevocably constitutes and appoints _____ as its attorney-in-fact with full power of substitution in the premises to transfer the same on the books of the Company.

Dated: _____     By: _____

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED OR SOLD, UNLESS IT HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR UNLESS AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THIS SECURITY IS SUBJECT TO CERTAIN AGREEMENTS, RESTRICTIONS ON TRANSFER AND OTHER TERMS AND CONDITIONS SET FORTH IN THE LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, A COPY OF WHICH MAY BE OBTAINED FROM THE COMPANY AT ITS PRINCIPAL EXECUTIVE OFFICES.

NY\6483354.4

# EXHIBIT 36

DA01028



THE STATE
of ALASKA

GOVERNOR BILL WALKER

**Department of Natural Resources**

DIVISION OF OIL & GAS

550 W 7ᵗʰ Avenue, Suite 1100
Anchorage, AK 99501-3560
Main: 907.269.8800
Fax: 907.269.8939

December 26, 2017                                              VIA CERTIFIED MAIL

Bruce Webb
Sr. Vice President
Furie Operating Alaska, LLC
188 W. Northern Lights Blvd., Suite 620
Anchorage, AK 99503

Re:    Kitchen Lights Unit – Notice of Default and Cure Demand
       Failure to Fulfill Drilling Commitment

Dear Mr. Webb,

This letter serves as notice of default for the Kitchen Lights Unit (KLU) under 11 AAC
83.374(a) for failure to meet the drilling commitments initially set forth by Furie in its October 7,
2016 Plan of Development (POD). Furie, however, can fully cure default through completion of
the listed work commitments described on page three of this notice of default.

The KLU is an 83,394-acre unit divided into four blocks: the Corsair, North, Southwest, and
Central Blocks. Originally, the State of Alaska (State), Department of Natural Resources (DNR),
Division of Oil and Gas (Division) approved formation of the Kitchen Unit on January 31, 2007
and later the expansion and renaming of the Kitchen Unit to the Kitchen Lights Unit on June 30,
2009.

By regulation and under the terms of the unit agreement, the operator, Furie Operating Alaska,
LLC (Furie), must conduct proposed exploration or development activities in accordance with an
approved Plan of Exploration (POE) or Plan of Development (POD). Failure to fulfill the
commitments for a POE or POD is a default of the unit. *See* 11 AAC 83.374(a).

Operation of the KLU previously and up through the present reflects a history of committing to
drilling activities, but then delaying or changing those work commitments. Among other
commitments, the 2015 POE required Furie to drill two development wells in the Corsair block
by November 30, 2015. Furie did not drill these wells. Instead, it submitted an August 27, 2015
POE amendment proposing removal of these drilling work commitments from its 2015 POE and
deferring the drilling until November 30, 2016. The Division deferred Furie's drilling
commitments to be addressed in Furie's 2016 Plan of Development (POD).

In its October 7, 2016 4th POD, approved by the Division on December 8, 2016, Furie again
committed to development activities in the Corsair block, with an alternative plan to explore in
the North block. Specifically, Furie committed to:

- Complete the KLU #A-1 well in the Corsair block by November 30, 2017.

FURIE-BANKR_00200533
DA01029

- Either (a) by November 30, 2017, drill and log a development well in the Corsair Block to the Sterling flow test zone reached by the KLU #3 well and present DNR with a plan for completing the well; or (b) by December 30, 2017, drill and log the KLU #4 exploration well in the North Block.

In an amendment to Furie's 4th POD, Furie changed alternative (b), above, to state that by December 30, 2017, Furie will drill and log either KLU #4 or KLU #6-Deep Jurassic. The KLU #6-Deep Jurassic well is proposed for ADL 389198 in the Corsair Block. Furie previously labeled a prospective well in ADL 389924 as "KLU #6," but has renamed it KLU #13. The Division approved Furie's Amendment to the 4th POD on June 2, 2017.

Furie's November 8, 2017 Revised Fifth Plan of Development (5th POD) for the January 5, 2018 through January 4, 2019 period, deemed complete on November 17, 2017 and under review by the Division, commits to:

(i)     Complete the KLU #A-1 well if advisable based on logs, data, and market conditions.

(ii)    Drill and acquire all necessary logs and data to properly evaluate one new development well from the Julius R. platform to the stratigraphic equivalent of the Sterling flow tested zones in the KLU #3 well, namely the sand encountered from 6964 feet to 6998 feet measured depth in the KLU #3 well, unless interpretations from the shallower data in a well indicate that producible hydrocarbons are unlikely to be found by drilling to that equivalent horizon depth. Based on the logs and data acquired from the new development well, develop a plan for completing the well and present the plan to DNR.

(iii)   As an alternative to the development well described in (ii), Furie may conduct drilling and evaluation of an exploration well as described [as follows]:

- Provided Furie has enough time and conditions safely permit, use commercially reasonable efforts to either (a) drill and log an exploration well; or (b) re-enter, deepen and log the KLU #4 exploration well.

- Furie will continue to interpret and evaluate the 3-D geophysical seismic data it acquired during the summer and fall of 2015.

In short, Furie has failed to meet its drilling commitments going back to 2015. It committed to drill two wells by November 30, 2015. Furie did not drill the wells. The Division approved a POE amendment to defer those drilling commitments to November 30, 2016. Furie did not drill the wells. Furie committed to drilling two wells again in 2016. It did not drill those wells, and again seeks to defer its commitment another year.

Under Article 20.1 of the Kitchen Unit Agreement, failure to comply with any of the terms of an approved unit agreement, including plans of exploration, development, or operations that are a part of the unit agreement, is a default under the unit agreement:

> The Commissioner will, in his or her discretion, determine that failure of the Unit Operator or the Working Interest Owners to comply with any of the terms of this

Agreement, including any Approved Unit Plan, is a default under this Agreement. The failure to comply because of force majeure is not a default.

Based upon the foregoing, DNR hereby provides notice of default. DNR provides Furie with the following opportunity to cure under 11 AAC 83.374(b). By December 31, 2018, Furie will:

- Complete the KLU #A-1 well; and
- Either (a) drill, evaluate, and test a new development well to the Sterling Formation; (b) drill, evaluate, and test KLU #4; or (c) drill, evaluate, and test or KLU #6-Deep Jurassic.

To fully cure default, Furie must satisfy the above listed work commitments set forth in this notice of default. To further ensure Furie is complying with its proposed 5th POD work commitments, Furie will submit to the Division quarterly work commitment updates beginning in January 2018, with the first quarterly work commitment update due no later than March 30, 2018.

If Furie fails to cure default, DNR may pursue either unit contraction under 11 AAC 83.356(e), or unit termination in accordance with 11 AAC 83.374.

The Division will evaluate Furie's proposed POD separately from this notice of default.

An eligible person affected by this decision may request reconsideration of it in accordance with 11 AAC 02. Any request for reconsideration must be received within 20 calendar days after the date of "issuance" of this decision, as defined in 11 AAC 02.040(c) and (d), and may be mailed or delivered to Andrew T. Mack, Commissioner, Department of Natural Resources, 550 West 7th Avenue, Suite 1400, Anchorage, Alaska 99501; faxed to 1-907-269-8918; or sent by electronic mail to dnr.appeals@alaska.gov. This decision takes effect immediately. An eligible person must first request reconsideration of this decision in accordance with 11 AAC 02 before appealing this decision to Superior Court. If the Commissioner does not act on a request for reconsideration within 30 days after issuance of this decision, the request for reconsideration is considered denied and this decision becomes a final administrative order and decision on the 31st day after issuance for the purposes of an appeal to Superior Court. A copy of 11 AAC 02 may be obtained from any regional information office of the Department of Natural Resources.

Sincerely,

Andrew T. Mack
Commissioner
Department of Natural Resources

# EXHIBIT 37

DA01032

Message

| | |
|---|---|
| **From**: | David Elder [d.elder@furiealaska.com] |
| **Sent**: | 1/1/2018 10:07:31 AM |
| **To**: | Bruce Ganer [bganer@sprioilgas.com] |
| **CC**: | van Stephoudt, Theodor [TvanStephoudt@ReedSmith.com]; Bruce Webb [b.webb@furiealaska.com]; Ed Hutchinson [ehutchinson@sprioilgas.com] |
| **Subject**: | Re: Please call David's Cell Phone-----some follow up FYI |

I prefer we do it today as it is important that we fully understand the analysis and ensure that we revive the proper documentation. We have a duties as a prudent operator to dot all the I's and cross the t's.

Thanks,

DE

Sent from my iPhone

On Jan 1, 2018, at 12:46 PM, Bruce Ganer <bganer@sprioilgas.com> wrote:

Sounds like we should talk today. How about I call you in about an hour I am about to leave the house to go to my daughter's and son in laws for the afternoon evening, I could call from there?
I could discuss with the other guys tomorrow or in the morning before our Wednesday "milestone conference call".
Regards
BLG

**From:** van Stephoudt, Theodor [mailto:TvanStephoudt@ReedSmith.com]
**Sent:** Monday, January 1, 2018 12:16 PM
**To:** 'Bruce Ganer' <bganer@sprioilgas.com>
**Cc:** 'Bruce Webb' <b.webb@furiealaska.com>; 'Ed Hutchinson' <ehutchinson@sprioilgas.com>; 'David Elder' <d.elder@furiealaska.com>
**Subject:** RE: Please call David's Cell Phone-----some follow up FYI
**Importance:** High
Bruce,
Thank you very much for the information. I think that we would need a call to go through the information and to fully understand it. Please let us know what would be a convenient day and time to discuss. Please note that David Elder will be in the hospital tomorrow. I am available today and tomorrow morning and at specific times during the day but I will need to take my wife to the hospital for bone scans tomorrow. Happy New Year!
Kind regards, Theo

**Theodor van Stephoudt**
Cell: +1.347.429.0158

**From:** Bruce Ganer [mailto:bganer@sprioilgas.com]
**Sent:** Monday, January 01, 2018 1:04 PM
**To:** 'David Elder'; van Stephoudt, Theodor
**Cc:** 'Bruce Webb'; 'Ed Hutchinson'
**Subject:** RE: Please call David's Cell Phone-----some follow up FYI
Theo, David, and Bruce FYI below...I wanted to share and discuss with you all, particularly with Theo before passing along to anyone else.
Reservoir characterization numbers for KLU A1 & A2A versus some of the high rate completions recorded from North Cook Inlet.

