officers, directors, stockholders, partners, members, employees, affiliates, representatives or agents of the same or of the Company (individually, a "Covered Person" and, collectively, the "Covered Persons") shall be personally liable in any manner whatsoever for any debt, liability, or other obligation of the Company, whether such debt, liability, or other obligation arises in contract, tort, or otherwise. Except as otherwise required by any non-waivable provision of the Act or other applicable law, no Covered Person shall be liable to the Sole Member or any other Person bound by this Agreement for losses sustained or liabilities incurred as a result of any act or omission of a Covered Person, unless there has been a final and non-appealable judgment entered by a court of competent jurisdiction determining that, in respect of the matter in question, such losses or liabilities were primarily attributable to the fact that the specified Covered Person acted in bad faith or engaged in intentional fraud, willful misconduct, gross negligence or a knowing violation of law. The Covered Persons are intended to be express and intended beneficiaries of this Section 13.

14. Indemnification.

a) To the fullest extent permitted by law, the Company shall indemnify and hold harmless each Covered Person from and against any and all losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs ("Claims"). A Covered Person shall not be entitled to indemnification under this Section 14(a) with respect to (i) any Claim with respect to which such Covered Person has engaged in intentional fraud, gross negligence, willful misconduct, bad faith or a knowing violation of law or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) was brought to enforce such Covered Person's rights to indemnification hereunder. Expenses incurred by a Covered Person regarding any Claim pursuant to this Section 14(a) shall be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount unless it shall be determined that such Covered Person is not entitled to be indemnified by the Company as authorized by this Section 14(a). Upon such determination, such Covered Person shall reimburse the Company for expenses already advanced.

b) The Company hereby acknowledges that each Covered Person that is (A) ECP or (B) an officer, employee, partner or advisor of ECP (each of ECP and each such officer, employee, partner and advisor, an "ECP Covered Person") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of ECP. Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (meaning, for the avoidance of doubt, that the Company's obligations to each ECP Covered Person are primary and any obligation of ECP to advance expenses or to provide indemnification for the same expenses or liabilities incurred by each ECP Covered Person are secondary), (ii) the Company will be required to advance the full amount of expenses incurred by each ECP Covered Person and will be liable for the full amount of all liabilities, expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by this Section 14(b) without regard to any rights each ECP Covered

6

FURIE-BANKR_00200630
DA01087

Person may have against ECP and (iii) the Company irrevocably waives, relinquishes and releases ECP from any and all claims against ECP for contribution, subrogation or any other recovery of any kind in respect thereof. Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by ECP on behalf of an ECP Covered Person with respect to any claim for which such ECP Covered Person has sought indemnification or advancement of expenses from the Company will affect the foregoing and ECP will have a right of contribution and/or be subrogated, to the extent of such advancement or payment, to all of the rights of recovery of such ECP Covered Person against the Company. ECP is an express and intended third party beneficiary of the terms of this Section 14(b).

       c) If a Covered Person is entitled under any provision of this Section 14 to indemnification by the Company for some or a portion of the expenses (including attorneys' fees), judgments, fines or amounts paid in settlement actually and reasonably incurred by or on behalf of such Covered Person in connection with any action, suit, proceeding or investigation and any appeal therefrom but not, however, for the total amount thereof, the Company shall nevertheless indemnify the Covered Person for the portion of such expenses (including attorneys' fees), judgments, fines or amounts paid in settlement to which Covered Person is entitled.

       d) The Company may purchase and maintain insurance, at its expense, to protect itself and any manager, officer, employee or agent of the Company or another corporation, partnership, joint venture, trust or other enterprise (including any employee benefit plan) against any expense, liability or loss incurred by him or her, as the case may be, in any such capacity, or arising out of his or her status as such, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under the Act.

       e) If this Section 14 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify each Covered Person as to any expenses (including attorney's fees), judgments, fines and amounts paid in settlement in connection with any action, suit, proceeding or investigation, whether civil, criminal or administrative, including an action by or in the right of the Company, to the fullest extent permitted by any applicable portion of this Section 14 that shall not have been invalidated and to the fullest extent permitted by applicable law. The Covered Persons are intended to be express and intended beneficiaries of this Section 14.

       15.   UCC Article 8 Opt-In. The Company hereby irrevocably elects that all limited liability company interests (expressed in common units) in the Company (the "Ownership Interests") shall be securities governed by Article 8 of the Uniform Commercial Code as in effect in the State of Delaware or any other applicable jurisdiction. Each certificate evidencing Ownership Interests shall bear the following legend: "THIS CERTIFICATE EVIDENCES AN INTEREST IN CORSAIR OIL & GAS LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION." No amendment to this section shall be effective until all outstanding Ownership Interest certificates have been surrendered to the Company for cancellation. Any such certificates shall be recorded in a register thereof maintained by the

7

Company.

16.    Certificated Interests.  The Ownership Interests shall be represented by certificates substantially in the form attached hereto as Exhibit C.

17.    Transferability.    Notwithstanding anything contained herein to the contrary, each member of the Company shall be permitted to pledge or hypothecate any or all of its Ownership Interests, including all interests, economic rights, control rights and status rights as a member, to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such Ownership Interests pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of Ownership Interests, the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any member and without becoming a member, to exercise the membership/partnership voting rights of the member granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, upon its election to do so, shall become a member under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the Company, and shall be bound by all of the obligations, of a member under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging member shall cease to be a member and shall have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a member shall constitute any necessary approval of such member under the Act to the foregoing provisions of this Section 17. This Section 17 may not be amended or modified so long as any of the Ownership Interests are subject to a pledge or hypothecation without the pledgee's (or the transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the Ownership Interests are intended to be express and intended beneficiaries of this Section 17.

18.    Amendments.  Any amendment or modification to this Agreement and/or the Certificate, in each case, shall not be effective without the consent of both the ECP Manager and the Independent Manager.

19.    No Partition Action. Neither the Member nor any former Member shall have any right to maintain any action for partition with respect to the property of the Company.

20.    Governing Law.  The validity and enforceability of this Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

21.    Severability of Provisions.  Each provision of this Agreement shall be considered separable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity,

8

FURIE-BANKR_00200632
DA01089

unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

22.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, any of which may be delivered via facsimile or PDF, each of which will be deemed to be an original and all of which will constitute one agreement, binding on all parties hereto.

*[Signature Page Follows]*

9

FURIE-BANKR_00200633
DA01090

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Agreement Date.

**SOLE MEMBER:**

**DEUTSCHE OEL & GAS AG**

By: _____
Name: Kay Rieck
Title:   Authorized Signatory

*[Signature Page to the Second A&R LLC Agreement of Corsair Oil & Gas LLC]*

FURIE-BANKR_00200634
DA01091

## EXHIBIT A

1. Trent Justus Kososki (the ECP Manager)

2. Kay Rieck (the Member Manager)

3. Jeffrey A. Brodsky (the Independent Manager)

FURIE-BANKR_00200635
DA01092

## **EXHIBIT B**

1.  Thomas E Hord – Chief Operating Officer

2.  David W. Elder – Chief Financial Officer

FURIE-BANKR_00200636
DA01093

## EXHIBIT C

*[See attached.]*

FURIE-BANKR_00200637
DA01094

Certificate No. __

## CORSAIR OIL & GAS LLC
### a Delaware Limited Liability Company
Membership Interest Certificate

This certifies that **Deutsche Oel & Gas AG** is the owner of *One Thousand (1,000)* fully paid common units of Corsair Oil & Gas LLC (the "Company"), to the extent and as described in the LLC Agreement (as defined below), in the capacity of the Sole Member of the Company.

THIS CERTIFICATE EVIDENCES AN INTEREST IN CORSAIR OIL & GAS LLC AND SHALL BE A SECURITY GOVERNED BY ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF DELAWARE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ARTICLE 8 OF THE UNIFORM COMMERCIAL CODE OF EACH OTHER APPLICABLE JURISDICTION.

This Certificate shall be governed by and constructed in accordance with the laws of the State of Delaware without regard to otherwise governing principles of conflicts of law.

IN WITNESS WHEREOF, the said Company has caused this Certificate to be signed by its duly authorized officer this _____, 20__.

### CORSAIR OIL & GAS LLC

By: _____
Name:  David W. Elder
Title:    Chief Financial Officer

**CAPITALIZED TERMS USED AND NOT OTHERWISE DEFINED HEREIN ARE USED AS DEFINED IN THAT CERTAIN SECOND AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF THE COMPANY, DATED AS OF JANUARY 25, 2018 (AS THE SAME MAY BE AMENDED OR RESTATED FROM TIME TO TIME, THE "LLC AGREEMENT").**

**THE OWNERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND SAID LAWS OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS THEREOF.**

**THE OWNERSHIP INTERESTS REPRESENTED HEREBY ARE, AND THIS CERTIFICATE SHALL IN ALL RESPECTS BE, SUBJECT TO RESTRICTIONS ON TRANSFER AND CERTAIN OTHER AGREEMENTS SET FORTH IN THE LLC AGREEMENT. A COPY OF SUCH AGREEMENT SHALL BE FURNISHED WITHOUT CHARGE TO THE HOLDER HEREOF UPON WRITTEN REQUEST.**

# EXHIBIT 46

DA01096



Short Hills    Houston    San Diego

January 31, 2018

Cornucopia Oil & Gas Company, LLC
Furie Operating Alaska, LLC
100 Enterprise Avenue
League City, TX  77573
Attention:  David Elder

**VIA EMAIL AND FACSIMILE**

  Re: Notice of Events of Default; Reservation of Rights

Gentlemen:

   Reference is made to (i) that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as amended on July 30, 2015, September 2, 2015, October 15, 2015, October 23, 2015, November 6, 2015, November 13, 2015, November 17, 2015, November 20, 2015, November 25, 2015, December 11, 2015, January 12, 2016, March 9, 2016, March 25, 2016, April 13, 2016, April 29, 2016, May 4, 2016, May 23, 2016, June 14, 2016, July 8, 2016, August 11, 2016 and September 28, 2016 and as further modified, amended, waived or supplemented prior to the date hereof, the "***Credit Agreement***") entered into by and among Cornucopia Oil & Gas Company, LLC, a Texas limited liability company ("***Cornucopia***"), Furie Operating Alaska, LLC, a Texas limited liability company ("***FOA***", and together with Cornucopia, the "***Borrowers***", and each, a "***Borrower***"), Energy Capital Partners Mezzanine Opportunities Fund A, LP, a Delaware limited partnership ("***ECP Fund A***"), Energy Capital Partners Mezzanine Opportunities Fund, LP, a Delaware limited partnership ("***ECP Fund***"), Energy Capital Partners Mezzanine Opportunities Fund B, LP, a Delaware limited partnership ("***ECP Fund B***"), Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, a Delaware limited partnership ("***ECP Midstream***"), Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP, a Delaware limited partnership ("***ECP Midstream II***") (with ECP Fund A, ECP Fund, ECP Fund B and ECP Midstream, each, a "***Lender***," and collectively, the "***Lenders***"), ECP Fund A, as administrative agent (the "***Administrative Agent***") and collateral agent (the "***Collateral Agent***") for the Lenders and (ii) that certain Forbearance Agreement and Nineteenth Amendment to the Amended and Restated Credit Agreement dated as of July 8, 2016 (as amended on August 11, 2016 and as further modified, amended, waived or supplemented on September 28, 2016, the "***Forbearance Agreement***"), entered into by and among Deutsche Oel & Gas AG, a German corporation (the "***Sponsor***"), the Borrowers, the Lenders, and the Administrative Agent.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

US-DOCS\97933731.4

FURIE-BANKR_00173595
DA01097

As you know, certain Defaults and Events of Default have occurred and are continuing under the Credit Agreement and certain Forbearance Defaults have occurred and are continuing under the Forbearance Agreement as of the date hereof, including, without limitation, each of the Defaults, Events of Default, and Forbearance Defaults listed in Exhibit A attached hereto (such existing Defaults, Events of Default, and Forbearance Defaults collectively, the "Designated Events of Default" and each, a "Designated Event of Default"). Accordingly, as a result of the Designated Events of Default, as well as any other Defaults, Events of Default, or Forbearance Defaults that may exist, the Administrative Agent and the Lenders are entitled to exercise any and all default-related rights and remedies under the Credit Agreement, the Forbearance Agreement, other Credit Documents and/or applicable law. The Forbearance Period (under and as defined in the Forbearance Agreement) terminated on December 15, 2016 in accordance with Section 4(b)(iii) of the Forbearance Agreement.

