

(c) <u>Currency; Taxes</u>:  All Fees, Expenses and any other amounts payable hereunder will be invoiced and are payable in U.S. dollars, free and clear of any withholding taxes or deductions.

6.  <u>Term of Agreement</u>:  Unless terminated earlier as set forth below, this engagement shall terminate upon completion of the Services.  This Agreement may be terminated at any time by Ankura or Company on thirty (30) days' prior written notice to the other.  Any termination of this Agreement shall not affect any provisions that survive the termination hereof, including, (i) the indemnification, reimbursement, contribution and other obligations set forth in this Agreement, including <u>Schedule I</u>, and (ii) Ankura's right to receive payment of Fees earned and Expenses incurred by Ankura through the date of termination, and the Company shall immediately pay or cause to be paid all such reasonable Fees and Expenses due and owing.  If the Agreement is terminated, the parties hereto agree that Ankura may pursue, advise and/or provide services to any third party(ies) relating to or involving the Company, subject, however, to compliance with the obligations set forth in paragraph 9, below.

7.  <u>Court Approval</u>: In the event that a filing under the Bankruptcy Code is necessary or required, the Company will use its best efforts to ensure that the court authorizes the Company to continue to honor its obligations under this Agreement, including all indemnification obligations hereunder (including <u>Schedule I</u>) and payment by the Company of all Fees and Expenses in accordance with the terms hereunder (including Ankura's reasonable and documented counsel's fees and expenses) and, if necessary, approves the retention of Ankura pursuant to the terms of this Agreement, *nunc pro tunc* to the date the insolvency proceeding was commenced.

8.  <u>Nature of Services; Use of Advice</u>:

(a) Ankura shall act as an independent contractor under this Agreement, and not in any other capacity and any obligations arising out of its engagement shall be owed solely to the Company.  Any advice rendered pursuant to this Agreement is intended solely for the use of the Company in considering the matters to which this Agreement relates, and such advice may not be relied upon by any other person or used for any other purpose.  Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in <u>Schedule I</u>) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

(b) Any advice rendered by or other materials prepared by, or any communication from, Ankura (in each case, the "*Ankura Advice*") may not be disclosed, or used, in whole or in part, to or by, any third party, or summarized, quoted from, or otherwise referred to in any manner, without the prior written consent of Ankura.  Ankura Advice may only be used by the Company for the purposes set forth in this Agreement.  The terms of this Agreement shall not be referred to without Ankura's prior written consent.

(c)  At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Company.

9.  <u>Confidentiality and Internal Use</u>:  In connection with this engagement, either party (the "*Receiving Party*") may come into the possession, whether orally or in writing, of Confidential Information of the other party (the "*Disclosing Party*").  The Receiving Party hereby agrees that it will not disclose, publish or distribute such

6



Confidential Information to any third party without the Disclosing Party's consent. For purposes of this Agreement, "*Confidential Information*" means (a) the existence and terms of this Agreement and (b) any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include: (i) information that was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) information that is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) information that is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; (iv) information that is independently developed without use of or reference to any Confidential Information; or (v) information, memoranda, reports, analyses, or other work product created by or in consultation with Scott M. Pinsonnault in his capacity as ICOO of the Company. Notwithstanding the foregoing, the Receiving Party is entitled to disclose Confidential Information to (i) its legal advisors, (ii) the Company's financing parties, and (iii) a third party to the extent it is required by any court of competent jurisdiction or by a governmental or regulatory authority or where there is a legal right, duty or requirement to disclose, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice to any such disclosure under clause (iii) so that Disclosing Party can seek a protective order; and provided further that the Receiving Party shall inform any party receiving Confidential Information under clauses (i), (ii), or (iii) of the confidential nature of the information (and the Receiving Party shall be responsible for any breach of the applicable confidentiality provisions of this Agreement by any such party).Nothing in this Section 9 or this Agreement shall prohibit Ankura from using the Company's name and logo as part of a general client listing and as a specific citation in proposals or similar directed marketing efforts.

It is understood and agreed that any report, analysis, or other work product prepared by Ankura as a result of the Services (the "*Work Product*") shall constitute property of the Company. For the avoidance of doubt, the confidentiality provisions set forth in this section 9 shall not prohibit the Company's internal use of the Work Product or the disclosure of the Work Product to the Company's legal advisors or financing parties in any way. Notwithstanding the foregoing, if the Work Product bears Ankura's name, the Company shall not use the Work Product without prior consent of Ankura (such consent not to be unreasonably withheld).

10. Indemnification: The Company shall, jointly and severally, provide indemnification, contribution and reimbursement as set forth in Schedule I hereto. The terms and provisions of Schedule I are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in Schedule I) is requested or required to appear as a witness in any Action (as defined in Schedule I) that is brought by or on behalf of or against the Company or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, the Company shall, jointly and severally, reimburse Ankura and the Indemnified Person for all reasonable, documented, actual out of pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the reasonable and documented fees and disbursements of legal counsel.

11. Entire Agreement; Amendments: This Agreement (including Schedule I) represents the entire agreement between the parties, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

12. Counterparts: This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

7

FURIE-ANK_00000935
DA01169



**Private and Confidential**

13. Severability:  The invalidity or unenforceability of any provision of this Agreement (including Schedule I) shall not affect the validity or enforceability of any other provision.

14. Announcements: Ankura shall be entitled to identify the Company and use the Company's name and logo in connection with marketing and pitch materials upon conclusion of the Services.  In addition, if requested by Ankura, the Company agrees that in any press release related to the Services or outcome of the Services provided hereunder, the Company will include in such press release a mutually acceptable reference to Ankura's role as ICOO and advisor to the Company.

15. Governing Law; Jury Trial Waiver; Jurisdiction: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE.  ANKURA, AND THE COMPANY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, ANKURA AND THE COMPANY IRREVOCABLE AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS.  EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN SECTION 16 HEREOF.  EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER.  EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION 15.

16. Notices: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below.

17. Miscellaneous:

8

FURIE-ANK_00000936
DA01170



(a) <u>Conflicts</u>:

    i) Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us, and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify you immediately and take appropriate actions, as necessary. The Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Unless otherwise provided in an order of a bankruptcy court in a bankruptcy proceeding of the Company. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement which are directly adverse to the Company shall not be provided by personnel working on this engagement without prior written consent of the Company.

    ii) The Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. The Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to the Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to the Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the Company under this engagement. Ankura will not have any duty to disclose to the Company or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

(b) <u>Liability</u>: No (i) direct or indirect holder of any equity interests or securities of Ankura whether such holder is a limited or general partner, member, stockholder or otherwise, (ii) affiliate of Ankura, or (iii) director, officer, employee, representative, or agent of Ankura, or of an affiliate of Ankura or of any such direct or indirect holder of any equity interests or securities of Ankura (collectively, the *"Party Affiliates"*) shall have any personal liability or obligation of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby, and the Company waives and releases all claims against such Party Affiliates related to any such liability.

(c) <u>Authority; Due Authorization; Enforceability</u>: The Company represents and warrants that the Board has duly approved the retention of Ankura and approved the terms of this Agreement, including the appointment and authorization of the ICOO. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such party and constitutes the legal, valid and binding agreement of each such party, enforceable in accordance with its terms.

FURIE-ANK_00000937
DA01171



(d) Independent Contractors: In connection with the Services, Ankura may, without consent from the Company utilize employees, agents or independent contractors or its own affiliates or its own agents or independent contractors. References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. The parties intend that an independent contractor relationship will be created by this Agreement. As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Ankura employees will not be entitled to receive from the Company any vacation, sick pay, leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. Ankura will be responsible for all withholding, income and other taxes incurred in connection with the operation and conduct of its business.

(e) Limitations of Engagement: The Company acknowledges that Ankura is being retained solely to assist the Company as described in this Agreement. The Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. The Company understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to the Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or otherwise, or any transaction contemplated thereby or incidental thereto. In rendering its Services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Ankura is not assuming any responsibility for any decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) Limitations on Actions. No action, regardless of form, relating to this engagement, the Services provided hereunder or this Agreement, may be brought by either party more than one (1) year after the cause of action has accrued, except than an action for nonpayment may be brought by a third party not later than one (1) year following the due date of the last payment owing to the party bringing such action.

(g) Counsel Representation: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel, there shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.

(h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties.

10



(i) <u>Headings</u>: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) <u>Survival</u>: Upon any termination of this Agreement, Section 2-4 and 6-11, 13-15, 17(b), 17(d), 17(e), 17(f), 17(g), 17(j), 17(l), 17(m) and <u>Schedule I</u> hereto shall survive such termination and shall remain in effect. The obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) <u>Force Majeure</u>: Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) <u>Non-Solicitation</u>: During the Term of this engagement and for a period of one (1) year thereafter, the Company agrees that it will not directly or indirectly employ, solicit, engage, or retain the services of such personnel whom they had substantive contact within the course of this engagement without the payment to Ankura of two (2) times the total direct compensation paid to such personnel in the preceding twelve (12) months, provided however that this section shall not apply to Ankura personnel who do not have substantive contact within the course of this engagement and who respond to a general solicitation or advertisement not specifically directed to Ankura personnel.

(m) <u>Insurance</u>: The Company shall maintain directors/managers, officers and corporate liability insurance policy (the "*Policy*"), with at least $[enter current coverages] million in coverage to cover the ICOO in addition to the existing officers and directors/managers serving in such positions. The Company shall cause its insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the ICOO. Upon any cancellation or nonrenewal of the Policy by the insurer, the Company shall exercise their rights to extend the claim period to a six-year "discovery period" and shall exercise such rights and pay the premium required thereunder.

[Signature pages follow.]

11

FURIE-ANK_00000939
DA01173



**Private and Confidential**

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call Scott M. Pinsonnault at (214) 771-6133.  We look forward to working with you on this important matter.

*Ankura Consulting Group, LLC*

By: _____

Scott M. Pinsonnault
Senior Managing Director

[Additional signature pages follow.]

12

FURIE-ANK_00000940
DA01174



**Private and Confidential**

Accepted and agreed to as of the Effective Date:

**Cornucopia Oil and Gas Company LLC**

By: _____
Name: David Elder
Title: Chief Financial Officer


**CORSAIR OIL & GAS LLC**
a Delaware limited liability company
By: _____
Name: David Elder
Title:  Chief Financial Officer


**FURIE OPERATING ALASKA, LLC,**
a Delaware limited liability company
By: _____
Name: David Elder
Title: Chief Financial Officer


[Signature page to Engagement Agreement]


13

FURIE-ANK_00000941
DA01175



## Schedule I

This Schedule I is a part of and incorporated into the letter agreement (the "*Agreement*"), dated as of March 20, 2018 between Ankura Consulting Group, LLC ("*Ankura*"), and Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (the "*Company*"), pursuant to which Ankura has been engaged to provide interim management and restructuring advisory services as set forth in the Agreement.  Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, the Company, jointly and severally, agrees that it shall defend, indemnify and hold harmless Ankura and its affiliates and their respective directors/managers, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "*Indemnified Person*"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "*Liabilities*"), and will reimburse each Indemnified Person for all reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of counsel) (collectively, "*Expenses*") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "*Actions*"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; provided that the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review to have resulted from such Indemnified Person's negligence or willful misconduct in connection with any of the actions, inactions or Services.  The Company shall also reimburse such Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this Schedule I).  Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

The Company shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura.  The Company will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations.  Notwithstanding the foregoing,

14

FURIE-ANK_00000942
DA01176



in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Company pursuant to the Agreement.

No Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its respective owners, parents, affiliates, security holders or creditors for, or in connection with advice or Services rendered or to be rendered by any Indemnified Person pursuant to the Agreement, or any Indemnified Person's actions or inactions in connection with any such advice, Services except for Liabilities (and related Expenses) of the Company that are finally determined by a judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's negligence or willful misconduct in connection with any such advice, actions, inactions or Services, provided however, that, in no event shall any Indemnified Person be liable to the Company in an aggregate amount in excess of the amount of fees actually received by Ankura pursuant to the Agreement. In no event shall Ankura be liable to the Company for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct claim), or any consequential, special, indirect, direct, incidental, punitive or exemplary loss, damage or expense relating to this engagement, the Services or this Agreement, (in contract, tort or otherwise) or to the Company or its respective owners, parents, affiliates, security holders or creditors).

Prior to entering into any agreement or arrangement during the term of this engagement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura.

