without such invalid, unlawful or unenforceable provision shall, nevertheless, remain in full force and effect.

16.    PRIOR AGREEMENTS; COMPLETE UNDERSTANDING; AMENDMENT. This Agreement supersedes and replaces any and all prior agreements and understandings between the parties hereto respecting the employment of the Executive by the Company and constitutes the complete understanding between the parties with respect to the employment of the Executive hereunder, and no statement, representation, warranty or covenant has been made by any party with respect thereto except as expressly set forth herein.  This Agreement shall not be altered, modified, amended or terminated except by written instrument signed by each of the parties hereto.

17.    HEADINGS.  The headings set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect nor shall they in any way affect the substance of any provisions contained in this Agreement.

18.    DISPUTE RESOLUTION; FEES AND EXPENSES.

(a)    If a dispute arises between the Executive and the Company out of or in connection with this Agreement the parties may elect to resolve the dispute via mediation in Houston, Texas.  If, within thirty (30) days after the dispute arises, the mediation is unsuccessful, or if the parties elect to initially forgo mediation, any dispute between the Executive and the Company arising out of or in connection with this Agreement shall be submitted to trial by court or to a trial by a jury in Houston, Texas. Except as set forth in the following Section 18(b), each party shall pay his own fees and expenses in connection with any such mediation or trial proceeding.

(b)    In the event the Company shall discharge the Executive during the term of this Agreement and in a mediation and/or trial proceeding instituted pursuant thereto it shall be determined that said discharge was without an Act of Cause as defined herein, then the Company shall reimburse the Executive for all fees and expenses (including reasonable attorney's fees) incurred by him and arising out of, or in connection with, such controversy.

19.    GOVERNING LAW.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

20.    CODE SECTION 409A COMPLIANCE.  The parties intend for payments and benefits provided pursuant to this Agreement be exempt from (as short-term deferral or involuntary separation pay), or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively "***Code Section 409A***").  To the maximum extent possible, this Agreement shall be interpreted and administered consistent with such intent, including without limitation by modifying any provision hereof.  To the extent any provision hereof is modified for the purpose of complying with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company of the applicable provision without violating the provisions of Code Section 409A.  All taxable reimbursements and in-kind benefits provided under this Agreement

FURIE-ANK_00000887
DA01225

shall be made or provided in accordance with Code Section 409A including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses available for reimbursement, or the in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit. In no event shall the Company be liable for any tax, interest or penalty that may be imposed on Executive pursuant to Code Section 409A or any similar or related provision of U.S. tax law, or damages for failing to comply with Code Section 409A or similar or related provision of U.S. tax law. For purposes of Code Section 409A, Executive's right to receive any instalment payments owing pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

21.    INDEMNIFICATION.

(a)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY HEREBY AGREES TO RELEASE, PROTECT, DEFEND AND INDEMNIFY AND HOLD FREE AND HARMLESS THE EXECUTIVE FROM, FOR AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, EXPENSES, LIABILITY, JUDGMENTS, AWARDS OR LOSSES WHATSOEVER (HEREINAFTER REFERRED TO AS "CLAIMS") BROUGHT OR SUFFERED BY ANY PERSONS RELATING TO OR ARISING FROM ANY ACTIVITY OR SERVICES BY EXECUTIVE UNDER THIS AGREEMENT, OR ANY BREACH OF THIS AGREEMENT BY THE COMPANY, TO THE EXTENT ANY SUCH CLAIMS IN ANY WAY ARISE OUT OF, RESULT FROM, OR ARE IN ANY WAY CONNECTED WITH THE EXECUTIVE'S SERVICES, OR THE COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT WITH ANY OTHER PERSON, ENTITY OR THIRD PARTY, OR THE COMPANY'S FAILURE TO COMPLY WITH ANY LAW OR REGULATION, EXCEPT TO THE EXTENT ANY SUCH CLAIMS ARE CAUSED BY OR ARISE OUT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, BREACH OF THIS AGREEMENT OR FAILURE TO COMPLY WITH ANY LAW OR REGULATION BY THE EXECUTIVE.

(b)    The Company agrees that the Company shall maintain throughout the term of this Agreement, directors and officer's insurance, which shall extend to and cover Executive for all risks covered by such insurance.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

FURIE-ANK_00000888
DA01226

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By:

Name: JEFFREY BRODSKY

Title: MANAGER

**FURIE OPERATING ALASKA, LLC**

By:

Name: JEFFREY BRODSKY

Title: MANAGER

**CORSAIR OIL & GAS LLC**

By:

Name: JEFFREY BRODSKY

Title: MANAGER

By:

DAVID W. ELDER

13

EXHIBIT A

Additional Bonus Criteria, if any:

Individual goals and targets will be used to measure additional bonus criteria and will be set annually with the Company's Board of Managers and agreed to by the Executive within thirty (30) days after the execution of this Agreement for the 2018 Contract Year and thereafter annually by December 1 for the subsequent Contract Years.

FURIE-ANK_00000890
DA01228

# EXHIBIT 57

DA01229

WRITTEN CONSENT IN LIEU OF
MEETING OF THE BOARD OF MANAGERS OF
CORSAIR OIL & GAS LLC

---

The undersigned, being the majority of the members of the board of managers (the "Board") of Corsair Oil & Gas LLC, a Delaware limited liability company (the "Company"), pursuant to, and in compliance with, Section 18-404 of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. and Section 7 of the Second Amended and Restated Limited Liability Company Agreement of the Company (the "LLC Agreement"), do hereby consent in writing that the following resolutions are adopted and are effective for all purposes as of March 25, 2018:

**Approval of Engagement of Scott M. Pinsonnault et al.**

WHEREAS, the Board deems it advisable and in the best interest of the Company to engage (the "Engagement") (i) Ankura Consulting Group, LLC ("Ankura") (to provide interim management and advisor services) and (ii) Scott M. Pinsonnault to act as Interim Chief Operating Officer (the "Interim Chief Operating Officer"), pursuant to an agreement to be entered into between the Company, Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company, Furie Operating Alaska, LLC, a Delaware limited liability company and Ankura, in substantially the form attached hereto as Exhibit A (the "Engagement Letter"), and deems it advisable and in the best interests of the Company for the Company to enter into and perform under and pursue the transactions contemplated by the Engagement Letter and to authorize, adopt and approve the Engagement Letter and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby;

NOW, THEREFORE, BE IT RESOLVED, that the Engagement and the Engagement Letter be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that David W. Elder (the "Authorized Officer"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company the Engagement Letter and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company, as he may deem necessary or desirable in connection therewith.

**Approval of the Employment Agreement**

WHEREAS, the Board has reviewed that certain Employment Agreement of David W. Elder, to be entered into by and among David W. Elder, the Company, Cornucopia Oil & Gas

FURIE-ANK_00000891
DA01230

Company, LLC, a Delaware limited liability company and Furie Operating Alaska, LLC, a Delaware limited liability company, substantially in the form attached hereto as Exhibit A (the "Employment Agreement") and deems it advisable and in the best interests of the Company for the Company to enter into and perform under and pursue the transactions contemplated by the Employment Agreement and to authorize, adopt and approve the Employment Agreement and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith, including or otherwise ancillary to or reasonably necessary in connection with the transactions contemplated thereby.

NOW, THEREFORE, BE IT RESOLVED, that the Employment Agreement be, and hereby is, adopted, approved and confirmed in all respects; and

RESOLVED FURTHER, that each member of the Board (each an "Authorized Person"), shall be, and hereby is, individually authorized and empowered to take, or cause to be taken, any and all actions which he may deem necessary, appropriate, advisable or desirable to execute and deliver in the name and on behalf of the Company the Employment Agreement and carry out the purpose and intent of the foregoing resolutions, and to make, execute, file and deliver, or cause to be made, executed, filed and delivered, all agreements, undertakings, resolutions, documents, instruments or certificates in the name and on behalf of the Company, as he may deem necessary or desirable in connection therewith.

## General Authorization and Ratification

NOW, THEREFORE, BE IT RESOLVED, that, consistent with the foregoing resolutions, each Authorized Person and any officer or employee or agent of the Company under the supervision or management and direction of the Authorized Person, in each case, on behalf of the Company, be, and each of them acting alone hereby is, authorized and empowered in the name and on behalf of the Company to carry out fully the intent and purposes of the foregoing resolutions and each of the actions or transactions contemplated thereby, and to, in connection therewith, (a) prepare, execute and deliver or cause to be prepared, executed and delivered, and where necessary, advisable, desirable or appropriate, file or cause to be filed with the appropriate governmental authorities, all other agreements, instruments and documents, including, but not limited to, all certificates, contracts, bonds, receipts or other papers, (b) incur and pay or cause to be incurred or paid all fees, expenses and taxes, including, without limitation, legal fees and expenses, (c) engage such persons as he or she shall in his or her judgment determine to be necessary, advisable, desirable or appropriate, and (d) do any and all other acts and things, as he or she deems necessary, advisable, desirable or appropriate (with the doing of any such act or thing being conclusive evidence that the same is deemed necessary, advisable, desirable or appropriate); and that any and all actions heretofore taken in the name and on behalf of the Company, in connection with the foregoing resolutions and each of the actions or transactions contemplated thereby, are hereby, in all respects, authorized, confirmed, ratified and approved as the actions of the Company.

*[Signature Pages Follow]*

FURIE-ANK_00000892
DA01231

**IN WITNESS WHEREOF**, the undersigned has executed this written consent as of the date first written above.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____

Date:      25 March 2018

**Jeffrey Brodsky**, in his capacity as the Independent Manager

By: _____

Date: 3-25-18

**Kay Rieck**, in his capacity as the Member Manager

By: _____

Date:      03/25/18

**Exhibit A**

**Ankura Engagement Letter**

[Attached]

FURIE-ANK_00000894
DA01233



**Private and Confidential**

March 23, 2018

Furie Operating Alaska, LLC
188 W. Northern Lights Blvd.,
Suite 620
Anchorage, AK 99503

Dear Members of the Board of Managers:

This letter agreement (this "*Agreement*"), entered into as of March 23, 2018 (the "*Effective Date*"), confirms the terms of the agreement among Ankura Consulting Group, LLC ("*Ankura*") and Corsair Oil & Gas LLC, a Delaware limited liability company, Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (collectively, with each of their subsidiaries and affiliates, the "*Company")* pursuant to which Ankura has been engaged to act as the advisor to Company to provide interim management and advisory services as set forth below.

We have been retained by the Company and its Board of Managers ("*Board*") and will report to the Board.

1.  Scope of Engagement: On the terms and subject to the conditions of this Agreement, Ankura will provide to the Company the following interim management and restructuring advisory services (the "*Services*"), as requested by the Company and agreed to by Ankura:

    (a)  Provide Scott M. Pinsonnault to serve as the Interim Chief Operating Officer of the Company ("*ICOO*") with the responsibilities that are traditional and customary (for the avoidance of doubt, the Company does not currently have a CEO);

    i)  Overseeing day-to-day business operations;

    ii)  Evaluating, implementing and managing cost reduction measures and operational improvement measures necessary to preserve and maximize the value and efficiency of the Company;

    iii)  Assisting in developing and evaluating the Company's business plan and the preparation of a revised operating plan and cash flow forecasts;

    iv)  Approving new expenditures, commitments or cash payments;

    v)  Addressing liquidity concerns and developing 13-week cash forecast;

    vi)  Managing the financial and operational reporting processes;

    vii)  Making decisions with respect to the Company's operations and its personnel (all employees and officers of the company shall report directly to the interim COO);

    viii)  Making decisions with respect to all professionals engaged by, strategies developed, and activities taken by the Company;

    ix)  Monitoring operational aspects of the company, including status of production, regulatory and environmental compliance, and an understanding of insurance programs and premiums;

    x)  Overseeing all reporting and communications under the Company's material contracts, including, without limitation, credit agreement and customer offtake agreements;

1

FURIE-ANK_00000895
DA01234



xi)     Helping to prepare status updates, management presentations, and other deliverables for internal and external distribution;

xii)    Making business and financial decisions with respect to any financing sought or put in place and any other restructuring-related decisions;

xiii)   Act as primary point of contact for PRA under the PRA Management Agreement and direct the activities of PRA on behalf of the Company;

xiv)    Other services and activities as mutually agreed by the Board and the interim COO; and

xv)     Making decisions with respect product marketing, derivatives and risk management.

(b) Ankura will provide additional interim management services and personnel at the discretion of the Board and at the reasonable discretion of the ICOO (the "*Engagement Personnel*");

In the event there is a disagreement as to any direction, guidance or instruction to be given to Ankura in connection with the foregoing Services, Ankura shall take such direction, guidance or instruction from the Independent Manager of the Company.

It is our intention to work closely with you and management throughout the course of our engagement.  Regular discussions with you regarding our progress should provide you with an opportunity to confirm or request that we modify the scope of our engagement to best serve your needs. The Services and compensation arrangements set forth herein do not encompass other advisory services not set forth in this Section 1.  If the Company and Ankura later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

Notwithstanding anything to the contrary in this Agreement, the Company and the Board agree that the ICOO shall be authorized, in such capacity, to made decisions with respect to all aspects of the management and operations of the Company's business, including, without limitation, organization, human resources, marketing, sales, operations, supply chain, finance, administration and other such areas as the ICOO may identify, in such manner, as the ICOO deems appropriate, subject only to appropriate governance by the Board in accordance with the Company's by-laws and applicable laws.

2.   Company Information and Reports:

In order to fulfill the Services under this Agreement, it will be necessary for Ankura personnel to have unfettered access to the Company's facilities and certain books, records and reports of the Company.  In addition, Ankura will need to have discussions with the Company's management and certain other personnel.  Ankura will perform the Services in a manner that will permit the business operations of the Company to proceed in an orderly fashion, subject to the requirements of this engagement. We understand that the Company has agreed it will furnish Ankura with such information as Ankura believes appropriate to its assignment (all such information so furnished being the *"Information"*). The Company recognizes and confirms that Ankura (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company.  The Company shall advise Ankura promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance upon which Ankura formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading.  To the best of the Company's knowledge, the Information to be furnished by or on behalf of

2

FURIE-ANK_00000896
DA01235



the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Ankura will submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the objectives of our engagement. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will have no obligation to, and will not, update our reports or extend our activities beyond the scope set forth herein unless you request, and we agree to do so.

3.   Fees and Expenses: For Ankura's Services hereunder, the Company agrees to pay to Ankura the following non-refundable fees (the ICOO Fee and the Advisory Fee, collectively the "*Fee*")

    (a)   ICOO Fee: a monthly fee for the ICOO in the amount of $60,000 (the "*ICOO Fee*") to be invoiced to the Company by Ankura pursuant to the procedures set forth in paragraph 5(b) below;

    (b)   Advisory Fees: our fees for the Services set forth above for the Engagement Personnel (the "*Advisory Fees*") will be based on the actual hours expended at our standard hourly rates that are in effect when the Services are rendered. Our rates generally are revised annually. Our current hourly rates are as follows:

| Professional | Rates per hour |
|---|---|
| Senior Managing Directors | $850-950 |
| Other professionals | $350-800 |
| Paraprofessionals | $150-250 |

Ankura will provide a 10% discount on its hourly rate per employee when the employee bills greater than 20-30 hours in a particular calendar week, and a 20% discount on its hourly rate per employee when the employee bills greater than 30-40 hours in a particular calendar week and 30% discount on its hourly rate per employee when the employee bills greater than 40 hours in a particular calendar week. The discounts will be reflected in detail on the monthly invoice.

