**13.6 General:** If the Contractor employs subcontractors to perform any Work, then the Contractor agrees to require such subcontractors to obtain, carry and keep in force during the time in which they are engaging in performing the Work hereunder, policies of insurance as set forth above in proportion to the value of the Work performed by the Contractor's subcontractors. Failure to maintain said insurance, approved as aforesaid, shall constitute sufficient grounds for the immediate cancellation or suspension of this Agreement by the Company.

**14  Accidents to be Reported:** In the event any member of the Contractor is involved in any loss, injury or damage on any member of the Company's premises or vessels, or if such injury, loss or damage involves any member of the Company's property, equipment or personnel or the property, equipment or personnel of any member of the Contractor or if such accident involves any third party in any manner whatsoever while the Contractor or any of its affiliates is performing any duties within the scope of this Agreement, the Contractor shall promptly report such injury, loss or damage to the attention of the Company's Representative or their designated representative. If the matter involves loss of life, serious injury or substantial property loss or damage, this report shall be made by telephone call, followed as soon as possible by a report in writing via electronic means. If the matter is of a less serious nature, notification may be made by letter posted in regular United States mail. All injuries, loss or damage must be reported. The reporting of any such matter will not imply any admission of liability on the part of any member of the Company or any member of the Contractor.

**15. Force Majeure:** The Agreement is subject to all applicable federal, state and local laws, orders, rules and regulations. Any delays in or failures of performance by either Party shall not constitute default hereunder or give rise to any claims for damages, if and to the extent such delays or failures of performance of the Work are caused by occurrences of *Force Majeure*. For purposes of this Agreement, "*Force Majeure*" includes, but is not limited to, acts of God, acts of the public enemy, *Laws and Regulations*, wars or warlike action (whether actual or impending), arrests and other restraints of government (civil or military), blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, sabotage, tropical storms and hurricanes, civil disturbances, tidal waves, explosions, confiscation or seizure by any government or other public authority, and any other causes, whether of the kind herein enumerated or otherwise, that are not reasonably within the control of the Party claiming a suspension and that could not have been overcome by the exercise of ordinary diligence. For purposes of this Agreement, "*Laws and Regulations*" means [the valid laws, rules, regulations, and orders (both civil and military) of the United States of America and all other governmental bodies having jurisdiction over the Work, or any part thereof, or any site where any part of the Work is performed, or any transportation routes to and from such site, whether such now exist or hereafter come into effect]. The Party experiencing *Force Majeure* shall notify the other Party with reasonable promptness of the existence of any such *Force Majeure* and the probable duration thereof, and shall provide the other Party from time to time with correct information concerning same. The Party experiencing *Force Majeure* shall take all reasonable actions to remove or avoid the cause of *Force Majeure*.

**16. Assignment of Agreement:** Neither Party shall assign this Agreement or any portion of the Work without the prior written consent of the other Party; however, the Contractor may assign its right to payment for Work performed to any person or entity with written notice to, and consent by, the Company, which shall not be unreasonably withheld, and provided further that the

FURIE-ANK_00000326
DA01291

Company may assign (i) this Agreement to any affiliated entity on notice to the Contractor and (ii) all or any part of its rights, benefits and interests of this Agreement and any Work Order to any financial institution or lender providing financing to the Company and its operations. The Contractor agrees to sign a consent to assignment of such rights, benefits and interests of the Company with any of the Company's lenders in form and substance reasonably acceptable to the Contractor and the Company's lenders. No assignment by the Company shall release the Company from or diminish its liabilities and responsibilities under this Agreement.

**17. *Alterations*:** No changes or alterations shall be made to Work unless they are in writing and signed by properly authorized representatives of both the Company and the Contractor.

**18. *Waiver*.** No benefit or right accruing to either Party under this Agreement shall be waived unless the waiver is reduced to writing and signed by both Parties to this Agreement. The failure of either Party to exercise any of its rights under this Agreement shall in no way constitute a waiver of those rights, nor shall such failure excuse the other Party from any of its obligations under this Agreement.

**19. *Labor, Equipment, Materials, Supplies, and Services*:**

**19.1** In the performance of the Work, the Contractor is an independent contractor, with the authority to control and direct the performance of the details of the Work, the Company being interested only in the results obtained, but the Work shall meet the approval of the Company. The Contractor specifically agrees that all persons employed by the Contractor in performing Work covered by this Agreement, or by the Contractor's subcontractors, are not the employees of the Company for any purpose whatsoever, and the Contractor hereby agrees to immediately reimburse the Company for all contributions, taxes, interest and penalties necessarily paid by the Company under any unemployment, compensation, labor or insurance laws covering employees of the Contractor or the Contractor's subcontractors.

**19.2** In all cases where the Contractor's employees (defined to include the Contractor's direct, borrowed, special, or statutory employees) are covered by the Louisiana Worker's Compensation Act, La.Rev.Stat. §23:1021 *et seq.,* the Company and the Contractor agree that all Work performed by the Contractor and its employees pursuant to this Agreement are an integral part of and are essential to the ability of the Company to generate the Company's own goods, products and services for purposes of La. Rev.Stat. §23:1061(A) (1). Furthermore, the Company and the Contractor agree that the Company is the principal or statutory employer of the Contractor's employees for purposes of La.Rev.Stat. §23:1061(A) (3). Irrespective of the Company's status as the statutory employer or special employer (as defined in La.Rev.Stat. §23:1031(C)) of the Contractor's employees, the Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from the Company.

**19.3** The Contractor warrants, represents, and guarantees that all tools and equipment used will be furnished, and all Work (and labor to be performed under the terms of this Agreement) will be performed in accordance with all applicable federal, state, and local laws, rules, regulations, orders, and ordinances and with the provisions of this Agreement.

FURIE-ANK_00000327
DA01292

**19.4** The Contractor shall keep and maintain equipment furnished by the Company in good condition, at the Contractor's sole expense, and upon the termination of the use of such equipment, return same to the Company in as good condition as when received, ordinary wear and tear excepted.

**19.5** The Contractor shall examine, before using, all vessels, materials, equipment and supplies furnished by the Company for performance directed pursuant to this Agreement, and will exercise diligence in reporting to the Company any apparent defects to allow the Company to replace same without delaying operations.

**20. *Audit:*** The Contractor shall maintain a true and correct set of records pertaining to Work performed or goods supplied hereunder and all transactions related thereto. The Contractor further agrees to retain all such records for a period of not less than two (2) years from the completion of the Work performed or goods supplied hereunder. Any representative authorized by the Company may audit at any reasonable time or times at the Contractor's normal place of business within such two (2) year period any and all records of the Contractor relating to the Work performed or goods supplied hereunder and all transactions related thereto for the purpose of determining whether there has been compliance with this Agreement. If an audit is commenced within such two (2) year period, the books and records shall be maintained for as long as reasonably required to complete the audit. The Company agrees to take commercially reasonable steps to maintain the confidentiality of the Contractor's books and records reviewed in connection with any such inspection or audit. Notwithstanding anything to the contrary herein, it is understood and agreed that the Company shall not be entitled to the Contractor's cost structures, calculations of the basis for its personnel hourly rates, prices charged or amounts paid to its vendors, profit margins, trade or professional information, drawings, formula and designs, any documents or materials subject to attorney-client or similar privilege, or other confidential or proprietary information.

**21. *Government Regulations:***

**21.1** The Contractor shall comply, where applicable, with the following clauses contained in 41 CFR: Sections 60-1.4(a) (Equal Employment Opportunity); 1-12.803-10 (certification of non-segregated facilities); Part 50-250 (employment opportunity for veterans); Part *60-741* (employment opportunities for handicapped individuals); Sections 1-1.710 (subcontracting with small business concerns); 1-1.805 (subcontracting with labor surplus area concerns); 1-1.1310 (subcontracting with minority business enterprises); and 42 USC §12101 *et seq.* (the Americans with Disabilities Act). These clauses are incorporated herein by reference if and to the extent applicable to this Agreement by law, executive order, or regulation. The Contractor represents that it is in compliance with the reporting requirements of 41 CFR § 60-1.40 and Part 60-2.

**21.2** The Contractor shall comply where applicable with all environmental protection laws, regulations, orders and rules issued by any governmental agency having jurisdiction over the area in which operations are being conducted. These laws, regulations, orders and rules are incorporated herein by reference if and to the extent applicable to this Agreement by law, executive order or regulations.

FURIE-ANK_00000328
DA01293

**22. *Applicable Law:*** To the extent that Work activities are maritime in nature, this Agreement shall be interpreted and construed in accordance with United States General Maritime Law, excluding any conflicts of law principles that would direct the substantive law of another jurisdiction to apply. To the extent that maritime law is inapplicable, the substantive laws of the State of Alaska shall apply excluding any conflicts of law principles that would direct the substantive law of another jurisdiction to apply. Any suit or proceeding hereunder shall be brought in any U.S. Federal District Court having personal jurisdiction over the Parties and venue over the civil action. Each Party hereby irrevocably consents to the jurisdiction of such federal courts and waives any objection that such courts are an inconvenient forum. If subject matter jurisdiction in U.S. Federal District Court is not available, any suit or proceeding hereunder shall be brought in any state court of competent jurisdiction located in Anchorage, Anchorage Borough, Alaska, and the parties hereby agree to personal jurisdiction in such courts and waive any objection that such courts are an inconvenient forum.

**23. *Confidentiality*.** All information obtained by all members of the Company and the Contractor in performing the Work including, without limitation, information concerning seismic operations, well depths, formations penetrated, coring, testing, surveying and completions; any other information which the discloser of such information ("*Disclosing Party*") deems proprietary or confidential; or any other information (whether delivered in writing or orally) that by its nature would be reasonably considered as confidential ("*Confidential Information*") shall be held strictly confidential by the Party receiving such information ("*Receiving Party*"), and shall not, without Disclosing Party's prior written permission, be divulged by any member of Receiving Party to any person or entity whatsoever other than designated representatives of Disclosing Party. Receiving Party shall use the same degree of care to avoid disclosure of such information as Receiving Party employs with respect to its own Confidential Information of like importance. The Parties hereto agree that information shall not be deemed Confidential Information, and Receiving Party shall have no obligation with respect to any such information which: (i) was generally known to the public prior to the disclosure under this Agreement; (ii) is already known to Receiving Party prior to receipt from Disclosing Party as evidenced by written records of Receiving Party dated prior to the receipt; (iii) is or becomes publicly known through no wrongful act of Receiving Party or any person to whom the Receiving Party discloses such information; (iv) is received from a third party without breach of this Agreement or any other obligation to maintain the confidentiality of such information; (v) is independently developed by Receiving Party, as evidenced by contemporaneously prepared documented records; or (vi) is required to be disclosed by securities laws or the rules or regulations of a stock exchange. Any combination of elements of information shall not be deemed to be excluded from the class of Confidential Information by reason of each such element satisfying one or more of the exclusions set forth in clauses (i)-(vi) of this Section unless the combination itself satisfies one or more such exclusions. If Receiving Party or its Representatives are requested or required by legal process to disclose any Confidential Information, Receiving Party shall promptly notify Disclosing Party of such request or requirement so that Disclosing Party may seek an appropriate protective order or waive compliance with this Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, Receiving Party or its Representatives are compelled to disclose the Confidential Information, Receiving Party and its Representatives may disclose only such of the Confidential Information to the party compelling disclosure as is required by law and, in connection with such compelled disclosure, Receiving Party shall use its best efforts to obtain from the party to whom disclosure is made

FURIE-ANK_00000329
DA01294

written assurance that confidential treatment will be accorded to such portion of the Confidential Information as is disclosed. Notwithstanding the provisions of this paragraph, a Party may disclose and authorize the use of the Confidential Information to its (i) employees, (ii) agents, (iii) affiliates, (iv) professional advisors (including legal and financial advisors and insurance carriers or consultants), to the extent such disclosure is necessary for such advisors to provide such advice, and (v) financing parties for the purposes of negotiating, renegotiating or securing financing by the Disclosing Party or its affiliates; and, in the case of professional advisors or financing parties owe confidentiality obligations under written agreement with the Disclosing Party that contains substantively the same terms as those contained in this paragraph (collectively, "*Representatives*"). In any event, the Receiving Party shall be responsible for any breach of the terms of this Agreement by any of its Representatives. All written data delivered by Disclosing Party to Receiving Party pursuant to this Agreement shall be and remain the property of Disclosing Party, and all such written data, and all copies thereof, shall be promptly returned to Disclosing Party upon written request, or destroyed at Disclosing Party's option. Without the prior written consent of the Company, the Contractor shall not use the Company's name in connection with any publicity, release, advertisement, or other publication.

    **24. *Entire Agreement*.** Except as specifically agreed in writing by the Parties, this Agreement and its Exhibits supersede all negotiations, understandings and agreements between the Parties and constitutes the entire understanding and agreement between the Parties relative to the Work. This Agreement shall not be modified or supplemented, nor shall any benefit or right accruing to the Company or the Contractor under this Agreement (or any Amendment or Addendum) be deemed waived by the terms of any other purchase order, invoice or other document unless the proposed modification, supplementation or waiver is approved and signed by the expressly authorized representatives of the Parties, having actual authority, by separate written instrument (which states an express intent to modify, supplement or waive this Agreement) signed in advance of the Work being performed.

    **25. *Third Parties*:** Except as specifically provided for elsewhere in this Agreement, this Agreement shall not be construed to confer any benefit on any third party not a Party to this Agreement nor shall it provide any rights to such third party to enforce its provisions.

    **26. *Drugs and Alcohol*:** To help ensure a safe, productive work environment. the Company may establish a program designed to prohibit the use, transportation and possession of firearms, drugs and/or controlled substances, drug paraphernalia and alcoholic beverages on helicopters, boats, vessels, drill rigs, offshore platforms, drilling locations, or the Company's other premises. The Company understands and accepts that the Contractor utilizes a third party service to administer its controlled substance program. Illegal drugs include marijuana, amphetamines, barbiturates, opiates, cocaine, codeine, morphine, hallucinogenic substances (LSD) and any similar drugs and/or chemical synthetics deemed hazardous by the Company. Such programs if established, upon notice shall apply to those of the Contractor's employees, agents, servant and subcontractors performing work on the Company's worksite. The Company specifically reserves the right to carry out reasonable searches of individuals, their personal effects and vehicles when entering, on and leaving the Company's premises. The Company will initiate the searches without prior announcement. Individuals found in violation will be removed from the Company's premises immediately. Submission to such a search is strictly voluntary, however, refusal may be cause for

FURIE-ANK_00000330
DA01295

not allowing that individual on the well site or the Company's other premises. It is the Contractor's responsibility to notify its employees of this prohibition and its enforcement.

**27.  *Consequential Damages:*** Notwithstanding anything to the contrary contained elsewhere herein, neither the Contractor nor the Company shall be liable to the other Party's Group (i.e., Company Group or Contractor Group, as applicable) for any damages that could not fairly and reasonably be considered as directly arising naturally from the breach in question, including, but not limited to, loss of use, loss of profit, loss of revenue, business interruption, loss of productivity, loss of efficiency, acceleration, loss of product or production (or any other damages not measured by actual damages that could not fairly and reasonably be considered as arising naturally from the beach in question) or punitive damages of any kind or character whenever arising under this Agreement or any Work Order or as a result of, relating to or in connection with the Work, and no claim for any such damages or losses shall be made by either the Contractor or the Company against the other Party, and EACH PARTY SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE AFFILIATES AS APPLICABLE, AGAINST SUCH DAMAGES OR LOSSES, REGARDLESS OF WHETHER SUCH CLAIM IS BASED OR CLAIMED TO BE BASED ON NEGLIGENCE (INCLUDING SOLE, CONTRIBUTORY JOINT, ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE), UNSEAWORTHINESS, UNAIRWORTHINESS, FAULT, BREACH OF WARRANTY, BREACH OF AGREEMENT, STATUTE, STRICT LIABILITY OR OTHERWISE AND INCLUDING PRE-EXISTING CONDITIONS.

