# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| FURIE OPERATING ALASKA, LLC, *et al.*,[1] | ) Case No. 19-11781 (LSS) |
| Debtors. | ) (Jointly Administered) |
| | ) **Related to Docket Nos. 14 and 377** |

## MELODY LENDERS' PRELIMINARY OBJECTION TO MOTION OF THE DEBTORS FOR ENTRY OF ORDER APPROVING THE SALE OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND RELATED RELIEF

Melody Special Situations Offshore Credit Mini-Master Fund., L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund., L.P. and Melody Capital Partners FDB Credit Fund, L.P. and/or their respective affiliates (collectively, the "Melody Lenders"), in their capacities as Prepetition Term Loan Lenders[2] and DIP Lenders, hereby submit this preliminary objection (the "Preliminary Objection") to the sale of the Debtors' Assets free and clear of liens, claims, interests and encumbrances, and related relief, and respectfully state as follows:

---

[1]  The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Furie Operating Alaska, LLC (8721); Cornucopia Oil & Gas Company, LLC (9914); and Corsair Oil & Gas LLC (8012). The location of the Debtors' corporate headquarters and the service address for all Debtors is 188 W. Northern Lights Blvd., Suite 620, Anchorage, Alaska 99503.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing on a Super-Priority, Senior Secured Basis, (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Lenders, and (III) Modifying the Automatic Stay* [Docket No. 186] (the "Final DIP Order") or the *Motion of Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of the Debtors' Assets, (B) Approving Stalking Horse Bid Protections, (C) Scheduling an Auction for, and Hearing to Approve, the Sale of the Debtors' Assets, (D) Approving the Form and Manner of Notice Thereof, (E) Approving Contract Assumption and Assignment Procedures and (F) Granting Related Relief and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (B) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 14].

1.      Throughout these chapter 11 cases, the Melody Lenders have expressed support for the Debtors' efforts to market and sell their assets on an expedited basis. Indeed, although the Melody Lenders were hopeful that the marketing process would produce many active bidders, and that the Auction conducted pursuant to the Bidding Procedures would result in those bidders materially increasing their bids, the marketing process yielded only two bids[3]: (a) a credit bid submitted by the DIP Agent and the Prepetition Term Loan Agent valued at $15,000,001 for the purchase of the equity of the Debtors pursuant to a plan of reorganization (the "Credit Bid"); and (b) a significantly lower cash bid from HEX L.L.C. ("HEX") for the purchase of the assets of the Debtors (the "Initial HEX Bid"). *See* Auction Transcript p. 7. On the day of the Auction, but before the official commencement of the Auction, HEX submitted a bid to the Debtors via term sheet that purported to improve the terms of the Credit Bid, including (x) changing its bid from an asset purchase to an "equity purchase" pursuant to a plan of reorganization; (y) increasing its purchase price to $15,000,010 (just $9 above the Credit Bid purchase price); and (c) agreeing to assume certain contracts, all without certain contingencies that were identified in the Credit Bid (the "Revised HEX Bid"). *See* Auction Transcript pp. 9-19. Without creating any record or showing how or why the Debtors determined that the Revised HEX Bid was a better bid than the Credit Bid, the Debtors announced that the Revised HEX Bid was the Successful Bid. *See* Auction Transcript p. 19. Since the Auction concluded, the Debtors have filed only a single notice with the Court, indicating that the Revised HEX Bid is the Successful Bid and confirming that the hearing to approve the Sale remains scheduled for December 12, 2019 at 10:30 a.m. *See Notice of Auction Results* [Docket No. 377]. The Debtors have yet to file the terms of the Revised HEX

---

[3]     The Auction transcript is annexed hereto as Exhibit A (the "Auction Transcript").

Bid, the Purchase Agreement, or the revised Sale Order, leaving parties in the dark as to the actual terms of the Successful Bid.

