## **Exhibit A**

Debt Documents

## **Exhibit A-1**

AIDEA Loan Agreement

[See attached.]

Draft 5/29/2020 - Subject to Review and Approval by all Parties in all respects

**LOAN AGREEMENT**

dated as of [●], 2020

among

HEX Cook Inlet, LLC,
an Alaska limited liability company,

(as a Borrower),

and

Cornucopia Oil & Gas Company, LLC,
a Delaware limited liability company,

(as a Borrower),

and

Furie Operating Alaska, LLC,
a Delaware limited liability company,

(as a Borrower),

and

Corsair Oil & Gas LLC,
a Delaware limited liability company,

(as a Borrower),

and

Alaska Industrial Development and Export Authority,
a public corporation of the State of Alaska,

(the Authority)

{01011050}

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ....................................................................2
    1.1     Definitions .................................................................2
    1.2     Rules of Interpretation ...............................................2

ARTICLE 2 THE LOAN ........................................................................2
    2.1     AIDEA Loan .............................................................2
    2.2     Tax Treatment ...........................................................6
    2.3     Other Payment Terms .................................................6
    2.4     Reserve Funds ..........................................................6
    2.5     [Reserved]. ...............................................................8
    2.6     Assignment or Pledge of Authority's Rights .................8
    2.7     [Reserved]. ...............................................................8
    2.8     [Reserved]. ...............................................................8

ARTICLE 3 CONDITIONS PRECEDENT ...............................................9
    3.1     Conditions Precedent to the Effective Date ..................9

ARTICLE 4 REPRESENTATIONS AND WARRANTIES ..........................13
    4.1     Status .....................................................................13
    4.2     Authority ................................................................13
    4.3     Governmental Authorizations ....................................14
    4.4     No Breach or Default ................................................14
    4.5     Compliance with Law ...............................................14
    4.6     Business, Capitalization, Joint Ventures, Subsidiaries, Etc. ...................14
    4.7     Investment Company Act ...........................................15
    4.8     Regulatory Matters ...................................................15
    4.9     ERISA ....................................................................16
    4.10    Hazardous Substance ...............................................16
    4.11    Labor Disputes and Acts of God .................................17
    4.12    Disclosure ..............................................................17
    4.13    Tax Sharing Agreements ...........................................17
    4.14    Regulation U, Etc. ...................................................18
    4.15    Organizational ID Number; Location of Collateral .......18
    4.16    Title and Liens .......................................................18
    4.17    Collateral ...............................................................18
    4.18    Restriction on Liens. ................................................19
    4.19    Accounts. ...............................................................19
    4.20    Commodity Exchange Act. ........................................19
    4.21    Material Contracts ...................................................19
    4.22    Permits ..................................................................19
    4.23    Sufficiency of Material Contracts; Services Rights .......20
    4.24    Material Personal Property ........................................21
    4.25    Reserves ................................................................21

  4.26  Use of Proceeds..........................................................................................21

ARTICLE 5 AFFIRMATIVE COVENANTS....................................................................21
  5.1  Financial Statements and Other Reports......................................................21
  5.2  Notices – Operation of Business.................................................................23
  5.3  Existence; Maintenance of Contracts..........................................................26
  5.4  Government Approvals................................................................................26
  5.5  Compliance with Law.................................................................................26
  5.6  Taxes........................................................................................................27
  5.7  Warranty of Title.......................................................................................27
  5.8  Books and Records....................................................................................27
  5.9  Preservation of Rights; Further Assurances................................................27
  5.10  Separateness..............................................................................................28
  5.11  Additional Collateral.................................................................................28
  5.12  Security Interests; Further Assurances.......................................................28
  5.13  Material Contracts.....................................................................................29
  5.14  Indemnification.........................................................................................29
  5.15  Tax Credits................................................................................................31
  5.16  Insurance...................................................................................................31
  5.17  Enstar Letter of Credit...............................................................................31
  5.18  Abandonment............................................................................................32
  5.19  Appointment of Accounting Firm...............................................................32
  5.20  Approvals of Foreclosures.........................................................................32
  5.21  Chief Operating Officer.............................................................................32
  5.22  Operator....................................................................................................32
  5.23  Sale Proceeds............................................................................................33
  5.24  Use of Funds.............................................................................................33
  5.25  Financial Covenants...................................................................................34
  5.26  State of Alaska Economic Development.....................................................34
  5.27  Meeting and Hearings................................................................................34

ARTICLE 6 NEGATIVE COVENANTS...........................................................................35
  6.1  Debt, Liens and Other Encumbrances........................................................35
  6.2  Dividends, Distributions and Redemptions................................................35
  6.3  Restrictions on Asset Sales........................................................................35
  6.4  Dissolution; Merger; Acquisitions.............................................................35
  6.5  Material Changes in Business; Amendments to Organizational Documents35
  6.6  Subsidiaries and Joint Ventures.................................................................36
  6.7  Prohibition on Issuance of Equity Interest..................................................36
  6.8  Name and Location; Fiscal Year.................................................................36
  6.9  Accounts...................................................................................................36
  6.10  Compliance with Anti-Terrorism Laws......................................................36
  6.11  Transactions with Affiliates.......................................................................37
  6.12  Material Contracts.....................................................................................37
  6.13  Prohibition on Amendments to Material Contracts......................................37
  6.14  Use of Collateral.......................................................................................38
  6.15  Assignment...............................................................................................38

6.16    Hazardous Substance ........................................................................38

ARTICLE 7 EVENTS OF DEFAULT; REMEDIES ...........................................38
7.1    Events of Default ................................................................................38
7.2    Remedies ............................................................................................42

ARTICLE 8 [RESERVED] .................................................................................43

ARTICLE 9 MISCELLANEOUS ........................................................................43
9.1    Addresses ...........................................................................................43
9.2    Right to Set-Off ..................................................................................44
9.3    Delay and Waiver ...............................................................................45
9.4    Costs, Expenses and Attorneys' Fees ................................................45
9.5    Entire Agreement ...............................................................................45
9.6    Governing Law ...................................................................................46
9.7    Confidentiality ...................................................................................46
9.8    Severability ........................................................................................46
9.9    Headings .............................................................................................47
9.10   Accounting Terms ..............................................................................47
9.11   No Partnership ....................................................................................47
9.12   AIDEA Security Documents ..............................................................48
9.13   Limitation on Liability .......................................................................48
9.14   Waiver of Jury Trial ...........................................................................48
9.15   Consent to Jurisdiction ......................................................................48
9.16   Knowledge and Attribution ...............................................................49
9.17   Successors and Assigns; No Third-Party Beneficiaries .....................49
9.18   Usury Savings Clause .........................................................................49
9.19   Counterparts .......................................................................................49
9.20   [Reserved]. .........................................................................................50
9.21   Joint and Several Liability .................................................................50
9.22   Alaska Mortgage Provisions ..............................................................52
9.23   AIDEA Loan Documents ...................................................................52
9.24   AIDEA Documents ............................................................................53

## Index of Schedules[1]

| | |
|---|---|
| Schedule I | The Authority; Wire Instructions |
| Schedule 3.1.6 | Litigation |
| Schedule 4.5 | Compliance with Law |
| Schedule 4.6.1 | Contracts Other than Material Contracts |
| Schedule 4.6.5 | Equity Interests and Ownership; Officers |
| Schedule 4.10 | Hazardous Substances |
| Schedule 4.20 | Accounts |
| Schedule 4.26 | Sources and Uses of Funds |
| Schedule 5.4 | Governmental Authorizations |
| Schedule A | Performance Bonds |
| Schedule B | Material Contracts |

## Index of Exhibits

| | |
|---|---|
| Exhibit A | Definitions and Rules of Interpretation |
| Exhibit B | [Reserved] |
| Exhibit C | Form of Note |
| Exhibit D | [Reserved] |
| Exhibit E | Filing Offices |
| Exhibit F | [Reserved] |
| Exhibit G | Permits |
| | Part I   Applicable Permits |
| | Part II  Pending Permits |
| Exhibit H | [Reserved] |
| Exhibit I | [Reserved] |
| Exhibit J | Kitchen Lights Unit |
| Exhibit K | [Reserved] |
| Exhibit L | Form of Mortgage |
| Exhibit M | Form of Perfection Certificate |
| Exhibit N | Description of Facilities |
| Exhibit O | Upland |

---

[1]    Note to Draft: To be updated/conformed to updated draft.

{01011050}

THIS LOAN AGREEMENT dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**") is entered into among HEX Cook Inlet, LLC, an Alaska limited liability company ("**HEX CI**"), Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company ("**Cornucopia**"), Furie Operating Alaska, LLC, a Delaware limited liability company ("**FOA**"), and Corsair Oil & Gas LLC, a Delaware limited liability company ("**Corsair**", and together with HEX CI, Cornucopia and FOA, each a "**Borrower**", and together, the "**Borrowers**"), and the Alaska Industrial Development and Export Authority, a public corporation of the State of Alaska (the "**Authority**").

The parties to this Agreement agree as follows:

## ARTICLE 1
## DEFINITIONS

**1.1**    **DEFINITIONS.**  Except as otherwise expressly provided, capitalized terms used in this Agreement and its exhibits and schedules shall have the meanings given in <u>Exhibit A.</u>

**1.2**    **RULES OF INTERPRETATION.**  Except as otherwise expressly provided, the rules of interpretation set forth in <u>Exhibit A</u> shall apply to this Agreement and the other AIDEA Loan Documents.

## ARTICLE 2
## THE LOAN

**2.1**    **AIDEA LOAN.**

**2.1.1**    *AIDEA Loan.*

(a)    <u>The AIDEA Loan</u>.  Subject to the satisfaction of the terms and conditions set forth in this Agreement, the Authority agrees to lend to Borrowers hereunder the principal amount of Seven Million Five Hundred Thousand Dollars ($7,500,000)[2] (the "**AIDEA Loan**").  The amount borrowed under this Agreement and subsequently repaid or prepaid may not be reborrowed.  In the event the Authority lends to the Borrowers additional amounts not to exceed Five Million Dollars ($5,000,000), such additional amounts loaned to Borrowers shall be part of the AIDEA Loan and shall be secured by a first priority Lien in the Collateral pursuant to the Security Documents and Intercreditor Agreements.

(b)    <u>Interest; Applicable Discount</u>.  The AIDEA Loan shall bear interest on the unpaid principal amount thereof from and after the Effective Date at a rate per annum equal to (i) 10.00%, less (ii) the Applicable Quarterly Discount, if any (the "**Interest Rate**"), compounded daily.  In the event the Debt Service Coverage Ratio, calculated as of the last day of

---

[2]    JDO NTD: The amount of the AIDEA Loan is subject to final determination based on the Base Case Financial Model showing a minimum DSCR of 1.50:1.00 at each payment period through the Maturity Date, a minimum Reserve Coverage Ratio of 1.25:1.00, and a satisfactory sources and uses of funds, including minimum six month Debt Service Reserve Fund.  The amount is also subject to 3 AAC 99.580 (principal amount of a development project financing may not exceed 75 percent of the estimated cost of the project).

{01011050}}

any calendar quarter, over the course of the immediately preceding twelve-month period equals or exceeds 1.75:1.00, the interest rate on the AIDEA Loan shall be reduced 0.5% and in the event the Debt Service Coverage Ratio over the course of such prior twelve-month period equals or exceeds 2.00:1.00, the interest rate for the AIDEA Loan shall be reduced a total of 1.0%, in each case, for the next quarterly period only (the "**Applicable Quarterly Discount**").  For clarity, the Debt Service Coverage Ratio will be tested on the last day of each quarter and the interest rate discount, if any, will be effective during the quarter commencing the following day. The Borrowers agree that all computations by the Authority of the Applicable Quarterly Discount shall be conclusive in the absence of manifest error.

(c)      <u>Interest Payments</u>.  Interest accrued on the AIDEA Loan shall be payable in arrears (i) on the first day of each calendar quarter and (ii) if not previously paid in full, at maturity (by acceleration or otherwise) of the AIDEA Loan.

**2.1.2**   *Interest Account and Interest Computations*.  The Borrowers authorize the Authority to record in an account or accounts maintained by the Authority on its books (i) the date and amount of each principal and interest payment on the AIDEA Loan and (ii) such other information as the Authority may determine is necessary for the computation of interest payable by the Borrowers hereunder.  The Borrowers agree that all computations by the Authority of interest shall be conclusive in the absence of manifest error.  All computations of interest shall be based upon a year of 365 days and the actual days elapsed.

**2.1.3**   *Promissory Note*.  The obligation of the Borrowers to repay the AIDEA Loan, to pay interest thereon at the rates provided herein and any and all other Obligations hereunder, shall be evidenced by one or more promissory notes substantially in the form of Exhibit C (the "**Note**"), payable to the Authority and in the principal amount of the AIDEA Loan. The Borrowers authorize the Authority to record in its books and records the date and amount of the AIDEA Loan, and each payment or prepayment of principal thereunder.  The Borrowers further authorize the Authority to attach to and make a part of the Note continuations of the schedule attached thereto as necessary.  No failure to make any such notations, nor any errors in making any such notations, shall affect the validity of the Borrowers' obligations to repay the full aggregate unpaid principal amount of the AIDEA Loan or the duties of the Borrowers hereunder or thereunder.

**2.1.4**   *Prepayments and Repayments*.

(a)      <u>AIDEA Loan Repayment</u>.  The Borrowers shall repay the Authority in Cash the full aggregate unpaid principal amount of the AIDEA Loan together with all accrued and unpaid interest, fees, charges, costs and other Obligations on the Maturity Date (it being understood that other provisions of this Agreement may require all or part of such Obligations to be repaid earlier).

(b)      <u>Quarterly Payments</u>.  On the first day of each calendar quarter after the Effective Date, the Borrowers shall make a scheduled payment of principal of the AIDEA Loan in an amount equal to Borrowers' hypothetical Cash and Cash Equivalents in excess of the Cash and Cash Equivalents required for Borrowers to have as of the date of each quarterly payment date, based on a four (4) year amortization and the Base Case Financial Model, a minimum Debt Service

Coverage Ratio of 1.50:1.00 and a minimum Reserve Coverage Ratio of 1.15:1.00 based on Proved Developed Producing Reserves (initially, Beluga A1-A3 wells, as adjusted to include Sterling wells, when producing). The amount of the scheduled payments shall be set forth in an attachment to the Note. The amount of the scheduled payments will be updated by the Authority based on any prepayments made by Borrowers. The Borrowers agree that all computations by the Authority of the required quarterly payments shall be conclusive in the absence of manifest error.

(c)        Optional Prepayment of the AIDEA Loan.

(i)        The Borrowers may, at their option, pay in advance of maturity thereof the AIDEA Loan without premium or penalty. All payments made pursuant to this Section 2.1.4(c)(i) shall be applied as provided in Section 2.3.6.

(ii)       [Reserved].

(d)        Mandatory Prepayment of the AIDEA Loan.

(i)        Commencing on the Effective Date and continuing until Borrowers' satisfaction of the conditions set forth in Section 2.1.4(d)(ii), on first day of each calendar quarter, the Borrowers shall make a mandatory prepayment of the AIDEA Loan, together with accrued interest thereon, in an amount equal to 100% of Borrowers' Excess Cash. Such payment shall be made by cash sweep from the Proceeds Account pursuant to the Accounts Agreement.

(ii)       Commencing on the first day of the calendar quarter after Borrowers (A) debottleneck the Beluga A4 well, and (B) achieve a sustained gas production (as measured over a period of 30 days) exceeding 14.5 MMscf/day, and continuing on the first day of each calendar quarter thereafter, the Borrowers shall make a mandatory prepayment of the AIDEA Loan, together with accrued interest thereon, in an amount equal to 25% of Borrowers' Excess Cash. Such payment shall be made by cash sweep from the Proceeds Account pursuant to the Accounts Agreement.

(iii)      Without prejudice to any rights that the Authority has in respect of any Event of Default that may occur pursuant to Section 6.1.1, no later than the Banking Day following the date of receipt by the Borrowers of any Net Cash Proceeds from the incurrence of any Debt of the Borrowers (other than with respect to any Debt permitted to be incurred pursuant to Section 6.1.1), the Borrowers shall prepay the AIDEA Loan, together with accrued interest, in each case, at par value, in an aggregate amount equal to 100% of such Net Cash Proceeds.

(iv)      Without prejudice to any rights that the Authority has in respect of any Event of Default that may occur pursuant to Section 6.3, no later than the Banking Day following the date of receipt by the Borrowers of any Net Cash Proceeds from any sale, transfer, lease, encumbrance, or other disposition of Property other than a Permitted Disposition, the Borrowers shall prepay the AIDEA Loan, together with accrued interest thereon, in each case, at par value, in an amount equal to 100% of such Net Cash Proceeds. The foregoing sentence shall not apply to any Net Cash Proceeds from any sale, assignment, pledge, transfer, lease, encumbrance, or other disposition of any State Tax Credits (or any other proceeds of State Tax Credits), which shall be governed by Section 5.15 and the terms of the Tax Credit Intercreditor Agreement.

(v)     If on any date the Borrowers shall receive Net Cash Proceeds from any Event of Loss that exceeds $1,000,000[3] then, unless a Reinvestment Notice shall be delivered in respect thereof within ten (10) Banking Days of the receipt of such Net Cash Proceeds, the Borrowers shall notify the Authority of the amount of such Net Cash Proceeds received, and shall within two (2) Banking Days after receipt of such Net Cash Proceeds make a mandatory prepayment of the AIDEA Loan in an amount equal to such Net Cash Proceeds; *provided*, that if the Net Cash Proceeds received exceed $[●] (a "Total Loss"), no Reinvestment Notice shall be delivered and the Borrower shall within two (2) Banking Days after receipt of such Net Cash Proceeds make a mandatory prepayment of the AIDEA Loan, together with accrued interest thereon, in an amount equal to such Net Cash Proceeds within ten (10) Banking Days of the receipt of such Net Cash Proceeds; *provided*, further that, notwithstanding the foregoing, (i) to the extent that aggregate Net Cash Proceeds of the Borrowers in connection with any Event of Loss do not exceed $[●] for any one event, $[●] in the aggregate in any fiscal year or $[●] in the aggregate during the period from the Effective Date until the termination of this Agreement, the Borrowers may reinvest such Net Cash Proceeds without delivering a Reinvestment Notice pursuant to this clause (iii) so long as the Borrowers notify the Authority of such amounts and (ii) on each Reinvestment Prepayment Date, the Borrowers shall make a mandatory prepayment of the AIDEA Loan, together with accrued interest thereon, in an amount equal to the Reinvestment Prepayment Amount.

(A)     If a Reinvestment Notice is delivered by the Borrowers, prior to undertaking any repair, replacement or restoration of the Facilities, the Borrowers shall deliver to the Authority the following:

1.     a certificate executed by a Responsible Officer of each Borrower indicating that (i) the Facilities can be repaired, replaced or restored within six (6) months after the Event of Loss with the Net Cash Proceeds, any Cash equity contributions received by the Borrowers following such repair, replacement or restoration, the Facilities will be able to operate in accordance with Applicable Law, Applicable Permits, the AIDEA Loan Documents and Prudent Operating Practices and (iii) no Default or Event of Default has occurred other than due to such Event of Loss and such repair, replacement or restoration will not result in any Default or Event of Default; and

2.     detailed plans for repair, replacement or restoration of the Facilities subject to such Event of Loss.

(vi)     The Authority shall review each Reinvestment Notice within ten (10) days of receipt, and the Borrowers shall not commence any such repair, replacement or restoration other than to protect or preserve production, minimize revenue loss or prevent or mitigate an emergency situation involving endangerment of life, human health, safety or the environment or damage to Property without the prior written consent of the Authority. If the Authority does not reject the Reinvestment Notice within ten (10) days of receipt, the Borrower may proceed with the planned repair, replacement or restoration in accordance with the Reinvestment Notice and using the Net Cash Proceeds received.

---

[3]     JDO NTD: Subject to final review and approval by AIDEA based on insurance consultant review.

{01011050}}

**2.2    TAX TREATMENT**.  The parties agree that for U.S. federal income tax purposes, the AIDEA Loan shall be treated as "debt" and shall not be treated as a "contingent payment debt instrument".

**2.3    OTHER PAYMENT TERMS**.

**2.3.1    *Place and Manner*.**  The Borrowers shall make all payments due to the Authority to the account set forth in Schedule I, or to such other account as the Authority shall notify the Borrowers in writing from time to time, in Dollars and in immediately available funds not later than 10:00 a.m., Alaska time, on the date on which such payment is due.  Any payment made after such time on any day shall be deemed received on the Banking Day after such payment is received.

**2.3.2    *Date*.**  Whenever any payment due hereunder that is required to be paid in Cash (excluding any payments made in kind) shall fall due on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall be included in the computation of interest or fees, as the case may be, without duplication of any interest or fees so paid in the next subsequent calculation of interest or fees payable.

**2.3.3    *Late Payments and Events of Default*.**  Upon the occurrence and during the continuation of any Default or Event of Default, the Borrowers shall pay interest on the overdue amount of (a) the AIDEA Loan and (b) interest, fees and any other amounts and Obligations payable under this Agreement or any other AIDEA Loan Document, in each case, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on the AIDEA Loan pursuant to Section 2.1.1(b) (such rate, the "**Default Rate**") in each case from the date such amount shall be due until such amount shall be paid in full, compounded daily.  Interest payable pursuant to this Section 2.3.3 shall be due and payable upon demand.

**2.3.4    *Taxes*.  Payments Net of Taxes.**  Any and all payments to or for the benefit of the Authority by or on behalf of the Borrowers hereunder or under any other AIDEA Loan Document shall be made without deduction or withholding for any Taxes unless required by law.

**2.3.5    *Withholding Exemption Certificates*.**  The Authority agrees that it will deliver to the Borrowers two (2) duly completed copies of United States Internal Revenue Service Form W–9 certifying that the Authority is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes.

**2.3.6    *Application of Payments*.**  Except as expressly otherwise provided in the AIDEA Loan Documents, payments made under this Agreement and the other AIDEA Loan Documents and other amounts received by the Authority under this Agreement and the other AIDEA Loan Documents shall be applied, *first*, to all accrued but unpaid interest thereon then due and owing and, *second* to outstanding principal then due and owing or otherwise to be prepaid, and *third* to any fees, costs, charges or expenses payable to the Authority hereunder or under the other AIDEA Loan Documents.

**2.4    RESERVE FUNDS** .

{01011050}}

**2.4.1** *Debt Service Reserve Funds*  On the Effective Date, Borrower shall deposit into an account held at the Depository Bank (the "**Debt Service Reserve Account**") the DSRF Required Balance" to assure Borrower's ability to make payments on, and perform its other Obligations under, the AIDEA Loan.  Provided no Event of Default has occurred and is continuing, Borrowers thereafter may disburse an amount from the Debt Service Reserve Account to make the first quarterly payment of interest and principal due after the Effective Date pursuant to Section 2.1.1(c) and Section 2.1.4(b); *provided*, the Debt Service Reserve Account shall be restored by Borrowers to the DSRF Required Balance on or before the second quarterly payment date and thereafter shall be maintained at or above the DSRF Required Balance until payment in full of all principal and interest due on the AIDEA Loan and all other Obligations.  Except as provided in this Section 2.4.1, amounts held in the Debt Service Reserve Account may be used to make payments due under the AIDEA Loan Documents only at the sole discretion of, and written approval by the Authority.  Borrowers agree to replenish at least fifty percent (50%) of any amounts withdrawn within thirty (30) days shall replenish the Account to the DSRF Required Balance within sixty (60) days of the date of such withdrawal.

**2.4.2** *Account Requirements.*

(a)     Borrowers grant to the Authority a first-priority perfected security interest in the Debt Service Reserve Account and any and all funds now or hereafter deposited in the Debt Service Reserve Accounts as additional security for payment of the Obligations until expended or applied by the Authority as provided in the AIDEA Loan Documents. The provisions of this Section 2.4.2 are intended to give the Authority "control" of the Accounts and the Account Collateral within the meaning of the UCC.  The Debt Service Reserve Account shall be subject to a Control Agreement.

(b)     Notwithstanding anything to the contrary contained herein or in any other AIDEA Loan Document, Borrowers shall not, without obtaining the Authority's prior written consent, further pledge, assign or grant any security interest in the Debt Service Reserve Account or the funds deposited therein or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming the Authority as the secured party, to be filed with respect thereto. The Authority shall have the right to file a financing statement or statements under the UCC in connection with any of the Reserve Accounts and the Account Collateral with respect thereto in the form required to properly perfect the Authority's security interest therein.

(c)     Notwithstanding anything to the contrary contained herein or in any other AIDEA Loan Document, upon the occurrence and during the continuance of an Event of Default, without notice from the Authority (i) Borrowers shall have no rights in respect of the Reserve Accounts and (ii) the Authority shall have all rights and remedies with respect to the Reserve Accounts and the amounts on deposit therein and the Account Collateral as described in this Agreement and in the AIDEA Security Documents, in addition to all of the rights and remedies available to a secured party under the UCC, and, notwithstanding anything to the contrary contained in this Agreement or in the AIDEA Security Documents, may apply the amounts of such Accounts as the Authority determines in its sole discretion including, but not limited to, payment of the Obligations.

{01011050}}

(d)     The insufficiency of funds on deposit in the Debt Service Reserve Account shall not absolve Borrowers of the obligation to make any payments, as and when due under the AIDEA Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

**2.5     [RESERVED].**

**2.6     ASSIGNMENT OR PLEDGE OF AUTHORITY'S RIGHTS.**

(a)     The Authority may assign the AIDEA Loan and all the Authority's rights under this Agreement and the AIDEA Loan Documents, and may negotiate the Note. Borrowers consent to any such assignment and negotiation and agree to make payments due on the AIDEA Loan directly to the Authority's assignee, pledgee, or the holder of the Note without any defense or set-off.

(b)     Borrowers acknowledge that the Authority may pledge the AIDEA Loan, the Authority's rights under this Agreement and the other AIDEA Loan Documents as collateral for the repayment of bonds the Authority may issue at a later date. Borrowers further acknowledge that the Authority may assign its rights under this Agreement and the other AIDEA Loan Documents to a trustee pursuant to a trust indenture that is made with respect to bonds the Authority may issue at a later date. Borrowers consent to any such pledge or assignment, and each Borrower commits itself to continue to perform its obligations under this Agreement and the AIDEA Loan Documents, making payments to any pledgee or trustee as directed to do so.

(c)     Borrowers agree to cooperate with the Authority to execute such documents and take such other steps as may be reasonably necessary to effectuate any assignment or pledge described in this Section 2.6, including documents necessary to perfect the assignee's or pledgee's interest in the Collateral. Borrowers further agree to cooperate with the Authority with respect to the issuance of any bonds described in this Section 2.6, including:  (i) participating in the preparation of, and authorizing the publication of, any official statement or other offering document needed in connection with the issuance of such bonds; (ii) entering into any continuing disclosure obligation that may be required under Securities and Exchange Commission Rule 15c2-12 with respect to such bonds; (iii) executing any tax, arbitrage, or similar agreement pertaining to the exemption of interest on such bonds from gross income for federal income tax purposes, as applicable; (iv) taking such actions as may be necessary to establish or maintain the exemption of interest on such bonds from gross income for federal income tax purposes; (v) having Borrowers' legal counsel deliver such legal opinions, in a form acceptable to the Authority and the bond underwriters, as are required to support the issuance of the bonds; and (vi) such other actions as may be reasonably required by the Authority in connection with the issuance of such bonds. The Authority shall reimburse Borrowers for reasonable expenses incurred by Borrowers in connection with the foregoing.

**2.7     [RESERVED].**

**2.8     [RESERVED].**

{01011050}}

# ARTICLE 3
# CONDITIONS PRECEDENT

**3.1** **CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**. The effectiveness of this Agreement and the occurrence of the Effective Date are subject to the satisfaction of each of the following conditions (unless waived in writing by the Authority), all of which shall be in form, scope and substance reasonably satisfactory to the Authority:

**3.1.1** *Resolutions; Incumbency.* Delivery to the Authority of a certificate from each of the Borrowers, in each case signed by an appropriate authorized officer of each such entity and dated as of the Effective Date: (i) authorizing, as applicable, the borrowings herein provided for, the granting of the Liens in the Collateral created by the AIDEA Security Documents, and the execution, delivery and performance of this Agreement, the other AIDEA Loan Documents and any instruments or agreements required hereunder or thereunder to which such entity is a party; and (ii) as to the incumbency of the natural persons authorized to execute and deliver this Agreement, the other AIDEA Loan Documents and any instruments or agreements required hereunder or thereunder to which such entity is a party.

**3.1.2** *Formation Documents.* Delivery to the Authority of a copy of the limited liability company agreement (which such limited liability company agreements shall include customary provisions opting in to Article 8 of the UCC) and certificate of formation or organization of each of the Borrowers, in each case certified by a Responsible Officer of each such entity as being true, correct and complete on the Effective Date, and any related agreements or certificates filed in accordance with Applicable Law.

**3.1.3** *Good Standing Certificates.* Delivery to the Authority of a certificate issued by the Secretary of State of Delaware or the State of Alaska Department of Commerce, Community and Economic Development, for each of the Borrowers, as applicable, and, if applicable, each state of foreign qualification (which shall include the state of Alaska), in each case dated no more than 30 days prior to the Effective Date and certifying that such entity is in good standing or has current status, and is qualified to do business in, and, if applicable, has paid all franchise taxes or similar taxes due to, such state.

**3.1.4** *AIDEA Loan Documents.* Delivery to the Authority of executed copies of the AIDEA Loan Documents, including without limitation delivery of the Note.

**3.1.5** *Legal Opinions.* Delivery to the Authority of legal opinions of Chipman Brown Cicero & Cole, LLP, as New York and Delaware counsel to the Borrowers, and by David H. Bundy, PC, as Alaska law counsel to the Borrowers, addressed to the Authority.

**3.1.6** *Absence of Litigation.* Other than the Bankruptcy Cases and except as set forth on Schedule 3.1.6, no action, suit, proceeding or investigation shall be pending or, to the knowledge of the Borrowers, threatened against the Borrowers or the Properties of the Borrowers. No order, judgment or decree shall have been issued or, to the knowledge of the Borrowers, proposed to be issued by any Governmental Authority relating the Borrowers or the Properties of the Borrowers.

{010110501}

**3.1.7**    *Payment of Filing and Recording Fees*.  All amounts required to be paid to or deposited with the Authority on or prior to the Effective Date, including all Taxes, fees and other costs payable in connection with the execution, delivery, recording and filing of the documents and instruments referred to in this Section 3.1, shall have been paid in full or, as approved by the Authority, provided for.

**3.1.8**    *UCC and Tax Lien Reports and other Lien Reports.*  The Authority shall have received UCC, judgment, tax lien reports and Real Property lien reports of a date no less recent than ten (10) Banking Days before the Effective Date for the Borrowers in each of the jurisdictions in which UCC-1 financing statements or Mortgages will be filed in respect of the Collateral, showing that the security interests created under AIDEA Security Documents will be prior to all other financing statements, or other security documents (other than those in respect of Permitted Prior Liens) wherein the security interest is perfected by filing in respect of the Collateral under the UCC in such jurisdiction or by the Mortgages.

**3.1.9**    *Collateral: Filings and Recordings*.  The Authority shall have received, in each case in form and substance reasonably satisfactory to the Authority:

(a)        UCC financing statements, naming each Borrower as debtor and the Authority as secured party, in form appropriate for filing as may be necessary to perfect the security interests to be created by the AIDEA Security Documents;

(b)        Delivery to the Authority of all original certificates representing the Pledged Equity Interests, accompanied by instruments of transfer indorsed in blank;

(c)        copies of all other recordings and filings of, or with respect to, the AIDEA Security Documents as may be requested by the Authority acting reasonably to perfect the security interests to be created by the AIDEA Security Documents; and

(d)        satisfactory evidence that all other actions necessary to perfect the security interests purported to be created by the AIDEA Security Documents have been taken or will be taken on the Effective Date.

**3.1.10** *Government Authorizations and Consents*.  (a) Each Borrower shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the execution, delivery and performance of the AIDEA Loan Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Authority and (b) all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the AIDEA Loan Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

**3.1.11** *Real Property Deliverables*.    Delivery to the Authority of each of the following real property-related deliverables, in each case in form and substance reasonably satisfactory to the Authority:

{01011050}}

(a)     a duly executed Mortgage;

(b)     [the Title Policy, together with evidence that all title insurance premiums and expenses, filing, recordation, subscription and inscription fees and all recording and other similar fees, and all recording, stamp and other Taxes and other expenses related to the issuance of the Title Policy and such filings, registrations and recordings necessary for the consummation of the transactions contemplated by this Agreement and the other AIDEA Loan Documents have been paid in full by or on behalf of the Borrowers.  The Title Policy shall insure that the Mortgage on the Upland is a first priority Lien (subject only to Permitted Prior Liens).]; and[4]

(c)     title opinion by Stoel Rives LLP covering the leases and lands situated in the Kitchen Lights Unit.

**3.1.12** *Insurance and Bonds*.  The Authority shall have received (a) certified copies of all policies evidencing insurance that comply with Section 5.16 (or a binder, commitment or certificates signed by the insurer or a broker authorized to bind the insurer), showing the Authority as additional insureds and additional loss payees (except with respect to third party liability policies); and (b) all bonds required by the State of Alaska for operation of the Project.

**3.1.13** *Other Documents*.  The Borrowers shall cooperate and provide to the Authority such other documents as the Authority may request to effect the transactions contemplated by this Agreement, including the perfection of any security interest granted pursuant to the AIDEA Loan Documents.

**3.1.14** *[Reserved]*.

**3.1.15** *No Default*.  No Default or Event of Default has occurred and is continuing or will result from the incurrence of the AIDEA Loan.

**3.1.17** *No Material Adverse Effect*.  There shall not have occurred a Material Adverse Effect nor be any existing event or condition that could reasonably be expected to result in a Material Adverse Effect immediately before and after giving effect to the incurrence of the AIDEA Loan.

**3.1.18** *Plan; Confirmation Order*.

(a)     The Plan shall not have been amended, modified or supplemented after [●], 2020 in any manner and no condition to the effectiveness thereof shall have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Authority in any material respect.

(b)     The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Authority and shall have been entered confirming the Plan.

---

[4]     JDO NTD:  Exceptions stated in the Preliminary Commitment will be reviewed by AIDEA.

{01011050}}

(c)     The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Authority in any material respect and shall not be subject to any pending appeals.

(d)     The Confirmation Order shall authorize the Debtors to execute, deliver and perform all of their obligations under all AIDEA Loan Documents and shall contain no term or provision that contradicts such authorization.

(e)     The Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects.

(f)     The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived (in accordance with the terms of the Plan) without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Authority in any material respect unless consented to by the Authority (such consent not to be unreasonably withheld, conditioned or delayed), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Effective Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

**3.1.19** *Effective Date Capitalization*.  Concurrently with the Effective Date, the Authority shall have received evidence satisfactory to the Authority demonstrating that HEX CI has received capital contributions in an amount equal to at least $2,500,000 (the "**Equity Contribution**").

**3.1.20** *Solvency*.  Each Borrower, individually, immediately after giving effect to the transactions contemplated by the AIDEA Loan Documents and the Plan, is Solvent.

**3.1.21** *Reports and Financial Requirements.*

(a)     <u>Base Case Financial Model</u>.  Borrowers shall have provided to the Authority a Base Case Financial Model, satisfactory to the Authority, demonstrating Borrowers will maintain a minimum 1.50:1.00 Debt Service Coverage Ratio and a minimum 1.25:1.00 Proved Reserves Coverage Ratio as of each Quarterly Date on which a payment on the AIDEA Loan is to be made through the Maturity Date.

(b)     <u>Financial Pro Forma; Budgets</u>.  Borrowers shall have delivered to the Authority a financial pro forma, satisfactory to the Authority, extending through the economic life of the Kitchen Lights Units, on a monthly basis, and initial operating budget and Capital Expenditures budget for the Project, on a monthly basis, satisfactory to the Authority.

(c)     <u>Engineer's Report</u>. The Independent Engineer Report shall be reasonably satisfactory to the Authority.

(d)     <u>Distressed Sale Valuation</u>.  Borrowers shall have delivered to the Authority a distressed sale valuation report for all material Properties, satisfactory to the Authority.

{01011050}}

(e)     Insurance Report.  The Insurance Consultant Report shall be reasonably satisfactory to the Authority.

(f)     Alaska Filings.  Delivery to the Authority of a copy of all filings made by Borrowers with the Alaska Department of Natural Resources, Alaska Department of Environmental Conservation and the Alaska Oil and Gas Commission.

**3.1.22** *Limited Liability Company Agreements.*  Delivery to the Authority of executed copies of the limited liability company agreements for each Borrower, as amended and restated, as applicable, in for reasonably satisfactory to the Authority.

**3.1.23** *Material Contracts and Permits.*  Delivery to the Authority of copies of all Material Contracts and Applicable Permits of the Borrowers not previously delivered to the Authority, each of which shall be reasonably satisfactory in form and substance to the Authority.

**3.1.24** *Fees and Expenses.*  The Borrowers shall have paid, in Cash, or provided for the payment, in Cash, or, at AIDEA's discretion, from the Loan: (x) the Authority's loan origination fee in the amount of one percent (1%) of the AIDEA Loan, (y) all amounts due to the Authority pursuant to the Cash Reimbursement Agreement between the Authority and HEX L.L.C., dated April 9, 2020; and (z) any other amounts due to the Authority pursuant to this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

Each Borrower makes the following representations and warranties to and in favor of the Authority as of the Effective Date and as of each date any certificate is delivered pursuant to the AIDEA Loan Documents:

**4.1**     STATUS.  Each Borrower (a) is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware except, in the case of HEX CI, the State of Alaska and (b) is duly qualified and authorized to do business and in good standing in each jurisdiction where the character of its Properties or the nature of its activities makes such qualification necessary.  Each Borrower has all requisite limited liability company power and authority to own or hold under lease and operate the property it purports to own or hold under lease, to carry on its business as now being conducted and as now proposed to be conducted in respect of its Properties and to execute, deliver and perform its obligations hereunder and the other AIDEA Loan Documents to which it is a party.

**4.2**     AUTHORITY.  Each Borrower has full power and authority to execute and deliver this Agreement and the other AIDEA Loan Documents to which it is a party and to carry out their respective obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the other AIDEA Loan Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on their respective parts and each Borrower has executed and delivered the AIDEA Loan Documents to which it is a party.  This Agreement and the other AIDEA Loan Documents to which it is a party constitute valid and legally binding obligations, enforceable against each Borrower in accordance with their respective terms, except as

{01011050}}

enforceability may be limited by applicable bankruptcy, insolvency, reorganization and other similar laws now or hereafter in effect relating to creditors' rights generally or by general principles of equity (whether enforced at law or in equity).

**4.3     GOVERNMENTAL AUTHORIZATIONS**.  There is no proceeding pending, or to their knowledge, threatened against any Borrower that seeks to, or may be reasonably expected to rescind, terminate, modify in any manner adverse to the Properties of the Borrowers or the Borrowers or suspend any Governmental Authorization or this Agreement or materially interfere with its ability to fully perform its obligations and duties set forth under this Agreement or the other AIDEA Loan Documents.

**4.4     NO BREACH OR DEFAULT**.  The execution, delivery and performance by each Borrower of this Agreement and the transactions contemplated hereby and by the other AIDEA Loan Documents does not and will not (a) require any consent or approval or registration with or notice to or other action of any Governmental Authority or any other Person except for Pending Permits and immaterial Permits and consents as expressly provided for herein or the AIDEA Loan Documents or that has otherwise been obtained and is currently in effect or (b) constitute a breach of any term or provision of, conflict with, or violate or constitute a default under (with or without notice, or lapse of time, or both), or result in or require the creation of any Lien (other than Permitted Encumbrances) upon any of its property under, (i) any outstanding indenture, mortgage, loan agreement or other contract or agreement to which any Borrower is a party, or their respective Properties is bound, (ii) their respective operating agreement, certificate of formation or other Organizational Documents, or any other Contractual Obligations, (iii) any material Applicable Law (or require any consents, approvals, notifications or authorizations thereunder) applicable to or binding on the Borrowers or any of their respective Properties, or (iv) any order, writ, judgment or decree of any Court or other Governmental Authority having applicability to any Borrower.

**4.5     COMPLIANCE WITH LAW**.  Except as expressly identified on Schedule 4.5, there are no (a) material violations by any Borrower of any Legal Requirement; and (b) written notices of material violation of any Legal Requirement relating to the Properties of any Borrower, the AIDEA Loan Documents or the Collateral have been received by any Borrower.

**4.6     BUSINESS, CAPITALIZATION, JOINT VENTURES, SUBSIDIARIES, ETC.**

**4.6.1**  *No Other Business*.  No Borrower has conducted, and no Borrower is conducting, any business other than the development, construction, ownership, operation, maintenance and financing of the Properties of the Borrowers and, in each case, activities related and incidental thereto, does not have any outstanding Debt or other liabilities or contingent obligations other than pursuant to or permitted by the AIDEA Loan Documents, and, except as disclosed in Schedule 4.6.1, is not a party to or bound by any material contract other than the Material Contracts, the AIDEA Loan Documents to which it is a party and those other instruments and agreements which it is permitted to enter into pursuant to the AIDEA Loan Documents.

**4.6.2**  *Borrower not a Partner*.  No Borrower is a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture.

{01011050}}

**4.6.3** *Subsidiaries*.  FOA does not have any Subsidiaries, does not hold any Equity Interests in any other entity and is a wholly-owned direct Subsidiary of Cornucopia. Cornucopia does not have any Subsidiaries other than FOA and does not hold any Equity Interests in any other entity other than FOA.  Corsair does not have any Subsidiaries and does not hold any Equity Interests in any other entity.  Each of Cornucopia and Corsair is a wholly-owned direct Subsidiary of HEX CI.

**4.6.4** *Due Authorization*.  The Equity Interests of each Borrower have been duly authorized and validly issued and are fully paid and non-assessable.  Schedule 4.6.4 correctly sets forth the ownership of the Equity Interests of each Borrower as of the Effective Date.  As of the Effective Date, the officers of the Borrowers are as set forth in Schedule 4.6.4.

**4.6.5** *Equity Interest Equivalents*.  There exists no Equity Interest Equivalents granting a right to any Person to acquire an interest in any Borrower, and there are no Equity Interests of any Borrower outstanding which, upon conversion or exchange, would require the issuance by any Borrower of any additional Equity Interests of any Borrower or other Equity Interest Equivalents convertible into, exchangeable for or evidencing the right to subscribe for or purchase, any Equity Interest of any Borrower.

**4.7** **INVESTMENT COMPANY ACT**.  No Borrower is subject to regulation under any federal or state statute or regulation which may limit its ability to incur Debt or which may otherwise render all or any portion of the Obligations unenforceable.  No Borrower is an "investment company", "registered investment company", a company "controlled" by an "investment company" or a "registered investment company" or a "principal underwriter" of a "registered investment company", within the meaning of the Investment Company Act of 1940.

**4.8** **REGULATORY MATTERS**.

**4.8.1** *Natural Gas Act of 1938; State Regulation*.  No Borrower is (i) a "natural-gas company" as defined under the Natural Gas Act of 1938 ("**NGA**") and subject to regulation by FERC as a "natural-gas company" under the NGA and FERC's rules and regulations implemented thereunder or an "intrastate pipeline" as defined under the Natural Gas Policy Act of 1978 ("**NGPA**")  and subject to regulation by FERC as an "interstate pipeline" under Section 311 of the NGPA and FERC's rules and regulations implemented thereunder or (ii) subject to regulation by the Regulatory Commission of Alaska under the Alaska Public Utilities Regulatory Act, AS 42.05 et seq.; the Pipeline Act, AS 42.06 et seq. or the In-State Pipeline Contract Carrier Act, AS 42.08 et seq.  To the Borrowers' knowledge, the Authority shall not, solely as a result of entering into this Agreement, be subject to regulation by (i) FERC under the NGA or NGPA or (ii) the Regulatory Commission of Alaska under the Alaska Public Utilities Regulatory Act, AS 42.05 et seq.; the Pipeline Act, AS 42.06 et seq. or the In-State Pipeline Contract Carrier Act, AS 42.08 et seq.

**4.8.2** *State Regulation***.**  None of the Borrowers or the Authority or will be, solely as the result of this Agreement or the AIDEA Loan Documents and the transactions contemplated thereby, subject to regulation as a public utility, common carrier, public service company or similar designation under the public utility laws of any state in which any Borrower operates, and none of the Borrowers nor the Authority is or will be, solely as the result of this Agreement or the AIDEA

Loan Documents and the transactions contemplated thereby, subject to the laws of any state in which any Borrower or its Subsidiaries operates respecting the rates charged by, or the financial or organizational regulation of, a public utility or similar designation.

**4.9    ERISA**.

(a)    Either (a) there are no Pension Plans maintained or sponsored by any Borrower or any ERISA Affiliate or (b) except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Borrower and each ERISA Affiliate (i) are in compliance in all respects with the currently applicable provisions of ERISA and the Code with respect to each Pension Plan, (ii) have not incurred, or reasonably expect to incur, any liability to the PBGC under Title IV of ERISA (other than liability for premiums due in the ordinary course), and (iii) have not incurred, or reasonably expect to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan.

(b)    (i) Each Pension Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of each Borrower and each ERISA Affiliate, nothing has occurred that would prevent, or cause the loss of, such qualification, (ii) no ERISA Event has occurred or is reasonably likely to occur, (iii) no Pension Plan has any Unfunded Pension Liability, and (iv) there are no pending or, to the best knowledge of any Borrower or any ERISA Affiliate, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Pension Plan that, in each case of (i) through (iv), individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**4.10    HAZARDOUS SUBSTANCE**. Except as set forth in Schedule 4.10:

(a)    No Borrower is or has in the past been in material violation of any Environmental Law;

(b)    no Borrower or any third party has used, released, generated, manufactured, produced or stored, or transported thereto or therefrom, any Hazardous Substances in, on, under, or about any property or facility owned, leased, occupied or otherwise operated by any Borrower in a manner or amount that could reasonably be expected to subject either of the Borrowers or the Authority to any material Environmental Claims; and

(c)    to the knowledge of each Borrower, there neither is, nor has been, any condition, circumstance, action, activity or event that could reasonably be expected to subject (i) FOA or Cornucopia to any material Environmental Claims or other liability under any material Environmental Law or (ii) the Authority to any material Environmental Claims or other material liability under any Environmental Law.

{01011050}}

**4.11    LABOR DISPUTES AND ACTS OF GOD**.

      **4.11.1** *Acts of God*.  Neither the business nor the Properties of any Borrower have been damaged by any fire, explosion, accident, drought, storm, hail, earthquake, embargo, act of God or of the public enemy, or other casualty (whether or not covered by insurance).

      **4.11.2** *Labor Disputes*.  There is (a) no unfair labor practice complaint pending against either, or to the knowledge of any Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is pending against any Borrower or, to the knowledge of any Borrower, threatened in writing against any of them, (b) no strike, lockout, work stoppage or other labor dispute in existence or threatened in writing involving any Borrower, and (c) to the knowledge of any Borrower, no union representation question existing with respect to the employees of any Borrower and, to the knowledge of any Borrower, no union organization activity that is taking place, except with respect to any matter specified in clause (a) or (b) above such as could not reasonably be expected to result in a material liability to any Borrower.

      **4.12    DISCLOSURE**.  As of the Effective Date, neither this Agreement nor any certificate or other AIDEA Loan Document furnished to the Authority, or to any consultant submitting a report to the Authority, by or, to the knowledge of any Borrower, on behalf of, any Borrower in connection with the transactions contemplated by this Agreement and the other AIDEA Loan Documents contains any statements of material facts which, taken as a whole, are untrue in any material respect or omits to state a material fact necessary in order to make the statements contained herein or therein, taken as a whole, not misleading in light of the circumstances in which they were made.  As of the Effective Date, the projections, estimates, assumptions, expectations, forecasts, budgets, assessments and statements of or as to market conditions, statements of opinion or intent and discussions of strategy contained herein or therein have been prepared in good faith based upon reasonable assumptions, it being understood that such projections, estimates, assumptions, expectations, forecasts, budgets, assessments, statements and discussions are subject to significant uncertainties and contingencies, and that no assurance can be given that any of the projections, estimates, assumptions, expectations, forecasts, budgets, assessments, statements or discussions will be realized.  There are no facts known (or which should, upon the reasonable exercise of diligence, be known) to any Borrower (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the Authority for use in connection with the transactions contemplated hereby.

      **4.13    TAX SHARING AGREEMENTS**.  No Borrower is party to or bound by any Tax sharing agreement or similar agreement or arrangement (whether or not written) pursuant to which it may have an obligation to make payments after the Effective Date, other than obligations under the terms of (a) this Agreement and any other AIDEA Loan Documents, (b) the Second Lien Documents, (c) the New Term Loan Agreement and any other New Term Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the New Term Loan Documents and (d) the Tax Credit Loan Agreement and any other Tax Credit Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the Tax Credit Loan Documents.

{01011050}}

**4.14** **REGULATION U, ETC.**.  No Borrower is engaged principally, or as one of its principal activities, in the business of extending credit for the purpose of purchasing or carrying margin stock or any other purpose that would cause the AIDEA Loan to constitute a "purpose credit" (as defined in Regulation T, U or X of the Federal Reserve Board), and no part of the proceeds of the AIDEA Loan will be used by any Borrower to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

**4.15** **ORGANIZATIONAL ID NUMBER; LOCATION OF COLLATERAL**.

**4.15.1**  As of the Effective Date, HEX CI's organizational identification number is 10132220, FOA's organizational identification number is 6727391, Corsair's organizational identification number is 6727383 and Cornucopia's organizational identification number is 6727372.

**4.15.2**  As of the Effective Date, all of the tangible Collateral is located on the Properties of the Borrowers or at the addresses set forth in <u>Section 9.1</u>, except as otherwise permitted by the Pledge and Security Agreement.

**4.16** **TITLE AND LIENS**.  Other than as expressly permitted by the AIDEA Loan Documents, each Borrower has good, legal and valid title to, or, with respect to Property other than Real Property, right to use, their respective Properties and all of the Collateral free and clear of all Liens except Permitted Encumbrances.  No portion of the Properties of any Borrower has been leased, subleased, licensed or otherwise granted by any Borrower to any Person.  No Borrower has leased or otherwise granted any Person the right to use or occupy its Properties.  No Borrower has granted any, and there are no, outstanding options, rights of first offer or rights of first refusal to purchase its Properties or any portion thereof or interest therein.  No Borrower has received written notice of any pending, and to the knowledge of each Borrower, there is no threatened, condemnation proceeding or special assessment with respect to any of the Properties of any Borrower.

**4.17** **COLLATERAL**.

**4.17.1**  Subject to the Intercreditor Agreements, the security interests granted to the Authority pursuant to the AIDEA Security Documents for the benefit of the Secured Parties in the Collateral:

(a)     constitute, as to personal property included in the Collateral, a valid first priority security interest and lien under the UCC, except for, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted Encumbrances are subject to the Liens under the AIDEA Security Documents;

(b)     upon recording, constitute, as to real property included in the Collateral, a valid and subsisting first priority Lien of record on all the real property of each Borrower, to the extent applicable, subject to no Liens and encumbrances except for, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted Encumbrances are subject to the Liens under the AIDEA Security Documents; and

{01011050}}

(c)        are perfected (i) with respect to any property that can be perfected by filing, upon the filing of financing statements in the filing offices identified on Exhibit E, (ii) with respect to any property that can be perfected by control and is described in the Control Agreement or other applicable control agreement, upon execution of such Control Agreement or other applicable control agreement, as applicable, and (iii) with respect to any certificated securities or any property that can only be perfected by possession, upon the Authority receiving possession thereof, and in each case such security interest will be, as to Collateral perfected under the UCC as aforesaid, subject to the Intercreditor Agreements, superior and prior to the rights of all third Persons now existing or hereafter arising whether by way of Lien of any type, assignment or otherwise, except for, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted Encumbrances are subject to the Liens under the AIDEA Security Documents.

**4.17.2**    *[Reserved]*.

**4.18**        **RESTRICTION ON LIENS.**    None of the Borrowers is a party to any material agreement or arrangement (other than the Intercreditor Agreements and instruments creating Liens permitted by Section 6.1.2, but then only on the Property subject of such Lien), or subject to any order, judgment, writ or decree that restricts or purports to restrict its ability to grant Liens to the Authority or any Secured Party on or in respect of their respective assets or properties to secure the Obligations.

**4.19**        **ACCOUNTS.**    Except as set forth on Schedule 4.20, no Borrower has any deposit, securities or other accounts.

**4.20**        **COMMODITY EXCHANGE ACT.**    As of the Effective Date, no Borrower (a) has entered into or is otherwise party to any Hedging Agreements, (b) is subject to regulation as a "commodity pool," "commodity pool operator," or "commodity trading advisor," as defined in Sections 1a(10), 1a(11), and 1a(12), respectively, of the CEA or (c) is required to qualify as an Eligible Contract Participant.

**4.21**        **MATERIAL CONTRACTS**.    As of the Effective Date, the list of Material Contracts contained in Schedule B is a true, correct and complete list of all contracts material to the ownership, maintenance or operation of the Properties of any Borrower and the Properties of the Borrowers.  True and complete copies of each Material Contract including all amendments thereto in effect as of the Effective Date have been delivered to the Authority. Except as has been previously disclosed in writing to the Authority, as of the Effective Date, none of the Material Contracts has been amended, modified or terminated.  All Material Contracts are in full force and effect.  There is no material default under any such Material Contract and no event has occurred and is continuing or has failed to occur, and no condition exists, that, with the passage of time or upon giving of notice or both, could constitute an event of default thereunder or give rise to any right of termination of such Material Contract.

**4.22**    **PERMITS**.

**4.22.1** *Existing Permits*.    As of the Effective Date, Exhibit G contains a complete and correct list of all material Permits required under any existing Applicable Law to develop, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers in the ordinary course

{01011050}}

of business.  As of the Effective Date, Part I of Exhibit G lists all of such Permits that are presently Applicable Permits and Part II of Exhibit G lists all of such Permits that are presently Pending Permits.

    **4.22.2** *Applicable Permits*.  Each of the Applicable Permits has been duly obtained by or assigned to the Borrowers, and is in full force and effect, and except as disclosed therein, (a) is not subject to any current legal proceeding, (b) is not subject to any unsatisfied condition, or to any restriction, limitation or other provision that could reasonably be expected to result in a material limitation on the effectiveness thereof, or a material modification or revocation thereof and (c) all applicable appeal periods with respect thereto have expired.  Each Borrower is in compliance in all material respects with all Applicable Permits.  Except for the Pending Permits, the Applicable Permits are all of the material Permits required to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers in the ordinary course of business and Applicable Law, and each such Permit is adequate and sufficient for that purpose.

    **4.22.3** *Pending Permits*.  No fact or circumstance exists, to any Borrower's knowledge, which indicates that any Pending Permit shall not be timely obtainable and fully effective without material difficulty, expense or delay by any Borrower, on or before the date such Pending Permit is necessary in connection with the transactions contemplated by the AIDEA Loan Documents, or to meet the performance obligations of any Borrower under the AIDEA Loan Documents.  Further, to each Borrower's knowledge, no fact or circumstance exists that, upon expiration of the appeal period applicable to any Pending Permit, would prevent any Borrower from making the representations contained in Section 4.22.2.

    **4.23**    SUFFICIENCY OF MATERIAL CONTRACTS; SERVICES RIGHTS.

    **4.23.1** Other than those that can be reasonably expected to be commercially available when and as required, the services to be performed, the materials to be supplied and the real property interests, easements and other Property and rights owned by or otherwise granted to the Borrowers pursuant to the Material Contracts:

    (a)    comprise all of the property interests necessary for the acquisition, leasing, development, construction, installation, completion, ownership, operation and maintenance of the Properties of each Borrower required to be used or maintained in connection with the Properties in accordance with all Legal Requirements, as presently contemplated and in the ordinary course of business;

    (b)    are sufficient to enable the Properties to be located and operated in the locations where operated; and

    (c)    provide adequate ingress and egress for any reasonable purpose in connection with the ownership, operation and maintenance of such Properties; and

    (d)    There are no material services, materials or rights required for the operation or maintenance of the Properties of the Borrowers for the intended purposes in accordance with the Plan of Operations other than (a) those that are available to the Borrowers or (b) those that can reasonably be expected to be available to the Borrowers as and when required on commercially reasonable terms consistent with the Plan of Operations.

{01011050}}

**4.24** **MATERIAL PERSONAL PROPERTY**.  All pipelines, wells, gas processing plants, platforms and other material improvements, fixtures and equipment owned in whole or in part by the Borrowers or any of the Subsidiaries that are necessary to conduct normal operations in accordance with the Plan of Operations are being maintained in a state adequate to conduct normal operations.

**4.25** **RESERVES**. Borrowers have delivered to the Authority a Reserve Report dated October 23, 2019.  To the knowledge of each Borrower, (i) the assumptions stated or used in the preparation of the Reserve Report are reasonable, (ii) all information furnished by the Borrowers or their predecessors for use in the preparation of the Reserve Report was accurate in all material respects, (iii) there has been no material adverse change in the amount of the estimated oil and gas reserves shown in the Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business, and (iv) the Reserve Report does not, in any case, omit any material statement or information necessary to cause the same not to be misleading to the Authority.

**4.26** **USE OF PROCEEDS.**  Borrowers will use the proceeds of the AIDEA Loan and the Equity Contribution solely (a) for HEX CI to pay the purchase price for the Corsair and Cornucopia Equity Interests; (b) for working capital; (c) to fund the DSRF Required Balance, and (d) to pay fees and expenses related to the transactions (including closing costs) contemplated by this Agreement, as more specifically set forth in Schedule 4.26.

**ARTICLE 5**
**AFFIRMATIVE COVENANTS**

Until the AIDEA Loan Termination Date:

**5.1** **FINANCIAL STATEMENTS AND OTHER REPORTS.**

**5.1.1** *Quarterly.*  As soon as practicable and in any event within 45 days after the end of each quarterly accounting period of its fiscal year (including the fourth fiscal quarter of each fiscal year), each Borrower shall deliver: (A) an unaudited consolidated and consolidating balance sheet of Borrowers, as of the last day of such quarterly period and the related consolidated statements of income, cash flow, and equity (where applicable prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes)) for such quarterly period and (in the case of second, third, and fourth quarterly periods) for the portion of the fiscal year ending with the last day of such quarterly period, setting forth in each case in comparative form corresponding unaudited figures from the preceding fiscal year, and a report from the management of the Borrowers discussing and analyzing such financial results and their effect on the financial projections of the Borrowers for the following twelve (12) month period; and (B) schedules demonstrating the calculation of the Financial Covenants under Section 5.25; and (C) updated financial forecast and (D) copies of account statements for the Debt Service Reserve Account.  Notwithstanding the foregoing, for the first full quarter after the Effective Date, the items required pursuant to (A), (B) and (C), above, shall not be due until 90 days after the end of the quarter.

{01011050}}

**5.1.2** *Annual.* As soon as practicable and in any event within 120 days after the close of each applicable fiscal year, each Borrower shall deliver audited consolidated and consolidating financial statements of Borrowers; *provided* such statements for the year ending December 31, 2020 shall be delivered within 180 days after December 31, 2020. Such consolidated and consolidating financial statements shall include a consolidated statement of equity, a consolidated and consolidating balance sheet as of the close of such year, an consolidated income and expense statement, reconciliation of capital accounts and a consolidated statement of cash flow, all prepared in accordance with GAAP, certified by an independent certified public accountant selected by the Borrowers, with the approval of the Authority. Such certificate shall not be qualified or limited because of restricted or limited examination by such accountant of any material portion of the records of any Borrower.

**5.1.3** *Monthly.* Within 15 days after the end of each month commencing with the first full month occurring after the Effective date, the Borrowers shall deliver (A) internally prepared financial information (or management reports or updates) and monthly information with respect to the quantity of oil, natural gas, natural gas liquids and other liquid or gaseous hydrocarbons delivered by the Borrowers, sales of the foregoing (to the extent such information is available), average volumes processed per day, revenue and expenses; (B) a detailed report of all Capital Expenditures expended during such immediately preceding calendar month; (C) a detailed report of all Lease Operating Expenses and Capital Expenditures expended during such immediately preceding calendar month, together with a detailed reconciliation against the budgets for the same, during such calendar month, in form and substance satisfactory to the Authority acting reasonably; and (D) a detailed report of drilling activity, including counts of jobs associated with rig operations; *provided* during the first quarter after the Effective Date, the monthly reports shall be delivered within 30 days after the end of each calendar month.

**5.1.5** *Authority Requests.* From time to time, as soon as practicable after the request of the Authority, each of the Borrowers shall deliver to the Authority such other information and data with respect to the Borrowers or any Property or operations of the Borrowers.

**5.1.6** *Perfection Certificate.* Concurrently with the delivery of financial statements pursuant to <u>Section 5.1.1</u> and <u>5.1.2</u>, each of the Borrowers shall deliver to the Authority (a) an updated Perfection Certificate or (b) a certificate signed by a Responsible Officer of each Borrower certifying that there have been no changes to the Perfection Certificate most recently delivered pursuant to this <u>Section 5.1.6</u>, which certification and certification may be made a part of the certificate delivered pursuant to <u>Section 5.1.2</u>.

**5.1.7** *Reserve Reports.* Within 120 days after the end of the calendar year ended December 31, 2020, and each calendar year thereafter, Borrowers shall provide a reserve report ("**Reserve Report**") prepared by an independent petroleum engineer reasonably satisfactory to the Authority. The Reserve Report shall include a certification by a Responsible Officer that (i) the assumptions stated or used in the preparation of the Reserve Report are reasonable, (ii) all information furnished by the Borrowers or their predecessors for use in the preparation of the Reserve Report was accurate in all material respects, (iii) there has been no material adverse change in the amount of the estimated oil and gas reserves shown in the Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business, and (iv) the Reserve Report does not, in any case, omit any material statement

{01011050}

or information necessary to cause the same not to be misleading to the Authority. The Reserve Report may be supplemented by all such other internal information as the Borrowers or the Authority, acting reasonably, may request or deem appropriate, including without limitation sufficient internally prepared information to permit the Authority's engineering consultants to prepare economic engineering evaluations covering the Properties.

      **5.1.8** *Officer's Certificate*. Each time financial statements are delivered under Section 5.1.1 and 5.1.2 above, each of the Borrowers shall deliver or cause to be delivered along with such financial statements, a certificate signed by a Responsible Officer of each Borrower, certifying that (a) such officer has made or caused to be made a review of the transactions and financial condition of each Borrower during the relevant fiscal period, (b) that such financial statements have been prepared in conformity with GAAP applied consistently throughout the relevant periods (except as otherwise approved and disclosed therein) and fairly presents, in all material respects, the consolidated and consolidating financial position of Borrowers at the respective dates thereof and the consolidated results of operations and cash flows of Borrowers described therein for each of the periods then ended, subject, in the case of any unaudited quarterly financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure, (c) that such review has not, to such Responsible Officer's knowledge, disclosed the existence of any event or condition which constitutes, as of the date of such certificate, a Default or Event of Default, or if any such event or condition existed or exists, the nature thereof and the corrective actions that any Borrower have taken or propose to take with respect thereto, and (d) that each Borrower is in full compliance with all covenants in this Agreement and each other AIDEA Loan Document, and (e) and Borrowers' calculations of the Financial Covenants under Section 5.25 are accurate based on the requirements set forth in this Agreement.

      **5.1.9** *Telephone Conferences*. The Borrowers shall host a quarterly telephone conference with the Authority on a date and time during each fiscal quarter to be mutually agreed and other telephone conferences between such quarterly telephone conferences as may be reasonably requested by the Authority.

      **5.2** **NOTICES – OPERATION OF BUSINESS**. The Borrowers shall promptly upon receipt of or giving notice (or upon a Responsible Officer of any Borrower otherwise obtaining knowledge thereof) and, except as otherwise noted below, in any event, within 30 days after the occurrence thereof, of any of the following, give notice to the Authority of the following (with copies of any underlying notices, papers, files or related documentation), which notice shall be accompanied by a statement of a Responsible Officer of each Borrower setting forth details of the occurrence referred to therein and stating what action the Borrowers propose to take with respect thereto, of:

          (a)        as soon as possible, and in any event within three (3) Banking Days after (i) receipt of service of process in respect of any pending litigation, suit, proceeding or investigation before any court, arbiter or other governmental authority or, (ii) any Borrower's knowledge, that the same is threatened against any Borrower, such notice to include, if requested in writing by the Authority, copies of all papers filed in such litigation and to be given monthly if any such papers have been filed since the last notice given;

(b)         promptly, but in no event later than three (3) Banking Days after the receipt thereof by any Borrower, copies of (i) any material Permit obtained by any Borrower after the Effective Date, (ii) any material amendment, supplement or other modification to, or revocation of, any material Permit received by any Borrower after the Effective Date, (iii) all material notices relating to any of the Borrowers' Property received by any Borrower from or delivered by any Borrower to any Governmental Authority and (iv) material notices in connection with any material dispute or disputes of which any Borrower has knowledge or for which written notice has been received by any Borrower which may exist between any Borrower and any Governmental Authority;

(c)         as soon as possible, and in any event within three (3) Banking Days after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any Default or Event of Default;

(d)         any casualty, damage or loss, whether or not insured, through fire, theft, other hazard or casualty, to any property of the Borrowers having value, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000);

(e)         (i) promptly, and in any event within three (3) Banking Days of the occurrence thereof, any cancellation, suspension, material change in or non-renewal of the terms, coverage or amounts of any insurance required to be maintained hereunder, (ii) at least 30 days prior notice of any expiration of any insurance required to be maintained hereunder, (iii) within ten (10) days after renewal of coverage of any insurance policy, updated certificates of insurance and (iv) upon request of the Authority from time to time, full information as to insurance received;

(f)         copies of any (i) notice of termination of any Material Contract, (ii) material amendments or modifications to any Material Contracts, (iii) Additional Material Contract and (iv) notices of any event of force majeure or material default under any Material Contract;

(g)         any claim of events of force majeure or delay under any engineering, construction and procurement agreement of any Borrower or under any other Material Contract (including claims therefor regardless of whether the Borrowers believe such claim has merit);

(h)         any intentional withholding of compensation, or any right to withhold compensation, claimed by any Person under a Material Contract, other than retention provided by the express terms of any such contracts;

(i)         any (i) Release of Hazardous Substances on or from any location, (ii) pending or, to any Borrower's knowledge, threatened, Claim under any Environmental Law against any Borrower or, to any Borrower's knowledge, any of its Affiliates, contractors, subcontractors, lessees, lessors or any other Persons, arising in connection with their occupying or conducting operations at any location which, if adversely determined, reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect, (iii) any condition, circumstance, occurrence or event that reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 under Environmental Laws or in the imposition of any Lien or any other restriction on

{01011050} }

the title, ownership or transferability of any Property of any Borrower or in a Material Adverse Effect, (iv) any proposed action to be taken by any Borrower that could subject it to any additional or different requirements or liabilities under Environmental Laws that reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect, or (v) existence of any underground tank not previously disclosed in writing, operative or temporarily or permanently closed;

(j)         any proceeding or legislation by any Governmental Authority to expropriate, condemn, confiscate, nationalize or otherwise acquire compulsorily any Borrower, or all or any portion of the Borrowers' business or assets (whether or not constituting a Default or Event of Default);

(k)         promptly, but in no event later than three (3) Banking Days after occurrence thereof, (i) any Unplanned Outage or the scheduling of any Unplanned Outage, in each case, for any Facility with an anticipated duration in excess of 24 hours and (ii) any Unplanned Outage or Planned Outage for any Facility (scheduled or otherwise) with a duration in excess of two (2) days;

(l)         as soon as possible, and in any event within three (3) Banking Days after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any termination (other than any scheduled expiration in accordance with its terms), default or event of default under any contractual obligations of any Borrower or any other Person, or notice of any other event that, with the passage of time or upon giving of notice or both, that reasonably could be expected, if not cured, to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(m)        any Lien (other than a Permitted Encumbrance) being granted or established or becoming enforceable over any Properties of any Borrower;

(n)         the occurrence of any event, condition or circumstance that would be required to be disclosed in a current report filed by any Borrower with the Securities and Exchange Commission on Form 8-K if such Borrower were required to file such reports;

(o)         promptly, and in any event within three (3) Banking Days after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any event, condition, circumstance or change that has constituted or reasonably could be expected to result in, individually or in the aggregate, liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(p)         the occurrence of an ERISA Event that has constituted or reasonably could be expected to result in, individually or in the aggregate, liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(q)         [Reserved];

(r)         promptly upon receipt thereof, copies of all notices, requests, reports and other documents received by any Borrower, or delivered by any Borrower, under or pursuant to any Second Lien Document, Tax Credit Loan Documents, or New Term Loan Document;

{01011050}}

(s)        (i) for each calendar year, commencing with the calendar year ending December 31, 2021, no later than forty-five (45) days prior to the beginning of such calendar year, the Borrowers shall deliver to the Authority (A) an operating plan and a budget for the Borrowers, detailed by month, of anticipated revenues and anticipated expenditures of the Borrowers, each such annual budget to include operation expenses (including reasonable allowance for contingencies), reserves and all other anticipated operating costs of the Borrowers for the ensuing calendar year and (B) an additional budget for the Borrowers, detailed by month, of aggregate anticipated corporate general and administrative expenses not included in the budgets prepared pursuant to clause (A) above, and each such annual budget shall include required debt payments payable by the Borrowers for the ensuing calendar year and (ii) any material amendments or modifications to such annual operating plan and budgets described in the foregoing clauses (A) and (B); and

(t)        promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Borrower or the Properties of any Borrower or compliance with the terms of any AIDEA Loan Document that the Authority may request.

(u)        as soon as possible upon any failure to make any payment to the State of Alaska or any political subdivision thereof when due.

**5.3      EXISTENCE; MAINTENANCE OF CONTRACTS**. Except as otherwise expressly permitted under this Agreement, at all times, (i) each of the Borrowers shall maintain and preserve its existence as a Delaware limited liability company and all material rights, privileges and franchises necessary or desirable in the conduct of its business, (ii) in the case of Cornucopia, maintain its ownership interest in FOA, (iii) each of the Borrowers shall perform all of its material Contractual Obligations and enforce its material rights under its Material Contracts, (iv) each of the Borrowers shall maintain, renew and comply in all material respects with all Applicable Permits, (v) take all reasonable action necessary to prevent termination (except by expiration in accordance with its terms) of, each and every Material Contract, including prosecution of suits to enforce any right of each Borrower thereunder and enforcement of any claims with respect thereto, (vi) each of the Borrowers shall otherwise continue to engage in the same business as contemplated by the AIDEA Loan Documents and the other Material Contracts, (vii) each of the Borrowers shall maintain and keep, or cause to be maintained and kept, its properties in good repair, working order and condition consistent with Prudent Operating Practices (other than ordinary wear and tear) and (viii) each of the Borrowers shall make or cause to be made all repairs (structural and non-structural, extraordinary or ordinary (ordinary wear and tear excepted)) necessary to keep such properties in such condition, in each case, as would allow for the ordinary conduct of business.

**5.4      GOVERNMENT APPROVALS**. The Borrowers shall promptly obtain all Governmental Authorizations required to operate its business in the ordinary course, including without limitation, those required by the agencies set forth on <u>Schedule 5.</u>4 and shall deliver to the Authority copies of all filings made with the agencies set forth on <u>Schedule 5.4</u>.

**5.5      COMPLIANCE WITH LAW**. The Borrowers shall promptly comply, or cause compliance, in all material respects with all Legal Requirements, including, without limitation,

{01011050}}

Environmental Laws and all Legal Requirements relating to equal employment opportunity or employee benefit plans, Pension Plans and employee safety, with respect to each Borrower.

5.6     **TAXES**.  The Borrowers shall (a) timely file, or cause to be filed, all Tax returns, (b) pay, or cause to be paid, as and when due and prior to delinquency, all Taxes (including any Alaska Taxes), assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to such Person or its Properties (including all Taxes, assessments and charges made by any Governmental Authority for public improvements that may be secured by a Lien on such Person's Properties), and all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of its respective Properties; *provided*, *however*, that, in the case of this clause (b) such Person may, by appropriate proceedings diligently conducted, contest or cause to be contested in good faith any such Taxes, assessments and other charges and, in such event, may permit the Taxes, assessments or other charges so contested to remain unpaid during any period, including appeals, when such Person is in good faith contesting or causing to be contested the same by appropriate proceedings diligently conducted, so long as (i)  such Person maintains adequate reserves with respect thereto in accordance with GAAP, (ii) enforcement of the contested Tax, assessment or other charge is effectively stayed pursuant to Applicable Law for the entire duration of such contest and (iii) any Tax, assessment or other charge determined to be due, together with any interest or penalties thereon, is timely paid after resolution of such contest and (c) each remain a Pass-Through Entity.

5.7     **WARRANTY OF TITLE**.  The Borrowers shall maintain (a) valid ownership or leasehold interest in, or valid rights to use (subject to the JOA), its respective interests in the Upland, the Facilities and any other Properties of any Borrower and (b) good, marketable, legal and valid title (or with respect to Property other than Real Property, rights sufficient for the transactions contemplated hereby) to all of its respective Properties (other than Properties disposed of pursuant to Section 6.3), in each case, free and clear of all Liens other than Permitted Encumbrances.

5.8     **BOOKS AND RECORDS**.  The Borrowers shall maintain adequate books, accounts and records with respect to the Borrowers and prepare all financial statements required hereunder in accordance with GAAP and in material compliance with the regulations of any Governmental Authority having jurisdiction thereof, and, subject to any applicable requirements of Applicable Law and safety requirements, permit employees or agents of the Authority at any reasonable times and upon reasonable prior notice to inspect all of each Borrower's Properties, to examine or audit all of its and their books, accounts and records and make copies and memoranda thereof, and to communicate with the auditors of the Borrowers outside the presence of the Borrowers.

5.9     **PRESERVATION OF RIGHTS; FURTHER ASSURANCES**.

5.9.1     The Borrowers shall from time to time, execute, acknowledge, record, register, deliver and/or file all such notices, statements, instruments and other documents and pay any fees associated therewith (including any memorandum of lease or other agreement, financing statement, continuation statement, certificate of title or estoppel certificate) and take such other steps as may be necessary or advisable to render or maintain fully valid, perfected, protected and enforceable under all Applicable Laws, the rights, Liens and priorities of the Authority (on behalf of the Secured Parties) with respect to all Collateral and other security from time to time furnished

under this Agreement and the other AIDEA Loan Documents or intended to be so furnished, in each case in such form and at such times as shall be requested by the Authority.

5.9.2    The Borrowers shall perform all acts that may be necessary to perfect the Lien granted to the Authority (on behalf of the Secured Parties) herein, including, unless otherwise performed by the Authority, the filing of UCC-1 financing statements and execution of other agreements in form and substance satisfactory to the Authority acting reasonably, perform all acts that may be necessary to maintain, preserve, and protect the Collateral and the perfection and priority of the Lien (subject to the Intercreditor Agreements) granted to the Authority pursuant to the AIDEA Security Documents, and properly and efficiently administer, operate, and maintain the Collateral, subject to the Intercreditor Agreements.

5.10    **SEPARATENESS**.  Each of the Borrowers shall comply with the following:

(a)    maintain deposit accounts or accounts separate from those of any Affiliate of any Borrower (other than HEX CI and FOA, in the case of Cornucopia, and Cornucopia, in the case of FOA) with commercial banking institutions and will not commingle its funds with those of any Affiliate of any Borrower (other than HEX CI and FOA, in the case of Cornucopia, and Cornucopia, in the case of FOA);

(b)    act solely in its own name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(c)    conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, such conduct of business shall be reflected in all oral and written communications (if any), including invoices, purchase orders, and contracts);

(d)    obtain legally sufficient authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(e)    comply in all material respects with the terms of its Organizational Documents.

5.11    **ADDITIONAL COLLATERAL**.  With respect to any property acquired after the Effective Date by a Borrower that is intended to be subject to the Lien created by any of the AIDEA Security Documents but is not so subject, promptly take such actions and execute and/or deliver to the Authority such documents as the Authority shall require to confirm the validity, perfection and priority of the Lien of the AIDEA Security Documents on such after-acquired Collateral.

5.12    **SECURITY INTERESTS; FURTHER ASSURANCES**.  Promptly, upon the request of the Authority, at the expense of the Borrowers, each Borrower shall execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the AIDEA Security Documents or otherwise deemed by the Authority necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for

{01011050}}

Permitted Encumbrances, or obtain any consents or waivers as may be necessary or appropriate in connection therewith, to the extent required by the applicable AIDEA Security Documents.  Upon the exercise by the Authority acting reasonably of any power, right, privilege or remedy pursuant to any AIDEA Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, each Borrower shall execute and deliver all applications, certifications, instruments and other documents and papers that the Authority acting reasonably may require.

**5.13     MATERIAL CONTRACTS.**  Borrowers shall pay all obligations due under the Material Contracts, howsoever arising, as and when due and payable, except such as may be contested in good faith or as to which a bona fide dispute may exist; provided that (a) adequate Cash reserves have been established or provision has been made to the satisfaction of the Authority acting reasonably for the posting of security for, or the bonding of, such obligations or the prompt payment thereof in the event that such obligation is payable or (b) non-payment of such obligation pending the resolution of such contest or dispute could not reasonably be expected to result, individually or in the aggregate, in losses of liabilities in excess of $100,000 or a Material Adverse Effect.

**5.14     INDEMNIFICATION.**

**5.14.1**   The Borrowers shall jointly and severally indemnify, defend and hold harmless the Authority, and, in their capacities as such, their respective Affiliates, officers, directors, controlling Persons, employees, agents, advisors, members, successors and assigns (collectively, the "**Indemnitees**"), from and against and reimburse the Indemnitees for:

(a)          any and all claims (including without limitation, claims by any Borrower or the Authority), obligations, liabilities, losses, damages, injuries (to person or property), penalties, actions, suits, judgments, costs and expenses of whatever kind or nature, whether or not well-founded, meritorious or unmeritorious, that are demanded, asserted or claimed against any such Indemnitee in any way relating to, or arising out of or in connection with, this Agreement, the other AIDEA Loan Documents, the Collateral or the transactions contemplated herewith or thereunder in connection with any amendment, modification or waiver of the provisions of the AIDEA Loan Documents and in connection with the exercise or enforcement of the rights and remedies of the Authority or enforcement of the obligations under the AIDEA Loan Documents or in connection with the AIDEA Loan, including all such Claims incurred during any workout, restructuring or negotiations in respect of the Obligations (collectively, "**Subject Claims**"), except for Subject Claims by the Borrowers to enforce their rights under the AIDEA Loan Documents against an Indemnitee; *provided*, *however*, that this Section 5.14.1(a) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, or other amounts arising from any non-Tax claims; and

(b)          any and all Subject Claims arising in connection with the Release or presence of any Hazardous Substances, whether foreseeable or unforeseeable, including all reasonable costs of removal and disposal of such Hazardous Substances, all reasonable costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and court costs.

{01011050}}

**5.14.2** No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrowers or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnitee's actual fraud, gross negligence, or willful misconduct.  In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

**5.14.3** The indemnities provided by the Borrowers pursuant to this Section 5.14 shall not apply with respect to an Indemnitee to the extent finally determined by a court of competent jurisdiction as arising in whole or in part as a result of the actual fraud, gross negligence or willful misconduct of such Indemnitee, but shall continue to apply to other Indemnitees.  In addition, such indemnities shall not include or extend to any Subject Claims (A) incurred or suffered by any of the Indemnitees to the extent that such Indemnitee shall have expressly agreed in Section 9.4 herein to bear such Subject Claim without right of reimbursement or (B) that have not resulted from an act or omission by a Borrower or its Affiliates and has been brought by an Indemnitee against any other Indemnitee (other than any Claims against the Authority in its capacity as such or in fulfilling its role as an agent or similar role hereafter) (a "**Specified Claim**").

**5.14.4** The provisions of this Section 5.14 shall survive foreclosure of the AIDEA Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrowers' joint and several obligations hereunder, shall be in addition to any other rights and remedies of the Authority, and may not be amended, modified or waived in a manner adverse to any Indemnitee without the Authority's written consent.

**5.14.5** In case any action, suit or proceeding shall be brought against any Indemnitee, such Indemnitee shall promptly notify the Borrowers of the commencement thereof, provided that failure to provide any such notice shall not relieve the Borrowers of their obligations set forth in this Section 5.14.

**5.14.6** Any Indemnitee against whom any Subject Claim is made shall be entitled to compromise or settle any such Subject Claim; provided that such Indemnitee consults with and coordinates such compromise or settlement with the Borrowers.  Any such compromise or settlement shall be binding upon the Borrowers for purposes of this Section 5.14.6.

**5.14.7** Upon payment of any Subject Claim by the Borrowers pursuant to this Section 5.14 or other similar indemnity provisions contained herein to or on behalf of an Indemnitee, the Borrowers, without any further action, shall be subrogated to any and all claims that such Indemnitee may have relating thereto, and such Indemnitee shall cooperate with the Borrowers and the Borrowers' insurance carrier as may be reasonably requested by the Borrowers to enable the Borrowers to vigorously pursue such claims.  In the event that the Borrowers shall have paid an amount to or on behalf of an Indemnitee in respect of any Subject Claim pursuant to the indemnification provisions of this Section 5.14 and such Indemnitee subsequently shall be reimbursed in respect of such Subject Claim from any other Person and, as a result, the aggregate amount so received by such Indemnitee shall exceed the amount of such Subject Claim, then (a) so long as no Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Borrowers an amount equal to the lesser of (i) the amount of such excess, (ii) the amount of

{01011050}}

such reimbursement from such other Person and (iii) the amount so paid by the Borrowers and (b) if an Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Authority the amount otherwise payable pursuant to clause (a) of this sentence, for application by the Authority to any amounts due and owing under this Agreement.

     **5.14.8**  Any amounts payable by the Borrowers pursuant to this <u>Section 5.14</u> shall be payable within five (5) Banking Days after the Borrowers receive an invoice for such amounts from any applicable Indemnitee, and if not paid within such five (5)-Banking Day period shall bear interest at the applicable rate pursuant to <u>Section 2.3.3</u> for late payments.

     **5.15**    **TAX CREDITS**. The Borrowers shall timely complete and file, in accordance with Applicable Laws, with the DOR all applications for State Tax Credits which the Borrowers are entitled to claim, but in no event, later than forty five (45) days after the first date on which such applications can be filed with the DOR.

     **5.16**    **INSURANCE**.[5]  The Borrowers will at all times, maintain or cause to be maintained in full force and effect, with insurers of recognized standing adequate insurance (including deductibles which are customary and prudent for the industry) in respect of the property and assets of the Borrowers according to Prudent Industry Practices, including all risk property insurance on an occurrence basis in an amount equal to or greater than the replacement costs of the major components of the operating systems with a combined single limit in the amount of $50,000,000, and will furnish to the Authority, promptly following written request from the Authority, information presented in reasonable detail as to the insurance so carried and with respect to Collateral located in the United States, the Borrowers will obtain flood insurance in such total amount as may reasonably be required by the Authority, if at any time the area in which any improvements located on any Collateral is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time. Each such policy of insurance shall (i) in the case of liability insurance, name the Authority as an additional insured thereunder as its interests may appear, and (ii) in the case of each property insurance policy, contain an additional loss payable clause that names the Authority as an additional loss payee thereunder. Whenever an Event of Default has occurred and is continuing, the Authority shall have the right to collect, and Borrower hereby assigns to the Authority for the benefit of the Authority, any and all monies that may become payable under any such policies of property insurance by reason of damage, loss or destruction of any property which stands as security for the Obligations or any part thereof, and the Authority may, at its election (which election shall be made in the reasonable discretion of the Authority), either apply for the benefit of the Authority all or any part of the sums so collected toward payment of the Obligations whether or not such Obligations are then due and payable, in such manner as the Authority may elect or release same to Borrower.

     **5.17**    **ENSTAR LETTER OF CREDIT**.  The Borrowers shall use their good faith efforts to negotiate a reduction to the amount of credit support required pursuant to Section 12 of the APC

---

[5]    JDO NTD: Insurance requirements are subject to review and approval by the parties.

{01011050}}

Gas Sales Agreement, and shall provide to APC replacement credit support to satisfy FOA's obligations under Section 12 of the APC Gas Sales Agreement in full on or before April 15, 2021.

**5.18**    **ABANDONMENT**.  The Borrowers shall provide written notice to the Authority upon any decision by a Borrower to effect an Abandonment promptly, and in any event within five (5) Banking Days after any such final decision by any Borrower.  Without limiting the generality of the foregoing, any such decision shall be deemed to have been made if the board of directors, any committee thereof or any other governing authority of a Borrower with authority over the decision of whether to proceed with or abandon the design and construction of the one or more of the Facilities shall have, by resolution or other means, determined or directed in writing that activities related to such design and construction permanently cease; *provided*, that any cessation of activities for the time periods set forth in the definition of Abandonment shall not be subject to any deemed decision or five (5) Banking Day period.

**5.19**    **APPOINTMENT OF ACCOUNTING FIRM**.  The Borrowers shall retain an accounting firm acceptable to the Authority to perform an annual audit on all future annual financial statements of each Borrower.

**5.20**    **APPROVALS OF FORECLOSURES**.  The Borrowers shall comply with any actions reasonably requested by the Authority in connection with obtaining approvals of the Alaska Department of Natural Resources (and any other applicable Governmental Authority) for the Authority to foreclose on or otherwise take ownership of or title to the Borrowers' interest in the Properties subject to the Mortgages; *provided, however*, that, for the avoidance of doubt, failure of the Borrowers to obtain such approval after using commercially reasonable efforts to comply with such actions shall not constitute an Event of Default.

**5.21**    **CHIEF OPERATING OFFICER**.  From and after the Effective Date, the Borrowers shall at all times have a chief operating officer or interim chief operating officer.  If the chief operating officer or interim chief operating officer voluntarily resigns after the Effective Date or is terminated in accordance with the Borrowers' limited liability company agreements, the Borrowers shall appoint a replacement chief operating officer or interim chief operating officer within 30 days of the effective date of such resignation.

**5.22**    **OPERATOR.**

**5.22.1**  FOA will act as the operator of the Project, subject to this Section 5.23 and the terms of the JOA to the extent applicable to the Project; provided that FOA will not voluntarily resign as operator under the JOA other than upon the request of the Authority pursuant to this Section 5.24.  While operator, FOA will operate the Project in accordance with Prudent Operating Practices, Applicable Laws, Applicable Permits and the terms of the JOA, the AIDEA Loan Documents and the Material Contracts to the extent applicable to the Project, and the Borrowers will be responsible for all costs of operating and maintaining the Project.

**5.22.2**  In the event FOA for any reason shall cease to be the operator of any portion of the Project the operatorship of which is under the JOA (the "**JOA Assets**"), then, subject to the terms of the JOA, the Borrowers shall, at the request of the Authority, take all such actions as within its control, including obtaining all applicable JOA approvals, to appoint an Acceptable

{01011050}}

Operator as operator of such portions of the JOA Assets with respect to which FOA has ceased to be the operator, subject to any applicable regulatory approvals.

**5.22.3** Upon the request of the Authority upon or following the occurrence of a Furie Operating Default or the occurrence of any matter which would give rise to or require the removal of FOA as operator under the JOA, FOA shall resign as operator under the JOA with respect to the JOA Assets and, subject to the terms of the JOA, the Borrowers shall take all actions as within the Borrowers' control, including obtaining all applicable JOA approvals, to appoint an Acceptable Operator as operator of the JOA Assets, subject to any applicable regulatory approvals. The Borrowers will promptly provide written notice to the Authority of any notice received by either Borrower of any alleged default by FOA, as operator, under the JOA.

**5.22.4** In the event FOA for any reason shall cease to be the operator of any portion of the Project other than the JOA Assets, or upon or following the occurrence of a Furie Operating Default, the Borrowers shall take all such actions as within their control, including obtaining all applicable JOA approvals, to appoint an Acceptable Operator as operator of such portions of the Project or portions thereof covered by the JOA, and for those portions of the Project not covered by the JOA, in each case subject to any applicable regulatory approvals.

**5.22.5** Upon any resignation or removal of FOA as operator under the JOA in accordance with <u>Section 5.23.2</u> or <u>Section 5.23.4</u>, or upon the appointment of an Acceptable Operator as contract operator with respect to any JOA Assets, (a) the Borrowers shall cooperate in the transition of operations to such Acceptable Operator, and (b) FOA shall promptly deliver all relevant books and records and other property (including, without limitation, Intellectual Property) of FOA or any other former operator under the JOA over to such Acceptable Operator (or other successor operator, as applicable); provided that FOA shall have the right to retain copies of any books, records and other files.

**5.23** **SALE PROCEEDS.** The Borrowers shall deposit, and shall use reasonable efforts to cause third parties that would otherwise make payments directly to the Borrowers to deposit, into the Proceeds Account all proceeds from the sale of any gas and natural gas liquids produced from the Properties. All such proceeds of shall be applied and disbursed from the Proceeds Account as set forth in the Accounts Agreement.

**5.24** **USE OF FUNDS.** Borrowers agrees that payment of Project costs, expenses, and debt service, shall be made in the following order of priority:

**5.24.1** Necessary oil and gas lease rents, royalties, and ad valorem and production taxes as due;

**5.24.2** DR&R sinking fund as required by Borrowers' agreement with the Alaska Department of Natural Resources;

**5.24.3** Lease Operating Expenses incurred in accordance with Prudent Industry Practices;

**5.24.4** Capital Expenditures incurred in accordance with Prudent Industry Practices.

{01011050}}

**5.24.5** Capital Expenditure reserves appropriate based on Prudent Industry Practices.

**5.24.6** Principal and interest due on the AIDEA Loan, as provided in the AIDEA Loan Documents;

**5.24.7** Deposits to the Debt Service Reserve Account necessary to maintain the Reserve Account in accordance with Section 2.4;

**5.24.8** Fees and other amounts due the Authority under the terms of the AIDEA Loan Documents; and

**5.24.9** Principal and interest due on the Second Lien Term Loan and the New Term Loan as provided in the Intercreditor Agreements.

**5.25** **FINANCIAL COVENANTS.**

**5.25.1** *Debt Service Coverage Ratio.*  As of the last day of each fiscal quarter, Borrowers Debt Service Coverage Ratio shall be equal to or greater than 1.25 to 1.00.

**5.25.2** *Current Ratio.* As of the last day of each fiscal quarter, Borrowers Current Ratio shall be equal to or greater than 1.00 to 1.00.

**5.25.3** *Proved Reserves Coverage Ratio.* As of the last day of each fiscal quarter, Borrowers Proved Reserves Coverage Ratio shall be equal to or greater than 1.15:1.00.

**5.26** **STATE OF ALASKA ECONOMIC DEVELOPMENT**.  In order to promote economic development and access to natural gas resources throughout the State of Alaska, Borrowers agree that once Borrowers have achieved production of gas from the Sterling formation at sustained rates to negotiate rates at a meaningful discount level to be reasonably determined between the parties to the agreement for interruptible gas volumes produced by the Borrowers to underserved or constrained gas utilities in Alaska.  For purposes of this Section 5.26, the term "meaningful discount" does not require Borrowers to provide a discount that would materially impair Borrowers' financial capacity to make payments required to be made pursuant to the Second Lien Term Loan when due.

**5.27** **MEETING AND HEARINGS**.  For the twelve (12) month period following the Effective Date, Borrowers shall have an executive reasonably available to attend, in person or telephonically, scheduled meetings of the Authority's Board of Directors, or other scheduled public forums, including committee meetings of the Alaska Legislature, where the AIDEA Loan or the Project is on the agenda, if attendance is requested by the Authority.

{01011050}}

## ARTICLE 6
## NEGATIVE COVENANTS

Until the AIDEA Loan Termination Date:

**6.1**     **DEBT, LIENS AND OTHER ENCUMBRANCES**.

**6.1.1**     The Borrowers shall not incur, create, assume or permit to exist any Debt, except Permitted Debt.

**6.1.2**     The Borrowers shall not create, assume or suffer to exist any Lien or any other encumbrances on the Collateral, except Permitted Encumbrances, or assign any right to receive income.

**6.2**     **DIVIDENDS, DISTRIBUTIONS AND REDEMPTIONS**.   No Borrower shall pay, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so (including, unless otherwise agreed by the Authority, payment of any amount pursuant to a Contractual Obligation entered into by any Borrower and any Affiliate of any Borrower or payment of any expense reimbursement to any Affiliate of any Borrower (excluding any other Borrower)).

**6.3**     **RESTRICTIONS ON ASSET SALES**.   The Borrowers shall not sell, lease, assign, transfer or otherwise dispose of any assets (including without limitation any Equity Interests or working interests), whether now owned or hereafter acquired, except (a) sales of as-extracted hydrocarbons in the ordinary course of their business and at fair market value and for Cash (excluding, for the avoidance of doubt, any forward sale or volumetric or dollar denominated production payment), (b) sales, leases, assignments, transfers or other disposals of assets that are worn out or no longer usable in connection with the operation or maintenance of the Borrower's business for Cash and at fair market value, (c) other sales, leases, assignments, transfers or other disposals of assets that are: (i) in the ordinary course of business, (ii) for fair market value (as determined by the Authority acting reasonably), (iii) in exchange for 100% Cash or Cash Equivalent consideration, and (iv) either (x) in an aggregate amount not to exceed $100,000 in any fiscal year of the Borrowers or (y) result in proceeds that are sufficient to fully repay all of the Obligations outstanding under this Agreement in accordance with the AIDEA Intercreditor Agreement and such amounts are paid to the Authority, or (d) sales, assignments, encumbrances, pledges or other transfers of State Tax Credits and the proceeds thereof pursuant to Tax Credit Loan Documents and the New Term Loan Documents. The Borrowers shall not enter into any sale and leaseback or synthetic debt transactions.

**6.4**     **DISSOLUTION; MERGER; ACQUISITIONS**.   No Borrower shall not (a) wind up, liquidate or dissolve its affairs, or sell, lease or otherwise transfer or dispose of all or substantially all of its property, assets or business, (b) combine, merge or consolidate with or into any other entity, or (c) purchase or otherwise acquire all or substantially all of the assets of any Person.

**6.5**     **MATERIAL CHANGES IN BUSINESS; AMENDMENTS TO ORGANIZATIONAL DOCUMENTS**.   No Borrower shall (a) change the nature of its business or expand its business beyond the business contemplated in the AIDEA Loan Documents or activities incidental thereto or take any action, whether by acquisition or otherwise, which would constitute or result in any

{01011050}}

material alteration to the nature of such business; or (b) directly or indirectly, change its legal form or any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its limited liability company interest or otherwise terminate, amend or modify any such Organizational Document or agreement or any provision thereof, or enter into any new agreement with respect to its limited liability company interest, other than any such amendments, modifications or changes or such new agreements to which the prior written consent of the Authority acting reasonably.

**6.6      SUBSIDIARIES AND JOINT VENTURES**.  No Borrower shall (a) become a general or limited partner in any partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture, (b) form or hold any Equity Interest in any other Person, other than Cornucopia's ownership of Equity Interests of FOA, (c) engage in any business other than owning and operating the Properties of the Borrowers and related activities in the ordinary course of business consistent with past practice, (d) fail to maintain bank accounts and books of account separate from any other Person (other than, in the case of FOA, Cornucopia and in the case of Cornucopia, FOA), (e) fail to cause its liabilities to be readily distinguishable from the liabilities of another Person, or (f) fail to conduct its business solely in its own name in a manner not misleading to other Persons as to its identity.

**6.7      PROHIBITION ON ISSUANCE OF EQUITY INTEREST**.  No Borrower shall issue any additional Equity Interest on or following the Effective Date unless such issuance is approved by the Authority acting reasonably.

**6.8      NAME AND LOCATION; FISCAL YEAR**.  No Borrower shall change its name, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise), jurisdiction of organization, type of organization, sole place of business, chief executive office or fiscal year or establish any trade names unless such change is approved by the Authority acting reasonably.

**6.9      ACCOUNTS**.  The Borrowers shall not maintain any deposit or securities accounts other than (a) deposit accounts and securities accounts subject to Control Agreements or, subject to and in accordance with the AIDEA Intercreditor Agreement, control agreements in favor of the Authority, (b) each collateral account holding initial margin, variation margin and collateral or other performance assurance provided to the Borrowers by counterparties to the Borrowers' Contractual Obligations, (c) the [Tax Credit Collateral Account][6], provided that such account is subject to a control agreement in favor of the Tax Credit Agent or the New Term Loan Agent, as applicable in accordance with the Tax Credit Intercreditor Agreement and (d) accounts holding performance assurances of the Borrowers to Governmental Authorities pursuant to Applicable Law, and (e) any Operating Account (*provided* that such account is subject to a Control Agreement before any Cash is deposited into such Operating Account).[7]

**6.10      COMPLIANCE WITH ANTI-TERRORISM LAWS**.  The Borrowers shall not:

**6.10.1**  directly or indirectly, (i) conduct any operations in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (ii) conduct any business or engage in

---

[6]      Note to Draft: Tax Credit account mechanics to be discussed with V&E.
[7]      Note to Draft: List of permitted accounts subject to ongoing review.

{01011050}}

making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

      **6.10.2**  directly or indirectly cause or permit any of the funds of the Borrowers that are used to repay the AIDEA Loan or other Obligations to be derived from any unlawful activity with the result that the making of the AIDEA Loan would be in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

      **6.10.3**  cause or permit (i) a Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in any Borrower or (ii) any of the funds or properties of any Borrower that are used to repay the AIDEA Loan or other Obligations to constitute property of, or be beneficially owned directly or indirectly by, a Sanctioned Person; and

      **6.10.4**  deliver to the Authority any certification or other evidence requested from time to time by the Authority, confirming the compliance by each Borrower of this <u>Section 6.10</u>.

    **6.11**  **TRANSACTIONS WITH AFFILIATES**.  The Borrowers shall not directly or indirectly enter into any contract, transaction or series of transactions with or for the benefit of an Affiliate without the prior approval of the Authority except (a) in the ordinary course of business and on a commercially reasonable arms-length basis on terms at least as favorable to the Borrowers as terms that could have been obtained from a third party who was not an Affiliate, (b) the transactions contemplated by the JOA Operator Appointment Agreements, and (c) transactions between the Borrowers.

    **6.12**  **MATERIAL CONTRACTS**.  The Borrowers shall not assign any Material Contract without obtaining prior written consent from the Authority (which consent shall not be unreasonably withheld or delayed.  The Borrowers shall not enter into or become a party to any Additional Material Contract without (a) obtaining prior written consent from the Authority (which consent shall not be unreasonably withheld or delayed), (b) delivering such documents as shall be necessary or advisable for such Material Contract and the rights and interests thereunder to become subject to the Liens of the Security Documents, (c) providing an executed copy of such Additional Material Contract to the Authority and (d) procuring from each applicable counterparty to such Additional Material Contract a Consent to Assignment, if requested by the Authority, promptly upon the execution of such agreement or other written consent in form and substance reasonably satisfactory to the Authority.

    **6.13**  **PROHIBITION ON AMENDMENTS TO MATERIAL CONTRACTS**.

      **6.13.1**  The Borrowers shall not amend, modify, supplement or waive, accept, or permit or consent to the termination, amendment, modification, supplement or waiver (including any waiver (or refund) of damages (liquidated or otherwise) payable by any party under any Material Contracts (other than any Second Lien Document, New Term Loan Document, or Tax Credit Loan Document)) in any material respect of, any provision of, or give any material consent under any of the Material Contracts (other than any Second Lien Document, New Term Loan

Document, or Tax Credit Loan Document) without the prior written consent of the Authority, which shall not be unreasonably withheld or delayed.

6.13.2  The Borrowers shall not terminate, amend, modify, supplement or waive or accept, permit or consent to the termination, amendment, modification, supplement or waiver of, any JOA Operator Appointment Agreements, or the PRA Management Agreement; *provided, however*, the PRA Management Agreement may be terminated, amended, modified, supplemented or waived with the unanimous consent of the board of managers of the Borrowers.

6.13.3  The Borrowers shall not amend, modify, supplement or waive or accept, or permit or consent to the amendment, modification, supplement or waiver of, any Second Lien Document, New Term Loan Document, Tax Credit Loan Document unless permitted under the Intercreditor Agreements.

6.14   USE OF COLLATERAL.  The Borrowers shall not use, or permit to be used, the Collateral for any purpose other than for the operation of the Project as contemplated by the AIDEA Loan Documents and the Material Contracts.

6.15   ASSIGNMENT.  The Borrowers shall not assign its rights hereunder or under any of the AIDEA Loan Documents to any Person without the prior written consent of the Authority.

6.16   HAZARDOUS SUBSTANCE.  The Borrowers shall not Release into the environment any Hazardous Substances in violation of any Legal Requirements, including Environmental Laws, or any material Permits, except for violations with respect to which (a) the Release (i) is not continuing or reasonably likely to re-occur and is not susceptible to cure or (ii) is continuing but is susceptible to cure and which either Borrower is diligently and in good faith attempting to correct, (b) there are no unsatisfied reporting or remediation requirements under applicable Legal Requirements, including Environmental Laws, or material Permits, and (c) no material non-monetary penalties or sanctions have been imposed or are reasonably likely to be imposed (except for the remediation of such violation) under applicable Legal Requirements, including Environmental Laws, or material Permits.

## ARTICLE 7
## EVENTS OF DEFAULT; REMEDIES

7.1   EVENTS OF DEFAULT.  The occurrence of any of the following events shall constitute an event of default (each an **"Event of Default"**) hereunder:

7.1.1   *Failure to Make Payments.*  Any Borrower shall fail to pay, in accordance with the terms of this Agreement, (a) any principal of the AIDEA Loan on the date that such sum is due, or (b) any interest on the AIDEA Loan or any other Obligation, any scheduled fee, cost, charge, sum or amount due hereunder or under the other AIDEA Loan Documents, or any other fee, cost, charge, sum or other amount due under this Agreement within five (5) Banking Days after such sum is due.

{01011050}

### 7.1.2    *Violation of Covenants*.

(a)        Any Borrower fails to perform or observe any of the covenants set forth in <u>Sections 5.3</u> (*Existence; Maintenance of Contracts*), <u>5.6</u> (*Taxes*), <u>5.7</u> (*Warranty of Title*), <u>5.16</u> (*Insurance*), or <u>Article 6</u> and such failure shall continue un-remedied for a period of ten (10) days.

(b)        Any Borrower shall fail to perform or observe any other covenant to be observed or performed by it hereunder or any other AIDEA Loan Document not otherwise specifically provided for in <u>clause (a)</u> above and such failure shall continue unremedied for a period of 10 days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Authority.

(c)        Any AIDEA Loan Document or any material provision thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Borrower or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Borrower shall repudiate or deny any portion of its liability or obligation for the Obligations.

### 7.1.3    *Representations and Warranties*.    Any representation, warranty, certification or statement of fact made or deemed made by any Borrower herein or by any Borrower in any other AIDEA Loan Document or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made (except to the extent qualified as to materiality (including Material Adverse Effect) in which case a default shall occur if such representation, warranty, certification or statement of fact made or deemed to be made shall be untrue in any respect).

### 7.1.4    *Change of Control*.  A Change of Control occurs.

### 7.1.5    *Bankruptcy* or *Insolvency*. Any Borrower shall become subject to a Bankruptcy Event.

### 7.1.6    *Judgments*.  A final judgment or judgments (including with respect to Environmental Claims) shall be entered against any Borrower in the amount of $100,000 or more individually or in the aggregate or a final judgment shall be entered against any Borrower which if left unstayed could reasonably be expected to result in losses or liabilities in excess of $100,000 or a Material Adverse Effect (other than (i) a judgment which is fully covered by insurance (subject to applicable deductibles) as to which the insurer does not dispute coverage or is discharged within 30 days after its entry, or (ii) a judgment the execution of which is effectively stayed within 30 days after its entry unless, after the entry of such stay, there shall be a period of more than 30 consecutive days during which the execution of such judgment is not effectively stayed).

### 7.1.7    *Debt Cross Default*. *(*a) Failure of any Borrower to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Debt (other than the AIDEA Loan) in an individual principal amount of $100,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any provided therefore, (b) breach or default by any Borrower

{01011050}}

with respect to any other material term of (i) one or more items of Debt (other than the AIDEA Loan) in the individual or aggregate principal amounts referred to in clause (a) above or (ii) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Debt, in each case beyond the grace period, if any, provided therefor, and the effect (but without giving effect to any waivers or extensions granted by any such holder of such Debt (or a trustee or agent on behalf of such holder or holders)) of the occurrence of such breach or default is to cause, or to permit the holder of such Debt (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Debt to be demanded or to become or be declared due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be or (c) an Event of Default (as defined in any of the Second Lien Credit Agreement, the Tax Credit AIDEA Loan Agreement or the New Term Loan Agreement) shall occur after the Effective Date.

**7.1.8** *Breach of Material Contract.*

(a)　　　Any Borrower shall be in breach of, or in default under, any material term, condition, covenant or obligation under a Material Contract and such breach or default shall not be remediable or, if remediable, either Borrower, as applicable, shall fail to cure or otherwise remedy such breach within the cure period provided in such Material Contract; *provided*, however that a Kitchen Lights Unit Agreement Default shall not constitute a breach of or default unless and until the Department of Natural Resources of the State of Alaska reaches a resolution in respect thereto that is materially adverse to the Authority.

(b)　　　At any time after the execution and delivery thereof, any Material Contract or any material provision hereof or thereof (1) ceases to be in full force and effect or to be valid and binding on any party thereto (other than by reason of the satisfaction of performance of such agreement or provision or any termination thereof in accordance with the terms thereof) or any such party shall so state in writing, or such agreement is assigned or otherwise transferred (except as otherwise required or expressly permitted hereunder or thereunder) or is prematurely terminated by any party thereto, (2) is or becomes invalid, illegal or unenforceable, or any party hereto or thereto repudiates or disavows such agreement in writing or takes any action to challenge the validity or enforceability of such agreement, (3) is declared null and void by a Governmental Authority of competent jurisdiction or written notice is given by any Governmental Authority or applicable counterparty contesting the validity or enforcement thereof, or (4) fails to or ceases to provide the rights, powers and privileges purported to be created thereby or hereby.

**7.1.9** *ERISA.* (a) An ERISA Event occurs which has resulted or could reasonably be expected to result, individually or in the aggregate, in liability of Borrower in an aggregate amount in excess of $100,000, or (b) Borrower fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan.

**7.1.10** *Invalidity of Documents.*

(a)         Any material provision of any AIDEA Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect;

(b)         any Borrower or any other Person a party thereto (other than the Authority) contests in writing the validity or enforceability of any provision of any AIDEA Loan Document; or

(c)         any Borrower denies in writing that any Borrower has any or further liability or obligation under any AIDEA Loan Document, or purports in writing to revoke, terminate or rescind any AIDEA Loan Document.

**7.1.11** *Loss of Collateral.*  Any substantial portion of any Borrower's Properties are damaged or seized or appropriated by any Governmental Authority, without appropriate Insurance Proceeds (subject to the underlying deductible) or fair compensation being paid therefor so as to allow replacement of such property or prepayment of the AIDEA Loan and to allow any Borrower, in the Authority's reasonable judgment, to continue to satisfy its obligations hereunder and under the other AIDEA Loan Documents.

**7.1.12** *Security.*  Any of the AIDEA Security Documents, once executed and delivered, shall, except as the result of the acts or omissions of the Authority with respect to any Collateral in its possession, fail to provide the Authority  the Liens (or the priority thereof), rights, titles, interest, remedies permitted by law, powers or privileges intended to be created thereby with respect to the Collateral or, except in accordance with its terms, cease to be in full force and effect, or the priority set forth in the Intercreditor Agreements or validity thereof (except as permitted hereby) or the applicability thereof to the AIDEA Loan, the Obligations or any other obligations purported to be secured or guaranteed thereby or any part thereof shall be disaffirmed in writing by or on behalf of any Borrower.

**7.1.13** *Loss of, Failure to Obtain or Breach of Permits.*

(a)         Any Borrower, as of any date, shall fail to possess any Applicable Permit necessary in connection with the transactions contemplated in the AIDEA Documents where such failure could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect, and such failure shall continue unremedied for a period of forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Authority.

(b)         Any Applicable Permit necessary in connection with the transactions contemplated in the AIDEA Loan Documents shall be materially modified (other than modifications requested by the Borrowers and approved in writing in advance of such modification by the Authority acting reasonably), revoked, canceled or not renewed by the issuing agency or other Governmental Authority having jurisdiction where such modification, revocation, cancellation or nonrenewal could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect, and such modification, revocation, cancellation or nonrenewal of such Applicable Permit shall continue unremedied for a

41

{01011050}}

period of forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Authority.

(c)      Any Borrower shall be in breach of or in default under any material term, condition, covenant or obligation under any Applicable Permit where such breach or default could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect and such breach or default shall not be remediable or, if remediable, any Borrower shall fail to cure or otherwise remedy such breach or default within forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Authority.

**7.1.14** *Operator Under JOA.*  None of FOA, Corsair or an Acceptable Operator is the operator under the JOA with respect to the JOA Assets.

**7.1.15** *Abandonment.*  An Abandonment shall have occurred.

**7.1.16** *Permanent Midstream Shutdown.*  A Permanent Midstream Shutdown shall have occurred.

**7.2**      **REMEDIES**.  Upon the occurrence and during the continuation of an Event of Default, subject to the Intercreditor Agreements, the Authority is vested with the exclusive right to, and, without further notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind, all such notices and demands being waived, may exercise any or all of the following cumulative and non-exclusive rights and remedies, in any combination or order that the Authority may elect, in addition to such other rights or remedies as the Authority may have hereunder, under the AIDEA Loan Documents, any instrument, document or agreement now existing or hereafter arising, or at law or in equity:

**7.2.1**      *Cure by the Authority*. Without any obligation to do so, make disbursements on behalf of the Borrowers to cure any Event of Default hereunder and to cure any default and render any performance under any Material Contracts as the Authority in its sole discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Authority's interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by the Borrowers to the Authority on demand and secured by the AIDEA Loan Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the aggregate amount of the AIDEA Loan.

**7.2.2**      *Acceleration*. Declare and make all sums of outstanding principal, all accrued but unpaid interest remaining under this Agreement and any outstanding AIDEA Loan and other Obligations, together with all unpaid fees, costs and charges due hereunder or under any other AIDEA Loan Document, (the "**Acceleration Amounts**") immediately due and payable and require the Borrowers, immediately, without presentment, demand, protest or other notice of any kind, all of which the Borrowers hereby expressly waives, to pay the Authority, as applicable, an amount in immediately available funds equal to the aggregate amount of all such Acceleration Amounts.

{01011050}}

**7.2.3**    *Cash Collateral.*    Apply or execute upon any amounts on deposit or any proceeds or any other moneys of any Borrower on deposit with the Authority (as applicable) in the manner provided in the UCC and other relevant Applicable Law with respect to Cash collateral.

**7.2.4**    *Foreclose on Collateral.*    Exercise any or all of its rights as a secured creditor under the UCC, and any or all rights granted by this Agreement and by law, including the right to require the Borrowers to assemble the Collateral and make it available to the Authority at a place to be designated by the Authority.  The Borrowers hereby agree that three (3) Banking Days' notice of a public sale of any Collateral or notice of the date after which a private sale of any Collateral may take place is commercially reasonable.

**7.2.5**    *Remedies Under AIDEA Loan Documents*. Exercise any and all rights and remedies available to it under any of the AIDEA Loan Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral pursuant to the AIDEA Security Documents.

**ARTICLE 8**
**[RESERVED]**

**ARTICLE 9**
**MISCELLANEOUS**

**9.1**    **ADDRESSES**.    Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to the Authority:

Alaska Industrial Development and Export Authority
813 W. Northern Lights Blvd.
Anchorage, Alaska 99503
Attention: Executive Director
Phone: +1 (907) 771-3050
E-mail: aweitzner@aidea.org


With a copy (which will not constitute notice) to:

Jermain, Dunnagan & Owens, P.C.
3000 A St, Ste 300
Anchorage, Alaska 99503
Attention: Mark Melchert
Phone: 907-563-8844
E-mail: mmelchert@jdolaw.com

{01011050}}

If to the Borrowers:

HEX Cook Inlet LLC
Cornucopia Oil & Gas Company, LLC
Corsair Oil & Gas Company, LLC
Furie Operating Alaska, LLC
Attention: Kevin Hemenway188 W. Northern Lights Blvd., Suite 620
Anchorage, AK 99503
Phone: 907-565-2011
Fax: 907-277-3796
E-mail: hemenwayk@aol.com

With a copy (which will not constitute notice) to:

David H. Bundy, Esq.
721 Depot Drive
Anchorage AK 99501
Phone: (907) 248-8431

E-mail: dhb@alaska.net

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service, (c) in the event overnight delivery services are not readily available, if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested or (d) if sent by telecopy or electronic mail (in portable document format).  Notice so given shall be effective upon receipt by the addressee, except that communication or notice so transmitted by telecopy or other direct written electronic means (including e-mail) shall be deemed to have been validly and effectively given on the day (if a Banking Day and, if not, on the next following Banking Day) on which it is transmitted if transmitted before 5:00 p.m., Alaska time, recipient's time, and if transmitted after that time, on the next following Banking Day; *provided, however,* that if any notice is tendered to an addressee and the delivery thereof is refused by such addressee, such notice shall be effective upon such tender.  Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of 30 days' notice to the other parties in the manner set forth hereinabove.

**9.2**    **RIGHT TO SET-OFF**.  In addition to any rights now or hereafter granted under Applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Authority is hereby authorized at any time or from time to time, to the extent permitted under applicable Legal Requirements, without presentment, demand, protest or other notice of any kind to the Borrowers or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Authority (including by branches and agencies of the Authority wherever located) to or for the credit or the account of the Borrowers, against and on account of the Obligations of the Borrowers hereunder,

{01011050}}

irrespective of whether or not the Authority shall have made any demand hereunder and although said Obligations, or any of them, shall be contingent or unmatured.

**9.3     DELAY AND WAIVER**.  No delay or omission to exercise any right, power or remedy accruing to the Authority upon the occurrence of any Default or Event of Default or any breach or default by the Borrowers under this Agreement or any other AIDEA Loan Document shall impair any such right, power or remedy of the Authority, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single Event of Default, Default or other breach or default be deemed a waiver of any other Event of Default, Default or other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of the Authority of any Event of Default, Default or other breach or default under this Agreement or any other AIDEA Loan Document, or any waiver on the part of the Authority of any provision or condition of this Agreement or any other AIDEA Loan Document, must be in writing and shall be effective only to the extent in such writing specifically set forth.

**9.4     COSTS, EXPENSES AND ATTORNEYS' FEES**. From and after the Effective Date, the Borrowers will pay to the Authority, upon five (5) Banking Days' written demand therefor, all of their documented out-of-pocket costs and expenses (limited, in the case of legal and advisory expenses, to the reasonable and documented fees, disbursements, and other charges of one outside counsel, one local Delaware counsel, and one financial advisor for the Authority (and, in each case, as selected by the Authority)) expended or incurred in connection with due diligence investigation, travel expenses, the administration of this Agreement (including, but not limited to, all expenses and costs incurred pursuant to <u>Section 5.9</u>), the other AIDEA Loan Documents, and any other documents related thereto or contemplated hereby.  The Borrowers will reimburse the Authority, and its respective related Indemnitees, for all reasonable and documented actual costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred by the Authority in enforcing this Agreement or the other AIDEA Loan Documents and in connection with a Default or Event of Default, including in connection with actions for declaratory relief in any way related to this Agreement or the other AIDEA Loan Documents and in collecting any sum which becomes due to the Authority under the AIDEA Loan Documents.  The provisions of this <u>Section 9.4</u> shall survive foreclosure of the AIDEA Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrowers' obligations hereunder, and shall be in addition to any other rights and remedies of the Authority and its Affiliates. For the avoidance of doubt, the reimbursement rights provided for in this <u>Section 9.4</u> shall not extend to any costs, fees or expenses arising in connection with or resulting from a Specified Claim.

**9.5     ENTIRE AGREEMENT**.  This Agreement, the other AIDEA Loan Documents, and any other agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Agreement or any AIDEA Loan Document, this Agreement and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement shall prevail.  This Agreement and the other AIDEA Loan Documents may only be amended or modified in writing signed by authorized representatives of each party.

{01011050}}

**9.6**       **GOVERNING LAW**.  This Agreement, and any instrument or agreement required hereunder (to the extent not otherwise expressly provided for therein), shall be governed by, and construed under, the laws of the State of Alaska, without regard to the conflict of law principles that would result in the application of any law other than the law of the State of Alaska.

**9.7**       **CONFIDENTIALITY**.  No party hereto, in its capacity as a receiving party, shall disclose any Confidential Information to any third party without the prior written consent of the party delivering such Confidential Information (*provided* that any disclosure of Confidential Information described in clause (a) of the definition thereof shall require the prior consent of the Borrowers), other than:

(a)       in the case of disclosure by the Authority, (i) to the Authority's auditors, officers, directors, employees, agents, advisors, funding sources, investors, potential investors, potential lenders (including potential purchasers of the AIDEA Loan and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential)), (ii) to any other Person party hereto, (iii) to actual or prospective lenders or credit default providers, in each case on a confidential basis, (iv) to actual or prospective participants, in each case on a confidential basis, (v) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law, (vi) in connection with any litigation, arbitration or other legal proceeding to which the Authority is a party, (vii) to the lenders and agents under the AIDEA Loan Agreement, the Second Lien Credit Agreement, the Tax Credit Loan Agreement and the New Term Loan Agreement, (viii) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking or (ix) in connection with the exercise of any remedies hereunder or under any other AIDEA Loan Document or any action or proceeding relating to this Agreement or any other AIDEA Loan Document or the enforcement of rights hereunder or thereunder (including any judicial or non-judicial foreclosure);

(b)       [Reserved]; or

(c)       in the case of disclosure by the Borrowers, (i) to the Borrowers' auditors, officers, directors, employees, agents, representatives, advisors, funding sources, investors, potential investors and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, (iii) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law or (iv) in connection with any litigation, arbitration or other legal proceeding to which the Borrowers are a party.

**9.8**       **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, (a) the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which come as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

{01011050}}

**9.9** **HEADINGS**.  Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

**9.10** **ACCOUNTING TERMS**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and practices consistent with those applied in the preparation of the financial statements submitted by the Borrowers to the Authority, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles and practices.

**9.11** **NO PARTNERSHIP**.  The Authority and the Borrowers intend that the relationship between them shall be solely that of creditor and debtor.  Nothing contained in this Agreement, the Note or in any of the other AIDEA Loan Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between the Authority and the Borrowers or any other Person.  The Authority shall not be in any way responsible or liable for the debts, losses, obligations or duties of the Borrowers or any other Person or with respect to the Properties of the Borrowers or otherwise.  All obligations to pay real property or other taxes, assessments, insurance premiums, and all other fees and charges arising from the ownership, operation, lease or occupancy of the Properties of the Borrowers and to perform all obligations and other agreements and contracts relating to the Properties of the Borrowers shall be the sole responsibility of the Borrowers, as applicable.

The Borrowers acknowledge that the Authority may be providing debt financing, equity capital or other services to other companies in respect of which the Borrowers may have conflicting interests regarding the transactions described herein and otherwise.  The Borrowers acknowledge that the Authority has no obligation to use in connection with the transactions contemplated hereby, or to furnish to the Borrowers, Confidential Information obtained from other companies.

The Borrowers further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between the Borrowers and the Authority is intended to be or has been created in respect of any of the transactions contemplated by this Agreement and the other AIDEA Loan Documents, irrespective of whether the Authority has advised or is advising the Borrowers on other matters, (b) the Authority, on the one hand, and the Borrowers, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do the Borrowers rely on, any fiduciary duty on the part of the Authority, (c) the Borrowers are capable of evaluating and understanding, and the Borrowers understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other AIDEA Loan Documents, (d) the Borrowers have been advised that the Authority is engaged in a broad range of transactions that may involve interests that differ from the Borrowers' interests and that the Authority does not have any obligation to disclose such interests and transactions to the Borrowers by virtue of any fiduciary, advisory or agency relationship and (e) the Borrowers waive, to the fullest extent permitted by law, any claims the Borrowers may have arising out of or in connection with the transactions contemplated by this Agreement and the other AIDEA Loan Documents against the Authority for breach of fiduciary duty or alleged breach of fiduciary duty and agree that the Authority shall not have any liability (whether direct or indirect) to the Borrowers in

{01011050}}

respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of the Borrowers, including the Borrowers' stockholders, employees or creditors.

**9.12    AIDEA SECURITY DOCUMENTS**.  Reference is hereby made to the AIDEA Security Documents for the provisions, among others, relating to the nature and extent of the security provided thereunder; the rights, duties and obligations of the Borrowers party thereto; and the rights of the Authority with respect to such security.

**9.13    LIMITATION ON LIABILITY**.  No Claim shall be made by any party to this Agreement or any of their respective Affiliates against any other party hereto or the Authority or any of its Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether or not the Claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or the other AIDEA Loan Documents or any act or omission or event occurring in connection therewith; and each party hereto hereby waives, releases and agrees not to sue upon any such Claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; *provided*, *however*, that no party shall be required to waive Claims against the Borrowers; *provided*, *however*, neither this limitation of liability nor this exception shall limit in any manner the releases set forth in this Agreement or the AIDEA Loan Documents.

For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, nothing herein shall limit the right or ability of any Person that is a lender (whether in its capacity as the Authority or otherwise) to make a Claim against any Person in respect of a document or agreement other than this Agreement, the Note and the AIDEA Security Documents.

**9.14    WAIVER OF JURY TRIAL**.    THE LENDER AND THE BORROWERS, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER AND THE BORROWERS TO ENTER INTO THIS AGREEMENT.

**9.15    CONSENT TO JURISDICTION**.  The Authority and the Borrowers agree that any legal action or proceeding by or against the Borrowers, or with respect to or arising out of or relating to this Agreement, the Note, or any other AIDEA Loan Documents, may be brought in or removed to the courts of the State of Alaska, in and for the Third Judicial District, located in Anchorage, Alaska, or, to the extent permitted by Applicable Law, of any federal court sitting in Anchorage, Alaska.  By execution and delivery of this Agreement, each of the Authority and the Borrowers accept, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall limit the right of the Authority to sue in any other jurisdiction in connection with the exercise of the rights under any AIDEA Security Documents or the enforcement of any judgment.  The Authority and the Borrowers irrevocably consent to the service of process out of any of the aforementioned courts in any manner permitted by Applicable Law.  The Authority and the Borrowers further agree that the aforesaid courts of the State of Alaska and of the United States of

{01011050}}

America shall have exclusive jurisdiction with respect to any claim or counterclaim of the Borrowers based upon the assertion that the rate of interest charged by the Authority on or under this Agreement, the AIDEA Loan or the other AIDEA Loan Documents is usurious. The Authority and the Borrowers hereby waive, to the extent permitted by Applicable Law, any claim, objection or right to stay or dismiss any action or proceeding under or in connection with this Agreement or any other AIDEA Loan Document brought before the foregoing courts on the basis of *forum non-conveniens.*

**9.16** **KNOWLEDGE AND ATTRIBUTION**.  References in this Agreement and the otherAIDEA Loan Documents to the "knowledge," "best knowledge" or facts and circumstances "known to" the Borrowers, and all like references, mean facts or circumstances of which a Responsible Officer of the Borrowers or other relevant Person has actual knowledge after reasonable due inquiry.

**9.17** **SUCCESSORS AND ASSIGNS; NO THIRD-PARTY BENEFICIARIES**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The Borrowers may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Authoritys in their sole and absolute discretion.  The Authority may assign all or a portion of the AIDEA Loan and sell participations in such AIDEA Loan.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and permitted assigns and participants, in the case of <u>Sections 5.14</u>, and <u>9.4</u>, Indemnitees) any legal or equitable right, remedy or Claim under or by reason of this Agreement.

**9.18** **USURY SAVINGS CLAUSE**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under Applicable Law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the AIDEA Loan made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect.  In addition, if when the AIDEA Loan made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrowers shall pay to the Authority an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of the Authority and the Borrowers to conform strictly to any applicable usury laws.  Accordingly, if the Authority contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at the Authority's option be applied to the outstanding amount of the AIDEA Loan made hereunder or be refunded to the Borrowers.

**9.19** **COUNTERPARTS**.  This Agreement may be executed in one or more counterparts, and by the parties hereto in separate counterparts, each of which when executed shall be deemed

{01011050}}

to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or electronic means in portable document format of an executed counterpart of a signature page of this Agreement (or of an executed counterpart of any amendment or waiver of this Agreement or any Exhibit hereto to be executed and delivered hereunder) shall be as effective as delivery of a manually executed counterpart hereof.

9.20     [RESERVED].

9.21     JOINT AND SEVERAL LIABILITY.

  **9.21.1** *Joint and Several Liability*. All Obligations of Borrowers under this Agreement and the other AIDEA Loan Documents shall be joint and several Obligations of each Borrower, and each of the Borrowers hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with respect to the payment and performance of all such Obligations. Anything contained in this Agreement and the other AIDEA Loan Documents to the contrary notwithstanding, the Obligations of each Borrower hereunder, solely to the extent that such Borrower did not receive proceeds of AIDEA Loan from any borrowing hereunder, shall be limited to a maximum aggregate amount equal to the largest amount that would not render its Obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under section 548 of the Bankruptcy Code or any applicable provisions of comparable state law (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of such Borrower, contingent or otherwise, that are relevant under the Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Borrower in respect of intercompany Debt to the other Borrower or their respective Affiliates (other than such Borrower) to the extent that such Debt would be discharged in an amount equal to the amount paid by such Borrower hereunder) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation or contribution of such Borrower pursuant to Applicable Law.

  **9.21.2** *Subrogation*. Until the Obligations shall have been paid in full in Cash, each Borrower shall withhold exercise of any right of subrogation, contribution or any other right to enforce any remedy which it now has or may hereafter have against the other Borrowers or any other guarantor of the Obligations. Each Borrower further agrees that, to the extent the waiver of its rights of subrogation, contribution and remedies as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any such rights such Borrower may have against the other Borrower, any collateral or security or any such other guarantor, shall be junior and subordinate to any rights the Authority may have against the other Borrower, any such collateral or security, and any such other guarantor. The Borrowers under this Agreement and the other AIDEA Loan Documents together desire to allocate among themselves, in a fair and equitable manner, their Obligations arising under this Agreement and the other AIDEA Loan Documents. Accordingly, in the event any payment or distribution is made on any date by any Borrower under this Agreement and the other AIDEA Loan Documents (a **"Funding Borrower"**) that exceeds its Obligation Fair Share (as defined below) as of such date, that Funding Borrower shall be entitled to a contribution from the other Borrower in the amount of such other Borrower's Obligation Fair Share Shortfall (as defined below) as of such date, with the result that all such contributions will cause each Borrower's Obligation Aggregate Payments (as defined below) to equal its Obligation Fair Share as of such date. **"Obligation Fair Share"** means, with respect to

a Borrower as of any date of determination, an amount equal to (i) the ratio of (x) the Obligation Fair Share Contribution Amount (as defined below) with respect to such Borrower to (y) the aggregate of the Obligation Fair Share Contribution Amounts with respect to all Borrowers, multiplied by (ii) the aggregate amount paid or distributed on or before such date by the Funding Borrower under this Agreement and the other AIDEA Loan Documents in respect of the Obligations guaranteed. **"Obligation Fair Share Shortfall"** means, with respect to a Borrower as of any date of determination, the excess, if any, of the Obligation Fair Share of such Borrower over the Obligation Aggregate Payments of such Borrower. **"Obligation Fair Share Contribution Amount"** means, with respect to a Borrower as of any date of determination, the maximum aggregate amount of the Obligations of such Borrower under this Agreement and the other AIDEA Loan Documents that would not render its Obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; *provided* that, solely for purposes of calculating the Obligation Fair Share Contribution Amount with respect to any Borrower for purposes of this Section 9.21, any assets or liabilities of such Borrower arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or Obligations of contribution hereunder shall not be considered as assets or liabilities of such Borrower. **"Obligation Aggregate Payments"** means, with respect to a Borrower as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Borrower in respect of this Agreement and the other AIDEA Loan Documents (including in respect of this Section 9.21) minus (ii) the aggregate amount of all payments received on or before such date by such Borrower from the other Borrower as contributions under this Section 9.21. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Borrower. The allocation among Borrowers of their Obligations as set forth in this Section 9.21 shall not be construed in any way to limit the liability of any Borrower hereunder or under any AIDEA Document.

      **9.21.3** *Representative of Borrowers*. FOA hereby appoints Cornucopia as its agent, attorney-in-fact and representative for the purpose of (i) making any borrowing requests or other requests required under this Agreement, (ii) the giving and receipt of notices by and to the Borrowers under this Agreement, (iii) the delivery of all documents, reports, financial statements and written materials required to be delivered by the Borrowers under this Agreement, and (iv) all other purposes incidental to any of the foregoing. FOA agrees that any action taken by Cornucopia as the agent, attorney-in-fact and representative of FOA shall be binding upon FOA to the same extent as if directly taken by FOA. Corsair hereby appoints Cornucopia as its agent, attorney-in-fact and representative for the purpose of (i) the giving and receipt of notices by and to the Borrowers under this Agreement, (ii) the delivery of all documents, reports, financial statements and written materials required to be delivered by the Borrowers under this Agreement, and (iii) all other purposes incidental to any of the foregoing. Corsair agrees that any action taken by Cornucopia as the agent, attorney-in-fact and representative of Corsair shall be binding upon Corsair to the same extent as if directly taken by Corsair.

      **9.21.4** *Obligations Absolute*. Each Borrower hereby waives, for the benefit of the beneficiaries: (a) any right to require any Secured Party, as a condition of payment or performance by such Borrower, to (i) proceed against any other Borrower or any other Person, (ii) proceed against or exhaust any security held from any other Borrower, any guarantor or any other Person,

(iii) proceed against or have resort to any balance of any Deposit Account, securities account or credit on the books of any Secured Party in favor of any other Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or defense of any other Borrower based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any other Borrower from any cause other than payment in full of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Borrower's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Borrower's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**9.22      ALASKA MORTGAGE PROVISIONS**.  The Borrowers are personally obligated and fully liable for the amount due under the Agreement and the other AIDEA Documents.  The Authority has the right to sue on the Agreement and obtain a personal judgment against Borrowers for satisfaction of the amount due under the Agreement and the other AIDEA Loan Documents either before or after a judicial foreclosure of the mortgage or deed of trust under AS 09.45.170 – 09.45.220.

**9.23      AIDEA LOAN DOCUMENTS.**

(a)      Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Authority pursuant to the AIDEA Security Documents and the exercise of any right or remedy by the Authority hereunder and thereunder are subject to the provisions of the Intercreditor Agreements to which AIDEA is party.  In the event of any conflict between the terms of such Intercreditor Agreements and this Agreement, the terms of such Intercreditor Agreements shall govern and control.

(b)      Each Borrower agrees that the Second Lien Credit Agreement and each Second Lien Security Document shall each include the following language (or language to similar effect approved by the Authority):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Second Lien Agent pursuant to the Second Lien Security Documents and the exercise of any right or remedy by the Second Lien Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between AIDEA and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor. In the event of any conflict between the terms of the

{01011050}}

Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

(c)    Each Borrower agrees that the New Term Loan Agreement and each New Term Loan Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the New Term Loan Agent pursuant to the New Term Loan Collateral Documents and the exercise of any right or remedy by the New Term Loan Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent, the Tax Credit Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor. In the event of any conflict between the terms of the Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

(d)    Each Borrower agrees that the Tax Credit Loan Agreement and each Tax Credit Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Tax Credit Agent pursuant to the Tax Credit Collateral Documents and the exercise of any right or remedy by the Tax Credit Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between ING Capital, LLC as Tax Credit Agent, the New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor. In the event of any conflict between the terms of the Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

**9.24    AIDEA DOCUMENTS**.  Each Borrower agrees it shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Authority may request to effectuate the terms of and the Lien priorities contemplated by the AIDEA Loan Documents.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**EXHIBIT A**

DEFINITIONS

"**Abandonment**" means a permanent abandonment by the Borrowers of the operation of one or more of the Platform, Pipeline or Processing Plant or of one or more of the Wells or the cessation of any construction or operating activities on the Platform, Pipeline or Processing Plant for more than 90 consecutive days; *provided* that if the Borrowers provide notice of the events triggering the Borrowers' duty to provide notice under Section 5.18, or if the events under Section 5.18 that trigger the Borrowers' duty to provide notice have occurred but the Borrowers fail to provide such notice, then an Abandonment shall be deemed to have occurred.

"**Acceleration Amounts**" has the meaning assigned to such term in Section 7.2.2.

"**Acceptable Operator**" means, any Person that has substantial experience as an operator of production and midstream facilities similar to the production and midstream facilities of the Borrowers and acceptable to the Authority acting reasonably.

"**Accounts Agreement**" means the Accounts Agreement, dated as of [●] among the Borrowers, the Authority and the Depositary.

"**Additional Material Contract**" means any contract or series of related contracts to which any Borrower is a party or to which their assets are bound that is material to the business or operations of the Borrowers or the Properties of the Borrowers or the termination of which would reasonably be expected to result in liabilities or losses in excess of $100,000 or cause a Material Adverse Effect.  Each such contract or series of related contracts that requires payments by or contemplates payments to any Borrower of more than $500,000 during the term of such contract shall be deemed an Additional Material Contract.

"**Affiliate**" of a specified Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, or that holds or beneficially owns 10% or more of the Equity Interests in the Person specified or 10% or more of the voting securities of the Person specified; *provided*, that in no event shall the Authority or any agency, public corporation or political subdivision of the State of Alaska be considered an Affiliate of the Borrowers.

"**Agreement**" has the meaning given in the preamble of this Agreement.

"**AIDEA Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between the Authority and the Second Lien Agent, and acknowledged and agreed to by the Borrowers.

"**AIDEA Loan Documents**" means, collectively, this Agreement, the Note and the Security Documents, together with all agreements, documents, instruments and certificates, delivered or executed by any of the Borrowers from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof.

"**AIDEA Loan**" has the meaning given in <u>Section 2.1.1(a)</u> of this Agreement.

"**AIDEA Loan Obligations**" has the meaning given in the AIDEA Intercreditor <u>Agreement.</u>.

"**AIDEA Security Documents**" means the Pledge and Security Agreement, the Pledge Agreement, the Mortgage, the Control Agreements, any account control agreement entered into by either Borrower, the Intercreditor Agreements, any fixture filings, financing statements or other certificates executed, filed or recorded in connection with the foregoing, and all other instruments, documents and agreements delivered by or on behalf of either Borrower pursuant to the Agreement or any of the other AIDEA Loan Documents in order to grant to, or perfect in favor of, the Authority, a Lien on any real, personal or mixed property of that Borrower as security for the Obligations.

"**AIDEA Loan Termination Date**" means the date on which (a) the principal of and interest on the AIDEA Loan, and all fees and other amounts payable hereunder and under the other AIDEA Loan Documents shall have been paid in full in Cash and (b) all other Obligations hereunder and under the other AIDEA Loan Documents have been satisfied (other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no claim has been asserted).

"**Alaska Taxes**" means any Taxes imposed by the State of Alaska or any governmental authority therein or any royalty-in-value obligations owed to the State of Alaska or any governmental authority therein, in each case that could reduce, offset, withhold or delay payment on the State Tax Credits and that are reasonably expected to be payable by the Borrowers.

"**AML Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Authority, the Borrowers from time to time concerning or relating to anti-money laundering.

"**Anchorage Recording District**" means that Recorder's Office for the District of Anchorage in which oil or gas liens are recorded.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Borrowers from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Anti-Terrorism Laws**" means any of the following: (a) the Anti-Terrorism Order; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Patriot Act; (f) any regulations promulgated pursuant to any of the foregoing or (g) comparable laws, rules and directives administered or enforced by the United Nations Security Council, the European Union, or a member state of the European Union.

"**APC**" means Alaska Pipeline Company, an Alaska corporation.

"**APC Gas Sales Agreement**" means the Gas Sales Agreement, dated as of February 26, 2016, between FOA and APC, as amended by that certain Amendment to Gas Sales Agreement, dated as of September 13, 2017 between FOA and APC, that certain Second Amendment to Gas Sales Agreement dated as of April 25, 2019 between FOA and APC and that certain Third Amendment to Gas Sales Agreement dated as of February 14, 2020.

"**APC LC Cap Amount**" means, at any time, the lesser of: (a) (i) from the Effective Date until March 31, 2021, $3,000,000 and (ii) from April 1, 2021 to May 31, 2021, $2,500,000; and (b) the total aggregate amount of credit support required under the APC Gas Sales Agreement *less* any other credit support provided to APC in satisfaction thereof.

"**Applicable Laws**" means and includes any and all laws, statutes, codes, ordinances, orders, rules, regulations, any constitutional provision, treaties, decrees, writs, judgments, decisions, certificates, licenses, holdings, determinations, injunctions, Permits or requirements of any Governmental Authority (including all Environmental Laws), along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, as such may be amended or modified from time to time.  Unless the context clearly requires otherwise, the term "Applicable Law" shall include each of the foregoing as in effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the Effective Date.

"**Applicable Permit**" means, at any time, any Permit, including any zoning, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Permit, in each case that is (a) necessary at such time in connection with the transactions contemplated by the AIDEA Loan Documents or the Material Contracts or the operation of the Borrower's Properties (in each case, to the extent required by Legal Requirements, the AIDEA Loan Documents or the Material Contracts), or for the Borrowers to enter into any AIDEA Loan Document or Material Contract or to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements and (b) otherwise listed on Part I of Exhibit G.

"**Applicable Quarterly Discount**" has the meaning set forth in Section 2.1.1(b).

"**Authority**" means the Alaska Industrial Development and Export Authority, its successors and assigns.

"**Banking Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized to be closed in Kenai, Alaska.

"**Bankruptcy Cases**" means the cases related to Borrowers' voluntary petition for relief filed August 9, 2019 under chapter 11 of the Bankruptcy Code in the Bankruptcy Court captioned *In re Furie Operating Alaska, LLC,* Case No. 19-11781.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, as applicable to the Bankruptcy Cases.

"**Bankruptcy Event**" shall be deemed to occur, with respect to any Person, if:

(a)     such Person shall institute a voluntary case seeking liquidation or reorganization under the Bankruptcy Code, or shall consent to the institution of an involuntary case thereunder against it;

(b)     such Person shall apply for, or by consent or acquiescence or otherwise there shall be an appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers for itself or substantially all of its assets;

(c)     such Person shall make a general assignment of substantially all of its assets for the benefit of its creditors;

(d)     such Person shall admit in writing its inability to pay its debts generally as they become due; or

an involuntary case shall be commenced seeking liquidation or reorganization of such Person under the Bankruptcy Code and (i) the petition commencing the involuntary case is not timely controverted, (ii) the petition commencing the involuntary case is not dismissed within 60 days of its filing, (iii) an interim trustee is appointed to take possession of all or a portion of the property, and/or to operate all or any part of the business of such Person and such appointment is not vacated within 60 days, or (iv) an order for relief shall have been issued or entered therein.

"**Base Case Financial Model**" means, at any particular time, a financial model prepared by the Borrowers forecasting the revenues and expenditures for operation of Beluga Wells A1-4 for time periods through the Maturity Date and based upon assumptions and methodology provided by the Borrowers and acceptable to the Authority as of the Effective Date, which model shall be provided to the Authority as a fully functional Microsoft Excel – based financial model.  The Authority will be entitled to engage the Independent Engineer (in consultation with the Borrowers at any time no Default has occurred and is continuing) to review any updated Base Case Financial Model delivered by the Borrowers if, when compared to the then approved Base Case Financial Model, the updated Base Case Financial Model evidences (i) any line item deviating by 10% or more or (ii) in the opinion of the Authority, acting reasonably, a material change to the operation of the Project. The Base Case Financial Model shall encompass the consolidated long-term forecast of the Borrower, which shall include the forecasts of production, revenues, operating costs, Capital Expenditures, financial covenant calculations, hedge positions, Proven and Probable Reserves, and projected free cash flow.

"**Books and Records**" means, as to any Person, all of such Person's books and records including ledgers; federal and state tax returns; records regarding such Person's assets or liabilities, business operations or financial condition; and all computer programs or storage or any equipment containing such information.

"**Borrowers**" has the meaning given in the preamble of the Agreement.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures of the Borrowers that, in accordance with GAAP, are or should be included in "purchase of property and

equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of the Borrowers.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $5,000,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**CEA**" means the Commodity Exchange Act, as amended.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended.

"**Change of Control**" means any transaction as a result of which (a) HEX L.L.C. fails to directly or indirectly own 80% of the Equity Interests in HEX CI, (b) HEX CI fails to directly own at least 100% of the Equity Interests in each of Cornucopia and Corsair, (c) Cornucopia ceases to directly own 100% of the Equity Interests in FOA or (d) a Disqualified Owner shall own the Equity Interests in any of HEX L.L.C. or the Borrowers, directly or indirectly.

"**Change of Law**" means the adoption of any Applicable Law after the date of the Agreement, any change in any Applicable Law or the application or requirements thereof after the date of the Agreement (whether such change occurs in accordance with the terms of such Applicable Law as enacted on or prior to the date of the Agreement, as a result of amendment made after the date of the Agreement, or otherwise), any change in the interpretation or administration of any Applicable Law by any Governmental Authority after the date of the Agreement, or compliance by the Borrowers or the Authority with any request or directive made or issued after the date of the Agreement (whether or not having the force of law, but if not having

the force of law, being of a type with which the Borrowers or the Authority customarily complies) by any Governmental Authority.  For the avoidance of doubt, Change of Law shall be deemed to include all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (a) under or in connection with the implementation of the Dodd-Frank Act and (b) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority, regardless of the date adopted, issued, promulgated or implemented).

"**Claim**" means any and all liabilities, losses, administrative or regulatory or judicial actions, suits, demands, decrees, claims, Liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages (foreseeable and unforeseeable, including consequential and punitive damages), penalties, fees, out-of-pocket costs, expenses, disbursements, attorneys' fees or consultants' fees.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) on which Liens are purported to be granted pursuant to the AIDEA Security Documents as security for the Obligations.

"**Condemnation**" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action of or proceeding by any Governmental Authority relating to any of the Borrowers' Properties.

"**Confidential Information**" means (a) the terms and conditions of each of the AIDEA Loan Documents and Material Contracts, including any amendments, waivers, supplements or other modifications thereto and all negotiations and communications in respect thereof and (b) any and all documents, materials and information (whether oral, written, electronic or in any other form) relating to the assets, operations, business, financial condition, results of operations or prospects of the Borrowers disclosed to or obtained by the Authority (each a "**receiving party**") pursuant to the Agreement or the other AIDEA Loan Documents or otherwise provided to a receiving party by or on behalf of any Borrower (each a "**disclosing party**") in connection with the Agreement or the other AIDEA Loan Documents, but does not include any such information that (i) is or becomes generally available to the public (other than as a result of a breach by a receiving party of its confidentiality obligations under Section 9.7), (ii) was lawfully available to any receiving party on a non-confidential basis prior to such information being disclosed by or on behalf of, or obtained from, a disclosing party, (iii) is or becomes available to any receiving party from a source other than a disclosing party or (iv) is subject to disclosure pursuant to Alaska Statute 44.88.215 or the public records laws of the State of Alaska.

"**Confirmation Order**" means that final order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, filed in the Bankruptcy Cases at Docket No. [●].

"**Consolidated Current Assets**" means, at any time, the sum of the current assets of Borrowers at such time, determined in accordance with GAAP.

"**Consolidated Current Liabilities**" means, at any time, the sum of current liabilities of Borrowers at such time, determined in accordance with GAAP.

"**Consolidated Net Operating Income**" means, for any period, Borrowers' earnings before interest expense, income taxes, depreciation, depletion, and amortization.

"**Contractual Obligation"** means, as applied to any Person, any provision of any Securities issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its Properties is bound or to which it or any of its Properties is subject.

"**Control Agreement**" means a customary account control agreement in form and substance reasonably satisfactory to the Authority pursuant to which the depositary institution maintaining the relevant account agrees that the Authority shall have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts) and pursuant to which such issuer, securities intermediary, commodities intermediary or depositary institution (as applicable) shall agree to comply solely with the Authority's entitlement orders or instructions with respect to the disposition of funds or to apply any value distributed on account of any commodity account, as applicable, in such account upon the occurrence and continuance of an Event of Default and without the consent of any other Person.

"**Copyright License**" means, as to any Person, all rights under any written document now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party) granting the right to use any Copyright or Copyright registration.

"**Copyrights**" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person: (a) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed; all registrations and applications for registration of any such copyrights in the United States or any other country, including registrations, recordings and applications; and supplemental registrations, recordings, and applications in the United States Copyright Office; and (b) all Proceeds of the foregoing, including license royalties and Proceeds of infringement suits; the right to sue for past, present and future infringements; all rights corresponding thereto throughout the world; and all renewals and extensions thereof.

"**Cornucopia**" has the meaning given in the preamble of this Agreement.

"**Cornucopia Equity Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between the Authority, the New Term Loan Agent, the Tax Credit Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers.

"**Corsair**" means Corsair Oil & Gas LLC, a Delaware limited liability company.

"**Current Ratio**" means the ratio of Borrowers' Consolidated Current Assets to Consolidated Current Liabilities. The Authority's review and determination of the Current Ratio,

and all component calculations, based on Borrowers' calculation of the same and documentation that may be requested by the Authority, shall be conclusive and binding on Borrowers absent manifest error.

"**Debt**" of any Person at any date means, without duplication, any indebtedness of such Person, whether or not contingent, including:

(a)     all obligations of such Person for borrowed money;

(b)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of property or services;

(d)     all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as Capital Leases in respect of which such Person is liable;

(e)     all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property);

(f)     all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other instrument (except to the extent collateralized by Cash or Cash Equivalents not otherwise constituting Collateral);

(g)     all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; and

(h)     obligations of such Person as a surety, guarantor, accommodation endorser or otherwise, for or upon the obligation of any other Person, including all Debt of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, except the endorsement of negotiable Instruments in the ordinary course of business.

"**Debt Service Coverage Ratio**" or "**DSCR**" shall mean as of the first day of the calendar month of each fiscal quarter, the quotient obtained by dividing (1) the Borrowers' Consolidated Net Operating Income for the twelve (12) consecutive months ending on such date by (2) the aggregate principal and interest due and payable during the same twelve (12) month period under (i) the AIDEA Loan, (ii) the Second Lien Term Loan, the New Term Loan, and the Tax Credit Loan to the extent paid from Consolidated Net Operating Income, (iii) the interest due and payable on any insurance premium financing Debt (excluding principal paid on such premium financing Debt) and (iv) any other scheduled payments of interest and principal due with respect to any Debt; *provided* during the first year after the Effective Date, the DSCR shall be calculated using the time period between the Effective Date and the calculation date. Borrowers shall deliver to the Authority such information as is reasonably required for the Authority to make all applicable

calculations.  The Authority's review and determination of the Debt Service Coverage Ratio, and all component calculations, based on Borrowers' calculation of the same and documentation that may be requested by the Authority, shall be conclusive and binding on Borrowers absent manifest error.

"**Debtors**" has the meaning given in the Plan.

"**Default**" means any occurrence, circumstance or event, or any combination thereof, which, with the lapse of time and/or the giving of notice, would constitute an Event of Default.

"**Default Rate**" has the meaning given in <u>Section 2.3.3</u>.

"**Deposit Account**" has the meaning assigned to such term in the UCC.

"**Depository Bank**" means [●].

"**disclosing party**" has the meaning given in the definition of "Confidential Information".

"**Disqualified Owner**" means any Person that, as of the date it first becomes a direct or indirect owner of membership interests in any Borrower: (i) is designated as a Sanctioned Person; (ii) is in violation of the AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws or Sanctions; or (iii) has been convicted of money laundering under any AML Law, which conviction has not been overturned; provided, however, that a Person shall not be a Disqualified Owner if: (x) prior to the date that the Person first becomes a direct or indirect owner of membership interests in any Borrower, the applicable Borrower provides the Secured Parties with reasonably satisfactory documentation and other written information required under applicable "know your customer" and AML Laws, regulations and requirements (including the Patriot Act) in respect of such Person; and (y) as of the date the Person first becomes a direct or indirect owner of the membership interests in any Borrower, such Person has certified to the Second Lien Agent that none of the criteria set forth in the foregoing clauses (i) to (iii) in this definition are applicable to such Person.

"**Dollar**" and "**$**" mean United States dollars or such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts in the United States of America.

"**DOR**" means the State of Alaska, Department of Revenue.

"**DSRF Required Balance**" means an amount equal to the payments of interest and principal due on the AIDEA Loan during the six (6) month period following the date of calculation. The DSRF Required Balance shall be calculated as of the first day of each calendar quarter.

"**Effective Date**" means the Banking Day on which the satisfaction by the Borrowers or waiver by the Authority of the conditions precedent to closing of this Agreement set forth in <u>Section 3.1</u> occurs.

"**Eligible Contract Participant**" has the meaning set forth in Section 1(a)(18) of the CEA.

"**Environmental Claim**" means any and all Claims relating in any way to any Environmental Law or any Permit issued under any such Environmental Law, including (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to health, safety or the environment.

"**Environmental Laws**" means all Applicable Laws pertaining to human health, occupational safety and environmental matters, including those arising under CERCLA, RCRA, the Superfund Amendments and Reauthorization Act of 1986, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, each as amended, those arising under the laws of the State of Alaska, as amended, and any other state or local statute, regulation, ordinance, order, guidance or decree relating to health, safety or the environment.

"**Equity Contribution**" has the meaning set forth in <u>Section 3.1.19</u>.

"**Equity Interest Equivalents**" means all rights, warrants, options, convertible securities or indebtedness, exchangeable securities or other instruments, or other rights that are outstanding and exercisable for or convertible or exchangeable into, directly or indirectly, any Equity Interest described in clause (a) of the definition thereof at the time of issuance or upon the passage of time or occurrence of some future event.

"**Equity Interests**" means (a) the equity ownership rights in a business entity, whether a corporation, company, joint stock company, limited liability company, general or limited partnership, joint venture, bank, association, trust, trust company, land trust, business trust, sole proprietorship or other business entity or organization, and whether in the form of capital stock, ownership unit, limited liability company interest, limited or general partnership interest or any other form of ownership, and (b) also includes all Equity Interest Equivalents.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure by any Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by any Borrower or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA; (d) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a

Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in "at-risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate; (j) the engagement by any Borrower or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (k) the imposition of a Lien upon any Borrower pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; (l) the assertion of a material claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or the assets thereof, or against any Borrower or any ERISA Affiliate in connection with any Pension Plan; or (m) the making of an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

"**ERISA Plan**" means any employee benefit plan (a) maintained by any Borrower or any ERISA Affiliate, or to which any of them contributes or is obligated to contribute, for its employees and (b) covered by Title IV of ERISA or to which Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA applies.

"**Event of Default**" has the meaning given in <u>Section 7.1</u>.

"**Event of Loss**" means a single insured event or a related series of insured events causing any loss of, destruction of or damage to, or any Condemnation of, all or any portion of assets or Property of any Borrower or any other event giving rise to a claim under any other insurance policy, including without limitation, business interruption.

"**Excess Cash**" means, as of the date of calculation, the amount of Borrowers' Cash and Cash Equivalents after payments made pursuant to <u>Section 5.24</u>.

"**Existing Letter of Credit**" means that certain irrevocable standby letter of credit, number IS000037787U, issued by Wells Fargo Bank, N.A. on April 12, 2018 for the benefit of APC, on behalf of Furie, as the same may be amended, extended or otherwise modified from time to time.

"**Facilities**" means the Platform, the Pipeline and the Processing Plant, or any portion of any of the foregoing.

"**FERC**" means the Federal Energy Regulatory Commission.

"**FOA**" has the meaning given in the preamble of the Agreement.

"**Fraudulent Transfer Laws**" has the meaning given in <u>Section 9.21.1</u>.

"**Funding Borrower**" has the meaning given in <u>Section 9.21.2</u>.

"**Furie Operating Default**" means (a) the dissolution or bankruptcy of FOA or Cornucopia, (b) a Change of Control of FOA and/or Cornucopia, (c) the occurrence of any event

that would give the other working interests owners under the JOA the right to remove FOA or Cornucopia under the JOA, (d) FOA's or Cornucopia's commission of an act (or its failure to take an action), which act or omission (i) constitutes fraud, gross negligence, or willful misconduct or (ii) causes a Material Adverse Effect on the operation of any of the Facilities, (e) other than as set forth in clause (d) above, FOA or Cornucopia breaches or fails to observe or perform any material term, condition or obligation contained in this Agreement, the other AIDEA Loan Documents or the Material Contracts and fails to correct, or fails to diligently pursue correction of, such breach within thirty (30) days after receipt of written notice from the Authority of any such breach and such breach is continuing or (f) an Event of Default has occurred and is continuing.

"**GAAP**" means generally accepted accounting principles in the United States.

"**General Intangibles**" means, as to any Person, all general intangibles (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all right, title and interest that such Person may now or hereafter have under any contract, all payment intangibles (as that term is defined in the UCC), customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, databases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses-in-action, rights to receive tax refunds and other payments, rights to receive dividends, distributions, Cash, Instruments and other property in respect of or in exchange for Equity Interests and other Investment Property, and rights of indemnification.

"**Goodwill**" means, as to any Person, all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party).

"**Governmental Authority**" means any nation, sovereign or government; any federal, regional, state, tribal authority, province, local or political subdivision; and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Governmental Authorization**" means any authorization, approval, consent, franchise, license, covenant, order, ruling, Permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"**Hazardous Substances**" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant"

or a "contaminant" (or words of similar intent or meaning) by any Governmental Authority under Applicable Law, including but not limited to petroleum, petroleum byproducts, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable or explosive substances, or pesticides.

"**Hedging Agreement**" means any option, Swap, cap, floor, collar, forward purchase or similar agreements or arrangements (physical or otherwise) (or any combination of the foregoing) dealing with interest rates, basis differentials, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to the Authority which are presently in effect or, to the extent allowed by law, under such Applicable Laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than Applicable Laws now allow.

"**Indemnitees**" has the meaning given in <u>Section 5.14.1</u>.

"**Independent Engineer Report**" means that certain report, dated [●], prepared by PRA and covering the Project.

"**Insurance Consultant Report**" means that certain report from Marsh & McLennan, dated [●], with respect to the insurance coverage for the Borrowers and the Project.

"**Instrument**" has the meaning assigned to such term in the UCC.

"**Insurance Proceeds**" means all amounts and Proceeds (including instruments) received by or on behalf of the Borrowers (as loss payee or additional insured) or any of their Affiliates under any insurance policy maintained by the Borrowers, or any Person in respect of any Property of the Borrowers.

"**Intellectual Property**" means, as to any Person, all Copyrights, Licenses, Patents, Trademarks, inventions, designs, trade secrets and customers lists now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"**Intercreditor Agreements**" means each of the AIDEA Intercreditor Agreement, the Tax Credit Intercreditor Agreement and the Cornucopia Equity Intercreditor Agreement.

"**Investment Property**" means, as to any Person, all investment property (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"**IRS**" means the United States Internal Revenue Service.

"**JOA**" means the Operating Agreement dated October 21, 2010, among FOA (f/k/a Escopeta Oil Co., L.L.C.), Cornucopia (f/k/a Escopeta Oil of Alaska LLC) and the other minority working interest owners party thereto, as modified by that certain Side Letter Agreement entered

into as of October 22, 2010 among FOA, Cornucopia and Taylor Minerals, LLC, as further modified by that certain RWIO Settlement Agreement filed in the Bankruptcy Cases at Docket No. 617-2.

"**JOA Assets**" means the Properties of the Borrowers the operatorship of which is under the JOA.

"**Kitchen Lights Unit Agreement**" means the Kitchen Lights Unit Agreement (f/k/a the Kitchen Unit Agreement) effective as of February 1, 2007, including all Plans of Exploration, Plans of Development and Plans of Operation agreed and approved thereunder, in relation to the Kitchen Lights Unit.

"**Kitchen Lights Unit**" means all of the interests that the Borrowers currently own or control, and all of the interests the Borrowers may hereafter acquire or control, in, to or under the Alaska Division of Land leases listed and shown on Exhibit J.

"**Lease Operating Expenses**" means those costs incurred or incidental to bringing the subsurface minerals (gas) up to the surface and converting it to marketable products.  Lease Operating Expenses do not include any transportation expenses incurred to move the products from the Borrowers' Processing Plant to markets where they can be sold.

"**Legal Requirements**" means, as to any Person, the articles of incorporation, bylaws or other Organizational Documents of such Person and any requirement under an Applicable Permit and any Applicable Law, in each case, applicable to or binding upon such Person or any of its Properties or to which such Person or any of its property is subject.

"**Licenses**" means, as to any Person, all Copyright Licenses, Patent Licenses, Trademark Licenses or other licenses of rights or interests now held or hereafter acquired by such Person.

"**Lien**" means (a) any mortgage, deed of trust, lien, pledge, assignment, charge, security interest, or easement or encumbrance or other exception to title of any kind (including any agreement to give any of the foregoing), whether or not filed, recorded or otherwise perfected under Applicable Law, as well as the interest of a vendor or lessor under any conditional sale agreement, any lease or license in the nature thereof, or other title retention agreement relating to such asset and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrowers taken as a whole; (b) the ability of any Borrower to fully and timely perform its Obligations; (c) the legality, validity, binding effect or enforceability against any Borrower of a AIDEA Loan Document to which it is a party; or (d) the rights, remedies and benefits available to, or conferred upon, the Authority or any Secured Party under any AIDEA Security Document.

"**Material Contract**" means each agreement listed on Schedule B and each Additional Material Contract entered into after the Effective Date, including all amendments, supplements, and modifications thereto, in each case, solely to the extent expressly permitted hereunder.

"**Maturity Date**" means the earlier of (a) the fourth (4th) anniversary of the Effective Date and (b) the date on which the entire outstanding principal balance of the AIDEA Loan, together with all unpaid interest, fees, charges and costs becomes due and payable under this Agreement.

"**Midstream Facilities**" means the Pipeline and the Processing Plant.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means (a) the Deed of Trust with Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of [●], 2020, from the Borrowers to First American Title Company, as Trustee, the Authority, as Beneficiary (to be recorded in the Anchorage Recording District and in the Kenai Recording District), as such Mortgage may be amended, amended and restated, supplemented or otherwise modified from time to time, and (b) each other agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on Collateral consisting of Real Property interests and other related Collateral, which shall be in the form attached as Exhibit L, with such modifications as are reasonably satisfactory to the Authority, with such schedules and including such provisions as shall be necessary or desirable to conform such document to applicable local law

"**Multiemployer Plan**" means any ERISA Plan that is a multiemployer plan (as defined in Section 3(37) of ERISA).

"**Net Cash Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of Event of Loss, insurance proceeds or condemnation awards and similar payments, minus (b) the sum of (i) all reasonable and customary fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of any sale, transfer, lease, encumbrance, or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), amounts required to be applied to the repayment of Debt secured by a Lien expressly permitted under this Agreement on such asset (other than any Lien that is subordinate to the Liens securing the Obligations) and (iii) the amount of all Taxes paid (or reasonably estimated to be payable) in connection with such event.

"**New Term Loan Agent**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**New Term Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among Cornucopia, the lenders party thereto, and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**New Term Loan Collateral Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**New Term Loan Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Note**" has the meaning given in Section 2.1.3.

"**Obligation Aggregate Payments**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share Contribution Amount**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share Shortfall**" has the meaning given in Section 9.21.2.

"**Obligations**" means and includes, with respect to any Person, all loans, advances, debts, liabilities, and obligations, howsoever arising, owed by such Person to the Authority (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, pursuant to the terms of the Agreement or any of the other AIDEA Loan Documents, including all principal, interest (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding in connection with a Bankruptcy Event at the rate, including any applicable post-default rate, even if such interest is not enforceable, allowable or allowed as a Claim in such proceeding), fees, charges, expenses, attorneys' fees and accountants fees chargeable to such Person and payable by such Person hereunder or thereunder.

"**Organizational Documents**" means (a) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of the Agreement or any other AIDEA Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Pass-Through Entity**" means an entity that is properly treated for U.S. federal and applicable state, local and foreign income and franchise Tax purposes as (a) disregarded as an entity separate from its owner or (b) a partnership.

"**Patents**" means, as to any Person, all of the following in which such Person now holds or hereafter acquires any interest:  (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory

thereof, or any other country; and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pending Permits**" means the Permits that are not, at a given time, Applicable Permits but will become Applicable Permits at a future time.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any ERISA Plan other than a Multiemployer Plan that is maintained or is contributed to by any Borrower or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Perfection Certificate**" means a certificate, in the form of <u>Exhibit M</u> or any other form approved by the Authority, executed by a Responsible Officer of each Borrower, as the same shall be supplemented from time to time.

"**Permits**" means all governmental licenses, permits, franchises, easements, certifications, filings, notices, tariffs, and authorizations held by or made by or on behalf of the Borrowers or required to operate the business of the Borrowers or to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers.

"**Permitted Debt**" means:

(a)    Debt incurred under the AIDEA Loan Documents (including any subsequent additional advances not to exceed Five Million Dollars ($5,000,000));

(b)    Debt incurred under the Second Lien Documents, the Tax Credit Loan Documents and the New Term Loan Documents in the original principal amount as of the Effective Date, plus accrued but unpaid interest, costs and fees pursuant to the foregoing;

(c)    trade Debt, accounts payable or other similar Debt incurred in the ordinary course of business (but not for borrowed money) (i) not more than 60 days past due, or (ii) being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; *provided* that adequate reserves have been made in accordance with GAAP;

(d)    contingent liabilities required under any Permit or Contractual Obligation of the Borrowers, other than, in each case, Debt for borrowed money;

(e)    to the extent constituting debt, Debt of any Borrower incurred in the ordinary course of business under (i) natural gas sales agreements in effect as of the Effective Date (excluding, for the avoidance of doubt, any natural gas sales agreements

consisting of prepaid forward contracts, volumetric or dollar denominated production payments or similar arrangements), (ii) financings of insurance premiums up to an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000) and (iii) obligations pursuant to applicable legal requirements of the Alaska Department of Natural Resources or Alaska Oil and Gas Conservation Commission up to an aggregate of Four Million Dollars ($4,000,000);

(f)      Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Debt is covered within five (5) Banking Days;

(g)      purchase money indebtedness incurred in the ordinary course of business to the extent contemplated by clause (n) of the definition of Permitted Encumbrances (and subject to the aggregate cap therein);

(h)      Debt in respect of workers' compensation claims, self-insurance obligations, performance and surety bonds in the ordinary course of business;

(i)      Debt arising from netting services, overdraft protection, cash management obligations and otherwise in connection with deposit, securities and commodities accounts in the ordinary course of business;

(j)      subordinated unsecured Debt incurred by FOA to Cornucopia or Cornucopia to FOA as long as such Debt is evidenced by promissory notes that have been pledged to the Authority; and

(k)      the guarantee by FOA to Cornucopia or Cornucopia to FOA of any Debt incurred by the Borrowers and described in another clause of this definition; *provided*, that if the Permitted Debt that is being guaranteed is unsecured and/or subordinated in right of payment to the Obligations, the guarantee shall also be unsecured and/or subordinated in right of payment to the Obligations.

(l)      Capital Leases in an aggregate amount not to exceed $300,000.

Except as expressly set forth in sub-section (l), above, no Capital Lease entered into on or after the date hereof shall constitute "Permitted Debt".

"**Permitted Disposition**" means the sale, transfer, lease, encumbrance, or other disposition of any portion of any Collateral or other Property of any Borrower or its Subsidiaries permitted under Section 6.3(a), (b) or (d) (but, in the case of clause Section 6.3(d), only so long as the proceeds of such sale, transfer, encumbrance or other disposition are applied to the Tax Credit Obligations per the terms of the Tax Credit Loan Agreement and the Tax Credit Intercreditor Agreement).

"**Permitted Encumbrances**" means

(a)      the rights and interests of the Authority as provided in the Intercreditor Agreements;

(b)    the rights and interests of each of the Second Lien Agent, the Tax Credit Agent and the New Term Loan Agent as provided in the Intercreditor Agreements;

(c)    the rights and interests of the Authority as provided in the AIDEA Loan Documents;

(d)    Liens for any Tax, assessment or other governmental charge permitted pursuant to Section 5.7 that secure obligations not in excess of $100,000 at any time, so long as such Liens are subordinate to the Obligations;

(e)    Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and (i) a bond or other security has been posted or provided in such manner and amount as to assure the Authority that any amounts determined to be due will be promptly paid in full when such appeal or proceeding is concluded, (ii) adequate reserves in accordance with GAAP have been established by the Borrowers therefor or (iii) the amount thereof is fully covered by insurance (subject to applicable deductibles); *provided* that the aggregate amount of such attachment or judgment Liens shall not secure obligations in excess of $100,000 at any time;

(f)    Liens, deposits or pledges to secure (i) statutory obligations, including under workers' compensation laws and unemployment insurance, (ii) performance bonds issued in connection with any Applicable Permits or (iii) performance of bids, tenders, contracts (other than for the repayment of borrowed money), surety and appeal bonds or leases, or for purposes of like general nature in the ordinary course of its business, with any such Lien to be released as promptly as practicable and, in the case of clause (iii), securing obligations not to exceed $100,000 in the aggregate at any time;

(g)    materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, including Liens arising under AS 31.05.100-31.05.110, arising in the ordinary course of business that are (i) not yet due or (ii) being contested in good faith and by appropriate proceedings, so long as, in the case of this clause (ii), (A) such Lien does not attach to, become enforceable against its other creditors with respect to, involve any substantial danger of the sale, forfeiture or loss of or interfere in any material respect with the use or right to dispose of, the Properties of any Borrower; (B) a bond or other security has been posted or provided in such manner and amount as to assure the Second Lien Agent that any taxes, assessments or other charges determined to be due will be promptly paid in full when such contest is determined; and (C) adequate reserves in accordance with GAAP have been established by the Borrowers therefor;

(h)    filing of UCC financing statements as a precautionary measure in connection with operating leases;

(i)    easements, rights-of-way, restrictions (including zoning restrictions), trackage rights, minor defects or irregularities in title, restrictions on use of real property and other similar encumbrances or liens that, in the aggregate, do not materially interfere with the value or use, or are useful to the operation, of the Property to which such Lien is attached;

(j)        rights reserved for or vested in any municipality or Governmental Authority to control or regulate the use of the Real Property or to use the Real Property in any manner, including zoning and land use regulations;

(k)        Liens arising by virtue of any statutory or common law provisions relating to bankers' liens, rights of set-off or similar rights;

(l)        purchase money Liens upon or in real property or equipment acquired or held by the Borrowers in the ordinary course of business securing the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (n) shall not exceed $100,000 at any time outstanding;

(m)        Liens arising under the JOA;

(n)        Liens securing Debt described in clause (e) of the definition of "Permitted Debt"; *provided* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (n) shall not exceed $4,000,000 at any time outstanding;

(o)        to the extent constituting a Lien, all overriding royalties existing as of the Effective Date;

(p)        Liens arising under the Kitchen Lights Unit Agreement;

(q)        Liens arising under that certain Farmout Letter Agreement among Pacific Energy Resources Ltd., Pacific Energy Alaska Operating LLC, and FOA (f/k/a Escopeta Oil Co., L.L.C.) dated February 11, 2009 (a memorandum of which was recorded on March 19, 2009 in the Anchorage Recording District as Doc. No. 2009-017350-0, and on March 23, 2009 in the Kenai Recording District as Doc. No. 2009-002662-0);

(r)        Liens arising under the Lease Assignment and Participation Agreement, dated October 22, 2010;

(s)        [all exceptions scheduled in the Title Policy];

(t)        [Reserved]; and

(u)        ROWs created or granted by the Borrowers for any other purpose that would not render the Upland unusable, or materially impair the use of the Upland, for the operation of the Processing Plant;

"**Permitted Prior Liens**" means Permitted Encumbrances described in clause (f), (i), (o), (p), (q), (r), (s), or (u) of the definition thereof solely to the extent such Liens are afforded priority over the Liens and security interests granted to the Authority by operation of Applicable Law.

"**Person**" means any natural person, corporation, limited liability company, limited liability partnership, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Pipeline**" has the meaning set forth on Exhibit N.

"**Plan**" means the means the Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code filed in the Bankruptcy Cases on May 6, 2020 at Docket No. 754, as may be amended or modified from time to time in accordance with the terms thereof, including the Plan Supplement (as defined in the Plan), and all exhibits, annexes and other supplements appended or related to the Plan and/or to the Plan Supplement.

"**Planned Outage**" means periodic scheduled maintenance, repairs, modifications, and testing, including integrity testing of pipelines and vessels, of the Facilities.

"**Platform**" has the meaning set forth on Exhibit N.

"**Pledge Agreement**" means the Pledge Agreement, dated as of the Effective Date, between HEX CI and the Authority.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement, dated as of the Effective Date, between Cornucopia, Corsair and FOA and the Authority.

"**PRA**" means PetroTechnical Resources of Alaska, LLC.

"**PRA Management Agreement**" means that certain management agreement, dated as of [●], entered into by FOA, Corsair and PRA, and delivered to the Authority.

"**Proceeds**" means proceeds (as that term is defined in the UCC).

"**Proceeds Account**" has the meaning given in the Accounts Agreement.

"**Processing Plant**" has the meaning set forth on Exhibit N.

"**Project**" means the operation of the Facilities and the Wells for the production and sale of gas.

"**Properties**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible (including Contractual Obligations).

"**Proved Developed Producing Reserves**" means Proved Producing Reserves that are expected to be recovered from existing Wells, including reserves behind pipe.  As of the Effective Date, such existing Wells are Beluga Wells A1-A3.

"**Proved Producing Reserves**" means, with respect to the Beluga and the Sterling formations within the Kitchen Lights Unit, those quantities of gas which by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible, from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations.

"**Proved Reserves Coverage Ratio**" means the ratio of the (i) PV10 of the Proved Producing Reserves as of the latest Reserve Report to (ii) Total Secured Debt as of the date such ratio is calculated.  The Proved Reserves Coverage Ratio will be tested on the first day of each calendar quarter (the "**Proved Reserves Coverage Ratio Date**").  For the avoidance of doubt, for example, the April 1 Proved Reserves Coverage Ratio will be tested based on the December 31 Reserve Report and the Total Secured Debt as of April 1.   The Authority's review and determination of the Proved Reserves Coverage Ratio, and all component calculations, based on Borrowers' calculation of the same and documentation that may be requested by the Authority, shall be conclusive and binding on Borrowers absent manifest error.

"**Prudent Industry Practices**" means those prudent and good practices, methods, techniques, standards, codes, specifications and acts generally followed or used by reasonably prudent design, engineering or construction managers, as applicable, in the oil and gas and exploration and production industry (when applied with respect to the Wells and the Platform and actions with respect thereto) or midstream industry (when applied to the Midstream Facilities and actions with respect thereto) in the United States of America who are regularly involved in projects similar to the Project which, in the exercise of prudent judgment, in light of the facts known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent in all material respects with Applicable Laws, Applicable Permits and Pending Permits. "Prudent Industry Practices" is not intended to be limited to the optimum practices, methods, techniques, standards, codes, specifications and acts to the exclusion of all others, but rather to be an acceptable range of practices, methods, techniques, standards, codes, specifications and acts, as applied having due regard for, among other things, the requirements of Applicable Laws, Applicable Permits and Pending Permits.

"**Prudent Operating Practices**" means, in connection with the operation and maintenance of the Platform, the Pipeline, Processing Plant and the Borrowers' other Property, as applicable, those prudent and good practices, methods, techniques, acts and standards of safety, performance, dependability, efficiency and economy generally recognized by reasonably prudent operators in the Borrowers' industry in the United States of America as good and proper, which, in the exercise of prudent judgment, in light of the facts known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent in all material respects with Applicable Laws, standards of reliability and safety, and Applicable Permits.   "Prudent Operating Practices" is not intended to be limited to the optimum practices, methods, techniques, standards and acts to the exclusion of all others, but rather to be an acceptable range of practices, methods, techniques, standards and acts, as applied having due regard for, among other things, the requirements of Applicable Laws, standards of reliability and safety, and Applicable Permits.

"**RCRA**" means the Resource Conservation and Recovery Act.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, including easements and rights of way, together with, in each case, all improvements and fixtures located thereon.

"**receiving party**" has the meaning given in the definition of "Confidential Information".

"**Reinvestment Notice**" means a written notice executed by a Responsible Officer of each Borrower stating that no Default or Event of Default has occurred and is continuing, other than a Default or Event of Default that has arisen solely as a result of the relevant Event of Loss, and that the Borrowers intend and expect to use all or a specified portion of the Net Cash Proceeds of an Event of Loss to acquire or repair the Facilities or assets useful in connection therewith.

"**Reinvestment Prepayment Amount**" means with respect to any Event of Loss, the aggregate Net Cash Proceeds received by the Borrowers in connection therewith that are not applied to prepay the AIDEA Loan pursuant to Section 2.1.4(d)(v) as a result of a Reinvestment Notice, less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair the Project or assets useful in connection therewith.

"**Reinvestment Prepayment Date**" means with respect to any Event of Loss in respect of which the Borrowers have delivered a Reinvestment Notice, the earlier of (a) the date occurring twelve months after such Event of Loss and (b) the date on which the Borrowers shall have determined not to, or shall have otherwise ceased to, acquire or repair the Facilities or assets useful in connection therewith with all or any portion of the relevant Net Cash Proceeds.

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, migrating, emitting, escaping, emptying, seeping, placing and the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Reportable Event**" means any of the "reportable events" set forth in Section 4043(c) of ERISA or the regulations issued thereunder (as in effect on the date hereof), with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. § 4043 (as in effect on the date hereof).

"**Reserve Report**" has the meaning set forth in Section 5.1.6.  For purposes of the Reserve Report and this Agreement, reserve terms not specifically defined herein shall have the meanings ascribed to them by the Society of Petroleum Engineers.

"**Responsible Officer**" means, as to any Person, its president, its chief executive officer, chief financial officer, any vice president, treasurer, assistant treasurer or secretary, any natural Person who is a managing general partner, member or manager (or any of the preceding with regard to any other managing general partner, member or manager), or any project manager or natural Person with similar responsibilities.

"**Restricted Payment**" means, collectively, (a) any dividend or other distribution (whether in Cash, securities or other property, including transfers of any tax benefits) with respect to any Equity Interests of any Borrower, or any payment (whether in Cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement,

acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to any holder of any such Person's Equity Interests and (b) any management or similar fees payable to any Affiliate of the Borrowers.

"**ROW**" means non-exclusive rights of way, easements and servitudes.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government (currently, Cuba, Iran, Myanmar, North Korea, and Syria).

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury, or Switzerland (b) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (c) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (a) or (b) hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (b) the United Nations Security Council; (c) the European Union; (d) Her Majesty's Treasury; or (e) Switzerland.

"**Second Lien Agent**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Second Lien Credit Agreement**" means that certain Credit Agreement, dated as of [●], 2020, among the Second Lien Lenders and FOA, Corsair and Cornucopia, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Second Lien Documents**" means the Second Lien Credit Agreement and each of the other agreements, documents and instruments providing for or evidencing the Second Lien Term Loan, as such agreements, documents and instruments may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Second Lien Lenders**" means Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP, AFG Investments 1A, LLC, Melody Special Situations Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund, L.P., and Melody Capital Partners FDB Credit Fund, LLC, and other lenders from time to time party to the Second Lien Credit Agreement.

"**Second Lien Security Documents**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Second Lien Term Loan**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Secured Parties**" means collectively, the Authority, each Indemnitee pursuant to Section 5.14.1, and each agent appointed by the Authority from time to time pursuant to this Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Software**" means, as to any Person, all software (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Solvent**" with respect to any Person, means that as of the date of determination both (a)(i) the then fair saleable value of the property of such Person is (1) greater than the total amount of liabilities (including contingent liabilities) of such Person and (2) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and due considering all financing alternatives, ordinary operating income and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under Applicable Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Claim**" has the meaning given in Section 5.14.

"**State Tax Credits**" means all Alaska State tax credits and State tax credit certificates with respect to which any Borrower is entitled to or receives proceeds, including any such tax credits or tax credit certificates acquired on or after the Effective Date, under Alaska Statutes 43.55.023(a) (Qualified Capital Expenditures), 43.55.023(l) (Well Lease Expenditures), 43.55.023(b) (Carry Forward Losses); and/or 43.55.025 (Exploration Expenditures).

"**Subject Claims**" has the meaning given in Section 5.14.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Tax Credit Agent**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Collateral Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between ING Capital, LLC, New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers.

"**Tax Credit Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among Cornucopia, the lenders party thereto, and ING Capital, LLC as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Tax Credit Loan Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Obligations**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Taxes**" means all present or future taxes, levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" means First American Title Company.

"**Title Policy**" means an American Land Title Association 2006 Form extended coverage mortgagee's policy of title insurance or such other form as is reasonably acceptable to the Authority, or a binding marked irrevocable and unconditional commitment to issue such policy, (a) dated as of the Effective Date and to be re-dated as of the date of recording of the Mortgage, and (b) issued by the Title Company in an amount not less than 100% of the principal amount of the AIDEA Loan.

"**Total Secured Debt**" means the aggregate principal and interest outstanding from time to time on the AIDEA Loan, the Second Lien Term Loan, the Tax Credit Loan, the New Term Loan and any other secured Debt of the Borrowers.

"**Trademarks**" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person:  (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all Goodwill associated with or symbolized by any of the foregoing.

"**Treasury Regulations**" means the U.S. Department of Treasury Regulations promulgated under the Code, as amended from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Alaska; *provided*, *however*, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of Alaska, the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions of the AIDEA Security Documents relating to such perfection, priority or remedies.

"**Unplanned Outage**" means any outage other than a Planned Outage of the Facilities.

"**Upland**" means the property located in Kenai Peninsula Borough, Alaska, described on Exhibit O to the Agreement.

"**Wells**" means the KLU #A1, KLU #A2A, KLU #3 and KLU #A4 wells, also known as the Belgua A1, A2, A3 and A4 wells.

## RULES OF INTERPRETATION

1.  The singular includes the plural and the plural includes the singular.

2.  "Or" is not exclusive.

3.  A reference to an Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

4.  A reference to a Person includes its permitted successors and permitted assigns.

5.  Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

6.  The words "include," "includes" and "including" are not limiting.

7.  A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document. In the event of any conflict between the provisions of the Agreement (exclusive of the Exhibits, Schedules, Annexes and Appendices thereto) and any Exhibit, Schedule, Annex or Appendix thereto, the provisions of the Agreement shall control.

8.  Except as otherwise provided in the Agreement, references to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

9.  The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

10. References to "days" shall mean calendar days, unless the term "Banking Days" shall be used. References to a time of day shall mean such time in Alaska, unless otherwise specified.

11. In the computation of time periods from a specified date to a specified later date, the word "from" means "from and including," the word "through" means "through and including," and the words "to" and "until" each mean "to but excluding."

12. Unless otherwise expressly specified herein, (a) amounts paid or payable hereunder shall be in Dollars and (b) all amounts denoted by an "$" shall be in Dollars.

13. The AIDEA Loan Documents are the result of negotiations among, and have been reviewed by the Borrowers, the Authority and their respective counsel. Accordingly, the AIDEA Loan

Draft 5/29/2020 - Subject to Review and Approval by all Parties in all respects

Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against the Borrowers or the Authority solely as a result of any such party having drafted or proposed the ambiguous provision.

The word "either", when used in reference to two Persons (such as any Borrower), is not limiting, and shall mean "a" or "any" Person.

## **Exhibit A-2**

DIP Replacement Loan Agreement


[See attached.]

*K&E Draft 5/29/20*
*subject to the Second Lien Lenders' review and comment in all respects*

**SECOND LIEN CREDIT AGREEMENT**

dated as of [●], 2020

among
Cornucopia Oil & Gas Company, LLC,
a Delaware limited liability company

(as a Borrower),

Furie Operating Alaska, LLC,
a Delaware limited liability company,

(as a Borrower),

Corsair Oil & Gas LLC,
a Delaware limited liability company,

(as a Borrower),

Energy Capital Partners Mezzanine Opportunities Fund A, LP,
a Delaware limited partnership

(as the Second Lien Agent),

and

The Lenders from time to time party hereto
(as the Lenders)

TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS.......................................................................................1
    1.1      Definitions.............................................................................................1
    1.2      Rules of Interpretation ........................................................................1

ARTICLE 2 THE CREDIT FACILITIES ...............................................................1
    2.1      Second Lien Term Loan Facility .......................................................1
    2.2      Tax Treatment.....................................................................................5
    2.3      Other Payment Terms .........................................................................5
    2.4      Pro Rata Treatment .............................................................................7
    2.5      Alternate Offices ................................................................................8
    2.6      Enstar Letter of Credit. ......................................................................8
    2.7      FIRPTA Matters..................................................................................9

ARTICLE 3 CONDITIONS PRECEDENT ............................................................10
    3.1      Conditions Precedent to the Effective Date .....................................10

ARTICLE 4 REPRESENTATIONS AND WARRANTIES..........................................14
    4.1      Status..................................................................................................14
    4.2      Authority ............................................................................................14
    4.3      Governmental Authorizations............................................................14
    4.4      No Breach or Default .........................................................................14
    4.5      Compliance with Law ........................................................................15
    4.6      Business, Capitalization, Joint Ventures, Subsidiaries, Etc.......................15
    4.7      Investment Company Act ...................................................................15
    4.8      Regulatory Matters.............................................................................16
    4.9      Hazardous Substance .........................................................................16
    4.10    Tax Sharing Agreements....................................................................16
    4.11    Regulation U, Etc...............................................................................17
    4.12    Organizational ID Number; Location of Collateral ..................................17
    4.13    Title and Liens ...................................................................................17
    4.14    Collateral............................................................................................17
    4.15    Accounts ............................................................................................18
    4.16    Commodity Exchange Act..................................................................18
    4.17    Material Contracts..............................................................................18
    4.18    Permits ...............................................................................................19
    4.19    State Tax Credits................................................................................19

ARTICLE 5 AFFIRMATIVE COVENANTS...........................................................20
    5.1      Financial Statements and other Reports.............................................20
    5.2      Notices – Operation of Business........................................................22
    5.3      Existence; Maintenance of Contracts.................................................25
    5.4      Government Approvals.......................................................................26

5.5      Compliance with Law ...................................................................................26
5.6      Taxes ...............................................................................................................26
5.7      Warranty of Title............................................................................................26
5.8      Books and Records .........................................................................................27
5.9      Preservation of Rights; Further Assurances....................................................27
5.10     Separateness ...................................................................................................27
5.11     Additional Collateral......................................................................................28
5.12     Security Interests; Further Assurances............................................................28
5.13     Material Contracts ..........................................................................................28
5.14     Indemnification ..............................................................................................29
5.15     Tax Credits .....................................................................................................30
5.16     Insurance ........................................................................................................32
5.17     Enstar Letter of Credit ...................................................................................32
5.18     Approvals of Foreclosures .............................................................................33
5.19     [Revenues.......................................................................................................33
5.20     [Revenue Account] Waterfall ........................................................................33

ARTICLE 6 NEGATIVE COVENANTS .........................................................................34
6.1      Debt, Liens and Other Encumbrances ............................................................34
6.2      Dividends, Distributions and Redemptions ....................................................34
6.3      Restrictions on Asset Sales ............................................................................34
6.4      Dissolution; Merger; Acquisitions .................................................................35
6.5      Material Changes in Business; Amendments to Organizational Documents35
6.6      Subsidiaries and Joint Ventures .....................................................................35
6.7      Prohibition on Issuance of Equity Interest .....................................................35
6.8      Name and Location; Fiscal Year.....................................................................35
6.9      Accounts .........................................................................................................36
6.10     Compliance with Anti-Terrorism Laws ..........................................................36
6.11     Transactions with Affiliates ...........................................................................36
6.12     Material Contracts ..........................................................................................37
6.13     Prohibition on Amendments to Material Contracts .........................................37

ARTICLE 7 EVENTS OF DEFAULT; REMEDIES .........................................................37
7.1      Events of Default ............................................................................................37
7.2      Remedies.........................................................................................................41

ARTICLE 8 THE AGENT; SUBSTITUTION....................................................................42
8.1      Appointment, Powers and Immunities............................................................42
8.2      Reliance by the Second Lien Agent.................................................................44
8.3      Non-Reliance ..................................................................................................45
8.4      Defaults ...........................................................................................................45
8.5      Indemnification ...............................................................................................45
8.6      Successor Second Lien Agent..........................................................................46
8.7      Authorization ..................................................................................................46
8.8      The Second Lien Agent ..................................................................................47
8.9      Amendments; Waivers....................................................................................47
8.10     Withholding Tax .............................................................................................48

8.11     General Provisions as to Payments ............................................................49
8.12     Participation ............................................................................................49
8.13     Transfer of Second Lien Term Loans ........................................................50
8.14     Assignability as Collateral ......................................................................52
8.15     Register ..................................................................................................52

ARTICLE 9 MISCELLANEOUS ............................................................................52
9.1      Addresses ...............................................................................................52
9.2      Right to Set-Off .......................................................................................54
9.3      Delay and Waiver ....................................................................................55
9.4      Costs, Expenses and Attorneys' Fees ........................................................55
9.5      Entire Agreement .....................................................................................55
9.6      Governing Law ........................................................................................56
9.7      Confidentiality .........................................................................................56
9.8      Severability .............................................................................................56
9.9      Headings .................................................................................................57
9.10     Accounting Terms.....................................................................................57
9.11     No Partnership ........................................................................................57
9.12     Second Lien Security Documents ..............................................................58
9.13     Limitation on Liability .............................................................................58
9.14     Waiver of Jury Trial .................................................................................58
9.15     Consent to Jurisdiction.............................................................................59
9.16     Knowledge and Attribution.......................................................................59
9.17     Successors and Assigns; No Third-Party Beneficiaries............................59
9.18     Usury Savings Clause ..............................................................................59
9.19     Counterparts ...........................................................................................60
9.20     Patriot Act ..............................................................................................60
9.21     Joint and Several Liability .......................................................................60
9.22     Alaska Mortgage Provisions ....................................................................62
9.23     Second Lien Documents. ..........................................................................63
9.24     Second Lien Documents ...........................................................................64
9.25     Acknowledgement and Consent to Bail-In of EEA Financial Institutions 64

**Index of Schedules[1]**

| | |
|---|---|
| Schedule I | The Lenders; Commitments; Wire Instructions |
| Schedule 3.1.6 | Litigation |
| Schedule 4.5 | Compliance with Law |
| Schedule 4.6.1 | Contracts Other than Material Contracts |
| Schedule 4.9 | Hazardous Substances |
| Schedule 4.15 | Accounts |
| Schedule A | Performance Bonds |
| Schedule B | Material Contracts |

**Index of Exhibits**

| | |
|---|---|
| Exhibit A | Definitions and Rules of Interpretation |
| Exhibit B | Payment in Kind Notice |
| Exhibit C | Form of Second Lien Term Loan Note |
| Exhibit D | Lending Offices |
| Exhibit E | Filing Offices |
| Exhibit F | [Reserved] |
| Exhibit G | Permits |
| | Part I   Applicable Permits |
| | Part II  Pending Permits |
| Exhibit H | Form of Assignment Agreement |
| Exhibit I | [Reserved] |
| Exhibit J | Kitchen Lights Unit |
| Exhibit K | [Reserved] |
| Exhibit L | Form of Mortgage |
| Exhibit M | Form of Perfection Certificate |
| Exhibit N | Description of Facilities |
| Exhibit O | Upland |

---

[1]       Note to Draft: To be updated/conformed to updated draft.

THIS SECOND LIEN CREDIT AGREEMENT dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, this "**Agreement**") is entered into among Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company, ("**Cornucopia**"), Furie Operating Alaska, LLC, a Delaware limited liability company ("**FOA**") and Corsair Oil & Gas LLC, a Delaware limited liability company ("**Corsair**", and together with Cornucopia and FOA, each a "**Borrower**", and together, the "**Borrowers**"), Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP (collectively, the "**ECP Lenders**"), AFG Investments 1A, LLC, Melody Special Situations Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund, L.P., Melody Capital Partners FDB Credit Fund, LLC, and other lenders from time to time party hereto, and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as administrative agent and collateral agent for the Lenders (the "**Second Lien Agent**").

The parties to this Agreement agree as follows:

# ARTICLE 1
# DEFINITIONS

**1.1**     **DEFINITIONS.**  Except as otherwise expressly provided, capitalized terms used in this Agreement and its exhibits and schedules shall have the meanings given in Exhibit A.

**1.2**     **RULES OF INTERPRETATION.**  Except as otherwise expressly provided, the rules of interpretation set forth in Exhibit A shall apply to this Agreement and the other Second Lien Documents.

# ARTICLE 2
# THE CREDIT FACILITIES

**2.1**     **SECOND LIEN TERM LOAN FACILITY**.

**2.1.1**   *Second Lien Term Loans*.

(a)        Availability of Second Lien Term Loans.

(i)        Subject to the satisfaction of the terms and conditions set forth in this Agreement, each holder of Allowed DIP Claims (as such terms are defined in the Plan) that is entitled to a pro rata share of the DIP Replacement Debt (as such term is defined in the Plan), severally agrees that such Allowed DIP Claims shall be deemed exchanged for, repaid by and converted into a term loan to the Borrowers hereunder (each a "**Second Lien Term Loan**"), on a dollar-for-dollar basis in an aggregate principal amount equal to $15,000,000 (as such amount may be increased pursuant to Section 2.6 or reduced pursuant to Section 2.7), on the Effective Date and without any further action by any such party, each Lender's Second Lien Term Loans shall, on the Effective Date, be deemed to be Second Lien Term Loans and administered hereunder (the "**Second Lien Credit Facility**").  No Lender shall have any commitment to make any Loans other than the Loans deemed funded and outstanding as provided in this Section 2.1.1.

(ii)        Second Lien Term Loans that are repaid or prepaid may not be reborrowed.

(b)    Second Lien Term Loan Interest.  All Second Lien Term Loans shall bear interest on the unpaid principal amount thereof from and after the twenty-four (24) month anniversary of the Effective Date until such Second Lien Term Loans are paid in full at a rate per annum equal to 7.00% (the "**Applicable PIK Interest Amount**").  For the avoidance of doubt, no interest shall accrue or be payable for the first twenty-four (24) months after the Effective Date. Interest accrued on the Second Lien Term Loans shall be paid in kind in an amount equal to the Applicable PIK Interest Amount by adding the Applicable PIK Interest Amount to the unpaid principal balance of the Second Lien Term Loans on and as of the date of such payment in kind, and shall thereafter constitute principal of the Second Lien Term Loans for all purposes of this Agreement.

(c)    Interest Payments.  From and after the twenty-four (24) month anniversary of the Effective Date, interest accrued on each Second Lien Term Loan shall be payable in arrears (i) on the last Banking Day of each calendar quarter and (ii) if not previously paid in full, at maturity (by acceleration or otherwise) of such Second Lien Term Loan.  The Borrowers shall deliver a notice substantially in the form attached hereto as Exhibit B to the Second Lien Agent no later than three (3) Banking Days prior to the date on which interest on the Second Lien Term Loans is payable, which notice shall certify the dollar amount of interest that shall be added to the principal amount of such Second Lien Term Loans in accordance herewith on such interest payment date.

**2.1.2**    *Interest Account and Interest Computations*.  The Borrowers authorize the Lenders to record in an account or accounts maintained by each Lender on its books (i) the date and amount of each principal and interest payment on the Second Lien Term Loans and (ii) such other information as the Lenders may determine is necessary for the computation of interest payable by the Borrowers hereunder.  The Borrowers agree that all computations by the Lenders of interest shall be conclusive in the absence of manifest or demonstrable error.  All computations of interest shall be based upon a year of 360 days and the actual days elapsed.

**2.1.3**    *Promissory Notes.*  The obligation of the Borrowers to repay the Second Lien Term Loans made by each Lender, to pay interest thereon at the rates provided herein and any and all other Obligations hereunder, shall, upon the written request of any Lender, be evidenced by one or more promissory notes substantially in the form of Exhibit C (in each case, individually, a "**Note**"), payable to each such Lender and in the principal amount of such Lender's Second Lien Term Loans.  The Borrowers authorize each Lender to record in its books and records the date and amount of the Second Lien Term Loans made by such Lender, and each payment or prepayment of principal thereunder, each payment of the Applicable PIK Interest Amount (which shall be added to the outstanding principal balance of such Second Lien Term Loans).  The Borrowers further authorize each Lender to attach to and make a part of such Lender's Note continuations of the schedule attached thereto as necessary.  No failure to make any such notations, nor any errors in making any such notations, shall affect the validity of the Borrowers' obligations to repay the full aggregate unpaid principal amount of the Second Lien Term Loans or the duties of the Borrowers hereunder or thereunder.  This Section 2.1.3 shall not affect Section 8.15 and, in case of any conflict, Section 8.15 shall govern.

**2.1.4**    *Prepayments and Repayments*.

(a)        Second Lien Term Loan Repayment.  The Borrowers shall repay the Lenders in Cash the full aggregate unpaid principal amount of the Second Lien Term Loans together with all accrued and unpaid interest, fees, charges, costs and other Obligations on the Maturity Date (it being understood that other provisions of this Agreement may require all or part of such Obligations to be repaid earlier).

(b)        Optional Prepayment of the Second Lien Term Loans.

(i)        The Borrowers may, at their option, upon five (5) Banking Days' irrevocable written notice to the Lenders, pay in advance of maturity thereof the Second Lien Term Loans in whole, or from time to time in part, in minimum amounts of $500,000, or an integral multiple of $250,000 in excess thereof (or such lesser amount as shall then be outstanding) without premium or penalty.  All payments made pursuant to this Section 2.1.4(b)(i) shall be applied as provided in Section 2.1.4(d).

(ii)        All such prepayments shall be made by notice given to the Second Lien Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to the Second Lien Agent (and the Second Lien Agent will promptly transmit such original notice by telefacsimile or telephone to each Lender).  Upon the giving of any such notice, the amount of the Second Lien Term Loans specified in such notice shall become due and payable on the prepayment date specified therein; *provided* that, notwithstanding anything to the contrary in this Section 2.1.4(b)(ii) any notice of prepayment delivered pursuant to this Section 2.1.4(b)(ii) may provide that such prepayment is conditioned upon the occurrence of other transactions specified in such notice of prepayment.

(c)        Mandatory Prepayment of the Second Lien Term Loans.

(i)        Without prejudice to any rights that the Second Lien Agent or any Lender has in respect of any Event of Default that may occur pursuant to Section 6.1.1, no later than the Banking Day following the date of receipt by the Borrowers or the Sponsor of any Net Cash Proceeds from the incurrence of any Debt of the Borrowers (other than with respect to any Debt permitted to be incurred pursuant to Section 6.1.1), the Borrowers shall prepay the Second Lien Term Loans, together with accrued interest, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an aggregate amount equal to 100% of such Net Cash Proceeds.

(ii)        Without prejudice to any rights that the Second Lien Agent or any Lender has in respect of any Event of Default that may occur pursuant to Section 6.3, no later than the Banking Day following the date of receipt by the Borrowers or the Sponsor of any Net Cash Proceeds from any sale, transfer, lease, encumbrance, or other disposition of Property other than a Permitted Disposition, the Borrowers shall prepay the Second Lien Term Loans, together with accrued interest thereon, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an amount equal to 100% of such Net Cash Proceeds.  The foregoing sentence shall not apply to any Net Cash Proceeds from any sale, assignment, pledge, transfer, lease, encumbrance, or other disposition of any State Tax Credits (or any other proceeds

of State Tax Credits), which shall be governed by <u>Section 5.15</u> and the terms of the Tax Credit Intercreditor Agreement.

(iii)        No later than (x) ten (10) Banking Days of any Borrower's receipt of Net Cash Proceeds from any Event of Loss that exceed $1,000,000 (but does not constitute a Total Loss), unless a Reinvestment Notice shall be delivered in respect thereof within such period, the Borrowers shall notify the Second Lien Agent of the amount of such Net Cash Proceeds received, and shall prepay the Second Lien Term Loans, together with accrued interest thereon, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an amount equal to 100% of such Net Cash Proceeds, (y) two (2) Banking Days of any Borrower's receipt of Net Cash Proceeds from any Event of Loss that exceed $[●] (a "**Total Loss**"), the Borrowers shall notify the Second Lien Agent of the amount of such Net Cash Proceeds received, and shall prepay the Second Lien Term Loans, together with accrued interest thereon, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an amount equal to 100% of such Net Cash Proceeds and (y) no later than (1) the date occurring twelve months after an Event of Loss and (2) the date on which the Borrowers shall have determined not to, or shall have otherwise ceased to, acquire or repair the Facilities or assets useful in connection therewith with all or any portion of the Net Cash Proceeds from an Event of Loss, if there are any Net Cash Proceeds from such Event of Loss that have not been applied to repair, replacement or restoration of the Facilities in accordance with this <u>Section 2.1.4(c)(iii)</u>, the Borrowers shall notify the Second Lien Agent of the amount of such Net Cash Proceeds, and shall prepay the Second Lien Term Loans, together with accrued interest thereon, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an amount equal to 100% of such Net Cash Proceeds.

(A)        If a Reinvestment Notice is delivered by the Borrowers, prior to undertaking any repair, replacement or restoration of the Facilities, the Borrowers shall deliver to the Second Lien Agent the following:

1.        a certificate executed by a Responsible Officer of each Borrower indicating that (i) the Facilities can be repaired, replaced or restored within six (6) months after the Event of Loss with the Net Cash Proceeds, any Cash equity contributions received by the Borrowers and any Cash that the Borrowers are permitted to apply to Restricted Payments in accordance with <u>Section 6.2</u>, (ii) following such repair, replacement or restoration, the Facilities will be able to operate in accordance with Applicable Law, Applicable Permits, the Second Lien Documents and Prudent Operating Practices and (iii) no Default or Event of Default has occurred other than due to such Event of Loss and such repair, replacement or restoration will not result in any Default or Event of Default; and

2.        detailed plans for repair, replacement or restoration of the Facilities subject to such Event of Loss.

(B)        The Second Lien Agent shall review each Reinvestment Notice within ten (10) days of receipt, and the Borrowers shall not commence any such repair, replacement or restoration other than to protect or preserve production, minimize revenue loss or prevent or mitigate an emergency situation involving endangerment of life, human health, safety or the environment or damage to Property without the prior written consent of the

Second Lien Agent.  If the Second Lien Agent does not reject the Reinvestment Notice within ten (10) days of receipt, the Borrower may proceed with the planned repair, replacement or restoration in accordance with the Reinvestment Notice and using the Net Cash Proceeds received.[2]

(iv)        No later than the second Banking Day following the date of receipt by the Borrowers (or the Tax Credit Agent or the Second Lien Agent, as applicable) of any Tax Credit Proceeds that are payable to the Lenders pursuant to <u>Section [5.14]</u>, after payment of any amounts required to be paid to the Tax Credit Agent thereunder, the Borrowers shall prepay the Second Lien Term Loans, together with accrued interest thereon, in each case, at par value, and shall Cash Collateralize any outstanding Letter of Credit, in an amount equal to the lesser of (A) 100% of such Tax Credit Proceeds and (B) the Obligations then outstanding, including all accrued and unpaid interest.  Thereafter any remaining Tax Credit Proceeds shall be applied in accordance with <u>Section [5.14]</u>.

(d)        <u>Order of Application</u>.  All amounts subject to prepayment pursuant to <u>Sections 2.1.4(b)</u> and <u>2.1.4(c)</u> shall be applied (i) *first*, (x) to accrued interest and (y) then to the principal of the Second Lien Term Loans until the Second Lien Term Loans are paid in full in Cash, (ii) *second*, to Cash Collateralize the Letter of Credit and (B) *third*, to pay all other outstanding Obligations.

(e)        <u>Terms of all Prepayments or Repayments</u>.  Upon the payment of any amounts in respect of Second Lien Term Loans hereunder, the Borrowers shall pay to the Second Lien Agent for the account of each applicable Lender, in addition to the principal amount of the applicable Second Lien Term Loans being prepaid or repaid (including all accrued PIK Interest that has been added to the principal balance of the Second Lien Term Loans), whether such payment is an optional payment pursuant to <u>Section 2.1.4(b)</u> or a mandatory repayment pursuant to <u>Section 2.1.4(c)</u>, all accrued and unpaid interest thereon to but not including the date of such prepayment on the amount prepaid.

**2.2        TAX TREATMENT**.  For U.S. federal and applicable state and local income tax purposes, the Borrowers, the Second Lien Agent and each Lender agree (i) that the Second Lien Term Loans shall be treated as indebtedness and shall not be treated as "contingent payment debt instruments" within the meaning of  Section 1.1275-4 of the Treasury Regulations and (ii) to file all of its applicable tax returns and reports in accordance with the treatment set forth in clause (i).[3]

**2.3        OTHER PAYMENT TERMS**.[4]

**2.3.1**   *Place and Manner*.  The Borrowers shall make all payments due to each Lender hereunder to the Second Lien Agent, for the account of such Lender, to the account of such Lender set forth in <u>Schedule I</u>, or to such other account as the Second Lien Agent shall notify the Borrowers in writing from time to time, in Dollars and in immediately available funds not later than 2:00 p.m., New York City time, on the date on which such payment is due.  Any payment made after such time on any day shall be deemed received on the Banking Day after such payment

---

[2]        Note to Draft: Section 2.1.4(c)(iii) to be aligned with final draft of AIDEA credit agreement.
[3]        Note to Draft: Section 2.2 modified to align with Tax Credit Loan Agreement; to be conformed to final draft of Tax Credit Loan Agreement.
[4]        Note to Draft: Mechanics subject to further review.

is received.  The Second Lien Agent shall promptly disburse in immediately available funds to each Lender each such payment received by the Second Lien Agent for such Lender.

        **2.3.2**   *Date.*  Whenever any payment due hereunder that is required to be paid in Cash (excluding any payments made in kind) shall fall due on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall be included in the computation of interest or fees, as the case may be, without duplication of any interest or fees so paid in the next subsequent calculation of interest or fees payable.

        **2.3.3**   *Late Payments and Events of Default.*  Upon the occurrence and during the continuation of any Default or Event of Default, the Borrowers shall pay interest on the overdue amount of (a) the Second Lien Term Loans owing to each Lender and (b) interest, fees and any other amounts and Obligations payable under this Agreement or any other Second Lien Document, in each case, at a rate per annum equal to 2% per annum above the rate per annum required to be paid on such Second Lien Term Loans pursuant to <u>Section 2.1.1(b)</u> (such rate, the "**Default Rate**") in each case from the date such amount shall be due until such amount shall be paid in full, compounded monthly.  Interest payable pursuant to this <u>Section 2.3.3</u> shall be due and payable upon demand.[5]

        **2.3.4**   *Payments Net of Taxes.* Any and all payments to or for the benefit of any Lender or the Second Lien Agent by or on behalf of the Borrowers hereunder or under any other Second Lien Document shall be made without deduction or withholding for any Taxes unless required by law.

        **2.3.5**   *Withholding Exemption Certificates.*  Each Lender upon becoming a Lender hereunder agrees that it will deliver to the Borrowers and the Second Lien Agent either (a) if it is formed under the laws of the United States of America or a state thereof, two (2) duly completed copies of United States Internal Revenue Service Form W–9, or (b) if it is not so formed, to the extent it is legally able to do so, two (2) duly completed copies of United States Internal Revenue Service Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI or successor applicable form (in the case of any Lender claiming an exemption under the so-called portfolio interest exemption rules, together with a certificate signed by such Lender stating that, for purposes of applying Section 881(c)(3) of the Code or a successor provision, it is not (i) a bank, (ii) a ten (10) percent shareholder of any Borrower, or (iii) a controlled foreign corporation related to any Borrower), as the case may be, certifying in each case that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes.  Each Lender which delivers to the Borrowers and the Second Lien Agent a Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI pursuant to the preceding sentence further undertakes to deliver to the Borrowers and the Second Lien Agent further copies of Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI, or successor applicable forms, or other manner of certification or procedure, as the case may be, on or before the date that any such certification or form expires or becomes obsolete or within a reasonable time after gaining knowledge of the occurrence of any event requiring a change in the most recent certification and forms previously delivered by it to the Borrowers and the Second Lien Agent, and such extensions or renewals thereof as may reasonably be requested by

---

[5]      Note to Draft: To be aligned with Sections 2.3.3 of the AIDEA Credit Agreement and the Tax Credit Loan Agreement.

the Borrowers and the Second Lien Agent, certifying in the case of a Form W-8BEN, W-8BEN-E, W-8IMY or W-8ECI that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes or promptly notifying the Borrowers and the Second Lien Agent of its legal inability to do so.[6] If a payment made to a Lender under any Second Lien Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Second Lien Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Second Lien Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Second Lien Agent as may be necessary for the Borrowers and the Second Lien Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.3.5, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

    2.3.6    *Application of Payments.*  Except as expressly otherwise provided in the Second Lien Documents, payments made under this Agreement and the other Second Lien Documents and other amounts received by the Second Lien Agent or the Lenders under this Agreement and the other Second Lien Documents shall be applied, *first*, to any fees, costs, charges or expenses payable to the Second Lien Agent and the Lenders hereunder or under the other Second Lien Documents, *second*, to all accrued but unpaid interest thereon then due and owing and, *third* to outstanding principal then due and owing or otherwise to be prepaid.

    2.4    **PRO RATA TREATMENT**.

    2.4.1    *Payments.*  Except as otherwise provided herein, each payment of principal of and interest and fees on the Second Lien Term Loans shall be made or shared among the Lenders pro rata according to their respective Proportionate Shares (unless otherwise agreed by each adversely affected Lender).

    2.4.2    *Sharing of Payments, Etc.*  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of any Second Lien Term Loans owed to it, in excess of its ratable share of payments on account of such Second Lien Term Loans obtained by all Lenders entitled to such payments (unless otherwise agreed to by each such adversely affected Lender), such Lender shall forthwith segregate and hold in trust and promptly pay over to the Second Lien Agent (for distribution among the Lenders according to their respective Proportionate Shares) with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.

    2.4.3    *Consent Fees.*  No Borrower nor any of their Affiliates will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as Lender hereunder) as consideration for the agreement of such Lender in respect of any modification or waiver of the Second Lien Loan Documents,

---

[6]        Note to Draft: Change made to align with Tax Credit Loan Agreement.

unless all Lenders so agreeing are concurrently paid, on the same terms, their Proportionate Share of such remuneration or other value; *provided* that nothing in this Section 2.4.3 shall prohibit the reimbursement of Lenders pursuant to Section 9.4 in the amounts permitted thereunder.

**2.5** **ALTERNATE OFFICES**. Any Lender may, upon written notice to the Borrowers, designate a Lending Office other than that set forth on Exhibit E and may assign all of its interests under the Second Lien Documents and its Notes to such Lending Office.

**2.6** **ENSTAR LETTER OF CREDIT.**

**2.6.1** Subject to the terms and conditions set forth in this Agreement, from time to time, the Second Lien Agent and the ECP Lenders agree to use commercially reasonable efforts to arrange for the provision of a Letter of Credit (or extensions or reinstatements of a Letter of Credit previously arranged) for the account of the Borrowers to satisfy the Borrowers' obligation to deliver and maintain a letter of credit under the APC Gas Sales Agreement, in an aggregate face amount not exceeding, at any time, the then applicable APC LC Cap Amount, as the Borrowers may request in writing; *provided* that the Second Lien Agent and the ECP Lenders shall have no obligation to arrange for the provision of a Letter of Credit, if: (A) unless the Second Lien Agent has approved such expiry date in its sole discretion, the expiry date of the Letter of Credit would occur after the date which is twelve (12) months after the date of issuance or after May 31, 2021, (B) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain the Second Lien Agent or any ECP Lender from arranging for the provision of the Letter of Credit, or the Letter of Credit Issuer from issuing the Letter of Credit or any Applicable Laws applicable to the Second Lien Agent, any ECP Lender or the Letter of Credit Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Second Lien Agent, any ECP Lender and/or the Letter of Credit Issuer shall prohibit, or request that the Letter of Credit Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon the Letter of Credit Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which the Letter of Credit Issuer is not otherwise compensated), or shall impose upon the Letter of Credit Issuer any unreimbursed loss, cost or expense which was not applicable on the Effective Date and which the Letter of Credit Issuer deems material to it, (C) the issuance of, or request to arrange for the provision for issuance of, the Letter of Credit would violate any Applicable Laws or one or more policies of the Second Lien Agent or any ECP Lender generally or the Letter of Credit Issuer generally applicable to the Letter of Credit Issuer's customers; (D) the Letter of Credit is to be denominated in a currency other than Dollars; (E) the Letter of Credit contains any provisions for automatic reinstatement of the stated amount after any drawing thereunder; or (F) if, immediately after giving effect to the issuance of the Letter of Credit, the aggregate undrawn amount of the Letter of Credit and the aggregate amount of all Letter of Credit disbursements that have not been reimbursed by or on behalf of the Borrowers would be greater than the then applicable APC LC Cap Amount.  For the avoidance of doubt, none of the ECP Lenders, the Second Lien Agent or their respective Affiliates shall have any obligation to serve as a Letter of Credit Issuer or otherwise issue, extend or reinstate a Letter of Credit hereunder, and the obligations of the Second Lien Agent and the ECP Lenders hereunder are solely with respect to using such Person's commercially reasonable efforts with respect to arranging for the provision of a Letter of Credit for the account of the Borrowers, it being understood that the issuance of a Letter

of Credit and existence of the letter of credit facility under which the Letter of Credit shall be issued is not guaranteed by the terms hereof.

**2.6.2** *Existing Letter of Credit*. Notwithstanding anything herein to the contrary, the Existing Letter of Credit shall be deemed to have been issued pursuant to <u>Section 2.6.1</u> of this Agreement.

**2.6.3** *Letter of Credit Fees*.  As consideration for the Second Lien Agent and ECP Lenders arranging for the provision of a Letter of Credit hereunder, the Borrowers agree to reimburse to the Second Lien Agent at cost, for the benefit of the ECP Lenders:

(a)        for all amounts payable by the Second Lien Agent to the Letter of Credit Issuer for any extension of the credit facility under which the Letter of Credit will be issued and all amounts of and in connection with the requested issuance, reinstatement, renewal or amendment of the Letter of Credit hereunder;

(b)        the per annum amount equal to the Letter of Credit Margin on the daily face amount of the Letter of Credit, less the amount of any draws on the Letter of Credit, commencing on the issuance date thereof and continuing for so long as the Letter of Credit remains outstanding calculated on the basis of actual days elapsed in a year consisting of 360 days; and

(c)        any additional amount required to be paid by the Second Lien Agent or the ECP Lenders in connection with the Letter of Credit or on any amounts drawn thereon,

which amounts may be paid by increasing the amount of the Second Lien Term Loans held by the ECP Lenders on the last day of each calendar quarter.[7]

**2.6.4** *Drawings; Second Lien Term Loan Principal Increases.* In the case of any drawing on the Letter of Credit, the principal amount of the Second Lien Term Loans held by the ECP Lenders shall automatically be increased on a dollar for dollar basis corresponding to the amount so drawn.

**2.7**    **FIRPTA MATTERS.**

**2.7.1** *FIRPTA Reduction*. In the event the Sponsor is required to pay any Taxes imposed pursuant to FIRPTA in connection with the transactions set forth in the Acquisition by Foreclosure Agreement (as defined in the Plan) (the aggregate amount of any such Taxes, the "**FIRPTA Liability**"), the principal amount of Second Lien Term Loans shall be automatically reduced on a dollar for dollar basis corresponding to the amount of the FIRPTA Liability, which reduction shall be allocated pro rata amongst Lenders based on each Lender's Proportionate Share as of the Effective Date (without taking into account any increase in the principal amount of the Second Lien Term Loans pursuant to <u>Section 2.6</u>), *provided* that the reduction in principal amount

---

[7]        Note to Draft: Currently, the fees payable in connection with the Existing Letter of Credit is only the 1.6% per annum margin.  However, if ECP has to replace or extend the Existing Letter of Credit when it expires in August 2020, the fees may change.  ECP is fine to agree to pass the fees along at cost, without any markup, but cannot guarantee the fees for the entire period during which it has agreed to use commercially reasonable efforts to make the Existing Letter of Credit available.

of Second Lien Term Loans pursuant to this Section 2.7.1 shall not exceed $1,000,000 in the aggregate.

2.7.2    *FIRPTA Holdback.* In the event that the Second Lien Term Loans would be repaid in full prior to the fourth (4th) anniversary of the Effective Date and before any FIRPTA Liability has been assessed and paid, the FIRPTA Holdback Amount shall be deposited by the Borrowers into the FIRPTA Escrow Account.  On the first Banking Day following the conclusion of the FIRPTA Holdback Period, the FIRPTA Holdback Amount shall be applied in accordance with Section 2.7.3.  Amounts withheld with respect to FIRPTA Liability shall be treated as if paid to Lenders on the date such amounts would otherwise have been paid and then set aside by such Lenders in connection with the FIRPTA Liability obligations and shall not accrue or otherwise be entitled to interest (other than any interest accruing on such amounts in the FIRPTA Escrow Account), which shall only be distributable to the Lenders at the end of the FIRPTA Holdback Period pursuant to Section 2.7.3.

2.7.3    *FIRPTA Escrow Amount Release*.  On the first Banking Day after the end of the FIRPTA Holdback Period, the Borrowers shall transfer all funds on deposit in the FIRPTA Escrow Account to the Second Lien Agent, for distribution pro rata amongst Lenders based on each Lender's Proportionate Share as of the Effective Date (without taking into account any increase in the principal amount of the Second Lien Term Loans pursuant to Section 2.6).  The parties hereto agree that until all funds on deposit in the FIRPTA Escrow Account (if any, at the end of the FIRPTA Holdback Period) have been transferred to the Second Lien Agent in accordance with this Section 2.7.3, the Obligations shall be deemed to not be repaid and all of the Sponsor's and the Borrowers' obligations hereunder and under each other Second Lien Document shall remain in full force and effect.

## ARTICLE 3
## CONDITIONS PRECEDENT

3.1    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.  The effectiveness of this Agreement and the occurrence of the Effective Date are subject to the satisfaction of each of the following conditions (unless waived in writing by the Second Lien Agent with the consent of the Required Lenders), all of which shall be in form, scope and substance reasonably satisfactory to the Second Lien Agent and the Required Lenders:

3.1.1    *Incumbency.*  Delivery to the Second Lien Agent of a certificate from each of the Borrowers and the Sponsor, in each case signed by an appropriate authorized officer of each such entity and dated the Effective Date, as to the incumbency of the natural persons authorized to execute and deliver this Agreement, the other Second Lien Documents and any instruments or agreements required hereunder or thereunder to which such entity is a party.

3.1.2    *Formation Documents.*  Delivery to the Second Lien Agent of a copy of the limited liability company agreement (which such limited liability company agreements shall include customary provisions opting in to Article 8 of the UCC) and certificate of formation or organization of each of the Borrowers and the Sponsor, in each case certified by a Responsible Officer of each such entity as being true, correct and complete on the Effective Date, and any related agreements or certificates filed in accordance with Applicable Law.

**3.1.3** *Good Standing Certificates.* Delivery to the Second Lien Agent of a certificate issued by the Secretary of State of Delaware for each of the Borrowers and the Sponsor, and, if applicable, each state of foreign qualification (which shall include the state of Alaska), in each case dated no more than 30 days prior to the Effective Date and certifying that such entity is in good standing or has current status, and is qualified to do business in, and, if applicable, has paid all franchise taxes or similar taxes due to, such state.

**3.1.4** *Second Lien Documents.* Delivery to the Second Lien Agent of executed copies of the Second Lien Documents.  If requested by any Lender, delivery to the Second Lien Agent of an original Note in the amount of such Lender's Proportionate Share of the Second Lien Term Loans.

**3.1.5** *Legal Opinions.* Delivery to the Second Lien Agent of legal opinions of Chipman Brown Cicero & Cole, LLP, as New York and Delaware counsel to the Borrowers and the Sponsor and by David H. Bundy, PC, as Alaska law counsel to the Borrowers and Sponsor, addressed to the Second Lien Agent and the Lenders.

**3.1.6** *Absence of Litigation.* Other than the Bankruptcy Cases and except as set forth on Schedule 3.1.6, no action, suit, proceeding or investigation shall be pending or, to the knowledge of the Borrowers, threatened against the Sponsor (to the Borrowers' knowledge), the Borrowers or the Properties of the Sponsor (to the Borrowers' knowledge) or the Properties of the Borrowers. No order, judgment or decree shall have been issued or, to the knowledge of the Borrowers, proposed to be issued by any Governmental Authority relating to the Sponsor (to the Borrowers' knowledge), the Borrowers or the Properties of the Sponsor (to the Borrowers' knowledge) or the Properties of the Borrowers.

**3.1.7** *Payment of Filing and Recording Fees*.  All amounts required to be paid to or deposited with the Second Lien Agent on or prior to the Effective Date, including all Taxes, fees and other costs payable in connection with the execution, delivery, recording and filing of the documents and instruments referred to in this <u>Section 3.1</u>, shall have been paid in full by the Sponsor[8] or, as approved by the Second Lien Agent, provided for.

**3.1.8** *UCC and Tax Lien Reports and other Lien Reports.*  The Second Lien Agent shall have received UCC, judgment, tax lien reports and Real Property lien reports of a date no less recent than ten (10) Banking Days before the Effective Date.

**3.1.9** *Collateral: Filings and Recordings*.  The Second Lien Agent shall have received, in each case in form and substance reasonably satisfactory to the Second Lien Agent:

(a)      UCC financing statements, naming each Borrower as debtor and the Second Lien Agent as secured party, in form appropriate for filing;

(b)      UCC financing statement terminations or amendments required pursuant to Section 9.26 of the Tax Credit Loan Agreement, in form appropriate for filing;

---

[8]      Note to Draft: Lenders are working to obtain an estimate of fees.

(c)            copies of all other recordings and filings of, or with respect to, the Second Lien Security Documents as may be requested by the Required Lenders acting reasonably; and

(d)            satisfactory evidence that all other actions necessary to perfect the security interests purported to be created by the Second Lien Security Documents have been taken or will be taken on the Effective Date.

**3.1.10** *Government Authorizations and Consents.* (a) Each Borrower shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the execution, delivery and performance of the Second Lien Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Second Lien Agent and (b) all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Second Lien Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

**3.1.11** *Real Property Deliverables.* Delivery to the Second Lien Agent, in form and substance reasonably satisfactory to the Second Lien Agent and appropriate for filing, a duly executed Mortgage.[9]

**3.1.12** *Insurance and Bonds.* The Second Lien Agent shall have received (a) certified copies of all policies evidencing insurance that comply with Section 5.16 (or a binder, commitment or certificates signed by the insurer or a broker authorized to bind the insurer), showing the Lenders as additional insureds and additional loss payees (except with respect to third party liability policies) and (b) all bonds required by the State of Alaska for operation of the Facilities.[10]

**3.1.13** *Other Documents.* The Borrowers shall cooperate and provide to the Lenders such other documents as the Lenders may request to effect the transactions contemplated by this Agreement, including the perfection of any security interest granted pursuant to the Second Lien Documents.

**3.1.14** *Patriot Act.* The Second Lien Agent and the Lenders shall have received all documentation and other information requested by the Second Lien Agent or the respective Lenders that is required by bank regulatory authorities under the applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

**3.1.15** *No Default.* No Default or Event of Default has occurred and is continuing or will result from the incurrence of the Second Lien Term Loans.

---

[9]      Note to Guess Rudd: Please confirm whether there will be two forms of mortgages, one for filing on June 30 and another for filing on July 1, or is the same form filed on both days?

[10]      Note to Draft: Clause (b) added from the AIDEA Loan Agreement; to conform to final draft of AIDEA Loan Agreement.

**3.1.17** *No Material Adverse Effect.*   There shall not have occurred a Material Adverse Effect nor be any existing event or condition that could reasonably be expected to result in a Material Adverse Effect immediately before and after giving effect to the incurrence of the Second Lien Term Loans.

**3.1.19** *Plan; Confirmation Order.*

(a)        The Plan shall not have been amended, modified or supplemented after [●], 2020 in any manner and no condition to the effectiveness thereof shall have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Lenders in any material respect.

(b)        The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Required Lenders and shall have been entered confirming the Plan.

(c)        The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Lenders in any material respect and shall not be subject to any pending appeals.

(d)        The Confirmation Order shall authorize the Debtors to execute, deliver and perform all of their obligations under all Second Lien Term Loan Documents and shall contain no term or provision that contradicts such authorization.

(e)        The Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects.

(f)        The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived (in accordance with the terms of the Plan) without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Lenders in any material respect unless consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Effective Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

**3.1.20** *Effective Date Capitalization*.   Concurrently with the Effective Date, the Sponsor shall have contributed to FOA an aggregate capital contribution in an amount equal to $5,000,000 (in excess of any amounts contributed to any of the Borrowers for the purposes of paying any amounts required to be paid under the Plan on the Effective Date).

**3.1.21** *Solvency*.   Each Borrower, individually, immediately after giving effect to the transactions contemplated by the Second Lien Loan Documents and the Plan, is Solvent.

**3.1.22** *JOA Notice*. Each Borrower shall provide notice to each of the other parties to the JOA, pursuant to Section VIII.D. thereof, notifying such other parties that it has granted an encumbrance over its interests in the Contract Area (as defined in the JOA).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES [11]

Each Borrower makes the following representations and warranties to and in favor of the Second Lien Agent and the Lenders as of the Effective Date and as of each date any certificate is delivered pursuant to the Second Lien Documents:

**4.1**　　**STATUS**.  Each Borrower (a) is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware and (b) is duly qualified and authorized to do business and in good standing in each jurisdiction where the character of its Properties or the nature of its activities makes such qualification necessary.  Each Borrower has all requisite limited liability company power and authority to own or hold under lease and operate the property it purports to own or hold under lease, to carry on its business as now being conducted and as now proposed to be conducted in respect of its Properties and to execute, deliver and perform its obligations hereunder and the other Second Lien Documents to which it is a party.

**4.2**　　**AUTHORITY**.  Each Borrower has full power and authority to execute and deliver this Agreement and the other Second Lien Documents to which it is a party and to carry out their respective obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the other Second Lien Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on their respective parts and each Borrower has executed and delivered the Second Lien Documents to which it is a party.  This Agreement and the other Second Lien Documents to which it is a party constitute valid and legally binding obligations, enforceable against each Borrower in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization and other similar laws now or hereafter in effect relating to creditors' rights generally or by general principles of equity (whether enforced at law or in equity).

**4.3**　　**GOVERNMENTAL AUTHORIZATIONS**.  There is no proceeding pending, or to their knowledge, threatened against any Borrower that seeks to, or may be reasonably expected to rescind, terminate, modify in any manner adverse to the Properties of the Borrowers or the Borrowers or suspend any Governmental Authorization or this Agreement or materially interfere with its ability to fully perform its obligations and duties set forth under this Agreement or the other Second Lien Documents.

**4.4**　　**NO BREACH OR DEFAULT**.  The execution, delivery and performance by each Borrower of this Agreement and the transactions contemplated hereby and by the other Second Lien Documents does not and will not (a) require any consent or approval or registration with or notice to or other action of any Governmental Authority or any other Person except for Pending

---

[11]　　Note to Draft: Relevant reps and warranties, covenants and events of default to align with the corollary provisions in the AIDEA Credit Agreement

Permits and immaterial Permits and consents as expressly provided for herein or the Second Lien Documents or that has otherwise been obtained and is currently in effect or (b) constitute a breach of any term or provision of, conflict with, or violate or constitute a default under (with or without notice, or lapse of time, or both), or result in or require the creation of any Lien (other than Permitted Encumbrances) upon any of its property under, (i) any outstanding indenture, mortgage, loan agreement or other contract or agreement to which any Borrower is a party, or their respective Properties is bound, (ii) their respective operating agreement, certificate of formation or other Organizational Documents, or any other Contractual Obligations, (iii) any material Applicable Law (or require any consents, approvals, notifications or authorizations thereunder) applicable to or binding on the Borrowers or any of their respective Properties, or (iv) any order, writ, judgment or decree of any Court or other Governmental Authority having applicability to any Borrower.

   **4.5**  **COMPLIANCE WITH LAW**. Except as otherwise have been delivered to the Second Lien Agent and that are expressly identified on <u>Schedule 4.5</u>, there are no (a) material violations by any Borrower of any Legal Requirement; and (b) written notices of material violation of any Legal Requirement relating to the Properties of any Borrower, the Second Lien Documents or the Collateral have been received by any Borrower.

   **4.6**  **BUSINESS, CAPITALIZATION, JOINT VENTURES, SUBSIDIARIES, ETC.**

   **4.6.1** *No Other Business*.  No Borrower has conducted, and no Borrower is conducting, any business other than the development, construction, ownership, operation, maintenance and financing of the Properties of the Borrowers and, in each case, activities related and incidental thereto, does not have any outstanding Debt or other liabilities or contingent obligations other than pursuant to or permitted by the Second Lien Documents, and, except as disclosed in <u>Schedule 4.6.1</u>, is not a party to or bound by any material contract other than the Material Contracts, the Second Lien Documents to which it is a party and those other instruments and agreements which it is permitted to enter into pursuant to the Second Lien Documents.

   **4.6.2** *Borrower not a Partner*.  No Borrower is a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture.

   **4.6.3** *Subsidiaries*.  FOA does not have any Subsidiaries, does not hold any Equity Interests in any other entity and is a wholly-owned direct Subsidiary of Cornucopia. Cornucopia does not have any Subsidiaries other than FOA and does not hold any Equity Interests in any other entity other than FOA.  Corsair does not have any Subsidiaries and does not hold any Equity Interests in any other entity.  Each of Cornucopia and Corsair is a wholly-owned direct Subsidiary of the Sponsor.

   **4.7**  **INVESTMENT COMPANY ACT**. No Borrower is subject to regulation under any federal or state statute or regulation which may limit its ability to incur Debt or which may otherwise render all or any portion of the Obligations unenforceable.  No Borrower is an "investment company", "registered investment company", a company "controlled" by an "investment company" or a "registered investment company" or a "principal underwriter" of a "registered investment company", within the meaning of the Investment Company Act of 1940.

**4.8**        **REGULATORY MATTERS**.

        **4.8.1**  *Natural Gas Act of 1938; State Regulation*.  No Borrower is (i) a "natural-gas company" as defined under the Natural Gas Act of 1938 ("**NGA**") and subject to regulation by FERC as a "natural-gas company" under the NGA and FERC's rules and regulations implemented thereunder or an "intrastate pipeline" as defined under the Natural Gas Policy Act of 1978 ("**NGPA**")  and subject to regulation by FERC as an "interstate pipeline" under Section 311 of the NGPA and FERC's rules and regulations implemented thereunder or (ii) subject to regulation by the Regulatory Commission of Alaska under the Alaska Public Utilities Regulatory Act, AS 42.05 et seq.; the Pipeline Act, AS 42.06 et seq. or the In-State Pipeline Contract Carrier Act, AS 42.08 et seq.  To the Borrowers' knowledge, neither the Second Lien Agent nor the Lenders shall, solely as a result of entering into this Agreement, be subject to regulation by (i) FERC under the NGA or NGPA or (ii) the Regulatory Commission of Alaska under the Alaska Public Utilities Regulatory Act, AS 42.05 et seq.; the Pipeline Act, AS 42.06 et seq. or the In-State Pipeline Contract Carrier Act, AS 42.08 et seq.

        **4.8.2**  *State Regulation*.  None of the Borrowers, the Second Lien Agent or the Lenders is or will be, solely as the result of this Agreement or the Second Lien Documents and the transactions contemplated thereby, subject to regulation as a public utility, common carrier, public service company or similar designation under the public utility laws of any state in which any Borrower operates, and none of the Borrowers, the Second Lien Agent nor the Lenders is or will be, solely as the result of this Agreement or the Second Lien Documents and the transactions contemplated thereby, subject to the laws of any state in which any Borrower or its Subsidiaries operates respecting the rates charged by, or the financial or organizational regulation of, a public utility or similar designation.

        **4.9**        **HAZARDOUS SUBSTANCE**. Except as set forth in <u>Schedule 4.9</u>:

        (a)        No Borrower is or has in the past been in material violation of any Environmental Law;

        (b)        no Borrower or any third party has used, released, generated, manufactured, produced or stored, or transported thereto or therefrom, any Hazardous Substances in, on, under, or about any property or facility owned, leased, occupied or otherwise operated by any Borrower in a manner or amount that could reasonably be expected to subject either of the Borrowers, the Second Lien Agent or the Lenders to any material Environmental Claims; and

        (c)        to the knowledge of each Borrower, there neither is, nor has been, any condition, circumstance, action, activity or event that could reasonably be expected to subject (i) FOA or Cornucopia to any material Environmental Claims or other liability under any material Environmental Law or (ii) the Second Lien Agent or the Lenders to any material Environmental Claims or other material liability under any Environmental Law.

        **4.10**      **TAX SHARING AGREEMENTS**.  No Borrower is party to or bound by any Tax sharing agreement or similar agreement or arrangement (whether or not written) pursuant to which it may have an obligation to make payments after the Effective Date, other than obligations under the terms of (a) this Agreement and any other Second Lien Documents, (b) the New Term Loan

Agreement and any other New Term Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the New Term Loan Documents and (c) the Tax Credit Loan Agreement and any other Tax Credit Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the Tax Credit Loan Documents.

**4.11    REGULATION U, ETC**.  No Borrower is engaged principally, or as one of its principal activities, in the business of extending credit for the purpose of purchasing or carrying margin stock or any other purpose that would cause the Second Lien Credit Facility to constitute a "purpose credit" (as defined in Regulation T, U or X of the Federal Reserve Board), and no part of the proceeds of the Second Lien Term Loans will be used by any Borrower to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

**4.12    ORGANIZATIONAL ID NUMBER; LOCATION OF COLLATERAL**.

**4.12.1** As of the Effective Date, FOA's organizational identification number is 6727391, Corsair's organizational identification number is 6727383 and Cornucopia's organizational identification number is 6727372.[12]

**4.12.2** As of the Effective Date, all of the tangible Collateral is located on the Properties of the Borrowers or at the addresses set forth in <u>Section 9.1</u>, except as otherwise permitted by the Pledge and Security Agreement.

**4.13    TITLE AND LIENS**.  Other than as expressly permitted by the Second Lien Documents, each Borrower has good, legal and valid title to, or, with respect to Property other than Real Property, right to use, their respective Properties and all of the Collateral free and clear of all Liens except Permitted Encumbrances.  No portion of the Properties of any Borrower has been leased, subleased, licensed or otherwise granted by any Borrower to any Person.  No Borrower has leased or otherwise granted any Person the right to use or occupy its Properties.  No Borrower has granted any, and there are no, outstanding options, rights of first offer or rights of first refusal to purchase its Properties or any portion thereof or interest therein.  No Borrower has received written notice of any pending, and to the knowledge of each Borrower, there is no threatened, condemnation proceeding or special assessment with respect to any of the Properties of any Borrower.

**4.14    COLLATERAL**.

**4.14.1** Subject to the Intercreditor Agreements, the security interests granted to the Second Lien Agent for the benefit of the Secured Parties pursuant to the Second Lien Security Documents in the Collateral:

(a)    constitute, as to personal property included in the Collateral, a valid first priority security interest and lien under the UCC, except, with respect to priority, the Permitted Prior Liens and, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted

---

[12]    Note to Borrowers: Please update as required.

Encumbrances (other than Permitted Prior Liens) are subject to the Liens under the Second Lien Security Documents;

(b)    upon recording, constitute, as to real property included in the Collateral, a valid and subsisting first priority Lien of record on all the real property of each Borrower, to the extent applicable, subject to no Liens and encumbrances except, with respect to priority, the Permitted Prior Liens and, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted Encumbrances (other than Permitted Prior Liens) are subject to the Liens under the Second Lien Security Documents; and

(c)    are perfected (i) with respect to any property that can be perfected by filing, upon the filing of financing statements in the filing offices identified on Exhibit E, (ii) with respect to any property that can be perfected by control and is described in the Control Agreement or other applicable control agreement, upon execution of such Control Agreement or other applicable control agreement, as applicable, and (iii) with respect to any certificated securities or any property that can only be perfected by possession, upon the Second Lien Agent receiving possession thereof, and in each case such security interest will be, as to Collateral perfected under the UCC as aforesaid, subject to the Intercreditor Agreements, superior and prior to the rights of all third Persons now existing or hereafter arising whether by way of Lien of any type, assignment or otherwise, except, with respect to priority, the Permitted Prior Liens and, after the Effective Date, Permitted Encumbrances; *provided* that such Permitted Encumbrances (other than Permitted Prior Liens) are subject to the Liens under the Security Documents.

**4.14.2**  The Tax Credit Certificates and proceeds from all State Tax Credits, including without limitation all State Tax Credits due to the Borrower from the DOR have been collaterally assigned to (a) the Tax Credit Agent pursuant to the Tax Credit Collateral Documents, (b) the New Term Loan Agent pursuant to the New Term Loan Collateral Documents and (c) the Second Lien Agent pursuant to the Pledge and Security Agreement.[13]

**4.15**    ACCOUNTS.  Except as set forth on Schedule 4.15, no Borrower has any deposit, securities or other accounts.

**4.16**    COMMODITY EXCHANGE ACT.  As of the Effective Date, no Borrower (a) has entered into or is otherwise party to any Hedging Agreements, (b) is subject to regulation as a "commodity pool," "commodity pool operator," or "commodity trading advisor," as defined in Sections 1a(10), 1a(11), and 1a(12), respectively, of the CEA or (c) is required to qualify as an Eligible Contract Participant.

**4.17**    MATERIAL CONTRACTS.  As of the Effective Date, the list of Material Contracts contained in Schedule [●] is a true, correct and complete list of all contracts material to the ownership, maintenance or operation of the Properties of any Borrower and the Properties of the Borrowers.  True and complete copies of each Material Contract including all amendments thereto in effect as of the Effective Date have been delivered to the Second Lien Agent. Except as has been previously disclosed in writing to the Second Lien Agent, as of the Effective Date, none of the Material Contracts has been amended, modified or terminated.  All Material Contracts are in

---

[13]    Note to Draft: Changes from Tax Credit Loan Agreement; to be conformed to the final draft of the Tax Credit Loan Agreement.

full force and effect.  There is no material default under any such Material Contract and no event has occurred and is continuing or has failed to occur, and no condition exists, that, with the passage of time or upon giving of notice or both, could constitute an event of default thereunder or give rise to any right of termination of such Material Contract.[14]

**4.18    PERMITS**.

**4.18.1**  *Existing Permits*.  As of the Effective Date, <u>Exhibit [●]</u> contains a complete and correct list of all material Permits required under any existing Applicable Law to develop, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers in the ordinary course of business.  As of the Effective Date, <u>Part I</u> of <u>Exhibit [●]</u> lists all of such Permits that are presently Applicable Permits and <u>Part II</u> of <u>Exhibit [●]</u> lists all of such Permits that are presently Pending Permits.

**4.18.2**  *Applicable Permits*.  Each of the Applicable Permits has been duly obtained by or assigned to the Borrowers, and is in full force and effect, and except as disclosed therein, (a) is not subject to any current legal proceeding, (b) is not subject to any unsatisfied condition, or to any restriction, limitation or other provision that could reasonably be expected to result in a material limitation on the effectiveness thereof, or a material modification or revocation thereof and (c) all applicable appeal periods with respect thereto have expired.  Each Borrower is in compliance in all material respects with all Applicable Permits.  Except for the Pending Permits, the Applicable Permits are all of the material Permits required to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers in the ordinary course of business and Applicable Law, and each such Permit is adequate and sufficient for that purpose.

**4.18.3**  *Pending Permits*.  No fact or circumstance exists, to any Borrower's knowledge, which indicates that any Pending Permit shall not be timely obtainable and fully effective without material difficulty, expense or delay by any Borrower, on or before the date such Pending Permit is necessary in connection with the transactions contemplated by the Second Lien Documents, or to meet the performance obligations of any Borrower under the Second Lien Documents.  Further, to each Borrower's knowledge, no fact or circumstance exists that, upon expiration of the appeal period applicable to any Pending Permit, would prevent any Borrower from making the representations contained in <u>Section 4.18.2</u>.[15]

**4.19    STATE TAX CREDITS**.

(a)    There are no deficiency payments, liquidated damages or other expenses or amounts currently due or payable (or reasonably expected to be due and payable) that could result in an offset against the State Tax Credits.  Cornucopia is in compliance with the provisions of AS 43.55.028(e).

---

[14]    Note to Draft: Added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

[15]    Note to Draft: Added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

(b)    Cornucopia has timely filed all state oil and gas production tax returns with the DOR no later than February 28 in each tax year set forth on <u>Schedule 4.19</u> following the applicable tax year.

(c)    Cornucopia has, concurrently with the filing of each Alaska Tax Credit Application set forth on <u>Schedule 4.19</u>, collaterally assigned to the Tax Credit Agent all State Tax Credits to the extent permitted by Alaska law, by the filing with the DOR of a Tax Credit Assignment in accordance with Tax Credit Loan Agreement, together with (i) an Alaska Optional Waiver of Confidentiality for Tax Credit Certificate Information relating to Assignments under AS 43.55.029 in a form prescribed by the DOR (Form 355 or equivalent) in favor of the Tax Credit Agent and (ii) a State of Alaska Electronic Payment Agreement filed with the Alaska Department of Administration and the DOR.

(d)    Cornucopia has timely completed and filed with the DOR, in accordance with Applicable Laws, all Alaska Tax Credit Applications set forth on <u>Schedule 4.19</u> for the State Tax Credits no later than forty five (45) days after the first date on which such Alaska Tax Credit Applications can be filed with the DOR.

(e)    Cornucopia has filed with the DOR, no later than ten (10) Banking Days' following the issuance of each State Tax Credit, a DOR Purchase Application relating to such State Tax Credit together with the applicable Tax Credit Assignment as required by AS 43.55.029(a), which DOR Purchase Applications are set forth on <u>Schedule 4.19</u>.[16]

## ARTICLE 5
## AFFIRMATIVE COVENANTS

Until the Second Lien Termination Date:

**5.1    FINANCIAL STATEMENTS AND OTHER REPORTS.**

**5.1.1**    *Quarterly.*  As soon as practicable and in any event within 45 days after the end of each quarterly accounting period of its fiscal year (including the fourth fiscal quarter of each fiscal year), beginning with the first full quarter after the Effective Date, each Borrower shall deliver (A) an unaudited consolidated and consolidating balance sheet of the Borrowers, as of the last day of such quarterly period and the related consolidated statements of income, cash flow, and equity (where applicable prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes)) for such quarterly period and (in the case of second, third, and fourth quarterly periods) for the portion of the fiscal year ending with the last day of such quarterly period, setting forth in each case in comparative form corresponding unaudited figures from the preceding fiscal year, and a report from the management of the Borrowers discussing and analyzing such financial results and their effect on the financial projections of the Borrowers for the following twelve (12) month period and (B) an updated financial forecast.

---

[16]    Note to Draft: Added from Tax Credit Loan Agreement; to be conformed to the final draft of the Tax Credit Loan Agreement.

Notwithstanding the foregoing, for the first full quarter after the Effective Date, the items required pursuant to (A) and (B), above, shall not be due until 90 days after the end of such quarter.[17]

      5.1.2    *Annual*.  As soon as practicable and in any event within 120 days after the close of each applicable fiscal year, each Borrower shall deliver audited consolidated and consolidating financial statements of the Borrowers; *provided* such statements for the year ending December 31, 2020 shall be delivered within 180 days after December 31, 2020.  Such consolidated and consolidating (in the case of Cornucopia) financial statements shall include a consolidated statement of equity, a consolidated and consolidating balance sheet as of the close of such year, an consolidated income and expense statement, reconciliation of capital accounts and a consolidated statement of cash flow, all prepared in accordance with GAAP, certified by an independent certified public accountant selected by the Borrowers, with the approval of the Second Lien Agent acting reasonably.  Such certificate shall not be qualified or limited because of restricted or limited examination by such accountant of any material portion of the records of any Borrower.[18]

      5.1.3    *Monthly*.  Within fifteen (15) days after the end of each month commencing with the first full month occurring after the Effective Date, the Borrowers shall deliver: (A) internally prepared financial information (or management reports or updates) and monthly information with respect to the quantity of oil, natural gas, natural gas liquids and other liquid or gaseous hydrocarbons delivered by the Borrowers, sales of the foregoing (to the extent such information is available), average volumes processed per day, revenue and expenses; (B) a detailed report of all Capital Expenditures expended during such immediately preceding calendar month*;* (C) a detailed report of all Lease Operating Expenses and Capital Expenditures expended during such immediately preceding calendar month, together with a detailed reconciliation against the budgets for the same, during such calendar month, in form and substance satisfactory to the Second Lien Agent acting reasonably; and (D) a detailed report of drilling activity, including counts of jobs associated with rig operations; <u>provided</u> during the first quarter after the Effective Date, the monthly reports shall be delivered within 30 days after the end of each calendar month.[19]

      5.1.4    *Second Lien Agent/Lender Requests*.  From time to time, as soon as practicable after the request of the Second Lien Agent or any Lender, each of the Borrowers shall deliver to the Second Lien Agent such other information and data with respect to the Borrowers or any Property or operations of the Borrowers.

      5.1.5    *Perfection Certificate*.  Concurrently with the delivery of financial statements pursuant to <u>Section 5.1.1</u> and <u>5.1.2</u>, each of the Borrowers shall deliver to the Second Lien Agent (a) an updated Perfection Certificate or (b) a certificate signed by a Responsible Officer of each Borrower certifying that there have been no changes to the Perfection Certificate most

---

[17]    Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

[18]    Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

[19]    Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

recently delivered pursuant to this <u>Section 5.1.5</u>, which certification and certification may be made a part of the certificate delivered pursuant to <u>Section 5.1.2</u>.

   **5.1.6** *Reserve Reports*.  Within 120 days after the end of the calendar year ended December 31, 2020, and each calendar year thereafter, Borrowers shall provide a reserve report ("**Reserve Report**") prepared by an independent petroleum engineer reasonably satisfactory to the Second Lien Agent.  The Reserve Report shall include a certification by a Responsible Officer that (i) the assumptions stated or used in the preparation of the Reserve Report are reasonable, (ii) all information furnished by the Borrowers or their predecessors for use in the preparation of the Reserve Report was accurate in all material respects, (iii) there has been no material adverse change in the amount of the estimated oil and gas reserves shown in the Reserve Report since the date thereof, except for changes which have occurred as a result of production in the ordinary course of business, and (iv) the Reserve Report does not, in any case, omit any material statement or information necessary to cause the same not to be misleading to the Second Lien Agent.  The Reserve Report may be supplemented by all such other internal information as the Borrowers or the Second Lien Agent, acting reasonably, may request or deem appropriate, including without limitation sufficient internally prepared information to permit the Second Lien Agent's engineering consultants to prepare economic engineering evaluations covering the Properties.[20]

   **5.1.7** *Officer's Certificate*.  Each time financial statements are delivered under <u>Section 5.1.1</u> and <u>5.1.2</u> above, each of the Borrowers shall deliver or cause to be delivered along with such financial statements, a certificate signed by a Responsible Officer of each Borrower, certifying that (a) such officer has made or caused to be made a review of the transactions and financial condition of each Borrower during the relevant fiscal period, (b) that such financial statements have been prepared in conformity with GAAP applied consistently throughout the relevant periods (except as otherwise approved and disclosed therein) and fairly presents, in all material respects, the consolidated and consolidating financial position of Cornucopia and Corsair, at the respective dates thereof and the consolidated results of operations and cash flows of Cornucopia and Corsair described therein for each of the periods then ended, subject, in the case of any unaudited quarterly financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure, (c) that such review has not, to such Responsible Officer's knowledge, disclosed the existence of any event or condition which constitutes, as of the date of such certificate, a Default or Event of Default, or if any such event or condition existed or exists, the nature thereof and the corrective actions that any Borrower have taken or propose to take with respect thereto, and (d) that each Borrower is in full compliance with all covenants in this Agreement and each other Second Lien Document.

   **5.1.8** *Telephone Conferences*.  The Borrowers shall host a quarterly telephone conference with the Second Lien Agent and the Lenders on a date and time during each fiscal quarter to be mutually agreed and other telephone conferences between such quarterly telephone conferences as may be reasonably requested by the Second Lien Agent.

   **5.2**  **N**OTICES – **O**PERATION OF **B**USINESS. The Borrowers shall promptly upon receipt of or giving notice (or upon a Responsible Officer of any Borrower otherwise obtaining

---

[20] Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

knowledge thereof) and, except as otherwise noted below, in any event, within 30 days after the occurrence thereof, of any of the following, give notice to the Second Lien Agent of the following (with copies of any underlying notices, papers, files or related documentation), which notice shall be accompanied by a statement of a Responsible Officer of each Borrower setting forth details of the occurrence referred to therein and stating what action the Borrowers propose to take with respect thereto, of:

(a)        as soon as possible, and in any event within three (3) Banking Days after (i) receipt of service of process in respect of any pending litigation, suit, proceeding or investigation before any court, arbiter or other governmental authority or, (ii) any Borrower's knowledge, that the same is threatened against any Borrower, such notice to include, if requested in writing by the Second Lien Agent, copies of all papers filed in such litigation and to be given monthly if any such papers have been filed since the last notice given;

(b)        promptly, but in no event later than three (3) Banking Days after the receipt thereof by any Borrower, copies of (i) any material Permit obtained by any Borrower after the Effective Date, (ii) any material amendment, supplement or other modification to, or revocation of, any material Permit received by any Borrower after the Effective Date, (iii) all material notices relating to any of the Borrowers' Property received by any Borrower from or delivered by any Borrower to any Governmental Authority and (iv) material notices in connection with any material dispute or disputes of which any Borrower has knowledge or for which written notice has been received by any Borrower which may exist between any Borrower and any Governmental Authority;

(c)        as soon as possible, and in any event within one (1) Banking Day after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any Default or Event of Default;

(d)        any casualty, damage or loss, whether or not insured, through fire, theft, other hazard or casualty, to any property of the Borrowers having value, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000);

(e)        (i) promptly, and in any event within one (1) Banking Day of the occurrence thereof, any cancellation, suspension, material change in or non-renewal of the terms, coverage or amounts of any insurance required to be maintained hereunder, (ii) at least 30 days prior notice of any expiration of any insurance required to be maintained hereunder, (iii) within ten (10) days after renewal of coverage of any insurance policy, updated certificates of insurance and (iv) upon request of the Second Lien Agent from time to time, full information as to insurance received;

(f)        copies of any (i) notice of termination of any Material Contract, (ii) material amendments or modifications to any Material Contracts, (iii) Additional Material Contract and (iv) notices of any event of force majeure or material default under any Material Contract;

(g)        any claim of events of force majeure or delay under any engineering, construction and procurement agreement of any Borrower or under any other Material Contract (including claims therefor regardless of whether the Borrowers believe such claim has merit);

(h)        any intentional withholding of compensation, or any right to withhold compensation, claimed by any Person under a Material Contract, other than retention provided by the express terms of any such contracts;

(i)        any (i) Release of Hazardous Substances on or from any location, (ii) pending or, to any Borrower's knowledge, threatened, Claim under any Environmental Law against any Borrower or, to any Borrower's knowledge, any of its Affiliates, contractors, subcontractors, lessees, lessors or any other Persons, arising in connection with their occupying or conducting operations at any location which, if adversely determined, reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect, (iii) any condition, circumstance, occurrence or event that reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 under Environmental Laws or in the imposition of any Lien or any other restriction on the title, ownership or transferability of any Property of any Borrower or in a Material Adverse Effect, (iv) any proposed action to be taken by any Borrower that could subject it to any additional or different requirements or liabilities under Environmental Laws that reasonably could be expected to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect, or (v) existence of any underground tank not previously disclosed in writing, operative or temporarily or permanently closed;

(j)        any proceeding or legislation by any Governmental Authority to expropriate, condemn, confiscate, nationalize or otherwise acquire compulsorily any Borrower, or all or any portion of the Borrowers' business or assets (whether or not constituting a Default or Event of Default);

(k)        promptly, but in no event later than three (3) Banking Days after occurrence thereof, (i) any Unplanned Outage or the scheduling of any Unplanned Outage, in each case, for any Facility with an anticipated duration in excess of 24 hours and (ii) any Unplanned Outage or Planned Outage for any Facility (scheduled or otherwise) with a duration in excess of two (2) days;

(l)        as soon as possible, and in any event within three (3) Banking Days after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any termination (other than any scheduled expiration in accordance with its terms), default or event of default under any contractual obligations of any Borrower or any other Person, or notice of any other event that, with the passage of time or upon giving of notice or both, that reasonably could be expected, if not cured, to result, individually or in the aggregate, in liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(m)        any Lien (other than a Permitted Encumbrance) being granted or established or becoming enforceable over any Properties of any Borrower;

(n)         the occurrence of any event, condition or circumstance that would be required to be disclosed in a current report filed by any Borrower with the Securities and Exchange Commission on Form 8-K if such Borrower were required to file such reports;

(o)         promptly, and in any event within three (3) Banking Days after a Responsible Officer of any Borrower obtains knowledge of the occurrence thereof, any event, condition, circumstance or change that has constituted or reasonably could be expected to result in, individually or in the aggregate, liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(p)         the occurrence of an ERISA Event that has constituted or reasonably could be expected to result in, individually or in the aggregate, liabilities or losses in excess of $100,000 or a Material Adverse Effect;

(q)         promptly, upon the request thereof, such other information and documentation required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations (including the Patriot Act) as from time to time requested by the Second Lien Agent or any Lender;

(r)         promptly upon receipt thereof, copies of all notices, requests, reports and other documents received by any Borrower, or delivered by any Borrower, under or pursuant to any AIDEA Loan Document, Tax Credit Loan Documents, or New Term Loan Document;

(s)         (i) for each calendar year, commencing with the calendar year ending December 31, 2020, no later than forty-five (45) days prior to the beginning of such calendar year, the Borrowers shall deliver to the Second Lien Agent (A) an operating plan and a budget for the Borrowers, detailed by month, of anticipated revenues and anticipated expenditures of the Borrowers, each such annual budget to include operation expenses (including reasonable allowance for contingencies), reserves and all other anticipated operating costs of the Borrowers for the ensuing calendar year and (B) an additional budget for the Borrowers, detailed by month, of aggregate anticipated corporate general and administrative expenses not included in the budgets prepared pursuant to clause (A) above, and each such annual budget shall include required debt payments payable by the Borrowers for the ensuing calendar year and (ii) any material amendments or modifications to such annual operating plan and budgets described in the foregoing clauses (A) and (B);

(t)         as soon as possible upon any failure to make any payment to the State of Alaska or any political subdivision thereof when due; and

(u)         promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Borrower or the Properties of any Borrower or compliance with the terms of any Second Lien Document that the Second Lien Agent or any Lender may request.

**5.3      EXISTENCE; MAINTENANCE OF CONTRACTS**. Except as otherwise expressly permitted under this Agreement, at all times, (i) each of the Borrowers shall maintain and preserve its existence as a Delaware limited liability company and all material rights, privileges and franchises necessary or desirable in the conduct of its business, (ii) in the case of Cornucopia,

maintain its ownership interest in FOA, (iii) each of the Borrowers shall perform all of its material Contractual Obligations and enforce its material rights under its Material Contracts, (iv) each of the Borrowers shall maintain, renew and comply in all material respects with all Applicable Permits, (v) take all reasonable action necessary to prevent termination (except by expiration in accordance with its terms) of, each and every Material Contract, including prosecution of suits to enforce any right of each Borrower thereunder and enforcement of any claims with respect thereto, (vi) each of the Borrowers shall otherwise continue to engage in the same business as contemplated by the Second Lien Documents and the other Material Contracts, (vii) each of the Borrowers shall maintain and keep, or cause to be maintained and kept, its properties in good repair, working order and condition consistent with Prudent Operating Practices (other than ordinary wear and tear) and (viii) each of the Borrowers shall make or cause to be made all repairs (structural and non-structural, extraordinary or ordinary (ordinary wear and tear excepted)) necessary to keep such properties in such condition, in each case, as would allow for the ordinary conduct of business.

5.4    **GOVERNMENT APPROVALS**.  The Borrowers shall promptly obtain all Governmental Authorizations required to operate its business in the ordinary course.

5.5    **COMPLIANCE WITH LAW**.  The Borrowers shall promptly comply, or cause compliance, in all material respects with all Legal Requirements, including, without limitation, the CEA, the Dodd-Frank Act and all regulations promulgated thereunder, Environmental Laws and all Legal Requirements relating to equal employment opportunity or employee benefit plans, Pension Plans and employee safety, with respect to each Borrower.

5.6    **TAXES**.  The Borrowers shall (a) timely file, or cause to be filed, all Tax returns, (b) pay, or cause to be paid, as and when due and prior to delinquency, all Taxes (including any Alaska Taxes), assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to such Person or its Properties (including all Taxes, assessments and charges made by any Governmental Authority for public improvements that may be secured by a Lien on such Person's Properties), and all utility and other charges incurred in the operation, maintenance, use, occupancy and upkeep of its respective Properties; *provided*, *however*, that, in the case of this clause (b) such Person may, by appropriate proceedings diligently conducted, contest or cause to be contested in good faith any such Taxes, assessments and other charges and, in such event, may permit the Taxes, assessments or other charges so contested to remain unpaid during any period, including appeals, when such Person is in good faith contesting or causing to be contested the same by appropriate proceedings diligently conducted, so long as (i) such Person maintains adequate reserves with respect thereto in accordance with GAAP, (ii) enforcement of the contested Tax, assessment or other charge is effectively stayed pursuant to Applicable Law for the entire duration of such contest and (iii) any Tax, assessment or other charge determined to be due, together with any interest or penalties thereon, is timely paid after resolution of such contest and (c) each remain a Pass-Through Entity.[21]

5.7    **WARRANTY OF TITLE**.  The Borrowers shall maintain (a) valid ownership or leasehold interest in, or valid rights to use (subject to the JOA), its respective interests in the Upland, the Facilities and any other Properties of any Borrower and (b) good, marketable, legal

---

[21]    Note to Draft: To be aligned with Section 5.5 in the Tax Credit Agreement with respect to application of this provision to Cornucopia.

and valid title (or with respect to Property other than Real Property, rights sufficient for the transactions contemplated hereby) to all of its respective Properties (other than Properties disposed of pursuant to <u>Section 6.3</u>), in each case, free and clear of all Liens other than Permitted Encumbrances.

**5.8** **BOOKS AND RECORDS**. The Borrowers shall maintain adequate books, accounts and records with respect to the Borrowers and prepare all financial statements required hereunder in accordance with GAAP and in material compliance with the regulations of any Governmental Authority having jurisdiction thereof, and, subject to any applicable requirements of Applicable Law and safety requirements, permit employees or agents of the Second Lien Agent and the Lenders at any reasonable times and upon reasonable prior notice to inspect all of each Borrower's Properties, to examine or audit all of its and their books, accounts and records and make copies and memoranda thereof, and to communicate with the auditors of the Borrowers outside the presence of the Borrowers.

**5.9** **PRESERVATION OF RIGHTS; FURTHER ASSURANCES**.

**5.9.1** The Borrowers shall from time to time, execute, acknowledge, record, register, deliver and/or file all such notices, statements, instruments and other documents and pay any fees associated therewith (including any memorandum of lease or other agreement, financing statement, continuation statement, certificate of title or estoppel certificate) and take such other steps as may be necessary or advisable to render or maintain fully valid, perfected, protected and enforceable under all Applicable Laws, the rights, Liens and priorities of the Second Lien Agent (on behalf of the Secured Parties) with respect to all Collateral and other security from time to time furnished under this Agreement and the other Second Lien Documents or intended to be so furnished, in each case in such form and at such times as shall be requested by the Second Lien Agent.

**5.9.2** The Borrowers shall perform all acts that may be necessary to perfect the Lien granted to the Second Lien Agent (on behalf of the Secured Parties) herein, including, unless otherwise performed by the Second Lien Agent, the filing of UCC-1 financing statements and execution of other agreements in form and substance satisfactory to the Required Lenders acting reasonably, perform all acts that may be necessary to maintain, preserve, and protect the Collateral and the perfection and priority of the Lien (subject to the Intercreditor Agreements) granted to the Second Lien Agent (on behalf of the Secured Parties) pursuant to the Second Lien Security Documents, and properly and efficiently administer, operate, and maintain the Collateral, subject to the Intercreditor Agreements.

**5.10** **SEPARATENESS**. Each of the Borrowers shall comply with the following:

(a) maintain deposit accounts or accounts, separate from those of any Affiliate of any Borrower (other than FOA, in the case of Cornucopia, and Cornucopia, in the case of FOA) with commercial banking institutions and will not commingle its funds with those of any Affiliate of any Borrower (other than FOA, in the case of Cornucopia, and Cornucopia, in the case of FOA);

(b)　　　　act solely in its own name and through its duly authorized officers, managers, representatives or agents in the conduct of its businesses;

(c)　　　　conduct in all material respects its business solely in its own name, in a manner not misleading to other Persons as to its identity (without limiting the generality of the foregoing, such conduct of business shall be reflected in all oral and written communications (if any), including invoices, purchase orders, and contracts);

(d)　　　　obtain legally sufficient authorization from member(s), shareholder(s), director(s) and manager(s), as required by its limited liability company agreement or bylaws for all of its limited liability company or corporate actions; and

(e)　　　　comply in all material respects with the terms of its Organizational Documents.

**5.11    ADDITIONAL COLLATERAL.**  With respect to any property acquired after the Effective Date by a Borrower that is intended to be subject to the Lien created by any of the Second Lien Security Documents but is not so subject, promptly take such actions and execute and/or deliver to the Second Lien Agent such documents as the Second Lien Agent shall require to confirm the validity, perfection and priority of the Lien of the Second Lien Security Documents on such after-acquired Collateral.

**5.12    SECURITY INTERESTS; FURTHER ASSURANCES.**  Promptly, upon the request of the Second Lien Agent, at the expense of the Borrowers, each Borrower shall execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Second Lien Security Documents or otherwise deemed by the Second Lien Agent necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Encumbrances, or obtain any consents or waivers as may be necessary or appropriate in connection therewith, to the extent required by the applicable Second Lien Security Documents.  Upon the exercise by the Required Lenders acting reasonably of any power, right, privilege or remedy pursuant to any Second Lien Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, each Borrower shall execute and deliver all applications, certifications, instruments and other documents and papers that the Required Lenders acting reasonably may require.

**5.13    MATERIAL CONTRACTS.**  Borrowers shall pay all obligations due under the Material Contracts, howsoever arising, as and when due and payable, except such as may be contested in good faith or as to which a bona fide dispute may exist; provided that (a) adequate Cash reserves have been established or provision has been made to the satisfaction of the Required Lenders acting reasonably for the posting of security for, or the bonding of, such obligations or the prompt payment thereof in the event that such obligation is payable or (b) non-payment of such obligation pending the resolution of such contest or dispute could not reasonably be expected to result, individually or in the aggregate, in losses of liabilities in excess of $100,000 or a Material Adverse Effect.

**5.14    INDEMNIFICATION.**[22]

**5.14.1**  The Borrowers shall jointly and severally indemnify, defend and hold harmless the Second Lien Agent and each Lender, and, in their capacities as such, their respective Affiliates, officers, directors, shareholders, controlling Persons, employees, agents, advisors, members, successors and assigns (collectively, the "**Indemnitees**"), from and against and reimburse the Indemnitees for:

(a)    any and all claims (including without limitation, claims by any Borrower or Lender), obligations, liabilities, losses, damages, injuries (to person or property), penalties, actions, suits, judgments, costs and expenses of whatever kind or nature, whether or not well-founded, meritorious or unmeritorious, arising after the Effective Date, that are demanded, asserted or claimed against any such Indemnitee in any way relating to, or arising out of or in connection with, this Agreement, the other Second Lien Documents, the Collateral or the transactions contemplated herewith or thereunder in connection with any amendment, modification or waiver of the provisions of the Second Lien Documents and in connection with the exercise or enforcement of the rights and remedies of the Lenders and the Second Lien Agent and enforcement of the obligations under the Second Lien Documents or in connection with the Second Lien Term Loans, including all such Claims incurred during any workout, restructuring or negotiations in respect of the Obligations (collectively, "**Subject Claims**"), except for Subject Claims by the Borrowers to enforce their rights under the Second Lien Documents against an Indemnitee[; provided, however, that this <u>Section 5.14.1(a)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages or other amounts arising from any non-Tax claims][23]; and

(b)    any and all Subject Claims arising in connection with the Release or presence of any Hazardous Substances, whether foreseeable or unforeseeable, including all reasonable costs of removal and disposal of such Hazardous Substances, all reasonable costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and court costs.

**5.14.2**  No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrowers or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnitee's actual fraud, gross negligence, or willful misconduct.  In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

**5.14.3**  The indemnities provided by the Borrowers pursuant to this <u>Section 5.14</u> shall not apply with respect to an Indemnitee to the extent finally determined by a court of competent jurisdiction as arising in whole or in part as a result of the actual fraud, gross negligence or willful misconduct of such Indemnitee, but shall continue to apply to other Indemnitees.  In

---

[22]    Note to Draft: To be aligned with corollary provisions in the AIDEA and Tax Credit Loan Agreements
[23]    Note to Draft: Bracketed language under review by the lenders.

addition, such indemnities shall not include or extend to any Subject Claims (A) incurred or suffered by any of the Indemnitees to the extent that such Indemnitee shall have expressly agreed in Section 2.3.5, or Section 9.4 herein to bear such Subject Claim without right of reimbursement or (B) that have not resulted from an act or omission by a Borrower or its Affiliates and has been brought by an Indemnitee against any other Indemnitee (other than any Claims against the Second Lien Agent in its capacity as such or in fulfilling its role as an agent or similar role hereafter) (a "**Specified Claim**").

       **5.14.4**  The provisions of this Section 5.14 shall survive foreclosure of the Second Lien Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrowers' joint and several obligations hereunder, shall be in addition to any other rights and remedies of the Lenders, and may not be amended, modified or waived in a manner adverse to any Indemnitee without each Lender's written consent.

       **5.14.5**  In case any action, suit or proceeding shall be brought against any Indemnitee, such Indemnitee shall promptly notify the Borrowers of the commencement thereof, provided that failure to provide any such notice shall not relieve the Borrowers of their obligations set forth in this Section 5.14.

       **5.14.6**  Any Indemnitee against whom any Subject Claim is made shall be entitled to compromise or settle any such Subject Claim; provided that such Indemnitee consults with and coordinates such compromise or settlement with the Borrowers.  Any such compromise or settlement shall be binding upon the Borrowers for purposes of this Section 5.14.6.

       **5.14.7**  Upon payment of any Subject Claim by the Borrowers pursuant to this Section 5.14 or other similar indemnity provisions contained herein to or on behalf of an Indemnitee, the Borrowers, without any further action, shall be subrogated to any and all claims that such Indemnitee may have relating thereto, and such Indemnitee shall cooperate with the Borrowers and the Borrowers' insurance carrier as may be reasonably requested by the Borrowers to enable the Borrowers to vigorously pursue such claims.  In the event that the Borrowers shall have paid an amount to or on behalf of an Indemnitee in respect of any Subject Claim pursuant to the indemnification provisions of this Section 5.14 and such Indemnitee subsequently shall be reimbursed in respect of such Subject Claim from any other Person and, as a result, the aggregate amount so received by such Indemnitee shall exceed the amount of such Subject Claim, then (a) so long as no Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Borrowers an amount equal to the lesser of (i) the amount of such excess, (ii) the amount of such reimbursement from such other Person and (iii) the amount so paid by the Borrowers and (b) if an Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Second Lien Agent the amount otherwise payable pursuant to clause (a) of this sentence, for application by the Second Lien Agent to any amounts due and owing under this Agreement.

       **5.14.8**  Any amounts payable by the Borrowers pursuant to this Section 5.14 shall be payable within five (5) Banking Days after the Borrowers receive an invoice for such amounts from any applicable Indemnitee, and if not paid within such five (5)-Banking Day period shall bear interest at the applicable rate pursuant to Section 2.3.3 for late payments.

       **5.15**       **TAX CREDITS**.  Subject to the Tax Credit Intercreditor Agreement:

**5.15.1** The Borrowers shall cause the proceeds of all State Tax Credits to be deposited into the Agent Account, or another Controlled Account in accordance with the Tax Credit Intercreditor Agreement, and to be applied in the following order of priority:

(a)         *First*, until the Discharge of Tax Credit Obligations, to the Tax Credit Agent for application by the Tax Credit Agent to the Tax Credit Obligations in accordance with the Tax Credit Loan Documents;

(b)         *Second*, until the Discharge of Second Lien Obligations, to the Second Lien Agent for application by the Second Lien Agent to the Obligations in accordance with the Second Lien Documents;

(c)         *Third*, until the Discharge of Third Lien Obligations, (i) seventy-five percent (75%) of each Dollar of any such proceeds shall be paid to the New Term Loan Agent for application by the New Term Loan Agent to the New Term Loan Obligations in accordance with the New Term Loan Documents and (ii) twenty-five percent (25%) of each Dollar of any such proceeds shall be paid to the Sponsor; and

(d)         *Fourth*, at any time thereafter, to the Sponsor.

**5.15.2** In the event that the Borrowers receive any proceeds of any State Tax Credits, the Borrower shall hold such proceeds in trust for the Lenders in the [Tax Credit Proceeds Account][24] and shall immediately turn over and deliver to, prior to the Discharge of First Lien Obligations, the Tax Credit Agent, after the Discharge of First Lien Obligations but prior to the Discharge of Second Lien Obligations, the Second Lien Agent and after the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations but prior to the Discharge of Third Lien Obligations, the New Term Loan Agent, as applicable, all such proceeds, in kind, and in the exact form received.

**5.15.3** Cornucopia shall promptly take all such actions necessary and appropriate under the laws of the State of Alaska in order for the Second Lien Agent to collect and receive in full, subject to the Tax Credit Intercreditor Agreement, the amounts reflected in each Alaska Tax Credit Application, including (i) compliance with the provisions of AS 43.55.028(e), and (ii) upon the request of the Second Lien Agent, the filing and diligent pursuit of an appropriate appeal relating to the DOR's denial or reduction of any State Tax Credits or proceeds thereof that have been applied for pursuant to any Alaska Tax Credit Application or DOR Purchase Application (with all costs and expenses of any such appeal borne solely by Cornucopia).

**5.15.4** Cornucopia shall transmit all data, information, reports and returns to the DOR or DNR, as applicable, in accordance with the requirements of AS 43.55 and 15 AAC 55

---

[24]       Note to Draft: Account structure to be discussed with HEX and Lenders.  We propose four accounts, each subject to a DACA: Revenue Account (main account into which all revenues and proceeds other than Tax Credit Proceeds and Other Proceeds will be deposited), DSRA for benefit of AIDEA, Other Proceeds Account (into which all loss proceeds, asset sale proceeds and proceeds of unpermitted indebtedness will be deposited) and the Tax Credit Proceeds Account (into which any State Tax Credit Proceeds that are not paid into the Agent Account will be deposited, though all such proceeds should be paid into the Agent Account).

and as otherwise requested by the DOR or DNR, as applicable, in each case with a copy to the Second Lien Agent.

      **5.15.5**  Cornucopia shall promptly, but in any event within three (3) Banking Days after the receipt thereof, deliver to the Second Lien Agent and the Lenders copies of any notice, request or other document received by a Responsible Officer of Cornucopia pursuant to or in connection with the State Tax Credits of Cornucopia or any Alaska Tax Credit Applications therefor or any Tax Credit Assignments thereof, whether from the DOR, the State of Alaska or otherwise, or any notice, request or other document sent by Cornucopia to any such Person relating to any of the foregoing, in each case unless all of the information contained in such notice or correspondence is generally available to the public.

      **5.15.6**  To the extent Cornucopia fails to timely take any action required by this Section 5.15 to collect and receive in full the amounts reflected in each Alaska Tax Credit Application, in addition to all other remedies available to the Second Lien Agent and the Lenders, the Second Lien Agent may, in its discretion and subject to the Tax Credit Intercreditor Agreement, take any such action, and Cornucopia hereby appoints the Second Lien Agent as its attorney in fact to take any such action on behalf of Cornucopia, which appointment is irrevocable and coupled with an interest.[25]

      **5.16**    **INSURANCE**.  The Borrowers will at all times, maintain or cause to be maintained in full force and effect, with insurers of recognized standing adequate insurance (including deductibles which are customary and prudent for the industry) in respect of the property and assets of the Borrowers according to prudent industry standards, including all risk property insurance in an amount equal to or greater than the total aggregate amount of any Permitted Debt outstanding plus platform abandonment costs of the major components of the operating systems and will furnish to the Second Lien Agent, promptly following written request from the Second Lien Agent, information presented in reasonable detail as to the insurance so carried and with respect to Collateral located in the United States, the Borrowers will obtain flood insurance in such total amount as may reasonably be required by the Second Lien Agent, if at any time the area in which any improvements located on any Collateral is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time. Each such policy of insurance shall (i) in the case of liability insurance, name the Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each property insurance policy, contain an additional loss payable clause that names the Lenders as an additional loss payee thereunder.

      **5.17**    **ENSTAR LETTER OF CREDIT**.  The Borrowers shall use their good faith efforts to negotiate a reduction to the amount of credit support required pursuant to Section 12 of the APC

---

[25]     Note to Draft: Changes from Tax Credit Loan Agreement; to be conformed to final draft of Tax Credit Loan Agreement.

Gas Sales Agreement and shall provide to APC replacement credit support to satisfy FOA's obligations under Section 12 of the APC Gas Sales Agreement in full on or before April 15, 2021.[26]

**5.18    APPROVALS OF FORECLOSURES**.  The Borrowers shall comply with any actions reasonably requested by the Second Lien Agent in connection with obtaining approvals of the Alaska Department of Natural Resources (and any other applicable Governmental Authority) for the Second Lien Agent to foreclose on or otherwise take ownership of or title to the Borrowers' interest in the Properties subject to the Mortgages; provided, however, that, for the avoidance of doubt, failure of the Borrowers to obtain such approval after using commercially reasonable efforts to comply with such actions shall not constitute an Event of Default.[27]

**5.19    [REVENUES**.  The Borrowers shall deposit, and shall use reasonable efforts to cause third parties that would otherwise make payments directly to the Borrowers to deposit, into the [Revenue Account] all proceeds from the sale of any gas and natural gas liquids produced from the Properties and all other revenues received by the Borrowers other than [Tax Credit Proceeds, Asset Sale Proceeds, Debt Proceeds and Loss Proceeds].  All such amounts on deposit in the [Revenue Account] of shall be applied and disbursed from the [Revenue Account] as set forth in Section 5.23.][28]

**5.20    [REVENUE ACCOUNT] WATERFALL**.  Borrowers agree that amounts on deposit in the [Revenue Account] shall be applied in the following order of priority:

**5.20.1**  Necessary oil and gas lease rents, royalties, and ad valorem and production taxes as due;

**5.20.2**  DR&R sinking fund as required by Borrowers' agreement with the Alaska Department of Natural Resources;

**5.20.3**  Lease Operating Expenses incurred in accordance with Prudent Industry Practices;[29]

**5.20.4**  Capital Expenditures incurred in accordance with Prudent Industry Practices;

**5.20.5**  Capital Expenditure reserves appropriate based on Prudent Industry Practices;

---

[26]    Note to Draft: Changed from May 31, 2021 in the Plan Term Sheet to make sure that the LC is replaced in advance of a May 31, 2021 expiration date – the LC is permitted to be drawn if it is not replaced 30 days prior to its expiration

[27]    Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

[28]    Note to Draft: To be updated when account structure is agreed.

[29]    Note to Draft: Should there be a waterfall level for payment of any other operating expenses, like property taxes?  Also, do the Borrowers need to reserve for operating expenses, capex that will be payable in the future in order to prevent unintentionally sweeping cash that is needed to operate the business?

**5.20.6**  Principal and interest due on the AIDEA Loan, as provided in the AIDEA Loan Documents;

**5.20.7**  Deposits to the Debt Service Reserve Account necessary to maintain the Reserve Account in accordance with Section 2.4;

**5.20.8**  Fees and other amounts due to AIDEA under the terms of the AIDEA Loan Documents; and

**5.20.9**  Any amounts due in Cash under this Agreement or any other Second Lien Document and permitted to be paid to the Second Lien Agent (for and on behalf of the Second Lien Lenders) under the Intercreditor Agreements.

## ARTICLE 6
## NEGATIVE COVENANTS

Until the Second Lien Termination Date:

**6.1**  DEBT, LIENS AND OTHER ENCUMBRANCES.

**6.1.1**  The Borrowers shall not incur, create, assume or permit to exist any Debt, except Permitted Debt.

**6.1.2**  The Borrowers shall not create, assume or suffer to exist any Lien or any other encumbrances on the Collateral, except Permitted Encumbrances, or assign any right to receive income.

**6.2**  DIVIDENDS, DISTRIBUTIONS AND REDEMPTIONS.  No Borrower shall pay, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so (including, unless otherwise agreed by the Required Lenders, payment of any amount pursuant to a Contractual Obligation entered into by any Borrower and any Affiliate of any Borrower or payment of any expense reimbursement to any Affiliate of any Borrower (excluding any other Borrower)) except a dividend of up to an aggregate amount of $2,500,000 following the date on which the Borrowers have repaid, in cash, at least $7,500,000 of the principal amount of the Second Lien Term Loans (the "**Permitted Dividend**"), *provided* that at the time any Permitted Dividend is paid, no Default or Event of Default shall have occurred or be continuing.

**6.3**  RESTRICTIONS ON ASSET SALES.  The Borrowers shall not sell, lease, assign, transfer or otherwise dispose of any assets (including without limitation any Equity Interests or working interests), whether now owned or hereafter acquired, except, to the extent permitted by the Indemnity Agreement (a) sales of as-extracted hydrocarbons in the ordinary course of their business and at fair market value and for Cash (excluding, for the avoidance of doubt, any forward sale or volumetric or dollar denominated production payment), (b) sales, leases, assignments, transfers or other disposals of assets that are worn out or no longer usable in connection with the operation or maintenance of the Borrower's business for Cash and at fair market value, (c) other sales, leases, assignments, transfers or other disposals of assets that are: (i) in the ordinary course of business, (ii) for fair market value (as determined by the Required Lenders acting reasonably),

(iii) in exchange for 100% Cash or Cash Equivalent consideration and (iv) either (x) in an aggregate amount not to exceed $100,000 in any fiscal year of the Borrowers or (y) result in proceeds that are sufficient to fully repay all of the Obligations outstanding under this Agreement in accordance with the AIDEA Intercreditor Agreement (d) assignments, encumbrances or pledges State Tax Credits and the proceeds thereof pursuant to Tax Credit Loan Documents, the Second Lien Documents and the New Term Loan Documents to the secured parties thereunder or (e) if approved by each of the Tax Credit Agent, the New Term Loan Agent and the Second Lien Agent, sales, leases, assignments, transfers or other disposals of assets among the Borrowers. The Borrowers shall not enter into any sale and leaseback or synthetic debt transactions.

6.4     **DISSOLUTION; MERGER; ACQUISITIONS**.   No Borrower shall (a) wind up, liquidate or dissolve its affairs, or sell, lease or otherwise transfer or dispose of all or substantially all of its property, assets or business, (b) combine, merge or consolidate with or into any other entity, or (c) purchase or otherwise acquire all or substantially all of the assets of any Person.[30]

6.5     **MATERIAL CHANGES IN BUSINESS; AMENDMENTS TO ORGANIZATIONAL DOCUMENTS**.  The Borrowers shall not (a) change the nature of its business or expand its business beyond the business contemplated in the Second Lien Documents or activities incidental thereto or take any action, whether by acquisition or otherwise, which would constitute or result in any material alteration to the nature of such business; or (b) directly or indirectly, change its legal form or any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its limited liability company interest or otherwise terminate, amend or modify any such Organizational Document or agreement or any provision thereof, or enter into any new agreement with respect to its limited liability company interest, other than any such amendments, modifications or changes or such new agreements to which the prior written consent of the Required Lenders acting reasonably.

6.6     **SUBSIDIARIES AND JOINT VENTURES**.  No Borrower shall (a) become a general or limited partner in any partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture, (b) form or hold any Equity Interest in any other Person, other than Cornucopia's ownership of Equity Interests of FOA, (c) engage in any business other than owning and operating the Properties of the Borrowers and related activities in the ordinary course of business consistent with past practice, (d) fail to maintain bank accounts and books of account separate from any other Person (other than, in the case of FOA, Cornucopia and in the case of Cornucopia, FOA), (e) fail to cause its liabilities to be readily distinguishable from the liabilities of another Person, or (f) fail to conduct its business solely in its own name in a manner not misleading to other Persons as to its identity.

6.7     **PROHIBITION ON ISSUANCE OF EQUITY INTEREST**.   None of Cornucopia, Corsair, or FOA shall issue any additional Equity Interest on or following the Effective Date unless such issuance is approved by the Required Lenders acting reasonably.

6.8     **NAME AND LOCATION; FISCAL YEAR**.  No Borrower shall change its name, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise),

---

[30]     Note to Draft: Changes added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

jurisdiction of organization, type of organization, sole place of business, chief executive office or fiscal year or establish any trade names unless such change is approved by the Required Lenders acting reasonably.

**6.9** **ACCOUNTS**. [The Borrowers shall not maintain any deposit or securities accounts other than (a) deposit accounts and securities accounts subject to Control Agreements or, subject to and in accordance with the AIDEA Intercreditor Agreement, control agreements in favor of the AIDEA Loan Collateral Agent, (b) each collateral account holding initial margin, variation margin and collateral or other performance assurance provided to the Borrowers by counterparties to the Borrowers' Contractual Obligations, (c) the [Tax Credit Collateral Account], provided that such account is subject to a control agreement in favor of the Tax Credit Agent or the New Term Loan Agent, as applicable in accordance with the Tax Credit Intercreditor Agreement and (d) accounts holding performance assurances of the Borrowers to Governmental Authorities pursuant to Applicable Law].[31]

**6.10** **COMPLIANCE WITH ANTI-TERRORISM LAWS**. The Borrowers shall not:

**6.10.1** directly or indirectly, (i) conduct any operations in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (ii) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

**6.10.2** directly or indirectly cause or permit any of the funds of the Borrowers that are used to repay the Second Lien Term Loans or other Obligations to be derived from any unlawful activity with the result that the making of the Second Lien Term Loans would be in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

**6.10.3** cause or permit (i) a Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in any Borrower or (ii) any of the funds or properties of any Borrower that are used to repay the Second Lien Term Loans or other Obligations to constitute property of, or be beneficially owned directly or indirectly by, a Sanctioned Person; and

**6.10.4** deliver to the Lenders any certification or other evidence requested from time to time by any Lender, confirming the compliance by each Borrower of this Section 6.10.

**6.11** **TRANSACTIONS WITH AFFILIATES**. The Borrowers shall not directly or indirectly enter into any contract, transaction or series of transactions with or for the benefit of an Affiliate without the prior approval of the Second Lien Agent except (a) in the ordinary course of business and on a commercially reasonable arms-length basis on terms at least as favorable to the Borrowers as terms that could have been obtained from a third party who was not an Affiliate and (b) transactions between the Borrowers.[32]

---

[31]    Note to Draft: List of permitted accounts subject to ongoing review.
[32]    Note to Draft: Provision added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

**6.12** **MATERIAL CONTRACTS.** The Borrowers shall not assign any Material Contract without obtaining prior written consent from the Second Lien Agent (which consent shall not be unreasonably withheld or delayed). The Borrowers shall not enter into or become a party to any Additional Material Contract without (a) obtaining prior written consent from the Second Lien Agent (which consent shall not be unreasonably withheld or delayed), (b) delivering such documents as shall be necessary or advisable for such Material Contract and the rights and interests thereunder to become subject to the Liens of the Security Documents, (c) providing an executed copy of such Additional Material Contract to the Second Lien Agent and (d) procuring from each applicable counterparty to such Additional Material Contract a Consent to Assignment, if requested by the Second Lien Agent, promptly upon the execution of such agreement or other written consent in form and substance reasonably satisfactory to the Second Lien Agent. [33]

**6.13** **PROHIBITION ON AMENDMENTS TO MATERIAL CONTRACTS.** From and after the Discharge of First Lien Obligations:

**6.13.1** The Borrowers shall not amend, modify, supplement or waive, accept, or permit or consent to the termination, amendment, modification, supplement or waiver (including any waiver (or refund) of damages (liquidated or otherwise) payable by any party under any Material Contracts (other than any Second Lien Document, New Term Loan Document, or Tax Credit Loan Document)) in any material respect of, any provision of, or give any material consent under any of the Material Contracts (other than any AIDEA Loan Document, New Term Loan Document, or Tax Credit Loan Document) without the prior written consent of the *Second Lien Agent*, which shall not be unreasonably withheld or delayed;

**6.13.2** The Borrowers shall not terminate, amend, modify, supplement or waive or accept, permit or consent to the termination, amendment, modification, supplement or waiver of the PRA Management Agreement[34]; and

**6.13.3** The Borrowers shall not amend, modify, supplement or waive or accept, or permit or consent to the amendment, modification, supplement or waiver of, any AIDEA Loan Document, New Term Loan Document, Tax Credit Loan Document unless permitted under the Intercreditor Agreements.[35]

# ARTICLE 7
# EVENTS OF DEFAULT; REMEDIES

**7.1** **EVENTS OF DEFAULT.** The occurrence of any of the following events shall constitute an event of default (each an **"Event of Default"**) hereunder:

**7.1.1** *Failure to Make Payments.* Any Borrower or the Sponsor shall fail to pay, in accordance with the terms of this Agreement, (a) any principal of the Second Lien Term Loans

---

[33]     Note to Draft: Provision added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

[34]     Note to Draft: Are the Borrowers entering into a PRA Management Agreement? If so, please could you send a copy of such agreement to the lenders?

[35]     Note to Draft: Provision added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

on the date that such sum is due, or (b) any interest on the Second Lien Term Loans or any other Obligation, any scheduled fee, cost, charge, sum or amount due hereunder or under the other Second Lien Documents, or any other fee, cost, charge, sum or other amount due under this Agreement within five (5) Banking Days after such sum is due.

**7.1.2** *Violation of Covenants*.

(a)        Any Borrower fails to perform or observe any of the covenants set forth in <u>Sections 5.3</u> (*Existence; Maintenance of Contracts*), <u>5.6</u> (*Taxes*), <u>5.7</u> (*Warranty of Title*), <u>5.16</u> (*Insurance*), or <u>Article 6</u>.

(b)        Any Borrower shall fail to perform or observe any other covenant to be observed or performed by it hereunder or any other Second Lien Document not otherwise specifically provided for in <u>clause (a)</u> above and such failure shall continue unremedied for a period of 10 days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Second Lien Agent.

(c)        Any Second Lien Document or any material provision thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Borrower, the Sponsor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Borrower shall repudiate or deny any portion of its liability or obligation for the Obligations.

**7.1.3** *Representations and Warranties*.    Any representation, warranty, certification or statement of fact made or deemed made by any Borrower herein or by any Borrower in any other Second Lien Document or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made (except to the extent qualified as to materiality (including Material Adverse Effect) in which case a default shall occur if such representation, warranty, certification or statement of fact made or deemed to be made shall be untrue in any respect).

**7.1.4** *Change of Control*.  A Change of Control occurs.

**7.1.5** *Bankruptcy* or *Insolvency*. Any Borrower or the Sponsor shall become subject to a Bankruptcy Event.

**7.1.6** *Judgments*.  A final judgment or judgments (including with respect to Environmental Claims) shall be entered against any Borrower in the amount of $100,000 or more individually or in the aggregate or a final judgment shall be entered against any Borrower which if left unstayed could reasonably be expected to result in losses or liabilities in excess of $100,000 or a Material Adverse Effect (other than (i) a judgment which is fully covered by insurance (subject to applicable deductibles) as to which the insurer does not dispute coverage or is discharged within 30 days after its entry, or (ii) a judgment the execution of which is effectively stayed within 30 days after its entry unless, after the entry of such stay, there shall be a period of more than 30 consecutive days during which the execution of such judgment is not effectively stayed).

**7.1.7** *Debt Cross Default.* (a) Failure of any Borrower to pay when due any principal of or interest on or any other amount, including any payment in settlement, payable in respect of one or more items of Debt (other than the Second Lien Credit Facility) in an individual principal amount of $100,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any provided therefore, (b) breach or default by any Borrower with respect to any other material term of (i) one or more items of Debt (other than the Second Lien Credit Facility) in the individual or aggregate principal amounts referred to in clause (a) above or (ii) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Debt, in each case beyond the grace period, if any, provided therefor, and the effect (but without giving effect to any waivers or extensions granted by any such holder of such Debt (or a trustee or agent on behalf of such holder or holders)) of the occurrence of such breach or default is to cause, or to permit the holder of such Debt (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, such Debt to be demanded or to become or be declared due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be or (c) an Event of Default (as defined in any of the AIDEA Loan Agreement, the Tax Credit Loan Agreement or the New Term Loan Agreement) shall occur after the Effective Date.

**7.1.8** *Breach of Material Contract.*

(a)  Any Borrower shall be in breach of, or in default under, any material term, condition, covenant or obligation under a Material Contract and such breach or default shall not be remediable or, if remediable, either Borrower, as applicable, shall fail to cure or otherwise remedy such breach within the cure period provided in such Material Contract.

(b)  At any time after the execution and delivery thereof, any Material Contract or any material provision hereof or thereof (1) ceases to be in full force and effect or to be valid and binding on any party thereto (other than by reason of the satisfaction of performance of such agreement or provision or any termination thereof in accordance with the terms thereof) or any such party shall so state in writing, or such agreement is assigned or otherwise transferred (except as otherwise required or expressly permitted hereunder or thereunder) or is prematurely terminated by any party thereto, (2) is or becomes invalid, illegal or unenforceable, or any party hereto or thereto repudiates or disavows such agreement in writing or takes any action to challenge the validity or enforceability of such agreement, (3) is declared null and void by a Governmental Authority of competent jurisdiction or written notice is given by any Governmental Authority or applicable counterparty contesting the validity or enforcement thereof, or (4) fails to or ceases to provide the rights, powers and privileges purported to be created thereby or hereby.[36]

**7.1.9** *ERISA.* (a) An ERISA Event occurs which has resulted or could reasonably be expected to result, individually or in the aggregate, in liability of Borrower in an aggregate amount in excess of $100,000, or (b) Borrower fails to pay when due, after the expiration of any

---

[36]  Note to Draft: Provision added from AIDEA Credit Agreement; to be conformed to the final draft of the AIDEA Credit Agreement.

applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan.

**7.1.10** *Invalidity of Documents*.

(a)        Any material provision of any Second Lien Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect;

(b)        any Borrower, the Sponsor or any other person a party thereto (other than the Second Lien Agent) contests in writing the validity or enforceability of any provision of any Second Lien Document; or

(c)        any Borrower or the Sponsor denies in writing that any Borrower has any or further liability or obligation under any Second Lien Document, or purports in writing to revoke, terminate or rescind any Second Lien Document.

**7.1.11** *Loss of Collateral*.  Any substantial portion of any Borrower's Properties are damaged or seized or appropriated by any Governmental Authority, without appropriate Insurance Proceeds (subject to the underlying deductible) or fair compensation being paid therefor so as to allow replacement of such property or prepayment of the Second Lien Term Loans and to allow any Borrower, in the Second Lien Agent's reasonable judgment, to continue to satisfy its obligations hereunder and under the other Second Lien Documents.

**7.1.12** *Security*.  Any of the Second Lien Security Documents, once executed and delivered, shall, except as the result of the acts or omissions of the Second Lien Agent with respect to any Collateral in its possession, fail to provide the Second Lien Agent the Liens (or the priority thereof), rights, titles, interest, remedies permitted by law, powers or privileges intended to be created thereby with respect to the Collateral or, except in accordance with its terms, cease to be in full force and effect, or the priority set forth in the Intercreditor Agreements or validity thereof (except as permitted hereby) or the applicability thereof to the Second Lien Term Loans, the Obligations or any other obligations purported to be secured or guaranteed thereby or any part thereof shall be disaffirmed in writing by or on behalf of any Borrower or the Sponsor.

**7.1.13** *Loss of, Failure to Obtain or Breach of Permits*.

(a)        Any Borrower, as of any date, shall fail to possess any Applicable Permit necessary in connection with the transactions contemplated in the Second Lien Documents where such failure could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect, and such failure shall continue unremedied for a period of forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Second Lien Agent.

(b)        Any Applicable Permit necessary in connection with the transactions contemplated in the Second Lien Documents shall be materially modified (other than modifications requested by the Borrowers and approved in writing in advance of such modification by the Required Lenders acting reasonably), revoked, canceled or not renewed by the issuing

agency or other Governmental Authority having jurisdiction where such modification, revocation, cancellation or nonrenewal could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect, and such modification, revocation, cancellation or nonrenewal of such Applicable Permit shall continue unremedied for a period of forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Second Lien Agent.

(c)        Any Borrower shall be in breach of or in default under any material term, condition, covenant or obligation under any Applicable Permit where such breach or default could reasonably be expected to result, individually or in the aggregate, in a liability or loss in excess of $100,000 or a Material Adverse Effect and such breach or default shall not be remediable or, if remediable, any Borrower shall fail to cure or otherwise remedy such breach or default within forty-five (45) days after a Responsible Officer of any Borrower becomes aware thereof or any Borrower receives written notice thereof from the Second Lien Agent.

**7.1.14**  *Operator Under JOA*.  None of FOA, Corsair or an Acceptable Operator is the operator under the JOA with respect to the JOA Assets.

**7.2**      **REMEDIES**.  Upon the occurrence and during the continuation of an Event of Default, subject to the Intercreditor Agreements, the Second Lien Agent is vested with the exclusive right to, and shall, at the election of the Required Lenders, without further notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind, all such notices and demands being waived, may exercise any or all of the following cumulative and non-exclusive rights and remedies, in any combination or order that the Required Lenders may elect, in addition to such other rights or remedies as the Lenders may have hereunder, under the Second Lien Security Documents, any instrument, document or agreement now existing or hereafter arising, or at law or in equity (it being agreed and understood that the Lenders vest the Second Lien Agent with the exclusive right to exercise such rights and remedies):

**7.2.1**  *Cure by the Second Lien Agent*. Without any obligation to do so, make disbursements on behalf of the Borrowers to cure any Event of Default hereunder and to cure any default and render any performance under any Material Contracts as the Required Lenders in their sole discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Second Lien Agent's and Lenders' interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by the Borrowers to the Second Lien Agent on demand and secured by the Second Lien Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the aggregate amount of the Second Lien Credit Facility.

**7.2.2**  *Acceleration*. Declare and make all sums of outstanding principal, all accrued but unpaid interest remaining under this Agreement and any outstanding Second Lien Term Loans and other Obligations, together with all unpaid fees, costs and charges due hereunder or under any other Second Lien Document, (the "**Acceleration Amounts**") immediately due and payable and require the Borrowers, immediately, without presentment, demand, protest or other notice of any kind, all of which the Borrowers hereby expressly waives, to pay the Second Lien

Agent or the Lenders, as applicable, an amount in immediately available funds equal to the aggregate amount of all such Acceleration Amounts; *provided* that in the event of an Event of Default occurring under Section 7.1.5 with respect to any Borrower, all such amounts shall become immediately due and payable without further act of the Second Lien Agent or the Lenders.

       **7.2.3**  *Cash Collateral.*  Apply or execute upon any amounts on deposit or any proceeds or any other moneys of any Borrower on deposit with the Second Lien Agent or any Lender (as applicable) in the manner provided in the UCC and other relevant Applicable Law with respect to Cash collateral.

       **7.2.4**  *Foreclose on Collateral.*  Exercise any or all of its rights as a secured creditor under the UCC, and any or all rights granted by this Agreement and by law, including the right to require the Borrowers to assemble the Collateral and make it available to the Second Lien Agent at a place to be designated by the Second Lien Agent.  The Borrowers hereby agree that three (3) Banking Days' notice of a public sale of any Collateral or notice of the date after which a private sale of any Collateral may take place is commercially reasonable.

       **7.2.5**  *Remedies Under Second Lien Documents*. Exercise any and all rights and remedies available to it under any of the Second Lien Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral pursuant to the Second Lien Security Documents.

Notwithstanding anything to the contrary contained in this Agreement or any other Second Lien Document to the contrary, and subject to the terms of the Intercreditor Agreements, each Lender expressly and irrevocably (a) waives any right to take or institute any actions or proceedings, judicial or otherwise, for any right or remedy or assert any other cause of action against any of the Borrowers, the Sponsor or their respective Subsidiaries whether with respect to any Collateral, any other property of any such entity or otherwise, without the prior written consent of the Second Lien Agent (which shall not be withheld if directed by the Required Lenders acting reasonably) and (b) subject to the terms set forth herein, each Lender vests the Second Lien Agent, acting at the instructions of the Required Lenders acting reasonably, with the exclusive right to enforce rights, exercise remedies (including setoff rights) and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral; provided, that (i) in exercising the rights and remedies with respect to the Collateral, the Second Lien Agent, acting at the direction of the Required Lenders, may enforce the provisions of the Second Lien Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion and (ii) such exercise and enforcement shall include the rights of the Second Lien Agent (or any other agent appointed by Required Lenders) to sell or otherwise dispose of the Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction, under the Second Lien Documents and as provided under the bankruptcy laws or any other laws of any applicable jurisdiction.

**ARTICLE 8**
**THE AGENT; SUBSTITUTION**

    **8.1**       **APPOINTMENT, POWERS AND IMMUNITIES**.

**8.1.1**    Each Lender hereby appoints and authorizes the Second Lien Agent to act by or through its officers, directors, agents, employees or Affiliates as its agent hereunder and under the other Second Lien Documents with such powers as are expressly delegated to the Second Lien Agent by the terms of this Agreement and the other Second Lien Documents, together with such other powers as are reasonably incidental thereto.  The duties of the Second Lien Agent shall be mechanical and administrative in nature; the Second Lien Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement or in any other Second Lien Document, or be a trustee or fiduciary for any Lender and nothing in this Agreement or in any other Second Lien Document, expressed or implied, is intended to or shall be so construed as to impose upon the Second Lien Agent any obligations in respect of this Agreement or any other Second Lien Document except as expressly set forth herein or therein.  Notwithstanding anything to the contrary contained herein, the Second Lien Agent shall not be required to take any action which is contrary to this Agreement or any other Second Lien Documents or any Legal Requirement or exposes the Second Lien Agent to any liability.  None of the Second Lien Agent, any Lender or any of their respective Affiliates shall be responsible to any other Lender for any recitals, statements, representations or warranties made by the Borrowers or any of their respective Affiliates contained in this Agreement or in any certificate or other document referred to or provided for in, or received by the Second Lien Agent, or any Lender under this Agreement, for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any Notes or any other document referred to or provided for herein or for any failure by the Borrowers or any of their respective Affiliates to perform their respective obligations hereunder or thereunder.  The Second Lien Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care.

**8.1.2**    The Second Lien Agent and its directors, officers, employees or agents shall not be responsible for any action taken or omitted to be taken by it or them hereunder or under any other Second Lien Document or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Without limiting the generality of the foregoing, the Second Lien Agent:

(a)    may treat the payee of any Note as the holder thereof until the Second Lien Agent receives an Assignment Agreement or other written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to the Second Lien Agent;

(b)    may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by them in accordance with the advice of such counsel, accountants or experts;

(c)    makes no warranty or representation to any Lender for any statements, warranties or representations made in or in connection with any Material Contract or Second Lien Document;

(d)    shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Second Lien

Document on the part of any party thereto or to inspect the property (including the Books and Records) of the Borrowers, the Sponsor or any other Person;

(e)        shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Second Lien Document or any other instrument or document furnished pursuant hereto; and

(f)        may rely solely on (i) the advice of an independent engineer or an insurance consultant (except in circumstances in which the approval or consent of the Required Lenders or all of the Lenders if expressly required hereunder or under any other Second Lien Document), or (ii) the approval, direction or consent of the Required Lenders (except in circumstances in which the approval, direction or consent of all of the Lenders is expressly required hereunder or under any other Second Lien Document), in each case, in making any determination hereunder or under any other Second Lien Document.

Except as otherwise provided under this Agreement, upon the Second Lien Agent's receipt of instruction from the Required Lenders, the Second Lien Agent shall take any action (or refrain from taking any action) permitted to be taken by it under this Agreement or any of the other Second Lien Documents.  If the Second Lien Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Second Lien Document, the Second Lien Agent shall be entitled to refrain from such act or taking such action unless and until the Second Lien Agent shall have received instructions from the Required Lenders; and the Second Lien Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Second Lien Agent as a result of the Second Lien Agent acting or refraining from acting hereunder or under any other Second Lien Document in accordance with the instructions of the Required Lenders.

**8.1.3**    Except for any action expressly required of the Second Lien Agent hereunder, it shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction from the Lenders of their indemnification obligations under <u>Section 8.5</u> against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Second Lien Document shall require the Second Lien Agent to take any action that it reasonably believes to be contrary to Applicable Law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

**8.2**    **RELIANCE BY THE SECOND LIEN AGENT**.  The Second Lien Agent shall be entitled to rely upon any certificate, notice or other document (including any cable, telegram, telecopy or written electronic communication) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent engineers, insurance consultants, independent accountants and other experts selected by the Second Lien Agent.  As to any other matters not expressly provided for by this Agreement, the Second Lien Agent shall not be required to take any action or exercise any discretion, but shall be required to act or to refrain from acting upon instructions of the Required

Lenders (except that the Second Lien Agent shall not be required to take any action which exposes the Second Lien Agent to personal liability or which is contrary to this Agreement, any other Second Lien Document or any Legal Requirement) and shall in all cases be fully protected in acting, or in refraining from acting, hereunder or under any other Second Lien Document in accordance with the instructions of the Required Lenders (or, where so expressly stated, all of the Lenders), and such instructions of the Required Lenders (or all of the Lenders, where applicable) and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders.

**8.3** **NON-RELIANCE**. Each Lender represents that it has independently and without reliance on the Second Lien Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of the financial condition and affairs of the Borrowers and decision to enter into this Agreement and agrees that it will, independently and without reliance upon the Second Lien Agent, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisals and decisions in taking or not taking action under this Agreement. None of the Second Lien Agent or any Lender shall be required to keep informed as to the performance or observance by the Borrowers or their respective Affiliates under this Agreement or any other document referred to or provided for herein or to make inquiry of, or to inspect the Properties or Books and Records of, the Borrower or their respective Affiliates.

**8.4** **DEFAULTS**. The Second Lien Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Second Lien Agent has received a written notice from a Lender or the Borrowers, referring to this Agreement, describing such Default or Event of Default and indicating that such notice is a notice of default. If the Second Lien Agent receives such a notice of the occurrence of a Default or an Event of Default, the Second Lien Agent shall give notice thereof to the Lenders. The Second Lien Agent shall take such action with respect to such Default or Event of Default as is provided in Article 7 or if not provided for in Article 7, as the Second Lien Agent shall be reasonably directed by the Required Lenders; *provided, however,* that, unless and until the Second Lien Agent shall have received such directions, the Second Lien Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interest of the Lenders.

**8.5** **INDEMNIFICATION**. Without limiting the Obligations of the Borrowers hereunder, each Lender agrees to indemnify the Second Lien Agent, ratably in accordance with its Proportionate Share, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever Second Lien Agent, which may at any time be imposed on, incurred by or asserted against the Second Lien Agent in any way relating to or arising out of this Agreement, the other Second Lien Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or the enforcement of any of the terms hereof or thereof; *provided, however,* that no Lender shall be liable for any of the foregoing to the extent they arise from the Second Lien Agent's gross negligence or willful misconduct of the Second Lien Agent. The Second Lien Agent shall be fully justified in refusing to take or to continue to take any action hereunder unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Without limitation of the foregoing, each Lender agrees to reimburse the Second Lien Agent promptly upon

demand for its ratable share of any out-of-pocket expenses (including counsel fees) incurred by the Second Lien Agent in connection with the preparation, execution, administration or enforcement of, or legal advice in respect of rights or responsibilities under, the Second Lien Documents, to the extent that the Second Lien Agent is not reimbursed for such expenses by the Borrowers.

**8.6    SUCCESSOR SECOND LIEN AGENT**.  The Second Lien Agent may resign at any time by giving written notice thereof to the Lenders and the Borrowers.  The Second Lien Agent may be removed involuntarily only for a material breach of its duties and obligations hereunder or under the other Second Lien Documents or for gross negligence or willful misconduct in connection with the performance of its duties hereunder or under the other Second Lien Documents and then only upon the affirmative vote of the Required Lenders.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Second Lien Agent.  If no successor Second Lien Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 10 days after the retiring Second Lien Agent's giving of notice of resignation or the Lenders' removal of the retiring Second Lien Agent, the retiring Second Lien Agent may, on behalf of the Lenders, appoint a successor Second Lien Agent, which shall be a Lender, if any Lender shall be willing to serve, and otherwise shall be a commercial bank having a combined capital and surplus of at least $50,000,000.  Upon the acceptance of any appointment as the Second Lien Agent under the Second Lien Documents by a successor Second Lien Agent, such successor Second Lien Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Second Lien Agent, and the retiring Second Lien Agent shall be discharged from its duties and obligations as the Second Lien Agent only under the Second Lien Documents.  After any retiring Second Lien Agent's resignation or removal hereunder as the Second Lien Agent, the provisions of Section 5.14 and this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Second Lien Agent under the Second Lien Documents.

**8.7    AUTHORIZATION**.  The Second Lien Agent is hereby authorized by each Lender to execute, deliver and perform each of the Second Lien Documents to which the Second Lien Agent is or is intended to be a party and each Lender agrees to be bound by all of the agreements of the Second Lien Agent contained in the Second Lien Documents.  The execution, delivery and performance by the Second Lien Agent in respect of Second Lien Documents entered into prior to the Effective Date is hereby ratified and affirmed. Without limiting the generality of the foregoing, each Lender (a) consents to the terms and provisions of the Intercreditor Agreements, (b) agrees that it is and will be bound (as a Lender) by the terms and conditions of the Intercreditor Agreements, whether or not such Lender executes such agreement, (c) authorizes the Second Lien Agent to enter into the Intercreditor Agreements and (d) agrees that it will not take any actions contrary to the provisions of the Intercreditor Agreements. The Second Lien Agent is further authorized by each Lender (a) to release Liens on property (including any Collateral granted or held by it) (i) upon payment in full of all Obligations (other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no Claim has been asserted), (ii) that any Borrower is permitted to sell or transfer or otherwise dispose of pursuant to the terms of this Agreement and the other Second Lien Documents or (iii) if approved, authorized or ratified in writing in accordance with Section 8.9, and (b) to enter into agreements supplemental hereto for the purpose of curing any formal defect, inconsistency, omission or ambiguity in this Agreement or    any    other    Second    Lien    Document    to    which    it    is    a    party.

Notwithstanding anything herein to the contrary, each Lender acknowledges that the Liens and security interest granted to the Second Lien Agent pursuant to the Second Lien Security Documents and the exercise of any right or remedy by the Second Lien Agent thereunder are subject to the provisions of the Intercreditor Agreements. In the event of any conflict between the terms of the Intercreditor Agreements and any other Second Lien Security Documents, the terms of the Intercreditor Agreements shall govern and control.

**8.8** **THE SECOND LIEN AGENT**.  With respect to the Second Lien Term Loans made by it and any Note issued to it, the Second Lien Agent shall have the same rights and powers under the Second Lien Documents as any other Lender and may exercise the same as though it were not the Second Lien Agent.   The term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Second Lien Agent in its individual capacity.  The Second Lien Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with the Borrowers or any other Person, without any duty to account therefor to the Lenders.

**8.9** **AMENDMENTS; WAIVERS**.  Subject to the provisions of this <u>Section 8.9</u>, unless otherwise specified in this Agreement or another Second Lien Document, the Required Lenders (or the Second Lien Agent with the consent in writing of the Required Lenders acting reasonably) and the Borrowers may enter into agreements supplemental hereto for the purpose of adding, amending, modifying or waiving any provisions to the Second Lien Documents or changing in any manner the rights of the Lenders or the Borrowers hereunder or waiving any Default or Event of Default; *provided, however,* that:

(a) no such supplemental agreement shall:

(i) without the consent of all of the Lenders affected thereby, modify or waive the requirements under <u>Section 2.1.4</u> (*Prepayments and Repayments*), <u>2.4</u> (*Pro Rata Treatment*), <u>8.1</u> (*Appointment, Powers and Immunities*), <u>8.12</u> (*Participation*) or <u>8.13</u> (*Transfer of Second Lien Term Loans*);

(ii) without the consent of all Lenders, modify or waive the requirements under any other provision of any Second Lien Document specifically requiring the consent of or waiver by all of the Lenders;

(iii) without the consent of all of the Lenders affected thereby, reduce the amount or extend the payment date for any amount due hereunder, whether principal, interest, fees or other amounts;

(iv) without the consent of all Lenders, reduce the percentage specified in the definition of Required Lenders;

(v) without the consent of all Lenders, amend this <u>Section 8.9</u>; or

(vi) without the consent of all Lenders, release all or substantially all of the Collateral from the Lien of any of the Second Lien Security Documents or release any

party acting as a guarantor under a Second Lien Document (except as specifically permitted by the terms of the relevant Second Lien Document);

(vii)    without the consent of the ECP Lenders, amend <u>Section 2.6</u>; and

(viii)    without the consent of all Lenders, modify or waive the final paragraph of <u>Section 8.13</u>.

(b)    no such supplemental agreement shall, without the consent of the Second Lien Agent, change the Second Lien Agent's duties, obligations, rights, remedies, indemnities or immunities;

*provided,* that any waiver, amendment or modification of either Intercreditor Agreement (and any related definitions) may be effected by an agreement or agreements in writing entered into among the Second Lien Agent and the Required Lenders (or the Second Lien Agent with the consent in writing of the Required Lenders) without the consent of any Borrower, so long as such amendment, waiver or modification does not impose any additional duties or obligations on any Borrower, alter or impair any right of or otherwise adversely affect any Borrower under the Second Lien Documents.

## 8.10    WITHHOLDING TAX.

**8.10.1**  The Second Lien Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the forms or other documentation required by <u>Section 2.3.5</u> are not delivered to the Second Lien Agent, then the Second Lien Agent may withhold from any payment to any Lender not providing such forms or other documentation, an amount equivalent to the applicable withholding tax.

**8.10.2**  If the Second Lien Agent reasonably determines that any payment under this Agreement has been made to a Lender without an applicable Tax being properly withheld for whatever reason or if the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Second Lien Agent did not properly withhold Tax from amounts paid to or for the account of any Lender, such Lender shall immediately pay the Second Lien Agent any such applicable withholding taxes to the extent not previously deducted and indemnify the Second Lien Agent fully for all amounts paid, directly or indirectly, by the Second Lien Agent as tax or otherwise, including penalties and interest, together with all expenses incurred in connection therewith, including legal expenses, allocated staff costs, and any out-of-pocket expenses.  Each Lender hereby authorizes the Second Lien Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or the Note against any amount due the Second Lien Agent under this <u>Section 8.10.2</u>.

**8.10.3**  If any Lender sells, assigns, grants participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of <u>Sections 2.3.5</u>, <u>8.10.1</u> and <u>8.10.2</u> as though it were such Lender.

**8.11**    **GENERAL PROVISIONS AS TO PAYMENTS**.  The Second Lien Agent shall promptly distribute to each Lender, subject to the terms of the assignment and assumption agreement between the Second Lien Agent and such Lender, its Proportionate Share of each payment of principal and interest payable to the Lenders on the Second Lien Term Loans and of fees hereunder received by the Second Lien Agent for the account of the Lenders and of any other amounts owing under the Second Lien Term Loans, in accordance with the provisions of Section 2.4.  The payments made for the account of each Lender shall be made, and distributed to it, at its Lending Office designated in Exhibit D, as the same may be modified in accordance with the provisions of Section 2.5.

**8.12**    **PARTICIPATION**.  Subject to the applicable provisions of Section 8.13 and this Section 8.12, nothing herein provided shall prevent any Lender from selling a participation in its Second Lien Term Loans; *provided* that (a) (i) no such sale of a participation shall alter such Lender's or the Borrowers' obligations hereunder, (ii) such Lender's obligations hereunder shall remain unchanged, (iii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iv) the Borrowers, the Second Lien Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (b) such Lender shall (and any agreement pursuant to which any Lender may grant a participation in its rights with respect to its Second Lien Term Loans shall provide that such Lender shall), with respect to such Second Lien Term Loans, retain the sole right and responsibility to exercise the rights of such Lender, and enforce the obligations of the Borrowers relating to such Second Lien Term Loans, including the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Second Lien Document and the right to take action to have the Notes declared due and payable pursuant to Article 7 (without, for the avoidance of doubt, any voting agreements between such Lender and such participant with respect thereto).  The Borrowers agree that each participant of the Second Lien Term Loans of any Lender shall comply with the requirements under Section 2.3.5 (it being understood that the documentation required under Section 2.3.5 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 8.13; *provided* that such participant agrees to be subject to the provisions of Section 2.5 as if it were an assignee under Section 8.13. Any Lender may, in connection with any participation or proposed participation pursuant to this Section 8.12, disclose to the participant or proposed participant any information relating to the Borrowers furnished to such Lender by or on behalf of the Borrowers; *provided, however,* that, prior to any such disclosure, the participant or proposed participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in Section 9.7.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Second Lien Term Loans or other obligations under the Second Lien Documents (the **"Participant Register"**); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any loans or its other obligations under any Second Lien Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations and Section 1.163-5(b) of the Proposed Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each

Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Second Lien Agent (in its capacity as Second Lien Agent) shall have no responsibility for maintaining a Participant Register.  Any Lenders that grant a participation hereunder shall provide prompt notice thereof to the Second Lien Agent and the other Lenders.  Notwithstanding anything herein to the contrary, no Lender shall enter into any voting agreement, or any similar agreement that would have a similar practical effect, with any other Lender.

**8.13    TRANSFER OF SECOND LIEN TERM LOANS**.  Notwithstanding anything else herein to the contrary, any Lender, after delivering to the Second Lien Agent a written notice in the form of Exhibit H, appropriately completed (an **"Assignment Agreement"**), may from time to time, at its option, sell, assign, transfer, negotiate or otherwise dispose of all or a portion of its Second Lien Term Loans, made hereunder (including the Lender's interest in this Agreement and the other Second Lien Documents) to its Affiliates or to any bank, financial, lending or other entity or institution or fund (an "**Eligible Assignee**") which in such assigning Lender's judgment is reasonably capable of performing the obligations of a Lender hereunder; *provided, however,* that no Lender (including any assignee of any Lender) may assign any portion of its Second Lien Term Loans in an amount less than $250,000 (unless (A) to another Lender or an Affiliate of any Lender or (B) in the event that a Lender may be left with no Second Lien Term Loans, if it assigns its entire Second Lien Term Loans); *provided*, *however*, that notwithstanding anything to the contrary, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (i) a natural Person or (ii) to the Sponsor, the Borrower or any of their respective Subsidiaries.

In the event of any such assignment,

(a)    the assigning Lender's Proportionate Share shall be reduced by the amount of the Proportionate Share assigned to the new lender,

(b)    the parties to such assignment shall execute and deliver an Assignment Agreement evidencing such sale, assignment, transfer or other disposition,

(c)    at the new Lender's option, the Borrowers shall execute and deliver to such new lender a Note, as requested, in a principal amount equal to such new lender's (without duplication) Second Lien Term Loans, and the Borrowers shall if requested execute and exchange with the assigning Lender a replacement note for any Note in an amount equal to the (without duplication) Second Lien Term Loans retained by the Lender, if any, and

(d)    the Second Lien Agent shall amend Schedule I to reflect the Proportionate Shares of the Lenders following such assignment or, with respect to the Second Lien Term Loans, the Register, to reflect the Proportionate Shares of the Lenders following such assignment.

Thereafter, such new lender shall be deemed to be a Lender and shall have all of the rights and duties of a Lender (except as otherwise provided in this Article 8), in accordance with its Proportionate Share, under each of the Second Lien Documents.  The entries on Schedule I, or, with respect to the Second Lien Term Loans, the Register, maintained pursuant to this Section 8.13 shall be prima facie evidence of the existence of the amounts of the obligations recorded therein;

*provided* that the failure of the Second Lien Agent to maintain and amend such schedule shall not in any manner affect the obligation of the Borrowers to repay the Second Lien Term Loans in accordance with the terms of this Agreement.  Any assigning Lender may, in connection with any assignment or proposed assignment pursuant to this <u>Section 8.13</u>, disclose to the assignee or proposed assignee any information relating to the Borrowers or their Properties furnished to such Lender by or on behalf of the Borrowers; *provided, however*, that, prior to any such disclosure, the assignee or proposed assignee shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in <u>Section 9.7</u>.

Notwithstanding anything in <u>Section 8.13</u>, <u>Section 8.12</u> or the definition of "Required Lenders," to the contrary, for purposes of determining whether the Required Lenders or the Lenders, as applicable, have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Second Lien Document or any departure by the Sponsor or any Borrower therefrom or, subject to the following paragraph, any plan of reorganization pursuant to the Bankruptcy Code, or (ii) otherwise acted on any matter related to any Second Lien Document or (iii) directed or required the Second Lien Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Second Lien Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require the Second Lien Agent or any Lender to take (or refrain from taking) any such action and:

        (i)        all Second Lien Term Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

        (ii)        all Second Lien Term Loans held by Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

Notwithstanding anything in this Agreement or the other Second Lien Documents to the contrary, each Affiliated Lender hereby agrees that and each Affiliated Lender Assignment Agreement shall provide a confirmation that, if a proceeding under any debtor relief law shall be commenced by or against any Borrower or the Sponsor at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Second Lien Agent to vote on behalf of such Affiliated Lender with respect to the Second Lien Term Loans held by such Affiliated Lender in any manner, unless the Second Lien Agent instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Second Lien Term Loans held by it as the Second Lien Agent directs; *provided* that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Second Lien Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliated Lenders.

Notwithstanding anything herein to the contrary, no Lender may, without the affirmative consent of the Second Lien Agent, distribute its Second Lien Term Loans to any of its limited partners, non-managing members or similar passive equity holders of any investment fund or other collective investment vehicle comprising or beneficially owning such Lender; *provided*, *however*, that if the Second Lien Agent grants consent to any Lender to distribute its Second Lien Term Loans to any such Persons, each other non-assigning Lender shall be entitled, at any time after the date of such assignment, to distribute its Second Lien Term Loans in the same manner.

**8.14   ASSIGNABILITY AS COLLATERAL**.   Notwithstanding any other provision contained in this Agreement or any other Second Lien Document to the contrary, any Lender may assign as collateral security all or any portion of the Second Lien Term Loans or Notes held by it in favor of any Federal Reserve Lender in accordance with Regulation A of the Board of Governors of the Federal Reserve System; *provided* that any payment in respect of such assigned Second Lien Term Loans or Notes made by the Borrowers to or for the account of the assigning or pledging Lender in accordance with the terms of this Agreement shall satisfy the Borrowers' obligations hereunder in respect of such assigned Second Lien Term Loans or Notes to the extent of such payment.  No such assignment shall release the assigning Lender from its obligations hereunder.

**8.15   REGISTER**.   The Second Lien Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain records of any assignment of rights and obligations of Lenders under this Agreement and keep a register (the "**Register**") for recordation of the names and addresses of each Lender of each Lender (if any) and the principal amounts (and stated interest) of the Second Lien Term Loans owing to each Lender.  The entries in such register shall be conclusive in the absence of any manifest or demonstrable error, and the Borrowers, the Second Lien Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrowers and any Lender (but only to the extent of entries in the Register that are applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

## ARTICLE 9
## MISCELLANEOUS

**9.1   ADDRESSES**.   Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to the Second Lien Agent or ECP Lenders:

12680 High Bluff Drive, Suite 400
San Diego, CA 92130
Attention: Jennifer Gray
Phone: +1 (858) 703-4408
Fax: +1 (858) 703-4401
E-mail: jgray@ecpartners.com

With a copy (which will not constitute notice) to:

12680 High Bluff Drive, Suite 400
San Diego, CA 92130
Attention: Michael Rumpolo
Phone: +1 (973) 671-6127
E-mail: mrumpolo@ecpartners.com

With a copy (which will not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Kelann Brook Stirling
Phone: 212-909-3232
E-mail: kelann.stirling@kirkland.com

If to the Melody Lenders:

Melody Special Situations Offshore Credit Mini-Master Fund, L.P.
Melody Capital Partners Offshore Credit Mini-Master Fund, L.P.
Melody Capital Partners Onshore Credit Fund, L.P.
Melody Capital Partners FDB Credit Fund LLC
c/o Melody Capital Partners, LP
717 Fifth Avenue, 12th Floor
New York, NY 10022
Attention: Notices
Phone: 212-583-8700
E-mail: notices@melody.com

With a copy (which will not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention: Abhilash M. Raval & Lauren C. Doyle
Phone: 212-530-5123
E-mail: ARaval@milbank.com
Email: LDoyle@milbank.com

If to the Borrowers:

Cornucopia Oil & Gas Company, LLC
Corsair Oil & Gas Company, LLC
Furie Operating Alaska, LLC
Attention: Kevin Hemenway
188 W. Northern Lights Blvd., Suite 620
Anchorage, AK 99503
Phone: 907-565-2011
Fax: 907-277-3796

E-mail: hemenwayk@aol.com

With a copy (which will not constitute notice) to:

David H. Bundy, Esq.
721 Depot Drive
Anchorage AK 99501
Phone: (907) 248-8431
E-mail: dhb@alaska.net

If to AFG Investments 1A, LLC:

[●][37]

With a copy (which will not constitute notice) to:

[●][38]

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service, (c) in the event overnight delivery services are not readily available, if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested or (d) if sent by telecopy or electronic mail (in portable document format). Notice so given shall be effective upon receipt by the addressee, except that communication or notice so transmitted by telecopy or other direct written electronic means (including e-mail) shall be deemed to have been validly and effectively given on the day (if a Banking Day and, if not, on the next following Banking Day) on which it is transmitted if transmitted before 5:00 p.m., New York City time, recipient's time, and if transmitted after that time, on the next following Banking Day; *provided, however,* that if any notice is tendered to an addressee and the delivery thereof is refused by such addressee, such notice shall be effective upon such tender. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of 30 days' notice to the other parties in the manner set forth hereinabove.

**9.2**    **RIGHT TO SET-OFF**. In addition to any rights now or hereafter granted under Applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Second Lien Agent and each Lender is hereby authorized at any time or from time to time, to the extent permitted under applicable Legal Requirements, without presentment, demand, protest or other notice of any kind to the Borrowers or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Second Lien Agent or any Lender (including by branches and agencies of the Second Lien Agent and each Lender wherever located) to or for the credit or the account of the Borrowers, against and on account of the Obligations of the Borrowers hereunder, irrespective of whether or

---

[37]    Note to McGinty: Please add notice information.
[38]    Note to McGinty: Please add copy to information.

not the Second Lien Agent shall have made any demand hereunder and although said Obligations, or any of them, shall be contingent or unmatured.

**9.3** **DELAY AND WAIVER**.  No delay or omission to exercise any right, power or remedy accruing to the Second Lien Agent or Lenders upon the occurrence of any Default or Event of Default or any breach or default by the Borrowers under this Agreement or any other Second Lien Document shall impair any such right, power or remedy of the Second Lien Agent or Lenders, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single Event of Default, Default or other breach or default be deemed a waiver of any other Event of Default, Default or other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of the Second Lien Agent or any Lender of any Event of Default, Default or other breach or default under this Agreement or any other Second Lien Document, or any waiver on the part of the Second Lien Agent or any Lender of any provision or condition of this Agreement or any other Second Lien Document, must be in writing and shall be effective only to the extent in such writing specifically set forth.  All remedies, either under this Agreement or any other Credit Document or by law or otherwise afforded to the Administrative Agent and the Lenders, shall be cumulative and not alternative.

**9.4** **COSTS, EXPENSES AND ATTORNEYS' FEES**. From and after the Effective Date, the Borrowers will pay to the Lenders and the Second Lien Agent, upon five (5) Banking Days' written demand therefor, all of their documented out-of-pocket costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred after the Effective Date in connection with the administration of this Agreement (including, but not limited to, all expenses and costs incurred pursuant to Section 5.9), the other Second Lien Documents, and any other documents related thereto or contemplated hereby.  The Borrowers will reimburse the Second Lien Agent and the Lenders, and their respective related Indemnitees, for all reasonable and documented actual costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred after the Effective Date by the Second Lien Agent or the Lenders in enforcing this Agreement or the other Second Lien Documents and in connection with a Default or Event of Default, including in connection with actions for declaratory relief in any way related to this Agreement or the other Second Lien Documents and in collecting any sum which becomes due to the Lenders under the Second Lien Documents, and in responding to or defending against any audit initiated by the State of Alaska with respect to any State Tax Credits or Validated Expenditures.  The provisions of this Section 9.4 shall survive foreclosure of the Second Lien Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrowers' obligations hereunder, and shall be in addition to any other rights and remedies of the Lenders, the Second Lien Agent and their respective Affiliates. For the avoidance of doubt, the reimbursement rights provided for in this Section 9.4 shall not extend to any costs, fees or expenses arising in connection with or resulting from a Specified Claim.

**9.5** **ENTIRE AGREEMENT**.  This Agreement, the other Second Lien Documents, and any other agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Agreement or any Second Lien Document, this Agreement

and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement shall prevail.  This Agreement and the other Second Lien Documents may only be amended or modified in accordance with Section 8.9 hereof.

**9.6**    **GOVERNING LAW**.  This Agreement, and any instrument or agreement required hereunder (to the extent not otherwise expressly provided for therein), shall be governed by, and construed under, the laws of the State of New York, without regard to the conflict of law principles that would result in the application of any law other than the law of the State of New York (other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law).

**9.7**    **CONFIDENTIALITY**.  No party hereto, in its capacity as a receiving party, shall disclose any Confidential Information to any third party without the prior written consent of the party delivering such Confidential Information (*provided* that any disclosure of Confidential Information described in clause (a) of the definition thereof shall require the prior consent of the Borrowers), other than:

(a)        in the case of disclosure by the Second Lien Agent or any Lender, (i) to the Second Lien Agent's or such Lender's respective auditors, officers, directors, employees, agents, advisors, funding sources, investors, potential investors, potential lenders (including potential purchasers of the Second Lien Term Loan and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential)), (ii) to any other Person party hereto, the Second Lien Agent and the other Lenders, (iii) to actual or prospective Lenders or credit default providers, in each case on a confidential basis and otherwise in accordance with the last sentence of Section 8.13, (iv) to actual or prospective participants, in each case on a confidential basis and otherwise in accordance with the fourth to last sentence of Section 8.12, (v) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law, (vi) in connection with any litigation, arbitration or other legal proceeding to which the Second Lien Agent or any Lender is a party, (vii) to the lenders and agents under the AIDEA Loan Agreement, the Tax Credit Loan Agreement and the New Term Loan Agreement, (viii) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking or (ix) in connection with the exercise of any remedies hereunder or under any other Second Lien Document or any action or proceeding relating to this Agreement or any other Second Lien Document or the enforcement of rights hereunder or thereunder (including any judicial or non-judicial foreclosure); or

(b)        in the case of disclosure by the Borrowers, (i) to the Borrowers' auditors, officers, directors, employees, agents, representatives, advisors, funding sources, investors, potential investors and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, (iii) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law or (iv) in connection with any litigation, arbitration or other legal proceeding to which the Borrowers are a party.

**9.8**    **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, (a) the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or

unenforceable provisions with valid provisions the economic effect of which come as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.9** **HEADINGS**. Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

**9.10** **ACCOUNTING TERMS**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP and practices consistent with those applied in the preparation of the financial statements submitted by the Borrowers to the Second Lien Agent, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles and practices.

**9.11** **NO PARTNERSHIP**. The Lenders and the Borrowers intend that the relationship between them shall be solely that of creditor and debtor. Nothing contained in this Agreement, the Notes or in any of the other Second Lien Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between the Second Lien Agent and Lenders and the Borrowers or any other Person. The Second Lien Agent and Lenders shall not be in any way responsible or liable for the debts, losses, obligations or duties of the Borrowers, the Sponsor or any other Person or with respect to the Properties of the Borrowers or the Sponsor or otherwise. All obligations to pay real property or other taxes, assessments, insurance premiums, and all other fees and charges arising from the ownership, operation, lease or occupancy of the Properties of the Borrowers and to perform all obligations and other agreements and contracts relating to the Properties of the Borrowers shall be the sole responsibility of the Borrowers, as applicable.

The Borrowers acknowledge that the Lenders, the Second Lien Agent, their respective Affiliates and funds managed by any of them (collectively, the "**Creditor Parties**") may be providing debt financing, equity capital or other services to other companies in respect of which the Borrowers may have conflicting interests regarding the transactions described herein and otherwise. The Borrowers acknowledge that none of the Creditor Parties have any obligation to use in connection with the transactions contemplated hereby, or to furnish to the Borrowers, Confidential Information obtained from other companies.

The Borrowers further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between the Borrowers and the Creditor Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement and the other Second Lien Documents, irrespective of whether the Creditor Parties have advised or is advising the Borrowers on other matters, (b) the Creditor Parties, on the one hand, and the Borrowers, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do the Borrowers rely on, any fiduciary duty on the part of the Creditor Parties, (c) the Borrowers are capable of evaluating and understanding, and the Borrowers understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Second Lien Documents, (d) the Borrowers have been advised that each of the Creditor Parties is engaged in a

broad range of transactions that may involve interests that differ from the Borrowers' interests and that none of the Creditor Parties has any obligation to disclose such interests and transactions to the Borrowers by virtue of any fiduciary, advisory or agency relationship and (e) the Borrowers waive, to the fullest extent permitted by law, any claims the Borrowers may have arising out of or in connection with the transactions contemplated by this Agreement and the other Second Lien Documents against the Creditor Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Creditor Parties shall have any liability (whether direct or indirect) to the Borrowers in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of the Borrowers, including the Borrowers' stockholders, employees or creditors.

**9.12** **SECOND LIEN SECURITY DOCUMENTS**. Reference is hereby made to the Second Lien Security Documents for the provisions, among others, relating to the nature and extent of the security provided thereunder; the rights, duties and obligations of the Borrowers party thereto; and the rights of the Second Lien Agent and the Lenders with respect to such security.

**9.13** **LIMITATION ON LIABILITY**. No Claim shall be made by any party to this Agreement or any of their respective Affiliates against any other party hereto or the Lenders or any of their Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether or not the Claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or the other Second Lien Documents or any act or omission or event occurring in connection therewith; and each party hereto hereby waives, releases and agrees not to sue upon any such Claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor; *provided*, *however*, that (i) no party shall be required to waive Claims against the Borrowers; *provided*, *however*, neither this limitation of liability nor this exception shall limit in any manner the releases set forth in this Agreement or the Second Lien Documents; (ii) no Lender shall be required to waive Claims (subject to the limitation of damages set forth in this sentence) to the extent they arise from the Second Lien Agent's gross negligence or willful misconduct; and (iii) the Second Lien Agent shall be fully justified in refusing to take or continuing to take any action unless it shall first be satisfied by the indemnity pursuant to Section 8.5.

For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, nothing herein shall limit the right or ability of any Person that is a Lender (whether in its capacity as a Lender or otherwise) to make a Claim against any Person in respect of a document or agreement other than this Agreement, the Notes and the Second Lien Security Documents.

**9.14** **WAIVER OF JURY TRIAL**. THE SECOND LIEN AGENT, THE LENDERS, AND THE BORROWERS, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER SECOND LIEN DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE SECOND LIEN AGENT, THE LENDERS AND THE BORROWERS TO ENTER INTO THIS AGREEMENT.

**9.15** **CONSENT TO JURISDICTION**.  The Second Lien Agent, the Lenders and the Borrowers agree that any legal action or proceeding by or against the Borrowers, or with respect to or arising out of or relating to this Agreement, the Notes, or any other Second Lien Document, may be brought in or removed to the courts of the State of New York, in and for the County of New York, or, to the extent permitted by Applicable Law, of any federal court sitting in the borough of Manhattan.  By execution and delivery of this Agreement, each of the Second Lien Agent, the Lenders and the Borrowers accept, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall limit the right of the Second Lien Agent or the Lenders to sue in any other jurisdiction in connection with the exercise of the rights under any Second Lien Security Documents or the enforcement of any judgment.  The Second Lien Agent, the Lenders and the Borrowers irrevocably consent to the service of process out of any of the aforementioned courts in any manner permitted by Applicable Law.  The Second Lien Agent, the Lenders and the Borrowers further agree that the aforesaid courts of the State of New York and of the United States of America shall have exclusive jurisdiction with respect to any claim or counterclaim of the Borrowers based upon the assertion that the rate of interest charged by the Lenders on or under this Agreement, the Second Lien Term Loans or the other Second Lien Documents is usurious.  The Second Lien Agent, the Lenders and the Borrowers hereby waive, to the extent permitted by Applicable Law, any claim, objection or right to stay or dismiss any action or proceeding under or in connection with this Agreement or any other Second Lien Document brought before the foregoing courts on the basis of *forum non-conveniens.*

**9.16** **KNOWLEDGE AND ATTRIBUTION**.  References in this Agreement and the other Second Lien Documents to the "knowledge," "best knowledge" or facts and circumstances "known to" the Borrowers, and all like references, mean facts or circumstances of which a Responsible Officer of the Borrowers or other relevant Person has actual knowledge after reasonable due inquiry.

**9.17** **SUCCESSORS AND ASSIGNS; NO THIRD-PARTY BENEFICIARIES**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The Borrowers may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lenders in their sole and absolute discretion.  Each Lender may assign all or a portion of its Second Lien Term Loans and sell participations in such Second Lien Term Loans, subject to the applicable provisions of Article 8.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and permitted assigns and participants, in the case of Sections 5.14, 8.5 and 9.4, Indemnitees) any legal or equitable right, remedy or Claim under or by reason of this Agreement.

**9.18** **USURY SAVINGS CLAUSE**.  Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under Applicable Law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Second Lien Term Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times

been in effect.  In addition, if when the Second Lien Term Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrowers shall pay to Second Lien Agent for the account of the Lenders an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrowers to conform strictly to any applicable usury laws. Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Second Lien Term Loans made hereunder or be refunded to the Borrowers.

**9.19**    **COUNTERPARTS**.  This Agreement may be executed in one or more counterparts, and by the parties hereto in separate counterparts, each of which when executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or electronic means in portable document format of an executed counterpart of a signature page of this Agreement (or of an executed counterpart of any amendment or waiver of this Agreement or any Exhibit hereto to be executed and delivered hereunder) shall be as effective as delivery of a manually executed counterpart hereof.

**9.20**    **PATRIOT ACT**.  The Second Lien Agent and each Lender hereby notify the Borrowers that pursuant to the requirements of the Patriot Act, they are required to obtain, verify and record information that identifies each Borrower, which information includes the name, address and tax identification number of each Borrower and other information that will allow such Lender to identify each Borrower in accordance with the Patriot Act and other applicable "know-your-customer" and AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws. This notice is given in accordance with the requirements of the Patriot Act.  Borrowers shall, promptly following a request by any Lender or Second Lien Agent, provide all documentation and other information that such Lender or Second Lien Agent, as applicable, requests in order to comply with its ongoing obligations under applicable "know your customer", AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws and any rules or regulations thereunder, including the PATRIOT Act.

**9.21**    **JOINT AND SEVERAL LIABILITY**.

**9.21.1** *Joint and Several Liability*. All Obligations of Borrowers under this Agreement and the other Second Lien Documents shall be joint and several Obligations of each Borrower, and each of the Borrowers hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with respect to the payment and performance of all such Obligations.  Anything contained in this Agreement and the other Second Lien Documents to the contrary notwithstanding, the Obligations of each Borrower hereunder, solely to the extent that such Borrower did not receive proceeds of Second Lien Term Loans from any borrowing hereunder, shall be limited to a maximum aggregate amount equal to the largest amount that would not render its Obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under section 548 of the Bankruptcy Code or any applicable provisions of comparable state law (collectively, the **"Fraudulent Transfer Laws"**), in each case after giving effect to all other liabilities of such Borrower, contingent or otherwise, that are relevant under the

Fraudulent Transfer Laws (specifically excluding, however, any liabilities of such Borrower in respect of intercompany Debt to the other Borrower or their respective Affiliates (other than such Borrower) to the extent that such Debt would be discharged in an amount equal to the amount paid by such Borrower hereunder) and after giving effect as assets to the value (as determined under the applicable provisions of the Fraudulent Transfer Laws) of any rights to subrogation or contribution of such Borrower pursuant to Applicable Law.

      **9.21.2** *Subrogation*.  Until the Obligations shall have been paid in full in Cash, each Borrower shall withhold exercise of any right of subrogation, contribution or any other right to enforce any remedy which it now has or may hereafter have against the other Borrower or any other guarantor of the Obligations.  Each Borrower further agrees that, to the extent the waiver of its rights of subrogation, contribution and remedies as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any such rights such Borrower may have against the other Borrower, any collateral or security or any such other guarantor, shall be junior and subordinate to any rights the Second Lien Agent may have against the other Borrower, any such collateral or security, and any such other guarantor.  The Borrowers under this Agreement and the other Second Lien Documents together desire to allocate among themselves, in a fair and equitable manner, their Obligations arising under this Agreement and the other Second Lien Documents.  Accordingly, in the event any payment or distribution is made on any date by any Borrower under this Agreement and the other Second Lien Documents (a **"Funding Borrower"**) that exceeds its Obligation Fair Share (as defined below) as of such date, that Funding Borrower shall be entitled to a contribution from the other Borrower in the amount of such other Borrower's Obligation Fair Share Shortfall (as defined below) as of such date, with the result that all such contributions will cause each Borrower's Obligation Aggregate Payments (as defined below) to equal its Obligation Fair Share as of such date.  **"Obligation Fair Share"** means, with respect to a Borrower as of any date of determination, an amount equal to (i) the ratio of (x) the Obligation Fair Share Contribution Amount (as defined below) with respect to such Borrower to (y) the aggregate of the Obligation Fair Share Contribution Amounts with respect to all Borrowers, <u>multiplied by</u> (ii) the aggregate amount paid or distributed on or before such date by the Funding Borrower under this Agreement and the other Second Lien Documents in respect of the Obligations guarantied.  **"Obligation Fair Share Shortfall"** means, with respect to a Borrower as of any date of determination, the excess, if any, of the Obligation Fair Share of such Borrower over the Obligation Aggregate Payments of such Borrower.  **"Obligation Fair Share Contribution Amount"** means, with respect to a Borrower as of any date of determination, the maximum aggregate amount of the Obligations of such Borrower under this Agreement and the other Second Lien Documents that would not render its Obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; *provided* that, solely for purposes of calculating the Obligation Fair Share Contribution Amount with respect to any Borrower for purposes of this <u>Section 9.21</u>, any assets or liabilities of such Borrower arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or Obligations of contribution hereunder shall not be considered as assets or liabilities of such Borrower. **"Obligation Aggregate Payments"** means, with respect to a Borrower as of any date of determination, an amount equal to (i) the aggregate amount of all payments and distributions made on or before such date by such Borrower in respect of this Agreement and the other Second Lien Documents (including in respect of this <u>Section 9.21</u>) <u>minus</u> (ii) the aggregate amount of all payments received on or before such date by such Borrower from the other Borrower as

contributions under this Section 9.21.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Borrower.  The allocation among Borrowers of their Obligations as set forth in this Section 9.21 shall not be construed in any way to limit the liability of any Borrower hereunder or under any Second Lien Document.

**9.21.3** *Representative of Borrowers*.  FOA hereby appoints Cornucopia as its agent, attorney-in-fact and representative for the purpose of (i) making any borrowing requests or other requests required under this Agreement, (ii) the giving and receipt of notices by and to the Borrowers under this Agreement, (iii) the delivery of all documents, reports, financial statements and written materials required to be delivered by the Borrowers under this Agreement, and (iv) all other purposes incidental to any of the foregoing.  FOA agrees that any action taken by Cornucopia as the agent, attorney-in-fact and representative of FOA shall be binding upon FOA to the same extent as if directly taken by FOA.  Corsair hereby appoints Cornucopia as its agent, attorney-in-fact and representative for the purpose of (i) the giving and receipt of notices by and to the Borrowers under this Agreement, (ii) the delivery of all documents, reports, financial statements and written materials required to be delivered by the Borrowers under this Agreement, and (iii) all other purposes incidental to any of the foregoing.  Corsair agrees that any action taken by Cornucopia as the agent, attorney-in-fact and representative of Corsair shall be binding upon Corsair to the same extent as if directly taken by Corsair.

**9.21.4** *Obligations Absolute*.  Each Borrower hereby waives, for the benefit of the beneficiaries: (a) any right to require any Secured Party, as a condition of payment or performance by such Borrower, to (i) proceed against any other Borrower, the Sponsor or any other Person, (ii) proceed against or exhaust any security held from any other Borrower, any guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account, securities account or credit on the books of any Secured Party in favor of any other Borrower or any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or defense of any other Borrower or the Sponsor based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of any other Borrower or the Sponsor from any cause other than payment in full of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Borrower's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Borrower's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**9.22** **ALASKA MORTGAGE PROVISIONS**.  The Borrowers are personally obligated and fully liable for the amount due under the Agreement and the other Second Lien Documents.  The

Second Lien Agent, at the direction of the Required Lenders, has the right to sue on the Agreement and obtain a personal judgment against Borrowers for satisfaction of the amount due under the Agreement and the other Second Lien Documents either before or after a judicial foreclosure of the mortgage or deed of trust under AS 09.45.170 – 09.45.220.

**9.23    SECOND LIEN DOCUMENTS.**

(a)    Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Second Lien Agent pursuant to the Second Lien Security Documents and the exercise of any right or remedy by the Second Lien Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreements. In the event of any conflict between the terms of the Intercreditor Agreements and this Agreement, the terms of the Intercreditor Agreements shall govern and control.

(b)    Each Borrower agrees that the AIDEA Loan Agreement and each AIDEA Loan Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

> "Notwithstanding anything herein to the contrary, the Lien and security interest granted to the AIDEA Loan Collateral Agent pursuant to the AIDEA Loan Collateral Documents and the exercise of any right or remedy by the AIDEA Loan Collateral Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between Alaska Industrial Development and Export Authority as AIDEA Loan Collateral Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor. In the event of any conflict between the terms of the Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

(c)    Each Borrower agrees that the New Term Loan Agreement and each New Term Loan Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

> "Notwithstanding anything herein to the contrary, the Lien and security interest granted to the New Term Loan Agent pursuant to the New Term Loan Collateral Documents and the exercise of any right or remedy by the New Term Loan Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent, the Tax Credit Agent and the Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor. In the event of any conflict between the terms of the Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

(d)    Each Borrower agrees that the Tax Credit Loan Agreement and each Tax Credit Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Tax Credit Agent pursuant to the Tax Credit Collateral Documents and the exercise of any right or remedy by the Tax Credit Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), between ING Capital, LLC as Tax Credit Agent, the New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor. In the event of any conflict between the terms of the Intercreditor Agreement and this agreement, the terms of the Intercreditor Agreement shall govern and control."

**9.24     SECOND LIEN DOCUMENTS**.  Each Borrower agrees it shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Required Lenders may request to effectuate the terms of and the Lien priorities contemplated by the Second Lien Documents.

**9.25     ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS**.  Notwithstanding anything to the contrary in any Second Lien Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Second Lien Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of a Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

**9.25.1** the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

**9.25.2** the effects of any Bail-In Action on any such liability, including, if applicable:

(a)          a reduction in full or in part or cancellation of any such liability;

(b)          a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Second Lien Document; or

(c)          the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any the applicable Resolution Authority.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**EXHIBIT A**

DEFINITIONS

"**Acceleration Amounts**" has the meaning assigned to such term in Section 7.2.2.

"**Acceptable Operator**" means, any Person that has substantial experience as an operator of production and midstream facilities similar to the production and midstream facilities of the Borrowers and acceptable to the Required Lenders acting reasonably.

"**Additional Material Contract**" means any contract or series of related contracts to which any Borrower is a party or to which their assets are bound that is material to the business or operations of the Borrowers or the Properties of the Borrowers or the termination of which would reasonably be expected to result in liabilities or losses in excess of $100,000 or cause a Material Adverse Effect.  Each such contract or series of related contracts that requires payments by or contemplates payments to any Borrower of more than $500,000 during the term of such contract shall be deemed an Additional Material Contract.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" of a specified Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, or that holds or beneficially owns 10% or more of the Equity Interests in the Person specified or 10% or more of the voting securities of the Person specified; *provided*, that in no event shall the Second Lien Agent, any Lender or any Affiliate of any Lender be considered an Affiliate of the Borrowers.

"**Affiliated Lender**" means, at any time, any Lender that is an Affiliate of the Sponsor or any Borrower (other than the Sponsor, the Borrowers or any of their respective Subsidiaries).

"**Agent Account**" means a deposit account established by the Tax Credit Agent in Alaska and maintained at Northrim Bank, or, after the Discharge of First Lien Obligations (as defined in the Tax Credit Intercreditor Agreement) any replacement deposit account established by the New Term Loan Agent or the Second Lien Collateral Agent pursuant to the Tax Credit Intercreditor Agreement, in each case, into which State Tax Credit proceeds shall be deposited as described herein and in accordance with the Tax Credit Intercreditor Agreement.

"**Agreement**" has the meaning given in the preamble of this Agreement.

"**AIDEA**" means Alaska Industrial Development and Export Authority.

"**AIDEA Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between the AIDEA Loan Collateral Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor.

"**AIDEA Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among FOA, Corsair, and Cornucopia and [●], as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**AIDEA Loan Collateral Agent**" has the meaning given in the AIDEA Intercreditor Agreement.

"**AIDEA Loan Collateral Documents**" has the meaning given in the AIDEA Intercreditor Agreement.

"**AIDEA Loan Documents**" means the AIDEA Loan Agreement and the ["Credit Documents"] (as defined in the AIDEA Loan Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other AIDEA Loan Obligation, as such agreements, documents and instruments may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**AIDEA Loan Obligations**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Alaska Taxes**" means any Taxes imposed by the State of Alaska or any governmental authority therein or any royalty-in-value obligations owed to the State of Alaska or any governmental authority therein, in each case that could reduce, offset, withhold or delay payment on the State Tax Credits and that are reasonably expected to be payable by the Borrowers.

"**Alaska Tax Credit Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under AS 43.55.023 for tax credits under the Alaska Oil and Gas Production Tax Law, including all tax credits available pursuant to AS 43.55.023(a), AS 43.55.023(l), AS 43.55.023(b) and AS 43.55.025.

"**AML Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Lender, the Second Lien Agent, the Borrowers or the Sponsor from time to time concerning or relating to anti-money laundering.

"**Anchorage Recording District**" means that Recorder's Office for the District of Anchorage in which oil or gas liens are recorded.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Borrowers or the Sponsor from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Anti-Terrorism Laws**" means any of the following: (a) the Anti-Terrorism Order; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Patriot Act; (f) any regulations promulgated pursuant to any of the foregoing or (g) comparable laws, rules and directives administered or

enforced by the United Nations Security Council, the European Union, or a member state of the European Union.

"**APC**" means Alaska Pipeline Company, an Alaska corporation.

"**APC Gas Sales Agreement**" means the Gas Sales Agreement, dated as of February 26, 2016, between FOA and APC, as amended by that certain Amendment to Gas Sales Agreement, dated as of September 13, 2017 between FOA and APC, that certain Second Amendment to Gas Sales Agreement dated as of April 25, 2019 between FOA and APC and that certain Third Amendment to Gas Sales Agreement dated as of February 14, 2020.

"**APC LC Cap Amount**" means, at any time, the lesser of: (a) (i) from the Effective Date until March 31, 2021, $3,000,000 and (ii) from April 1, 2021 to May 31, 2021, $2,500,000; and (b) the total aggregate amount of credit support required under the APC Gas Sales Agreement *less* any other credit support provided to APC in satisfaction thereof.

"**Applicable Laws**" means and includes any and all laws, statutes, codes, ordinances, orders, rules, regulations, any constitutional provision, treaties, decrees, writs, judgments, decisions, certificates, licenses, holdings, determinations, injunctions, Permits or requirements of any Governmental Authority (including all Environmental Laws), along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, as such may be amended or modified from time to time.  Unless the context clearly requires otherwise, the term "Applicable Law" shall include each of the foregoing as in effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the Effective Date.

"**Applicable Permit**" means, at any time, any Permit, including any zoning, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Permit, in each case that is (a) necessary at such time in connection with the transactions contemplated by the Second Lien Documents or the Material Contracts or the operation of the Borrower's Properties (in each case, to the extent required by Legal Requirements, the Second Lien Documents or the Material Contracts), or for the Borrowers to enter into any Second Lien Document or Material Contract or to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements and (b) otherwise listed on Part I of Exhibit G.

"**Applicable PIK Interest Amount**" has the meaning given in Section 2.1.1(b).

"**Assignment Agreement**" has the meaning given in Section 8.13.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time)

and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Banking Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized to be closed in New York, New York or Kenai, Alaska.

"**Bankruptcy Cases**" means the cases related to Borrowers' voluntary petition for relief filed August 9, 2019 under chapter 11 of the Bankruptcy Code in the Bankruptcy Court captioned In re Furie Operating Alaska, LLC, Case No. 19-11781.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, as applicable to the Bankruptcy Cases.

"**Bankruptcy Event**" shall be deemed to occur, with respect to any Person, if:

(a)      such Person shall institute a voluntary case seeking liquidation or reorganization under the Bankruptcy Code, or shall consent to the institution of an involuntary case thereunder against it;

(b)      such Person shall apply for, or by consent or acquiescence or otherwise there shall be an appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers for itself or substantially all of its assets;

(c)      such Person shall make a general assignment of substantially all of its assets for the benefit of its creditors;

(d)      such Person shall admit in writing its inability to pay its debts generally as they become due; or

an involuntary case shall be commenced seeking liquidation or reorganization of such Person under the Bankruptcy Code and (i) the petition commencing the involuntary case is not timely controverted, (ii) the petition commencing the involuntary case is not dismissed within 60 days of its filing, (iii) an interim trustee is appointed to take possession of all or a portion of the property, and/or to operate all or any part of the business of such Person and such appointment is not vacated within 60 days, or (iv) an order for relief shall have been issued or entered therein.

"**Books and Records**" means, as to any Person, all of such Person's books and records including ledgers; federal and state tax returns; records regarding such Person's assets or liabilities, business operations or financial condition; and all computer programs or storage or any equipment containing such information.

"**Borrowers**" has the meaning given in the preamble of the Agreement.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures of the Borrowers that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of the Borrowers.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Collateralize**" means to pledge and deposit with or deliver to the Second Lien Agent, for the benefit of one or more of the Letter of Credit Issuer or the ECP Lenders, Cash or deposit account balances in an amount equal to 103% of the face amount of the Letter of Credit then outstanding.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $5,000,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**CEA**" means the Commodity Exchange Act, as amended.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended.

"**Change of Control**" means (x) any transaction as a result of which (a) HEX, LLC fails to directly or indirectly own 80% of the Equity Interests in Cornucopia and Corsair, (b) the Sponsor fails to directly own at least 100% of the Equity Interests in each of Cornucopia and Corsair, (c) Cornucopia ceases to directly own 100% of the Equity Interests in FOA or (d) a Disqualified Owner shall own the Equity Interests in any of the Borrowers, directly or indirectly, or (y) any

change in ownership of any Borrower or the Sponsor occurs which results in the failure of Cornucopia to meet the eligibility requirements of AS 43.55.028.[39]

"**Change of Law**" means the adoption of any Applicable Law after the date of the Agreement, any change in any Applicable Law or the application or requirements thereof after the date of the Agreement (whether such change occurs in accordance with the terms of such Applicable Law as enacted on or prior to the date of the Agreement, as a result of amendment made after the date of the Agreement, or otherwise), any change in the interpretation or administration of any Applicable Law by any Governmental Authority after the date of the Agreement, or compliance by the Borrowers or any Lender with any request or directive made or issued after the date of the Agreement (whether or not having the force of law, but if not having the force of law, being of a type with which the Borrowers or such Lender customarily complies) by any Governmental Authority.  For the avoidance of doubt, Change of Law shall be deemed to include all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (a) under or in connection with the implementation of the Dodd-Frank Act and (b) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority, regardless of the date adopted, issued, promulgated or implemented).

"**Claim**" means any and all liabilities, losses, administrative or regulatory or judicial actions, suits, demands, decrees, claims, Liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages (foreseeable and unforeseeable, including consequential and punitive damages), penalties, fees, out-of-pocket costs, expenses, disbursements, attorneys' fees or consultants' fees.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Equity Interests) on which Liens are purported to be granted pursuant to the Second Lien Security Documents as security for the Obligations.

"**Condemnation**" means any taking, seizure, confiscation, requisition, exercise of rights of eminent domain, public improvement, inverse condemnation, condemnation or similar action of or proceeding by any Governmental Authority relating to any of the Borrowers' Properties.

"**Confidential Information**" means (a) the terms and conditions of each of the Second Lien Documents and Material Contracts, including any amendments, waivers, supplements or other modifications thereto and all negotiations and communications in respect thereof and (b) any and all documents, materials and information (whether oral, written, electronic or in any other form) relating to the assets, operations, business, financial condition, results of operations or prospects of the Borrowers disclosed to or obtained by the Second Lien Agent or any Lender (each a "**receiving party**") pursuant to the Agreement or the other Second Lien Documents or otherwise provided to a receiving party by or on behalf of any Borrower (each a "**disclosing party**") in connection with the Agreement or the other Second Lien Documents, but does not include any

---

[39]    Note to Draft: Clause (y) added from Tax Credit Loan Agreement; to conformed to final version of Tax Credit Loan Agreement.

such information that (i) is or becomes generally available to the public (other than as a result of a breach by a receiving party of its confidentiality obligations under <u>Section 9.7</u>), (ii) was lawfully available to any receiving party on a non-confidential basis prior to such information being disclosed by or on behalf of, or obtained from, a disclosing party, (iii) is or becomes available to any receiving party from a source other than a disclosing party or (iv) is subject to disclosure pursuant to Alaska Statute 44.88.215 or the public records laws of the State of Alaska.

"**Confirmation Order**" means that final order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, filed in the Bankruptcy Cases at Docket No. [●].

"**Contractual Obligation**" means, as applied to any Person, any provision of any Securities issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its Properties is bound or to which it or any of its Properties is subject.

"**Control Agreement**" means a customary account control agreement in form and substance reasonably satisfactory to the Second Lien Agent pursuant to which the depositary institution maintaining the relevant account agrees that the Second Lien Agent shall have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts) and pursuant to which such issuer, securities intermediary, commodities intermediary or depositary institution (as applicable) shall agree to comply solely with the Second Lien Agent's entitlement orders or instructions with respect to the disposition of funds or to apply any value distributed on account of any commodity account, as applicable, in such account upon the occurrence and continuance of an Event of Default and without the consent of any other Person.

"**Copyright License**" means, as to any Person, all rights under any written document now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party) granting the right to use any Copyright or Copyright registration.

"**Copyrights**" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person:  (a) all copyrights in any original work of authorship fixed in any tangible medium of expression, now known or later developed; all registrations and applications for registration of any such copyrights in the United States or any other country, including registrations, recordings and applications; and supplemental registrations, recordings, and applications in the United States Copyright Office; and (b) all Proceeds of the foregoing, including license royalties and Proceeds of infringement suits; the right to sue for past, present and future infringements; all rights corresponding thereto throughout the world; and all renewals and extensions thereof.

"**Cornucopia**" has the meaning given in the preamble of this Agreement.

"**Cornucopia Equity Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between the AIDEA Collateral Agent, the New Term Loan

Agent, the Tax Credit Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor.

"**Corsair**" means Corsair Oil & Gas LLC, a Delaware limited liability company.

"**Creditor Parties**" has the meaning given in <u>Section 9.11</u>.

"**Debt**" of any Person at any date means, without duplication, any indebtedness of such Person, whether or not contingent, including:

(a)     all obligations of such Person for borrowed money;

(b)     all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)     all obligations of such Person to pay the deferred purchase price of property or services;

(d)     all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as Capital Leases in respect of which such Person is liable;

(e)     all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property);

(f)     all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other instrument (except to the extent collateralized by Cash or Cash Equivalents not otherwise constituting Collateral);

(g)     all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; and

(h)     obligations of such Person as a surety, guarantor, accommodation endorser or otherwise, for or upon the obligation of any other Person, including all Debt of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, except the endorsement of negotiable Instruments in the ordinary course of business.

"**Debtors**" has the meaning given in the Plan.

"**Default**" means any occurrence, circumstance or event, or any combination thereof, which, with the lapse of time and/or the giving of notice, would constitute an Event of Default.

"**Default Rate**" has the meaning given in <u>Section 2.3.3</u>.

"**Deposit Account**" has the meaning assigned to such term in the UCC.

"**Discharge of Second Lien Obligations**" has the meaning assigned to such term in the Tax Credit Intercreditor Agreement.

"**Discharge of Tax Credit Obligations**" has the meaning assigned to the term "Discharge of First Lien Obligations" in the Tax Credit Intercreditor Agreement.

"**Discharge of Third Lien Obligations**" has the meaning assigned to such term in the Tax Credit Intercreditor Agreement.

"**disclosing party**" has the meaning given in the definition of "Confidential Information".

"**Disqualified Owner**" means any Person that, as of the date it first becomes a direct or indirect owner of membership interests in any Borrower: (i) is designated as a Sanctioned Person; (ii) is in violation of the AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws or Sanctions; or (iii) has been convicted of money laundering under any AML Law, which conviction has not been overturned; provided, however, that a Person shall not be a Disqualified Owner if: (x) prior to the date that the Person first becomes a direct or indirect owner of membership interests in any Borrower, the applicable Borrower provides the Secured Parties with reasonably satisfactory documentation and other written information required under applicable "know your customer" and AML Laws, regulations and requirements (including the Patriot Act) in respect of such Person; and (y) as of the date the Person first becomes a direct or indirect owner of the membership interests in any Borrower, such Person has certified to the Second Lien Agent that none of the criteria set forth in the foregoing clauses (i) to (iii) in this definition are applicable to such Person.

"**Dollar**" and "**$**" mean United States dollars or such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts in the United States of America.

"**DOR**" means the State of Alaska, Department of Revenue.

"**DOR Purchase Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under the provisions of AS 43.55.028(e) providing for the cash purchase of the State Tax Credits by the DOR as contemplated by AS 43.55.28

"**ECP Lenders**" has the meaning given in the preamble of this Agreement.

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the Banking Day on which the satisfaction by the Borrowers or waiver by the Lenders of the conditions precedent to closing of this Agreement set forth in Section 3.1 occurs.

"**Eligible Assignee**" has the meaning given in Section 8.13.

"**Eligible Contract Participant**" has the meaning set forth in Section 1(a)(18) of the CEA.

"**Environmental Claim**" means any and all Claims relating in any way to any Environmental Law or any Permit issued under any such Environmental Law, including (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to health, safety or the environment.

"**Environmental Laws**" means all Applicable Laws pertaining to human health, occupational safety and environmental matters, including those arising under CERCLA, RCRA, the Superfund Amendments and Reauthorization Act of 1986, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, each as amended, those arising under the laws of the State of Alaska, as amended, and any other state or local statute, regulation, ordinance, order, guidance or decree relating to health, safety or the environment.

"**Equity Interest Equivalents**" means all rights, warrants, options, convertible securities or indebtedness, exchangeable securities or other instruments, or other rights that are outstanding and exercisable for or convertible or exchangeable into, directly or indirectly, any Equity Interest described in clause (a) of the definition thereof at the time of issuance or upon the passage of time or occurrence of some future event.

"**Equity Interests**" means (a) the equity ownership rights in a business entity, whether a corporation, company, joint stock company, limited liability company, general or limited partnership, joint venture, bank, association, trust, trust company, land trust, business trust, sole proprietorship or other business entity or organization, and whether in the form of capital stock, ownership unit, limited liability company interest, limited or general partnership interest or any other form of ownership, and (b) also includes all Equity Interest Equivalents.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Borrower within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure by any Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by any Borrower or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA; (d) a complete or partial withdrawal by any Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in "at-risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower or any ERISA Affiliate; (j) the engagement by any Borrower or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (k) the imposition of a Lien upon any Borrower pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; (l) the assertion of a material claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or the assets thereof, or against any Borrower or any ERISA Affiliate in connection with any Pension Plan; or (m) the making of an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

"**ERISA Plan**" means any employee benefit plan (a) maintained by any Borrower or any ERISA Affiliate, or to which any of them contributes or is obligated to contribute, for its employees and (b) covered by Title IV of ERISA or to which Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA applies.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning given in Section 7.1.

"**Event of Loss**" means a single insured event or a related series of insured events causing any loss of, destruction of or damage to, or any Condemnation of, all or any portion of assets or Property of any Borrower or any other event giving rise to a claim under any other insurance policy, including without limitation, business interruption.

"**Existing Letter of Credit**" means that certain irrevocable standby letter of credit, number IS000037787U, issued by Wells Fargo Bank, N.A. on April 12, 2018 for the benefit of APC, on behalf of FOA, as the same may be amended, extended or otherwise modified from time to time.

"**Facilities**" means the Platform, the Pipeline and the Processing Plant, or any portion of any of the foregoing.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements and fiscal or regulatory legislation, rules or official interpretations adopted pursuant to any intergovernmental agreement implementing the foregoing.

"**Federal Reserve Lender**" means the Federal Reserve Bank to which a Lender assigns as collateral security all or any portion of the Second Lien Term Loans or Notes held by such Lender.

"**FERC**" means the Federal Energy Regulatory Commission.

"**FIRPTA**" means the Foreign Investment in Real Property Tax Act provisions under the Code.

"**FIRPTA Escrow Account**" means an interest bearing escrow account, to be established by the Borrowers and governed pursuant to an escrow agreement in form and substance satisfactory to the Borrowers and the Lenders, for the purposes of satisfying the FIRPTA Liability or repayment of the Second Lien Term Loan, as applicable.

"**FIRPTA Holdback Amount**" means $1,000,000 in Cash which would otherwise be available to be used to repay the Lenders.

"**FIRPTA Holdback Period**" means the period ending (i) on the third anniversary of the Effective Date if the Second Lien Term Loans would otherwise be repaid in full prior to such third anniversary or (ii) on the fourth anniversary of the Effective Date if the Second Lien Term Loans would otherwise be repaid in full after the third anniversary of the Effective Date, but before the fourth anniversary thereof; provided, however, such period referred in clause (i) or (ii) shall be extended if at the end of such period the Sponsor is the subject of a pending dispute with the IRS with respect to the FIRPTA Liability until the resolution of such dispute.

"**FIRPTA Liability**" has the meaning given in Section 2.7.1.

"**FOA**" has the meaning given in the preamble of the Agreement.

"**Fraudulent Transfer Laws**" has the meaning given in Section 9.21.1.

"**Funding Borrower**" has the meaning given in Section 9.21.2.

"**GAAP**" means generally accepted accounting principles in the United States.

"**General Intangibles**" means, as to any Person, all general intangibles (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all right, title and interest that such Person may now or hereafter have under any contract, all payment intangibles (as that term is defined in the UCC), customer lists, Licenses, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential

information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, Software, databases, data, skill, expertise, experience, processes, models, drawings, materials, Books and Records, Goodwill (including Goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key-person, and business interruption insurance, and all unearned premiums), uncertificated securities, choses-in-action, rights to receive tax refunds and other payments, rights to receive dividends, distributions, Cash, Instruments and other property in respect of or in exchange for Equity Interests and other Investment Property, and rights of indemnification.

"**Goodwill**" means, as to any Person, all goodwill, trade secrets, proprietary or confidential information, technical information, procedures, formulae, quality control standards, designs, operating and training manuals, customer lists, and distribution agreements now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party).

"**Governmental Authority**" means any nation, sovereign or government; any federal, regional, state, tribal authority, province, local or political subdivision; and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Governmental Authorization**" means any authorization, approval, consent, franchise, license, covenant, order, ruling, Permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"**Hazardous Substances**" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant" or a "contaminant" (or words of similar intent or meaning) by any Governmental Authority under Applicable Law, including but not limited to petroleum, petroleum byproducts, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable or explosive substances, or pesticides.

"**Hedging Agreement**" means any option, Swap, cap, floor, collar, forward purchase or similar agreements or arrangements (physical or otherwise) (or any combination of the foregoing) dealing with interest rates, basis differentials, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such Applicable Laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than Applicable Laws now allow.

"**Indemnitees**" has the meaning given in <u>Section 5.14.1</u>.

"**Indemnity Agreement**" means that certain Indemnity Agreement, dated as of the date hereof, among the Tax Credit Collateral Agent, the Second Lien Agent, Cornucopia and the Sponsor.

"**Instrument**" has the meaning assigned to such term in the UCC.

"**Insurance Proceeds**" means all amounts and Proceeds (including instruments) received by or on behalf of the Borrowers, the Sponsor or the Second Lien Agent (as loss payee or additional insured) or any of their Affiliates under any insurance policy maintained by the Borrowers, the Sponsor or any Person in respect of any Property of the Borrowers.

"**Intellectual Property**" means, as to any Person, all Copyrights, Licenses, Patents, Trademarks, inventions, designs, trade secrets and customers lists now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"**Intercreditor Agreements**" means each of the AIDEA Intercreditor Agreement, the Tax Credit Intercreditor Agreement and the Cornucopia Equity Intercreditor Agreement.

"**Investment Property**" means, as to any Person, all investment property (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), wherever located.

"**IRS**" means the United States Internal Revenue Service.

"**JOA**" means the Operating Agreement dated October 21, 2010, among FOA (f/k/a Escopeta Oil Co., L.L.C.), Cornucopia (f/k/a Escopeta Oil of Alaska LLC) and the other minority working interest owners party thereto, as modified by that certain Side Letter Agreement entered into as of October 22, 2010 among FOA, Cornucopia and Taylor Minerals, LLC, as further modified by that certain RWIO Settlement Agreement filed in the Bankruptcy Cases at Docket No. 617-2.

"**JOA Assets**" means the Properties of the Borrowers the operatorship of which is under the JOA.

"**Kitchen Lights Unit**" means all of the interests that the Borrowers currently own or control, and all of the interests the Borrowers may hereafter acquire or control, in, to or under the Alaska Division of Land leases listed and shown on Exhibit J.

"**Kitchen Lights Unit Agreement**" means the Kitchen Lights Unit Agreement (f/k/a the Kitchen Unit Agreement) effective as of February 1, 2007, including all Plans of Exploration, Plans of Development and Plans of Operation agreed and approved thereunder, in relation to the Kitchen Lights Unit.

"**Lease Operating Expenses**" means those costs incurred or incidental to bringing the subsurface minerals (gas) up to the surface and converting it to marketable products.  Lease Operating Expenses do not include any transportation expenses incurred to move the products from the Borrowers' Processing Plant to markets where they can be sold.

"**Legal Requirements**" means, as to any Person, the articles of incorporation, bylaws or other Organizational Documents of such Person and any requirement under an Applicable Permit and any Applicable Law, in each case, applicable to or binding upon such Person or any of its Properties or to which such Person or any of its property is subject.

"**Lender**" or "**Lenders**" means the Persons listed on Schedule I and any other Person that shall have become a party hereto pursuant to an Assignment Agreement for so long as such Person shall be a party to this Agreement.

"**Lender Group**" means each of the ECP Lenders, the Melody Lenders or AFG Investments 1A, LLC.

"**Lending Office**" means, with respect to any Lender, the office designated as such beneath the name of such Lender on Exhibit E to the Agreement or in the assignment and acceptance agreement pursuant to which it became a Lender or such other office of such Lender as such Lender may specify from time to time to the Second Lien Agent and the Borrowers.

"**Letter of Credit**" means a letter of credit issued by a Letter of Credit Issuer and arranged by the Second Lien Agent and/or any ECP Lender pursuant to Section 2.6.1 hereof either as originally issued or as the same may, from time to time, be amended or otherwise modified or extended in accordance with the terms thereof and hereof.

"**Letter of Credit Issuer**" means (a) any ECP Lender or (b) commercial bank, investment bank or other similar financial institution that extends credit in the form of a standby letter of credit, revolving loans or other similar credit facilities in the ordinary course of business.

"**Letter of Credit Margin**" means one hundred and sixty (160) basis points (1.60%) per annum or such other amount as indicated by written notice from the Second Lien Agent to the Borrowers, together with reasonable documentary support.

"**Licenses**" means, as to any Person, all Copyright Licenses, Patent Licenses, Trademark Licenses or other licenses of rights or interests now held or hereafter acquired by such Person.

"**Lien**" means (a) any mortgage, deed of trust, lien, pledge, assignment, charge, security interest, or easement or encumbrance or other exception to title of any kind (including any agreement to give any of the foregoing), whether or not filed, recorded or otherwise perfected under Applicable Law, as well as the interest of a vendor or lessor under any conditional sale agreement, any lease or license in the nature thereof, or other title retention agreement relating to such asset and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrowers taken as a whole; (b) the ability of any Borrower to fully and timely perform its Obligations; (c) the legality, validity, binding effect or enforceability against any Borrower of a Second Lien Document to which it is a party; or (d) the rights, remedies

and benefits available to, or conferred upon, the Second Lien Agent and any Lender or any Secured Party under any Second Lien Document.

"**Material Contract**" means each agreement listed on <u>Schedule B</u> and each Additional Material Contract entered into after the Effective Date, including all amendments, supplements, and modifications thereto, in each case, solely to the extent expressly permitted hereunder.

"**Maturity Date**" means the earlier of (a) the fifth (5th) anniversary of the Effective Date and (b) the date on which the entire outstanding principal balance of the Second Lien Term Loans, together with all unpaid interest, fees, charges and costs becomes due and payable under this Agreement.

"**Melody Lenders**" means, collectively, Melody Special Situations Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund, L.P. and Melody Capital Partners FDB Credit Fund, LLC.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means (a) the Deed of Trust with Power of Sale, Security Agreement, Financing Statement and Fixture Filing, dated as of [●], 2020, from the Borrowers to First American Title Company, as Trustee, the Second Lien Agent and the Lenders party thereto (to be recorded in the Anchorage Recording District and in the Kenai Recording District), as such Mortgage may be amended, amended and restated, supplemented or otherwise modified from time to time, and (b) each other each agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on Collateral consisting of Real Property interests and other related Collateral, which shall be in the form attached as <u>Exhibit L,</u> with such modifications as are reasonably satisfactory to the Second Lien Agent, with such schedules and including such provisions as shall be necessary or desirable to conform such document to applicable local law.

"**Multiemployer Plan**" means any ERISA Plan that is a multiemployer plan (as defined in Section 3(37) of ERISA).

"**Net Cash Proceeds**" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of Event of Loss, insurance proceeds or condemnation awards and similar payments, minus (b) the sum of (i) all reasonable and customary fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of any sale, transfer, lease, encumbrance, or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), amounts required to be applied to the repayment of Debt secured by a Lien expressly permitted under this Agreement on such asset (other than any Lien that is subordinate to the Liens securing the Obligations) and (iii) the amount of all Taxes paid (or reasonably estimated to be payable) in connection with such event.

"**New Term Loan Agent**" has the meaning given to the term "Third Lien Agent" in the Tax Credit Intercreditor Agreement.

"**New Term Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among Cornucopia, the lenders party thereto, and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**New Term Loan Collateral Documents**" has the meaning given in the New Term Loan Agreement.

"**New Term Loan Documents**" has the meaning given in the New Term Loan Agreement.

"**New Term Loan Obligations**" has the meaning given to the term "Third Lien Obligations" in the Tax Credit Intercreditor Agreement.

"**Note**" has the meaning given in Section 2.1.3.

"**Obligation Aggregate Payments**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share Contribution Amount**" has the meaning given in Section 9.21.2.

"**Obligation Fair Share Shortfall**" has the meaning given in Section 9.21.2.

"**Obligations**" means and includes, with respect to any Person, all loans, advances, debts, liabilities, and obligations, howsoever arising, owed by such Person to the Second Lien Agent, the Lenders or any other Secured Party (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, pursuant to the terms of the Agreement or any of the other Second Lien Documents, including all principal, interest (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding in connection with a Bankruptcy Event at the rate, including any applicable post-default rate, even if such interest is not enforceable, allowable or allowed as a Claim in such proceeding), fees, charges, expenses, attorneys' fees and accountants fees chargeable to such Person and payable by such Person hereunder or thereunder.

"**Organizational Documents**" means (a) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of the Agreement or any other Second Lien Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Participant Register**" has the meaning given in <u>Section 8.12</u>.

"**Pass-Through Entity**" means an entity that is properly treated for U.S. federal and applicable state, local and foreign income and franchise Tax purposes as (a) disregarded as an entity separate from its owner or (b) a partnership.

"**Patents**" means, as to any Person, all of the following in which such Person now holds or hereafter acquires any interest:  (a) all letters patent of the United States or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country; and (b) all reissues, continuations, continuations-in-part or extensions thereof.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pending Permits**" means the Permits that are not, at a given time, Applicable Permits but will become Applicable Permits at a future time.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any ERISA Plan other than a Multiemployer Plan that is maintained or is contributed to by either Borrower or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Perfection Certificate**" means a certificate, in the form of <u>Exhibit M</u> or any other form approved by the Second Lien Agent, executed by a Responsible Officer of each Borrower, as the same shall be supplemented from time to time.

"**Permits**" means all governmental licenses, permits, franchises, easements, certifications, filings, notices, tariffs, and authorizations held by or made by or on behalf of the Borrowers or required to operate the business of the Borrowers or to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrowers.

"**Permitted Debt**"[40] means:

---

[40]    Note to Draft: To be conformed to AIDEA Loan Agreement.

(a)      Debt incurred under the Second Lien Documents;

(b)      Debt incurred under the AIDEA Loan Documents (including any subsequent additional advances not to exceed Five Million Dollars ($5,000,000) in the aggregate), the Tax Credit Loan Documents and the New Term Loan Documents;

(c)      trade Debt, accounts payable or other similar Debt incurred in the ordinary course of business (but not for borrowed money) (i) not more than 60 days past due, or (ii) being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; *provided* that adequate reserves have been made in accordance with GAAP;

(d)      contingent liabilities required under any Permit or Contractual Obligation of the Borrowers, other than, in each case, Debt for borrowed money;

(e)      to the extent constituting debt, Debt of any Borrower incurred in the ordinary course of business under (i) natural gas sales agreements in effect as of the Effective Date (excluding, for the avoidance of doubt, any natural gas sales agreements consisting of prepaid forward contracts, volumetric or dollar denominated production payments or similar arrangements), (ii) financings of insurance premiums up to an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000) and (iii) obligations pursuant to applicable legal requirements of the Alaska Department of Natural Resources or Alaska Oil and Gas Conservation Commission up to an aggregate of Four Million Dollars ($4,000,000);

(f)      Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Debt is covered within five (5) Banking Days;

(g)      purchase money indebtedness incurred in the ordinary course of business to the extent contemplated by clause (n) of the definition of Permitted Encumbrances (and subject to the aggregate cap therein);

(h)      Debt in respect of workers' compensation claims, self-insurance obligations, performance and surety bonds in the ordinary course of business;

(i)      Debt arising from netting services, overdraft protection, cash management obligations and otherwise in connection with deposit, securities and commodities accounts in the ordinary course of business;

(j)      subordinated unsecured Debt incurred by FOA to Cornucopia or Cornucopia to FOA as long as such Debt is evidenced by promissory notes that have been pledged to the Second Lien Agent; and

(k)      the guarantee by FOA to Cornucopia or Cornucopia to FOA of any Debt incurred by the Borrowers and described in another clause of this definition; *provided*, that if the Permitted Debt that is being guaranteed is unsecured and/or subordinated in right of payment to the Obligations, the guarantee shall also be unsecured and/or subordinated in right of payment to the Obligations.

83

Notwithstanding anything to the contrary herein or in any other Second Lien Document, no Capital Lease entered into on or after the date hereof shall constitute "Permitted Debt".

"**Permitted Disposition**" means the sale, transfer, lease, encumbrance, or other disposition of any portion of any Collateral or other Property of any Borrower or its Subsidiaries permitted under Section 6.3(a), (b) or (d) (but, in the case of clause Section 6.3(d), only so long as the proceeds of such sale, transfer, encumbrance or other disposition are applied to the Tax Credit Obligations per the terms of the Tax Credit Loan Agreement and the Tax Credit Intercreditor Agreement).

"**Permitted Encumbrances**" means

(a)    the rights and interests of the AIDEA Loan Collateral Agent as provided in the AIDEA Loan Documents, subject to the Intercreditor Agreements;

(b)    the rights and interests of each of the Tax Credit Agent and the New Term Loan Agent as provided in Tax Credit Loan Documents and the New Term Loan Documents, respectively, subject to the Intercreditor Agreements;

(c)    the rights and interests of the Second Lien Agent for the benefit of the Secured Parties as provided in the Second Lien Documents, subject to the Intercreditor Agreements;

(d)    Liens for any Tax, assessment or other governmental charge permitted pursuant to Section 5.7 that secured obligations not in excess of $100,000 at any time, so long as such Liens are subordinate to the Obligations;

(e)    Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and (i) a bond or other security has been posted or provided in such manner and amount as to assure the Second Lien Agent that any amounts determined to be due will be promptly paid in full when such appeal or proceeding is concluded, (ii) adequate reserves in accordance with GAAP have been established by the Borrowers therefor or (iii) the amount thereof is fully covered by insurance (subject to applicable deductibles); *provided* that the aggregate amount of such attachment or judgment Liens shall not secure obligations in excess of $100,000 at any time;

(f)    Liens, deposits or pledges to secure (i) statutory obligations, including under workers' compensation laws and unemployment insurance, (ii) performance bonds issued in connection with any Applicable Permits or (iii) performance of bids, tenders, contracts (other than for the repayment of borrowed money), surety and appeal bonds or leases, or for purposes of like general nature in the ordinary course of its business, with any such Lien to be released as promptly as practicable and, in the case of clause (iii), securing obligations not to exceed $100,000 in the aggregate at any time;

(g)    materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, including Liens arising under AS 31.05.100-31.05.110, arising in the ordinary course of business that are (i) not yet due or (ii) being contested in good faith and by appropriate proceedings, so long as, in the case of this clause (ii), (A) such Lien does not

attach to, become enforceable against its other creditors with respect to, involve any substantial danger of the sale, forfeiture or loss of or interfere in any material respect with the use or right to dispose of, the Properties of any Borrower; (B) a bond or other security has been posted or provided in such manner and amount as to assure the Second Lien Agent that any taxes, assessments or other charges determined to be due will be promptly paid in full when such contest is determined; and (C) adequate reserves in accordance with GAAP have been established by the Borrowers therefor;

(h)     filing of UCC financing statements as a precautionary measure in connection with operating leases;

(i)     easements, rights-of-way, restrictions (including zoning restrictions), trackage rights, minor defects or irregularities in title, restrictions on use of real property and other similar encumbrances or liens that, in the aggregate, do not materially interfere with the value or use, or are useful to the operation, of the Property to which such Lien is attached;

(j)     rights reserved for or vested in any municipality or Governmental Authority to control or regulate the use of the Real Property or to use the Real Property in any manner, including zoning and land use regulations;

(k)     Liens arising by virtue of any statutory or common law provisions relating to bankers' liens, rights of set-off or similar rights;

(l)     purchase money Liens upon or in real property or equipment acquired or held by the Borrowers in the ordinary course of business securing the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (l) shall not exceed $100,000 at any time outstanding;

(m)     Liens arising under the JOA;

(n)     Liens securing Debt described in clause (e) of the definition of "Permitted Debt"; *provided* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (n) shall not exceed $4,000,000 at any time outstanding;[41]

---

[41]     Note to Draft: Language added from AIDEA Loan Agreement; to be confirmed to the final draft of the AIDEA Loan Agreement.

(o)    to the extent constituting a Lien, all overriding royalties existing as of the Effective Date;

(p)    Liens arising under the Kitchen Lights Unit Agreement;

(q)    Liens arising under that certain Farmout Letter Agreement among Pacific Energy Resources Ltd., Pacific Energy Alaska Operating LLC, and FOA (f/k/a Escopeta Oil Co., L.L.C.) dated February 11, 2009 (a memorandum of which was recorded on March 19, 2009 in the Anchorage Recording District as Doc. No. 2009-017350-0, and on March 23, 2009 in the Kenai Recording District as Doc. No. 2009-002662-0);

(r)    Liens arising under the Lease Assignment and Participation Agreement, dated October 22, 2010;

(s)    Liens and encumbrances in existence as of the Borrowers' acquisition of the Upland; and

(t)    ROWs created or granted by the Borrowers for any other purpose that would not render the Upland unusable, or materially impair the use of the Upland, for the operation of the Processing Plant;

"**Permitted Prior Liens**" means (a) Permitted Encumbrances described in clause (f), (i), (o), (p), (q), (r), (s), or (t) of the definition thereof solely to the extent such Liens are afforded priority over the Liens and security interests granted to the Second Lien Agent by operation of Applicable Law and (b) Permitted Encumbrances described in clauses (a) and (b) of the definition thereof solely to the extent such Liens are afforded priority (other than in the case of the New Term Loan Agent) over the Liens and security interests granted to the Second Lien Agent pursuant to the Intercreditor Agreements.

"**Person**" means any natural person, corporation, limited liability company, limited liability partnership, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Pipeline**" has the meaning set forth on Exhibit N.

"**Plan**" means the means the Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code filed in the Bankruptcy Cases on May 6, 2020 at Docket No. 754, as may be amended or modified from time to time in accordance with the terms thereof, including the Plan Supplement (as defined in the Plan), and all exhibits, annexes and other supplements appended or related to the Plan and/or to the Plan Supplement.

"**Planned Outage**" means periodic scheduled maintenance, repairs, modifications, and testing, including integrity testing of pipelines and vessels, of the Facilities.

"**Platform**" has the meaning set forth on Exhibit N.

"**Pledge Agreement**" means the Pledge Agreement, dated as of the Effective Date, between the Sponsor and the Second Lien Agent for the benefit of the Lenders.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement, dated as of the Effective Date, between the Borrowers and the Second Lien Agent for the benefit of the Lenders.

"**Proceeds**" means proceeds (as that term is defined in the UCC).

"**Processing Plant**" has the meaning set forth on Exhibit N.

"**Properties**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible (including Contractual Obligations).

"**Proportionate Share**" means, with respect to each Lender at any time, a percentage equal to the quotient of (a) such Lender's outstanding Second Lien Term Loans divided by (b) the outstanding Second Lien Term Loans of all of the Lenders.

"**Prudent Industry Practices**" means those prudent and good practices, methods, techniques, standards, codes, specifications and acts generally followed or used by reasonably prudent design, engineering or construction managers, as applicable, in the oil and gas and exploration and production industry (when applied with respect to the Wells and the Platform and actions with respect thereto) or midstream industry (when applied to the Midstream Facilities and actions with respect thereto) in the United States of America who are regularly involved in projects similar to the Project which, in the exercise of prudent judgment, in light of the facts known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent in all material respects with Applicable Laws, Applicable Permits and Pending Permits. "Prudent Industry Practices" is not intended to be limited to the optimum practices, methods, techniques, standards, codes, specifications and acts to the exclusion of all others, but rather to be an acceptable range of practices, methods, techniques, standards, codes, specifications and acts, as applied having due regard for, among other things, the requirements of Applicable Laws, Applicable Permits and Pending Permits.

"**Prudent Operating Practices**" means, in connection with the operation and maintenance of the Platform, the Pipeline, Processing Plant and the Borrowers' other Property, as applicable, those prudent and good practices, methods, techniques, acts and standards of safety, performance, dependability, efficiency and economy generally recognized by reasonably prudent operators in the Borrowers' industry in the United States of America as good and proper, which, in the exercise of prudent judgment, in light of the facts known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent in all material respects with Applicable Laws, standards of reliability and safety, and Applicable Permits. "Prudent Operating Practices" is not intended to be limited to the optimum practices, methods, techniques, standards and acts to the exclusion of all others, but rather to be an acceptable range of practices, methods, techniques, standards and acts, as applied having due regard for, among other things, the requirements of Applicable Laws, standards of reliability and safety, and Applicable Permits.

"**RCRA**" means the Resource Conservation and Recovery Act.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased

or operated by any person, whether by lease, license or other means, including easements and rights of way, together with, in each case, all improvements and fixtures located thereon.

"**receiving party**" has the meaning given in the definition of "Confidential Information".

"**Register**" has the meaning given in <u>Section 8.15</u>.

"**Reinvestment Notice**" means a written notice executed by a Responsible Officer of each Borrower stating that no Default or Event of Default has occurred and is continuing, other than a Default or Event of Default that has arisen solely as a result of the relevant Event of Loss, and that the Borrowers intend and expect to use all or a specified portion of the Net Cash Proceeds of an Event of Loss to acquire or repair the Facilities or assets useful in connection therewith.

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, migrating, emitting, escaping, emptying, seeping, placing and the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Reportable Event**" means any of the "reportable events" set forth in Section 4043(c) of ERISA or the regulations issued thereunder (as in effect on the date hereof), with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. § 4043 (as in effect on the date hereof).

"**Required Lenders**" means, at any time, the Lenders having Proportionate Shares which in the aggregate exceed 50.0% of the Proportionate Shares of all Lenders; *provided* that to the same extent set forth in <u>Section 8.13</u> with respect to determination of Required Lenders, the Second Lien Term Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"**Reserve Report**" has the meaning set forth in <u>Section 5.1.6</u>.  For purposes of the Reserve Report and this Agreement, reserve terms not specifically defined herein shall have the meanings ascribed to them by the Society of Petroleum Engineers.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, as to any Person, its president, its chief executive officer, chief financial officer, any vice president, treasurer, assistant treasurer or secretary, any natural Person who is a managing general partner, member or manager (or any of the preceding with regard to any other managing general partner, member or manager), or any project manager or natural Person with similar responsibilities.

"**Restricted Payment**" means, collectively, (a) any dividend or other distribution (whether in Cash, securities or other property, including transfers of any tax benefits) with respect to any Equity Interests of any Borrower, or any payment (whether in Cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to any holder of any such Person's Equity Interests and (b) any management or similar fees payable to any Affiliate of the Sponsor or the Borrowers.

"**ROW**" means non-exclusive rights of way, easements and servitudes.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government (currently, Cuba, Iran, Myanmar, North Korea, and Syria).

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury, or Switzerland (b) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (c) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (a) or (b) hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (b) the United Nations Security Council; (c) the European Union; (d) Her Majesty's Treasury; or (e) Switzerland.

"**Second Lien Agent**" has the meaning given in the preamble of the Agreement.

"**Second Lien Credit Facility**" has the meaning given in Section 2.1.1(a)(i).

"**Second Lien Documents**" means, collectively, this Agreement, the Notes and the Second Lien Security Documents, together with all agreements, documents, instruments and certificates, delivered or executed by any of the Borrowers from time to time in connection therewith, each as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof.

"**Second Lien Security Documents**" means the Pledge and Security Agreement, the Pledge Agreement, the Mortgage, the Control Agreements, any account control agreement entered into by either Borrower, the Intercreditor Agreements, any fixture filings, financing statements or other certificates executed, filed or recorded in connection with the foregoing, and all other instruments, documents and agreements delivered by or on behalf of either Borrower pursuant to the Agreement or any of the other Second Lien Documents in order to grant to, or perfect in favor of, the Second Lien Agent, for the benefit of the Lenders, a Lien on any real, personal or mixed property of that Borrower as security for the Obligations.

"**Second Lien Term Loan**" has the meaning given in Section 2.1.1(a)(i).

"**Second Lien Termination Date**" means the date on which (a) the principal of and interest on each Second Lien Term Loan, and all fees and other amounts payable hereunder and under the other Second Lien Documents shall have been paid in full in Cash (b) the FIRPTA Holdback Period shall have concluded and (c) all other Obligations hereunder and under the other Second Lien Documents have been satisfied (other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no claim has been asserted).

"**Secured Parties**" means collectively, the Second Lien Agent, each of the Lenders, each Indemnitee pursuant to Section 5.14.1 and each co-agent or sub-agent appointed by the Second Lien Agent from time to time pursuant to this Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Software**" means, as to any Person, all software (as that term is defined in the UCC) now owned or hereafter acquired by such Person (or in which such Person has rights or the power to transfer rights to a secured party), including all computer programs and all supporting information provided in connection with a transaction related to any program.

"**Solvent**" with respect to any Person, means that as of the date of determination both (a)(i) the then fair saleable value of the property of such Person is (1) greater than the total amount of liabilities (including contingent liabilities) of such Person and (2) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and due considering all financing alternatives, ordinary operating income and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under Applicable Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Claim**" has the meaning given in Section 5.14.

"**Sponsor**" means HEX Cook Inlet LLC, an Alaska limited liability company.

"**State Tax Credits**" means all Alaska State tax credits and State tax credit certificates with respect to which any Borrower is entitled to or receives proceeds, including any such tax credits or tax credit certificates acquired on or after the Effective Date, under Alaska Statutes 43.55.023(a)

(Qualified Capital Expenditures), 43.55.023(l) (Well Lease Expenditures), 43.55.023(b) (Carry Forward Losses); and/or 43.55.025 (Exploration Expenditures).

"**Subject Claims**" has the meaning given in <u>Section 5.14</u>.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Tax Credit Agent**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Assignment**" means a present assignment of one hundred percent (100%) of the State Tax Credits expected to be issued by the DOR, from the Borrower to and in favor of the Administrative Agent, filed with the DOR on DOR Form 355 or its equivalent (Notice of Assignment of Tax Credit Certificates under AS 43.55.029), which shall comply with the provisions of AS 43.55.029.

"**Tax Credit Certificates**" means transferable certificates evidencing the right to exercise unused tax credits of a producer or explorer, against tax levied by AS 43.55.011 or redeemed under AS 43.55.028, as described in AS 43.55.023(d) and 43.55.025(f).

"**Tax Credit Collateral**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Collateral Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between ING Capital, LLC, New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor.

"**Tax Credit Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among Cornucopia, the lenders party thereto, and ING Capital, LLC as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Tax Credit Loan Documents**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Obligations**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Proceeds**" means any proceeds of Tax Credit Collateral, including any payments received in connection with the State Tax Credits, required to be applied to repay the Obligations in accordance with the payment waterfall set forth in Section 5.15.1.

"**Taxes**" means all present or future taxes, levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" means First American Title Company.

"**Total Loss**" has the meaning given in Section 2.1.4(c)(iii).

"**Trademarks**" means, as to any Person, all of the following now owned or hereafter adopted or acquired by such Person:  (a) all trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and General Intangibles of like nature (whether registered or unregistered), all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state or territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all Goodwill associated with or symbolized by any of the foregoing.

"**Treasury Regulations**" means the U.S. Department of Treasury Regulations promulgated under the Code, as amended from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions of the Second Lien Security Documents relating to such perfection, priority or remedies.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unplanned Outage**" means any outage other than a Planned Outage of the Facilities.

"**Upland**" means the property located in Kenai Peninsula Borough, Alaska, described on Exhibit O to the Agreement.

"**Validated Expenditures**" means the amount of expenditures set forth in supporting invoices provided by the Borrower and incurred (within the meaning of 15 AAC 55.290) by the Borrower with respect to a Qualifying Operation that is the subject of an Alaska Tax Credit Application set forth on Schedule 4.23 of the Tax Credit Loan Agreement as in effect on the Effective Date.

["**Wells**" means the KLU #A1, KLU #A2A, KLU #3 and KLU #A4 wells, also known as the Belgua A1, A2, A3 and A4 wells.][42]

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

---

[42]    Note to Debtors: Please provide updated definition that would pick up Beluga, Sterling.

## RULES OF INTERPRETATION

1.  The singular includes the plural and the plural includes the singular.

2.  "Or" is not exclusive.

3.  A reference to an Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

4.  A reference to a Person includes its permitted successors and permitted assigns.

5.  Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

6.  The words "include," "includes" and "including" are not limiting.

7.  A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated.  Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document.  In the event of any conflict between the provisions of the Agreement (exclusive of the Exhibits, Schedules, Annexes and Appendices thereto) and any Exhibit, Schedule, Annex or Appendix thereto, the provisions of the Agreement shall control.

8.  Except as otherwise provided in the Agreement, references to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

9.  The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

10. References to "days" shall mean calendar days, unless the term "Banking Days" shall be used. References to a time of day shall mean such time in New York, New York, unless otherwise specified.

11. In the computation of time periods from a specified date to a specified later date, the word "from" means "from and including," the word "through" means "through and including," and the words "to" and "until" each mean "to but excluding."

12. Unless otherwise expressly specified herein, (a) amounts paid or payable hereunder shall be in Dollars and (b) all amounts denoted by an "$" shall be in Dollars.

13. The Second Lien Documents are the result of negotiations among, and have been reviewed by the Borrowers, the Second Lien Agent, each Lender and their respective counsel.  Accordingly, the Second Lien Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against the Borrowers, the Second Lien Agent or any Lender solely as a result of any such party having drafted or proposed the ambiguous provision.

The word "either", when used in reference to two Persons (such as any Borrower), is not limiting, and shall mean "a" or "any" Person.

## **Exhibit A-3**

New Tax Credit Loan Agreement

[See attached.]

V&E Draft 5/29/2020

**AMENDED AND RESTATED CREDIT AGREEMENT**

Dated as of June [__], 2020

among

Cornucopia Oil & Gas Company, LLC,
a Delaware limited liability company

(as the Borrower),

the Lenders party hereto from time to time

and

ING Capital LLC
a Delaware limited liability company

(as the Administrative Agent)

## TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ........................................................................................ 1
    1.1    Definitions ................................................................................................ 1
    1.2    Rules of Interpretation .......................................................................... 1

ARTICLE 2. THE CREDIT FACILITIES ................................................................. 1
    2.1    Term Loans .............................................................................................. 1
    2.2    Tax Treatment ........................................................................................ 4
    2.3    Other Payment Terms ............................................................................ 4
    2.4    Pro Rata Treatment ................................................................................ 7
    2.5    Change of Circumstances ....................................................................... 8
    2.6    Alternate Office; Minimization of Costs ............................................. 10
    2.7    Effect of Benchmark Transition Event ............................................... 10

ARTICLE 3. CONDITIONS PRECEDENT ............................................................. 11
    3.1    Conditions Precedent to the Effective Date ........................................ 11

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ................................... 14
    4.1    Status ....................................................................................................... 15
    4.2    Authority ................................................................................................. 15
    4.3    Governmental Authorizations ............................................................. 15
    4.4    No Breach or Default ............................................................................ 15
    4.5    Compliance with Law ........................................................................... 15
    4.6    Capitalization, Joint Ventures, Subsidiaries, Etc. ............................. 16
    4.7    Investment Company Act ...................................................................... 16
    4.8    Tax Sharing Agreements ...................................................................... 16
    4.9    Taxes ....................................................................................................... 16
    4.10   Organizational ID Number; Location of Collateral .......................... 17
    4.11   Title and Liens ....................................................................................... 17
    4.12   Collateral ................................................................................................ 17
    4.13   Patriot Act ............................................................................................. 18
    4.14   State Tax Credits ................................................................................... 18
    4.15   Anti-Terrorism Laws. ........................................................................... 19

ARTICLE 5. AFFIRMATIVE COVENANTS ......................................................... 19
    5.1    Financial Statements and other Reports ............................................ 19
    5.2    Notices – Operation of Business ......................................................... 20
    5.3    Existence ................................................................................................. 22
    5.4    Compliance with Law ........................................................................... 22
    5.5    Taxes ....................................................................................................... 22
    5.6    Warranty of Title .................................................................................. 22
    5.7    Books and Records ............................................................................... 22

i

5.8     Preservation of Rights; Further Assurances................................................... 22
5.9     Security Interests; Further Assurances........................................................... 23
5.10    Indemnification ............................................................................................. 23
5.11    State Tax Credits ........................................................................................... 25

ARTICLE 6. NEGATIVE COVENANTS ............................................................................. 26

6.1     Debt, Liens and Other Encumbrances .......................................................... 26
6.2     Restrictions on Asset Sales ........................................................................... 26
6.3     Dissolution .................................................................................................... 27
6.4     Amendments to Organizational Documents .................................................. 27
6.5     Subsidiaries and Joint Ventures ................................................................... 27
6.6     Prohibition on Issuance of Equity Interest ................................................... 27
6.7     Name and Location; Fiscal Year................................................................... 27
6.8     Accounts ....................................................................................................... 27
6.9     Tax Credits.................................................................................................... 27
6.10    Compliance with Anti-Terrorism Laws ....................................................... 28

ARTICLE 7. EVENTS OF DEFAULT; REMEDIES ........................................................... 29

7.1     Events of Default .......................................................................................... 29
7.2     Remedies....................................................................................................... 31

ARTICLE 8. THE AGENT; SUBSTITUTION........................................................................ 33

8.1     Appointment, Powers and Immunities.......................................................... 33
8.2     Reliance by the Administrative Agent ........................................................... 35
8.3     Non-Reliance ................................................................................................ 35
8.4     Defaults ........................................................................................................ 35
8.5     Indemnification ............................................................................................. 35
8.6     Successor Administrative Agent .................................................................... 36
8.7     Authorization ................................................................................................ 36
8.8     The Administrative Agent.............................................................................. 37
8.9     Amendments; Waivers................................................................................... 37
8.10    Withholding Tax ............................................................................................ 38
8.11    General Provisions as to Payments ............................................................... 38
8.12    Participation ................................................................................................. 39
8.13    Transfer of Loans ......................................................................................... 40
8.14    Assignability as Collateral ........................................................................... 42
8.15    Register ......................................................................................................... 42

ARTICLE 9. MISCELLANEOUS ....................................................................................... 42

9.1     Addresses ...................................................................................................... 42
9.2     Right to Set-Off............................................................................................. 43
9.3     Delay and Waiver ......................................................................................... 44
9.4     Costs, Expenses and Attorneys' Fees ........................................................... 44
9.5     Entire Agreement .......................................................................................... 44
9.6     Governing Law .............................................................................................. 45

US 7054423v.5 ING100/16001

9.7     Confidentiality ................................................................................................. 45
9.8     Severability ..................................................................................................... 46
9.9     Headings .......................................................................................................... 46
9.10    Accounting Terms ............................................................................................ 46
9.11    No Partnership ................................................................................................. 46
9.12    Security Documents ......................................................................................... 47
9.13    Limitation on Liability ..................................................................................... 47
9.14    Waiver of Jury Trial ......................................................................................... 48
9.15    Consent to Jurisdiction ..................................................................................... 48
9.16    Knowledge and Attribution .............................................................................. 48
9.17    Successors and Assigns; No Third-Party Beneficiaries .................................... 48
9.18    Usury Savings Clause ....................................................................................... 48
9.19    Counterparts ..................................................................................................... 49
9.20    Patriot Act ........................................................................................................ 49
9.21    Obligations Absolute ........................................................................................ 49
9.22    Intercreditor Agreement ................................................................................... 50
9.23    Credit Documents ............................................................................................. 51
9.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ......... 51
9.25    Amendment and Restatement ........................................................................... 52
9.26    Release of FOA ................................................................................................ 52

US 7054423v.5 ING100/16001

List of Schedules

| | |
|---|---|
| Schedule I | The Lenders; Wire Instructions |
| Schedule 3.1.6 | Litigation |
| Schedule 4.5 | Compliance with Law |
| Schedule 4.6.1 | Contracts other than Material Contracts |
| Schedule 4.6.4 | Equity Interests and Ownership |
| Schedule 4.9 | Hazardous Substances |
| Schedule 4.17.2 | Tax Credit Assignments |
| Schedule 4.19 | Affiliate Transactions |
| Schedule 4.21 | Accounts |
| Schedule 4.23 | State Tax Credits[1] |
| Schedule A | Material Contracts |

## **Index of Exhibits**

| | |
|---|---|
| Exhibit A | Definitions and Rules of Interpretation |
| Exhibit B | Form of Amended and Restated Note |
| Exhibit C | Lending Offices |
| Exhibit D | Permits |
| | Part I   Applicable Permits |
| | Part II  Pending Permits |
| Exhibit E | Schedule of Security Filings |
| Exhibit F | Form of Assignment Agreement |
| Exhibit G | Form of Perfection Certificate |

---

[1] Schedule 4.23 to set forth all Alaska Tax Credit Applications that have been filed, the State Tax Credits that have been received, the DOR Purchase Applications for each State Tax Credit and the fiscal years for which the State Tax Credits have been received.

US 7054423v.5 ING100/16001

THIS AMENDED AND RESTATED CREDIT AGREEMENT (this "**Agreement**" or the "**Credit Agreement**") dated as of [_____], 2020, is entered into among Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company (the "**Borrower**"), the lenders party hereto from time to time (the "**Lenders**") and ING Capital LLC, a Delaware limited liability company, as administrative agent and collateral agent for the Lenders (in such capacity, the "**Administrative Agent**").

WHEREAS, the Borrower, Furie Operating Alaska, LLC ("**FOA**" and together with the Borrower, the "**Prepetition Borrowers**"), the lenders party thereto (the "**Prepetition Lenders**") and ING Capital LLC, as administrative agent and collateral agent for the Prepetition Lenders (in such capacity, the "**Prepetition Administrative Agent**") are parties to that certain Credit Agreement, dated as of July 30, 2015 (as amended, restated, modified, or supplemented prior to the date hereof, the "**Prepetition Credit Agreement**"), pursuant to which the Prepetition Lenders made certain loans to the Prepetition Borrowers and other extensions of credit which remain outstanding (the "**Prepetition Loans**");

WHEREAS, pursuant to and upon consummation of the Plan (as defined herein), the Prepetition Lenders have agreed to continue a portion of their loans under the Prepetition Credit Agreement, which debt is a restructuring and rearrangement of the debt of the Prepetition Borrowers through an amendment and restatement of the Prepetition Credit Agreement, which will amend and restate the Prepetition Credit Agreement as provided in this Agreement; and

WHEREAS, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the Administrative Agent's giving notice of the Effective Date as contemplated in <u>Section 3.1</u> hereof, the parties hereto agree that the Prepetition Credit Agreement is hereby amended, renewed, extended and restated in its entirety on (and subject to) the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the agreements herein and in the other Credit Documents and in reliance upon the representations and warranties set forth herein and therein, the parties agree to amend and restate the Prepetition Credit Agreement in its entirety as follows:

## ARTICLE 1.
## DEFINITIONS

**1.1    DEFINITIONS.**  Except as otherwise expressly provided, capitalized terms used in this Agreement and its exhibits and schedules shall have the meanings given in <u>Exhibit A</u>.

**1.2    RULES OF INTERPRETATION.**  Except as otherwise expressly provided, the rules of interpretation set forth in <u>Exhibit A</u> shall apply to this Agreement and the other Credit Documents.

## ARTICLE 2.
## THE CREDIT FACILITIES

**2.1    TERM LOANS.**

**2.1.1** *Term Loans.*

(a)    <u>Restructured Loans</u>.  Subject to the terms and conditions set forth herein, each Lender severally agrees to restructure and rearrange the Prepetition Loans owing to it under the Prepetition Credit Agreement as a Loan hereunder (the "**Loans**") in an amount for each such Lender equal to such Lender's Proportionate Share of $60,000,000 (the "**Credit Facility**").  Such Loans shall be deemed to have been made in a single draw on the Effective Date and, once repaid or prepaid, in whole or in part, may not be reborrowed. No Lender shall have any commitment to make any Loans other than the Loans deemed funded and outstanding as provided in this <u>Section 2.1.1(a)</u>.

(b)    <u>PIK Interest</u>.  Interest shall accrue on the unpaid principal amount of the Loans (including all accrued PIK Interest to be added to the principal balance of such Loans as herein provided) from the date that is the first anniversary of the Effective Date or, with respect to any PIK Interest, the date on which any PIK Interest is added to the outstanding principal balance of the Loans, until the maturity or prepayment thereof at the Interest Rate. On any Interest Payment Date that is not the Maturity Date, the Borrower shall pay all accrued and unpaid interest on the Loans as of such Interest Payment Date in kind, rather than in Cash, by adding the amount of such interest, calculated at the applicable Interest Rate for each Loan, to the principal balance outstanding of each Loan (such interest to be paid in kind as so described, "**PIK Interest**").  Commencing with the first day of the following Interest Period, the amount of PIK Interest accrued during any previous Interest Period shall automatically and without further action be added to the outstanding principal balance of the Loans.

(c)    <u>Principal Payment</u>.  Subject to Section 7.2.6, the Borrower shall repay the Lenders in Cash the full aggregate unpaid principal amount of the Loans (including all accrued PIK Interest that has been added to the principal balance of the Loans), if any, on the Maturity Date, together with all accrued and unpaid interest thereon and all fees and costs then due and payable. For the avoidance of doubt, the Borrower's repayment obligation set forth herein is non-recourse, as further provided in Section 7.2.6, and the sole source of Cash from which the Loans shall be repaid is the proceeds of the Tax Credit Collateral.

**2.1.2** *Interest Payments.*

(a)    <u>Interest Payment Dates</u>.  The Borrower shall pay in kind, as set forth in Section 2.1.1(b), accrued interest on the unpaid principal amount of the Loans (including all accrued PIK Interest to be added to the principal balance of the Loans as herein provided) on the next Banking Day following the end of each calendar month for all interest accrued to the last day of such calendar month, in each case as described in <u>Section 2.1.1(b)</u> (each such date on which an interest payment occurs, an "**Interest Payment Date**").

(b)    <u>Interest Account and Interest Computations</u>.  The Borrower authorizes the Lenders to record in an account or accounts maintained by each Lender on its books (i) the date and amount of each principal and interest payment on the Loans and (ii) such other information as the Lenders may determine is necessary for the computation of interest

2

payable by the Borrower hereunder.  The Borrower agrees that all computations by the Lenders of interest shall be conclusive in the absence of manifest or demonstrable error.  All computations of interest shall be based upon a year of 360 days and the actual days elapsed.

**2.1.3**  *Promissory Notes.*  The obligation of the Borrower to repay the Loans made by each Lender, to pay interest thereon at the rates provided herein and any and all other Obligations hereunder shall, upon the written request of any Lender, be evidenced by one or more promissory notes substantially in the form of <u>Exhibit B</u> (in each case, individually, a "**Note**"), payable to each such Lender and in the principal amount of such Lender's Loan.  The Borrower authorizes each Lender to record in its books and records the date and amount of the Loans made by such Lender, and each payment or prepayment of principal thereunder, each payment of PIK Interest (which as provided in <u>Section 2.1.1(b)</u> shall be added to the outstanding principal balance of the applicable Loans).  The Borrower further authorizes each Lender to attach to and make a part of such Lender's Note continuations of the schedule attached thereto as necessary.  No failure to make any such notations, nor any errors in making any such notations, shall affect the validity of the Borrower's obligations to repay the full aggregate unpaid principal amount of the Loans (including all accrued PIK Interest that has been added to the principal balance of the Loans) or the duties of the Borrower hereunder or thereunder.  This <u>Section 2.1.3</u> shall not affect <u>Section 8.15</u> and, in case of any conflict, <u>Section 8.15</u> shall govern.

**2.1.4**  *Prepayments and Repayments.*

(a)  <u>Terms of All Prepayments</u>.

(i)  All prepayments of any Loan made hereunder shall be accompanied by the applicable Breakage Amount attributable to such Prepayment.

(ii)  Upon the payment of any amounts in respect of Loans hereunder, the Borrower shall pay to the Administrative Agent for the account of each applicable Lender, in addition to the principal amount of the applicable Loans being prepaid or repaid (including all accrued PIK Interest that has been added to the principal balance of the Loans), whether such payment is an optional payment pursuant to <u>Section 2.1.4(b)</u> or a mandatory repayment pursuant to <u>Section 2.1.4(c)</u>, all accrued and unpaid interest thereon to but not including the date of such prepayment on the amount prepaid.

(b)  <u>Optional Prepayment</u>.

(i)  Subject to <u>Section 2.1.4(a)</u>, the Borrower may, at its option, upon 5 Banking Days' irrevocable written notice to the Lenders, pay in advance of maturity thereof any Loan, in whole, or from time to time in part, in minimum amounts of $500,000 or an integral multiple of $250,000 in excess thereof (or such lesser amount as shall then be outstanding) at a price equal to 100% of the amount thereof.  All payments made pursuant to this <u>Section 2.1.4(b)(i)</u> shall be applied to reduce the amount of the Loans in the order described in <u>Section 2.1.4(d)</u>.

(ii)  All such prepayments shall be made by notice given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if

3

given by telephone, promptly confirmed by delivery of written notice thereof to the Administrative Agent (and the Administrative Agent will promptly transmit such original notice by telefacsimile, email or telephone to each Lender). Upon the giving of any such notice, the amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; *provided* that, notwithstanding anything to the contrary in this <u>Section 2.1.4(b)</u> any notice of prepayment delivered pursuant to this <u>Section 2.1.4(b)</u> may provide that such prepayment is conditioned upon the occurrence of other transactions specified in such notice of prepayment.

(c)    <u>Mandatory Prepayment</u>. No later than the second Banking Day following the date of receipt by the Borrowers (or the Administrative Agent) of any State Tax Credit Proceeds that are payable to the Lenders pursuant to Section 5.11, the Loans shall be repaid with such Proceeds in an amount equal to the lesser of (i) 100% of such State Tax Credit Proceeds and (ii) the Obligations then outstanding in respect of such Loans, including all accrued and unpaid interest. Thereafter any remaining State Tax Credit Proceeds shall be applied in accordance with Section 5.11.

(d)    <u>Order of Application</u>. All payments made pursuant to <u>Section 2.1.4(b)(i)</u> and <u>Section 2.1.4(c)</u> shall be applied (i) *first*, to pay accrued and unpaid interest on the principal amount of the Loans so prepaid that has not yet been added to the principal amount of the Loans in accordance with <u>Section 2.1.2</u>, (ii) *second*, to pay all outstanding Breakage Amounts with respect to such Loans as of the date of such payment, (iii) *third,* to pay all outstanding principal amounts of all such Loans in inverse order in which such Loans were made and (iv) *fourth*, to pay all other outstanding Obligations.

**2.2    TAX TREATMENT**. For U.S. federal and applicable state and local income tax purposes, the Borrower, the Administrative Agent and each Lender agree (i) that the Loans shall be treated as indebtedness and shall not be treated as "contingent payment debt instruments" within the meaning of  Section 1.1275-4 of the Treasury Regulations and (ii) to file all of its applicable tax returns and reports in accordance with the treatment set forth in clause (i).

**2.3    OTHER PAYMENT TERMS**.

**2.3.1    *Place and Manner*.** The Borrower shall make all payments due to each Lender hereunder to the Administrative Agent, for the account of such Lender, to the account of such Lender set forth in <u>Schedule I</u>, or to such other account as the Administrative Agent shall notify the Borrower in writing from time to time, in Dollars, without set-off or counterclaim, and in immediately available funds not later than 2:00 p.m., New York City time, on the date on which such payment is due. Any payment made after such time on any day shall be deemed received on the Banking Day after such payment is received. The Administrative Agent shall disburse in immediately available funds to each Lender each such payment received by the Administrative Agent for such Lender, such disbursement to occur on the day such payment is received if received by 2:00 p.m., New York City time, on such day or if otherwise reasonably possible; otherwise, such disbursement shall occur on the next Banking Day.

**2.3.2    *Date.*** Whenever any payment due hereunder that is required to be paid in Cash (excluding any payments made in kind) shall fall due on a day other than a Banking Day, such

4

payment shall be made on the next succeeding Banking Day, and such extension of time shall be included in the computation of interest or fees, as the case may be, without duplication of any interest or fees so paid in the next subsequent calculation of interest or fees payable.

**2.3.3** *Late Payments and Events of Default.* Upon the occurrence and during the continuation of any Default or Event of Default, the Borrower shall pay interest on (a) the unpaid principal amount of the Loans (including all accrued PIK Interest that has been added to the principal balance of such Loans) owing to each Lender that is not paid when due at a rate per annum equal to 2% per annum above the Interest Rate to be paid on such Loans (such rate, the "**Default Rate**") and (b) to the extent permitted by Applicable Law, the amount of any interest, fee or other amount payable under this Agreement or any other Credit Document that is not paid when due, at the Default Rate, in each case from the date such amount shall be due until such amount shall be paid in full, compounded monthly.

**2.3.4** *Taxes.*

(a)    <u>Payments Net of Taxes</u>.  Any and all payments to or for the benefit of any Lender or the Administrative Agent by or on behalf of the Borrower hereunder or under any other Credit Document shall be made without deduction or withholding for any Taxes unless required by Applicable Law.  If any present or future Taxes (excluding (i) net income and franchise Taxes, which include Taxes imposed on or measured by the net income of such Lender, imposed by any jurisdiction or any political subdivision or taxing authority thereof or therein as a result of a present or former connection between such Lender and such jurisdiction or political subdivision, unless such connection results from such Lender's executing, delivering, becoming a party to or performing its obligations or receiving a payment under, or enforcing, this Agreement or any Note or performing any other activities contemplated thereby or relating thereto, (ii) any U.S. federal withholding Taxes imposed under FATCA, (iii) Taxes attributable to such Person's failure to comply with <u>Section 2.3.5</u> and (iv) U.S. federal withholding Taxes imposed on payments made to or for the account of such Lender pursuant to this Agreement, under the law effective as of the date it becomes a Lender, except to the extent that on the date such entity became a Lender, the assigning or transferring Lender would be entitled to a payment under this <u>Section 2.3.4</u>) (all such non-excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of the Borrower hereunder being hereinafter referred to as "**Indemnified Taxes**"), are required to be deducted or withheld from or in respect of any sum payable by the Borrower or the Administrative Agent hereunder or under any other Credit Document to the Administrative Agent or any Lender:

(i)    the sum payable by the Borrower shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this <u>Section 2.3.4</u>), such Lender or the Administrative Agent receives an amount equal to the sum it would have received had no such deductions been made;

(ii)    the Borrower or the Administrative Agent shall make such deductions; and

(iii)    the Borrower or the Administrative Agent shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with Applicable Law.

In addition, the Borrower agrees to pay any present or future stamp, recording, intangible, court, documentary, filing or similar Taxes and any other excise or property Taxes (not including income or franchise taxes) that arise from any payment made hereunder or under any other Credit Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to this Agreement or any other Credit Document (hereinafter referred to as **"Other Taxes"**).

(b)    <u>Tax Indemnity</u>. The Borrower shall indemnify each Lender and the Administrative Agent for the full amount of Indemnified Taxes and Other Taxes (including any Indemnified Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this <u>Section 2.3.4</u>) paid or payable by any Lender or the Administrative Agent, or required to be withheld or deducted from a payment to such Lender or the Administrative Agent and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted.  Payments due from the Borrower pursuant to this indemnification shall be made within 10 days from the date such Lender or Administrative Agent makes written demand therefor (in the case of a Lender, submitted through the Administrative Agent), which demand shall be accompanied by a certificate describing all Tax and other liability amounts, which shall be conclusive absent manifest error.

(c)    <u>Receipt</u>.  Within ten (10) days after the date of any payment of Indemnified or Other Taxes by the Borrower, the Borrower shall furnish to the Administrative Agent, at its address referred to in <u>Section 9.1</u>, the original or a certified copy of a receipt issued by a Governmental Authority evidencing payment thereof, reasonably satisfactory to the Administrative Agent.    The Borrower shall compensate each Lender and the Administrative Agent for all reasonable losses and expenses sustained by such Lender as a result of any failure by the Borrower to so furnish such copy of such receipt.

(d)    <u>Survival of Obligations</u>.  The obligations of the Borrower under this <u>Section 2.3.4</u> shall survive the termination of this Agreement and the repayment of the Obligations of the Borrower.

**2.3.5**    *Withholding Exemption Certificates.*    Each Lender upon becoming a Lender hereunder agrees that it will deliver to the Borrower and the Administrative Agent either (a) if it is a U.S. Person, two (2) duly completed copies of United States Internal Revenue Service Form W–9, or (b) if it is not a U.S. Person, to the extent it is legally able to do so, two (2) duly completed copies of United States Internal Revenue Service Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI or successor applicable form (in the case of any Lender claiming an exemption under the so-called portfolio interest exemption rules, together with a certificate signed by such Lender stating that, for purposes of applying section 881(c)(3) of the Code or a successor provision, it is not (i) a bank, (ii) a ten (10) percent shareholder of the Borrower, or (iii) a controlled foreign corporation related to the Borrower), as the case may be, certifying in each case that such Lender

6

is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes. Each Lender which delivers to the Borrower and the Administrative Agent a Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI pursuant to the preceding sentence further undertakes to deliver to the Borrower and the Administrative Agent, to the extent it is legally able to do so, further copies of Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI, or successor applicable forms, or other manner of certification or procedure, as the case may be, on or before the date that any such letter or form expires or becomes obsolete or within a reasonable time after gaining knowledge of the occurrence of any event requiring a change in the most recent letter and forms previously delivered by it to the Borrower and the Administrative Agent, and such extensions or renewals thereof as may reasonably be requested by the Borrower and the Administrative Agent, certifying in the case of a Form W-8BEN, W-8BEN-E, W-8IMY or W-8ECI that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes or promptly notifying the Borrower and the Administrative Agent in writing of its legal inability to do so. If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this Section 2.3.5, "FATCA" shall include any amendments made to FATCA after the date of this Agreement. Notwithstanding any other provision of this Section 2.3.5, any Form W-9 required to be delivered pursuant to this Section 2.3.5 that was delivered by a Lender at the time such Lender became a party to the Prepetition Credit Agreement shall be deemed to have been delivered by such Lender on or before the date on which it becomes a party to this Agreement

**2.3.6** *Application of Payments*. Except as expressly otherwise provided in the Credit Documents, payments made under this Agreement and the other Credit Documents and other amounts received by the Administrative Agent or the Lenders under this Agreement and the other Credit Documents shall, first, be applied to any fees, costs, charges or expenses payable to the Administrative Agent or the Lenders hereunder or under the other Credit Documents, second, to all accrued but unpaid interest thereon then due and owing, and, third, to outstanding principal then due and owing or otherwise to be prepaid.

**2.4** PRO RATA TREATMENT.

**2.4.1** *Sharing of Payments*. Except as otherwise provided herein, each payment of principal of and interest and fees on the Loans shall be made or shared among the Lenders holding such Loans pro rata according to their respective Proportionate Shares of the Loans. If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of any Loans owed to it, in excess of its ratable share of payments on account of such Loans obtained by all Lenders entitled to such payments, such Lender shall

7

forthwith segregate and hold in trust and promptly pay over to the Administrative Agent (for distribution among the Lenders according to their respective Proportionate Shares) in the form received any such payment in excess of its ratable share of payments on account of such Loans obtained by all Lenders entitled to such payments, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.

**2.5** **CHANGE OF CIRCUMSTANCES**.

**2.5.1** *Increased Costs Generally*. If any Change of Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(b)    subject the Administrative Agent or any Lender to any Tax of any kind whatsoever with respect to this Agreement or the Loans, Loan principal or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or change the basis of taxation of payments to the Administrative Agent or any Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 2.3.4</u>);

(c)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Rate Loans made by such Lender; or

(d)    impose on any Lender any other condition, cost or expense affecting this Agreement;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable hereunder or in connection herewith by any Lender (whether of principal, interest or any other amount), then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such reduction suffered.

**2.5.2** *Capital Requirements*. If any Lender determines that (a) any Change of Law after the date of this Agreement increases the amount of capital or liquidity required or expected to be maintained by such Lender (or the Lending Office of such Lender) or any Person controlling such Lender (a "**Capital Adequacy Requirement**") and (b) the amount of capital maintained by such Lender or such Person which is attributable to or based upon the Loans, or this Agreement must be increased as a result of such Capital Adequacy Requirement (taking into account such Lender's or such Person's policies with respect to capital adequacy), the Borrower shall pay to the Administrative Agent for the account of such Lender or such Person, upon demand of the Administrative Agent for the account of such Lender or such Person, such amounts as such Lender or such Person shall reasonably determine are sufficient to compensate such Lender or such Person for the increased costs to such Lender or such Person of such increased capital; *provided* that no Lender shall request such compensation unless such Lender certifies in the notice delivered pursuant to <u>Section 2.5.3</u> below how such increased costs are calculated and that such Lender is seeking substantially similar compensation from similarly situated borrowers generally in such Lender's loan portfolio. A certificate of such Lender or such Person, setting forth in reasonable detail the computation of any such increased costs, delivered to the Borrower by the Administrative Agent on behalf of such Lender or such Person shall, in the absence of manifest or demonstrable

8

error, be conclusive and binding on the Borrower for purposes of this Agreement.  For the avoidance of doubt, this Section 2.5 shall apply to all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (i) under or in connection with the implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("**Dodd-Frank Act**") and (ii) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented.

    **2.5.3** *Notice; Participating Lenders' Rights.*  Each Lender shall notify the Borrower of any event occurring after the date of this Agreement that will entitle such Lender to compensation pursuant to Section 2.5.1 or Section 2.5.2, as promptly as practicable, and in no event later than 120 days after a Responsible Lender Officer of such Lender obtains knowledge thereof; *provided* that any Lender's failure to notify the Borrower within such 120-day period shall not relieve the Borrower of its obligation under this Section 2.5.  Except as otherwise expressly set forth in Section 8.12, no Person purchasing from a Lender a participation in the Loans (as opposed to an assignment) shall be entitled to any payment from or on behalf of the Borrower pursuant to Section 2.5.1 or Section 2.5.2.  For the avoidance of doubt, upon the sale by any Lender of a participation in the Loans, the Borrower shall continue to be obligated to make payments hereunder to such selling Lender that are otherwise payable hereunder as though such sale had not taken place.

    **2.5.4** *Reserves on LIBOR Rate Loans.*  The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits (currently known as Eurocurrency liabilities), additional interest on the unpaid principal amount of each LIBOR Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable in kind, rather than in Cash, on each Interest Payment Date, by adding the amount of such interest, calculated at the applicable Interest Rate for such Loan, to the principal balance outstanding of such Loan; provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

    **2.5.5** *Illegality.*  If any Lender determines that any Applicable Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender to make, maintain or fund Loans whose interest is determined by reference to the LIBOR Rate, or to determine or charge interest rates based upon the LIBOR Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to continue LIBOR Rate Loans shall be suspended, until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Administrative Agent shall during the period of such suspension compute the interest rate applicable to such Lender with reference to the Prime Rate instead of the LIBOR Rate

9

until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the LIBOR Rate.

**2.6    ALTERNATE OFFICE; MINIMIZATION OF COSTS.**

**2.6.1**    To the extent reasonably possible, each Lender shall take any reasonable actions to reduce any liability of the Borrower to any Lender under <u>Section 2.3.4</u>, <u>Section 2.5.1</u> or <u>Section 2.5.2</u> so long as such Lender, in its sole discretion, would not be subject to any unreimbursed cost or expense and does not determine that such action is disadvantageous to such Lender.

**2.6.2**    If and with respect to each occasion that a Lender makes a demand for compensation pursuant to <u>Section 2.3.4</u>, <u>Section 2.3.5</u>, <u>Section 2.5.1</u> or <u>Section 2.5.2</u> or such Lender fails to make a Loan in violation of its obligations hereunder, then such Lender shall, upon 5 Banking Days' prior delivery of an irrevocable written notice from the Borrower to such Lender specifying an assignee (which shall be a bank, financial, lending or other entity or institution or fund reasonably satisfactory to the Administrative Agent) willing and able to assume and accept all of such Lender's rights and obligations under this Agreement and the other Credit Documents, assign, in accordance with the provisions of <u>Section 8.13</u> hereof, all of such Lender's rights and obligations under this Agreement and the other Credit Documents to such assignee in consideration for (a) the payment on the date of the assignment by such assignee to such Lender of the principal amount of, and accrued interest on, the outstanding Loans held by such Lender on the date of such assignment, together with any and all other amounts owing to such Lender under any provision of this Agreement or the other Credit Documents accrued to the date of such assignment, and (b) the release of such Lender from any further liability hereunder.  Such notice from the Borrower shall specify an effective date for the assignment of such Lender's rights and obligations hereunder, which date shall not be later than five (5) days after the day such notice is given.

**2.6.3**    Any Lender may, upon written notice to the Borrower, designate a Lending Office other than that set forth on <u>Exhibit C</u> and may assign all of its interests under the Credit Documents and its Notes to such Lending Office; *provided* that such designation and assignment do not at the time of such designation and assignment increase the reasonably foreseeable liability of the Borrower under <u>Section 2.3.4</u>, <u>Section 2.5.1</u> or <u>Section 2.5.2</u>.

**2.7    EFFECT OF BENCHMARK TRANSITION EVENT**

**2.7.1**    *Benchmark Replacement*. Notwithstanding anything to the contrary herein or in any other Credit Document, if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred prior to the Reference Time in respect of any determination of the Benchmark on any date, the Benchmark Replacement will replace the then-current Benchmark for all purposes hereunder or under any Credit Document in respect of such determination on such date and all determinations on all subsequent dates. If the Benchmark Replacement is determined in accordance with clause (1) or (2) of the definition of "Benchmark Replacement", in connection with a Benchmark Transition Event, such Benchmark Replacement will become effective as of the Reference Time on the applicable Benchmark Replacement Date without any amendment to, or further action or consent of any other party to, this Agreement. If the Benchmark Replacement is determined in accordance with clause (3) of the

10

definition of "Benchmark Replacement," or in connection with an Early Opt-in Election, such Benchmark Replacement will become effective at 5:00 p.m. on the fifth (5th) Banking Day after the date notice of such Benchmark Replacement is provided to the Borrower without any amendment to this Agreement or further action or consent of the Borrower.

**2.7.2** *Benchmark Replacement Conforming Changes.* In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Credit Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of the Borrower.

**2.7.3** *Notices; Standards for Decisions and Determinations.* The Administrative Agent will promptly notify the Borrower of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes, (iv) the removal or reinstatement of any tenor of Term SOFR pursuant to clause (d) below and (v) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent pursuant to this Section titled "Effect of Benchmark Transition Event," including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from the Borrower.

**2.7.4** *Unavailability of Tenor of Term SOFR.* Notwithstanding anything to the contrary herein or in any other Credit Document, at any time and with respect to any Interest Period, if the Benchmark at such time is Term SOFR and Term SOFR for the applicable tenor is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion, the Administrative Agent may (i) modify the definition of "Interest Period" for all determinations of interest at or after such time to remove such unavailable tenor and (ii) if Term SOFR, as applicable, for the applicable tenor is displayed on such screen or information service after its removal pursuant to clause (i) above, modify the definition of "Interest Period" for all determinations of interest at or after such time to reinstate such previously removed tenor.

**2.7.5** *Benchmark Unavailability Period.* Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Loans shall bear interest with reference to the Prime Rate instead of the LIBOR Rate.

## ARTICLE 3.
## CONDITIONS PRECEDENT

**3.1    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE**.  The effectiveness of this Agreement and the occurrence of the Effective Date is subject to the satisfaction of each of the following conditions (unless waived in writing by the Administrative Agent with the consent of

11

the Required Lenders), all of which shall be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

**3.1.1**    *Incumbency.*    Delivery to the Administrative Agent of a certificate, from the Borrower, in each case signed by an appropriate authorized officer of each such entity and dated the Effective Date, as to the incumbency of the natural persons authorized to execute and deliver this Agreement, the other Credit Documents and/or any instruments or agreements required hereunder or thereunder to which such entity is a party.

**3.1.2**    *Formation Documents.*    Delivery to the Administrative Agent of a copy of the limited liability company agreement (which such limited liability company agreements shall include customary provisions opting in to Article 8 of the UCC) and certificate of formation or organization of the Borrower, in each case certified by a Responsible Officer of each such entity as being true, correct and complete on the Effective Date, and any related agreements or certificates filed in accordance with Applicable Law.

**3.1.3**    *Good Standing Certificates.*    Delivery to the Administrative Agent of certificates issued by the Secretary of State of the state of organization of the Borrower, and, if applicable, each state of foreign qualification (which shall include the state of Alaska), in each case dated no more than 30 days prior to the Effective Date and certifying that such entity is in good standing or has current status, and is qualified to do business in, and, if applicable, has paid all franchise taxes or similar taxes due to, such state.

**3.1.4**    *Credit Documents.*    Delivery to the Administrative Agent of executed copies of the Credit Documents.  If requested by any Lender, delivery to the Administrative Agent of an original Note in the amount of such Lender's Proportionate Share of the Loans.

**3.1.5**    *Legal Opinions.*    Delivery to the Administrative Agent of legal opinions of Chipman Brown Cicero & Cole, LLP, as New York and Delaware counsel to the Borrower and the Sponsor and by David H. Bundy, PC, as Alaska law counsel to the Borrower and Sponsor, addressed to the Administrative Agent and the Lenders.

**3.1.6**    *Absence of Litigation.*    Other than the Bankruptcy Cases and except as set forth on Schedule 3.1.6, no action, suit, proceeding or investigation shall be pending or, to the knowledge of the Borrower, threatened against the Sponsor (to the Borrower's knowledge), the Borrower or the Properties of the Sponsor (to the Borrower's knowledge) or the Properties of the Borrower. No order, judgment or decree shall have been issued or, to the knowledge of the Borrower, proposed to be issued by any Governmental Authority relating to the Sponsor (to the Borrower's knowledge), the Borrower or the Properties of the Sponsor (to the Borrower's knowledge) or the Properties of the Borrower.

**3.1.7**    *Payment of Filing and Recording Fees*.    All amounts required to be paid to or deposited with the Administrative Agent on or prior to the Effective Date, including all Taxes, fees and other costs payable in connection with the execution, delivery, recording and filing of the documents and instruments referred to in this Section 3.1, shall have been paid in full or, as approved by the Administrative Agent, provided for.

US 7054423v.5 ING100/16001

**3.1.8**   *UCC and Tax Lien Reports.*  The Administrative Agent shall have received UCC, judgment and tax lien reports of a date no less recent than ten (10) Banking Days before the Effective Date, showing that the security interests created under the Security Documents will be prior to all other financing statements, or other security documents wherein the security interest is perfected by filing in respect of the Collateral under the UCC in such jurisdiction.

**3.1.9**   *Collateral; Filings and Recordings.*  The Administrative Agent shall have received, in each case in form and substance reasonably satisfactory to the Administrative Agent:

(a)   a UCC financing statement (Form UCC-l), naming the Borrower as debtor and the Administrative Agent as secured party, filed with the appropriate Governmental Authority sufficient to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral;[2]

(b)   copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by the Required Lenders acting reasonably; and

(c)   satisfactory evidence that all other actions necessary to perfect the security interests purported to be created by the Security Documents have been taken.

**3.1.10**  *Governmental Authorizations and Consents.*  (a) The Borrower shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the execution, delivery and performance of the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent and (b) all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

**3.1.11**  *Undertaking Agreement.*  The Administrative Agent shall have received an Undertaking Agreement from the Operator, in form and substance satisfactory to the Administrative Agent.[3]

**3.1.12**  *Other Documents.*  The Borrower shall have provided to the Lenders such other documents as the Lenders may request to effect the transactions contemplated by this Agreement, including the perfection of any security interest granted pursuant to the Credit Documents.

**3.1.13**  *Patriot Act.*  At least one (1) Banking Day prior to the Effective Date, the Lenders shall have received all documentation and other information reasonably requested by the

---

[2] NTD: Since the liens under this credit facility will be continued from the prepetition liens, no new filings are expected.

[3] NTD: This does not need to be a separate agreement but can built into one of the loan documents as long as the Administrative Agent and Lenders under this credit facility are third party beneficiaries.  See the definition of Undertaking Agreement for the required language.

13

Administrative Agent that is required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act.

**3.1.14** *No Default*.  No Default or Event of Default has occurred and is continuing or will result from the incurrence of the Loans.

**3.1.15** *Plan; Confirmation Order*.

(a)      The Plan shall not have been amended, modified or supplemented after [●], 2020 in any manner and no condition to the effectiveness thereof shall have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Lenders in any material respect.

(b)      The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Required Lenders and shall have been entered confirming the Plan.

(c)      The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Lenders in any material respect and shall not be subject to any pending appeals.

(d)      The Confirmation Order shall authorize the Debtors to execute, deliver and perform all of their obligations under all Credit Documents and shall contain no term or provision that contradicts such authorization.

(e)      The Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects.

(f)      The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived (in accordance with the terms of the Plan) without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Lenders in any material respect unless consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Effective Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES

The Borrower makes the following representations and warranties to and in favor of the Administrative Agent and the Lenders as of the Effective Date and as of each date any certificate is delivered pursuant to the Credit Documents:

14

**4.1** **STATUS**. The Borrower (a) is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware and (b) is duly qualified and authorized to do business and in good standing in each jurisdiction where the character of its Properties or the nature of its activities makes such qualification necessary. The Borrower has all requisite limited liability company power and authority to own or hold under lease and operate the property it purports to own or hold under lease, to carry on its business as now being conducted and as now proposed to be conducted in respect of its Properties and to execute, deliver and perform its obligations hereunder and the other Credit Documents to which it is a party.

**4.2** **AUTHORITY**. The Borrower has full power and authority to execute and deliver this Agreement and the other Credit Documents to which it is a party and to carry out its obligations hereunder and thereunder. The execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on its parts and the Borrower has executed and delivered the Credit Documents to which it is a party. This Agreement and the other Credit Documents to which it is a party constitute valid and legally binding obligations, enforceable against the Borrower in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization and other similar laws now or hereafter in effect relating to creditors' rights generally or by general principles of equity (whether enforced at law or in equity).

**4.3** **GOVERNMENTAL AUTHORIZATIONS**. There is no proceeding pending, or to its knowledge, threatened against the Borrower that seeks to, or may be reasonably expected to rescind, terminate, modify in any manner adverse to the State Tax Credits or suspend any Governmental Authorization or this Agreement or materially interfere with its ability to fully perform its obligations and duties set forth under this Agreement or the other Credit Documents.

**4.4** **NO BREACH OR DEFAULT**. The execution, delivery and performance by the Borrower of this Agreement and the transactions contemplated hereby and by the other Credit Documents does not and will not (a) require any consent or approval or registration with notice to or other action of any Governmental Authority or any other Person except for Pending Permits and immaterial Permits and consents as expressly provided for herein or the Credit Documents or that has otherwise been obtained and is currently in effect or (b) constitute a breach of any term or provision of, conflict with, or violate or constitute a default under (with or without notice, or lapse of time, or both), or result in or require the creation of any Lien (other than Permitted Encumbrances) upon any of its property under, (i) any outstanding indenture, mortgage, loan agreement or other contract or agreement to which the Borrower is a party, or its Properties is bound, (ii) its operating agreement, certificate of formation or other Organizational Documents, or any other Contractual Obligations, (iii) any material Applicable Law (or require any consents, approvals, notifications or authorizations thereunder) applicable to or binding on the Borrower or any of its Properties, or (iv) any order, writ, judgment or decree of any Court or other Governmental Authority having applicability to the Borrower.

**4.5** **COMPLIANCE WITH LAW**. Except as otherwise have been delivered to the Administrative Agent and that are expressly identified on Schedule 4.5, there are no (a) material violations by the Borrower of any Legal Requirement relating to the Credit Documents or that could have an adverse effect on the value or collectability of the Collateral; and (b) written notices

US 7054423v.5 ING100/16001

of material violation of any Legal Requirement relating to the Credit Documents or the Collateral have been received by the Borrower.

### 4.6    CAPITALIZATION, JOINT VENTURES, SUBSIDIARIES, ETC.

**4.6.1**    *Borrower not a Partner*.  The Borrower is not a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture.

**4.6.2**    *Subsidiaries*.  The Borrower does not have any Subsidiaries other than FOA and does not hold any Equity Interests in any other entity other than FOA.  The Borrower is a wholly-owned direct Subsidiary of the Sponsor.

**4.6.3**    *Due Authorization*.  The Equity Interests of the Borrower have been duly authorized and validly issued and are fully paid and non-assessable.  Schedule 4.6.4 correctly sets forth the ownership of the Equity Interests of the Borrower as of the Effective Date.

**4.6.4**    *Equity Interest Equivalents*. There exists no Equity Interest Equivalents granting a right to any Person to acquire an interest in the Borrower, and there is no Equity Interests of the Borrower outstanding which upon conversion or exchange would require, the issuance by the Borrower of any additional Equity Interests of the Borrower or other Equity Interest Equivalents convertible into, exchangeable for or evidencing the right to subscribe for or purchase, any Equity Interest of the Borrower.

### 4.7    INVESTMENT COMPANY ACT. The Borrower is not subject to regulation under any federal or state statute or regulation which may limit its ability to incur Debt or which may otherwise render all or any portion of the Obligations unenforceable.  The Borrower is not an "investment company", "registered investment company", a company "controlled" by an "investment company" or a "registered investment company" or a "principal underwriter" of a "registered investment company", within the meaning of the Investment Company Act of 1940.

### 4.8    TAX SHARING AGREEMENTS.

### 4.9    TAXES.

**4.9.1**    The Borrower has filed all federal, state and local Tax returns (including any Alaska Tax Returns) that it is required to file, has paid all Taxes it is required to pay to the extent due (other than those Taxes that are not yet due and for which the Borrower has established reserves that are adequate for the payment thereof and are required by GAAP). For federal income tax purposes, the Borrower is a Pass-Through Entity.

**4.9.2**    (a) No Liens for Taxes have been filed with respect to the assets of the Sponsor or the Borrower, (b) no material unresolved claim has been asserted in writing with respect to any Taxes of the Borrower, (c) no unresolved claim has been asserted in writing with respect to any AK Obligations of the Borrower, (d) no waiver or agreement by the Borrower is in force for the extension of time for the assessment or payment of any Tax, and (e) no request for any such extension or waiver is currently pending.  There is no pending or, to the knowledge of the

16

Borrower, threatened audit or investigation by any Governmental Authority of the Borrower with respect to Taxes.

**4.9.3**    The Borrower is not party to or bound by any Tax sharing agreement or similar agreement or arrangement (whether or not written) pursuant to which it may have an obligation to make payments after the Effective Date, other than obligations under the terms of (a) this Agreement and any other Credit Documents regarding the collateral assignment of State Tax Credits to the Administrative Agent on behalf of the Lenders, (b) the Second Lien Credit Agreement and any other Second Lien Loan Document relating to the collateral assignment of the State Tax Credits pursuant to the Second Lien Loan Documents, subject to the Intercreditor Agreement and (c) the New Term Loan Agreement and any other New Term Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the New Term Loan Documents, subject to the Intercreditor Agreement.

**4.10**    ORGANIZATIONAL ID NUMBER; LOCATION OF COLLATERAL.

**4.10.1**    As of the Effective Date, the Borrower's organizational identification number is 6727372.[4]

**4.10.2**    As of the Effective Date, all of the tangible Collateral is located on the Properties of Borrower or at the addresses set forth in <u>Section 9.1</u>, except as otherwise permitted by the Security Agreement.

**4.11**    TITLE AND LIENS.  Other than as expressly permitted by the Credit Documents, the Borrower has good, legal and valid title to, or, with respect to all of the Collateral free and clear of all Liens except Permitted Encumbrances.   No portion of the Collateral has been leased, subleased, licensed or otherwise granted by the Borrower to any Person.

**4.12**    COLLATERAL.

**4.12.1**    Subject to the Intercreditor Agreements, the security interests granted to the Administrative Agent for the benefit of the Secured Parties pursuant to the Security Documents in the Collateral:

(a)    Constitute, as to the Tax Credit Collateral, a valid first priority security interest and lien under the UCC and, as to the Cornucopia Equity Collateral, a valid third priority security interest and lien under the UCC (junior to the liens securing the AIDEA Loan Obligations and the Second Lien Obligations and subject in all respects to the Intercreditor Agreements); and

(b)    are perfected, with respect to any property that can be perfected by filing, as a result of the financing statements that have been filed in the filing offices identified on <u>Exhibit E</u>.

**4.12.2**    The Tax Credit Certificates and proceeds from all State Tax Credits, including without limitation all State Tax Credits due to the Borrower from the DOR, have been collaterally

---

[4] Note to Borrower: Please update as required.

17

assigned to (a) the Administrative Agent pursuant to the Security Agreement and applicable Tax Credit Assignments, which Tax Credit Assignments are set forth on <u>Schedule 4.17.2</u>, (b) the Second Lien Agent pursuant to the Second Lien Collateral Documents and (c) the New Term Loan Agent pursuant to the New Term Loan Collateral Documents.

**4.13** **PATRIOT ACT**.  To the extent applicable, the Borrower is in compliance, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Patriot Act.  The Borrower has provided to the Administrative Agent and the Lenders true and correct documentation and other information as requested by the Administrative Agent or the Lenders in order to comply with requirements of the Patriot Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.14** **STATE TAX CREDITS**.

(a)    There are no deficiency payments, liquidated damages or other expenses or amounts currently due or payable (or reasonably expected to be due and payable) that could result in an offset against the State Tax Credits.  The Borrower is in compliance with the provisions of AS 43.55.028(e).

(b)    The Borrower has timely filed all state oil and gas production tax returns with the DOR no later than February 28 in each tax year set forth on <u>Schedule 4.23</u> following the applicable tax year.

(c)    The Borrower has, concurrently with the filing of each Alaska Tax Credit Application set forth on <u>Schedule 4.23</u>, collaterally assigned to the Administrative Agent all State Tax Credits to the extent permitted by Alaska law, by the filing with the DOR of a Tax Credit Assignment in accordance with this Agreement, together with (i) an Alaska Optional Waiver of Confidentiality for Tax Credit Certificate Information relating to Assignments under AS 43.55.029 in a form prescribed by the DOR (Form 355 or equivalent) in favor of the Administrative Agent and (ii) a State of Alaska Electronic Payment Agreement filed with the Alaska Department of Administration and the DOR.

(d)    The Borrower has timely completed and filed with the DOR, in accordance with Applicable Laws, all Alaska Tax Credit Applications set forth on <u>Schedule 4.23</u> for the State Tax Credits no later than forty five (45) days after the first date on which such Alaska Tax Credit Applications can be filed with the DOR.

(e)    The Borrower has filed with the DOR, no later than ten (10) Banking Days' following the issuance of each State Tax Credit, a DOR Purchase Application relating to such State Tax Credit together with the applicable Tax Credit Assignment as required by AS 43.55.029(a), which DOR Purchase Applications are set forth on <u>Schedule 4.23</u>.

**4.15    ANTI-TERRORISM LAWS.**

The Borrower and each of its Affiliates, Subsidiaries, officers, directors and employees has (a) conducted its operations in accordance with applicable AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (b) not conducted its business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (c) not engaged in or conspired to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws.

# ARTICLE 5.
# AFFIRMATIVE COVENANTS

Until the Termination Date:

**5.1    FINANCIAL STATEMENTS AND OTHER REPORTS.**

**5.1.1**    *Quarterly.*  As soon as practicable and in any event within 90 days after the end of each quarterly accounting period of its fiscal year (including the fourth fiscal quarter of each fiscal year), the Borrower shall deliver an unaudited consolidated and consolidating balance sheet of the Borrower, as of the last day of such quarterly period and the related consolidated statements of income, cash flow, and equity (where applicable prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes)) for such quarterly period and (in the case of second, third, and fourth quarterly periods) for the portion of the fiscal year ending with the last day of such quarterly period, setting forth in each case in comparative form corresponding unaudited figures from the preceding fiscal year, and a report from the management of the Borrower discussing and analyzing such financial results and their effect on the financial projections of the Borrower for the following twelve (12) month period.

**5.1.2**    *Annual.*  As soon as practicable and in any event within 180 days after the close of each applicable fiscal year, the Borrower shall deliver audited consolidated and consolidating financial statements of the Borrower.  Such consolidated and consolidating financial statements shall include a consolidated statement of equity, a consolidated and consolidating balance sheet as of the close of such year, an consolidated income and expense statement, reconciliation of capital accounts and a consolidated statement of cash flow, all prepared in accordance with GAAP, certified by an independent certified public accountant selected by the Borrower.  Such certificate shall not be qualified or limited because of restricted or limited examination by such accountant of any material portion of the records of the Borrower.

**5.1.3**    *Monthly.*  As soon as practicable and in any event within thirty (30) days after the end of each month commencing with the third full month occurring after the Effective Date, the Borrower shall deliver (a) internally prepared financial information (or management reports or updates) and monthly information with respect to the quantity of oil, natural gas, natural gas liquids

and other liquid or gaseous hydrocarbons delivered by the Borrower, sales of the foregoing (to the extent such information is available), average volumes processed per day, revenue and expenses and (b) a detailed report of all Capital Expenditures expended during such immediately preceding calendar month.

**5.1.4** *Administrative Agent Requests.* From time to time, as soon as practicable after the request of the Administrative Agent or any Lender, the Borrower shall deliver to the Administrative Agent such other information and data with respect to the Borrower or any Properties or operations of the Borrower.

**5.1.5** *Officer's Certificate.* Each time financial statements are delivered under Section 5.1.1 and 5.1.2 above, the Borrower shall deliver or cause to be delivered along with such financial statements, a certificate signed by a Responsible Officer of the Borrower, certifying that (a) such officer has made or caused to be made a review of the transactions and financial condition of the Borrower during the relevant fiscal period, (b) that such financial statements have been prepared in conformity with GAAP applied consistently throughout the relevant periods (except as otherwise approved and disclosed therein) and fairly presents, in all material respects, the consolidated and consolidating financial position of the Borrower, at the respective dates thereof and the consolidated results of operations and cash flows of the Borrower described therein for each of the periods then ended, subject, in the case of any unaudited quarterly financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure, (c) that such review has not, to such Responsible Officer's knowledge, disclosed the existence of any event or condition which constitutes, as of the date of such certificate, a Default or Event of Default, or if any such event or condition existed or exists, the nature thereof and the corrective actions that the Borrower have taken or propose to take with respect thereto, and (d) that the Borrower is in full compliance with all covenants in this Agreement and each other Credit Document.

**5.1.6** *Telephone Conferences.* The Borrower shall host a quarterly telephone conference with the Administrative Agent and the Lenders on a date and time during each fiscal quarter to be mutually agreed and other telephone conferences between such quarterly telephone conferences as may be reasonably requested by the Administrative Agent.

**5.2** NOTICES – OPERATION OF BUSINESS. The Borrower shall promptly upon receipt of or giving notice (or upon a Responsible Officer of the Borrower otherwise obtaining knowledge thereof) and, except as otherwise noted below, in any event, within 10 days after the occurrence thereof, of any of the following, give notice to the Administrative Agent of the following (with copies of any underlying notices, papers, files or related documentation), which notice shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto, of:

(a)    as soon as possible, and in any event within three (3) Banking Days after (i) receipt of service of process in respect of any pending litigation, suit, proceeding or investigation before any court, arbiter or other governmental authority that could be reasonably be expected to have an adverse effect on the value or collectability of the Collateral or, (ii) the Borrower's knowledge, that the same is threatened against the

20

Borrower, such notice to include, if requested in writing by the Administrative Agent, copies of all papers filed in such litigation and to be given monthly if any such papers have been filed since the last notice given;

(b)     promptly, but in no event later than three (3) Banking Days after the receipt thereof by the Borrower, copies of material notices in connection with any material dispute or disputes of which the Borrower has knowledge or for which written notice has been received by the Borrower which may exist between the Borrower and any Governmental Authority that could reasonably be expected to have an adverse effect on the value or collectability of the Collateral;

(c)     as soon as possible, and in any event within one (1) Banking Day after a Responsible Officer of the Borrower obtains knowledge of the occurrence thereof, any Default or Event of Default;

(d)     any proceeding or legislation by any Governmental Authority to expropriate, condemn, confiscate, nationalize or otherwise acquire compulsorily the Collateral (whether or not constituting a Default or Event of Default);

(e)     any Lien (other than a Permitted Encumbrance) being granted or established or becoming enforceable over the Collateral;

(f)     promptly, upon the request thereof, such other information and documentation required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations (including the Patriot Act) as from time to time requested by the Administrative Agent or any Lender;

(g)     as soon as possible, and in any event within one (1) Banking Day after a Responsible Officer of the Borrower becomes aware thereof, any occurrence or event that could reasonably be expected to result in a delay in the timely filing of, or inability to pay in full, any Taxes (including any Alaska Taxes), assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to the Borrower or Corsair or any of their respective Subsidiaries;

(h)     as soon as possible, and in any event within one (1) Banking Day after a Responsible Officer of the Borrower becomes aware thereof, any occurrence or event that could reasonably be expected to result in a delay in the timely filing of, or inability to pay in full, any Taxes (including any Alaska Taxes), assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to the Borrower or Corsair or any of their respective Subsidiaries;

(i)     promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower or the Properties of the Borrower or compliance with the terms of any Credit Document that the Administrative Agent or any Lender may request; and

(j)     as soon as possible upon any failure to make any payment to the State of Alaska or any political subdivision thereof when due.

21

**5.3**    **EXISTENCE**. Except as otherwise expressly permitted under this Agreement, at all times, (a) the Borrower shall maintain and preserve its existence as a Delaware limited liability company and all material rights, privileges and franchises necessary or desirable in the conduct of its business and (b) the Borrower shall maintain its ownership interest in FOA.

**5.4**    **COMPLIANCE WITH LAW**. The Borrower shall promptly comply, or cause compliance, in all material respects with all Legal Requirements relating to the Credit Documents or the Collateral if failure to comply could reasonably be expected to have an adverse effect on the value or collectability of the Collateral.

**5.5**    **TAXES**.  Subject to the requirements of <u>Section 5.11</u>, the Borrower shall (a) timely file all tax returns, (b) pay, or cause to be paid, as and when due and prior to delinquency, all Taxes and all AK Obligations, assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to the Borrower, in Cash or other consideration (provided that such other consideration shall not include any offset of the State Tax Credits); and (c) shall remain a Pass-Through Entity.

**5.6**    **WARRANTY OF TITLE**.  The Borrower shall maintain good, marketable, legal and valid title to the Collateral free and clear of all Liens other than Permitted Encumbrances.

**5.7**    **BOOKS AND RECORDS**.  The Borrower shall maintain adequate books, accounts and records with respect to the Borrower and prepare all financial statements required hereunder in accordance with GAAP and in material compliance with the regulations of any Governmental Authority having jurisdiction thereof, and, subject to any applicable requirements of Applicable Law and safety requirements, permit employees or agents of the Administrative Agent and the Lenders at any reasonable times and upon reasonable prior notice to inspect all of the Borrower's Properties, to examine or audit all of its books, accounts and records and make copies and memoranda thereof, and to communicate with the auditors of the Borrower outside the presence of the Borrower.

**5.8**    **PRESERVATION OF RIGHTS; FURTHER ASSURANCES**.

**5.8.1**    The Borrower shall from time to time, execute, acknowledge, record, register, deliver and/or file all such notices, statements, instruments and other documents and pay any fees associated therewith (including any memorandum of lease or other agreement, financing statement, continuation statement, certificate of title or estoppel certificate) and take such other steps as may be necessary or advisable to render or maintain fully valid, perfected, protected and enforceable under all Applicable Laws, the rights, Liens and priorities of the Administrative Agent (on behalf of the Secured Parties) with respect to all Collateral and other security from time to time furnished under this Agreement and the other Credit Documents or intended to be so furnished, in each case in such form and at such times as shall be requested by the Administrative Agent.

**5.8.2**    The Borrower shall perform all acts that may be necessary to perfect the Lien granted to the Administrative Agent (on behalf of the Secured Parties) herein, including, unless otherwise performed by the Administrative Agent, the filing of UCC-1 financing statements and execution of other agreements in form and substance satisfactory to the Required Lenders acting reasonably, perform all acts that may be necessary to maintain, preserve, and protect the Collateral

and the perfection and priority of the Lien with respect to the Collateral granted to the Administrative Agent (on behalf of the Secured Parties) pursuant to the Security Documents, and properly and efficiently administer, operate, and maintain the Collateral, subject to the Intercreditor Agreements.

**5.9    SECURITY INTERESTS; FURTHER ASSURANCES**.  Promptly, upon the request of the Administrative Agent or the Required Lenders, at the expense of the Borrower, the Borrower shall execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Required Lenders necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Encumbrances, or obtain any consents or waivers as may be necessary or appropriate in connection therewith, to the extent required by the applicable Security Documents.  Upon the exercise by the Administrative Agent or the Required Lenders acting reasonably of any power, right, privilege or remedy pursuant to any Credit Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or the Required Lenders acting reasonably may require.

**5.10    INDEMNIFICATION**.

**5.10.1**  The Borrower shall indemnify, defend and hold harmless the Administrative Agent and each Lender, and, in their capacities as such, their respective Affiliates, officers, directors, shareholders, controlling Persons, employees, agents, advisors, members, successors and assigns (collectively, the "**Indemnitees**"), from and against and reimburse the Indemnitees for:

(a)    any and all claims (including without limitation, claims by the Borrower or Lender), obligations, liabilities, losses, damages, injuries (to person or property), penalties, actions, suits, judgments, costs and expenses of whatever kind or nature, whether or not well-founded, meritorious or unmeritorious, arising after the Effective Date, that are demanded, asserted or claimed against any such Indemnitee in any way relating to, or arising out of or in connection with, this Agreement, the other Credit Documents, the Collateral or the transactions contemplated herewith or thereunder in connection with any amendment, modification or waiver of the provisions of the Credit Documents and in connection with the exercise or enforcement of the rights and remedies of the Lenders and the Administrative Agent or enforcement of the obligations under the Credit Documents or in connection with the Loans, including all such Claims incurred during any workout, restructuring or negotiations in respect of the Obligations (collectively, "**Subject Claims**"), except for Subject Claims by the Borrower to enforce its rights under the Credit Documents against an Indemnitee; and

(b)    any and all Subject Claims arising in connection with the Release or presence of any Hazardous Substances, whether foreseeable or unforeseeable, including all reasonable costs of removal and disposal of such Hazardous Substances, all reasonable

US 7054423v.5 ING100/16001

costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and court costs.

**5.10.2**  No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrower or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnitee's actual fraud, gross negligence, or willful misconduct.  In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

**5.10.3**  The indemnities provided by the Borrower pursuant to this Section 5.10 shall not apply with respect to an Indemnitee to the extent finally determined by a court of competent jurisdiction as arising in whole or in part as a result of the actual fraud, gross negligence or willful misconduct of such Indemnitee, but shall continue to apply to other Indemnitees.  In addition, such indemnities shall not include or extend to any Subject Claims (a) incurred or suffered by any of the Indemnitees to the extent that such Indemnitee shall have expressly agreed in Section 9.4 herein to bear such Subject Claim without right of reimbursement or (b) that have not resulted from an act or omission by the Borrower or its Affiliates and has been brought by an Indemnitee against any other Indemnitee (other than any Claims against the Administrative Agent in its capacity as such or in fulfilling its role as an agent or similar role hereafter) (a "**Specified Claim**").

**5.10.4**  The provisions of this Section 5.10 shall survive foreclosure of the Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrower's obligations hereunder, shall be in addition to any other rights and remedies of the Lenders, and may not be amended, modified or waived in a manner adverse to any Indemnitee without each Lender's written consent.

**5.10.5**  In case any action, suit or proceeding shall be brought against any Indemnitee, such Indemnitee shall promptly notify the Borrower of the commencement thereof, provided that failure to provide any such notice shall not relieve the Borrower of its obligations set forth in this Section 5.10.

**5.10.6**  Any Indemnitee against whom any Subject Claim is made shall be entitled to compromise or settle any such Subject Claim; *provided* that such Indemnitee consults with and coordinates such compromise or settlement with the Borrower.  Any such compromise or settlement shall be binding upon the Borrower for the purposes of this Section 5.10.6.

**5.10.7**  Upon payment of any Subject Claim by the Borrower pursuant to this Section 5.10 or other similar indemnity provisions contained herein to or on behalf of an Indemnitee, the Borrower, without any further action, shall be subrogated to any and all claims that such Indemnitee may have relating thereto, and such Indemnitee shall cooperate with the Borrower and the Borrower's insurance carrier as may be reasonably requested by the Borrower to enable the Borrower to vigorously pursue such claims.  In the event that the Borrower shall have paid an amount to or on behalf of an Indemnitee in respect of any Subject Claim pursuant to the indemnification provisions of this Section 5.10 and such Indemnitee subsequently shall be reimbursed in respect of such Subject Claim from any other Person and, as a result, the aggregate

24

amount so received by such Indemnitee shall exceed the amount of such Subject Claim, then (a) so long as no Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Borrower an amount equal to the lesser of (i) the amount of such excess, (ii) the amount of such reimbursement from such other Person and (iii) the amount so paid by the Borrower and (b) if an Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Administrative Agent the amount otherwise payable pursuant to clause (a) of this sentence, for application by the Administrative Agent to any amounts due and owing under this Agreement.

**5.10.8**  Any amounts payable by the Borrower pursuant to this Section 5.10 shall be payable within five (5) Banking Days after the Borrower receives an invoice for such amounts from any applicable Indemnitee, and if not paid within such five (5)-Banking Day period shall bear interest at the applicable rate pursuant to Section 2.3.3 for late payments.

**5.10.9**  For the avoidance of doubt, the indemnification provisions set forth in this Section 5.10 shall be subject to Section 7.2.6.

**5.11**  STATE TAX CREDITS.

(a)  The Borrower shall cause the proceeds of all State Tax Credits to be deposited into the Agent Account and shall be applied in accordance with the order of priority set forth in the Tax Credit Intercreditor Agreement.  In the event that the Borrower receives any proceeds of any State Tax Credits, the Borrower shall hold such proceeds in trust for the Lenders and shall immediately turn over and deliver to the Administrative Agent all such proceeds, in kind, and in the exact form received.  The Borrower shall endorse any instrument or other form of payment that is payable to the Borrower that represents proceeds of any of the State Tax Credits in favor of the Lenders.

(b)  The Borrower shall promptly take all such actions necessary and appropriate under the laws of the State of Alaska in order for the Administrative Agent to collect and receive in full the amounts reflected in each Alaska Tax Credit Application, including (i) compliance with the provisions of AS 43.55.028(e), and (ii) upon the request of the Administrative Agent, the filing and diligent pursuit of an appropriate appeal relating to the DOR's denial or reduction of any State Tax Credits or proceeds thereof that have been applied for pursuant to any Alaska Tax Credit Application or DOR Purchase Application (with all costs and expenses of any such appeal borne solely by the Borrower).

(c)  The Borrower shall transmit all data, information, reports and returns to the DOR or DNR, as applicable, in accordance with the requirements of AS 43.55 and 15 AAC 55 and as otherwise requested by the DOR or DNR, as applicable, in each case with a copy to the Administrative Agent.

(d)  The Borrower shall promptly, but in any event within three (3) Banking Days after the receipt thereof, deliver to the Administrative Agent and the Lenders copies of any notice, request or other document received by a Responsible Officer of the Borrower pursuant to or in connection with the State Tax Credits of the Borrower or any Alaska Tax Credit Applications therefor or any Tax Credit Assignments thereof, whether from the DOR, the State of Alaska or otherwise, or any notice, request or other document sent by

25

the Borrower to any such Person relating to any of the foregoing, in each case unless all of the information contained in such notice or correspondence is generally available to the public.

(e)    To the extent the Borrower fails to timely take any action required by this Section 5.11 to collect and receive in full the amounts reflected in each Alaska Tax Credit Application, in addition to all other remedies available to the Administrative Agent and the Lenders, the Administrative Agent may, in its discretion, take any such action, and the Borrower hereby appoints the Administrative Agent as its attorney in fact to take any such action on behalf of the Borrower, which appointment is irrevocable and coupled with an interest.

## ARTICLE 6.
## NEGATIVE COVENANTS

Until the Termination Date:

**6.1    DEBT, LIENS AND OTHER ENCUMBRANCES.**

**6.1.1**    The Borrower shall not incur, create, assume or permit to exist any Debt, except Permitted Debt.

**6.1.2**    The Borrower shall not (a) create, assume or suffer to exist any Lien or any other encumbrances on the Collateral, except Permitted Encumbrances, except for Liens securing the Second Lien Obligations and the New Term Loan Obligations, in each case in accordance with the Tax Credit Intercreditor Agreement, or (b) assign any right to receive State Tax Credit Proceeds.

**6.2    RESTRICTIONS ON ASSET SALES.** The Borrower shall not sell, lease, assign, transfer or otherwise dispose of any assets (including without limitation any Equity Interests or working interests), whether now owned or hereafter acquired, except, to the extent permitted by the Indemnity Agreement, (a) sales of as-extracted hydrocarbons in the ordinary course of its business and at fair market value and for Cash (excluding, for the avoidance of doubt, any forward sale or volumetric or dollar denominated production payment), (b) sales, leases, assignments, transfers or other disposals of assets that are worn out or no longer usable in connection with the operation or maintenance of the Borrower's business for Cash and at fair market value, or (c) other sales, leases, assignments, transfers or other disposals of assets that are: (i) in the ordinary course of business, (ii) for fair market value (as determined by the Required Lenders acting reasonably), (iii) in exchange for 100% Cash or Cash Equivalent consideration and (iv) either (x) in an aggregate amount not to exceed $100,000 in any fiscal year of the Borrower or (y) result in proceeds that are sufficient to fully repay all of the outstanding Obligations in accordance with the Intercreditor Agreements, (d) assignments, encumbrances or pledges of State Tax Credits and the proceeds thereof pursuant to Tax Credit Loan Documents and the New Term Loan Documents and the New Term Loan Documents to the secured parties thereunder or (e) if approved by the Administrative Agent, sales, leases, assignments, transfers or other disposals of assets among Cornucopia and its Affiliates.

US 7054423v.5 ING100/16001

**6.3    DISSOLUTION**. The Borrower shall not wind up, liquidate or dissolve its affairs, or sell, lease or otherwise transfer or dispose of all or substantially all of its property, assets or business.

**6.4    AMENDMENTS TO ORGANIZATIONAL DOCUMENTS**. The Borrower shall not directly or indirectly, change its legal form or any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its limited liability company interest or otherwise terminate, amend or modify any such Organizational Document or agreement or any provision thereof, or enter into any new agreement with respect to its limited liability company interest, other than any such amendments, modifications or changes or such new agreements that could not reasonably be expected to materially and adversely impact the rights of the Lenders and the Administrative Agent under this Agreement and the other Credit Documents, taken as a whole.

**6.5    SUBSIDIARIES AND JOINT VENTURES**.  The Borrower shall not (a) fail to maintain bank accounts and books of account separate from any other Person, (b) fail to cause its liabilities to be readily distinguishable from the liabilities of another Person, or (c) fail to conduct its business solely in its own name in a manner not misleading to other Persons as to its identity.

**6.6    PROHIBITION ON ISSUANCE OF EQUITY INTEREST**.  The Borrower shall not issue any additional Equity Interest on or following the Effective Date unless such issuance is approved by the Required Lenders acting reasonably.

**6.7    NAME AND LOCATION; FISCAL YEAR**.  The Borrower shall not change its name, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise), jurisdiction of organization, type of organization, sole place of business, chief executive office or fiscal year or establish any trade names unless such change is approved by the Required Lenders acting reasonably.

**6.8    ACCOUNTS**.  The Borrower shall not maintain any deposit or securities accounts other than (a) deposit accounts and securities accounts subject to Control Agreements, (b) as permitted under the AIDEA Loan Documents, (c) each collateral account holding initial margin, variation margin and collateral or other performance assurance provided to the Borrower by counterparties to the Borrower's or FOA's Contractual Obligations and (d) accounts holding performance assurances of the Borrower or FOA to Governmental Authorities pursuant to Applicable Law.

**6.9    TAX CREDITS**.  The Borrower shall not:

(a)    (i) grant any extension of time for payment or modify in any respect the terms of the State Tax Credits, Alaska Tax Credit Applications, Tax Credit Assignments or DOR Purchase Applications; (ii) compromise or settle any amounts evidenced by the State Tax Credits or owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program; (iii) release in whole or in part the State of Alaska, the DOR or any other Person liable for payment of the amounts evidenced by the State Tax Credits or amounts owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program; or (iv) grant any credits, discounts, allowances, deductions or the like

27

with respect to any amounts evidenced by the State Tax Credits or owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program.  In the event the DOR determines the dollar amount to be received in connection with the State Tax Credits will be less than the face amount of the State Tax Credits, the Borrower shall have the right to contest or appeal such action by the DOR, provided that (A) no Default or Event of Default has occurred and is continuing and (B) the Borrower is contesting or appealing such action in good faith by appropriate proceedings promptly instituted and diligently conducted.  In the event that the Borrower fails to take action with respect to the enforcement of the State Tax Credits as directed by the Administrative Agent pursuant to the preceding sentence, the Administrative Agent shall have the absolute and unlimited right to take any and all steps in the Borrower's name as are necessary or appropriate, in the determination of the Administrative Agent, to collect all amounts due in connection with the State Tax Credits;

(b)      hinder, delay or interfere with payment of the proceeds of the State Tax Credits to the Administrative Agent or otherwise fail to reasonably cooperate with and assist the Administrative Agent in connection with the Administrative Agent's handling and collection of the amounts reflected in the State Tax Credits;

(c)      amend, modify, supplement, revoke or terminate the powers of attorney, waivers of confidentiality, electronic payment agreements, State Tax Credit, Tax Credit Assignments or DOR Purchase Applications that have been filed with the DOR or the Department of Administration of the State of Alaska, as applicable, except upon the prior written consent of the Administrative Agent; or

(d)      take any action or fail to refrain from taking any action that, in the opinion of Alaska counsel to the Administrative Agent, could reasonably be expected to result in the withholding by the State of Alaska of any payments in respect of the State Tax Credits.

**6.10    COMPLIANCE WITH ANTI-TERRORISM LAWS**. The Borrower shall not:

(a)      directly or indirectly, (i) conduct any operations in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (ii) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

(b)      directly or indirectly, cause or permit any of the funds of the Borrower that are used to repay the Loans or other Obligations to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws; and

(c)      cause or permit (i) a Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Borrower or (ii) any of the funds or properties

28

of the Borrower that are used to repay the Loans or other Obligations to constitute property of, or be beneficially owned directly or indirectly by, a Sanctioned Person.

The Borrower shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender, confirming the compliance by the Borrower of this <u>Section 6.10</u>.

## ARTICLE 7.
## EVENTS OF DEFAULT; REMEDIES

**7.1    EVENTS OF DEFAULT**.   The occurrence of any of the following events shall constitute an event of default (each an "**Event of Default**") hereunder:

**7.1.1    *Failure to Make Payments*.**   The Borrower or the Sponsor shall fail to pay, in accordance with the terms of this Agreement, (a) any principal (including PIK Interest) of the Loans on the date that such sum is due or (b) any interest on the Loans or any other Obligation, any scheduled fee, cost, charge, sum or amount due hereunder or under the other Credit Documents, or any other fee, cost, charge, sum or other amount due under this Agreement within three (3) Banking Days after such sum is due.

**7.1.2    *Violation of Covenants*.**

(a)    The Borrower fails to perform or observe any of the covenants set forth in <u>Sections 5.2(c)</u> (*Notice of Default*), <u>5.3</u> (*Existence; Maintenance of Contracts*), <u>5.5</u> (*Taxes*), <u>5.6</u> (*Warranty of Title*), <u>5.11</u> (*Tax Credits*) or <u>Article 6</u>.

(b)    The Borrower or the Sponsor shall fail to perform or observe any other covenant to be observed or performed by it hereunder or any other Credit Document not otherwise specifically provided for in clause (a) above and such failure shall continue unremedied for a period of 10 days after a Responsible Officer of the Borrower or the Sponsor becomes aware thereof or the Borrower or the Sponsor receives written notice thereof from the Administrative Agent.

(c)    The Borrower or the Sponsor shall fail to perform or observe any of the covenants set forth in Sections 2 or 3, in each case, of the Indemnity Agreement.

(d)    Any Credit Document or any material provision thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by the Borrower or the Sponsor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or the Borrower or the Sponsor shall repudiate or deny any portion of its liability or obligation for the Obligations.

**7.1.3    *Representations and Warranties*.**   Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or the Sponsor herein or in any other Credit Document or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made (except to the extent qualified as to materiality (including Material Adverse Effect) in which case a default shall occur if such

representation, warranty, certification or statement of fact made or deemed to be made shall be untrue in any respect).

**7.1.4** *Change of Control*.  A Change of Control occurs.

**7.1.5** *Bankruptcy or Insolvency*.  The Borrower or the Sponsor shall become subject to a Bankruptcy Event.

**7.1.6** *Judgments*.  A final judgment or judgments (including with respect to Environmental Claims) shall be entered against the Borrower in the amount of $100,000 or more individually or in the aggregate or a final judgment shall be entered against the Borrower which if left unstayed could reasonably be expected to result in losses or liabilities in excess of $100,000 or a Material Adverse Effect (other than (a) a judgment which is fully covered by insurance (subject to applicable deductibles) as to which the insurer does not dispute coverage or is discharged within 30 days after its entry, or (b) a judgment the execution of which is effectively stayed within 30 days after its entry unless, after the entry of such stay, there shall be a period of more than 30 consecutive days during which the execution of such judgment is not effectively stayed).

**7.1.7** *Debt Cross Default*.  (a) Breach or default by the Borrower with respect to any other material term of (i) one or more items of Debt (other than the Credit Facility) in the individual principal amount of $50,000 or more or with an aggregate principal amount of $50,000 or more or (ii) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Debt, in each case beyond the grace period, if any, provided therefor, and the effect (but without giving effect to any waivers or extensions granted by any such holder of such Debt (or a trustee or agent on behalf of such holder or holders)) of the occurrence of such breach or default is to cause, such Debt to be demanded or to become or be declared due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be or (b) an Event of Default (as defined in the Second Lien Credit Agreement) has occurred and is continuing under the Second Lien Credit Agreement, except to the extent that the required lenders party thereto have agreed to forbear from exercising remedies in connection with such Event of Default (as defined in the Second Lien Credit Agreement) (and in such case, for the period of such forbearance, no Event of Default shall occur under this Agreement).

**7.1.8** *Invalidity of Documents*.

    (a)    Any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect;

    (b)    the Borrower, the Sponsor or any other Person party thereto (other than the Administrative Agent) contests in writing the validity or enforceability of any provision of any Credit Document; or

    (c)    the Borrower or the Sponsor denies in writing that it has any or further liability or obligation under any Credit Document, or purports in writing to revoke, terminate or rescind any Credit Document.

30

**7.1.9**    *State Tax Credits*.

(a)    The State of Alaska shall have not caused to be deposited into the Agent Account proceeds of the State Tax Credits in an amount not less than the outstanding Obligations by the Maturity Date, and such Obligations have not been paid in full.

(b)    Any event or other development occurs as a result of which it is reasonably likely that the State of Alaska will not pay proceeds of the State Tax Credits in an amount greater than or equal to the outstanding Obligations by the Maturity Date.

**7.1.10**    *Security*.    Any of the Security Documents, once executed and delivered, shall, except as the result of the acts or omissions of the Administrative Agent with respect to any Collateral in its possession, fail to provide the Administrative Agent the Liens (or the priority thereof), rights, titles, interest, remedies permitted by law, powers or privileges intended to be created thereby with respect to the Collateral or, except in accordance with its terms, cease to be in full force and effect, or the priority or validity thereof (except as permitted hereby) or the applicability thereof to the Loans, the Obligations or any other obligations purported to be secured or guaranteed thereby or any part thereof shall be disaffirmed in writing by or on behalf of the Borrower or the Sponsor.

**7.2**    **REMEDIES**.    Upon the occurrence and during the continuation of an Event of Default, subject to the Intercreditor Agreements, the Administrative Agent is vested with the exclusive right to, and shall, at the election of the Required Lenders, without further notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind, all such notices and demands being waived, exercise any or all of the following cumulative and non-exclusive rights and remedies, in any combination or order that the Required Lenders may elect, in addition to such other rights or remedies as the Lenders may have hereunder, under the Security Documents, any instrument, document or agreement now existing or hereafter arising, or at law or in equity (it being agreed and understood that the Lenders vest the Administrative Agent with the exclusive right to exercise such rights and remedies):

**7.2.1**    *Cure by the Administrative Agent*.    Without any obligation to do so, make disbursements on behalf of the Borrower to cure any Event of Default hereunder and to cure any default and render any performance under any Material Contracts as the Required Lenders in their sole discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Administrative Agent's and Lenders' interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by the Borrower to the Administrative Agent on demand and secured by the Credit Documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the aggregate amount of the Credit Facility.

**7.2.2**    *Acceleration*.    Declare and make all sums of outstanding principal (including PIK Interest), all accrued but unpaid interest remaining under this Agreement and any outstanding Loans and other Obligations, together with all unpaid fees, costs and charges due hereunder or under any other Credit Document (the "**Acceleration Amounts**"), immediately due and payable and require the Borrower, immediately, without presentment, demand, protest or other notice of

any kind, all of which the Borrower hereby expressly waives, to pay the Administrative Agent or the Lenders, as applicable an amount in immediately available funds equal to the aggregate amount of all such Acceleration Amounts; *provided* that in the event of an Event of Default occurring under Section 7.1.5 with respect to the Borrower, all such amounts shall become immediately due and payable without further act of the Administrative Agent or the Lenders *provided further,* that the Borrower's obligation to pay Acceleration Amounts is non-recourse and limited to the proceeds of the Collateral in accordance with Section 2.1.1(c).

**7.2.3**    *Cash Collateral.*  Apply or execute upon any amounts on deposit or any proceeds or any other moneys of the Borrower on deposit with the Administrative Agent or any Lender (as applicable) in the manner provided in the UCC and other relevant Applicable Law with respect to Cash collateral.

**7.2.4**    *Foreclose on Collateral.*  Exercise any or all of its rights as a secured creditor under the UCC, and any or all rights granted by this Agreement and by law, including the right to require the Borrower to assemble the Collateral and make it available to the Administrative Agent at a place to be designated by the Administrative Agent.  The Borrower hereby agrees that three (3) Banking Days' notice of a public sale of any Collateral or notice of the date after which a private sale of any Collateral may take place is commercially reasonable.

**7.2.5**    *Remedies Under Credit Documents*. Exercise any and all rights and remedies available to it under any of the Credit Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral pursuant to the Security Documents.

**7.2.6**    *Non-Recourse*.  Notwithstanding anything to the contrary herein and except as provided in the Indemnity Agreement, (a) neither the Borrower nor the Sponsor, FOA or Corsair are personally liable for any of the Obligations and one of them shall have any duty to pay the Obligations other than from proceeds of the Collateral, and (b) the rights and remedies of the Administrative Agent and Lenders under this Agreement with respect to the Obligations are limited to recourse against the Collateral as provided in the Security Documents.

Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document to the contrary, each Lender expressly and irrevocably (a) waives any right to take or institute any actions or proceedings, judicial or otherwise, for any right or remedy or assert any other cause of action against the Borrower, the Sponsor or their respective Subsidiaries whether with respect to any Collateral, any other property of any such entity or otherwise, without the prior written consent of the Administrative Agent (which shall not be withheld if directed by the Required Lenders acting reasonably) and (b) subject to the terms set forth herein, each Lender vests the Administrative Agent, acting at the instructions of the Required Lenders acting reasonably, with the exclusive right to enforce rights, exercise remedies (including setoff rights) and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral; provided, that (i) in exercising the rights and remedies with respect to the Collateral, the Administrative Agent, acting at the direction of the Required Lenders, may enforce the provisions of the Credit Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion and (ii) such exercise and enforcement shall include the rights of the Administrative Agent (or any other agent appointed by Required Lenders) to sell or otherwise dispose of the Collateral upon foreclosure, to incur expenses

32

in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction, under the Credit Documents and as provided under the bankruptcy laws or any other laws of any applicable jurisdiction.

## ARTICLE 8.
## THE AGENT; SUBSTITUTION

### 8.1    APPOINTMENT, POWERS AND IMMUNITIES.

**8.1.1**    Each Lender hereby appoints and authorizes the Administrative Agent to act by or through its officers, directors, agents, employees or Affiliates as its agent hereunder and under the other Credit Documents with such powers as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement or in any other Credit Document, or be a trustee or fiduciary for any Lender and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein.  Notwithstanding anything to the contrary contained herein, the Administrative Agent shall not be required to take any action which is contrary to this Agreement or any other Credit Documents or any Legal Requirement or exposes the Administrative Agent to any liability.  None of the Administrative Agent, any Lender or any of their respective Affiliates shall be responsible to any other Lender for any recitals, statements, representations or warranties made by the Borrower or any of its Affiliates contained in this Agreement or in any certificate or other document referred to or provided for in, or received by the Administrative Agent, or any Lender under this Agreement, for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any Notes or any other document referred to or provided for herein or for any failure by the Borrower or any of its Affiliates to perform their respective obligations hereunder or thereunder.  The Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care.

**8.1.2**    The Administrative Agent and its directors, officers, employees or agents shall not be responsible for any action taken or omitted to be taken by it or them hereunder or under any other Credit Document or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  Without limiting the generality of the foregoing, the Administrative Agent:

> (a)    may treat the payee of any Note as the holder thereof until the Administrative Agent receives an Assignment Agreement or other written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to the Administrative Agent;

33

(b)       may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by them in accordance with the advice of such counsel, accountants or experts;

(c)       makes no warranty or representation to any Lender for any statements, warranties or representations made in or in connection with any Material Contract or Credit Document;

(d)       shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Credit Document on the part of any party thereto or to inspect the property (including the Books and Records) of the Borrower, the Sponsor or any other Person;

(e)       shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Credit Document or any other instrument or document furnished pursuant hereto; and

(f)       may rely solely on the approval, direction or consent of the Required Lenders (except in circumstances in which the approval, direction or consent of all of the Lenders is expressly required hereunder or under any other Credit Document), in each case, in making any determination hereunder or under any other Credit Document.

Except as otherwise provided under this Agreement, upon the Administrative Agent's receipt of instruction from the Required Lenders, the Administrative Agent shall take any action (or refrain from taking any action) permitted to be taken by it under this Agreement or any of the other Credit Documents.  If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

**8.1.3**    Except for any action expressly required of the Administrative Agent hereunder, it shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction from the Lenders of their indemnification obligations under Section 8.5 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  No provision of this Agreement or any Credit Document shall require the Administrative Agent to take any action that it reasonably believes to be contrary to Applicable Law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

US 7054423v.5 ING100/16001

**8.2    RELIANCE BY THE ADMINISTRATIVE AGENT**.  The Administrative Agent shall be entitled to rely upon any certificate, notice or other document (including any cable, telegram, telecopy or written electronic communication) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent engineers, insurance consultants, independent accountants and other experts selected by the Administrative Agent.  As to any other matters not expressly provided for by this Agreement, the Administrative Agent shall not be required to take any action or exercise any discretion, but shall be required to act or to refrain from acting upon instructions of the Required Lenders (except that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, any other Credit Document or any Legal Requirement) and shall in all cases be fully protected in acting, or in refraining from acting, hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders (or, where so expressly stated, all of the Lenders), and such instructions of the Required Lenders (or all of the Lenders, where applicable) and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders.

**8.3    NON-RELIANCE**.  Each Lender represents that it has independently and without reliance on the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of the financial condition and affairs of the Borrower and decision to enter into this Agreement and agrees that it will, independently and without reliance upon the Administrative Agent, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisals and decisions in taking or not taking action under this Agreement.  None of the Administrative Agent or any Lender shall be required to keep informed as to the performance or observance by the Borrower or its Affiliates under this Agreement or any other document referred to or provided for herein or to make inquiry of, or to inspect the Properties or Books and Records of, the Borrower or its Affiliates.

**8.4    DEFAULTS**.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received a written notice from a Lender or the Borrower, referring to this Agreement, describing such Default or Event of Default and indicating that such notice is a notice of default.  If the Administrative Agent receives such a notice of the occurrence of a Default or an Event of Default, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as is provided in Article 7 or if not provided for in Article 7, as the Administrative Agent shall be reasonably directed by the Required Lenders; *provided, however,* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interest of the Lenders.

**8.5    INDEMNIFICATION**.  Without limiting the Obligations of the Borrower hereunder, each Lender agrees to indemnify the Administrative Agent, ratably in accordance with its Proportionate Share, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of this Agreement, the other Credit Documents or any documents

35

contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or the enforcement of any of the terms hereof or thereof; *provided, however,* that no Lender shall be liable for any of the foregoing to the extent they arise from the Administrative Agent's gross negligence or willful misconduct.  The Administrative Agent shall be fully justified in refusing to take or to continue to take any action hereunder unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent in connection with the preparation, execution, administration or enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

**8.6    SUCCESSOR ADMINISTRATIVE AGENT**.  The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower.  The Administrative Agent may be removed involuntarily only for a material breach of its duties and obligations hereunder or under the other Credit Documents or for gross negligence or willful misconduct in connection with the performance of its duties hereunder or under the other Credit Documents and then only upon the affirmative vote of the Required Lenders.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 10 days after the retiring Administrative Agent's giving of notice of resignation or the Lenders' removal of the retiring Administrative Agent, the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a Lender, if any Lender shall be willing to serve, and otherwise shall be a commercial bank having a combined capital and surplus of at least $50,000,000.  Upon the acceptance of any appointment as the Administrative Agent under the Credit Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations as the Administrative Agent only under the Credit Documents.  After any retiring Administrative Agent's resignation or removal hereunder as the Administrative Agent, the provisions of Section 5.10 and this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Credit Documents.

**8.7    AUTHORIZATION**.  The Administrative Agent is hereby authorized by each Lender to execute, deliver and perform each of the Credit Documents to which the Administrative Agent is or is intended to be a party and each Lender agrees to be bound by all of the agreements of the Administrative Agent contained in the Credit Documents.  The execution, delivery and performance by the Administrative Agent in respect of Credit Documents entered into prior to the Effective Date is hereby ratified and affirmed.  Without limiting the generality of the foregoing, each Lender (a) consents to the terms and provisions of the Intercreditor Agreement, (b) agrees that it is and will be bound (as a Lender) by the terms and conditions of the Intercreditor Agreement, whether or not such Lender executes such agreement, (c) authorizes the Administrative Agent to enter into the Intercreditor Agreement and (d) agrees that it will not take any actions contrary to the provisions of the Intercreditor Agreement.  The Administrative Agent is further authorized by each Lender (i) to release Liens on property (including any Collateral

36

granted or held by it) (A) upon payment in full of all Obligations (other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no Claim has been asserted), (B) that the Borrower is permitted to sell or transfer or otherwise dispose of pursuant to the terms of this Agreement and the other Credit Documents or (C) if approved, authorized or ratified in writing in accordance with Section 8.9, and (ii) to enter into agreements supplemental hereto for the purpose of curing any formal defect, inconsistency, omission or ambiguity in this Agreement or any other Credit Document to which it is a party.

**8.8** **THE ADMINISTRATIVE AGENT**.  With respect to the Loans held by it and any Note issued to it, the Administrative Agent shall have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Administrative Agent.  The term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with the Borrower or any other Person, without any duty to account therefor to the Lenders.

**8.9** **AMENDMENTS; WAIVERS**.  Subject to the provisions of this Section 8.9, unless otherwise specified in this Agreement or another Credit Document, the Required Lenders (or the Administrative Agent with the consent in writing of the Required Lenders acting reasonably) and the Borrower may enter into agreements supplemental hereto for the purpose of adding, amending, modifying or waiving any provisions to the Credit Documents or changing in any manner the rights of the Lenders or the Borrower hereunder or waiving any Default or Event of Default; *provided, however,* that:

(a)    no such supplemental agreement shall:

(i)    without the consent of all of the Lenders affected thereby, modify or waive the requirements under Section 2.1.1(c) (*Loan Principal Payment*), 2.1.4(b) (*Optional Prepayment*), 2.1.4(c) (*Mandatory Prepayment*), 2.4 (*Pro Rata Treatment*), 2.5 (*Change of Circumstances*), 8.1 (*Appointment, Powers and Immunities*), 8.12 (*Participation*) or 8.13 (*Transfer of Loans*);

(ii)    without the consent of all Lenders, modify or waive the requirements under any other provision of any Credit Document specifically requiring the consent of or waiver by all of the Lenders;

(iii)    without the consent of all of the Lenders affected thereby, extend the Maturity Date;

(iv)    without the consent of all of the Lenders affected thereby, reduce the amount or extend the payment date for any amount due hereunder, whether principal, interest, fees or other amounts;

(v)    without the consent of all Lenders, reduce the percentage specified in the definition of Required Lenders;

(vi)    without the consent of all Lenders, amend this Section 8.9; or

37

(vii)    without the consent of all Lenders, release any Collateral from the Lien of any of the Security Documents or release any party acting as a guarantor under a Credit Document (except as specifically permitted by the terms of the relevant Credit Document); and

(b)    no such supplemental agreement shall, without the consent of the Administrative Agent, change the Administrative Agent's duties, obligations, rights, remedies, indemnities or immunities;

*provided,* that any waiver, amendment or modification of any Intercreditor Agreement (and any related definitions) may be effected by an agreement or agreements in writing entered into among the Administrative Agent and the Required Lenders (or the Administrative Agent with the consent in writing of the Required Lenders) without the consent of the Borrower, so long as such amendment, waiver or modification does not impose any additional duties or obligations on the Borrower, alter or impair any right of or otherwise adversely affect the Borrower under the Credit Documents.

**8.10    WITHHOLDING TAX**.

**8.10.1**  The Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the forms or other documentation required by Section 2.3.5 are not delivered to the Administrative Agent, then the Administrative Agent may withhold from any payment to any Lender not providing such forms or other documentation, an amount equivalent to the applicable withholding tax.  Nothing in this Section 8.10.1 shall relieve the Borrower of its obligations with respect to Indemnified Taxes and Other Taxes provided in Section 2.3.4.

**8.10.2**  Subject to Section 2.3.4, if the Administrative Agent reasonably determines that any payment under this Agreement has been made to a Lender without an applicable Tax being properly withheld for whatever reason or if the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender,  such Lender shall immediately pay the Administrative Agent any such applicable withholding taxes to the extent not previously deducted and indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred in connection therewith, including legal expenses, allocated staff costs, and any out-of-pocket expenses.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or the Note against any amount due the Administrative Agent under this Section 8.10.2.

**8.10.3**  If any Lender sells, assigns, grants participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of Sections 2.3.5, 8.10.1 and 8.10.2 as though it were such Lender.

**8.11    GENERAL PROVISIONS AS TO PAYMENTS**.    The Administrative Agent shall promptly distribute to each Lender, subject to the terms of the assignment and assumption

38

agreement between the Administrative Agent and such Lender, its Proportionate Share of each payment of principal and interest payable to the Lenders on the Loans and of fees hereunder received by the Administrative Agent for the account of the Lenders and of any other amounts owing under the Loans, in accordance with the provisions of <u>Section 2.4</u>.  The payments made for the account of each Lender shall be made, and distributed to it, at its Lending Office designated in <u>Exhibit C</u>, as the same may be modified in accordance with the provisions of <u>Section 2.6.3</u>.

 **8.12** **PARTICIPATION**.  Subject to the applicable provisions of <u>Section 8.13</u> and this <u>Section 8.12</u>, nothing herein provided shall prevent any Lender from selling a participation in its Loans; *provided* that (a) (i) no such sale of a participation shall alter such Lender's or the Borrower's obligations hereunder, (ii) such Lender's obligations hereunder shall remain unchanged, (iii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (b) such Lender shall (and any agreement pursuant to which any Lender may grant a participation in its rights with respect to its Loans shall provide that such Lender shall), with respect to such Loans, retain the sole right and responsibility to exercise the rights of such Lender, and enforce the obligations of the Borrower relating to such Loans, including the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document and the right to take action to have the Notes declared due and payable pursuant to <u>Article 7</u> (without, for the avoidance of doubt, any voting agreements between such Lender and such participant with respect thereto).  The Borrower agrees that each participant of the Loans of any Lender shall be entitled to the benefits of <u>Section 2.3.4</u> and <u>2.5</u> (subject to the requirements and limitations therein, including the requirements under <u>Section 2.3.5</u> (it being understood that the documentation required under <u>Section 2.3.5</u> shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>Section 8.13</u>; *provided* that such participant (A) agrees to be subject to the provisions of <u>Section 2.6</u> as if it were an assignee under <u>Section 8.13</u>; and (B) shall not be entitled to receive any greater payment under <u>Section 2.3.4</u> and <u>2.5</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change of Law that occurs after the participant acquired the applicable participation.  Any Lender may, in connection with any participation or proposed participation pursuant to this <u>Section 8.12</u>, disclose to the participant or proposed participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided, however,* that, prior to any such disclosure, the participant or proposed participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in <u>Section 9.7</u>.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the **"Participant Register"**); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any loans or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded

in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. Any Lenders that grant a participation hereunder shall provide prompt notice thereof to the Administrative Agent and the other Lenders. Notwithstanding anything herein to the contrary, no Lender shall enter into any voting agreement, or any similar agreement that would have a similar practical effect, with any other Lender.

**8.13    TRANSFER OF LOANS**. Notwithstanding anything else herein to the contrary, any Lender, after (x) delivering to the Administrative Agent a written notice in the form of Exhibit F, appropriately completed (an **"Assignment Agreement"**), (y) receiving the Administrative Agent's prior written consent (unless such assignment is to an Affiliate of such Lender), which will not be unreasonably withheld may from time to time, at its option, sell, assign, transfer, negotiate or otherwise dispose of all or a portion of its Loans made hereunder (including the Lender's interest in this Agreement and the other Credit Documents) to its Affiliates or to any bank, financial, lending or other entity or institution or fund (an "**Eligible Assignee**") (a) which in such assigning Lender's judgment is reasonably capable of performing the obligations of a Lender hereunder, and (b) which would not otherwise then increase any costs payable by the Borrower pursuant to Section 2.3.4, Section 2.3.5, Section 2.5.1 or Section 2.5.2; *provided, however,* that no Lender (including any assignee of any Lender) may assign any portion of its Loans in an amount less than $250,000 (unless (i) to another Lender or an Affiliate of any Lender or (ii) in the event that a Lender may be left with no Loans if it assigns its entire Loans); and *provided further* that notwithstanding anything to the contrary, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (A) a natural Person or (B) to the Sponsor, the Borrower or any of their respective Subsidiaries.

In the event of any such assignment,

(a)    the assigning Lender's Proportionate Share shall be reduced by the amount of the Proportionate Share assigned to the new lender,

(b)    the parties to such assignment shall execute and deliver an Assignment Agreement evidencing such sale, assignment, transfer or other disposition,

(c)    at the new Lender's option, the Borrower shall execute and deliver to such new lender a Note, as requested, in a principal amount equal to such new lender's (without duplication) Loans, and the Borrower shall if requested execute and exchange with the assigning Lender a replacement note for any Note in an amount equal to the (without duplication) Loans retained by the Lender, if any, and

(d)    the Administrative Agent shall amend Schedule I attached hereto and the Register to reflect the Proportionate Shares of the Lenders following such assignment.

Thereafter, such new lender shall be deemed to be a Lender and shall have all of the rights and duties of a Lender (except as otherwise provided in this Article 8), in accordance with its Proportionate Share, under each of the Credit Documents. The entries on Schedule I maintained pursuant to this Section 8.13 and the Register shall be prima facie evidence of the existence of the

amounts of the obligations recorded therein; *provided* that the failure of the Administrative Agent to maintain and amend such schedule shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.  Any assigning Lender may, in connection with any assignment or proposed assignment pursuant to this Section 8.13, disclose to the assignee or proposed assignee any information relating to the Borrower or its Properties furnished to such Lender by or on behalf of the Borrower; *provided, however*, that, prior to any such disclosure, the assignee or proposed assignee shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in Section 9.7.

Notwithstanding anything in this Section 8.13, Section 8.12 or the definition of "Required Lenders," to the contrary, for purposes of determining whether the Required Lenders or the Lenders, as applicable, have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or any departure by the Sponsor or the Borrower therefrom or, subject to the following paragraph, any plan of reorganization pursuant to the Bankruptcy Code, or (ii) otherwise acted on any matter related to any Credit Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Credit Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action and:

> (i)     all Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

> (ii)    all Loans held by Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

Notwithstanding anything in this Agreement or the other Credit Documents to the contrary, each Affiliated Lender hereby agrees that and each Affiliated Lender Assignment Agreement shall provide a confirmation that, if a proceeding under any debtor relief law shall be commenced by or against the Borrower, FOA or the Sponsor at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliated Lender with respect to the Loans held by such Affiliated Lender in any manner, unless the Administrative Agent instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Loans held by it as the Administrative Agent directs; provided that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliated Lenders.

US 7054423v.5 ING100/16001

**8.14    ASSIGNABILITY AS COLLATERAL**.  Notwithstanding any other provision contained in this Agreement or any other Credit Document to the contrary, any Lender may assign as collateral security all or any portion of the Loans or Notes held by it in favor of any Federal Reserve Lender in accordance with Regulation A of the Board of Governors of the Federal Reserve System or any central bank having jurisdiction over such Lender; *provided* that any payment in respect of such assigned Loans or Notes made by the Borrower to or for the account of the assigning or pledging Lender in accordance with the terms of this Agreement shall satisfy the Borrower's obligations hereunder in respect of such assigned Loans or Notes to the extent of such payment. No such assignment shall release the assigning Lender from its obligations hereunder.

**8.15    REGISTER**.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain records of any assignment of rights and obligations of Lenders under this Agreement and keep a register (the "**Register**") for recordation of the names and addresses of each Lender, and the principal amounts (and stated interest) of the Loans owing to each Lender.  The entries in such register shall be conclusive in the absence of any manifest or demonstrable error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender (but only to the extent of entries in the Register that are applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

## ARTICLE 9.
## MISCELLANEOUS

**9.1    ADDRESSES**.  Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to the Administrative Agent:

ING Capital LLC
1133 Avenue of Americas
New York, NY 10036
Attention: Global Securitization
Telecopy: (646) 424 6077
Telephone: (646) 424 7059
Attention: Peter Clinton
E-mail: peter.clinton@ing.com
Attention: Thomas Ryan
E-mail: Thomas.ryan@ing.com
Attention: Yury Marasanov
E-mail: yury.marasanov@ing.com

42

If to the Borrower:

Cornucopia Oil & Gas Company, LLC
Attention: Kevin Hemenway
188 West Northern Lights Blvd., Suite 620
Anchorage, AK 99503
Phone: 907-565-2011
Fax : 907-277-3796
Email: hemenwayk@aol.com

With a copy (which will not constitute notice) to:

David H. Bundy, Esq.
721 Depot Drive
Anchorage AK 99501
Phone: (907) 248-8431
E-mail: dhb@alaska.net

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service, (c) in the event overnight delivery services are not readily available, if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested or (d) if sent by telecopy or electronic mail (in portable document format). Notice so given shall be effective upon receipt by the addressee, except that communication or notice so transmitted by telecopy or other direct written electronic means (including e-mail) shall be deemed to have been validly and effectively given on the day (if a Banking Day and, if not, on the next following Banking Day) on which it is transmitted if transmitted before 5:00 p.m., New York City time, recipient's time, and if transmitted after that time, on the next following Banking Day; *provided, however,* that if any notice is tendered to an addressee and the delivery thereof is refused by such addressee, such notice shall be effective upon such tender. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of 30 days' notice to the other parties in the manner set forth hereinabove.

**9.2    RIGHT TO SET-OFF**.  In addition to any rights now or hereafter granted under Applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, to the extent permitted under applicable Legal Requirements, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Administrative Agent or any Lender (including by branches and agencies of the Administrative Agent and each Lender wherever located) to or for the credit or the account of the Borrower, against and on account of the Obligations of the Borrower hereunder, irrespective of whether or not the Administrative Agent shall have made any demand hereunder and although said Obligations, or any of them, shall be contingent or unmatured.

43

**9.3** **DELAY AND WAIVER**. No delay or omission to exercise any right, power or remedy accruing to the Lenders upon the occurrence of any Default or Event of Default or any breach or default by the Borrower under this Agreement or any other Credit Document shall impair any such right, power or remedy of the Administrative Agent or Lenders, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single Event of Default, Default or other breach or default be deemed a waiver of any other Event of Default, Default or other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of the Administrative Agent or any Lender of any Event of Default, Default or other breach or default under this Agreement or any other Credit Document, or any waiver on the part of the Administrative Agent or any Lender of any provision or condition of this Agreement or any other Credit Document, must be in writing and shall be effective only to the extent in such writing specifically set forth. All remedies, either under this Agreement or any other Credit Document or by law or otherwise afforded to the Administrative Agent and the Lenders, shall be cumulative and not alternative.

**9.4** **COSTS, EXPENSES AND ATTORNEYS' FEES**.[5] From and after the Effective, the Borrowers will pay to the Lenders and the Administrative Agent, upon five (5) Banking Days' written demand therefor, all of their documented out-of-pocket costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred in connection with the administration of this Agreement (including, but not limited to, all expenses and costs incurred pursuant to Section 5.8), the other Credit Documents, and any other documents related thereto or contemplated hereby. The Borrower will reimburse the Administrative Agent and the Lenders, and their respective related Indemnitees, for all reasonable and documented actual costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred by the Administrative Agent or the Lenders in enforcing this Agreement or the other Credit Documents and in connection with a Default or Event of Default, including in connection with actions for declaratory relief in any way related to this Agreement or the other Credit Documents, in collecting any sum which becomes due to the Lenders under the Credit Documents, and in responding to or defending against any audit initiated by the State of Alaska with respect to any State Tax Credits or any Validated Expenditures. The provisions of this Section 9.4 shall survive foreclosure of the Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrower's obligations hereunder, and shall be in addition to any other rights and remedies of the Lenders, the Administrative Agent and their respective Affiliates. For the avoidance of doubt, the reimbursement rights provided for in this Section 9.4 shall not extend to any costs, fees or expenses arising in connection with or resulting from a Specified Claim.

**9.5** **ENTIRE AGREEMENT**. This Agreement, the other Credit Documents, and any other agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof. In the event of any conflict between the terms, conditions and provisions of this Agreement or any other Credit Document and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement or

---

[5] NTD: To be conformed to the Second Lien Credit Agreement.

44

such other Credit Document shall prevail.  This Agreement and the other Credit Documents may only be amended or modified in accordance with <u>Section 8.9</u> hereof.

**9.6**    **GOVERNING LAW**.  This Agreement, and any instrument or agreement required hereunder (to the extent not otherwise expressly provided for therein), shall be governed by, and construed under, the laws of the State of New York, without regard to the conflict of law principles that would result in the application of any law other than the law of the State of New York (other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law).

**9.7**    **CONFIDENTIALITY**.  No party hereto, in its capacity as a "**receiving party**", shall disclose any Confidential Information to any third party without the prior written consent of the party delivering such Confidential Information (*provided* that any disclosure of Confidential Information described in clause (a) of the definition thereof shall require the prior consent of the Administrative Agent and the Borrower), other than:

(a)    in the case of disclosure by the Administrative Agent or any Lender, (i) to the Administrative Agent's or such Lender's respective auditors, officers, directors, employees, agents, advisors, funding sources, investors, potential investors, potential lenders (including potential purchasers of the Loans) and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, the Administrative Agent and the other Lenders, (iii) to actual or prospective Lenders or credit default providers, in each case on a confidential basis and otherwise in accordance with the last sentence of <u>Section 8.13</u>, (iv) to actual or prospective participants, in each case on a confidential basis and otherwise in accordance with the fourth to last sentence of <u>Section 8.12</u>, (v) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law, (vi) in connection with any litigation, arbitration or other legal proceeding to which the Administrative Agent or any Lender is a party, (vii) to the lenders and agents under the AIDEA Loan Agreement, the Second Lien Credit Agreement and the New Term Loan Agreement, (viii) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking or (ix) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder (including any judicial or non-judicial foreclosure); or

(b)    in the case of disclosure by the Borrower, (i) to the Borrower's auditors, officers, directors, employees, agents, representatives, advisors, funding sources, investors, potential investors and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, (iii) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law or (iv) in connection with any litigation, arbitration or other legal proceeding to which the Borrower is a party.

The Borrower consents to the publication by the Administrative Agent and Lenders of customary advertising material relating to transactions contemplated hereby, using the names,

45

product photographs, logos or trademarks of the Borrower.  In addition, the Administrative Agent and Lenders may disclose information regarding this Agreement and the Credit Facility to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and Lenders in connection with the administration and management of the Credit Documents.

**9.8**    **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, (a) the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which come as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.9**    **HEADINGS**.  Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

**9.10**    **ACCOUNTING TERMS**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and practices consistent with those applied in the preparation of the financial statements submitted by the Borrower to the Administrative Agent, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles and practices.

**9.11**    **NO PARTNERSHIP**.  The Lenders and the Borrower intend that the relationship between them shall be solely that of creditor and debtor.  Nothing contained in this Agreement, the Notes or in any of the other Credit Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between the Administrative Agent and Lenders and the Borrower or any other Person.  The Administrative Agent and Lenders shall not be in any way responsible or liable for the debts, losses, obligations or duties of the Borrower, the Sponsor or any other Person or with respect to the Properties of the Borrower, the Sponsor or otherwise.  All obligations to pay real property or other taxes, assessments, insurance premiums, and all other fees and charges arising from the ownership, operation, lease or occupancy of the Properties of the Borrower or the Sponsor and to perform all obligations and other agreements and contracts relating to the Properties of the Borrower shall be the sole responsibility of the Borrower.

The Borrower acknowledges that the Lenders, the Administrative Agent, their respective Affiliates and funds managed by any of them (collectively, the "**Creditor Parties**") may be providing debt financing, equity capital or other services to other companies in respect of which the Borrower may have conflicting interests regarding the transactions described herein and otherwise.  The Borrower acknowledges that none of the Creditor Parties have any obligation to use in connection with the transactions contemplated hereby, or to furnish to the Borrower, Confidential Information obtained from other companies.

46

The Borrower further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Borrower and the Creditor Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement and the other Credit Documents, irrespective of whether the Creditor Parties have advised or is advising the Borrower on other matters, (b) the Creditor Parties, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do the Borrower rely on, any fiduciary duty on the part of the Creditor Parties, (c) the Borrower is capable of evaluating and understanding, and the Borrower understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Credit Documents, (d) the Borrower has been advised that each of the Creditor Parties is engaged in a broad range of transactions that may involve interests that differ from the Borrower's interests and that none of the Creditor Parties has any obligation to disclose such interests and transactions to the Borrower by virtue of any fiduciary, advisory or agency relationship and (e) the Borrower waives, to the fullest extent permitted by law, any claims the Borrower may have arising out of or in connection with the transactions contemplated by this Agreement and the other Credit Documents against the Creditor Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Creditor Parties shall have any liability (whether direct or indirect) to the Borrower in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of the Borrower, including the Borrower's stockholders, employees or creditors.

**9.12** **SECURITY DOCUMENTS**.  Reference is hereby made to the Security Documents for the provisions, among others, relating to the nature and extent of the security provided thereunder; the rights, duties and obligations of the Borrower; and the rights of the Administrative Agent and the Lenders with respect to such security.

**9.13** **LIMITATION ON LIABILITY**.  No Claim shall be made by any party to this Agreement or any of their respective Affiliates against any other party hereto or the Lenders or any of their Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether or not the Claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or the other Credit Documents or any act or omission or event occurring in connection therewith; and each party hereto hereby waives, releases and agrees not to sue upon any such Claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor *provided, however*, that (a) no party shall be required to waive Claims against the Borrower; *provided, however*, neither this limitation of liability nor this exception shall limit in any manner the releases set forth in this Agreement or the Credit Documents; (b) no Lender shall be required to waive Claims (subject to the limitation of damages set forth in this sentence) to the extent they arise from the Administrative Agent's gross negligence or willful misconduct; and (c) the Administrative Agent shall be fully justified in refusing to take or continuing to take any action unless it shall first be satisfied by the indemnity pursuant to Section 8.5.

For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, nothing herein shall limit the right or ability of any Person that is a Lender (whether in its capacity as a Lender or otherwise) to make a Claim against any Person in respect of a document or agreement other than this Agreement, the Notes and the Credit Documents.

**9.14** **WAIVER OF JURY TRIAL**. THE ADMINISTRATIVE AGENT, THE LENDERS, AND THE BORROWER, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT, THE LENDERS AND THE BORROWER TO ENTER INTO THIS AGREEMENT.

**9.15** **CONSENT TO JURISDICTION**. The Administrative Agent, the Lenders and the Borrower agree that any legal action or proceeding by or against the Borrower, or with respect to or arising out of or relating to this Agreement, the Notes, or any other Credit Document, may be brought in or removed to the courts of the State of New York, in and for the County of New York, or, to the extent permitted by Applicable Law, of any federal court sitting in the borough of Manhattan. By execution and delivery of this Agreement, each of the Administrative Agent, the Lenders and the Borrower accept, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall limit the right of the Administrative Agent or the Lenders to sue in any other jurisdiction in connection with the exercise of the rights under any Security Documents or the enforcement of any judgment. The Administrative Agent, the Lenders and the Borrower irrevocably consent to the service of process out of any of the aforementioned courts in any manner permitted by Applicable Law. The Administrative Agent, the Lenders and the Borrower further agree that the aforesaid courts of the State of New York and of the United States of America shall have exclusive jurisdiction with respect to any claim or counterclaim of the Borrower based upon the assertion that the rate of interest charged by the Lenders on or under this Agreement, the Loans or the other Credit Documents is usurious. The Administrative Agent, the Lenders and the Borrower hereby waive, to the extent permitted by Applicable Law, any claim, objection or right to stay or dismiss any action or proceeding under or in connection with this Agreement or any other Credit Document brought before the foregoing courts on the basis of *forum non-conveniens.*

**9.16** **KNOWLEDGE AND ATTRIBUTION**. References in this Agreement and the other Credit Documents to the "knowledge," "best knowledge" or facts and circumstances "known to" the Borrower, and all like references, mean facts or circumstances of which a Responsible Officer of the Borrower or other relevant Person has actual knowledge after reasonable due inquiry.

**9.17** **SUCCESSORS AND ASSIGNS; NO THIRD-PARTY BENEFICIARIES**. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. The Borrower may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lenders in their sole and absolute discretion. Each Lender may assign all or a portion of its Loans, and sell participations in such Loans, subject to the applicable provisions of Article 8. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and permitted assigns and participants and, in the case of Section 5.10, Section 8.5 and Section 9.4, Indemnitees) any legal or equitable right, remedy or Claim under or by reason of this Agreement.

**9.18** **USURY SAVINGS CLAUSE**. Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees

in connection therewith deemed in the nature of interest under Applicable Law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent for the account of the Lenders an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

**9.19    COUNTERPARTS**.  This Agreement may be executed in one or more counterparts, and by the parties hereto in separate counterparts, each of which when executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or electronic means in portable document format of an executed counterpart of a signature page of this Agreement (or of an executed counterpart of any amendment or waiver of this Agreement or any Exhibit hereto to be executed and delivered hereunder) shall be as effective as delivery of a manually executed counterpart hereof.

**9.20    PATRIOT ACT**.  The Administrative Agent and each Lender hereby notify the Borrower that pursuant to the requirements of the Patriot Act, they are required to obtain, verify and record information that identifies the Borrower, which information includes the name, address and tax identification number of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act and other applicable "know-your-customer" and AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws. This notice is given in accordance with the requirements of the Patriot Act.  The Borrower shall, promptly following a request by any Lender or the Administrative Agent, provide all documentation and other information that such Lender or the Administrative Agent, as applicable, requests in order to comply with its ongoing obligations under applicable "know your customer", AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws and any rules or regulations thereunder, including the Patriot Act.

**9.21    OBLIGATIONS ABSOLUTE**. The Borrower hereby waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by the Borrower, to (i) proceed against the Sponsor or any other Person, (ii) proceed against or exhaust any security held from any guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account, securities account or credit on the books of any Secured Party in favor of any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority

49

or any disability or defense of the Sponsor based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Sponsor from any cause other than payment in full of the Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Borrower's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Borrower's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

**9.22    INTERCREDITOR AGREEMENT.**

(a)    Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Administrative Agent pursuant to the Security Documents and the exercise of any right or remedy by the Administrative Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Tax Credit Intercreditor Agreement shall govern and control.

(b)    The Borrower agrees that the Second Lien Credit Agreement and each Second Lien Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Second Lien Agent pursuant to the Second Lien Collateral Documents and the exercise of any right or remedy by the Second Lien Agent hereunder and thereunder are subject to the provisions of (a) the Intercreditor Agreement, dated as of [__], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "AIDEA Intercreditor Agreement"), between the Alaska Industrial Development and Export Authority as AIDEA Loan Collateral Agent and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor and (b) the Intercreditor Agreement, dated as of [__], 2020, between the ING Capital LLC, as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as the New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor (the "Tax Credit Intercreditor Agreement", and together with the AIDEA Intercreditor Agreement, the "Intercreditor Agreements"). In the event of any conflict between the terms of any Intercreditor Agreement and this agreement, the terms of such Intercreditor Agreement shall govern and control."

(c)    The Borrower agrees that the New Term Loan Agreement and each New Term Loan Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the New Term Loan Agent pursuant to the New Term Loan Collateral Documents and the exercise of any right or remedy by the New Term Loan Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreement, dated as of [__], 2020, between the ING Capital LLC, as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as the Second Lien Agent and the New Term Loan Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor (the "Tax Credit Intercreditor Agreement", and together with the AIDEA Intercreditor Agreement, the "Intercreditor Agreements"). In the event of any conflict between the terms of any Intercreditor Agreement and this agreement, the terms of such Intercreditor Agreement shall govern and control."

(d)    The Borrower agrees that the AIDEA Loan Agreement shall include the following language (or language to similar effect approved by the Required Lenders):

Notwithstanding anything herein to the contrary herein or in any other AIDEA Loan Document, the Lien and security interest granted to the Authority shall not at any time include any Tax Credit Collateral (as defined in the Tax Credit Intercreditor Agreement). The Authority hereby (a) disclaims any and all interest in the Tax Credit Collateral and (b) agrees to grant a security interest in favor of the Tax Credit Agent in any Tax Credit Collateral acquired or deemed to be owned by the Authority. In the event that the Authority receives any proceeds of any State Tax Credits, the Authority agrees to hold such proceeds in trust for the lenders under the Tax Credit Loan Agreement and to immediately turn over and deliver to the Tax Credit Agent all such proceeds, in kind, and in the exact form received.

**9.23    CREDIT DOCUMENTS**. The Borrower agrees it shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Required Lenders may request to effectuate the terms of and the Lien priorities contemplated by the Credit Documents.

**9.24    ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS.**[6] Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of a Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

---

[6] Note to Draft: To be updated to reflect most recent changes relating to Brexit.

US 7054423v.5 ING100/16001

**9.24.1** the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

**9.24.2** the effects of any Bail-In Action on any such liability, including, if applicable:

(a)     a reduction in full or in part or cancellation of any such liability;

(b)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(c)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any the applicable Resolution Authority.

**9.25     AMENDMENT AND RESTATEMENT.** The parties hereto agree that this Agreement is a restatement of, and an extension of, and amendment to, the Prepetition Credit Agreement.  This Agreement does not in any way constitute a novation of the Prepetition Credit Agreement, but is an amendment and restatement of same.  It is understood and agreed that, except to the extent released by the Administrative Agent as contemplated herein, the Liens securing the Obligations under and as defined in the Prepetition Credit Agreement and the rights, duties, liabilities and obligations of the Borrower under the Prepetition Credit Agreement and the Prepetition Credit Documents to which it is a party shall not be extinguished but shall be carried forward and shall secure such obligations and liabilities as amended, renewed, extended and restated by this Agreement.

**9.26     RELEASE OF FOA.** Effective on the Effective Date, the Prepetition Administrative Agent, the Prepetition Administrative Agent and the Prepetition Lenders (a) hereby release FOA as a Borrower under the Prepetition Credit Agreement and a Grantor under the Prepetition Security Agreement and FOA is hereby discharged and released from all obligations under the Prepetition Credit Documents, (b) hereby release all of the security interests granted by FOA or Cornucopia to the Prepetition Administrative Agent or any Prepetition Secured Party under the Prepetition Credit Documents other than the security interests in the Collateral and (c) authorize the termination of any UCC financing statements listing FOA, and the amendment of any UCC financing statements listing Cornucopia, as debtor and the Prepetition Administrative Agent as secured party.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

US 7054423v.5 ING100/16001

**IN WITNESS WHEREOF,** the parties have caused this Credit Agreement to be duly executed as of the day and year first above written.


BORROWER:


**CORNUCOPIA OIL & GAS COMPANY, LLC**

a Delaware limited liability company


By: _____
      Name:
      Title:


[Signature Page to Amended and Restated Credit Agreement]

ADMINISTRATIVE AGENT AND LENDER:
**ING CAPITAL LLC,**
a Delaware limited liability company


By: _____
     Name:  Peter Clinton
     Title:    Managing Director


By: _____
     Name:  Thomas Ryan
     Title:    Managing Director




PREPETITION ADMINISTRATIVE AGENT,
PREPETITION  COLLATERAL AGENT AND
PREPETITION LENDER (solely for purposes of
Section 9.26):
ING CAPITAL LLC,
a Delaware limited liability company


By: _____
     Name:  Peter Clinton
     Title:    Managing Director


By: _____
     Name:  Thomas Ryan
     Title:    Managing Director




[Signature Page to Amended and Restated Credit Agreement]

**EXHIBIT A**

DEFINITIONS

"**AAC**" means Alaska Administrative Code.

"**Acceleration Amounts**" has the meaning assigned to such term in Section 7.2.2.

"**Acceptable Operator**" means, any Person that has substantial experience as an operator of production and midstream facilities similar to the production and midstream facilities of the Borrower and acceptable to the Required Lenders acting reasonably.

"**Additional Material Contract**" means any contract or series of related contracts to which the Borrower is a party or to which its assets are bound that is material to the business or operations of the Borrower or the Properties of the Borrower or the termination of which would reasonably be expected to result in liabilities or losses in excess of $100,000 or cause a Material Adverse Effect.  Each such contract or series of related contracts that requires payments by or contemplates payments to the Borrower of more than $500,000 during the term of such contract shall be deemed an Additional Material Contract.

"**Adjustment Date**" means initially the Effective Date, and thereafter the first (1st) Banking Day of every month.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" of a specified Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, or that holds or beneficially owns 10% or more of the Equity Interests in the Person specified or 10% or more of the voting securities of the Person specified; *provided*, that in no event shall the Administrative Agent, any Lender or any Affiliate of any Lender be considered an Affiliate of the Borrower.

"**Affiliated Lender**" means, at any time, any Lender that is an Affiliate of the Sponsor or the Borrower (other than the Sponsor, the Borrower or any of their respective Subsidiaries).

"**Agent Account**" means a deposit account established by the Administrative Agent in Alaska and maintained at Northrim Bank, into which State Tax Credit proceeds shall be deposited as described herein.

"**Agreement**" has the meaning given in the preamble of this Agreement.

"**AIDEA**" means Alaska Industrial Development and Export Authority.

"**AIDEA Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [__], 2020, between AIDEA and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

A-1

"**AIDEA Loan Agreement**" means that certain Credit Agreement, dated as of [__], 2020 among the Borrower, FOA, Corsair and AIDEA, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**AIDEA Loan Collateral Agent**" has the meaning given in the AIDEA Intercreditor Agreement.

"**AIDEA Loan Collateral Documents**" has the meaning given in the AIDEA Intercreditor Agreement.

"**AIDEA Loan Documents**" means the AIDEA Loan Agreement and the ["**Credit Documents**"] (as defined in the AIDEA Loan Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other AIDEA Loan Obligation, as such agreements, documents and instruments may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**AIDEA Loan Obligations**" has the meaning given in the AIDEA Intercreditor Agreement.

"**AK Obligations**" means all present or future taxes (including, without limitation, property or production taxes), levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees, rental, royalty, or other charges imposed by the State of Alaska (or any regional, local or political subdivision thereof), including any interest, additions to tax or penalties applicable thereto or other obligations of any kind (including, without limitation, any dismantlement, removal and restoration obligations or other bonding obligations).

"**Alaska Oil and Gas Production Tax Law**" means the Alaska Oil and Gas Production Tax statute, AS 43.55.011 et seq.

"**Alaska Tax Credit Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under AS 43.55.023 for tax credits under the Alaska Oil and Gas Production Tax Law, including all tax credits available pursuant to AS 43.55.023(a), AS 43.55.023(l), AS 43.55.023(b) and AS 43.55.025.

"**Alaska Tax Returns**" means any State of Alaska tax return for which the Borrower and any other member of its consolidated, combined, affiliated, unitary or similar income tax group for the State of Alaska could file to preserve net operating losses with respect to their business or other operations in the State of Alaska.

"**AML Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Lender, the Administrative Agent, the Borrower or the Sponsor from time to time concerning or relating to anti-money laundering.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or the Sponsor from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

A-2

"**Anti-Terrorism Laws**" means any of the following: (a) the Anti-Terrorism Order; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Patriot Act; (f) any regulations promulgated pursuant to any of the foregoing or (g) comparable laws, rules and directives administered or enforced by the United Nations Security Council, the European Union, or a member state of the European Union.

"**Applicable Laws**" means and includes any and all laws, statutes, codes, ordinances, orders, rules, regulations, any constitutional provision, treaties, decrees, writs, judgments, decisions, certificates, licenses, holdings, determinations, injunctions, Permits or requirements of any Governmental Authority (including all Environmental Laws), along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, as such may be amended or modified from time to time.  Unless the context clearly requires otherwise, the term "Applicable Law" shall include each of the foregoing as in effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the Effective Date.

"**Applicable Permit**" means, at any time, any Permit, including any zoning, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Permit, in each case that is (a) necessary at such time in connection with the transactions contemplated by the Credit Documents or the Material Contracts or the operation of the Borrower's Properties (in each case to the extent required by Legal Requirements, the Credit Documents or the Material Contracts), or for the Borrower to enter into any Credit Document or Material Contract or to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements and (b) otherwise listed on Part I of Exhibit D.

"**AS**" means Alaska Statute.

"**Assignment Agreement**" has the meaning given in Section 8.13.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Banking Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized to be closed in New York, New York or Kenai, Alaska and, if such day relates to any LIBOR Rate Loan, means any such day that is also a London Banking Day.

A-3

"**Bankruptcy Cases**" means the cases related to Borrower's and FOA's voluntary petition for relief filed August 9, 2019 under chapter 11 of the Bankruptcy Code in the Bankruptcy Court captioned In re Furie Operating Alaska, LLC, Case No. 19-11781.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, as applicable to the Bankruptcy Cases.

"**Bankruptcy Event**" shall be deemed to occur, with respect to any Person, if:

(a)     such Person shall institute a voluntary case seeking liquidation or reorganization under the Bankruptcy Code, or shall consent to the institution of an involuntary case thereunder against it;

(b)     such Person shall apply for, or by consent or acquiescence or otherwise there shall be an appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers for itself or substantially all of its assets;

(c)     such Person shall make a general assignment of substantially all of its assets for the benefit of its creditors;

(d)     such Person shall admit in writing its inability to pay its debts generally as they become due; or

(e)     an involuntary case shall be commenced seeking liquidation or reorganization of such Person under the Bankruptcy Code and (i) the petition commencing the involuntary case is not timely controverted, (ii) the petition commencing the involuntary case is not dismissed within 60 days of its filing, (iii) an interim trustee is appointed to take possession of all or a portion of the property, and/or to operate all or any part of the business of such Person and such appointment is not vacated within 60 days, or (iv) an order for relief shall have been issued or entered therein.

"**Benchmark**" means, initially, LIBOR; provided that if a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date have occurred with respect to LIBOR or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has become effective pursuant to clause (a) of this Section titled "Effect of Benchmark Transition Event."

"**Benchmark Replacement**" means, for any Interest Period, the first alternative set forth in the order below that can be determined by the Administrative Agent as of the Benchmark Replacement Date:

1.     the sum of: (i) Term SOFR or, if the Administrative Agent determines that Term SOFR for the applicable Corresponding Tenor cannot be determined, Next Available Term SOFR, and (ii) the Benchmark Replacement Adjustment;

2.      the sum of: (i) Compounded SOFR and (ii) the Benchmark Replacement Adjustment;

3.      the sum of: (i) the alternate rate of interest that has been selected by the Administrative Agent as the replacement for the then-current Benchmark for the applicable Corresponding Tenor and (ii) the Benchmark Replacement Adjustment;

provided that, in the case of clauses (1) and (2) above, such rate, or the underlying rates component thereof, is or are displayed on a screen or other information service that publishes such rate or rates from time to time as selected by the Administrative Agent in its reasonable discretion. If the Benchmark Replacement as determined pursuant to clause (1), (2) or (3) above would be less than zero, the Benchmark Replacement will be deemed to be zero for the purposes of this Agreement.

"**Benchmark Replacement Adjustment**" means, for any Interest Period:

1.      for purposes of clauses (1) and (2) of the definition of "Benchmark Replacement," the first alternative set forth in the order below that can be determined by the Administrative Agent as of the Benchmark Replacement Date:

a.  the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected or recommended by the Relevant Governmental Body for the applicable Unadjusted Benchmark Replacement;

b.  the spread adjustment (which may be a positive or negative value or zero) that would apply to the fallback rate for a derivative transaction referencing the ISDA Definitions to be effective upon an index cessation event with respect to LIBOR for the Corresponding Tenor; and

2.      for purposes of clause (3) of the definition of "Benchmark Replacement," the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent for the applicable Corresponding Tenor;

provided that, in the case of clause (1) above, such adjustment is displayed on a screen or other information service that publishes such Benchmark Replacement Adjustment from time to time as selected by the Administrative Agent in its reasonable discretion.

"**Benchmark Replacement Conforming Changes**" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Interest Period," timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

A-5

**"Benchmark Replacement Date"** means the earliest to occur of the following events with respect to the then-current Benchmark:

      1.     in the case of clause (1) or (2) of the definition of "Benchmark Transition Event," the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the Benchmark permanently or indefinitely ceases to provide the Benchmark;

      2.     in the case of clause (3) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein; or

      3.     in the case of an Early Opt-in Election, the first (1st) Banking Day after the Rate Election Notice is provided to the Borrower.

For the avoidance of doubt, if the event giving rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.

**"Benchmark Transition Event"** means the occurrence of one or more of the following events with respect to the then-current Benchmark:

      1.     a public statement or publication of information by or on behalf of the administrator of the Benchmark announcing that such administrator has ceased or will cease to provide the Benchmark, permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark;

      2.     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark, the central bank for the currency of the Benchmark, an insolvency official with jurisdiction over the administrator for the Benchmark, a resolution authority with jurisdiction over the administrator for the Benchmark or a court or an entity with similar insolvency or resolution authority over the administrator for the Benchmark, which states that the administrator of the Benchmark has ceased or will cease to provide the Benchmark permanently or indefinitely, <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Benchmark; or

      3.     a public statement or publication of information by the regulatory supervisor for the administrator of the Benchmark announcing that the Benchmark is no longer representative.

**"Benchmark Unavailability Period"** means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the then-current Benchmark and solely to the extent that the then-current Benchmark has not been replaced with a Benchmark Replacement pursuant to clauses (1) or (2) of the definition of "Benchmark Replacement," the period (x) beginning at the time that such Benchmark Replacement Date pursuant to clauses (1) or (2) of that definition has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder or under any Credit Document in accordance with the Section titled "Effect of Benchmark Transition Event" and (y) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder or under any Credit Document in accordance with the Section titled "Effect of Benchmark Transition Event."

A-6

"**Books and Records**" means, as to any Person, all of such Person's books and records including ledgers; federal and state tax returns; records regarding such Person's assets or liabilities, business operations or financial condition; and all computer programs or storage or any equipment containing such information.

"**Borrower**" has the meaning given in the preamble of the Agreement.

"**Breakage Amount**" means the Lenders' breakage costs related to early termination of interest rate contracts, if any, as reasonably calculated by the Lenders.

"**Capital Adequacy Requirement**" has the meaning given in Section 2.5.2.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures of the Borrower that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of the Borrower.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $5,000,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**CEA**" means the Commodity Exchange Act, as amended.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended.

A-7

"**Change of Control**" means (x) any transaction as a result of which (a) HEX, LLC fails to directly or indirectly own 80% of the Equity Interests in the Borrower, (b) the Sponsor fails to directly own at least 100% of the Equity Interests in the Borrower, (c) the Borrower ceases to directly own 100% of the Equity Interests in FOA or (d) a Disqualified Owner shall own the Equity Interests in the Borrower, directly or indirectly or (y) any change in ownership of the Borrower or the Sponsor occurs which results in the failure of the Borrower to meet the eligibility requirements of AS 43.55.028.[7]

"**Change of Law**" means the adoption of any Applicable Law after the date of the Agreement, any change in any Applicable Law or the application or requirements thereof after the date of the Agreement (whether such change occurs in accordance with the terms of such Applicable Law as enacted on or prior to the date of the Agreement, as a result of amendment made after the date of the Agreement, or otherwise), any change in the interpretation or administration of any Applicable Law by any Governmental Authority after the date of the Agreement, or compliance by the Borrower or any Lender with any request or directive made or issued after the date of the Agreement (whether or not having the force of law, but if not having the force of law, being of a type with which the Borrower or such Lender customarily complies) by any Governmental Authority. For the avoidance of doubt, Change of Law shall be deemed to include all requests, rules, guidelines or directives concerning liquidity and capital adequacy issued by any United States regulatory authority (a) under or in connection with the implementation of the Dodd-Frank Act and (b) in connection with the implementation of the recommendations of the Bank for International Settlements or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority), regardless of the date adopted, issued, promulgated or implemented).

"**Claim**" means any and all liabilities, losses, administrative or regulatory or judicial actions, suits, demands, decrees, claims, Liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages (foreseeable and unforeseeable, including consequential and punitive damages), penalties, fees, out-of-pocket costs, expenses, disbursements, attorneys' fees or consultants' fees.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, the Tax Credit Collateral, the Equity Interests of the Borrower and any other Property in which Liens are purported to be granted pursuant to the Security Documents as security for the Obligations.

"**Compounded SOFR**" means the compounded average of SOFRs for the applicable Corresponding Tenor, with the rate, or methodology for this rate, and conventions for this rate (which may include compounding in arrears with a lookback and/or suspension period as a mechanism to determine the interest amount payable prior to the end of each Interest Period) being established by the Administrative Agent in accordance with:

---

[7] NTD: Clause (y) is in the term sheet.

1.      the rate, or methodology for this rate, and conventions for this rate selected or recommended by the Relevant Governmental Body for determining compounded SOFR; <u>provided</u> that:

2.      if, and to the extent that, the Administrative Agent determines that Compounded SOFR cannot be determined in accordance with clause (1) above, then the rate, or methodology for this rate, and conventions for this rate that the Administrative Agent determines are substantially consistent with at least five currently outstanding U.S. dollar-denominated syndicated or bilateral credit facilities at such time (as a result of amendment or as originally executed) that are publicly available for review;

<u>provided</u>, <u>further</u>, that if the Administrative Agent decides that any such rate, methodology or convention determined in accordance with clause (1) or clause (2) is not administratively feasible for the Administrative Agent, then Compounded SOFR will be deemed unable to be determined for purposes of the definition of "Benchmark Replacement."

"**Confidential Information**" means (a) the terms and conditions of each of the Credit Documents and Material Contracts, including any amendments, waivers, supplements or other modifications thereto and all negotiations and communications in respect thereof and (b) any and all documents, materials and information (whether oral, written, electronic or in any other form) relating to the assets, operations, business, financial condition, results of operations or prospects of the Borrower disclosed to or obtained by the Administrative Agent or any Lender (each a "**receiving party**") pursuant to the Agreement or the other Credit Documents or otherwise provided to a receiving party by or on behalf of the Borrower (each a "**disclosing party**") in connection with the Agreement or the other Credit Documents, but does not include any such information that (i) is or becomes generally available to the public (other than as a result of a breach by a receiving party of its confidentiality obligations under <u>Section 9.7</u>), (ii) was lawfully available to any receiving party on a non-confidential basis prior to such information being disclosed by or on behalf of, or obtained from, a disclosing party or (iii) is or becomes available to any receiving party from a source other than a disclosing party.

"**Confirmation Order**" means that final order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, filed in the Bankruptcy Cases at Docket No. [__].

"**Contractual Obligation**" means, as applied to any Person, any provision of any Securities issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its Properties is bound or to which it or any of its Properties is subject.

"**Control Agreement**" means a customary account control agreement in form and substance reasonably satisfactory to the Administrative Agent pursuant to which the depositary institution maintaining the relevant account agrees that the Administrative Agent shall have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts) and pursuant to which such issuer, securities intermediary,

A-9

commodities intermediary or depositary institution (as applicable) shall agree to comply solely with the Administrative Agent's entitlement orders or instructions with respect to the disposition of funds or to apply any value distributed on account of any commodity account, as applicable, in such account upon the occurrence and continuance of an Event of Default and without the consent of any other Person.

"**Cornucopia**" has the meaning given in the preamble of the Agreement.

"**Cornucopia Equity Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between AIDEA, the New Term Loan Agent, the Administrative Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

"**Corresponding Tenor**" with respect to a Benchmark Replacement means a tenor (including overnight) having approximately the same length (disregarding business day adjustment) as the applicable tenor for the applicable Interest Period with respect to the then-current Benchmark.

"**Corsair**" means Corsair Oil & Gas LLC, a Delaware limited liability company.

"**Credit Documents**" means, without duplication, the Agreement, any Notes, the Security Documents, the Intercreditor Agreement, the Indemnity Agreement, and all other loan, security or other agreements, letter agreements, documents, instruments and certificates, and other similar document entered into by the Borrower, the Sponsor and the Lenders in connection with the transactions contemplated by the Credit Documents.

"**Loans**" has the meaning given in Section 2.1.1(a).

"**Creditor Parties**" has the meaning given in Section 9.11.

"**Debt**" of any Person at any date means, without duplication, any indebtedness of such Person, whether or not contingent, including:

> (a)      all obligations of such Person for borrowed money;

> (b)      all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

> (c)      all obligations of such Person to pay the deferred purchase price of property or services;

> (d)      all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as Capital Leases in respect of which such Person is liable;

> (e)      all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property);

A-10

(f)      all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other instrument;

(g)      all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; and

(h)      obligations of such Person as a surety, guarantor, accommodation endorser or otherwise, for or upon the obligation of any other Person, including all Debt of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, except the endorsement of negotiable Instruments in the ordinary course of business.

"**Debtors**" has the meaning given in the Plan.

"**Default**" means any occurrence, circumstance or event, or any combination thereof, which, with the lapse of time and/or the giving of notice, would constitute an Event of Default.

"**Default Rate**" has the meaning given in <u>Section 2.3.3</u>.

"**Deposit Account**" has the meaning assigned to such term in the UCC.

"**disclosing party**" has the meaning given in the definition of "Confidential Information".

"**Disqualified Owner**" means any Person that, as of the date it first becomes a direct or indirect owner of membership interests in the Borrower: (a) is designated as a Sanctioned Person; (b) is in violation of the AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws or Sanctions; or (c) has been convicted of money laundering under any AML Law, which conviction has not been overturned; provided, however, that a Person shall not be a Disqualified Owner if: (x) prior to the date that the Person first becomes a direct or indirect owner of membership interests in the Borrower, the Borrower provides the Secured Parties with reasonably satisfactory documentation and other written information required under applicable "know your customer" and AML Laws, regulations and requirements (including the Patriot Act) in respect of such Person; and (y) as of the date the Person first becomes a direct or indirect owner of the membership interests in the Borrower, such Person has certified to the Administrative Agent that none of the criteria set forth in the foregoing clauses (a) to (c) in this definition are applicable to such Person.

"**Dodd-Frank Act**" has the meaning given in <u>Section 2.5.2</u>.

"**Dollar**" and "**$**" mean United States dollars or such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts in the United States of America.

"**DNR**" means the State of Alaska Department of Natural Resources.

"**DOR**" means the State of Alaska, Department of Revenue.

"**DOR Purchase Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under the provisions of AS 43.55.028(e) providing for the cash purchase of the State Tax Credits by the DOR as contemplated by AS 43.55.28

"**Early Opt-in Election**" means the occurrence of:

1.      a determination by the Administrative Agent that at least five currently outstanding U.S. dollar-denominated syndicated or bilateral credit facilities at such time contain (as a result of amendment or as originally executed) as a benchmark interest rate, in lieu of LIBOR, Term SOFR plus a Benchmark Replacement Adjustment, and

2.      the election by the Administrative Agent to declare that an Early Opt-in Election has occurred and the provision by the Administrative Agent of written notice of such election to the Borrower (the "*Rate Election Notice*").

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the Banking Day on which the satisfaction by the Borrower or waiver by the Lenders of the conditions precedent to closing of this Agreement set forth in Section 3.1 occurs.

"**Eligible Assignee**" has the meaning given in Section 8.13.

"**Eligible Contract Participant**" has the meaning set forth in Section 1(a)(18) of the CEA.

"**Environmental Claim**" means any and all Claims relating in any way to any Environmental Law or any Permit issued under any such Environmental Law, including (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to health, safety or the environment.

"**Environmental Laws**" means all Applicable Laws pertaining to human health, occupational safety and environmental matters, including those arising under CERCLA, RCRA, the Superfund Amendments and Reauthorization Act of 1986, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Federal Clean Water Act, the Federal Clean Air Act, the

A-12

Toxic Substances Control Act, each as amended, or any state or local statute, regulation, ordinance, order, guidance or decree relating to health, safety or the environment.

"**Equity Interest Equivalents**" means all rights, warrants, options, convertible securities or indebtedness, exchangeable securities or other instruments, or other rights that are outstanding and exercisable for or convertible or exchangeable into, directly or indirectly, any Equity Interest described in clause (a) of the definition thereof at the time of issuance or upon the passage of time or occurrence of some future event.

"**Equity Interests**" means (a) the equity ownership rights in a business entity, whether a corporation, company, joint stock company, limited liability company, general or limited partnership, joint venture, bank, association, trust, trust company, land trust, business trust, sole proprietorship or other business entity or organization, and whether in the form of capital stock, ownership unit, limited liability company interest, limited or general partnership interest or any other form of ownership, and (b) also includes all Equity Interest Equivalents.

"**ERISA**" means the Employee Retirement Income Security Act of 1974.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code or Section 4001 of ERISA (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) the failure by the Borrower or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules or the filing of an application for the waiver of the minimum funding standards under the Pension Funding Rules; (c) the incurrence by the Borrower or any ERISA Affiliate of any liability pursuant to Section 4063 or 4064 of ERISA or a cessation of operations with respect to a Pension Plan within the meaning of Section 4062(e) of ERISA; (d) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is insolvent (within the meaning of Section 4245 of ERISA); (e) the filing of a notice of intent to terminate a Pension Plan under, or the treatment of a Pension Plan amendment as a termination under, Section 4041 of ERISA; (f) the institution by the PBGC of proceedings to terminate a Pension Plan; (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the determination that any Pension Plan is in "at-risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA) or that a Multiemployer Plan is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA); (i) the imposition or incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate; (j) the engagement by the Borrower or any ERISA Affiliate in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; (k) the imposition of a Lien upon the Borrower or any ERISA Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA; (l) the assertion of a material claim (other than routine claims for benefits) against any ERISA Plan other than a Multiemployer Plan or the assets thereof, or against the Borrower or any ERISA Affiliate in connection with any Pension Plan; or (m) the making of

A-13

an amendment to a Pension Plan that could result in the posting of bond or security under Section 436(f)(1) of the Code.

"**ERISA Plan**" means any employee benefit plan (a) maintained by the Borrower or any ERISA Affiliate, or to which any of them contributes or is obligated to contribute, for its employees and (b) covered by Title IV of ERISA or to which Section 412 or Section 430 of the Code or Section 302 or Section 303 of ERISA applies.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning given in Section 7.1.

"**Existing Bonding Program**" means the bonding program set forth in Alaska House Bill 331 (2018).

"**Facilities**" means the Platform, the Pipeline and the Processing Plant, or any portion of any of the foregoing.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of the Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements and fiscal or regulatory legislation, rules or official interpretations adopted pursuant to any intergovernmental agreement implementing the foregoing.

"**Federal Reserve Bank of New York's Website**" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"**Federal Reserve Lender**" means the Federal Reserve Bank to which a Lender assigns as collateral security all or any portion of the Loans or Notes held by such Lender.

"**FERC**" means the Federal Energy Regulatory Commission.

"**FOA**" has the meaning given in the recitals of the Agreement.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any nation, sovereign or government; any federal, regional, state, tribal authority, province, local or political subdivision; and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Governmental Authorization**" means any authorization, approval, consent, franchise, license, covenant, order, ruling, Permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

A-14

"**Hazardous Substances**" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant" or a "contaminant" (or words of similar intent or meaning) by any Governmental Authority under Applicable Law, including but not limited to petroleum, petroleum byproducts, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable or explosive substances, or pesticides.

"**Hedging Agreement**" means any option, swap, cap, floor, collar, forward purchase or similar agreements or arrangements (physical or otherwise) (or any combination of the foregoing) dealing with interest rates, basis differentials, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such Applicable Laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than Applicable Laws now allow.

"**Indemnitees**" has the meaning given in Section 5.10.1.

"**Indemnity Agreement**" means that certain Indemnity Agreement, dated as of the Effective Date, among the Borrower, the Sponsor, the Administrative Agent and the New Term Loan Agent.

"**Instrument**" has the meaning assigned to such term in the UCC.

"**Insurance Proceeds**" means all amounts and Proceeds (including instruments) received by or on behalf of the Borrower, the Sponsor or the Administrative Agent (as loss payee or additional insured) or any of their Affiliates under any insurance policy maintained by the Borrower, the Sponsor or any Person in respect of any Property of the Borrower.

"**Intercreditor Agreements**" means each of the Tax Credit Intercreditor Agreement and the Cornucopia Equity Intercreditor Agreement.

"**Interest Payment Date**" has the meaning given in Section 2.1.2(a).

"**Interest Period**" means the period commencing on the first Banking Day of each calendar month.

"**Interest Rate**" means a rate per annum equal to the sum of the LIBOR Rate and 4.00%.

"**IRS**" means the United States Internal Revenue Service.

"**ISDA Definitions**" means the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time.

A-15

"**JOA**" means the Operating Agreement dated October 21, 2010, among FOA (f/k/a Escopeta Oil Co., L.L.C.), the Borrower (f/k/a Escopeta Oil of Alaska LLC) and the other minority working interest owners party thereto, as modified by that certain Side Letter Agreement entered into as of October 22, 2010 among FOA, the Borrower and Taylor Minerals, LLC, as further modified by that certain RWIO Settlement Agreement filed in the Bankruptcy Cases at Docket No. 617-2.

"**JOA Assets**" means the Properties of the Borrower the operatorship of which is under the JOA.

"**Kitchen Lights Unit**" means all of the interests that the Borrower currently own or control, and all of the interests the Borrower may hereafter acquire or control, in, to or under the Alaska Division of Land leases listed and shown on Exhibit J to the AIDEA Loan Agreement in effect as of the date hereof, with such amendments, waivers, modifications or supplements as may have been approved in writing by the Administrative Agent.

"**Kitchen Lights Unit Agreement**" means the Kitchen Lights Unit Agreement (f/k/a the Kitchen Unit Agreement) effective as of February 1, 2007, including all Plans of Exploration, Plans of Development and Plans of Operation agreed and approved thereunder, in relation to the Kitchen Lights Unit.

"**Legal Requirements**" means, as to any Person, the articles of incorporation, bylaws or other Organizational Documents of such Person and any requirement under an Applicable Permit and any Applicable Law, in each case, applicable to or binding upon such Person or any of its Properties or to which such Person or any of its property is subject.

"**Lender**" or "**Lenders**" means the Persons listed on Schedule I and any other Person that shall have become a party hereto pursuant to an Assignment Agreement for so long as such Person shall be a party to this Agreement.

"**Lending Office**" means, with respect to any Lender, the office designated as such beneath the name of such Lender on Exhibit C to the Agreement or in the assignment and acceptance agreement pursuant to which it became a Lender or such other office of such Lender as such Lender may specify from time to time to the Administrative Agent and the Borrower.

"**LIBOR Rate**" means the rate per annum equal to the ICE Benchmark Administration LIBOR Rate ("**LIBOR**"), as published by Reuters (or other commercially available source providing quotations of LIBOR as designated by the Administrative Agent from time to time) as determined for each Adjustment Date at approximately 11:00 a.m. London time two (2) Banking Days prior to the Adjustment Date, for dollar deposits (for delivery on the Adjustment Date) with a term of one month, as adjusted from time to time in the Administrative Agent's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs; provided that to the extent a comparable or successor rate is approved by the Administrative Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent. If such rate is not available at such time for

A-16

any reason or is less than zero, then the LIBOR Rate for that one month period will be determined by such alternative method as reasonably selected by the Administrative Agent that results in a rate that exceeds zero. The LIBOR Rate will be adjusted on each Adjustment Date and remain fixed until the next Adjustment Date.

"**LIBOR Rate Loan**" means a Loan that bears interest at a rate based on the definition of the LIBOR Rate.

"**Lien**" means (a) any mortgage, deed of trust, lien, pledge, assignment, charge, security interest, or easement or encumbrance or other exception to title of any kind (including any agreement to give any of the foregoing), whether or not filed, recorded or otherwise perfected under Applicable Law, as well as the interest of a vendor or lessor under any conditional sale agreement, any lease or license in the nature thereof, or other title retention agreement relating to such asset and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Loans**" has the meaning given in Section 2.1.1(a).

"**London Banking Day**" means any day on which dealings in dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower taken as a whole; (b) the ability of the Borrower to fully and timely perform its Obligations; (c) the legality, validity, binding effect or enforceability against the Borrower of a Credit Document to which it is a party; or (d) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means each agreement listed on Schedule A and each Additional Material Contract entered into after the Effective Date, including all amendments, supplements, and modifications thereto, in each case, solely to the extent expressly permitted hereunder.

"**Maturity Date**" means the earlier of (a) the fourth (4th) anniversary of the Effective Date and (b) the date on which the entire outstanding principal balance of the Loans, together with all unpaid interest, fees, charges and costs becomes due and payable under this Agreement.

"**Moody's**" means Moody's Investors Service, Inc.

"**Multiemployer Plan**" means any ERISA Plan that is a multiemployer plan (as defined in Section 3(37) of ERISA).

"**New Term Loan Agent**" has the meaning given to "Third Lien Agent" in the Tax Credit Intercreditor Agreement.

"**New Term Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among the Borrower, the lenders party thereto, and Energy Capital Partners Mezzanine

A-17

Opportunities Fund A, LP as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**New Term Loan Collateral Documents**" has the meaning given to "Third Lien Collateral Documents" in the Tax Credit Intercreditor Agreement.

"**New Term Loan Documents**" has the meaning given to "Third Lien Loan Documents" in the Tax Credit Intercreditor Agreement.

"**New Term Loan Obligations**" has the meaning given to "Third Lien Obligations" in the Tax Credit Intercreditor Agreement.

"**Next Available Term SOFR**" means, at any time, for any Interest Period, Term SOFR for the longest tenor that can be determined by the Administrative Agent that is shorter than the applicable Corresponding Tenor.

"**NGA**" has the meaning given in Section 4.8.

"**NGPA**" has the meaning given in Section 4.8.

"**Note**" has the meaning given in Section 2.1.3.

"**Obligations**" means and includes, with respect to any Person, all loans, advances, debts, liabilities, and obligations, howsoever arising, owed by such Person to the Administrative Agent, the Lenders or any Secured Party of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, pursuant to the terms of the Agreement or any of the other Credit Documents, including all principal, interest (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding in connection with a Bankruptcy Event at the rate, including any applicable post-default rate, even if such interest is not enforceable, allowable or allowed as a Claim in such proceeding), fees, charges, expenses, attorneys' fees and accountants fees chargeable to such Person and payable by such Person hereunder or thereunder.

"**Operator**" means the operator under the JOA, initially FOA.

"**Organizational Documents**" means (a) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of the Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Participant Register**" has the meaning given in Section 8.12.

A-18

"**Pass-Through Entity**" means an entity that is properly treated for U.S. federal and applicable state, local and foreign income and franchise Tax purposes as (a) disregarded as an entity separate from its owner or (b) a partnership.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pending Permits**" means the Permits that are not, at a given time, Applicable Permits but will become Applicable Permits at a future time.

"**Pension Funding Rules**" means the rules of the Code and ERISA regarding minimum funding standards and minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"**Pension Plan**" means any ERISA Plan other than a Multiemployer Plan that is maintained or is contributed to by the Borrower, the Sponsor or any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"**Perfection Certificate**" means a certificate, in the form of <u>Exhibit G</u> or any other form approved by the Administrative Agent, executed by a Responsible Officer of the Borrower, as the same shall be supplemented from time to time.

"**Permits**" means all governmental licenses, permits, franchises, easements, certifications, filings, notices, tariffs, and authorizations held by or made by or on behalf of the Borrower or required to operate the business of the Borrower or to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrower.

"**Permitted Debt**"[8] means

(a)    Debt incurred under the Credit Documents;

(b)    Debt incurred under the AIDEA Loan Documents, the Second Lien Loan Documents and the New Term Loan Documents, in each case subject to the Intercreditor Agreements;

(c)    trade Debt, accounts payable or other similar Debt incurred in the ordinary course of business (but not for borrowed money) (i) not more than 60 days past due, or (ii) being contested in good faith by appropriate proceedings promptly instituted and

---

[8] Note to Draft: To be conformed to AIDEA Loan Agreement.

diligently conducted; *provided* that adequate reserves have been made in accordance with GAAP;

(d)    contingent liabilities required under any Permit or Contractual Obligation of the Borrower, other than, in each case, Debt for borrowed money;

(e)    to the extent constituting debt, Debt of the Borrower incurred in the ordinary course of business under (i) natural gas sales agreements in effect as of the Effective Date (excluding, for the avoidance of doubt, any natural gas sales agreements consisting of prepaid forward contracts, volumetric or dollar denominated production payments or similar arrangements), (ii) financings of insurance premiums up to an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000) and (iii) obligations pursuant to applicable legal requirements of the DNR or Alaska Oil and Gas Conservation Commission up to an aggregate of Four Million Dollars ($4,000,000);

(f)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Debt is covered within five (5) Banking Days;

(g)    purchase money indebtedness incurred in the ordinary course of business to the extent contemplated by clause (l) of the definition of Permitted Encumbrances (and subject to the aggregate cap therein);

(h)    Debt in respect of workers' compensation claims, self-insurance obligations, performance and surety bonds in the ordinary course of business;

(i)    Debt arising from netting services, overdraft protection, cash management obligations and otherwise in connection with deposit, securities and commodities accounts in the ordinary course of business;

(j)    subordinated unsecured Debt incurred by the Borrower to FOA in an aggregate amount (together with all amounts outstanding under the immediately succeeding <u>clause (k)</u>) not to exceed $100,000;

(k)    the guarantee by the Borrower to FOA of any Debt incurred by FOA in an aggregate amount (together with all amounts outstanding under the immediately preceding <u>clause (j)</u>) not to exceed $100,000; and

(l)    any Debt for borrowed money incurred by the Borrower that is not secured by the Tax Credit Collateral.

Notwithstanding anything to the contrary herein or in any other Credit Document, no Capital Lease entered into on or after the date hereof shall constitute "Permitted Debt".

"**Permitted Dividend**" has the meaning given in <u>Section **Error! Reference source not found.**</u>.

"**Permitted Encumbrances**" means

(a)    the rights and interests of the AIDEA Loan Collateral Agent as provided in the Intercreditor Agreements;

(b)    the rights and interests of each of the Second Lien Agent and the New Term Loan Agent as provided in the Intercreditor Agreements;

(c)    the rights and interests of the Administrative Agent for the benefit of the Lenders as provided in the Credit Documents;

(d)    Liens for any Tax, assessment or other governmental charge that are not then required by to be paid pursuant to Section 5.6 and that secure obligations not in excess of $100,000 at any time, so long as such Liens are subordinate to the Obligations;

(e)    Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and (i) a bond or other security has been posted or provided in such manner and amount as to assure the Administrative Agent that any amounts determined to be due will be promptly paid in full when such appeal or proceeding is concluded, (ii) adequate reserves in accordance with GAAP have been established by the Borrower therefor or (iii) the amount thereof is fully covered by insurance (subject to applicable deductibles); *provided* that the aggregate amount of such attachment or judgment Liens shall not secure obligations in excess of $100,000 at any time;

(f)    Liens, deposits or pledges to secure (i) statutory obligations, including under workers' compensation laws and unemployment insurance, (ii) performance bonds issued in connection with any Applicable Permits or (iii) performance of bids, tenders, contracts (other than for the repayment of borrowed money), surety and appeal bonds or leases, or for purposes of like general nature in the ordinary course of its business, with any such Lien to be released as promptly as practicable and, in the case of clause (ii), securing obligations not to exceed $100,000 in the aggregate at any time;

(g)    materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, including Liens arising under AS 31.05.100-31.05.110, arising in the ordinary course of business that are (i) not yet due or (ii) being contested in good faith and by appropriate proceedings, so long as, in the case of this clause (ii), (A) such Lien does not attach to, become enforceable against its other creditors with respect to, involve any substantial danger of the sale, forfeiture or loss of or interfere in any material respect with the use or right to dispose of, the Properties of the Borrower; (B) a bond or other security has been posted or provided in such manner and amount as to assure the Administrative Agent that any taxes, assessments or other charges determined to be due will be promptly paid in full when such contest is determined; and (C) adequate reserves in accordance with GAAP have been established by the Borrower therefor;

(h)    filing of UCC financing statements as a precautionary measure in connection with operating leases;

(i)    easements, rights-of-way, restrictions (including zoning restrictions), trackage rights, minor defects or irregularities in title, restrictions on use of real property and other similar encumbrances or liens that, in the aggregate, do not materially interfere

A-21

with the value or use, or are useful to the operation, of the Property to which such Lien is attached;

(j)    rights reserved for or vested in any municipality or Governmental Authority to control or regulate the use of the Real Property or to use the Real Property in any manner, including zoning and land use regulations;

(k)    Liens arising by virtue of any statutory or common law provisions relating to bankers' liens, rights of set-off or similar rights;

(l)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower in the ordinary course of business securing the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (l) shall not exceed $100,000 at any time outstanding;

(m)    Liens arising under the JOA;

(n)    Liens securing Debt described in clause (e)(iii) of the definition of "Permitted Debt"; *provided* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (n) shall not exceed $4,000,000 at any time outstanding;

(o)    To the extent constituting a Lien, all overriding royalties existing as of the Effective Date;

(p)    Liens arising under the Kitchen Lights Unit Agreement;

(q)    Liens arising under that certain Farmout Letter Agreement among Pacific Energy Resources Ltd., Pacific Energy Alaska Operating LLC, and FOA (f/k/a Escopeta Oil Co., L.L.C.) dated February 11, 2009 (a memorandum of which was recorded on March 19, 2009 in the Anchorage Recording District as Doc. No. 2009-017350-0, and on March 23, 2009 in the Kenai Recording District as Doc. No. 2009-002662-0);

(r)    Liens arising under the Lease Assignment and Participation Agreement, dated October 22, 2010;

(s)    [all exceptions scheduled in the Title Policy];

(t)    Liens and encumbrances in existence as of the Borrower's acquisition of the Upland;

A-22

(u)    ROWs created or granted by the Borrower for any other purpose that would not render the Upland unusable, or materially impair the use of the Upland, for the operation of the Processing Plant; and

(v)    Liens securing Debt described in clause (l) of the definition of "Permitted Debt".

"**Person**" means any natural person, corporation, limited liability company, limited liability partnership, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**PIK Interest**" has the meaning given in <u>Section 2.1.1(b)</u>.

"**Pipeline**" has the meaning given in the AIDEA Loan Agreement.

"**Plan**" means the means the Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code filed in the Bankruptcy Cases on May 6, 2020 at Docket No. 754, as may be amended or modified from time to time in accordance with the terms thereof, including the Plan Supplement (as defined in the Plan), and all exhibits, annexes and other supplements appended or related to the Plan and/or to the Plan Supplement.

"**Planned Outage**" means periodic scheduled maintenance, repairs, modifications, and testing, including integrity testing of pipelines and vessels, of the Facilities.

"**Platform**" has the meaning given in the AIDEA Loan Agreement.

"**Prepetition Administrative Agent**" has the meaning given in the recitals of the Agreement.

"**Prepetition Borrowers**" has the meaning given in the recitals of the Agreement.

"**Prepetition Credit Agreement**" has the meaning given in the recitals of the Agreement.

"**Prepetition Credit Documents**" has the meaning given to the term "Credit Documents" in the Prepetition Credit Agreement.

"**Prepetition Lenders**" has the meaning given in the recitals of the Agreement.

"**Prepetition Loans**" has the meaning given in the recitals of the Agreement.

"**Prime Rate**" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).

"**Proceeds**" has the meaning assigned to such term in the UCC.

A-23

"**Processing Plant**" has the meaning given in the AIDEA Loan Agreement.

"**Properties**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible (including Contractual Obligations).

"**Proportionate Share**" means, with respect to each Lender at any time, a percentage equal to the quotient of: such Lender's Loans *divided by* the total outstanding Loans, it being acknowledged, in each case, that, upon any transfer by a Lender of all or part of its Loans, the Administrative Agent may revise Schedule I to reflect the Lenders' Proportionate Shares after giving effect to such transfer.

"**Prudent Operating Practices**" means, in connection with the operation and maintenance of the Platform, the Pipeline, Processing Plant and the Borrower's other Property, as applicable, those prudent and good practices, methods, techniques, acts and standards of safety, performance, dependability, efficiency and economy generally recognized by reasonably prudent operators in the Borrower's industry in the United States of America as good and proper, which, in the exercise of prudent judgment, in light of the facts known at the time a decision was made, would have been expected to accomplish the desired result in a manner consistent in all material respects with Applicable Laws, standards of reliability and safety, and Applicable Permits. "Prudent Operating Practices" is not intended to be limited to the optimum practices, methods, techniques, standards and acts to the exclusion of all others, but rather to be an acceptable range of practices, methods, techniques, standards and acts, as applied having due regard for, among other things, the requirements of Applicable Laws, standards of reliability and safety, and Applicable Permits.

"**Qualified Bonding Program**" means (a) the Existing Bonding Program and (b) any program that is reasonably similar to the Existing Bonding Program to the extent such program becomes available and for which the Borrower has received the written consent of the Administrative Agent and the Lenders to participate therein.

"**Qualifying Operation**" means the development and exploration of certain oil and gas properties of the Borrower and FOA located in, or in the proximity of, the Kitchen Lights Unit. With respect to State Tax Credits, such development meets the requirements of former AS 43.55.023(a), (b) and (l) and AS 43.55.025, as applicable.

"**RCRA**" means the Resource Conservation and Recovery Act.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, including easements and rights of way, together with, in each case, all improvements and fixtures located thereon.

"**receiving party**" has the meaning given in the definition of "Confidential Information".

"**Reference Time**" with respect to any determination of the Benchmark means (1) if the Benchmark is LIBOR, 11:00 a.m. (London time) on the day that is two London banking days preceding the date of such determination, and (2) if the Benchmark is not LIBOR, the time determined by the Administrative Agent in accordance with the Benchmark Replacement Conforming Changes.

A-24

"**Register**" has the meaning given in <u>Section 8.15</u>.

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, migrating, emitting, escaping, emptying, seeping, placing and the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Relevant Governmental Body**" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Reportable Event**" means any of the "reportable events" set forth in Section 4043(c) of ERISA or the regulations issued thereunder (as in effect on the date hereof), with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. § 4043 (as in effect on the date hereof).

"**Required Lenders**" means, at any time, the Lenders having Proportionate Shares which in the aggregate exceed 50.0% of the Proportionate Shares of all Lenders; *provided* that to the same extent set forth in <u>Section 8.13</u> with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Lender Officer**" means, with respect to any Lender, any duly authorized officer of such Lender that has direct and ongoing involvement in the credit decisions made in respect of the Agreement and the other Credit Document.

"**Responsible Officer**" means, as to any Person, its president, its chief executive officer, chief financial officer, any vice president, treasurer, assistant treasurer or secretary, any natural Person who is a managing general partner, member or manager (or any of the preceding with regard to any other managing general partner, member or manager), or any project manager or natural Person with similar responsibilities.

"**Restricted Payment**" means, collectively, (a) any dividend or other distribution (whether in Cash, securities or other property, including transfers of any tax benefits) with respect to any Equity Interests of the Borrower, or any payment (whether in Cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to any holder of any such Person's Equity Interests and (b) any management or similar fees payable to any Affiliate of the Sponsor or the Borrower.

"**ROW**" means non-exclusive rights of way, easements and servitudes.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings

with such country, territory or government (currently, Cuba, Iran, Myanmar, North Korea, and Syria).

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury, or Switzerland (b) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (c) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (a) or (b) hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (b) the United Nations Security Council; (c) the European Union; (d) Her Majesty's Treasury; or (e) Switzerland.

"**Second Lien Credit Agreement**" means that certain Credit Agreement, dated as of [__], 2020 among the Borrower, FOA and Corsair, the lenders party thereto and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Second Lien Agent**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Second Lien Collateral Documents**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Second Lien Loan Documents**" means the Second Lien Credit Agreement and the "Second Lien Documents" (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments providing for or evidencing any other Second Lien Obligation, as such agreements, documents and instruments may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Second Lien Obligations**" has the meaning given in the AIDEA Intercreditor Agreement.

"**Secured Parties**" means collectively, the Administrative Agent, the Lenders, each Indemnitee pursuant to Section 5.10.1 and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to this Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim

A-26

certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means the Amended and Restated Security Agreement, dated as of the Effective Date, between the Borrower and the Administrative Agent for the benefit of the Secured Parties.

"**Security Documents**" means the Security Agreement or any financing statements or other certificates executed, filed or recorded in connection with the foregoing, and all other instruments, documents and agreements delivered by or on behalf of the Borrower pursuant to the Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Administrative Agent, for the benefit of the Lenders, a Lien on the Collateral as security for the Obligations.

"**SOFR**" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"**Solvent**" with respect to any Person, means that as of the date of determination both (a) (i) the then fair saleable value of the property of such Person is (A) greater than the total amount of liabilities (including contingent liabilities) of such Person and (B) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and due considering all financing alternatives, ordinary operating income and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under Applicable Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Claim**" has the meaning given in Section 5.10.

"**Sponsor**" means [HEX Cook Inlet, LLC, an Alaska limited liability company].[9]

"**State Tax Credits**" means all Alaska State tax credits and State tax credit certificates with respect to which the Borrower is entitled to or receives proceeds under Alaska Statutes 43.55.023(a) (Qualified Capital Expenditures), 43.55.023(l) (Well Lease Expenditures), former 43.55.023(b) (Carry Forward Losses); and/or 43.55.025 (Exploration Expenditures), including without limitation, those set forth on Schedule 4.23.

"**Subject Claims**" has the meaning given in Section 5.10.1(a).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of

---

[9] Note to HEX: Please confirm.

the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Tax Credit Assignment**" means a present assignment of one hundred percent (100%) of the State Tax Credits expected to be issued by the DOR, from the Borrower to and in favor of the Administrative Agent, filed with the DOR on DOR Form 355 or its equivalent (Notice of Assignment of Tax Credit Certificates under AS 43.55.029), which shall comply with the provisions of AS 43.55.029.

"**Tax Credit Certificates**" means transferable certificates evidencing the right to exercise unused tax credits of a producer or explorer, against tax levied by AS 43.55.011 or redeemed under AS 43.55.028, as described in AS 43.55.023(d) and 43.55.025(f).

"**Tax Credit Collateral**" means collectively, the State Tax Credits and all (a) present and future distributions, income, increases, profits, combinations, reclassifications, improvements, and products of, all or part of the State Tax Credits; (b) present and future General Intangibles, Chattel Paper, Documents, Instruments and Payment Intangibles (as such terms are defined in the UCC) with respect to all or part of the State Tax Credits; (c) accounts, contract rights, cash and noncash proceeds, and other rights arising from or by virtue of, or from the voluntary or involuntary sale or other disposition of, or collections with respect to, or insurance proceeds payable with respect to, or proceeds payable by virtue of claims against any other Person with respect to, all or any part of the State Tax Credits; and (d) to the extent not otherwise included herein, all payments under any indemnity, warranty, or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the State Tax Credits, including any payments and rights to payment under the Indemnity Agreement.

"**Tax Credit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [__], 2020, between the Administrative Agent, the New Term Loan Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

"**Taxes**" means all present or future taxes, levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term SOFR**" means the forward-looking term rate for the applicable Corresponding Tenor based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"**Termination Date**" means the date on which (a) the principal of and interest on each Loan, and all fees and other amounts payable hereunder and under the other Credit Documents shall have been paid in full in Cash and (b) all other Obligations hereunder have been satisfied

(other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no claim has been asserted).

"**Title Policy**" has the meaning given in the AIDEA Loan Agreement.

"**Treasury Regulations**" means the U.S. Department of Treasury Regulations promulgated under the Code, as amended from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions of the Security Documents relating to such perfection, priority or remedies.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Unadjusted Benchmark Replacement**" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Undertaking Agreement**" means an agreement in form and substance acceptable to the Administrative Agent, the New Term Loan Agent and the Second Lien Agent in which an Operator, among other things, (a) disclaims any and all interest in the Tax Credit Collateral, (b) agrees to grant a security interest in favor of the Administrative Agent, the New Term Loan Agent and the Second Lien Agent in any Tax Credit Collateral acquired or deemed to be owned by such Operator and (c) in the event that such Operator receives any proceeds of any State Tax Credits, agrees to hold such proceeds in trust for the Lenders and to immediately turn over and deliver to, prior to the Discharge of First Lien Obligations (as defined in the Tax Credit Intercreditor Agreement), the Administrative Agent, after the Discharge of First Lien Obligations and prior to the Discharge of Second Lien Obligations (as each such term is defined in the Tax Credit Intercreditor Agreement), the Second Lien Agent and after the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations, but prior to the Discharge of Third Lien Obligations (as each such term is defined in the Tax Credit Intercreditor Agreement), the New Term Loan Agent all such proceeds, in kind, and in the exact form received.

"**Unplanned Outage**" means any outage other than a Planned Outage of the Facilities.

"**Upland**" has the meaning given in the AIDEA Loan Agreement.

US 7054423v.5 ING100/16001

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**Validated Expenditures**" means the amount of expenditures set forth in supporting invoices provided by the Borrower and incurred (within the meaning of 15 AAC 55.290) by the Borrower with respect to a Qualifying Operation that is the subject of an Alaska Tax Credit Application set forth on Schedule 4.23.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

US 7054423v.5 ING100/16001

## RULES OF INTERPRETATION

1. The singular includes the plural and the plural includes the singular.

2. "Or" is not exclusive.

3. A reference to an Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

4. A reference to a Person includes its permitted successors and permitted assigns.

5. Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

6. The words "include," "includes" and "including" are not limiting.

7. A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document. In the event of any conflict between the provisions of the Agreement (exclusive of the Exhibits, Schedules, Annexes and Appendices thereto) and any Exhibit, Schedule, Annex or Appendix thereto, the provisions of the Agreement shall control.

8. Except as otherwise provided in the Agreement, references to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

9. The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

10. References to "days" shall mean calendar days, unless the term "Banking Days" shall be used. References to a time of day shall mean such time in New York, New York, unless otherwise specified.

11. In the computation of time periods from a specified date to a specified later date, the word "from" means "from and including," the word "through" means "through and including," and the words "to" and "until" each mean "to but excluding."

12. Unless otherwise expressly specified herein, (a) amounts paid or payable hereunder shall be in Dollars and (b) all amounts denoted by an "$" shall be in Dollars.

US 7054423v.5 ING100/16001

13. The Credit Documents are the result of negotiations among, and have been reviewed by, the Borrower, the Administrative Agent, each Lender and their respective counsel. Accordingly, the Credit Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against the Borrower, the Administrative Agent or any Lender solely as a result of any such party having drafted or proposed the ambiguous provision.

14. For all purposes under this Agreement and any other Loan Document, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

The word "either", when used in reference to two Persons (such as the Borrower), is not limiting, and shall mean "a" or "any" Person.

A-32

## **Exhibit A-4**

New Term Loan Agreement

[To come.]