**<u>Exhibit A</u>**

Debt Documents

## **Exhibit A-4**

New Term Loan Agreement


[See attached.]

*K&E Draft 6/7/2020*
*Subject to Ongoing Review; to be updated to reflect final draft of Tax Credit Loan Agreement*

**THIRD AMENDED AND RESTATED CREDIT AGREEMENT**

originally dated as of July 15, 2014

originally amended and restated as of March 19, 2015

as further amended and restated as of April 12, 2018

and as further amended and restated as of June [___], 2020

among

Cornucopia Oil & Gas Company, LLC,
a Delaware limited liability company

(as the Borrower),

the Lenders party hereto from time to time

and

Energy Capital Partners Mezzanine Opportunities Fund A, LP,
a Delaware limited partnership

(as the Administrative Agent)

TABLE OF CONTENTS

Page

ARTICLE 1. DEFINITIONS ................................................................................................ 1

   1.1   Definitions ................................................................................................................ 1
   1.2   Rules of Interpretation ............................................................................................ 2

ARTICLE 2. THE CREDIT FACILITIES ........................................................................... 2

   2.1   Term Loans ............................................................................................................... 2
   2.2   Tax Treatment .......................................................................................................... 3
   2.3   Other Payment Terms ............................................................................................. 3
   2.4   Pro Rata Treatment ................................................................................................. 5
   2.5   Alternate Office ....................................................................................................... 6

ARTICLE 3. CONDITIONS PRECEDENT ........................................................................ 6

   3.1   Conditions Precedent to the Effective Date ........................................................ 6

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ................................................ 9

   4.1   Status ........................................................................................................................ 9
   4.2   Authority .................................................................................................................. 9
   4.3   Governmental Authorizations ............................................................................... 9
   4.4   No Breach or Default ........................................................................................... 10
   4.5   Compliance with Law .......................................................................................... 10
   4.6   Capitalization, Joint Ventures, Subsidiaries, Etc. ............................................ 10
   4.7   Investment Company Act ..................................................................................... 10
   4.8   Taxes ...................................................................................................................... 11
   4.9   Organizational ID Number; Location of Collateral ........................................ 11
   4.10  Title and Liens ...................................................................................................... 12
   4.11  Collateral ............................................................................................................... 12
   4.12  Patriot Act ............................................................................................................. 12
   4.13  State Tax Credits ................................................................................................... 12
   4.14  Anti-Terrorism Laws. .......................................................................................... 13

ARTICLE 5. AFFIRMATIVE COVENANTS .................................................................... 13

   5.1   Financial Statements and other Reports ............................................................ 13
   5.2   Notices – Operation of Business ......................................................................... 15
   5.3   Existence ................................................................................................................ 16
   5.4   Compliance with Law .......................................................................................... 16
   5.5   Taxes ...................................................................................................................... 16
   5.6   Warranty of Title .................................................................................................. 16
   5.7   Books and Records ............................................................................................... 16
   5.8   Preservation of Rights; Further Assurances ..................................................... 17
   5.9   Security Interests; Further Assurances ............................................................... 17
   5.10  Indemnification ..................................................................................................... 17

i

5.11   State Tax Credits ............................................................................................ 19

ARTICLE 6. NEGATIVE COVENANTS ................................................................... 20

6.1    Debt, Liens and Other Encumbrances ............................................................ 20
6.2    Restrictions on Asset Sales ............................................................................ 21
6.3    Dissolution ..................................................................................................... 21
6.4    Amendments to Organizational Documents .................................................. 21
6.5    Subsidiaries and Joint Ventures .................................................................... 21
6.6    Prohibition on Issuance of Equity Interest .................................................... 21
6.7    Name and Location; Fiscal Year .................................................................... 21
6.8    Accounts ......................................................................................................... 22
6.9    Tax Credits ..................................................................................................... 22
6.10   Compliance with Anti-Terrorism Laws ......................................................... 23

ARTICLE 7. EVENTS OF DEFAULT; REMEDIES ................................................. 23

7.1    Events of Default ........................................................................................... 23
7.2    Remedies ......................................................................................................... 25

ARTICLE 8. THE AGENT; SUBSTITUTION ........................................................... 27

8.1    Appointment, Powers and Immunities ........................................................... 27
8.2    Reliance by the Administrative Agent ............................................................ 29
8.3    Non-Reliance .................................................................................................. 29
8.4    Defaults ........................................................................................................... 30
8.5    Indemnification ............................................................................................... 30
8.6    Successor Administrative Agent ..................................................................... 30
8.7    Authorization .................................................................................................. 31
8.8    The Administrative Agent ............................................................................... 31
8.9    Amendments; Waivers .................................................................................... 31
8.10   Withholding Tax ............................................................................................. 33
8.11   General Provisions as to Payments ................................................................ 33
8.12   Participation .................................................................................................... 33
8.13   Transfer of Loans ........................................................................................... 34
8.14   Assignability as Collateral ............................................................................. 36
8.15   Register ........................................................................................................... 36

ARTICLE 9. MISCELLANEOUS ............................................................................... 37

9.1    Addresses ........................................................................................................ 37
9.2    Right to Set-Off .............................................................................................. 39
9.3    Delay and Waiver ........................................................................................... 39
9.4    Costs, Expenses and Attorneys' Fees ............................................................ 39
9.5    Entire Agreement ............................................................................................ 40
9.6    Governing Law ............................................................................................... 40
9.7    Confidentiality ................................................................................................ 40
9.8    Severability ..................................................................................................... 41
9.9    Headings ......................................................................................................... 41

9.10    Accounting Terms.................................................................................... 41
9.11    No Partnership ........................................................................................ 41
9.12    Security Documents ................................................................................ 42
9.13    Limitation on Liability ........................................................................... 42
9.14    Waiver of Jury Trial ............................................................................... 43
9.15    Consent to Jurisdiction........................................................................... 43
9.16    Knowledge and Attribution..................................................................... 43
9.17    Successors and Assigns; No Third-Party Beneficiaries............................ 44
9.18    Usury Savings Clause ............................................................................. 44
9.19    Counterparts ........................................................................................... 44
9.20    Patriot Act .............................................................................................. 44
9.21    Obligations Absolute .............................................................................. 45
9.22    Intercreditor Agreements ........................................................................ 45
9.23    Credit Documents ................................................................................... 47
9.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions... 47
9.25    Amendment and Restatement .................................................................. 48
9.26    Release of FOA....................................................................................... 48

List of Schedules

Schedule I            The Lenders; Wire Instructions
Schedule 3.1.6       Litigation
Schedule 4.5         Compliance with Law
Schedule 4.6.1       Contracts other than Material Contracts
Schedule 4.6.3       Equity Interests and Ownership
Schedule 4.9         Hazardous Substances
Schedule 4.11.2      Tax Credit Assignments
Schedule 4.13        State Tax Credits[1]
Schedule A           Material Contracts

## **Index of Exhibits**

Exhibit A            Definitions and Rules of Interpretation
Exhibit B            Form of Amended and Restated Note
Exhibit C            Lending Offices
Exhibit D            Permits
                     Part I   Applicable Permits
                     Part II  Pending Permits
Exhibit E            Schedule of Security Filings

---

[1] Schedule 4.13 to set forth all Alaska Tax Credit Applications that have been filed, the State Tax Credits that have been received, the DOR Purchase Applications for each State Tax Credit and the fiscal years for which the State Tax Credits have been received.

THIS THIRD AMENDED AND RESTATED CREDIT AGREEMENT (this "**Agreement**" or the "**Credit Agreement**") dated as of [_____], 2020, is entered into among Cornucopia Oil & Gas Company, LLC, a Delaware limited liability company (the "**Borrower**"), Energy Capital Partners Mezzanine Opportunities Fund A, LP, Energy Capital Partners Mezzanine Opportunities Fund, LP, Energy Capital Partners Mezzanine Opportunities Fund B, LP (collectively, the "**ECP Lenders**"), AFG Investments 1A, LLC, Melody Special Situations Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund, L.P., Melody Capital Partners FDB Credit Fund, LLC, and other lenders from time to time party hereto and Energy Capital Partners Mezzanine Opportunities Fund A, LP, a Delaware limited partnership, as administrative agent and collateral agent for the Lenders (in such capacity, the "**Administrative Agent**").

WHEREAS, the Borrower, Furie Operating Alaska, LLC ("**FOA**" and together with the Borrower, the "**Prepetition Borrowers**"), the lenders party thereto (the "**Prepetition Lenders**") and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as administrative agent and collateral agent for the Prepetition Lenders (in such capacity, the "**Prepetition Administrative Agent**") are parties to that certain Credit Agreement, dated as of July 14, 2014 (as amended, restated, modified, or supplemented prior to the date hereof, the "**Prepetition Credit Agreement**"), pursuant to which the Prepetition Lenders made certain loans to the Prepetition Borrowers and other extensions of credit which remain outstanding (the "**Prepetition Loans**");

WHEREAS, pursuant to and upon consummation of the Plan (as defined herein), the Prepetition Lenders have agreed to restructure their loans under the Prepetition Credit Agreement, which debt is a restructuring and rearrangement of the debt of the Prepetition Borrowers through an amendment and restatement of the Prepetition Credit Agreement, which will amend and restate the Prepetition Credit Agreement as provided in this Agreement;

WHEREAS, pursuant to and upon consummation of the Plan, AFG Investments 1A, LLC in partial satisfaction of its Allowed DIP Claims (as defined in the Plan), shall receive its share of $500,000 of indebtedness under this Agreement; and

WHEREAS, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and subject to the Administrative Agent's giving notice of the Effective Date as contemplated in Section 3.1 hereof, the parties hereto agree that the Prepetition Credit Agreement is hereby amended, renewed, extended and restated in its entirety on (and subject to) the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the agreements herein and in the other Credit Documents and in reliance upon the representations and warranties set forth herein and therein, the parties agree to amend and restate the Prepetition Credit Agreement in its entirety as follows:

## ARTICLE 1.
## DEFINITIONS

1.1    **DEFINITIONS.**  Except as otherwise expressly provided, capitalized terms used in this Agreement and its exhibits and schedules shall have the meanings given in Exhibit A.

**1.2    RULES OF INTERPRETATION.**  Except as otherwise expressly provided, the rules of interpretation set forth in Exhibit A shall apply to this Agreement and the other Credit Documents.

## ARTICLE 2.
## THE CREDIT FACILITIES

**2.1    TERM LOANS.**

**2.1.1**  *Term Loans*.

(a)    Restructured Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to restructure and rearrange the Prepetition Loans owing to it under the Prepetition Credit Agreement as a Loan hereunder, or in the case of AFG Investments 1A, LLC, shall be deemed to have made a Loan hereunder as of the Effective Date (collectively, the "**Loans**") in each case in an amount for each such Lender set forth on Schedule I, and in a total aggregate amount for all Lenders equal to $21,000,000 (the "**Credit Facility**").  Such Loans shall be deemed to have been made in a single draw on the Effective Date and, once repaid or prepaid, in whole or in part, may not be reborrowed. No Lender shall have any commitment to make any Loans other than the Loans deemed funded and outstanding as provided in this Section 2.1.1(a).

(b)    Principal Payment.  The Borrower shall repay the Lenders in Cash the full aggregate unpaid principal amount of the Loans on the Maturity Date, together with all expenses and costs then due and payable (including any Default Interest, if applicable). For the avoidance of doubt, the Borrower's repayment obligation set forth herein is non-recourse, as further provided in Section 7.2.6, and the sole source of Cash from which the Loans shall be repaid is the proceeds of the Tax Credit Collateral.  Each Lender hereby acknowledges and agrees that any payment received by such Lender under the Indemnity Agreement (and not required to be turned over by such Lender pursuant to any of the Intercreditor Agreements) and/or the Litigation Trust Agreement shall, in each case, be deemed to be a repayment (on a dollar for dollar basis) of the Loans under this Agreement for all purposes under this Agreement and each other Credit Document.

**2.1.2**  *Promissory Notes*.  The obligation of the Borrower to repay the Loans made by each Lender and any and all other Obligations hereunder shall, upon the written request of any Lender, be evidenced by one or more promissory notes substantially in the form of Exhibit B (in each case, individually, a "**Note**"), payable to each such Lender and in the principal amount of such Lender's Loan.  The Borrower authorizes each Lender to record in its books and records the date and amount of the Loans made by such Lender, and each payment or prepayment of principal thereunder.  The Borrower further authorizes each Lender to attach to and make a part of such Lender's Note continuations of the schedule attached thereto as necessary.  No failure to make any such notations, nor any errors in making any such notations, shall affect the validity of the Borrower's obligations to repay the full aggregate unpaid principal amount of the Loans or the duties of the Borrower hereunder or thereunder. This Section 2.1.2 shall not affect Section 8.15 and, in case of any conflict, Section 8.15 shall govern.

2

**2.1.3** *Prepayments and Repayments.*

(a)    Optional Prepayment.

(i)    The Borrower may, at its option, upon 5 Banking Days' irrevocable written notice to the Lenders, pay in advance of maturity thereof any Loan, in whole, or from time to time in part, in minimum amounts of $500,000 or an integral multiple of $250,000 in excess thereof (or such lesser amount as shall then be outstanding) at a price equal to 100% of the amount thereof.    All payments made pursuant to this Section 2.1.3(a)(i) shall be applied to reduce the amount of the Loans in the order described in Section 2.1.3(c).

(ii)    All such prepayments shall be made by notice given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed by delivery of written notice thereof to the Administrative Agent (and the Administrative Agent will promptly transmit such original notice by telefacsimile, email or telephone to each Lender).    Upon the giving of any such notice, the amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein; *provided* that, notwithstanding anything to the contrary in this Section 2.1.3(a) any notice of prepayment delivered pursuant to this Section 2.1.3(a) may provide that such prepayment is conditioned upon the occurrence of other transactions specified in such notice of prepayment.

(b)    Mandatory Prepayment.  Subject to the Tax Credit Intercreditor Agreement, no later than the second Banking Day following the date of receipt by the Borrowers (or the Administrative Agent) of any State Tax Credit Proceeds that are payable to the Lenders in accordance with Section 4.1 of the Tax Credit Intercreditor Agreement, the Loans shall be repaid with such Proceeds in an amount equal to the lesser of (i) 100% of such State Tax Credit Proceeds and (ii) the Obligations then outstanding in respect of such Loans, including all accrued and unpaid interest.    Thereafter any remaining State Tax Credit Proceeds shall be applied in accordance with Section 4.1 of the Tax Credit Intercreditor Agreement.

(c)    Order of Application.  All payments made pursuant to Section 2.1.3(a)(i) and Section 2.1.3(b) shall be applied (i) *first*, to pay all outstanding principal amounts of all such Loans in inverse order in which such Loans were made and (ii) *second*, to pay all other outstanding Obligations.

**2.2**    **TAX TREATMENT**.  For U.S. federal and applicable state and local income tax purposes, the Borrower, the Administrative Agent and each Lender agree (i) that the Loans shall be treated as indebtedness and shall not be treated as "contingent payment debt instruments" within the meaning of Section 1.1275-4 of the Treasury Regulations and (ii) to file all of its applicable tax returns and reports in accordance with the treatment set forth in clause (i).

**2.3**    **OTHER PAYMENT TERMS**.

**2.3.1**    *Place and Manner.*  The Borrower shall make all payments due to each Lender hereunder to the Administrative Agent, for the account of such Lender, to the account of such

Lender set forth in Schedule I, or to such other account as the Administrative Agent shall notify the Borrower in writing from time to time, in Dollars, without set-off or counterclaim, and in immediately available funds not later than 2:00 p.m., New York City time, on the date on which such payment is due.  Any payment made after such time on any day shall be deemed received on the Banking Day after such payment is received.  The Administrative Agent shall disburse in immediately available funds to each Lender each such payment received by the Administrative Agent for such Lender, such disbursement to occur on the day such payment is received if received by 2:00 p.m., New York City time, on such day or if otherwise reasonably possible; otherwise, such disbursement shall occur on the next Banking Day.

**2.3.2**   *Date.*   Whenever any payment due hereunder that is required to be paid in Cash shall fall due on a day other than a Banking Day, such payment shall be made on the next succeeding Banking Day, and such extension of time shall be included in the computation of fees without duplication of any fees so paid in the next subsequent calculation of fees payable.

**2.3.3**   *Late Payments and Events of Default.*   Upon the occurrence and during the continuation of any Default or Event of Default, the Borrower shall pay interest on (a) the unpaid principal amount of the Loans owing to each Lender that is not paid when due at a rate per annum equal to the Prime Rate *plus* 2% per annum (such rate, the "**Default Rate**" and such interest, "**Default Interest**") and (b) to the extent permitted by Applicable Law, the amount of any interest, fee or other amount payable under this Agreement or any other Credit Document that is not paid when due, at the Default Rate, in each case from the date such amount shall be due until such amount shall be paid in full, compounded monthly.

**2.3.4**   *Payments Net of Taxes*.   Any and all payments to or for the benefit of any Lender or the Administrative Agent by or on behalf of the Borrower hereunder or under any other Credit Document shall be made without deduction or withholding for any Taxes unless required by Applicable Law.

**2.3.5**   *Withholding Exemption Certificates.*   Each Lender upon becoming a Lender hereunder agrees that it will deliver to the Borrower and the Administrative Agent either (a) if it is a U.S. Person, two (2) duly completed copies of United States Internal Revenue Service Form W–9, or (b) if it is not a U.S. Person, to the extent it is legally able to do so, two (2) duly completed copies of United States Internal Revenue Service Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI or successor applicable form (in the case of any Lender claiming an exemption under the so-called portfolio interest exemption rules, together with a certificate signed by such Lender stating that, for purposes of applying section 881(c)(3) of the Code or a successor provision, it is not (i) a bank, (ii) a ten (10) percent shareholder of the Borrower, or (iii) a controlled foreign corporation related to the Borrower), as the case may be, certifying in each case that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes.  Each Lender which delivers to the Borrower and the Administrative Agent a Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI pursuant to the preceding sentence further undertakes to deliver to the Borrower and the Administrative Agent, to the extent it is legally able to do so, further copies of Form W-8BEN, W-8BEN-E, W–8IMY or W-8ECI, or successor applicable forms, or other manner of certification or procedure, as the case may be, on or before the date that any such letter or form expires or becomes obsolete or within a reasonable time after gaining knowledge of the occurrence of any event requiring a change in the

most recent letter and forms previously delivered by it to the Borrower and the Administrative Agent, and such extensions or renewals thereof as may reasonably be requested by the Borrower and the Administrative Agent, certifying in the case of a Form W-8BEN, W-8BEN-E, W-8IMY or W-8ECI that such Lender is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes or promptly notifying the Borrower and the Administrative Agent in writing of its legal inability to do so.  If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by Applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 2.3.5, "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Notwithstanding any other provision of this Section 2.3.5, any Form W-9 required to be delivered pursuant to this Section 2.3.5 that was delivered by a Lender at the time such Lender became a party to the Prepetition Credit Agreement shall be deemed to have been delivered by such Lender on or before the date on which it becomes a party to this Agreement.

**2.3.6**   *Application of Payments.*   Except as expressly otherwise provided in the Credit Documents, payments made under this Agreement and the other Credit Documents and other amounts received by the Administrative Agent or the Lenders under this Agreement and the other Credit Documents shall, first, be applied to any fees, costs, charges or expenses payable to the Administrative Agent or the Lenders hereunder or under the other Credit Documents (including Default Interest, if any), and second to outstanding principal then due and owing or otherwise to be prepaid.

**2.4**   **PRO RATA TREATMENT**.

**2.4.1**   *Sharing of Payments*. Except as otherwise provided herein, each payment of principal, Default Interest (if any) and fees on the Loans shall be made or shared among the Lenders holding such Loans pro rata according to their respective Proportionate Shares of the Loans.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of any Loans owed to it, in excess of its ratable share of payments on account of such Loans obtained by all Lenders entitled to such payments, such Lender shall forthwith segregate and hold in trust and promptly pay over to the Administrative Agent (for distribution among the Lenders according to their respective Proportionate Shares) in the form received any such payment in excess of its ratable share of payments on account of such Loans obtained by all Lenders entitled to such payments, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.

**2.4.2**   *Consent Fees*. No Borrower nor any of their Affiliates will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or

otherwise, to any Lender (in its capacity as Lender hereunder) as consideration for the agreement of such Lender in respect of any modification or waiver of the New Term Loan Documents, unless all Lenders so agreeing are concurrently paid, on the same terms, their Proportionate Share of such remuneration or other value; provided that nothing in this Section 2.4.2 shall prohibit the reimbursement of Lenders pursuant to Section 9.4 in the amounts permitted thereunder.

**2.5    ALTERNATE OFFICE.**

Any Lender may, upon written notice to the Borrower, designate a Lending Office other than that set forth on Exhibit C and may assign all of its interests under the Credit Documents and its Notes to such Lending Office; *provided* that such designation and assignment do not at the time of such designation and assignment increase the reasonably foreseeable liability of the Borrower.

