## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FURIE OPERATING ALASKA, LLC, *et al.*,[1] | Case No. 19-11781 (LSS) |
| Debtors. | (Jointly Administered) |

---

### DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF ENTRY OF AN ORDER CONFIRMING THE THIRD AMENDED JOINT PLAN OF REORGANIZATION FOR THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

---

Dated: June 8, 2020
      Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**
Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson (DE Bar No. 5024)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
Email:  matthew.ward@wbd-us.com
       ericka.johnson@wbd-us.com

-and-

**MCDERMOTT WILL & EMERY LLP**
Timothy W. Walsh (admitted *pro hac vice*)
Riley T. Orloff (admitted *pro hac vice*)
340 Madison Avenue
New York, New York 10173-1922
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:  twwalsh@mwe.com
       rorloff@mwe.com

*Counsel to Debtors and Debtors in Possession*

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Furie Operating Alaska, LLC (8721); Cornucopia Oil & Gas Company, LLC (9914); and Corsair Oil & Gas LLC (8012).  The location of the Debtors' corporate headquarters and the service address for all Debtors is 188 W. Northern Lights Blvd. Suite 620, Anchorage, Alaska 99503.

## TABLE OF CONTENTS

**Page(s)**

**PRELIMINARY STATEMENT** ................................................................................. 1

**BACKGROUND** ..................................................................................................... 2

    A.   General Background ........................................................................................ 2

    B.   The Plan Process ............................................................................................ 5

**ARGUMENT** ........................................................................................................... 7

    A.   The Plan Meets the Bankruptcy Code's Requirements and Should Be Approved ............ 7

        (i)      Section 1129(a)(1):  The Plan Complies With the Applicable Provisions of the Bankruptcy Code ........................................................................................ 7

        (ii)     Section 1122: The Plan Classifications Are Appropriate ................................ 8

        (iii)    Section 1123(a): The Plan's Content is Appropriate ...................................... 9

        (iv)    Section 1123(b): the Plan Contains Certain Permissible Provisions .............. 10

            **(a)**    The Plan's Release, Exculpation, and Injunction Provisions are Appropriate and Should be Approved ............................................... 10

                **(1)**    Debtor Releases ....................................................................... 11

                **(2)**    Third-Party Release .................................................................. 15

                **(3)**    Injunction and Exculpation Provisions ...................................... 17

        (v)      Section 1129(a)(2): The Plan Complies With the Bankruptcy Code ............. 19

        (vi)    Section 1129(a)(3): The Plan has Been Proposed in Good Faith ................... 20

        (vii)   Section 1129(a)(4): The Plan Provides for Approval of Certain Administrative Expenses ...................................................................................... 22

        (viii)  Section 1129(a)(5): The Plan Contains Proper Disclosures .......................... 22

        (ix)    Section 1129(a)(6): No Governmental Regulatory Commission Has Jurisdiction Over the Debtors ................................................................... 23

        (x)      Section 1129(a)(7): The Plan is in the Best Interest of All Creditors ............ 24

        (xi)    Section 1129(a)(8): The Plan has Been Accepted by Impaired Voting Classes 25

        (xii)   Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Priority, Administrative, and Tax Claims ................................................... 26

        (xiii)  Section 1129(a)(10): At Least One Class of Impaired Classes Has Accepted the Plan ............................................................................................... 26

        (xiv)  Section 1129(a)(11): The Plan is Feasible ................................................. 26

        (xv)   Section 1129(a)(12): All Fees Have Been or Will be Paid ........................... 28

        (xvi)  Section 1129(a)(13) Through Section 1129(a)(16) Do Not Apply to the Plan 28

i

# TABLE OF CONTENTS

**Page(s)**

(xvii)   Section 1129(b): The Plan Satisfies the "Cram Down Requirements"........... 29

(xviii)  Section 1129(c) Through Section 1129(e) Have Been Satisfied .................... 32

B.   Objections ................................................................................................................. 32

C.   A Waiver of Any Stay of Confirmation is Appropriate..................................................... 36

D.   The Debtors' Proposed Findings Regarding the Foreclosure and Transaction are Appropriate ................................................................................................................. 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, 526 U.S. 434
   (1999) ........................................................................................................29

*In re Am. Solar King Corp.,*
   90 B.R. 808, 815 (W.D. Tex. 1988) .......................................................23

*In re Armstrong World Indus.,*
   320 B.R. 523 (D. Del. 2005) .................................................................30

*In re Armstrong World Indus., Inc.,*
   348 B.R. 111 (Bankr. D. Del. 2006) ........................................................7

*Bank of Am. Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. Partnership,*
   526 U.S. 434 (1999) .............................................................................24

*In re Bowles*,
   48 B.R. 502 (Bankr. E.D. Va. 1985) ....................................................29

*In re Brotby,*
   303 B.R. 177 (B.A.P. 9th Cir. 2003) ...................................................27

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) .....................................................29

*In re Crowthers McCall Pattern, Inc.,*
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) ..................................................24

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ..................................................19

*Folger Adam Securities, Inc. v. DeMatteis/MacGregor, J.V.*,
   209 F.3d 252, 263 (3d Cir. 2000) ....................................................34, 35

*In re Freymiller Trucking, Inc.*,
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ..............................................29

*Gillman v. Cont'l Airlines (In re Cont'l Airlines)*,
   203 F.3d 203 (3d Cir.. 2000) ................................................................18

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) .........................................12, 17, 18

## TABLE OF AUTHORITIES

**Page(s)**

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009).................................31

*In re John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
987 F.2d 154 (3d Cir. 1993)...................................................................................8

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1987)....................................................................19

*JPMorgan Chase Bank, N.A. V. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009)...................23

*Kane v. Johns-Manville Corp.*,
843 F.2d 636 (2d Cir. 1988)..........................................................................26, 29

*In re Lakeside Global II, Ltd.*,
116 B.R. 499 (Bankr. S.D. Tex. 1989) ..................................................................27

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ......................................................................24

*In re Lernout & Hauspie Speech Prods. N.V.*,
308 B.R. 672 (D. Del. 2004) ..................................................................................20

*In re Lisanti Foods*,
329 B.R. 491 (D.N.J. 2005) ...................................................................................22

*In re Master Mortgage Invest. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)....................................................11, 12, 14

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
354 B.R. 1 (D. Conn. 2006) ...................................................................................26

*In re NII Holdings, Inc.*,
288 B.R. 356 (Bankr. D. Del. 2002) ......................................................................20

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D. Del. 2008) ........................................................................7

*In re Okoreeh-Bahm*,
836 F.2d 1030 (6th Cir. 1988) ...............................................................................20

*Olympia & York Fla. Equity Corp. v. Bank of N.Y. (In re Holywell Corp.)*,
913 F.2d 873 (11th Cir. 1990) ..................................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

*In re PPI Enterprises, Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998) ...................................................................20

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir.. 2000)...................................................................18, 20

*In re Resorts Int'l, Inc.*,
145 B.R. 412 (Bankr. D.N.J. 1990) ...................................................................22

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984) ...................................................................19

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................12, 27

*In re Tribune Co.*,
476 B.R. 843 (Bankr. D. Del. 2012) ...................................................................8

*U.S. Bank N.A. v. Wilmington Sav. Fund Soc'y (In re MPM Silicones, LLC)*,
531 B.R. 321, 331 n.8 (S.D.N.Y. 2015)...................................................................31

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*,
426 B.R. 114 (Bankr. D. Del. 2010) ...................................................................11, 17

*In re W.R. Grace & Co.*,
446 B.R. 96 (Bankr. D. Del. 2011) ...................................................................18

*In re W.R. Grace & Co.*,
475 B.R. 34 (D. Del. 2012)...................................................................8

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................12, 17, 18

*In re Wash. Mut., Inc.*,
461 B.R. 200 (Bankr. D. Del. 2011) ...................................................................24

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999) ...................................................................11, 14, 20

**Statutes**

11 U.S.C. § 507(a)(2)...................................................................28

11 U.S.C. § 1123...................................................................*Passim*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

11 U.S.C. § 1129(a) ................................................................................................*Passim*

11 U.S.C. § 1129(b) ................................................................................................*Passim*

28 U.S.C. § 1930................................................................................................................28

**Other Authorities**

Fed. R. Bankr. P. 3020(e) ................................................................................................36

H.R. Rep. No. 95-595, at 412 (1977)..............................................................................19

S. Rep. No. 95-989 (1978) ..............................................................................................19

The above-captioned debtors and debtors in possession (the "Debtors") hereby submit this memorandum of law (this "Memorandum") in support of confirmation of *The Third Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 806] (the "Plan").[1]  The Debtors respectfully request confirmation of the Plan pursuant to the proposed form of order filed contemporaneously herewith (the "Confirmation Order").  In support of the Plan, the Debtors rely upon and incorporate by reference (a) the *Declaration of Scott M. Pinsonnault in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "First Day Declaration"); (b) the *Declaration of Alex Orchowski of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Third Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 809] (the "Tabulation Declaration"); and (c) the *Declaration of Scott M. Pinsonnault of Ankura Consulting Group, LLC in Support of Confirmation of the Third Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 810] (the "Confirmation Declaration").