## SUMMARY OF INFORMATION THAT IS ATTACHED
Wellname pay feet HPVH (hydrocarbon pore volume) PHIH (porosity thickness) ave Porosity ave Sw Production Rates (mmcfpd)
A1 (Beluga) 80.5 15.8 26.2  26.12 40

FURIE-BANKR_00139672
DA01033

Proposed
A2A(Sterling) 95.2 18.3 30.9 32.44 40.78
A2A (Beluga) 20.7 3.0 5.2 24.91 41.78 10-15
NCI A2 Sterling 72 13.4 23.3 32.36 42.49
Beluga 83.4 13.8 24.4 29.26 43.44
Total comp 155.4 27.2 47.7 12-20
NCI A12(Sterling) 278.8 48.1 71.8 25.75 33.0
Beluga 135 22.1 35 25.95 36.86
Total comp 413.8 70.2 106.8 15-33
NCI A13(Sterling) 208.2 31.5 51.5 24.74 38.83
Beluga 26.1 3.1 5.2 19.92 40.38
Total comp 234.3 34.6 56.7 20-40

Discuss tomorrow or today? I am still running some other numbers that might lead to optimizations in design and generating simple plots for simpler illustration of comparisons. Note the much better performance from much less pay in the A2A Beluga. There is potentially a hybrid completion that allows completing more pay at one time but also allows exerting larger pressure drawdowns without threatening to over stress the sand.

Best regards,

BLG

**From:** David Elder [mailto:d.elder@furiealaska.com]
**Sent:** Sunday, December 31, 2017 12:51 PM
**To:** Bruce Ganer <bganer@sprioilgas.com>
**Cc:** 'Bruce Webb' <b.webb@furiealaska.com>; 'van Stephoudt, Theodor' <tvanstephoudt@reedsmith.com>
**Subject:** Re: Please call David's Cell Phone

Bruce:

My compliments to you and your team for the work that you have done. To summarize our discussions, we need the following items to properly document our decision prior to submitting the contracts and capital budget for lender consent.

1.    Letter signed by PE signing off on loads that will be positioned on the platform to do the completion do not compromise the structural integrity or exceed specifications required to permit the monopod.
2.    Review CAD drawings as to placement of equipment and people for the safe completion of the well
3.    Review with the FOA management team of how this will work, schedule and contingencies.
4.    Detailed review of the AFE (which I need as soon as possible) and schedule.

I am finishing up the contract review today and will forward on to PRA as well. One thing that must be changed is including a date certain as to when the rig is released to Furie so mobilization to the platform can commence.

Thank you,

DE

**From:** Bruce Ganer <bganer@sprioilgas.com>
**Date:** Friday, December 29, 2017 at 10:07 PM
**To:** Theodor van Stephoudt <TvanStephoudt@ReedSmith.com>
**Cc:** 'David Elder' <d.elder@furiealaska.com>, 'Bruce Webb' <b.webb@furiealaska.com>
**Subject:** RE: Please call David's Cell Phone

FYI, I did call David, and I believe we had a very good discussion. Filled him in on our Wednesday meeting and the subsequent follow up work we have done since.

We have made good progress with still all green lights on the Moncla rig and doing the originally proposed completion. The follow up work from the deliverables Tom Walsh sent is enlightening but really isn't "apples to apples". So currently in the process of reconciling differences and then will incorporate into a model for estimating what we can reasonably expect from our Beluga if done the same way.

The key difference is that they (ConocoPhillips and now Hilcorp) completed very large vertical sections commingling Sterling and Beluga. We have to play by different rules these days, not being automatically permitted to commingle the two. Also these days getting a commingle order is a complicated and drawn out. The key engineering/mathematical element in producibility is permeability-feet (KH) for any given differential pressure exerted under production. Since at NCI they were permitted to significantly increase completed thickness (H), so assuming we are all the same on

FURIE-BANKR_00139673
DA01034

permeability and we exert the same pressure drawdown, if their H is twice ours then there producible rate is also twice ours. Said another way if our H is half theirs then we need twice the pressure drawdown to get the same rate. There in lies the problem if we have to exert larger drawdowns on the sand face to get same rates it is more likely to lead to sand failure in our case where it does not in their case.

I am in the process of comparing their completions and reservoir characteristics coupled with production to model what we can achieve with the same completion but proportionately reduced reservoir.

Will get back to you all soon.

Regards

Bruce

**From:** van Stephoudt, Theodor [mailto:TvanStephoudt@ReedSmith.com]
**Sent:** Friday, December 29, 2017 10:47 AM
**To:** 'Bruce Ganer (bganer@sprioilgas.com)' <bganer@sprioilgas.com>
**Cc:** David Elder (d.elder@furiealaska.com) <d.elder@furiealaska.com>
**Subject:** Please call David's Cell Phone
**Importance:** High

Bruce,

I hope that this message finds you well. Please call David when you have a chance. Greatly appreciated!

Kind regards, Theo

**Theodor van Stephoudt**
Cell: +1.347.429.0158

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

FURIE-BANKR_00139674
DA01035

# EXHIBIT 38

DA01036

Message

| | |
|---|---|
| **From**: | Bruce Ganer [bganer@sprioilgas.com] |
| **Sent**: | 1/6/2018 5:40:18 PM |
| **To**: | 'K. Rieck' [rieck@deutsche-oel-gas.com] |
| **CC**: | 'Bruce Webb' [b.webb@furiealaska.com] |
| **Subject**: | FW: Production versus reserves |

Kay,

WE SHOULD HAVE ENOUGH ZONES/RESERVES COMPLETED TO DELIVER ENOUGH GAS TO COVER 8 YEARS OF GAS
CONTRACTS. Over 100 Bcf completed by NSAI estimates, see table below.

BUT, I HAVE CONCERNS ABOUT PRODUCTION PERFORMANCE VERSUS RESERVE ESTIMATES TO DATE. Mechanical
issues/poor cement/communication behind pipe OR bad reserve estimates???

Procedure suggested (need to discuss) for the Spring 2018:

1). ASAP, Slide sleeves in KLU A2A, temporarily close current producing Beluga zones and open the Sterling (4018)
to verify good gas production. Leave open and produce (?)

2). If KLU A2A Sterling (4018) tests good, all ok, but if not try to determine source/cause of water if
produced. Lower Sterling (4669, 4725) already made water, source determination "inconclusive" by Schlumberger

3). Slide current KLU 3 producing Beluga zone sleeve closed. ReComplete KLU #3 in the Beluga, "Hilcorp"
completion style to add/perforate most or all of remaining Beluga 11.64 Bcf (NSAI).

4). Complete KLU A-1 per proposed plan via Moncla rig, adding another zone with "backup" materials and supplies
pretty much already purchased. This to expose an additional 8.9 Bcf (NSAI).

This should add the equivalent of about two year's worth of contracted gas for insurance, and the procedure should also
evaluate the condition of the already existing completions to determine if reworks in 2018 & 2019 will be required.

This activity adds rate from the Beluga which there is currently more confidence in and hopefully yields information on
the Sterling to determine if cement squeeze(s) or other remedial measures can fix Sterling production.

From this information plans could be made for procedures to fix, if possible, the Sterling water produced zones to
capture NSAI reserves. Feasibility to rework in 2018 or 2019 would be evaluated.

This activity should allow deferring the need to drill a well until 2019 or beyond.

This is the best way I can explain and express the situation, as simply as I can.

I would like to discuss with you tomorrow at your convenience.

Please advise

Best regards,
Bruce

FURIE-BANKR_00171871
DA01037

NSAI RESERVES  VERSUS PERFORMANCE TODATE

# Current completions

| Wellname | current rate | zone | cumulative production | NSAI |
|---|---|---|---|---|
| Reserves | | COMMENTS | | |

KLU 3                Beluga (5940/5990, 6960)    1.863 Bcf          7.389 Bcf          6 mmcfpd    approaching line pressure probably decline to 0 mmcfpd by spring/midsummer 2018.

KLU3                 Sterling (4172)             .237 Bcf           0
Bcf          shutin              produced briefly, made water, shut in producing ~8 mmcfpd 900 bwpd.

KLU A2A              Beluga (5402, 5700, 5869)   4.895 Bcf          13.663
Bcf          11 mmcfpd           approaching line pressure probably decline to 6 mmcfpd by summer/fall, maybe 0 production by end of year.

KLU A2A              Sterling (4669,4725)        0.2 Bcf            25
Bcf          0 Shutin             opened briefly, started producing water, shutin producing 13 mmcfpd & 172 bwpd.

**(bad cement OR bad reserve estimate ????? inconclusive from Schlumberger)**

KLU A2A              Sterling (4018)             0                  65.1
Bcf          0                   **Concerns over bad cement(?) or bad reserve estimate(?).**

KLU A1               Beluga(5402, 5790, 5940/5990)    0                  7.1
Bcf          0
PROPOSED             Beluga (5090, 5050,
4973)                                                                could add 1.8 Bcf, have
back up equipment mostly already purchased to make the completion add.

FURIE-BANKR_00171872
DA01038

# EXHIBIT 39

DA01039

Message

| From: | Gordon Raines [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=B83182EE9D9D4C6BBAFC3F3237397F61-GORDON RAIN] |
|---|---|
| Sent: | 1/9/2018 8:45:30 AM |
| To: | David Elder [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=986c15f96e6f425baf445da2c4e19167-David Elder] |
| Subject: | Re: Projected Rates |

David – let me know what else you need. I may not have provided everything you requested but the charts should be right.

Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

---

**From:** Raines <g.raines@furiealaska.com>
**Date:** Monday, January 8, 2018 at 2:53 PM
**To:** David Elder <d.elder@furiealaska.com>
**Subject:** Projected Rates

David – take a look at the last two tabs. This assumes a linear depletion based on current rate of decline.

KLU A-2A: Currently producing from both Beluga zones through gravel packs but there are two additional through tubing recompletions which could give up some gas although we would be rate limited even with TT sand control. The Upper Sterling was producing 7 – 8 bbls/hr (water) along with 13 mmcfd before we closed off this zone and went to the lower Beluga. This was the zone (upper Sterling) we performed the production, hydro, and multi-flowshot logs in Jan 2017. Note we did not test the Upper Sterling zone as per BG during the 4 point testing of the Belugas and lower sterling. This well will have 4 1/2" tubing which will inhibit production as water production increases, particularly wells with low bottom hole pressures. Minimal unloading rates for 4 1/2" tubing run a little above 5 mmcfd.

KLU 3: Originally produced the Upper Sterling in this well beginning in Nov 2015 until water encroached in Dec 2016 (+/- 600 bwpd). Shut in at this point – due to disposal costs ($66/bbl) . Closed off Upper Sterling and CT fished out setting tool in March of 2017 from just below Upper Sterling zone. Opened Beluga zones and are currently producing this well at 5+ mmcfd with FTP @ 450 psi. Note this well was recompleted from 2 7/8" to 3 1/2" tubing with minimal unloading rates around 2 mmcfd. Recall the lower Sterling tested wet back in 2013 and has not been produced.