In accordance with Section 2.3.3 of the Credit Agreement, the Borrowers shall pay interest at a rate equal to the Default Rate on the First Out Term Loans and any accrued and unpaid interest thereon, the Amendment and Waiver Fee (as defined in the First Amendment Fee Letter), the Amendment and Waiver Fee (as defined in the Ninth Amendment Fee Letter), the Tranche B Installments that were due and payable on January 16, 2017, July 16, 2017, and January 16, 2018 and the accrued and unpaid interest on the Second Out Term Loans that was due and payable on the Interest Payment Dates occurring on each of January 3, 2017, April 3, 2017, July 3, 2017, October 2, 2017, and January 2, 2018.

Nothing in this letter or in any ongoing discussions or negotiations between Administrative Agent and/or any one or more of the Lenders, on the one hand, and the Borrowers and Sponsor and/or their respective affiliates, on the other hand (if any), nor any delay on the part of Administrative Agent or the Lenders in exercising any of their respective rights and remedies under the Credit Agreement, the Forbearance Agreement, the other Credit Documents and/or applicable law, shall directly or indirectly: (i) create any obligation to forbear from taking any enforcement action, or to make any further extensions of credit, (ii) constitute a consent to or waiver of any past, present or future Default or Event of Default (including the Designated Events of Default) or other violation of any provisions of the Credit Agreement, the Forbearance Agreement, or any other Credit Documents, (iii) amend, modify or operate as a waiver of any provision of the Credit Agreement, the Forbearance Agreement or any other Credit Documents or any right, power, privilege or remedy of Administrative Agent or any one or more of the Lenders thereunder or under applicable law or constitute an agreement to forbear or to restructure the Obligations in any respect or otherwise modify the capital structure of any or all of the Borrowers and/or the Sponsor, or (iv) constitute a course of dealing or other basis for altering any rights or obligations of Administrative Agent or the Lenders under the Credit Documents or any Obligations of the Borrowers or the Sponsor under the Credit Agreement, the Forbearance Agreement, other Credit Documents or any other contract or instrument. Nothing contained in this letter shall confer on Borrowers or the Sponsor or Person any right to notice or cure periods with respect to any Event of Default.

This letter confirms that the Administrative Agent and the Lenders have not waived the Designated Events of Default and each of Administrative Agent and the Lenders expressly reserves all of its rights, powers, privileges and remedies under the Credit Agreement, the

FURIE-BANKR_00173596
DA01098

Forbearance Agreement, other Credit Documents and/or applicable law, including, without limitation, its right at any time, as applicable, (i) to incur further obligations under the Credit Agreement as a result of any Designated Event of Default, (ii) to accelerate the Obligations, (iii) to charge the default rate of interest in respect of the Obligations (as of any date from and after the date on which the first Designated Event of Default first occurred), (iv) to commence any legal or other action to collect any or all of the Obligations from any or all of the Borrowers, the Sponsor, and any other person liable therefor and/or any Collateral, (v) to foreclose or otherwise realize on any or all of the Collateral and/or as appropriate, set-off or apply to the payment of any or all of the Obligations, any or all of the Collateral, (vi) to take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any or all of the Credit Agreement, the Forbearance Agreement, other Credit Documents or applicable law, and (vii) to reject any forbearance, financial restructuring or other proposal made by or on behalf of Borrowers, the Sponsor or any creditor or equity holder.  Each of Administrative Agent and the Lenders may exercise their respective rights, powers, privileges and remedies, including those set forth in (i) through (vii) above at any time in its sole and absolute discretion without further notice.  No oral representations or course of dealing on the part of Administrative Agent, any Lender or any of its officers, employees or agents, and no failure or delay by Administrative Agent or any Lender with respect to the exercise of any right, power, privilege or remedy under any of the Credit Agreement, the Forbearance Agreement, other Credit Documents or applicable law shall operate as a waiver thereof, and the single or partial exercise of any such right, power, privilege or remedy shall not preclude any later exercise of any other right, power, privilege or remedy.

*[Signature pages to follow]*

US-DOCS\97933731.4

FURIE-BANKR_00173597
DA01099

Very truly yours,

**ENERGY CAPITAL PARTNERS MEZZANINE
OPPORTUNITIES FUND A, LP,**
a Delaware limited partnership,
as Administrative Agent and a Lender

By: Energy Capital Partners Mezzanine GP, LP
Its: General Partner

By: Energy Capital Partners Mezzanine, LLC
Its: General Partner

By: ECP ControlCo, LLC
Its: Sole Member

By: _____
    Name: Andrew D. Singer
    Title:  Managing Member


**ENERGY CAPITAL PARTNERS MEZZANINE
OPPORTUNITIES FUND, LP,**
a Delaware limited partnership

By: Energy Capital Partners Mezzanine GP, LP
Its: General Partner

By: Energy Capital Partners Mezzanine, LLC
Its: General Partner

By: ECP ControlCo, LLC
Its: Sole Member

By: _____
    Name: Andrew D. Singer
    Title:  Managing Member


**ENERGY CAPITAL PARTNERS MEZZANINE
OPPORTUNITIES FUND B, LP,**
a Delaware limited partnership

By: Energy Capital Partners Mezzanine GP, LP
Its: General Partner

By: Energy Capital Partners Mezzanine, LLC
Its: General Partner

By: ECP ControlCo, LLC
Its: Sole Member

By: _____
    Name: Andrew D. Singer
    Title:  Managing Member

[Reservation of Rights Letter]US-DOCS\97933731.4

FURIE-BANKR_00173598
DA01100

**ENERGY CAPITAL PARTNERS MEZZANINE
(ALASKA MIDSTREAM CO-INVEST), LP,**
a Delaware limited partnership

By:  Energy Capital Partners GP Mezzanine Co-
Investment (Alaska Midstream), LLC
Its:  General Partner

By:  Energy Capital Partners Mezzanine, LLC
Its:  Sole Member

By:  ECP ControlCo, LLC
Its:  Sole Member


By:  _____
    Name: Andrew D. Singer
    Title:  Managing Member

**ENERGY CAPITAL PARTNERS MEZZANINE
(ALASKA MIDSTREAM CO-INVEST) II, LP,**
a Delaware limited partnership

By:  Energy Capital Partners GP Mezzanine Co-
Investment (Alaska Midstream), LLC
Its:  General Partner

By:  Energy Capital Partners Mezzanine, LLC
Its:  Sole Member

By:  ECP ControlCo, LLC
Its:  Sole Member


By:  _____
    Name: Andrew D. Singer
    Title:  Managing Member

[Reservation of Rights Letter]US-DOCS\97933731.4

FURIE-BANKR_00173599
DA01101

**EXHIBIT A**

**Designated Events of Defaults**

**I.     Current Defaults**

1.      Sponsor's failure to make the Equity Contribution for the calendar month of March 2016 in the amount of $2,800,040 to Cornucopia on or prior to June 24, 2016 as required by Section 2.01(a)(i) of the Equity Contribution Agreement (it being understood that the Sponsor has made $2,530,264 of the Equity Contribution required to be made for the calendar month of March 2016, $200,000 of which was received on or about July 28, 2016), which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(i) of the Credit Agreement.

2.      Sponsor's failure to make the Equity Contribution for the calendar month of April 2016 in the amount of $2,500,000 to Cornucopia on or prior to June 24, 2016 as required by Section 2.01(a)(i) of the Equity Contribution Agreement (it being understood that the Sponsor has made $313,815 of the Equity Contribution required to be made for the calendar month of April 2016), which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(i) of the Credit Agreement.

3.      Sponsor's failure to make the Equity Contribution for the calendar month of May 2016 in the amount of $17,059,840 to Cornucopia on or prior to June 24, 2016 as required by Section 2.01(a)(i) of the Equity Contribution Agreement (it being understood that the Sponsor has made $4,678 of the Equity Contribution required to be made for the calendar month of May 2016), which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(i) of the Credit Agreement.

4.      Sponsor's failure to make the Equity Contribution for the calendar month of June 2016 in the amount of $12,295,321 to Cornucopia on or prior to June 30, 2016 as required by Section 2.01(a)(i) of the Equity Contribution Agreement, which failure shall constitutes an Event of Default pursuant to Section 7.1.18(d)(ii) of the Credit Agreement.

5.      Sponsor's failure to make the Construction Reserve Account Shortfall Contribution (as defined in the Equity Contribution Agreement) pursuant to Section 2.01(a)(iii) of the Equity Contribution Agreement in connection with the transfer by Borrowers of $5,613,919.92 from the Construction Reserve Account to the Construction Account on May 12, 2016 that resulted in a Construction Reserve Account Shortfall on such date, which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(ii) of the Credit Agreement.

6.      Sponsor's failure to make the Construction Reserve Account Shortfall Contribution (as defined in the Equity Contribution Agreement) pursuant to Section 2.01(a)(iii) of the Equity Contribution Agreement in connection with the transfer by Borrowers of $876,674 from the Construction Reserve Account to the Construction Account on June 9, 2016 that resulted in a Construction Reserve Account Shortfall on such date, which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(ii) of the Credit Agreement.

FURIE-BANKR_00173600
DA01102

7.     Cornucopia's failure to direct the Depositary to withdraw from the Construction Account and transfer to the Litigation Reserve Account an amount equal to $1,250,000 on each Monthly Date occurring for the calendar months of January 2016, April 2016 and May 2016 in accordance with Section 3.1(e) of the Accounts Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

8.     Sponsor's failure to make the Construction Reserve Account Shortfall Contribution (as defined in the Equity Contribution Agreement) pursuant to Section 2.01(a)(iii) of the Equity Contribution Agreement in connection with the transfer by Borrowers of $8,525,332 from the Construction Reserve Account to the Construction Account on May 24, 2016 that resulted in a Construction Reserve Account Shortfall on such date, which failure constitutes an Event of Default pursuant to Section 7.1.18(d)(ii) of the Credit Agreement.

9.     The issuance of the "Notice of Events of Default; Reservation of Rights" dated July 5, 2016 by the Administrative Agent and the Lenders and the failure to obtain advance consent to this Agreement from the Tax Credit Administrative Agent constitutes a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement with respect to the Tax Credit Loan Agreement.

10.     On April 11, 2016 the Borrowers exceeded by $126,550.00 the $1,500,000.00 limit on Permitted Debt incurred with respect to financings of insurance premiums. The amount of such Debt was reduced to less than $1,500,000.00 on or before May 11, 2016.

11.     On June 29, 2016 the Governor of the State of Alaska vetoed the state legislature's $430 million appropriation to the Oil & Gas Tax Credit Fund. Such veto may constitute a "Change in Tax Credit Law" for purposes of the Tax Credit Loan Agreement. If so, then the Borrowers may be in default under the Tax Credit Loan Agreement for failure to make a mandatory prepayment under <u>Section 2.1.5(c)(iv)</u> of the Tax Credit Loan Agreement. Such a default under the Tax Credit Loan Agreement may constitute or result in a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement.

12.     On July 26, 2016 the Tax Credit Administrative Agent and the Tax Credit Lenders issued a "Reservation of Rights Letter" to the Borrowers, notifying them that the following events of default had occurred and were continuing under the Tax Credit Loan Agreement: "(i) the Borrowers' failure to deliver to the Administrative Agent audited consolidated and consolidating (in case of the Administrative Borrower) financial statements for the fiscal year ended December 31, 2015 no later than June 30, 2016 in accordance with the Consent and Waiver, in the manner set forth in Section 5.1.2 of the Credit Agreement, and the related defaults under Sections 5.1.4 and 5.1.5 of the Credit Agreement; (ii) the Borrowers entering into the ECP 19th Amendment; and (iii) each of the Borrowers' Events of Default under the ECP Credit Agreement set forth in the ECP 19th Amendment each of which is an Event of Default under Section 7.1.8(b)(ii) of the Credit Agreement." Each of such defaults asserted under the Tax Credit Loan Agreement may constitute or result in a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement.

US-DOCS\97933731.4

FURIE-BANKR_00173601
DA01103

13.     On September 27, 2016, the Borrowers commenced drilling activities relating to the Osprey Well in violation of Section 6.27 of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(a) of the Credit Agreement.

14.     The failure to construct the ten (10) inch underground pipeline entirely within the easement granted by the Kenai Peninsula Borough, as required by Section 5.3(d) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Sections 7.1.2(a) and 7.1.3 of the Credit Agreement.

15.     The failure to achieve Project Completion on or before the Date Certain, which failure constitutes an Event of Default pursuant to Section 7.1.11 of the Credit Agreement.

16.     Cornucopia's failure to direct the Depositary to withdraw from the Construction Account and transfer to the Litigation Reserve Account an amount equal to $125,000 on the Monthly Date occurring for the calendar month of October 2016 in accordance with Section 3.1(e) of the Accounts Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

17.     The failure to deliver to the Administrative Agent and each Lender an Acceptable Equity Contribution Plan on or prior to July 29, 2016, which failure constitutes a Forbearance Default pursuant to Section 4(c) of the Forbearance Agreement.