These indemnification, contribution and other provisions of this Schedule I shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.

15

FURIE-ANK_00000943
DA01177

**Exhibit B**

**Employment Agreement**

[Attached]

FURIE-ANK_00000944
DA01178

**Execution Version**
**March 14, 2018**

# EMPLOYMENT AGREEMENT
# DAVID W. ELDER

THIS EMPLOYMENT AGREEMENT (the "*Agreement*"), effective as of February 15, 2018, is entered into by and among CORNUCOPIA OIL & GAS COMPANY, LLC, a Delaware limited liability company ("*Cornucopia*"), its subsidiary, FURIE OPERATING ALASKA, LLC, a Delaware limited liability company (the "*FOA*") and CORSAIR OIL & GAS LLC, a Delaware limited liability company ("*Corsair*"), each having its principal executive office at 188 W. Northern Lights Blvd., Suite 620, Anchorage, AK 99503 and DAVID W. ELDER, residing at 238 Sunset Ridge, League City, Texas ( the "*Executive*"). Cornucopia, FOA and Corsair are hereinafter collectively called the "*Company*").

## WITNESSETH:

WHEREAS, incident to a previous three year term of employment with the Company, the Company hereby desires to retain and continue to employ the Executive to work for the Company and such of its other affiliates of Cornucopia and FOA as Company may request from time to time and the Executive is willing to be stay on and continue to be employed by the Company upon the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.    <u>EMPLOYMENT</u>.  The Company hereby employs the Executive to serve as Chief Financial Officer of each of Cornucopia, FOA and Corsair and the Executive hereby accepts such employment upon the terms and conditions hereinafter set forth. Provided; however, if the Sole Member nominates another individual to be the Chief Financial Officer, and such nominee is approved by the Board of Mangers, then the Executive will continue serve as the Chief Admisnistrative Officer of Cornucopia, FOA and Corsair with such responsibilities as are reasonably acceptable to the Executive. The Company and Executive understand and acknowledge that this Agreement is a contract for employment and as such the Executive is not to be considered an "at-will" employee of the Company under any state, local and/or federal law.

2.    <u>TERM</u>.  The term of employment of the Executive hereunder shall be for the period commencing as of the date hereof and for an initial three year term, unless sooner terminated in the manner hereinafter provided, ending at the close of business on February 14, 2021 (with each 12 month period from February 15 to February 14 during the term herein called a "*Contract Year*" and the period from the date hereof to February 14, 2021 called the "*Contract Term*"). The Contract Term may be renewed or extended upon written agreement of the Company and Executive.

3.    <u>DUTIES AND SERVICES</u>.

(a)    The Executive agrees to faithfully and diligently serve the Company in the capacity as Chief Financial Officer on a full time basis and shall be in charge of all day to day financial management of the Company under the direction of the Board of Managers of the

FURIE-ANK_00000945
DA01179

Company, and to perform from time to time such additional executive duties as the Board of Managers of the Company shall reasonably request; provided that such duties shall be consistent with the Executive's present position and status.  The Executive shall report directly to the Company's Board of Managers. The Executive agrees that, subject to the next sentence, during the period of employment he shall devote his full business time, energy and skill to such employment.  The Executive may serve on board of directors or as a manager of an LLC (with compensation related thereto) that is engaged in charitable causes if such service does do not interfere with Executive's ability to perform his executive duties under this Employment Agreement on a full time basis at the times and places as may be required by the Company.

(b)     The Company will provide the Executive with an office in Anchorage, Alaska or at such location as shall be designated by the Board of Managers of the Company, which location shall be reasonably acceptable to the Executive, which will be the same as or comparable to the office now used by the Executive, and will provide the Executive with executive secretarial services at such office.  When not working at the Company provided office in Alaska, the Executive will provide his services/perform his duties remotely.

(c)     Alaska Terms:  Executive shall travel to Alaska via business class airfare and will work at least ten days a month in Alaska unless (i) work schedule requires more or (ii) the Company and Executive mutually agree to some lesser amount of time in writing.  While in Alaska the Executive will be lodged in a hotel or corporate apartment mutually acceptable to the Executive and Company; said lodging to be paid for by the Company.  The Company shall provide and pay for Executive's transportation while in Alaska; this may be achieved through a rental car, car lease, and/or through taxi/Uber/Lyft ride sharing options and reasonable expenses for dining.

4.     <u>COMPENSATION</u>.

(a)     As compensation for the services to be rendered hereunder by the Executive, the Company agrees to pay the Executive, and the Executive agrees to accept, effective February 15, 2018 a salary at the rate of Two Hundred Fifty-Five Thousand Two Hundred Dollars ($255,200.00) per annum through the Contract Term of this Agreement, which amount shall be subject to an annual cost of living increase as provided for in Section 4(b) hereof.  (Collectively, such annual compensation plus all cumulative cost of living increases shall be hereinafter referred to as "***Basic Annual Compensation***").  The Executive's Basic Annual Compensation shall be payable biweekly (in conjunction with the payment by the Company of its employees' biweekly payroll).

(b)     In the event the "Consumer Price Index — United States City Average — Urban Consumers," published by the Bureau of Labor Statistics of the United States Department of Labor (the "*CPI-U*"), shall indicate that as of December 31 of any year during the term of this Agreement, the CPI-U during the twelve months then ended shall have increased over the previous twelve months, then the Basic Annual Compensation, in respect of any Contract Year, commencing with the Contract Year beginning on February 15 2019,  shall be increased prospectively, effective on such day, by an amount equal to the lesser of (i) an amount equal to the Basic Annual Compensation multiplied by such percentage increase in the prior calendar year's CPI-U and (ii) five percent (5%) of the Executive's Basic Annual

FURIE-ANK_00000946
DA01180

Compensation paid during the immediately preceding Contract Year (herein called the "*5% Limitation*"). For example, subject to the 5% Limitation, if the Basic Annual Compensation in 2018, hypothetically, is $255,200 and the CPI-U increase for the year ended December 31, 2018 is two percent (2%), then the Basic Annual Compensation for the 2019 Contract Year commencing February 15, 2019, would be $260,304 ($255,200 x 2% = $5,104 + $255,200 = $260,304). In the event that there is a change in the basis of calculating the CPI-U, or if a change is made in the terms or number of items contained in the CPI-U, or if the CPI-U is discontinued, the Company and the Executive shall, in good faith, mutually agree upon a substitute index or formula, and such substitute index or formula shall henceforth have the same effect as if it had been originally designated herein. Notwithstanding any provisions to the contrary contained in this Agreement, in no event shall the Basic Annual Compensation in any calendar year be increased by more than the 5% Limitation unless otherwise specifically agreed by the Company.

5.    OTHER BENEFITS.

(a)    The Executive shall be entitled to participate on the same basis and subject to the same qualifications as other executives of the Company, in an employee benefits plan, including a 401K Plan with, if practicable, a Company-matching provision using a "safe harbor" provision (with respect to the required annual percentage test) contribution to be determined by the Company, a life, health, medical, hospitalization or surgical insurance plan or policy (with coverage for the Executive and his family), and any vacation or fringe benefit plans or programs, whether now existing or hereafter established.

(b)    The Executive shall be entitled to an annual minimum cash bonus ("*Annual Minimum Bonus*") with respect to each Contract Year in an amount equal to 25% of Basic Annual Compensation, subject to Executive's continued employment through the last day of such Contract Year (except as otherwise provided in Sections 5(j) and 7). The Annual Minimum Bonus shall be payable no later than March 15 of the calendar year following such Contract Year.

(c)    Provided the Bonus Criteria (as defined below) are met, the Company, in its absolute discretion, may pay Executive an additional Bonus (the "*Discretionary Bonus*") with respect to each Contract Year in an amount not exceeding one hundred percent (100%) of the Executive's Basic Annual Compensation for the immediately preceding Contract Year, subject to Executive's continued employment through the last day of the Contract Year. Any Discretionary Bonus shall be payable no later than March 15 of the calendar year following such Contract Year. Any Discretionary Bonus shall be based on the performance and criteria set forth below (the "*Bonus Criteria*").

(i)    The performance based portion of the Bonus Criteria shall be based on (A) the Company's EBITDA performance for the 12-month period ending on the previous December 31 compared against the Company's annual budget for such period, (B) the Company's performance in meeting its obligations on a timely basis under any credit facilities with lenders or investors, (C) the Company's applications for and receipt of incentive tax credits from the State of Alaska and

3

FURIE-ANK_00000947
DA01181

(D) results in obtaining and executing financing as approved by the Company's Board of Managers.

(ii)    In addition, the Bonus Criteria shall include such other discretionary criteria established by the Company's Board of Managers pursuant to the provisions of Exhibit A attached hereto.

(d)    Subject to Section 8, Executive shall be entitled to a cash retention bonus ("*Retention Bonus*") in an amount equivalent to the Executive's Basic Annual Compensation for the immediately preceding Contract Year payable upon the earliest of one of the following events: (i) immediately upon the conclusion of the Contract Term, (ii) a Trigger Event, (iii) upon Executive's death or disability or (iv) upon termination of Executive's employment by the Company without an Act of Cause (as defined in Section 6 below), in each case subject to the Executive's continued employment with the Company through such event; said Retention Bonus is in addition to, separate and apart from any other compensation due to Executive, including but not limited to the Annual Minimum Bonus and the Discretionary Bonus described above in 5(b)-(c).  The Retention Bonus shall be paid on a date determined by the Company that is within thirty (30) days following the occurrence of the applicable event set forth in clause (i), (ii), (iii) and (iv).

(e)    Subject to Section 8, in the event of a public sale by the Company or its ultimate parent entity of any equity securities and the Company or such ultimate parent entity becomes listed on any recognized state or securities exchange, subject to the Executive's continued employment with the Company through such event, the Executive shall be entitled to receive all amounts due to Executive under the provisions in Section 7 below.

(f)    Nothing contained herein shall be deemed to be a waiver by the Executive of, or to diminish or modify, any vested rights which the Executive may have or may hereafter acquire under any employee benefit plan of the Company.

(g)    It is contemplated that, in connection with his employment hereunder, the Executive may be required to incur reasonable business, dining, entertainment and travel expenses.  The Company agrees to reimburse the Executive in full for all reasonable and necessary business, entertainment and other related expenses, including travel expenses, incurred or expended by him incident to the performance of his duties hereunder, and incurred or expended in accordance with the Company's policies with respect to such expenses, upon submission by the Executive to the Company of such vouchers or expense statements satisfactorily evidencing such expenses as may be reasonably required by the Company.

(h)    It is understood and agreed by the parties hereto that during the term of the Executive's employment hereunder he shall be entitled to annual vacations (taken consecutively or in segments), the length of which shall be consistent with the effective discharge of the Executive's duties and the general customs, practices and policies of the Company applicable to employees of the Executive's status; provided, however, that it is agreed that the Executive shall be entitled to twenty business days (20) of vacation each year, to be taken annually on a non-cumulative basis with any unused portion to be carried over per the Company's vacation policy.

FURIE-ANK_00000948
DA01182

(i)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, in addition to all other compensation and benefits to which the Executive may be entitled under the terms of this Agreement, to the extent permitted by applicable law, the Company shall pay one of the following: (1) costs of Executive's health benefits under COBRA for a period of eighteen (18) months, as same may be extended by law, from the date of termination of such employment or until any earlier date Executive on which ceases to be covered by the Company's COBRA coverage under his COBRA election after such termination, or (2)  in the event that COBRA does not apply to Executive then the Company shall pay Executive's monthly premiums for himself and all current dependents under an insurance plan that provides equivalent coverage to that of the Company for a period of 18 months.

(j)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, the Company agrees to pay Executive the greater of (i) Executive's Basic Annual Compensation for the remainder of the balance of the Contract Term and (ii) twelve (12) months of the Executive's then current per annum salary plus Retention Bonus plus any Annual Minimum Bonus due, in each case payable in a lump sum on a date determined by the Company that is within thirty (30) days following the date of termination.  In addition to the foregoing payment, the Executive shall be entitled to any unpaid bi-weekly compensation due to the Executive as of the date of such termination, plus reasonable documented attorneys' fees of the Executive (up to a maximum amount of $50,000 and subject to applicable withholding) to the extent the Executive is required to take any legal action against the Company to recover any benefits or other compensation due to him from the Company as a result of the Company's termination of the Executive without an Act of Cause, in each case payable on a date determined by the Company that is within thirty (30) days following the date of termination.