    (c)   Success Fee: Within 45 calendar days of the Effective Date the Parties shall agree to an amendment of this agreement to account for a mutually acceptable and reasonable Success Fee

3



(the, "*Success Fee*") based on, among other items and factors, the success of the Company over the anticipated term of the engagement. The fee shall be reasonable and customary for such engaging Parties on and assignment of this nature.

(d) <u>Expenses Reimbursement</u>: Ankura shall be entitled to reimbursement of reasonable and documented out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including for Ankura's reasonable and documented out-of-pocket fees and expenses for outside legal counsel and other third party advisors) incurred in connection with this Agreement, including the negotiation and performance of this Agreement and the matters contemplated hereby) (collectively, "*Expenses*").

(e) <u>Reasonableness of Fees</u>: The Company acknowledges that it believes that Ankura's general interim management and restructuring experience and expertise will inure to the benefit of the parties hereto, that the value to the parties hereto of Ankura's Services derives in substantial part from that experience and expertise and that, accordingly, the structure and amount of the Fees to be paid to Ankura hereunder are reasonable. The Company acknowledges that a substantial professional commitment of time and effort will be required of Ankura and its professionals hereunder, and that such commitment may foreclose other opportunities for Ankura. Given the numerous issues which may arise in engagements such as this, Ankura's commitment to the variable level of time and effort necessary to address such issues, the expertise and capabilities of Ankura that will be required in this engagement, and the market rate for Ankura's services of this nature, whether in-court or out-of-court, the parties agree that the fee arrangement provided for herein is reasonable, fairly compensates Ankura, and provides the requisite certainty to the parties hereto.

(f) <u>Testimony; Subpoena Requests</u>. The Company agrees that if any of the principals or professionals of Ankura are required to testify, (other than testimony provided by the ICOO), at the request of the Company, on the Company's behalf or by legal, regulatory, administrative, arbitration or judicial order, at any proceeding related to the Services or this Agreement, Ankura will be compensated by the Company for our associated time charges at our regular hourly rates, in effect at the time and reimbursed for our reasonable and documented out-of-pocket expenses, including counsel fees. In addition, Ankura will be compensated for any time and expense (including, without limitation, reasonable and documented legal fees and expenses) that Ankura may incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with the Services or this Agreement.

4.  <u>Retainer</u>

(a) In connection with the foregoing, it is Ankura's policy to receive an advance retainer for the Fees and Expenses. Upon execution of this Agreement, the Company shall provide Ankura with such retainer in the amount of $60,000 (the "*Retainer*"). The Retainer will be maintained throughout the engagement and returned to the Company upon completion of Ankura's Services. In addition, the Company agrees to replenish the Retainer upon request of Ankura so that the amount of any Retainer is equal to Ankura's estimated Fees and Expenses for the upcoming month. Ankura reserves the right to apply the Retainer to outstanding Fees and Expenses as Services are rendered and to Expenses as they are incurred. The Company understands and acknowledges that any Retainer is earned by Ankura upon receipt, any Retainer becomes the property of Ankura upon

4

FURIE-ANK_00000898
DA01237



receipt, the Company no longer has a property interest in any Retainer upon Ankura's receipt, any Retainer will be placed in Ankura's general account and will not be held in a client trust account, and the Company will not earn any interest on any Retainer; *provided, however*, that at the conclusion of the engagement, if the amount of any Retainer held by Ankura is in excess of the amount of Ankura's outstanding Fees and Expenses, Ankura will pay to the Company the amount by which any Retainer exceeds such Fees and Expenses. The Company further understands and acknowledges that the use of Retainers is an integral condition of the engagement, is necessary to ensure that the Company continues to have access to Ankura's Services, Ankura is compensated for the Services provided to the Company; Ankura is not a pre-petition creditor in the event of a bankruptcy filing and that in light of the foregoing, the provision of the Retainers is in the Company's best interests.

(b)  If any of the Company's entities files a petition or has commenced against it any proceeding under Title 11 of the United States Code (the "***Bankruptcy Code***"), some Fees and Expenses (whether or not billed) incurred before the filing of bankruptcy petitions (voluntary or involuntary) might remain unpaid as of the date of the filing. The unused portion, if any, of the Retainer will be applied to any such unpaid pre-petition Fees and Expenses. Ankura will then hold any portion of the Retainer not otherwise properly applied for payment of any such unpaid pre-filing Fees and Expenses (whether or not billed) as on account cash to be applied to our final invoice in any case under the Bankruptcy Code.

5.  Payment Obligations and Billing

   (a)  Payment Obligations:

   i)  The obligations of the Company under this Agreement (including the indemnification, reimbursement and contribution obligations described in Schedule I) shall be joint and several obligations. The payment of the Fees and Expenses hereunder are the exclusive obligations of the Company. Prior to commencing any proceedings under any insolvency regime, the Company shall pay all invoiced amounts, whether for Fees or Expenses or otherwise, to Ankura by wire transfer of immediately available funds.

   (b)  Billing:  In addition to the Retainer, the Company agrees to pay all Fees and Expenses immediately upon receipt of an invoice to the Company for all Services rendered and Expenses incurred. Payment of the Fees, Expenses and Retainer (including any additional amounts to replenish the Retainer) shall be made via wire transfer to the following account:

Please Remit Payment to:

Wire Payment to: Ankura Consulting Group, LLC
JP Morgan Chase, NA
P.O. Box 32185 270 Park Avenue
New York, NY 10087-2185 New York, NY 10017

ABA Routing #: 021000021 ACH Routing #: 111000614
Account #: 672653925
Bank Contact: Carolyn Banks
Bank Contact Phone #: (214) 965-3925

5

FURIE-ANK_00000899
DA01238



(c) Currency; Taxes:  All Fees, Expenses and any other amounts payable hereunder will be invoiced and are payable in U.S. dollars, free and clear of any withholding taxes or deductions.

6.   Term of Agreement:  Unless terminated earlier as set forth below, this engagement shall terminate upon completion of the Services.  This Agreement may be terminated at any time by Ankura or Company on thirty (30) days' prior written notice to the other.  Any termination of this Agreement shall not affect any provisions that survive the termination hereof, including, (i) the indemnification, reimbursement, contribution and other obligations set forth in this Agreement, including Schedule I, and (ii) Ankura's right to receive payment of Fees earned and Expenses incurred by Ankura through the date of termination, and the Company shall immediately pay or cause to be paid all such reasonable Fees and Expenses due and owing.  If the Agreement is terminated, the parties hereto agree that Ankura may pursue, advise and/or provide services to any third party(ies) relating to or involving the Company, subject, however, to compliance with the obligations set forth in paragraph 9, below.

7.   Court Approval: In the event that a filing under the Bankruptcy Code is necessary or required, the Company will use its best efforts to ensure that the court authorizes the Company to continue to honor its obligations under this Agreement, including all indemnification obligations hereunder (including Schedule I) and payment by the Company of all Fees and Expenses in accordance with the terms hereunder (including Ankura's reasonable and documented counsel's fees and expenses) and, if necessary, approves the retention of Ankura pursuant to the terms of this Agreement, *nunc pro tunc* to the date the insolvency proceeding was commenced.

8.   Nature of Services; Use of Advice:

(a) Ankura shall act as an independent contractor under this Agreement, and not in any other capacity and any obligations arising out of its engagement shall be owed solely to the Company.  Any advice rendered pursuant to this Agreement is intended solely for the use of the Company in considering the matters to which this Agreement relates, and such advice may not be relied upon by any other person or used for any other purpose.  Nothing in this Agreement, expressed or implied, is intended to confer or does confer on any person or entity, other than the parties hereto, the Indemnified Persons (as such term is defined in Schedule I) and each of their respective successors, heirs and assigns, any rights or remedies under or by reason of this Agreement or as a result of the services to be rendered by Ankura hereunder.

(b) Any advice rendered by or other materials prepared by, or any communication from, Ankura (in each case, the "*Ankura Advice*") may not be disclosed, or used, in whole or in part, to or by, any third party, or summarized, quoted from, or otherwise referred to in any manner, without the prior written consent of Ankura.  Ankura Advice may only be used by the Company for the purposes set forth in this Agreement.  The terms of this Agreement shall not be referred to without Ankura's prior written consent.

(c)  At the direction of legal counsel, certain communications and correspondence between Ankura and reports and analyses prepared by Ankura, in connection with this Agreement and the matters contemplated hereby, will be considered in preparation for litigation, and accordingly, will be subject to the attorney-client privilege and work-product privilege between Ankura and the Company.

9.   Confidentiality and Internal Use:  In connection with this engagement, either party (the "*Receiving Party*") may come into the possession, whether orally or in writing, of Confidential Information of the other party (the "*Disclosing Party*").  The Receiving Party hereby agrees that it will not disclose, publish or distribute such

6

FURIE-ANK_00000900
DA01239



Confidential Information to any third party without the Disclosing Party's consent. For purposes of this Agreement, "*Confidential Information*" means (a) the existence and terms of this Agreement and (b) any and all non-public, confidential or proprietary knowledge, data, or information of or concerning the Disclosing Party. For the avoidance of doubt, Confidential Information includes without limitation, research, analyses, names, business plans, valuations, databases and management systems. Confidential Information shall not include: (i) information that was publicly known and made generally available in the public domain prior to the time of disclosure; (ii) information that is already in the lawful possession of the Receiving Party at the time of disclosure; (iii) information that is lawfully obtained from a third party lawfully in possession of such information and without a breach of such third party's obligations of confidentiality; (iv) information that is independently developed without use of or reference to any Confidential Information; or (v) information, memoranda, reports, analyses, or other work product created by or in consultation with Scott M. Pinsonnault in his capacity as ICOO of the Company. Notwithstanding the foregoing, the Receiving Party is entitled to disclose Confidential Information to (i) its legal advisors, (ii) the Company's financing parties, and (iii) a third party to the extent it is required by any court of competent jurisdiction or by a governmental or regulatory authority or where there is a legal right, duty or requirement to disclose, provided that Receiving Party shall use its best efforts to promptly give Disclosing Party written prior notice to any such disclosure under clause (iii) so that Disclosing Party can seek a protective order; and provided further that the Receiving Party shall inform any party receiving Confidential Information under clauses (i), (ii), or (iii) of the confidential nature of the information (and the Receiving Party shall be responsible for any breach of the applicable confidentiality provisions of this Agreement by any such party).Nothing in this Section 9 or this Agreement shall prohibit Ankura from using the Company's name and logo as part of a general client listing and as a specific citation in proposals or similar directed marketing efforts.

It is understood and agreed that any report, analysis, or other work product prepared by Ankura as a result of the Services (the "*Work Product*") shall constitute property of the Company. For the avoidance of doubt, the confidentiality provisions set forth in this section 9 shall not prohibit the Company's internal use of the Work Product or the disclosure of the Work Product to the Company's legal advisors or financing parties in any way. Notwithstanding the foregoing, if the Work Product bears Ankura's name, the Company shall not use the Work Product without prior consent of Ankura (such consent not to be unreasonably withheld).

10. <u>Indemnification</u>: The Company shall, jointly and severally, provide indemnification, contribution and reimbursement as set forth in <u>Schedule I</u> hereto. The terms and provisions of <u>Schedule I</u> are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement. Further, if an Indemnified Person (as defined in <u>Schedule I</u>) is requested or required to appear as a witness in any Action (as defined in <u>Schedule I</u>) that is brought by or on behalf of or against the Company or that otherwise relates to this Agreement or the Services rendered by Ankura hereunder, the Company shall, jointly and severally, reimburse Ankura and the Indemnified Person for all reasonable, documented, actual out of pocket expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the reasonable and documented fees and disbursements of legal counsel.

11. <u>Entire Agreement; Amendments</u>: This Agreement (including <u>Schedule I</u>) represents the entire agreement between the parties, supersedes all previous agreements relating to the subject matter hereof (should they exist) and may not be modified or amended except in writing signed by all of the parties hereto.

12. <u>Counterparts</u>: This Agreement may be executed in counterparts (and by facsimile or other electronic means), each of which shall constitute an original and all of which together will be deemed to be one and the same document.

7

FURIE-ANK_00000901
DA01240



**Private and Confidential**

13. <u>Severability</u>:  The invalidity or unenforceability of any provision of this Agreement (including <u>Schedule I</u>) shall not affect the validity or enforceability of any other provision.

14. <u>Announcements</u>: Ankura shall be entitled to identify the Company and use the Company's name and logo in connection with marketing and pitch materials upon conclusion of the Services.  In addition, if requested by Ankura, the Company agrees that in any press release related to the Services or outcome of the Services provided hereunder, the Company will include in such press release a mutually acceptable reference to Ankura's role as ICOO and advisor to the Company.

15. <u>Governing Law; Jury Trial Waiver; Jurisdiction</u>: THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE.  ANKURA, AND THE COMPANY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED UPON CONTRACT, TORT OR OTHERWISE) RELATED TO OR ARISING OUT OF OR IN CONNECTION WITH THE ENGAGEMENT OF ANKURA PURSUANT TO, OR THE PERFORMANCE BY ANKURA OF THE SERVICES CONTEMPLATED BY, THIS AGREEMENT.  REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY CLAIMS OR DISPUTES BETWEEN OR AMONG THE PARTIES HERETO ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT AND MAINTAINED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK, WHICH COURTS SHALL HAVE EXCLUSIVE JURISDICTION OVER THE ADJUDICATION OF SUCH MATTERS; PROVIDED HOWEVER, THAT IF ANY ENTITY COMPRISING THE COMPANY BECOMES A DEBTOR UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, ANKURA AND THE COMPANY IRREVOCABLE AGREE TO SUBMIT TO THE EXCLUSIVE JURISDICTION AND FORUM OF THE BANKRUPTCY COURT IN WHICH SUCH CHAPTER 11 CASE IS PENDING.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO FURTHER IRREVOCABLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND HEREBY WAIVES IN ALL RESPECTS ANY CLAIM OR OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON-CONVENIENS.  EACH PARTY HERETO AGREES THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION BROUGHT IN ANY SUCH COURT SHALL BE CONCLUSIVE AND BINDING UPON IT AND MAY BE ENFORCED IN ANY OTHER COURT(S) HAVING JURISDICTION OVER IT BY SUIT UPON SUCH JUDGMENT.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN ALL SUCH DISPUTES BY THE MAILING OF COPIES OF SUCH PROCESS TO THE NOTICE ADDRESS FOR EACH SUCH PERSON AS SET FORTH IN SECTION 16 HEREOF.  EACH OF THE PARTIES HERETO HEREBY CERTIFIES THAT NO REPRESENTATIVE OR AGENT OF ANY OTHER PARTY HERETO HAS REPRESENTED EXPRESSLY OR OTHERWISE THAT SUCH PARTY WOULD NOT SEEK TO ENFORCE THE PROVISIONS OF THIS WAIVER.  EACH OF THE PARTIES HERETO HEREBY ACKNOWLEDGES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY AND IN RELIANCE UPON, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION 15.