**28.  *Severability:*** If, in any legal proceeding, it is determined that any provision of this Agreement is unenforceable under applicable law, the unenforceable provision shall automatically be amended to conform to that which is enforceable under the law. In any event, the validity or enforceability of any provision shall not affect any other provision of this Agreement, and the Agreement shall be construed and enforced as if such provision had not been included.

**29.  *Execution/Counterparts:*** This Agreement and any Work Order may be executed by the Parties by electronic, facsimile or original signatures and may be executed in one or more counterparts, each of which shall constitute an original and all of which when read together shall constitute one and the same instrument.

**30.  *Independent Contractors:*** In connection with the Services, the Contractor may, with consent, not to be unreasonably withheld, from the Company utilize employees, agents or independent contractors or its own affiliates or its own agents or independent contractors. References in this Agreement to  personnel of the Contractor shall apply equally to employees, agents or independent contractors of the Contractor and its affiliates. The parties intend that an independent contractor relationship will be created by this Agreement.  As an independent contractor, the Contractor will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business. Employees of the Contractor will not be entitled to receive from the Company any vacation, sick pay, leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. The Contractor will be responsible for all withholding, income and other taxes incurred in connection with the operation and conduct of its business.

17

FURIE-ANK_00000331
DA01296

# EXHIBIT A

## Work to be Performed

**Pursuant to Master Services Agreement Dated April 10, 2018**

**Parties: Furie Operating Alaska LLC, and**

**Petrotechnical Resources of Alaska, LLC**

### Scope of Work and Job Specifications:

| Minimum Required Job Categories | Maximum Rates |
|---|---|
| PRA Principal in Charge | $24,000/mo |
| Drilling Manager | $350/hr |
| Drilling Engineer | $250/hr |
| Petroleum Engineer | $300/hr |
| Reservoir Engineer | $250/hr |
| Geophysicist | $250/hr |
| Geologist | $250/hr |
| Petrophysicist | $250/hr |
| Logistics | $200/hr |
| Scheduler | $175/hr |
| Procurement specialist/Contracts | $175/hr |
| Safety Engineer | $200/hr |
| HSE Field Compliance | $2100/day |
| Permitting | $175/hr |
| Company Man | $2300/day |
| Wellsite Geo | $1800/day |
| Cost controller | $175/hr |
| Engineering Tech | $125/hr |

FURIE-ANK_00000332
DA01297

**PRA Scope**

| Well | Task | Description |
|------|------|-------------|
| KLU-1 | Develop Completion Design Basis | Refine perf intervals, packer depth, tubing size |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | AFE | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Update service contracts | Update existing service company contracts, or negotiate new contract terms |
| | Sundry level procedures | High level definition of wellwork activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Complete on paper | Walk through of well completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well completion |
| | AOGCC Sundry submission, review, approval | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-A4 | Finalize BHL, directional design | Integrate seismic and well data to finalize well target locations and directional design |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | Drilling Design | Prepare preliminary design for drilling and completion of well |
| | AFE | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Update service contracts | Update existing service company contracts, or negotiate new contract terms |
| | Permit to Drill procedures | High level definition of well operations activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Drill the well on paper | Walk through of well completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well drilling and completion |
| | Permit to Drill, AOGCC | Submit Permit to Drill to AOGCC for their review and approval |
| | Sundries upon completion | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-3 | Develop design basis for workover/completion | Plan for removing existing completion, squeezing all perforations, and recompleting |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | AFE, cost estimate and schedule | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Sundry level procedures | High level definition of wellwork activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Workover and Complete on paper | Walk through of well workover and completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well workover and completion |
| | AOGCC Sundry submission, review, approval | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-A2A | Monitor performance | Develop plan for accessing Sterling, and adding Beluga perfs as early as 2019 |

FURIE-ANK_00000333
DA01298

| General | Logistics | Contract boats, shore base, helicopter |
|---|---|---|
| | Bathymetry/mitigation plan | Detailed bathymetry around platform |
| | Safety/HSE | Response, bridging document |
| | Permitting | Obtain existing permits from Furie, update as required. Update permitting compliance matrix |
| | Additional permits | Obtain Permits specific to the proposed operations, SPCC, MG1, AOGCC Sundry's etc. |
| | Inspection and commission of rig | Finalize and approve rig contract with Spartan and 3rd party inspectors. Prep rig for operations, or such other rig as the Contractor recommends and is approved by the Company. |
| | Project schedule and management | Update and issue project schedule |
| | MSA and workorder agreement | Select vendors, agree, prepayment and credit terms, not sufficient time for RFP process |
| | MSA and work orders | Negotiate terms of MSAs and Work Orders, and present same to the Company, which will execute such instruments. The Contractor may execute such instruments in its own name or on behalf of the Company only with the prior written consent of the Company, as set forth in Section 1(b) of the Agreement. |
| | Cost management/tracking/vetting | Define invoice review process |
| | Miscellaneous | Additional work done at written direction of Company, including workovers of existing wells, recompletions of existing wells, drilling new wells, and investigations for additional reserve potential |
| Asset management | Update current ADNR Plan of Development | Agency relations, secure updated Plan of Development approval |
| | Reservoir Characterization | Seismic interpretation, 3D static model, dynamic model |
| | Depletion Plan | Surveillance, additional wells, Sterling reserves exploitation |
| | Annual reporting | Plan of Development, pressure reports, permit compliance reporting |
| | Facilities upgrades | Monitoring and surface sand control |
| | Water handling | Permitting and drilling disposal well, if needed |
| | Facility and pipeline monitoring and reporting | Monitor facilities, provide direction on operating parameter's |
| | Production Surveillance | Monitor well, provide direction on flowing parameter's, recommend remedial operations |
| | Production Management | Supervise production operations, production internal and regulatory reporting |

FURIE-ANK_00000334
DA01299

**EXHIBIT B**

## MASTER RATE SCHEDULE
### Effective: April 10, 2018



**Petrotechnical Resources of Alaska, LLC (PRA) 2017 Rate Schedule**

| | |
|---|---|
| General Clerk | $55.00 per hour |
| Secretary/Word Processor | $65.00 per hour |
| Administrator | $70.00 per hour |
| Senior Administrator | $85.00 per hour |
| Technical Assistant | $95.00 per hour |
| Assistant Professional | $120.00 per hour |
| Associate Professional | $130.00 per hour |
| Professional 1 | $150.00 per hour |
| Professional 2 | $165.00 per hour |
| Senior Professional 1 | $175.00 per hour |
| Senior Professional 2 | $185.00 per hour |
| Supervising Professional 1 | $200.00 per hour |
| Supervising Professional 2 | $230.00 per hour |
| Principal Professional 1 | $200.00 per hour |
| Principal Professional 2 | $250.00 per hour |
| Principal Professional 3 | $300.00 per hour |
| Principal Professional 4 | $350.00 per hour |
| Oil and Gas Legal Advisor | $350.00 per hour |
| Expert Witness Testimony | $350.00 per hour |

21

FURIE-ANK_00000335
DA01300

**Schedule I**

This <u>Schedule I</u> is a part of and incorporated into the agreement (the *"Agreement"*), dated as of April 10th, 2018, by and between Petrotechnical Resources of Alaska, LLC (the *"Contractor"*), and Furie Operating Alaska, LLC, a Texas limited liability company (the *"Company"*), pursuant to which the Contractor has been engaged to provide consulting and management services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

The following defined terms are used in this Agreement:

> *"Liabilities"* means any losses, claims, damages, judgments, assessments, costs and other liabilities.

> *"Action"* means any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any indemnified person is a party.

Notwithstanding anything in this Agreement to the contrary, the following indemnities shall apply, subject to the limitation on damages addressed in Section 27 of the Agreement: (i) Company's "Knock-for-Knock" Indemnity. COMPANY SHALL FULLY INDEMNIFY AND DEFEND THE CONTRACTOR AND ITS AFFILIATES AND THEIR RESPECTIVE DIRECTORS/MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS AND OTHER AGENTS APPOINTED BY ANY OF THE FOREGOING AND EACH OTHER PERSON, IF ANY, CONTROLLING THE CONTRACTOR OR ANY OF ITS AFFILIATES (THE CONTRACTOR AND EACH SUCH PERSON AND ENTITY BEING REFERRED TO AS THE *"CONTRACTOR GROUP"*) FROM AND AGAINST ANY AND ALL DAMAGES TO THE EXTENT ARISING FROM INJURY TO OR ILLNESS OR DEATH OF ANY EMPLOYEE OR AGENT OF ANY MEMBER OF THE COMPANY AND ITS AFFILIATES AND THEIR RESPECTIVE DIRECTORS/MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS AND OTHER AGENTS APPOINTED BY ANY OF THE FOREGOING AND EACH OTHER PERSON, IF ANY, CONTROLLING THE COMPANY OR ANY OF ITS AFFILIATES (THE COMPANY AND EACH SUCH PERSON AND ENTITY BEING REFERRED TO AS THE *"COMPANY GROUP"*) OR FROM ANY LOSS OF OR DAMAGE TO ANY PROPERTY OF ANY MEMBER OF THE COMPANY GROUP, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE CONTRACTOR GROUP. The Company agrees that this voluntary and mutual indemnity agreement will be supported by insurance of the types and in at least the minimum amounts required in Section 13, and shall be primary to any other insurance provided by the Company Group. The Company agrees to consult and cooperate in good faith with the Contractor in the selection and retention of legal counsel to represent the Contractor in any Action with respect to an indemnifiable claim. Notwithstanding the foregoing, the Contractor may select its own counsel to participate in any Action at the Contractor's sole cost and expense; provided, however, the Contractor's right to participate in any Action shall not limit the Company's obligations hereunder. The Company will not, without prior written consent of the Contractor (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any member of the Contractor Group is a

FURIE-ANK_00000336
DA01301

party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of the Contractor Group from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any member of the Contractor Group.

(ii) Contractor's "Knock-for-Knock" Indemnity. CONTRACTOR SHALL FULLY INDEMNIFY AND DEFEND THE COMPANY GROUP FROM AND AGAINST ANY AND ALL DAMAGES TO THE EXTENT ARISING FROM INJURY TO OR ILLNESS OR DEATH OF ANY EMPLOYEE OR AGENT OF ANY MEMBER OF THE CONTRACTOR GROUP OR FROM ANY LOSS OF OR DAMAGE TO ANY PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE COMPANY GROUP. The Contractor agrees that this voluntary and mutual indemnity agreement will be supported by insurance of the types and in at least the minimum amounts required in Section 13, and shall be primary to any other insurance provided by the Contractor Group. The Contractor agrees to consult and cooperate in good faith with the Company in the selection and retention of legal counsel to represent the Company in any Action with respect to an indemnifiable claim. Notwithstanding the foregoing, the Company may select its own counsel to participate in any Action at the Company's sole cost and expense; provided, however, the Company's right to participate in any Action shall not limit the Contractor's obligations hereunder. The Contractor will not, without prior written consent of the Company (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any member of the Company Group is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of the Company Group from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any member of the Company Group.

FURIE-ANK_00000337
DA01302

**<u>Annex B</u>**

**PRA Consent**

506433.20002
US_ACTIVE-139713923.7

FURIE-ANK_00000338
DA01303

### Form of Consent to Collateral Assignment

This CONSENT TO COLLATERAL ASSIGNMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Consent**"), dated as of [_____], 20[\_\_], is entered into by [_____], a [_____] ("**Project Party**"), CORNUCOPIA OIL & GAS COMPANY, LLC, a Delaware limited liability company ("**Cornucopia**"), FURIE OPERATING ALASKA, LLC, a Delaware limited liability Company ("**FOA**" and, together with Cornucopia, "**Furie**"), and ENERGY CAPITAL PARTNERS MEZZANINE OPPORTUNITIES FUND A, LP, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns in such capacity, "**Collateral Agent**") for the Secured Parties (as defined in the Credit Agreement referred to below).

### RECITALS

A.    Furie intends to develop, procure, construct, finance, own, operate and maintain the Project (as defined in the Credit Agreement referred to below).

B.    Furie and Project Party have entered into that certain [_____], dated as of [_____] (the "**Assigned Agreement**"), pursuant to which [*describe Assigned Agreement*].

C.    In order to finance the development, design, engineering, construction, operation and maintenance of the Project, Furie has entered into that certain Credit Agreement, dated as of July 15, 2014, among Furie, Collateral Agent and the other lenders party thereto (as amended and restated by that certain Amended and Restated Credit Agreement, dated as of March 19, 2015, by and among Furie, Collateral Agent and the lenders party thereto and that certain Second Amended and Restated Credit Agreement, dated as of April 12, 2018 by and among Furie, Collateral Agent and the lenders party thereto and as it may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") pursuant to which, among other things, the lenders party thereto have agreed to provide funds for the foregoing.

D.    Furie has agreed to secure all of its obligations under the Credit Agreement and the other Credit Documents (as defined in the Credit Agreement) by granting to Collateral Agent, for the benefit of the Secured Parties, a first priority lien on substantially all of the assets and properties owned by Furie.  Pursuant to that certain Pledge and Security Agreement, dated as of July 15, 2014 (as amended on August 11, 2016, the "**Security Agreement**") among Furie and Collateral Agent, Furie has, among other things, collaterally assigned all of its right, title and interest in, to and under (but not Furie's liabilities, obligations or duties with respect to), and granted Collateral Agent, for the benefit of the Secured Parties, a first priority security interest in the Assigned Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the parties hereto hereby agree, notwithstanding anything to the contrary in the Assigned Agreement, as follows:

FURIE-ANK_00000339
DA01304

1.    <u>Definitions</u>.    Unless otherwise stated, references herein to any Person shall include its successors and permitted assigns and, in the case of any governmental authority, any Person succeeding to its functions and capacities.

2.    <u>Representations and Warranties</u>.    Project Party hereby represents and warrants that as of the date hereof:

(a)    Project Party is a [_____] duly organized and validly existing and in good standing under the laws of [_____], and is duly qualified to do business and is in good standing in the State of Alaska and in all other jurisdictions where necessary in light of the business it conducts and the property it owns and intends to conduct and own and in light of the transactions contemplated by the Assigned Agreement.

(b)    Project Party has the full power, authority and legal right to execute, deliver and perform its obligations hereunder and under the Assigned Agreement.  The execution, delivery and performance by Project Party of this Consent and the Assigned Agreement and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary partnership, limited liability company, shareholder or other organizational action.    This Consent and the Assigned Agreement have been duly executed and delivered by Project Party and constitute the legal, valid and binding obligations of Project Party, enforceable against it in accordance with their respective terms, except as the enforceability thereof may be limited by (i) applicable bankruptcy, insolvency, moratorium, or other similar laws affecting the enforcement of creditors' rights generally and (ii) the application of general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(c)    The execution, delivery and performance by Project Party of this Consent and the Assigned Agreement do not and will not (i) require any consent or approval of the managers, directors or officers of Project Party, any partner, membership interest holder or shareholder of Project Party, any governmental authority or of any other Person which has not been obtained and each such consent or approval that has been obtained is in full force and effect, (ii) violate any provision of any law having applicability to Project Party or any provision of the organizational documents of Project Party, (iii) conflict with, result in a breach of or constitute a default under any provision of the organizational documents of Project Party or any indenture or loan or credit agreement or any other agreement, lease or instrument to which Project Party is a party or by which Project Party or its property or assets are bound or affected, or (iv) result in or require the creation or imposition of any lien or encumbrance upon or with respect to any of the property or assets of Project Party now owned or hereafter acquired.