2. While the Melody Lenders remain supportive of the Debtors' efforts to sell their businesses as a going concern, they remain deeply concerned about what exactly it is that the Debtors and HEX agreed to at the Auction, and whether those agreements, as will eventually be documented in a revised form of purchase agreement (the "HEX Purchase Agreement") and sale order (the "HEX Sale Order"), and an eventual plan of reorganization (the "HEX Plan"), impinge on the Melody Lenders' rights as both a DIP Lender and Prepetition Term Loan Lender and are materially adverse to the Melody Lenders and their rights under the Final DIP Order and DIP Credit Agreement. Indeed, it is unclear from the Auction Transcript whether or not the parties fully or mutually understand the terms that they agreed to (including the contingencies that may be included in the Revised HEX Bid). *See* Auction Transcript pp. 10-12, 15-17. The Melody Lenders are concerned that the Debtors, internalizing the mantra that "cash is king", may have accepted an offer that they are not in fact capable of effectuating because, among other things, it attempts to strip the Melody Lenders of certain fundamental rights and protections (including the right to be repaid in cash in full on its outstanding portion of the DIP Obligations and to consent to the release of collateral, including the proceeds of the Tax Credits). Accordingly, the Melody Lenders are forced to bring this Preliminary Objection to ensure their rights under the Final DIP Order, the DIP Credit Agreement, the New Side Letter and the Bankruptcy Code are not trampled upon as collateral damage in the Debtors' effort not to lose the "bird in hand." At a minimum, until such time as the parties have had a chance to fully review and digest all of the terms of the Revised HEX Bid, including the terms of the HEX Purchase Agreement, HEX Sale Order and HEX Plan, it is premature to proceed with the Sale Hearing as presently scheduled.

**I.      The Revised HEX Bid Does Not Satisfy the DIP Obligations in Full in Cash**

3.      The Revised HEX Bid contemplates that the purchase and sale of the Debtors' equity will be consummated pursuant to a plan of reorganization. Section 1129(a)(9) of the Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that such plan must, on the effective date, satisfy in full and in cash all administrative expenses. 11 U.S.C. § 1129(a)(9). The requirements of section 1129(a)(9) apply equally to the DIP Obligations, which are superpriority claims under sections 507 and 503 of the Bankruptcy Code. In addition, both the Final DIP Order and the DIP Credit Agreement require upon consummation of a plan or sale transaction the repayment of the DIP Obligations (as defined therein), in full and in cash. *See* Final DIP Order ¶ 5; DIP Credit Agreement § 2.1.6(a)(ii) ("The DIP Facility consists of $15,000,000 … together with the applicable interest, advances, expenses, fees and other charges … payable in full and in cash on the Maturity Date [(which includes, among other things "the substantial consummation of a Plan which has been confirmed by an order entered by the Bankruptcy Court" and "the consummation of a Sale Transaction")] …."); DIP Credit Agreement § 2.1.6(a)(ii); *see also* Final DIP Order ¶ J; DIP Credit Agreement § 2.1.6(a)(ii)(x) ("Subject to the last proviso in this Paragraph J [(which deals with a Credit Bid of the Prepetition Term Loan Obligations)], the DIP Loans together with all accrued and unpaid interest, fees, charges, costs and other Obligations shall be repaid in full in cash.").

4.      The DIP Credit Agreement similarly prohibits any amendment, modification or waiver of the obligations to repay the DIP Obligations in full and with any consideration other than cash without each DIP Lender's consent (the so-called "sacred lender rights"). *See* DIP Credit Agreement § 8.9(a):