## ARTICLE 3.
## CONDITIONS PRECEDENT

**3.1    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**    The effectiveness of this Agreement and the occurrence of the Effective Date is subject to the satisfaction of each of the following conditions (unless waived in writing by the Administrative Agent with the consent of the Required Lenders), all of which shall be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Required Lenders:

**3.1.1    *Incumbency.***    Delivery to the Administrative Agent of a certificate from the Borrower and the Sponsor, in each case signed by an appropriate authorized officer of each such entity and dated the Effective Date, as to the incumbency of the natural persons authorized to execute and deliver this Agreement, the other Credit Documents and/or any instruments or agreements required hereunder or thereunder to which such entity is a party.

**3.1.2    *Formation Documents.***    Delivery to the Administrative Agent of a copy of the limited liability company agreement (which such limited liability company agreements shall include customary provisions opting in to Article 8 of the UCC) and certificate of formation or organization of the Borrower and the Sponsor, in each case certified by a Responsible Officer of each such entity as being true, correct and complete on the Effective Date, and any related agreements or certificates filed in accordance with Applicable Law.

**3.1.3    *Good Standing Certificates.***    Delivery to the Administrative Agent of certificates issued by the Secretary of State of the state of organization of the Borrower and the Sponsor, and, if applicable, each state of foreign qualification (which shall include the state of Alaska), in each case dated no more than 30 days prior to the Effective Date and certifying that such entity is in good standing or has current status, and is qualified to do business in, and, if applicable, has paid all franchise taxes or similar taxes due to, such state.

**3.1.4    *Credit Documents.***    Delivery to the Administrative Agent of executed copies of the Credit Documents.  If requested by any Lender, delivery to the Administrative Agent of an original Note in the amount of such Lender's Proportionate Share of the Loans.

**3.1.5    *Legal Opinions.***    Delivery to the Administrative Agent of legal opinions of Chipman Brown Cicero & Cole, LLP, as New York and Delaware counsel to the Borrower and

the Sponsor and by David H. Bundy, PC, as Alaska law counsel to the Borrower and Sponsor, addressed to the Administrative Agent and the Lenders.

**3.1.6**   *Absence of Litigation.*   Other than the Bankruptcy Cases and except as set forth on Schedule 3.1.6, (i) no action, suit, proceeding or investigation shall be pending or, to the knowledge of the Borrower, threatened, against the Borrower or the Properties of the Borrower and (ii) no action, suit, proceeding or investigation shall be pending or, to the knowledge of the Borrower, threatened, against the Sponsor or the Properties of the Sponsor. No order, judgment or decree shall have been issued or, to the knowledge of the Borrower, proposed to be issued by any Governmental Authority relating to the Sponsor, the Borrower or the Properties of the Sponsor or the Properties of the Borrower.

**3.1.7**   *Payment of Filing and Recording Fees.*   All amounts required to be paid to or deposited with the Administrative Agent on or prior to the Effective Date, including all Taxes, fees and other costs payable in connection with the execution, delivery, recording and filing of the documents and instruments referred to in this Section 3.1, shall have been paid in full by the Sponsor or, as approved by the Administrative Agent, provided for.

**3.1.8**   *UCC and Tax Lien Reports.*   The Administrative Agent shall have received UCC, judgment and tax lien reports of a date no less recent than ten (10) Banking Days before the Effective Date, showing that the security interests created under the Security Documents will, subject to the Intercreditor Agreements, be prior to all other financing statements, or other security documents wherein the security interest is perfected by filing in respect of the Collateral under the UCC in such jurisdiction.

**3.1.9**   *Collateral; Filings and Recordings.*   The Administrative Agent shall have received, in each case in form and substance reasonably satisfactory to the Administrative Agent:

(a)   a UCC financing statement (Form UCC-l), naming the Borrower as debtor and the Administrative Agent as secured party, filed with the appropriate Governmental Authority sufficient to perfect the security interests purported to be created by the Security Documents, covering the applicable Collateral;

(b)   copies of all other recordings and filings of, or with respect to, the Security Documents as may be requested by the Required Lenders acting reasonably; and

(c)   satisfactory evidence that all other actions necessary to perfect the security interests purported to be created by the Security Documents have been taken.

**3.1.10**   *Governmental Authorizations and Consents.*   (a) The Borrower shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary in connection with the execution, delivery and performance of the Credit Documents and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent and (b) all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the transactions contemplated by the Credit Documents and no action, request for stay, petition for review or rehearing, reconsideration, or appeal with

respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.

**3.1.11** *Undertaking Agreement*.  The Administrative Agent shall have received a duly executed copy of the Undertaking Agreement, dated June [●], 2020, entered into by the Administrative Agent, the Tax Credit Agent, the Second Lien Agent and FOA, in its capacity as Operator.

**3.1.12** *Other Documents*.  The Borrower shall have provided to the Lenders such other documents as the Lenders may request to effect the transactions contemplated by this Agreement, including the perfection of any security interest granted pursuant to the Credit Documents.

**3.1.13** *Patriot Act*.  At least one (1) Banking Day prior to the Effective Date, the Lenders shall have received all documentation and other information requested by the Administrative Agent that is required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act.

**3.1.14** *No Default*.  No Default or Event of Default has occurred and is continuing or will result from the incurrence of the Loans.

**3.1.15** *No Material Adverse Effect*.  There shall not have occurred a Material Adverse Effect nor be any existing event or condition that could reasonably be expected to result in a Material Adverse Effect immediately before and after giving effect to the incurrence of the Loans.

**3.1.16** *Plan; Confirmation Order*.

(a)    The Plan shall not have been amended, modified or supplemented after [●], 2020 in any manner and no condition to the effectiveness thereof shall have been waived that, individually or in the aggregate, would reasonably be expected to adversely affect the interests of the Lenders in any material respect.

(b)    The Confirmation Order shall be in form and substance materially consistent with the Plan and otherwise reasonably satisfactory to the Required Lenders and shall have been entered confirming the Plan.

(c)    The Confirmation Order shall be in full force and effect and not have been stayed, reversed, or vacated, amended, supplemented, or modified except that such order may be further amended, supplemented or otherwise modified in any manner that would not reasonably be expected to adversely affect the interests of the Lenders in any material respect and shall not be subject to any pending appeals.

(d)    The Confirmation Order shall authorize the Debtors to execute, deliver and perform all of their obligations under all Credit Documents and shall contain no term or provision that contradicts such authorization.

(e)    The Debtors shall be and shall have been in compliance with the Confirmation Order in all material respects.

(f)     The Plan shall have become effective in accordance with its terms and all conditions to the effectiveness of the Plan shall have been satisfied or waived (in accordance with the terms of the Plan) without giving effect to any waiver that would reasonably be expected to adversely affect the interests of the Lenders in any material respect unless consented to by the Required Lenders (such consent not to be unreasonably withheld, conditioned or delayed), and all transactions contemplated therein or in the Confirmation Order to occur on the effective date of the Plan shall have been (or concurrently with the Effective Date, shall be) substantially consummated in accordance with the terms thereof and in compliance with Applicable Laws.

**3.1.17** *Solvency*.   The Borrower, immediately after giving effect to the transactions contemplated by the Credit Documents and the Plan, is Solvent.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES

The Borrower makes the following representations and warranties to and in favor of the Administrative Agent and the Lenders as of the Effective Date and as of each date any certificate is delivered pursuant to the Credit Documents:

**4.1     STATUS**.   The Borrower (a) is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware and (b) is duly qualified and authorized to do business and in good standing in each jurisdiction where the character of its Properties or the nature of its activities makes such qualification necessary.  The Borrower has all requisite limited liability company power and authority to own or hold under lease and operate the property it purports to own or hold under lease, to carry on its business as now being conducted and as now proposed to be conducted in respect of its Properties and to execute, deliver and perform its obligations hereunder and the other Credit Documents to which it is a party.

**4.2     AUTHORITY**.   The Borrower has full power and authority to execute and deliver this Agreement and the other Credit Documents to which it is a party and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite limited liability company action on its parts and the Borrower has executed and delivered the Credit Documents to which it is a party.  This Agreement and the other Credit Documents to which it is a party constitute valid and legally binding obligations, enforceable against the Borrower in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization and other similar laws now or hereafter in effect relating to creditors' rights generally or by general principles of equity (whether enforced at law or in equity).

**4.3     GOVERNMENTAL AUTHORIZATIONS**.   There is no proceeding pending, or to its knowledge, threatened against the Borrower that seeks to, or may be reasonably expected to rescind, terminate, modify in any manner adverse to the State Tax Credits or suspend any Governmental Authorization or this Agreement or materially interfere with its ability to fully perform its obligations and duties set forth under this Agreement or the other Credit Documents.

**4.4    NO BREACH OR DEFAULT**.  The execution, delivery and performance by the Borrower of this Agreement and the transactions contemplated hereby and by the other Credit Documents does not and will not (a) require any consent or approval or registration with or notice to or other action of any Governmental Authority or any other Person except for Pending Permits and immaterial Permits and consents as expressly provided for herein or the Credit Documents or that has otherwise been obtained and is currently in effect or (b) constitute a breach of any term or provision of, conflict with, or violate or constitute a default under (with or without notice, or lapse of time, or both), or result in or require the creation of any Lien (other than Permitted Encumbrances) upon any of its property under, (i) any outstanding indenture, mortgage, loan agreement or other contract or agreement to which the Borrower is a party, or its Properties is bound, (ii) its operating agreement, certificate of formation or other Organizational Documents, or any other Contractual Obligations, (iii) any material Applicable Law (or require any consents, approvals, notifications or authorizations thereunder) applicable to or binding on the Borrower or any of its Properties, or (iv) any order, writ, judgment or decree of any Court or other Governmental Authority having applicability to the Borrower.

**4.5    COMPLIANCE WITH LAW**.  Except as otherwise have been delivered to the Administrative Agent and that are expressly identified on Schedule 4.5, there are no (a) material violations by the Borrower of any Legal Requirement relating to the Credit Documents or that could have an adverse effect on the value or collectability of the Collateral; and (b) written notices of material violation of any Legal Requirement relating to the Credit Documents or the Collateral have been received by the Borrower (it being acknowledged and agreed that this representation is given to the Borrower's knowledge only, with respect to the period prior to the Effective Date).

**4.6    CAPITALIZATION, JOINT VENTURES, SUBSIDIARIES, ETC.**

**4.6.1    *Borrower not a Partner*.**  The Borrower is not a general partner or a limited partner in any general or limited partnership or a joint venturer in any joint venture, except to the extent its respective activities under the JOA constitute a joint venture.

**4.6.2    *Subsidiaries*.**  The Borrower does not have any Subsidiaries other than FOA and does not hold any Equity Interests in any other entity other than FOA.  The Borrower is a wholly-owned direct Subsidiary of the Sponsor.

**4.6.3    *Due Authorization*.**  The Equity Interests of the Borrower have been duly authorized and validly issued and are fully paid and non-assessable.  Schedule 4.6.3 correctly sets forth the ownership of the Equity Interests of the Borrower as of the Effective Date.

**4.6.4    *Equity Interest Equivalents*.**  There exists no Equity Interest Equivalents granting a right to any Person to acquire an interest in the Borrower, and there is no Equity Interests of the Borrower outstanding which upon conversion or exchange would require, the issuance by the Borrower of any additional Equity Interests of the Borrower or other Equity Interest Equivalents convertible into, exchangeable for or evidencing the right to subscribe for or purchase, any Equity Interest of the Borrower.

**4.7    INVESTMENT COMPANY ACT**. The Borrower is not subject to regulation under any federal or state statute or regulation which may limit its ability to incur Debt or which may

otherwise render all or any portion of the Obligations unenforceable.  The Borrower is not an "investment company", "registered investment company", a company "controlled" by an "investment company" or a "registered investment company" or a "principal underwriter" of a "registered investment company", within the meaning of the Investment Company Act of 1940.

**4.8**    TAXES.

**4.8.1**    The Borrower has filed, or caused to be filed, all federal, state and local Tax returns (including any Alaska Tax Returns) that it is or any of its [parent entities] is required to file, has paid, or caused to be paid, all Taxes it is required to pay to the extent due (other than those Taxes that are not yet due and for which the Borrower has established reserves that are adequate for the payment thereof and are required by GAAP). For federal income tax purposes, the Borrower is a Pass-Through Entity (it being acknowledged and agreed that the representation with respect to the filing of the Borrower's parent entities' Tax returns (including any Alaska Tax Returns) is given to the Borrower's knowledge only, with respect to the period prior to the Effective Date).

**4.8.2**    (a) No Liens for Taxes have been filed with respect to the assets of the Sponsor or the Borrower, (b) no material unresolved claim has been asserted in writing with respect to any Taxes of the Borrower, (c) no unresolved claim has been asserted in writing with respect to any AK Obligations of the Borrower, (d) no waiver or agreement by the Borrower is in force for the extension of time for the assessment or payment of any Tax, and (e) no request for any such extension or waiver is currently pending.  There is no pending or, to the knowledge of the Borrower, threatened audit or investigation by any Governmental Authority of the Borrower with respect to Taxes.

**4.8.3**    The Borrower is not party to or bound by any Tax sharing agreement or similar agreement or arrangement (whether or not written) pursuant to which it may have an obligation to make payments after the Effective Date, other than obligations under the terms of (a) this Agreement and any other Credit Documents regarding the collateral assignment of State Tax Credits to the Administrative Agent on behalf of the Lenders, (b) the Second Lien Credit Agreement and any other Second Lien Loan Document relating to the collateral assignment of the State Tax Credits pursuant to the Second Lien Loan Documents, subject to the Intercreditor Agreement and (c) the Tax Credit Loan Agreement and any other Tax Credit Loan Documents relating to the collateral assignment of the State Tax Credits pursuant to the Tax Credit Loan Documents, subject to the Intercreditor Agreement.

**4.9**    ORGANIZATIONAL ID NUMBER; LOCATION OF COLLATERAL.

**4.9.1**    As of the Effective Date, the Borrower's organizational identification number is 6727372.[2]

**4.9.2**    As of the Effective Date, all of the tangible Collateral is located on the Properties of Borrower or at the addresses set forth in Section 9.1, except as otherwise permitted by the Security Agreement.

---

[2] Note to Borrower: Please update as required.

**4.10    TITLE AND LIENS.**  Other than as expressly permitted by the Credit Documents, the Borrower has good, legal and valid title to, or, with respect to all of the Collateral free and clear of all Liens except Permitted Encumbrances.  No portion of the Collateral has been leased, subleased, licensed or otherwise granted by the Borrower to any Person.

**4.11    COLLATERAL.**

**4.11.1**  Subject to the Intercreditor Agreements, the security interests granted to the Administrative Agent for the benefit of the Secured Parties pursuant to the Security Documents in the Collateral:

(a)    constitute, as to the Tax Credit Collateral, a security interest and lien under the UCC and, as to the Cornucopia Equity Collateral (as defined in the Cornucopia Equity Intercreditor Agreement), a valid security interest and lien under the UCC, in each case with the priority set forth in the Intercreditor Agreements; and

(b)    are perfected, with respect to any property that can be perfected by filing, as a result of the financing statements that have been filed in the filing offices identified on Exhibit E.

**4.11.2**  The Tax Credit Certificates and proceeds from all State Tax Credits, including without limitation all State Tax Credits due to the Borrower from the DOR, have been collaterally assigned to (a) the Tax Credit Agent pursuant to the Tax Credit Collateral Documents and the applicable Tax Credit Assignments, which Tax Credit Assignments are set forth on Schedule 4.11.2, (b) the Second Lien Agent pursuant to the Second Lien Collateral Documents and (c) the Administrative Agent pursuant to the Security Documents.

**4.12    PATRIOT ACT.**  To the extent applicable, the Borrower is in compliance, with (a) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) the Patriot Act.  The Borrower has provided to the Administrative Agent and the Lenders true and correct documentation and other information as requested by the Administrative Agent or the Lenders in order to comply with requirements of the Patriot Act.  No part of the proceeds of the Loans will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended (it being acknowledged and agreed that this representation is given to the Borrower's knowledge only, with respect to the period prior to the Effective Date).

**4.13    STATE TAX CREDITS.**

(a)    There are no deficiency payments, liquidated damages or other expenses or amounts currently due or payable (or reasonably expected to be due and payable) that could result in an offset against the State Tax Credits.  The Borrower is in compliance with the provisions of AS 43.55.028(e).

(b)    The Borrower has timely filed all state oil and gas production tax returns with the DOR no later than February 28 in each tax year set forth on <u>Schedule 4.13</u> following the applicable tax year.

(c)    The Borrower has, concurrently with the filing of each Alaska Tax Credit Application set forth on <u>Schedule 4.13</u>, collaterally assigned to the Administrative Agent all State Tax Credits to the extent permitted by Alaska law, by the filing with the DOR of a Tax Credit Assignment in accordance with this Agreement, together with (i) an Alaska Optional Waiver of Confidentiality for Tax Credit Certificate Information relating to Assignments under AS 43.55.029 in a form prescribed by the DOR (Form 355 or equivalent) in favor of the Administrative Agent and (ii) a State of Alaska Electronic Payment Agreement filed with the Alaska Department of Administration and the DOR.

(d)    The Borrower has timely completed and filed with the DOR, in accordance with Applicable Laws, all Alaska Tax Credit Applications set forth on <u>Schedule 4.13</u> for the State Tax Credits no later than forty five (45) days after the first date on which such Alaska Tax Credit Applications can be filed with the DOR.

(e)    The Borrower has filed with the DOR, no later than ten (10) Banking Days' following the issuance of each State Tax Credit, a DOR Purchase Application relating to such State Tax Credit together with the applicable Tax Credit Assignment as required by AS 43.55.029(a), which DOR Purchase Applications are set forth on <u>Schedule 4.13</u>.

**4.14    ANTI-TERRORISM LAWS.**

The Borrower and each of its Affiliates, Subsidiaries, officers, directors and employees has, (a) conducted its operations in accordance with applicable AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (b) not conducted its business or engaged in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (c) not engaged in or conspired to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws (it being acknowledged and agreed that this representation is given to the Borrower's knowledge only, with respect to the period prior to the Effective Date).

## ARTICLE 5.
## AFFIRMATIVE COVENANTS

Until the Termination Date:

**5.1    FINANCIAL STATEMENTS AND OTHER REPORTS.**[3]

**5.1.1    *Quarterly*.**  As soon as practicable and in any event within 90 days after the end of each quarterly accounting period of its fiscal year (including the fourth fiscal quarter of each fiscal year), the Borrower shall deliver an unaudited consolidated and consolidating balance sheet of the Borrower, as of the last day of such quarterly period and the related consolidated statements of

---

[3] NTD: Financial reporting to be conformed to AIDEA Credit Agreement and Second Lien Credit Agreement.

income, cash flow, and equity (where applicable prepared in accordance with GAAP (subject to normal year-end audit adjustments and the absence of footnotes)) for such quarterly period and (in the case of second, third, and fourth quarterly periods) for the portion of the fiscal year ending with the last day of such quarterly period, setting forth in each case in comparative form corresponding unaudited figures from the preceding fiscal year, and a report from the management of the Borrower discussing and analyzing such financial results and their effect on the financial projections of the Borrower for the following twelve (12) month period.

**5.1.2** *Annual*. As soon as practicable and in any event within 180 days after the close of each applicable fiscal year, the Borrower shall deliver audited consolidated and consolidating financial statements of the Borrower. Such consolidated and consolidating financial statements shall include a consolidated statement of equity, a consolidated and consolidating balance sheet as of the close of such year, an consolidated income and expense statement, reconciliation of capital accounts and a consolidated statement of cash flow, all prepared in accordance with GAAP, certified by an independent certified public accountant selected by the Borrower. Such certificate shall not be qualified or limited because of restricted or limited examination by such accountant of any material portion of the records of the Borrower.

**5.1.3** *Monthly*. As soon as practicable and in any event within fifteen (15) days after the end of each month commencing with the third full month occurring after the Effective Date, the Borrower shall deliver (a) internally prepared financial information (or management reports or updates) and monthly information with respect to the quantity of oil, natural gas, natural gas liquids and other liquid or gaseous hydrocarbons delivered by the Borrower, sales of the foregoing (to the extent such information is available), average volumes processed per day, revenue and expenses and (b) a detailed report of all Capital Expenditures expended during such immediately preceding calendar month.

**5.1.4** *Administrative Agent Requests*. From time to time, as soon as practicable after the request of the Administrative Agent or any Lender, the Borrower shall deliver to the Administrative Agent such other information and data with respect to the Borrower or any Properties or operations of the Borrower.