## PRELIMINARY STATEMENT

1.      The Debtors respectfully request confirmation of the Plan, which is supported by the majority of creditors entitled to vote.  As described more fully in the Plan and the *Second Amended Disclosure Statement for the Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code* [Docket No. 755] (the "Disclosure Statement"), the Plan is the culmination of extensive arm's-length negotiations between the Debtors and other key stakeholders.  The only party attempting to stand in the way of plan confirmation is the United States, on behalf of the Bureau of Customs and Border Protection

---

[1]     Capitalized terms used but not defined herein have the definitions ascribed to such terms in the Plan.

1

(the "CBP").  For the reasons discussed herein, the Court should overrule the CBP Objection (as defined below) and confirm the Plan.

## BACKGROUND

**A.**      **General Background**

2.      On August 9, 2019 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing a voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      As set forth more fully in the First Day Declaration, Disclosure Statement, and Plan, the Debtors operate as an independent energy company primarily focused on the acquisition, exploration, production, and development of offshore oil and gas properties in the State of Alaska's Cook Inlet region.  The Debtors hold a majority working interest in thirty-five competitive oil and gas leases in the Cook Inlet.  Additionally, the Debtors wholly own and operate an offshore production platform in the middle of the Cook Inlet to extract natural gas.

4.      In recent years, the Debtors have faced strong economic headwinds and operational challenges that significantly and adversely impacted the operating performance of their businesses.  The Debtors undertook a prepetition process to evaluate various strategic alternatives to address these financial and operational challenges.  The Debtors determined that pursuing a sale of the Debtors as a going-concern would be in their best interest and the best interest of their creditors.

5.      On June 5, 2019, the Debtors formally retained Seaport Global Securities LLC ("Seaport") and, with Seaport's assistance, started the work necessary to run a successful sale process.  The Debtors, through Seaport and their other professionals, conducted a robust marketing effort for the sale of the Debtors' assets and/or equity interests.  Throughout these

Chapter 11 Cases, the Debtors have continued marketing their assets with the goal of consummating a going-concern sale.

6.      On December 5, 2019, the Debtors held an auction in accordance with the bidding procedures approved by this Court.  At the conclusion of the auction, HEX L.L.C. ("HEX") was named the Successful Bidder.  However, after the auction, HEX did not make the required deposits or provide evidence of committed financing as required by the terms of its successful bid.  As a result, the Debtors, in the exercise of their fiduciary duties, determined to pursue other offers.

7.      On February 17, 2020, Kachemak Exploration LLC ("Kachemak") submitted to the Debtors that certain *Acquisition by Foreclosure Agreement*, dated February 17, 2020, between and among the Debtors, as sellers, and Kachemak, as the acquirer (the "Kachemak AFA").  Under the Kachemak AFA, Kachemak would acquire new equity interests of the reorganized debtors to be issued pursuant to a chapter 11 plan.  However, on March 19, 2020, Kachemak notified the Debtors that it was terminating the Kachemak AFA in accordance with its terms because certain of the Debtors' prepetition lenders did not timely consent to the transactions contemplated therein.  Following the termination of the Kachemak AFA, the Debtors renewed discussions with HEX regarding the sale of new equity interests (the "New Equity Interests") on terms similar to those outlined in the Kachemak AFA.

8.      Earlier in the case, on November 5, 2019, the Debtors filed a Motion[2] to establish dates by which Proofs of Claim against the Debtors must be submitted.  On September 12, 2019,

---

[2]  *Debtors' Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; And (III) Approving the Form, Manner, and Sufficiency of Providing Notice Thereof* [Docket No. 209].

the Court entered an Order[3] establishing a general bar date of December 16, 2019 at 5:00 p.m.
and a governmental bar date of February 5, 2020 at 5:00 p.m.  On February 19, 2020, the
Debtors filed a Motion[4] to establish a bar date for administrative claims.  On March 4, 2020, the
Court entered an Order[5] establishing April 6, 2020 at 5:00 p.m. (prevailing Eastern Time) as
deadline by which proofs of claim with respect to administrative claims (other than claims under
Bankruptcy Code section 503(b)(9)) arising after the Petition Date and on or before February 29,
2020 must be filed.  The Plan sets the date that is the first Business Day that is thirty (30) days
after the Effective Date as the last date by which proofs of claim with respect to administrative
claims arising on or after March 1, 2020 and prior to the Effective Date must be filed.

9.    On November 5, 2019, the Debtors filed a Motion[6] requesting an extension of the
exclusivity period, and on November 18, 2020, the Court entered an Order[7] extending Debtors'
exclusivity period and exclusive solicitation period through and including March 9, 2020 and
May 5, 2020, respectively.  On March 5, 2020, the Debtors filed a second Motion[8] requesting an
additional extension of the exclusivity period, and on March 25, 2020, the Court entered an
Order[9] extending Debtors' exclusivity period and exclusive solicitation period through and
including June 9, 2020 and August 8, 2020, respectively.  On May 12, 2020, the Debtors filed a

---

[3] *Order (I) Establishing Deadlines for Filing Proofs of Claim; (II) Approving Procedures for Filing Proofs of Claim; And (III) Approving the Form, Manner, and Sufficiency of Providing Notice Thereof* [Docket No. 258].

[4] *Debtors' Motion for Entry of an Order (I) Establishing an Administrative Bar Date and (III) Approving the Form and Manner of Notice Thereof* [Docket No. 552].

[5] *Order (I) Establishing an Administrative Bar Date and (III) Approving the Form and Manner of Notice Thereof* [Docket No. 615].

[6] *Motion of the Debtors for Entry of an Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptance Thereof* [Docket No. 260].

[7] *Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 289].

[8] *Debtors' Second Motion for Entry of an Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptance Thereof* [Docket No. 628].

[9] *Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 682].

third Motion[10] requesting a final extension of the exclusivity period to allow for the solicitation of votes on the Plan.  On June 3, 2020, the Court entered an Order[11] extending Debtors' exclusivity period and exclusive solicitation period through and including June 27, 2020 and August 13, 2020, respectively

### B.    The Plan Process

10.    The discussions between HEX and the Debtors culminated in the Plan Term Sheet, dated April 14, 2020 (the "Plan Term Sheet"), outlining the sale of New Equity Interests to HEX pursuant to the Plan (the "Acquisition").  The Debtors' Board reviewed the Plan Term Sheet and determined, in the exercise of its fiduciary duties, that pursuing the transactions contemplated therein would maximize value and was in the best interests of the Debtors' estates.

11.    Subsequently, HEX, the DIP Secured Parties, the Prepetition Secured Parties, and the Debtors entered into the Plan Term Sheet, a copy of which was filed with the Bankruptcy Court on April 15, 2020 [Docket No. 708].  On April 19, 2020, HEX and the Debtors entered into that certain *Acquisition by Foreclosure Agreement*, dated as of that date (the "HEX AFA").  On May 6, 2020, the Debtors filed a second amended plan and amended Disclosure Statement.  After filing the second amended plan, the Debtors received comments from the United States Trustee for the District of Delaware (the "U.S. Trustee").  The second amended plan was subsequently revised to address the concerns raised by the U.S. Trustee.

12.    After extensive discussions between the Debtors and the Debtors' key stakeholders, including HEX and the Prepetition Lenders, which resulted significant revisions to the Plan and concessions by all parties involved, the Debtors filed the Plan on June 7, 2020.  The

---

[10]    *Debtors' Third Motion for Entry of an Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptance Thereof* [Docket No. 768].

[11]    *Order Extending the Exclusivity Periods for the Filing of a Chapter 11 Plan and Solicitation of Acceptances Thereof* [Docket No. 801].

Plan provides that the Prepetition Term Loan Administrative Agent will complete a foreclosure for the retention and acceptance of the pledged interests in Cornucopia and Corsair (the "<u>Pledged Equity</u>") by its designee, in partial satisfaction of the Prepetition Term Loan Obligations. The Pledged Equity will be cancelled and extinguished pursuant to the terms of the Plan, the Confirmation Order, and the New Equity Interests, pursuant to the terms of the HEX AFA, the Plan, the Confirmation Order, and the other Definitive Documents, will be issued to HEX's, designee, HEX Cook Inlet LLC, and Alaskan limited liability company ("<u>HEX Cook Inlet</u>"). In exchange, HEX Cook Inlet will pay $5 million to the Debtors, which will be used to satisfy certain claims and taxes.

13.    On April 20, 2020, the Court entered an Order[12] scheduling a hearing to consider the Disclosure Statement for May 8, 2020 and requiring responses or objections to be filed by May 5, 2020. On May 8, 2020, following the Disclosure Statement hearing, the Court entered an Order[13] (the "<u>Disclosure Statement Order</u>"), approving the Disclosure Statement and approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan (the "<u>Solicitation Procedures</u>"). The Disclosure Statement Order also established dates related to approval of the Plan, including scheduling a hearing for June 11, 2020 to consider confirmation of the Plan and establishing June 5, 2020 as the deadline for receipt of votes and for filing objections to the Plan.