Give me a call if you have any questions,

Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

# EXHIBIT 40

DA01041

Message

| | |
|---|---|
| **From**: | Bruce Ganer [bganer@sprioilgas.com] |
| **Sent**: | 1/11/2018 12:19:40 PM |
| **To**: | 'Jason Ganer' [jganer@sprioilgas.com]; 'Ed Hutchinson' [ehutchinson@sprioilgas.com]; 'J W Burman' [jack@exploitech.com]; g.raines@furiealaska.com; David [d.elder@furiealaska.com]; 'Bruce Webb' [b.webb@furiealaska.com]; bganer@sprioilgas.com |
| **CC**: | Theodor van Stephoudt [tvanstephoudt@reedsmith.com] |
| **Subject**: | FW: current SPRI evaluation guidelines and mission |

All,

Theo and I had been discussing our current activities and he asked me to take this opportunity to be sure and make clear the mission of our current evaluation efforts.  To be sure, the only thing we are currently charged to do is evaluate the feasibility of completing the KLU A-1 using the Moncla rig, and determining associated/resultant costs.  There are a couple of types of completion options that we are considering namely the originally proposed frac pack completion, and another, has been dubbed as the "Hilcorp-NCI" completion which involves perforating more net pay but does not incorporate sand control.  Our goal is to figure out how we can complete more of the total pay H at one time AND minimize cost .......safely.  Anything outside of that is not within the scope of our deliverables for this exercise.  Further to this, any and all information as well as plans being **contemplated** are restricted to internal use only and not to be shared with anyone outside of Furie-SPRI.  If there is any information to be shared or discussed outside of Furie-SPRI, it can only be done so with Kay Rieck's direct authorization.

Let me know if you have any questions or wish to discuss.

Thanks,
Bruce

FURIE-BANKR_00171895
DA01042

# EXHIBIT 41

DA01043

Message

| | |
|---|---|
| **From**: | Theodor van Stephoudt [TvanStephoudt@ReedSmith.com] |
| **Sent**: | 1/22/2018 11:47:22 AM |
| **To**: | David [d.elder@furiealaska.com] |
| **CC**: | K. Rieck (rieck@deutsche-oel-gas.com) [rieck@deutsche-oel-gas.com] |
| **Subject**: | CFO Duties |

**Importance**:    High

David,

Kay has requested that I sent you a clarifying email on your duties in form of an e-mail message.

As Furie's CFO you help us with financing, perform financial reports, analysis, budgets and projections, pay invoices and royalties on time, help Tony Nunes with contracts and insurance, help get ECP approvals for gas contracts, and other things as per instructions from ownership.

As you are not in operations, please do not discuss operational issues with ECP or PRA or others outside of Furie such as well or reservoir issues unless otherwise instructed by ownership.  In addition, do not discuss issues with contractors other than finances, invoices, contracts and insurance unless otherwise instructed by ownership.  This includes all aspects of operations.  Do not discuss issues with Furie's gas buyers unless instructed by ownership or to get approvals from ECP.

Please do not discuss any issues with representatives from the State other than State Revenue for royalties or tax credits.  This includes DNR.

Do not contact or talk with any media outlets or representatives.

Last, if Furie's ownership or management make decisions and public statements, please fully support such decisions.  If you have questions, comments or suggestions, please call Kay, me, Christopher, or Tony.  Your opinion is valuable and matters greatly but do not raise any questions or comments in writing.

You have been a tremendous asset for the company and we look forward to our continued success.

Kind regards, Theo

Theodor van Stephoudt
Cell:  +1.347.429.0158

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version

RS.US.201.407.01

# EXHIBIT 42

DA01045

Message
_____

From:       K. Rieck [rieck@deutsche-oel-gas.com]
Sent:       1/23/2018 6:43:56 PM
To:         Bruce Webb [b.webb@furiealaska.com]
Subject:    Re: KLU Production Information


Call me thanks Kay

Von meinem iPhone gesendet

> Am 24.01.2018 um 03:08 schrieb Bruce Webb <b.webb@furiealaska.com>:
>
> Kay - we need your advice.
> Read below.
>
>
> Thanks Theo.
>
> I would agree with Bruce Ganer - at first blush.  I don't know if ECP can
> force us to release it.
> But, the picture that is painted shows significant decline in productionŠ
> which might be a good thing in regards to ECP's evaluation of the
> company's worth?
>
> With you, I agree it is Kay's decision.
>
> Regards,
>
> Bruce Webb
> Sr. Vice President
>
>
>
> On 1/23/18, 1:55 PM, "van Stephoudt, Theodor"
> <TvanStephoudt@ReedSmith.com> wrote:
>
>> Bruce,
>>
>> I discussed the issue with Bruce Ganer and we do not see a good reason
>> for providing the data. I defer to Kay for his decision.
>>
>> Kind regards, Theo
>>
>> Theodor van Stephoudt
>>
>> Mobile Phone: +1.347.429.0158
>>
>> From: Bruce Webb <b.webb@furiealaska.com<mailto:b.webb@furiealaska.com>>
>> Date: Tuesday, Jan 23, 2018, 5:52 PM
>> To: mahler@deutsche-oel-gas.com
>> <mahler@deutsche-oel-gas.com<mailto:mahler@deutsche-oel-gas.com>>, van
>> Stephoudt, Theodor
>> <TvanStephoudt@ReedSmith.com<mailto:TvanStephoudt@ReedSmith.com>>
>> Cc: K A Y ... R I E C K
>> <rieck@deutsche-oel-gas.com<mailto:rieck@deutsche-oel-gas.com>>
>> Subject: FW: KLU Production Information
>>
>> Theo and Christoph,
>>
>> Do you have any objection of Furie providing the detailed production
>> information to PRA (ECP's consultant).
>> David Elder began the dialog with PRA on January 5th.  There seems to be
>> no indication why they are requesting it.
>>
>> -Bruce
>>
>>

FURIE-BANKR_00171875
DA01046

```
>> From: Gordon Raines
>> <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>
>> Date: Tuesday, January 23, 2018 at 6:39 AM
>> To: Bruce Ganer <bganer@sprioilgas.com<mailto:bganer@sprioilgas.com>>
>> Cc: David Elder
>> <d.elder@furiealaska.com<mailto:d.elder@furiealaska.com>>, Bruce Webb
>> <b.webb@furiealaska.com<mailto:b.webb@furiealaska.com>>
>> Subject: Re: KLU Production
>>
>> I've made a correction to one of the notes on the KLU A-2A – please
>> discard the previous version.
>> (good catch David)
>>
>>
>> Gordon Raines
>> Production Manager
>> Furie Alaska LLC
>> Cell: 337-278-0594
>> g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>
>>
>> From: Raines <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>
>> Date: Tuesday, January 23, 2018 at 8:58 AM
>> To: Bruce Ganer <bganer@sprioilgas.com<mailto:bganer@sprioilgas.com>>
>> Cc: David Elder
>> <d.elder@furiealaska.com<mailto:d.elder@furiealaska.com>>, Bruce Webb
>> <b.webb@furiealaska.com<mailto:b.webb@furiealaska.com>>
>> Subject: KLU Production
>>
>> All,
>>
>> Pete Stokes has asked for the KLU production summary which I have
>> attached. There is information in the plot (see notes) which reflect the
>> work done on the KLU A-2A lower Sterling and I wanted to make sure there
>> are no objections with sharing this data.
>>
>>
>> Thanks,
>>
>> Gordon Raines
>> Production Manager
>> Furie Alaska LLC
>> Cell: 337-278-0594
>> g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>
>>
>> From: Pete Stokes <pstokes@petroak.com<mailto:pstokes@petroak.com>>
>> Date: Friday, January 19, 2018 at 11:07 AM
>> To: Raines <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>
>> Subject: Re: Daily production reports
>>
>> Thanks
>>
>> Get Outlook for iOS<https://aka.ms/o0ukef>
>> _____
>> From: Gordon Raines
>> <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>
>> Sent: Friday, January 19, 2018 4:19:38 AM
>> To: Pete Stokes
>> Subject: Re: Daily production reports
>>
>> Hello Pete – I should have this to you by Monday.
>>
>> Gordon Raines
>> (c) 337-278-0594
>>
>> On Jan 18, 2018, at 7:02 PM, Pete Stokes
>> <pstokes@petroak.com<mailto:pstokes@petroak.com>> wrote:
>>
>> Gordon,
>> Was wondering if this daily information is available yet?
>> Thanks,
>> Pete
>>
>> From: Gordon Raines [mailto:g.raines@furiealaska.com]
```

FURIE-BANKR_00171876
DA01047

```
>> Sent: Thursday, January 11, 2018 1:28 PM
>> To: Pete Stokes
>> Cc: David Elder; Tom Walsh
>> Subject: Re: Daily production reports
>>
>> Pete,
>> I may not have all of the data but will take a run at it.
>>
>>
>> Gordon Raines
>> Production Manager
>> Furie Alaska LLC
>> Cell: 337-278-0594
>> g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>
>>
>> From: Pete Stokes <pstokes@petroak.com<mailto:pstokes@petroak.com>>
>> Date: Thursday, January 11, 2018 at 3:53 PM
>> To: Raines <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>
>> Cc: "David Elder
>> (d.elder@furiepetroleum.com<mailto:d.elder@furiepetroleum.com>)"
>> <d.elder@furiepetroleum.com<mailto:d.elder@furiepetroleum.com>>, Tom
>> Walsh <twalsh@petroak.com<mailto:twalsh@petroak.com>>
>> Subject: FW: Daily production reports
>>
>> Gordon,
>> Is it possible to get a similar excel file/plot for 2015 (KLU-3) and 2016
>> (KLU-3 and KLU A-2A)?
>> Thanks
>> Pete
>>
>> Peter J. Stokes, PE & MBA
>> Cell Phone: (907) 223-6220
>>
>> Petrotechnical Resources of Alaska
>> 3601 C Street Suite 822
>> Anchorage, AK 99503
>> Phone: (907) 272-1232
>> Fax: (907) 272-1344
>>
>> Email:pstokes@petroak.com<https://newmail.petroak.com/owa/UrlBlockedError.
>> aspx>
>>
>>
>>
>> From: David Elder [mailto:d.elder@furiepetroleum.com]
>> Sent: Friday, January 05, 2018 5:03 PM
>> To: Tom Walsh
>> Cc: Gordon Raines; Amit Bushan; Trent Kososki; Marty Lemon; Pete Stokes;
>> Bruce Ganer
>> Subject: Re: Daily production reports
>>
>> Tom:
>>
>> Anything you need just let us know. I have attached the 12/31/ 17 report
>> I received from Gordon. Please let Gordon know what else you need.
>>
>> Thanks,
>>
>> DE
>>
>> From: Tom Walsh <twalsh@petroak.com<mailto:twalsh@petroak.com>>
>> Date: Friday, January 5, 2018 at 7:53 PM
>> To: David Elder
>> <d.elder@furiepetroleum.com<mailto:d.elder@furiepetroleum.com>>
>> Cc: Gordon Raines
>> <g.raines@furiealaska.com<mailto:g.raines@furiealaska.com>>, Amit Bushan
>> <abushan@ecpartners.com<mailto:abushan@ecpartners.com>>, Trent Kososki
>> <tkososki@ecpartners.com<mailto:tkososki@ecpartners.com>>, Marty Lemon
>> <mlemon@petroak.com<mailto:mlemon@petroak.com>>, Pete Stokes
>> <pstokes@petroak.com<mailto:pstokes@petroak.com>>, Bruce Ganer
>> <bganer@sprioilgas.com<mailto:bganer@sprioilgas.com>>
>> Subject: Daily production reports
>>
```

FURIE-BANKR_00171877
DA01048

```
>> David,
>>
>> Would it be possible for Marty, Pete and I to get copies of the daily
>> production reports from the KLU wells?  I believe we were getting them
>> last year for a time, but we are no longer receiving.
>>
>> Thanks,
>>
>> Tom
>>
>>
>> ---------------------------------------------------------------------------
>> -------------------------------------------------
>> ---------------------------------------------------------------------------
>> -------------------------------------------------
>> This email contains confidential and / or privileged information.
>> If you are not the intended recipient or have received this e-mail in
>> error,
>> please notify the sender immediately and destroy this e-mail. Any
>> unauthorized copying,
>> disclosure or distribution of the material in this e-mail is strictly
>> forbidden.
>>
>>
>>
>>
>>
>> Click here<https://www.mailcontrol.com/sr/MZbqvYs5QwJvpeaetUwhCQ==> to
>> report this email as spam.
>>
>>
>>
>> * * *
>>
>> This E-mail, along with any attachments, is considered confidential and
>> may well be legally privileged. If you have received it in error, you are
>> on notice of its status. Please notify us immediately by reply e-mail and
>> then delete this message from your system. Please do not copy it or use
>> it for any purposes, or disclose its contents to any other person. Thank
>> you for your cooperation.
>>
>> Disclaimer Version RS.US.201.407.01
>
> <KLU Prod Summary rev 1-22-18[5].xlsx>
```

# EXHIBIT 43

DA01050

**FOURTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**FURIE OPERATING ALASKA, LLC**

This FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") of FURIE OPERATING ALASKA, LLC (the "Company"), a Delaware limited liability company organized under the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (as amended from time to time, the "Act"), is effective as of January 25, 2018 (the "Agreement Date").