18.     Sponsor's failure to make the Equity Contribution for the calendar month of July 2016 in the amount of $12,000,000 to Cornucopia on or prior to July 30, 2016 as required by Section 5(b) of the Forbearance Agreement, which failure constitutes a Forbearance Default pursuant to Section 4(c) of the Forbearance Agreement.

19.     The failure to deliver to the Administrative Agent and each Lender on or prior to July 31, 2016 evidence of the Borrowers' satisfaction of the New Development Well Conditions, which failure constitutes a Forbearance Default pursuant to Section 4(c) of the Forbearance Agreement.

20.     The Borrowers' failure to obtain prior consent from the Tax Credit Administrative Agent to the amendment of the Equity Contribution Agreement pursuant to the Twenty-First Amendment constitutes an Event of Default under Section 7.1.2(a) of the Tax Credit Loan Agreement.

21.     Sponsor's failure to make the Equity Contribution for the calendar month of October 2016 in the amount of $1,000,000 to Cornucopia on or prior to October 31, 2016, as required by the Equity Contribution Schedule, as amended by the 20th Amendment to the Credit Agreement and Section 5(b) of the Forbearance Agreement, which failure constitutes a Forbearance Default pursuant to Section 4(c) of the Forbearance Agreement.

22.     Cornucopia's failure to direct the Depositary to withdraw from the Construction Account and transfer to the Litigation Reserve Account an amount equal to $125,000 on the Monthly Date occurring for the calendar month of November 2016 in accordance with Section 3.1(e) of the Accounts Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

US-DOCS\97933731.4

FURIE-BANKR_00173602
DA01104

23.   Cornucopia's failure to direct the Depositary to withdraw from the Construction Account and transfer to the Litigation Reserve Account an amount equal to $125,000 on the Monthly Date occurring for the calendar month of December 2016 in accordance with Section 3.1(e) of the Accounts Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

24.   The Borrowers' failure to make required payment of the full aggregate unpaid principal amount of the First Out Term Loans on the First Out Term Loan Maturity Date pursuant to Section 2.1.1(e)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

25.   The Borrowers' failure to make required payment of the accrued and unpaid interest on the First Out Term Loans on the First Out Term Loan Maturity Date pursuant to Section 2.1.1(e)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

26.   The Borrowers' failure to make the required payment of the Amendment and Waiver Fee (as defined in the First Amendment Fee Letter) on December 15, 2016 pursuant to the First Amendment Fee Letter, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

27.   The Borrowers' failure to make the required payment of the Amendment and Waiver Fee (as defined in the Ninth Amendment Fee Letter) on December 15, 2016 pursuant to the Ninth Amendment Fee Letter, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

28.   The Borrowers' failure to make the required Tranche B Installment payment on January 16, 2017 pursuant to Section 2.1.5(b) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

29.   The Borrowers' failure to make the required payment of the accrued and unpaid interest on the Second Out Term Loans on the Interest Payment Date occurring on January 2, 2016 pursuant to Section 2.1.1(c)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

30.   On January 6, 2017 the Tax Credit Administrative Agent and the Tax Credit Lenders issued a "Reservation of Rights Letter" to the Borrowers, notifying them that in addition to those events of default under the Tax Credit Loan Agreement of which the Borrowers had already been notified, the following additional events of default had occurred and were continuing under the Tax Credit Loan Agreement: "[a]n Event of Default has occurred and is continuing under Section 7.11 of the Credit Agreement on account of the Borrowers' failure to pay cash interest on the Loans (each of which converted to an Extension Loan on September 30, 2016) in accordance with Section 2.1.6 of the Credit Agreement on the Interest Payment Date scheduled for January 2, 2017 within three (3) Banking Days after such sum was due[;] . . . [a]n Event of Default has occurred and is continuing under Section 7.1.17 of the Credit Agreement on account of the State of Alaska's default to the Borrowers related to its payments with respect to State Tax

9

FURIE-BANKR_00173603
DA01105

Credits and the prorations made by State of Alaska under 15 AAC 55.325(d)[; and] Events of Default have occurred under Section 7.1.8 of the Credit Agreement due to the occurrence of the Events of Default under the ECP Credit Agreement set forth in the Notice of Events of Default; Reservation of Rights Letter, dated December 16, 2016, delivered by the ECP Administrative Agent and the ECP Lenders to the Borrowers."   On June 21, 2017, the Tax Credit Administrative Agent and the Tax Credit Lenders issued a "Reservation of Rights Letter" to the Borrowers, notifying them that events of default under the Tax Credit Loan Agreement of which the Borrowers were previously notified in the July 26, 2017 and January 6, 2017 Reservation of Rights Letters were continuing under the Tax Credit Loan Agreement. Each of such defaults asserted under the Tax Credit Loan Agreement may constitute or result in a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement.

31.    Cornucopia's failure to direct the Depositary to withdraw from the Construction Account and transfer to the Litigation Reserve Account an amount equal to $125,000 on the Monthly Date occurring for the calendar month of January 2017 in accordance with Section 3.1(e) of the Accounts Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

32.    The Borrowers' failure to retain a "big four" accounting firm or other nationally recognized accounting firm acceptable to the Administrative Agent on or prior to March 31, 2017 to perform an annual audit on all future annual financial statements of each Borrower, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

33.    The Borrowers' failure to make the required payment of the accrued and unpaid interest on the Second Out Term Loans on the Interest Payment Date occurring on April 3, 2017 pursuant to Section 2.1.1(c)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

34.    Each Borrower's failure to deliver to the Administrative Agent within 120 days after the Calendar Year ended December 31, 2016, updates to or bringdowns, as of December 31 of such Calendar Year, of the Closing Date Reserve Reports pursuant to Section 5.1.7 of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

35.    The Borrowers' failure to timely complete and file Alaska Tax Credit Applications no later than forty five (45) days after the first date on which such Alaska Tax Credit Applications could have been be filed with the DOR, as required by Section 5.27(b) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

36.    Each Borrower's failure to perform all material Contractual Obligations under the Material Contracts, as identified by Alaska Pipeline Company in its letter dated February 10, 2017, as required by Section 5.3 of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(a) of the Credit Agreement.

US-DOCS\97933731.4

FURIE-BANKR_00173604
DA01106

37. Each Borrower's failure to deliver to the Administrative Agent on or prior to March 31, 2017 the audited consolidated and consolidating (in the case of Cornucopia) financial statements of such Borrower for the fiscal year ended December 31, 2015, together with a consolidated statement of equity, a consolidated and consolidating balance sheet as of the close of such year, a consolidated income and expense statement, reconciliation of capital accounts and a consolidated statement of cash flow, all prepared in accordance with GAAP, certified by an independent certified public accountant selected by the Borrowers pursuant to Section 5.1.2 of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.2(c) of the Credit Agreement.

38. The Borrowers' failure to make the required payment of the accrued and unpaid interest on the Second Out Term Loans on the Interest Payment Date occurring on July 3, 2017 pursuant to Section 2.1.1(c)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

39. The Borrowers' failure to make the required payment of the Tranche B Installment on the Semi-Annual Payment Date occurring on July 16, 2017 pursuant to Section 2.1.5(b)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

40. The Borrowers' failure to obtain the written consent of the Administrative Agent to permit the material amendment of the Unit Plan of Development by the Alaska Department of Natural Resources in violation of Section 6.27 of the Credit Agreement, which failure constitutes an Event of Default under Section 7.1.2(a) of the Credit Agreement.

41. The Borrowers' failure to deliver a material amendment to the Unit Plan of Development obtained from the Alaska Department of Natural Resources within five (5) Banking Days after receipt of such amendment as required pursuant to Section 5.2(b) of the Credit Agreement, which failure constitutes a Default under Section 7.1.2(c) of the Credit Agreement.

42. The Borrowers' failure to pay all State of Alaska property taxes due on June 30, 2017, as required by Section 5.9 of the Credit Agreement, which failure constitutes an Event of Default under Section 7.1.2(a) of the Credit Agreement.

43. The Borrowers' failure to make the required payment of the accrued and unpaid interest on the Second Out Term Loans on the Interest Payment Date occurring on October 2, 2017 pursuant to Section 2.1.1(c)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

44. The Borrowers' failure to make the required payment of accrued and unpaid interest due on October 3, 2017 pursuant to the Tax Credit Loan Agreement, which default under the Tax Credit Loan Agreement may constitute or result in a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement.

45. The Borrowers' failure to make the payments required to be made pursuant to Section 2.1.5(d)(iii) of the Credit Agreement on the Quarterly Dates occurring on each applicable

11

FURIE-BANKR_00173605
DA01107

Quarterly Date, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

46.     The Borrowers' failure to obtain the written consent of the Administrative Agent to permit the Sponsor to enter into that certain letter agreement with PJT Partners LP, dated June 28, 2017, as amended by that certain Amendment No. 1 to Letter Agreement dated June 28, 2017, dated October 10, 2017, to the extent of any obligation on either of the Borrowers thereunder, as required by Section 6.9 of the Credit Agreement, which failure constitutes an Event of Default under Section 7.1.2(a) of the Credit Agreement.

47.     The Borrowers' failure to make the required payment of the accrued and unpaid interest on the Second Out Term Loans on the Interest Payment Date occurring on January 2, 2018 pursuant to Section 2.1.1(c)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

48.     The Borrowers' failure to meet their drilling commitments initially set forth under Furie's October 7, 2016 Plan of Development as required pursuant to Sections 5.3(c) and 5.13.1 of the Credit Agreement, which failure constitutes a Default under Sections 7.1.2(a), Section 7.1.2(c) and 7.1.8 of the Credit Agreement.

49.     The Borrowers' failure to make the required payment of the Tranche B Installment on the Semi-Annual Payment Date occurring on January 16, 2018 pursuant to Section 2.1.5(b)(i) of the Credit Agreement, which failure constitutes an Event of Default pursuant to Section 7.1.1 of the Credit Agreement.

50.     The Borrowers' alleged failure to comply with the provisions of the conditional approval letter for the Kitchen Lights Unit delivered by the Alaska Oil and Gas Conservation Commission (AOGCC) on April 17, 2015, as detailed in that certain letter from AOGCC to FOA, dated as of December 11, 2017, as required pursuant to Section 5.3(d) and 5.13.1 of the Credit Agreement, which failure would constitute an Event of Default under Section 7.1.2(a) and 7.1.2(c) of the Credit Agreement.

51.     Each of the foregoing Events of Default may constitute or result in a default or event of default under Section 7.1.8 of the Tax Credit Loan Agreement.  Such a default or event of default under the Tax Credit Loan Agreement may constitute or result in a "Debt Cross Default" Event of Default under Section 7.1.7(c) of the Credit Agreement.

US-DOCS\97933731.4

FURIE-BANKR_00173606
DA01108

# EXHIBIT 47

DA01109

Message

| | |
|---|---|
| **From**: | van Stephoudt, Theodor [TvanStephoudt@ReedSmith.com] |
| **Sent**: | 2/14/2018 6:34:48 AM |
| **To**: | 'Gordon Raines' [g.raines@furiealaska.com] |
| **CC**: | Bruce Webb [b.webb@furiealaska.com]; Bruce Ganer [bganer@sprioilgas.com]; Mark Slaughter [m.slaughter@furiealaska.com]; David Elder [d.elder@furiealaska.com] |
| **Subject**: | RE: KLU A-2A Upper Sterling Test |

**Importance**:    High

Gordon,

Apologies for the delay in my response. We have determined that the test right now would not be appropriate as the A2-A is the well that produces the majority of our gas and we should not touch that well in the short term. We should test the upper Sterling once we have the A-1 completed and have performed our work on the KLU-3 so that we can switch over production to one of these wells in case something happens while we are testing. Sorry for the confusion but we need to take the approach with the lowest risks levels.

Kind regards, Theo

**Theodor van Stephoudt**
Cell: +1.347.429.0158

---

**From:** Gordon Raines [mailto:g.raines@furiealaska.com]
**Sent:** Wednesday, February 14, 2018 8:10 AM
**To:** van Stephoudt, Theodor
**Cc:** Bruce Webb; Bruce Ganer; Mark Slaughter; David Elder
**Subject:** Re: KLU A-2A Upper Sterling Test

Have we decided if we will be proceeding with the KLU A-2A Upper Sterling 4 point test or will defer to later in the year? I need to let the vendors know what our plans are.

At a minimum, we will determine fluid levels with an echometer.

Thank you,

Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

---

**From:** Raines <g.raines@furiealaska.com>
**Date:** Friday, February 9, 2018 at 3:35 PM
**To:** "van Stephoudt, Theodor" <tvanstephoudt@reedsmith.com>
**Cc:** Bruce Webb <b.webb@furiealaska.com>, Bruce Ganer <bganer@sprioilgas.com>, Mark Slaughter <m.slaughter@furiealaska.com>, David Elder <d.elder@furiealaska.com>
**Subject:** Re: KLU A-2A Upper Sterling Test

Update: at present I am still attempting to confirm all necessary vendors and services are available but I don't have a firm commitment from SLB for the nitrogen services. My understanding from a 2/7/08 conversation with them was that they

FURIE-BANKR_00200167
DA01110

would be available but that is not necessarily the case. I am expecting a call shortly and will provide another update at that point.

Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

---

**From:** Raines <g.raines@furiealaska.com>
**Date:** Friday, February 9, 2018 at 6:27 AM
**To:** "van Stephoudt, Theodor" <tvanstephoudt@reedsmith.com>
**Cc:** Bruce Webb <b.webb@furiealaska.com>, Bruce Ganer <bganer@sprioilgas.com>, Mark Slaughter <m.slaughter@furiealaska.com>, David Elder <d.elder@furiealaska.com>
**Subject:** FW: KLU A-2A Upper Sterling Test

Good Morning All,
Our plans to test the Upper Sterling in the KLU A-2A well are summarized below with a few updates which I hope to finalize today.

Update:Mobe date will be **ASAP** which is dependent on 3 resources, 1 of which is confirmed

o           Nitrogen Services (SLB) is available

o           Wireline Services (Expro) is not confirmed but I have requested that Expro expedite their equipment availability. Should they not be able to meet our needs, I will contact Ponder W/L (David – I may need an MSA although we have used them in the past)

o           Boat – I will be in touch with OMSI this morning but need the W/L availability date in order to set a mobe date.

I will provide an update this morning.

Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

---

**From:** Raines <g.raines@furiealaska.com>
**Date:** Thursday, February 8, 2018 at 4:21 PM
**To:** Willie Chang <willie.chang@exprogroup.com>, Brody Boudreaux <brody.boudreaux@exprogroup.com>, John Campbell <john.campbell@exprogroup.com>
**Cc:** Bruce Ganer <bganer@sprioilgas.com>, Furie Lead Op <furieleadoperators@furiealaska.com>, Furie Operating Julius Platform <juliusplatform@furiealaska.com>, 'Furie Production Superintendents' <prodsupt@furiealaska.com>, Mark Slaughter <m.slaughter@furiealaska.com>, Ed Hutchinson <ehutchinson@sprioilgas.com>
**Subject:** Re: KLU A-2A Upper Sterling

I've included a short recap of today's conference call. Please edit as necessary.

• Proposed Start Date: Mobe equipment and personnel on March 2, 2018

• Expro W/L equipment currently undergoing maintenance and 3rd party testing

FURIE-BANKR_00200168
DA01111

- The KLU A-2A has not been tested or produced in the Upper Sterling therefor we will use Willie's test design (attached)

- Tandem bhp gauges will be pinned with a set screw and installed in the profile just below the bottom set of perfs

- Furie production operators and Expro personnel will provide data updates during test period

- Once the well has undergone the 4 point test procedure and the gauges are pulled, we are assuming we will produce the well for an additional 3 – 4 days at a rate to be based on drawdown limitations established while testing. For gas marketing purposes, we are tentatively targeting a rate of 15 mmcfd.

- Furie will provide an onsite well work consultant

- SLB N2 services will be available until mid-March

Action Items:

- Notify AOGCC of plans to isolate the Beluga perfs and test the Upper Sterling (GJR)

- Notify gas marketing of tentative schedule and corresponding rates (GJR)

- Confirm status of Expro equipment for March 2, 2018 mobe date (John C)

- Confirm status of SLB N2 equipment and N2 volume requirements for March 2, 2018 mobe date (GJR)

- Locate Echometer - shoot fluid levels in KLU A-2A and KLU 3 well (Brody B)

- Coordinate with OMSI on boat for March 2, 2018 (Furie Lead / Prod Supt)


Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com

**From:** Raines <g.raines@furiealaska.com>
**Date:** Wednesday, February 7, 2018 at 2:52 PM
**To:** Willie Chang <willie.chang@exprogroup.com>, Mark Bevans <mark.bevans@exprogroup.com>, Jacques Guillot <jacques.guillot@exprogroup.com>
**Cc:** Bruce Ganer <bganer@sprioilgas.com>
**Subject:** KLU A-2A Upper Sterling

Willie, Mark, Jacques -
We would like to set up a 4 point test for the Upper Sterling (4735 – 4803' MD) in the next couple of weeks. Can we discuss this over the phone tomorrow?

Mark – I've attached the procedure we used in November of 2016 which we can modify. We need to discuss the pinning of the gauges as well. Can you work up a cost estimate? Also need to know when personnel and equipment would be available.


Gordon Raines
Production Manager
Furie Alaska LLC
Cell: 337-278-0594
g.raines@furiealaska.com
* * *
This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this

FURIE-BANKR_00200169
DA01112

message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

FURIE-BANKR_00200170
DA01113

# EXHIBIT 48

DA01114

**To:**     K A Y ... R I E C K[rieck@deutsche-oel-gas.com]
**Cc:**     van Stephoudt, Theodor[tvanstephoudt@reedsmith.com]
**From:**  Bruce Webb
**Sent:**  Wed 2/14/2018 9:35:14 AM (UTC-09:00)
**Subject:**  Bruce Ganer

Elder is on the phone with PRA and ECP. He's talking about how much water the Sterling produces and how Bruce Ganer's information is all wrong. He is telling them that Bruce Ganer is NOT an officer of the company and has no right to withhold information that he (David) has requested to be sent to PRA. He said he is getting ready to "burn his ass" because he (David) is an officer and he makes the decisions, not Ganer.

Since Ganer is acting under the direct orders of Kay, it may be necessary for a higher level executive to weigh in and give Ganer a little protection.

David just walked out of the office again with his new cell phone.

FURIE-BANKR_00106831
DA01115

# EXHIBIT 49

DA01116





# REQUEST FOR PROPOSAL

## from Petrotechnical Resources of Alaska

### on behalf of
### Furie Operating Alaska, LLC

## for Kitchen Lights Unit Well A1, 3, A4

### Proposals requested from following vendors:

Spartan Offshore Drilling, LLC

Shelf Drilling Offshore Resources Limited II

FURIE-BANKR_00200537
DA01117

Table of Contents

**PROJECT OVERVIEW** .......................................................................................................................... **3**
   Table 1: ................................................................................................................................................. 3

**Location Information** ........................................................................................................................ **4**

**Well A1 Program** ............................................................................................................................... **5**
   A1 Schematic ......................................................................................................................................... 5

**Well 3 Program** ................................................................................................................................. **6**
   Well 3 Schematic ................................................................................................................................... 6

**Well A4 Program** ............................................................................................................................... **7**
   A4 Directional Program ......................................................................................................................... 7

**Simultaneous Operations** ............................................................................................................... **8**

**Period of Performance** ..................................................................................................................... **8**

**Scope of Services** .............................................................................................................................. **8**

**Proposal Requests** ............................................................................................................................ **9**

**Confidentiality** ................................................................................................................................ **10**

**Response Deadline** .......................................................................................................................... **10**

FURIE-BANKR_00200538
DA01118

## PROJECT OVERVIEW

Petrotechnical Resources of Alaska (PRA) with support of Furie Operating Alaska, LLC is providing a Request for Proposal (RFP) for rig services for the scope of work as listed in Table 1.

Table 1: Overview of the proposed field activities and proposed timing:

| Timing | Main Activity |
|---|---|
| Feb-April, 2018 | **Pre-Season Rig inspection, Commissioning, & Mobilization**.<br><br>Estimated time is complete work scope: Dependent on rig selection |
| Early May, 2018 | **Well A1 Completion:** Well requires original completion. This well has been drilled and cased with 9-5/8" casing to its target depth. This is the first well in the program and is to commence as soon as weather conditions allow<br><br>KLU slot location: Slot D<br>Estimated time range to complete work scope: 7 to 35 days. |
| Early May-Early June, 2018 | **Well 3 Workover:** Well requires the current completion to be removed and a replacement completion installed<br><br>KLU slot location: Slot A<br>Estimated time is complete work scope: 22 to 65 days. |
| June, 2018 | **Well A4 Drill and Complete:** Well is a new location that will be drilled, cased, and completed.<br><br>KLU slot location: Slot C<br>Estimated time is complete work scope: 24 to 52 days |
| Early July, 2018 | **Demobilization of all equipment.**<br><br>Estimated time is complete work scope: Dependent on rig selection |

## Location Information



Please reference document "PF Elevation Plan_Well Slots_Framing Plan" for detailed engineering drawings of location.

## Well A1 Program

Well A1 is a suspended well accessed via Slot D with 9-5/8" casing to a depth of 8,223' MD / 6,938' TVD.  A 4-1/2" completion with a single packer will be installed. *This is a tentative completion program and is subject to change.*

## A1 Schematic



FURIE-BANKR_00200541
DA01121

## Well 3 Program

Well 3 is a producing well accessed via Slot A with 3-1/2" X 2-7/8" completion to a depth of 7,010'
MD.  The well have a SITP of 963psi as of 11/17/2017.  A 3-1/2" completion with a single packer
will be installed.  *This is a tentative completion program and is subject to change.  Additional time
may be required to remove all eight packers in the currently installed completion.*

## Well 3 Schematic



## Well A4 Program

Well is a new location that will be drilled, cased, and completed via Slot C. KLU A4 is planned to be drilled to a depth of 8,500' MD / 7,436' TVD. 13-3/8" surface casing will be set at 2,013' MD. 9-5/8" production casing well be set at 8,500' MD. The well will be completed with 4-1/2" tubing.

## A4 Directional Program



## Simultaneous Operations

KLU platform will have simultaneous operations ongoing during each phase of the program. Please reference table 1. Unaffected producing wells are not currently planned to require shut in during this program.

## Period of Performance

Current project plans are for a 3 well program as outlined in table 1. As designed this is estimated to require 53 days plus the pre-season rig inspection, commissioning, mobilization, and de-mobilization. These are tentative plans and are subject to change. The alternative options that are currently being considered have the potential to add an additional 99 days to the program. The majority of this time variance is due to differing completion designs and the estimated time required to remove the current Well 3 completion.

Pre-season rig inspection and commissioning are to be completed by May 1st or first window of suitable weather conditions to transport rig to well location.

Please indicate minimum and maximum length of time rig could be made available to the Project, any calendar time frames that your rig is not available, and any special concerns or questions you have regarding this drilling program. Specify any special requirements necessary to formally commit to this project. An IADC Offshore Daywork Drilling Contract - U.S. Format should be used for proposal responses

## Scope of Services

This RFP scope is for drilling rig and the associated rig support equipment and personnel. PRA requests that you specify what exactly you can and will be able to supply if you express interest in utilizing your drilling rig in this project.

The following services are to be included in submitted proposals.
- Required tugs and anchor handler vessels
  - Service to be provided by rig vendor and billed to operator.
  - Please specify required vessels
- Anchor / positioning winch system as required
- Seafloor survey and spud can penetration mitigation program
  - Please provide recommendation for appropriate seafloor survey and spud can penetration mitigation program
- 3rd party commissioning acceptance inspection
  - Lloyds Registry or other industry recognized vendor
  - Service to be provided by rig vendor and billed to operator.
- Cook Inlet demobilization location
  - Other demobilization locations will not be considered

## Proposal Requests

Submitted rig proposals are to be as follows
- All inclusive standard day work contract
  - Cost Plus or Cost Reimbursable contracts will not be considered
- Defined maximum time requirements and day rate costs for pre-season rig inspection, commissioning, mobilization, and de-mobilization
- Defined cost for the following as applicable:
  - Pre-mobilization, commissioning, and inspection
    - Maximum work scope days as applicable
  - Mobilization rate
    - Maximum mobilization days, after which cost would be $0.day until rig acceptance
  - Rig operating rate
    - Minimum operating days as applicable
  - Demobilization rate
    - Maximum de-mobilization days, after which cost would be $0.day
  - Layup preparation rate
    - Maximum work scope days, after which cost would be $0.day
- Rig or crew cost rate variance for aqueous vs non-aqueous fluid system.
  - The KLU platform is a zero discharge location
- Acknowledgment that should rig vendor contract with another operator during the 2018 drilling season, pre mobilization commissioning, mobilization and demobilization costs are to be split between the two operators on an operating days utilization bases
- Acknowledgment that should rig vendor contract with another operator during the 2018 drilling season any work for another contract will count toward the rig vendors minimum term requirement
- IADC Offshore Daywork Drilling Contract – U.S. Format
  - Provide complete copy including appendices
- Additionally, please employ the following table to facilitate cost analysis by operator

| Cost Type | Day Rate Cost | Contract time minimums or maximums | Additional Comments |
|---|---|---|---|
| Pre-mobilization, commissioning, and inspection | | | |
| Mobilization rate | | | |
| Rig operating rate | | | |
| Demobilization rate | | | |
| Layup preparation rate | | | |

FURIE-BANKR_00200545
DA01125

## Confidentiality

Individual company proposals and any associated documentation provided to PRA will be kept confidential and only used for the purposes of the Furie KLU project.