6.      TERMINATION OF EXECUTIVE'S EMPLOYMENT FOR CAUSE.    The Company shall have the right to terminate the employment of the Executive under this Agreement, as well as any and all compensation to which the Executive would otherwise be entitled hereunder (except for compensation to which the Executive is entitled through the date of such termination and any benefits referred to in Section 5 hereof in which the Executive has a vested right under the terms and conditions pursuant to which such benefits were granted), if, and only if, the Executive shall have committed any material act of proven dishonesty or fraud against the Company or a felony or in the event of gross negligence or willful misconduct of the Executive (such act or acts or event being hereinafter referred to as an "*Act of Cause*").  In the event the Board of Managers of the Company elects to terminate the employment of the Executive under this Agreement for an Act of Cause as set forth above, the Company shall send written notice to such effect to the Executive, and the Executive's employment under this Agreement, and this Agreement, shall thereupon terminate as of a date to be specified in such notice, which date shall be not less than 10 days after the sending of such notice.

7.      PAYMENTS UPON EXPIRATION, SALE OF ASSETS, SECURITIES OR CHANGE OF CONTROL.

(a)      Subject to Section 8, upon the earliest to occur of any of the events listed in (b) below during the Contract Term (each, a "*Trigger Event*"), subject to the Executive's

5

FURIE-ANK_00000949
DA01183

continued employment with the Company through the applicable Trigger Event, the Executive shall receive a cash payment in an amount that is equal to the following:

> an amount (the "***Trigger Event Amount***") equal to the total of (A) an amount obtained by multiplying by two (2)) the Executive's Basic Annual Compensation payable for the Contract Year in which the Trigger Event occurs, ***plus*** (B) the maximum Bonus to which the Executive would be entitled for the 12-month period ending on the next December 1 after the date of the Trigger Event, ***plus*** (C) 1.0% of the amount by which the Sales Price (as hereinafter defined) exceeds the tangible net worth of the Company (computed in accordance with U.S generally accepted accounting principles consistently applied with all prior periods) as of the date hereof, ***plus*** (D) Retention Bonus, ***plus*** (E) Annual Minimum Bonus.

The Trigger Event Amount shall be paid on a date determined by the Company that is within thirty (30) days following the applicable Trigger Event; provided that, in lieu of a cash payment on the occurrence of a Trigger Event, the Executive may, to the greatest permitted by, and in compliance with, applicable law, elect to receive stock, warrants, options or other agreed equity interests, of equivalent value to the cash payments provided above, in any public offering of the Company's stock or shares or other company or entity to whom the Company's or any of its parent entities' assets or membership interests are sold pursuant to any Trigger Event. The amount and terms of any such equity interests will be as agreed between the Company and the Executive at such time.

(b)   Trigger Events shall be:

(i)   the public sale by the Company, its immediate member entity, or its ultimate parent entity, of any equity securities, or any securities convertible into or exchangeable into equity securities of any such entity;

(ii)   Kay Rieck and his affiliates sells his or their interests in the Company to any non-affiliated entity so that he or they own, directly or indirectly, less than fifty percent (50%) of the membership interests of the Company, its immediate member entity or its ultimate parent entity (on a fully diluted basis);

(iii)   the sale, transfer or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of more than fifty percent (50%) of the book value or fair market value of the consolidated assets of the Company, its immediate member entity or its ultimate parent entity, excluding any sale, transfer or distribution to an affiliated entity;

(iv)   the sale, transfer, or other disposition (including a farm in or farm out arrangement) of more than a fifteen percent (15%) interest in the oil and gas and other mineral leasehold interests owned by Cornucopia in the Kitchen Lights Unit in the Cook Inlet, or elsewhere in Alaska, with or without a change of operator or manager of the leases so sold, transferred or disposed of or farmed out, excluding any sale, transfer or distribution to an affiliated entity;

FURIE-ANK_00000950
DA01184

(v)    the merger, consolidation or other business combination with any entity other than an affiliated entity of the Company, its immediate member entity, its ultimate parent entity or any of their respective affiliates, or the liquidation or dissolution of the Company, its immediate member entity or its ultimate parent entity; or

(vi)    the refinancing in full with the proceeds of equity or other indebtedness of the Company of the Company's obligations under that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as amended, amended and restated, supplemented or modified from time to time, the "*Credit Agreement*"), among Cornucopia, FOA, Energy Capital Partners Mezzanine Opportunities Fund A, LP, in its capacity as administrative agent (the "*Administrative Agent*") and collateral agent thereunder (the "*Collateral Agent*") and the lenders party thereto from time to time (the "*Lenders*") and the other Credit Documents (as defined in the Credit Agreement).

(c)    For the purposes of this Section 7, "*Sales Price*" shall mean:

(i)    upon the occurrence of the Trigger Event set forth in clause (b)(i) or (b)(iii) above, the fair market value (as hereinafter defined) of the Company as of the effective date of such event;

(ii)    upon the occurrence of the Trigger Event set forth in clause (b)(ii) above, (A) if the entity the securities of which are sold is the Company, the price at which such securities are offered to the public multiplied by the aggregate number of common shares outstanding, fully diluted, upon the completion of such public offering less all Additional Equity (as hereinafter defined), or (B) if the entity the equity securities of which are sold is an entity other than the Company, the fair market value of the Company as of the date of such sale;

(iii)    upon the occurrence of a Trigger Event set forth in clause (b)(iv) or (b)(vi) above (other than a liquidation or dissolution of the Company), the total consideration received by the selling members in such transaction divided by the percentage of total membership interests or common shares (if applicable), fully diluted, of the Company sold at the time of such transaction less all Additional Equity;

(iv)    upon the occurrence of a Trigger Event set forth in clause (b)(v) above, the total consideration or other compensation, in cash or kind, received by the Company or any member or affiliate of the Company for the interest sold; and

(v)    in the event of a liquidation or dissolution of the Company, the total amount distributable to the Company's members pursuant to such liquidation or dissolution after taking into account (A) a pro rata deduction in the amount distributable equally to all Additional Equity and (B) an addition thereto equal to the aggregate of all dividends and management, investment banking and any other fees paid to the parent or affiliates of the Company.

7

FURIE-ANK_00000951
DA01185

(vi)    If the Company or its immediate or ultimate parent entity is a publicly traded entity, "fair market value" shall mean the amount equal to the aggregate number of the shares of the owner outstanding on a fully diluted basis multiplied by the average market price of such entity's common stock for the ten (10) business days (based upon closing share prices) prior to the effective date of such event less all Additional Equity. If such entity is not a publicly traded company, "fair market value" shall mean the greater of the net worth or the appraised value of such entity, less all Additional Equity, as provided by a mutually agreed upon investment banking firm in a written opinion letter prepared at the expense of such entity that is based upon what the fully diluted common stock market value of such entity would be if it were a publicly traded entity after taking into account relevant factors such as prior history, earnings potential and industry multiples of earnings, cash flow and asset values. "Additional Equity" shall mean all fully diluted shares that are outstanding as a result of capital provided through sources other than the Initial Investment (as hereinafter defined). "Initial Investment" shall mean the dollar amount initially invested in the Company or its immediate or ultimate parent entity less organization and other expenses capitalized on the balance sheet as of the date hereof as an asset, excluding any covenant not to compete, if capitalized.

8.    <u>LENDER EVENTS</u>.  Notwithstanding anything in this Agreement to the contrary, no bonus or severance payments shall be payable to the Executive under Sections 5(d), 5(e), 5(i), 5(j) or 7 of this Agreement in connection with or following (i) any acquisition (by way of a sale, transfer, exchange or other disposition), directly or indirectly, by one or more of the Lenders, the Administrative Agent, the Collateral Agent or any affiliate thereof, or any other funds managed or advised by Energy Capital Partners (each, an "***ECP Party***"), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of securities of FOA, Cornucopia and/or Corsair or (ii) the sale, transfer, exchange or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of any or all of the assets of FOA, Cornucopia and/or Corsair, any of their respective immediate member entities or any of their respective ultimate parent entities, in the aggregate, directly or indirectly, to one or more ECP Parties,  in each case including, without limitation, pursuant to (A) the exercise of any rights and remedies available to the Lenders or any other Secured Party (as defined in the Credit Agreement) under any of the Credit Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral (as defined in the Credit Agreement) pursuant to the Security Documents (as defined in the Credit Agreement), or (B) any consensual transaction or out-of court settlement (any such acquisition described in clause (i) or (ii), an "ECP Acquisition"); provided that if, following any such ECP Acquisition, all the securities or assets acquired by the ECP Parties are transferred to a third party not affiliated with any of the ECP Parties, then the Company shall pay to the Executive, subject to Executive's continued employment with the Company through the date of such transfer, a bonus equal to the sum of (x) the Executive's Basic Annual Compensation for the immediately preceding Contract Year and (y) the Annual Minimum Bonus, in each case on a date determined by the Company that is within thirty (30) days following such subsequent transfer.

9.    <u>NON-COMPETITION</u>.  If the Company shall discharge the Executive for an Act of Cause pursuant to Section 6 hereof, then for a period of one year commencing on the date of

8

FURIE-ANK_00000952
DA01186

such discharge the Executive shall not, directly or indirectly, accept employment, provide consulting services to, or otherwise assist any company or individual or group that (i) competes in the markets in the geographical areas in which the Company performs oil and gas exploration and production operations at the time of discharge, directly or indirectly, or (ii) engages in any line or lines of business of the Company at the time of discharge.

10.     DEATH OR DISABILITY.   The obligations of the Company hereunder shall terminate forthwith in the event of the death of the Executive during the term hereof or in the event that the Executive shall fail to perform his services hereunder because of medically determinable physical or mental incapacity or disability either for (i) a continuous period of more than 180 days or (ii) a period aggregating 180 days or more during any 12 successive months.  In any such event, the Executive or his legal representative, as the case may be, shall, to the fullest extent permitted by applicable law, continue to receive the compensation to which the Executive would have been entitled pursuant to Section 4 hereof (and the Company will also be responsible for the provisions of Section 5(a) hereof to the extent permitted by applicable law) had his employment continued through the end of the month in which death or termination occurs and for the following two (2) months *plus* Retention Bonus per Section 5(d) hereof.  The Executive or his legal representative shall also receive any benefits and bonus referred to in Section 5 hereof in which the Executive has a vested right or if such bonus criteria had been met, as the case may be, and all unvested stock options or restricted stock units to which the Executive is entitled at the time of his death shall immediately vest upon such death, as of the date of death or termination, under the terms and conditions of the plan or program pursuant to which such benefits were granted. Any such benefits or bonus to which the Executive was thus so entitled or which vested as of the date of the Executive's death or disability shall be paid to the Executive's legal representative on a date determined by the Company that is within thirty (30) days after such date of death or disability.

11.     CONFIDENTIALITY.

(a)     Recognizing that his employment hereunder will involve access to proprietary and confidential knowledge and information pertaining to the business of the Company and its business methods, systems, plans and policies, the Executive agrees that, during and after the term of this agreement and his employment, he shall not (otherwise than pursuant to his duties hereunder (including any such disclosure pursuant to his duties hereunder to agents, advisors and lenders of the Company) or as required by law) disclose to an unauthorized third party any proprietary or confidential information pertaining to the Company or its operations or customers. In the event of any termination of employment, the Executive shall return all Company property of whatever nature in his possession or control to the Company. Notwithstanding the foregoing, nothing herein shall prevent the Executive from reporting possible violations of federal law or regulation to, otherwise communicating with or participating in any investigation or proceeding that may be conducted by, or providing documents and other information, without notice to the Company, to, any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, including in accordance with the provisions of and rules promulgated under Section 21F of the Exchange Act or Section 806 of the Sarbanes-Oxley Act of 2002, as each may have been amended from time to time, or any other whistleblower protection provisions of state or federal law or regulation.

FURIE-ANK_00000953
DA01187

(b)    The provisions of this Section 11 shall survive the expiration or termination of this Agreement, without regard to the reason therefor.