16. <u>Notices</u>: Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered (including via email so long as the recipient acknowledges receipt) at the address set forth in the signature blocks of each such person below.

17. <u>Miscellaneous</u>:

8

FURIE-ANK_00000902
DA01241



(a) <u>Conflicts</u>:

 i) Ankura is involved in a wide range of other activities from which conflicting interests, or duties, may arise. We have undertaken an inquiry of our records in accordance with our standard business practices based on the parties identified to us, and have determined that we may proceed. Due to the diversity of Ankura's experts and advisory services, Ankura cannot be certain all relationships have or will come to light. Should an actual conflict come to the attention of Ankura during the course of this engagement, we will notify you immediately and take appropriate actions, as necessary. The Company represents and warrants that it has informed Ankura of the parties-in-interest to this matter and agrees that it will inform Ankura of additions to, or name changes for, those parties-in-interest. Unless otherwise provided in an order of a bankruptcy court in a bankruptcy proceeding of the Company. Ankura is not restricted from working on other engagements involving the parties in this matter; however, during the course of this engagement, services of the nature described in this Agreement which are directly adverse to the Company shall not be provided by personnel working on this engagement without prior written consent of the Company.

 ii) The Company acknowledges that Ankura and its affiliates may have provided professional services to, may currently provide professional services to, or may in the future provide such services to other parties-in-interest. The Company agrees that Ankura, its affiliates, subsidiaries, subcontractors and their respective personnel will have no responsibility to the Company in relation to such professional services, nor any responsibility to use or disclose information Ankura possesses by reason of such services, whether or not such information might be considered material to the Company. Information which is held elsewhere within Ankura but is not publicly available will not for any purpose be taken into account in determining Ankura's responsibilities to the Company under this engagement. Ankura will not have any duty to disclose to the Company or any other party or utilize for the benefit of any such party's or any other party any non-public information, or the fact that Ankura is in possession of such information, acquired in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business.

(b) <u>Liability</u>:  No (i) direct or indirect holder of any equity interests or securities of Ankura whether such holder is a limited or general partner, member, stockholder or otherwise, (ii) affiliate of Ankura, or (iii) director, officer, employee, representative, or agent of Ankura, or of an affiliate of Ankura or of any such direct or indirect holder of any equity interests or securities of Ankura (collectively, the *"Party Affiliates"*) shall have any personal liability or obligation of any nature whatsoever in connection with or under this Agreement or the transactions contemplated hereby, and the Company waives and releases all claims against such Party Affiliates related to any such liability.

(c) <u>Authority; Due Authorization; Enforceability</u>: The Company represents and warrants that the Board has duly approved the retention of Ankura and approved the terms of this Agreement, including the appointment and authorization of the ICOO. Each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement and to perform its obligations hereunder. Each party hereto further represents and warrants that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each such party and constitutes the legal, valid and binding agreement of each such party, enforceable in accordance with its terms.

9

FURIE-ANK_00000903
DA01242



(d) Independent Contractors: In connection with the Services, Ankura may, without consent from the Company utilize employees, agents or independent contractors or its own affiliates or its own agents or independent contractors. References in this Agreement to Ankura personnel shall apply equally to employees, agents or independent contractors of Ankura and its affiliates. The parties intend that an independent contractor relationship will be created by this Agreement. As an independent contractor, Ankura will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Ankura employees will not be entitled to receive from the Company any vacation, sick pay, leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. Ankura will be responsible for all withholding, income and other taxes incurred in connection with the operation and conduct of its business.

(e) Limitations of Engagement: The Company acknowledges that Ankura is being retained solely to assist the Company as described in this Agreement. The Company agrees that it will be solely responsible implementing any advice or recommendations and for ensuring that any such implementation complies with applicable law. The Company understands that Ankura is not undertaking to provide any legal, regulatory, accounting, insurance, tax or other similar professional advice and the Company confirms that it is relying on its own counsel, accountants and similar advisors for such advice. This engagement shall not constitute an audit or review, or any other type of financial statement reporting engagement. It is expressly agreed that, other than as set forth in this Agreement, Ankura will not evaluate or attest to the Company's internal controls, financial reporting, illegal acts or disclosure deficiencies and Ankura shall be under no obligation to provide formal fairness or solvency opinions with respect to any bankruptcy case or otherwise, or any transaction contemplated thereby or incidental thereto. In rendering its Services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Ankura is not assuming any responsibility for any decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any transaction. Ankura shall not have any obligation or responsibility to provide legal, regulatory, accounting, tax, audit, "crisis management" or business consultant advice or services hereunder, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

(f) Limitations on Actions. No action, regardless of form, relating to this engagement, the Services provided hereunder or this Agreement, may be brought by either party more than one (1) year after the cause of action has accrued, except than an action for nonpayment may be brought by a third party not later than one (1) year following the due date of the last payment owing to the party bringing such action.

(g) Counsel Representation: The terms of this Agreement have been negotiated by the parties hereto, who have each been represented by counsel, there shall be no presumption that any of the provisions of this Agreement shall be construed adverse to any party as "drafter" in the event of a contention of ambiguity in this Agreement, and the parties waive any statute or rule of law to such effect.

(h) Assignment: This Agreement may not be assigned by any party hereto without the prior written consent of the other parties. Any attempted assignment of this Agreement made without such consent shall be void and of no effect, at the option of the non-assigning parties.

10

FURIE-ANK_00000904
DA01243



(i) <u>Headings</u>: Headings used herein are for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

(j) <u>Survival</u>: Upon any termination of this Agreement, Section 2-4 and 6-11, 13-15, 17(b), 17(d), 17(e), 17(f), 17(g), 17(j), 17(l), 17(m) and <u>Schedule I</u> hereto shall survive such termination and shall remain in effect.  The obligations under Section 9 shall survive for two (2) years after termination of this Agreement.

(k) <u>Force Majeure</u>:  Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including but not limited to, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

(l) <u>Non-Solicitation</u>:  During the Term of this engagement and for a period of one (1) year thereafter, the Company agrees that it will not directly or indirectly employ, solicit, engage, or retain the services of such personnel whom they had substantive contact within the course of this engagement without the payment to Ankura of two (2) times the total direct compensation paid to such personnel in the preceding twelve (12) months, provided however that this section shall not apply to Ankura personnel who do not have substantive contact within the course of this engagement and who respond to a general solicitation or advertisement not specifically directed to Ankura personnel.

(m) <u>Insurance</u>:   The Company shall maintain directors/managers, officers and corporate liability insurance policy (the "***Policy***"), with at least $[enter current coverages] million in coverage to cover the ICOO in addition to the existing officers and directors/managers serving in such positions.  The Company shall cause its insurance broker to send copies of all documentation and other communications regarding the Policy, including without limitation any renewal or cancellation thereof to the attention of the ICOO.  Upon any cancellation or nonrenewal of the Policy by the insurer, the Company shall exercise their rights to extend the claim period to a six-year "discovery period" and shall exercise such rights and pay the premium required thereunder.

[Signature pages follow.]

11

FURIE-ANK_00000905
DA01244



**Private and Confidential**

If the foregoing correctly sets forth our understanding, please indicate your acceptance thereof in the space provided below, whereupon this Agreement and your acceptance shall constitute a binding agreement between us.

If you have any questions, please call Scott M. Pinsonnault at (214) 771-6133. We look forward to working with you on this important matter.

*Ankura Consulting Group, LLC*

By: _____
  Scott M. Pinsonnault
  Senior Managing Director

[Additional signature pages follow.]

12

FURIE-ANK_00000906
DA01245



**Private and Confidential**

Accepted and agreed to as of the Effective Date:

**Cornucopia Oil and Gas Company LLC**

By: _____
Name: David Elder
Title: Chief Financial Officer


**CORSAIR OIL & GAS LLC**
a Delaware limited liability company
By: _____
Name: David Elder
Title:  Chief Financial Officer


**FURIE OPERATING ALASKA, LLC,**
a Delaware limited liability company
By: _____
Name: David Elder
Title: Chief Financial Officer


[Signature page to Engagement Agreement]


13

FURIE-ANK_00000907
DA01246



## Schedule I

This <u>Schedule I</u> is a part of and incorporated into the letter agreement (the "*Agreement*"), dated as of March 20, 2018 between Ankura Consulting Group, LLC ("*Ankura*"), and Cornucopia Oil and Gas Company LLC, a Delaware limited liability company and its' wholly owned subsidiary, Furie Operating Alaska, LLC (the "*Company*"), pursuant to which Ankura has been engaged to provide interim management and restructuring advisory services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

As a material part of the consideration for the agreement of Ankura to furnish its Services under the Agreement, the Company, jointly and severally, agrees that it shall defend, indemnify and hold harmless Ankura and its affiliates and their respective directors/managers, officers, employees, attorneys and other agents appointed by any of the foregoing and each other person, if any, controlling Ankura or any of its affiliates (Ankura and each such person and entity being referred to as an "*Indemnified Person*"), from and against any losses, claims, damages, judgments, assessments, costs and other liabilities (collectively, "*Liabilities*"), and will reimburse each Indemnified Person for all reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of counsel) (collectively, "*Expenses*") as they are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any Indemnified Person is a party (collectively, "*Actions*"), in each case, related to or arising out of or in connection with the Services rendered or to be rendered by an Indemnified Person pursuant to the Agreement or any Indemnified Persons' actions or inactions in connection with any such Services; <u>provided</u> that the Company will not be responsible for any Liabilities or Expenses of any Indemnified Person that are determined by a judgment of a court of competent jurisdiction, which judgment is no longer subject to appeal or further review to have resulted from such Indemnified Person's negligenceor willful misconduct in connection with any of the actions, inactions or Services. The Company shall also reimburse such Indemnified Person for all Expenses as they are incurred in connection with enforcing such Indemnified Persons' rights under the Agreement (including without limitation its rights under this <u>Schedule I</u>). Such Indemnified Person shall reasonably cooperate with the defense of any Actions.

The Company shall, if requested by Ankura, assume the defense of any such Action including the employment of counsel reasonably satisfactory to Ankura. The Company will not, without prior written consent of Ankura (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any Indemnified Person is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of such Indemnified Person from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any Indemnified Person.

In the event that the foregoing indemnity is not available, for any reason, to an Indemnified Person in accordance with the Agreement, the Company shall contribute to the Liabilities and Expenses paid or payable by such Indemnified Person in such proportion as is appropriate to reflect (i) the relative benefits to the Company, on the one hand, and to Ankura, on the other hand, of the matters contemplated by the Agreement, or (ii) if the allocation provided by the immediately preceding clause (i) is not permitted by applicable law, not only such relative benefits but also the relative fault of the Company, on the one hand, and Ankura, on the other hand, in connection with the matters as to which such Liabilities or Expenses relate, as well as any other relevant equitable considerations. Notwithstanding the foregoing,

FURIE-ANK_00000908
DA01247



in no event shall any Indemnified Persons be required to contribute an aggregate amount in excess of the amount of fees actually received by Ankura from the Company pursuant to the Agreement.

No Indemnified Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company or its respective owners, parents, affiliates, security holders or creditors for, or in connection with advice or Services rendered or to be rendered by any Indemnified Person pursuant to the Agreement, or any Indemnified Person's actions or inactions in connection with any such advice, Services except for Liabilities (and related Expenses) of the Company that are finally determined by a judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's negligence or willful misconduct in connection with any such advice, actions, inactions or Services, provided however, that, in no event shall any Indemnified Person be liable to the Company in an aggregate amount in excess of the amount of fees actually received by Ankura pursuant to the Agreement. In no event shall Ankura be liable to the Company for any loss of use, data, goodwill, revenues or profits (whether or not deemed to constitute a direct claim), or any consequential, special, indirect, direct, incidental, punitive or exemplary loss, damage or expense relating to this engagement, the Services or this Agreement, (in contract, tort or otherwise) or to the Company or its respective owners, parents, affiliates, security holders or creditors).

Prior to entering into any agreement or arrangement during the term of this engagement with respect to, or effecting, any (i) merger, statutory exchange or other business combination or proposed sale, exchange, dividend or other distribution or liquidation of all or a significant portion of its assets, or (ii) significant recapitalization or reclassification of its outstanding securities that does not directly or indirectly provide for the assumption of the obligations of the Company set forth in this Agreement, the Company will notify Ankura in writing thereof, if not previously so notified, and shall arrange in connection therewith alternative means of providing for the obligations of the Company set forth in this Agreement, including the assumption of such obligations by another party, insurance, surety bonds, the creation of an escrow, or other credit support arrangements, in each case in an amount and upon terms and conditions reasonably satisfactory to Ankura.

These indemnification, contribution and other provisions of this <u>Schedule I</u> shall (i) remain operative and in full force and effect regardless of any termination of the Agreement or completion of the engagement by Ankura; (ii) inure to the benefit of any successors, assigns, heirs or personal representative of any Indemnified Person; and (iii) be in addition to any other rights that any Indemnified Person may have.

15

FURIE-ANK_00000909
DA01248

**Exhibit B**

**Employment Agreement**

[Attached]

FURIE-ANK_00000910
DA01249

**Execution Version**
**March 14, 2018**

# EMPLOYMENT AGREEMENT
# DAVID W. ELDER

THIS EMPLOYMENT AGREEMENT (the "*Agreement*"), effective as of February 15, 2018, is entered into by and among CORNUCOPIA OIL & GAS COMPANY, LLC, a Delaware limited liability company ("*Cornucopia*"), its subsidiary, FURIE OPERATING ALASKA, LLC, a Delaware limited liability company (the "*FOA*") and CORSAIR OIL & GAS LLC, a Delaware limited liability company ("*Corsair*"), each having its principal executive office at 188 W. Northern Lights Blvd., Suite 620, Anchorage, AK 99503 and DAVID W. ELDER, residing at 238 Sunset Ridge, League City, Texas ( the "*Executive*"). Cornucopia, FOA and Corsair are hereinafter collectively called the "*Company*").

## WITNESSETH:

WHEREAS, incident to a previous three year term of employment with the Company, the Company hereby desires to retain and continue to employ the Executive to work for the Company and such of its other affiliates of Cornucopia and FOA as Company may request from time to time and the Executive is willing to be stay on and continue to be employed by the Company upon the terms and conditions hereinafter set forth:

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto hereby agree as follows:

1.    <u>EMPLOYMENT</u>.  The Company hereby employs the Executive to serve as Chief Financial Officer of each of Cornucopia, FOA and Corsair and the Executive hereby accepts such employment upon the terms and conditions hereinafter set forth. Provided; however, if the Sole Member nominates another individual to be the Chief Financial Officer, and such nominee is approved by the Board of Mangers, then the Executive will continue serve as the Chief Admisnistrative Officer of Cornucopia, FOA and Corsair with such responsibilities as are reasonably acceptable to the Executive. The Company and Executive understand and acknowledge that this Agreement is a contract for employment and as such the Executive is not to be considered an "at-will" employee of the Company under any state, local and/or federal law.