(d)    There is no action, suit or proceeding at law or in equity by or before any governmental authority, arbitral tribunal or other body now pending or, to the knowledge of Project Party, threatened against or affecting Project Party or any of its property or assets which (i) if adversely determined, individually or in the aggregate, could have a material adverse effect on its ability to perform its obligations hereunder or

R-2

FURIE-ANK_00000340
DA01305

under the Assigned Agreement or (ii) questions the validity, binding effect or enforceability hereof or of the Assigned Agreement.

(e)     There exists no event of default or circumstance which, with the passage of time or giving of notice, would constitute an event of default under the Assigned Agreement by Project Party and, to the best knowledge of Project Party, Furie.

3.     Consent to Assignment.  Project Party hereby acknowledges and consents to the collateral assignment under the Security Agreement of all of Furie's right, title and interest in, to and under the Assigned Agreement to Collateral Agent. Project Party further acknowledges, consents and agrees that:

(a)     Collateral Agent and any designee or assignee thereof shall be entitled to exercise any and all rights of Furie under the Assigned Agreement in accordance with its terms and Project Party shall comply in all respects with such exercise.  Without limiting the generality of the foregoing, Collateral Agent and any assignee thereof shall have the full right and power to enforce directly against Project Party all obligations of Project Party under the Assigned Agreement and otherwise to exercise all remedies thereunder and to make all demands and give all notices and make all requests required or permitted to be made by Furie under the Assigned Agreement.

(b)     In the event of a default by Furie in the performance of any of its obligations under the Assigned Agreement, or upon the occurrence or non-occurrence of any event or condition under the Assigned Agreement which would immediately or with the passage of any applicable grace period or the giving of notice, or both, enable Project Party to terminate or suspend its performance under the Assigned Agreement (each hereinafter a "**Default**"), notwithstanding any notice period provided in the Assigned Agreement, Project Party will not terminate or suspend its performance under the Assigned Agreement until it first gives prompt written notice of such Default to Collateral Agent and affords Collateral Agent or its designee or assignee the following cure periods: (i) prior to any suspension of performance (without terminating the Assigned Agreement), a cure period of fifteen (15) Business Days from receipt of notice of Default, (ii) prior to any termination as a result of a non-monetary Default, so long as Collateral Agent has confirmed in writing that Collateral Agent or its designee or assignee intends to cure such default within thirty (30) days after receipt of notice of such Default, a cure period of ninety (90) days from the receipt of a notice of Default and (iii) prior to any termination as a result of a payment Default, a cure period of fifteen (15) Business Days from the receipt of a notice of Default; provided, however, that during such cure periods Collateral Agent or its designee or assignee continues to perform each of Furie's other obligations under the Assigned Agreement; provided, further that (a) if possession by Collateral Agent or its designee or assignee of any portion of the Project owned by Furie (whether owned as of the date hereof or hereafter acquired, transferred or assigned to Collateral Agent or otherwise) or possession of any of Furie's other properties is necessary to cure any non-monetary Default and Collateral Agent notifies Project Party that an event of default has occurred and is continuing under the Security Agreement or any other Credit Document, and Collateral Agent or its designee or assignee commences foreclosure proceedings, Collateral Agent or its designees or

R-3

FURIE-ANK_00000341
DA01306

assignees will be allowed a reasonable time to complete such proceedings and the time period specified in clause (i) of this Section 3(b) shall be extended for such period (but in no event shall such cure period exceed, in the aggregate, one hundred twenty (120) days following receipt of such notice of a Default) and (b) if Collateral Agent or its designee or assignee is prohibited from curing any such Default by any process, stay or injunction issued by any governmental authority or pursuant to any bankruptcy or insolvency proceeding or other similar proceeding involving Furie, then the time periods specified herein for curing a Default shall be extended for the period of such prohibition so long as Collateral Agent or its designee or assignee is diligently pursuing its rights or remedies in such proceeding or otherwise.

(c)     Project Party agrees that it will not, without the prior written consent of Collateral Agent, not to be unreasonably withheld, conditioned or delayed: (i) assign or otherwise transfer any of its rights or obligations under the Assigned Agreement, (ii) terminate (other than the expiration of the Assigned Agreement in accordance with its terms) the Assigned Agreement, except to the extent there has been a repayment in full of all outstanding obligations secured under the Security Agreement and the other Credit Documents or (iii) enter into any amendment or other modification of the Assigned Agreement.   Project Party acknowledges that, under the Credit Documents, Furie is required to obtain the consent of Collateral Agent prior to agreeing to any amendment, modification or waiver of, or consent or approval under, the Assigned Agreement.

(d)     Project Party shall deliver to Collateral Agent, concurrently with the delivery thereof to Furie, a copy of each notice, request or demand given by Project Party pursuant to the Assigned Agreement.

(e)     In the event that Collateral Agent or its designee(s) succeeds to Furie's interest under the Assigned Agreement, whether by foreclosure or otherwise, (i) Project Party shall recognize Collateral Agent or such designee(s) as its counterparty under the Assigned Agreement and will continue to perform its obligations thereunder, and (ii) the liability of Collateral Agent or such designee(s), as applicable, under the Assigned Agreement and the sole recourse of Project Party in seeking enforcement of the obligations under the Assigned Agreement shall be limited to the extent of the obligations assumed by Collateral Agent or such designee(s), as applicable, under the Assigned Agreement.   Except as otherwise set forth in clause (ii) immediately above, none of Collateral Agent, ECP Administrative Agent (as defined in the Credit Agreement) or the Secured Parties shall be liable for the performance or observance of any of the obligations or duties of Furie under the Assigned Agreement, and the assignment of the Assigned Agreement by Furie to Collateral Agent for the benefit of the Secured Parties shall not give rise to any duties or obligations whatsoever on the part of Collateral Agent or the Secured Parties owing to Project Party.

(f)     Upon the exercise by Collateral Agent of the remedies set forth in the Credit Documents, Collateral Agent may assign its rights and interests and the rights and interests of Furie under the Assigned Agreement to any purchaser or transferee, if

R-4

FURIE-ANK_00000342
DA01307

such purchaser or transferee shall assume all of the obligations of Furie under the Assigned Agreement.  Upon such assignment and assumption, Collateral Agent shall be relieved of all obligations under the Assigned Agreement arising after such assignment and assumption.

(g)    In the event that (i) the Assigned Agreement is rejected by a trustee or debtor-in-possession in any bankruptcy or insolvency proceeding involving Furie or (ii) the Assigned Agreement is terminated as a result of any bankruptcy or insolvency proceeding involving Furie and, if within 90 days after such rejection or termination, Collateral Agent or its designee(s) shall so request and shall certify in writing to Project Party that it or its designee intends to perform the obligations of Furie as and to the extent required under the rejected or terminated Assigned Agreement, Project Party promptly shall execute and deliver to Collateral Agent or such designee(s) a replacement Assigned Agreement, which shall be for the balance of the remaining term under the rejected or terminated Assigned Agreement before giving effect to such rejection or termination and shall contain the same conditions, agreements, terms, provisions and limitations as such rejected or terminated Assigned Agreement (except for any requirements which have been fulfilled by Furie and Project Party prior to such rejection or termination). References in this Consent to the "Assigned Agreement" shall be deemed also to refer to such new Assigned Agreement.

(h)    In the event that Collateral Agent or its designee(s), or any purchaser, transferee, grantee or assignee of the interests of Collateral Agent or its designee(s) in the Project assumes or becomes liable under the Assigned Agreement (as contemplated in subsections (e), (f) or (g) above or otherwise), liability in respect of any and all obligations of any such party under the Assigned Agreement shall be limited solely to such party's interest in Furie's rights under the Assigned Agreement and in the Project (and no officer, director, employee, shareholder or agent thereof shall have any liability with respect thereto).

4.    Miscellaneous.

(a)    No failure on the part of Collateral Agent or any of its agents or designee(s) to exercise and no delay in exercising, and no course of dealing with respect to, any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The remedies provided herein are cumulative and not exclusive of any remedies provided by law.

(b)    All notices, requests and other communications provided for herein and under the Assigned Agreement (including, without limitation, any modifications of, or waivers or consents under, this Consent) shall be given or made in writing (including, without limitation, by facsimile transmission) delivered to the intended recipient at the "Address for Notices" specified below its name on the signature pages hereof or, as to any party, at such other address as shall be designated by such party in a notice to each other party.  Except as otherwise provided in this Consent, all such communications shall

FURIE-ANK_00000343
DA01308

be deemed to have been duly given when transmitted by facsimile transmission or personally delivered or, in the case of a mailed notice, upon receipt, in each case given or addressed as aforesaid.

(c)      This Consent may be amended or modified only by an instrument in writing signed by Project Party, Furie and Collateral Agent, and any provision of this Consent may be waived only by Collateral Agent.  Any waiver shall be effective only for the specified purpose for which it was given.

(d)      This Consent shall be binding upon and inure to the benefit of the respective successors and assigns of Project Party, Furie, the Secured Parties and Collateral Agent (provided, however, that neither Project Party nor Furie may assign or transfer their respective rights hereunder without the prior written consent of Collateral Agent).

(e)      This Consent may be executed in any number of counterparts, all of which when taken together shall constitute one and the same instrument and any of the parties hereto may execute this Consent by signing any such counterpart.  This Consent shall become effective at such time as Collateral Agent shall have received counterparts hereof signed by all of the intended parties hereto.  Delivery of an executed counterpart of a signature page of this Consent by facsimile transmission or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Consent.

(f)      If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of Collateral Agent and the other Secured Parties in order to carry out the intentions of the parties hereto as nearly as may be possible and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

(g)      Headings appearing herein are used solely for convenience and are not intended to affect the interpretation of any provision of this Consent.

(h)      The agreements of the parties hereto are solely for the benefit of Project Party, Furie and Collateral Agent and the other Secured Parties, and no Person (other than the parties hereto, the Secured Parties and their successors and assigns permitted hereunder) shall have any rights hereunder.

(i)      This Consent shall be governed by, and construed under, the laws of the State of New York, without regard to the conflict of law principles that would result in the application of any law other than the law of the State of New York (other than Section 5 1401 and Section 5 1402 of the New York General Obligations Law).

R-6

FURIE-ANK_00000344
DA01309

(j)    **EACH OF PROJECT PARTY AND FURIE HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS CONSENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH OF PROJECT PARTY AND FURIE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

(k)    **EACH OF PROJECT PARTY, FURIE AND COLLATERAL AGENT HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS CONSENT OR THE ASSIGNED AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PROJECT PARTY, FURIE AND COLLATERAL AGENT TO ENTER INTO THIS CONSENT.**

(l)    All obligations of Cornucopia and FOA hereunder shall be joint and several, and all references herein to Furie shall be deemed to be Cornucopia and FOA, acting jointly and severally.

[Signature Pages Follow]

R-7

FURIE-ANK_00000345
DA01310

IN WITNESS WHEREOF, each of the undersigned by its officer duly authorized has caused this Consent to Collateral Assignment to be duly executed and delivered as of the date first written above.

**PROJECT PARTY:**                    [_____]

                                   By:  _____
                                         Name:
                                         Title:

Address for Notices:

R-8

FURIE-ANK_00000346
DA01311

**CORSAIR:**                                    **CORSAIR OIL & GAS, LLC**

By: _____
       Name:
       Title:


**FOA:**                                        **FURIE OPERATING ALASKA, LLC**

By: _____
       Name:
       Title:


Address for Notices for Corsair and FOA:

<u>If to FOA</u>:

Corsair Oil & Gas, LLC
Furie Operating Alaska, LLC
Attn:   David W. Elder, CFO
188 W. Northern Lights Blvd., Suite 620
Anchorage, AK 99503


       -    and -

<u>With a copy to</u>:

ReedSmith LLP
Attn: David M. Hryck
599 Lexington Avenue, 22nd Floor
New York, New York, 11022
Phone: 212-549-0370
Email: dhryck@reedsmith.com

Stoel Rives LLP
Attn: Jon Iversen
510 L Street, Suite 500
Anchorage, AK 99501
Phone: (907) 263-8420
Fax:    (907) 277-1920
Email: jeiversen@stoel.com


Signature Page to Consent to Collateral Assignment

FURIE-ANK_00000347
DA01312

**Collateral Agent:**

**ENERGY CAPITAL PARTNERS
MEZZANINE OPPORTUNITIES FUND A, LP,**
as administrative agent and collateral agent for the
Secured Parties

By: _____

     Name:

     Title:

Address for Notices:

    12680 High Bluff Drive, Suite 400
    San Diego, CA 92130
    Attention: Andy Singer
    Fax: +1 (858) 703-4401
    E-mail: asinger@ecpartners.com

    With a copy (which will not constitute notice) to:

    12680 High Bluff Drive, Suite 400
    San Diego, CA 92130
    Attention: Jennifer Gray
    Fax: +1 (858) 703-4401
    E-mail: jgray@ecpartners.com

FURIE-ANK_00000348
DA01313

**Annex C**

**First Amendment**

506433.20002
US_ACTIVE-139713923.7

FURIE-ANK_00000349
DA01314

**FIRST AMENDMENT**
**TO THE**
**FOURTH AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**
**OF**

**FURIE OPERATING ALASKA, LLC**
**A Delaware Limited Liability Company**

This First Amendment (this "<u>Amendment</u>") to the Fourth Amended and Restated Limited Liability Company Agreement of Furie Operating Alaska, LLC (the "<u>Company</u>") is adopted on April 12, 2018 (the "<u>First Amendment Effective Date</u>") by Cornucopia Oil & Gas Company, LLC, a Delaware limited liability Company ("<u>Cornucopia</u>"), in its capacity as the sole member of the Company (the "<u>Sole Member</u>").

<u>RECITALS</u>

A.     The Sole Member executed that certain Fourth Amended and Restated Limited Liability Company Agreement of the Company, dated as of January 25, 2018 (the "<u>LLC Agreement</u>").

B.     The Sole Member, the ECP Manager and the Independent Manager desire to adopt this Amendment pursuant to Section 18 of the LLC Agreement.

C.     Immediately prior to the execution of this Amendment by the Sole Member, the Board (including the ECP Manager and the Independent Manager) consented to the adoption of this Amendment by unanimous written consent.

<u>AGREEMENT</u>

The Sole Member hereby adopts the following:

1.     <u>Definitions</u>. Capitalized terms used in this Amendment and not otherwise defined herein have the meanings given such terms in the LLC Agreement.

2.     <u>Amendments to Section 7 of the LLC Agreement</u>.

a)     In Section 7(a) of the LLC Agreement: (i) each reference to "<u>Section 7(g)(ii)</u>" is hereby deleted and, in each case, replaced with "<u>Section 7(e)</u> and <u>Section 7(f)</u>"; (ii) the reference to "<u>Section 7(g)</u>" is hereby deleted and replaced with "<u>Section 7(e)</u>"; and (iii) the reference to "<u>Section 7(e)</u>" is hereby deleted and replaced with "<u>Section 7(d)</u>".

b)     In Section 7(b) of the LLC Agreement, the second sentence is hereby deleted in its entirety and replaced with the following: "The Independent Manager may only be removed (with or without cause) or replaced, in each case, from time to time, by both the ECP Lenders and the Member Manager upon notice to the Company."

c)     Section 7(c) of the LLC Agreement is hereby deleted in its entirety.