4

> . . . no such supplemental agreement shall:
>
> *(i)* *without the consent of all of the Lenders affected thereby, modify or waive the requirements under __Section 2.1.5__ __(Superpriority Nature of Obligations and Liens), 2.1.6__ __(Prepayments and Repayments),__ 2.4 (Pro Rata Treatment), 2.5 (Change of Circumstances), 5.6 (Proceeds), 6.19 (Assignment), 8.1 (Appointment, Powers and Immunities), 8.12 (Participation) or 8.13 (Transfer of DIP Loans, DIP Loan Commitment);*
>
> *(ii)* *without the consent of all Lenders, modify or waive the requirements under any other provision of any DIP Document specifically requiring the consent of or waiver by all of the Lenders;*
>
> (iii) without the consent of the Lenders affected thereby, extend the DIP Availability Period or the DIP Commitment Termination Date beyond the latest date provided for under Section 2.1.6(a)(i);
>
> *(iv)* *without the consent of all of the Lenders affected thereby, reduce the amount or extend the payment date for any amount due hereunder, whether principal, interest, fees or other amounts;*
>
> (v) without the consent of the Lenders affected thereby, increase the DIP Loan Commitment;
>
> (vi) without the consent of all Lenders, reduce the percentage specified in the definition of Required Lenders;
>
> (vii) without the consent of all Lenders, amend Exhibit D;
>
> (viii) without the consent of all Lenders, amend this Section 8.9; or
>
> *(ix)* *without the consent of all Lenders, release all or substantially all of the Collateral from the Lien of any of the DIP Security Documents* or release any party acting as a guarantor under a DIP Document (except as specifically permitted by the terms of the relevant DIP Document).

DIP Credit Agreement § 8.9(a) (emphasis added).

5. In addition, the form of Sale Order filed by the Debtors on October 28, 2019 presupposes and confirms the Debtors' obligation to repay the DIP Obligations in full and in cash

upon consummation of any sale. *See Notice of Filing of Proposed (I) Forms of Securities and Asset Purchase Agreements and (II) Sale Order* [Docket No. 237], <u>Exhibit C</u> (the "<u>Form of Sale Order</u>") ¶ 9 ("Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, upon Closing, and subject to the satisfaction in full in cash of all then outstanding DIP Obligations in accordance with the terms of the DIP Orders and in accordance with the Purchase Agreement, the Assets shall be transferred to the Buyer free and clear of all liens, claims, encumbrances, and interests (subject to the Assumed Liabilities and the Permitted Liens) …."). Moreover, the Form of Sale Order provides:

> [N]othing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights … of the DIP Agent and/or the DIP Lenders pursuant to the DIP Orders or the DIP Documents, or in respect of the DIP Obligations or the liens, security interests, or superpriority claims of the DIP Lenders, until the Closing and the repayment in full in cash of the DIP Obligations.

Form of Sale Order ¶ 48.

> Nothing in the Purchase Agreement or this Sale Order shall be deemed to amend, modify, or limit the rights and claims of the Prepetition Term Loan Lenders pursuant to the DIP Orders or the Prepetition Term Loan Documents.

Form of Sale Order ¶ 49.

6.      Despite these requirements, however, the $15,000,010 in cash to be provided by HEX in connection with the Revised HEX Bid is all but certain to be insufficient to repay the DIP Obligations in full. The cash purchase price announced by the Debtors of $15,000,010 is, despite its aesthetic similarity to the principal amount of the DIP Loans, a misleading figure. Before the Debtors' creditors will see any portion of the $15 million in cash, the Debtors will be required to withhold 15% of the purchase price for Foreign Investment in Real Property Tax Act ("<u>FIRPTA</u>") withholdings because the Debtors' financial sponsor is a foreign

6

entity.[4] *See* Auction Transcript pp. 15-17. That withholding alone will reduce the available cash proceeds to $12,750,008.50, well below the $15 million principal amount of the DIP Loans—which amount doesn't include interest, fees and other expenses that will increase the total amount of the DIP Obligations well above $15 million. *See* DIP Credit Agreement §§ 2.1.1(c); 2.1.2(a); 2.1.6(a)(ii); and Final DIP Order § C. In order to offset the obvious numerical difference in the purchase price between the Revised HEX Bid and the Credit Bid as a result of FIRPTA withholding, the Revised HEX Bid purports to give the DIP Lenders take-back debt for the amount withheld from the purchase price, with such debt to be ***secured by their own existing collateral*** (*i.e.*, a portion of the Prepetition Tax Credit Priority Collateral that presently secures the Prepetition Term Loan Obligations). *See* Auction Transcript pp. 15-17. A secured take-back loan, however, is demonstrably not cash, and thus cannot satisfy the DIP Obligations in full in cash as required under section 1129 of the Bankruptcy Code, rendering the HEX Plan non-confirmable as a matter of law. The Melody Lenders similarly object to any provision of the Form of Sale Order that requests the holdback of some unspecified amount of the sale proceeds to be used as cash collateral during the remainder of the cases. Form of Sale Order ¶ 40. The Melody Lenders are not agreeing to fund additional administrative expenses out of the cash proceeds of the sale. These provisions—alone—raise serious doubts regarding the Debtors' designation of the Revised HEX Bid as the Successful Bid over the Credit Bid.[5] Because the Melody Lenders have not agreed to waive their