**5.1.5** *Officer's Certificate*. Each time financial statements are delivered under Section 5.1.1 and 5.1.2 above, the Borrower shall deliver or cause to be delivered along with such financial statements, a certificate signed by a Responsible Officer of the Borrower, certifying that (a) such officer has made or caused to be made a review of the transactions and financial condition of the Borrower during the relevant fiscal period, (b) that such financial statements have been prepared in conformity with GAAP applied consistently throughout the relevant periods (except as otherwise approved and disclosed therein) and fairly presents, in all material respects, the consolidated and consolidating financial position of the Borrower, at the respective dates thereof and the consolidated results of operations and cash flows of the Borrower described therein for each of the periods then ended, subject, in the case of any unaudited quarterly financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure, (c) that such review has not, to such Responsible Officer's knowledge, disclosed the existence of any event or condition which constitutes, as of the date of such certificate, a Default or Event of Default, or if any such event or condition existed or exists, the nature thereof and the corrective actions that the Borrower have taken or propose to take with respect thereto, and (d) that

14

the Borrower is in full compliance with all covenants in this Agreement and each other Credit Document.

**5.1.6** *Telephone Conferences*. The Borrower shall host a quarterly telephone conference with the Administrative Agent and the Lenders on a date and time during each fiscal quarter to be mutually agreed and other telephone conferences between such quarterly telephone conferences as may be reasonably requested by the Administrative Agent.

**5.2** NOTICES – OPERATION OF BUSINESS. The Borrower shall promptly upon receipt of or giving notice (or upon a Responsible Officer of the Borrower otherwise obtaining knowledge thereof) and, except as otherwise noted below, in any event, within 10 days after the occurrence thereof, of any of the following, give notice to the Administrative Agent of the following (with copies of any underlying notices, papers, files or related documentation), which notice shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto, of:

(a)    as soon as possible, and in any event within three (3) Banking Days after (i) receipt of service of process in respect of any pending litigation, suit, proceeding or investigation before any court, arbiter or other governmental authority that could be reasonably be expected to have an adverse effect on the value or collectability of the Collateral or, (ii) the Borrower's knowledge, that the same is threatened against the Borrower, such notice to include, if requested in writing by the Administrative Agent, copies of all papers filed in such litigation and to be given monthly if any such papers have been filed since the last notice given;

(b)    promptly, but in no event later than three (3) Banking Days after the receipt thereof by the Borrower, copies of material notices in connection with any material dispute or disputes of which the Borrower has knowledge or for which written notice has been received by the Borrower which may exist between the Borrower and any Governmental Authority that could reasonably be expected to have an adverse effect on the value or collectability of the Collateral;

(c)    as soon as possible, and in any event within one (1) Banking Day after a Responsible Officer of the Borrower obtains knowledge of the occurrence thereof, any Default or Event of Default;

(d)    any proceeding or legislation by any Governmental Authority to expropriate, condemn, confiscate, nationalize or otherwise acquire compulsorily the Collateral (whether or not constituting a Default or Event of Default);

(e)    any Lien (other than a Permitted Encumbrance) being granted or established or becoming enforceable over the Collateral;

(f)    promptly, upon the request thereof, such other information and documentation required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations (including the Patriot Act) as from time to time requested by the Administrative Agent or any Lender;

15

(g)    as soon as possible, and in any event within two (2) Banking Day after a Responsible Officer of the Borrower becomes aware thereof, any occurrence or event that could reasonably be expected to result in a delay in the timely filing of, or inability to pay in full, any Taxes (including any AK Obligations), assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to the Borrower or Corsair or any of their respective Subsidiaries;

(h)    promptly, but in no event later than three (3) Banking Days after the receipt or delivery thereof by the Borrower, copies of material notices in connection with the Tax Credit Collateral that are delivered by the Borrower to any Governmental Authority or received by the Borrower from any Governmental Authority (including with respect to any State Tax Credit bonding program);

(i)    promptly, from time to time, such other information regarding the operations, business affairs and financial condition of the Borrower or the Properties of the Borrower or compliance with the terms of any Credit Document that the Administrative Agent or any Lender may request; and

(j)    as soon as possible upon any failure to make any payment to the State of Alaska or any political subdivision thereof when due.

**5.3    EXISTENCE**. Except as otherwise expressly permitted under this Agreement, at all times, (a) the Borrower shall maintain and preserve its existence as a Delaware limited liability company and all material rights, privileges and franchises necessary or desirable in the conduct of its business and (b) the Borrower shall maintain its ownership interest in FOA.

**5.4    COMPLIANCE WITH LAW**. The Borrower shall promptly comply, or cause compliance, in all material respects with all Legal Requirements relating to the Credit Documents or the Collateral if failure to comply could reasonably be expected to have an adverse effect on the value or collectability of the Collateral.

**5.5    TAXES**.  Subject to the requirements of Section 5.11, the Borrower shall (a) timely file all tax returns, (b) pay, or cause to be paid, as and when due and prior to delinquency, all Taxes and all AK Obligations, assessments and governmental charges of any kind that may at any time be assessed or levied against or with respect to the Borrower, in Cash or other consideration (provided that such other consideration shall not include any offset of the State Tax Credits); and (c) shall remain a Pass-Through Entity.

**5.6    WARRANTY OF TITLE**.  The Borrower shall maintain good, marketable, legal and valid title to the Collateral free and clear of all Liens other than Permitted Encumbrances.

**5.7    BOOKS AND RECORDS**.  The Borrower shall maintain adequate books, accounts and records with respect to the Borrower and prepare all financial statements required hereunder in accordance with GAAP and in material compliance with the regulations of any Governmental Authority having jurisdiction thereof, and, subject to any applicable requirements of Applicable Law and safety requirements, permit employees or agents of the Administrative Agent and the Lenders at any reasonable times and upon reasonable prior notice to inspect all of the Borrower's Properties, to examine or audit all of its books, accounts and records and make copies and

16

memoranda thereof, and to communicate with the auditors of the Borrower outside the presence of the Borrower.

### 5.8    PRESERVATION OF RIGHTS; FURTHER ASSURANCES.

**5.8.1**    The Borrower shall from time to time, execute, acknowledge, record, register, deliver and/or file all such notices, statements, instruments and other documents and pay any fees associated therewith (including any memorandum of lease or other agreement, financing statement, continuation statement, certificate of title or estoppel certificate) and take such other steps as may be necessary or advisable to render or maintain fully valid, perfected, protected and enforceable under all Applicable Laws, the rights, Liens and priorities of the Administrative Agent (on behalf of the Secured Parties) with respect to all Collateral and other security from time to time furnished under this Agreement and the other Credit Documents or intended to be so furnished, in each case in such form and at such times as shall be requested by the Administrative Agent.

**5.8.2**    The Borrower shall perform all acts that may be necessary to perfect the Lien granted to the Administrative Agent (on behalf of the Secured Parties) herein, including, unless otherwise performed by the Administrative Agent, the filing of UCC-1 financing statements and execution of other agreements in form and substance satisfactory to the Required Lenders acting reasonably, perform all acts that may be necessary to maintain, preserve, and protect the Collateral and the perfection and priority of the Lien with respect to the Collateral granted to the Administrative Agent (on behalf of the Secured Parties) pursuant to the Security Documents, and properly and efficiently administer, operate, and maintain the Collateral, subject to the Intercreditor Agreements.

### 5.9    SECURITY INTERESTS; FURTHER ASSURANCES.    Promptly, upon the request of the Administrative Agent or the Required Lenders, at the expense of the Borrower, the Borrower shall execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Required Lenders necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except for Permitted Encumbrances, or obtain any consents or waivers as may be necessary or appropriate in connection therewith, to the extent required by the applicable Security Documents.    Upon the exercise by the Administrative Agent or the Required Lenders acting reasonably of any power, right, privilege or remedy pursuant to any Credit Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent or the Required Lenders acting reasonably may require.

### 5.10    INDEMNIFICATION.

**5.10.1**    The Borrower shall indemnify, defend and hold harmless the Administrative Agent and each Lender, and, in their capacities as such, their respective Affiliates, officers, directors, shareholders, controlling Persons, employees, agents, advisors, members, successors and assigns (collectively, the "**Indemnitees**"), from and against and reimburse the Indemnitees for:

(a)    any and all claims (including without limitation, claims by the Borrower or Lender), obligations, liabilities, losses, damages, injuries (to person or property), penalties, actions, suits, judgments, costs and expenses of whatever kind or nature, whether or not well-founded, meritorious or unmeritorious, arising after the Effective Date, that are demanded, asserted or claimed against any such Indemnitee in any way relating to, or arising out of or in connection with, this Agreement, the other Credit Documents, the Collateral or the transactions contemplated herewith or thereunder in connection with any amendment, modification or waiver of the provisions of the Credit Documents and in connection with the exercise or enforcement of the rights and remedies of the Lenders and the Administrative Agent or enforcement of the obligations under the Credit Documents or in connection with the Loans, including all such Claims incurred during any workout, restructuring or negotiations in respect of the Obligations (collectively, "**Subject Claims**"), except for Subject Claims by the Borrower to enforce its rights under the Credit Documents against an Indemnitee; and

(b)    any and all Subject Claims arising in connection with the Release or presence of any Hazardous Substances, whether foreseeable or unforeseeable, including all reasonable costs of removal and disposal of such Hazardous Substances, all reasonable costs associated with claims for damages to persons or property, and reasonable attorneys' and consultants' fees and court costs.

**5.10.2**  No Indemnitee shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Borrower or any of their subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted solely from such Indemnitee's actual fraud, gross negligence, or willful misconduct.  In no event, however, shall any Indemnitee be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

**5.10.3**  The indemnities provided by the Borrower pursuant to this Section 5.10 shall not apply with respect to an Indemnitee to the extent finally determined by a court of competent jurisdiction as arising in whole or in part as a result of the actual fraud, gross negligence or willful misconduct of such Indemnitee, but shall continue to apply to other Indemnitees.  In addition, such indemnities shall not include or extend to any Subject Claims (a) incurred or suffered by any of the Indemnitees to the extent that such Indemnitee shall have expressly agreed in Section 9.4 herein to bear such Subject Claim without right of reimbursement or (b) that have not resulted from an act or omission by the Borrower or its Affiliates and has been brought by an Indemnitee against any other Indemnitee (other than any Claims against the Administrative Agent in its capacity as such or in fulfilling its role as an agent or similar role hereafter) (a "**Specified Claim**").

**5.10.4**  The provisions of this Section 5.10 shall survive foreclosure of the Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrower's obligations hereunder, shall be in addition to any other rights and remedies of the Lenders, and may not be amended, modified or waived in a manner adverse to any Indemnitee without each Lender's written consent.

**5.10.5**  In case any action, suit or proceeding shall be brought against any Indemnitee, such Indemnitee shall promptly notify the Borrower of the commencement thereof, provided that failure to provide any such notice shall not relieve the Borrower of its obligations set forth in this Section 5.10.

**5.10.6**  Any Indemnitee against whom any Subject Claim is made shall be entitled to compromise or settle any such Subject Claim; *provided* that such Indemnitee consults with and coordinates such compromise or settlement with the Borrower.  Any such compromise or settlement shall be binding upon the Borrower for the purposes of this Section 5.10.6.

**5.10.7**  Upon payment of any Subject Claim by the Borrower pursuant to this Section 5.10 or other similar indemnity provisions contained herein to or on behalf of an Indemnitee, the Borrower, without any further action, shall be subrogated to any and all claims that such Indemnitee may have relating thereto, and such Indemnitee shall cooperate with the Borrower and the Borrower's insurance carrier as may be reasonably requested by the Borrower to enable the Borrower to vigorously pursue such claims.  In the event that the Borrower shall have paid an amount to or on behalf of an Indemnitee in respect of any Subject Claim pursuant to the indemnification provisions of this Section 5.10 and such Indemnitee subsequently shall be reimbursed in respect of such Subject Claim from any other Person and, as a result, the aggregate amount so received by such Indemnitee shall exceed the amount of such Subject Claim, then (a) so long as no Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Borrower an amount equal to the lesser of (i) the amount of such excess, (ii) the amount of such reimbursement from such other Person and (iii) the amount so paid by the Borrower and (b) if an Event of Default has occurred and is continuing, such Indemnitee shall promptly pay to the Administrative Agent the amount otherwise payable pursuant to clause (a) of this sentence, for application by the Administrative Agent to any amounts due and owing under this Agreement.

**5.10.8**  Any amounts payable by the Borrower pursuant to this Section 5.10 shall be payable within five (5) Banking Days after the Borrower receives an invoice for such amounts from any applicable Indemnitee, and if not paid within such five (5)-Banking Day period shall bear interest at the applicable rate pursuant to Section 2.3.3 for late payments.

**5.10.9**  For the avoidance of doubt, the indemnification provisions set forth in this Section 5.10 shall be subject to Section 7.2.6.

**5.11**  STATE TAX CREDITS.

**5.11.1**  The Borrower shall cause all proceeds of the State Tax Credits (the "**State Tax Credit Proceeds**") to be deposited into the Agent Account.  All amounts deposited into the Agent Account shall be applied in accordance with the order of priority set forth in Section 4.01 of the Tax Credit Intercreditor Agreement.  In the event that the Borrower receives any State Tax Credit Proceeds, the Borrower shall deposit such proceeds into the Tax Credit Reserve Account and hold such proceeds in trust for the Lenders and, subject to the Tax Credit Intercreditor Agreement, shall immediately turn over and deliver to the Administrative Agent all such proceeds, in kind, and in the exact form received, for application in accordance with the order of priority set forth in Section 4.1 of the Tax Credit Intercreditor Agreement.  The Borrower shall endorse any instrument or other

19

form of payment that is payable to the Borrower that represents proceeds of any of the State Tax Credits in favor of the Lenders.

**5.11.2**  The Borrower shall promptly take all such actions necessary and appropriate under the laws of the State of Alaska in order for the Administrative Agent to collect and receive in full the amounts reflected in each Alaska Tax Credit Application, including (i) compliance with the provisions of AS 43.55.028(e), and (ii) upon the request of the Administrative Agent, the filing and diligent pursuit of an appropriate appeal relating to the DOR's denial or reduction of any State Tax Credits or proceeds thereof that have been applied for pursuant to any Alaska Tax Credit Application or DOR Purchase Application (with all costs and expenses of any such appeal borne solely by the Borrower).

**5.11.3**  The Borrower shall transmit all data, information, reports and returns to the DOR or DNR, as applicable, in accordance with the requirements of AS 43.55 and 15 AAC 55 and as otherwise requested by the DOR or DNR, as applicable, in each case with a copy to the Administrative Agent.

**5.11.4**  The Borrower shall promptly, but in any event within three (3) Banking Days after the receipt thereof, deliver to the Administrative Agent and the Lenders copies of any notice, request or other document received by a Responsible Officer of the Borrower pursuant to or in connection with the State Tax Credits of the Borrower or any Alaska Tax Credit Applications therefor or any Tax Credit Assignments thereof, whether from the DOR, the State of Alaska or otherwise, or any notice, request or other document sent by the Borrower to any such Person relating to any of the foregoing, in each case unless all of the information contained in such notice or correspondence is generally available to the public.

**5.11.5**  To the extent the Borrower fails to timely take any action required by this Section 5.11 to collect and receive in full the amounts reflected in each Alaska Tax Credit Application, in addition to all other remedies available to the Administrative Agent and the Lenders, the Administrative Agent may, in its discretion, take any such action, and the Borrower hereby appoints the Administrative Agent as its attorney in fact to take any such action on behalf of the Borrower, which appointment is irrevocable and coupled with an interest.

### ARTICLE 6.
### NEGATIVE COVENANTS

Until the Termination Date:

**6.1**    DEBT, LIENS AND OTHER ENCUMBRANCES.

**6.1.1**    The Borrower shall not incur, create, assume or permit to exist any Debt, except Permitted Debt.

**6.1.2**    The Borrower shall not (a) create, assume or suffer to exist any Lien or any other encumbrances on the Collateral, except Permitted Encumbrances, except for Liens securing the Second Lien Obligations and the Tax Credit Obligations, in each case in accordance with the Tax Credit Intercreditor Agreement, or (b) assign any right to receive Tax Credit Collateral proceeds.

**6.2**    **RESTRICTIONS ON ASSET SALES**.  The Borrower shall not sell, lease, assign, transfer or otherwise dispose of any assets (including without limitation any Equity Interests or working interests), whether now owned or hereafter acquired, except, to the extent permitted by the Indemnity Agreement, (a) sales of as-extracted hydrocarbons in the ordinary course of its business and at fair market value and for Cash (excluding, for the avoidance of doubt, any forward sale or volumetric or dollar denominated production payment), (b) sales, leases, assignments, transfers or other disposals of assets that are worn out or no longer usable in connection with the operation or maintenance of the Borrower's business for Cash and at fair market value, (c) other sales, leases, assignments, transfers or other disposals of assets that are: (i) in the ordinary course of business, (ii) for fair market value (as determined by the Required Lenders acting reasonably), (iii) in exchange for 100% Cash or Cash Equivalent consideration and (iv) either (x) in an aggregate amount not to exceed $100,000 in any fiscal year of the Borrower or (y) result in proceeds that are sufficient to fully repay all of the outstanding Obligations in accordance with the Intercreditor Agreements, or (d) assignments, encumbrances or pledges of State Tax Credits and the proceeds thereof pursuant to the Tax Credit Loan Documents, the Second Lien Loan Documents and the Credit Documents to the secured parties thereunder.  In addition, if approved by the Administrative Agent, the Borrower may engage in sales, leases, assignments, transfers or other disposals of assets among Cornucopia and its Affiliates.

**6.3**    **DISSOLUTION**.  The Borrower shall not wind up, liquidate or dissolve its affairs, or sell, lease or otherwise transfer or dispose of all or substantially all of its property, assets or business.

**6.4**    **AMENDMENTS TO ORGANIZATIONAL DOCUMENTS**.  The Borrower shall not directly or indirectly, change its legal form or any of its Organizational Documents (including by the filing or modification of any certificate of designation) or any agreement to which it is a party with respect to its limited liability company interest or otherwise terminate, amend or modify any such Organizational Document or agreement or any provision thereof, or enter into any new agreement with respect to its limited liability company interest, other than any such amendments, modifications or changes or such new agreements that could not reasonably be expected to materially and adversely impact the rights of the Lenders and the Administrative Agent under this Agreement and the other Credit Documents, taken as a whole.

**6.5**    **SUBSIDIARIES AND JOINT VENTURES**.  The Borrower shall not (a) fail to maintain bank accounts and books of account separate from any other Person, (b) fail to cause its liabilities to be readily distinguishable from the liabilities of another Person, or (c) fail to conduct its business solely in its own name in a manner not misleading to other Persons as to its identity.

**6.6**    **PROHIBITION ON ISSUANCE OF EQUITY INTEREST**.  The Borrower shall not issue any additional Equity Interest on or following the Effective Date unless such issuance is approved by the Required Lenders acting reasonably.

**6.7**    **NAME AND LOCATION; FISCAL YEAR**.  The Borrower shall not change its name, corporate structure (e.g., by merger, consolidation, change in corporate form or otherwise), jurisdiction of organization, type of organization, sole place of business, chief executive office or fiscal year or establish any trade names unless such change is approved by the Required Lenders acting reasonably.

**6.8    ACCOUNTS**.  The Borrower shall not maintain any deposit or securities accounts other than (a) the Tax Credit Reserve Account, which shall be subject to a Control Agreement, (b) deposit and securities accounts permitted under the Second Lien Documents and the AIDEA Loan Documents, (c) each collateral account holding initial margin, variation margin and collateral or other performance assurance provided to the Borrower by counterparties to the Borrower's or FOA's Contractual Obligations and (d) accounts holding performance assurances of the Borrower or FOA to Governmental Authorities pursuant to Applicable Law.

**6.9    TAX CREDITS**.  The Borrower shall not:

(a)    (i) grant any extension of time for payment or modify in any respect the terms of the State Tax Credits, Alaska Tax Credit Applications, Tax Credit Assignments or DOR Purchase Applications; (ii) compromise or settle any amounts evidenced by the State Tax Credits or owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program; (iii) release in whole or in part the State of Alaska, the DOR or any other Person liable for payment of the amounts evidenced by the State Tax Credits or amounts owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program; or (iv) grant any credits, discounts, allowances, deductions or the like with respect to any amounts evidenced by the State Tax Credits or owed under the DOR Purchase Applications other than pursuant to a Qualified Bonding Program.  In the event the DOR determines the dollar amount to be received in connection with the State Tax Credits will be less than the face amount of the State Tax Credits, the Borrower shall have the right to contest or appeal such action by the DOR, provided that (A) no Default or Event of Default has occurred and is continuing and (B) the Borrower is contesting or appealing such action in good faith by appropriate proceedings promptly instituted and diligently conducted.  In the event that the Borrower fails to take action with respect to the enforcement of the State Tax Credits as directed by the Administrative Agent pursuant to the preceding sentence, the Administrative Agent shall have the absolute and unlimited right to take any and all steps in the Borrower's name as are necessary or appropriate, in the determination of the Administrative Agent, to collect all amounts due in connection with the State Tax Credits;

(b)    hinder, delay or interfere with payment of the proceeds of the State Tax Credits to the Administrative Agent or otherwise fail to reasonably cooperate with and assist the Administrative Agent in connection with the Administrative Agent's handling and collection of the amounts reflected in the State Tax Credits;

(c)    amend, modify, supplement, revoke or terminate the powers of attorney, waivers of confidentiality, electronic payment agreements, State Tax Credit, Tax Credit Assignments or DOR Purchase Applications that have been filed with the DOR or the Department of Administration of the State of Alaska, as applicable, except upon the prior written consent of the Administrative Agent; or

(d)    take any action or fail to refrain from taking any action that, in the opinion of Alaska counsel to the Administrative Agent, could reasonably be expected to result in the withholding by the State of Alaska of any payments in respect of the State Tax Credits.