---

[12]   *Order Granting Debtors' Motion for (I) a Shortened Notice and Objection Period, (II) an Expedited Hearing, and (III) an Expedited Ruling With Respect to Debtors' Motion for Entry of an Order (A) Approving Disclosure Statement; (B) Establishing Voting Record Date, Voting Deadline, and Other Dates; (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on Plan and for Filing Objections to Plan; (D) Approving Manner and Forms of Notice and Other Related Documents; and (E) Granting Related Relief* [Docket No. 720].

[13]   *Order (A) Approving Disclosure Statement; (B) Establishing Voting Record Date, Voting Deadline, and Other Dates; (C) Approving Procedures for Soliciting, Receiving, and Tabulating Votes on Plan and for Filing Objections to Plan; (D) Approving Manner and Forms of Notice and Other Related Documents; and (E) Granting Related Relief* [Docket No 761].

14. Following entry of the Disclosure Statement Order, the Debtors' claims and balloting agent, Prime Clerk LLC commenced solicitation of the Plan by sending solicitation packages (the "Solicitation Packages") to Holders of Claims in Class 3 (Prepetition Tax Credit Claims) and Holders of Claims in Class 4 (Prepetition Term Loan Claims) (together, the "Voting Classes").  As set forth in the Tabulation Declaration, the Voting Classes voted to accept the Plan.

15. On May 29, 2020 and on June 8, 2020, the Debtors filed additional documents and forms of documents, agreements, schedules, and exhibits to the Plan to effectuate the terms and conditions of the Plan (collectively, the "Plan Supplement").  The Plan Supplement includes, *inter alia*, forms or drafts of (i) the New Debt Documents; (ii) the Restructuring Transactions Memorandum; (iii) the Litigation Trust Documents; (iv) the organizational documents for HEX Cook Inlet and the Reorganized Debtors, as applicable; (v) the Schedule of Retained Causes of Action; and (vi) the Assumed Contracts and Leases List, all as defined and further described in the Plan.

## ARGUMENT

### A. The Plan Meets the Bankruptcy Code's Requirements and Should Be Approved

16. By this Memorandum, the Debtors submit that confirmation of the Plan is appropriate as it satisfies Bankruptcy Code sections 1123, 1125, and 1129.

#### (i) Section 1129(a)(1):  The Plan Complies With the Applicable Provisions of the Bankruptcy Code

17. To achieve confirmation of the Plan, the Debtors must demonstrate by a preponderance of the evidence that it complies with the application provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  *See also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (Bankr. D. Del. 2006); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del.

2008).  As set forth in this Memorandum, the Plan satisfies all provisions of Bankruptcy Code

section 1129 and complies with all other applicable Bankruptcy Code sections, the Bankruptcy

Rules, the Local Rules, and applicable nonbankruptcy law.  *See In re W.R. Grace & Co.*, 475

B.R. 34, 173 (D. Del. 2012).

> **(ii)**    **Section 1122: The Plan Classifications Are Appropriate**

18.    Bankruptcy Code section 1122 provides, in pertinent part:

> (a) Except as provided in subsection (b) of this section, a plan may
> place a claim or an interest in a particular class only if such claim
> or interest is substantially similar to the other claims or interests of
> such class.
>
> (b) A plan may designate a separate class of claims consisting only
> of every unsecured claim that is less than or reduced to an amount
> that the court approves as reasonable and necessary for
> administrative convenience.

11 U.S.C. § 1122.  Bankruptcy Code section 1122 affords the proponent of a plan with

significant flexibility in the classification of claims and interests, so long as there is a reasonable

basis for such classification.  *See In re Tribune Co.*, 476 B.R. 843, 854 (Bankr. D. Del. 2012)

(finding that "Section 1122(a) is permissive," in that "it does *not* provide that *all* similar claims

must be placed in the same class").  *See also In re John Hancock Mut. Life Ins. Co. v. Route 37

Bus. Park Assocs.*, 987 F.2d 154, 158-59 (3d Cir. 1993); *Olympia & York Fla. Equity Corp. v.

Bank of N.Y. (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir. 1990); *In re Avia Energy Dev.,

LLC*, Case No. 05-39339 (BJH), 2007 WL 2238039, at *2 (Bankr. N.D. Tex. Aug. 2, 2007).

19.    Here, the Plan designates the following Classes:

> Class 1 – Other Priority Claims
>
> Class 2 – Other Secured Claims
>
> Class 3 – Prepetition Tax Credit Claims
>
> Class 4 – Prepetition Term Loan Claims

Class 5 – General Unsecured Claims

Class 6 – Intercompany Claims

Class 7 – Intercompany Interests

Class 8 – Interests in Cornucopia and Corsair

Such classifications comply with Bankruptcy Code section 1122. All Claims and Interests within a Class are substantially similar. Additionally, each Claim and Interest differ from Claims and Interests in other Classes based upon such Claim or Interest's legal or factual nature.

20. The Plan also includes certain revisions that were requested by parties to the Plan Term Sheet, the U.S. Trustee, and the RWIO Parties. Accordingly, all affected parties had an opportunity to provide comments prior to solicitation.

21. Thus, the Debtors submit that the classification scheme within the Plan is consistent with Bankruptcy Code section 1122.

**(iii)    Section 1123(a): The Plan's Content is Appropriate**

22. Bankruptcy Code section 1123(a) elucidates seven requirements which a plan must contain. 11 U.S.C. § 1123(a). Here, each such requirement has been met:

a.    As set forth above, the Plan designates Classes of Claims and Interests as required by Bankruptcy Code section 1123(a)(1). *See* Article III.A.

b.    The Plan sets forth which Classes of Claims are impaired or unimpaired as required by Bankruptcy Code sections 1123(a)(2) and (a)(3). *See* Article III.A.

c.    The Plan provides for equal treatment within each Class as required by Bankruptcy Code section 1123(a)(4). *See* Article III.A.

d.    The Plan provides for adequate means for implementation including: (i) the issuance of new equity to be acquired by HEX, or its designee, pursuant to the HEX AFA; (ii) the issuance of the DIP Replacement Loan Debt, New Tax Credit Debt, or New Term Loan Debt; (iii) the establishment of the Litigation Trust and appointment of the Litigation Trustee; (v) the transfer of the Litigation Trust Assets to the Litigation Trust; and (vi) the procedures for distributions to Holders of Allowed Claims. Thus, together with the Plan Supplement, the Plan contains

adequate means for implementation as required by Bankruptcy Code section 1123(a)(5).  *See* Article IV; Plan Supplement.

e.  The amended and restated limited liability company operating agreements for the Reorganized Debtors, which were filed as part of the Plan Supplement, do not provide for the issuance of non-voting equity securities pursuant to and to the extent required by section 1123(a)(6) of the Bankruptcy Code.

f.  The Plan and Plan Supplement provide for the establishment of the Litigation Trust and the appointment of the Litigation Trustee.  The Litigation Trust will be administered and controlled by the Litigation Trustee for the benefit of the Litigation Trust beneficiaries.  Thus, the Debtors submit that Bankruptcy Code section 1123(a)(7) has been met as selection of the Litigation Trustee is consistent with the interests of creditors, holders of equity interests, and public policy.

**(iv)    Section 1123(b): the Plan Contains Certain Permissible Provisions**

23.    Bankruptcy Code section 1123(b) sets forth permissive provisions which may be incorporated into a plan.  A plan may: impair or unimpair any class of claims; provide for the assumption or rejection of executory contracts and unexpired leases; provide for the settlement or retention of a debtor's claims; modify or leave unaffected the rights of holders of claims; and include any provision not inconsistent with the Bankruptcy Code.  11 U.S.C. § 1123(b).

24.    The Plan provides for the classification and impairment or unimpairment of certain Classes.  *See* Article III.  The Plan contains provisions governing the further assumption or rejection of executory contracts and unexpired leases.  *See* Article V.  The Plan provides for the establishment of the Litigation Trust and the transfer of the Litigation Trust Assets to the Litigation Trust.  *See* Article IV.L.  The Plan also contains procedures for distributions and the allowance or disallowance of Claims.  *See* Article VI and VII.

**(a)    The Plan's Release, Exculpation, and Injunction Provisions are Appropriate and Should be Approved**

25.    Consistent with Bankruptcy Code section 1123(b), the Plan also contains: (a) releases by the Debtors and their estates (the "Debtor Releases"); (b) releases by certain third

10

parties (the "Third Party Release"); and (c) provisions related to injunction and exculpation. *See* Article VIII.  As detailed below, the aforementioned provisions are proper under the circumstances of these Chapter 11 Cases because they are fair and equitable, given for reasonable consideration, and an integral part of the Plan.  The Debtor Releases are being provided in exchange for fair consideration.

26.    Granting a release to the Released Parties is wholly appropriate in these Chapter 11 Cases and consistent with applicable law.  These parties are entitled to a release under the circumstances of these Chapter 11 Cases.  As set forth below, such releases should be approved.