RECITALS

A.    The Company was formed as a Texas limited liability company pursuant to those certain articles of organization filed in the office of the Secretary of State of the State of Texas on December 15, 1999, in accordance with the Texas Business Organizations Code (as amended from time to time, the "TBOC").

B.    The Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "Conversion") and was formed as a Delaware limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Delaware on the date hereof (as amended or amended and restated from time to time, the "Certificate").

C.    In connection with the Conversion and filing of the Certificate, CORNUCOPIA OIL & GAS COMPANY, LLC (the "Sole Member") desires to amend and restate that certain Third Amended and Restated Company Agreement of the Company, dated as of December 10, 2017 (as amended, the "Previous Agreement").

D.    This Agreement amends and restates the Previous Agreement in its entirety.

AGREEMENT

In consideration of the covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Agreement.  This Agreement shall be considered the "Limited Liability Company Agreement" of the Company within the meaning of § 18-101(7) of the Act.  To the extent this Agreement is inconsistent in any respect with the Act, this Agreement shall control to the extent permitted by applicable law.

2.    Member.  CORNUCOPIA OIL & GAS COMPANY, LLC is the sole member of the Company.

3.    Purpose.  The purpose of the Company is to engage in all lawful businesses or activities in which a limited liability company may be engaged under applicable law (including, without limitation, the Act).

1

4.    <u>Name</u>.  The name of the Company is "Furie Operating Alaska, LLC".

5.    <u>Registered Agent and Principal Office</u>.   The registered office and registered agent of the Company in the State of Delaware shall be as the Sole Member may designate from time to time.  The Company may have such other offices as the Sole Member may designate from time to time.  The mailing address of the Company shall be 188 W. Northern Lights Blvd., Ste. 620, Anchorage, AK 99503.

6.    <u>Term of Company</u>.  The Company shall continue in existence in perpetuity unless its business and affairs are earlier wound up following dissolution at such time as this Agreement may specify.

7.    <u>Management of Company</u>.

a)  The business and affairs of the Company shall be managed and controlled by or under the direction of a board of managers (the "<u>Board</u>"), which may exercise all such powers of the Company and do all such lawful acts and things as are not prohibited by law or by the Certificate.  Except as set forth in <u>Section 7(g)(ii)</u>, all consents, decisions, approvals, or any other actions taken by the Board require the consent of a majority of the entire Board and all references herein to consents, decisions, approvals and any other actions taken by the Board shall be read to require a majority of the entire Board.  The Board, acting by a majority of the entire Board (subject to <u>Section 7(g)(ii)</u>), shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, but subject to <u>Section 7(g)</u>, the Board is hereby authorized and empowered to act through its officers and employees and other persons designated by the Board in carrying out any and all of its powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Board possesses under this Agreement to any of its officers and employees and to any other person designated by the Board.  Except as set forth in <u>Section 5</u> and <u>Section 7(e)</u>, the Sole Member, in such capacity, shall not participate in the management or control of the business and affairs of the Company or have any authority to bind the Company.

b)  The Board shall consist of three (3) individuals, comprised of: (i) one (1) designee appointed by Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP, Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP (collectively, the "<u>ECP Lenders</u>"); (ii) Kay Rieck (the "<u>Member Manager</u>"); and (iii) one (1) other manager appointed by (and reasonably acceptable to) both the ECP Lenders and the Member Manager (the "<u>Independent Manager</u>").  Subject to <u>Section 7(c)</u>, the Independent Manager may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by both the ECP Lenders and the Member Manager upon notice to the Company.  The Independent Manager may not be removed or replaced by the Board.  The names of the initial managers of the Board, serving the Company on and after the date of this Agreement, until their successors are appointed in accordance with this Agreement, are set forth on <u>Exhibit A</u> attached hereto, without the need for further designation or approval.

2

FURIE-BANKR_00200606
DA01052

c)  Notwithstanding anything to the contrary in Section 7(b), the ECP Lenders shall have the right to replace the Independent Manager with another manager appointed solely by the ECP Lenders if the Sole Member and the Company (collectively, the "Borrowers") are not able to (i) by February 15, 2018 (in lieu of the ECP Lenders and/or their affiliates or other funds managed or advised by Energy Capital Partners (collectively, "ECP") providing the New Capital (as defined below)), deliver to the ECP Lenders a fully executed and binding commitment from a third party to provide to one of the Borrowers additional capital (the "New Capital") in an amount equal to the lesser of (x) $35 million, plus reasonable and customary lender, advisor and legal fees not to exceed $1,750,000 or (y) the amount necessary to complete construction of the Osprey Well (as defined in that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as heretofore amended and as further amended, amended and restated, waived, supplemented or otherwise modified from time to time, the "ECP Credit Agreement"), by and among the Borrowers, the ECP Lenders and the ECP Administrative Agent thereunder), in form and substance reasonably acceptable to the ECP Lenders, or (ii) by March 15, 2018, deliver to the ECP Lenders fully executed finance documents with respect to such third party financing consistent in all material respects with the binding commitment referred to in the foregoing clause (i) (with all conditions precedent therein having been satisfied).

d)  The designee appointed by the ECP Lenders pursuant to Section 7(b) (the "ECP Manager") and, if applicable, the replacement Independent Manager appointed solely by the ECP Lenders pursuant to Section 7(c): (i) may each respectively only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the ECP Lenders upon notice to the Company; and (ii) may not be removed or replaced, in each case, by the Sole Member or the Board.  Notwithstanding the foregoing, if the ECP Lenders have exercised their right to appoint a replacement Independent Manager pursuant to Section 7(c)(i), such Independent Manager appointed by the ECP Lenders may be replaced with an Independent Manager appointed pursuant to Section 7(b)(iii), if, on or before March 15, 2018, the Borrowers deliver to the ECP Lenders fully executed finance documents pursuant to which a third party will provide the New Capital (with all conditions precedent therein having been satisfied and in form and substance reasonably acceptable to the ECP Lenders).  The ECP Lenders are intended to be express and intended beneficiaries of this Section 7.

e)  The Member Manager: (i) may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the Sole Member upon notice to the Company; and (ii) may not be removed or replaced by the Board.

f)  The Board shall have the power and authority to designate officers of the Company, including a Chief Executive Officer, Chief Financial Officer, President, any number of Vice Presidents, a Treasurer, a Secretary, any number of Assistant Treasurers and Assistant Secretaries and/or any other officers with such other titles as determined by the Board, who, subject to Section 7(g), shall have such authority and perform such duties in the day-to-day administration of the Company as generally pertain to their respective offices, subject to the oversight and direction of the Board, and shall, subject to Section 7(g), have such other powers as the Board may determine.  The Board may remove any officer of the Company from office at any time.  The names of the initial officers serving the Company on and after the date of this Agreement and the capacities in which they serve, until their successors are appointed in accordance with this Agreement, are set forth on Exhibit B attached hereto, without the need for

3

further designation or approval.

g) Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, any provision providing for delegation of any powers and/or authorities to any officer, employee or other designated person), the following actions by the Company shall require:

i) the consent of the majority of the entire Board: (1) issuing additional equity securities or permitting the admission or withdrawal of members; (2) effecting or permitting the sale or transfer of any equity security in, or material asset of, the Company; (3) making any distributions (other than distributions to the Sole Member, authority over which may be delegated by the Board to any of its officers and employees); (4) making any investment or acquisition (other than in the ordinary course of business); (5) effecting the sale of (whether structured as a sale of all or substantially all assets, or a sale of a majority of equity securities, merger, consolidation, recapitalization or otherwise) the Company; (6) effecting any recapitalization, restructuring or reorganization; (7) incurring or guaranteeing additional indebtedness (other than trade debt, accounts payable or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money)); (8) accepting or requiring a capital contribution from any Person (as defined below) other than capital contributions consisting of common equity from the Sole Member to the Company (for the avoidance of doubt, no additional equity securities shall be issued in connection with any such capital contributions from the Sole Member to the Company); (9) hiring, terminating or removing any officer or employee, or increasing the salary of any officer or employee in excess of competitive market rates in its industry for a company of comparable size; (10) authorizing the establishment of, or amending, modifying or terminating, any employee compensation plan; (11) amending or entering into any material contract or any contract with DEUTSCHE OEL & GAS AG, the Member Manager or any affiliate of DEUTSCHE OEL & GAS AG or the Member Manager, respectively (other than contracts between the Sole Member and the Company); (12) seeking to amend and/or amending any permit or other material governmental authorization; (13) adopting any budget; (14) making, committing to, or approving any capital expenditures in excess of the amount included for such capital expenditures in the then adopted budget(s); or (15) creating, assuming or suffering to exist a lien or any other encumbrance on the Company's material properties or assets, in each case, other than Permitted Encumbrances (as defined in the ECP Credit Agreement); and

ii) the unanimous consent of the ECP Manager, the Independent Manager and the Member Manager: dissolving, liquidating or winding up the Company or any of the Company's businesses or otherwise voluntarily approving, commencing or taking any action to effectuate or that would reasonably be expected to result in the Company taking advantage of any bankruptcy or insolvency law of any jurisdiction.

h) Notwithstanding anything to the contrary in Section 7(a) or Section 7(g), the consent of the ECP Manager or any Independent Manager appointed by the ECP Lenders pursuant to Section 7(c), shall not be required in connection with the Company's entry into any binding third party commitment (or the finance documentation thereof) to provide the Company with financing that would (by its terms) repay in full in cash all of the Obligations (as defined in the ECP Credit Agreement) outstanding under the ECP Credit Agreement upon funding of such

4

FURIE-BANKR_00200608
DA01054

financing (taking into account any funding of New Capital by ECP).