## Response Deadline

All proposals are to be received by noon Feb 23rd, 2018.   PRA would be glad to discuss and answer any questions or concerns you may have.

Proposals are to be submitted to the PRA office or via email at:
>  Petrotechnical Resources of Alaska
>  Care of: Tom Walsh
>  PRA Managing Partner
>  3601 C Street Suite 1424
>  Anchorage, Ak 99503
>  twalsh@petroak.com
>  Voice: 907-272-1232
>  Fax: 907-272-1344

Technical contact:
>  Marty Lemon P.E.
>  PRA Project / Well Operations Manager
>  Voice: 907-223-0806
>  mlemon@petroak.com

# EXHIBIT 50

DA01127

## CONFIDENTIALITY AGREEMENT

This CONFIDENTIALITY AGREEMENT ("**Agreement**") is effective as of March __8__, 2018, between **Cornucopia Oil and Gas Company LLC,** a Delaware limited liability company and its' wholly owned subsidiary**, Furie Operating Alaska, LLC,** a Delaware limited liability company, with its principal executive offices having a mailing address 188 W. Northern Lights Blvd., Suite 620, Anchorage, AK 99503 ("referred to collectively herein as **Furie**"), and **Ankura Consulting, LLC** a **Delaware limited liability corporation** with offices at 1775 Sherman Street, Suite 2775 Denver, CO 80203("**Recipient**"). FURIE and Recipient are hereinafter individually referred to as a "Party" and jointly referred to as the "Parties".

WHEREAS, Recipient desires to review certain confidential and proprietary business related documents, financial statements, and other information of, or provided by FURIE or any of its affiliates or subsidiaries; and

WHEREAS, each Party desires to enter into this Agreement to provide for maintaining the confidentiality of such information that FURIE or any of its affiliates or subsidiaries may provide to Recipient.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants hereof, the Parties, intending to be legally bound, hereby covenant and agree as follows:

1. **DEFINITIONS**:

   Confidential Information. "Confidential Information" means all written, recorded, electronic or oral information (including, without limitation, all financial information, files, books, charts, records, studies, reports, schedules, and statistical information) which may be furnished or disclosed to Recipient by FURIE or any of its affiliates or subsidiaries or any advisor of the foregoing or which shall hereafter be obtained by Recipient through an inspection of the property, operations or documents of FURIE or any of its affiliates or subsidiaries. Such term shall also include memoranda, notes, reports, and documents relating to and derived directly from Confidential Information, all copies

SD\523381.1

FURIE-ANK_00001281
DA01128

and extracts of Confidential Information and all computer-generated studies and data prepared by or for the benefit of Recipient in connection with its use of the Confidential Information.

In no event shall the term "Confidential Information" as used herein refer to or include any information disclosed to Recipient which:

(a)     at the time of disclosure to Recipient, is in the public domain, or thereafter enters the public domain other than as a result of a disclosure by Recipient in violation of this Agreement;

(b)     as may be shown by written records, is in the possession or knowledge of the Recipient prior to its disclosure by FURIE or any of its affiliates or subsidiaries;

(c)     is acquired by or from a third party who, to Recipient's knowledge, had not received such information on a confidential basis; or

(d)     is independently developed or acquired by Recipient without violating any of its obligations under this Agreement.

Authorized Persons.  Authorized Persons means all employees of Recipient who shall have been supplied Confidential Information and informed of the confidential nature of such Confidential Information.

## 2. **USE OF CONFIDENTIAL INFORMATION**:

Recipient shall receive all Confidential Information in strict confidence, shall not disclose the Confidential Information to any Person in any manner whatsoever, and shall use the same degree of care, but no less than a reasonable degree of care exercised in good faith, as it takes with its own confidential information of a similar nature, to maintain the confidentiality and secrecy of such Confidential Information, including, without limitation, the fact that discussions are taking place with respect thereto or the status thereof, or the fact that Confidential Information has been made available to Recipient or its Authorized Persons.  Without limiting the generality of the foregoing, Recipient agrees to restrict the circulation and disclosure of Confidential Information to its Authorized Persons and only to the extent reasonably necessary, and Recipient shall take all reasonable actions necessary

2

CONFIDENTIAL

to ensure that each Authorized Person to whom it circulates or otherwise discloses Confidential Information maintains the confidentiality thereof and shall be liable hereunder for any unauthorized disclosure thereof by such Authorized Person. Recipient agrees that it shall not modify, reverse engineer, create other works from or disassemble any product contained in or related to the Confidential Information. In addition to the foregoing, Recipient and its Authorized Persons will not use the Confidential Information for any purpose other than in connection with Recipient's evaluation of the financial condition of FURIE or any of its affiliates or subsidiaries.

### 3. DISCLOSURE REQUIRED BY LAW:

If Recipient or any Authorized Person receiving Confidential Information hereunder shall be requested or required to disclose such Confidential Information to any court, tribunal, administrative agency or other governmental body in the United States, or elsewhere, Recipient shall provide FURIE with the earliest written notice practicably possible of such request or requirement so that FURIE may either, at its sole cost and expense, seek a protective order or waive compliance with the provisions of this Agreement, and Recipient shall reasonably cooperate with FURIE in protecting such confidential or proprietary nature of the Confidential Information which must so be disclosed. Upon the issuance or denial of a protective order, the receipt of a waiver hereunder or the failure of FURIE to seek a protective order or provide a waiver within a reasonable period of time, Recipient may disclose such Confidential Information as so required without breaching the confidentiality obligations imposed hereby and without liability to FURIE, and such disclosure shall be in accordance, if applicable, with such protective order or waiver.

### 4. EQUITABLE RELIEF:

The Parties understand and agree that a breach of the terms of this Agreement may cause irreparable harm, for which there may not be adequate remedy at law, as a result of which the Parties hereby consent to the issuance by any court of competent jurisdiction of an injunction, restraining order or other such equitable relief enjoining or restraining the breach of the Agreement. Such remedy may be in addition to all other remedies available at law or equity.

### 5. NO PUBLIC DISCLOSURE OF RELATIONSHIP:

SD\523381.1

3

CONFIDENTIAL

FURIE-ANK_00001283
DA01130

The Parties agree that neither Party will, without the written consent of the other Party, disclose to the media that the Parties are discussing a possible business relationship except as this may be superseded by further agreements between the Parties.

6. **TERM**:

The term of this Agreement shall extend for a period of three (3) years from the date of this Agreement unless FURIE and Recipient enter into a engagement in which event the term of this Agreement terminate on the date that is three (3) years after the expiration or termination of such engagement.  Upon written request of FURIE, Recipient shall promptly return and deliver, or cause to be returned and delivered, to FURIE all Confidential Information including copies and abstracts thereof provided to Recipient by FURIE or shall destroy all documents containing Confidential Information that have been prepared by Recipient.  Such destruction will be certified by an appropriate individual of Recipient.

7. **ASSIGNMENT**:

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and/or assigns.

8. **CHOICE OF LAW**:

This Agreement shall be governed and construed in accordance with the laws of New York without giving effect to its conflict of law principles.

9. **NO IMPLIED WAIVER**:

No failure or delay by FURIE hereto in enforcing any right, power or privilege created hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power or privilege.

10. **SEVERABILITY OF PROVISIONS**:

If any provision of this Agreement shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable because of the conflict of such provision with any constitution or statute or rule or public policy or for any other reason such circumstances shall not have the effect of

4

SD\523381.1

rendering any other provision or provisions herein contained invalid, inoperative or unenforceable. This Agreement shall be reformed and construed as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision shall be reformed so that it would be valid, operative and enforceable to the maximum extent permitted, except when such reformation would operate as an undue hardship on any Party or constitute a substantial deviation from the general intent and purpose of such Party as reflected in this Agreement, in which event the Parties shall negotiate in good faith with respect to a replacement provision.

11. **DRAFTING OF AGREEMENT**:

   This Agreement is the result of negotiations between the Parties.  No Party shall be considered the drafter of this Agreement for the purposes of construing the meaning of any part of or the whole of this Agreement.

12. **ENTIRE AGREEMENT**:

   This Agreement contains the entire agreement of the Parties and may be changed only by an instrument in writing executed by both Parties referencing this Agreement.

*[Signature Page Follows]*

5

SD\523381.1

CONFIDENTIAL

**IN WITNESS WHEREOF**, the Parties have caused this Confidentiality Agreement to be executed as of the date first above written.

**Furie Operating Alaska, LLC**

By: _____

Name: _David W. Elder_____

Title: __Chief Financial Officer_____

**Cornucopia Oil & Gas Company, LLC**

By: _____

Name: _David W. Elder_____

Title: __Chief Financial Officer_____

**Recipient**

By: _____

Name: Scott M. Pinsonnault

Title:_ Senior Managing Director

6

SD\523381.1

FURIE-ANK_00001286
DA01133

# EXHIBIT 51

DA01134

Message

| | |
|---|---|
| **From**: | Trent Kososki [tkososki@ecpartners.com] |
| **Sent**: | 3/8/2018 4:19:11 PM |
| **To**: | rieck@dogag.de; rieck@deutsche-oel-gas.com; Jeffrey Brodsky [jbrodsky@qtadvisors.com] |
| **CC**: | Theodor van Stephoudt [tvanstephoudt@hotmail.com]; d.elder@furiepetroleum.com; Andy Singer [asinger@ecpartners.com]; Jennifer Gray [jgray@ecpartners.com]; Amit Bushan [abushan@ecpartners.com] |
| **Subject**: | Furie Board - Interim CEO Candidate Interviews Tuesday - 3/13 12pm ET (11am CT) |
| **Attachments**: | Dacarba Discussion Materials_March 2018.pdf; Ankura - Qualifications.PDF |

Members of the Board of Directors --

Jeff and I spoke and we plan to proceed with interviewing interim CEO candidates next week.  Given how time is of the essence, the proposed candidates are available to meet in Houston on Tuesday, March 13th beginning at 11am CT / 12pm ET and expected to last until 1:30pm CT / 2:30pm ET.  The candidates plan to meet in person at ECP's Houston office (located at 1000 Louisiana St on the 52nd Floor).  Jeff plans to go to ECP's NY office (One World Trade Center) to video into the meeting.

Kay and Theo, please feel free to join by phone, video from ECP NY office or in person in Houston.  We would welcome David Elder's participation given his knowledge of the company's financials and the need for him to be comfortable working with the selected interim CEO.

I recommend that the board interview the following candidates from Ankura and Dacarba – both have received very strong references for their energy, turnaround, E&P and offshore experience – and they have Alaska experience as well.   Both firms feature highly experienced executives that can parachute in and fulfil the responsibilities the company needs.

I also spoke to Alvarez and Marsal – and while many of us have a strong opinion of the firm, I believe that they may represent a potentially higher-cost solution – and the individuals I spoke to there seemed to have a bit less familiarity with offshore/E&P/Alaska.  If the Board is not satisfied with either of the candidates below, we could consider including them.

•    **Scott Pinsonnault**, *Ankura (materials on Ankura attached)*
o       21 years of operating, financial, and restructuring experience in the energy, power generation, oil & gas, and related industries.
o       Strong technical background that includes hands-on geophysical technical operational and engineering experience.
o       Most recently served as CRO for two oil & gas exploration and production companies, where he led pre and post-petition work including attempted pre-petition debt alternatives, arranging DIP financing, preparation for filing, sales processing, plan confirmations and all aspects of bankruptcy administration.
o       About Ankura:
▪       Ankura's nationally recognized professionals have advised energy debtors and creditors through some of the most complex restructuring, turnaround and transaction scenarios.
▪       Ankura has unparalleled C-Suite, Board, public company and private equity experience.
▪       Armed with vast, real-world executive experience, our professionals have successfully worked through some of the toughest situations faced by company boards and management teams.
▪       We have a proven track-record and expertise across the energy value chain, including the E&P, midstream, utilities, services, renewables, power generation and other infrastructure.
▪       Our Team sets itself apart by bringing an investor's perspective, having served as investors for leading institutional and private equity funds.

FURIE-BANKR_00173949
DA01135

- **Ryan Bouley and Sean Clemmets**, *Dacarba – Ryan and Sean propose either Gary Pittman (Energy XXI, Geokinetics, Edge Petroleum, Pioneer Companies, Vermillion Companies, Trono) or Bryan Gaston (ABARTA, German Pellets, Hamilton Metals, LyondellBasell, GM, Pacific Lumber, RG Steel, Winn-Dixie, Knight Oil Tools) – full detailed bios on proposed interim CEO candidates to follow later (materials on Dacarba attached)*
  o About Dacarba
  ▪ Dacarba is a wholly-owned subsidiary of Opportune that supports all industries and brings an unmatched array of experience and expertise to energy assignments
  ▪ Team includes professionals from leading financial advisory firms
  ▪ Operating as Opportune, Dacarba professionals advised on transaction value totaling more than $50.0 billion during 2016
  ▪ Total transaction advisory value of senior team in excess of $1.1 trillion
  ▪ Offices in New York, Houston, and Dallas
  ▪ Track record advising companies and their stakeholders on some of the largest and most complex restructurings in recent history

Please let me know if you have any questions and please also confirm your planned attendance by phone, video or in person so I can arrange the logistics accordingly.