12.    NO SET-OFF; DEDUCTIONS AND WITHHOLDING.

(a)    The Executive's rights hereunder, including any payments to which the Executive is entitled hereunder, shall not be subject to diminution or to any right of setoff, recoupment or counterclaim by reason of any other agreement, relationship or course of dealing between the Executive, on the one hand, and the Company or any officer, director, employee, agent or affiliate thereof, or any assignee or successor of the foregoing, on the other hand, and the obligations of the Company hereunder shall be completely performed by the Company, or any aforementioned assignee or successor, without regard to any such other agreement, relationship or cause of dealing.   The aforementioned terms "assignee or successor," for purposes of this Agreement are to include any and all "successors and assigns" described in Section 13 hereof.

(b)    The Executive agrees that the Company shall have the right to withhold from any and all payments required to be made to the Executive pursuant to this Agreement all Federal, state, local and/or other taxes which the Company determines are required to be withheld in accordance with applicable statutes, regulations or orders as from time to time in effect and any payments due to the Company in respect of advances or loans made by the Company to the Executive.

13.    ASSIGNABILITY AND BINDING EFFECT.   The rights and obligations arising under this Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors, and legal representatives of the Executive, and shall inure to the benefit of and be binding upon the Company and its respective assigns and successors, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise, but (i) without the prior written consent of the Company, neither this Agreement nor the rights or obligations of the Executive hereunder may be assigned, pledged, hypothecated or otherwise transferred by the Executive to another person, firm or corporation, nor may the obligations of the Executive hereunder be delegated, and (ii) without the prior written consent of the Executive, the Company shall not assign this Agreement or its rights hereunder to a third party other than a successor to the business of the Company, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise.

14.    NOTICES.   All notices, requests, demands and other communications ("*Notices*") hereunder shall be in writing and shall be delivered personally or sent by certified mail, first class postage prepaid and return receipt requested, to the other party hereto at his or its mailing address as set forth at the beginning of this Agreement.   Notices shall be deemed to have been given at the time when given, if personally delivered, or at the date postmarked, if mailed.   Any party may change the address to which such communications hereunder shall be sent by sending notice of such change to the other party as herein provided.

15.    SEVERABILITY.   If any provision of this Agreement or any part hereof is invalid, unlawful or incapable of being enforced by reason of public policy or any rule of law or principle of equity, all conditions and provisions of the Agreement which can be given effect

10

FURIE-ANK_00000954
DA01188

without such invalid, unlawful or unenforceable provision shall, nevertheless, remain in full force and effect.

16.     PRIOR AGREEMENTS; COMPLETE UNDERSTANDING; AMENDMENT. This Agreement supersedes and replaces any and all prior agreements and understandings between the parties hereto respecting the employment of the Executive by the Company and constitutes the complete understanding between the parties with respect to the employment of the Executive hereunder, and no statement, representation, warranty or covenant has been made by any party with respect thereto except as expressly set forth herein.  This Agreement shall not be altered, modified, amended or terminated except by written instrument signed by each of the parties hereto.

17.     HEADINGS.  The headings set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect nor shall they in any way affect the substance of any provisions contained in this Agreement.

18.     DISPUTE RESOLUTION; FEES AND EXPENSES.

(a)     If a dispute arises between the Executive and the Company out of or in connection with this Agreement the parties may elect to resolve the dispute via mediation in Houston, Texas.  If, within thirty (30) days after the dispute arises, the mediation is unsuccessful, or if the parties elect to initially forgo mediation, any dispute between the Executive and the Company arising out of or in connection with this Agreement shall be submitted to trial by court or to a trial by a jury in Houston, Texas. Except as set forth in the following Section 18(b), each party shall pay his own fees and expenses in connection with any such mediation or trial proceeding.

(b)     In the event the Company shall discharge the Executive during the term of this Agreement and in a mediation and/or trial proceeding instituted pursuant thereto it shall be determined that said discharge was without an Act of Cause as defined herein, then the Company shall reimburse the Executive for all fees and expenses (including reasonable attorney's fees) incurred by him and arising out of, or in connection with, such controversy.

19.     GOVERNING LAW.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

20.     CODE SECTION 409A COMPLIANCE.  The parties intend for payments and benefits provided pursuant to this Agreement be exempt from (as short-term deferral or involuntary separation pay), or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively "*Code Section 409A*").  To the maximum extent possible, this Agreement shall be interpreted and administered consistent with such intent, including without limitation by modifying any provision hereof.  To the extent any provision hereof is modified for the purpose of complying with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company of the applicable provision without violating the provisions of Code Section 409A.  All taxable reimbursements and in-kind benefits provided under this Agreement

11

FURIE-ANK_00000955
DA01189

shall be made or provided in accordance with Code Section 409A including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses available for reimbursement, or the in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit. In no event shall the Company be liable for any tax, interest or penalty that may be imposed on Executive pursuant to Code Section 409A or any similar or related provision of U.S. tax law, or damages for failing to comply with Code Section 409A or similar or related provision of U.S. tax law. For purposes of Code Section 409A, Executive's right to receive any instalment payments owing pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

21.    INDEMNIFICATION.

(a)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY HEREBY AGREES TO RELEASE, PROTECT, DEFEND AND INDEMNIFY AND HOLD FREE AND HARMLESS THE EXECUTIVE FROM, FOR AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, EXPENSES, LIABILITY, JUDGMENTS, AWARDS OR LOSSES WHATSOEVER (HEREINAFTER REFERRED TO AS "CLAIMS") BROUGHT OR SUFFERED BY ANY PERSONS RELATING TO OR ARISING FROM ANY ACTIVITY OR SERVICES BY EXECUTIVE UNDER THIS AGREEMENT, OR ANY BREACH OF THIS AGREEMENT BY THE COMPANY, TO THE EXTENT ANY SUCH CLAIMS IN ANY WAY ARISE OUT OF, RESULT FROM, OR ARE IN ANY WAY CONNECTED WITH THE EXECUTIVE'S SERVICES, OR THE COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT WITH ANY OTHER PERSON, ENTITY OR THIRD PARTY, OR THE COMPANY'S FAILURE TO COMPLY WITH ANY LAW OR REGULATION, EXCEPT TO THE EXTENT ANY SUCH CLAIMS ARE CAUSED BY OR ARISE OUT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, BREACH OF THIS AGREEMENT OR FAILURE TO COMPLY WITH ANY LAW OR REGULATION BY THE EXECUTIVE.

(b)    The Company agrees that the Company shall maintain throughout the term of this Agreement, directors and officer's insurance, which shall extend to and cover Executive for all risks covered by such insurance.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

12

FURIE-ANK_00000956
DA01190

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By: _____
Name:  JEFFREY BRODSKY
Title:  MANAGER

**FURIE OPERATING ALASKA, LLC**

By: _____
Name:  JEFFREY BRODSKY
Title:  MANAGER

**CORSAIR OIL & GAS LLC**

By: _____
Name:  JEFFREY BRODSKY
Title:  MANAGER

By: _____
DAVID W. ELDER

13

# EXHIBIT A

Additional Bonus Criteria, if any:

Individual goals and targets will be used to measure additional bonus criteria and will be set annually with the Company's Board of Managers and agreed to by the Executive within thirty (30) days after the execution of this Agreement for the 2018 Contract Year and thereafter annually by December 1 for the subsequent Contract Years.

FURIE-ANK_00000958
DA01192

# EXHIBIT 56

DA01193

WRITTEN CONSENT IN LIEU OF
MEETING OF THE BOARD OF MANAGERS OF
CORNUCOPIA OIL & GAS COMPANY, LLC

---

The undersigned, being the majority of the members of the board of managers (the "Board") of Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company (the "Company"), pursuant to, and in compliance with, Section 18-404 of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. and Section 7 of the Fourth Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement"), do hereby consent in writing that the following resolutions are adopted and are effective for all purposes as of March 25, 2018:

## Approval of Engagement of Scott M. Pinsonnault et al.

WHEREAS, Furie Operating Alaska, LLC, a Delaware limited liability company ("FOA"), is a wholly-owned subsidiary of the Company, and, pursuant to the LLC Agreement, a majority of the Board must consent to certain actions by FOA;

WHEREAS, the Board deems it advisable and in the best interest of both the Company, for itself and as sole member of FOA, and FOA for the Company to engage (the "Engagement") (i) Ankura Consulting Group, LLC ("Ankura") (to provide interim management and advisor services)  and (ii) Scott M. Pinsonnault to act as Interim Chief Operating Officer (the "Interim Chief Operating Officer"), pursuant to an agreement to be entered into between the Company, FOA, Corsair Oil & Gas LLC, a Delaware limited liability company ("Corsair") and Ankura, in substantially the form attached hereto as Exhibit A (the "Engagement Letter"), and deems it advisable and in the best interests of both the Company, for itself and as sole member of FOA, and FOA for FOA to enter into and perform under and pursue the transactions contemplated by the Engagement Letter and to authorize, adopt and approve the Engagement Letter and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company or FOA, as applicable, in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby;

NOW, THEREFORE, BE IT RESOLVED, that the Engagement and the Engagement Letter be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that David W. Elder, as Chief Financial Officer of the Company (the "Authorized Officer"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company or FOA, as applicable, the Engagement Letter and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company or FOA, as applicable, as he may deem necessary or desirable in connection therewith.

FURIE-ANK_00000856
DA01194

**Approval of the Employment Agreement**

WHEREAS, FOA is a wholly-owned subsidiary of the Company, and, pursuant to the LLC Agreement, a majority of the Board must consent to certain actions by FOA;

WHEREAS, the Board has reviewed that certain Employment Agreement of David W. Elder, to be entered into by and among David W. Elder, the Company, FOA and Corsair, substantially in the form attached hereto as Exhibit B (the "Employment Agreement") and deems it advisable and in the best interests of both the Company, for itself and as sole member of FOA, and FOA for FOA to enter into and perform under and pursue the transactions contemplated by the Employment Agreement and to authorize, adopt and approve the Employment Agreement and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company or FOA, as applicable, in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby.

NOW, THEREFORE, BE IT RESOLVED, that the Employment Agreement be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that each member of the Board (each an "Authorized Person"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company or FOA, as applicable, the Employment Agreement and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company or FOA, as applicable, as he may deem necessary or desirable in connection therewith.

**General Authorization and Ratification**

NOW, THEREFORE, BE IT RESOLVED, that, consistent with the foregoing resolutions, the Authorized Officer, each Authorized Person and any officer or employee or agent of the Company or FOA, as applicable, under the supervision or management and direction of the Authorized Officer, or an Authorized Person, in each case, on behalf of the Company or FOA, as applicable, be, and each of them acting alone hereby is, authorized and empowered in the name and on behalf of the Company or FOA, as applicable, to carry out fully the intent and purposes of the foregoing resolutions and each of the actions or transactions contemplated thereby, and to, in connection therewith, (a) prepare, execute and deliver or cause to be prepared, executed and delivered, and where necessary, advisable, desirable or appropriate, file or cause to be filed with the appropriate governmental authorities, all other agreements, instruments and documents, including, but not limited to, all certificates, contracts, bonds, receipts or other papers, (b) incur and pay or cause to be incurred or paid all fees, expenses and taxes, including, without limitation, legal fees and expenses, (c) engage such persons as he or she shall in his or her judgment determine to be necessary, advisable, desirable or appropriate, and (d) do any and all other acts and things, as he or she deems necessary, advisable, desirable or appropriate (with the doing of any such act or thing being conclusive evidence that the same is deemed necessary, advisable, desirable or appropriate); and that any and all actions heretofore taken in the name and on behalf of the

FURIE-ANK_00000857
DA01195

Company or FOA, as applicable, in connection with the foregoing resolutions and each of the actions or transactions contemplated thereby, are hereby, in all respects, authorized, confirmed, ratified and approved as the actions of the Company or FOA, as applicable.

*[Signature Pages Follow]*

FURIE-ANK_00000858
DA01196

**IN WITNESS WHEREOF**, the undersigned has executed this written consent as of the date first written above.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____

Date:    25 March 2018

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____

Date: 3-25-18

**Kay Rieck**, in his capacity as the Member Manager

By: _____

Date:    03/25/18

FURIE-ANK_00000859
DA01197

**Exhibit A**

**Engagement Letter**

[Attached]

FURIE-ANK_00000860
DA01198



**Private and Confidential**

March 23, 2018

Furie Operating Alaska, LLC
188 W. Northern Lights Blvd.,
Suite 620
Anchorage, AK 99503

Dear Members of the Board of Managers:

This letter agreement (this "*Agreement*"), entered into as of March 23, 2018 (the "*Effective Date*"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("*Ankura*") and Corsair Oil & Gas LLC, a Delaware limited liability company, Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (collectively, with each of their subsidiaries and affiliates, the "*Company"*) pursuant to which Ankura has been engaged to act as the advisor to Company to provide interim management and advisory services as set forth below.