2.    <u>TERM</u>.  The term of employment of the Executive hereunder shall be for the period commencing as of the date hereof and for an initial three year term, unless sooner terminated in the manner hereinafter provided, ending at the close of business on February 14, 2021 (with each 12 month period from February 15 to February 14 during the term herein called a "*Contract Year*" and the period from the date hereof to February 14, 2021 called the "*Contract Term*"). The Contract Term may be renewed or extended upon written agreement of the Company and Executive.

3.    <u>DUTIES AND SERVICES</u>.

(a)    The Executive agrees to faithfully and diligently serve the Company in the capacity as Chief Financial Officer on a full time basis and shall be in charge of all day to day financial management of the Company under the direction of the Board of Managers of the

FURIE-ANK_00000911
DA01250

Company, and to perform from time to time such additional executive duties as the Board of Managers of the Company shall reasonably request; provided that such duties shall be consistent with the Executive's present position and status.  The Executive shall report directly to the Company's Board of Managers. The Executive agrees that, subject to the next sentence, during the period of employment he shall devote his full business time, energy and skill to such employment.  The Executive may serve on board of directors or as a manager of an LLC (with compensation related thereto) that is engaged in charitable causes if such service does do not interfere with Executive's ability to perform his executive duties under this Employment Agreement on a full time basis at the times and places as may be required by the Company.

(b)     The Company will provide the Executive with an office in Anchorage, Alaska or at such location as shall be designated by the Board of Managers of the Company, which location shall be reasonably acceptable to the Executive, which will be the same as or comparable to the office now used by the Executive, and will provide the Executive with executive secretarial services at such office.  When not working at the Company provided office in Alaska, the Executive will provide his services/perform his duties remotely.

(c)     Alaska Terms:  Executive shall travel to Alaska via business class airfare and will work at least ten days a month in Alaska unless (i) work schedule requires more or (ii) the Company and Executive mutually agree to some lesser amount of time in writing.  While in Alaska the Executive will be lodged in a hotel or corporate apartment mutually acceptable to the Executive and Company; said lodging to be paid for by the Company.  The Company shall provide and pay for Executive's transportation while in Alaska; this may be achieved through a rental car, car lease, and/or through taxi/Uber/Lyft ride sharing options and reasonable expenses for dining.

4.     <u>COMPENSATION</u>.

(a)     As compensation for the services to be rendered hereunder by the Executive, the Company agrees to pay the Executive, and the Executive agrees to accept, effective February 15, 2018 a salary at the rate of Two Hundred Fifty-Five Thousand Two Hundred Dollars ($255,200.00) per annum through the Contract Term of this Agreement, which amount shall be subject to an annual cost of living increase as provided for in Section 4(b) hereof.  (Collectively, such annual compensation plus all cumulative cost of living increases shall be hereinafter referred to as "***Basic Annual Compensation***").  The Executive's Basic Annual Compensation shall be payable biweekly (in conjunction with the payment by the Company of its employees' biweekly payroll).

(b)     In the event the "Consumer Price Index — United States City Average — Urban Consumers," published by the Bureau of Labor Statistics of the United States Department of Labor (the "***CPI-U***"), shall indicate that as of December 31 of any year during the term of this Agreement, the CPI-U during the twelve months then ended shall have increased over the previous twelve months, then the Basic Annual Compensation, in respect of any Contract Year, commencing with the Contract Year beginning on February 15 2019,  shall be increased prospectively, effective on such day, by an amount equal to the lesser of (i) an amount equal to the Basic Annual Compensation multiplied by such percentage increase in the prior calendar year's CPI-U and (ii) five percent (5%) of the Executive's Basic Annual

2

FURIE-ANK_00000912
DA01251

Compensation paid during the immediately preceding Contract Year (herein called the "**5% Limitation**").  For example, subject to the 5% Limitation, if the Basic Annual Compensation in 2018, hypothetically, is $255,200 and the CPI-U increase for the year ended December 31, 2018 is two percent (2%), then the Basic Annual Compensation for the 2019 Contract Year commencing February 15, 2019, would be $260,304 ($255,200 x 2% = $5,104 + $255,200 = $260,304).  In the event that there is a change in the basis of calculating the CPI-U, or if a change is made in the terms or number of items contained in the CPI-U, or if the CPI-U is discontinued, the Company and the Executive shall, in good faith, mutually agree upon a substitute index or formula, and such substitute index or formula shall henceforth have the same effect as if it had been originally designated herein.  Notwithstanding any provisions to the contrary contained in this Agreement, in no event shall the Basic Annual Compensation in any calendar year be increased by more than the 5% Limitation unless otherwise specifically agreed by the Company.

5.    OTHER BENEFITS.

(a)    The Executive shall be entitled to participate on the same basis and subject to the same qualifications as other executives of the Company, in an employee benefits plan, including a 401K Plan with, if practicable, a Company-matching provision using a "safe harbor" provision (with respect to the required annual percentage test) contribution to be determined by the Company, a life, health, medical, hospitalization or surgical insurance plan or policy (with coverage for the Executive and his family), and any vacation or fringe benefit plans or programs, whether now existing or hereafter established.

(b)    The Executive shall be entitled to an annual minimum cash bonus ("**Annual Minimum Bonus**") with respect to each Contract Year in an amount equal to 25% of Basic Annual Compensation, subject to Executive's continued employment through the last day of such Contract Year (except as otherwise provided in Sections 5(j) and 7).  The Annual Minimum Bonus shall be payable no later than March 15 of the calendar year following such Contract Year.

(c)    Provided the Bonus Criteria (as defined below) are met, the Company, in its absolute discretion, may pay Executive an additional Bonus (the "**Discretionary Bonus**") with respect to each Contract Year in an amount not exceeding one hundred percent (100%) of the Executive's Basic Annual Compensation for the immediately preceding Contract Year, subject to Executive's continued employment through the last day of the Contract Year. Any Discretionary Bonus shall be payable no later than March 15 of the calendar year following such Contract Year.  Any Discretionary Bonus shall be based on the performance and criteria set forth below (the "**Bonus Criteria**").

(i)    The performance based portion of the Bonus Criteria shall be based on (A) the Company's EBITDA performance for the 12-month period ending on the previous December 31 compared against the Company's annual budget for such period, (B) the Company's performance in meeting its obligations on a timely basis under any credit facilities with lenders or investors, (C) the Company's applications for and receipt of incentive tax credits from the State of Alaska and

FURIE-ANK_00000913
DA01252

(D) results in obtaining and executing financing as approved by the Company's Board of Managers.

(ii)    In addition, the Bonus Criteria shall include such other discretionary criteria established by the Company's Board of Managers pursuant to the provisions of Exhibit A attached hereto.

(d)    Subject to Section 8, Executive shall be entitled to a cash retention bonus ("***Retention Bonus***") in an amount equivalent to the Executive's Basic Annual Compensation for the immediately preceding Contract Year payable upon the earliest of one of the following events: (i) immediately upon the conclusion of the Contract Term, (ii) a Trigger Event, (iii) upon Executive's death or disability or (iv) upon termination of Executive's employment by the Company without an Act of Cause (as defined in Section 6 below), in each case subject to the Executive's continued employment with the Company through such event; said Retention Bonus is in addition to, separate and apart from any other compensation due to Executive, including but not limited to the Annual Minimum Bonus and the Discretionary Bonus described above in 5(b)-(c).  The Retention Bonus shall be paid on a date determined by the Company that is within thirty (30) days following the occurrence of the applicable event set forth in clause (i), (ii), (iii) and (iv).

(e)    Subject to Section 8, in the event of a public sale by the Company or its ultimate parent entity of any equity securities and the Company or such ultimate parent entity becomes listed on any recognized state or securities exchange, subject to the Executive's continued employment with the Company through such event, the Executive shall be entitled to receive all amounts due to Executive under the provisions in Section 7 below.

(f)    Nothing contained herein shall be deemed to be a waiver by the Executive of, or to diminish or modify, any vested rights which the Executive may have or may hereafter acquire under any employee benefit plan of the Company.

(g)    It is contemplated that, in connection with his employment hereunder, the Executive may be required to incur reasonable business, dining, entertainment and travel expenses.  The Company agrees to reimburse the Executive in full for all reasonable and necessary business, entertainment and other related expenses, including travel expenses, incurred or expended by him incident to the performance of his duties hereunder, and incurred and expended in accordance with the Company's policies with respect to such expenses, upon submission by the Executive to the Company of such vouchers or expense statements satisfactorily evidencing such expenses as may be reasonably required by the Company.

(h)    It is understood and agreed by the parties hereto that during the term of the Executive's employment hereunder he shall be entitled to annual vacations (taken consecutively or in segments), the length of which shall be consistent with the effective discharge of the Executive's duties and the general customs, practices and policies of the Company applicable to employees of the Executive's status; provided, however, that it is agreed that the Executive shall be entitled to twenty business days (20) of vacation each year, to be taken annually on a non-cumulative basis with any unused portion to be carried over per the Company's vacation policy.

FURIE-ANK_00000914
DA01253

(i)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, in addition to all other compensation and benefits to which the Executive may be entitled under the terms of this Agreement, to the extent permitted by applicable law, the Company shall pay one of the following: (1) costs of Executive's health benefits under COBRA for a period of eighteen (18) months, as same may be extended by law, from the date of termination of such employment or until any earlier date Executive on which ceases to be covered by the Company's COBRA coverage under his COBRA election after such termination, or (2)  in the event that COBRA does not apply to Executive then the Company shall pay Executive's monthly premiums for himself and all current dependents under an insurance plan that provides equivalent coverage to that of the Company for a period of 18 months.

(j)      Subject to Section 8, in the event of termination of the Executive's employment by the Company at any time during the Contract Term without an Act of Cause, the Company agrees to pay Executive the greater of (i) Executive's Basic Annual Compensation for the remainder of the balance of the Contract Term and (ii) twelve (12) months of the Executive's then current per annum salary plus Retention Bonus plus any Annual Minimum Bonus due, in each case payable in a lump sum on a date determined by the Company that is within thirty (30) days following the date of termination.  In addition to the foregoing payment, the Executive shall be entitled to any unpaid bi-weekly compensation due to the Executive as of the date of such termination, plus reasonable documented attorneys' fees of the Executive (up to a maximum amount of $50,000 and subject to applicable withholding) to the extent the Executive is required to take any legal action against the Company to recover any benefits or other compensation due to him from the Company as a result of the Company's termination of the Executive without an Act of Cause, in each case payable on a date determined by the Company that is within thirty (30) days following the date of termination.

6.      TERMINATION OF EXECUTIVE'S EMPLOYMENT FOR CAUSE.    The Company shall have the right to terminate the employment of the Executive under this Agreement, as well as any and all compensation to which the Executive would otherwise be entitled hereunder (except for compensation to which the Executive is entitled through the date of such termination and any benefits referred to in Section 5 hereof in which the Executive has a vested right under the terms and conditions pursuant to which such benefits were granted), if, and only if, the Executive shall have committed any material act of proven dishonesty or fraud against the Company or a felony or in the event of gross negligence or willful misconduct of the Executive (such act or acts or event being hereinafter referred to as an "*Act of Cause*").  In the event the Board of Managers of the Company elects to terminate the employment of the Executive under this Agreement for an Act of Cause as set forth above, the Company shall send written notice to such effect to the Executive, and the Executive's employment under this Agreement, and this Agreement, shall thereupon terminate as of a date to be specified in such notice, which date shall be not less than 10 days after the sending of such notice.

7.      PAYMENTS UPON EXPIRATION, SALE OF ASSETS, SECURITIES OR CHANGE OF CONTROL.

(a)      Subject to Section 8, upon the earliest to occur of any of the events listed in (b) below during the Contract Term (each, a "*Trigger Event*"), subject to the Executive's

FURIE-ANK_00000915
DA01254

continued employment with the Company through the applicable Trigger Event, the Executive shall receive a cash payment in an amount that is equal to the following:

> an amount (the "***Trigger Event Amount***") equal to the total of (A) an amount obtained by multiplying by two (2)) the Executive's Basic Annual Compensation payable for the Contract Year in which the Trigger Event occurs, ***plus*** (B) the maximum Bonus to which the Executive would be entitled for the 12-month period ending on the next December 1 after the date of the Trigger Event, ***plus*** (C) 1.0% of the amount by which the Sales Price (as hereinafter defined) exceeds the tangible net worth of the Company (computed in accordance with U.S generally accepted accounting principles consistently applied with all prior periods) as of the date hereof, ***plus*** (D) Retention Bonus, ***plus*** (E) Annual Minimum Bonus.

The Trigger Event Amount shall be paid on a date determined by the Company that is within thirty (30) days following the applicable Trigger Event; provided that, in lieu of a cash payment on the occurrence of a Trigger Event, the Executive may, to the greatest permitted by, and in compliance with, applicable law, elect to receive stock, warrants, options or other agreed equity interests, of equivalent value to the cash payments provided above, in any public offering of the Company's stock or shares or other company or entity to whom the Company's or any of its parent entities' assets or membership interests are sold pursuant to any Trigger Event. The amount and terms of any such equity interests will be as agreed between the Company and the Executive at such time.

(b)    Trigger Events shall be:

(i)    the public sale by the Company, its immediate member entity, or its ultimate parent entity, of any equity securities, or any securities convertible into or exchangeable into equity securities of any such entity;

(ii)    Kay Rieck and his affiliates sells his or their interests in the Company to any non-affiliated entity so that he or they own, directly or indirectly, less than fifty percent (50%) of the membership interests of the Company, its immediate member entity or its ultimate parent entity (on a fully diluted basis);

(iii)    the sale, transfer or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of more than fifty percent (50%) of the book value or fair market value of the consolidated assets of the Company, its immediate member entity or its ultimate parent entity, excluding any sale, transfer or distribution to an affiliated entity;

(iv)    the sale, transfer, or other disposition (including a farm in or farm out arrangement) of more than a fifteen percent (15%) interest in the oil and gas and other mineral leasehold interests owned by Cornucopia in the Kitchen Lights Unit in the Cook Inlet, or elsewhere in Alaska, with or without a change of operator or manager of the leases so sold, transferred or disposed of or farmed out, excluding any sale, transfer or distribution to an affiliated entity;

FURIE-ANK_00000916
DA01255

(v)     the merger, consolidation or other business combination with any entity other than an affiliated entity of the Company, its immediate member entity, its ultimate parent entity or any of their respective affiliates, or the liquidation or dissolution of the Company, its immediate member entity or its ultimate parent entity; or

(vi)     the refinancing in full with the proceeds of equity or other indebtedness of the Company of the Company's obligations under that certain Amended and Restated Credit Agreement, dated as of March 19, 2015 (as amended, amended and restated, supplemented or modified from time to time, the "*Credit Agreement*"), among Cornucopia, FOA, Energy Capital Partners Mezzanine Opportunities Fund A, LP, in its capacity as administrative agent (the "*Administrative Agent*") and collateral agent thereunder (the "*Collateral Agent*") and the lenders party thereto from time to time (the "*Lenders*") and the other Credit Documents (as defined in the Credit Agreement).