FURIE-ANK_00000350
DA01315

d)    Section 7(d) of the LLC Agreement is hereby deleted in its entirety and replaced with the following as the new Section 7(c) of the LLC Agreement: "The designee appointed by the ECP Lenders pursuant to <u>Section 7(b)</u> (the "<u>ECP Manager</u>"): (i) may only be removed (with or without cause) or replaced, in each case, from time to time and at any time, by the ECP Lenders upon notice to the Company; and (ii) may not be removed or replaced, in each case, by the Sole Member or the Board.  The ECP Lenders are intended to be express and intended beneficiaries of this <u>Section 7</u>."

e)    Section 7(e) of the LLC Agreement shall be new Section 7(d) of the LLC Agreement.

f)    Section 7(f) of the LLC Agreement is hereby deleted in its entirety and replaced with the following as the new Section 7(e) of the LLC Agreement:

"(i)    For so long as that certain letter agreement, dated as of March 23, 2018, by and among Ankura Consulting Group, LLC, Cornucopia, the Company, and Corsair Oil & Gas LLC (as heretofore amended, otherwise modified or replaced pursuant to <u>Section 7(f)(ii)(2)</u> hereof, the "<u>Ankura Agreement</u>") remains in full force, Scott M. Pinsonnault or his replacement (the "<u>Designated Interim COO</u>") shall have the power and authority to take any and all actions delegated to the Designated Interim COO pursuant to and in accordance with this Agreement or the Ankura Agreement, including, but not limited to, preparing, executing and delivering or causing to be prepared, executed and delivered, all agreements, certificates, instruments and documents, in each case, to carry out the intent and purposes of the foregoing; *provided, however*, if the Ankura Agreement is terminated and not otherwise replaced pursuant to <u>Section 7(f)(ii)(2)</u> hereof, the Board, acting by a majority of the entire Board, with such majority including at least the ECP Manager for purposes of this proviso, shall have the same power and authority delegated to the previous Designated Interim COO as set forth in the Ankura Agreement.

(ii)    Notwithstanding anything to the contrary contained in this <u>Section 7(e)</u>, the Board, acting by a majority of the entire Board, with such majority including at least the Member Manager for purposes of this <u>Section 7(e)(ii)</u>, shall have the sole power and authority to designate the Chief Executive Officer of the Company, who shall have only such powers, authority and duties that have been delegated by the Board by unanimous approval.

(iii)    The names of the officers serving the Company as of April 12, 2018 and the capacities in which they serve, until their successors are appointed in accordance with this Agreement, are set forth on <u>Exhibit B</u> attached hereto, without the need for further designation or approval."

g)    Section 7(g) of the LLC Agreement is hereby deleted in its entirety and replaced with the following as the new Section 7(f) of the LLC Agreement: "Notwithstanding anything to the contrary contained in this Agreement but subject to the Credit Documents (as defined in that certain Second Amended and Restated Credit Agreement, dated as of April 12, 2018 (as heretofore amended and as further amended, amended and restated, waived, supplemented or otherwise modified from time to time, the "<u>ECP Credit Agreement</u>"), by and among the Borrowers (as defined in the ECP Credit Agreement), the ECP Lenders and the

FURIE-ANK_00000351
DA01316

administrative agent and collateral agent thereunder) in all respects:

(i)     The following actions by the Company shall require the consent of the majority of the entire Board: (1) issuing additional common limited liability interests or permitting the admission or withdrawal of members; (2) effecting or permitting the sale or transfer of any equity security of the Company; (3) making any distributions; (4) effecting the sale of (whether structured as a sale of all or substantially all assets, or a sale of a majority of equity securities, merger, consolidation, recapitalization or otherwise) the Company; (5) effecting any recapitalization, restructuring or reorganization; (6) incurring or guaranteeing additional indebtedness (other than trade debt, accounts payable or other similar indebtedness incurred in the ordinary course of business (but not for borrowed money)); (7) accepting or requiring a capital contribution from any Person (as defined below) other than capital contributions consisting of common equity from the Sole Member to the Company (for the avoidance of doubt, no additional equity securities shall be issued in connection with any such capital contributions from the Sole Member to the Company); or (8) incurring combined total fees, costs and expenses with Corsair Oil & Gas LLC in excess of $2,500,000 under the PRA Management Agreement; and

(ii)    The unanimous consent of the ECP Manager, the Independent Manager and the Member Manager shall be required to take any of the following actions: (1) dissolving, liquidating or winding up the Company or any of the Company's businesses or otherwise voluntarily approving, commencing or taking any action to effectuate or that would reasonably be expected to result in the Company taking advantage of any bankruptcy or insolvency law of any jurisdiction; (2) amending, modifying, replacing or terminating the Ankura Agreement; (3) amending or modifying the PRA Plan (as defined in the ECP Credit Agreement); (4) except as set forth in Section 7(f)(i)(8), amending, modifying, replacing or terminating the PRA Management Agreement (as defined in the ECP Credit Agreement); (5) issuing preferred limited liability interests or other equity securities (other than additional common limited liability interests pursuant to Section 7(f)(i)(1)); or (6) take or delegate any action to any Person (as defined below) other than the Designated Interim COO which has been and remains delegated to the Designated Interim COO pursuant to this Agreement.

h)     Section 7(h) of the LLC Agreement is hereby deleted in its entirety.

3.     Additional Amendments to the LLC Agreement.

a)     In Section 8 of the LLC Agreement, the first sentence is hereby deleted in its entirety and replaced with the following: "Whenever any manager of the Board or any officer of the Company who is also a director, officer, employee, partner or advisor of the ECP Lenders and/or their affiliates or other funds managed or advised by Energy Capital Partners (collectively, "ECP") is required or permitted to make a decision, take or approve an action, or omit to do any of the foregoing, then such manager or officer shall be entitled to consider only such interests and factors, including its own, as it desires, and shall have no duty or obligation to consider any other interests or factors whatsoever."

b)     In Section 10 of the LLC Agreement, "Section 7(g)(i)(11)" is hereby deleted and replaced with "Section 7(e)(i) and Section 7(f)".

FURIE-ANK_00000352
DA01317

      c)      In Section 12 of the LLC Agreement, "Section 7(g)(ii)" is hereby deleted and replaced with "Section 7(f)(ii)(1)".

      d)      In Exhibit B to the LLC Agreement, "Thomas E Hord – Chief Operating Officer" is hereby deleted and replaced with "Scott M. Pinsonnault – Interim Chief Operating Officer".

      4.      <u>Limited Effect</u>.   This Amendment shall be effective as of the First Amendment Effective Date, and Cornucopia, in its capacity as the Sole Member, shall be deemed a party to and bound by this Amendment.  Except as expressly amended in accordance with <u>Sections 2</u> and <u>3</u> of this Amendment, the LLC Agreement (and for the avoidance of doubt, each of the other documents referenced herein) shall remain unmodified and in full force and effect.

      5.      <u>Entire Agreement</u>.  This Amendment, together with the LLC Agreement, constitutes the entire agreement of the Company relating to, among other things, the management of the Company, the rights and obligations of the Sole Member, and the organization and operation of the Company as a limited liability company in accordance with the Act, and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

      6.      <u>Miscellaneous</u>.  Sections 18, 20, 21 and 22 of the LLC Agreement are hereby incorporated by reference as if fully set forth herein, in each case, *mutatis mutandis*.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Sole Member has caused this Amendment to be duly executed as of the First Amendment Effective Date.

**SOLE MEMBER**:

**CORNUCOPIA OIL & GAS COMPANY, LLC**

By: _____
Name: David W. Elder
Title:   Chief Financial Officer

506433.20002
US_ACTIVE-139713923.7

FURIE-ANK_00000354
DA01319

# EXHIBIT 61

DA01320

**EXHIBIT D**

**Resolutions**

**WRITTEN CONSENT IN LIEU OF
MEETING OF THE BOARD OF MANAGERS OF
CORNUCOPIA OIL & GAS COMPANY, LLC**

**Effective as of April 12, 2018**

The undersigned, being all of the members of the board of managers (the "**Board**") of Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company (the "**Company**"), pursuant to, and in compliance with, Section 18-404 of the Delaware Limited Liability Company Act 6 Del. C. § 18-101, et seq. and Section 7 of the Fourth Amended and Restated Limited Liability Company Agreement of the Company (the "**LLC Agreement**"), do hereby consent in writing that the following resolutions are adopted and are effective for all purposes as of the date hereof:

**Approval of the Amendment and Restatement Documents**

**WHEREAS**, the Company directly owns 100% of the equity interests in Furie Operating Alaska, LLC (the "**Subsidiary Company**", and together with the Company, the "**Borrowers**");

**WHEREAS**, the Borrowers obtained funding for their operations and infrastructure being installed in the Cook Inlet in Alaska and its onshore gas processing facilities being constructed and installed onshore in Kenai, Alaska pursuant to that certain Credit Agreement, dated as of July 15, 2014 (as amended and restated pursuant to an Amended and Restated Credit Agreement, dated as of March 19, 2015, and as further amended, modified, amended and restated or supplemented prior to the date hereof, the "**Original Credit Agreement**") entered into by and among the Borrowers, Energy Capital Partners Mezzanine Opportunities Fund A, LP, a Delaware limited partnership ("**ECP Fund A**"), as administrative agent and collateral agent (the "**Administrative Agent**"), and Energy Capital Partners Mezzanine Opportunities Fund, LP, a Delaware limited partnership ("**ECP Fund LP**"), Energy Capital Partners Mezzanine Opportunities Fund B, LP, a Delaware limited partnership ("**ECP Fund B**"), Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest), LP, a Delaware limited partnership ("**ECP Alaska Midstream**"), and Energy Capital Partners Mezzanine (Alaska Midstream Co-Invest) II, LP, a Delaware limited partnership ("**ECP Alaska Midstream II**" and together with the Administrative Agent, ECP Fund A, ECP Fund LP, ECP Fund B and ECP Alaska Midstream, collectively, the "**Lenders**");

**WHEREAS**, in connection with the Original Credit Agreement, the Borrowers entered into (i) that certain Amended and Restated Accounts Agreement, dated as of March 19, 2015 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Amended and Restated Accounts Agreement**"), with ECP Fund A, as collateral agent (the "**Collateral Agent**") and Wells Fargo Bank, National Association, as depositary (the "**Depositary**"), and (ii) that certain Deed of Trust With Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of July 15, 2014 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Deed of Trust**"), granted to First American Title Company, a California corporation, as the trustee (the "**Trustee**"), and acknowledged by the Collateral Agent, and each Lender;

**WHEREAS**, in connection with the Original Credit Agreement, pursuant to that certain Pledge and Security Agreement, dated as of July 15, 2014 (as amended, modified, amended and restated or supplemented prior to the date hereof, the "**Pledge and Security Agreement**"), by the Borrowers in favor

FURIE-ANK_00000171
DA01321

of the Collateral Agent, the Company granted a lien on all of its assets to secure the obligations of the Borrowers under the Original Credit Agreement;

**WHEREAS**, in order to, among other things, obtain additional funding in an aggregate principal amount of up to $35,000,000 and arrange for the provision of a letter of credit for the account of the Borrowers, the Borrowers plan to enter into the Second Amended and Restated Credit Agreement, dated as of the date hereof (as amended, modified, amended and restated or supplemented from time to time, the "**Credit Agreement**") entered into by the Borrowers, the Lenders and the Administrative Agent, which amends and restates the Original Credit Agreement from and after the A&R Effective Date (as defined in the Credit Agreement);

**WHEREAS**, as a condition to the effectiveness of the Credit Agreement and in order to secure the Obligations (as defined in the Credit Agreement) of the Borrowers under the Credit Agreement, the Borrowers plan to amend the Deed of Trust by granting that certain Fourth Amendment to Deed of Trust with Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of the date hereof (the "**Deed of Trust Amendment**"), to the Trustee, which will be acknowledged by the Collateral Agent, and each Lender;

**WHEREAS**, as a condition to the effectiveness of the Credit Agreement, the Borrowers plan to enter into a Sixth Amendment to Amended and Restated Accounts Agreement and Reaffirmation Agreement dated as of the date hereof, by and among the Borrowers, Deutsche Oel & Gas AG, a German corporation, Corsair Oil & Gas LLC, a Delaware limited liability company, Kay Rieck, an individual, the Lenders, the Depositary, the Administrative Agent and the Collateral Agent, pursuant to which, among other things, the Amended and Restated Accounts Agreement shall be amended and the Borrowers and Deustche Oel & Gas AG will confirm their respective guarantees, pledges, grants of security interest and other Obligations, under and subject to the terms of the Pledge and Security Agreement and the other Security Documents (as defined in the Credit Agreement) to which they are a party (the "**Amendment and Reaffirmation Agreement**" and together with the Credit Agreement, and the Deed of Trust Amendment, collectively the "**Amendment and Restatement Documents**");

**WHEREAS**, complete or substantially complete versions of each of the Amendment and Restatement Documents requested by the Board have been presented to the Board; and

**WHEREAS**, the Board finds it to be in the best interest and benefit of both the Company, for itself and as a sole member of the Subsidiary Company, and the Subsidiary Company for the Company to (i) enter into, execute and perform all of its obligations under the Amendment and Restatement Documents and the other Definitive Documents (defined below); and (ii) reaffirm its guarantees, pledges, grants of security interests, undertakings and other obligations, as applicable, under the Credit Documents (as defined in the Credit Agreement) to which it is a party.

**NOW THEREFORE BE IT RESOLVED**, as follows:

**RESOLVED**, that each of the Amendment and Restatement Documents, and the terms thereof and the transactions contemplated thereby be, and is hereby, authorized and approved in all respects;

**RESOLVED**, that the Company be and is hereby authorized and directed to execute and deliver and perform the Amendment and Restatement Documents and each Credit Document and any instruments, certificates, financing statements, or agreements required thereunder and such agreements, certificates, instruments and other documents as any Authorized Signatory (as defined below) may determine to be required or advisable in connection with the Amendment and Restatement Documents and each of the Credit Documents or otherwise to effectuate any of these resolutions (herein collectively

FURIE-ANK_00000172
DA01322

called "**Definitive Documents**"), the execution thereof to be conclusive evidence of such determination and the authority therefor, to file and record (or to authorize and cause the filing or recording of) financing statements and other filings or recording documents and instruments with respect to the Collateral (as defined in the Credit Agreement), to perform all of its obligations under such Definitive Documents and to take all other actions as any Authorized Signatory may determine to be required or advisable in connection with the transactions contemplated by the Definitive Documents, or otherwise to effectuate any of the resolutions herein, the taking of such action to be conclusive evidence or such determination and the authority therefor;

**RESOLVED**, that the Company be and is hereby authorized and directed to reaffirm the grant of the security interests in the Collateral created by the Security Documents (as defined in the Credit Agreement and as amended in the Amendment and Restatement Documents), and any instruments or agreements required to which the Company is a party in connection with the contemplated transactions; and

**RESOLVED**, that each of David W. Elder, as Chief Financial Officer, and Scott M. Pinsonnault, as Interim Chief Operating Officer (each, an "**Authorized Signatory**") be and are hereby authorized and directed, acting individually, to execute, deliver and perform, on behalf of the Company and the Subsidiary Company, each of the Definitive Documents and any and all other necessary documents and take all other required actions as may be necessary or advisable in such Authorized Signatory's opinion to effectuate, consummate and comply with the purposes and intent of the Definitive Documents and the transactions contemplated thereby, the execution thereof or the taking of any such action to be conclusive evidence of such determination and the authority therefor.