---

[4] Notably, the FIRPTA withholdings obligations are not due in a credit bid scenario. Like the FIRPTA withholding tax, there are additional administrative expenses that will be incurred by virtue of pursuing a third-party bid versus a credit bid.

[5] The Revised HEX Bid is arguably of far less value to the estates than the Credit Bid. In addition to the FIRPTA withholding tax, when evaluating the Revised HEX Bid, the starting position for the purchase price should be further reduced by an additional $8 million on account of certain tax credit proceeds that are being assigned to HEX and that otherwise would have been used to satisfy the obligations owed to the secured lenders (discussed *infra*). That brings the purchase price down to an equivalent of no more than $4,750,008.50 of value to these estates. Notably, the assignment of this collateral was not part of the Credit Bid. In addition, the Revised HEX Bid contains multiple contingencies that were only disclosed on the record

7

right to be paid in full in cash, nor consented to less than full repayment of their DIP Obligations in cash, redirecting the cash proceeds of the sale to HEX (the "HEX Sale") in any manner contravenes the express terms of the Final DIP Order, the DIP Credit Agreement, the Form of Sale Order and section 1129 of the Bankruptcy Code. In addition, it is clear that any payment of the DIP Obligations that is less than in full and in cash is inconsistent with the provisions of the DIP Credit Agreement and the Final DIP Order, and is materially adverse to the Melody Lenders.

## II.  The Revised HEX Bid Cannot Release Collateral without the Melody Lenders' Consent

7.  In order to negotiate an increased cash purchase price in excess of the original $2.5 million bid submitted by HEX, the Debtors were forced to forego certain additional assets that serve as collateral for the DIP Obligations and the Prepetition Term Loan Obligations. Specifically, under the DIP Credit Agreement, the Final DIP Order, the New Side Letter and the ING Side Letter[6], the value associated with the Tax Credits constitutes a portion of the Prepetition Tax Credit Priority Collateral that presently secures the DIP Obligations and the Prepetition Term

---

at the Auction. Indeed, HEX presumed that it was obtaining an indemnity with respect to certain lawsuits pending in the Chapter 11 Cases. *See* Auction Transcript pp. 10-12. It was then explained to HEX that while there would be no indemnification, the bid could be contingent on obtaining an acceptable form of plan and confirmation order that provides a traditional discharge of liabilities. *Id*. pp. 11-12. No one discussed on the record of the Auction what those liabilities would be or whether those liabilities would in fact be dischargeable. Comparing apples to apples, the Credit Bid contains similar contingencies regarding the discharge of liabilities and the resolution of certain pending claims, cure amounts and causes of action. Lastly, the Revised HEX Bid extends the deadline to provide proof of funds necessary to consummate the bid and the full Good Faith Deposit to January 10, 2020. *Id.* p. 14. Such contingency, which was not permitted by the Bidding Procedures, is not a component of the Credit Bid.

[6]  On information and belief, ING Capital LLC, in its capacity as Prepetition Tax Credit Administrative Agent, and Energy Capital Partners Mezzanine Opportunities Fund A, LP, in its capacity as Prepetition Term Loan Administrative Agent, entered into that certain side letter agreement, dated on or about November 27, 2019 (the "ING Side Letter"), which sets forth the terms of an internal corporate reorganization and certain modifications to the prepetition agreement between the Prepetition Agents, including, among other things, modifications to the collateral sharing provisions regarding application of the proceeds of the Prepetition Tax Credit Priority Collateral. Although the Melody Lenders were provided a draft copy of the ING Side Letter before it was executed, neither the Melody Lenders nor their advisors have reviewed an executed copy of the letter. The Melody Lenders reserve all of their rights to object to the terms of the ING Side Letter, including, without limitation, to ensure that its terms are not materially adverse to their interests.