**6.10**    **COMPLIANCE WITH ANTI-TERRORISM LAWS**. The Borrower shall not:

(a)    directly or indirectly, (i) conduct any operations in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws, (ii) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws;

(b)    directly or indirectly, cause or permit any of the funds of the Borrower that are used to repay the Loans or other Obligations to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws; and

(c)    cause or permit (i) a Sanctioned Person to have any direct or indirect interest in or benefit of any nature whatsoever in the Borrower or (ii) any of the funds or properties of the Borrower that are used to repay the Loans or other Obligations to constitute property of, or be beneficially owned directly or indirectly by, a Sanctioned Person.

The Borrower shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender, confirming the compliance by the Borrower of this Section 6.10.

## ARTICLE 7.
## EVENTS OF DEFAULT; REMEDIES

**7.1**    **EVENTS OF DEFAULT**.    The occurrence of any of the following events shall constitute an event of default (each an "**Event of Default**") hereunder:

**7.1.1**    *Failure to Make Payments.*    The Borrower or the Sponsor shall fail to pay, in accordance with the terms of this Agreement, (a) any principal of the Loans on the date that such sum is due or (b) any other Obligation, any scheduled fee, cost, charge, sum or amount due hereunder or under the other Credit Documents, or any other fee, cost, charge, sum or other amount due under this Agreement within three (3) Banking Days after such sum is due.

**7.1.2**    *Violation of Covenants*.

(a)    The Borrower fails to perform or observe any of the covenants set forth in Sections 5.2(c) (*Notice of Default*), 5.3 (*Existence; Maintenance of Contracts*), 5.5 (*Taxes*), 5.6 (*Warranty of Title*), 5.11 (*State Tax Credits*) or Article 6.

(b)    The Borrower or the Sponsor shall fail to perform or observe any other covenant to be observed or performed by it hereunder or any other Credit Document not otherwise specifically provided for in clause (a) above and such failure shall continue unremedied for a period of 10 days after a Responsible Officer of the Borrower or the Sponsor becomes aware thereof or the Borrower or the Sponsor receives written notice thereof from the Administrative Agent.

23

(c)      The Borrower or the Sponsor shall fail to perform or observe any of the covenants set forth in Sections 2 or 3, in each case, of the Indemnity Agreement.

(d)      Any Credit Document or any material provision thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by the Borrower or the Sponsor or any other Person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or the Borrower or the Sponsor shall repudiate or deny any portion of its liability or obligation for the Obligations.

**7.1.3**   *Representations and Warranties*.  Any representation, warranty, certification or statement of fact made or deemed made by the Borrower or the Sponsor herein or in any other Credit Document or in any document required to be delivered in connection herewith or therewith shall be untrue in any material respect when made or deemed made (except to the extent qualified as to materiality (including Material Adverse Effect) in which case a default shall occur if such representation, warranty, certification or statement of fact made or deemed to be made shall be untrue in any respect).

**7.1.4**   *Change of Control*.  A Change of Control occurs.

**7.1.5**   *Bankruptcy or Insolvency*.  The Borrower or the Sponsor shall become subject to a Bankruptcy Event.

**7.1.6**   *Judgments*.  A final judgment or judgments (including with respect to Environmental Claims) shall be entered against the Borrower in the amount of $100,000 or more individually or in the aggregate or a final judgment shall be entered against the Borrower which if left unstayed could reasonably be expected to result in losses or liabilities in excess of $100,000 or a Material Adverse Effect (other than (a) a judgment which is fully covered by insurance (subject to applicable deductibles) as to which the insurer does not dispute coverage or is discharged within 30 days after its entry, or (b) a judgment the execution of which is effectively stayed within 30 days after its entry unless, after the entry of such stay, there shall be a period of more than 30 consecutive days during which the execution of such judgment is not effectively stayed).

**7.1.7**   *Debt Cross Default*.  (a) Breach or default by the Borrower with respect to any other material term of (i) one or more items of Debt (other than the Credit Facility) in the individual principal amount of $100,000 or more or with an aggregate principal amount of $100,000 or more or (ii) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Debt, in each case beyond the grace period, if any, provided therefor, and the effect (but without giving effect to any waivers or extensions granted by any such holder of such Debt (or a trustee or agent on behalf of such holder or holders)) of the occurrence of such breach or default is to cause, such Debt to be demanded or to become or be declared due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Debt to be made, prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be or (b) an Event of Default (as defined in the Second Lien Credit Agreement) has occurred and is continuing under the Second Lien Credit Agreement, except to the extent that the

required lenders party thereto have agreed to forbear from exercising remedies in connection with such Event of Default (as defined in the Second Lien Credit Agreement) (and in such case, for the period of such forbearance, no Event of Default shall occur under this Agreement).

**7.1.8** *Invalidity of Documents.*

(a)     Any material provision of any Credit Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder, ceases to be in full force and effect;

(b)     the Borrower, the Sponsor or any other Person party thereto (other than the Administrative Agent) contests in writing the validity or enforceability of any provision of any Credit Document; or

(c)     the Borrower or the Sponsor denies in writing that it has any or further liability or obligation under any Credit Document, or purports in writing to revoke, terminate or rescind any Credit Document.

**7.1.9** *Security.*   Any of the Security Documents, once executed and delivered, shall, except as the result of the acts or omissions of the Administrative Agent with respect to any Collateral in its possession, fail to provide the Administrative Agent the Liens (or the priority thereof), rights, titles, interest, remedies permitted by law, powers or privileges intended to be created thereby with respect to the Collateral or, except in accordance with its terms, cease to be in full force and effect, or the priority or validity thereof (except as permitted hereby) or the applicability thereof to the Loans, the Obligations or any other obligations purported to be secured or guaranteed thereby or any part thereof shall be disaffirmed in writing by or on behalf of the Borrower or the Sponsor.

**7.2**     **REMEDIES**.   Upon the occurrence and during the continuation of an Event of Default, subject to the Intercreditor Agreements, the Administrative Agent is vested with the exclusive right to, and shall, at the election of the Required Lenders, without further notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, or other notices or demands of any kind, all such notices and demands being waived, exercise any or all of the following cumulative and non-exclusive rights and remedies, in any combination or order that the Required Lenders may elect, in addition to such other rights or remedies as the Lenders may have hereunder, under the Security Documents, any instrument, document or agreement now existing or hereafter arising, or at law or in equity (it being agreed and understood that the Lenders vest the Administrative Agent with the exclusive right to exercise such rights and remedies):

**7.2.1**     *Cure by the Administrative Agent.*   Without any obligation to do so, make disbursements on behalf of the Borrower to cure any Event of Default hereunder and to cure any default and render any performance under any Material Contracts as the Required Lenders in their sole discretion may consider necessary or appropriate, whether to preserve and protect the Collateral or the Administrative Agent's and Lenders' interests therein or for any other reason, and all sums so expended, together with interest on such total amount at the Default Rate (but in no event shall the rate exceed the maximum lawful rate), shall be repaid by the Borrower to the Administrative Agent on demand and secured by the Credit Documents, notwithstanding that such

expenditures may, together with amounts advanced under this Agreement, exceed the aggregate amount of the Credit Facility.

**7.2.2** *Acceleration.* Declare and make all sums of outstanding principal and any outstanding Loans and other Obligations, together with all unpaid fees, costs and charges due hereunder or under any other Credit Document (the "**Acceleration Amounts**"), immediately due and payable and require the Borrower, immediately, without presentment, demand, protest or other notice of any kind, all of which the Borrower hereby expressly waives, to pay the Administrative Agent or the Lenders, as applicable an amount in immediately available funds equal to the aggregate amount of all such Acceleration Amounts; *provided* that in the event of an Event of Default occurring under Section 7.1.5 with respect to the Borrower, all such amounts shall become immediately due and payable without further act of the Administrative Agent or the Lenders *provided further,* that the Borrower's obligation to pay Acceleration Amounts is non-recourse and limited to the proceeds of the Collateral in accordance with Section 7.2.6.

**7.2.3** *Cash Collateral.* Apply or execute upon any amounts on deposit or any proceeds or any other moneys of the Borrower on deposit with the Administrative Agent or any Lender (as applicable) in the manner provided in the UCC and other relevant Applicable Law with respect to Cash collateral.

**7.2.4** *Foreclose on Collateral.* Exercise any or all of its rights as a secured creditor under the UCC, and any or all rights granted by this Agreement and by law, including the right to require the Borrower to assemble the Collateral and make it available to the Administrative Agent at a place to be designated by the Administrative Agent.  The Borrower hereby agrees that three (3) Banking Days' notice of a public sale of any Collateral or notice of the date after which a private sale of any Collateral may take place is commercially reasonable.

**7.2.5** *Remedies Under Credit Documents.* Exercise any and all rights and remedies available to it under any of the Credit Documents, including judicial or non-judicial foreclosure or public or private sale of any of the Collateral pursuant to the Security Documents.

**7.2.6** *Non-Recourse.*  Notwithstanding anything to the contrary herein and except as provided in the Indemnity Agreement, (a) neither the Borrower nor the Sponsor, FOA or Corsair are personally liable for any of the Obligations and none of them shall have any duty to pay the Obligations other than from proceeds of the Collateral, and (b) the rights and remedies of the Administrative Agent and Lenders under this Agreement with respect to the Obligations are limited to recourse against the Collateral and proceeds thereof as provided in the Security Documents. The Administrative Agent and the Lenders hereby acknowledge and agree that from and after the date on which all of the State Tax Credits are paid in accordance with [●][4], redeemed pursuant to the Existing Bonding Program or another Qualified Bonding Program, or released or otherwise terminated pursuant to a settlement agreement with the State of Alaska entered into in accordance with this Agreement (and any and all amounts due under such settlement arrangement have been paid to the Administrative Agent and the Lenders, in accordance with the Intercreditor Agreements), neither the Borrower nor the Sponsor, FOA or Corsair shall have any further

---

[4]        Note to AK Counsel: Please fill in appropriate legislative references.

Obligations under this Agreement or any other Credit Document, and as of such date the Obligations shall be deemed to be fully repaid.

**7.2.7** *Borrower's Rights In Tax Credit Collateral*.  Subject to Section 2(c) of the Indemnity Agreement, at all times when no Event of Default exists, the Borrower shall retain all of its rights to participate in and approve any settlement or compromise of the amount of the Tax Credit Collateral, and nothing in this agreement shall be construed to waive or limit such rights. At any time after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders shall have all of the rights with respect to the Tax Credit Collateral, subject to the Tax Credit Intercreditor Agreement, and the Borrower shall have no approval rights with respect to any action described therein.

Notwithstanding anything to the contrary contained in this Agreement or any other Credit Document to the contrary, each Lender expressly and irrevocably (a) waives any right to take or institute any actions or proceedings, judicial or otherwise, for any right or remedy or assert any other cause of action against the Borrower, the Sponsor or their respective Subsidiaries whether with respect to any Collateral, any other property of any such entity or otherwise, without the prior written consent of the Administrative Agent (which shall not be withheld if directed by the Required Lenders acting reasonably) and (b) subject to the terms set forth herein, each Lender vests the Administrative Agent, acting at the instructions of the Required Lenders acting reasonably, with the exclusive right to enforce rights, exercise remedies (including setoff rights) and make determinations regarding the release, sale, disposition or restrictions with respect to the Collateral; provided, that (i) in exercising the rights and remedies with respect to the Collateral, the Administrative Agent, acting at the direction of the Required Lenders, may enforce the provisions of the Credit Documents and exercise remedies thereunder, all in such order and in such manner as it may determine in the exercise of its sole discretion and (ii) such exercise and enforcement shall include the rights of the Administrative Agent (or any other agent appointed by Required Lenders) to sell or otherwise dispose of the Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction, under the Credit Documents and as provided under the bankruptcy laws or any other laws of any applicable jurisdiction.

## ARTICLE 8.
## THE AGENT; SUBSTITUTION

**8.1** **APPOINTMENT, POWERS AND IMMUNITIES**.

**8.1.1**   Each Lender hereby appoints and authorizes the Administrative Agent to act by or through its officers, directors, agents, employees or Affiliates as its agent hereunder and under the other Credit Documents with such powers as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement or in any other Credit Document, or be a trustee or fiduciary for any Lender and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as

expressly set forth herein or therein. Notwithstanding anything to the contrary contained herein, the Administrative Agent shall not be required to take any action which is contrary to this Agreement or any other Credit Documents or any Legal Requirement or exposes the Administrative Agent to any liability. None of the Administrative Agent, any Lender or any of their respective Affiliates shall be responsible to any other Lender for any recitals, statements, representations or warranties made by the Borrower or any of its Affiliates contained in this Agreement or in any certificate or other document referred to or provided for in, or received by the Administrative Agent, or any Lender under this Agreement, for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any Notes or any other document referred to or provided for herein or for any failure by the Borrower or any of its Affiliates to perform their respective obligations hereunder or thereunder. The Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by it with reasonable care.

    **8.1.2**    The Administrative Agent and its directors, officers, employees or agents shall not be responsible for any action taken or omitted to be taken by it or them hereunder or under any other Credit Document or in connection herewith or therewith, except for its or their own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). Without limiting the generality of the foregoing, the Administrative Agent:

        (a)    may treat the payee of any Note as the holder thereof until the Administrative Agent receives an Assignment Agreement or other written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to the Administrative Agent;

        (b)    may consult with legal counsel, independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by them in accordance with the advice of such counsel, accountants or experts;

        (c)    makes no warranty or representation to any Lender for any statements, warranties or representations made in or in connection with any Material Contract or Credit Document;

        (d)    shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of any Credit Document on the part of any party thereto or to inspect the property (including the Books and Records) of the Borrower, the Sponsor or any other Person;

        (e)    shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of any Credit Document or any other instrument or document furnished pursuant hereto; and

        (f)    may rely solely on the approval, direction or consent of the Required Lenders (except in circumstances in which the approval, direction or consent of all of the Lenders is expressly required hereunder or under any other Credit Document), in each case, in making any determination hereunder or under any other Credit Document.

Except as otherwise provided under this Agreement, upon the Administrative Agent's receipt of instruction from the Required Lenders, the Administrative Agent shall take any action (or refrain from taking any action) permitted to be taken by it under this Agreement or any of the other Credit Documents. If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders; and the Administrative Agent shall not incur liability to any Lender by reason of so refraining. Without limiting the foregoing, neither any Lender nor the holder of any Note shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

8.1.3    Except for any action expressly required of the Administrative Agent hereunder, it shall in all cases be fully justified in failing or refusing to act unless it shall receive further assurances to its reasonable satisfaction from the Lenders of their indemnification obligations under Section 8.5 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. No provision of this Agreement or any Credit Document shall require the Administrative Agent to take any action that it reasonably believes to be contrary to Applicable Law or to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties thereunder or in the exercise of any of its rights or powers if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

8.2    **RELIANCE BY THE ADMINISTRATIVE AGENT**. The Administrative Agent shall be entitled to rely upon any certificate, notice or other document (including any cable, telegram, telecopy or written electronic communication) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person or Persons, and upon advice and statements of legal counsel, independent engineers, insurance consultants, independent accountants and other experts selected by the Administrative Agent. As to any other matters not expressly provided for by this Agreement, the Administrative Agent shall not be required to take any action or exercise any discretion, but shall be required to act or to refrain from acting upon instructions of the Required Lenders (except that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to this Agreement, any other Credit Document or any Legal Requirement) and shall in all cases be fully protected in acting, or in refraining from acting, hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders (or, where so expressly stated, all of the Lenders), and such instructions of the Required Lenders (or all of the Lenders, where applicable) and any action taken or failure to act pursuant thereto shall be binding on all of the Lenders.

8.3    **NON-RELIANCE**. Each Lender represents that it has independently and without reliance on the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of the financial condition and affairs of the Borrower and decision to enter into this Agreement and agrees that it will, independently and without reliance upon the Administrative Agent, or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own appraisals and decisions in taking or not taking action under this Agreement. None of the

Administrative Agent or any Lender shall be required to keep informed as to the performance or observance by the Borrower or its Affiliates under this Agreement or any other document referred to or provided for herein or to make inquiry of, or to inspect the Properties or Books and Records of, the Borrower or its Affiliates.

**8.4    DEFAULTS**.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received a written notice from a Lender or the Borrower, referring to this Agreement, describing such Default or Event of Default and indicating that such notice is a notice of default.  If the Administrative Agent receives such a notice of the occurrence of a Default or an Event of Default, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as is provided in Article 7 or if not provided for in Article 7, as the Administrative Agent shall be reasonably directed by the Required Lenders; *provided, however,* that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interest of the Lenders.

**8.5    INDEMNIFICATION**.  Without limiting the Obligations of the Borrower hereunder, each Lender agrees to indemnify the Administrative Agent, ratably in accordance with its Proportionate Share, for any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of this Agreement, the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or the enforcement of any of the terms hereof or thereof; *provided, however,* that no Lender shall be liable for any of the foregoing to the extent they arise from the Administrative Agent's gross negligence or willful misconduct.  The Administrative Agent shall be fully justified in refusing to take or to continue to take any action hereunder unless it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for its ratable share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent in connection with the preparation, execution, administration or enforcement of, or legal advice in respect of rights or responsibilities under, the Credit Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

**8.6    SUCCESSOR ADMINISTRATIVE AGENT**.  The Administrative Agent may resign at any time by giving written notice thereof to the Lenders and the Borrower.  The Administrative Agent may be removed involuntarily only for a material breach of its duties and obligations hereunder or under the other Credit Documents or for gross negligence or willful misconduct in connection with the performance of its duties hereunder or under the other Credit Documents and then only upon the affirmative vote of the Required Lenders.  Upon any such resignation or removal, the Required Lenders shall have the right to appoint a successor Administrative Agent. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 10 days after the retiring Administrative Agent's giving of notice of resignation or the Lenders' removal of the retiring Administrative Agent, the

retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a Lender, if any Lender shall be willing to serve, and otherwise shall be a commercial bank having a combined capital and surplus of at least $50,000,000.  Upon the acceptance of any appointment as the Administrative Agent under the Credit Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations as the Administrative Agent only under the Credit Documents.  After any retiring Administrative Agent's resignation or removal hereunder as the Administrative Agent, the provisions of Section 5.10 and this Article 8 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Credit Documents.

8.7    **AUTHORIZATION**.  The Administrative Agent is hereby authorized by each Lender to execute, deliver and perform each of the Credit Documents to which the Administrative Agent is or is intended to be a party and each Lender agrees to be bound by all of the agreements of the Administrative Agent contained in the Credit Documents.  The execution, delivery and performance by the Administrative Agent in respect of Credit Documents entered into prior to the Effective Date is hereby ratified and affirmed.  Without limiting the generality of the foregoing, each Lender (a) consents to the terms and provisions of the Intercreditor Agreement, (b) agrees that it is and will be bound (as a Lender) by the terms and conditions of the Intercreditor Agreement, whether or not such Lender executes such agreement, (c) authorizes the Administrative Agent to enter into the Intercreditor Agreement and (d) agrees that it will not take any actions contrary to the provisions of the Intercreditor Agreement.  The Administrative Agent is further authorized by each Lender (i) to release Liens on property (including any Collateral granted or held by it) (A) upon the Termination Date, (B) that the Borrower is permitted to sell or transfer or otherwise dispose of pursuant to the terms of this Agreement and the other Credit Documents or (C) if approved, authorized or ratified in writing in accordance with Section 8.9, and (ii) to enter into agreements supplemental hereto for the purpose of curing any formal defect, inconsistency, omission or ambiguity in this Agreement or any other Credit Document to which it is a party.  Notwithstanding anything herein to the contrary, each Lender acknowledges that the Liens and security interest granted to the Administrative Agent pursuant to the Security Documents and the exercise of any right or remedy by the Administrative Agent thereunder are subject to the provisions of the Intercreditor Agreements. In the event of any conflict between the terms of the Intercreditor Agreements and any other Security Documents, the terms of the Intercreditor Agreements shall govern and control.