### (1)    Debtor Releases

27.    Article VIII.B of the Plan contains the Debtor Releases.  The Debtor Releases provide that on the Effective Date, the Debtors and the Estates will release claims and causes of action against the (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the DIP Agent; (d) the DIP Lenders; (e) the Prepetition Agents; (f) the Prepetition Lenders; (g) the Acquirer; (h) Melody; (i) the Webb Parties; and (j) the RWIO Parties (the "Released Parties"). For the reasons below, the Debtors believe that is appropriate for such parties to receive releases in these Chapter 11 Cases.

28.    Pursuant to Bankruptcy Code section 1123(b)(3)(A), debtors may release claims "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable and in the best interests of the estate." *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010).  When determining whether such debtor releases are appropriate, a court considers the "specific facts and equities of each case," which typically involves consideration of the factors set forth in *In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999).  These factors (hereinafter the "*Master Mortgage* Factors") look to:

1. An identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;

2. Substantial contribution by the non-debtor of assets to the reorganization;

3. The essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

4. An agreement by a substantial majority of creditors to support the injunction, specifically if the impaired class of classes "overwhelmingly" votes to accept the plan; and

5. A provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.

*In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). *See also In re Master Mortgage Invest. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994). The court need not find all factors apply in a particular case. *In re Wash. Mut., Inc.*, 442 B.R. 314, 346 (Bankr. D. Del. 2011). Instead, these factors are "helpful in weighing the equities of the particular case after a fact-specific review." *In re Indianapolis Downs*, 486 B.R. at 303. They "provide guidance in the Court's determination of fairness" and "form the foundation for such an analysis, with due consideration of the factors that may be relevant to [the] case" but are not "exclusive nor conjunctive requirements". *In re Hercules Offshore, Inc.*, 565 B.R. 732, 756 (Bankr. D. Del. 2016) (quoting *In re Wash. Mut.*, 442 B.R. at 346-47). *See also Master Mortgage Inv. Fund, Inc.*, 168 B.R. at 935.

29.     Here, the Court should approve the Releases because the Releases are fair, reasonable, and in the best interests of the Debtors and the estates. First, there is an identity of interest between the Debtors and the Released Parties. The Released Parties were all instrumental in formulating the Plan. *See, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that the debtors and their secured lenders "share[d] the common goal of

12

confirming the [] Plan" and implementing the consummation thereof, thus, giving rise to an identity of interest between the parties).

30.     Second, each Released Party has made substantial contributions to the Chapter 11 Cases, including, among other things, funding the Chapter 11 Cases, which allowed for the parties to conduct the sale process in the attempt to find a buyer, investigate any claims belonging to the Debtors, and provide for the plan process that will include the formulation of the Litigation Trust, funding the prosecution of claims by the Litigation Trust, negotiating and drafting the Plan and documents in the Plan Supplement.  Each of the Debtors' lenders is accepting less than the amount that such lenders would otherwise be entitled to under the Bankruptcy Code by, depending on the type of Claim held, agreeing to forego principal, fees, and/or interest otherwise due and owing to such Holder.  The RWIO Parties have agreed to reduce their working interest in the Oil and Gas Leases operated by the Debtors and settle litigation claims in order for the sale of New Equity Interests to occur.  Lastly, the Webb Parties have agreed to sell and/or settle claims such Entities have asserted or seek to assert to facilitate confirmation of the Plan.  The contributions of the Released Parties were essential to administering these Chapter 11 Cases and preserving the value for the Debtors' creditors.

31.     Third, the releases contemplated by the Plan were an essential component of the Plan process.  The Debtors and their various stakeholders were able to reach resolution with regard to the Plan, and the underlying agreement would not have been reached absent such releases.  Additionally, without the releases, the Debtors' prepetition lenders would not have contributed to the Plan and the process of formulating and negotiating the same.

32.     Fourth, as set forth in the Tabulation Declaration, a majority of voting Holders of Claims in Class 3 and Class 4 support confirmation of the Plan:

13

| | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|---|---|---|---|---|---|
| | % | % | % | % | |
| Class 3 – Prepetition Tax Credit Claims | 1 | 0 | $75,142,523.88 | $0.00 | **Accept** |
| | 100% | 0% | 100% | 0% | |
| Class 4 – Prepetition Term Loan Claims | 9 | 0 | $461,955,623.00 | $0.00 | **Accept** |
| | 100% | 0% | 100% | 0% | |

33.    Fifth, the Debtors believe that the consummation of the Acquisition and the creation of the Litigation Trust for the benefit of creditors presents the best possible chance for maximum recovery for creditors in these Chapter 11 Cases.  Stated more directly, the consideration for the Release provide the only avenue of recovery for creditors in these Chapter 11 Cases.  As set forth below, creditors would receive less if these Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.  *See, e.g.*, *In re Zenith*, 241 B.R. at 111 (explaining that the fifth factor was met because "the Plan does provide a distribution to creditors in exchange for the releases" and supporting that conclusion by explaining that creditors received more under the plan than they would have in a liquidation).

34.    Significantly, the five *Master Mortgage* Factors require the Court to "examine the terms of the plan of reorganization, the outcome of the solicitation of the plan and the necessity of the injunction to the success of the plan."  *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017), *aff'd* 591 B.R. 559 (D. Del. 2018).  When examining the permissibility of releases, the *Master Mortgage* Factors "do not ask the bankruptcy judge to examine or make rulings with respect to the many claims that may be released by virtue of the third party releases."  *Id.*  A confirmation order of "a plan with releases, therefore, does not rule on the merits of the state law claims being released."  *Id.* at 273.  Releases are creatures of

federal bankruptcy law and a determination that a plan comports with federal requirements of plan confirmation is all that is required for the approval of releases. *Id.*

35.     The Debtor Releases are an integral part of the Plan and are appropriate under applicable law. Accordingly, the Debtors submit that the Debtor Releases should be approved.

### (2)     Third-Party Release

36.     The Plan contains the following definition with regard to the Third Party Release:

"*Releasing Party*" means, collectively: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) the DIP Agent; (d) the DIP Lenders; (e) the Prepetition Agents; (f) the Prepetition Lenders; (g) the Acquirer; (h) Melody; (i) the Webb Parties; (j) the RWIO Parties (excluding release of monetary and non-monetary obligations otherwise owing in the ordinary course as of the Effective Date on account of overriding royalty interests held by the RWIO Parties); (k) all holders of Claims and Interests (other than holders of Fee Claims) that opt into the releases in the Plan; (l) with respect to each of the foregoing Entities in clauses (a) through (k), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, principals, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, participants, successors and assigns, subsidiaries, Affiliates, and managed accounts or funds, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, management companies, fund advisors, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that any holder of a Claim or Interest (other than a holder of a Fee Claim) that fails to opt into or Entity that otherwise objects to the releases in the Plan shall not be a "Releasing Party".

37.     The Third Party Release contained in the Plan states as follows:

Notwithstanding anything contained in the Plan to the contrary, for good and valuable consideration, on and after the Effective Date, each Releasing Party is deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates or Affiliates, as applicable, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or derivatively on behalf of any holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the

15

Debtors' capital structure, the assertion or enforcement of rights and remedies against a Debtor or other Entity, the purchase, sale, or rescission of the purchase or sale of any Security issued by the Debtors or the Reorganized Debtors or the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions (but excluding Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors), intercompany transactions between or among the Debtors and/or their Affiliates, the subject matter of, or the transactions or events giving rise to, and Claim or Interest that is treated in the Plan, the DIP Documents, the Prepetition Tax Credit Documents, the Prepetition Term Loan Documents, the Chapter 11 Cases and any related adversary proceedings, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Disclosure Statement, the DIP Documents, the Plan, the Plan Supplement, the Acquisition Documents, the New Debt Documents, the Litigation Trust Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Documents, the Plan, the Plan Supplement, the Acquisition Documents, the New Debt Documents, the Litigation Trust Documents, or the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, but excluding, solely with respect to any Exculpated Party, Claims or Causes of Action related to any act or omission occurring from the Petition Date through the Effective Date that is determined by Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.   Notwithstanding anything herein or in any Definitive Documents and/or other document or agreement to the contrary the DIP Agent, Prepetition Term Loan Administrative Agent, all holders of Prepetition Term Loan Claims and all holders of DIP Claims each hereby release each other on the Effective Date for any and all Claims and Causes of Action arising under the DIP Documents and Prepetition Term Loan Documents including, without limitation, all Claims and Causes of Action related to any indemnification, reimbursement or contribution obligations, including on account of any fees or expenses incurred by any such party.   Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement and the New Debt Documents) executed to implement the Plan, including the Acquisition Documents.  For the avoidance of doubt, any release by a Releasing Party of Claims or Causes of Action asserted or assertable derivatively by such Releasing Party on behalf of any holder of any Claim against, or Interest in, a Debtor or other Entity shall not, solely by operation of such release by such Releasing Party, effect a release of any direct Claim or Cause of Action held by such holder of any Claim against, or Interest in, a Debtor or other Entity.