8.    Standards of Conduct.  Whenever any manager of the Board or any officer of the Company who is also a director, officer, employee, partner or advisor of ECP is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing, then such manager or officer shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever.  To the extent that any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP has, at law or in equity, duties (including, without limitation, fiduciary duties) to the Company or other person bound by the terms of this Agreement, such manager or officer, acting in accordance with this Agreement, shall not be liable to the Company or any such other Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties of any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP, otherwise existing at law or in equity, replace such other duties to the greatest extent permitted under applicable law.

9.    No Fiduciary Duties; Business Opportunities.  To the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, in each case, solely in their respective capacities as such, shall have any duty, fiduciary or otherwise, to the Company in connection with the business and affairs of the Company or any consent or approval given or withheld pursuant to this Agreement.  To the fullest extent permitted by applicable law, neither the Member Manager, the ECP Manager nor the Independent Manager shall be precluded from engaging directly or indirectly in any other business, venture or opportunity, or from directly or indirectly purchasing, selling, holding, managing or operating properties or any other asset or interest therein for its own account or for the account of any other natural person, partnership, joint venture, association, corporation, limited liability company, trust or other entity (each, a "Person"), including the acquisition, management or operation of any business that competes with the Company or engaging in commercial transactions with any customer or supplier of the Company or any of its subsidiaries.  Neither the Company nor any other Person will have any right by virtue of this Agreement in or to any such other business, venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of any such other business, venture or activity by the Member Manager, the ECP Manager or the Independent Manager, in each case, will not be deemed wrongful or improper; and no notice, approval or other sharing of any such other opportunity, venture or activity will be required, and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any such opportunity, venture or activity.

10.    Transaction with Interested Parties.  Subject to Section 7(g)(i)(11), no contract or transaction between the Company and one or more of its managers or officers, or between the Company and any corporation, company, partnership, association, or other organization (including, without limitation, ECP) in which one or more of the managers or officers of the Company are partners, directors, officers, employees, managers or agents, or have a financial interest in the Company, shall be void or voidable solely for this reason.

11.    Distributions.  Each distribution of cash or other property by the Company shall be made 100% to the Sole Member.  Each item of income, gain, loss, deduction, and credit

5

FURIE-BANKR_00200609
DA01055

of the Company shall be allocated 100% to the Sole Member.

12. <u>Dissolution and Winding Up</u>. The Company shall dissolve and its business and affairs shall only be wound up pursuant to a written instrument executed by the Sole Member; *provided*, that the Sole Member shall not execute any such written instrument without the unanimous prior consent of the ECP Manager, the Independent Manager and the Member Manager pursuant to <u>Section 7(g)(ii)</u>.

13. <u>Limited Liability</u>. Except as otherwise required by any non-waivable provision of the Act or other applicable law, none of the prior, current or future managers, officers, directors, stockholders, partners, members, employees, affiliates, representatives or agents of the same or of the Company (individually, a "<u>Covered Person</u>" and, collectively, the "<u>Covered Persons</u>") shall be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise. Except as otherwise required by any non-waivable provision of the Act or other applicable law, no Covered Person shall be liable to the Sole Member or any other Person bound by this Agreement for losses sustained or liabilities incurred as a result of any act or omission of a Covered Person, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, such losses or liabilities were primarily attributable to the fact that the specified Covered Person acted in bad faith or engaged in intentional fraud, willful misconduct, gross negligence or a knowing violation of law. The Covered Persons are intended to be express and intended beneficiaries of this <u>Section 13</u>.

14. <u>Indemnification</u>.

a) To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs ("<u>Claims</u>"). A Covered Person shall not be entitled to indemnification under this <u>Section 14(a)</u> with respect to (i) any Claim with respect to which such Covered Person has engaged in intentional fraud, gross negligence, willful misconduct, bad faith or a knowing violation of law or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) was brought to enforce such Covered Person's rights to indemnification hereunder. Expenses incurred by a Covered Person regarding any Claim pursuant to this <u>Section 14(a)</u> shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount unless it shall be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this <u>Section 14(a)</u>. Upon such determination, such Covered Person shall reimburse the Company for expenses already advanced.

b) The Company hereby acknowledges that each Covered Person that is (A) ECP or (B) an officer, employee, partner or advisor of ECP (each of ECP and each such officer,

FURIE-BANKR_00200610
DA01056

employee, partner and advisor, an "ECP Covered Person") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of ECP. Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (meaning, for the avoidance of doubt, that the Company's obligations to each ECP Covered Person are primary and any obligation of ECP to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each ECP Covered Person are secondary), (ii) the Company will be required to advance the full amount of expenses incurred by each ECP Covered Person and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Section 14(b) without regard to any rights each ECP Covered Person may have against ECP and (iii) the Company irrevocably waives, relinquishes and releases ECP from any and all claims against ECP for contribution, subrogation or any other recovery of any kind in respect thereof.   Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by ECP on behalf of an ECP Covered Person with respect to any claim for which such ECP Covered Person has sought indemnification or advancement of expenses from the Company will affect the foregoing and ECP will have a right of contribution and/or be subrogated, to the extent of such advancement or payment, to all of the rights of recovery of such ECP Covered Person against the Company.   ECP is an express and intended third party beneficiary of the terms of this Section 14(b).

c)   If a Covered Person is entitled under any provision of this Section 14 to indemnification by the Company for some or a portion of the expenses (including attorneys' fees), judgments, fines or amounts paid in settlement actually and reasonably incurred by or on behalf of such Covered Person in connection with any action, suit, proceeding or investigation and any appeal therefrom but not, however, for the total amount thereof, the Company shall nevertheless indemnify the Covered Person for the portion of such expenses (including attorneys' fees), judgments, fines or amounts paid in settlement to which Covered Person is entitled.

d)   The Company may purchase and maintain insurance, at its expense, to protect itself and any manager, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise (including any employee benefit plan) against any expense, liability or loss incurred by him or her, as the case may be, in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

e)   If this Section 14 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person as to any expenses (including attorney's fees), judgments, fines and amounts paid in settlement in connection with any action, suit, proceeding or investigation, whether civil, criminal or administrative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 14 that shall not have been invalidated and to the fullest extent permitted by applicable law.   The Covered Persons are intended to be express and intended beneficiaries of this Section 14.

15.   UCC Article 8 Opt-In.   The Company hereby irrevocably elects that all limited liability company interests (expressed in common units) in the Company (the

FURIE-BANKR_00200611
DA01057

"Ownership Interests") shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware or any other applicable jurisdiction. Each certificate evidencing Ownership Interests shall bear the following legend: "THIS CERTIFICATE EVIDENCES AN INTEREST IN FURIE OPERATING ALASKA, LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION." No amendment to this section shall be effective until all outstanding Ownership Interest certificates have been surrendered to the Company for cancellation. Any such certificates shall be recorded in a register thereof maintained by the Company.

16.    Certificated Interests. The Ownership Interests shall be represented by certificates substantially in the form attached hereto as Exhibit C.

17.    Transferability.    Notwithstanding anything contained herein to the contrary, each member of the Company shall be permitted to pledge or hypothecate any or all of its Ownership Interests, including all interests, economic rights, control rights and status rights as a member, to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such Ownership Interests pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of Ownership Interests, the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any member and without becoming a member, to exercise the membership/partnership voting rights of the member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, upon its election to do so, shall become a member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a member under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging member shall cease to be a member and shall have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a member shall constitute any necessary approval of such member under the Act to the foregoing provisions of this Section 17. This Section 17 may not be amended or modified so long as any of the Ownership Interests are subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Ownership Interests are intended to be express and intended beneficiaries of this Section 17.

18.    Amendments. Any amendment or modification to this Agreement and/or the Certificate, in each case, shall not be effective without the consent of both the ECP Manager and the Independent Manager.

8

FURIE-BANKR_00200612
DA01058

19. <u>No Partition Action</u>. Neither the Member nor any former Member shall have any right to maintain any action for partition with respect to the property of the Company.

20. <u>Governing Law</u>. The validity and enforceability of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

21. <u>Severability of Provisions</u>. Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

22. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile or PDF, each of which will be deemed to be an original and all of which will constitute one agreement, binding on all parties hereto.

[*Signature Page Follows*]

FURIE-BANKR_00200613
DA01059

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Agreement Date.

**SOLE MEMBER:**

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By: _____
Name: David W. Elder
Title:   Chief Financial Officer

*[Signature Page to the Fourth A&R LLC Agreement of Furie Operating Alaska, LLC]*

FURIE-BANKR_00200614
DA01060

## EXHIBIT A

1.  Trent Justus Kososki (the ECP Manager)

2.  Kay Rieck (the Member Manager)

3.  Jeffrey A. Brodsky (the Independent Manager)

FURIE-BANKR_00200615
DA01061

## EXHIBIT B

1. Thomas E Hord – Chief Operating Officer

2. David W. Elder – Chief Financial Officer

3. Bruce Webb – Senior Vice President

FURIE-BANKR_00200616
DA01062

**<u>EXHIBIT C</u>**

*[See attached.]*

FURIE-BANKR_00200617
DA01063

Certificate No. __

**FURIE OPERATING ALASKA, LLC**
**a Delaware Limited Liability Company**
Membership Interest Certificate

This certifies that **Cornucopia Oil & Gas Company, LLC** is the owner of *One Thousand (1,000)* fully paid common units of Furie Operating Alaska, LLC (the "Company"), to the extent and as described in the LLC Agreement (as defined below), in the capacity of the Sole Member of the Company.

THIS CERTIFICATE EVIDENCES AN INTEREST IN FURIE OPERATING ALASKA, LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION.

This Certificate shall be governed by and constructed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

IN WITNESS WHEREOF, the said Company has caused this Certificate to be signed by its duly authorized officer this _____, 20__.

**FURIE OPERATING ALASKA, LLC**


By: _____
Name:  David W. Elder
Title:   Chief Financial Officer

**CAPITALIZED TERMS USED AND NOT OTHERWISE DEFINED HEREIN ARE USED AS DEFINED IN THAT CERTAIN FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JANUARY 25, 2018 (AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME, THE "LLC AGREEMENT").**

**THE OWNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.**

**THE OWNERSHIP INTERESTS REPRESENTED HEREBY ARE, AND THIS CERTIFICATE SHALL IN ALL RESPECTS BE, SUBJECT TO RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN THE LLC AGREEMENT. A COPY OF SUCH AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE TO THE HOLDER HEREOF UPON WRITTEN REQUEST.**

# EXHIBIT 44

DA01065

**FOURTH AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**
**CORNUCOPIA OIL & GAS COMPANY, LLC**

This FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") of CORNUCOPIA OIL & GAS COMPANY, LLC (the "Company"), a Delaware limited liability company organized under the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (as amended from time to time, the "Act"), is effective as of January 25, 2018 (the "Agreement Date").