Thank you.

TK

Trent Justus Kososki
**Energy Capital Partners**
1000 Louisiana Street, Suite 5200 | Houston, TX 77002
Direct: 713.496.3107 | Mobile: 212.729.9211
tkososki@ecpartners.com | LinkedIn

CONFIDENTIALITY NOTICE: This message originates from Energy Capital Partners. This message and any attachments are solely for the use of the intended recipients. They may contain privileged and/or confidential information or other information protected from disclosure. If you are not an intended recipient, you are hereby notified that you received this email in error and that any review, dissemination, distribution or copying of this email and any attachment is strictly prohibited. If you have received this email in error, please contact the sender and delete the message and any attachment from your system.

FURIE-BANKR_00173950
DA01136

# EXHIBIT 52

DA01137

## WRITTEN CONSENT OF THE MAJORITY OF
## MANAGERS OF FURIE OPERATING ALASKA, LLC

### March 15, 2018

The undersigned, being members of the board of Managers (the "**Authorizing Parties**") of FURIE OPERATING ALASKA, LLC ("**Company**"), a Delaware limited liability company (effective as of January 25, 2018), hereby take the following actions and adopt the following resolutions by written consent in accordance with the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "**Act**") and the Company's Fourth Amended and Restated Limited Liability Company Agreement:

**WHEREAS**, the Company was formed as a Texas limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Texas on December 15, 1999, in accordance with the Texas Business Organizations Code (as amended from time to time, the "**TBOC**"); and

**WHEREAS**, the Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "**Conversion**") and was formed as a Delaware limited liability company pursuant to that certain formation certificate filed in the office of the Secretary of State of the State of Delaware on January 25, 2018 (as amended or amended and restated from time to time, the "**Certificate**");

**WHEREAS**, the Authorizing Parties have considered the financial and operational conditions of the Company's business; and

**WHEREAS**, the Authorizing Parties have reviewed the historical performance of the Company and the current and long-term liabilities of the Company; and

**WHEREAS**, the Authorizing Parties have concluded, after consulting with the Company's attorneys, Reed Smith LLP ("**Reed Smith**"), and its other professional advisors (collectively, the "**Advisors**"), that the Company is in dire financial condition; and

**WHEREAS**, the Authorizing Parties have reviewed, considered, and received the recommendations and the advice of the Company's Advisors with respect to potential avenues for relief that are available to the Company, including the possibility of pursuing a restructuring of the Company's business and assets under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") or pursuing an alternative out of court restructuring; and

**WHEREAS**, the Authorizing Parties hereby affirm that David W. Elder ("**Elder**") serves as Chief Financial Officer, Thomas E. Hord ("**Hord**") serves as the Chief Operating Officer of the Company and Bruce Webb ("**Webb**") serves as the Senior Vice President of the Company, and

**WHEREAS**, the Authorizing Parties desire to delegate certain powers related to the Company Restructuring (as defined below) to their designees, which include Elder, Hord  and

1

FURIE-BANKR_00200375
DA01138

Webb (collectively the "**Designated Persons**"), as further set forth herein.

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Authorizing Parties, it is desirable and in the best interests of the Company, its Member, its creditors, and its stakeholders, that a voluntary petition (the "**Petition**") be filed by the Company under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the District of Texas or an alternative out of court restructuring or other arrangement be investigated and pursued (collectively, with the Petition, the "**Company Restructuring**"); and

**FURTHER RESOLVED**, that the Authorizing Parties hereby delegate to the Designated Persons the authority to explore, investigate, and pursue the Company Restructuring or such other arrangement as the Designated Persons deems necessary to alleviate the Company's financial condition, and to take any and all action necessary in his sole discretion to accomplish the foregoing, including, but not limited to, executing an agreement to engage Reed Smith to assist with the Company Restructuring, paying an appropriate retainer related to the same, and retaining other professional advisors; and

**FURTHER RESOLVED**, that the Company shall be, and it hereby is, directed and authorized to execute and file on behalf of the Company all petitions, schedules, lists and other papers or documents, and to take any and all action which it deems reasonable, advisable, expedient, convenient, necessary, or proper to obtain such relief; and

**FURTHER RESOLVED**, that the Authorizing Parties and any of the Designated Persons, be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company (i) to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the United States Bankruptcy Court for the District of Texas commencing a case (the "**Bankruptcy Case**") and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents, and (ii) to execute, verify, and file or cause to be filed all petitions, schedules, lists, motions, applications, and other papers or documents necessary or desirable in connection with the foregoing; and

**FURTHER RESOLVED**, that the law firm of Reed Smith be, and hereby is, authorized and empowered to represent the Company as its general bankruptcy counsel to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Bankruptcy Case; and in connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed an appropriate application for authority to retain the services of Reed Smith (the "**Bankruptcy Services**"); and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to employ any other individual and/or firm as professionals or

2

consultants or financial advisors to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and in connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed one or more appropriate applications for authority to retain the services of such firms; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices, and documents as may be required or as such officer may deem necessary, advisable, or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, and (b) perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices, and documents to be executed and delivered in such form; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to adopt resolutions and otherwise exercise the rights and powers of the Company as such Designated Person may deem necessary, appropriate or desirable and that thereupon such resolutions shall be deemed adopted as and for the Company; and

**FURTHER RESOLVED**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such actions were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and

**FURTHER RESOLVED**, that this written consent may be executed (a) in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument, and (b) in the original or by facsimile (or other electronic transmission), which shall be deemed to be an original; and

**FURTHER RESOLVED**, that the Managers are hereby authorized and directed to include this written consent in the Company's record book.

3

FURIE-BANKR_00200377
DA01140

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the date first written above.

BOARD MEMBERS:

_____
Kay Rieck, in his capacity as the
Member Manager

_____
Jeffrey A. Brodsky, in his capacity as the
Manager

FURIE-BANKR_00200378
DA01141

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the date first written above.

BOARD MEMBERS:

_____

Kay Rieck, in his capacity as the
Member Manager

_____

Jeffrey A. Brodsky, in his capacity as the
Manager

FURIE-BANKR_00200379
DA01142

# EXHIBIT 53

DA01143

## WRITTEN CONSENT OF THE MAJORITY OF
## MANAGERS OF CORNUCOPIA OIL & GAS COMPANY, LLC

### March 15, 2018

The undersigned, being members of the board of Managers (the "**Authorizing Parties**") of CORNUCOPIA OIL & GAS COMPANY, LLC ("**Company**"), a Delaware limited liability company (effective as of January 25, 2018), hereby take the following actions and adopt the following resolutions by written consent in accordance with the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "**Act**") and the Company's Fourth Amended and Restated Limited Liability Company Agreement:

**WHEREAS**, the Company was formed as a Texas limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Texas on July 14, 2006, in accordance with the Texas Business Organizations Code (as amended from time to time, the "**TBOC**"); and

**WHEREAS**, the Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "**Conversion**") and was formed as a Delaware limited liability company pursuant to that certain formation certificate filed in the office of the Secretary of State of the State of Delaware on January 25, 2018 (as amended or amended and restated from time to time, the "**Certificate**");

**WHEREAS**, the Authorizing Parties have considered the financial and operational conditions of the Company's business; and

**WHEREAS**, the Authorizing Parties have reviewed the historical performance of the Company and the current and long-term liabilities of the Company; and

**WHEREAS**, the Authorizing Parties have concluded, after consulting with the Company's attorneys, Reed Smith LLP ("**Reed Smith**"), and its other professional advisors (collectively, the "**Advisors**"), that the Company is in dire financial condition; and

**WHEREAS**, the Authorizing Parties have reviewed, considered, and received the recommendations and the advice of the Company's Advisors with respect to potential avenues for relief that are available to the Company, including the possibility of pursuing a restructuring of the Company's business and assets under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") or pursuing an alternative out of court restructuring; and

**WHEREAS**, the Authorizing Parties hereby affirm that David W. Elder ("**Elder**") serves as Chief Financial Officer and Thomas E. Hord ("**Hord**") serves as the Chief Operating Officer of the Company, and

**WHEREAS**, the Authorizing Parties desire to delegate certain powers related to the Company Restructuring (as defined below) to their designees, which include Elder and Hord (collectively the "**Designated Persons**"), as further set forth herein.

1

FURIE-BANKR_00200370
DA01144

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Authorizing Parties, it is desirable and in the best interests of the Company, its Member, its creditors, and its stakeholders, that a voluntary petition (the "**Petition**") be filed by the Company under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the District of Texas or an alternative out of court restructuring or other arrangement be investigated and pursued (collectively, with the Petition, the "**Company Restructuring**"); and

**FURTHER RESOLVED**, that the Authorizing Parties hereby delegate to the Designated Persons the authority to explore, investigate, and pursue the Company Restructuring or such other arrangement as the Designated Persons deem necessary to alleviate the Company's financial condition, and to take any and all action necessary in his sole discretion to accomplish the foregoing, including, but not limited to, executing an agreement to engage Reed Smith to assist with the Company Restructuring, paying an appropriate retainer related to the same, and retaining other professional advisors; and

**FURTHER RESOLVED**, that the Company shall be, and it hereby is, directed and authorized to execute and file on behalf of the Company all petitions, schedules, lists and other papers or documents, and to take any and all action which it deems reasonable, advisable, expedient, convenient, necessary, or proper to obtain such relief; and

**FURTHER RESOLVED**, that the Authorizing Parties and any of the Designated Persons, be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company (i) to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the United States Bankruptcy Court for the District of Texas commencing a case (the "**Bankruptcy Case**") and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents, and (ii) to execute, verify, and file or cause to be filed all petitions, schedules, lists, motions, applications, and other papers or documents necessary or desirable in connection with the foregoing; and

**FURTHER RESOLVED**, that the law firm of Reed Smith be, and hereby is, authorized and empowered to represent the Company as its general bankruptcy counsel to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Bankruptcy Case; and in connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed an appropriate application for authority to retain the services of Reed Smith (the "**Bankruptcy Services**"); and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to employ any other individual and/or firm as professionals or consultants or financial advisors to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and in

2

FURIE-BANKR_00200371
DA01145

connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed one or more appropriate applications for authority to retain the services of such firms; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices, and documents as may be required or as such officer may deem necessary, advisable, or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, and (b) perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices, and documents to be executed and delivered in such form; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to adopt resolutions and otherwise exercise the rights and powers of the Company as such Designated Person may deem necessary, appropriate or desirable and that thereupon such resolutions shall be deemed adopted as and for the Company; and

**FURTHER RESOLVED**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such actions were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and

**FURTHER RESOLVED**, that this written consent may be executed (a) in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument, and (b) in the original or by facsimile (or other electronic transmission), which shall be deemed to be an original; and

**FURTHER RESOLVED**, that the Managers are hereby authorized and directed to include this written consent in the Company's record book.

*[Signatures are on following page]*

3

FURIE-BANKR_00200372
DA01146

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the date first written above.

**BOARD MEMBERS:**

_____
Kay Rieck, in his capacity as the
Member Manager

_____
Jeffrey A. Brodsky, in his capacity as the
Manager

FURIE-BANKR_00200373
DA01147

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the date first written above.