We have been retained by the Company and its Board of Managers ("*Board*") and will report to the Board.

1.  Scope of Engagement: On the terms and subject to the conditions of this Agreement, Ankura will provide to the Company the following interim management and restructuring advisory services (the "*Services*"), as requested by the Company and agreed to by Ankura:

    (a) Provide Scott M. Pinsonnault to serve as the Interim Chief Operating Officer of the Company ("*ICOO*") with the responsibilities that are traditional and customary (for the avoidance of doubt, the Company does not currently have a CEO);

    i)    Overseeing day-to-day business operations;

    ii)   Evaluating, implementing and managing cost reduction measures and operational improvement measures necessary to preserve and maximize the value and efficiency of the Company;

    iii)  Assisting in developing and evaluating the Company's business plan and the preparation of a revised operating plan and cash flow forecasts;

    iv)   Approving new expenditures, commitments or cash payments;

    v)    Addressing liquidity concerns and developing 13-week cash forecast;

    vi)   Managing the financial and operational reporting processes;

    vii)  Making decisions with respect to the Company's operations and its personnel (all employees and officers of the company shall report directly to the interim COO);

    viii) Making decisions with respect to all professionals engaged by, strategies developed, and activities taken by the Company;

    ix)   Monitoring operational aspects of the company, including status of production, regulatory and environmental compliance, and an understanding of insurance programs and premiums;

    x)    Overseeing all reporting and communications under the Company's material contracts, including, without limitation, credit agreement and customer offtake agreements;

1

FURIE-ANK_00000861
DA01199



xi)   Helping to prepare status updates, management presentations, and other deliverables for internal and external distribution;

xii)  Making business and financial decisions with respect to any financing sought or put in place and any other restructuring-related decisions;

xiii) Act as primary point of contact for PRA under the PRA Management Agreement and direct the activities of PRA on behalf of the Company;

xiv)  Other services and activities as mutually agreed by the Board and the interim COO; and

xv)   Making decisions with respect product marketing, derivatives and risk management.

(b)  Ankura will provide additional interim management services and personnel at the discretion of the Board and at the reasonable discretion of the ICOO (the "*Engagement Personnel*");

In the event there is a disagreement as to any direction, guidance or instruction to be given to Ankura in connection with the foregoing Services, Ankura shall take such direction, guidance or instruction from the Independent Manager of the Company.

It is our intention to work closely with you and management throughout the course of our engagement. Regular discussions with you regarding our progress should provide you with an opportunity to confirm or request that we modify the scope of our engagement to best serve your needs. The Services and compensation arrangements set forth herein do not encompass other advisory services not set forth in this Section 1. If the Company and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

Notwithstanding anything to the contrary in this Agreement, the Company and the Board agree that the ICOO shall be authorized, in such capacity, to made decisions with respect to all aspects of the management and operations of the Company's business, including, without limitation, organization, human resources, marketing, sales, operations, supply chain, finance, administration and other such areas as the ICOO may identify, in such manner, as the ICOO deems appropriate, subject only to appropriate governance by the Board in accordance with the Company's by-laws and applicable laws.

2.   Company Information and Reports:

In order to fulfill the Services under this Agreement, it will be necessary for Ankura personnel to have unfettered access to the Company's facilities and certain books, records and reports of the Company. In addition, Ankura will need to have discussions with the Company's management and certain other personnel. Ankura will perform the Services in a manner that will permit the business operations of the Company to proceed in an orderly fashion, subject to the requirements of this engagement. We understand that the Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the "*Information*"). The Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company. The Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading. To the best of the Company's knowledge, the Information to be furnished by or on behalf of

2

FURIE-ANK_00000862
DA01200



the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will have no obligation to, and will not, update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

3. <u>Fees and Expenses</u>: For Ankura's Services hereunder, the Company agrees to pay to Ankura the following non-refundable fees (the ICOO Fee and the Advisory Fee, collectively the "***Fee***")

    (a) <u>ICOO Fee</u>: a monthly fee for the ICOO in the amount of $60,000 (the "***ICOO Fee***") to be invoiced to the Company by Ankura pursuant to the procedures set forth in paragraph 5(b) below;

    (b) <u>Advisory Fees</u>: our fees for the Services set forth above for the Engagement Personnel (the "***Advisory Fees***") will be based on the actual hours expended at our standard hourly rates that are in effect when the Services are rendered. Our rates generally are revised annually. Our current hourly rates are as follows:

| Professional | Rates per hour |
| --- | --- |
| Senior Managing Directors | $850-950 |
| Other professionals | $350-800 |
| Paraprofessionals | $150-250 |

Ankura will provide a 10% discount on its hourly rate per employee when the employee bills greater than 20-30 hours in a particular calendar week, and a 20% discount on its hourly rate per employee when the employee bills greater than 30-40 hours in a particular calendar week and 30% discount on its hourly rate per employee when the employee bills greater than 40 hours in a particular calendar week. The discounts will be reflected in detail on the monthly invoice.

    (c) <u>Success Fee</u>: Within 45 calendar days of the Effective Date the Parties shall agree to an amendment of this agreement to account for a mutually acceptable and reasonable Success Fee

3



(the, "*Success Fee*") based on, among other items and factors, the success of the Company over the anticipated term of the engagement. The fee shall be reasonable and customary for such engaging Parties on and assignment of this nature.

(d) <u>Expenses Reimbursement</u>: Ankura shall be entitled to reimbursement of reasonable and documented out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable and documented out-of-pocket fees and expenses for outside legal counsel and other third party advisors) incurred in connection with this Agreement, including the negotiation and performance of this Agreement and the matters contemplated hereby) (collectively, "*Expenses*").

(e) <u>Reasonableness of Fees</u>: The Company acknowledges that it believes that Ankura's general interim management and restructuring experience and expertise will inure to the benefit of the parties hereto, that the value to the parties hereto of Ankura's Services derives in substantial part from that experience and expertise and that, accordingly, the structure and amount of the Fees to be paid to Ankura hereunder are reasonable. The Company acknowledges that a substantial professional commitment of time and effort will be required of Ankura and its professionals hereunder, and that such commitment may foreclose other opportunities for Ankura. Given the numerous issues which may arise in engagements such as this, Ankura's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Ankura that will be required in this engagement, and the market rate for Ankura's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Ankura, and provides the requisite certainty to the parties hereto.

(f) <u>Testimony; Subpoena Requests</u>. The Company agrees that if any of the principals or professionals of Ankura are required to testify, (other than testimony provided by the ICOO), at the request of the Company, on the Company's behalf or by legal, regulatory, administrative, arbitration or judicial order, at any proceeding related to the Services or this Agreement, Ankura will be compensated by the Company for our associated time charges at our regular hourly rates, in effect at the time and reimbursed for our reasonable and documented out-of-pocket expenses, including counsel fees. In addition, Ankura will be compensated for any time and expense (including, without limitation, reasonable and documented legal fees and expenses) that Ankura may incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with the Services or this Agreement.

4. <u>Retainer</u>

(a) In connection with the foregoing, it is Ankura's policy to receive an advance retainer for the Fees and Expenses. Upon execution of this Agreement, the Company shall provide Ankura with such retainer in the amount of $60,000 (the "*Retainer*"). The Retainer will be maintained throughout the engagement and returned to the Company upon completion of Ankura's Services. In addition, the Company agrees to replenish the Retainer upon request of Ankura so that the amount of any Retainer is equal to Ankura's estimated Fees and Expenses for the upcoming month. Ankura reserves the right to apply the Retainer to outstanding Fees and Expenses as Services are rendered and to Expenses as they are incurred. The Company understands and acknowledges that any Retainer is earned by Ankura upon receipt, any Retainer becomes the property of Ankura upon

4



receipt, the Company no longer has a property interest in any Retainer upon Ankura's receipt, any Retainer will be placed in Ankura's general account and will not be held in a client trust account, and the Company will not earn any interest on any Retainer; *provided, however*, that at the conclusion of the engagement, if the amount of any Retainer held by Ankura is in excess of the amount of Ankura's outstanding Fees and Expenses, Ankura will pay to the Company the amount by which any Retainer exceeds such Fees and Expenses. The Company further understands and acknowledges that the use of Retainers is an integral condition of the engagement, is necessary to ensure that the Company continues to have access to Ankura's Services, Ankura is compensated for the Services provided to the Company; Ankura is not a pre-petition creditor in the event of a bankruptcy filing and that in light of the foregoing, the provision of the Retainers is in the Company's best interests.

(b) If any of the Company's entities files a petition or has commenced against it any proceeding under Title 11 of the United States Code (the "***Bankruptcy Code***"), some Fees and Expenses (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Retainer will be applied to any such unpaid pre-petition Fees and Expenses. Ankura will then hold any portion of the Retainer not otherwise properly applied for payment of any such unpaid pre-filing Fees and Expenses (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

5. <u>Payment Obligations and Billing</u>

   (a) <u>Payment Obligations</u>:

      i) The obligations of the Company under this Agreement (including the indemnification, reimbursement and contribution obligations described in <u>Schedule I</u>) shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of the Company. Prior to commencing any proceedings under any insolvency regime, the Company shall pay all invoiced amounts, whether for Fees or Expenses or otherwise, to Ankura by wire transfer of immediately available funds.

   (b) <u>Billing</u>: In addition to the Retainer, the Company agrees to pay all Fees and Expenses immediately upon receipt of an invoice to the Company for all Services rendered and Expenses incurred. Payment of the Fees, Expenses and Retainer (including any additional amounts to replenish the Retainer) shall be made via wire transfer to the following account:

      Please Remit Payment to:

      Wire Payment to: Ankura Consulting Group, LLC
      JP Morgan Chase, NA
      P.O. Box 32185 270 Park Avenue
      New York, NY 10087-2185 New York, NY 10017

      ABA Routing #: 021000021 ACH Routing #: 111000614
      Account #: 672653925
      Bank Contact: Carolyn Banks
      Bank Contact Phone #: (214) 965-3925

5



(c) <u>Currency; Taxes</u>:  All Fees, Expenses and any other amounts payable hereunder will be invoiced and are payable in U.S. dollars, free and clear of any withholding taxes or deductions.

6. <u>Term of Agreement</u>:  Unless terminated earlier as set forth below, this engagement shall terminate upon completion of the Services.  This Agreement may be terminated at any time by Ankura or Company on thirty (30) days' prior written notice to the other.  Any termination of this Agreement shall not affect any provisions that survive the termination hereof, including, (i) the indemnification, reimbursement, contribution and other obligations set forth in this Agreement, including <u>Schedule I</u>, and (ii) Ankura's right to receive payment of Fees earned and Expenses incurred by Ankura through the date of termination, and the Company shall immediately pay or cause to be paid all such reasonable Fees and Expenses due and owing.  If the Agreement is terminated, the parties hereto agree that Ankura may pursue, advise and/or provide services to any third party(ies) relating to or involving the Company, subject, however, to compliance with the obligations set forth in paragraph 9, below.

7. <u>Court Approval</u>: In the event that a filing under the Bankruptcy Code is necessary or required, the Company will use its best efforts to ensure that the court authorizes the Company to continue to honor its obligations under this Agreement, including all indemnification obligations hereunder (including <u>Schedule I</u>) and payment by the Company of all Fees and Expenses in accordance with the terms hereunder (including Ankura's reasonable and documented counsel's fees and expenses) and, if necessary, approves the retention of Ankura pursuant to the terms of this Agreement, *nunc pro tunc* to the date the insolvency proceeding was commenced.

8. <u>Nature of Services; Use of Advice</u>:

(a) Ankura shall act as an independent contractor under this Agreement, and not in any other capacity and any obligations arising out of its engagement shall be owed solely to the Company.  Any advice rendered pursuant to this Agreement is intended solely for the use of the Company in considering the matters to which this Agreement relates, and such advice may not be relied upon by any other person or used for any other purpose.  Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in <u>Schedule I</u>) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

(b) Any advice rendered by or other materials prepared by, or any communication from, Ankura (in each case, the "***Ankura Advice***") may not be disclosed, or used, in whole or in part, to or by, any third party, or summarized, quoted from, or otherwise referred to in any manner, without the prior written consent of Ankura.  Ankura Advice may only be used by the Company for the purposes set forth in this Agreement. The terms of this Agreement shall not be referred to without Ankura's prior written consent.