(c)     For the purposes of this Section 7, "*Sales Price*" shall mean:

(i)     upon the occurrence of the Trigger Event set forth in clause (b)(i) or (b)(iii) above, the fair market value (as hereinafter defined) of the Company as of the effective date of such event;

(ii)     upon the occurrence of the Trigger Event set forth in clause (b)(ii) above, (A) if the entity the securities of which are sold is the Company, the price at which such securities are offered to the public multiplied by the aggregate number of  common shares outstanding, fully diluted, upon the completion of such public offering less all Additional Equity (as hereinafter defined), or (B) if the entity the equity securities of which are sold is an entity other than the Company, the fair market value of the Company as of the date of such sale;

(iii)     upon the occurrence of a Trigger Event set forth in clause (b)(iv) or (b)(vi) above (other than a liquidation or dissolution of the Company), the total consideration received by the selling members in such transaction divided by the percentage of total membership interests or common shares (if applicable), fully diluted, of the Company sold at the time of such transaction less all Additional Equity;

(iv)     upon the occurrence of a Trigger Event set forth in clause (b)(v) above, the total consideration or other compensation, in cash or kind, received by the Company or any member or affiliate of the Company for the interest sold; and

(v)     in the event of a liquidation or dissolution of the Company, the total amount distributable to the Company's members pursuant to such liquidation or dissolution after taking into account (A) a pro rata deduction in the amount distributable equally to all Additional Equity and (B) an addition thereto equal to the aggregate of all dividends and management, investment banking and any other fees paid to the parent or affiliates of the Company.

7

FURIE-ANK_00000917
DA01256

(vi)    If the Company or its immediate or ultimate parent entity is a publicly traded entity, "fair market value" shall mean the amount equal to the aggregate number of the shares of the owner outstanding on a fully diluted basis multiplied by the average market price of such entity's common stock for the ten (10) business days (based upon closing share prices) prior to the effective date of such event less all Additional Equity. If such entity is not a publicly traded company, "fair market value" shall mean the greater of the net worth or the appraised value of such entity, less all Additional Equity, as provided by a mutually agreed upon investment banking firm in a written opinion letter prepared at the expense of such entity that is based upon what the fully diluted common stock market value of such entity would be if it were a publicly traded entity after taking into account relevant factors such as prior history, earnings potential and industry multiples of earnings, cash flow and asset values. "Additional Equity" shall mean all fully diluted shares that are outstanding as a result of capital provided through sources other than the Initial Investment (as hereinafter defined). "Initial Investment" shall mean the dollar amount initially invested in the Company or its immediate or ultimate parent entity less organization and other expenses capitalized on the balance sheet as of the date hereof as an asset, excluding any covenant not to compete, if capitalized.

8.    <u>LENDER EVENTS</u>.  Notwithstanding anything in this Agreement to the contrary, no bonus or severance payments shall be payable to the Executive under Sections 5(d), 5(e), 5(i), 5(j) or 7 of this Agreement in connection with or following (i) any acquisition (by way of a sale, transfer, exchange or other disposition), directly or indirectly, by one or more of the Lenders, the Administrative Agent, the Collateral Agent or any affiliate thereof, or any other funds managed or advised by Energy Capital Partners (each, an "***ECP Party***"), of beneficial ownership (within the meaning of Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of securities of FOA, Cornucopia and/or Corsair or (ii) the sale, transfer, exchange or other disposition in any single or related series of transactions (whether by purchase, merger or otherwise) of any or all of the assets of FOA, Cornucopia and/or Corsair, any of their respective immediate member entities or any of their respective ultimate parent entities, in the aggregate, directly or indirectly, to one or more ECP Parties,  in each case including, without limitation, pursuant to (A) the exercise of any rights and remedies available to the Lenders or any other Secured Party (as defined in the Credit Agreement) under any of the Credit Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral (as defined in the Credit Agreement) pursuant to the Security Documents (as defined in the Credit Agreement), or (B) any consensual transaction or out-of court settlement (any such acquisition described in clause (i) or (ii), an "ECP Acquisition"); provided that if, following any such ECP Acquisition, all the securities or assets acquired by the ECP Parties are transferred to a third party not affiliated with any of the ECP Parties, then the Company shall pay to the Executive, subject to Executive's continued employment with the Company through the date of such transfer, a bonus equal to the sum of (x) the Executive's Basic Annual Compensation for the immediately preceding Contract Year and (y) the Annual Minimum Bonus, in each case on a date determined by the Company that is within thirty (30) days following such subsequent transfer.

9.    <u>NON-COMPETITION</u>.  If the Company shall discharge the Executive for an Act of Cause pursuant to Section 6 hereof, then for a period of one year commencing on the date of

FURIE-ANK_00000918
DA01257

such discharge the Executive shall not, directly or indirectly, accept employment, provide consulting services to, or otherwise assist any company or individual or group that (i) competes in the markets in the geographical areas in which the Company performs oil and gas exploration and production operations at the time of discharge, directly or indirectly, or (ii) engages in any line or lines of business of the Company at the time of discharge.

      10.    DEATH OR DISABILITY.  The obligations of the Company hereunder shall terminate forthwith in the event of the death of the Executive during the term hereof or in the event that the Executive shall fail to perform his services hereunder because of medically determinable physical or mental incapacity or disability either for (i) a continuous period of more than 180 days or (ii) a period aggregating 180 days or more during any 12 successive months.  In any such event, the Executive or his legal representative, as the case may be, shall, to the fullest extent permitted by applicable law, continue to receive the compensation to which the Executive would have been entitled pursuant to Section 4 hereof (and the Company will also be responsible for the provisions of Section 5(a) hereof to the extent permitted by applicable law) had his employment continued through the end of the month in which death or termination occurs and for the following two (2) months *plus* Retention Bonus per Section 5(d) hereof.  The Executive or his legal representative shall also receive any benefits and bonus referred to in Section 5 hereof in which the Executive has a vested right or if such bonus criteria had been met, as the case may be, and all unvested stock options or restricted stock units to which the Executive is entitled at the time of his death shall immediately vest upon such death, as of the date of death or termination, under the terms and conditions of the plan or program pursuant to which such benefits were granted. Any such benefits or bonus to which the Executive was thus so entitled or which vested as of the date of the Executive's death or disability shall be paid to the Executive's legal representative on a date determined by the Company that is within thirty (30) days after such date of death or disability.

      11.    CONFIDENTIALITY.

      (a)    Recognizing that his employment hereunder will involve access to proprietary and confidential knowledge and information pertaining to the business of the Company and its business methods, systems, plans and policies, the Executive agrees that, during and after the term of this agreement and his employment, he shall not (otherwise than pursuant to his duties hereunder (including any such disclosure pursuant to his duties hereunder to agents, advisors and lenders of the Company) or as required by law) disclose to an unauthorized third party any proprietary or confidential information pertaining to the Company or its operations or customers. In the event of any termination of employment, the Executive shall return all Company property of whatever nature in his possession or control to the Company. Notwithstanding the foregoing, nothing herein shall prevent the Executive from reporting possible violations of federal law or regulation to, otherwise communicating with or participating in any investigation or proceeding that may be conducted by, or providing documents and other information, without notice to the Company, to, any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, Congress, and any agency Inspector General, including in accordance with the provisions of and rules promulgated under Section 21F of the Exchange Act or Section 806 of the Sarbanes-Oxley Act of 2002, as each may have been amended from time to time, or any other whistleblower protection provisions of state or federal law or regulation.

9

FURIE-ANK_00000919
DA01258

(b)    The provisions of this Section 11 shall survive the expiration or termination of this Agreement, without regard to the reason therefor.

12.    NO SET-OFF; DEDUCTIONS AND WITHHOLDING.

(a)    The Executive's rights hereunder, including any payments to which the Executive is entitled hereunder, shall not be subject to diminution or to any right of setoff, recoupment or counterclaim by reason of any other agreement, relationship or course of dealing between the Executive, on the one hand, and the Company or any officer, director, employee, agent or affiliate thereof, or any assignee or successor of the foregoing, on the other hand, and the obligations of the Company hereunder shall be completely performed by the Company, or any aforementioned assignee or successor, without regard to any such other agreement, relationship or cause of dealing.    The aforementioned terms "assignee or successor," for purposes of this Agreement are to include any and all "successors and assigns" described in Section 13 hereof.

(b)    The Executive agrees that the Company shall have the right to withhold from any and all payments required to be made to the Executive pursuant to this Agreement all Federal, state, local and/or other taxes which the Company determines are required to be withheld in accordance with applicable statutes, regulations or orders as from time to time in effect and any payments due to the Company in respect of advances or loans made by the Company to the Executive.

13.    ASSIGNABILITY AND BINDING EFFECT.    The rights and obligations arising under this Agreement shall inure to the benefit of and shall be binding upon the heirs, executors, administrators, successors, and legal representatives of the Executive, and shall inure to the benefit of and be binding upon the Company and its respective assigns and successors, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise, but (i) without the prior written consent of the Company, neither this Agreement nor the rights or obligations of the Executive hereunder may be assigned, pledged, hypothecated or otherwise transferred by the Executive to another person, firm or corporation, nor may the obligations of the Executive hereunder be delegated, and (ii) without the prior written consent of the Executive, the Company shall not assign this Agreement or its rights hereunder to a third party other than a successor to the business of the Company, whether by a merger, consolidation, sale of assets, change in controlling members or shareholders, or otherwise.

14.    NOTICES.    All notices, requests, demands and other communications ("*Notices*") hereunder shall be in writing and shall be delivered personally or sent by certified mail, first class postage prepaid and return receipt requested, to the other party hereto at his or its mailing address as set forth at the beginning of this Agreement.    Notices shall be deemed to have been given at the time when given, if personally delivered, or at the date postmarked, if mailed.    Any party may change the address to which such communications hereunder shall be sent by sending notice of such change to the other party as herein provided.

15.    SEVERABILITY.    If any provision of this Agreement or any part hereof is invalid, unlawful or incapable of being enforced by reason of public policy or any rule of law or principle of equity, all conditions and provisions of the Agreement which can be given effect

10

FURIE-ANK_00000920
DA01259

without such invalid, unlawful or unenforceable provision shall, nevertheless, remain in full force and effect.

16.     PRIOR AGREEMENTS; COMPLETE UNDERSTANDING; AMENDMENT. This Agreement supersedes and replaces any and all prior agreements and understandings between the parties hereto respecting the employment of the Executive by the Company and constitutes the complete understanding between the parties with respect to the employment of the Executive hereunder, and no statement, representation, warranty or covenant has been made by any party with respect thereto except as expressly set forth herein.  This Agreement shall not be altered, modified, amended or terminated except by written instrument signed by each of the parties hereto.

17.     HEADINGS.  The headings set forth in this Agreement are for convenience only and shall not be considered as part of this Agreement in any respect nor shall they in any way affect the substance of any provisions contained in this Agreement.

18.     DISPUTE RESOLUTION; FEES AND EXPENSES.

(a)     If a dispute arises between the Executive and the Company out of or in connection with this Agreement the parties may elect to resolve the dispute via mediation in Houston, Texas.  If, within thirty (30) days after the dispute arises, the mediation is unsuccessful, or if the parties elect to initially forgo mediation, any dispute between the Executive and the Company arising out of or in connection with this Agreement shall be submitted to trial by court or to a trial by a jury in Houston, Texas. Except as set forth in the following Section 18(b), each party shall pay his own fees and expenses in connection with any such mediation or trial proceeding.

(b)     In the event the Company shall discharge the Executive during the term of this Agreement and in a mediation and/or trial proceeding instituted pursuant thereto it shall be determined that said discharge was without an Act of Cause as defined herein, then the Company shall reimburse the Executive for all fees and expenses (including reasonable attorney's fees) incurred by him and arising out of, or in connection with, such controversy.

19.     GOVERNING LAW.  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Texas.

20.     CODE SECTION 409A COMPLIANCE.  The parties intend for payments and benefits provided pursuant to this Agreement be exempt from (as short-term deferral or involuntary separation pay), or comply with, the requirements of Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and guidance promulgated thereunder (collectively "*Code Section 409A*").  To the maximum extent possible, this Agreement shall be interpreted and administered consistent with such intent, including without limitation by modifying any provision hereof.  To the extent any provision hereof is modified for the purpose of complying with Code Section 409A, such modification shall be made in good faith and shall, to the maximum extent reasonably possible, maintain the original intent and economic benefit to Executive and the Company of the applicable provision without violating the provisions of Code Section 409A.  All taxable reimbursements and in-kind benefits provided under this Agreement

11

FURIE-ANK_00000921
DA01260

shall be made or provided in accordance with Code Section 409A including, where applicable, the requirement that (i) any reimbursement is for expenses incurred during the period of time specified in this Agreement, (ii) the amount of expenses available for reimbursement, or the in-kind benefits provided, during a calendar year may not affect the expenses eligible for reimbursement, or in-kind benefits provided, in any other calendar year, (iii) the reimbursement of an eligible expense will be made no later than the last day of the calendar year following the year in which the expense is incurred, and (iv) the right to reimbursement or in-kind benefits is not subject to liquidation or exchange for another benefit.  In no event shall the Company be liable for any tax, interest or penalty that may be imposed on Executive pursuant to Code Section 409A or any similar or related provision of U.S. tax law, or damages for failing to comply with Code Section 409A or similar or related provision of U.S. tax law.  For purposes of Code Section 409A, Executive's right to receive any instalment payments owing pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

21.    INDEMNIFICATION.

(a)    TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY HEREBY AGREES TO RELEASE, PROTECT, DEFEND AND INDEMNIFY AND HOLD FREE AND HARMLESS THE EXECUTIVE FROM, FOR AND AGAINST ANY AND ALL CLAIMS, DEMANDS, CAUSES OF ACTION, EXPENSES, LIABILITY, JUDGMENTS, AWARDS OR LOSSES WHATSOEVER (HEREINAFTER REFERRED TO AS "CLAIMS") BROUGHT OR SUFFERED BY ANY PERSONS RELATING TO OR ARISING FROM ANY ACTIVITY OR SERVICES BY EXECUTIVE UNDER THIS AGREEMENT, OR ANY BREACH OF THIS AGREEMENT BY THE COMPANY, TO THE EXTENT ANY SUCH CLAIMS IN ANY WAY ARISE OUT OF, RESULT FROM, OR ARE IN ANY WAY CONNECTED WITH THE EXECUTIVE'S SERVICES, OR THE COMPANY'S OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER AGREEMENT WITH ANY OTHER PERSON, ENTITY OR THIRD PARTY, OR THE COMPANY'S FAILURE TO COMPLY WITH ANY LAW OR REGULATION, EXCEPT TO THE EXTENT ANY SUCH CLAIMS ARE CAUSED BY OR ARISE OUT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT, FRAUD, BREACH OF THIS AGREEMENT OR FAILURE TO COMPLY WITH ANY LAW OR REGULATION BY THE EXECUTIVE.

(b)    The Company agrees that the Company shall maintain throughout the term of this Agreement, directors and officer's insurance, which shall extend to and cover Executive for all risks covered by such insurance.

*[SIGNATURES APPEAR ON THE FOLLOWING PAGE]*

12

FURIE-ANK_00000922
DA01261

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year first above written.