**Approval of the Project Management Agreement**

**WHEREAS**, the Board finds it to be in the best interest and benefit of both the Company, for itself and as a sole member of the Subsidiary Company, and the Subsidiary Company for the Subsidiary Company to engage Petroleum Resources of Alaska, LLC ("**PRA**") to provide certain management services to the Subsidiary Company, including oversight and execution of well completion and drilling planning, geoscience, health, safety, environmental, permitting, procurement, regulatory compliance, engineering, and operations services, pursuant to a management agreement to be entered into by the Subsidiary Company, Corsair and PRA in the form attached hereto as **Annex A** (the "**Project Management Agreement**") on the date hereof, and to execute and deliver any other documents and agreements contemplated to be delivered by the Subsidiary Company in connection with the Project Management Agreement, including or otherwise ancillary to or reasonably necessary in connection with the actions contemplated thereby;

**WHEREAS**, in connection with the Project Management Agreement and the Credit Agreement, the Board finds it to be in the best interest and benefit of both the Company, for itself and as a sole member of the Subsidiary Company, and the Subsidiary Company for the Subsidiary Company to enter into the Consent to Collateral Assignment in the form and attached hereto as **Annex B** (the "**PRA Consent**") on the date hereof; and

**WHEREAS**, complete or substantially complete versions of the Project Management Agreement and the PRA Consent have been presented to the Board.

**NOW, THEREFORE, BE IT RESOLVED**, that the entrance of the Subsidiary Company into the Project Management Agreement and the PRA Consent be, and hereby is, adopted, approved and confirmed in all respects.

---

506433.20002
US_ACTIVE-139713905.6

FURIE-ANK_00000173
DA01323

**Approval of the First Amendment**

 **WHEREAS**, the Board has reviewed that certain First Amendment to the Fourth Amended and Restated Limited Liability Company Agreement of the Company, to be dated as of the date hereof, by Deutsche Oel & Gas AG, substantially in the form attached hereto as <u>Annex C</u> (the "**First Amendment**"); and

 **WHEREAS**, the Board finds it to be in the best interest and benefit of the Company to amend the LLC Agreement as set forth in the First Amendment and to authorize, adopt and approve the First Amendment and any other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith.

 **NOW, THEREFORE, BE IT RESOLVED**, that the First Amendment be, and hereby is, adopted, approved and confirmed in all respects, and that all other documents and agreements attached thereto, referred to therein and contemplated to be delivered by the Company in connection therewith be, and hereby are, approved and confirmed in all respects; and

 **RESOLVED FURTHER**, that each of the Authorized Signatories be, and each of them acting alone hereby is, authorized to execute and deliver in the name and on behalf of the Company any documents and agreements attached to the First Amendment, referred to therein and contemplated to be delivered by the Company in connection therewith, in each case with such additions thereto, changes therein or deletions therefrom, as such Authorized Signatories executing and delivering the same in the name and on behalf of the Company may deem necessary, appropriate, advisable or desirable, with the execution and delivery thereof by such Authorized Signatories to be conclusive evidence of such determination.

**Approval of the Removal**

 **WHEREAS**, the Board finds it to be in the best interest and benefit of the Company to remove Thomas E. Hord as Chief Operating Officer of the Company (the "**Removal**").

 **NOW, THEREFORE, BE IT RESOLVED**, that the Removal be, and hereby is, approved and confirmed; and

 **RESOLVED FURTHER**, that Scott M. Pinsonnault, as Interim Chief Operating Officer of the Company, be, and hereby is, authorized to take any and all action, in the name and on behalf of the Company, deemed necessary, appropriate, advisable or desirable with respect to effectuating the Removal.

**General Authorization and Ratification of Prior Acts**

 **NOW, THEREFORE, BE IT RESOLVED**, that, consistent with the foregoing resolutions, each Authorized Signatory and any officer or employee or agent of the Company or the Subsidiary Company, as applicable, under the supervision or management and direction of an Authorized Signatory, in each case, on behalf of the Company or the Subsidiary Company, as applicable, be, and each of them acting alone hereby is, authorized and empowered in the name and on behalf of the Company or the Subsidiary Company, as applicable, to carry out fully the intent and purposes of the foregoing resolutions and each of the actions or transactions contemplated thereby, and to, in connection therewith, (a) prepare, execute and deliver or cause to be prepared, executed and delivered, and where necessary, advisable, desirable or appropriate, file or cause to be filed with the appropriate governmental authorities, all other agreements, instruments and documents, including, but not limited to, all certificates, contracts, bonds, receipts or other papers, (b) incur and pay or cause to be incurred or paid all fees, expenses and taxes,

FURIE-ANK_00000174
DA01324

including, without limitation, legal fees and expenses, (c) engage such persons as he or she shall in his or her judgment determine to be necessary, advisable, desirable or appropriate, and (d) do any and all other acts and things, as he or she deems necessary, advisable, desirable or appropriate (with the doing of any such act or thing being conclusive evidence that the same is deemed necessary, advisable, desirable or appropriate); and that any and all actions heretofore taken in the name and on behalf of the Company or the Subsidiary Company, as applicable, in connection with the foregoing resolutions and each of the actions or transactions contemplated thereby, are hereby, in all respects, authorized, confirmed, ratified and approved as the actions of the Company or the Subsidiary Company, as applicable.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

FURIE-ANK_00000175
DA01325

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____
Date: April 9, 2018

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____
Date:

**Kay Rieck**, in his capacity as the Member Manager

By: _____
Date:

Officer's Certificate of Cornucopia Oil & Gas Company, LLC – Exhibit "D" – Signature Page

FURIE-ANK_00000176
DA01326

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

**Trent Justus Kososki**, in his capacity as the ECP Manager

By: _____
Date:

**Jeffrey A. Brodsky**, in his capacity as the Independent Manager

By: _____
Date:

**Kay Rieck**, in his capacity as the Member Manager

By: _____
Date:

Officer's Certificate of Cornucopia Oil & Gas Company, LLC – Exhibit "D" – Signature Page

FURIE-ANK_00000177
DA01327

This Unanimous Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.

The undersigned, being all the members of the Board of the Company, do hereby consent to the foregoing action as of the date first above written.

Trent Justus Kososki, in his capacity as the ECP Manager

By: ........................................................
Date:

Jeffrey A. Brodsky, in his capacity as the Independent Manager

By: ........................................................
Date:

Kay Rieck, in his capacity as the Member Manager

By: ........................................................
Date:

Officer's Certificate of Cornucopia Oil & Gas Company, LLC - Exhibit "D" - Signature Page

FURIE-ANK_00000178
DA01328

**Annex A**

**Project Management Agreement**

FURIE-ANK_00000179
DA01329

# MASTER SERVICE AGREEMENT

THIS MASTER SERVICE AGREEMENT is entered into this 10th day of April, 2018 (the "*Effective Date*") by and between Furie Operating Alaska LLC and Corsair Oil & Gas LLC (collectively, the "*Company*") and Petrotechnical Resources of Alaska, LLC (the "*Contractor*") (the Company and the Contractor are referred to herein collectively as the "*Parties*" and each individually as a "*Party*"); *provided, however*, the rights and obligations of Corsair Oil & Gas LLC as Company hereunder shall only take effect, if at all, upon prior written notice from Furie Operating Alaska LLC to the Contractor. This Master Service Agreement, the Master Service Agreement Terms and Conditions attached hereto, any Work Orders issued pursuant to such Terms and Conditions and in any written instructions given to the Contractor by the Company in connection herewith or with such Terms and Conditions, and all Exhibits attached hereto, constitute and are collectively called the "*Agreement*".

## GENERAL INFORMATION

| | |
|---|---|
| **The Contractor**: Petrotechnical Resources of Alaska, LLC | **The Company**: Furie Operating Alaska LLC |
| An Alaska limited liability company | A Delaware limited liability company |
| The Contractor's Representative:<br>Name:   Tom Walsh (the "*Contractor Representative*") | The Company's Representative:<br>Name:     Scott Pinsonnault (the "*Company Representative*") |
| Address: 3601 C Street<br>           Suite 1424<br>           Anchorage, AK 99503 | Address: 188 W. Northern Lights Blvd.<br>           Suite 620<br>           Anchorage, AK 99503 |
| Telephone:  907-272-1232<br>Email:  tom@petroak.com | Telephone:   907-277-3726<br>Email:  s.pinsonnault@furiealaska.com |

**[Signatures appear on the following page]**

1

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement to be effective as of the date first above written.

THE COMPANY

**Furie Operating Alaska LLC**

By: _____

Name: _____

Title: _____

**Corsair Oil & Gas LLC**

By: _____

Name: _____

Title: _____

THE CONTRACTOR

**Petrotechnical Resources of Alaska, LLC**

By: _____

Name:  Thomas Walsh

Title:  Managing Partner

FURIE-ANK_00000181
DA01331

MASTER SERVICE AGREEMENT
TERMS AND CONDITIONS

Capitalized terms used but not defined herein have the meanings ascribed to them in the Master Service Agreement dated April 10th, 2018 to which this document is attached. THE PARTIES AGREE THAT THIS STATEMENT COMPLIES WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT <u>THIS AGREEMENT HAS PROVISIONS REQUIRING ONE PARTY (THE INDEMNITOR) TO BE RESPONSIBLE FOR THE NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT OF ANOTHER PARTY (THE INDEMNITEE).</u>

<u>THESE MASTER SERVICE AGREEMENT TERMS AND CONDITIONS ARE THE MASTER SERVICE AGREEMENT TERMS AND CONDITIONS REFERENCED IN THE MASTER SERVICE AGREEMENT (HEREINAFTER CALLED "*TERMS AND CONDITIONS*") AND FORM PART OF THE AGREEMENT BETWEEN THE PARTIES.</u>

BOTH PARTIES REPRESENT TO EACH OTHER (1) THAT SUCH PARTY HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF SUCH PARTY HAS NOT CONSULTED AN ATTORNEY, THAT SUCH PARTY WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO CONSULT AN ATTORNEY, BUT MADE AN INFORMED DECISION NOT TO DO SO, AND (2) THAT SUCH PARTY FULLY UNDERSTANDS ITS RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT.

1.      *Description of Services Performed by the Contractor or Third Parties:*

*(a)* The Contractor agrees to provide services, technical advice, materials, and personnel ("*Contractor Personnel*"), required and requested by the Company through the issuance of written Work Orders from time to time in Alaska (collectively herein called the "*Work*" or the "*Services*"). Without limiting the foregoing, the Work includes all labor necessary to perform such Work, including the services and Work set forth in <u>Exhibit A</u> attached hereto or any specifications referenced in <u>Exhibit A</u>. The Work includes all deliverables related thereto and all materials, fabrications, assemblies, equipment, supplies, spare parts and components incorporated into or to be used in connection with the Work or furnished pursuant to this Agreement. All Work shall be governed by this Agreement, including these Terms and Conditions, and all Exhibits and any Work Orders specifically issued in connection herewith ("*Work Orders*"), which shall supersede any conflicting terms and conditions contained in any proposals, letters, work tickets, invoices, or any other documents, whether referenced herein or not, but not the terms of this Agreement. The Contractor shall arrange for its personnel, material and equipment required to perform any Work to be available and ready for the commencement of Work at the designated location, at the time and on the schedule specified by the Company and shall cause the performance of all of the Contractor's obligations under this Agreement. Time is of the essence in this Agreement.

3

FURIE-ANK_00000182
DA01332

(b) The Contractor or its affiliates may engage third parties to perform any portion of the Services; provided, however,

(i) Prior to retaining any such third party, the Contractor shall provide the Company with written notice that sets out the identity of the third party and the services it shall perform. Promptly thereafter, the Company shall inform the Contractor whether such third party is acceptable to the Company. Notwithstanding the foregoing, the Company retains the right at any time to prohibit any third party retained by the Contractor from accessing the Company's property or performing Services. At the Company's sole discretion, agreements with third parties for the performance of any portion of the Services shall be executed by the Company or, with prior written authorization of the Company, the Contractor may execute such agreements.

(ii) The Contractor shall be responsible for determining that the Work of each third party is being performed in accordance with the requirements of the Work Order and Exhibit A and notify the Company, of defects and deficiencies in the Work. The Company shall have the authority to reject Work that does not conform to the Work Order or Exhibit A and shall notify the Contractor about the rejection. The failure of the Company to reject Work shall not constitute the acceptance of the Work.

(iii) The Contractor shall cause any third party to comply with the health, safety, security and environmental policies and procedures of the Company while they are on the property of the Company.

(iv) The Contractor shall be responsible for any Work performed by the third parties.

**2.** ***Fees and Expenses:*** The Company agrees to pay the Contractor the following fees for consulting and management services, which shall be based on the Master Rate Schedule set forth in Exhibit B attached hereto.

(a) PRA Principal in Charge Fee: The Contractor will designate a person (the "*PRA Principal in Charge*") who will be initially Tom Walsh, or a successor with similar experience and expertise, who will be available on a full-time basis and dedicated to this Agreement with the Company, unless a successor is appointed with the consent of the Company, which consent will not be unreasonably withheld or delayed. A monthly retainer for the PRA Principal in Charge in the amount of $24,000 will be invoiced to the Company by the Contractor pursuant to the procedures set forth in paragraph 6(b) below, and hours worked by the PRA Principal in Charge on the project in excess of 80 hours per month will be charged at the rate of $300/hr;

(b) Consulting and Management Fees: The Contractor's fees for the Services set forth above for the assigned Contractor Personnel under each Work Order will be determined by multiplying the actual hours expended in the proper performance of the Work Order at the Contractor's standard hourly rates set forth on Exhibit B attached hereto. The Contractors

FURIE-ANK_00000183
DA01333

rates generally are revised annually, but will not be increased without the consent of the Company. The Contractor's current hourly rates are provided in <u>Exhibit B</u> attached hereto; and

(c) Success Fee: The Parties may provide, as part of the scope of a Work Order, a success fee that provides an incentive to the Contractor to meet or exceed certain defined key performance metrics.

If at any time during the term of this Agreement the cumulative sum of the PRA Principal in Charge Fees and Consulting and Management Fees equals two million five hundred thousand dollars ($2,500,000), (i) the Company may suspend the performance of Services hereunder, and (ii) thereafter, the Company may re-evaluate the amount of the PRA Principal in Charge Fees and Consulting and Management Fees and the scope of work to be performed by the Contractor. Upon the Company's request, the Parties shall execute a written amendment to this Agreement to reflect any adjustments to the amount of the PRA Principal in Charge Fees and Consulting and Management Fees and/or revisions to the scope of work.

*3.    Expense Reimbursement:* The Contractor shall be entitled to reimbursement of reasonable documented out-of-pocket and direct expenses incurred in connection with the Services to be provided under this Agreement (including the Contractor's cost of license and maintenance fees for software). If such expenses exceed, in the aggregate, more than $75,000 cumulatively, the Contractor shall notify the Company Representative in writing.

*4.    Testimony, Subpoena Requests:* The Company agrees that if any of the Contractor's principals or professionals are required to testify at the request of the Company, on the Company's behalf or by legal, regulatory, administrative, arbitration or judicial order, at any proceeding related to the Work under this Agreement, the Contractor will be compensated by the Company for its associated time charged at the Contractor's scheduled hourly rates, in effect at the time and reimbursed for the Contractor's reasonable and documented out-of-pocket expenses, including counsel fees. In addition, the Contractor will be compensated for any time and expense (including, without limitation, reasonable and documented legal fees and expenses) that the Contractor may incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with, the Work or this Agreement.