Loan Obligations, and the Revised HEX Bid assigns a portion of this collateral to HEX (*i.e.*, the back-end recovery on $8 million of the residual proceeds of the Tax Credits and 50% of the residual proceeds thereafter that were to benefit the Prepetition Term Loan Lenders). *See* Auction Transcript pp. 14-15.

8. The assignment of the proceeds of the Tax Credits to HEX pursuant to the Revised HEX Bid is materially adverse to the Melody Lenders. First, absent payment in full in cash of the DIP Obligations, the DIP Agreement restricts the ability of the Debtors or the DIP Agent to release collateral without the consent of each DIP Lender. DIP Credit Agreement §§ 8.9(a)(i), (ix). The Melody Lenders have not consented to the release of valuable collateral that in the absence of payment in full in cash of the DIP Obligations would first be used to satisfy the DIP Obligations after repayment of the Prepetition Tax Credit Obligations in accordance with the Final DIP Order and the ING Term Sheet.

9. Second, the proceeds of the Tax Credit are already subject to a detailed waterfall set forth in the Final DIP Order (as may have been modified by the ING Term Sheet). Section R(vi) of the Final DIP Order provides as follows with respect to lien priority over the Prepetition Tax Credit Priority Collateral:

| **Prepetition Tax Credit Priority Collateral** | |
|---|---|
| *Priority* | *Lien Priority* |
| 1st | Adequate Protection Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties |
| 2nd | Prepetition Liens granted to the Prepetition Tax Credit Administrative Agent on behalf of the Prepetition Tax Credit Secured Parties to secure the Prepetition Tax Credit Obligations |
| 3rd | Priming Lien granted to the DIP Agent on behalf of the DIP Lenders to secure the DIP Obligations |

| | |
|---|---|
| 4th | Adequate Protection Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and the Prepetition Term Loan Administrative Agent (subject to the Term Loan Lender Payment Priority Waterfall) |
| 5th | Prepetition Liens granted to the Prepetition Term Loan Administrative Agent on behalf of the Tranche A Lenders, the Tranche B Lenders, the Tranche C Lenders and the Prepetition Term Loan Administrative Agent to secure the Tranche A Obligations, the Tranche B Obligations, the obligations in respect of the Tranche C Loans and the obligations owing to the Prepetition Term Loan Administrative Agent, on a *pari passu* basis (subject to the Term Loan Lender Payment Priority Waterfall) |

Section R(vii) of the Final DIP Order further provides that "[t]he Prepetition Term Loan Lender Payment Priority Waterfall … may only be modified with the written consent of each of the Prepetition Term Loan Lenders." Final DIP Order ¶ R(vii). Assigning this value to the Purchaser without the Melody Lenders' consent not only contravenes the express terms of the Final DIP Order, but also the express terms of the New Side Letter. Assuming that there are insufficient assets to satisfy the Prepetition Term Loan Obligations in full, recoveries on account of the Tax Credits become a meaningful source of recovery for the Tranche A Lenders. The Melody Lenders hold approximately 73% of the Tranche A Term Loan Obligations, and therefore are entitled to approximately 73% of the value associated with the Prepetition Tax Credit Priority Collateral securing the Tranche A Term Loan Obligations. Any sale or plan that purports to release the Melody Lenders' economic interest in this collateral without their consent will have a disproportionate effect on the Melody Lenders' recoveries under the Plan, is not authorized by the terms of the New Side Letter and will certainly be materially adverse to the Melody Lenders.