8.8    **THE ADMINISTRATIVE AGENT**.  With respect to the Loans held by it and any Note issued to it, the Administrative Agent shall have the same rights and powers under the Credit Documents as any other Lender and may exercise the same as though it were not the Administrative Agent.  The term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with the Borrower or any other Person, without any duty to account therefor to the Lenders.

8.9    **AMENDMENTS; WAIVERS**.  Subject to the provisions of this Section 8.9, unless otherwise specified in this Agreement or another Credit Document, the Required Lenders (or the

Administrative Agent with the consent in writing of the Required Lenders acting reasonably) and the Borrower may enter into agreements supplemental hereto for the purpose of adding, amending, modifying or waiving any provisions to the Credit Documents or changing in any manner the rights of the Lenders or the Borrower hereunder or waiving any Default or Event of Default; *provided, however,* that:

      (a)    no such supplemental agreement shall:

      (i)    without the consent of all of the Lenders affected thereby, modify or waive the requirements under Section 2.1.1(b) (*Loan Principal Payment*), 2.1.3(a) (*Optional Prepayment*), 2.1.3(b) (*Mandatory Prepayment*), 2.4 (*Pro Rata Treatment*), 8.1 (*Appointment, Powers and Immunities*), 8.12 (*Participation*) or 8.13 (*Transfer of Loans*);

      (ii)    without the consent of all Lenders, modify or waive the requirements under any other provision of any Credit Document specifically requiring the consent of or waiver by all of the Lenders;

      (iii)    without the consent of all of the Lenders affected thereby, extend the Maturity Date;

      (iv)    without the consent of all of the Lenders affected thereby, reduce the amount or extend the payment date for any amount due hereunder, whether principal, interest, fees or other amounts;

      (v)    without the consent of all Lenders, reduce the percentage specified in the definition of Required Lenders;

      (vi)    without the consent of all Lenders, amend this Section 8.9; or

      (vii)    without the consent of all Lenders, release any Collateral from the Lien of any of the Security Documents or release any party acting as a guarantor under a Credit Document (except as specifically permitted by the terms of the relevant Credit Document); or;

      (viii)    without the consent of all Lenders, modify or waive the final paragraph of Section 8.13; and

      (b)    no such supplemental agreement shall, without the consent of the Administrative Agent, change the Administrative Agent's duties, obligations, rights, remedies, indemnities or immunities;

*provided,* that any waiver, amendment or modification of any Intercreditor Agreement (and any related definitions) may be effected by an agreement or agreements in writing entered into among the Administrative Agent and the Required Lenders (or the Administrative Agent with the consent in writing of the Required Lenders) without the consent of the Borrower, so long as such amendment, waiver or modification does not impose any additional duties or obligations on the Borrower, alter or impair any right of or otherwise adversely affect the Borrower under the Credit Documents.

**8.10**    **WITHHOLDING TAX**.

**8.10.1**  The Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax.  If the forms or other documentation required by <u>Section 2.3.5</u> are not delivered to the Administrative Agent, then the Administrative Agent may withhold from any payment to any Lender not providing such forms or other documentation, an amount equivalent to the applicable withholding tax.

**8.10.2**  If the Administrative Agent reasonably determines that any payment under this Agreement has been made to a Lender without an applicable Tax being properly withheld for whatever reason or if the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender, such Lender shall immediately pay the Administrative Agent any such applicable withholding taxes to the extent not previously deducted and indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred in connection therewith, including legal expenses, allocated staff costs, and any out-of-pocket expenses.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or the Note against any amount due the Administrative Agent under this <u>Section 8.10.2</u>.

**8.10.3**  If any Lender sells, assigns, grants participation in, or otherwise transfers its rights under this Agreement, the purchaser, assignee, participant or transferee, as applicable, shall comply and be bound by the terms of <u>Sections 2.3.5</u>, <u>8.10.1</u> and <u>8.10.2</u> as though it were such Lender.

**8.11**    **GENERAL PROVISIONS AS TO PAYMENTS**.   The Administrative Agent shall promptly distribute to each Lender, subject to the terms of the assignment and assumption agreement between the Administrative Agent and such Lender, its Proportionate Share of each payment of principal and interest payable to the Lenders on the Loans and of fees hereunder received by the Administrative Agent for the account of the Lenders and of any other amounts owing under the Loans, in accordance with the provisions of <u>Section 2.4</u>.  The payments made for the account of each Lender shall be made, and distributed to it, at its Lending Office designated in <u>Exhibit C</u>, as the same may be modified in accordance with the provisions of <u>Section 2.6</u>.

**8.12**    **PARTICIPATION**.   Subject to the applicable provisions of <u>Section 8.13</u> and this <u>Section 8.12</u>, nothing herein provided shall prevent any Lender from selling a participation in its Loans; *provided* that (a) (i) no such sale of a participation shall alter such Lender's or the Borrower's obligations hereunder, (ii) such Lender's obligations hereunder shall remain unchanged, (iii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (b) such Lender shall (and any agreement pursuant to which any Lender may grant a participation in its rights with respect to its Loans shall provide that such Lender shall), with respect to such Loans, retain the sole right and responsibility to exercise the rights of such Lender, and enforce the obligations of the Borrower relating to such Loans, including the right to approve any amendment, modification or waiver of

any provision of this Agreement or any other Credit Document and the right to take action to have the Notes declared due and payable pursuant to Article 7 (without, for the avoidance of doubt, any voting agreements between such Lender and such participant with respect thereto). The Borrower agrees that each participant of the Loans of any Lender shall be entitled to the benefits of Section 2.3.4 (subject to the requirements and limitations therein, including the requirements under Section 2.3.5 (it being understood that the documentation required under Section 2.3.5 shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 8.13. Any Lender may, in connection with any participation or proposed participation pursuant to this Section 8.12, disclose to the participant or proposed participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; *provided, however,* that, prior to any such disclosure, the participant or proposed participant shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in Section 9.7. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the **"Participant Register"**); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any loans or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such loan or other obligation is in registered form under Section 5f.103-1(c) of the Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register. Any Lenders that grant a participation hereunder shall provide prompt notice thereof to the Administrative Agent and the other Lenders. Notwithstanding anything herein to the contrary, no Lender shall enter into any voting agreement, or any similar agreement that would have a similar practical effect, with any other Lender.

**8.13**    **TRANSFER OF LOANS**. Notwithstanding anything else herein to the contrary, any Lender, after delivering to the Administrative Agent a written notice in the form of Exhibit F, appropriately completed (an **"Assignment Agreement"**), may from time to time, at its option, sell, assign, transfer, negotiate or otherwise dispose of all or a portion of its Loans made hereunder (including the Lender's interest in this Agreement and the other Credit Documents) to its Affiliates or to any bank, financial, lending or other entity or institution or fund (an "**Eligible Assignee**") which in such assigning Lender's judgment is reasonably capable of performing the obligations of a Lender hereunder; *provided, however,* that no Lender (including any assignee of any Lender) may assign any portion of its Loans in an amount less than $250,000 (unless (i) to another Lender or an Affiliate of any Lender or (ii) in the event that a Lender may be left with no Loans if it assigns its entire Loans); and *provided further* that notwithstanding anything to the contrary, no Lender may assign or transfer by participation any of its rights or obligations hereunder to (A) a natural Person or (B) to the Sponsor, the Borrower or any of their respective Subsidiaries.

In the event of any such assignment,

(a)    the assigning Lender's Proportionate Share shall be reduced by the amount of the Proportionate Share assigned to the new lender,

(b)    the parties to such assignment shall execute and deliver an Assignment Agreement evidencing such sale, assignment, transfer or other disposition,

(c)    at the new Lender's option, the Borrower shall execute and deliver to such new lender a Note, as requested, in a principal amount equal to such new lender's (without duplication) Loans, and the Borrower shall if requested execute and exchange with the assigning Lender a replacement note for any Note in an amount equal to the (without duplication) Loans retained by the Lender, if any, and

(d)    the Administrative Agent shall amend Schedule I attached hereto and the Register to reflect the Proportionate Shares of the Lenders following such assignment.

Thereafter, such new lender shall be deemed to be a Lender and shall have all of the rights and duties of a Lender (except as otherwise provided in this Article 8), in accordance with its Proportionate Share, under each of the Credit Documents.  The entries on Schedule I maintained pursuant to this Section 8.13 and the Register shall be prima facie evidence of the existence of the amounts of the obligations recorded therein; *provided* that the failure of the Administrative Agent to maintain and amend such schedule shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.  Any assigning Lender may, in connection with any assignment or proposed assignment pursuant to this Section 8.13, disclose to the assignee or proposed assignee any information relating to the Borrower or its Properties furnished to such Lender by or on behalf of the Borrower; *provided, however*, that, prior to any such disclosure, the assignee or proposed assignee shall agree to preserve the confidentiality of any Confidential Information received by it from such Lender on substantially the same terms as those set forth in Section 9.7.

Notwithstanding anything in this Section 8.13, Section 8.12 or the definition of "Required Lenders," to the contrary, for purposes of determining whether the Required Lenders or the Lenders, as applicable, have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Credit Document or any departure by the Sponsor or the Borrower therefrom or, subject to the following paragraph, any plan of reorganization pursuant to the Bankruptcy Code, or (ii) otherwise acted on any matter related to any Credit Document or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Credit Document, no Affiliated Lender shall have any right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action and:

(i)    all Loans held by any Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders have taken any actions; and

(ii)    all Loans held by Affiliated Lenders shall be deemed to be not outstanding for all purposes of calculating whether all Lenders have taken any action unless

the action in question affects such Affiliated Lender in a disproportionately adverse manner than its effect on other Lenders.

Notwithstanding anything in this Agreement or the other Credit Documents to the contrary, each Affiliated Lender hereby agrees that and each Affiliated Lender Assignment Agreement shall provide a confirmation that, if a proceeding under any debtor relief law shall be commenced by or against the Borrower, FOA or the Sponsor at a time when such Lender is an Affiliated Lender, such Affiliated Lender irrevocably authorizes and empowers the Administrative Agent to vote on behalf of such Affiliated Lender with respect to the Loans held by such Affiliated Lender in any manner, unless the Administrative Agent instructs such Affiliated Lender to vote, in which case such Affiliated Lender shall vote with respect to the Loans held by it as the Administrative Agent directs; provided that such Affiliated Lender shall be entitled to vote in accordance with its sole discretion (and not in accordance with the direction of the Administrative Agent) in connection with any plan of reorganization to the extent any such plan of reorganization proposes to treat any Obligations held by such Affiliated Lender in a disproportionately adverse manner to such Affiliated Lender than the proposed treatment of similar Obligations held by Lenders that are not Affiliated Lenders.

Notwithstanding anything herein to the contrary, no Lender may, without the affirmative consent of the Administrative Agent, distribute its Loans to any of its limited partners, non-managing members or similar passive equity holders of any investment fund or other collective investment vehicle comprising or beneficially owning such Lender; provided, however, that if the Administrative Agent grants consent to any Lender to distribute its Loans to any such Persons, each other non-assigning Lender shall be entitled, at any time after the date of such assignment, to distribute its Loans in the same manner.

**8.14    ASSIGNABILITY AS COLLATERAL**.  Notwithstanding any other provision contained in this Agreement or any other Credit Document to the contrary, any Lender may assign as collateral security all or any portion of the Loans or Notes held by it in favor of any Federal Reserve Lender in accordance with Regulation A of the Board of Governors of the Federal Reserve System or any central bank having jurisdiction over such Lender; provided that any payment in respect of such assigned Loans or Notes made by the Borrower to or for the account of the assigning or pledging Lender in accordance with the terms of this Agreement shall satisfy the Borrower's obligations hereunder in respect of such assigned Loans or Notes to the extent of such payment. No such assignment shall release the assigning Lender from its obligations hereunder.

**8.15    REGISTER**.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain records of any assignment of rights and obligations of Lenders under this Agreement and keep a register (the "**Register**") for recordation of the names and addresses of each Lender, and the principal amounts (and stated interest) of the Loans owing to each Lender.  The entries in such register shall be conclusive in the absence of any manifest or demonstrable error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Borrower and any Lender (but only to the extent of entries in the Register that are applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

## ARTICLE 9.
## MISCELLANEOUS

9.1     ADDRESSES.  Any communications between the parties hereto or notices provided herein to be given may be given to the following addresses:

If to the Administrative Agent or ECP Lenders:

12680 High Bluff Drive, Suite 400
San Diego, CA 92130
Attention: Jennifer Gray
Phone: +1 (858) 703-4408
Fax: +1 (858) 703-4401
E-mail: jgray@ecpartners.com

With a copy (which will not constitute notice) to:

12680 High Bluff Drive, Suite 400
San Diego, CA 92130
Attention: Michael Rumpolo
Phone: +1 (973) 671-6127
E-mail: mrumpolo@ecpartners.com

With a copy (which will not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Kelann Brook Stirling
Phone: 212-909-3232
E-mail: kelann.stirling@kirkland.com

If to the Melody Lenders:

Melody Special Situations Offshore Credit Mini-Master Fund, L.P.
Melody Capital Partners Offshore Credit Mini-Master Fund, L.P.
Melody Capital Partners Onshore Credit Fund, L.P.
Melody Capital Partners FDB Credit Fund LLC
c/o Melody Capital Partners, LP
717 Fifth Avenue, 12th Floor
New York, NY 10022
Attention: Notices
Phone: 212-583-8700
E-mail: notices@melody.com

With a copy (which will not constitute notice) to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention: Abhilash M. Raval & Lauren C. Doyle
Phone: 212-530-5123
E-mail: ARaval@milbank.com
Email: LDoyle@milbank.com

If to AFG Investments 1A, LLC:

[●][5]

With a copy (which will not constitute notice) to:

[●][6]

If to the Borrower:

Cornucopia Oil & Gas Company, LLC
Attention: Kevin Hemenway
188 West Northern Lights Blvd., Suite 620
Anchorage, AK 99503
Phone: 907-565-2011
Fax: 907-277-3796
Email: hemenwayk@aol.com

With a copy (which will not constitute notice) to:

David H. Bundy, Esq.
721 Depot Drive
Anchorage AK 99501
Phone: (907) 248-8431
E-mail: dhb@alaska.net

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be considered as properly given (a) if delivered in person, (b) if sent by overnight delivery service, (c) in the event overnight delivery services are not readily available, if mailed by first class United States Mail, postage prepaid, registered or certified with return receipt requested or (d) if sent by telecopy or electronic mail (in portable document format). Notice so given shall be effective upon receipt by the addressee, except that communication or notice so transmitted by telecopy or other direct written electronic means (including e-mail) shall be deemed to have been validly and effectively given on the day (if a Banking Day and, if not, on the next following Banking Day) on which it is transmitted if transmitted before 5:00 p.m., New York City time, recipient's time, and if transmitted after that time, on the next following Banking Day; *provided, however,* that if any notice is tendered to an addressee and the delivery thereof is refused

---

[5]        Note to McGinty: Please add notice information.
[6]        Note to McGinty: Please add copy to information.

by such addressee, such notice shall be effective upon such tender. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of 30 days' notice to the other parties in the manner set forth hereinabove.

**9.2    RIGHT TO SET-OFF**. In addition to any rights now or hereafter granted under Applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent and each Lender is hereby authorized at any time or from time to time, to the extent permitted under applicable Legal Requirements, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special) and any other indebtedness at any time held or owing by the Administrative Agent or any Lender (including by branches and agencies of the Administrative Agent and each Lender wherever located) to or for the credit or the account of the Borrower, against and on account of the Obligations of the Borrower hereunder, irrespective of whether or not the Administrative Agent shall have made any demand hereunder and although said Obligations, or any of them, shall be contingent or unmatured.

**9.3    DELAY AND WAIVER**. No delay or omission to exercise any right, power or remedy accruing to the Lenders upon the occurrence of any Default or Event of Default or any breach or default by the Borrower under this Agreement or any other Credit Document shall impair any such right, power or remedy of the Administrative Agent or Lenders, nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring, nor shall any waiver of any single Event of Default, Default or other breach or default be deemed a waiver of any other Event of Default, Default or other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of the Administrative Agent or any Lender of any Event of Default, Default or other breach or default under this Agreement or any other Credit Document, or any waiver on the part of the Administrative Agent or any Lender of any provision or condition of this Agreement or any other Credit Document, must be in writing and shall be effective only to the extent in such writing specifically set forth. All remedies, either under this Agreement or any other Credit Document or by law or otherwise afforded to the Administrative Agent and the Lenders, shall be cumulative and not alternative.

**9.4    COSTS, EXPENSES AND ATTORNEYS' FEES**. From and after the Effective Date, the Borrowers will pay to the Lenders and the Administrative Agent, upon five (5) Banking Days' written demand therefor, all of their documented out-of-pocket costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred after the Effective Date in connection with the administration of this Agreement (including, but not limited to, all expenses and costs incurred pursuant to Section 5.9), the other Credit Documents, and any other documents related thereto or contemplated hereby. The Borrowers will reimburse the Administrative Agent and the Lenders, and their respective related Indemnitees, for all reasonable and documented actual costs and expenses, including reasonable attorneys' and consultants' fees, disbursements and other charges, expended or incurred after the Effective Date by the Administrative Agent or the Lenders in enforcing this Agreement or the other Credit Documents and in connection with a Default or Event of Default, including in connection with actions for declaratory relief in any way related to this Agreement or the other Credit Document in collecting any sum which becomes due to the Lenders under the Credit Documents, and in

responding to or defending against any audit initiated by the State of Alaska with respect to any State Tax Credits or Validated Expenditures. The provisions of this Section 9.4 shall survive foreclosure of the Security Documents, the termination of this Agreement and satisfaction or discharge of the Borrowers' obligations hereunder, and shall be in addition to any other rights and remedies of the Lenders, the Administrative Agent and their respective Affiliates. For the avoidance of doubt, the reimbursement rights provided for in this Section 9.4 shall not extend to any costs, fees or expenses arising in connection with or resulting from a Specified Claim.

9.5    ENTIRE AGREEMENT.  This Agreement, the other Credit Documents, and any other agreement, document or instrument attached hereto or referred to herein integrate all the terms and conditions mentioned herein or incidental hereto and supersede all oral negotiations and prior writings in respect to the subject matter hereof.  In the event of any conflict between the terms, conditions and provisions of this Agreement or any other Credit Document and any such agreement, document or instrument, the terms, conditions and provisions of this Agreement or such other Credit Document shall prevail.  This Agreement and the other Credit Documents may only be amended or modified in accordance with Section 8.9 hereof.

9.6    GOVERNING LAW.  This Agreement, and any instrument or agreement required hereunder (to the extent not otherwise expressly provided for therein), shall be governed by, and construed under, the laws of the State of New York, without regard to the conflict of law principles that would result in the application of any law other than the law of the State of New York (other than Section 5-1401 and Section 5-1402 of the New York General Obligations Law).

9.7    CONFIDENTIALITY.  No party hereto, in its capacity as a "**receiving party**", shall disclose any Confidential Information to any third party without the prior written consent of the party delivering such Confidential Information (*provided* that any disclosure of Confidential Information described in clause (a) of the definition thereof shall require the prior consent of the Administrative Agent and the Borrower), other than:

(a)    in the case of disclosure by the Administrative Agent or any Lender, (i) to the Administrative Agent's or such Lender's respective auditors, officers, directors, employees, agents, advisors, funding sources, investors, potential investors, potential lenders (including potential purchasers of the Loans) and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, the Administrative Agent and the other Lenders, (iii) to actual or prospective Lenders or credit default providers, in each case on a confidential basis and otherwise in accordance with the last sentence of Section 8.13, (iv) to actual or prospective participants, in each case on a confidential basis and otherwise in accordance with the fourth to last sentence of Section 8.12, (v) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law, (vi) in connection with any litigation, arbitration or other legal proceeding to which the Administrative Agent or any Lender is a party, (vii) to the lenders and agents under the AIDEA Loan Agreement, the Second Lien Credit Agreement and the Tax Credit Loan Agreement, (viii) as requested or required by any state, federal or foreign authority or examiner regulating banks or banking or (ix) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the

40

enforcement of rights hereunder or thereunder (including any judicial or non-judicial foreclosure); or

(b)        in the case of disclosure by the Borrower, (i) to the Borrower's auditors, officers, directors, employees, agents, representatives, advisors, funding sources, investors, potential investors and other representatives (*provided* that such Persons have been informed of the confidential nature of such information and instructed to keep such information confidential), (ii) to any other Person party hereto, (iii) as required by any Applicable Law or any judicial or administrative process or as otherwise required by law or (iv) in connection with any litigation, arbitration or other legal proceeding to which the Borrower is a party.