38.     The Debtors thus drafted the Plan to contain only consensual third party releases. Consensual third party releases may be contained in a plan.  *In re Washington Mut*., 442 B.R. at 352; *In re Spansion*, 426 B.R. at 144.   Under *Indianapolis Downs* and its progeny, consensual third party releases may be consensual with regard to creditors are unimpaired and deemed to accept a plan and when impaired creditors either fail to vote or opt out.   *In re Indianapolis Downs, LLC*, 486 B.R. at 305 ("In this case, the third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases.  As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Release may be properly characterized as consensual and will be approved.").

39.     Here, as provided Ballots and Notices of Non-Voting Status, the Holders of Claims and Interests were required to voluntarily opt into the Third Party Release.  Such releases are, therefore, fully consensual.  Moreover, the Third Party Release is an integral part of the Plan and is appropriate under applicable law.  Accordingly, the Debtors submit that the Third Party Release should be approved

### (3)     Injunction and Exculpation Provisions

40.     <u>Exculpation Provisions</u>.   Article VIII.D. of the Plan contains the following exculpation provision:

> Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for and each Exculpated Party is released and exculpated from any liability to any holder of a Cause of Action, Claim, or Interest for or related to any act or omission occurring from the Petition Date through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or consummation of the DIP Documents, the Disclosure Statement, the Plan, the

17

Plan Supplement, the Acquisition Documents, the New Debt Documents, the Litigation Trust Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Documents, the Disclosure Statement, the Plan, the Plan Supplement, the Acquisition Documents, the New Debt Documents, the Litigation Trust Documents, or the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place between the Petition Date through the Effective Date, but excluding, solely with respect to any Exculpated Party, Claims or Causes of Action related to any act or omission that is determined by Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence.

Further, "Exculpated Parties" means:

collectively, and in each case in its capacity as such, each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Debtors' directors and officers who served in such capacity during any portion of the Chapter 11 Cases; and (d) the Debtors' professionals retained in the Chapter 11 Cases pursuant to an Order of the Bankruptcy Court.  Notwithstanding anything to the contrary in this provision or the Plan, Exculpated Parties shall not include any Non-Released Parties. Article I.A.70.

41.    The Exculpation provision is limited to the Exculpated Parties and any of such parties' successors and assigns, solely in their capacity as such.

42.    Exculpation provisions in a plan are appropriate when the protection is necessary and given exchange for fair consideration.  *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 211-14 (3d Cir. 2000).  *See also In re PWS Holding Corp.*, 228 F.3d at 246-47 (holding that an exculpation provision "does not affect the liability of third parties, but rather sets forth the appropriate standard of liability.").  Estate fiduciaries, lenders, and other parties participating in the plan process are frequently the subject of exculpation provisions.  *See, e.g.*, *In re W.R. Grace & Co.*, 446 B.R. 96, 132-33 (Bankr. D. Del. 2011); *In re Wash Mut. Inc.*, 442 B.R. at 350-51; *In re Indianapolis Downs, LLC*, 486 B.R. at 306.

43.     For these reasons, the Debtors submit that the exculpation provisions in the Plan should be approved.

44.     <u>Injunction Provisions</u>.   Article VIII.E. of the Plan contains certain injunction provisions related to the parties who hold Claims, Interests, or Causes of Action that have been released pursuant to the Plan.   The injunction provisions are necessary to effectuate the Plan. Without such injunction provisions, the Debtors would be unable to fulfill their respective responsibilities under the Plan. The injunction provisions in the Plan are narrowly tailored and should be approved.

### (v)     Section 1129(a)(2): The Plan Complies With the Bankruptcy Code

45.     Bankruptcy Code section 1129(a)(2) requires that the plan proponent "compl[y] with the allocable provisions of [the Bankruptcy Code]."   11 U.S.C. § 1129(a)(2).   The legislative history of Bankruptcy Code section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under Bankruptcy Code sections 1125 and 1126.   *See* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1987). *See also In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).   As set forth below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of Bankruptcy Code sections 1125 and 1126 regarding disclosure and plan solicitation.

46.     As discussed herein and in the Tabulation Report, the Plan meets the requirements of Bankruptcy Code sections 1125 and 1126.   The Debtors have complied with applicable Bankruptcy Code provisions, the Bankruptcy Rules, the Local Rules, including Local Rule

3017-2, and other applicable law in the transmission of the Plan, the Ballots, and related documents and notices.    Accordingly, the Debtors have complied with the provisions of Bankruptcy Code sections 1125 and 1126, thus fulfilling the requirements of Bankruptcy Code section 1129(a)(2).

   **(vi)    Section 1129(a)(3): The Plan has Been Proposed in Good Faith**

47.    As required by Bankruptcy Code section 1129(a)(3), the Plan has been proposed "proposed in good faith and not by any means forbidden by law."    The determination of good faith should be left simply to the Court's common sense and judgment.    *In re Okoreeh-Bahm*, 836 F.2d 1030, 1033 (6th Cir. 1988).

48.    The Third Circuit has addressed the good faith standard under Bankruptcy Code section 1129(a)(3), stating that "[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point on inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy Code."    *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3rd Cir. 2000); *In re Lernout & Hauspie Speech Prods. N.V.*, 308 B.R. 672, 675 (D. Del. 2004) (finding that good faith requires "that (1) the plan be consistent with the objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and good intentions and with a basis for expecting that reorganization can be achieved; or (3) there was fundamental fairness in dealing with the creditors.").    *See also In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999); *In re PPI Enterprises, Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998).    Generally, bankruptcy courts examine the totality of the circumstances when determining whether a plan has been proposed in good faith.    *In re PPI Enters. (U.S.)*, 324 F.3d 197, 211 (3d Cir. 2003).

49.    The Plan is the result of extensive arm's-length negotiations among the Debtors and its key stakeholders, including the Acquirer, the DIP Lenders, and the Prepetition Lenders.

Throughout this process, all these stakeholders were active and engaged participants in the drafting of the Plan and all parties made concessions in order to provide for a consensual Plan to be filed.  In short, the Plan process would not have been possible without the contributions and cooperation of these parties.

50.    Here, the Plan is consistent with the objectives of the Bankruptcy Code.  It provides for the consummation of the Acquisition and facilitates the transfer of assets to a Litigation Trust that will be administered by a Litigation Trustee for the benefit of the Litigation Trust beneficiaries.  Throughout these Chapter 11 Cases, the Debtors and other parties in interest have demonstrated a firm commitment to maximizing value of the Debtors' estates for the benefit of all of their creditor constituencies.  The parties have expended great efforts to maximize the value of the estates, including conducting a going-concern sale process, investigating causes of action belonging to the estates, and engaging in vigorous negotiations regarding the exit strategy that best protects the interests of the estates and their creditors.  The Debtors have consistently acted in good faith during these Chapter 11 Cases and have proposed the Plan with honesty and good intentions.

51.    The terms contained within the Plan demonstrate fundamental fairness in dealing with the creditors.  In the absence of the Plan, only the Prepetition Lenders would receive a recovery because the Prepetition Lenders are undersecured.  The asset values of the Debtors' estates, in addition to the potential litigation proceeds of the Litigation Trust Assets, are far less than the remaining amount of the secured claim held by the Prepetition Lenders.  As a result of substantial negotiations, the Debtors developed the Plan that provides funding to a Litigation Trust to administer the assets of the estates, monetize those assets, and then oversee disbursements to Litigation Trust beneficiaries.

52.     The overwhelming voting support also demonstrates the fairness of the Plan.  The goal of the Plan is to maximize distributions to creditors, a legitimate and honest purpose.  Further, the Plan has been proposed in compliance with all applicable laws, rules, and regulations.  As such, the Plan complies with Bankruptcy Code section 11239(a)(3).

**(vii)     Section 1129(a)(4): The Plan Provides for Approval of Certain Administrative Expenses**

53.     Bankruptcy Code section 1129(a)(4) requires that payments by a debtor "for services or for costs and expenses in connection with the case, or in connection with the plan and incident to the case," either be approved by the Court as reasonable or subject to approval of the Court as reasonable.  11 U.S.C. § 1129(a)(4). *See also In re Resorts Int'l, Inc.*, 145 B.R. 412, 475-76 (Bankr. D.N.J. 1990); *In re Lisanti Foods*, 329 B.R. 491, 503 (D.N.J. 2005).

54.     Article II of the Plan provides that any payments made or promised by the Debtors for services rendered in connection with the Chapter 11 Cases will be subject to review by the Court and other parties in interest.  Furthermore, the estates will be able to pay all allowed administrative expenses.  These procedures satisfy Bankruptcy Code section 1129(a)(4).

**(viii)    Section 1129(a)(5): The Plan Contains Proper Disclosures**

55.     Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors, that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy, and, to the extent there are any insiders who will be retained or employed by the reorganized debtors, that there be disclosure of the identity and nature of any compensation of any such insiders.  If, at the time of confirmation, the debtor is unable to identify these individuals by name, a debtor still satisfies this requirement so long as directors will be appointed consistent with the company's

22

organizational documents and applicable state and federal law.[14]   In instances where specific individuals are not yet known, the Debtors have disclosed the process by which the applicable directors will be selected.