## RECITALS

A.      The Company was formed as a Texas limited liability company pursuant to those certain articles of organization filed in the office of the Secretary of State of the State of Texas on July 14, 2006, in accordance with the Texas Business Organizations Code (as amended from time to time, the "TBOC").

B.      The Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "Conversion") and was formed as a Delaware limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Delaware on the date hereof (as amended or amended and restated from time to time, the "Certificate").

C.      In connection with the Conversion and filing of the Certificate, DEUTSCHE OEL & GAS AG (the "Sole Member") desires to amend and restate that certain Third Amended and Restated Company Agreement of the Company, dated as of December 10, 2017 (as amended, the "Previous Agreement").

D.      This Agreement amends and restates the Previous Agreement in its entirety.

## AGREEMENT

In consideration of the covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.      Agreement.  This Agreement shall be considered the "Limited Liability Company Agreement" of the Company within the meaning of § 18-101(7) of the Act.  To the extent this Agreement is inconsistent in any respect with the Act, this Agreement shall control to the extent permitted by applicable law.

2.      Member.  DEUTSCHE OEL & GAS AG is the sole member of the Company.

3.      Purpose.  The purpose of the Company is to engage in all lawful businesses or activities in which a limited liability company may be engaged under applicable law (including, without limitation, the Act).

1

FURIE-BANKR_00200591
DA01066

4. <u>Name</u>.  The name of the Company is "Cornucopia Oil & Gas Company, LLC".

5. <u>Registered Agent and Principal Office</u>.  The registered office and registered agent of the Company in the State of Delaware shall be as the Sole Member may designate from time to time.  The Company may have such other offices as the Sole Member may designate from time to time.  The mailing address of the Company shall be 188 W. Northern Lights Blvd., Ste. 620, Anchorage, AK 99503.

6. <u>Term of Company</u>.  The Company shall continue in existence in perpetuity unless its business and affairs are earlier wound up following dissolution at such time as this Agreement may specify.

7. <u>Management of Company</u>.

a) The business and affairs of the Company shall be managed and controlled by or under the direction of a board of managers (the "<u>Board</u>"), which may exercise all such powers of the Company and do all such lawful acts and things as are not prohibited by law or by the Certificate.  Except as set forth in <u>Section 7(g)(ii)</u>, all consents, decisions, approvals, or any other actions taken by the Board require the consent of a majority of the entire Board and all references herein to consents, decisions, approvals and any other actions taken by the Board shall be read to require a majority of the entire Board.  The Board, acting by a majority of the entire Board (subject to <u>Section 7(g)(ii)</u>), shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, but subject to <u>Section 7(g)</u>, the Board is hereby authorized and empowered to act through its officers and employees and other persons designated by the Board in carrying out any and all of its powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Board possesses under this Agreement to any of its officers and employees and to any other person designated by the Board.  Except as set forth in <u>Section 5</u> and <u>Section 7(e)</u>, the Sole Member, in such capacity, shall not participate in the management or control of the business and affairs of the Company or have any authority to bind the Company.

b) The Board shall consist of three (3) individuals, comprised of: (i) one (1) designee appointed by Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP, Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP (collectively, the "<u>ECP Lenders</u>"); (ii) Kay Rieck (the "<u>Member Manager</u>"); and (iii) one (1) other manager appointed by (and reasonably acceptable to) both the ECP Lenders and the Member Manager (the "<u>Independent Manager</u>").  Subject to <u>Section 7(c)</u>, the Independent Manager may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by both the ECP Lenders and the Member Manager upon notice to the Company.  The Independent Manager may not be removed or replaced by the Board.  The names of the initial managers of the Board, serving the Company on and after the date of this Agreement, until their successors are appointed in accordance with this Agreement, are set forth on <u>Exhibit A</u> attached hereto,

2

without the need for further designation or approval.

c) Notwithstanding anything to the contrary in Section 7(b), the ECP Lenders shall have the right to replace the Independent Manager with another manager appointed solely by the ECP Lenders if the Company and Furie Operating Alaska, LLC ("FOA" and together with the Company, the "Borrowers") are not able to (i) by February 15, 2018 (in lieu of the ECP Lenders and/or their affiliates or other funds managed or advised by Energy Capital Partners (collectively, "ECP") providing the New Capital (as defined below)), deliver to the ECP Lenders a fully executed and binding commitment from a third party to provide to one of the Borrowers additional capital (the "New Capital") in an amount equal to the lesser of (x) $35 million, plus reasonable and customary lender, advisor and legal fees not to exceed $1,750,000 or (y) the amount necessary to complete construction of the Osprey Well (as defined in that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as heretofore amended and as further amended, amended and restated, waived, supplemented or otherwise modified from time to time, the "ECP Credit Agreement"), by among the Borrowers, the ECP Lenders and the ECP Administrative Agent thereunder), in form and substance reasonably acceptable to the ECP Lenders, or (ii) by March 15, 2018, deliver to the ECP Lenders fully executed finance documents with respect to such third party financing consistent in all material respects with the binding commitment referred to in the foregoing clause (i) (with all conditions precedent therein having been satisfied).

d) The designee appointed by the ECP Lenders pursuant to Section 7(b) (the "ECP Manager") and, if applicable, the replacement Independent Manager appointed solely by the ECP Lenders pursuant to Section 7(c): (i) may each respectively only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the ECP Lenders upon notice to the Company; and (ii) may not be removed or replaced, in each case, by the Sole Member or the Board. Notwithstanding the foregoing, if the ECP Lenders have exercised their right to appoint a replacement Independent Manager pursuant to Section 7(c)(i), such Independent Manager appointed by the ECP Lenders may be replaced with an Independent Manager appointed pursuant to Section 7(b)(iii), if, on or before March 15, 2018, the Borrowers deliver to the ECP Lenders fully executed finance documents pursuant to which a third party will provide the New Capital (with all conditions precedent therein having been satisfied and in form and substance reasonably acceptable to the ECP Lenders). The ECP Lenders are intended to be express and intended beneficiaries of this Section 7.

e) The Member Manager: (i) may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the Sole Member upon notice to the Company; and (ii) may not be removed or replaced by the Board.

f) The Board shall have the power and authority to designate officers of the Company, including a Chief Executive Officer, Chief Financial Officer, President, any number of Vice Presidents, a Treasurer, a Secretary, any number of Assistant Treasurers and Assistant Secretaries and/or any other officers with such other titles as determined by the Board, who, subject to Section 7(g), shall have such authority and perform such duties in the day-to-day administration of the Company as generally pertain to their respective offices, subject to the oversight and direction of the Board, and shall, subject to Section 7(g), have such other powers as the Board may determine. The Board may remove any officer of the Company from office at

FURIE-BANKR_00200593
DA01068

any time. The names of the initial officers serving the Company on and after the date of this Agreement and the capacities in which they serve, until their successors are appointed in accordance with this Agreement, are set forth on <u>Exhibit B</u> attached hereto, without the need for further designation or approval.

g) Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, any provision providing for delegation of any powers and/or authorities to any officer, employee or other designated person) or in the organizational documents of FOA, the following actions by the Company or FOA, in each case, shall require:

i) the consent of the majority of the entire Board: (1) issuing additional equity securities or permitting the admission or withdrawal of members; (2) effecting or permitting the sale or transfer of any equity security in, or material asset of, in each case, the Company or FOA; (3) making any distributions (other than distributions from FOA to the Company, authority over which may be delegated by the Board to any of its officers and employees); (4) making any investment or acquisition (other than in the ordinary course of business or any investment by the Company in FOA); (5) effecting the sale of (whether structured as a sale of all or substantially all assets, or a sale of a majority of equity securities, merger, consolidation, recapitalization or otherwise) the Company or FOA; (6) effecting any recapitalization, restructuring or reorganization; (7) incurring or guaranteeing additional indebtedness (other than trade debt, accounts payable or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money)); (8) accepting or requiring a capital contribution from any Person (as defined below) other than capital contributions consisting of common equity from the Sole Member to the Company and from the Company to FOA (in each case, for the avoidance of doubt, no additional equity securities shall be issued in connection with any such capital contributions from the Sole Member to the Company or from the Company to FOA); (9) hiring, terminating or removing any officer or employee, or increasing the salary of any officer or employee in excess of competitive market rates in its industry for a company of comparable size; (10) authorizing the establishment of, or amending, modifying or terminating, any employee compensation plan; (11) amending or entering into any material contract or any contract with the Sole Member, the Member Manager or any affiliate of the Sole Member or the Member Manager, respectively (other than contracts between the Company and FOA); (12) seeking to amend and/or amending any permit or other material governmental authorization; (13) adopting any budget; (14) making, committing to, or approving any capital expenditures in excess of the amount included for such capital expenditures in the then adopted budget(s); or (15) creating, assuming or suffering to exist a lien or any other encumbrance on either the Company's or FOA's material properties or assets, in each case, other than Permitted Encumbrances (as defined in the ECP Credit Agreement); and

ii) the unanimous consent of the ECP Manager, the Independent Manager and the Member Manager: dissolving, liquidating or winding up the Company, FOA or any of the Company's or FOA's respective businesses or otherwise voluntarily approving, commencing or taking any action to effectuate or that would reasonably be expected to result in the Company or FOA taking advantage of any bankruptcy or insolvency law of any jurisdiction.

h) Notwithstanding anything to the contrary in <u>Section 7(a)</u> or <u>Section 7(g)</u>, the consent of the ECP Manager or any Independent Manager appointed by the ECP Lenders

4

FURIE-BANKR_00200594
DA01069

pursuant to <u>Section 7(c)</u>, shall not be required in connection with the Company's or FOA's entry into any binding third party commitment (or the finance documentation thereof) to provide the Company and/or FOA with financing that would (by its terms) repay in full in cash all of the Obligations (as defined in the ECP Credit Agreement) outstanding under the ECP Credit Agreement upon funding of such financing (taking into account any funding of New Capital by ECP).

8.   <u>Standards of Conduct</u>.  Whenever any manager of the Board or any officer of the Company who is also a director, officer, employee, partner or advisor of ECP is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing, then such manager or officer shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever.  To the extent that any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP has, at law or in equity, duties (including, without limitation, fiduciary duties) to the Company or other person bound by the terms of this Agreement, such manager or officer, acting in accordance with this Agreement, shall not be liable to the Company or any such other Person for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties of any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP, otherwise existing at law or in equity, replace such other duties to the greatest extent permitted under applicable law.

9.   <u>No Fiduciary Duties; Business Opportunities</u>.  To the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, in each case, solely in their respective capacities as such, shall have any duty, fiduciary or otherwise, to the Company in connection with the business and affairs of the Company or any consent or approval given or withheld pursuant to this Agreement.  To the fullest extent permitted by applicable law, neither the Member Manager, the ECP Manager nor the Independent Manager shall be precluded from engaging directly or indirectly in any other business, venture or opportunity, or from directly or indirectly purchasing, selling, holding, managing or operating properties or any other asset or interest therein for its own account or for the account of any other natural person, partnership, joint venture, association, corporation, limited liability company, trust or other entity (each, a "<u>Person</u>"), including the acquisition, management or operation of any business that competes with the Company or engaging in commercial transactions with any customer or supplier of the Company or any of its subsidiaries.  Neither the Company nor any other Person will have any right by virtue of this Agreement in or to any such other business, venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of any such other business, venture or activity by the Member Manager, the ECP Manager or the Independent Manager, in each case, will not be deemed wrongful or improper; and no notice, approval or other sharing of any such other opportunity, venture or activity will be required, and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any such opportunity, venture or activity.