**BOARD MEMBERS:**

_____

Kay Rieck, in his capacity as the
Member Manager

_____

Jeffrey A. Brodsky, in his capacity as the
Manager

# EXHIBIT 54

DA01149

**WRITTEN CONSENT OF THE MAJORITY OF**
**MANAGERS OF CORSAIR OIL & GAS LLC**

**March 15, 2018**

The undersigned, being members of the board of Managers (the "**Authorizing Parties**") of CORSAIR OIL & GAS LLC ("**Company**"), a Delaware limited liability company (effective as of January 25, 2018), hereby take the following actions and adopt the following resolutions by written consent in accordance with the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "**Act**") and the Company's Second Amended and Restated Limited Liability Company Agreement:

**WHEREAS**, the Company was formed as a Texas limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Texas on June 26, 2014, in accordance with the Texas Business Organizations Code (as amended from time to time, the "**TBOC**"); and

**WHEREAS**, the Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "**Conversion**") and was formed as a Delaware limited liability company pursuant to that certain formation certificate filed in the office of the Secretary of State of the State of Delaware on January 25, 2018 (as amended or amended and restated from time to time, the "**Certificate**");

**WHEREAS**, the Authorizing Parties have considered the financial and operational conditions of the Company's business; and

**WHEREAS**, the Authorizing Parties have reviewed the historical performance of the Company and the current and long-term liabilities of the Company; and

**WHEREAS**, the Authorizing Parties have concluded, after consulting with the Company's attorneys, Reed Smith LLP ("**Reed Smith**"), and its other professional advisors (collectively, the "**Advisors**"), that the Company is in dire financial condition; and

**WHEREAS**, the Authorizing Parties have reviewed, considered, and received the recommendations and the advice of the Company's Advisors with respect to potential avenues for relief that are available to the Company, including the possibility of pursuing a restructuring of the Company's business and assets under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") or pursuing an alternative out of court restructuring; and

**WHEREAS**, the Authorizing Parties hereby affirm that David W. Elder ("**Elder**") serves as Chief Financial Officer and Thomas E. Hord ("**Hord**") serves as the Chief Operating Officer of the Company, and

**WHEREAS**, the Authorizing Parties desire to delegate certain powers related to the Company Restructuring (as defined below) to their designees, which include Elder and Hord (collectively the "**Designated Persons**"), as further set forth herein.

1

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Authorizing Parties, it is desirable and in the best interests of the Company, its Member, its creditors, and its stakeholders, that a voluntary petition (the "**Petition**") be filed by the Company under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the District of Texas or an alternative out of court restructuring or other arrangement be investigated and pursued (collectively, with the Petition, the "**Company Restructuring**"); and

**FURTHER RESOLVED**, that the Authorizing Parties hereby delegate to Designated Persons the authority to explore, investigate, and pursue the Company Restructuring or such other arrangement as the Designated Persons deem necessary to alleviate the Company's financial condition, and to take any and all action necessary in his sole discretion to accomplish the foregoing, including, but not limited to, executing an agreement to engage Reed Smith to assist with the Company Restructuring, paying an appropriate retainer related to the same, and retaining other professional advisors; and

**FURTHER RESOLVED**, that the Company shall be, and it hereby is, directed and authorized to execute and file on behalf of the Company all petitions, schedules, lists and other papers or documents, and to take any and all action which it deems reasonable, advisable, expedient, convenient, necessary, or proper to obtain such relief; and

**FURTHER RESOLVED**, that the Authorizing Parties and any of the Designated Persons, be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company (i) to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the United States Bankruptcy Court for the District of Texas commencing a case (the "**Bankruptcy Case**") and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents, and (ii) to execute, verify, and file or cause to be filed all petitions, schedules, lists, motions, applications, and other papers or documents necessary or desirable in connection with the foregoing; and

**FURTHER RESOLVED**, that the law firm of Reed Smith be, and hereby is, authorized and empowered to represent the Company as its general bankruptcy counsel to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Bankruptcy Case; and in connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed an appropriate application for authority to retain the services of Reed Smith (the "**Bankruptcy Services**"); and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to employ any other individual and/or firm as professionals or consultants or financial advisors to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and in

2

connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed one or more appropriate applications for authority to retain the services of such firms; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices, and documents as may be required or as such officer may deem necessary, advisable, or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, and (b) perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices, and documents to be executed and delivered in such form; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to adopt resolutions and otherwise exercise the rights and powers of the Company as such Designated Person may deem necessary, appropriate or desirable and that thereupon such resolutions shall be deemed adopted as and for the Company; and

**FURTHER RESOLVED**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such actions were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and

**FURTHER RESOLVED**, that this written consent may be executed (a) in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument, and (b) in the original or by facsimile (or other electronic transmission), which shall be deemed to be an original; and

**FURTHER RESOLVED**, that the Managers are hereby authorized and directed to include this written consent in the Company's record book.

*[Signatures are on following page]*

3

FURIE-BANKR_00200345
DA01152

**IN WITNESS WHEREOF**, the undersigned have executed this Consent as of the date first written above.

BOARD MEMBERS:

_____
Kay Rieck, in his capacity as the
Member Manager


_____
Jeffrey A. Brodsky, in his capacity as the
Manager

**WRITTEN CONSENT OF THE MAJORITY OF
MANAGERS OF CORSAIR OIL & GAS LLC**

**March 15, 2018**

The undersigned, being members of the board of Managers (the "**Authorizing Parties**") of CORSAIR OIL & GAS LLC ("**Company**"), a Delaware limited liability company (effective as of January 25, 2018), hereby take the following actions and adopt the following resolutions by written consent in accordance with the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq. (as amended from time to time, the "**Act**") and the Company's Second Amended and Restated Limited Liability Company Agreement:

**WHEREAS**, the Company was formed as a Texas limited liability company pursuant to that certain certificate of formation filed in the office of the Secretary of State of the State of Texas on June 26, 2014, in accordance with the Texas Business Organizations Code (as amended from time to time, the "**TBOC**"); and

**WHEREAS**, the Company was converted to a Delaware limited liability company in accordance with the TBOC and the Act (the "**Conversion**") and was formed as a Delaware limited liability company pursuant to that certain formation certificate filed in the office of the Secretary of State of the State of Delaware on January 25, 2018 (as amended or amended and restated from time to time, the "**Certificate**");

**WHEREAS**, the Authorizing Parties have considered the financial and operational conditions of the Company's business; and

**WHEREAS**, the Authorizing Parties have reviewed the historical performance of the Company and the current and long-term liabilities of the Company; and

**WHEREAS**, the Authorizing Parties have concluded, after consulting with the Company's attorneys, Reed Smith LLP ("**Reed Smith**"), and its other professional advisors (collectively, the "**Advisors**"), that the Company is in dire financial condition; and

**WHEREAS**, the Authorizing Parties have reviewed, considered, and received the recommendations and the advice of the Company's Advisors with respect to potential avenues for relief that are available to the Company, including the possibility of pursuing a restructuring of the Company's business and assets under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") or pursuing an alternative out of court restructuring; and

**WHEREAS**, the Authorizing Parties hereby affirm that David W. Elder ("**Elder**") serves as Chief Financial Officer and Thomas E. Hord ("**Hord**") serves as the Chief Operating Officer of the Company, and

**WHEREAS**, the Authorizing Parties desire to delegate certain powers related to the Company Restructuring (as defined below) to their designees, which include Elder and Hord (collectively the "**Designated Persons**"), as further set forth herein.

1

FURIE-BANKR_00200366
DA01154

**NOW, THEREFORE, BE IT RESOLVED**, that in the judgment of the Authorizing Parties, it is desirable and in the best interests of the Company, its Member, its creditors, and its stakeholders, that a voluntary petition (the "**Petition**") be filed by the Company under the provisions of the Bankruptcy Code in the United States Bankruptcy Court for the District of Texas or an alternative out of court restructuring or other arrangement be investigated and pursued (collectively, with the Petition, the "**Company Restructuring**"); and

**FURTHER RESOLVED**, that the Authorizing Parties hereby delegate to Designated Persons the authority to explore, investigate, and pursue the Company Restructuring or such other arrangement as the Designated Persons deem necessary to alleviate the Company's financial condition, and to take any and all action necessary in his sole discretion to accomplish the foregoing, including, but not limited to, executing an agreement to engage Reed Smith to assist with the Company Restructuring, paying an appropriate retainer related to the same, and retaining other professional advisors; and

**FURTHER RESOLVED**, that the Company shall be, and it hereby is, directed and authorized to execute and file on behalf of the Company all petitions, schedules, lists and other papers or documents, and to take any and all action which it deems reasonable, advisable, expedient, convenient, necessary, or proper to obtain such relief; and

**FURTHER RESOLVED**, that the Authorizing Parties and any of the Designated Persons, be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company (i) to execute and verify the Petition as well as all other ancillary documents and to cause the Petition to be filed with the United States Bankruptcy Court for the District of Texas commencing a case (the "**Bankruptcy Case**") and to make or cause to be made prior to the execution thereof any modifications to the Petition or ancillary documents, and (ii) to execute, verify, and file or cause to be filed all petitions, schedules, lists, motions, applications, and other papers or documents necessary or desirable in connection with the foregoing; and

**FURTHER RESOLVED**, that the law firm of Reed Smith be, and hereby is, authorized and empowered to represent the Company as its general bankruptcy counsel to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and to take any and all actions to advance the Company's rights, including the preparation of pleadings and filings in the Bankruptcy Case; and in connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed an appropriate application for authority to retain the services of Reed Smith (the "**Bankruptcy Services**"); and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to employ any other individual and/or firm as professionals or consultants or financial advisors to the Company as are deemed necessary to represent and assist the Company in carrying out its duties under Title 11 of the United States Code, and in

2

connection therewith, the Designated Persons be and each of them, acting alone or in any combination, hereby is, authorized, directed, and empowered, on behalf of and in the name of the Company to execute appropriate retention agreements, pay appropriate retainers prior to and immediately upon the filing of the Bankruptcy Case, and to cause to be filed one or more appropriate applications for authority to retain the services of such firms; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices and documents to be executed and delivered in such form, as the officer performing or executing the same shall approve, and the performance or execution thereof by such officer shall be conclusive evidence of the approval thereof by such officer and by the Company; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone or in any combination is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to (a) take such further actions and execute and deliver such certificates, instruments, guaranties, notices, and documents as may be required or as such officer may deem necessary, advisable, or proper to carry out the intent and purpose of the foregoing resolutions, including the execution and delivery of any security agreements, pledges, financing statements and the like, and (b) perform the obligations of the Company under Title 11 of the United States Code, with all such actions to be performed in such manner, and all such certificates, instruments, guaranties, notices, and documents to be executed and delivered in such form; and

**FURTHER RESOLVED**, that the Designated Persons be, and each of them acting alone is, hereby authorized, directed, and empowered from time to time in the name and on behalf of the Company, to adopt resolutions and otherwise exercise the rights and powers of the Company as such Designated Person may deem necessary, appropriate or desirable and that thereupon such resolutions shall be deemed adopted as and for the Company; and

**FURTHER RESOLVED**, that all of the acts and transactions relating to matters contemplated by the foregoing resolutions, which acts would have been approved by the foregoing resolutions except that such actions were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified; and

**FURTHER RESOLVED**, that this written consent may be executed (a) in multiple counterparts, each of which shall constitute an original, but all of which shall constitute one and the same instrument, and (b) in the original or by facsimile (or other electronic transmission), which shall be deemed to be an original; and

**FURTHER RESOLVED**, that the Managers are hereby authorized and directed to include this written consent in the Company's record book.

*[Signatures are on following page]*

3

FURIE-BANKR_00200368
DA01156

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the date first written above.

BOARD MEMBERS:

_____
Kay Rieck, in his capacity as the
Member Manager

_____
Jeffrey A. Brodsky, in his capacity as the
Manager

FURIE-BANKR_00200369
DA01157

# EXHIBIT 55

DA01158

WRITTEN CONSENT IN LIEU OF
MEETING OF THE BOARD OF MANAGERS OF
FURIE OPERATING ALASKA, LLC

_____

The undersigned, being the majority of the members of the board of managers (the "Board") of Furie Operating Alaska, LLC, a Delaware limited liability company (the "Company"), pursuant to, and in compliance with, Section 18-404 of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. and Section 7 of the Fourth Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement"), do hereby consent in writing that the following resolutions are adopted and are effective for all purposes as of March 25, 2018:

**Approval of Engagement of Scott M. Pinsonnault et al.**

WHEREAS, the Board deems it advisable and in the best interest of the Company to engage (the "Engagement") (i) Ankura Consulting Group, LLC ("Ankura") (to provide interim management and advisor services)  and (ii) Scott M. Pinsonnault to act as Interim Chief Operating Officer (the "Interim Chief Operating Officer"), pursuant to an agreement to be entered into between the Company, Cornucopia, Corsair Oil & Gas LLC, a Delaware limited liability company and Ankura, in substantially the form attached hereto as Exhibit A (the "Engagement Letter"), and deems it advisable and in the best interests of the Company for the Company to enter into and perform under and pursue the transactions contemplated by the Engagement Letter and to authorize, adopt and approve the Engagement Letter and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby;

NOW, THEREFORE, BE IT RESOLVED, that the Engagement and the Engagement Letter be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that David W. Elder, as Chief Financial Officer of the Company (the "Authorized Officer"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company the Engagement Letter and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company, as he may deem necessary or desirable in connection therewith.

**Approval of the Employment Agreement**

WHEREAS, the Board has reviewed that certain Employment Agreement of David W. Elder, to be entered into by and among David W. Elder, the Company, Cornucopia Oil & Gas Company, LLC and Corsair Oil & Gas LLC, substantially in the form attached hereto as Exhibit B (the "Employment Agreement") and deems it advisable and in the best interests of the Company for the Company to enter into and perform under and pursue the transactions contemplated by the Employment Agreement and to

FURIE-ANK_00000925
DA01159

authorize, adopt and approve the Employment Agreement and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby.