(c) At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Company.

9. <u>Confidentiality and Internal Use</u>:  In connection with this engagement, either party (the "***Receiving Party***") may come into the possession, whether orally or in writing, of Confidential Information of the other party (the "***Disclosing Party***").  The Receiving Party hereby agrees that it will not disclose, publish or distribute such

6

FURIE-ANK_00000866
DA01204



Confidential Information to any third party without the Disclosing Party's consent. For purposes of this Agreement, "*Confidential Information*" means (a) the existence and terms of this Agreement and (b) any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include: (i) information that was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) information that is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) information that is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; (iv) information that is independently developed without use of or reference to any Confidential Information; or (v) information, memoranda, reports, analyses, or other work product created by or in consultation with Scott M. Pinsonnault in his capacity as ICOO of the Company. Notwithstanding the foregoing, the Receiving Party is entitled to disclose Confidential Information to (i) its legal advisors, (ii) the Company's financing parties, and (iii) a third party to the extent it is required by any court of competent jurisdiction or by a governmental or regulatory authority or where there is a legal right, duty or requirement to disclose, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice to any such disclosure under clause (iii) so that Disclosing Party can seek a protective order; and provided further that the Receiving Party shall inform any party receiving Confidential Information under clauses (i), (ii), or (iii) of the confidential nature of the information (and the Receiving Party shall be responsible for any breach of the applicable confidentiality provisions of this Agreement by any such party).Nothing in this Section 9 or this Agreement shall prohibit Ankura from using the Company's name and logo as part of a general client listing and as a specific citation in proposals or similar directed marketing efforts.

It is understood and agreed that any report, analysis, or other work product prepared by Ankura as a result of the Services (the "*Work Product*") shall constitute property of the Company. For the avoidance of doubt, the confidentiality provisions set forth in this section 9 shall not prohibit the Company's internal use of the Work Product or the disclosure of the Work Product to the Company's legal advisors or financing parties in any way. Notwithstanding the foregoing, if the Work Product bears Ankura's name, the Company shall not use the Work Product without prior consent of Ankura (such consent not to be unreasonably withheld).

10. Indemnification: The Company shall, jointly and severally, provide indemnification, contribution and reimbursement as set forth in Schedule I hereto. The terms and provisions of Schedule I are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in Schedule I) is requested or required to appear as a witness in any Action (as defined in Schedule I) that is brought by or on behalf of or against the Company or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, the Company shall, jointly and severally, reimburse Ankura and the Indemnified Person for all reasonable, documented, actual out of pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the reasonable and documented fees and disbursements of legal counsel.

11. Entire Agreement; Amendments: This Agreement (including Schedule I) represents the entire agreement between the parties, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

12. Counterparts: This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

7

FURIE-ANK_00000867
DA01205

 **Private and Confidential**

13. Severability:  The invalidity or unenforceability of any provision of this Agreement (including Schedule I) shall not affect the validity or enforceability of any other provision.

14. Announcements: Ankura shall be entitled to identify the Company and use the Company's name and logo in connection with marketing and pitch materials upon conclusion of the Services.  In addition, if requested by Ankura, the Company agrees that in any press release related to the Services or outcome of the Services provided hereunder, the Company will include in such press release a mutually acceptable reference to Ankura's role as ICOO and advisor to the Company.

15. Governing Law; Jury Trial Waiver; Jurisdiction: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE.  ANKURA, AND THE COMPANY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, ANKURA AND THE COMPANY IRREVOCABLE AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS.  EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN SECTION 16 HEREOF.  EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER.  EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION 15.

16. Notices: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below.

17. Miscellaneous:

8



(a) <u>Conflicts</u>:

   i) Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us, and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify you immediately and take appropriate actions, as necessary. The Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Unless otherwise provided in an order of a bankruptcy court in a bankruptcy proceeding of the Company. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement which are directly adverse to the Company shall not be provided by personnel working on this engagement without prior written consent of the Company.

   ii) The Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. The Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to the Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to the Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the Company under this engagement. Ankura will not have any duty to disclose to the Company or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

(b) <u>Liability</u>: No (i) direct or indirect holder of any equity interests or securities of Ankura whether such holder is a limited or general partner, member, stockholder or otherwise, (ii) affiliate of Ankura, or (iii) director, officer, employee, representative, or agent of Ankura, or of an affiliate of Ankura or of any such direct or indirect holder of any equity interests or securities of Ankura (collectively, the *"Party Affiliates"*) shall have any personal liability or obligation of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby, and the Company waives and releases all claims against such Party Affiliates related to any such liability.

(c) <u>Authority; Due Authorization; Enforceability</u>: The Company represents and warrants that the Board has duly approved the retention of Ankura and approved the terms of this Agreement, including the appointment and authorization of the ICOO. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such party and constitutes the legal, valid and binding agreement of each such party, enforceable in accordance with its terms.

9

FURIE-ANK_00000869
DA01207



Private and Confidential

(d) Independent Contractors: In connection with the Services, Ankura may, without consent from the Company utilize employees, agents or independent contractors or its own affiliates or its own agents or independent contractors. References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. The parties intend that an independent contractor relationship will be created by this Agreement. As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Ankura employees will not be entitled to receive from the Company any vacation, sick pay, leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. Ankura will be responsible for all withholding, income and other taxes incurred in connection with the operation and conduct of its business.

(e) Limitations of Engagement: The Company acknowledges that Ankura is being retained solely to assist the Company as described in this Agreement. The Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. The Company understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to the Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or otherwise, or any transaction contemplated thereby or incidental thereto. In rendering its Services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Ankura is not assuming any responsibility for any decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) Limitations on Actions. No action, regardless of form, relating to this engagement, the Services provided hereunder or this Agreement, may be brought by either party more than one (1) year after the cause of action has accrued, except than an action for nonpayment may be brought by a third party not later than one (1) year following the due date of the last payment owing to the party bringing such action.

(g) Counsel Representation: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel, there shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.

(h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties.

FURIE-ANK_00000870
DA01208



(i) <u>Headings</u>: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) <u>Survival</u>: Upon any termination of this Agreement, Section 2-4 and 6-11, 13-15, 17(b), 17(d), 17(e), 17(f), 17(g), 17(j), 17(l), 17(m) and <u>Schedule I</u> hereto shall survive such termination and shall remain in effect.  The obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) <u>Force Majeure</u>:  Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) <u>Non-Solicitation</u>:  During the Term of this engagement and for a period of one (1) year thereafter, the Company agrees that it will not directly or indirectly employ, solicit, engage, or retain the services of such personnel whom they had substantive contact within the course of this engagement without the payment to Ankura of two (2) times the total direct compensation paid to such personnel in the preceding twelve (12) months, provided however that this section shall not apply to Ankura personnel who do not have substantive contact within the course of this engagement and who respond to a general solicitation or advertisement not specifically directed to Ankura personnel.

(m) <u>Insurance</u>:  The Company shall maintain directors/managers, officers and corporate liability insurance policy (the "*Policy*"), with at least $[enter current coverages] million in coverage to cover the ICOO in addition to the existing officers and directors/managers serving in such positions.  The Company shall cause its insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the ICOO.  Upon any cancellation or nonrenewal of the Policy by the insurer, the Company shall exercise their rights to extend the claim period to a six-year "discovery period" and shall exercise such rights and pay the premium required thereunder.

[Signature pages follow.]

11

FURIE-ANK_00000871
DA01209



**Private and Confidential**

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call Scott M. Pinsonnault at (214) 771-6133.  We look forward to working with you on this important matter.

*Ankura Consulting Group, LLC*

By: _____

     Scott M. Pinsonnault
     Senior Managing Director

[Additional signature pages follow.]

12



**Private and Confidential**

Accepted and agreed to as of the Effective Date:

**Cornucopia Oil and Gas Company LLC**

By: _____
Name: David Elder
Title: Chief Financial Officer

**CORSAIR OIL & GAS LLC**
a Delaware limited liability company
By: _____
Name: David Elder
Title:  Chief Financial Officer

**FURIE OPERATING ALASKA, LLC,**
a Delaware limited liability company
By: _____
Name: David Elder
Title: Chief Financial Officer

[Signature page to Engagement Agreement]

13

FURIE-ANK_00000873
DA01211



**Private and Confidential**

## Schedule I

This <u>Schedule I</u> is a part of and incorporated into the letter agreement (the "*Agreement*"), dated as of March 20, 2018 between Ankura Consulting Group, LLC ("*Ankura*"), and Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (the "*Company*"), pursuant to which Ankura has been engaged to provide interim management and restructuring advisory services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, the Company, jointly and severally, agrees that it shall defend, indemnify and hold harmless Ankura and its affiliates and their respective directors/managers, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "*Indemnified Person*"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "*Liabilities*"), and will reimburse each Indemnified Person for all reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of counsel) (collectively, "*Expenses*") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "*Actions*"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; <u>provided</u> that the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review to have resulted from such Indemnified Person's negligenceor willful misconduct in connection with any of the actions, inactions or Services. The Company shall also reimburse such Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this <u>Schedule I</u>). Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

The Company shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura. The Company will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations. Notwithstanding the foregoing,

14

FURIE-ANK_00000874
DA01212



Private and Confidential

in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Company pursuant to the Agreement.

No Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its respective owners, parents, affiliates, security holders or creditors for, or in connection with advice or Services rendered or to be rendered by any Indemnified Person pursuant to the Agreement, or any Indemnified Person's actions or inactions in connection with any such advice, Services except for Liabilities (and related Expenses) of the Company that are finally determined by a judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's negligence or willful misconduct in connection with any such advice, actions, inactions or Services, provided however, that, in no event shall any Indemnified Person be liable to the Company in an aggregate amount in excess of the amount of fees actually received by Ankura pursuant to the Agreement.  In no event shall Ankura be liable to the Company for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct claim), or any consequential, special, indirect, direct, incidental, punitive or exemplary loss, damage or expense relating to this engagement, the Services or this Agreement, (in contract, tort or otherwise) or to the Company or its respective owners, parents, affiliates, security holders or creditors).

Prior to entering into any agreement or arrangement during the term of this engagement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura.

These indemnification, contribution and other provisions of this <u>Schedule I</u> shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.

15

FURIE-ANK_00000875
DA01213

**Exhibit B**

**Employment Agreement**

[Attached]

FURIE-ANK_00000876
DA01214

**Execution Version**
**March 14, 2018**

# EMPLOYMENT AGREEMENT
# DAVID W. ELDER

THIS EMPLOYMENT AGREEMENT (the "*Agreement*"), effective as of February 15, 2018, is entered into by and among CORNUCOPIA OIL & GAS COMPANY, LLC, a Delaware limited liability company ("*Cornucopia*"), its subsidiary, FURIE OPERATING ALASKA, LLC, a Delaware limited liability company (the "*FOA*") and CORSAIR OIL & GAS LLC, a Delaware limited liability company ("*Corsair*"), each having its principal executive office at 188 W. Northern Lights Blvd., Suite 620, Anchorage, AK 99503 and DAVID W. ELDER, residing at 238 Sunset Ridge, League City, Texas ( the "*Executive*"). Cornucopia, FOA and Corsair are hereinafter collectively called the "*Company*").

## WITNESSETH:

WHEREAS, incident to a previous three year term of employment with the Company, the Company hereby desires to retain and continue to employ the Executive to work for the Company and such of its other affiliates of Cornucopia and FOA as Company may request from time to time and the Executive is willing to be stay on and continue to be employed by the Company upon the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.    <u>EMPLOYMENT</u>.  The Company hereby employs the Executive to serve as Chief Financial Officer of each of Cornucopia, FOA and Corsair and the Executive hereby accepts such employment upon the terms and conditions hereinafter set forth. Provided; however, if the Sole Member nominates another individual to be the Chief Financial Officer, and such nominee is approved by the Board of Mangers, then the Executive will continue serve as the Chief Admisnistrative Officer of Cornucopia, FOA and Corsair with such responsibilities as are reasonably acceptable to the Executive. The Company and Executive understand and acknowledge that this Agreement is a contract for employment and as such the Executive is not to be considered an "at-will" employee of the Company under any state, local and/or federal law.