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By:  
Name: JEFFREY BRODSKY  
Title: MANAGER

**FURIE OPERATING ALASKA, LLC**

By:  
Name: JEFFREY BRODSKY  
Title: MANAGER

**CORSAIR OIL & GAS LLC**

By:  
Name: JEFFREY BRODSKY  
Title: MANAGER

By:  
DAVID W. ELDER

13

EXHIBIT A

Additional Bonus Criteria, if any:

Individual goals and targets will be used to measure additional bonus criteria and will be set annually with the Company's Board of Managers and agreed to by the Executive within thirty (30) days after the execution of this Agreement for the 2018 Contract Year and thereafter annually by December 1 for the subsequent Contract Years.

FURIE-ANK_00000924
DA01263

# EXHIBIT 58

DA01264

**Monday, June 11, 2018 at 8:13:51 AM Mountain Daylight Time**

| | |
|---|---|
| **Subject:** | FW: #2: Upcoming ECP Agreement - EVP employment contract request |
| **Date:** | Monday, June 11, 2018 at 3:59:04 AM Mountain Daylight Time |
| **From:** | Tim Otto |
| **To:** | Scott Pinsonnault |
| **Attachments:** | image001.png |

**Von:** Bruce Webb <b.webb@furiealaska.com>
**Datum:** Donnerstag, 29. März 2018 um 16:57
**An:** "van Stephoudt, Theodor" <tvanstephoudt@reedsmith.com>
**Cc:** "K A Y ... R I E C K" <rieck@deutsche-oel-gas.com>
**Betreff:** #2: Upcoming ECP Agreement - EVP employment contract request

As soon as I sent this, Kay called and told me how ECP was changing the terms of everything.
I had heard this was coming because of how David and his new team were acting...
That is one of the other reasons I wanted the protection and standing of an employment contract.

We should just file Chapter 11 and get rid of these lying snakes.

**From:** Bruce Webb <b.webb@furiealaska.com>
**Date:** Thursday, March 29, 2018 at 4:53 PM
**To:** "van Stephoudt, Theodor" <tvanstephoudt@reedsmith.com>
**Cc:** "K A Y ... R I E C K" <rieck@deutsche-oel-gas.com>
**Subject:** Upcoming ECP Agreement - EVP employment contract request

Theo,
I am planning on talking to Kay today about this, among other things.
Of course, this request is subject to his approval.

In the upcoming agreement with ECP, there will be a provision to renew or extend David Elder's contract.
In that agreement, I would also like to have an employment contract.
In my potential contract, I would like the position of **Executive Vice President** and the benefit of the **same terms and salary ($250,000)** as David Elder.
I think it is only fair that Furie fights for this, since ECP is fighting for Elder's.

**Here is why:**

I have never had the protection of a contract, only Kay's protection.
I have worked on this project for the last twelve (12) years.
Being an "Executive Vice President" rather than a Senior Vice President puts me on more equal ground with Elder.
  *right now I am an Officer, but not an Executive of the company.
Since working for Furie in 2011, I received one (1) salary increase from Damon Cade.
  * That increase was $15K per year.... Just enough to put me in a higher tax bracket and have a net loss in pay,
    I am sure that was Damon's intent – since Kay told him to give me a raise.  A $250K salary would be a $35K increase.
I am the only employee with a vested ownership interest in the company and its success.
Over the years I have saved Furie millions of dollars, and thwarted bad decisions that could have put the company out of business.
And lastly, although a bit childish, it would be a well deserved slap in David's face!

**Page 1 of 2**

FURIE-BANKR_00106770
DA01265

I know the intent is to get the ECP agreement, with Elder's new contract, executed by tomorrow. Adding something easy – and equal to Elder's should not be difficult.

Let's see what Kay thinks.

*Regards,*
*Bruce Webb*
*Sr. Vice President*



**188 W. Northern Lights Blvd., Suite 620**
**Anchorage, Alaska 99503**
**Office: 907.277.3726**
**Fax: 907.277.3796**
**Cell: 907.331-7399**
**Email: b.webb@furiealaska.com**

**Page 2 of 2**

# EXHIBIT 59

DA01267

| From: | Bruce Webb |
|---|---|
| Sent: | Monday, April 2, 2018 8:43 PM CDT |
| To: | David Elder; van Stephoudt, Theodor; K A Y ... R I E C K |
| CC: | Scott Pinsonnault; Christoph Mahler |
| Subject: | FW: Administrative Expense Claim in Aurora |
| Attachments: | SKMBT_75118033009500.pdf |
| Importance: | High |

Hi David,

Since you are the keeper of the numbers, can you look over the attachment (and see below) and determine if it correct?

Looks like we may be getting some money out of Aurora's bankruptcy.

*Thanks,*

*Bruce Webb*
*Sr. Vice President*

**From:** Gary Sleeper <gsleeper@jdolaw.com>
**Date:** Friday, March 30, 2018 at 11:15 AM
**To:** Bruce Webb <b.webb@furiealaska.com>
**Subject:** Administrative Expense Claim in Aurora

Hi Bruce. As you know the Aurora case converted to a Chapter 7. In the Rule 1019 report filed by the debtor (relevant page attached), the debtor reports Furie has an unpaid administrative expense claim in the case of approximately $717,000. Since the presently known administrative expenses total approximately $1.5, Furie holds approximately 46% of the Chapter 11 administrative expenses in the case. And since the Chapter 7 trustee is holding about $500,000 in cash, and expects to recover at least another $100k, there is a reasonable possibility a portion of Furie's administrative claim may be paid. You may ultimately have to deal with a preference claim, but for now it is important that your administrative claim is properly stated. So can you tell me whether Furie's administrative claim as reported in the form 1019 is correct? Thanks.

Gary



JERMAIN DUNNAGAN & OWENS, P.C.

**Gary C. Sleeper**
Jermain, Dunnagan & Owens, PC
3000 A Street, Suite 300
Anchorage, AK 99503
Tel: 907.563.8844
Fax: 907.563.7322

**MWE009274**

FURIE-BANKR_00106743
DA01268

**From:** Scan@JDOLaw.com [mailto:Scan@JDOLaw.com]
**Sent:** Friday, March 30, 2018 10:50 AM
**To:** Gary Sleeper <gsleeper@jdolaw.com>
**Subject:** Message from KMBT_751

*The information contained in this transmittal is confidential, may be subject to attorney-client privilege and is intended only for the use of the recipient named above. If the reader of this information is not the intended recipient, or the employee or agent responsible for delivery of this information to the intended recipient, you are hereby notified that this is not a waiver of privilege and any dissemination, distribution, or copying of this information is strictly prohibited. If you have received this information in error, please notify the sender immediately by telephone at (907) 563-8844 and delete this message from your system.*

**MWE009275**
FURIE-BANKR_00106744
DA01269

# EXHIBIT 60

DA01270

**EXHIBIT D**

**Resolutions**

**WRITTEN CONSENT IN LIEU OF**
**MEETING OF THE BOARD OF MANAGERS OF**
**FURIE OPERATING ALASKA, LLC**

**Effective as of April 12, 2018**

The undersigned, being all of the members of the board of managers (the "**Board**") of Furie Operating Alaska, LLC, a Delaware limited liability company (the "**Company**"), pursuant to, and in compliance with, Section 18-404 of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. and Section 7 of the Fourth Amended and Restated Limited Liability Company Agreement of the Company (the "**LLC Agreement**"), do hereby consent in writing that the following resolutions are adopted and are effective for all purposes as of the date hereof:

<u>**Approval of the Amendment and Restatement Documents**</u>

    **WHEREAS**, the Company is a wholly owned subsidiary of Cornucopia Oil & Gas Company, LLC (the "**Parent Company**", and together with the Company, the "**Borrowers**");

    **WHEREAS**, the Borrowers obtained funding for their operations and infrastructure being installed in the Cook Inlet in Alaska and its onshore gas processing facilities being constructed and installed onshore in Kenai, Alaska pursuant to that certain Credit Agreement, dated as of July 15, 2014 (as amended and restated pursuant to an Amended and Restated Credit Agreement, dated as of March 19, 2015, and as further amended, modified, amended and restated or supplemented prior to the date hereof, the "**Original Credit Agreement**") entered into by and among the Borrowers, Energy Capital Partners Mezzanine Opportunities Fund A, LP, a Delaware limited partnership ("**ECP Fund A**"), as administrative agent and collateral agent (the "**Administrative Agent**"), and Energy Capital Partners Mezzanine Opportunities Fund, LP, a Delaware limited partnership ("**ECP Fund LP**"), Energy Capital Partners Mezzanine Opportunities Fund B, LP, a Delaware limited partnership ("**ECP Fund B**"), Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, a Delaware limited partnership ("**ECP Alaska Midstream**"), and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP, a Delaware limited partnership ("**ECP Alaska Midstream II**" and together with the Administrative Agent, ECP Fund A, ECP Fund LP, ECP Fund B and ECP Alaska Midstream, collectively, the "**Lenders**");

    **WHEREAS**, in connection with the Original Credit Agreement, the Borrowers entered into (i) that certain Amended and Restated Accounts Agreement, dated as of March 19, 2015 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Amended and Restated Accounts Agreement**"), with ECP Fund A, as collateral agent (the "**Collateral Agent**") and Wells Fargo Bank, National Association, as depositary (the "**Depositary**") and (ii) that certain Deed of Trust With Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of July 15, 2014 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Deed of Trust**"), granted to First American Title Company, a California corporation, as the trustee (the "**Trustee**"), and acknowledged by the Collateral Agent, and each Lender;

    **WHEREAS**, in connection with the Original Credit Agreement, pursuant to that certain Pledge and Security Agreement, dated as of July 15, 2014 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Pledge and Security Agreement**"), by the Borrowers in

FURIE-ANK_00000306
DA01271

favor of the Collateral Agent, the Company granted a lien on all of the Company's assets to secure the obligations of the Borrowers under the Original Credit Agreement;

**WHEREAS**, in order to, among other things, obtain additional funding in an aggregate principal amount of up to $35,000,000 and arrange for the provision of a letter of credit for the account of the Borrowers, the Borrowers plan to enter into the Second Amended and Restated Credit Agreement, dated as of the date hereof (as amended, modified, amended and restated or supplemented from time to time, the "**Credit Agreement**") entered into by the Borrowers, the Lenders and the Administrative Agent, which amends and restates the Original Credit Agreement from and after the A&R Effective Date (as defined in the Credit Agreement);

**WHEREAS**, as a condition to the effectiveness of the Credit Agreement and in order to secure the Obligations (as defined in the Credit Agreement) of the Borrowers under the Credit Agreement, the Borrowers plan to amend the Deed of Trust by granting that certain Fourth Amendment to Deed of Trust with Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of the date hereof (the "**Deed of Trust Amendment**"), to the Trustee, which will be acknowledged by the Collateral Agent, and each Lender;

**WHEREAS**, as a condition to the effectiveness of the Credit Agreement, the Borrowers plan to enter into a Sixth Amendment to Amended and Restated Accounts Agreement and Reaffirmation Agreement, dated as of the date hereof, by and among the Borrowers, Deutsche Oel & Gas AG, a German corporation, Corsair Oil & Gas LLC, a Delaware limited liability company, Kay Rieck, an individual, the Lenders, the Depositary, the Administrative Agent and the Collateral Agent, pursuant to which, among other things, the Amended and Restated Accounts Agreement shall be amended and the Borrowers and Deustche Oel & Gas AG will confirm their respective guarantees, pledges, grants of security interest and other Obligations, under and subject to the terms of the Pledge and Security Agreement and the other Security Documents (as defined in the Credit Agreement) to which they are a party (the "**Amendment and Reaffirmation Agreement**" and together with the Credit Agreement, and the Deed of Trust Amendment, collectively the "**Amendment and Restatement Documents**");

**WHEREAS**, complete or substantially complete versions of each of the Amendment and Restatement Documents requested by the Board have been presented to the Board; and

**WHEREAS**, the Board finds it to be in the Company's best interest and for the Company's benefit to (i) enter into, execute and perform all of its obligations under the Amendment and Restatement Documents and the other Definitive Documents (defined below); and (ii) reaffirm its guarantees, pledges, grants of security interests, undertakings and other obligations, as applicable, under the Credit Documents (as defined in the Credit Agreement) to which it is a party.

**NOW THEREFORE BE IT RESOLVED**, as follows:

**RESOLVED**, that each of the Amendment and Restatement Documents, and the terms thereof and the transactions contemplated thereby be, and is hereby, authorized and approved in all respects;

**RESOLVED**, that the Company be and is hereby authorized and directed to execute and deliver and perform the Amendment and Restatement Documents, and each Credit Document and any instruments, certificates, financing statements or agreements required thereunder and such agreements, certificates, instruments and other documents as any Authorized Signatory (as defined below) may determine to be required or advisable in connection with the Amendment and Restatement Documents and each Credit Document or otherwise to effectuate any of these resolutions (herein collectively called "**Definitive Documents**"), the execution thereof to be conclusive evidence of such determination and the

FURIE-ANK_00000307
DA01272

authority therefor, to file and record (or to authorize and cause the filing or recording of) financing statements and other filings or recording documents and instruments with respect to the Collateral (as defined in the Credit Agreement), to perform all of its obligations under such Definitive Documents and to take all other actions as any Authorized Signatory may determine to be required or advisable in connection with the transactions contemplated by the Definitive Documents or otherwise to effectuate any of the resolutions herein, the taking of such action to be conclusive evidence or such determination and the authority therefor;

**RESOLVED**, that the Company be and is hereby authorized and directed to reaffirm the grant of the security interests in the Collateral created by the Security Documents (as defined in the Credit Agreement and as amended by the Amendment and Restatement Documents), and any instruments or agreements required to which the Company is a party in connection with the contemplated transactions; and

**RESOLVED**, that each of David W. Elder, as Chief Financial Officer, and Scott M. Pinsonnault, as Interim Chief Operating Officer (each, an "**Authorized Signatory**") be and are hereby authorized and directed, acting individually, to execute, deliver and perform, on behalf of the Company, each of the Definitive Documents and any and all other necessary documents and take all other required actions as may be necessary or advisable in such Authorized Signatory's opinion to effectuate, consummate and comply with the purposes and intent of the Definitive Documents and the transactions contemplated thereby, the execution thereof or the taking of any such action to be conclusive evidence of such determination and the authority therefor.

**Approval of the Project Management Agreement**

**WHEREAS**, the Board finds it to be in the Company's best interest and for the Company's benefit to engage Petroleum Resources of Alaska, LLC ("**PRA**") to provide certain management services to the Company, including oversight and execution of well completion and drilling planning, geoscience, health, safety, environmental, permitting, procurement, regulatory compliance, engineering, and operations services, pursuant to a management agreement to be entered into by the Company, Corsair Oil & Gas LLC, and PRA in the form attached hereto as **Annex A** (the "**Project Management Agreement**") on the date hereof, and to execute and deliver any other documents and agreements contemplated to be delivered by the Company in connection with the Project Management Agreement, as applicable, including or otherwise ancillary to or reasonably necessary in connection with the actions contemplated thereby; and

**WHEREAS**, in connection with the Project Management Agreement and the Credit Agreement, the Board finds it to be in the Company's best interest and for the Company's benefit for the Company to enter into the Consent to Collateral Assignment in the form and attached hereto as **Annex B** (the "**PRA Consent**") on the date hereof; and

**WHEREAS**, complete or substantially complete versions of the Project Management Agreement and the PRA Consent have been presented to the Board.