*5.    Retainer:* In connection with the foregoing, it is the Contractor's policy to receive an advance retainer for the fees and expenses. Upon execution of this Agreement, the Company shall provide the Contractor with such retainer in the amount of $200,000 (the "*Retainer*"). The Contractor may apply the Retainer to fees and expenses due and owing under this Agreement, and the Retainer will be maintained throughout the engagement and returned to the Company upon completion of the Contractor's services. Payment of the Retainer shall be made within five (5) business days after the execution of this Agreement. In addition, the Company agrees to replenish the Retainer upon request of the Contractor so that the amount of any Retainer is equal to the Contractor's estimated fees and expenses for the upcoming month. The Contractor reserves the right to apply the Retainer to outstanding fees and expenses as Work is performed and to expenses as they are incurred. The Company understands and acknowledges that any Retainer is earned by the Contractor upon receipt, any Retainer becomes the property of the Contractor upon receipt, the

5

FURIE-ANK_00000184
DA01334

Company no longer has a property interest in any Retainer upon the Contractor's receipt, any Retainer will be placed in the Contractor's general account, and will not be held in a client trust account, and the Company will not earn any interest on any Retainer; provided, however, that at the conclusion of the engagement under this Agreement, if the amount of any Retainer held by the Contractor is in excess of the amount of the Contractor's outstanding fees and expenses, the Contractor will pay to the Company the amount by which the Retainer exceeds such fees and expenses. The Company further understands and acknowledges that the use of the Retainer is an integral condition of the engagement under this Agreement, is necessary to ensure that the Company continues to have access to the Contractor's services, the Contractor is compensated for the Work performed for the Company; the Contractor is not a pre-petition creditor in the event of a bankruptcy filing and that in light of the foregoing, the provision of the Retainer is in the Company's best interests.

**6.** *Payment Obligations and Billing.*

(a) Payment Obligations: The payment of the fees and expenses hereunder are the exclusive obligations of the Company. Prior to commencing any proceedings under any insolvency regime, the Company shall pay all invoiced amounts, whether for fees or expenses, to the Contractor by wire transfer of immediately available funds.

(b) Billing: In addition to the Retainer, the Company agrees to pay all fees and expenses within thirty (30) days upon receipt of an invoice to the Company for all Work performed and expenses incurred. Payment of the fees, expenses and Retainer (including any additional amounts to replenish the Retainer) shall be made to the following account:

> Direct to Wire Routing Transit Number (RTN/ABA) 121000248
>
> Bank name Wells Fargo Bank, N.A.
>
> Bank address, 420 Montgomery city & state San Francisco, CA 94104
>
> BNF/Field 4200 Your complete Wells Fargo account number 1101372915
>
> Beneficiary Petrotechnical Resources of Alaska, LLC
>
> CHIPS Participant ABA 0509

(c) Lien Releases: Each invoice submitted by Contractor shall be accompanied by a certificate from an authorized representative of Contractor in a form reasonably acceptable to Company stating that there are no liens or lienable claims on or against Company or its property by reason of the operations of, or services performed by, Contractor hereunder.

**7.** *Duration of Agreement:* This Agreement may be terminated at the option of either Party by giving the other Party thirty (30) calendar days' prior written notice to that effect. For the purpose of giving this notice, or any notice that may be necessary in the performance of this Agreement, the address of the Parties shall be and remain as shown on page 1 of this Agreement until such notice is given by either Party to the other Party, in writing, of a change of address in

FURIE-ANK_00000185
DA01335

accordance with the notice provisions of this Agreement. Notwithstanding, any such termination notice, no such termination shall be effective as to any Work then being performed under any Work Order nor as to any warranty period ongoing at the time of such termination until the completion of any such Work, in the case of the Work, and expiration of the applicable warranty period, in the case of any warranty. The provisions of Sections 4, 5, 9, 10, 12, 17, 19, 20, 22, 23, 24, 25 and 27 shall survive the termination, cancellation, or completion of this Agreement and any Work performed hereunder. If: (i) the Contractor fails without good cause to perform the Work or any part thereof in a good, safe and workmanlike manner or to fully, faithfully or timely perform any of its obligations hereunder due to no fault on the part of the Company or (ii) the Contractor (a) goes into liquidation or bankruptcy (other than voluntarily for the purpose of re-organization or reconstruction), (b) makes an arrangement, composition or compromise with its creditors, or (c) has a receiver appointed in respect of the whole or any part of its assets, or (iii) the equivalent of (ii) (a), (b) or (c) above occurs, the Company may at any time thereafter terminate this Agreement and any Work Order upon issuance of written notice without any liability to the Contractor except that the Company shall compensate the Contractor for any Work performed to the date of such termination, provided however that if liquidation under sub-clause (a) above occurs, this Agreement and any Work Order shall automatically terminate without any notice being required. Such termination shall be without prejudice to the Company's rights at law or in equity to claim damages against the Contractor for its failure to perform the Work or any part thereof.

　　　**8.**　　**Payment of Claims; No Liens:** The Contractor shall promptly pay all bills and other indebtedness for labor and for materials furnished or purchased by it involved in or arising out of this Agreement and any Work Order, and shall maintain detailed books and records relating thereto.  The Company shall pay the Contractor's undisputed invoices in a timely manner, the Contractor agrees to keep and maintain the Work and assets and property of the Company and its affiliates, owners, and joint venture partners free from any liens and encumbrances arising out of the Work or asserted or filed by the Contractor or any of its affiliates and subcontractors during and after completion of the Work under this Agreement, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement. ***The Contractor hereby agrees to indemnify, defend and hold harmless the Company and its affiliates, owners, employees, agents, and joint venture partners from and against any such liens or claims to any lien arising (by operation of law or otherwise), asserted or filed against the Company or any of its affiliates, owners, employees, agents, or joint venture partners or any of its or their oil and gas wells and other property and assets in connection with the Contractor's performance under this Agreement, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement, regardless of any joint, contributory, comparative or other negligence or fault of any person or entity entitled to be indemnified hereunder.  If the Contractor fails to satisfy or discharge any such lien or charge promptly after receiving notice from the Company, the Company may, at its option, pay or discharge any such liens and may deduct such payments from any sum due, or which thereafter becomes due, to the Contractor hereunder.***

　　　***The Contractor acknowledges and agrees that neither it nor any affiliate, employee, owner, agent or sub-contractor has the right, power or authority to create, incur or permit to be imposed on any vessel owned, leased or contracted by the Company any liens whatsoever, provided the Company satisfies its payment obligations to the Contractor for Work performed under this Agreement.***

FURIE-ANK_00000186
DA01336

### 9.    *Standard of Performance/Warranties:*

**9.1** The Contractor warrants and represents that the Work will be performed safely, in a good and workmanlike manner and in accordance with good offshore oilfield practices, the Contractor regularly conducts training and safety programs, all materials, equipment, goods, supplies or manufactured articles furnished by the Contractor in the performance of the Work shall comply with specifications and requirements set forth in an applicable Work Order, and that the Contractor will not employ in the Work for the Company any employee whose employment violates applicable labor laws. The Contractor shall familiarize itself with the locations where the Work will be performed and the hazards that might be encountered and take all appropriate precautions to protect all persons who are at any time directly or indirectly affected by the Work.

**9.2** The Contractor further warrants and represents that (i) the Work shall be conducted in accordance with all applicable safety laws and regulations, precautions and procedures and by employing reasonable protective equipment and devices as required by safety associations, government agencies, municipalities, or otherwise, (ii) any equipment, materials or supplies incorporated into or utilized in the performance of the Work shall be free from defects pursuant to the written specification provided in the Work Order or Exhibit A, and (iii) the Contractor shall perform the Work and cause its subcontractors to perform the Work in compliance with any specifications applicable to the Work that are provided by the Company. The Contractor will replace, at its sole expense, any of its employees whose replacement is requested by the Company for good cause. Without limiting the Company's remedies, the Contractor agrees that, subject to the provisions of this Section 9, any portion of the Work found to be defective or incorrectly performed or unsuitable shall be removed, corrected, replaced, or corrected by the Contractor without additional cost (including transportation costs) or risk to the Company, provided the Contractor is notified by the Company within thirty (30) business days after the Company's discovery of the defective Work, and provided further that such obligation to repair, correct or re-perform shall under no circumstances extend for a period which exceeds thirty (30) days from performance of the Work by the Contractor, provided the Company provides the Contractor notice of the non-compliance prior to its departure from the work site.

**9.3** (a) Without limiting the Company's remedies, the Contractor agrees that, subject to the provisions of this Section 9, such obligation to repair, correct or re-perform shall under no circumstances extend for a period which exceeds one hundred and eighty (180) days from performance of the Work by the Contractor. With respect to machinery, equipment, materials or other products purchased from third parties, the Contractor shall have no warranty obligation under this Agreement if: (i) any product is not stored or handled in a safe and workmanlike manner by the Company, its affiliates or contractors (other than the Contractor) after delivery and/or is not installed, operated or maintained in accordance with the Contractor's written operation and maintenance instructions; (ii) the defect of the Work resulted from damages occurring after delivery of the product, which damages do not arise out of any defective work performed by the Contractor; or (iii) any defect was not reported by the Company within  thirty (30) business days after the Company's discovery of the defective Work. *The Contractor makes no warranties with respect to materials or supplies manufactured or supplied by third parties and hereby assigns to*

8

*the Company, to the extent possible, all warranties and guarantees received from the manufacturers and suppliers of machinery, equipment, materials or other products.*

(b) *THE CONTRACTOR'S WARRANTY OBLIGATIONS ABOVE SHALL NOT APPLY TO THE EXTENT ANY NON-COMPLIANCE IS CAUSED DIRECTLY BY (i) ANY ALTERATION OR REPAIR BY THE COMPANY OF ANY GOODS, SERVICES OR EQUIPMENT, OR THE COMPANY'S FAILURE TO PROPERLY USE, OPERATE OR MAINTAIN ANY GOODS OR EQUIPMENT IN ACCORDANCE WITH THE CONTRACTOR'S OR THE MANUFACTURER'S RECOMMENDATION, (ii) ABNORMAL WELL CONDITIONS, (iii) VANDALISM BY A PARTY OTHER THAN AN EMPLOYEE OF THE CONTRACTOR, (iv) FORCE MAJEURE (AS DEFINED IN SECTION 15), OR (v) INCORRECT, INCOMPLETE OR INACCURATE DATA, DRAWINGS, INFORMATION OR SPECIFICATIONS PROVIDED TO THE CONTRACTOR BY THE COMPANY.*

**EXCEPT FOR THE EXPRESS WARRANTIES CONTAINED IN THIS SECTION 9 AND IN SECTIONS 19 AND 21, THE CONTRACTOR DISCLAIMS ALL OTHER WARRANTIES EXPRESS OR IMPLIED AND ALL IMPLIED OR STATUTORY WARRANTIES OF FITNESS FOR PURPOSE, MERCHANTABILITY AND OTHER STATUTORY REMEDIES WHICH ARE INCONSISTENT WITH THIS CLAUSE ARE EXPRESSLY WAIVED.**

**9.4** Prior to beginning the Work, the Contractor shall obtain and maintain thereafter throughout the term of this Agreement and any Work Order all licenses, permits, certificates, and other forms of documentation required for the Contractor to operate its business and perform its services to be provided for the Company under this Agreement, provided however that the Company shall secure and maintain all permits, licenses and permissions necessary to perform the Work under any Work Order, including any access necessary to reach any well site. If the Contractor is denied any access to a well or Work site, the Company shall pay the Contractor for all time lost at the rates specified in this Agreement unless access was denied due to the negligence or fault of the Contractor.

**10. Title to the Work and Materials.** Title to the Work in and to all goods and materials furnished by the Contractor and incorporated or intended to be permanently incorporated into the Work shall transfer to the Company immediately upon payment therefor, subject always to the Contractor's obligation to fix, repair or replace defective Work or equipment as per Section 9.

**11. Intellectual Property/Work Product:** To the extent that a Party or any of its affiliates learns, discovers, develops or creates any intellectual property or other rights arising out of this Agreement containing the Company's proprietary or confidential information, those rights are the exclusive property of such Party, provided however that if any of the Contractor's intellectual property are incorporated into the Work or any equipment or property sold or leased to the Company as part of the Work, the Company shall have an irrevocable, non-transferable, non-exclusive, fully paid (royalty free), perpetual license (without the right to sublicense) to use such intellectual property to the extent necessary for the Company to utilize the Work. The cost of

9

FURIE-ANK_00000188
DA01338

obtaining or enforcing any intellectual property or other rights will be borne by the Party that owns the rights.

**12. *Indemnification***:   Each Party shall provide indemnification, contribution and reimbursement as set forth in Schedule I hereto.  The terms and provisions of Schedule I hereto are an integral part hereof, are hereby incorporated by reference, are subject in all respects to the provisions hereof and shall survive any termination or expiration of this Agreement.  Further, if an indemnified person is requested or required to appear as a witness in any Action (as defined in Schedule I hereto) that is brought by or on behalf of or against the indemnifying Party or that otherwise relates to this Agreement or the Services rendered by the Contractor hereunder, the indemnifying Party shall reimburse the indemnified Party for all reasonable, documented, actual out-of-pocket expenses incurred by them in connection with such indemnified person appearing or preparing to appear as such a witness, including without limitation, the reasonable and documented fees and disbursements of legal counsel. In support of the indemnity obligations set out in Schedule I hereto, each Party shall provide, each for the benefit of the other Party, coverage and amounts of liability insurance set out in Section 13. Notwithstanding anything to the contrary contained in this Agreement, a Party's total, cumulative indemnity obligation under this Agreement shall not in any circumstances exceed the maximum amount of the applicable insurance coverage limits set forth in Section 13; provided, however, this limitation of liability shall not apply to any losses, liabilities, damages or claims attributable to or arising from the Contractor's breach or non-compliance with Section 8 (Payment of Claims; No Liens), Section 13 (Insurance), Section 23 (Confidentiality), Schedule I hereto, or in circumstances of the willful misconduct or gross negligence of the applicable Party's Group (i.e., Company Group or Contractor Group).

**13. *Insurance.***   Each Party shall purchase and maintain in full force and effect, with underwriters acceptable to the indemnified Party (all carriers shall be AM Best A rated as a minimum or otherwise agreed by the indemnified Party), the following policies of insurance of the indemnifying Party, which shall be primary as to any other valid and existing policies of insurance of the indemnified Party but only to the extent of the indemnifying Party's indemnification obligations. Except for Worker's Compensation Insurance and Employers' Liability Insurance, all such policies shall name all members of indemnified Party and its respective affiliates, as applicable, as additional assureds, but only to the extent of indemnifying Party's indemnification obligations set forth in this Agreement. All policies shall waive all rights of subrogation by the underwriters against all members of the indemnified Party and its respective affiliates, as applicable, but only to the extent of such Party's indemnification obligations set forth in this Agreement.

**13.1 *Workers' Compensation & Employers' Liability Insurance:***

    a.  All States where operations are being conducted.

    b.  Coverage "B" Employers' Liability
          Limit: $1,000,000 Each Accident Bodily Injury by Accident
               $1,000,000  Policy Limit Bodily Injury by Disease
               $1,000,000 Each Employee Bodily Injury by Disease

    c.  Alternate Employer Endorsement

FURIE-ANK_00000189
DA01339

**13.2. *Commercial General Liability Insurance:*** Standard ISO Commercial General Liability conditions with the following conditions:

    a.  Premises/operations coverage

    b.  The Contractor's protective work let or sub-let

    c.  Products and Completed Operations coverages

    d.  Contractual liability specifically insuring the Agreement between the Company and the Contractor.

    e.  Sudden and accidental pollution coverage

    f.  Deletion of any Watercraft Liability Exclusions.

    g.  Minimum Coverage Limits:

        Limit: $1,000,000 each occurrence/$2,000,000 general aggregate.

**13.3. *Maritime Employer's Liability Coverage (including coverage for Transportation, Wages Maintenance and Cure)("MEL"):*** In an amount not less than $1,000,000 any one accident or occurrence. The MEL coverage can be placed on a separate policy and shall contain the following endorsements:

    a.  In Rem

    b.  Alternate Employer

    c.  Death on the High Seas Act

    d.  Waiver of Subrogation

**13.4 *Automobile Liability Insurance:***

    a.  Coverage to include all owned, non-owned and hired Automobiles.

    b.  Minimum Coverage Limits:

        Combined single limit $1,000,000 each accident

**13.5 *Umbrella:*** No less than $5,000,000 each accident and in the aggregate above the coverage provided in Section 13.1 through Section 13.4 above.