10

### III. The Melody Lenders Object to Certain Provisions Contained in the Form of Sale Order

10.     Absent the filing of the HEX Purchase Agreement, the HEX Sale Order, and the HEX Plan, it is impossible to evaluate the terms of the Revised HEX Bid and whether any other terms of the bid may be materially adverse to the Melody Lenders. Nevertheless, in order to preserve their rights to object to such grounds when the HEX Purchase Agreement, HEX Sale Order, and HEX Plan ultimately are filed, the Melody Lenders object to the following findings and related requested relief contained in the Form of Sale Order and consistent with the Melody Lenders' rights set forth above:

   a. The findings in Paragraphs H and O state that the Debtors have determined that the Successful Bid (*i.e.*, the HEX Sale) and Purchase Agreement maximizes value for the benefit of the Debtors' estates, and that the value of the Debtors' estates will be maximized through a sale of the Assets on a going concern basis. Form of Sale Order ¶¶ H, O. For the reasons described above, the Melody Lenders dispute the finding that the HEX Sale maximizes value of the Debtors' estates.

   b. The finding in Paragraph H states that the Successful Bid is in accordance and compliance with the Bidding Procedures and the Bidding Procedures Order. Form of Sale Order ¶ H. This is not the case, as HEX presently does not have committed financing in place to consummate the HEX Sale and has not yet demonstrated the financial wherewithal to complete the Successful Bid, both of which are requirements for submitting a "Qualified Bid." *See* Bidding Procedures ¶¶ 2.D.iii, iv; 2.H.iv.

   c. Paragraph AA provides that the attachment of Liens to the sale proceeds will be subject to among other things, the Carve-Out. Form of Sale Order ¶ AA. The Carve-Out has not been triggered and upon consummation of the HEX Plan will not be triggered.

   d. The Form of Sale Order purports to release certain Liens and Claims, and provides for deemed consent, none of which the Melody Lenders have consented to release. *See* Form of Sale Order ¶ CC; ¶ 6; and ¶ 13 (among others).

   e. Paragraph 5 of the Form of Sale Order appears to vest all right, title and interest in the Assets upon the Closing in the Buyer, free and clear of all Liens, Claims and/or Interests (other than Permitted Liens and Assumed Liabilities) as long as the proceeds of the Sale Transaction are applied as set forth in the Form of Sale Order. Form of Sale Order ¶ 5. The Melody Lenders object to this relief to the extent the

      payment waterfall and distribution of proceeds required by the DIP Documents is not honored.

   f.  Paragraph 39 of the Form of Sale Order provides that the Debtors shall pay the sale proceeds to the DIP Agent for application and payment of all obligations to the DIP Lenders in accordance with the Final DIP Order, the New Side Letter and the DIP Credit Agreement. Form of Sale Order ¶ 39. Paragraph 40, however, proposes to apply the sale proceeds in a manner that diverges from the terms of these documents. Form of Sale Order ¶ 40. The Melody Lenders object to any relief to the extent it conflicts with the application of proceeds set forth in the Final DIP Order and DIP Credit Agreement (summarized above).

   g.  Paragraph 42 of the Form of Sale Order would authorize the Debtors to convey the Assets in a manner reasonably necessary to perform the terms of the Purchase Agreement, and take any action reasonably requested by the DIP Secured Parties in connection with evidencing the repayment of the DIP Obligations or the release of any DIP Liens. Form of Sale Order ¶ 42. The Melody Lenders object to this relief to the extent it authorizes the Debtors to take any actions that conflict with the terms of the Final DIP Order, the DIP Credit Agreement, the New Side Letter or are materially adverse to the Melody Lenders.

   11.    The Melody Lenders reserve the right to object to any other provisions of the HEX Sale Order, the HEX Purchase Agreement or the HEX Plan, when they are filed. In particular, given that the HEX Revised Bid is to be effected pursuant to the HEX Plan, the Melody Lenders expressly reserve all rights, including under the Final DIP Order, the New Side Letter, the DIP Documents, the Prepetition Term Loan Documents and at law to raise any objection including, without limitation, with respect to the distributions to be provided to the Melody Lenders and their proposed treatment under the HEX Plan or any other plan of reorganization.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

For the foregoing reasons, the Melody Lenders respectfully request that the Court defer consideration of the Revised HEX Bid and adjourn the Sale Hearing or, in the alternative, deny the proposed sale to HEX pursuant to the Revised HEX Bid.

Dated: Wilmington, Delaware
December 10, 2019

**COLE SCHOTZ P.C.**

/s/ David R. Hurst
David R. Hurst (No. 3743)
J. Kate Stickles (No. 2917)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117

*Co-Counsel to the Melody Lenders*