The Borrower consents to the publication by the Administrative Agent and Lenders of customary advertising material relating to transactions contemplated hereby, using the names, product photographs, logos or trademarks of the Borrower.  In addition, the Administrative Agent and Lenders may disclose information regarding this Agreement and the Credit Facility to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and Lenders in connection with the administration and management of the Credit Documents, and shall share such disclosed information with Borrower upon request.

**9.8**    **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, (a) the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which come as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**9.9**    **HEADINGS**.  Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

**9.10**    **ACCOUNTING TERMS**.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and practices consistent with those applied in the preparation of the financial statements submitted by the Borrower to the Administrative Agent, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles and practices.

**9.11**    **NO PARTNERSHIP**.  The Lenders and the Borrower intend that the relationship between them shall be solely that of creditor and debtor.  Nothing contained in this Agreement, the Notes or in any of the other Credit Documents shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between the Administrative Agent and Lenders and the Borrower or any other Person.  The Administrative Agent and Lenders shall not be in any way responsible or liable for the debts, losses, obligations or duties of the Borrower, the Sponsor or any other Person or with respect to the Properties of the Borrower, the Sponsor or otherwise.  All obligations to pay real property or other taxes,

assessments, insurance premiums, and all other fees and charges arising from the ownership, operation, lease or occupancy of the Properties of the Borrower or the Sponsor and to perform all obligations and other agreements and contracts relating to the Properties of the Borrower shall be the sole responsibility of the Borrower.

The Borrower acknowledges that the Lenders, the Administrative Agent, their respective Affiliates and funds managed by any of them (collectively, the "**Creditor Parties**") may be providing debt financing, equity capital or other services to other companies in respect of which the Borrower may have conflicting interests regarding the transactions described herein and otherwise. The Borrower acknowledges that none of the Creditor Parties have any obligation to use in connection with the transactions contemplated hereby, or to furnish to the Borrower, Confidential Information obtained from other companies.

The Borrower further acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Borrower and the Creditor Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement and the other Credit Documents, irrespective of whether the Creditor Parties have advised or is advising the Borrower on other matters, (b) the Creditor Parties, on the one hand, and the Borrower, on the other hand, have an arms-length business relationship that does not directly or indirectly give rise to, nor do the Borrower rely on, any fiduciary duty on the part of the Creditor Parties, (c) the Borrower is capable of evaluating and understanding, and the Borrower understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Credit Documents, (d) the Borrower has been advised that each of the Creditor Parties is engaged in a broad range of transactions that may involve interests that differ from the Borrower's interests and that none of the Creditor Parties has any obligation to disclose such interests and transactions to the Borrower by virtue of any fiduciary, advisory or agency relationship and (e) the Borrower waives, to the fullest extent permitted by law, any claims the Borrower may have arising out of or in connection with the transactions contemplated by this Agreement and the other Credit Documents against the Creditor Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that none of the Creditor Parties shall have any liability (whether direct or indirect) to the Borrower in respect of such a fiduciary duty claim or to any Person asserting a fiduciary duty claim on behalf of or in right of the Borrower, including the Borrower's stockholders, employees or creditors.

**9.12   SECURITY DOCUMENTS**.  Reference is hereby made to the Security Documents for the provisions, among others, relating to the nature and extent of the security provided thereunder; the rights, duties and obligations of the Borrower; and the rights of the Administrative Agent and the Lenders with respect to such security.

**9.13   LIMITATION ON LIABILITY**.  No Claim shall be made by any party to this Agreement or any of their respective Affiliates against any other party hereto or the Lenders or any of their Affiliates, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any breach or wrongful conduct (whether or not the Claim therefor is based on contract, tort or duty imposed by law), in connection with, arising out of or in any way related to the transactions contemplated by this Agreement or the other Credit Documents or any act or omission or event occurring in connection therewith; and each party hereto hereby waives, releases and agrees not to sue upon any such Claim for any such damages,

whether or not accrued and whether or not known or suspected to exist in its favor *provided, however*, that (a) no party shall be required to waive Claims against the Borrower; *provided, however*, neither this limitation of liability nor this exception shall limit in any manner the releases set forth in this Agreement or the Credit Documents; (b) no Lender shall be required to waive Claims (subject to the limitation of damages set forth in this sentence) to the extent they arise from the Administrative Agent's gross negligence or willful misconduct; and (c) the Administrative Agent shall be fully justified in refusing to take or continuing to take any action unless it shall first be satisfied by the indemnity pursuant to Section 8.5.

For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, nothing herein shall limit the right or ability of any Person that is a Lender (whether in its capacity as a Lender or otherwise) to make a Claim against any Person in respect of a document or agreement other than this Agreement, the Notes and the Credit Documents.

**9.14    WAIVER OF JURY TRIAL**.  THE ADMINISTRATIVE AGENT, THE LENDERS, AND THE BORROWER, HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR THE OTHER CREDIT DOCUMENTS.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT, THE LENDERS AND THE BORROWER TO ENTER INTO THIS AGREEMENT.

**9.15    CONSENT TO JURISDICTION**.  The Administrative Agent, the Lenders and the Borrower agree that any legal action or proceeding by or against the Borrower, or with respect to or arising out of or relating to this Agreement, the Notes, or any other Credit Document, may be brought in or removed to the courts of the State of New York, in and for the County of New York, or, to the extent permitted by Applicable Law, of any federal court sitting in the borough of Manhattan.  By execution and delivery of this Agreement, each of the Administrative Agent, the Lenders and the Borrower accept, for itself and in respect of its property, generally, irrevocably and unconditionally, the exclusive jurisdiction of the aforesaid courts; *provided* that nothing herein shall limit the right of the Administrative Agent or the Lenders to sue in any other jurisdiction in connection with the exercise of the rights under any Security Documents or the enforcement of any judgment.  The Administrative Agent, the Lenders and the Borrower irrevocably consent to the service of process out of any of the aforementioned courts in any manner permitted by Applicable Law.  The Administrative Agent, the Lenders and the Borrower further agree that the aforesaid courts of the State of New York and of the United States of America shall have exclusive jurisdiction with respect to any claim or counterclaim of the Borrower based upon the assertion that the rate of interest charged by the Lenders on or under this Agreement, the Loans or the other Credit Documents is usurious.  The Administrative Agent, the Lenders and the Borrower hereby waive, to the extent permitted by Applicable Law, any claim, objection or right to stay or dismiss any action or proceeding under or in connection with this Agreement or any other Credit Document brought before the foregoing courts on the basis of *forum non-conveniens*.

**9.16    KNOWLEDGE AND ATTRIBUTION**.  References in this Agreement and the other Credit Documents to the "knowledge," "best knowledge" or facts and circumstances "known to" the Borrower, and all like references, mean facts or circumstances of which a Responsible Officer

of the Borrower or other relevant Person has actual knowledge or should have had knowledge after reasonable due inquiry.

**9.17    SUCCESSORS AND ASSIGNS; NO THIRD-PARTY BENEFICIARIES**.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  The Borrower may not assign or otherwise transfer any of its rights under this Agreement without the prior written consent of the Lenders in their sole and absolute discretion.  Each Lender may assign all or a portion of its Loans, and sell participations in such Loans, subject to the applicable provisions of Article 8.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto and their respective successors and permitted assigns and participants and, in the case of Section 5.10, Section 8.5 and Section 9.4, Indemnitees) any legal or equitable right, remedy or Claim under or by reason of this Agreement.

**9.18    USURY SAVINGS CLAUSE**.    Notwithstanding any other provision herein, the aggregate interest rate charged with respect to any of the Obligations, including all charges or fees in connection therewith deemed in the nature of interest under Applicable Law shall not exceed the Highest Lawful Rate.  If the rate of interest (determined without regard to the preceding sentence) under this Agreement at any time exceeds the Highest Lawful Rate, the outstanding amount of the Loans made hereunder shall bear interest at the Highest Lawful Rate until the total amount of interest due hereunder equals the amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect. In addition, if when the Loans made hereunder are repaid in full the total interest due hereunder (taking into account the increase provided for above) is less than the total amount of interest which would have been due hereunder if the stated rates of interest set forth in this Agreement had at all times been in effect, then to the extent permitted by law, the Borrower shall pay to Administrative Agent for the account of the Lenders an amount equal to the difference between the amount of interest paid and the amount of interest which would have been paid if the Highest Lawful Rate had at all times been in effect.  Notwithstanding the foregoing, it is the intention of Lenders and the Borrower to conform strictly to any applicable usury laws.  Accordingly, if any Lender contracts for, charges, or receives any consideration which constitutes interest in excess of the Highest Lawful Rate, then any such excess shall be cancelled automatically and, if previously paid, shall at such Lender's option be applied to the outstanding amount of the Loans made hereunder or be refunded to the Borrower.

**9.19    COUNTERPARTS**.  This Agreement may be executed in one or more counterparts, and by the parties hereto in separate counterparts, each of which when executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery by telecopier or electronic means in portable document format of an executed counterpart of a signature page of this Agreement (or of an executed counterpart of any amendment or waiver of this Agreement or any Exhibit hereto to be executed and delivered hereunder) shall be as effective as delivery of a manually executed counterpart hereof.

**9.20    PATRIOT ACT**.  The Administrative Agent and each Lender hereby notify the Borrower that pursuant to the requirements of the Patriot Act, they are required to obtain, verify and record information that identifies the Borrower, which information includes the name, address and tax identification number of the Borrower and other information that will allow such Lender

to identify the Borrower in accordance with the Patriot Act and other applicable "know-your-customer" and AML Laws, Anti-Corruption Laws or Anti-Terrorism Laws. This notice is given in accordance with the requirements of the Patriot Act. The Borrower shall, promptly following a request by any Lender or the Administrative Agent, provide all documentation and other information that such Lender or the Administrative Agent, as applicable, requests in order to comply with its ongoing obligations under applicable "know your customer", AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws and any rules or regulations thereunder, including the Patriot Act.

9.21    **OBLIGATIONS ABSOLUTE**. The Borrower hereby waives, for the benefit of the Secured Parties: (a) any right to require any Secured Party, as a condition of payment or performance by the Borrower, to (i) proceed against the Sponsor or any other Person, (ii) proceed against or exhaust any security held from any guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account, securities account or credit on the books of any Secured Party in favor of any other Person, or (iv) pursue any other remedy in the power of any Secured Party whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or defense of the Sponsor based on or arising out of the lack of validity or the unenforceability of the Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of the Sponsor from any cause other than payment in full of the Obligations (or deemed payment in full of the Obligations pursuant to Section 7.2.6); (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Secured Party's errors or omissions in the administration of the Obligations, except behavior which amounts to gross negligence or willful misconduct; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of the Borrower's obligations hereunder, (ii) the benefit of any statute of limitations affecting the Borrower's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that any Secured Party protect, secure, perfect or insure any security interest or lien or any property subject thereto; and (f) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

9.22    **INTERCREDITOR AGREEMENTS**.

(a)    Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Administrative Agent pursuant to the Security Documents and the exercise of any right or remedy by the Administrative Agent hereunder and thereunder are subject to the provisions of the Intercreditor Agreements. In the event of any conflict between the terms of the Intercreditor Agreements and this Agreement, the terms of the Intercreditor Agreements shall govern and control.

(b)    The Borrower agrees that the Second Lien Credit Agreement and each Second Lien Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Second Lien Agent pursuant to the Second Lien Collateral Documents and the exercise of any right or remedy by the Second Lien Agent hereunder and thereunder are subject to the provisions of (a) the Intercreditor Agreement, dated as of [__], 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "AIDEA Intercreditor Agreement"), between the Alaska Industrial Development and Export Authority as AIDEA and Energy Capital Partners Mezzanine Opportunities Fund A, LP, as Second Lien Agent, and acknowledged and agreed to by the Borrowers and the Sponsor, (b) the Intercreditor Agreement, dated as of [__], 2020, between the ING Capital LLC, as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor (the "Tax Credit Intercreditor Agreement") and (c) the Intercreditor Agreement, dated as of [__], 2020, between the Alaska Industrial Development and Export Authority as AIDEA, ING Capital LLC as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor (the "Cornucopia Equity Intercreditor Agreement", and together with the AIDEA Intercreditor Agreement and the Tax Credit Intercreditor Agreement, the "Intercreditor Agreements"). In the event of any conflict between the terms of any Intercreditor Agreement and this agreement, the terms of such Intercreditor Agreement shall govern and control."

(c)     The Borrower agrees that the Tax Credit Loan Agreement and each Tax Credit Collateral Document shall each include the following language (or language to similar effect approved by the Required Lenders):

"Notwithstanding anything herein to the contrary, the Lien and security interest granted to the Tax Credit Agent pursuant to the Tax Credit Collateral Documents and the exercise of any right or remedy by the Tax Credit Agent hereunder and thereunder are subject to the provisions of (a) the Intercreditor Agreement, dated as of [__], 2020, between the ING Capital LLC, as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor (the "Tax Credit Intercreditor Agreement") and (b) the Intercreditor Agreement, dated as of [__], 2020, between the Alaska Industrial Development and Export Authority as AIDEA, ING Capital LLC as Tax Credit Administrative Agent, Energy Capital Partners Mezzanine Opportunities Fund A, LP as New Term Loan Agent and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Second Lien Agent, and acknowledged and agreed to by Cornucopia and the Sponsor (the "Cornucopia Equity Intercreditor Agreement", and together with the Tax Credit Intercreditor Agreement, the "Intercreditor Agreements"). In the event of any conflict between the terms of any Intercreditor Agreement and this agreement, the terms of such Intercreditor Agreement shall govern and control."

(d)    The Borrower agrees that the AIDEA Loan Agreement shall include the following language (or language to similar effect approved by the Required Lenders):

> "Notwithstanding anything herein to the contrary herein or in any other AIDEA Loan Document, the Lien and security interest granted to the Authority shall not at any time include any Tax Credit Collateral (as defined in the Tax Credit Intercreditor Agreement).  The Authority hereby (a) disclaims any and all interest in the Tax Credit Collateral and (b) agrees to grant a security interest in favor of the Tax Credit Agent, the New Term Loan Agent and the Second Lien Agent, subject to the Tax Credit Intercreditor Agreement, in any Tax Credit Collateral acquired or deemed to be owned by the Authority.  In the event that the Authority receives any proceeds of any State Tax Credits, the Authority agrees to hold such proceeds in trust for the lenders under the Tax Credit Loan Agreement, the Second Lien Credit Agreement and the New Term Loan Agreement and to immediately turn over and deliver to the Tax Credit Agent, the Second Lien Agent and the New Term Loan Agent, subject to the Tax Credit Intercreditor Agreement, all such proceeds, in kind, and in the exact form received.  Each of the Secured Parties under and as defined in the Tax Credit Loan Agreement, the Second Lien Credit Agreement and the New Term Loan Agreement is a third-party beneficiary to this paragraph and is entitled to the rights and benefits under this paragraph and may enforce the provisions of this paragraph as if it were a party hereto."

**9.23    CREDIT DOCUMENTS**. The Borrower agrees it shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Required Lenders may request to effectuate the terms of and the Lien priorities contemplated by the Credit Documents.

**9.24    ACKNOWLEDGEMENT AND CONSENT TO BAIL-IN OF EEA FINANCIAL INSTITUTIONS**. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of a Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

**9.24.1** the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

**9.24.2** the effects of any Bail-In Action on any such liability, including, if applicable:

(a)    a reduction in full or in part or cancellation of any such liability;

(b)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(c)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any the applicable Resolution Authority.

9.25    **AMENDMENT AND RESTATEMENT.** The parties hereto agree that this Agreement is a restatement of, and an extension of, and amendment to, the Prepetition Credit Agreement. This Agreement does not in any way constitute a novation of the Prepetition Credit Agreement, but is an amendment and restatement of same.  It is understood and agreed that, except to the extent released by the Administrative Agent as contemplated herein, the Liens securing the Obligations under and as defined in the Prepetition Credit Agreement and the rights, duties, liabilities and obligations of the Borrower under the Prepetition Credit Agreement and the Prepetition Credit Documents to which it is a party shall not be extinguished but shall be carried forward and shall secure such obligations and liabilities as amended, renewed, extended and restated by this Agreement.

9.26    **RELEASE OF FOA.** Effective on the Effective Date, the Prepetition Administrative Agent, the Prepetition Administrative Agent and the Prepetition Lenders (a) hereby release FOA as a Borrower under the Prepetition Credit Agreement and a Grantor under the Prepetition Security Agreement and FOA is hereby discharged and released from all obligations under the Prepetition Credit Documents, (b) hereby release all of the security interests granted by FOA or Cornucopia to the Prepetition Administrative Agent or any Prepetition Secured Party under the Prepetition Credit Documents other than the security interests in the Collateral and (c) authorize the termination of any UCC financing statements listing FOA, and the amendment of any UCC financing statements listing Cornucopia, as debtor and the Prepetition Administrative Agent as secured party.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

**EXHIBIT A**

DEFINITIONS

"**AAC**" means Alaska Administrative Code.

"**Acceleration Amounts**" has the meaning assigned to such term in Section 7.2.2.

"**Additional Material Contract**" means any contract or series of related contracts to which the Borrower is a party or to which its assets are bound that is material to the business or operations of the Borrower or the Properties of the Borrower or the termination of which would reasonably be expected to result in liabilities or losses in excess of $100,000 or cause a Material Adverse Effect.  Each such contract or series of related contracts that requires payments by or contemplates payments to the Borrower of more than $500,000 during the term of such contract shall be deemed an Additional Material Contract.

"**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"**Affiliate**" of a specified Person means any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified, or that holds or beneficially owns 10% or more of the Equity Interests in the Person specified or 10% or more of the voting securities of the Person specified; *provided*, that in no event shall the Administrative Agent, any Lender or any Affiliate of any Lender be considered an Affiliate of the Borrower.

"**Affiliated Lender**" means, at any time, any Lender that is an Affiliate of the Sponsor or the Borrower (other than the Sponsor, the Borrower or any of their respective Subsidiaries).

"**Agent Account**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Agreement**" has the meaning given in the preamble of this Agreement.

"**AIDEA**" means Alaska Industrial Development and Export Authority.

"**AIDEA Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [__], 2020, between AIDEA and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

"**AIDEA Loan Agreement**" means that certain Credit Agreement, dated as of [__], 2020 among the Borrower, FOA, Corsair and AIDEA, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**AIDEA Loan Collateral Documents**" has the meaning given to the term "AIDEA Security Documents" in the AIDEA Loan Agreement.

"**AIDEA Loan Documents**" has the meaning given in the AIDEA Loan Agreement.

A-1

"**AIDEA Loan Obligations**" has the meaning given in the AIDEA Loan Agreement.

"**AK Obligations**" means all present or future taxes (including, without limitation, property or production taxes), levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees, rental, royalty, or other charges imposed by the State of Alaska (or any regional, local or political subdivision thereof), including any interest, additions to tax or penalties applicable thereto or other obligations of any kind (including, without limitation, any dismantlement, removal and restoration obligations or other bonding obligations).

"**Alaska Oil and Gas Production Tax Law**" means the Alaska Oil and Gas Production Tax statute, AS 43.55.011 et seq.

"**Alaska Tax Credit Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under AS 43.55.023 for tax credits under the Alaska Oil and Gas Production Tax Law, including all tax credits available pursuant to AS 43.55.023(a), AS 43.55.023(l), AS 43.55.023(b) and AS 43.55.025.

"**Alaska Tax Returns**" means any State of Alaska tax return for which the Borrower and any other member of its consolidated, combined, affiliated, unitary or similar income tax group for the State of Alaska could file to preserve net operating losses with respect to their business or other operations in the State of Alaska.

"**AML Laws**" means all laws, rules, and regulations of any jurisdiction applicable to any Lender, the Administrative Agent, the Borrower or the Sponsor from time to time concerning or relating to anti-money laundering.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or the Sponsor from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"**Anti-Terrorism Laws**" means any of the following: (a) the Anti-Terrorism Order; (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations); (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations); (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations); (e) the Patriot Act; (f) any regulations promulgated pursuant to any of the foregoing or (g) comparable laws, rules and directives administered or enforced by the United Nations Security Council, the European Union, or a member state of the European Union.

"**Applicable Laws**" means and includes any and all laws, statutes, codes, ordinances, orders, rules, regulations, any constitutional provision, treaties, decrees, writs, judgments, decisions, certificates, licenses, holdings, determinations, injunctions, Permits or requirements of any Governmental Authority (including all Environmental Laws), along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, as such may be amended or modified from time to time.  Unless the context clearly requires otherwise, the term "Applicable Law" shall include each of the foregoing as in

effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the Effective Date.