56.    The Debtors have satisfied these requirements through disclosures in the Plan and the Plan Supplement.  In the Plan Supplement, the Debtors have identified the members of the Reorganized Debtors' management.  *See* Exhibit I to Plan Supplement.  Although the Litigation Trustee has not been identified, the selection process has been handled by the proposed Holders of Litigation Trust Interests and, as such is consistent with the best interests of Holders of Claims and Interests in the Debtors and public policy.  To the extent section 1129(a)(5) applies to the Litigation Trust, the Debtors have satisfied the requirements of this provision by, among other things, disclosing the manner by which the Litigation Trustee will be selected in the Plan.  *See* Article IV.L.   Moreover, the responsibilities of the Litigation Trustee are governed by the Litigation Trust Agreement, the form of which was provided in the Plan Supplement.  *See* Exhibit C to Plan Supplement.  Accordingly, Bankruptcy Code section 1129(a)(5) has been met.

### (ix)    Section 1129(a)(6): No Governmental Regulatory Commission Has Jurisdiction Over the Debtors

57.    Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."  11 U.S.C. § 1129(a)(6).  The Plan does not provide for any rate changes over

---

[14]    *JPMorgan Chase Bank, N.A. V. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors."), *appeal dismissed*, 449 B.R. 14 (S.D.N.Y. 2011, *aff'd*, 691 F.3d 476 (2d Cir. 2012); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

which a governmental regulatory commission has jurisdiction.   The Debtors submit that this

provision of the Bankruptcy Code is not applicable to the Plan.

### (x)    Section 1129(a)(7): The Plan is in the Best Interest of All Creditors

58.    Bankruptcy Code section 1129(a)(7) requires that a plan be in the best interests of

creditors and equity holders, commonly referred to as the "best interests" test.   The best interests

test requires that holders of impaired claims

> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim
> or interest property of a value, as of the effective date of the plan,
> that is not less than the amount that such holder would so receive
> or retain if the debtor were liquidated under chapter 7 of this title
> on such date.

11 U.S.C. § 1129(a)(7)(A).   The best interests test focuses on dissenting impaired holders of

claims and interests as individuals, rather than on entire classes of claims or interests.   *See Bank*

*of Am. Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 441 n.13

(1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if

the class as a whole votes to accept the plan.").   *See also In re Adelphia Commc'ns, Corp.*, 368

B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (section 1129(a)(7) is satisfied when an impaired holder

of claims would receive "no less than such holder would receive in a hypothetical chapter 7

liquidation.").    A plan may satisfy this requirement if the Court finds that each such

nonconsenting member of an impaired class of claims would receive at least as much under the

plan as it would under a chapter 7 liquidation.   *See In re Washington Mut., Inc.*, 461 B.R. 200,

241 (Bankr. D. Del. 2011); *In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section

1129(a)(7)(A) requires a determination whether a prompt chapter 7 liquidation would provide a

better return to particular creditors or interest holders than a chapter 11 reorganization.").   *See,*

*e.g.*, *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 297 (Bankr. S.D.N.Y. 1990).

59.    The Debtors submit that, if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, the value of distributions to each impaired class of Claims or Interests would be less than the value of distributions under the Plan.   As detailed in the liquidation analysis attached to the Disclosure Statement as Exhibit C (the "Liquidation Analysis"), the assets available for distribution under chapter 7 would be less than the Plan. Several factors contribute to smaller distributions: (a) the Debtors would incur additional administrative expenses, such as commissions and professional fees, in winding up chapter 7 cases, including the additional costs of a chapter 7 trustee to administer the chapter 7 cases; (b) the chapter 7 process would take substantially longer, whereas under the Plan, the Litigation Trust Assets will be transferred on the Effective Date; and (c) cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan.   For these reasons, the Debtors believe that the Plan is in the best interests of creditors.   The Holders of Claims in Classes 3 and 4 have voted to accept the Plan.   These Holders would receive as much if not more under the Plan as they would in a chapter 7 liquidation.

**(xi)    Section 1129(a)(8): The Plan has Been Accepted by Impaired Voting Classes**

60.    Bankruptcy Code section 1129(a)(8) requires that each class of claims either vote to accept a plan or are not impaired under a plan.   11 U.S.C. § 1129(a)(8).   As detailed in the Tabulation Declaration: (a) Holders of Claims in Class 1, Class 2, and Class 7 are unimpaired and deemed to accept the Plan; (b) Holders of Claims in Class 3 and Class 4 have voted to accept the Plan; and (c) Holders of Claims in Class 5, Class 6, and Class 8 are deemed to reject the Plan. However, as set forth below, the Plan may nevertheless be confirmed pursuant to Bankruptcy Code section 1129(b).

**(xii)    Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Priority, Administrative, and Tax Claims**

61.    Bankruptcy Code section 1129(a)(9) requires that certain types of priority claims receive specific treatment, unless the holders of such claims agree to different treatment. 11 U.S.C. § 1129(a)(9).  The Plan provides for the payment of Allowed Administrative Claims, Professional Fee Claims, DIP Claims, Priority Tax Claims, and Other Priority Claims.  *See* Article II and Article II.  Therefore, the Plan meets the requirements of Bankruptcy Code section 1129(a)(9).

**(xiii)    Section 1129(a)(10): At Least One Class of Impaired Classes Has Accepted the Plan**

62.    Bankruptcy Code section 1129(a)(10) requires affirmative acceptance of a plan by at least one class of impaired claims "determined without including any acceptance of the plan by any insider" if a class of claims is impaired by such plan.  11 U.S.C. § 1129(a)(10).  The Plan was accepted by Classes 3 and 4, each of which is impaired under the Plan and is not composed of insiders.  Thus, Bankruptcy Code section 1129(a)(10) has been met.

**(xiv)    Section 1129(a)(11): The Plan is Feasible**

63.    Bankruptcy Code section 1129(a)(11) requires that the Court find that

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C. § 1129(a)(11).  This is referred to as the "feasibility" standard and requires two determinations: (a) the debtor's ability to consummate the provisions of the plan, and (b) the debtor's ability to reorganize as viable entity.  *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *Mercury Capital Corp. v. Milford Conn. Assocs.,*

26

*L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("A 'relatively low threshold of proof' will satisfy the feasibility requirement.") (quoting *In re Brotby*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003)); *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (stating that the definition of feasibility "has been slightly broadened and contemplates whether [a] debtor can realistically carry out its Plan . . . and [b] whether the Plan offers a reasonable prospect of success and is workable").  Again, feasibility does not require that success be guaranteed, it only requires a reasonable assurance of compliance with plan terms.  *In re Tribune Co.*, 464 126, 185 (3d Cir. 2011) (citing *In re Washington Mutual Inc.*, 2011 WL 4090757, *41 (Bankr. D. Del. Sept. 13, 2011) (quoting *In re Orlando Investors LP,* 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989)))).  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.  *Id*. (quoting *In re Briscoe Enters, Ltd.*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

64.     The Plan contemplates the acquisition of the New Equity Interests of the Debtors assets by HEX, or its designee.  HEX and its designee, HEX Cook Inlet, have sufficient capital to consummate the Acquisition.  Moreover, Article IV sets forth the means for implementing the Plan, which include the issuance of the New Debt.  The New Debt will provide sufficient funding to consummate the transactions contemplated by the Plan.  Further, on the Effective Date, the Litigation Trust Assets will be transferred to the Litigation Trust, which shall administer the Litigation Trust Assets for the benefit of the Litigation Trust Beneficiaries.  On the Effective Date, all Executory Contracts not assumed before the Confirmation Date will be deemed rejected as set forth in the Plan.  The Reorganized Debtors will have sufficient resources to meet their various obligations under the Plan on or after the Effective Date.  The Debtors therefore submit that the feasibility requirement has been met.

**(xv)      Section 1129(a)(12): All Fees Have Been or Will be Paid**

65.      Bankruptcy Code section 1129(a)(12) requires that a plan provide for the payment of fees payable under 28 U.S.C. § 1930.  11 U.S.C. § 1129(a)(12).  Bankruptcy Code section 507 provides that such fees are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).

66.      The Plan provides that all statutory fees due and owing as of the Effective Date will be paid by the Debtors on or before the Effective Date.  Following the Effective Date, statutory fees will be paid the Debtors, Reorganized Debtors, and the Litigation Trust in the manner set forth in greater detail in the Plan.  Therefore, Bankruptcy Code section 1129(a)(12) has been met.

**(xvi)      Section 1129(a)(13) Through Section 1129(a)(16) Do Not Apply to the Plan**

67.      Bankruptcy Code section 1129(a)(13) requires that a plan provide for the continuation of all retiree benefits as defined by Bankruptcy Code section 1114.  11 U.S.C. 1129(a)(13).  The Debtors do not provide retiree benefits, therefore, Bankruptcy Code section 1129(a)(13) is not applicable.