10.   <u>Transaction with Interested Parties</u>.  Subject to <u>Section 7(g)(i)(11)</u>, no contract or transaction between the Company and one or more of its managers or officers, or between the Company and any corporation, company, partnership, association, or other organization (including, without limitation, ECP) in which one or more of the managers or

5

officers of the Company are partners, directors, officers, employees, managers or agents, or have a financial interest in the Company, shall be void or voidable solely for this reason.

11.    <u>Distributions</u>.  Each distribution of cash or other property by the Company shall be made 100% to the Sole Member.  Each item of income, gain, loss, deduction, and credit of the Company shall be allocated 100% to the Sole Member.

12.    <u>Dissolution and Winding Up</u>.  The Company shall dissolve and its business and affairs shall only be wound up pursuant to a written instrument executed by the Sole Member; *provided*, that the Sole Member shall not execute any such written instrument without the unanimous prior consent of the ECP Manager, the Independent Manager and the Member Manager pursuant to <u>Section 7(g)(ii)</u>.

13.    <u>Limited Liability</u>.  Except as otherwise required by any non-waivable provision of the Act or other applicable law, none of the prior, current or future managers, officers, directors, stockholders, partners, members, employees, affiliates, representatives or agents of the same or of the Company (individually, a "<u>Covered Person</u>" and, collectively, the "<u>Covered Persons</u>") shall be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise.  Except as otherwise required by any non-waivable provision of the Act or other applicable law, no Covered Person shall be liable to the Sole Member or any other Person bound by this Agreement for losses sustained or liabilities incurred as a result of any act or omission of a Covered Person, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, such losses or liabilities were primarily attributable to the fact that the specified Covered Person acted in bad faith or engaged in intentional fraud, willful misconduct, gross negligence or a knowing violation of law.  The Covered Persons are intended to be express and intended beneficiaries of this <u>Section 13</u>.

14.    <u>Indemnification</u>.

a)  To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs ("<u>Claims</u>").  A Covered Person shall not be entitled to indemnification under this <u>Section 14(a)</u> with respect to (i) any Claim with respect to which such Covered Person has engaged in intentional fraud, gross negligence, willful misconduct, bad faith or a knowing violation of law or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) was brought to enforce such Covered Person's rights to indemnification hereunder.  Expenses incurred by a Covered Person regarding any Claim pursuant to this <u>Section 14(a)</u> shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount unless it shall be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this <u>Section 14(a)</u>.  Upon such

6

FURIE-BANKR_00200596
DA01071

determination, such Covered Person shall reimburse the Company for expenses already advanced.

b) The Company hereby acknowledges that each Covered Person that is (A) ECP or (B) an officer, employee, partner or advisor of ECP (each of ECP and each such officer, employee, partner and advisor, an "ECP Covered Person") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of ECP. Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (meaning, for the avoidance of doubt, that the Company's obligations to each ECP Covered Person are primary and any obligation of ECP to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each ECP Covered Person are secondary), (ii) the Company will be required to advance the full amount of expenses incurred by each ECP Covered Person and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Section 14(b) without regard to any rights each ECP Covered Person may have against ECP and (iii) the Company irrevocably waives, relinquishes and releases ECP from any and all claims against ECP for contribution, subrogation or any other recovery of any kind in respect thereof.   Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by ECP on behalf of an ECP Covered Person with respect to any claim for which such ECP Covered Person has sought indemnification or advancement of expenses from the Company will affect the foregoing and ECP will have a right of contribution and/or be subrogated, to the extent of such advancement or payment, to all of the rights of recovery of such ECP Covered Person against the Company.  ECP is an express and intended third party beneficiary of the terms of this Section 14(b).

c)  If a Covered Person is entitled under any provision of this Section 14 to indemnification by the Company for some or a portion of the expenses (including attorneys' fees), judgments, fines or amounts paid in settlement actually and reasonably incurred by or on behalf of such Covered Person in connection with any action, suit, proceeding or investigation and any appeal therefrom but not, however, for the total amount thereof, the Company shall nevertheless indemnify the Covered Person for the portion of such expenses (including attorneys' fees), judgments, fines or amounts paid in settlement to which Covered Person is entitled.

d)  The Company may purchase and maintain insurance, at its expense, to protect itself and any manager, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise (including any employee benefit plan) against any expense, liability or loss incurred by him or her, as the case may be, in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

e)  If this Section 14 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person as to any expenses (including attorney's fees), judgments, fines and amounts paid in settlement in connection with any action, suit, proceeding or investigation, whether civil, criminal or administrative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 14 that shall not have been invalidated

7

FURIE-BANKR_00200597
DA01072

and to the fullest extent permitted by applicable law. The Covered Persons are intended to be express and intended beneficiaries of this Section 14.

15.    UCC Article 8 Opt-In. The Company hereby irrevocably elects that all limited liability company interests (expressed in common units) in the Company (the "Ownership Interests") shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware or any other applicable jurisdiction. Each certificate evidencing Ownership Interests shall bear the following legend: "THIS CERTIFICATE EVIDENCES AN INTEREST IN CORNUCOPIA OIL & GAS COMPANY, LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION." No amendment to this section shall be effective until all outstanding Ownership Interest certificates have been surrendered to the Company for cancellation. Any such certificates shall be recorded in a register thereof maintained by the Company.

16.    Certificated Interests. The Ownership Interests shall be represented by certificates substantially in the form attached hereto as Exhibit C.

17.    Transferability. Notwithstanding anything contained herein to the contrary, each member of the Company shall be permitted to pledge or hypothecate any or all of its Ownership Interests, including all interests, economic rights, control rights and status rights as a member, to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such Ownership Interests pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of Ownership Interests, the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any member and without becoming a member, to exercise the membership/partnership voting rights of the member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, upon its election to do so, shall become a member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a member under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging member shall cease to be a member and shall have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a member shall constitute any necessary approval of such member under the Act to the foregoing provisions of this Section 17. This Section 17 may not be amended or modified so long as any of the Ownership Interests are subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Ownership Interests are intended to be express and intended beneficiaries of this Section 17.

8

FURIE-BANKR_00200598
DA01073

18.    <u>Amendments</u>.  Any amendment or modification to this Agreement and/or the Certificate, in each case, shall not be effective without the consent of both the ECP Manager and the Independent Manager.

19.    <u>No Partition Action</u>. Neither the Member nor any former Member shall have any right to maintain any action for partition with respect to the property of the Company.

20.    <u>Governing Law</u>.  The validity and enforceability of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

21.    <u>Severability of Provisions</u>.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

22.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile or PDF, each of which will be deemed to be an original and all of which will constitute one agreement, binding on all parties hereto.

*[Signature Page Follows]*

9

FURIE-BANKR_00200599
DA01074

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Agreement Date.

**SOLE MEMBER:**

**DEUTSCHE OEL & GAS AG**

By: _____
Name: Kay Rieck
Title:   Authorized Signatory

*[Signature Page to the Fourth A&R LLC Agreement of Cornucopia Oil & Gas Company, LLC]*

FURIE-BANKR_00200600
DA01075

**EXHIBIT A**

1.  Trent Justus Kososki (the ECP Manager)

2.  Kay Rieck (the Member Manager)

3.  Jeffrey A. Brodsky (the Independent Manager)

FURIE-BANKR_00200601
DA01076

# EXHIBIT B

1. Thomas E Hord – Chief Operating Officer

2. David W. Elder – Chief Financial Officer

## **EXHIBIT C**

*[See attached.]*

FURIE-BANKR_00200603
DA01078

Certificate No. __

### CORNUCOPIA OIL & GAS COMPANY, LLC
**a Delaware Limited Liability Company**
Membership Interest Certificate

This certifies that **Deutsche Oel & Gas AG** is the owner of *One Hundred (100)* fully paid common units of Cornucopia Oil & Gas Company, LLC (the "Company"), to the extent and as described in the LLC Agreement (as defined below), in the capacity of the Sole Member of the Company.

THIS CERTIFICATE EVIDENCES AN INTEREST IN CORNUCOPIA OIL & GAS COMPANY, LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION.

This Certificate shall be governed by and constructed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

IN WITNESS WHEREOF, the said Company has caused this Certificate to be signed by its duly authorized officer this _____, 20__.

### CORNUCOPIA OIL & GAS COMPANY, LLC


By: _____
Name:  David W. Elder
Title:    Chief Financial Officer

**CAPITALIZED TERMS USED AND NOT OTHERWISE DEFINED HEREIN ARE USED AS DEFINED IN THAT CERTAIN FOURTH AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JANUARY 25, 2018 (AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME, THE "LLC AGREEMENT").**

**THE OWNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.**

**THE OWNERSHIP INTERESTS REPRESENTED HEREBY ARE, AND THIS CERTIFICATE SHALL IN ALL RESPECTS BE, SUBJECT TO RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN THE LLC AGREEMENT. A COPY OF SUCH AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE TO THE HOLDER HEREOF UPON WRITTEN REQUEST.**

FURIE-BANKR_00200604
DA01079

# EXHIBIT 45

DA01080

*Execution Version*

---

**SECOND AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**CORSAIR OIL & GAS LLC**

**A Delaware Limited Liability Company**

---

US-DOCS\97994180.1

FURIE-BANKR_00200624
DA01081

## SECOND AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
### OF
## CORSAIR OIL & GAS LLC

This SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (the "Agreement") of CORSAIR OIL & GAS LLC (the "Company"), a Delaware limited liability company organized under the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. (as amended from time to time, the "Act"), is effective as of January 25, 2018 (the "Agreement Date").

### RECITALS

A.    The Company was formed as a Texas limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Texas on June 26, 2014, in accordance with the Texas Business Organizations Code (as amended from time to time, the "TBOC").

B.    The Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "Conversion") and was formed as a Delaware limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Delaware on the date hereof (as amended or amended and restated from time to time, the "Certificate").

C.    In connection with the Conversion and filing of the Certificate, DEUTSCHE OEL & GAS AG (the "Sole Member") desires to amend and restate that certain First Amended and Restated Company Agreement of the Company, dated as of January 4, 2018 (as amended, the "Previous Agreement").

D.    This Agreement amends and restates the Previous Agreement in its entirety.

### AGREEMENT

In consideration of the covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Agreement.  This Agreement shall be considered the "Limited Liability Company Agreement" of the Company within the meaning of § 18-101(7) of the Act.  To the extent this Agreement is inconsistent in any respect with the Act, this Agreement shall control to the extent permitted by applicable law.

2.    Member.  DEUTSCHE OEL & GAS AG is the sole member of the Company.

3.    Purpose.  The purpose of the Company is to engage in all lawful businesses or activities in which a limited liability company may be engaged under applicable law (including, without limitation, the Act).