NOW, THEREFORE, BE IT RESOLVED, that the Employment Agreement be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that each member of the Board (each an "Authorized Person"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company the Employment Agreement and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company, as he may deem necessary or desirable in connection therewith.

## General Authorization and Ratification

NOW, THEREFORE, BE IT RESOLVED, that, consistent with the foregoing resolutions, the Authorized Officer, each Authorized Person and any officer or employee or agent of the Company under the supervision or management and direction of the Authorized Officer or an Authorized Person, in each case, on behalf of the Company, be, and each of them acting alone hereby is, authorized and empowered in the name and on behalf of the Company to carry out fully the intent and purposes of the foregoing resolutions and each of the actions or transactions contemplated thereby, and to, in connection therewith, (a) prepare, execute and deliver or cause to be prepared, executed and delivered, and where necessary, advisable, desirable or appropriate, file or cause to be filed with the appropriate governmental authorities, all other agreements, instruments and documents, including, but not limited to, all certificates, contracts, bonds, receipts or other papers, (b) incur and pay or cause to be incurred or paid all fees, expenses and taxes, including, without limitation, legal fees and expenses, (c) engage such persons as he or she shall in his or her judgment determine to be necessary, advisable, desirable or appropriate, and (d) do any and all other acts and things, as he or she deems necessary, advisable, desirable or appropriate (with the doing of any such act or thing being conclusive evidence that the same is deemed necessary, advisable, desirable or appropriate); and that any and all actions heretofore taken in the name and on behalf of the Company, in connection with the foregoing resolutions and each of the actions or transactions contemplated thereby, are hereby, in all respects, authorized, confirmed, ratified and approved as the actions of the Company.

*[Signature Pages Follow]*

FURIE-ANK_00000926
DA01160

**IN WITNESS WHEREOF**, the undersigned has executed this written consent as of the date first written above.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____

Date:     25 March 2018

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____

Date: 3-25-18

**Kay Rieck**, in his capacity as the Member Manager

By: _____

Date:     03/25/18

FURIE-ANK_00000927
DA01161

**Exhibit A**

**Engagement Letter (Ankura)**

[Attached]

FURIE-ANK_00000928
DA01162



March 23, 2018

Furie Operating Alaska, LLC
188 W. Northern Lights Blvd.,
Suite 620
Anchorage, AK 99503

Dear Members of the Board of Managers:

This letter agreement (this "*Agreement*"), entered into as of March 23, 2018 (the "*Effective Date*"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("*Ankura*") and Corsair Oil & Gas LLC, a Delaware limited liability company, Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (collectively, with each of their subsidiaries and affiliates, the "*Company")* pursuant to which Ankura has been engaged to act as the advisor to Company to provide interim management and advisory services as set forth below.

We have been retained by the Company and its Board of Managers ("*Board*") and will report to the Board.

1.  <u>Scope of Engagement</u>: On the terms and subject to the conditions of this Agreement, Ankura will provide to the Company the following interim management and restructuring advisory services (the "*Services*"), as requested by the Company and agreed to by Ankura:

    (a) Provide Scott M. Pinsonnault to serve as the Interim Chief Operating Officer of the Company ("*ICOO*") with the responsibilities that are traditional and customary (for the avoidance of doubt, the Company does not currently have a CEO);

        i)      Overseeing day-to-day business operations;

        ii)     Evaluating, implementing and managing cost reduction measures and operational improvement measures necessary to preserve and maximize the value and efficiency of the Company;

        iii)    Assisting in developing and evaluating the Company's business plan and the preparation of a revised operating plan and cash flow forecasts;

        iv)     Approving new expenditures, commitments or cash payments;

        v)      Addressing liquidity concerns and developing 13-week cash forecast;

        vi)     Managing the financial and operational reporting processes;

        vii)    Making decisions with respect to the Company's operations and its personnel (all employees and officers of the company shall report directly to the interim COO);

        viii)   Making decisions with respect to all professionals engaged by, strategies developed, and activities taken by the Company;

        ix)     Monitoring operational aspects of the company, including status of production, regulatory and environmental compliance, and an understanding of insurance programs and premiums;

        x)      Overseeing all reporting and communications under the Company's material contracts, including, without limitation, credit agreement and customer offtake agreements;

1

FURIE-ANK_00000929
DA01163



    xi)    Helping to prepare status updates, management presentations, and other deliverables for internal and external distribution;

    xii)    Making business and financial decisions with respect to any financing sought or put in place and any other restructuring-related decisions;

    xiii)    Act as primary point of contact for PRA under the PRA Management Agreement and direct the activities of PRA on behalf of the Company;

    xiv)    Other services and activities as mutually agreed by the Board and the interim COO; and

    xv)    Making decisions with respect product marketing, derivatives and risk management.

(b)    Ankura will provide additional interim management services and personnel at the discretion of the Board and at the reasonable discretion of the ICOO (the "*Engagement Personnel*");

In the event there is a disagreement as to any direction, guidance or instruction to be given to Ankura in connection with the foregoing Services, Ankura shall take such direction, guidance or instruction from the Independent Manager of the Company.

It is our intention to work closely with you and management throughout the course of our engagement. Regular discussions with you regarding our progress should provide you with an opportunity to confirm or request that we modify the scope of our engagement to best serve your needs. The Services and compensation arrangements set forth herein do not encompass other advisory services not set forth in this Section 1. If the Company and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

Notwithstanding anything to the contrary in this Agreement, the Company and the Board agree that the ICOO shall be authorized, in such capacity, to made decisions with respect to all aspects of the management and operations of the Company's business, including, without limitation, organization, human resources, marketing, sales, operations, supply chain, finance, administration and other such areas as the ICOO may identify, in such manner, as the ICOO deems appropriate, subject only to appropriate governance by the Board in accordance with the Company's by-laws and applicable laws.

2.   Company Information and Reports:

In order to fulfill the Services under this Agreement, it will be necessary for Ankura personnel to have unfettered access to the Company's facilities and certain books, records and reports of the Company. In addition, Ankura will need to have discussions with the Company's management and certain other personnel. Ankura will perform the Services in a manner that will permit the business operations of the Company to proceed in an orderly fashion, subject to the requirements of this engagement. We understand that the Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the *"Information"*). The Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company. The Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading. To the best of the Company's knowledge, the Information to be furnished by or on behalf of

2

FURIE-ANK_00000930
DA01164



the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will have no obligation to, and will not, update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

3.  Fees and Expenses: For Ankura's Services hereunder, the Company agrees to pay to Ankura the following non-refundable fees (the ICOO Fee and the Advisory Fee, collectively the "*Fee*")

    (a)  ICOO Fee: a monthly fee for the ICOO in the amount of $60,000 (the "*ICOO Fee*") to be invoiced to the Company by Ankura pursuant to the procedures set forth in paragraph 5(b) below;

    (b)  Advisory Fees: our fees for the Services set forth above for the Engagement Personnel (the "*Advisory Fees*") will be based on the actual hours expended at our standard hourly rates that are in effect when the Services are rendered. Our rates generally are revised annually. Our current hourly rates are as follows:

| Professional | Rates per hour |
| --- | --- |
| Senior Managing Directors | $850-950 |
| Other professionals | $350-800 |
| Paraprofessionals | $150-250 |

    Ankura will provide a 10% discount on its hourly rate per employee when the employee bills greater than 20-30 hours in a particular calendar week, and a 20% discount on its hourly rate per employee when the employee bills greater than 30-40 hours in a particular calendar week and 30% discount on its hourly rate per employee when the employee bills greater than 40 hours in a particular calendar week. The discounts will be reflected in detail on the monthly invoice.

    (c)  Success Fee: Within 45 calendar days of the Effective Date the Parties shall agree to an amendment of this agreement to account for a mutually acceptable and reasonable Success Fee

3

FURIE-ANK_00000931
DA01165



(the, "*Success Fee*") based on, among other items and factors, the success of the Company over the anticipated term of the engagement. The fee shall be reasonable and customary for such engaging Parties on and assignment of this nature.

(d) <u>Expenses Reimbursement</u>: Ankura shall be entitled to reimbursement of reasonable and documented out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable and documented out-of-pocket fees and expenses for outside legal counsel and other third party advisors) incurred in connection with this Agreement, including the negotiation and performance of this Agreement and the matters contemplated hereby) (collectively, "*Expenses*").

(e) <u>Reasonableness of Fees</u>: The Company acknowledges that it believes that Ankura's general interim management and restructuring experience and expertise will inure to the benefit of the parties hereto, that the value to the parties hereto of Ankura's Services derives in substantial part from that experience and expertise and that, accordingly, the structure and amount of the Fees to be paid to Ankura hereunder are reasonable. The Company acknowledges that a substantial professional commitment of time and effort will be required of Ankura and its professionals hereunder, and that such commitment may foreclose other opportunities for Ankura. Given the numerous issues which may arise in engagements such as this, Ankura's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Ankura that will be required in this engagement, and the market rate for Ankura's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Ankura, and provides the requisite certainty to the parties hereto.

(f) <u>Testimony; Subpoena Requests</u>. The Company agrees that if any of the principals or professionals of Ankura are required to testify, (other than testimony provided by the ICOO), at the request of the Company, on the Company's behalf or by legal, regulatory, administrative, arbitration or judicial order, at any proceeding related to the Services or this Agreement, Ankura will be compensated by the Company for our associated time charges at our regular hourly rates, in effect at the time and reimbursed for our reasonable and documented out-of-pocket expenses, including counsel fees. In addition, Ankura will be compensated for any time and expense (including, without limitation, reasonable and documented legal fees and expenses) that Ankura may incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with the Services or this Agreement.

4. <u>Retainer</u>

(a) In connection with the foregoing, it is Ankura's policy to receive an advance retainer for the Fees and Expenses. Upon execution of this Agreement, the Company shall provide Ankura with such retainer in the amount of $60,000 (the "*Retainer*"). The Retainer will be maintained throughout the engagement and returned to the Company upon completion of Ankura's Services. In addition, the Company agrees to replenish the Retainer upon request of Ankura so that the amount of any Retainer is equal to Ankura's estimated Fees and Expenses for the upcoming month. Ankura reserves the right to apply the Retainer to outstanding Fees and Expenses as Services are rendered and to Expenses as they are incurred. The Company understands and acknowledges that any Retainer is earned by Ankura upon receipt, any Retainer becomes the property of Ankura upon

4

FURIE-ANK_00000932
DA01166



receipt, the Company no longer has a property interest in any Retainer upon Ankura's receipt, any Retainer will be placed in Ankura's general account and will not be held in a client trust account, and the Company will not earn any interest on any Retainer; *provided, however*, that at the conclusion of the engagement, if the amount of any Retainer held by Ankura is in excess of the amount of Ankura's outstanding Fees and Expenses, Ankura will pay to the Company the amount by which any Retainer exceeds such Fees and Expenses. The Company further understands and acknowledges that the use of Retainers is an integral condition of the engagement, is necessary to ensure that the Company continues to have access to Ankura's Services, Ankura is compensated for the Services provided to the Company; Ankura is not a pre-petition creditor in the event of a bankruptcy filing and that in light of the foregoing, the provision of the Retainers is in the Company's best interests.

(b) If any of the Company's entities files a petition or has commenced against it any proceeding under Title 11 of the United States Code (the "***Bankruptcy Code***"), some Fees and Expenses (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Retainer will be applied to any such unpaid pre-petition Fees and Expenses. Ankura will then hold any portion of the Retainer not otherwise properly applied for payment of any such unpaid pre-filing Fees and Expenses (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

5. Payment Obligations and Billing

   (a) Payment Obligations:

      i) The obligations of the Company under this Agreement (including the indemnification, reimbursement and contribution obligations described in Schedule I) shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of the Company. Prior to commencing any proceedings under any insolvency regime, the Company shall pay all invoiced amounts, whether for Fees or Expenses or otherwise, to Ankura by wire transfer of immediately available funds.

   (b) Billing:    In addition to the Retainer, the Company agrees to pay all Fees and Expenses immediately upon receipt of an invoice to the Company for all Services rendered and Expenses incurred. Payment of the Fees, Expenses and Retainer (including any additional amounts to replenish the Retainer) shall be made via wire transfer to the following account:

   Please Remit Payment to:

   Wire Payment to: Ankura Consulting Group, LLC
   JP Morgan Chase, NA
   P.O. Box 32185 270 Park Avenue
   New York, NY 10087-2185 New York, NY 10017

   ABA Routing #: 021000021 ACH Routing #: 111000614
   Account #: 672653925
   Bank Contact: Carolyn Banks
   Bank Contact Phone #: (214) 965-3925

5

FURIE-ANK_00000933
DA01167