2.    <u>TERM</u>.  The term of employment of the Executive hereunder shall be for the period commencing as of the date hereof and for an initial three year term, unless sooner terminated in the manner hereinafter provided, ending at the close of business on February 14, 2021 (with each 12 month period from February 15 to February 14 during the term herein called a "*Contract Year*" and the period from the date hereof to February 14, 2021 called the "*Contract Term*"). The Contract Term may be renewed or extended upon written agreement of the Company and Executive.

3.    <u>DUTIES AND SERVICES</u>.

(a)    The Executive agrees to faithfully and diligently serve the Company in the capacity as Chief Financial Officer on a full time basis and shall be in charge of all day to day financial management of the Company under the direction of the Board of Managers of the

FURIE-ANK_00000877
DA01215

Company, and to perform from time to time such additional executive duties as the Board of Managers of the Company shall reasonably request; provided that such duties shall be consistent with the Executive's present position and status.  The Executive shall report directly to the Company's Board of Managers. The Executive agrees that, subject to the next sentence, during the period of employment he shall devote his full business time, energy and skill to such employment.  The Executive may serve on board of directors or as a manager of an LLC (with compensation related thereto) that is engaged in charitable causes if such service does do not interfere with Executive's ability to perform his executive duties under this Employment Agreement on a full time basis at the times and places as may be required by the Company.

(b)     The Company will provide the Executive with an office in Anchorage, Alaska or at such location as shall be designated by the Board of Managers of the Company, which location shall be reasonably acceptable to the Executive, which will be the same as or comparable to the office now used by the Executive, and will provide the Executive with executive secretarial services at such office.  When not working at the Company provided office in Alaska, the Executive will provide his services/perform his duties remotely.

(c)     Alaska Terms:  Executive shall travel to Alaska via business class airfare and will work at least ten days a month in Alaska unless (i) work schedule requires more or (ii) the Company and Executive mutually agree to some lesser amount of time in writing.  While in Alaska the Executive will be lodged in a hotel or corporate apartment mutually acceptable to the Executive and Company; said lodging to be paid for by the Company.  The Company shall provide and pay for Executive's transportation while in Alaska; this may be achieved through a rental car, car lease, and/or through taxi/Uber/Lyft ride sharing options and reasonable expenses for dining.

4.     <u>COMPENSATION</u>.

(a)     As compensation for the services to be rendered hereunder by the Executive, the Company agrees to pay the Executive, and the Executive agrees to accept, effective February 15, 2018 a salary at the rate of Two Hundred Fifty-Five Thousand Two Hundred Dollars ($255,200.00) per annum through the Contract Term  of this Agreement, which amount shall be subject to an annual cost of living increase as provided for in Section 4(b) hereof.  (Collectively, such annual compensation plus all cumulative cost of living increases shall be hereinafter referred to as "***Basic Annual Compensation***").  The Executive's Basic Annual Compensation shall be payable biweekly (in conjunction with the payment by the Company of its employees' biweekly payroll).

(b)     In the event the "Consumer Price Index — United States City Average — Urban Consumers," published by the Bureau of Labor Statistics of the United States Department of Labor (the "***CPI-U***"), shall indicate that as of December 31 of any year during the term of this Agreement, the CPI-U during the twelve months then ended shall have increased over the previous twelve months, then the Basic Annual Compensation, in respect of any Contract Year, commencing with the Contract Year beginning on February 15 2019,  shall be increased prospectively, effective on such day, by an amount equal to the lesser of (i) an amount equal to the Basic Annual Compensation multiplied by such percentage increase in the prior calendar year's CPI-U and (ii) five percent (5%) of the Executive's Basic Annual

2

FURIE-ANK_00000878
DA01216

Compensation paid during the immediately preceding Contract Year (herein called the "***5% Limitation***"). For example, subject to the 5% Limitation, if the Basic Annual Compensation in 2018, hypothetically, is $255,200 and the CPI-U increase for the year ended December 31, 2018 is two percent (2%), then the Basic Annual Compensation for the 2019 Contract Year commencing February 15, 2019, would be $260,304 ($255,200 x 2% = $5,104 + $255,200 = $260,304). In the event that there is a change in the basis of calculating the CPI-U, or if a change is made in the terms or number of items contained in the CPI-U, or if the CPI-U is discontinued, the Company and the Executive shall, in good faith, mutually agree upon a substitute index or formula, and such substitute index or formula shall henceforth have the same effect as if it had been originally designated herein. Notwithstanding any provisions to the contrary contained in this Agreement, in no event shall the Basic Annual Compensation in any calendar year be increased by more than the 5% Limitation unless otherwise specifically agreed by the Company.

5.    OTHER BENEFITS.

(a)    The Executive shall be entitled to participate on the same basis and subject to the same qualifications as other executives of the Company, in an employee benefits plan, including a 401K Plan with, if practicable, a Company-matching provision using a "safe harbor" provision (with respect to the required annual percentage test) contribution to be determined by the Company, a life, health, medical, hospitalization or surgical insurance plan or policy (with coverage for the Executive and his family), and any vacation or fringe benefit plans or programs, whether now existing or hereafter established.

(b)    The Executive shall be entitled to an annual minimum cash bonus ("***Annual Minimum Bonus***") with respect to each Contract Year in an amount equal to 25% of Basic Annual Compensation, subject to Executive's continued employment through the last day of such Contract Year (except as otherwise provided in Sections 5(j) and 7). The Annual Minimum Bonus shall be payable no later than March 15 of the calendar year following such Contract Year.

(c)    Provided the Bonus Criteria (as defined below) are met, the Company, in its absolute discretion, may pay Executive an additional Bonus (the "***Discretionary Bonus***") with respect to each Contract Year in an amount not exceeding one hundred percent (100%) of the Executive's Basic Annual Compensation for the immediately preceding Contract Year, subject to Executive's continued employment through the last day of the Contract Year. Any Discretionary Bonus shall be payable no later than March 15 of the calendar year following such Contract Year. Any Discretionary Bonus shall be based on the performance and criteria set forth below (the "***Bonus Criteria***").

(i)    The performance based portion of the Bonus Criteria shall be based on (A) the Company's EBITDA performance for the 12-month period ending on the previous December 31 compared against the Company's annual budget for such period, (B) the Company's performance in meeting its obligations on a timely basis under any credit facilities with lenders or investors, (C) the Company's applications for and receipt of incentive tax credits from the State of Alaska and

3

FURIE-ANK_00000879
DA01217

(D) results in obtaining and executing financing as approved by the Company's Board of Managers.

(ii)     In addition, the Bonus Criteria shall include such other discretionary criteria established by the Company's Board of Managers pursuant to the provisions of Exhibit A attached hereto.

(d)     Subject to Section 8, Executive shall be entitled to a cash retention bonus ("***Retention Bonus***") in an amount equivalent to the Executive's Basic Annual Compensation for the immediately preceding Contract Year payable upon the earliest of one of the following events: (i) immediately upon the conclusion of the Contract Term, (ii) a Trigger Event, (iii) upon Executive's death or disability or (iv) upon termination of Executive's employment by the Company without an Act of Cause (as defined in Section 6 below), in each case subject to the Executive's continued employment with the Company through such event; said Retention Bonus is in addition to, separate and apart from any other compensation due to Executive, including but not limited to the Annual Minimum Bonus and the Discretionary Bonus described above in 5(b)-(c).  The Retention Bonus shall be paid on a date determined by the Company that is within thirty (30) days following the occurrence of the applicable event set forth in clause (i), (ii), (iii) and (iv).

(e)     Subject to Section 8, in the event of a public sale by the Company or its ultimate parent entity of any equity securities and the Company or such ultimate parent entity becomes listed on any recognized state or securities exchange, subject to the Executive's continued employment with the Company through such event, the Executive shall be entitled to receive all amounts due to Executive under the provisions in Section 7 below.

(f)     Nothing contained herein shall be deemed to be a waiver by the Executive of, or to diminish or modify, any vested rights which the Executive may have or may hereafter acquire under any employee benefit plan of the Company.

(g)     It is contemplated that, in connection with his employment hereunder, the Executive may be required to incur reasonable business, dining, entertainment and travel expenses.  The Company agrees to reimburse the Executive in full for all reasonable and necessary business, entertainment and other related expenses, including travel expenses, incurred or expended by him incident to the performance of his duties hereunder, and incurred or expended in accordance with the Company's policies with respect to such expenses, upon submission by the Executive to the Company of such vouchers or expense statements satisfactorily evidencing such expenses as may be reasonably required by the Company.

(h)     It is understood and agreed by the parties hereto that during the term of the Executive's employment hereunder he shall be entitled to annual vacations (taken consecutively or in segments), the length of which shall be consistent with the effective discharge of the Executive's duties and the general customs, practices and policies of the Company applicable to employees of the Executive's status; provided, however, that it is agreed that the Executive shall be entitled to twenty business days (20) of vacation each year, to be taken annually on a non-cumulative basis with any unused portion to be carried over per the Company's vacation policy.

4

FURIE-ANK_00000880
DA01218

(i)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, in addition to all other compensation and benefits to which the Executive may be entitled under the terms of this Agreement, to the extent permitted by applicable law, the Company shall pay one of the following: (1) costs of Executive's health benefits under COBRA for a period of eighteen (18) months, as same may be extended by law, from the date of termination of such employment or until any earlier date Executive on which ceases to be covered by the Company's COBRA coverage under his COBRA election after such termination, or (2)  in the event that COBRA does not apply to Executive then the Company shall pay Executive's monthly premiums for himself and all current dependents under an insurance plan that provides equivalent coverage to that of the Company for a period of 18 months.

(j)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, the Company agrees to pay Executive the greater of (i) Executive's Basic Annual Compensation for the remainder of the balance of the Contract Term and (ii) twelve (12) months of the Executive's then current per annum salary plus Retention Bonus plus any Annual Minimum Bonus due, in each case payable in a lump sum on a date determined by the Company that is within thirty (30) days following the date of termination.  In addition to the foregoing payment, the Executive shall be entitled to any unpaid bi-weekly compensation due to the Executive as of the date of such termination, plus reasonable documented attorneys' fees of the Executive (up to a maximum amount of $50,000 and subject to applicable withholding) to the extent the Executive is required to take any legal action against the Company to recover any benefits or other compensation due to him from the Company as a result of the Company's termination of the Executive without an Act of Cause, in each case payable on a date determined by the Company that is within thirty (30) days following the date of termination.

6.      TERMINATION OF EXECUTIVE'S EMPLOYMENT FOR CAUSE.   The Company shall have the right to terminate the employment of the Executive under this Agreement, as well as any and all compensation to which the Executive would otherwise be entitled hereunder (except for compensation to which the Executive is entitled through the date of such termination and any benefits referred to in Section 5 hereof in which the Executive has a vested right under the terms and conditions pursuant to which such benefits were granted), if, and only if, the Executive shall have committed any material act of proven dishonesty or fraud against the Company or a felony or in the event of gross negligence or willful misconduct of the Executive (such act or acts or event being hereinafter referred to as an "*Act of Cause*").  In the event the Board of Managers of the Company elects to terminate the employment of the Executive under this Agreement for an Act of Cause as set forth above, the Company shall send written notice to such effect to the Executive, and the Executive's employment under this Agreement, and this Agreement, shall thereupon terminate as of a date to be specified in such notice, which date shall be not less than 10 days after the sending of such notice.

7.      PAYMENTS UPON EXPIRATION, SALE OF ASSETS, SECURITIES OR CHANGE OF CONTROL.

(a)      Subject to Section 8, upon the earliest to occur of any of the events listed in (b) below during the Contract Term (each, a "*Trigger Event*"), subject to the Executive's

FURIE-ANK_00000881
DA01219

continued employment with the Company through the applicable Trigger Event, the Executive shall receive a cash payment in an amount that is equal to the following:

> an amount (the "***Trigger Event Amount***") equal to the total of (A) an amount obtained by multiplying by two (2)) the Executive's Basic Annual Compensation payable for the Contract Year in which the Trigger Event occurs, ***plus*** (B) the maximum Bonus to which the Executive would be entitled for the 12-month period ending on the next December 1 after the date of the Trigger Event, ***plus*** (C) 1.0% of the amount by which the Sales Price (as hereinafter defined) exceeds the tangible net worth of the Company (computed in accordance with U.S generally accepted accounting principles consistently applied with all prior periods) as of the date hereof, ***plus*** (D) Retention Bonus, ***plus*** (E) Annual Minimum Bonus.