**NOW, THEREFORE, BE IT RESOLVED**, that the Project Management Agreement and PRA Consent be, and hereby are, adopted, approved and confirmed in all respects; and

**RESOLVED**, that each of the Authorized Signatories be and are hereby authorized and directed, acting individually, to execute, deliver and perform, on behalf of the Company, the Project Management Agreement, the PRA Consent and any and all other necessary documents and take all other required actions as may be necessary or advisable in such Authorized Signatory's opinion to effectuate,

FURIE-ANK_00000308
DA01273

consummate and comply with the purposes and intent of the Project Management Agreement and the transactions contemplated by each of the aforementioned documents, the execution thereof or the taking of any such action to be conclusive evidence of such determination and the authority therefor.

### Approval of the First Amendment

**WHEREAS**, the Board has reviewed that certain First Amendment to the Fourth Amended and Restated Limited Liability Company Agreement of the Company, to be dated as of the date hereof, by the Parent Company, substantially in the form attached hereto as **Annex C** (the "**First Amendment**"); and

**WHEREAS**, the Board finds it to be in the best interest and benefit of the Company to amend the LLC Agreement as set forth in the First Amendment and to authorize, adopt and approve the First Amendment and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith.

**NOW, THEREFORE, BE IT RESOLVED**, that the First Amendment be, and hereby is, adopted, approved and confirmed in all respects, and that all other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith be, and hereby are, approved and confirmed in all respects; and

**RESOLVED FURTHER**, that each of the Authorized Signatories be, and each of them acting alone hereby is, authorized to execute and deliver in the name and on behalf of the Company any documents and agreements attached to the First Amendment, referred to therein and contemplated to be delivered by the Company in connection therewith, in each case with such additions thereto, changes therein or deletions therefrom, as such Authorized Signatories executing and delivering the same in the name and on behalf of the Company may deem necessary, appropriate, advisable or desirable, with the execution and delivery thereof by such Authorized Signatories to be conclusive evidence of such determination.

### Approval of the Removal

**WHEREAS**, the Board finds it to be in the best interest and benefit of the Company to remove Thomas E. Hord as Chief Operating Officer of the Company (the "**Removal**").

**NOW, THEREFORE, BE IT RESOLVED**, that the Removal be, and hereby is, approved and confirmed; and

**RESOLVED FURTHER**, that Scott M. Pinsonnault, as Interim Chief Operating Officer of the Company, be, and hereby is, authorized to take any and all action, in the name and on behalf of the Company, deemed necessary, appropriate, advisable or desirable with respect to effectuating the Removal.

### General Authorization and Ratification of Prior Acts

**NOW, THEREFORE, BE IT RESOLVED**, that, consistent with the foregoing resolutions, each Authorized Signatory and any officer or employee or agent of the Company under the supervision or management and direction of an Authorized Signatory, in each case, on behalf of the Company, be, and each of them acting alone hereby is, authorized and empowered in the name and on behalf of the Company to carry out fully the intent and purposes of the foregoing resolutions and each of the actions or transactions contemplated thereby, and to, in connection therewith, (a) prepare, execute and deliver or cause to be prepared, executed and delivered, and where necessary, advisable, desirable or appropriate, file or cause to be filed with the appropriate governmental authorities, all other agreements, instruments

FURIE-ANK_00000309
DA01274

and documents, including, but not limited to, all certificates, contracts, bonds, receipts or other papers, (b) incur and pay or cause to be incurred or paid all fees, expenses and taxes, including, without limitation, legal fees and expenses, (c) engage such persons as he or she shall in his or her judgment determine to be necessary, advisable, desirable or appropriate, and (d) do any and all other acts and things, as he or she deems necessary, advisable, desirable or appropriate (with the doing of any such act or thing being conclusive evidence that the same is deemed necessary, advisable, desirable or appropriate); and that any and all actions heretofore taken in the name and on behalf of the Company, in connection with the foregoing resolutions and each of the actions or transactions contemplated thereby, are hereby, in all respects, authorized, confirmed, ratified and approved as the actions of the Company.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

FURIE-ANK_00000310
DA01275

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____
Date: April 9, 2018

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____
Date:

**Kay Rieck**, in his capacity as the Member Manager

By: _____
Date:

Officer's Certificate of Furie Operating Alaska, LLC – Exhibit "D" – Signature Page

FURIE-ANK_00000311
DA01276

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____
Date:

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____
Date:

**Kay Rieck**, in his capacity as the Member Manager

By: _____
Date:

FURIE-ANK_00000312
DA01277

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____
Date:

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____
Date:

Kay Rieck, in his capacity as the Member Manager

By: _____
Date:

Officer's Certificate of Furie Operating Alaska, LLC - Exhibit "D" - Signature Page

FURIE-ANK_00000313
DA01278

**<u>Annex A</u>**

**Project Management Agreement**

FURIE-ANK_00000314
DA01279

# MASTER SERVICE AGREEMENT

THIS MASTER SERVICE AGREEMENT is entered into this 10th day of April, 2018 (the "*Effective Date*") by and between Furie Operating Alaska LLC and Corsair Oil & Gas LLC (collectively, the "*Company*") and Petrotechnical Resources of Alaska, LLC (the "*Contractor*") (the Company and the Contractor are referred to herein collectively as the "*Parties*" and each individually as a "*Party*"); *provided, however*, the rights and obligations of Corsair Oil & Gas LLC as Company hereunder shall only take effect, if at all, upon prior written notice from Furie Operating Alaska LLC to the Contractor. This Master Service Agreement, the Master Service Agreement Terms and Conditions attached hereto, any Work Orders issued pursuant to such Terms and Conditions and in any written instructions given to the Contractor by the Company in connection herewith or with such Terms and Conditions, and all Exhibits attached hereto, constitute and are collectively called the "*Agreement*".

## GENERAL INFORMATION

| | |
|---|---|
| **The Contractor**: Petrotechnical Resources of Alaska, LLC | **The Company**: Furie Operating Alaska LLC |
| An Alaska limited liability company | A Delaware limited liability company |
| The Contractor's Representative:<br>Name:  Tom Walsh (the "*Contractor Representative*") | The Company's Representative:<br>Name:    Scott Pinsonnault (the "*Company Representative*") |
| Address: 3601 C Street<br>        Suite 1424<br>        Anchorage, AK 99503 | Address:  188 W. Northern Lights Blvd.<br>        Suite 620<br>        Anchorage, AK 99503 |
| Telephone:  907-272-1232<br>Email:  tom@petroak.com | Telephone:  907-277-3726<br>Email:  s.pinsonnault@furiealaska.com |

**[Signatures appear on the following page]**

1

FURIE-ANK_00000315
DA01280

**IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement to be effective as of the date first above written.**

THE COMPANY

**Furie Operating Alaska LLC**

By: _____

Name: _____

Title: _____

**Corsair Oil & Gas LLC**

By: _____

Name: _____

Title: _____

THE CONTRACTOR

**Petrotechnical Resources of Alaska, LLC**

By: _____

Name:  Thomas Walsh

Title:  Managing Partner

2

FURIE-ANK_00000316
DA01281

MASTER SERVICE AGREEMENT
TERMS AND CONDITIONS

Capitalized terms used but not defined herein have the meanings ascribed to them in the Master Service Agreement dated April 10th, 2018 to which this document is attached. THE PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS REQUIRING ONE PARTY (THE INDEMNITOR) TO BE RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (THE INDEMNITEE).

THESE MASTER SERVICE AGREEMENT TERMS AND CONDITIONS ARE THE MASTER SERVICE AGREEMENT TERMS AND CONDITIONS REFERENCED IN THE MASTER SERVICE AGREEMENT (HEREINAFTER CALLED "*TERMS AND CONDITIONS*") AND FORM PART OF THE AGREEMENT BETWEEN THE PARTIES.

BOTH PARTIES REPRESENT TO EACH OTHER (1) THAT SUCH PARTY HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF SUCH PARTY HAS NOT CONSULTED AN ATTORNEY, THAT SUCH PARTY WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO CONSULT AN ATTORNEY, BUT MADE AN INFORMED DECISION NOT TO DO SO, AND (2) THAT SUCH PARTY FULLY UNDERSTANDS ITS RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

1.      *Description of Services Performed by the Contractor or Third Parties:*

*(a)* The Contractor agrees to provide services, technical advice, materials, and personnel ("*Contractor Personnel*"), required and requested by the Company through the issuance of written Work Orders from time to time in Alaska (collectively herein called the "*Work*" or the "*Services*"). Without limiting the foregoing, the Work includes all labor necessary to perform such Work, including the services and Work set forth in Exhibit A attached hereto or any specifications referenced in Exhibit A. The Work includes all deliverables related thereto and all materials, fabrications, assemblies, equipment, supplies, spare parts and components incorporated into or to be used in connection with the Work or furnished pursuant to this Agreement. All Work shall be governed by this Agreement, including these Terms and Conditions, and all Exhibits and any Work Orders specifically issued in connection herewith ("*Work Orders*"), which shall supersede any conflicting terms and conditions contained in any proposals, letters, work tickets, invoices, or any other documents, whether referenced herein or not, but not the terms of this Agreement. The Contractor shall arrange for its personnel, material and equipment required to perform any Work to be available and ready for the commencement of Work at the designated location, at the time and on the schedule specified by the Company and shall cause the performance of all of the Contractor's obligations under this Agreement.  Time is of the essence in this Agreement.

3

FURIE-ANK_00000317
DA01282

(b)  The Contractor or its affiliates may engage third parties to perform any portion of the Services; provided, however,

    (i)    Prior to retaining any such third party, the Contractor shall provide the Company with written notice that sets out the identity of the third party and the services it shall perform. Promptly thereafter, the Company shall inform the Contractor whether such third party is acceptable to the Company. Notwithstanding the foregoing, the Company retains the right at any time to prohibit any third party retained by the Contractor from accessing the Company's property or performing Services. At the Company's sole discretion, agreements with third parties for the performance of any portion of the Services shall be executed by the Company or, with prior written authorization of the Company, the Contractor may execute such agreements.

    (ii)    The Contractor shall be responsible for determining that the Work of each third party is being performed in accordance with the requirements of the Work Order and Exhibit A and notify the Company, of defects and deficiencies in the Work. The Company shall have the authority to reject Work that does not conform to the Work Order or Exhibit A and shall notify the Contractor about the rejection. The failure of the Company to reject Work shall not constitute the acceptance of the Work.

    (iii)    The Contractor shall cause any third party to comply with the health, safety, security and environmental policies and procedures of the Company while they are on the property of the Company.

    (iv)    The Contractor shall be responsible for any Work performed by the third parties.

**2.**    ***Fees and Expenses:***  The Company agrees to pay the Contractor the following fees for consulting and management services, which shall be based on the Master Rate Schedule set forth in Exhibit B attached hereto.

(a) PRA Principal in Charge Fee: The Contractor will designate a person (the "*PRA Principal in Charge*") who will be initially Tom Walsh, or a successor with similar experience and expertise, who will be available on a full-time basis and dedicated to this Agreement with the Company, unless a successor is appointed with the consent of the Company, which consent will not be unreasonably withheld or delayed.  A monthly retainer for the PRA Principal in Charge in the amount of $24,000 will be invoiced to the Company by the Contractor pursuant to the procedures set forth in paragraph 6(b) below, and hours worked by the PRA Principal in Charge on the project in excess of 80 hours per month will be charged at the rate of $300/hr;

(b) Consulting and Management Fees: The Contractor's fees for the Services set forth above for the assigned Contractor Personnel under each Work Order will be determined by multiplying the actual hours expended in the proper performance of the Work Order at the Contractor's standard hourly rates set forth on Exhibit B attached hereto.  The Contractors

FURIE-ANK_00000318
DA01283

rates generally are revised annually, but will not be increased without the consent of the Company. The Contractor's current hourly rates are provided in <u>Exhibit B</u> attached hereto; and

(c) Success Fee: The Parties may provide, as part of the scope of a Work Order, a success fee that provides an incentive to the Contractor to meet or exceed certain defined key performance metrics.

If at any time during the term of this Agreement the cumulative sum of the PRA Principal in Charge Fees and Consulting and Management Fees equals two million five hundred thousand dollars ($2,500,000), (i) the Company may suspend the performance of Services hereunder, and (ii) thereafter, the Company may re-evaluate the amount of the PRA Principal in Charge Fees and Consulting and Management Fees and the scope of work to be performed by the Contractor. Upon the Company's request, the Parties shall execute a written amendment to this Agreement to reflect any adjustments to the amount of the PRA Principal in Charge Fees and Consulting and Management Fees and/or revisions to the scope of work.

  *3.*  *Expense Reimbursement:* The Contractor shall be entitled to reimbursement of reasonable documented out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including the Contractor's cost of license and maintenance fees for software). If such expenses exceed, in the aggregate, more than $75,000 cumulatively, the Contractor shall notify the Company Representative in writing.

  *4.*  *Testimony, Subpoena Requests:* The Company agrees that if any of the Contractor's principals or professionals are required to testify at the request of the Company, on the Company's behalf or by legal, regulatory, administrative, arbitration or judicial order, at any proceeding related to the Work under this Agreement, the Contractor will be compensated by the Company for its associated time charged at the Contractor's scheduled hourly rates, in effect at the time and reimbursed for the Contractor's reasonable and documented out-of-pocket expenses, including counsel fees. In addition, the Contractor will be compensated for any time and expense (including, without limitation, reasonable and documented legal fees and expenses) that the Contractor may incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with, the Work or this Agreement.

  *5.*  *Retainer:* In connection with the foregoing, it is the Contractor's policy to receive an advance retainer for the fees and expenses. Upon execution of this Agreement, the Company shall provide the Contractor with such retainer in the amount of $200,000 (the "*Retainer*"). The Contractor may apply the Retainer to fees and expenses due and owing under this Agreement, and the Retainer will be maintained throughout the engagement and returned to the Company upon completion of the Contractor's services. Payment of the Retainer shall be made within five (5) business days after the execution of this Agreement. In addition, the Company agrees to replenish the Retainer upon request of the Contractor so that the amount of any Retainer is equal to the Contractor's estimated fees and expenses for the upcoming month. The Contractor reserves the right to apply the Retainer to outstanding fees and expenses as Work is performed and to expenses as they are incurred. The Company understands and acknowledges that any Retainer is earned by the Contractor upon receipt, any Retainer becomes the property of the Contractor upon receipt, the

FURIE-ANK_00000319
DA01284

Company no longer has a property interest in any Retainer upon the Contractor's receipt, any Retainer will be placed in the Contractor's general account, and will not be held in a client trust account, and the Company will not earn any interest on any Retainer; provided, however, that at the conclusion of the engagement under this Agreement, if the amount of any Retainer held by the Contractor is in excess of the amount of the Contractor's outstanding fees and expenses, the Contractor will pay to the Company the amount by which the Retainer exceeds such fees and expenses.  The Company further understands and acknowledges that the use of the Retainer is an integral condition of the engagement under this Agreement, is necessary to ensure that the Company continues to have access to the Contractor's services, the Contractor is compensated for the Work performed for the Company; the Contractor is not a pre-petition creditor in the event of a bankruptcy filing and that in light of the foregoing, the provision of the Retainer is in the Company's best interests.