11

FURIE-ANK_00000190
DA01340

**13.6 General:** If the Contractor employs subcontractors to perform any Work, then the Contractor agrees to require such subcontractors to obtain, carry and keep in force during the time in which they are engaging in performing the Work hereunder, policies of insurance as set forth above in proportion to the value of the Work performed by the Contractor's subcontractors. Failure to maintain said insurance, approved as aforesaid, shall constitute sufficient grounds for the immediate cancellation or suspension of this Agreement by the Company.

**14   Accidents to be Reported:** In the event any member of the Contractor is involved in any loss, injury or damage on any member of the Company's premises or vessels, or if such injury, loss or damage involves any member of the Company's property, equipment or personnel or the property, equipment or personnel of any member of the Contractor or if such accident involves any third party in any manner whatsoever while the Contractor or any of its affiliates is performing any duties within the scope of this Agreement, the Contractor shall promptly report such injury, loss or damage to the attention of the Company's Representative or their designated representative. If the matter involves loss of life, serious injury or substantial property loss or damage, this report shall be made by telephone call, followed as soon as possible by a report in writing via electronic means. If the matter is of a less serious nature, notification may be made by letter posted in regular United States mail. All injuries, loss or damage must be reported. The reporting of any such matter will not imply any admission of liability on the part of any member of the Company or any member of the Contractor.

**15. Force Majeure:** The Agreement is subject to all applicable federal, state and local laws, orders, rules and regulations. Any delays in or failures of performance by either Party shall not constitute default hereunder or give rise to any claims for damages, if and to the extent such delays or failures of performance of the Work are caused by occurrences of *Force Majeure*. For purposes of this Agreement, "*Force Majeure*" includes, but is not limited to, acts of God, acts of the public enemy, *Laws and Regulations*, wars or warlike action (whether actual or impending), arrests and other restraints of government (civil or military), blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, sabotage, tropical storms and hurricanes, civil disturbances, tidal waves, explosions, confiscation or seizure by any government or other public authority, and any other causes, whether of the kind herein enumerated or otherwise, that are not reasonably within the control of the Party claiming a suspension and that could not have been overcome by the exercise of ordinary diligence. For purposes of this Agreement, "*Laws and Regulations*" means [the valid laws, rules, regulations, and orders (both civil and military) of the United States of America and all other governmental bodies having jurisdiction over the Work, or any part thereof, or any site where any part of the Work is performed, or any transportation routes to and from such site, whether such now exist or hereafter come into effect]. The Party experiencing *Force Majeure* shall notify the other Party with reasonable promptness of the existence of any such *Force Majeure* and the probable duration thereof, and shall provide the other Party from time to time with correct information concerning same. The Party experiencing *Force Majeure* shall take all reasonable actions to remove or avoid the cause of *Force Majeure*.

**16. Assignment of Agreement:** Neither Party shall assign this Agreement or any portion of the Work without the prior written consent of the other Party; however, the Contractor may assign its right to payment for Work performed to any person or entity with written notice to, and consent by, the Company, which shall not be unreasonably withheld, and provided further that the

FURIE-ANK_00000191
DA01341

Company may assign (i) this Agreement to any affiliated entity on notice to the Contractor and (ii) all or any part of its rights, benefits and interests of this Agreement and any Work Order to any financial institution or lender providing financing to the Company and its operations. The Contractor agrees to sign a consent to assignment of such rights, benefits and interests of the Company with any of the Company's lenders in form and substance reasonably acceptable to the Contractor and the Company's lenders. No assignment by the Company shall release the Company from or diminish its liabilities and responsibilities under this Agreement.

**17. *Alterations*:** No changes or alterations shall be made to Work unless they are in writing and signed by properly authorized representatives of both the Company and the Contractor.

**18. *Waiver*.** No benefit or right accruing to either Party under this Agreement shall be waived unless the waiver is reduced to writing and signed by both Parties to this Agreement. The failure of either Party to exercise any of its rights under this Agreement shall in no way constitute a waiver of those rights, nor shall such failure excuse the other Party from any of its obligations under this Agreement.

**19. *Labor, Equipment, Materials, Supplies, and Services*:**

**19.1** In the performance of the Work, the Contractor is an independent contractor, with the authority to control and direct the performance of the details of the Work, the Company being interested only in the results obtained, but the Work shall meet the approval of the Company. The Contractor specifically agrees that all persons employed by the Contractor in performing Work covered by this Agreement, or by the Contractor's subcontractors, are not the employees of the Company for any purpose whatsoever, and the Contractor hereby agrees to immediately reimburse the Company for all contributions, taxes, interest and penalties necessarily paid by the Company under any unemployment, compensation, labor or insurance laws covering employees of the Contractor or the Contractor's subcontractors.

**19.2** In all cases where the Contractor's employees (defined to include the Contractor's direct, borrowed, special, or statutory employees) are covered by the Louisiana Worker's Compensation Act, La.Rev.Stat. §23:1021 *et seq.*, the Company and the Contractor agree that all Work performed by the Contractor and its employees pursuant to this Agreement are an integral part of and are essential to the ability of the Company to generate the Company's own goods, products and services for purposes of La. Rev.Stat. §23:1061(A) (1). Furthermore, the Company and the Contractor agree that the Company is the principal or statutory employer of the Contractor's employees for purposes of La.Rev.Stat. §23:1061(A) (3). Irrespective of the Company's status as the statutory employer or special employer (as defined in La.Rev.Stat. §23:1031(C)) of the Contractor's employees, the Contractor shall remain primarily responsible for the payment of Louisiana Worker's Compensation benefits to its employees, and shall not be entitled to seek contribution for any such payments from the Company.

**19.3** The Contractor warrants, represents, and guarantees that all tools and equipment used will be furnished, and all Work (and labor to be performed under the terms of this Agreement) will be performed in accordance with all applicable federal, state, and local laws, rules, regulations, orders, and ordinances and with the provisions of this Agreement.

FURIE-ANK_00000192
DA01342

**19.4** The Contractor shall keep and maintain equipment furnished by the Company in good condition, at the Contractor's sole expense, and upon the termination of the use of such equipment, return same to the Company in as good condition as when received, ordinary wear and tear excepted.

**19.5** The Contractor shall examine, before using, all vessels, materials, equipment and supplies furnished by the Company for performance directed pursuant to this Agreement, and will exercise diligence in reporting to the Company any apparent defects to allow the Company to replace same without delaying operations.

**20. *Audit:*** The Contractor shall maintain a true and correct set of records pertaining to Work performed or goods supplied hereunder and all transactions related thereto. The Contractor further agrees to retain all such records for a period of not less than two (2) years from the completion of the Work performed or goods supplied hereunder. Any representative authorized by the Company may audit at any reasonable time or times at the Contractor's normal place of business within such two (2) year period any and all records of the Contractor relating to the Work performed or goods supplied hereunder and all transactions related thereto for the purpose of determining whether there has been compliance with this Agreement. If an audit is commenced within such two (2) year period, the books and records shall be maintained for as long as reasonably required to complete the audit.   The Company agrees to take commercially reasonable steps to maintain the confidentiality of the Contractor's books and records reviewed in connection with any such inspection or audit.   Notwithstanding anything to the contrary herein, it is understood and agreed that the Company shall not be entitled to the Contractor's cost structures, calculations of the basis for its personnel hourly rates, prices charged or amounts paid to its vendors, profit margins, trade or professional information, drawings, formula and designs, any documents or materials subject to attorney-client or similar privilege, or other confidential or proprietary information.

**21. *Government Regulations:***

**21.1** The Contractor shall comply, where applicable, with the following clauses contained in 41 CFR: Sections 60-1.4(a) (Equal Employment Opportunity); 1-12.803-10 (certification of non-segregated facilities); Part 50-250 (employment opportunity for veterans); Part *60-741* (employment opportunities for handicapped individuals);  Sections 1-1.710 (subcontracting with small business concerns); 1-1.805 (subcontracting with labor surplus area concerns); 1-1.1310 (subcontracting with minority business enterprises); and 42 USC §12101 *et seq.* (the Americans with Disabilities Act). These clauses are incorporated herein by reference if and to the extent applicable to this Agreement by law, executive order, or regulation. The Contractor represents that it is in compliance with the reporting requirements of 41 CFR § 60-1.40 and Part 60-2.

**21.2** The Contractor shall comply where applicable with all environmental protection laws, regulations, orders and rules issued by any governmental agency having jurisdiction over the area in which operations are being conducted. These laws, regulations, orders and rules are incorporated herein by reference if and to the extent applicable to this Agreement by law, executive order or regulations.

14

FURIE-ANK_00000193
DA01343

*22. Applicable Law:* To the extent that Work activities are maritime in nature, this Agreement shall be interpreted and construed in accordance with United States General Maritime Law, excluding any conflicts of law principles that would direct the substantive law of another jurisdiction to apply. To the extent that maritime law is inapplicable, the substantive laws of the State of Alaska shall apply excluding any conflicts of law principles that would direct the substantive law of another jurisdiction to apply. Any suit or proceeding hereunder shall be brought in any U.S. Federal District Court having personal jurisdiction over the Parties and venue over the civil action. Each Party hereby irrevocably consents to the jurisdiction of such federal courts and waives any objection that such courts are an inconvenient forum. If subject matter jurisdiction in U.S. Federal District Court is not available, any suit or proceeding hereunder shall be brought in any state court of competent jurisdiction located in Anchorage, Anchorage Borough, Alaska, and the parties hereby agree to personal jurisdiction in such courts and waive any objection that such courts are an inconvenient forum.

*23. Confidentiality.* All information obtained by all members of the Company and the Contractor in performing the Work including, without limitation, information concerning seismic operations, well depths, formations penetrated, coring, testing, surveying and completions; any other information which the discloser of such information ("*Disclosing Party*") deems proprietary or confidential; or any other information (whether delivered in writing or orally) that by its nature would be reasonably considered as confidential ("*Confidential Information*") shall be held strictly confidential by the Party receiving such information ("*Receiving Party*"), and shall not, without Disclosing Party's prior written permission, be divulged by any member of Receiving Party to any person or entity whatsoever other than designated representatives of Disclosing Party. Receiving Party shall use the same degree of care to avoid disclosure of such information as Receiving Party employs with respect to its own Confidential Information of like importance. The Parties hereto agree that information shall not be deemed Confidential Information, and Receiving Party shall have no obligation with respect to any such information which: (i) was generally known to the public prior to the disclosure under this Agreement; (ii) is already known to Receiving Party prior to receipt from Disclosing Party as evidenced by written records of Receiving Party dated prior to the receipt; (iii) is or becomes publicly known through no wrongful act of Receiving Party or any person to whom the Receiving Party discloses such information; (iv) is received from a third party without breach of this Agreement or any other obligation to maintain the confidentiality of such information; (v) is independently developed by Receiving Party, as evidenced by contemporaneously prepared documented records; or (vi) is required to be disclosed by securities laws or the rules or regulations of a stock exchange. Any combination of elements of information shall not be deemed to be excluded from the class of Confidential Information by reason of each such element satisfying one or more of the exclusions set forth in clauses (i)-(vi) of this Section unless the combination itself satisfies one or more such exclusions. If Receiving Party or its Representatives are requested or required by legal process to disclose any Confidential Information, Receiving Party shall promptly notify Disclosing Party of such request or requirement so that Disclosing Party may seek an appropriate protective order or waive compliance with this Agreement. If, in the absence of a protective order or the receipt of a waiver hereunder, Receiving Party or its Representatives are compelled to disclose the Confidential Information, Receiving Party and its Representatives may disclose only such of the Confidential Information to the party compelling disclosure as is required by law and, in connection with such compelled disclosure, Receiving Party shall use its best efforts to obtain from the party to whom disclosure is made

15

FURIE-ANK_00000194
DA01344

written assurance that confidential treatment will be accorded to such portion of the Confidential Information as is disclosed. Notwithstanding the provisions of this paragraph, a Party may disclose and authorize the use of the Confidential Information to its (i) employees, (ii) agents, (iii) affiliates, (iv) professional advisors (including legal and financial advisors and insurance carriers or consultants), to the extent such disclosure is necessary for such advisors to provide such advice, and (v) financing parties for the purposes of negotiating, renegotiating or securing financing by the Disclosing Party or its affiliates; and, in the case of professional advisors or financing parties owe confidentiality obligations under written agreement with the Disclosing Party that contains substantively the same terms as those contained in this paragraph (collectively, "*Representatives*"). In any event, the Receiving Party shall be responsible for any breach of the terms of this Agreement by any of its Representatives. All written data delivered by Disclosing Party to Receiving Party pursuant to this Agreement shall be and remain the property of Disclosing Party, and all such written data, and all copies thereof, shall be promptly returned to Disclosing Party upon written request, or destroyed at Disclosing Party's option. Without the prior written consent of the Company, the Contractor shall not use the Company's name in connection with any publicity, release, advertisement, or other publication.

**24. Entire Agreement.** Except as specifically agreed in writing by the Parties, this Agreement and its Exhibits supersede all negotiations, understandings and agreements between the Parties and constitutes the entire understanding and agreement between the Parties relative to the Work. This Agreement shall not be modified or supplemented, nor shall any benefit or right accruing to the Company or the Contractor under this Agreement (or any Amendment or Addendum) be deemed waived by the terms of any other purchase order, invoice or other document unless the proposed modification, supplementation or waiver is approved and signed by the expressly authorized representatives of the Parties, having actual authority, by separate written instrument (which states an express intent to modify, supplement or waive this Agreement) signed in advance of the Work being performed.

**25. Third Parties:** Except as specifically provided for elsewhere in this Agreement, this Agreement shall not be construed to confer any benefit on any third party not a Party to this Agreement nor shall it provide any rights to such third party to enforce its provisions.

**26. Drugs and Alcohol:** To help ensure a safe, productive work environment. the Company may establish a program designed to prohibit the use, transportation and possession of firearms, drugs and/or controlled substances, drug paraphernalia and alcoholic beverages on helicopters, boats, vessels, drill rigs, offshore platforms, drilling locations, or the Company's other premises. The Company understands and accepts that the Contractor utilizes a third party service to administer its controlled substance program. Illegal drugs include marijuana, amphetamines, barbiturates, opiates, cocaine, codeine, morphine, hallucinogenic substances (LSD) and any similar drugs and/or chemical synthetics deemed hazardous by the Company. Such programs if established, upon notice shall apply to those of the Contractor's employees, agents, servant and subcontractors performing work on the Company's worksite. The Company specifically reserves the right to carry out reasonable searches of individuals, their personal effects and vehicles when entering, on and leaving the Company's premises. The Company will initiate the searches without prior announcement. Individuals found in violation will be removed from the Company's premises immediately. Submission to such a search is strictly voluntary, however, refusal may be cause for

16

FURIE-ANK_00000195
DA01345

not allowing that individual on the well site or the Company's other premises. It is the Contractor's responsibility to notify its employees of this prohibition and its enforcement.