"**Applicable Permit**" means, at any time, any Permit, including any zoning, environmental protection, pollution (including air, water or noise), sanitation, import, export, safety, siting or building Permit, in each case that is (a) necessary at such time in connection with the transactions contemplated by the Credit Documents or the Material Contracts or the operation of the Borrower's Properties (in each case to the extent required by Legal Requirements, the Credit Documents or the Material Contracts), or for the Borrower to enter into any Credit Document or Material Contract or to consummate any transaction contemplated thereby, in each case in accordance with all applicable Legal Requirements and (b) otherwise listed on Part I of Exhibit D.

"**AS**" means Alaska Statute.

"**Assignment Agreement**" has the meaning given in Section 8.13.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"**Bail-In Legislation**" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation, rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"**Banking Day**" means any day other than a Saturday, Sunday or other day on which banks are authorized to be closed in New York, New York or Kenai, Alaska.

"**Bankruptcy Cases**" means the cases related to Borrower's and FOA's voluntary petition for relief filed August 9, 2019 under chapter 11 of the Bankruptcy Code in the Bankruptcy Court captioned In re Furie Operating Alaska, LLC, Case No. 19-11781.

"**Bankruptcy Code**" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, as applicable to the Bankruptcy Cases.

"**Bankruptcy Event**" shall be deemed to occur, with respect to any Person, if:

      (a)    such Person shall institute a voluntary case seeking liquidation or reorganization under the Bankruptcy Code, or shall consent to the institution of an involuntary case thereunder against it;

(b)    such Person shall apply for, or by consent or acquiescence or otherwise there shall be an appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers for itself or substantially all of its assets;

(c)    such Person shall make a general assignment of substantially all of its assets for the benefit of its creditors;

(d)    such Person shall admit in writing its inability to pay its debts generally as they become due; or

(e)    an involuntary case shall be commenced seeking liquidation or reorganization of such Person under the Bankruptcy Code and (i) the petition commencing the involuntary case is not timely controverted, (ii) the petition commencing the involuntary case is not dismissed within 60 days of its filing, (iii) an interim trustee is appointed to take possession of all or a portion of the property, and/or to operate all or any part of the business of such Person and such appointment is not vacated within 60 days, or (iv) an order for relief shall have been issued or entered therein.

"**Books and Records**" means, as to any Person, all of such Person's books and records including ledgers; federal and state tax returns; records regarding such Person's assets or liabilities, business operations or financial condition; and all computer programs or storage or any equipment containing such information.

"**Borrower**" has the meaning given in the preamble of the Agreement.

"**Capital Expenditures**" means, for any period, the aggregate of all expenditures of the Borrower that, in accordance with GAAP, are or should be included in "purchase of property and equipment" or similar items, or which should otherwise be capitalized, reflected in the statement of cash flows of the Borrower.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Cash**" means money, currency or a credit balance in any demand or Deposit Account.

"**Cash Equivalents**" means, as at any date of determination, any of the following: (a) marketable securities (i) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (ii) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (c) commercial paper maturing no more than three months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within three months after such date and issued or accepted by any commercial bank organized under the laws of the United

States of America or any state thereof or the District of Columbia that (i) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (ii) has Tier 1 capital (as defined in such regulations) of not less than $1,000,000,000; and (e) shares of any money market mutual fund that (i) has substantially all of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (ii) has net assets of not less than $5,000,000,000, and (iii) has the highest rating obtainable from either S&P or Moody's.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980 as amended.

"**Change of Control**" means (x) any transaction as a result of which (a) HEX, LLC fails to directly or indirectly own 80% of the Equity Interests in the Borrower, (b) the Sponsor fails to directly own at least 100% of the Equity Interests in the Borrower, (c) the Borrower ceases to directly own 100% of the Equity Interests in FOA or (d) a Disqualified Owner shall own the Equity Interests in the Borrower, directly or indirectly or (y) any change in ownership of the Borrower or the Sponsor occurs which results in the failure of the Borrower to meet the eligibility requirements of AS 43.55.028.

"**Claim**" means any and all liabilities, losses, administrative or regulatory or judicial actions, suits, demands, decrees, claims, Liens, judgments, warning notices, notices of noncompliance or violation, investigations, proceedings, removal or remedial actions or orders, or damages (foreseeable and unforeseeable, including consequential and punitive damages), penalties, fees, out-of-pocket costs, expenses, disbursements, attorneys' fees or consultants' fees.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means, collectively, the Tax Credit Collateral, the Cornucopia Equity Collateral and any other Property in which Liens are purported to be granted pursuant to the Security Documents as security for the Obligations.

"**Confidential Information**" means (a) the terms and conditions of each of the Credit Documents and Material Contracts, including any amendments, waivers, supplements or other modifications thereto and all negotiations and communications in respect thereof and (b) any and all documents, materials and information (whether oral, written, electronic or in any other form) relating to the assets, operations, business, financial condition, results of operations or prospects of the Borrower disclosed to or obtained by the Administrative Agent or any Lender (each a "**receiving party**") pursuant to the Agreement or the other Credit Documents or otherwise provided to a receiving party by or on behalf of the Borrower (each a "**disclosing party**") in connection with the Agreement or the other Credit Documents, but does not include any such information that (i) is or becomes generally available to the public (other than as a result of a breach by a receiving party of its confidentiality obligations under Section 9.7), (ii) was lawfully available to any receiving party on a non-confidential basis prior to such information being disclosed by or on behalf of, or obtained from, a disclosing party, (iii) is or becomes available to any receiving party from a source other than a disclosing party or (iv) is subject to disclosure pursuant to AS 44.88.215 or the public records laws of the State of Alaska.

"**Confirmation Order**" means that final order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, filed in the Bankruptcy Cases at Docket No. [___].

"**Contractual Obligation**" means, as applied to any Person, any provision of any Securities issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its Properties is bound or to which it or any of its Properties is subject.

"**Control Agreement**" means a customary account control agreement in form and substance reasonably satisfactory to the Administrative Agent pursuant to which the depositary institution maintaining the relevant account agrees that the Administrative Agent shall have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts) and pursuant to which such issuer, securities intermediary, commodities intermediary or depositary institution (as applicable) shall agree to comply solely with the Administrative Agent's entitlement orders or instructions with respect to the disposition of funds or to apply any value distributed on account of any commodity account, as applicable, in such account upon the occurrence and continuance of an Event of Default and without the consent of any other Person.

"**Cornucopia**" has the meaning given in the preamble of the Agreement.

"**Cornucopia Equity Collateral**" has the meaning given in the Cornucopia Equity Intercreditor Agreement.

"**Cornucopia Equity Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [●], 2020, between AIDEA, the Tax Credit Agent, the Administrative Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

"**Corsair**" means Corsair Oil & Gas LLC, a Delaware limited liability company.

"**Credit Documents**" means, without duplication, the Agreement, any Notes, the Security Documents, the Intercreditor Agreement, the Indemnity Agreement, and all other loan, security or other agreements, letter agreements, documents, instruments and certificates, and other similar document entered into by the Borrower, the Sponsor and the Lenders in connection with the transactions contemplated by the Credit Documents.

"**Creditor Parties**" has the meaning given in <u>Section 9.11</u>.

"**Debt**" of any Person at any date means, without duplication, any indebtedness of such Person, whether or not contingent, including:

(a)       all obligations of such Person for borrowed money;

(b)    all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services;

(d)    all obligations of such Person under leases which are or should be, in accordance with GAAP, recorded as Capital Leases in respect of which such Person is liable;

(e)    all obligations of such Person to purchase securities (or other property) which arise out of or in connection with the sale of the same or substantially similar securities (or property);

(f)    all deferred obligations of such Person to reimburse any bank or other Person in respect of amounts paid or advanced under a letter of credit or other instrument;

(g)    all Debt of others secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; and

(h)    obligations of such Person as a surety, guarantor, accommodation endorser or otherwise, for or upon the obligation of any other Person, including all Debt of others guaranteed directly or indirectly by such Person or as to which such Person has an obligation substantially the economic equivalent of a guarantee, except the endorsement of negotiable Instruments in the ordinary course of business.

"**Debtors**" has the meaning given in the Plan.

"**Default**" means any occurrence, circumstance or event, or any combination thereof, which, with the lapse of time and/or the giving of notice, would constitute an Event of Default.

"**Default Interest**" has the meaning given in Section 2.3.3.

"**Default Rate**" has the meaning given in Section 2.3.3.

"**Deposit Account**" has the meaning assigned to such term in the UCC.

"**disclosing party**" has the meaning given in the definition of "Confidential Information".

"**Disqualified Owner**" means any Person that, as of the date it first becomes a direct or indirect owner of membership interests in the Borrower: (a) is designated as a Sanctioned Person; (b) is in violation of the AML Laws, Anti-Corruption Laws, Anti-Terrorism Laws or Sanctions; or (c) has been convicted of money laundering under any AML Law, which conviction has not been overturned; provided, however, that a Person shall not be a Disqualified Owner if: (x) prior to the date that the Person first becomes a direct or indirect owner of membership interests in the Borrower, the Borrower provides the Secured Parties with reasonably satisfactory documentation and other written information required under applicable "know your customer" and AML Laws, regulations and requirements (including the Patriot Act) in respect of such Person; and (y) as of

the date the Person first becomes a direct or indirect owner of the membership interests in the Borrower, such Person has certified to the Administrative Agent that none of the criteria set forth in the foregoing clauses (a) to (c) in this definition are applicable to such Person.

"**DNR**" means the State of Alaska Department of Natural Resources.

"**Dollar**" and "**$**" mean United States dollars or such coin or currency of the United States of America as at the time of payment shall be legal tender for the payment of public and private debts in the United States of America.

"**DOR**" means the State of Alaska, Department of Revenue.

"**DOR Purchase Application**" means a request required to be filed with the DOR (on a form prescribed by the DOR) under the provisions of AS 43.55.028(e) providing for the cash purchase of the State Tax Credits by the DOR as contemplated by AS 43.55.28

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**Effective Date**" means the Banking Day on which the satisfaction by the Borrower or waiver by the Lenders of the conditions precedent to closing of this Agreement set forth in Section 3.1 occurs.

"**Eligible Assignee**" has the meaning given in Section 8.13.

"**Environmental Claim**" means any and all Claims relating in any way to any Environmental Law or any Permit issued under any such Environmental Law, including (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from Hazardous Substances or arising from alleged injury or threat of injury to health, safety or the environment.

"**Environmental Laws**" means all Applicable Laws pertaining to human health, occupational safety and environmental matters, including those arising under CERCLA, RCRA, the Superfund Amendments and Reauthorization Act of 1986, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Federal Clean Water Act, the Federal Clean Air Act, the

Toxic Substances Control Act, each as amended, or any state or local statute, regulation, ordinance, order, guidance or decree relating to health, safety or the environment.

"**Equity Interest Equivalents**" means all rights, warrants, options, convertible securities or indebtedness, exchangeable securities or other instruments, or other rights that are outstanding and exercisable for or convertible or exchangeable into, directly or indirectly, any Equity Interest described in clause (a) of the definition thereof at the time of issuance or upon the passage of time or occurrence of some future event.

"**Equity Interests**" means (a) the equity ownership rights in a business entity, whether a corporation, company, joint stock company, limited liability company, general or limited partnership, joint venture, bank, association, trust, trust company, land trust, business trust, sole proprietorship or other business entity or organization, and whether in the form of capital stock, ownership unit, limited liability company interest, limited or general partnership interest or any other form of ownership, and (b) also includes all Equity Interest Equivalents.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" has the meaning given in <u>Section 7.1</u>.

"**Existing Bonding Program**" means the bonding program set forth in Alaska House Bill 331 (2018).

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of the Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code (or any amended or successor version described above) and any intergovernmental agreements and fiscal or regulatory legislation, rules or official interpretations adopted pursuant to any intergovernmental agreement implementing the foregoing.

"**Federal Reserve Lender**" means the Federal Reserve Bank to which a Lender assigns as collateral security all or any portion of the Loans or Notes held by such Lender.

"**FOA**" has the meaning given in the recitals of the Agreement.

"**GAAP**" means generally accepted accounting principles in the United States.

"**Governmental Authority**" means any nation, sovereign or government; any federal, regional, state, tribal authority, province, local or political subdivision; and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"**Governmental Authorization**" means any authorization, approval, consent, franchise, license, covenant, order, ruling, Permit, certification, exemption, notice, declaration or similar right, undertaking or other action of, to or by, or any filing, qualification or registration with, any Governmental Authority.

"**Hazardous Substances**" means any material, substance or waste that is listed, classified, regulated, characterized or otherwise defined as "hazardous," "toxic," "radioactive," a "pollutant" or a "contaminant" (or words of similar intent or meaning) by any Governmental Authority under Applicable Law, including but not limited to petroleum, petroleum byproducts, asbestos or asbestos-containing material, polychlorinated biphenyls, flammable or explosive substances, or pesticides.

"**Highest Lawful Rate**" means the maximum lawful interest rate, if any, that at any time or from time to time may be contracted for, charged, or received under the laws applicable to any Lender which are presently in effect or, to the extent allowed by law, under such Applicable Laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than Applicable Laws now allow.

"**Indemnitees**" has the meaning given in <u>Section 5.10.1</u>.

"**Indemnity Agreement**" means that certain Indemnity Agreement, dated as of the Effective Date, among the Borrower, the Sponsor, the Administrative Agent and the Tax Credit Agent.

"**Instrument**" has the meaning assigned to such term in the UCC.

"**Intercreditor Agreements**" means each of the Tax Credit Intercreditor Agreement and the Cornucopia Equity Intercreditor Agreement.

"**JOA**" means the Operating Agreement dated October 21, 2010, among FOA (f/k/a Escopeta Oil Co., L.L.C.), the Borrower (f/k/a Escopeta Oil of Alaska LLC) and the other minority working interest owners party thereto, as modified by that certain Side Letter Agreement entered into as of October 22, 2010 among FOA, the Borrower and Taylor Minerals, LLC, as further modified by that certain RWIO Settlement Agreement filed in the Bankruptcy Cases at Docket No. 617-2.

"**Kitchen Lights Unit**" means all of the interests that the Borrower currently own or control, and all of the interests the Borrower may hereafter acquire or control, in, to or under the Alaska Division of Land leases listed and shown on <u>Exhibit J</u> to the AIDEA Loan Agreement in effect as of the date hereof, with such amendments, waivers, modifications or supplements as may have been approved in writing by the Administrative Agent.

"**Kitchen Lights Unit Agreement**" means the Kitchen Lights Unit Agreement (f/k/a the Kitchen Unit Agreement) effective as of February 1, 2007, including all Plans of Exploration, Plans of Development and Plans of Operation agreed and approved thereunder, in relation to the Kitchen Lights Unit.

"**Legal Requirements**" means, as to any Person, the articles of incorporation, bylaws or other Organizational Documents of such Person and any requirement under an Applicable Permit and any Applicable Law, in each case, applicable to or binding upon such Person or any of its Properties or to which such Person or any of its property is subject.

"**Lender**" or "**Lenders**" means the Persons listed on <u>Schedule I</u> and any other Person that shall have become a party hereto pursuant to an Assignment Agreement for so long as such Person shall be a party to this Agreement.

"**Lending Office**" means, with respect to any Lender, the office designated as such beneath the name of such Lender on <u>Exhibit C</u> to the Agreement or in the assignment and acceptance agreement pursuant to which it became a Lender or such other office of such Lender as such Lender may specify from time to time to the Administrative Agent and the Borrower.

"**Lien**" means (a) any mortgage, deed of trust, lien, pledge, assignment, charge, security interest, or easement or encumbrance or other exception to title of any kind (including any agreement to give any of the foregoing), whether or not filed, recorded or otherwise perfected under Applicable Law, as well as the interest of a vendor or lessor under any conditional sale agreement, any lease or license in the nature thereof, or other title retention agreement relating to such asset and any option, trust or other preferential arrangement having the practical effect of any of the foregoing and (b) in the case of Securities, any purchase option, call or similar right of a third party with respect to such Securities.

"**Litigation Trust Agreement**" means that certain litigation trust agreement entered into by [●], as the trustee, Cornucopia, Corsair and Furie, established for the benefit of the Lenders, as the beneficiaries of trust established thereby.

"**Loans**" has the meaning given in <u>Section 2.1.1(a)</u>.

"**Material Adverse Effect**" means a material adverse effect on and/or material adverse developments with respect to (a) the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower taken as a whole; (b) the ability of the Borrower to fully and timely perform its Obligations; (c) the legality, validity, binding effect or enforceability against the Borrower of a Credit Document to which it is a party; or (d) the rights, remedies and benefits available to, or conferred upon, the Administrative Agent and any Lender or any Secured Party under any Credit Document.

"**Material Contract**" means each agreement listed on <u>Schedule A</u> and each Additional Material Contract entered into after the Effective Date, including all amendments, supplements, and modifications thereto, in each case, solely to the extent expressly permitted hereunder.

"**Maturity Date**" means the earlier of (a) the fifth (5th) anniversary of the Effective Date and (b) the date on which the entire outstanding principal balance of the Loans, together with all unpaid interest, fees, charges and costs becomes due and payable under this Agreement.

"**Melody Lenders**" means, collectively, Melody Special Situations Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Offshore Credit Mini-Master Fund, L.P., Melody Capital Partners Onshore Credit Fund, L.P. and Melody Capital Partners FDB Credit Fund, LLC.

"**Moody's**" means Moody's Investors Service, Inc.

"**Note**" has the meaning given in <u>Section 2.1.2</u>.

A-11

"**Obligations**" means and includes, with respect to any Person, all loans, advances, debts, liabilities, and obligations, howsoever arising, owed by such Person to the Administrative Agent, the Lenders or any Secured Party of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, pursuant to the terms of the Agreement or any of the other Credit Documents, including all principal, interest (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding in connection with a Bankruptcy Event at the rate, including any applicable post-default rate, even if such interest is not enforceable, allowable or allowed as a Claim in such proceeding), fees, charges, expenses, attorneys' fees and accountants fees chargeable to such Person and payable by such Person hereunder or thereunder.

"**Operator**" means the operator under the JOA, initially FOA.

"**Organizational Documents**" means (a) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its by-laws, as amended, (b) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (c) with respect to any general partnership, its partnership agreement, as amended, and (d) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended. In the event any term or condition of the Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such Organizational Document shall only be to a document of a type customarily certified by such governmental official.

"**Participant Register**" has the meaning given in Section 8.12.

"**Pass-Through Entity**" means an entity that is properly treated for U.S. federal and applicable state, local and foreign income and franchise Tax purposes as (a) disregarded as an entity separate from its owner or (b) a partnership.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended.

"**Pending Permits**" means the Permits that are not, at a given time, Applicable Permits but will become Applicable Permits at a future time.

"**Permits**" means all governmental licenses, permits, franchises, easements, certifications, filings, notices, tariffs, and authorizations held by or made by or on behalf of the Borrower or required to operate the business of the Borrower or to develop, construct, test, operate, maintain, repair, own, lease or use the Properties of the Borrower.

"**Permitted Debt**"[7] means

---

[7] Note to Draft: To be conformed to AIDEA Loan Agreement.

(a)    Debt incurred under the Credit Documents;

(b)    Debt incurred under the AIDEA Loan Documents (including any subsequent additional advances not to exceed Five Million Dollars ($5,000,000) in the aggregate), the Second Lien Loan Documents and the Tax Credit Loan Documents (including, in each case, any refinancing thereof), in each case subject to the Intercreditor Agreements and the AIDEA Intercreditor Agreement, as applicable;

(c)    trade Debt, accounts payable or other similar Debt incurred in the ordinary course of business (but not for borrowed money) (i) not more than 60 days past due, or (ii) being contested in good faith by appropriate proceedings promptly instituted and diligently conducted; *provided* that adequate reserves have been made in accordance with GAAP;

(d)    contingent liabilities required under any Permit or Contractual Obligation of the Borrower, other than, in each case, Debt for borrowed money;

(e)    to the extent constituting debt, Debt of the Borrower incurred in the ordinary course of business under (i) natural gas sales agreements in effect as of the Effective Date (excluding, for the avoidance of doubt, any natural gas sales agreements consisting of prepaid forward contracts, volumetric or dollar denominated production payments or similar arrangements), (ii) financings of insurance premiums up to an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000) and (iii) obligations pursuant to applicable legal requirements of the DNR or Alaska Oil and Gas Conservation Commission up to an aggregate of Four Million Dollars ($4,000,000);

(f)    Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds, so long as such Debt is covered within five (5) Banking Days;

(g)    purchase money indebtedness incurred in the ordinary course of business to the extent contemplated by clause (l) of the definition of Permitted Encumbrances (and subject to the aggregate cap therein);

(h)    Debt in respect of workers' compensation claims, self-insurance obligations, performance and surety bonds in the ordinary course of business;

(i)    Debt arising from netting services, overdraft protection, cash management obligations and otherwise in connection with deposit, securities and commodities accounts in the ordinary course of business;

(j)    subordinated unsecured Debt incurred by the Borrower to FOA in an aggregate amount (together with all amounts outstanding under the immediately succeeding <u>clause (k)</u>) not to exceed $100,000;

(k)    the guarantee by the Borrower to FOA of any Debt incurred by FOA in an aggregate amount (together with all amounts outstanding under the immediately preceding <u>clause (j)</u>) not to exceed $100,000; and

(l)      any Debt for borrowed money incurred by the Borrower that is not secured by the Tax Credit Collateral.