68.      Bankruptcy Code section 1129(a)(14) relates to the payment of domestic support obligations.  11 U.S.C. § 1129(a)(14).  The Debtors are not subject to any domestic support obligations; therefore, this provision is not applicable.

69.      Bankruptcy Code section 1129(a)(15) applies to only cases where the debtor is an individual.  11 U.S.C. § 1129(a)(15).  Therefore, this provision does not apply to the Plan.

70.      Bankruptcy Code section 1129(a)(16) applies to transfers of property by a corporation or trust that is not money, business, or commercial corporation or trust.  11 U.S.C. § 1129(a)(16).  The Debtors are moneyed, business, or commercial entities, therefore Bankruptcy Code section 1129(a)(16) does not apply.

**(xvii)   Section 1129(b): The Plan Satisfies the "Cram Down Requirements"**

71.      Bankruptcy Code section 1129(b) provides a mechanism to confirm a plan when not all of the requirements of Bankruptcy Code section 1129(a) have been met.  This mechanism is commonly referred to as the "cram down."

72.      In relevant part, Bankruptcy Code section 1129(b) provides:

> [I]f all of the applicable requirements of [Bankruptcy Code section 1129(a)] other than [Bankruptcy Code section 1129(a)(8)] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b)(1).  Therefore, a court may "cram down" a plan over rejection by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes.  *Kane v. Johns-Manville Corp.*, 843 F.2d at 650.

73.      To determine whether "unfair discrimination exists," courts look to the facts and circumstances of the particular case.  *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does so [unfairly] discriminate is to be determined on a case-by-case basis."). *See also In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").  A plan unfairly discriminates when it treats similarly-situated classes materially different without a compelling justification.  *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (collecting cases).  A plan is fair and equitable with respect to an

impaired class of unsecured claims or interests that rejects a plan if it follows the absolute priority rule.  11 U.S.C. § 1129(b)(2)(B)(ii) and (C)(ii).  *See In re Armstrong World Indus.*, 320 B.R. 523, 532 (D. Del. 2005) (finding the fair and equitable requirement to be rooted in the absolute priority rule).

74.     Holders of Interests in Class 8 (Interests in Cornucopia and Corsair) are not receiving any distribution.  Holders of Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), and Class 7 (Intercompany Interests) are unimpaired, and thus, deemed to accept the Plan.  Holders of Claims in Class 3 (Prepetition Tax Credit Claims) and Class 4 (Prepetition Term Loan Claims) are impaired under the Plan.  Holders of Claims in Class 3 are receiving their Pro Rata share of the New Tax Credit Debt.  Holders of Claims in Class 4 are receiving their share of (i) $20.5 million of the New Term Loan Debt and (ii) 100% of the Litigation Trust Interests.

75.     The Plan is fair and equitable.  The treatment of Classes 5, 6, and 8 is appropriate because there are no similarly situated classes of Claims or Interests.

76.     Further, the Plan satisfies the absolute priority rule as no junior Holder of a Claim or Interest will receive any distribution unless the Holders of higher priority Claims receive the full value of their Claims or the Holders of such higher priority Claims have consented to such treatment.   Although the Intercompany Interests in Class 7 are being reinstated, such reinstatement is for the purposes of administrative convenience only.   Reinstatement of the Intercompany Interests merely preserves the corporate structure and does not reduce any distributions to creditors.

77.     Courts have held that the "technical preservation of equity is a means to preserve the corporate structure that does not have any economic substance and that does not enable any

junior creditor or interest holder to retain or recover any value under the Plan." *Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund, Ltd. (In re Ion Media Networks, Inc.)*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) (finding that the "Plan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the Debtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure."); *see also U.S. Bank N.A. v. Wilmington Sav. Fund Soc'y (In re MPM Silicones, LLC)*, 531 B.R. 321, 331 n.8 (S.D.N.Y. 2015) ("Nor does the Plan violate the absolute priority rule by preserving certain intercompany interests without paying the Subordinated Noteholders in full."). Consistent with this authority, courts in numerous jurisdictions frequently approve chapter 11 plans on a cram down basis pursuant to section 1129(b), notwithstanding the fact that intercompany interests remain unimpaired.[15]

78.    In this case, the Debtors' existing corporate structure has been carefully constructed for tax reasons and regulatory purposes, and preservation of this structure post-emergence maximizes the going-concern value of the enterprise for all stakeholders. Moreover, Intercompany Interests are not receiving or retaining any property under the Plan on account of their junior interests, and no senior class is prejudiced in any way by the reinstatement of the Intercompany Interests. The Debtors therefore submit that the cram down requirements of

---

[15]    *See e.g., In re Linn Energy, LLC,* Case No. 16-60040 (DRJ) (Bankr. S.D. Tex. Jan. 27, 2017) [Docket No. 1629] (order confirming plan that provided for cram down of senior claims and reinstatement of junior intercompany interests); *In re Magnum Hunter Resources Corp.*, Case No. 15-12533 (KGG) (Bankr. D. Del. April 18, 2016) [Docket No. 1175] (same); *In re Quicksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Jan. 29, 2016) [Docket No. 740] (same); *In re Arch Coal, Inc.*, Case No. 16-40120-705 (Bankr. E.D. Mo. Sept. 13, 2016) [Docket No. 1324] (same); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. July 27, 2016) [Docket No. 1359] (same); *In re Alpha Natural Resources, Inc.*, Case No. 15-33896 (KRH) (Bankr. E.D. Va. July 12, 2016) [Docket No. 3038] (same); *In re Energy XXII Ltd.*, Case No. 16-31928 (Bankr. S.D. Tex. Dec, 13, 2016) [Docket No. 1809] (same); *In re Midstates Petroleum Company, Inc.*, Case No. 16-32237 (DRJ) (Bankr. S.D. Tex. Sept. 28, 2016) [Docket No. 698] (same).

Bankruptcy Code section 1129(b) have been satisfied as the Plan is fair and equitable and does not unfairly discriminate.

> **(xviii)  Section 1129(c) Through Section 1129(e) Have Been Satisfied**

79.     Bankruptcy Code section 1129(c) requires the Court confirm only one plan.  11 U.S.C. § 1129(c).  The Plan is the only plan being confirmed in these Chapter 11 Cases, thus satisfying Bankruptcy Code section 1129(c).

80.     The principal purpose of the Plan is not the avoidance of taxes or the application of section 5 of the Security Act of 1933.  Therefore, Bankruptcy Code section 1129(d) is satisfied.

81.     Bankruptcy Code section 1129(e) is not applicable as none of these Chapter 11 Cases are "small business cases."

**B.     Objections[16]**

82.     The Debtors have received only a single objection to the Plan.  On June 5, 2020, the CBP filed the *Objection by the United States to: (1) The Second Amended Joint Plan of Reorganization for the Debtors Under Chapter 11 of the Bankruptcy Code; and (2) To the Rejection of a Settlement Agreement* [Docket No. 805] (the "CBP Objection").  The CBP Objection raises nine potential issues with the Plan, each of which will be addressed in turn.

83.     The CBP objects to the rejection of that certain *Settlement Agreement and Mutual Release of Claims*, dated as of February 3, 2017, by and between the CBP and Furie (the "CBP Settlement Agreement").  CBP Objection ¶ 5.  The Debtors have since amended the Rejected Contracts List to remove the CBP Settlement Agreement.  *See* Docket No. 808.  Accordingly, the CBP's objection to the Plan's treatment of rejected contracts has been resolved.

---

[16]   The Debtors reserve all rights to amend and supplement this document in response to any pleadings, objections, or responses received subsequent to this filing.

84.     The CBP also objects to the scope of the proposed Bankruptcy Code section 502(c) claims estimation process and the proposed Bankruptcy Code section 502(j) reconsideration process.  *Id.* ¶ 6.  This objection was also raised informally by the U.S. Trustee and has been addressed through modifications to Article VII.C. and the definitions of "Allowed" and "Disallowed" set forth in the Plan.  Accordingly, the CBP's objection to the Plan's claims estimation process has been resolved.

85.     The CBP further objects on the grounds that the Debtors do not provide for the payment of postpetition interest.  *Id.* ¶ 7, 8.  Article VI.F. of the Plan states that "unless . . . required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims."  As such, to the extent required by applicable bankruptcy law, postpetition interest *will* be paid.  Moreover, the CBP has not identified any claim entitled to postpetition interest that would not receive postpetition interest under the Plan.  Article II.A. provides for the payment in full of all Administrative Claims, except to the extent a Holder of such Administrative Claim agrees otherwise, as do Article II.D. and III.B.1. for Priority Tax Claims and Other Priority Claims, respectively.  Article III.B.2. allows the Debtors to satisfy Allowed Other Secured Claim through payment in full, reinstatement, or turn-over of subject collateral, as applicable, which also preserves such Holders' right to receive postpetition interest where appropriate.  Therefore, the Plan does provide for the payment of postpetition interest for all claims that may be entitled to receive such interest under applicable bankruptcy law.  Accordingly, the CBP's objection to the Plan's treatment of postpetition interest should be overruled.