1

FURIE-BANKR_00200625
DA01082

4.   Name. The name of the Company is "Corsair Oil & Gas LLC".

5.   Registered Agent and Principal Office.   The registered office and registered agent of the Company in the State of Delaware shall be as the Sole Member may designate from time to time.  The Company may have such other offices as the Sole Member may designate from time to time.  The mailing address of the Company shall be 188 W. Northern Lights Blvd., Ste. 620, Anchorage, AK 99503.

6.   Term of Company. The Company shall continue in existence in perpetuity unless its business and affairs are earlier wound up following dissolution at such time as this Agreement may specify.

7.   Management of Company.

a)  The business and affairs of the Company shall be managed and controlled by or under the direction of a board of managers (the "Board"), which may exercise all such powers of the Company and do all such lawful acts and things as are not prohibited by law or by the Certificate.  Except as set forth in Section 7(g)(ii), all consents, decisions, approvals, or any other actions taken by the Board require the consent of a majority of the entire Board and all references herein to consents, decisions, approvals and any other actions taken by the Board shall be read to require a majority of the entire Board.  The Board, acting by a majority of the entire Board (subject to Section 7(g)(ii)), shall have the power and authority to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including all powers and authorities, statutory or otherwise, possessed by members of limited liability companies under the laws of the State of Delaware.  In connection with the foregoing, but subject to Section 7(g), the Board is hereby authorized and empowered to act through its officers and employees and other persons designated by the Board in carrying out any and all of its powers and authorities under this Agreement, and to delegate any and all of the powers and authorities that the Board possesses under this Agreement to any of its officers and employees and to any other person designated by the Board.  Except as set forth in Section 5 and Section 7(e), the Sole Member, in such capacity, shall not participate in the management or control of the business and affairs of the Company or have any authority to bind the Company.

b)  The Board shall consist of three (3) individuals, comprised of: (i) one (1) designee appointed by Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP, Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP (collectively, the "ECP Lenders"); (ii) Kay Rieck (the "Member Manager"); and (iii) one (1) other manager appointed by (and reasonably acceptable to) both the ECP Lenders and the Member Manager (the "Independent Manager").  Subject to Section 7(c), the Independent Manager may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by both the ECP Lenders and the Member Manager upon notice to the Company.  The Independent Manager may not be removed or replaced by the Board.  The names of the initial managers of the Board, serving the Company on and after the date of this Agreement, until their successors are appointed in accordance with this Agreement, are set forth on Exhibit A attached hereto, without the need for further designation or approval.

2

FURIE-BANKR_00200626
DA01083

c) Notwithstanding anything to the contrary in Section 7(b), the ECP Lenders shall have the right to replace the Independent Manager with another manager appointed solely by the ECP Lenders if Cornucopia Oil & Gas Company, LLC ("Cornucopia") and Furie Operating Alaska, LLC ("FOA" and together with Cornucopia, the "Borrowers") are not able to (i) by February 15, 2018 (in lieu of the ECP Lenders and/or their affiliates or other funds managed or advised by Energy Capital Partners (collectively, "ECP") providing the New Capital (as defined below)), deliver to the ECP Lenders a fully executed and binding commitment from a third party to provide to one of the Borrowers additional capital (the "New Capital") in an amount equal to the lesser of (x) $35 million, plus reasonable and customary lender, advisor and legal fees not to exceed $1,750,000 or (y) the amount necessary to complete construction of the Osprey Well (as defined in that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as heretofore amended and as further amended, amended and restated, waived, supplemented or otherwise modified from time to time, the "ECP Credit Agreement"), by and among the Borrowers, the ECP Lenders and the ECP Administrative Agent thereunder), in form and substance reasonably acceptable to the ECP Lenders, or (ii) by March 15, 2018, deliver to the ECP Lenders fully executed finance documents with respect to such third party financing consistent in all material respects with the binding commitment referred to in the foregoing clause (i) (with all conditions precedent therein having been satisfied).

d) The designee appointed by the ECP Lenders pursuant to Section 7(b) (the "ECP Manager") and, if applicable, the replacement Independent Manager appointed solely by the ECP Lenders pursuant to Section 7(c): (i) may each respectively only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the ECP Lenders upon notice to the Company; and (ii) may not be removed or replaced, in each case, by the Sole Member or the Board. Notwithstanding the foregoing, if the ECP Lenders have exercised their right to appoint a replacement Independent Manager pursuant to Section 7(c)(i), such Independent Manager appointed by the ECP Lenders may be replaced with an Independent Manager appointed pursuant to Section 7(b)(iii), if, on or before March 15, 2018, the Borrowers deliver to the ECP Lenders fully executed finance documents pursuant to which a third party will provide the New Capital (with all conditions precedent therein having been satisfied and in form and substance reasonably acceptable to the ECP Lenders). The ECP Lenders are intended to be express and intended beneficiaries of this Section 7.

e) The Member Manager: (i) may only be removed or replaced (with or without cause), in each case, from time to time and at any time, by the Sole Member upon notice to the Company; and (ii) may not be removed or replaced by the Board.

f) The Board shall have the power and authority to designate officers of the Company, including a Chief Executive Officer, Chief Financial Officer, President, any number of Vice Presidents, a Treasurer, a Secretary, any number of Assistant Treasurers and Assistant Secretaries and/or any other officers with such other titles as determined by the Board, who, subject to Section 7(g), shall have such authority and perform such duties in the day-to-day administration of the Company as generally pertain to their respective offices, subject to the oversight and direction of the Board, and shall, subject to Section 7(g), have such other powers as the Board may determine. The Board may remove any officer of the Company from office at any time. The names of the initial officers serving the Company on and after the date of this Agreement and the capacities in which they serve, until their successors are appointed in

3

FURIE-BANKR_00200627
DA01084

accordance with this Agreement, are set forth on <u>Exhibit B</u> attached hereto, without the need for further designation or approval.

g) Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, any provision providing for delegation of any powers and/or authorities to any officer, employee or other designated person), the following actions by the Company shall require:

i)    the consent of the majority of the entire Board: (1) issuing additional equity securities or permitting the admission or withdrawal of members; (2) effecting or permitting the sale or transfer of any equity security in, or material asset of, the Company; (3) making any distributions; (4) making any investment or acquisition (other than in the ordinary course of business); (5) effecting the sale of (whether structured as a sale of all or substantially all assets, or a sale of a majority of equity securities, merger, consolidation, recapitalization or otherwise) the Company; (6) effecting any recapitalization, restructuring or reorganization; (7) incurring or guaranteeing additional indebtedness (other than trade debt, accounts payable or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money)); (8) accepting or requiring a capital contribution from any Person (as defined below) other than capital contributions consisting of common equity from the Sole Member to the Company (for the avoidance of doubt, no additional equity securities shall be issued in connection with any such capital contributions from the Sole Member to the Company); (9) hiring, terminating or removing any officer or employee, or increasing the salary of any officer or employee in excess of competitive market rates in its industry for a company of comparable size; (10) authorizing the establishment of, or amending, modifying or terminating, any employee compensation plan; (11) amending or entering into any material contract or any contract with the Sole Member, the Member Manager or any affiliate of the Sole Member or the Member Manager, respectively; (12) seeking to amend and/or amending any permit or other material governmental authorization; (13) adopting any budget; (14) making, committing to, or approving any capital expenditures in excess of the amount included for such capital expenditures in the then adopted budget(s); or (15) creating, assuming or suffering to exist a lien or any other encumbrance on the Company's material properties or assets, in each case, other than Permitted Encumbrances (as defined in the ECP Credit Agreement); and

ii)    the unanimous consent of the ECP Manager, the Independent Manager and the Member Manager: dissolving, liquidating or winding up the Company or any of the Company's businesses or otherwise voluntarily approving, commencing or taking any action to effectuate or that would reasonably be expected to result in the Company taking advantage of any bankruptcy or insolvency law of any jurisdiction.

8.    <u>Standards of Conduct</u>. Whenever any manager of the Board or any officer of the Company who is also a director, officer, employee, partner or advisor of ECP is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing, then such manager or officer shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever.  To the extent that any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP has, at law or in equity, duties (including, without limitation, fiduciary duties) to the Company or other person

4

FURIE-BANKR_00200628
DA01085

bound by the terms of this Agreement, such manager or officer, acting in accordance with this Agreement, shall not be liable to the Company or any such other Person for its good faith reliance on the provisions of this Agreement. The provisions of this Agreement, to the extent that they restrict the duties of any manager of the Board or officer of the Company who is also a director, officer, employee, partner or advisor of ECP, otherwise existing at law or in equity, replace such other duties to the greatest extent permitted under applicable law.

9.    No Fiduciary Duties; Business Opportunities. To the fullest extent permitted by applicable law, no manager of the Board or officer of the Company, in each case, solely in their respective capacities as such, shall have any duty, fiduciary or otherwise, to the Company in connection with the business and affairs of the Company or any consent or approval given or withheld pursuant to this Agreement. To the fullest extent permitted by applicable law, neither the Member Manager, the ECP Manager nor the Independent Manager shall be precluded from engaging directly or indirectly in any other business, venture or opportunity, or from directly or indirectly purchasing, selling, holding, managing or operating properties or any other asset or interest therein for its own account or for the account of any other natural person, partnership, joint venture, association, corporation, limited liability company, trust or other entity (each, a "Person"), including the acquisition, management or operation of any business that competes with the Company or engaging in commercial transactions with any customer or supplier of the Company or any of its subsidiaries. Neither the Company nor any other Person will have any right by virtue of this Agreement in or to any such other business, venture or activity of any Person (or to the income or proceeds derived therefrom), and the pursuit of any such other business, venture or activity by the Member Manager, the ECP Manager or the Independent Manager, in each case, will not be deemed wrongful or improper; and no notice, approval or other sharing of any such other opportunity, venture or activity will be required, and the legal doctrines of "corporate opportunity," "business opportunity" and similar doctrines will not be applied to any such opportunity, venture or activity.

10.    Transaction with Interested Parties. Subject to Section 7(g)(i)(11), no contract or transaction between the Company and one or more of its managers or officers, or between the Company and any corporation, company, partnership, association, or other organization (including, without limitation, ECP) in which one or more of the managers or officers of the Company are partners, directors, officers, employees, managers or agents, or have a financial interest in the Company, shall be void or voidable solely for this reason.

11.    Distributions. Each distribution of cash or other property by the Company shall be made 100% to the Sole Member. Each item of income, gain, loss, deduction, and credit of the Company shall be allocated 100% to the Sole Member.

12.    Dissolution and Winding Up. The Company shall dissolve and its business and affairs shall only be wound up pursuant to a written instrument executed by the Sole Member; *provided*, that the Sole Member shall not execute any such written instrument without the unanimous prior consent of the ECP Manager, the Independent Manager and the Member Manager pursuant to Section 7(g)(ii).

13.    Limited Liability. Except as otherwise required by any non-waivable provision of the Act or other applicable law, none of the prior, current or future managers,

5

FURIE-BANKR_00200629
DA01086