The Trigger Event Amount shall be paid on a date determined by the Company that is within thirty (30) days following the applicable Trigger Event; provided that, in lieu of a cash payment on the occurrence of a Trigger Event, the Executive may, to the greatest permitted by, and in compliance with, applicable law, elect to receive stock, warrants, options or other agreed equity interests, of equivalent value to the cash payments provided above, in any public offering of the Company's stock or shares or other company or entity to whom the Company's or any of its parent entities' assets or membership interests are sold pursuant to any Trigger Event. The amount and terms of any such equity interests will be as agreed between the Company and the Executive at such time.

(b)     Trigger Events shall be:

(i)     the public sale by the Company, its immediate member entity, or its ultimate parent entity, of any equity securities, or any securities convertible into or exchangeable into equity securities of any such entity;

(ii)     Kay Rieck and his affiliates sells his or their interests in the Company to any non-affiliated entity so that he or they own, directly or indirectly, less than fifty percent (50%) of the membership interests of the Company, its immediate member entity or its ultimate parent entity (on a fully diluted basis);

(iii)     the sale, transfer or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of more than fifty percent (50%) of the book value or fair market value of the consolidated assets of the Company, its immediate member entity or its ultimate parent entity, excluding any sale, transfer or distribution to an affiliated entity;

(iv)     the sale, transfer, or other disposition (including a farm in or farm out arrangement) of more than a fifteen percent (15%) interest in the oil and gas and other mineral leasehold interests owned by Cornucopia in the Kitchen Lights Unit in the Cook Inlet, or elsewhere in Alaska, with or without a change of operator or manager of the leases so sold, transferred or disposed of or farmed out, excluding any sale, transfer or distribution to an affiliated entity;

6

FURIE-ANK_00000882
DA01220

(v)      the merger, consolidation or other business combination with any entity other than an affiliated entity of the Company, its immediate member entity, its ultimate parent entity or any of their respective affiliates, or the liquidation or dissolution of the Company, its immediate member entity or its ultimate parent entity; or

(vi)      the refinancing in full with the proceeds of equity or other indebtedness of the Company of the Company's obligations under that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as amended, amended and restated, supplemented or modified from time to time, the "**Credit Agreement**"), among Cornucopia, FOA, Energy Capital Partners Mezzanine Opportunities Fund A, LP, in its capacity as administrative agent (the "**Administrative Agent**") and collateral agent thereunder (the "**Collateral Agent**") and the lenders party thereto from time to time (the "**Lenders**") and the other Credit Documents (as defined in the Credit Agreement).

(c)      For the purposes of this Section 7, "**Sales Price**" shall mean:

(i)      upon the occurrence of the Trigger Event set forth in clause (b)(i) or (b)(iii) above, the fair market value (as hereinafter defined) of the Company as of the effective date of such event;

(ii)      upon the occurrence of the Trigger Event set forth in clause (b)(ii) above, (A) if the entity the securities of which are sold is the Company, the price at which such securities are offered to the public multiplied by the aggregate number of common shares outstanding, fully diluted, upon the completion of such public offering less all Additional Equity (as hereinafter defined), or (B) if the entity the equity securities of which are sold is an entity other than the Company, the fair market value of the Company as of the date of such sale;

(iii)      upon the occurrence of a Trigger Event set forth in clause (b)(iv) or (b)(vi) above (other than a liquidation or dissolution of the Company), the total consideration received by the selling members in such transaction divided by the percentage of total membership interests or common shares (if applicable), fully diluted, of the Company sold at the time of such transaction less all Additional Equity;

(iv)      upon the occurrence of a Trigger Event set forth in clause (b)(v) above, the total consideration or other compensation, in cash or kind, received by the Company or any member or affiliate of the Company for the interest sold; and

(v)      in the event of a liquidation or dissolution of the Company, the total amount distributable to the Company's members pursuant to such liquidation or dissolution after taking into account (A) a pro rata deduction in the amount distributable equally to all Additional Equity and (B) an addition thereto equal to the aggregate of all dividends and management, investment banking and any other fees paid to the parent or affiliates of the Company.

7

FURIE-ANK_00000883
DA01221

(vi)    If the Company or its immediate or ultimate parent entity is a publicly traded entity, "fair market value" shall mean the amount equal to the aggregate number of the shares of the owner outstanding on a fully diluted basis multiplied by the average market price of such entity's common stock for the ten (10) business days (based upon closing share prices) prior to the effective date of such event less all Additional Equity. If such entity is not a publicly traded company, "fair market value" shall mean the greater of the net worth or the appraised value of such entity, less all Additional Equity, as provided by a mutually agreed upon investment banking firm in a written opinion letter prepared at the expense of such entity that is based upon what the fully diluted common stock market value of such entity would be if it were a publicly traded entity after taking into account relevant factors such as prior history, earnings potential and industry multiples of earnings, cash flow and asset values. "Additional Equity" shall mean all fully diluted shares that are outstanding as a result of capital provided through sources other than the Initial Investment (as hereinafter defined). "Initial Investment" shall mean the dollar amount initially invested in the Company or its immediate or ultimate parent entity less organization and other expenses capitalized on the balance sheet as of the date hereof as an asset, excluding any covenant not to compete, if capitalized.

8.    <u>LENDER EVENTS</u>.  Notwithstanding anything in this Agreement to the contrary, no bonus or severance payments shall be payable to the Executive under Sections 5(d), 5(e), 5(i), 5(j) or 7 of this Agreement in connection with or following (i) any acquisition (by way of a sale, transfer, exchange or other disposition), directly or indirectly, by one or more of the Lenders, the Administrative Agent, the Collateral Agent or any affiliate thereof, or any other funds managed or advised by Energy Capital Partners (each, an "***ECP Party***"), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of securities of FOA, Cornucopia and/or Corsair or (ii) the sale, transfer, exchange or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of any or all of the assets of FOA, Cornucopia and/or Corsair, any of their respective immediate member entities or any of their respective ultimate parent entities, in the aggregate, directly or indirectly, to one or more ECP Parties,  in each case including, without limitation, pursuant to (A) the exercise of any rights and remedies available to the Lenders or any other Secured Party (as defined in the Credit Agreement) under any of the Credit Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral (as defined in the Credit Agreement) pursuant to the Security Documents (as defined in the Credit Agreement), or (B) any consensual transaction or out-of court settlement (any such acquisition described in clause (i) or (ii), an "ECP Acquisition"); provided that if, following any such ECP Acquisition, all the securities or assets acquired by the ECP Parties are transferred to a third party not affiliated with any of the ECP Parties, then the Company shall pay to the Executive, subject to Executive's continued employment with the Company through the date of such transfer, a bonus equal to the sum of (x) the Executive's Basic Annual Compensation for the immediately preceding Contract Year and (y) the Annual Minimum Bonus, in each case on a date determined by the Company that is within thirty (30) days following such subsequent transfer.

9.    <u>NON-COMPETITION</u>.  If the Company shall discharge the Executive for an Act of Cause pursuant to Section 6 hereof, then for a period of one year commencing on the date of

8

FURIE-ANK_00000884
DA01222

such discharge the Executive shall not, directly or indirectly, accept employment, provide consulting services to, or otherwise assist any company or individual or group that (i) competes in the markets in the geographical areas in which the Company performs oil and gas exploration and production operations at the time of discharge, directly or indirectly, or (ii) engages in any line or lines of business of the Company at the time of discharge.

10. DEATH OR DISABILITY. The obligations of the Company hereunder shall terminate forthwith in the event of the death of the Executive during the term hereof or in the event that the Executive shall fail to perform his services hereunder because of medically determinable physical or mental incapacity or disability either for (i) a continuous period of more than 180 days or (ii) a period aggregating 180 days or more during any 12 successive months. In any such event, the Executive or his legal representative, as the case may be, shall, to the fullest extent permitted by applicable law, continue to receive the compensation to which the Executive would have been entitled pursuant to Section 4 hereof (and the Company will also be responsible for the provisions of Section 5(a) hereof to the extent permitted by applicable law) had his employment continued through the end of the month in which death or termination occurs and for the following two (2) months *plus* Retention Bonus per Section 5(d) hereof. The Executive or his legal representative shall also receive any benefits and bonus referred to in Section 5 hereof in which the Executive has a vested right or if such bonus criteria had been met, as the case may be, and all unvested stock options or restricted stock units to which the Executive is entitled at the time of his death shall immediately vest upon such death, as of the date of death or termination, under the terms and conditions of the plan or program pursuant to which such benefits were granted. Any such benefits or bonus to which the Executive was thus so entitled or which vested as of the date of the Executive's death or disability shall be paid to the Executive's legal representative on a date determined by the Company that is within thirty (30) days after such date of death or disability.

11. CONFIDENTIALITY.

(a) Recognizing that his employment hereunder will involve access to proprietary and confidential knowledge and information pertaining to the business of the Company and its business methods, systems, plans and policies, the Executive agrees that, during and after the term of this agreement and his employment, he shall not (otherwise than pursuant to his duties hereunder (including any such disclosure pursuant to his duties hereunder to agents, advisors and lenders of the Company) or as required by law) disclose to an unauthorized third party any proprietary or confidential information pertaining to the Company or its operations or customers. In the event of any termination of employment, the Executive shall return all Company property of whatever nature in his possession or control to the Company. Notwithstanding the foregoing, nothing herein shall prevent the Executive from reporting possible violations of federal law or regulation to, otherwise communicating with or participating in any investigation or proceeding that may be conducted by, or providing documents and other information, without notice to the Company, to, any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, including in accordance with the provisions of and rules promulgated under Section 21F of the Exchange Act or Section 806 of the Sarbanes-Oxley Act of 2002, as each may have been amended from time to time, or any other whistleblower protection provisions of state or federal law or regulation.

9

FURIE-ANK_00000885
DA01223

(b)     The provisions of this Section 11 shall survive the expiration or termination of this Agreement, without regard to the reason therefor.

12.     NO SET-OFF; DEDUCTIONS AND WITHHOLDING.

(a)     The Executive's rights hereunder, including any payments to which the Executive is entitled hereunder, shall not be subject to diminution or to any right of setoff, recoupment or counterclaim by reason of any other agreement, relationship or course of dealing between the Executive, on the one hand, and the Company or any officer, director, employee, agent or affiliate thereof, or any assignee or successor of the foregoing, on the other hand, and the obligations of the Company hereunder shall be completely performed by the Company, or any aforementioned assignee or successor, without regard to any such other agreement, relationship or cause of dealing.   The aforementioned terms "assignee or successor," for purposes of this Agreement are to include any and all "successors and assigns" described in Section 13 hereof.

(b)     The Executive agrees that the Company shall have the right to withhold from any and all payments required to be made to the Executive pursuant to this Agreement all Federal, state, local and/or other taxes which the Company determines are required to be withheld in accordance with applicable statutes, regulations or orders as from time to time in effect and any payments due to the Company in respect of advances or loans made by the Company to the Executive.

13.     ASSIGNABILITY AND BINDING EFFECT.   The rights and obligations arising under this Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors, and legal representatives of the Executive, and shall inure to the benefit of and be binding upon the Company and its respective assigns and successors, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise, but (i) without the prior written consent of the Company, neither this Agreement nor the rights or obligations of the Executive hereunder may be assigned, pledged, hypothecated or otherwise transferred by the Executive to another person, firm or corporation, nor may the obligations of the Executive hereunder be delegated, and (ii) without the prior written consent of the Executive, the Company shall not assign this Agreement or its rights hereunder to a third party other than a successor to the business of the Company, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise.

14.     NOTICES.   All notices, requests, demands and other communications ("***Notices***") hereunder shall be in writing and shall be delivered personally or sent by certified mail, first class postage prepaid and return receipt requested, to the other party hereto at his or its mailing address as set forth at the beginning of this Agreement.   Notices shall be deemed to have been given at the time when given, if personally delivered, or at the date postmarked, if mailed.   Any party may change the address to which such communications hereunder shall be sent by sending notice of such change to the other party as herein provided.

15.     SEVERABILITY.   If any provision of this Agreement or any part hereof is invalid, unlawful or incapable of being enforced by reason of public policy or any rule of law or principle of equity, all conditions and provisions of the Agreement which can be given effect

10

FURIE-ANK_00000886
DA01224