### 6.    *Payment Obligations and Billing.*

(a) Payment Obligations: The payment of the fees and expenses hereunder are the exclusive obligations of the Company.  Prior to commencing any proceedings under any insolvency regime, the Company shall pay all invoiced amounts, whether for fees or expenses, to the Contractor by wire transfer of immediately available funds.

(b) Billing: In addition to the Retainer, the Company agrees to pay all fees and expenses within thirty (30) days upon receipt of an invoice to the Company for all Work performed and expenses incurred.  Payment of the fees, expenses and Retainer (including any additional amounts to replenish the Retainer) shall be made to the following account:

Direct to Wire Routing Transit Number (RTN/ABA) 121000248

Bank name Wells Fargo Bank, N.A.

Bank address, 420 Montgomery city & state San Francisco, CA 94104

BNF/Field 4200 Your complete Wells Fargo account number 1101372915

Beneficiary Petrotechnical Resources of Alaska, LLC

CHIPS Participant ABA 0509

(c) Lien Releases:    Each invoice submitted by Contractor shall be accompanied by a certificate from an authorized representative of Contractor in a form reasonably acceptable to Company stating that there are no liens or lienable claims on or against Company or its property by reason of the operations of, or services performed by, Contractor hereunder.

### 7.    *Duration of Agreement:* This Agreement may be terminated at the option of either Party by giving the other Party thirty (30) calendar days' prior written notice to that effect. For the purpose of giving this notice, or any notice that may be necessary in the performance of this Agreement, the address of the Parties shall be and remain as shown on page 1 of this Agreement until such notice is given by either Party to the other Party, in writing, of a change of address in

FURIE-ANK_00000320
DA01285

accordance with the notice provisions of this Agreement. Notwithstanding, any such termination notice, no such termination shall be effective as to any Work then being performed under any Work Order nor as to any warranty period ongoing at the time of such termination until the completion of any such Work, in the case of the Work, and expiration of the applicable warranty period, in the case of any warranty. The provisions of Sections 4, 5, 9, 10, 12, 17, 19, 20, 22, 23, 24, 25 and 27 shall survive the termination, cancellation, or completion of this Agreement and any Work performed hereunder. If: (i) the Contractor fails without good cause to perform the Work or any part thereof in a good, safe and workmanlike manner or to fully, faithfully or timely perform any of its obligations hereunder due to no fault on the part of the Company or (ii) the Contractor (a) goes into liquidation or bankruptcy (other than voluntarily for the purpose of re-organization or reconstruction), (b) makes an arrangement, composition or compromise with its creditors, or (c) has a receiver appointed in respect of the whole or any part of its assets, or (iii) the equivalent of (ii) (a), (b) or (c) above occurs, the Company may at any time thereafter terminate this Agreement and any Work Order upon issuance of written notice without any liability to the Contractor except that the Company shall compensate the Contractor for any Work performed to the date of such termination, provided however that if liquidation under sub-clause (a) above occurs, this Agreement and any Work Order shall automatically terminate without any notice being required. Such termination shall be without prejudice to the Company's rights at law or in equity to claim damages against the Contractor for its failure to perform the Work or any part thereof.

   *8.*     *Payment of Claims; No Liens:* The Contractor shall promptly pay all bills and other indebtedness for labor and for materials furnished or purchased by it involved in or arising out of this Agreement and any Work Order, and shall maintain detailed books and records relating thereto. The Company shall pay the Contractor's undisputed invoices in a timely manner, the Contractor agrees to keep and maintain the Work and assets and property of the Company and its affiliates, owners, and joint venture partners free from any liens and encumbrances arising out of the Work or asserted or filed by the Contractor or any of its affiliates and subcontractors during and after completion of the Work under this Agreement, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement. *The Contractor hereby agrees to indemnify, defend and hold harmless the Company and its affiliates, owners, employees, agents, and joint venture partners from and against any such liens or claims to any lien arising (by operation of law or otherwise), asserted or filed against the Company or any of its affiliates, owners, employees, agents, or joint venture partners or any of its or their oil and gas wells and other property and assets in connection with the Contractor's performance under this Agreement, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement, regardless of any joint, contributory, comparative or other negligence or fault of any person or entity entitled to be indemnified hereunder. If the Contractor fails to satisfy or discharge any such lien or charge promptly after receiving notice from the Company, the Company may, at its option, pay or discharge any such liens and may deduct such payments from any sum due, or which thereafter becomes due, to the Contractor hereunder.*

   *The Contractor acknowledges and agrees that neither it nor any affiliate, employee, owner, agent or sub-contractor has the right, power or authority to create, incur or permit to be imposed on any vessel owned, leased or contracted by the Company any liens whatsoever, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement.*

FURIE-ANK_00000321
DA01286

9.    *Standard of Performance/Warranties:*

**9.1** The Contractor warrants and represents that the Work will be performed safely, in a good and workmanlike manner and in accordance with good offshore oilfield practices, the Contractor regularly conducts training and safety programs, all materials, equipment, goods, supplies or manufactured articles furnished by the Contractor in the performance of the Work shall comply with specifications and requirements set forth in an applicable Work Order, and that the Contractor will not employ in the Work for the Company any employee whose employment violates applicable labor laws. The Contractor shall familiarize itself with the locations where the Work will be performed and the hazards that might be encountered and take all appropriate precautions to protect all persons who are at any time directly or indirectly affected by the Work.

**9.2** The Contractor further warrants and represents that (i) the Work shall be conducted in accordance with all applicable safety laws and regulations, precautions and procedures and by employing reasonable protective equipment and devices as required by safety associations, government agencies, municipalities, or otherwise, (ii) any equipment, materials or supplies incorporated into or utilized in the performance of the Work shall be free from defects pursuant to the written specification provided in the Work Order or Exhibit A, and (iii) the Contractor shall perform the Work and cause its subcontractors to perform the Work in compliance with any specifications applicable to the Work that are provided by the Company. The Contractor will replace, at its sole expense, any of its employees whose replacement is requested by the Company for good cause. Without limiting the Company's remedies, the Contractor agrees that, subject to the provisions of this Section 9, any portion of the Work found to be defective or incorrectly performed or unsuitable shall be removed, corrected, replaced, or corrected by the Contractor without additional cost (including transportation costs) or risk to the Company, provided the Contractor is notified by the Company within thirty (30) business days after the Company's discovery of the defective Work, and provided further that such obligation to repair, correct or re-perform shall under no circumstances extend for a period which exceeds thirty (30) days from performance of the Work by the Contractor, provided the Company provides the Contractor notice of the non-compliance prior to its departure from the work site.

**9.3** (a) Without limiting the Company's remedies, the Contractor agrees that, subject to the provisions of this Section 9, such obligation to repair, correct or re-perform shall under no circumstances extend for a period which exceeds one hundred and eighty (180) days from performance of the Work by the Contractor. With respect to machinery, equipment, materials or other products purchased from third parties, the Contractor shall have no warranty obligation under this Agreement if: (i) any product is not stored or handled in a safe and workmanlike manner by the Company, its affiliates or contractors (other than the Contractor) after delivery and/or is not installed, operated or maintained in accordance with the Contractor's written operation and maintenance instructions; (ii) the defect of the Work resulted from damages occurring after delivery of the product, which damages do not arise out of any defective work performed by the Contractor; or (iii) any defect was not reported by the Company within  thirty (30) business days after the Company's discovery of the defective Work. *The Contractor makes no warranties with respect to materials or supplies manufactured or supplied by third parties and hereby assigns to*

8

FURIE-ANK_00000322
DA01287

*the Company, to the extent possible, all warranties and guarantees received from the manufacturers and suppliers of machinery, equipment, materials or other products.*

(b) *THE CONTRACTOR'S WARRANTY OBLIGATIONS ABOVE SHALL NOT APPLY TO THE EXTENT ANY NON-COMPLIANCE IS CAUSED DIRECTLY BY (i) ANY ALTERATION OR REPAIR BY THE COMPANY OF ANY GOODS, SERVICES OR EQUIPMENT, OR THE COMPANY'S FAILURE TO PROPERLY USE, OPERATE OR MAINTAIN ANY GOODS OR EQUIPMENT IN ACCORDANCE WITH THE CONTRACTOR'S OR THE MANUFACTURER'S RECOMMENDATION, (ii) ABNORMAL WELL CONDITIONS, (iii) VANDALISM BY A PARTY OTHER THAN AN EMPLOYEE OF THE CONTRACTOR, (iv) FORCE MAJEURE (AS DEFINED IN SECTION 15), OR (v) INCORRECT, INCOMPLETE OR INACCURATE DATA, DRAWINGS, INFORMATION OR SPECIFICATIONS PROVIDED TO THE CONTRACTOR BY THE COMPANY.*

**EXCEPT FOR THE EXPRESS WARRANTIES CONTAINED IN THIS SECTION 9 AND IN SECTIONS 19 AND 21, THE CONTRACTOR DISCLAIMS ALL OTHER WARRANTIES EXPRESS OR IMPLIED AND ALL IMPLIED OR STATUTORY WARRANTIES OF FITNESS FOR PURPOSE, MERCHANTABILITY AND OTHER STATUTORY REMEDIES WHICH ARE INCONSISTENT WITH THIS CLAUSE ARE EXPRESSLY WAIVED.**

**9.4**     Prior to beginning the Work, the Contractor shall obtain and maintain thereafter throughout the term of this Agreement and any Work Order all licenses, permits, certificates, and other forms of documentation required for the Contractor to operate its business and perform its services to be provided for the Company under this Agreement, provided however that the Company shall secure and maintain all permits, licenses and permissions necessary to perform the Work under any Work Order, including any access necessary to reach any well site. If the Contractor is denied any access to a well or Work site, the Company shall pay the Contractor for all time lost at the rates specified in this Agreement unless access was denied due to the negligence or fault of the Contractor.

**10. Title to the Work and Materials.** Title to the Work in and to all goods and materials furnished by the Contractor and incorporated or intended to be permanently incorporated into the Work shall transfer to the Company immediately upon payment therefor, subject always to the Contractor's obligation to fix, repair or replace defective Work or equipment as per Section 9.

**11. Intellectual Property/Work Product:** To the extent that a Party or any of its affiliates learns, discovers, develops or creates any intellectual property or other rights arising out of this Agreement containing the Company's proprietary or confidential information, those rights are the exclusive property of such Party, provided however that if any of the Contractor's intellectual property are incorporated into the Work or any equipment or property sold or leased to the Company as part of the Work, the Company shall have an irrevocable, non-transferable, non-exclusive, fully paid (royalty free), perpetual license (without the right to sublicense) to use such intellectual property to the extent necessary for the Company to utilize the Work. The cost of

9

FURIE-ANK_00000323
DA01288

obtaining or enforcing any intellectual property or other rights will be borne by the Party that owns the rights.

**12. *Indemnification***: Each Party shall provide indemnification, contribution and reimbursement as set forth in <u>Schedule I</u> hereto.  The terms and provisions of <u>Schedule I</u> hereto are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement.  Further, if an indemnified person is requested or required to appear as a witness in any Action (as defined in <u>Schedule I</u> hereto) that is brought by or on behalf of or against the indemnifying Party or that otherwise relates to this Agreement or the Services rendered by the Contractor hereunder, the indemnifying Party shall reimburse the indemnified Party for all reasonable, documented, actual out-of-pocket expenses incurred by them in connection with such indemnified person appearing or preparing to appear as such a witness, including without limitation, the reasonable and documented fees and disbursements of legal counsel. In support of the indemnity obligations set out in <u>Schedule I</u> hereto, each Party shall provide, each for the benefit of the other Party, coverage and amounts of liability insurance set out in Section 13. Notwithstanding anything to the contrary contained in this Agreement, a Party's total, cumulative indemnity obligation under this Agreement shall not in any circumstances exceed the maximum amount of the applicable insurance coverage limits set forth in Section 13; provided, however, this limitation of liability shall not apply to any losses, liabilities, damages or claims attributable to or arising from the Contractor's breach or non-compliance with Section 8 (Payment of Claims; No Liens), Section 13 (Insurance), Section 23 (Confidentiality), <u>Schedule I</u> hereto, or in circumstances of the willful misconduct or gross negligence of the applicable Party's Group (i.e., Company Group or Contractor Group).

**13. *Insurance.***  Each Party shall purchase and maintain in full force and effect, with underwriters acceptable to the indemnified Party (all carriers shall be AM Best A rated as a minimum or otherwise agreed by the indemnified Party), the following policies of insurance of the indemnifying Party, which shall be primary as to any other valid and existing policies of insurance of the indemnified Party but only to the extent of the indemnifying Party's indemnification obligations. Except for Worker's Compensation Insurance and Employers' Liability Insurance, all such policies shall name all members of indemnified Party and its respective affiliates, as applicable, as additional assureds, but only to the extent of indemnifying Party's indemnification obligations set forth in this Agreement. All policies shall waive all rights of subrogation by the underwriters against all members of the indemnified Party and its respective affiliates, as applicable, but only to the extent of such Party's indemnification obligations set forth in this Agreement.

**13.1 *Workers' Compensation & Employers' Liability Insurance:***

    a.   All States where operations are being conducted.

    b.   Coverage "B" Employers' Liability
           Limit: $1,000,000 Each Accident Bodily Injury by Accident
                $1,000,000  Policy Limit Bodily Injury by Disease
                $1,000,000 Each Employee Bodily Injury by Disease

    c.   Alternate Employer Endorsement

FURIE-ANK_00000324
DA01289

**13.2. *Commercial General Liability Insurance:*** Standard ISO Commercial General Liability conditions with the following conditions:

    a.  Premises/operations coverage

    b.  The Contractor's protective work let or sub-let

    c.  Products and Completed Operations coverages

    d.  Contractual liability specifically insuring the Agreement between the Company and the Contractor.

    e.  Sudden and accidental pollution coverage

    f.  Deletion of any Watercraft Liability Exclusions.

    g.  Minimum Coverage Limits:

       Limit: $1,000,000 each occurrence/$2,000,000 general aggregate.

**13.3. *Maritime Employer's Liability Coverage (including coverage for Transportation, Wages Maintenance and Cure)("MEL"):*** In an amount not less than $1,000,000 any one accident or occurrence. The MEL coverage can be placed on a separate policy and shall contain the following endorsements:

    a.  In Rem

    b.  Alternate Employer

    c.  Death on the High Seas Act

    d.  Waiver of Subrogation

**13.4 *Automobile Liability Insurance:***

    a.  Coverage to include all owned, non-owned and hired Automobiles.

    b.  Minimum Coverage Limits:

       Combined single limit $1,000,000 each accident

**13.5 *Umbrella:*** No less than $5,000,000 each accident and in the aggregate above the coverage provided in Section 13.1 through Section 13.4 above.

FURIE-ANK_00000325
DA01290