**27. *Consequential Damages*:** Notwithstanding anything to the contrary contained elsewhere herein, neither the Contractor nor the Company shall be liable to the other Party's Group (i.e., Company Group or Contractor Group, as applicable) for any damages that could not fairly and reasonably be considered as directly arising naturally from the breach in question, including, but not limited to, loss of use, loss of profit, loss of revenue, business interruption, loss of productivity, loss of efficiency, acceleration, loss of product or production (or any other damages not measured by actual damages that could not fairly and reasonably be considered as arising naturally from the beach in question) or punitive damages of any kind or character whenever arising under this Agreement or any Work Order or as a result of, relating to or in connection with the Work, and no claim for any such damages or losses shall be made by either the Contractor or the Company against the other Party, and EACH PARTY SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE OTHER PARTY AND ITS RESPECTIVE AFFILIATES AS APPLICABLE, AGAINST SUCH DAMAGES OR LOSSES, REGARDLESS OF WHETHER SUCH CLAIM IS BASED OR CLAIMED TO BE BASED ON NEGLIGENCE (INCLUDING SOLE, CONTRIBUTORY JOINT, ACTIVE, PASSIVE OR CONCURRENT NEGLIGENCE), UNSEAWORTHINESS, UNAIRWORTHINESS, FAULT, BREACH OF WARRANTY, BREACH OF AGREEMENT, STATUTE, STRICT LIABILITY OR OTHERWISE AND INCLUDING PRE-EXISTING CONDITIONS.

**28. *Severability*:** If, in any legal proceeding, it is determined that any provision of this Agreement is unenforceable under applicable law, the unenforceable provision shall automatically be amended to conform to that which is enforceable under the law. In any event, the validity or enforceability of any provision shall not affect any other provision of this Agreement, and the Agreement shall be construed and enforced as if such provision had not been included.

**29. *Execution/Counterparts*:** This Agreement and any Work Order may be executed by the Parties by electronic, facsimile or original signatures and may be executed in one or more counterparts, each of which shall constitute an original and all of which when read together shall constitute one and the same instrument.

**30. *Independent Contractors*:** In connection with the Services, the Contractor may, with consent, not to be unreasonably withheld, from the Company utilize employees, agents or independent contractors or its own affiliates or its own agents or independent contractors. References in this Agreement to personnel of the Contractor shall apply equally to employees, agents or independent contractors of the Contractor and its affiliates. The parties intend that an independent contractor relationship will be created by this Agreement.  As an independent contractor, the Contractor will have complete and exclusive charge of the management and operations of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operations of its business.  Employees of the Contractor will not be entitled to receive from the Company any vacation, sick pay, leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits.  The Contractor will be responsible for all withholding, income and other taxes incurred in connection with the operation and conduct of its business.

17

**EXHIBIT A**

**Work to be Performed**

**Pursuant to Master Services Agreement Dated April 10, 2018**

**Parties: Furie Operating Alaska LLC, and**

    **Petrotechnical Resources of Alaska, LLC**

**Scope of Work and Job Specifications:**

| Minimum Required Job Categories | Maximum Rates |
|---|---|
| PRA Principal in Charge | $24,000/mo |
| Drilling Manager | $350/hr |
| Drilling Engineer | $250/hr |
| Petroleum Engineer | $300/hr |
| Reservoir Engineer | $250/hr |
| Geophysicist | $250/hr |
| Geologist | $250/hr |
| Petrophysicist | $250/hr |
| Logistics | $200/hr |
| Scheduler | $175/hr |
| Procurement specialist/Contracts | $175/hr |
| Safety Engineer | $200/hr |
| HSE Field Compliance | $2100/day |
| Permitting | $175/hr |
| Company Man | $2300/day |
| Wellsite Geo | $1800/day |
| Cost controller | $175/hr |
| Engineering Tech | $125/hr |

FURIE-ANK_00000197
DA01347

**PRA Scope**

| Well | Task | Description |
|---|---|---|
| KLU-1 | Develop Completion Design Basis | Refine perf intervals, packer depth, tubing size |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | AFE | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Update service contracts | Update existing service company contracts, or negotiate new contract terms |
| | Sundry level procedures | High level definition of wellwork activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Complete on paper | Walk through of well completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well completion |
| | AOGCC Sundry submission, review, approval | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-A4 | Finalize BHL, directional design | Integrate seismic and well data to finalize well target locations and directional design |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | Drilling Design | Prepare preliminary design for drilling and completion of well |
| | AFE | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Update service contracts | Update existing service company contracts, or negotiate new contract terms |
| | Permit to Drill procedures | High level definition of well operations activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Drill the well on paper | Walk through of well completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well drilling and completion |
| | Permit to Drill, AOGCC | Submit Permit to Drill to AOGCC for their review and approval |
| | Sundries upon completion | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-3 | Develop design basis for workover/completion | Plan for removing existing completion, squeezing all perforations, and recompleting |
| | SOR | Statement of Requirements, defines technical requirements and objectives |
| | AFE, cost estimate and schedule | Authorization for Expenditure, financial document for cost estimate |
| | Long leads procurement | Identification and procurement of long lead items |
| | Sundry level procedures | High level definition of wellwork activity for submission to AOGCC |
| | Vendor engagement/design | Engage all required service providers and equipment/materials providers |
| | Workover and Complete on paper | Walk through of well workover and completion activities with service company reps |
| | Issue final procedures | Draft and issue final written procedures for well workover and completion |
| | AOGCC Sundry submission, review, approval | Submit Sundry forms to AOGCC for their review and approval |
| | End of well report, sundries, project wrap-up | Submit final Sundry's and required end of well reports to agencies and client |
| KLU-A2A | Monitor performance | Develop plan for accessing Sterling, and adding Beluga perfs as early as 2019 |

19

| General | Logistics | Contract boats, shore base, helicopter |
|---|---|---|
| | Bathymetry/mitigation plan | Detailed bathymetry around platform |
| | Safety/HSE | Response, bridging document |
| | Permitting | Obtain existing permits from Furie, update as required. Update permitting compliance matrix |
| | Additional permits | Obtain Permits specific to the proposed operations, SPCC, MG1, AOGCC Sundry's etc. |
| | Inspection and commission of rig | Finalize and approve rig contract with Spartan and 3rd party inspectors. Prep rig for operations, or such other rig as the Contractor recommends and is approved by the Company. |
| | Project schedule and management | Update and issue project schedule |
| | MSA and workorder agreement | Select vendors, agree, prepayment and credit terms, not sufficient time for RFP process |
| | MSA and work orders | Negotiate terms of MSAs and Work Orders, and present same to the Company, which will execute such instruments. The Contractor may execute such instruments in its own name or on behalf of the Company only with the prior written consent of the Company, as set forth in Section 1(b) of the Agreement. |
| | Cost management/tracking/vetting | Define invoice review process |
| | Miscellaneous | Additional work done at written direction of Company, including workovers of existing wells, recompletions of existing wells, drilling new wells, and investigations for additional reserve potential |
| Asset management | Update current ADNR Plan of Development | Agency relations, secure updated Plan of Development approval |
| | Reservoir Characterization | Seismic interpretation, 3D static model, dynamic model |
| | Depletion Plan | Surveillance, additional wells, Sterling reserves exploitation |
| | Annual reporting | Plan of Development, pressure reports, permit compliance reporting |
| | Facilities upgrades | Monitoring and surface sand control |
| | Water handling | Permitting and drilling disposal well, if needed |
| | Facility and pipeline monitoring and reporting | Monitor facilities, provide direction on operating parameter's |
| | Production Surveillance | Monitor well, provide direction on flowing parameter's, recommend remedial operations |
| | Production Management | Supervise production operations, production internal and regulatory reporting |

20

FURIE-ANK_00000199
DA01349

**EXHIBIT B**

## MASTER RATE SCHEDULE
### Effective: April 10, 2018



**Petrotechnical Resources of Alaska, LLC (PRA) 2017 Rate Schedule**

| | |
|---|---|
| General Clerk | $55.00 per hour |
| Secretary/Word Processor | $65.00 per hour |
| Administrator | $70.00 per hour |
| Senior Administrator | $85.00 per hour |
| Technical Assistant | $95.00 per hour |
| Assistant Professional | $120.00 per hour |
| Associate Professional | $130.00 per hour |
| Professional 1 | $150.00 per hour |
| Professional 2 | $165.00 per hour |
| Senior Professional 1 | $175.00 per hour |
| Senior Professional 2 | $185.00 per hour |
| Supervising Professional 1 | $200.00 per hour |
| Supervising Professional 2 | $230.00 per hour |
| Principal Professional 1 | $200.00 per hour |
| Principal Professional 2 | $250.00 per hour |
| Principal Professional 3 | $300.00 per hour |
| Principal Professional 4 | $350.00 per hour |
| Oil and Gas Legal Advisor | $350.00 per hour |
| Expert Witness Testimony | $350.00 per hour |

21

FURIE-ANK_00000200
DA01350

**Schedule I**

This <u>Schedule I</u> is a part of and incorporated into the agreement (the "*Agreement*"), dated as of April 10th, 2018, by and between Petrotechnical Resources of Alaska, LLC (the "*Contractor*"), and Furie Operating Alaska, LLC, a Texas limited liability company (the "*Company*"), pursuant to which the Contractor has been engaged to provide consulting and management services as set forth in the Agreement. Capitalized terms not defined herein shall have the same meaning assigned in the Agreement.

The following defined terms are used in this Agreement:

"*Liabilities*" means any losses, claims, damages, judgments, assessments, costs and other liabilities.

"*Action*" means any claim, action, proceeding or investigation, whether or not in connection with pending or threatened litigation and whether or not any indemnified person is a party.

Notwithstanding anything in this Agreement to the contrary, the following indemnities shall apply, subject to the limitation on damages addressed in Section 27 of the Agreement: (i) Company's "Knock-for-Knock" Indemnity. COMPANY SHALL FULLY INDEMNIFY AND DEFEND THE CONTRACTOR AND ITS AFFILIATES AND THEIR RESPECTIVE DIRECTORS/MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS AND OTHER AGENTS APPOINTED BY ANY OF THE FOREGOING AND EACH OTHER PERSON, IF ANY, CONTROLLING THE CONTRACTOR OR ANY OF ITS AFFILIATES (THE CONTRACTOR AND EACH SUCH PERSON AND ENTITY BEING REFERRED TO AS THE "*CONTRACTOR GROUP*") FROM AND AGAINST ANY AND ALL DAMAGES TO THE EXTENT ARISING FROM INJURY TO OR ILLNESS OR DEATH OF ANY EMPLOYEE OR AGENT OF ANY MEMBER OF THE COMPANY AND ITS AFFILIATES AND THEIR RESPECTIVE DIRECTORS/MANAGERS, OFFICERS, EMPLOYEES, ATTORNEYS AND OTHER AGENTS APPOINTED BY ANY OF THE FOREGOING AND EACH OTHER PERSON, IF ANY, CONTROLLING THE COMPANY OR ANY OF ITS AFFILIATES (THE COMPANY AND EACH SUCH PERSON AND ENTITY BEING REFERRED TO AS THE "*COMPANY GROUP*") OR FROM ANY LOSS OF OR DAMAGE TO ANY PROPERTY OF ANY MEMBER OF THE COMPANY GROUP, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE CONTRACTOR GROUP. The Company agrees that this voluntary and mutual indemnity agreement will be supported by insurance of the types and in at least the minimum amounts required in Section 13, and shall be primary to any other insurance provided by the Company Group. The Company agrees to consult and cooperate in good faith with the Contractor in the selection and retention of legal counsel to represent the Contractor in any Action with respect to an indemnifiable claim. Notwithstanding the foregoing, the Contractor may select its own counsel to participate in any Action at the Contractor's sole cost and expense; provided, however, the Contractor's right to participate in any Action shall not limit the Company's obligations hereunder. The Company will not, without prior written consent of the Contractor (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any member of the Contractor Group is a

22

FURIE-ANK_00000201
DA01351

party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of the Contractor Group from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any member of the Contractor Group.

(ii) Contractor's "Knock-for-Knock" Indemnity. CONTRACTOR SHALL FULLY INDEMNIFY AND DEFEND THE COMPANY GROUP FROM AND AGAINST ANY AND ALL DAMAGES TO THE EXTENT ARISING FROM INJURY TO OR ILLNESS OR DEATH OF ANY EMPLOYEE OR AGENT OF ANY MEMBER OF THE CONTRACTOR GROUP OR FROM ANY LOSS OF OR DAMAGE TO ANY PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP, EXCEPT TO THE EXTENT CAUSED OR CONTRIBUTED TO BY THE GROSS NEGLIGENCE OR THE WILLFUL MISCONDUCT OF THE COMPANY GROUP. The Contractor agrees that this voluntary and mutual indemnity agreement will be supported by insurance of the types and in at least the minimum amounts required in Section 13, and shall be primary to any other insurance provided by the Contractor Group. The Contractor agrees to consult and cooperate in good faith with the Company in the selection and retention of legal counsel to represent the Company in any Action with respect to an indemnifiable claim. Notwithstanding the foregoing, the Company may select its own counsel to participate in any Action at the Company's sole cost and expense; provided, however, the Company's right to participate in any Action shall not limit the Contractor's obligations hereunder. The Contractor will not, without prior written consent of the Company (which shall not be unreasonably withheld), settle, compromise or consent to the entry of any judgment in or otherwise seek to terminate any pending or threatened Action in respect of which indemnification or contribution may be sought hereunder (whether or not any member of the Company Group is a party thereto) unless such settlement, compromise, consent or termination (i) includes an unconditional release of the Company Group from all Liabilities arising out of such Action and (ii) does not include any admission or assumption of fault or culpability on the part of any member of the Company Group.

23

FURIE-ANK_00000202
DA01352

**Annex B**

**PRA Consent**

FURIE-ANK_00000203
DA01353

### Form of Consent to Collateral Assignment

This CONSENT TO COLLATERAL ASSIGNMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, this "**Consent**"), dated as of [_____], 20[__], is entered into by [_____], a [_____] ("**Project Party**"), CORNUCOPIA OIL & GAS COMPANY, LLC, a Delaware limited liability company ("**Cornucopia**"), FURIE OPERATING ALASKA, LLC, a Delaware limited liability Company ("**FOA**" and, together with Cornucopia, "**Furie**"), and ENERGY CAPITAL PARTNERS MEZZANINE OPPORTUNITIES FUND A, LP, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns in such capacity, "**Collateral Agent**") for the Secured Parties (as defined in the Credit Agreement referred to below).

### RECITALS

A.    Furie intends to develop, procure, construct, finance, own, operate and maintain the Project (as defined in the Credit Agreement referred to below).

B.    Furie and Project Party have entered into that certain [_____], dated as of [_____] (the "**Assigned Agreement**"), pursuant to which [*describe Assigned Agreement*].

C.    In order to finance the development, design, engineering, construction, operation and maintenance of the Project, Furie has entered into that certain Credit Agreement, dated as of July 15, 2014, among Furie, Collateral Agent and the other lenders party thereto (as amended and restated by that certain Amended and Restated Credit Agreement, dated as of March 19, 2015, by and among Furie, Collateral Agent and the lenders party thereto and that certain Second Amended and Restated Credit Agreement, dated as of April 12, 2018 by and among Furie, Collateral Agent and the lenders party thereto and as it may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") pursuant to which, among other things, the lenders party thereto have agreed to provide funds for the foregoing.

D.    Furie has agreed to secure all of its obligations under the Credit Agreement and the other Credit Documents (as defined in the Credit Agreement) by granting to Collateral Agent, for the benefit of the Secured Parties, a first priority lien on substantially all of the assets and properties owned by Furie. Pursuant to that certain Pledge and Security Agreement, dated as of July 15, 2014 (as amended on August 11, 2016, the "**Security Agreement**") among Furie and Collateral Agent, Furie has, among other things, collaterally assigned all of its right, title and interest in, to and under (but not Furie's liabilities, obligations or duties with respect to), and granted Collateral Agent, for the benefit of the Secured Parties, a first priority security interest in the Assigned Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the parties hereto hereby agree, notwithstanding anything to the contrary in the Assigned Agreement, as follows:

R-1

FURIE-ANK_00000204
DA01354