Notwithstanding anything to the contrary herein or in any other Credit Document, no Capital Lease entered into on or after the date hereof shall constitute "Permitted Debt".

"**Permitted Encumbrances**" means

(a)      the rights and interests of the AIDEA as provided in the AIDEA Loan Documents, subject to the Intercreditor Agreements and the AIDEA Intercreditor Agreement;

(b)      the rights and interests of each of the Second Lien Agent and the Tax Credit Agent as provided in the Second Lien Loan Documents and the Tax Credit Loan Documents, respectively, subject to the Intercreditor Agreements and, with respect to the Second Lien Agent, the AIDEA Intercreditor Agreement;

(c)      the rights and interests of the Administrative Agent for the benefit of the Lenders as provided in the Credit Documents, subject to the Intercreditor Agreements;

(d)      Liens for any Tax, assessment or other governmental charge that are not then required by to be paid pursuant to Section 5.5 and that secure obligations not in excess of $100,000 at any time, so long as such Liens are subordinate to the Obligations;

(e)      Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and (i) a bond or other security has been posted or provided in such manner and amount as to assure the Administrative Agent that any amounts determined to be due will be promptly paid in full when such appeal or proceeding is concluded, (ii) adequate reserves in accordance with GAAP have been established by the Borrower therefor or (iii) the amount thereof is fully covered by insurance (subject to applicable deductibles); *provided* that the aggregate amount of such attachment or judgment Liens shall not secure obligations in excess of $100,000 at any time;

(f)      Liens, deposits or pledges to secure (i) statutory obligations, including under workers' compensation laws and unemployment insurance, (ii) performance bonds issued in connection with any Applicable Permits or (iii) performance of bids, tenders, contracts (other than for the repayment of borrowed money), surety and appeal bonds or leases, or for purposes of like general nature in the ordinary course of its business, with any such Lien to be released as promptly as practicable and, in the case of clause (ii), securing obligations not to exceed $100,000 in the aggregate at any time;

(g)      materialmen's, mechanics', workers', repairmen's, employees' or other like Liens, including Liens arising under AS 31.05.100-31.05.110, arising in the ordinary course of business that are (i) not yet due or (ii) being contested in good faith and by appropriate proceedings, so long as, in the case of this clause (ii), (A) such Lien does not attach to, become enforceable against its other creditors with respect to, involve any substantial danger of the sale, forfeiture or loss of or interfere in any material respect with the use or right to dispose of, the Properties of the Borrower; (B) a bond or other security

has been posted or provided in such manner and amount as to assure the Administrative Agent that any taxes, assessments or other charges determined to be due will be promptly paid in full when such contest is determined; and (C) adequate reserves in accordance with GAAP have been established by the Borrower therefor;

(h)    filing of UCC financing statements as a precautionary measure in connection with operating leases;

(i)    easements, rights-of-way, restrictions (including zoning restrictions), trackage rights, minor defects or irregularities in title, restrictions on use of real property and other similar encumbrances or liens that, in the aggregate, do not materially interfere with the value or use, or are useful to the operation, of the Property to which such Lien is attached;

(j)    rights reserved for or vested in any municipality or Governmental Authority to control or regulate the use of the Real Property or to use the Real Property in any manner, including zoning and land use regulations;

(k)    Liens arising by virtue of any statutory or common law provisions relating to bankers' liens, rights of set-off or similar rights;

(l)    purchase money Liens upon or in real property or equipment acquired or held by the Borrower in the ordinary course of business securing the purchase price of such property or equipment or to secure Debt incurred solely for the purpose of financing the acquisition, construction or improvement of any such property or equipment to be subject to such Liens, or Liens existing on any such property or equipment at the time of acquisition (other than any such Liens created in contemplation of such acquisition that do not secure the purchase price), or extensions, renewals or replacements of any of the foregoing for the same or a lesser amount; *provided* that no such Lien shall extend to or cover any property other than the property or equipment being acquired, constructed or improved, and no such extension, renewal or replacement shall extend to or cover any property not theretofore subject to the Lien being extended, renewed or replaced; *provided further* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (l) shall not exceed $100,000 at any time outstanding;

(m)    Liens arising under the JOA;

(n)    Liens securing Debt described in clause (e)(iii) of the definition of "Permitted Debt"; *provided* that the aggregate principal amount of the Debt secured by Liens permitted by this clause (n) shall not exceed $4,000,000 at any time outstanding;

(o)    to the extent constituting a Lien, all overriding royalties existing as of the Effective Date;

(p)    Liens arising under the Kitchen Lights Unit Agreement;

(q)    Liens arising under that certain Farmout Letter Agreement among Pacific Energy Resources Ltd., Pacific Energy Alaska Operating LLC, and FOA (f/k/a Escopeta

Oil Co., L.L.C.) dated February 11, 2009 (a memorandum of which was recorded on March 19, 2009 in the Anchorage Recording District as Doc. No. 2009-017350-0, and on March 23, 2009 in the Kenai Recording District as Doc. No. 2009-002662-0);

(r)     Liens arising under the Lease Assignment and Participation Agreement, dated October 22, 2010;

(s)     [all exceptions scheduled in the Title Policy];

(t)     Liens and encumbrances in existence as of the Borrower's acquisition of the Upland;

(u)     ROWs created or granted by the Borrower for any other purpose that would not render the Upland unusable, or materially impair the use of the Upland, for the operation of the Processing Plant; and

(v)     Liens securing Debt described in clause (l) of the definition of "Permitted Debt".

"**Person**" means any natural person, corporation, limited liability company, limited liability partnership, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means the means the Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code filed in the Bankruptcy Cases on May 6, 2020 at Docket No. 754, as may be amended or modified from time to time in accordance with the terms thereof, including the Plan Supplement (as defined in the Plan), and all exhibits, annexes and other supplements appended or related to the Plan and/or to the Plan Supplement.

"**Pledge Agreement**" means the Third Lien Pledge Agreement, dated as of the Effective Date, between the Sponsor and the Administrative Agent for the benefit of the Secured Parties.

"**Prepetition Administrative Agent**" has the meaning given in the recitals of the Agreement.

"**Prepetition Borrowers**" has the meaning given in the recitals of the Agreement.

"**Prepetition Credit Agreement**" has the meaning given in the recitals of the Agreement.

"**Prepetition Credit Documents**" has the meaning given to the term "Credit Documents" in the Prepetition Credit Agreement.

"**Prepetition Lenders**" has the meaning given in the recitals of the Agreement.

"**Prepetition Loans**" has the meaning given in the recitals of the Agreement.

"**Prime Rate**" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per

annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).

"**Proceeds**" has the meaning assigned to such term in the UCC.

"**Processing Plant**" has the meaning given in the AIDEA Loan Agreement.

"**Properties**" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible (including Contractual Obligations).

"**Proportionate Share**" means, with respect to each Lender at any time, a percentage equal to the quotient of: such Lender's Loans *divided by* the total outstanding Loans, it being acknowledged, in each case, that, upon any transfer by a Lender of all or part of its Loans, the Administrative Agent may revise Schedule I to reflect the Lenders' Proportionate Shares after giving effect to such transfer.

"**Qualified Bonding Program**" means (a) the Existing Bonding Program and (b) any program that is reasonably similar to the Existing Bonding Program to the extent such program becomes available and for which the Borrower has received the written consent of the Administrative Agent and the Lenders to participate therein.

"**Qualifying Operation**" means the development and exploration of certain oil and gas properties of the Borrower and FOA located in, or in the proximity of, the Kitchen Lights Unit. With respect to State Tax Credits, such development meets the requirements of former AS 43.55.023(a), (b) and (l) and AS 43.55.025, as applicable.

"**RCRA**" means the Resource Conservation and Recovery Act.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, including easements and rights of way, together with, in each case, all improvements and fixtures located thereon.

"**receiving party**" has the meaning given in the definition of "Confidential Information".

"**Register**" has the meaning given in Section 8.15.

"**Release**" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, pumping, pouring, migrating, emitting, escaping, emptying, seeping, placing and the like, into or upon any land or water or air, or otherwise entering into the environment.

"**Required Lenders**" means, at any time, the Lenders having Proportionate Shares which in the aggregate exceed 50.0% of the Proportionate Shares of all Lenders; *provided* that to the same extent set forth in Section 8.13 with respect to determination of Required Lenders, the Loans of any Affiliated Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"**Responsible Officer**" means, as to any Person, its president, its chief executive officer, chief financial officer, any vice president, treasurer, assistant treasurer or secretary, any natural Person who is a managing general partner, member or manager (or any of the preceding with regard to any other managing general partner, member or manager), or any project manager or natural Person with similar responsibilities.

"**ROW**" means non-exclusive rights of way, easements and servitudes.

"**S&P**" means Standard & Poor's, a Division of The McGraw-Hill Companies, Inc.

"**Sanctioned Country**" means, at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government (currently, Cuba, Iran, Myanmar, North Korea, and Syria).

"**Sanctioned Person**" means, at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury, or Switzerland (b) any Person located, organized or resident in, or any Governmental Authority or governmental instrumentality of, a Sanctioned Country or (c) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (a) or (b) hereof.

"**Sanctions**" means economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (b) the United Nations Security Council; (c) the European Union; (d) Her Majesty's Treasury; or (e) Switzerland.

"**Second Lien Agent**" has the meaning given in the Second Lien Credit Agreement.

"**Second Lien Collateral Documents**" has the meaning given to the term "Second Lien Security Documents" in the Second Lien Credit Agreement.

"**Second Lien Credit Agreement**" means that certain Credit Agreement, dated as of June [__], 2020 among the Borrower, FOA and Corsair, the lenders party thereto and Energy Capital Partners Mezzanine Opportunities Fund A, LP as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Second Lien Loan Documents**" has the meaning given to the term "Second Lien Documents" in the Second Lien Credit Agreement.

"**Second Lien Obligations**" has the meaning given to the term "Obligations" in the Second Lien Credit Agreement.

"**Secured Parties**" means collectively, the Administrative Agent, the Lenders, each Indemnitee pursuant to Section 5.10.1 and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to this Agreement.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement**" means the Amended and Restated Security Agreement, dated as of the Effective Date, between the Borrower and the Administrative Agent for the benefit of the Secured Parties.

"**Security Documents**" means the Security Agreement, the Pledge Agreement and any financing statements or other certificates executed, filed or recorded in connection with the foregoing, and all other instruments, documents and agreements delivered by or on behalf of the Borrower pursuant to the Agreement or any of the other Credit Documents in order to grant to, or perfect in favor of, the Administrative Agent, for the benefit of the Lenders, a Lien on the Collateral as security for the Obligations.

"**Solvent**" with respect to any Person, means that as of the date of determination both (a) (i) the then fair saleable value of the property of such Person is (A) greater than the total amount of liabilities (including contingent liabilities) of such Person and (B) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and due considering all financing alternatives, ordinary operating income and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under Applicable Laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Claim**" has the meaning given in Section 5.10.

"**Sponsor**" means HEX Cook Inlet LLC, an Alaska limited liability company.

"**State Tax Credit Proceeds**" has the meaning given in Section 5.11.1.

"**State Tax Credits**" means all Alaska State tax credits and State tax credit certificates with respect to which the Borrower is entitled to or receives proceeds under AS 43.55.023(a) (Qualified Capital Expenditures), 43.55.023(l) (Well Lease Expenditures), former 43.55.023(b) (Carry Forward Losses); and/or 43.55.025 (Exploration Expenditures), including without limitation, those set forth on Schedule 4.13.

"**Subject Claims**" has the meaning given in Section 5.10.1(a).

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"**Tax Credit Agent**" has the meaning given to the term "First Lien Agent" the Tax Credit Intercreditor Agreement.

"**Tax Credit Assignment**" means a present assignment of one hundred percent (100%) of the State Tax Credits expected to be issued by the DOR, from the Borrower to and in favor of the Administrative Agent, filed with the DOR on DOR Form 355 or its equivalent (Notice of Assignment of Tax Credit Certificates under AS 43.55.029), which shall comply with the provisions of AS 43.55.029.

"**Tax Credit Certificates**" means transferable certificates evidencing the right to exercise unused tax credits of a producer or explorer, against tax levied by AS 43.55.011 or redeemed under AS 43.55.028, as described in AS 43.55.023(d) and 43.55.025(f).

"**Tax Credit Collateral**" has the meaning given in the Tax Credit Intercreditor Agreement.

"**Tax Credit Collateral Documents**" has the meaning given to the term "First Lien Collateral Documents" in the Tax Credit Intercreditor Agreement.

"**Tax Credit Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of [___], 2020, between the Administrative Agent, the Tax Credit Agent and the Second Lien Agent, and acknowledged and agreed to by the Borrower, FOA and the Sponsor.

"**Tax Credit Loan Agreement**" means that certain Credit Agreement, dated as of [●], 2020 among Cornucopia, the lenders party thereto, and ING Capital, LLC as Administrative Agent, as may be as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

"**Tax Credit Loan Documents**" has the meaning given to the term "First Lien Loan Documents" in the Tax Credit Intercreditor Agreement.

"**Tax Credit Obligations**" has the meaning given to the term "First Lien Obligations" in the Tax Credit Intercreditor Agreement.

"**Tax Credit Reserve Account**" means the deposit account established by [the Depositary Bank] in the name of Cornucopia, entitled "[●]" and numbered [●], which account is subject to the Control Agreement dated June [●], 2020, entered into by [the Depositary Bank] and the Administrative Agent.[8]

"**Taxes**" means all present or future taxes, levies, impost, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means the earlier of the date on which (a) (i) the principal of and interest on each Loan, and all fees and other amounts payable hereunder and under the other Credit Documents shall have been paid in full in Cash and (ii) all other Obligations hereunder have been satisfied (other than (x) those expressly stated to survive termination and (y) contingent obligations as to which no claim has been asserted) and (b) the Obligations shall be deemed to be fully repaid in accordance with Section 7.2.6.

"**Title Policy**" has the meaning given in the AIDEA Loan Agreement.

"**Treasury Regulations**" means the U.S. Department of Treasury Regulations promulgated under the Code, as amended from time to time.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" means the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions of the Security Documents relating to such perfection, priority or remedies.

"**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"**Upland**" has the meaning given in the AIDEA Loan Agreement.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

---

[8]       Note to Hex: Please provide account details.

"**Validated Expenditures**" means the amount of expenditures set forth in supporting invoices provided by the Borrower and incurred (within the meaning of 15 AAC 55.290) by the Borrower with respect to a Qualifying Operation that is the subject of an Alaska Tax Credit Application set forth on <u>Schedule 4.13</u>.

"**Write-Down and Conversion Powers**" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

## RULES OF INTERPRETATION

1. The singular includes the plural and the plural includes the singular.

2. "Or" is not exclusive.

3. A reference to an Applicable Law includes any amendment or modification to such Applicable Law, and all regulations, rulings and other Applicable Laws promulgated under such Applicable Law.

4. A reference to a Person includes its permitted successors and permitted assigns.

5. Accounting terms have the meanings assigned to them by GAAP, as applied by the accounting entity to which they refer.

6. The words "include," "includes" and "including" are not limiting.

7. A reference in a document to an Article, Section, Exhibit, Schedule, Annex or Appendix is to the Article, Section, Exhibit, Schedule, Annex or Appendix of such document unless otherwise indicated. Exhibits, Schedules, Annexes or Appendices to any document shall be deemed incorporated by reference in such document. In the event of any conflict between the provisions of the Agreement (exclusive of the Exhibits, Schedules, Annexes and Appendices thereto) and any Exhibit, Schedule, Annex or Appendix thereto, the provisions of the Agreement shall control.

8. Except as otherwise provided in the Agreement, references to any document, instrument or agreement (a) shall include all exhibits, schedules and other attachments thereto, (b) shall include all documents, instruments or agreements issued or executed in replacement thereof, and (c) shall mean such document, instrument or agreement, or replacement or predecessor thereto, as amended, amended and restated, modified and supplemented from time to time and in effect at any given time.

9. The words "hereof," "herein" and "hereunder" and words of similar import when used in any document shall refer to such document as a whole and not to any particular provision of such document.

10. References to "days" shall mean calendar days, unless the term "Banking Days" shall be used. References to a time of day shall mean such time in New York, New York, unless otherwise specified.

11. In the computation of time periods from a specified date to a specified later date, the word "from" means "from and including," the word "through" means "through and including," and the words "to" and "until" each mean "to but excluding."

12. Unless otherwise expressly specified herein, (a) amounts paid or payable hereunder shall be in Dollars and (b) all amounts denoted by an "$" shall be in Dollars.

13. The Credit Documents are the result of negotiations among, and have been reviewed by, the Borrower, the Administrative Agent, each Lender and their respective counsel. Accordingly, the Credit Documents shall be deemed to be the product of all parties thereto, and no ambiguity shall be construed in favor of or against the Borrower, the Administrative Agent or any Lender solely as a result of any such party having drafted or proposed the ambiguous provision.

14. For all purposes under this Agreement and any other Credit Document, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

The word "either", when used in reference to two Persons (such as the Borrower), is not limiting, and shall mean "a" or "any" Person.

**Schedule I**[9]

The Lenders; Initial Loan Amounts; Wire Instructions

| **Lender Name** | **Loans (as of the Effective Date)** | **Wire Instructions** |
|---|---|---|
| Energy Capital Partners Mezzanine Opportunities Fund A, LP | $4,326,508.00 | **Principal and Interest**<br>Account: Energy Capital Partners Mezzanine Opportunities Fund A, LP Agent Account<br>ABA: 021000021<br>Bank: JP Morgan Private Bank<br>Account #: 477959030<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Energy Capital Partners Management, LP<br>ABA: 021000021<br>Bank: JP Morgan Private Bank<br>Account #: 626448505 |
| Energy Capital Partners Mezzanine Opportunities Fund, LP | $217,769.00 | **Principal and Interest**<br>Account: Energy Capital Partners Mezzanine Opportunities Fund A, LP Agent Account<br>ABA: 021000021<br>Bank: JP Morgan Private Bank<br>Account #: 477959030<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Energy Capital Partners Management, LP<br>ABA: 021000021<br>Bank: JP Morgan Private Bank<br>Account #: 626448505 |
| Energy Capital Partners Mezzanine Opportunities Fund B, LP | $963,994.00 | **Principal and Interest**<br>Account: Energy Capital Partners Mezzanine Opportunities Fund A, LP Agent Account<br>ABA: 021000021<br>Bank: JP Morgan Private Bank<br>Account #: 477959030<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Energy Capital Partners Management, LP<br>ABA: 021000021 |

---

[9]    Note to Lenders: Please confirm wire instructions.

A-1

| | | |
|---|---|---|
| | | Bank: JP Morgan Private Bank<br>Account #: 626448505 |
| Melody Special Situations Offshore Credit Mini-Master Fund, L.P. | $4,813,519.00 | **Principal and Interest**<br>Account: Melody Special Situations Offshore Credit Mini-Master Fund, LP.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-357-3981<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Melody Special Situations Offshore Credit Mini-Master Fund, LP.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-357-3981 |
| Melody Capital Partners Offshore Credit Mini-Master Fund, L.P. | $ 2,793,745.00 | **Principal and Interest**<br>Account: Melody Capital Partners Offshore Credit Mini-Master Fund, L.P.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-357-4138<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Melody Capital Partners Offshore Credit Mini-Master Fund, L.P.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-357-4138 |
| Melody Capital Partners Onshore Credit Fund, L.P. | $ 3,974,529.00 | **Principal and Interest**<br>Account: Melody Capital Partners Onshore Credit Fund, L.P.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-456-3817<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Melody Capital Partners Onshore Credit Fund, L.P.<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-456-3817 |

| Melody Capital Partners FDB Credit Fund, L.P. | $3,409,936.00 | **Principal and Interest**<br>Account: Melody Capital Partners FDB Credit Fund LLC<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-456-3841<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: Melody Capital Partners FDB Credit Fund LLC<br>ABA: 121-000-248<br>Bank: Wells Fargo Bank, NA<br>Account Number: 417-456-3841 |
| --- | --- | --- |
| AFG Investments 1A, LLC | $500,000.00 | **Principal and Interest**<br>Account: MRP Fund I Master A, LLC<br>ABA: 121000248<br>Bank: Wells Fargo Bank, N.A.<br>Account # 4351744958<br><br>**Any Expenses to be Reimbursed by the Borrowers**<br>Account: MRP Fund I Master A, LLC<br>ABA: 121000248<br>Bank: Wells Fargo Bank, N.A.<br>Account # 4351744958 |