86.     The CBP further objects to language in the Plan that provides for the settlement of claims pursuant to Bankruptcy Rule 9019.  *Id.* ¶ 9.  This objection was also raised informally by the U.S. Trustee and has been addressed through modifications set forth in the Plan.  *See, e.g.*,

Articles IV.A., VIII.A., VIII.B., and VIII.C.   Accordingly, the CBP's objection to the Plan's settlement language has been resolved.

87.     The CBP further objects to the scope of the Third Party Release set forth in Article VIII.C. of the Plan.  *Id.* ¶ 10.  These releases are fully consensual, narrowly tailored, and should be approved for the reasons stated above in Section IV.A of this Confirmation Brief. Moreover, by failing to opt into and otherwise objecting to the Plan's Third Party Release, the CBP is not a Releasing Party and its rights are not affected.  Accordingly, the CBP's objection to Plan's Third Party Release should be overruled.

88.     The CBP further objects on the grounds that the Plan fails to preserve the setoff and recoupment rights of the United States.  *Id.* ¶ 11, 12.  The Plan's language has been modified to bring the Plan's treatment of third party setoff and recoupment rights in line with applicable Third Circuit law.  *See, e.g.*, Articles IV.P., VIII.E., and VIII.G.  As such, the Debtors believe that the CBP's objection to the Plan's treatment of setoff and recoupment rights has been resolved.  The Debtors note that CBP Objection appears to attempt to preserve a right of setoff beyond what is permitted under Bankruptcy Code section 553 and applicable Third Circuit law.

89.     In *Folger Adam Securities, Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 263 (3d Cir. 2000), the Third Circuit held that "the right of setoff will be extinguished if either [Bankruptcy Code] sections 362 or 363 are invoked," subject to a "possible . . . exception . . . where the setoff rights are actually taken prior to the commencement of the bankruptcy proceeding."  The Plan injunction, found in Article VIII.E., provides for the same treatment of setoff rights as required under *Folger Adams*.  Moreover, the Debtors negotiated language to be included in the Confirmation Order to preserve setoff rights under Bankruptcy Code section 553 with another branch of the United States government that would

apply equally to the CBP.  *See* Proposed Confirmation Order, Docket No. 811, ¶ 27

("Notwithstanding any provision of the Plan, this Confirmation Order, or any implementing or

supplementing plan documents, the United States' setoff rights under federal law as recognized

in Bankruptcy Code section 553, and recoupment rights, shall be preserved and are

unaffected.").)  Thus, the CBP's setoff rights, to the extent recognized under applicable law, are

adequately preserved.  To the extent that the CBP's objection attempts to assert a right to setoff

beyond the scope of Bankruptcy Code section 553 and the Third Circuit's holding in *Folger*

*Adams*, such objection should be overruled.

90.     The CBP further objects on the grounds that the Plan seeks relief broader than that

provided by Bankruptcy Code section 525.  CBP Objection ¶ 13.  This objection was also raised

informally by the U.S. Trustee and has been addressed through the modifications to Article

XII.K. set forth in the Plan.  Accordingly, the CBP's objection to the Plan's discriminatory

treatment language has been resolved.

91.     The CBP further objects to any attempt to value or characterize the transactions

contemplated by the Plan for tax purposes.  This objection is too vague to afford the Debtors

with an opportunity to meaningfully respond.  The Debtors believe that the Plan is consistent

with and not in conflict with applicable tax laws.  Accordingly, the CBP's objection to the Plan's

tax treatment should be overruled.

92.     Finally, the CBP objects to the provisions of the Plan that provide for immediate

binding effect.  *See* Article XII.A.  The Debtors believe that such provisions are necessary to

implement the Plan and the basis for such relief is well demonstrated.  Moreover, the Plan

amendments and Confirmation Order address each substantive issue raised by the CBP and do

not abridge the CBP's rights under applicable bankruptcy law.  As such, the CBP has no

legitimate basis for appeal and the Debtors' request for immediate binding effect upon the Effective Date should be approved.

93.    Accordingly, the Debtors submit that each ground for objection laid out in the CBP Objection should be overruled.

**C.    A Waiver of Any Stay of Confirmation is Appropriate**

94.    The Debtors request that the Court cause the Confirmation Order to become effective immediately upon its entry, notwithstanding the 14-day stay imposed by Bankruptcy Rule 3020.  The purpose of Bankruptcy Rule 3020(e) is to allow parties in interest with time to appeal a confirmation order before such appeal is moot.  Fed. R. Bankr. P. 3020(e), Adv. Comm. Notes, 1999 Amend.

95.    Here, such waiver is appropriate in these circumstances.    Immediate consummation of the Plan will not prejudice any party in interest.  Creditors will benefit from the immediate transfer of the Litigation Trust Assets, which will lead to more expeditious recoveries. Therefore, the Debtors submit that good cause exists to waiver the requirements of Bankruptcy Rule 3020(e).

**D.    The Debtors' Proposed Findings Regarding the Foreclosure and Transaction are Appropriate**

96.    The Debtors request that the Confirmation Order contain language regarding the treatment of the Foreclosure under applicable U.S. Department of Treasury Regulations ("Treasury Regulations").

97.    Under Section 1445(a) of the Internal Revenue Code of 1986 (the "Code"), a transferee ("Transferee") that acquires a U.S. real property interest from a non-U.S. person must typically withhold 15% of the amount realized on the transaction pursuant to the Foreign Investment in Real Property Tax Act of 1980 ("FIRPTA").  The Debtors may be treated as

non-U.S. persons due to their ultimate foreign ownership. However, where a security interest exists with respect to the property, and the Transferee acquires such property at a sale occurring pursuant to a foreclosure under such security interest, the Treasury Regulations permit the Transferee to withhold a lesser amount (the "alternative amount") if the Transferee complies with certain notice requirements (such withholding of a lesser amount under the applicable Treasury Regulations than would otherwise be required under FIRPTA, the "Foreclosure Exception"). Treas. Reg. § 1.1445-2(d)(3)(i)(A).

98.    Neither the Code nor Treasury Regulations provide a definition of "foreclosure" for purpose of these rules. Black's Law Dictionary defines the term as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." This definition does not indicate that a particular type of legal proceeding is required, as long as the proceeding is used to terminate a mortgagor's interest so either the lender can take title to the property or the property can be sold to satisfy the debt. Accordingly, because the transactions approved under the Plan (including as described in the Restructuring Transactions Memorandum) terminate the existing interests in the Pledged Equity so that such property could be sold and the proceeds could be distributed to lenders, such transactions approved under the Plan amount to a "foreclosure" for purposes of the Foreclosure Exception. This interpretation is consistent with the policy behind the foreclosure exception (*i.e.*, to facilitate the exercise of creditor remedies and provide withholding only on net amounts received by the debtor).

99.    Under the Foreclosure Exception, "if the alternative amount is zero, no withholding is required." Treas. Reg. §1.1445-2(d)(3)(i)(A)*(2)*. For purposes of the Foreclosure Exception, the "alternative amount" is "the entire amount, if any, determined by a court or

37

trustee with jurisdiction over the matter, that accrues to the debtor/transferor out of the amount realized from the foreclosure sale. The amount of any mortgage, lien, or other security agreement secured by the property, that is terminated, assumed by another person, or otherwise extinguished (as to the debtor/transferor) shall not be treated as an amount that accrues to the debtor/transferor for purposes of this §1.1445–2(d)(3)(i)(A)." Treas. Reg. §1.1445-2(d)(3)(i)(A)*(2)*. Here, no amount "accrues to the debtor/transferor."

100. Although Acquisition Proceeds temporarily flow to the Debtors, the Plan specifically requires the Debtors to use such amounts to pay certain Claims, taxes, and/or other obligations specified under the Plan. In addition, the amount of debt secured by the Pledged Equity far exceeds the amount realized on the Foreclosure. Accordingly, there is no true cash flow to the Debtors, and the amount realized on the Foreclosure does not exceed the amount of debt secured by the property. Thus, the "alternative amount" is zero and no withholding is required.

101. Accordingly, the Debtors' submit that the findings contained in the Confirmation Order are appropriate.

## Conclusion

For all of the foregoing reasons, the Debtors respectfully submit that the Court should

confirm the Plan because it fully satisfies all applicable requirements under the Bankruptcy

Code.

Dated: June 8, 2020
       Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Ericka F. Johnson*
Matthew P. Ward (DE Bar No. 4471)
Ericka F. Johnson (DE Bar No. 5024)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
Email:  matthew.ward@wbd-us.com
       ericka.johnson@wbd-us.com

-and-

**MCDERMOTT WILL & EMERY LLP**
Timothy W. Walsh (admitted *pro hac vice*)
Riley T. Orloff (admitted *pro hac vice*)
340 Madison Avenue
New York, New York 10173-1922
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:  twwalsh@mwe.com
       rorloff@mwe.com

*Counsel to Debtors and Debtors in Possession*